## EXHIBIT B

**Copy of All Filings with State Court**

345th District Court

## Case Summary

### Case No. D-1-GN-18-001842

**POZNER V. JONES**

§
§

Location: **345th District Court**
Filed on: **04/16/2018**

---

## Case Information

---

Case Type: Defamation
Case Status: **04/16/2018  Open**

## Assignment Information

---

**Current Case Assignment**
Case Number   D-1-GN-18-001842
Court         345th District Court
Date Assigned 04/16/2018

---

## Party Information

---

| | | |
|---|---|---|
| **Defendant** | **FREE SPEECH SYSTEMS LLC** | **REYNAL, FEDERICO ANDINO** *Retained* |
| | | **Blott, Jacquelyn W** *Retained* |
| | **INFOWARS LLC** | **REYNAL, FEDERICO ANDINO** *Retained* |
| | | **Blott, Jacquelyn W** *Retained* |
| | **JONES, ALEX E** | **Blott, Jacquelyn W** *Retained* |
| | | **REYNAL, FEDERICO ANDINO** *Retained* |

---

## Case Events

---

04/16/2018    ASM:GN CIVIL PETITION
             *Event Code: 600 Adjmt Amount: 307.00*

04/16/2018    
             !ORIGINAL PETITION/APPLICATION
             *PLAINTIFFS ORIGINAL PETITION AND REQUEST FOR DISCLOSURE (SD) Event Code: 5080*

04/16/2018    NEW:ORIGINAL PETITION/APPL (OCA)
             *Event Code: 4500*

04/23/2018    
             LETTER/EMAIL/CORR
             *LETTER Event Code: 5414*

04/26/2018    ASM:CITATION ISSUE
             *Event Code: 702 Adjmt Amount: 24.00*

05/29/2018    
             ANSWER
             *DEFENDANTS' ORIGINAL ANSWER Event Code: 5150*
             Party:   Defendant JONES, ALEX E

Printed on 04/05/2022 at 3:01 PM

345th District Court

## Case Summary

### Case No. D-1-GN-18-001842

06/19/2018   
MOTION
*MOTION FOR SUBSTITUTION OF COUNSEL Event Code: 5265*
    Party:   Defendant JONES, ALEX E

06/25/2018  
ORD:SUB & OR WITHDRAW COUNSEL
*ORDER ON MOTION FOR SUBSTITUTION OF COUNSEL Event Code: 8232*
    Party:   Defendant JONES, ALEX E

06/26/2018  
AMENDED/SUPPLEMENTED ANSWER
*DEFENDATS' FIRST AMENDED ANSWER Event Code: 5152*
    Party:   Defendant JONES, ALEX E

06/26/2018  
MOTION
*DEFENDANTS' MOTION TO DISMISS UNDER THE TEXAS CITIZENS' PARTICIPATION ACT Event Code: 5265*
    Party:   Defendant JONES, ALEX E

06/27/2018  
LETTER/EMAIL/CORR
*VACATION LETTER Event Code: 5414*
    Party:   Defendant JONES, ALEX E

06/28/2018  
LETTER/EMAIL/CORR
*VACATION LETTER Event Code: 5414*

06/29/2018  
LETTER/EMAIL/CORR
*VACATION LETTER Event Code: 5414*
    Party:   Defendant JONES, ALEX E

06/29/2018  
NOTICE
*NOTICE OF HEARING Event Code: 5554*
    Party:   Defendant JONES, ALEX E

07/03/2018  
LETTER/EMAIL/CORR
*LETTER FROM COUNSEL TO DISTRICT CLERK Event Code: 5414*

07/19/2018

LETTER/EMAIL/CORR
*LETTER FROM LORA J LIVINGSTON LOCAL ADMINISTRATIVE JUDGE TRA VIS COUNTY,TEXAS Event Code: 5414*

07/25/2018
RESPONSE
*PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT Event Code: 5153*

07/27/2018
MOTION
*DEFENDANTS' FIRST SUPPLEMENT TO MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT Event Code: 5265*
   Party:  Defendant JONES, ALEX E

07/27/2018   
!AFFIDAVIT
*SUPPLEMENTAL AFFIDAVIT OF DAVID JONES Event Code: 5482*

07/30/2018

AFFIDAVIT
*SUPPLEMENTAL AFFIDAVITS IN SUPPORT OF MOTION TO DISMISS UNDE R THE TEXAS CITIZENS PARTICIPATION ACT Event Code: 5401*
   Party:   Defendant JONES, ALEX E

07/31/2018

345th District Court

## Case Summary

### Case No. D-1-GN-18-001842

OTHER

*DEFENDANTS' SECOND SUPPLEMENT TO MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT Event Code: 5415*
Party:   Defendant JONES, ALEX E

07/31/2018

AFFIDAVIT

*SUPPLEMENTAL AFFIDAVIT IN SUPPORT OF MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT Event Code: 5401*
Party:   Defendant JONES, ALEX E

07/31/2018

OBJECTIONS

*DEFENDANTS' OBJECTIONS TO PLAINTIFFS' EVIDENCE SUBMITTED IN RESPONSE TO DEFENDANTS' MOTION TO DISMISS UNDER TO THE TEXAS CITIZENS PARTICIPATION ACT Event Code: 5156*
Party:   Defendant JONES, ALEX E

07/31/2018   LETTER/EMAIL/CORR
*LETTER (FLASH DRIVE EXHIBIT #B-46;B-47;B48;B-50 INCLUDED) Event Code: 5414*
Party:   Defendant JONES, ALEX E

07/31/2018   PLEADING
*PLAINTIFFS? FIRST AMENDED PETITION Event Code: 5054*

07/31/2018

ANSWER & ADDITIONAL PLEADING

*PLAINTIFFS? OBJECTION TO AFFIDAVIT AND SUPPLEMENTAL AFFIDAVI AFFIDAVITS IN SUPPORT OF DEFENDANTS? MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT Event Code: 5151*

08/01/2018

OTHER

*DEFENDANTS' BRIEF IN SUPPORT OF ITS MOTION TO DISMISS UNDER THE TEXAS CITIZENS PARTICIPATION ACT Event Code: 5415*
Party:   Defendant JONES, ALEX E

08/01/2018

MOTION

*REQUEST FOR ORDER TO ALLOW MEDIA COVERAGE WITH CONSENT OF PA RTIES OR WITNESSES Event Code: 5265*

08/01/2018   LETTER/EMAIL/CORR
*LETTER (EXHIBIT) Event Code: 5414*
Party:   Defendant JONES, ALEX E

08/02/2018

MOTION

*DEFENDANTS' SECOND MOTION TO DISMISS UNDER THE TEXAS CITIZEN S' PARTICIPATION ACT Event Code: 5265*
Party:   Defendant JONES, ALEX E

08/02/2018   NOTICE
*PLAINTIFFS' NOTICE OF SUPPLEMENTATION OF THE RECORD Event Code: 5554*

08/06/2018   LETTER/EMAIL/CORR
*LETTER EMAILED TO TIFFANEY GOULD Event Code: 5414*
Party:   Defendant JONES, ALEX E

08/06/2018   LETTER/EMAIL/CORR
*COMMUNICATION EMAILED TO TIFFANEY GOULD Event Code: 5414*
Party:   Defendant JONES, ALEX E

345th District Court

## Case Summary

### Case No. D-1-GN-18-001842

08/06/2018

OBJECTIONS

*OBJECTIONS TO LATE FILED DECLARATIONS OF LEONARD POZNER AND VERONIQUE DE LA ROSA Event Code: 5156*
Party:   Defendant JONES, ALEX E

08/07/2018

RESPONSE

*PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE DECLARATIONS OF LEONARD POZNER AND VERONIQUE DE LA ROSA WITH ATTACH ORDER Event Code: 5153*

08/07/2018

LETTER/EMAIL/CORR
*LETTER TO JUDGE JENKINS Event Code: 5414*

08/07/2018

LETTER/EMAIL/CORR
*LETTER FROM COUNSEL WITH FLASH DRIVE ATTACHED EX L-A Event Code: 5414*

08/10/2018

LETTER/EMAIL/CORR
*LETTER TO JUDGE JENKINS Event Code: 5414*
Party:   Defendant JONES, ALEX E

08/10/2018

RESPONSE

*DEFENDANTS' REPLY TO PLAINTIFFS' RESPONSE TO OBJECTIONS TO L ATE FILED DECLARATIONS OF LEONARD POZNER AND VERONIQUE DE LA ROSA Event Code: 5153*
Party:   Defendant JONES, ALEX E

08/10/2018

ASSIGNMENT BY PRESIDING JUDGE
*ASSIGNMENT BY PRESIDING JUDGE Event Code: 5423*

08/16/2018

LETTER/EMAIL/CORR
*LETTER FROM SCOTT H JENKINS JUDGE 53RD DISTRICT COURT TRAVIS COUNTY, TEXAS Event Code: 5414*

08/17/2018

NOTICE
*NOTICE OF HEARING Event Code: 5554*
Party:   Defendant JONES, ALEX E

08/23/2018

OTHER
*ARGUMENT OF AMICUS CURIAE Event Code: 5415*

08/23/2018

MOTION
*MOTION FOR LEAVE TO APPEAR AS FRIEND OF THE COURT Event Code: 5265*

08/27/2018

OTHER

*DEFENDANTS' RENEWED REQUEST FOR RULINGS ON TIMELY FILED OBJECTIONS TO PLAINTIFFS' EVIDENCE Event Code: 5415*
Party:   Defendant JONES, ALEX E

08/29/2018

ORD:DENIED MOTION/APPLICATION
*ORDER DENYING MOTION TO DISMISS Event Code: 8209*
Party:   Defendant JONES, ALEX E

08/30/2018

JUDGMENT NOTICE MAILED
*Form Number L60-51972 Issued by BARI HENSON (5601) JUDGMENT NOTICE MAILED Event Code: 5601*
Party:   Defendant JONES, ALEX E

08/30/2018

JUDGMENT NOTICE MAILED
*Form Number L60-51973 Issued by BARI HENSON (5601) JUDGMENT NOTICE MAILED Event Code: 5601*

345th District Court

## Case Summary

### Case No. D-1-GN-18-001842

09/04/2018

OBJECTIONS

> *DEFENDANTS' OBJECTION TO THE COURT'S REFUSAL TO RULE ON OBJECTIONS AND SECOND RENEWED REQUEST FOR RULINGS ON TIMELY FILED OBJECTIONS TO PLAINTIFFS' EVIDENCE Event Code: 5156*
> Party:   Defendant JONES, ALEX E

09/06/2018

OTHER

> *DEFENDANTS' REQUEST FOR THIS COURT TO TAKE JUDICIAL NOTICE O F ITS OWN DOCKET CONDITIONS NECESSITATING DELAY OF HEARING O N DEFENDANTS' SECOND MOTION TO DISMISS UNDER THE TEXAS CITIZ ENS PARTICIPATION ACT Event Code: 5415*
> Party:   Defendant JONES, ALEX E

09/12/2018

NOTICE OF APPEAL
> *DF-1 NOTICE OF APPEAL Event Code: 5553*
> Party:   Defendant JONES, ALEX E

09/12/2018

DESIGNATION CLRKS/REPORTR REC
> *DF-1 DESIGNATION FOR CLERK'S RECORD Event Code: 5409*
> Party:   Defendant JONES, ALEX E

09/12/2018

DESIGNATION CLRKS/REPORTR REC
> *DF-1 DESIGNATION FOR COURT REPORTER'SRECORD Event Code: 5409*
> Party:   Defendant JONES, ALEX E

09/13/2018   ASM:CLERKS RECORD
> *Event Code: 939 Adjmt Amount: 2343.00*
> Party:   Defendant JONES, ALEX E

09/13/2018

MSF:BILL OF COST FOR CLERK REC
> *Form Number B03-2657 Issued by HAMILTON LYNDA SELINA (102) MSF:BILL OF COST FOR C Event Code: 102*
> Party:   Defendant JONES, ALEX E

09/13/2018

LETTER/EMAIL/CORR
> *LETTER FROM 3RD COA Event Code: 5414*

09/14/2018

LETTER/EMAIL/CORR
> *LETTER FROM MARK C. ENOCH Event Code: 5414*
> Party:   Defendant JONES, ALEX E

09/18/2018

CLERKS RECORD TRANSMITTAL
> *TAMES RECORD SUBMISSION FOR COURT CLERK'S RECORD Event Code: 5606*

09/18/2018

LETTER/EMAIL/CORR
> *LETTER FROM 3RD COA Event Code: 5414*

09/20/2018

LETTER/EMAIL/CORR
> *LETTER TO TIFFANY GOULD FOR JUDGE JENKINS Event Code: 5414*
> Party:   Defendant JONES, ALEX E

10/12/2018

CLERKS RECORD TRANSMITTAL
> *EXHIBITS AND LETTER FILED WITH 3RD COA Event Code: 5606*

10/26/2018

LETTER/EMAIL/CORR
> *LETTER FROM 3RD COA Event Code: 5414*

12/07/2018

LETTER/EMAIL/CORR
> *VACATION LETTER Event Code: 5414*

345th District Court

## Case Summary

### Case No. D-1-GN-18-001842

| | |
|---|---|
| 02/06/2019 | MOTION<br>*JASON A JENSEN'S MOTION FOR LEAVE TO INTERVENE Event Code: 5265* |
| 11/05/2019 | ORD:JUDGMENT<br>*MEMORANDUM OPINION AND JUDGMENT FROM 3RD COA Event Code: 8216* |
| 11/06/2019 | NTC:ATTORNEY/COUNSEL<br>*NOTICE OF APPEARANCE OF COUNSEL Event Code: 5550*<br>Party:   Defendant JONES, ALEX E |
| 12/17/2019 | LETTER/EMAIL/CORR<br>*LETTER FROM 3RD COA Event Code: 5414* |
| 12/17/2019 | LETTER/EMAIL/CORR<br>*LETTER FROM 3RD COA Event Code: 5414* |
| 01/21/2020 | LETTER/EMAIL/CORR<br>*LETTER FROM 3RD COA Event Code: 5414* |
| 01/21/2020 | LETTER/EMAIL/CORR<br>*LETTER FROM 3RD COA Event Code: 5414* |
| 01/21/2020 | LETTER/EMAIL/CORR<br>*LETTER FROM 3RD COA Event Code: 5414* |
| 02/03/2020 | LETTER/EMAIL/CORR<br>*LETTER FROM 3RD COA Event Code: 5414* |
| 04/28/2020 | LETTER/EMAIL/CORR<br>*LETTER FROM SUPREME COURT OF TEXAS Event Code: 5414* |
| 07/23/2020 | LETTER/EMAIL/CORR<br>*LETTER/EMAIL/CORR FROM THIRD COURT OF APPEALS Event Code: 5414* |
| 01/22/2021 | OTHER<br>*LETTER FROM THE SUPREME COURT OF TEXAS Event Code: 5415* |
| 02/02/2021 | OTHER<br>*LETTER FROM THE THIRD COURT OF APPEALS Event Code: 5415* |
| 02/02/2021 | OTHER<br>*LETTER FROM THE SUPREME COURT OF TEXAS Event Code: 5415* |
| 02/19/2021 | OTHER<br>*LETTER FROM 3RD COA Event Code: 5415* |
| 02/19/2021 | OTHER<br>*LETTER TO SUPREME COURT OF TEXAS Event Code: 5415* |
| 02/23/2021 | OTHER<br>*LETTER FROM SUPREME COURT OF TEXAS Event Code: 5415* |
| 02/24/2021 | OTHER<br>*LETTER FROM 3RD COA Event Code: 5415* |
| 03/09/2021 | ASSIGNMENT BY PRESIDING JUDGE<br>*ASSIGNMENT BY PRESIDING JUDGE Event Code: 5423* |

Printed on 04/05/2022 at 3:01 PM

**345th District Court**

## Case Summary

### Case No. D-1-GN-18-001842

03/10/2021
ASSIGNMENT BY PRESIDING JUDGE
*ASSIGNMENT BY PRESIDING JUDGE Event Code: 5423*

03/11/2021
OTHER
*LETTER FROM 3RD COA Event Code: 5415*

03/11/2021
ASSIGNMENT BY PRESIDING JUDGE
*LETTER WITH COURT ASSIGNEMENT Event Code: 5423*

04/16/2021
OTHER
*LETTER FROM 3RD COA Event Code: 5415*

04/20/2021
ASSIGNMENT BY PRESIDING JUDGE
*Event Code: 5423*

04/27/2021
NOTICE
*NOTICE OF APPEARANCE ON BEHALF OF DEFENDANTS Event Code: 5554*
Party:   Defendant JONES, ALEX E

04/27/2021
MOTION
*DEFENDANTS? UNOPPOSED MOTION FOR SUBSTITUTION OF COUNSEL AND WITHDRAWAL OF COUNSEL Event Code: 5265*
Party:   Defendant JONES, ALEX E

05/14/2021
OTHER
*LETTER Event Code: 5415*

06/02/2021
OTHER
*LETTER FROM JUDGE GAMBLE Event Code: 5415*

06/03/2021
OTHER
*LETTER FROM JUDGE GUERRA GAMBLE Event Code: 5415*

06/04/2021
ORDER
*MANDATE FROM 3RD COA Event Code: 8225*

06/15/2021
MOTION
*DEFENDANTS? AMENDED UNOPPOSED MOTION FOR SUBSTITUTION OF COU NSEL AND WITHDRAWAL OF COUNSEL Event Code: 5265*

06/15/2021
OTHER
*UNSIGNED ORDER/PROPOSED ORDER Event Code: 5415*

06/21/2021
ORDER
*ORDER GRANTING DEFENDANTS? AMENDED UNOPPOSED MOTION FOR SUBSTITUTION OF COUNSEL AND WITHDRAWAL OF COUNSEL Event Code: 8225*

07/06/2021
MOTION
*AGREED MOTION TO ENTER LEVEL 3 SCHEDULING ORDER Event Code: 5265*

07/06/2021
MOTION
*OPPOSED MOTION FOR PRO HAC VICE ADMISSION OF MARC J. RANDAZZ A Event Code: 5265*

07/06/2021
MOTION

Printed on 04/05/2022 at 3:01 PM

345th District Court

## Case Summary

### Case No. D-1-GN-18-001842

*OPPOSED MOTION FOR PRO HAC VICE ADMISSION OF MARC J. RANDAZZ A BY RESIDENT ATTORNEY Event Code: 5265*

07/06/2021     OTHER
        *UNSIGNED ORDER/PROPOSED ORDER Event Code: 5415*

07/07/2021

OTHER
        *NON-PARTY AMOS PICTURES, LTD.?S REQUEST FOR ORDER TO ALLOW RECORDING AND BROADCASTING OF COURT PROCEEDINGS Event Code: 5415*

07/12/2021     OTHER
        *UNSIGNED ORDER/PROPOSED ORDER Event Code: 5415*

07/19/2021     ORDER
        *ORDER ALLOWING RECORDING AND BROADCASTING OF COURT PROCEEDIN GS Event Code: 8225*

07/23/2021     ANSWER
        *PLAINTIFFS? RESPONSE TO MOTION FOR PRO HAC VICE ADMISSION Event Code: 5150*

07/27/2021     MOTION
        *PLAINTIFFS' MOTION TO COMPEL AND MOTION FOR SANCTIONS Event Code: 5265*

07/30/2021     ANSWER
        *REPLY IN SUPPORT OF MOTION FOR PRO HAC VICE ADMISSION OF MAR C J. RANDAZZA Event Code: 5150*

08/02/2021

ANSWER
        *PLAINTIFFS? SUPPLEMENTAL RESPONSE TO MOTION FOR PRO HAC VICE REGARDING WITNESS TAMPERING IN THIS LAWSUIT Event Code: 5150*

08/02/2021

ANSWER
        *PLAINTIFFS? SUPPLEMENTAL RESPONSE TO MOTION FOR PRO HAC VICE REGARDING FALSE ACCUSATIONS AGAINST PLAINTIFFS? COUNSEL Event Code: 5150*

08/17/2021     MOTION
        *SUPPLEMENT TO MOTION FOR PRO HAC VICE ADMISSION OF MARC J. RANDAZZA Event Code: 5265*

08/18/2021

ANSWER
        *PLAINTIFFS? RESPONSE TO DEFENDANTS? SUPPLEMENT TO MOTION FOR PRO HAC VICE ADMISSION Event Code: 5150*

08/19/2021     NOTICE
        *NOTICE OF INTENTION TO TAKE DEPOSITION BY WRITTEN QUESTIONS Event Code: 5554*

08/19/2021     MOTION
        *PLAINTIFFS' MOTION FOR PROTECTION REGARDING IN CAMERA REVIEW Event Code: 5265*

08/30/2021

ANSWER
        *DEFENDANTS? RESPONSE TO PLAINTIFFS? MOTION TO COMPEL AND MOTION FOR SANCTIONS Event Code: 5150*
    Party:   Defendant JONES, ALEX E

09/01/2021     NOTICE
        *PLAINTIFFS' NOTICE OF FILING DECLARATION REGARDING ATTORNEYS ' FEES Event Code: 5554*

09/08/2021

ANSWER

**345th District Court**

## Case Summary

### Case No. D-1-GN-18-001842

*DEFENDANTS? OBJECTIONS AND RESPONSE TO PLAINTIFFS? DECLARATION REGARDING ATTORNEYS? FEES Event Code: 5150*

Party:   Defendant JONES, ALEX E

09/10/2021

ANSWER

*PLAINTIFFS? RESPONSE TO DEFENDANTS? OBJECTIONS TO DECLARATIO N REGARDING ATTORNEYS? FEES Event Code: 5150*

09/13/2021

OTHER

*RULE 203 CERTIFICATE-NEWTOWN YOUTH & FAMILY SERVICES BILLING Event Code: 5415*

09/13/2021

OTHER

*RULE 203 CERTIFICATE-NEWTOWN YOUTH & FAMILY SERVICES MEDICAL PSYCHIATRIC Event Code: 5415*

09/15/2021

MOTION

*PLAINTIFFS? MOTION FOR LEAVE TO SERVE NET WORTH DISCOVERY Event Code: 5265*

09/15/2021

MOTION

*PLAINTIFFS? MOTION FOR PROTECTION REGARDING MARC RANDAZZA Event Code: 5265*

09/15/2021

MOTION

*PLAINTIFFS? UNOPPOSED MOTION FOR PROTECTIVE ORDER OF CONFIDENTIALITY Event Code: 5265*

09/15/2021

NOTICE

*PLAINTIFFS? NOTICE REGARDING STATUS OF DISCOVERY Event Code: 5554*

09/15/2021

OTHER

*PLAINTIFFS? DESIGNATION OF EXPERTS Event Code: 5415*

09/27/2021

ORDER

*ORDER ON PLAINTIFFS' MOTION TO COMPEL AND MOTION FOR SANCTIONS Event Code: 8225*

10/05/2021

ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA)
*ORDER ON ATTORNEYS FEES FOR PLAINTIFFS MOTIONS FOR SANCTIONS*

10/11/2021

MOTION

*PLAINTIFFS MOTION TO MODIFY SEPTEMBER 27, 2021 ORDER*

10/11/2021

OTHER

*RULE 203- AGAPE THEORY INSTITUTE (MEDICAL/ PSYCHIATRIC)*

10/11/2021

OTHER

*RULE 203- AGAPE THERAPY INSTITUTE (BILLING)*

10/15/2021

ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA)
*AMENDED ORDER ON PLAINTIFFS' MOTION TO COMPEL AND MOTION FOR SANCTIONS*

10/22/2021

ANSWER

*DEFENDANTS RESPONSE TO PLAINTIFFS MOTION TO CONSOLIDATE*

10/22/2021

OTHER

*PROPOSED ORDER*

10/25/2021

ANSWER

*DEFENDANTS RESPONSE TO PLAINTIFFS MOTION FOR LEAVE TO CONDUCT NET WORTH DISCOVERY*

**345th District Court**

## Case Summary

### Case No. D-1-GN-18-001842

| | |
|---|---|
| 10/25/2021 | OTHER |
| | *UNSIGNED PROPOSED ORDER* |
| 10/25/2021 | ANSWER |
| | *DEFENDANTS RESPONSE TO PLAINTIFFS MOTION FOR PROTECTION REGARDING MARC RANDAZZA* |
| 10/25/2021 | OTHER |
| | *UNSIGNED PROPOSED ORDER* |
| 10/25/2021 | ANSWER |
| | *DEFENDANTS RESPONSE TO PLAINTIFFS MOTION TO MODIFY SEPTEMBER 27, 2021 ORDER* |
| 10/25/2021 | OTHER |
| | *UNSIGNED PROPOSED ORDER* |
| 10/26/2021 | ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA) |
| | *ORDER ON MOTION FOR PROTECTIVE ORDER OF CONFIDENTIALITY* |
| 11/05/2021 | ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA) |
| | *ORDER ON PLAINTIFFS MOTION FOR LEAVE TO SERVE NET WORTH DISCOVEY* |
| 11/10/2021 | OTHER |
| | *LETTER FROM 3RD COA* |
| 11/17/2021 | OTHER |
| | *LETTER FROM 3RD COA* |
| 11/17/2021 | OTHER |
| | *MEMORANDUM OPINION FROM 3RD COA* |
| 12/07/2021 | ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA) |
| | *ORDER ON MOTION FOR PROTECTIVE ORDER OF CONFIDENTIALITY* |
| 12/13/2021 | ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA) |
| | *ORDER ON PLAINTIFFS' MOTION TO CONSOLIDATE* |
| 12/13/2021 | ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA) |
| | *ORDER ON PLAINTIFF'S MOTION FOR PROTECTION REGARDING MARC RANDAZZA* |
| 12/27/2021 | MOTION |
| | *PLAINTIFFS MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION* |
| 01/04/2022 | MOTION |
| | *DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS , FRED ZIPP AND BECCA LEWIS* |
| 01/04/2022 | OTHER |
| | *EXHIBITS TO PLAINTIFF'S SECOND SUPPLEMENTAL DESIGNATION OF EXPERTS* |
| 01/05/2022 | OTHER |
| | *RULE 203 CERTIFICATE-ROTONDO, DEAN, JOHN M.D. P.A* |
| 01/05/2022 | |
| OTHER | |
| | *NON-PARTY MEDIA VERITE S UNOPPOSED REQUEST FOR ORDER TO ALLOWRECORDING AND BROADCASTING OF COURT PROCEEDINGS* |
| 01/05/2022 | OTHER |

345th District Court

## Case Summary

### Case No. D-1-GN-18-001842

| | |
|---|---|
| | *LETTER TO JUDGE SOIFER FROM COUNSEL* |
| 01/07/2022 | ANSWER |
| | *DEFENDANT, FREE SPEECH SYSTEMS, LLC S, RESPONSE IN OPPOSITION TO PLAINTIFFS MOTION FOR SANCTIONS REGARDING CORPORATE REPRESENTATIVE DEPOSITION* |
| | Party:   Defendant FREE SPEECH SYSTEMS LLC |
| | Party 2:  Attorney Reeves, Bradley Jordan |
| 01/07/2022 | OTHER |
| | *PROPOSED ORDER* |
| 01/11/2022 | NOTICE |
| | *NOTICE OF APPEARANCE AND DESIGNATION OF LEAD COUNSEL* |
| | Party:   Defendant FREE SPEECH SYSTEMS LLC; |
| | Defendant INFOWARS LLC; |
| | Defendant JONES, ALEX E |
| | Party 2:  Attorney Blott, Jacquelyn W |
| 01/12/2022 | MOTION |
| | *DEFENDANTS MOTION FOR CONTEMPT AND SANCTIONS* |
| | Party:   Defendant JONES, ALEX E |
| 01/24/2022 | ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA) |
| | *ORDER ON PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSTION* |
| 02/01/2022 | MOTION |
| | *PLAINTIFFS' MOTION FOR SANCTIONS UNDER RULE 215.4 RELATING TO REQUEST FOR ADMISSION* |
| | Party 2:  Attorney Bankston, Mark DuQuesnay |
| 02/08/2022 | NOTICE |
| | *NOTICE OF FILING OF DECLARATION ON ATTORNEY'S FEES* |
| 02/09/2022 | NOTICE |
| | *NOTICE OF DEPOSITION OF CORPORATE REPRESENTATIVE* |
| | Party:   Defendant FREE SPEECH SYSTEMS LLC; |
| | Defendant INFOWARS LLC; |
| | Defendant JONES, ALEX E |
| | Party 2:  Attorney Reeves, Bradley Jordan |
| 02/17/2022 | MOTION |
| | *UNOPPOSED MOTION FOR WITHDRAWAL OF COUNSEL* |
| | Party:   Defendant FREE SPEECH SYSTEMS LLC; |
| | Defendant INFOWARS LLC; |
| | Defendant JONES, ALEX E |
| 02/17/2022 | OTHER |
| | *PROPOSED ORDER* |
| 02/22/2022 | MOTION |
| | *MOTION FOR ADMISSION OF COUNSEL PRO HAC VICE* |
| | Party:   Defendant FREE SPEECH SYSTEMS LLC; |
| | Defendant INFOWARS LLC; |
| | Defendant JONES, ALEX E |
| | Party 2:  Attorney Blott, Jacquelyn W |
| 02/22/2022 | OTHER |
| | *PROPOSED ORDER* |

345th District Court

## Case Summary

### Case No. D-1-GN-18-001842

02/25/2022
ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA)
*ORDER GRANTING UNOPPOSED MOTION FOR WITHDRAWAL OF COUNSEL*
Party:   Defendant FREE SPEECH SYSTEMS LLC;
            Defendant INFOWARS LLC;
            Defendant JONES, ALEX E

02/25/2022
NOTICE
*NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL*
Party 2:   Attorney Akers, Cordt Cullen;
              Attorney Bankston, Mark DuQuesnay

02/25/2022
NOTICE
*NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL*
Party 2:   Attorney Akers, Cordt Cullen

03/01/2022
ANSWER
*PLAINTIFFS RESPONSE TO NORMAN PATTIS MOTION FOR ADMISSION OF COUNSEL PRO HAC VICE*
Party 2:   Attorney Akers, Cordt Cullen

03/01/2022
ANSWER
*PLAINTIFFS RESPONSE TO MOTION FOR CONTEMPT AND SANCTIONS*
Party 2:   Attorney Akers, Cordt Cullen

03/04/2022
MOTION
*PLAINTIFFS MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION*

03/04/2022
MOTION
*PLAINTIFFS MOTION FOR LEAVE TO DESIGNATE EXPERT ON NET WORTH*

03/08/2022
NOTICE
*NOTICE OF APPEARANCE*
Party:   Defendant FREE SPEECH SYSTEMS LLC;
            Defendant INFOWARS LLC;
            Defendant JONES, ALEX E
Party 2:   Attorney REYNAL, FEDERICO ANDINO

03/08/2022
NOTICE
*AMENDED NOTICE OF APPEARANCE*
Party:   Defendant FREE SPEECH SYSTEMS LLC;
            Defendant INFOWARS LLC;
            Defendant JONES, ALEX E
Party 2:   Attorney REYNAL, FEDERICO ANDINO

03/08/2022
ANSWER
*DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION*
Party:   Defendant FREE SPEECH SYSTEMS LLC;
            Defendant INFOWARS LLC;
            Defendant JONES, ALEX E
Party 2:   Attorney Blott, Jacquelyn W

03/08/2022
OTHER
*EXHIBIT A TO DEFENDANTS RESPONSE TO MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION*

03/08/2022
OTHER
*EXHIBIT B TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION*

03/08/2022

**345th District Court**

## Case Summary

### Case No. D-1-GN-18-001842

ANSWER

*DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR SANCTIONS UNDER RULE 215.4 RELATING TO REQUESTS FOR ADMISSIONS*

Party:  Defendant FREE SPEECH SYSTEMS LLC;
        Defendant INFOWARS LLC;
        Defendant JONES, ALEX E

Party 2:  Attorney Blott, Jacquelyn W

03/25/2022  ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA)
        *ORDER ALLOWING RECORDING AND BROADCASTING OF COURT PROCEEDINGS*
        Party:  Defendant JONES, ALEX E

03/28/2022  ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA)
        *AGREED ORDER ON PLAINTIFFS MOTION FOR LEAVE TO DESIGNATE EXPERT*
        Party:  Defendant JONES, ALEX E

03/28/2022  ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA)
        *ORDER DENYING NORMAN PATTIS MOTION FOR ADMISSION OF COUNSEL PRO HAC VICE*
        Party:  Defendant JONES, ALEX E

04/01/2022  ORDER    (Judicial Officer: GAMBLE, MAYA GUERRA)
        *ORDER ON PLAINTIFFS MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION*

---

## Hearings

04/25/2022  *CANCELED* **Jury Trial**  (9:01 AM)
        *Passed by Court*

05/23/2022  *CANCELED* **Jury Trial**  (9:01 AM)
        *Passed by Court*

08/22/2022  *CANCELED* **Setting Date**  (9:01 AM)
        *Passed by Court*

5/29/2018 8:00 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001842**
**Sandra Henriquez**

**NO. D-1-GN-18-1842**

| | | |
|---|---|---|
| **LEONARD POZNER and** | § | |
| **VERONIQUE DE LA ROSA,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiffs*, | § | |
| | § | |
| **V.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES, INFOWARS, LLC,** | § | |
| **and FREE SPEECH SYSTEMS, LLC** | § | |
| *Defendants*. | § | **345th JUDICIAL DISTRICT** |

## DEFENDANTS' ORIGINAL ANSWER

Defendants Alex Jones, Infowars, LLC, and Free Speech Systems, LLC (collectively, the "Defendants"), hereby file this Original Answer:

## General Denial

Defendants generally deny, each and every, all and singular, the allegations contained in Plaintiff's Original Petition, and request strict proof thereof.

## Request for Relief

WHEREFORE, Defendants respectfully request that the Plaintiffs be denied any relief as requested in their Original Petition or otherwise, that Plaintiffs take nothing on their claims, that Defendants be awarded their attorneys' fees under applicable law (including any motion to dismiss under Chapter 27 of the Texas Civil Practice and Remedies Code, the filing of which is hereby reserved), and that the

Court grant them such other and further relief as the Court deems equitable, just and proper.

Respectfully submitted,

**FULLENWEIDER WILHITE, P.C.**
4265 San Felipe Street
Houston, Texas 77027
Telephone: (713) 624-4100

By:*/s/ Randall B. Wilhite*
    Randall B. Wilhite
    Texas State Bar No. 21476400
    service@fullenweider.com

ATTORNEYS FOR DEFENDANTS

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing document has been e-served upon the parties listed below on May 28, 2018:

      Mark Bankston mark@fbtrial.com
      Kaster, Lynch, Farrar & Ball, LLP.
      1010 Lamar, Suite 1600
      Houston, Texas 77002

                                  */s/ Randall B. Wilhite*
                                    Randall B. Wilhite

6/19/2018 4:39 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Terri Juarez

NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 345th JUDICIAL DISTRICT |

## <u>MOTION FOR SUBSTITUTION OF COUNSEL</u>

COME NOW ALEX E. JONES, INFOWARS, LLC, AND FREE SPEECH SYSTEMS, LLC ("Defendants") and move this Court for an Order allowing them to substitute counsel of record in the above captioned matter and for good cause would respectfully show unto the Court as follows:

### I.

Defendants have retained the law firm of Glast, Phillips & Murray, P.C. to represent them in this case. Accordingly, they request that their current counsel, Randall B. White of Fullenweider Wilhite, P.C., be permitted to withdraw as their counsel of record and that in his place Mark C. Enoch of Glast, Phillips & Murray, P.C., 14801 Quorum Drive, Suite 500, Dallas, Texas 75254, be substituted to serve as their new counsel of record.

### II.

Such substitution is not intended to and will not cause any delay in these proceedings. Counsel for Plaintiffs consents to this motion as evidenced by Exhibit A

MOTION FOR SUBSTITUTION OF COUNSEL - Page 1

attached hereto and incorporated herein for all purposes.

WHEREFORE, PREMISES CONSIDERED, Defendants pray that this motion be in all things granted and for such other and further relief to which they may be justly entitled and for which they will ever pray.

Respectfully submitted,


By:  /s/ *Randall B. Wilhite*
    Randall B. Wilhite
    State Bar No. 21476400
    FULLENWEIDER WILHITE, P.C.
    4265 San Felipe Street, Suite 1400
    Houston, Texas 77027
    Telephone:  (713) 624-4145
    rwilhite@fullenweider.com


By:  /s/ *Mark C. Enoch*
    Mark C. Enoch
    State Bar No.06630360
    GLAST, PHILLIPS & MURRAY, P.C.
    14801 Quorum Drive, Suite 500
    Dallas, Texas 75254
    972-419-8366 Telephone
    972-419-8329 Facsimile
    fly63rc@verizon.net

## CERTIFICATE OF CONFERENCE

I Certify that I conferred via email with Mark Bankston, counsel for Plaintiff, on

June 18, 2018. Mr. Bankston consents to the relief requested herein.


*/s/ Mark C. Enoch*
Mark C. Enoch


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served upon the parties listed below via email and via efile.txcourts.gov's e-service system on June 19, 2018:

Mark Bankston
Farrar & Ball, LLP.
1010 Lamar, Suite 1600
Houston, Texas 77002
mark@fbtrial.com


Randall B. Wilhite
State Bar No. 21476400
FULLENWEIDER WILHITE, P.C.
4265 San Felipe Street, Suite 1400
Houston, Texas 77027
rwilhite@fullenweider.com


*/s/ Mark C. Enoch*
Mark C. Enoch



KASTER LYNCH
FARRAR & BALL LLP

TEXAS | FLORIDA

June 19, 2018

**_Via Facsimile: (972) 419-8329_**

Mr. Mark C. Enoch
Glast, Phillips & Murray, P.C.
14801 Quorum Drive, Ste. 500
Dallas, Texas 75254

     Re:    Cause No. D-1-GN-18-001842, *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, et al.*, In the 345th District Court of Travis County, Texas.

Dear Mr. Enoch,

    Plaintiffs Leonard Pozner and Veronique De La Rosa consent to Defendant's Motion to Substitute Counsel.

Sincerely,
Kaster Lynch Farrar & Ball

Mark D. Bankston

**EXHIBIT**

A

NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff*s, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 345th JUDICIAL DISTRICT |

## <u>ORDER ON MOTION FOR SUBSTITUTION OF COUNSEL</u>

On this date came on for consideration the Motion for Substitution of Counsel for Defendants Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC.  Noting that counsel for Plaintiffs consents to this motion and substitution of counsel, the Court finds that it should be GRANTED.

Therefore it is ORDERED that Mark C. Enoch of Glast, Phillips & Murray, P.C. shall be substituted as counsel for Defendants and Defendants' current counsel, Randall B. White of Fullenweider Wilhite, P.C., be permitted to withdraw as their counsel of record.

SIGNED this _____ day of _____, 2018.


_____
JUDGE PRESIDING

Filed In The District Court
of Travis County, Texas

JUN 2 5 2018 JC

At_____ 4:35 P.M.

Velva L. Price, District Clerk

NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 345th JUDICIAL DISTRICT |

## <u>ORDER ON MOTION FOR SUBSTITUTION OF COUNSEL</u>

On this date came on for consideration the Motion for Substitution of Counsel for

Defendants Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC. Noting that

counsel for Plaintiffs consents to this motion and substitution of counsel, the Court finds

that it should be GRANTED.

Therefore it is ORDERED that Mark C. Enoch of Glast, Phillips & Murray, P.C.

shall be substituted as counsel for Defendants and Defendants' current counsel,

Randall B. White of Fullenweider Wilhite, P.C., be permitted to withdraw as their

counsel of record.

SIGNED this ___25^TH___ day of ___June___, 2018.

_____
JUDGE PRESIDING

6/26/2018 4:04 PM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001842**
**Sandra Henriquez**

NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| | § | |
| V. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC | § | |
| *Defendants* | § | 345th JUDICIAL DISTRICT |

### DEFENDANTS' MOTION TO DISMISS
### UNDER THE TEXAS CITIZENS' PARTICIPATION ACT

COME NOW, Defendants Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC,

(collectively, the "Defendants"), and hereby file this, their Motion to Dismiss Under the Texas

Citizens' Participation Act and in support thereof would respectfully show this Honorable Court

as follows:

## I.

## INTRODUCTION

This case is not about whether or not the Sandy Hook tragedy happened, nor is this case

about whether Ms. De La Rosa and Mr. Pozner suffered an unthinkable tragedy on the morning

of December 14, 2012, when they lost their son during the shooting. Instead, this case is about

protecting the constitutional right to free speech of all Americans.

This lawsuit is a strategic device used by Plaintiffs to silence Defendants' free speech and

an attempt to hold Defendants liable for simply expressing their opinions regarding questioning

the government. The goal of this lawsuit is to silence Defendants, as well as anyone else who

refuses to accept what the mainstream media and government tell them, and prevent them from

expressing any doubt or raising questions.

---

Since long before the tragedy at Sandy Hook, Alex Jones has been an ardent and vocal supporter of the Second Amendment to the United States Constitution. He started with a local radio program during which he voiced his opinions and comments about various news stories. None of his opinions was more forcefully given than in defense of the Second Amendment. These forceful opinions and comments provoked strong disagreement from those who did not share the same views and thus created controversy.

His audience grew in large part because people agreed with his opinions about the Second Amendment and his opinion that mainstream corporate media and liberal elected and appointed government officials had historically worked to limit gun owners' rights, sometimes deceptively, and could not be trusted to preserve the rights of gun owners under the Second Amendment. Indeed, his shared opinions were that each of his listeners should question official reports and do their own investigations and analysis.

As his audience grew, his voice became more powerful. His speech was designed and intended to enlist his audiences, as well as the public in general, to become active in their cities, states and on the national level in defense of the Second Amendment. On his shows, he sometimes associated with and broadcast opinions and comments of others who held similar views and beliefs. These associations were helpful to his efforts to enlist support for his political positions and in defense of those who attacked him in order to discredit his causes.

As will be demonstrated below, the Plaintiffs' suit is not about legally actionable defamation. Rather, this suit is only the latest in Plaintiffs' efforts to silence those who openly oppose their very public 'herculean' efforts to ban the sale of certain weapons, ammunition and accessories, to pass new laws relating to gun registration and to limit free speech,. Within their sweeping efforts to ban these weapons, they have encountered opposition to their political views

from some they refer to as conspiracy theorists. They now seek to silence Jones who they believe is among the most vocal opponents of their agenda to limit Second Amendment rights.

This suit is all about Plaintiffs' attempt to use this Court to silence Mr. Jones and prevent him from expressing his constitutional rights of association, free speech and to petition. The danger of this, of course, is that if Mr. Jones' rights are limited, it is only a matter of time when others, whose opinions and speech are more 'acceptable' than Mr. Jones', lose theirs. Indeed, restricting expression of others on the internet is the goal of the Plaintiffs.

> "At some point we're all gonna have to lose some rights so the internet can be more manageable…" *Leonard Pozner*[1]

Because this suit was designed to publicly punish Defendants and thereby chill the exercise of rights by Mr. Jones and others who are politically aligned, this is a classic "strategic lawsuit against public participation" for which the Texas legislature provides a fast and certain remedy in the Texas Citizens' Participation Act.

What the United States Supreme Court has called the "parade of horribles" that could result should Plaintiffs' lawsuit continue is unlimited. The issues presented are not, nor are they intended to be, limited to the Sandy Hook shooting. The purpose of this lawsuit is to create new Texas law that opens Texas' citizens to civil liability should they openly question the government and/or craft any type of "conspiracy theory" or differing view to that which is reported by the mainstream media.

The political debate regarding governmental "false flags," gun control and conspiracy theories form the basis of each of Plaintiffs' causes of action. Under Plaintiffs' view of this lawsuit, if a Texas citizen criticizes reports of the government or mainstream media, openly supports the Second Amendment and gun rights and/or believes and voices his or her opinion

---

[1] Exhibit B, David Jones Aff., at ¶31 and its attached Exhibit B-27.

with regard to any conspiracy theory, whether it's the John F. Kennedy Assassination or the September 11, 2001, terrorist attack, they open themselves up to *defamation and civil liability* from people who are no more than tangentially connected to the report.

This case is the very reason why the Texas Legislature enacted the Texas Citizens' Participation Act, which was to protect those who express a constitutionally protected right from being targeted with a strategic lawsuit intended to silence them. For the reasons set forth below, this Court must dismiss Plaintiffs' lawsuit in its entirety.

## II.

### SUMMARY

It is apparent from the face of Plaintiffs' petition and the evidence in this case that the purpose of this suit is not to recover damages from any legally actionable defamation. Instead its primary and critical purpose is to *silence* Mr. Jones and those like him.

Plaintiffs' expressed goals are to limit free speech, ban assault rifles, certain ammunition and accessories and to expand federal registration and background checks. In particular they seek a complete ban on the "Bushmaster" AR-15 assault rifle, high-capacity clip and its ammunition that was used at Sandy Hook. They are continuing their pursuit of that goal on multiple fronts; this suit is one of those fronts.

Plaintiffs have used their notoriety to obtain favorable broadcast and print media coverage to convince others to help their agenda. They have lobbied at the federal level to ban the gun and did not succeed. However, knowing that suits against product manufacturers have been effectively used to change business practices and restrict or eliminate distribution of products, on their second front, Plaintiffs sued the Bushmaster manufacturer in their efforts to

remove that gun from the market. Their goal is to use civil litigation to change business practices and restrict or eliminate distribution of this product.

But there is a constitutionally significant difference between using litigation to force ***products*** off the market and forcing ***speech*** off the market. This is especially true when, as here, the constitutional rights involve criticism of the government and political debate.

In this case, Plaintiffs seek to force Defendants to change business practices and restrict or eliminate distribution of Mr. Jones' "products," which are his opinions and commentaries, as well as his large internet forum for others to express theirs. If they are successful at this, they will also be successful in restricting or removing a widely used forum for others with similar political views to associate and to express their First Amendment rights and petition the government for their causes.

While Plaintiffs claim that the Defendants' speech was about and specifically directed toward them, it is clear from the context of the broadcasts and the statements themselves that Defendants' speech was in connection with questioning and criticizing the government and mainstream media and expressing the opinions held by Mr. Jones, as well as many others, that Second Amendment rights were and are under attack. Thus, the statements related to privileged criticisms of government and were part of the fierce national debate about gun control in which Plaintiffs were publicly active participants.

The terrible tragedy at Sandy Hook instantly became the center of the political gun rights debates in this country. It was a watershed moment in that national debate as activists from both sides immediately became engaged in public debates on gun issues.

These debates occurred at town halls and in the halls of state houses and Congress. Most of those debates however, were elsewhere among the general population. Among those who

became more active in those national debates was Mr. Jones, who used his broadcasts to actively defend the Second Amendment.

Whether one considers Mr. Jones' opinions as merely unbelievable conspiracy theories or as insightful commentaries, there can be no question, after reviewing the entirety of the context of each complained of statement and broadcast, that Mr. Jones was exercising his constitutional rights to associate with others of similar political views, petitioning by communicating to enlist more public participation in defending the Second Amendment and expressing his and others' free speech and opinions about second amendment rights along with the government's and media's role in that national debate.

### III.

### FACTUAL BACKGROUND

**A.** **Leonard Pozner and Veronique De La Rosa**

The Plaintiffs in this case, Ms. De La Rosa and Mr. Pozner, are the parents of Noah Pozner, who tragically was one of the victims of the Sandy Hook shooting. Although Plaintiffs attempt to argue that they are "private individuals and are neither public officials nor public figures," both Plaintiffs inserted themselves into the controversy surrounding the Second Amendment making both of them limited-purpose public figures. As will be detailed below, the distinction between a private individual and limited-purpose public figure is important to this Court's analysis.

**1.** **After the Sandy Hook tragedy, both Plaintiffs inserted themselves into the political debate regarding gun control and conspiracy theories**

As this Court is aware, in the aftermath of the Sandy Hook shooting, gun control debates and conspiracy theories began to spread throughout the nation regarding what was being reported

and how the government should react to such tragedy. One of the primary conspiracy theorists was a Florida Atlantic Professor named James Tracy.

Three years after the Sandy Hook tragedy and in response to Professor Tracy's theories, both Mr. Pozner and Ms. De La Rosa began a campaign against him by penning a letter to the editor of the *SunSentinel*. While mentioning the Boston bombing, the Paris terrorist attack and the San Bernardino massacre, Mr. Pozner and Ms. De La Rosa stated that "[e]ach new high-profile act of violence inspires more controversies…" More specifically, Mr. Pozner and Ms. De La Rosa targeted Professor Tracy:

> "In this piece we want to focus on someone who is chief among conspiracy theorists– Florida Atlantic University Professor James Tracy."[2]

Mr. Pozner and Ms. De La Rosa complained that Professor Tracy had caused "mainstream publicity" of his Sandy Hook theories, including his claim that "the Obama administration had staged the event to prepare the country for strict gun control measures." With more than 800 news organizations covering the story, Professor Tracy, they said, had achieved tremendous success from this exposure and has since leveraged it into a popular internet blog and radio program.[3]

Importantly, in their letter, Plaintiffs stated:

> "A plethora of conspiracies arose after Sandy Hook, but ***none received as much mainstream publicity as [Professor Tracy]***, who suggested that the shooting never occurred…"[4]

Yet, in this case, Plaintiffs are now claiming that Mr. Jones and his companies are to blame. However, this example of Mr. Pozner and Ms. De La Rosa's involvement in this political debate and controversy is not limited to Professor Tracy alone.

---

[2] Exhibit B-5
[3] Exhibit B-5
[4] Exhibit B-5

### a.     Leonard Pozner

Mr. Pozner decided to dedicate his life to defending his son's honor and existence after Sandy Hook. In response to Sandy Hook conspiracy theorists, Mr. Pozner launched the internet website www.honr.com in order to stop "hoaxers." His mission is to "force hoaxers into alternative avenues to express these extreme and harmful ideas."[5] This "fight… has become his life's work."[6] Mr. Pozner posts news articles on his website titled "How to fight conspiracy theories," "Truthers: When conspiracy meets reality," and many others.[7] In fact, the front page of his website states as follows:

> "We bring awareness to the cruelty and criminality of abusive activity that victims and their families are shockingly subjected to following violent mass tragedies like Sandy Hook. We refer to those who wittingly and publicly defame, harass, and emotionally abuse victims of high-profile mass tragedies as 'hoaxers,' due to their irrational belief that these tragedies are government-staged hoaxes, and their victims are paid crisis actors.
>
> Existing laws make it very difficult and costly to prosecute hoaxers, which only emboldens them to spread defamation and disinformation, as well as employ intrusive and threatening behavior with relative impunity. We are working toward affecting positive changes to existing law as well as the creation of new legislation, so that society can hold these abusers personally accountable for their actions, providing much-needed relief to the victims and their families."[8]

Another one of Mr. Pozner's news articles is titled "Sandy Hook dad battles nearly five years after Newtown massacre: I'm not the type to turn a blind eye." In that article, Mr. Pozner, referring to his own public participation and personal crusade against conspiracy theorists and doubters, states:

> "This is *my battle*…"[9]

---

[5] Exhibit B-1
[6] Exhibit B-24
[7] Exhibit B-2
[8] Exhibit B-1
[9] Exhibit B-3

Mr. Pozner also spent $30,000 in pursung his lawsuit against Wolfgang Halbig who, according to Mr. Pozner, "is a ***main champion*** of the [Sandy Hooks conspiracy theory]."[10] Mr. Pozner's "online crusade" is described as "aggressive"[11] and ferocious. Mr. Pozner's dedication to his crusade extends to his volunteers who "actively hunt down [conspiracy theory content] on a near daily basis."[12] Yet, Mr. Pozner's and his volunteers' efforts are not limited to Sandy Hook, as his organization actively assists in fighting conspiracy theorists in other tragedies. Mr. Pozner intends to stop "social media platforms" that "give voice to people who don't think this in a healthy way."[13] In other words, Mr. Pozner simply wants to silence people like Jones.

Another news article that Mr. Pozner posted on his website is entitled "Sandy Hook father Leonard Pozner on death threats: I never imagined I'd have to fight for my child's legacy." In the article he discussed how "[n]ot even Batman could have stopped an AR-15," further establishing his presence in the gun control debate. Mr. Pozner also added that he watched Mr. Jones' broadcasts and liked him because Mr. Jones "appears to think out of the box" and is "entertaining." After all, Mr. Pozner "used to be into conspiracy theories."

However, the Sandy Hook tragedy transformed Mr. Pozner's personal beliefs and now he seeks to impute liability on all those who choose to believe differently. Referring to the proliferation of websites and conspiracy theorists, Mr. Pozner said, "[i]t's like a brushfire: you need to shape it and direct it. But if you leave it alone, it will burn down your forest, and it has reached all the way to the Whitehouse." Mr. Pozner has been trying to "shape the brushfire" since 2014.[14]

---

[10] Exhibit B-3
[11] Exhibit B-3
[12] Exhibit B-3
[13] Exhibit B-3
[14] Exhibit B-4

Using his experience in information technology, Mr. Pozner has scrubbed internet content, filed copyright claims, sued hoaxers and successfully petitioned a university in Florida to fire a professor who Mr. Pozner believed to be a "hoaxer."[15] Likewise, Mr. Pozner has given numerous interviews on major news networks regarding his participation in fighting these "hoaxers."

[16]

Due to his participation in the national gun control debate, a recent google search of his name associated with "gun control" yielded nearly 40,000 articles.[17]

### b. Veronique De La Rosa

Likewise, after the Sandy Hook tragedy, Ms. De La Rosa entered the national and very public debate over gun control. On January 18, 2013, she addressed the Connecticut General Assembly in her attempts to ban certain weapons and said, "[t]he only way I feel I can bring some purpose to [her son's death] is by speaking on the issue of gun control."[18]

---

[15] Exhibit B-4
[16] Exhibit B-28
[17] Exhibit B, at ¶30
[18] Exhibit B-25



[19]

Then, on February 14, 2013, Ms. De La Rosa spoke publicly at a rally outside of the Connecticut State Capital Building. Standing beside large signs demanding safer, rational gun laws, she told the crowd:

> "Assault weapons should be comprehensibly banned in the state of Connecticut… They have no place in the hands of civilians… Citizens may have the right to bear arms but they do not have the right to bear weapons of mass destruction."[20]



[21]

An article entitled, "After Newtown, Why No Progress on Guns?" was posted on the Newtown Action Alliance's Facebook page on November 12, 2013.[22] The "read more" link on

---

[19] Exhibit B-29
[20] Exhibit B-26
[21] Exhibit B-30

that article takes the reader to www.forward.com, where the reader can search the word "Pozner"[23] and find Ms. De La Rosa's "profile" among multiple articles about her.

According to her profile, Ms. De La Rosa became "one of the most vocal Newtown parents giving interviews with CNN's Anderson Cooper and…with People Magazine"[24] and her words influenced and "resonated" with Connecticut's legislature as it later "passed the strictest gun control laws in the nation…"[25] In fact, Ms. De La Rosa's profile openly acknowledges the fact that she is no longer simply a private individual as she claims to be in this lawsuit:

> "Before Newtown, [Ms. De La Rosa] was private citizen leading a quiet life as an oncology nurse and mother. On December 14, 2012, she was involuntarily thrust into the limelight. *But rather than shy away from the media onslaught*, [Ms. De La Rosa] made the *Herculean effort*, as Rabbi Praver said, of communicating her grief to the public. In so doing, *she kept Newtown and gun control on the national agenda*."[26]

According to an article in *Business Insider* in January 2013, Ms. De La Rosa and her family submitted a detailed proposal to a White House task force recommending a range of legal reforms relating to guns.[27] She also appeared and testified before the Connecticut panel on gun control in Hartford. A full text of her remarks reflects her publicly shared opinions that "…assault weapons should be comprehensibly banned" as "tools of mass carnage…such weapons have no place in our society."

Ms. De La Rosa also called for mandatory surrender of all newly illegal firearms and full registration of all guns as well as a "substantial tax" on all ammunition. Clearly, Ms. De La Rosa is fully and voluntarily engaged in a contentious and widespread national debate over guns.[28]

---

[22] Exhibit B-6
[23] Ms. De La Rosa is the ex-wife of Mr. Pozner. In many of the articles she is referred to as Mrs. Pozner.
[24] Exhibit B-7
[25] Exhibit B-7
[26] Exhibit B-7 (emphasis added)
[27] Exhibit B-8
[28] Exhibit B-9

---

Her public participation in the gun rights debate is well known as a google search of the term "Veronique Pozner gun control" resulted in 580,000 articles.[29]

Mr. Pozner and Ms. De La Rosa remain publicly active in the national gun control debate as they have joined other families in suing the City of Newtown[30] and filed an *amicus* brief in a case seeking to force Wal-Mart to stop selling assault rifles.[31]

They also filed suit against the maker of the firearm used to kill their child.[32] The suit, styled *Soto v. Bushmaster Firearms International LLC*, garnered wide attention and prompted those with differing views in the national gun debate to respond[33] and was intended to "provide a roadmap to success in court for other victims of mass shootings…"[34]

Plaintiffs' suit against the manufacturer continues to command national attention as reported by *CBS This Morning* on November 14, 2017.[35] After a lower court dismissed their case citing a federal law granting broad immunity to arms manufacturers, Plaintiffs appealed the decision to further their efforts to push for gun-control and keep the political debate surrounding the issue in the public view.[36] Predictably, the National Rifle Association, along with the Connecticut Citizens Defense League,[37] is involved in protecting this federal law.[38]

Plaintiffs' Bushmaster lawsuit suit was and is widely recognized as not just being about the Plaintiffs' injuries. Instead, Plaintiffs' Bushmaster lawsuit affected how– ***and if***– Remington

---

[29] Exhibit B, ¶30
[30] Exhibits B-10, B-11 and B-12
[31] *See Trinity Wall St. v. Wal-Mart Stores, Inc*., 792 F. 3d 323 (3rd Cir. 2015)
[32] Exhibit B-13
[33] Exhibit B-15
[34] Exhibit B-14
[35] Exhibit B-16
[36] Exhibit B-17
[37] Exhibit B-19
[38] Exhibit B-18

would do business in the future.[39] Remington Firearms, the maker of the rifle used at Sandy Hook recently filed for bankruptcy.[40]

Then, after filing this suit, Plaintiffs publicized it in their efforts to influence public opinion.





Clearly, contrary to their claims, Plaintiffs are not simply "private individuals."

---

[39] Exhibit B-20
[40] Exhibit B-17
[41] Exhibit B-32
[42] Exhibit B-33

**B.**    **This Lawsuit**

Plaintiffs filed the instant lawsuit on April 16, 2018, against Mr. Jones and his companies, Infowars, LLC and Free Speech Systems, LLC.[43] The claims in the lawsuit are based entirely on certain commentary and statements made by Mr. Jones in broadcasts in April and June 2017 (the "Broadcasts"). Further, Plaintiffs allege that broadcasts on April 22, 2017, April 28, 2017 and June 18, 2017, in their entirety, are false and defamatory.[44]

**1.**    **April 22, 2017**

In the April 22 broadcast, Mr. Jones opines on how the "corporate media" cannot be trusted because they have propagated what he considers to be false information about significant public events. In support of his opinions, Mr. Jones cites and refers to the reporting on the use of weapons of mass destruction (WMDs), which led to the Iraq war as an example, along with several others, including what he described as the use of a "blue" or "green" screens (hereafter referred to as a "blue screen") by CNN during a live interview conducted by Anderson Cooper regarding the Sandy Hook shooting.

In the specific instance complained of by the Plaintiffs in this lawsuit, Anderson Cooper's nose temporarily disappears in the video as he turns his head, which Mr. Jones argues is evidence of technical glitches that often occur when using a blue screen. Mr. Jones concluded that, in his opinion, CNN's use of the blue screen signifies that CNN was misrepresenting or faking the actual location of the interview, just as he believed they had been caught doing and admitted to in the past.

---

[43] Infowars is owned and operated by Defendant Free Speech Systems, LLC.
[44] Plaintiffs' Original Petition, at ¶62 and ¶63

Despite the fact that Ms. De La Rosa participated in this original interview with Anderson Cooper,[45] she only appears briefly in the video upon which Mr. Jones is commentating and his commentary focuses entirely on and is specifically directed toward CNN, not Ms. De La Rosa.

Mr. Pozner is neither shown, mentioned, referenced nor identified in any way during any of the alleged defamatory statements and broadcast on April 22, 2017. The same is true for all of Plaintiffs' claims regarding the alleged defamatory meaning behind each of the referenced instances of Mr. Jones' comments regarding CNN's possible use of blue screens.

The title of the April 22, 2017 broadcast upon which Plaintiffs base one of their claims was "Breaking: Sandy Hook Vampires Exposed." In the video, Mr. Jones specifically and explicitly explained that the reference to "vampires" in the title of the segment refers to the corporate media. Yet, despite this explanation, Plaintiffs nevertheless wrongly claim that they themselves were referred to as the "Sandy Hook Vampires."[46]

Mr. Jones further explains that certain comments that he had previously made in connection with possible faking or staging events at the Sandy Hook shooting was not an accusation against the children or families, but against the media and government officials, whose actions led many to question the official version of the event. Despite all of these explanations by Mr. Jones, Plaintiffs isolate specific statements, take them out of context while ignoring other relevant portions, and misinterpret what was said.

2.      **April 28, 2017**

The April 28 broadcast was video from a press conference that Mr. Jones held regarding his child custody case. During the 30-minute conference, he was briefly asked about Sandy

---

[45] Plaintiffs' Original Petition, at ¶13
[46] Plaintiffs' Original Petition, at ¶22

Hook. In response, Mr. Jones discusses how he played "devil's advocate" in the debate, but he does not mention or reference either Plaintiff, nor does he insinuate that the Plaintiffs or any parents of Sandy Hook victims engaged in any wrong doing. Likewise, Mr. Jones again provides his opinion and explains that he "think[s] we should investigate everything because ***the government*** has staged so much stuff…"[47] Yet again, the so-called defamatory statement was referenced in connection with Mr. Jones' opinions in connection with ***the government***, not the Plaintiffs.

### 3.      June 18, 2017

The June 18 broadcast was an interview of Mr. Jones by Megyn Kelly on NBC on that date.[48]  Despite the fact that Ms. Kelly interviewed and questioned Mr. Jones for more than 10 hours throughout the day on June 18, 2017, NBC and Ms. Kelly aired less than 18 minutes of the actual interview.[49] The portion of Mr. Jones' interview that was aired was taken out of context and edited by NBC and Ms. Kelly in an effort to increase their ratings.[50] What was taken out of context and portrayed by NBC and Ms. Kelly cannot be imputed to Mr. Jones or Defendants.

Regardless, in the portion aired by NBC, Ms. Kelly questioned Mr. Jones about the Sandy Hook shooting, but Mr. Jones does not mention or otherwise refer to either Plaintiff, nor does he make any statements insinuating wrongdoing by any of the parents of Sandy Hook victims. In fact, there is nothing said by Mr. Jones during the interview that could possibly be considered defamatory toward the Plaintiffs in any manner.

---

[47] Plaintiffs' Original Petition, at ¶23
[48] Plaintiffs' Original Petition, at ¶25, footnote 14
[49] Exhibit A, Alex Jones Aff., at ¶2
[50] Exhibit A, Alex Jones Aff., at ¶2

C.      **Irrelevant broadcasts**

In an attempt to distract this Court from what the true issues in this lawsuit are (i.e., whether the April 22, April 28 and June 18, 2017, broadcasts are defamatory in and of themselves), Plaintiffs' Original Petition also references broadcasts on June 13, 2017 and June 26, 2017.[51] In the June 13 broadcast, Mr. Jones merely mentions the word "blue screen" without any reference to either Plaintiff.[52] The June 26 broadcast concerns commentary by Infowars employee Owen Shroyer based on an article that was published by the online publication Zero Hedge.[53] The article referenced inconsistencies in the June 18 broadcast by Megyn Kelly on NBC, but the broadcast does not mention or otherwise concern, directly or indirectly, either Plaintiff. None of these facts are legally or factually relevant to any of Plaintiffs' causes of action and should be ignored by this Court.

Further, Plaintiffs' Original Petition also references a number of older broadcasts, well before the expiration of the one-year statute of limitations for defamation in Texas.[54] Again, none of these broadcasts has any relevance to whether the April 22, April 28 and June 18 broadcasts, *in and of themselves*, are defamatory. This Court's focus *must remain* on the broadcasts that Plaintiffs claim are defamatory.

Plaintiffs' goal in this litigation is to "revive" statements made that fall outside of the statute of limitations by claiming that the actual statements and broadcasts that are subject to this lawsuit are simply a "continuation" of a pattern of alleged falsities. However, no matter how Plaintiffs' argument is crafted, old statements cannot be "revived."

---

[51] Plaintiffs' Original Petition, at ¶62-67
[52] Plaintiffs' Original Petition, at ¶24, footnote 13
[53] Plaintiffs' Original Petition, at ¶29, footnote19
[54] Plaintiffs' Original Petition, at ¶60-75

## IV.

## THE IMPORTANCE OF THE FIRST AMENDMENT

"At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern. The freedom to speak one's mind is not only an aspect of individual liberty- and thus a good unto itself- but also is essential to the common quest for truth and the vitality of society as a whole… *The First Amendment recognizes no such thing as a 'false' idea.*"[55]

"[B]oth the U.S. Constitution and the Texas Constitution robustly protect freedom of speech."[56] The United States Constitution's protections for speech were "fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."[57] As the United States Supreme Court has emphasized:

"The right to think is the beginning of freedom, and *speech must be protected*… because speech is the beginning of thought."[58]

Likewise:

"The Texas Constitution also explicitly protects freedom of expression, declaring that '[e]very person shall be at liberty to speak, write or publish his opinions on any subject… and no law shall ever be passed curtailing the liberty of speech or of the press."[59]

"Protections for the press are *especially vital* because of the *pivotal role* it plays in the dissemination of information to the public."[60] Thus, a "free press" is "essential to a healthy democracy."[61] Similarly, one of the "foundational principles of American democracy is the

---

[55] *Hustler Magazine v. Falwell*, 485 U.S. 46, 50-51 (1988) (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503-504 (1984) (emphasis added)).
[56] *D Magazine Partners, L.P.*, 529 S.W.3d at 431
[57] *D Magazine Partners, L.P. v. Rosenthal*, 529 S.W.3d 429, 433 (Tex. 2017) (citing *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 269, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)
[58] *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 253, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002) (emphasis added)
[59] *D Magazine Partners, L.P.*, 529 S.W.3d at 433 (citing Tex. Const. art. I §8)
[60] *D Magazine Partners, L.P.*, 529 S.W.3d at 433 (citing *N.Y. Times Co. v. United States*, 403 U.S. 713, 717, 91 S. Ct. 2140, 29 L. Ed. 2d 822 (1971) (Black, J., concurring) (emphasis added).
[61] *D Magazine Partners, L.P.*, 529 S.W.3d at 431

---

freedom to comment on matters of public concern."[62] This "foundational principle" has been

repeatedly emphasized by the United States Supreme Court.

In *New York Times Co. v. Sullivan*[63], the Court expressed "a profound national

commitment to the principle that debate on public issues should be uninhibited, robust, and wide-

open and that [such debate] may well include vehement, caustic, and sometimes unpleasantly

sharp attacks on government…"[64]

The Court in *Rosenblatt v. Baer*[65] took this viewpoint even further:

"***Criticism of government*** is at the very center of the constitutionally protected
area of free discussion. Criticism of those responsible for government operations
must be free, les criticism of government itself be penalized."[66]

These "foundational principles" are equally protected by Texas law and fall within the

purview of the TCPA.[67]

## V.

## THE TEXAS CITIZENS' PARTICIPATION ACT

**A.    The Purpose of the TCPA**

The TCPA "protects citizens who… speak on matters of public concern from retaliatory

lawsuits that seek to intimidate or silence them"[68] and "professes an overarching purpose of

'safeguard[ing] the constitutional rights of persons to petition, speak freely, associate freely, and

otherwise participate in government" against infringement by meritless lawsuits, and is often

---

[62] *D Magazine Partners, L.P.*, 529 S.W.3d at 433
[63] *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964)
[64] *New York Times Co.*, 376 U.S. at 270
[65] *Rosenblatt v. Baer*, 383 U.S. 75, 85, 15 L. Ed. 2d 597, 86 S. Ct. 669 (1966)
[66] *Rosenblatt*, 383 U.S. at 85 (emphasis added)
[67] *Hersh v. Tatum*, 526 S.W.3d 462, 466 (Tex. 2017) ("The stated purpose of the [TCPA] is to 'encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law..."); *see also Foster v. Laredo Newspapers*, 541 S.W.2d 809, 812 (Tex. 1976) (quoting *Rosenblatt*, 383 U.S. at 85) ("Criticism of government is at the very center of the constitutionally protected area of free discussion…").
[68] *In re Lipsky*, 460 S.W.3d 579, 579 (Tex. 2015) (citing Tex. Civ. Prac. & Rem. Code §27.001-011)

characterized as an "anti-SLAPP" law.[69] The TCPA further directs that it is to be "construed liberally to effectuate its purpose and intent fully"[70] and it pursues "any such goals chiefly by defining a suspect class of legal proceedings that are deemed to implicate free expression, making these proceedings subject to threshold testing of potential merit, and compelling rapid dismissal- with mandatory cost-shifting and sanctions- for any found wanting."[71]

The Texas Supreme Court in *Adams v. Starside Custom Builders, LLC*[72], recently stated that "[t]he TCPA casts a wide net."[73] In fact, the Honorable Bob Pemberton wrote:

> "It is conceivable that the Legislature would see fit to **cast this net exceptionally widely- opting for a hand grenade rather than a rifle shot-** perhaps in recognition of a **high value being ascribed to constitutionally-protected expression** that may be subsumed somewhere within the Act's definitions of protected expression, or in an effort to capture expression-targeting 'legal actions' that might otherwise be creatively pleaded so as to avoid the statute's requirements."[74]

Under the TCPA, the movant bears the initial burden to show by a preponderance of evidence "that the legal action[75] is based on, relates to, or is in response to the party's exercise of" certain constitutional rights.[76] This first step of the TCPA is a legal question[77] and in determining whether "a legal action should be dismissed... the court **shall consider the pleadings** and supporting and opposing affidavits stating the facts on which the liability... is based."[78]

---

[69] *Cavin v. Abbott*, 2017 Tex. App. LEXIS 6511, *16 (Tex. App.- Austin, July 14, 2017) (emphasis added)

[70] *Cavin*, 2017 Tex. App. LEXIS 6511, at *16

[71] *Cavin*, 2017 Tex. App. LEXIS 6511, at *16

[72] *Adams v. Starside Custom Builders, LLC*, No. 16-0786, 2018 Tex. LEXIS 327, at *8 (Tex. 2018)

[73] *Adams*, 2018 Tex. LEXIS 327, at *8

[74] *Cavin v. Abbott*, 2017 Tex. App. LEXIS 6511, *42 (Tex. App.- Austin, July 14, 2017) (emphasis added).

[75] Pursuant to the statute, a "legal action" can be, among others, a "lawsuit" or "cause of action." Tex. Civ. Prac. & Rem. Code §27.001(6).

[76] Tex. Civ. Prac. & Rem. Code §27.005(b)

[77] *Whisenhunt v. Lippincott*, 416 S.W.3d 689, 695 (Tex. 2013); *Epperson v. Mueller*, No. 01-15-00231-CV, 2016 Tex. App. LEXIS 8671 (Tex. App.-Houston [1st Dist.] Aug. 11, 2016)

[78] *Hersh*, 526 S.W.3d at 466 (emphasis added); Tex. Civ. Prac. & Rem. Code §27.006(a)

Once the movant meets this evidentiary burden and proves that the TCPA applies, the burden shifts to the nonmovant to establish "by clear and specific evidence a prima facie case for each essential element of the claim in question" in order to avoid dismissal.[79]

Should the nonmovant meet its statutory burden, the burden shifts back to the movant, who may then establish by a preponderance of the evidence each essential element of a valid defense which, if established, results in a mandatory dismissal by the court.[80]

## VI.

## ARGUMENT AND AUTHORITIES

**A.**     **Plaintiffs' "legal action" is based on, related to and in response to Defendants' exercise of the Right to Free Speech, Right to Petition and Right of Association**

The TCPA is applicable to this litigation because: (1) Plaintiffs' legal action is factually predicated on Defendants' exercise of their constitutionally protected rights; and (2) Plaintiffs' legal action is otherwise "based on, relates to and is in response to" Defendants' exercise of their constitutionally protected rights.

**1.**     **Plaintiffs' legal action is factually predicated on Defendants' exercise of their constitutionally protected rights**

The Austin Court of Appeals has long held that the TCPA's language, "based on, relates to, or is in response to" "serves to capture, at a minimum, a 'legal action' that is factually predicated upon alleged conduct that would fall within the TCPA's definitions of 'exercise of the right of free speech…'"[81] The term "legal action" is defined by the TCPA, among others, as a "lawsuit" or "cause of action."[82] In this case, Plaintiffs' entire "lawsuit," as well as each

---

[79] Tex. Civ. Prac. & Rem. Code §27.005(c)
[80] Tex. Civ. Prac. & Rem. Code §27.005(d) ("the court shall dismiss…")
[81] *Cavin*, 2017 Tex. App. LEXIS 6511, at *20
[82] Tex. Civ. Prac. & Rem. Code §27.001(6)

individual "cause of action," is factually predicated upon Defendants' exercise of their constitutionally protected rights.

As stated above, when making the determination whether a "legal action" is based on, related to or in response to a movant's constitutionally protected right, the Texas Supreme Court has observed and stated that:

> "'[T]he ***plaintiff's petition***…, as so often has been said, is the 'best and all sufficient evidence of the nature of the action'…When it is ***clear from the plaintiff's pleadings*** that the action is covered by the [TCPA], ***the defendant need show no more***."[83]

### a. Right to Free Speech, Right of Association and Right to Petition

The TCPA defines the "exercise of the right of free speech" as "a communication made in connection with a matter of public concern,"[84] which "includes [among others] an issue related to… health or safety… community well-being… [or] the government."[85] Courts have broadly interpreted the TCPA's application to "matters of public concern"[86] which, by plain language of the statute, includes an issue related to health or safety; environmental, economic, or community well-being; the government; a public official or public figure; or a good, product, or service in the marketplace.[87] The Third Court of Appeals has explained:

> "[T]he TCPA does not require that the statements specifically "mention" health, safety, environmental, or economic concerns, nor does it require more than a "tangential relationship" to the same; rather, TCPA applicability requires only that the defendant's statements are "in connection with" "issue[s] related to"

---

[83] *Hersh*, 526 S.W.3d at 467
[84] *Hersh*, 526 S.W.3d at 466
[85] *Hersh*, 526 S.W.3d at 466; Tex. Civ. Prac. & Rem. Code §27.001(7)(A-E).
[86] *See, e.g., Adams*, 2018 Tex. LEXIS 327 at *10 (observing that communications by a resident that real estate developer had "chopped down trees, generally made life miserable for the residents, and engaged in unspecified other corrupt or criminal activity is of public concern"); *David Martin Camp v. Patterson*, 2017 Tex. App. LEXIS 7258, at *14 (Tex. App.- Austin 2017, no pet.) (holding that private texts and emails of contractor related to goods or products in the marketplace were "matters of public concern"); *Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 798 (Tex. App.- Austin 2017, pet. filed) (statements that former football player tried to hire a hit man to kill his agent were a "matter of public concern" because they concerned the safety of the agent).
[87] Tex. Civ. Prac. & Rem. Code §27.001(7)(A-E)

health, safety, environmental, economic, and other identified matters of public concern chosen by the Legislature."[88]

The TCPA defines the exercise of the "right to petition" as, among others: (i) a communication in connection with an issue under consideration or review by a legislative, executive, judicial, or other governmental body[89]; (ii) a communication that is reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial, or other governmental body[90]; and/or (iii) a communication reasonably likely to enlist public participation in an effort to effect consideration of an issue by a legislative, executive, judicial, or other governmental body.[91] "Communication" is defined as the making or submitting of a statement or video in any form or medium, including oral, visual, written, audiovisual, or electronic.[92] "Right of Association" within the TCPA means a "communication between individuals who join together to collectively express, promote, pursue, or defend common interests."[93]

As is apparent from Plaintiffs' Original Petition, each cause of action against Defendants, arising out of statements and broadcasts from April 22, 2017, April 28, 2017, and June 18, 2017, is based on, relates to and is response to Defendants' exercise of their right of free speech, right of association and right to petition. From Plaintiffs' Original Petition, it appears as though they are claiming that certain statements in and of themselves are defamatory and, at the same time, arguing that the broadcasts in their entirety are defamatory. Neither is true.

Importantly, for purposes of efficiency, Defendants contend and believe that each statement and broadcast not only constitute an expression of free speech, but also fall within the TCPA's definitions of the right to petition and right of association. All of the statements and

---

[88] *Cavin v. Abbott*, 2017 Tex. App. LEXIS 6511, at *28 (Tex. App.- Austin July 14, 2017, no pet.) (citing *Exxon v. Coleman*, 512 S.W.3d 895 (Tex. 2017)
[89] Tex. Civ. Prac. & Rem. Code §27.001(4)(B)
[90] Tex. Civ. Prac. & Rem. Code §27.001(4)(C)
[91] Tex. Civ. Prac. & Rem. Code §27.001(4)(D)
[92] Tex. Civ. Prac. & Rem. Code §27.001(1)
[93] Tex. Civ. Prac. & Rem. Code §27.001(2)

broadcasts were communications between individuals, Mr. Jones and his listeners, who join together to collectively express, promote, pursue, or defend common interests. Further, the subject matter upon which Mr. Jones' statements and broadcasts were made (i.e., questioning the mainstream media and governmental reports) likewise constitute communications that were reasonably likely to enlist public participation in an effort to effect consideration of an issue by a legislative, executive, judicial, or other governmental body.[94]

In order to prevent repetition regarding each statement and/or broadcast falling into the category of "free speech," "right of association," or "right to petition," Defendants will provide the analysis of free speech, but also believe that the "free speech" upon which Plaintiffs have based their lawsuits likewise constitute Mr. Jones' "right of association" and "right to petition" as defined by the TCPA.[95]

---

[94] Unlike the right of free speech under the TCPA, the exercise of the right of association and right to petition need not involve a matter of public concern. The right of association and right to petition under the TCPA include not only the right to directly petition the government for action but also the sorts of collateral actions aimed at influencing public opinion in support of petitioning the government, as well as associating with individuals to promote and defend common interests. *Serafine v. Blunt*, 466 SW 3d 352, 381 (Tex. App.- Austin 2015, no pet.). The "collateral actions" used by Mr. Jones are his speech, commentary and large forum to express his own and others' views urging the public to resist attempts to ban rifles and ammunition. All of the statements alleged to be defamatory in the April 22 broadcast including describing the flowers and leaves looking fake, the portion of Anderson Cooper's nose disappearing, the previous false use of blue screens by CNN, the prior claims of the government about WMD's in Iraq, the allowance by our government of the "Arab Spring" and the resulting fall of governments friendly to the US and the US allowing attacks on Serbia along with Mr. Jones' opinions about other reports and videos were communications "reasonably likely to enlist public participation" in an effort to petition government to not adopt restrictive gun laws and to adopt additional rights for gun owners. Further Mr. Jones reminded his viewers not to be "Dory" and forget about what he believed to be historical facts of deception in order to justify limiting gun owners' rights. His brief statements criticizing the government in the April 28 news conference were reasonably likely to enlist and encourage others to question and individually investigate official reports by government officials and mainstream media and not to accept as necessarily true accounts Mr. Jones believes to be designed to create sympathy for passage of additional gun restrictions. Likewise, each of the statements was a communication between individuals who join together to collectively express, promote, pursue, or defend common interests. Thus, each complained of statement and/or broadcast is based on, related to and in response to Defendants' exercise of their right to free speech, right of association and right to petition, each of which is equally protected under the TCPA.
[95] Tex. Civ. Prac. & Rem. Code §27.001(2); Tex. Civ. Prac. & Rem. Code §27.001(4)(B-D)

---

i.     *April 22, 2017*

The complained of specific statements made by Mr. Jones during the April 22, 2017, broadcasts were undeniably statements made with regard to a matter of public concern.[96] Each individual statement, both when viewed in its context as well as when viewed by itself, refers to matters of public concern.

When viewed in the entire context of the April 22, 2017, broadcast, it is clear that Mr. Jones is expressing his personal opinions and viewpoints with regard to questioning the mainstream media and government. Further, the same is apparent simply from reviewing the statements that are isolated and taken out of context by the Plaintiffs.

For example, in paragraph 14 of Plaintiffs' Original Petition, the following statement is isolated as being defamatory because it, according to Plaintiffs, allegedly promotes an argument that the "Sandy Hook shooting was faked or staged, and that Plaintiffs Veronique De La Rosa and Leonard Pozner are 'Sandy Hook Vampires' engaged in a cover-up."[97]

> "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and back the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists... if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists... attack Serbia, and lied about Serbia launching the attach, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."[98]

---

[96] Plaintiffs' Original Petition isolates statements made from the April 22, 2017, broadcast.  *See* Plaintiffs' Original Petition, at ¶¶13, 14, 17, 18, 19, 20 and 21.
[97] Plaintiffs' Original Petition, at ¶22
[98] Plaintiffs' Original Petition, at ¶14

The unambiguous language and meaning of this statement is undoubtedly referring to a matter of public concern (i.e., questioning the Government and mainstream media). Additionally, these statements pertained to a matter of public concern because Jones was also criticizing CNN's reporting and its television content is a good, product, or service in the marketplace.

Plaintiffs also argue that the April 22, 2017, broadcast in its entirety was defamatory.[99] However, the entire broadcast likewise was in reference to matters of public concern. Therefore, Plaintiffs' claims regarding the individual statements from the April 22, 2017, broadcast, as well as the April 22, 2017, broadcast in its entirety are based on, related to and in response to Mr. Jones "[e]xercise of the right of free speech" because each statement and broadcast was "a communication made in connection with a matter of public concern" as defined by the TCPA.[100] Thus, the TCPA is applicable to each of Plaintiffs' claims with regard to the April 22, 2017, broadcast.[101]

*ii.     April 28, 2017*

Similarly, Plaintiffs' claim that statements made from, as well as the entire April 28, 2017, broadcast, were defamatory. Specifically, Plaintiffs' claim that the following statement made by Mr. Jones during the April 28, 2017, broadcast constitutes defamation:

> "I think we should investigate everything because ***the government*** has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing Devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue-screens out there... Yes, ***the governments*** stage things."[102]

---

[99] Plaintiffs' Original Petition, at ¶62 and ¶63.
[100] Tex. Civ. Prac. & Rem. Code §27.001(3)
[101] Plaintiffs' Original Petition also includes other specific statements made by Mr. Jones during the April 22, 2017, broadcast, but it is unclear whether they contend and argue that each statement included in their petition was defamatory. However, should Plaintiffs argue that each of the specified statements constitutes defamation, each one of the statements was likewise made in connection with a matter of public concern, thus invoking the applicability and protection of the TCPA.
[102] Plaintiffs' Original Petition, at ¶23 (emphasis added)

Again, it is apparent from the text of the statement that Mr. Jones' statement was made with regard to a matter of public concern because the statement was made in connection with his opinion and view regarding the government.[103] Therefore, the TCPA is applicable to each of Plaintiffs' claims regarding the April 28, 2017, broadcast.

### iii.     June 18, 2017

Plaintiffs' claims regarding the June 18, 2017, so-called "broadcast" encounter many difficulties, as will be fully explained below. Nonetheless, the complained of statements made by Mr. Jones, taken out of context, edited and published by NBC and Megyn Kelly (not Defendants), were statements made in connection with a matter of public concern. One of the specific statements that Plaintiffs included in their petition is Mr. Jones' following statement:

"I do think there's some cover-up and some manipulation."[104]

Mr. Jones is again making a comment on and sharing his opinion with regard to the government, which unequivocally constitutes a matter of public concern. Thus, the TCPA likewise applies to each of Plaintiffs' claims based upon the June 18, 2017, broadcast.

Therefore, Mr. Jones has established by a preponderance of the evidence that Plaintiffs' entire lawsuit is "based on, relates to, or is in response to" Defendants' exercise of First Amendment rights. Because Defendants have established their burden and the applicability, the burden now shifts to Plaintiffs to establish by clear and specific evidence a prima facie case for each essential element of their claims.

**2.      Plaintiffs' legal action is otherwise "based on, relates to and is in response to" Defendants' exercise of their constitutionally protected rights.**

---

[103] A "matter of public concern" includes an issue related to "the government." Tex. Civ. Prac. & Rem. Code §27.001(7)(C).
[104] Plaintiffs' Original Petition, at ¶25

Despite the fact that Plaintiffs' lawsuit and causes of action are "factually predicated" on Defendants' exercise of their constitutional rights, even if the factual predicate was based on conduct and/or statements that were not protected, the TCPA would nonetheless be applicable because Plaintiffs' entire lawsuit otherwise "relates to and is in response to" Defendants' continued voice and involvement in political issues in this country.

In an interview with Anderson Cooper on or about April 18, 2018, Ms. De La Rosa stated:

> "I think there comes a time when, if there's a choice that's made over a ***relentless period of years to pedal falsehoods and to profit from them***, then there has to be a day of reckoning and accountability. And they say that sunlight is a great disinfectant. Well, I say let it shine."[105]

As is clear, Ms. De La Rosa seeks vengeance against Mr. Jones, not for any alleged defamatory statement asserted in Plaintiff's Original Petition. Instead, Ms. De La Rosa filed this lawsuit "based on, related to and in response to" Mr. Jones "relentless period of years" expressing his opinions and viewpoints to which Ms. De La Rosa strongly objects, even if such opinions have no relationship to Ms. De La Rosa.

Mr. Pozner has also revealed that his true complaint and goal in this lawsuit is not to remedy any alleged defamatory statement made by Mr. Jones. Instead, Mr. Pozner's primary goal is to simply prevent Mr. Jones and others like him from expressing their viewpoints. On June 14, 2017, www.courant.com posted an article written by Mr. Pozner that reveals his true intent and purpose in connection with Mr. Jones. In that article, Mr. Pozner wrote as follows:

> "Inflammatory personalities such as Alex Jones make a living peddling conspiratorial rhetoric and anti-government propaganda that appeals to a specific audience… It's much more comfortable to believe that women and children did not die and ***that the government they love to loathe is coming for their guns***…

---

[105] Exhibit B-34 (video CNN Cooper interview of De La Rosa - https://www.cnn.com/videos/us/2018/04/19/sandy-hook-parent-alex-jones-lawsuit-cooper-intv-sot-ac.cnn)

People like these by the tens of thousands are flocking to charismatic con men like Jones, with cultish reverence and conviction. With the aid of media platforms such as alternative talk radio, YouTube, Google, Facebook and Twitter, scores more are being reached and indoctrinated into the cult of delusional lunacy every day…

The hoaxer ideology must be challenged, discredited and disparaged…

The current climate of 'alternative facts' will give way to 'alternative history' if we allow the village idiots to grow in number and take over the town.

The exposure of Jones and his lunatic fringe to the masses is inevitable. Only then will this disturbing cult of insanity be exposed and dealt with by mainstream society. The government and the police are bound by the first amendment to honor the conspiracy theorists' right to free speech. ***Society, however, is free to despise, renounce, shame and shun them; to administer social justice in response to their repugnant worldview and wicked deeds. Hoaxers need to be rejected and shamed by their families, their neighbors, their bosses, their co-works, their friends and their communities***…

Alex Jones has demonstrated that he has the respect and ear of our president, as disturbing as this may be to the majority of responsible citizens…. ***The very fact that Jones has some semblance of influence over our president's thinking speaks to my position that we should challenge his warped and pernicious views out in the open public forum***… Maybe then people will see the monster that he truly is."[106]

In Mr. Pozner's view, although Mr. Jones is clearly expressing his view points with regard to issues presented in society (i.e., gun debate among others), which is clearly protected under the First Amendment, Mr. Jones' free speech, and all those like him, should be despised, renounced, and shamed by his families, neighbors, bosses, friends and communities. Because, as Mr. Pozner stated, their opinions and voices should be eliminated entirely due their "repugnant worldview…" Thus, Mr. Pozner seeks to prevent and silence Mr. Jones and his companies from exercising their free speech, right to associate with others to collectively express and defend

---

[106] Exhibit B-35

common interests and prevent them from publicly participating in political debates that Mr. Pozner deems unworthy of their participation as a result of their viewpoints.[107]

This lawsuit, aimed directly at Mr. Jones and his companies, is specifically intended to silence them and prevent them from expressing their opinions on matters of public concern. Further, as Mr. Pozner wrote, the fact that President Trump respect's Mr. Jones is "disturbing" and the "very fact that Jones has some semblance of influence over" President Trump's thinking supports Mr. Pozner's position that Mr. Jones, as well as millions others, should simply not be allowed to exercise their free speech, associate with others to promote a common goal, or petition the government for issues that Mr. Pozner deems unworthy.

Furthermore, as demonstrated in sections II and III A, above, both Plaintiffs have assumed high profile status and have fully engaged in the national debate over gun control. In fact, when their efforts with legislators and United States Senators did not yield a comprehensive ban on assault rifles, Plaintiffs decided to resort to the judicial system to obtain what they otherwise could not. Their suit against Remington was designed to accomplish what their legislative efforts failed to do, and it might have worked as a result of Remington's bankruptcy.

Just as they campaigned against certain firearms and ammunition, Plaintiffs have dedicated their time and energies to silencing those who *express* doubts about official reports and *discuss* theories about the events at Sandy Hook that are not consistent with facts that are reported in the mainstream media. Mr. Pozner's life's mission is to force hoaxers to stop communicating through the internet.[108] As stated above, this "fight…has become his life's

---

[107] Moreover, the fact that Jones' has "some semblance of influence" with the President is another reason for this suit.
[108] Exhibit B-1

work."[109] They've even obtained that commitment of volunteers who have actively tracked and taken down conspiracy theories and videos.

Together with Mr. Pozner, Ms. De La Rosa campaigned against Professor Tracy and successfully had him fired as a professor for expressing his conspiracy theories about Sandy Hook. Then Mr. Pozner sued Wolfgang Halbig, who is one of the most vocal conspiracy theorists about Sandy Hook.[110] In his Florida lawsuit[111], Mr. Pozner stated, among other things, that:

> "Mr. Halbig, contrary to what official authorities have already established, created a…website…focused on exposing the truth behind Sandy Hook."[112]

Now that they have had success silencing some conspiracy theorists by obtaining Professor Tracy's firing and the removal of conspiracy theories and videos and after suing Mr. Halbig, Plaintiffs set their sights on Mr. Jones and his audience.

Plaintiffs' actions included speeches before the Newtown City Council, Connecticut state legislature and the United States Congress. One and/or both of them have appeared on camera for nationally televised programs on CNN, CBS and other networks, all in their quest to outlaw conspiracy theories, assault rifles, high-capacity clips and to increase firearm registration requirements. Plaintiffs have sued the maker of the firearm used at Sandy Hook, in part, to cause its withdrawal of the bushmaster and other assault style weapons from the market.

Finally, Plaintiffs' counsel, Mark Bankston admitted on national television the real reasons for suing Defendants. Speaking of Jones, Mr. Bankston said:

> "…he's not going away. He's been given, just a Washington correspondent, he's given White House credentials…Claims to have the President's ear…Um, we think it's time for this to end, and *that's why we brought these suits*.[113]

---

[109] Exhibit B-24
[110] Exhibit B-36 (https://www.facebook.com/WolfgangWHalbig)
[111] Exhibit B-37
[112] *Id*.

"…it's also *not just about the Sandy Hook parents*, either. You know, these parent have seen what happens to them for five years, being tormented. And now they're seeing *it happen to the Parkland parents. It's, it's time for this to end*."[114]

Plaintiffs' counsel's stark admissions confirm that this suit is really not about alleged defamation in the past year. Rather, it's about Plaintiffs' fear of Jones' influence in public debate and expressed desire to end that influence even on subjects not related to Plaintiffs or Sandy Hook at all.[115]

As the foregoing demonstrates, Plaintiffs have coordinated their efforts with others to ban certain weapons, ammunition and accessories and broaden gun owner restrictions. They have also coordinated and joined forces with others to silence Jones.

Plaintiffs filed this lawsuit on April 16, 2018. On that same day and using the same law firm, another lawsuit was filed against Jones by Neil Heslin alleging substantially similar facts and claims and seeking similar relief.[116] Like Plaintiffs, Mr. Heslin has been publicly active in the national debate over guns and, like Plaintiffs, his goal, in part, is to silence Jones and use his - and this lawsuit to shut down Jones' internet broadcast platform in order to restrict his and millions of others' ability to speak, associate and petition the government in opposition to Plaintiffs' and his goals to restrict gun ownership.

---

[113] Exhibit B-41 (emphasis added)
[114] *Id*. (emphasis added)
[115] During her Today Show broadcast with Plaintiffs' attorney Mark Bankston, Ms. Kelly referred to Plaintiffs and their lawsuit. She then turned to Mr. Bankston and referring to a woman who was sent to prison for threats against the Pozners, said of Jones "…and even *that* has not stopped him" Mr. Bankston then replied "No it has not. There's no sign that he's going away…he's not going away…claims to have the President's ear. We think it's time for this to end and that's why we brought ***these suits***." These statements were after Ms. Kelly asked Mr. Heslin why he filed his suit. He answered "Well, it's accountability and responsibility…it's been going on for four and a half, five years… It's a total disrespect to myself, my son, the individuals who lost their lives that day but it extends so much further than that. It's disrespect to the community and the law enforcement, the first responders…it's just not right and he needs to - it needs to stop."  See Exhibit B-41.
[116] Exhibit B-41

This continued coordination between Plaintiffs and Mr. Heslin is further evidence that their and his lawsuit are based on, related to or filed in response to Defendants' exercise of their constitutional rights.

Therefore, even if this Court deemed Plaintiffs' lawsuit and causes of action not being "factually predicated" upon Defendants' exercise of their constitutionally protected rights, the lawsuit and causes of action are nonetheless "based on, related to and in response to" Defendants' exercise of their constitutionally protected rights defined under the TCPA as in "there is some sort of connection, reference, or relationship between them."[117]

## B.  **Plaintiffs cannot establish by clear and specific evidence a prima facie case for each essential element of their claims**

Having established that the TCPA applies to this action, the burden shifts to the Plaintiffs to produce "clear and specific" evidence of the essential elements of their causes of action for Defamation and Defamation Per Se, Conspiracy, Respondeat Superior and Exemplary Damages.[118]

The Court in *In re Lipsky*[119] held that "[t]he words 'clear' and 'specific' in the context of this statute have been interpreted respectively to mean, for the former, 'unambiguous,' 'sure,' or 'free from doubt' and, for the latter, 'explicit' or 'relating to a particular named thing.'" Plaintiffs cannot show clear and specific evidence of each essential element of each of their claims.

### 1.    **Defamation**

Defamation is a false and injurious impression of a Plaintiff published without legal excuse.[120] Actionable defamation requires: (a) publication of a false statement of fact to a third

---

[117] *Cavin*, 2017 Tex. App. LEXIS 6511, at *39
[118] Tex. Civ. Prac. & Rem. Code §27.005(c)
[119] *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015)
[120] *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000)

party; (b) that was defamatory concerning the Plaintiff; (c) with the requisite degree of fault, and (d) that proximately caused damages.[121] Compensatory damages in defamation cases "must compensate for 'actual injuries' and cannot merely be 'a disguised disapproval of the defendant.'"[122]

### a. There is no clear and specific evidence that Defendants published a false statement of fact to a third party that was defamatory concerning the Plaintiffs

#### i. Defendants fall within the classification of "media Defendants"

Defendants in defamation actions are categorized as either media or non-media Defendants.[123] The term "media Defendant" includes members of the "traditional media," meaning print and broadcast media (e.g., newspapers, television stations, and radio stations)[124] and members of the electronic, or online, media.[125]

There is no dispute that the Defendants constitute "media Defendants." Even Plaintiffs' Original Petition acknowledges that the Defendants fall within the classification of "media."

> "Defendant Alex E. Jones… is the host of radio and web-based news programming, 'The Alex Jones Show,' and he owns and operates the website Infowars.com."[126]

Mr. Jones and his companies, Infowars and Free Speech, fall within both classifications of "media Defendants" as described above. Defendants' primary business is reporting the news and giving commentary and opinions. The online content involves matters of public concern.

---

[121] *Bos v. Smith*, 2018 Tex. LEXIS 524, *26 (Tex. 2018)
[122] *Brady v. Klentzman*, 515 S.W.3d 878, 886 (Tex. 2017)
[123] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 333 (1974)
[124] *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170-171 (Tex. 2003) (magazine publisher was print media); *UTV v. Ardmore, Inc.*, 82 S.W.3d 609, 610-611 (Tex. App.- San Antonio 2002, no pet.) (television station was broadcast media); *Greer v. Abraham*, 489 S.W.3d 440, 442-443 (Tex. 2016) (trial court found blogger qualified as print media).
[125] *Service Empls. Int'l Un. v. Professional Janitorial Serv.*, 415 S.W.3d 387, 398 (Tex. App.- Houston [1ˢᵗ Dist.] 2013, pet. denied)
[126] Plaintiffs' Original Petition, at ¶4

The Alex Jones channel on Youtube has more than two million subscribers[127] and according to NBC and Megyn Kelly, Jones' Youtube channel as received 1.3 billion views.[128]

> ii.     *Each complained of statement and/or broadcasts was made in connection with matters of public concern*

A statement is a matter of public concern if: (1) the statement can be "fairly considered as relating to any matter of political, social, or other concern to the community" or (2) the statement concerns "a subject of legitimate news interest that is, a subject of general interest and of value and concern to the public."[129] Whether a statement is a matter of public or private concern is a question of law.[130]

As is clear from viewing the statements and broadcasts in the context in which they were made, the gist of each complained of statement and broadcast is simply to convey the importance of questioning the reports put out by the government and mainstream media. In any manner, each of the complained of statements and broadcasts can "fairly be considered as relating to any matter of political, social, or other concern to the community." Because each statement and/or broadcast constitutes a matter of public concern, the First Amendment provides greater protection to each statement and/or broadcast.[131]

> iii.    *There are no false statements of fact or false impressions because each complained of statement and broadcast constitutes an opinion*

---

[127] Exhibit B-38
[128] Exhibit B-39
[129] *Snyder v. Phelps*, 562 U.S. 443, 453 (2011); *Brady v. Klentzman*, 515 S.W.3d 878, 884 (Tex. 2017)
[130] *Conick v. Myers*, 461 U.S. 138, 148 n.7 (1983)
[131] *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-759, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985) (plurality opinion) ("[Speech] concerning public affairs is more than self-expression; it is the essence of self-government… Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.")

Whether a statement was an actionable statement of fact is a question of law for this Court to decide.[132] A statement of fact "is not actionable unless a reasonable fact-finder could reasonably conclude that the statement implies an assertion of fact, considering the entire context of the statement."[133] Likewise, the "statement must also be objectively verifiable as fact."[134]

As the Texas Supreme Court has stated:

"[E]ven when a statement is verifiable as false, it does not give rise to liability if the 'entire context in which it was made' discloses that it is ***merely an opinion masquerading as a fact.***"[135]

In determining whether a statement is that of an opinion or fact, "the Court should: (1) analyze the common usage of the specific language to determine whether it has a precise, well understood core of meaning that conveys facts, or whether the statement is indefinite and ambiguous; (2) assess the statement's verifiability, that is, whether it is objectively capable of being prove true or false; (3) consider the entire context of the article  column, including cautionary language; and (4) evaluate the kind of writing or speech as to its presentation as commentary or 'hard' news."[136]

There is no clear and specific evidence that any specific statement from the April 22, April 28, and June 18, 2017, broadcasts constituted a statement of fact. Likewise, when considered in light of the broadcasts in their entirety, there is no clear and specific evidence that any of the broadcasts, ***as a whole***, conveyed a false impression regarding Plaintiffs. There is no clear and specific evidence that the complained of statements and broadcasts do not constitute Mr. Jones' commentary and simply providing his opinions.

---

[132] *Champion Printing & Copying LLC v. Nichols*, No. 03-15-00704, 2017 Tex. App. LEXIS 7909, at *52 (Tex. App.- Austin 2017, pet. denied) (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990)
[133] *Champion Printing & Copying LLC*, 2017 Tex. App. LEXIS 7909, at *52
[134] *Champion Printing & Copying LLC*, 2017 Tex. App. LEXIS 7909, at *52
[135] *Dallas Morning News, Inc. v. Tatum*, 2018 Tex. LEXIS 404, at *9-10 (citing *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002) (emphasis added)
[136] *Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 341 (Tex. App.- San Antonio 1988, writ denied)

In fact, many of the statements alleged to have been defamatory contain unambiguous language establishing that they were not statements of fact. With regard to the "blue-screen" or "green-screen" issue, there can simply be no statement of fact when Mr. Jones views a video of Anderson Cooper and provides his commentary and opinion with regard to possibilities as to why Mr. Cooper's nose disappeared on the video,[137] all the while directing the viewers' attention to the very video about which he opined. No reasonable reader or listener would interpret Mr. Jones' statements regarding the possibility of a "blue-screen" being used as a verifiably false statement of fact, and even if it is verifiable as false, the entire context in which it was made discloses that the statements are mere opinions "masquerading as a fact."[138]

Furthermore, in Mr. Jones' statement described in paragraph 23, he states "*I think* we should investigate everything…"[139] Clearly, nothing about the statement conveys or could be considered a "statement of fact." The same is true for the June 18, 2017, statement where Mr. Jones again stated that "*I do think* there's some cover-up and some manipulation."[140] These words clearly convey that the statement is that of Mr. Jones' opinion.

> iv.    *None of the statements or broadcasts are capable of being defamatory*

In making the initial determination of whether a publication is "capable of a defamatory meaning," this Court must "construe the publication 'as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.'"[141] Whether

---

[137] *Gray v. St. Martin's Press, Inc.*, 221 F.3d 234, 248 (1st Cir. 2000) (quoting *Haynes v. Alfred A. Knopf. Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (A false statement is not actionable if "'it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts…'").

[138] *Dallas Morning News, Inc. v. Tatum*, 2018 Tex. LEXIS 404, *910 (Tex. 2018); *see also Partington v. Bugliosi*, 56 F.3d 1147, 1156-1157 (9th Cir. 1995) ("[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment.").

[139] Plaintiffs' Original Petition, at ¶23 (emphasis added)

[140] Plaintiffs' Original Petition, at ¶25 (emphasis added)

[141] *D Magazine Partners, L.P.*, 529 S.W.3d at 434

---

a publication is "false and defamatory" depends on a "reasonable person's perception of the *__entirety of a publication__* and not merely on individual statements."[142] To qualify as defamatory, a statement should be derogatory, degrading, somewhat shocking, and contain elements of disgrace.[143] But a communication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that only hurts the Plaintiff's feelings, is not actionable.[144] Further, "it is not defamatory to accuse a person of doing that which he has a legal right to do."[145]

There is no clear and specific prima facie evidence that any of the alleged defamatory broadcasts or statements were, when considering a "reasonable person's perception of the entirety of a publication," capable of being defamatory. More specifically, even if Defendants' statements regarding the usage of a blue screen were false, they are simply incapable of being defamatory because, as the Austin Court of Appeals has held, it is "not defamatory to accuse" Ms. De La Rosa of "doing that which [she] has a legal right to do," which, in this case, is be interviewed in front of a blue screen.[146] Thus, regardless of the truth of the statement, it simply cannot possibly be construed as defamatory toward either Plaintiff.

> v.  *Plaintiffs' reliance on "innuendo" cannot expand the plain meaning of words or introduce a new matter*

On their face, none of the alleged defamatory statements could possibly be construed as defamatory, which is why Plaintiffs' apparently rely upon extrinsic evidence and claim that the non-defamatory statements and/or broadcasts are defamatory by innuendo. Essentially, no matter

---

[142] *D Magazine Partners, L.P.*, 529 S.W.3d at 434 (citing *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) (emphasis added); *MKC Energy Invs., Inc. v. Sheldon*, 182 S.W.3d 372, 378 (Tex. App.- Beaumont 2005, no pet.) ("The statements alleged to be defamatory must be viewed in their context; they may be false, abusive, unpleasant, or objectionable to the plaintiff and still not be defamatory in light of the surrounding circumstances… The entire communication- *__not mere isolated sentences or portions__*- must be considered.") (emphasis added).
[143] *Means v. ABCABCO, Inc.*, 315 S.W.3d 209, 214 (Tex. App.- Austin 2010, no pet.)
[144] *Means*, 315 S.W.3d at 214
[145] *Means*, 315 S.W.3d at 214
[146] *Means*, 315 S.W.3d at 214

---

what the statement and/or broadcast says on its face, Plaintiffs claim that, by implication and innuendo, Defendants are actually directly accusing them of participating in a massive governmental conspiracy that revolves around the death of Plaintiff's child. Essentially, Plaintiffs ask this Court to disregard unambiguous language and transform that which is incapable of being defamatory into something that is defamatory.

"[T]he innuendo cannot enlarge or restrict the natural meaning of words, introduce new matter, or make certain that which was uncertain, except in so far as it connects the words published with the extrinsic or explanatory circumstances alleged."[147] In other words, "innuendo" may not transform unambiguous, non-defamatory statement into a defamatory statement by means of an unreasonable explanation or some subjective, personal interpretation of the statement not readily understandable as affecting the reputation of the Plaintiff in the community.[148]

Here, the innuendo that Plaintiffs advance from each of the statements and/or broadcasts cannot be drawn from the text of the statements and/or evidence used to support such claims. Plaintiffs impermissibly seek to "enlarge . . . the natural meaning of words" and "introduce new matter." Their "innuendo" does not seek to explain or identify anything in the broadcasts. Instead, the "innuendo" drawn by Plaintiffs changes the plain meaning of words and seeks to introduce a new matter into language that is manifestly unambiguous. Plaintiffs' are attempting to change Mr. Jones' statements regarding the government and CNN, along with its history of

---

[147] *Billington v. Hous. Fire & Cas. Ins.*, 226 S.W.2d 494, 497 (Tex. Civ. App.- Fort Worth 1950, no writ) (quoting *Moore v. Leverett*, 52 S.W.2d 252, 255 (Tex. Com. App. 1932)).

[148] *See Gartman v. Hedgpeth*, 138 Tex. 73, 77 (Tex. 1941) ("If the words employed are in no proper sense ambiguous or doubtful and in their ordinary and proper signification convey no defamatory meaning, such meaning cannot be enlarged or restricted by innuendo averments… If the language claimed to be defamatory is not reasonably susceptible of the meaning ascribed to it by innuendo, the innuendo will be unavailing."); *see generally Schauer v. Memorial Care Systems*, 856 S.W.2d 437, 448 (Tex. App.- Houston [1st Dist.] 1993, no writ); *Newton v. Dallas Morning News*, 376 S.W.2d 396, 398-400 (Tex. Civ. App.- Dallas 1964, no writ); *Montgomery Ward & Co. v. Peaster*, 178 S.W.2d 302, 305 (Tex. Civ. App.- Eastland 1944, no writ)

using "blue-screens," into statements directed at Plaintiffs and claiming that they are involved in a massive governmental conspiracy. Such transformation is not allowed by law. Thus, there is no clear and specific evidence to support any of the innuendos claimed by Plaintiffs.

Plaintiffs are attempting to bring extraneous and irrelevant "background" facts regarding Defendants (each of which clearly falls outside of the one-year statute of limitations) and use them to transform and change the plain meaning of unambiguous statements and broadcasts made by Defendants that are incapable of being defamatory. The true complaints of Plaintiffs lie outside of the statute of limitations and this Court must focus on the specific publications themselves to determine whether they are capable of being defamatory.

>    vi.    None of the statements or broadcasts is "of and concerning" the Plaintiffs as they do not make even an "oblique reference" to either Plaintiff[149]

Plaintiffs must produce clear and specific evidence that "the disputed publications were 'of and concerning'" them.[150] As the Austin Court of Appeals stated:

> "There must be evidence showing that the attack was read as ***specifically directed at the plaintiff***… In other words, the publication 'must refer to some ascertained or ascertainable person and that person must be the plaintiff.'"[151]

There is no clear and specific evidence that others would recognize either Plaintiff as the object of the alleged defamatory statements and/or broadcasts. There is no clear and specific evidence that any of the alleged statements and/or broadcasts identifies or mentions, directly or indirectly, either Plaintiff. In fact, the only remote connection to any of the alleged defamatory statements was the fact that Ms. De La Rosa was being interviewed (though no audio was being

---

[149] Indeed, the law against group libel is clear. If a defamatory statement refers to a large group of persons, a defamation claim cannot be maintained by the group or by any individual in the group. According to Plaintiffs, the alleged statements would have also defamed all first responders, volunteers, law enforcement officers, medical professionals and others. Such breadth of a defamation claim is impermissible in Texas.
[150] *Cox Tex. Newspapers, L.P. v. Penick*, 219 S.W.3d 425, 434 (Tex. App.- Austin 2007, pet. denied)
[151] *Cox Tex. Newspapers, L.P.*, 219 S.W.3d at 434

played) by Anderson Cooper when Mr. Jones' expressed his opinion, regarding why Mr. Cooper's nose disappeared during the interview. Mr. Pozner's alleged direct or indirect connection to the defamatory statements and broadcasts is non-existent.

The specific statements and broadcasts that Plaintiffs complain of "cannot be 'of and concerning'" them because none of the broadcasts or statements "makes even an oblique reference to [the Plaintiffs] as an individual."[152] Therefore, Plaintiffs cannot meet their burden.

### c.    *There is no clear and specific evidence that Mr. Jones possessed the requisite degree of fault*

#### i.    *Plaintiffs are limited purpose public figures*

Each of the Plaintiffs became a limited-purpose public figure relating to subject matter of the statements of Mr. Jones. Each became prominent in public discussions and debates about circumstances relating to Sandy Hook and the subsequent heated public debate over gun control initiatives and the Second Amendment to the U.S. Constitution.

Limited-purpose public figures are "public figures only for a limited range of issues surrounding a particular public controversy.[153] According to the Austin Court of Appeals:

> "[Limited-purpose public figures] are persons who 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved… inviting attention and comment,' who 'inject[] themselves or [are] drawn into a particular public controversy… assum[ing] special prominence in the resolution of public questions,' 'thrusting [themselves] into the vortex of [a] public issues… [or] engag[ing] the public's attention in an attempt to influence its outcome."[154]

---

[152] *Cox Tex. Newspapers, L.P.*, 219 S.W.3d at 436 (citing *Sullivan*, 376 U.S. at 289)
[153] *Neyland v. Thompson*, No. 03-13-00643-CV, 2015 Tex. App. LEXIS 3337, at *18 (Tex. App.- Austin 2015, no pet.)
[154] *Neyland*, 2015 Tex. App. LEXIS 3337, at *18

The issue of public figure status is a constitutional question for the Court to decide.[155] In making this determination, this Court is guided by the Texas Supreme Court's analysis of the Fifth Circuit's decision in *Trotter v. Jack Anderson Enters., Inc.*[156] To determine whether an individual is a limited-purpose public figure, the Texas Supreme Court has followed a three-part test: "(1) the controversy at issue must be public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution; (2) the plaintiff must have more than a trivial or tangential role in the controversy; and (3) the alleged defamation must be germane to the plaintiff's participation in the controversy."[157]

     (A) <u>The controversy at issue is public both in the sense that people are discussing it and people other than the immediate participants in the controversy are likely to feel the impact of its resolution</u>

In analyzing the first of these three criteria, it is obvious that numerous commentators, journalists, analysts, and public officials immediately became engaged in discussions about the tragedy and its aftermath including how the repercussions would affect the debate about guns in the country. Such discussions were highly charged and publicly aired far and wide. The hotly contested debates regarding mass shootings, the government, conspiracy theories and gun control are clearly public issues that have a wide-spread reach on not only the parties involved in this lawsuit, but the entire nation.

     (B)    <u>Plaintiffs have more than a trivial or tangential role in the controversy</u>

To determine whether an individual had more than a trivial or tangential role in the controversy, a Court should consider whether the Plaintiff: (1) actively sought publicity

---

[155] *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)
[156] *Trotter v. Jack Anderson Enters., Inc.*, 818 F.2d 431 (5th Cir. 1987)
[157] *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571-72 (Tex. 1998)

surrounding the controversy; (2) had access to the media; and (3) voluntarily engaged in activities that necessarily involved the risk of increased exposure and injury to reputation.[158]

As was detailed above, both Mr. Pozner and Ms. De La Rosa had more than a trivial or tangential role in this controversy. Both Plaintiffs actively sought publicity surrounding these controversies; had access to the media; and voluntarily engaged in activities that necessarily involved the risk of public criticism.

(C)     <u>The alleged defamation is germane to the Plaintiffs' participation in the controversy</u>

It is clear from the nature of the current national controversy surrounding much of the subject matter of this litigation, as well as Plaintiffs' repeated and voluntary participation in that controversy stemming from the Sandy Hook shootings, that any criticism of them related to facts and events related to Sandy Hook and gun control would be germane to their participation in that controversy.

Sandy Hook has been at the epicenter of gun rights debates for more than five years. Four days after the tragedy, President Obama featured his call for greater gun control during his Rose Garden address at the Sandy Hook prayer vigil.[159] Since that time, 210 new laws have been enacted to strengthen gun safety and additional seven more states have background checks.[160]

Sandy Hook was widely considered a "watershed moment" in the national gun control debate. Retailers stopped selling "assault rifles" and investors pulled their money out of gun manufacturers. As West Virginia Senator Joe Manchin stated immediately afterwards, Sandy Hook "changed everything." ABC reported that the debate over gun control was already

---

[158] *Neyland*, 2015 Tex. App. LEXIS 3337, at *19 (citing *WFAA-TV, Inc.*, 978 S.W.2d at 572-573)
[159] Exhibit B-21
[160] Exhibit B-22

"fierce."[161] That fierce debate has continued unabated and Plaintiffs have been active and public participants in that debate.

Within that controversy reside the hundreds of thousands of opinions and discussions on the internet that reflect deep seated distrust of official government accounts of high profile tragedies. A google search conducted on June 22, 2018 of the term "Sandy Hook conspiracies" generated 4,160,000 articles. Searching "Sandy Hook shootings gun control" yielded more than 5,950,000 articles.[162]

There can be no doubt that Sandy Hook and subsequent investigations have been at the center of gun control debate in this country for years. It is not surprising then that these subjects have also been prominent in the debates relating to the Second Amendment in and among hundreds of thousands of internet sites and among those who question the governments' accounts of it. Contrary to their assertions, Plaintiffs have, at all relevant times to this lawsuit, been "limited-purpose public figures" in that debate.

## ii. *There is no clear and specific evidence of actual malice*

The distinction between a private plaintiff and a limited-purpose public figure in a defamation case is important because, while the private plaintiff need only show the broadcaster of an allegedly defamatory statement "knew of should have known" that the statement was false, a limited-purpose public figure plaintiff must show that the broadcaster had "actual knowledge that it was false or the statement was made with reckless disregard of whether it was false or not.[163] In other words, because Plaintiffs are limited-purpose public figures, they must establish that the Defendants acted with ***actual malice***.[164]

---

[161] Exhibit B-23
[162] Exhibit B, at ¶30
[163] *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)
[164] *Carr v. Brasher*, 776 S.W.2d 567, 571 (Tex. 1989)

The Texas Supreme Court has explained that "[a]ctual malice is not ill will; it is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true."[165] In fact, the "constitutional focus is on the defendant's attitude toward the truth, not his attitude toward the plaintiff."[166]

Further, "reckless disregard' is defined as a high degree of awareness of probable falsity, for proof of which the plaintiff must present 'sufficient evidence to permit the conclusion that the ***defendant in fact entertained serious doubts as to the truth of his publication***.'"[167]

The "actual malice" standard also differs depending on what Plaintiffs allege was defamatory. When a claim for defamation is based on individual statements, actual malice is defined as publishing a statement with knowledge of or reckless disregard for its falsity.[168]

However, if the defamation claim is based on an ***entire publication***, actual malice is defined as publishing a statement that the Defendant knew or strongly suspected could present, as a whole, a false and defamatory impression of events.[169] As the Texas Supreme Court has stated:

> "This rule stems from the actual malice standard's purpose of protecting innocent but erroneous speech on public issues, while deterring 'calculated falsehood.'" A publisher's presentation of facts may be misleading, even negligently so, but is not a 'calculated falsehood' unless the publisher knows or strongly suspects that it is misleading."[170]

Plaintiffs cannot show clear and specific evidence that actual malice was present in any of the alleged defamatory statements and/or broadcasts. Furthermore, mere questioning of

---

[165] *Carr*, 776 S.W.2d at 571
[166] *Greer v. Abraham*, 489 S.W.3d 440, 444 (Tex. 2016)
[167] *Carr*, 776 S.W.2d at 571 (emphasis added)
[168] *Neely*, 418 S.W.3d at 69
[169] *Turner v. KTRK TV, Inc.*, 38 S.W.3d 103, 120-121 (Tex. 2000)
[170] *Turner*, 38 S.W.3d at 120

official reports and citing inconsistencies in statements made by others is not evidence of actual malice.[171]

> ### d.    There is no clear and specific evidence that any alleged defamatory publication was the proximate cause of Plaintiffs' injuries

Finally, there is no clear and specific evidence that each of the alleged defamatory publications was the proximate cause of Plaintiffs' injuries.[172]

## 2.    Defamation Per Se

"Defamation per se refers to statements that are so obviously harmful that general damages… may be presumed."[173] A statement is defamatory per se "if the words in and of themselves are so obviously hurtful to the person aggrieved by them that they require no proof of injury… If the court must resort to innuendo or extrinsic evidence to determine that the statement was defamatory," then the alleged statement constitutes defamation per quod and "requires proof of injury and damages.[174]

There is no clear and specific evidence that any of the alleged defamatory statements and/or broadcasts, in and of themselves, were so obviously harmful or fall within one of the categories of defamation per se. There is no clear and specific evidence that the statements and/or broadcasts: (1) injured Plaintiffs' reputation and thus, exposed them to public hatred, contempt or ridicule, or financial injury; (2) impeached Plaintiffs' honesty, integrity, virtue, or

---

[171] *See, e.g., Bose*, 466 U.S. at 512-13 (choice of language to describe an "event 'that bristled with ambiguities' and descriptive challenges for the [speaker] . . . does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella.").
[172] *Bos*, 2018 Tex. LEXIS 524, at *27
[173] *Brady v. Klentzman*, 515 S.W.3d 878, 886 (Tex. 2017)
[174] *Barker v. Hurst*, 2018 Tex. App. LEXIS 4555 at 23 (Tex. App. – Houston [1st Dist.] June 21, 2018, *Main v. Royall*, 348 S.W.3d 381, 390 (Tex. App.- Dallas 2011, no pet.); *see also Moore v. Waldrop*, 166 S.W.3d 380, 386 (Tex. App.- Waco 2005, no pet.); *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 691 (Tex. App.- Houston [1st Dist.] 2013, pet. denied) ("If the court must resort to innuendo or extrinsic evidence to determine whether a statement is defamatory, then it is defamation *per quod* and requires proof of injury and damages.")

reputation; or (3) published Plaintiffs' natural defects and thus exposed Plaintiffs to public hatred, ridicule, or financial injury.

Further, there is no clear and specific evidence that the statements and/or broadcasts: (1) falsely charged Plaintiffs with the commission of a crime; (2) injured Plaintiffs in their office, profession or occupation; (3) imputed that Plaintiffs presently have a loathsome disease; or (4) imputed sexual misconduct to either Plaintiff. Therefore, there is no clear and specific evidence to support Plaintiffs' claims for defamation per se.

### 3. Conspiracy

Under Texas law, an action for civil conspiracy requires five elements: (a) a combination of two or more persons; (b) the persons seek to accomplish an object or course of action; (c) the persons reach a meeting of the minds on the object or course of action; (d) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (e) damages occur as a proximate result.[175]

### a. There is no clear and specific evidence of a combination of two or more persons

To prove conspiracy, the Plaintiffs must establish that the Defendant was a member of a combination of two or more persons.[176] However, Texas law is clear that a single entity cannot conspire with itself.[177] Because a corporation cannot conspire with itself, corporate agents cannot conspire with each other when they participate in corporate action.[178] Likewise, an agent cannot

---

[175] *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)

[176] *Firestone Steel Prods. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996)

[177] *Fisher v. Yates*, 953 S.W.2d 370, 382 (Tex. App.- Texarkana 1997, pet. denied); *see also Editorial Caballero, S.A. de C.V. v. Playboy Enters.*, 359 S.W.3d 318, 337 (Tex. App.- Corpus Christi 2012, pet. denied) ("[A] company cannot conspire with its own employees as a matter of law.")

[178] *Crouch v. Trinque*, 262 S.W.3d 417, 427 (Tex. App- Eastland 2008, no pet.); *Wilhite v. H.E. Butt Co.*, 812 S.W.2d 1, 5 (Tex. App.- Corpus Christi 1991, no writ) (holding that, as a matter of law, a corporation cannot conspire with itself, no matter how many agents of the corporation participate in the alleged conspiracy); *Bayou Terrace Inv. Corp. v. Lyles*, 881 S.W.2d 810, 815 (Tex. App.- Houston [1st Dist.] 1994, no writ) ("[A] corporation

conspire with its principal[179] because "the acts of an agent and its principal are the acts of a single entity, and cannot constitute conspiracy."[180]

There is no clear and specific evidence that any of the Defendants was a member of two or more persons. Mr. Jones is the sole member of Defendants Free Speech Systems LLC and Infowars LLC, and he cannot have conspired with himself or his own agents (i.e. employees or managers of the LLCs).[181] Thus, Plaintiffs' conspiracy claims fail as a matter of law.

### b. There is no clear and specific evidence that Defendants sought to accomplish an object or course of action

Plaintiffs also must establish that the object of the combination was to accomplish: (i) an unlawful purpose; or (ii) a lawful purpose by unlawful means.[182] The Plaintiffs must show that at least one of the named Defendants was liable for an underlying tort[183] because the basis of a conspiracy claim is the damage resulting from the commission of the trot, not the conspiracy itself.[184] Further, there can be no conspiracy to accomplish a lawful purpose by lawful means, even when the Defendants acted with malice, which is not the case here.[185]

There is no clear and specific evidence that the object of any alleged combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means. More specifically, because there is no clear and specific evidence to support the elements of Plaintiffs' defamation and defamation per se claims, the claim for conspiracy likewise fails.[186]

---

cannot conspire with its own management personnel or employees when they act within the scope of their employment or in an agency relationship.")
[179] *Bradford v. Vento*, 48 S.W.3d 749, 761 (Tex. 2001)
[180] *Lyons v. Lindsey Morden Claims Mgmt.*, 985 S.W.2d 86, 91 (Tex. App.- El Paso 1998, no pet.)
[181] See Exhibit A, ¶3
[182] *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 881 (Tex. 2010)
[183] *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996)
[184] *Schlumberger Well Surv. Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex. 1968)
[185] *Brown v. American Freehold Land Mortg. Co.*, 80 S.W. 985, 987 (Tex. 1904)
[186] *MKC Energy Invs., Inc.*, 182 S.W.3d at 378 ("When non-libel claims are based on a libel cause of action, the person claiming a defamatory statement must first establish the libel elements in order to recover on the non-libel

---

### c. There is no clear and specific evidence that Defendants reached a meeting of the minds on the object or course of action

In addition, Plaintiffs must also establish that the parties involved had a meeting of the minds about the object of their conspiracy.[187] To have a meeting of the minds, the conspirators must have knowledge of the object and purpose of the conspiracy.[188] A Defendant "without knowledge of the object and purpose of a conspiracy cannot be a conspirator; he cannot agree, either expressly or tacitly, to the commission of a wrong" of which he is not aware.[189] Likewise, "meeting of the minds" means there was an agreement or understanding between conspirators to inflict a wrong on another party.[190]

There is no clear and specific evidence that there was a "meeting of the minds" on the object or course of action between Defendants, irrespective of whether they are legally capable of conspiring with one another.

### d. There is no clear and specific evidence of one or more unlawful, overt acts that were taken in pursuance of the object or course of action

Plaintiffs must also establish that one of the persons involved committed at least one unlawful, overt act in furtherance of the conspiracy.[191] There is no clear and specific evidence that one or more persons committed at least one unlawful, overt act in furtherance of the alleged conspiracy.

---

claims."). In this case, Plaintiffs' non-defamation claim, conspiracy, rests entirely on their claim for defamation. Therefore, without prevailing on their claim for defamation, Plaintiffs' conspiracy claim fails as a matter of law.
[187] *Transport Ins. v. Faircloth*, 898 S.W.2d 269, 278 (Tex. 1995)
[188] *Schlumberger Well Surv. Corp.*, 435 S.W.2d at 857
[189] *Schlumberger Well Surv. Corp.*, 435 S.W.2d at 857
[190] *Chu v. Hong*, 249 S.W.3d 441, 446 (Tex. 2008) ("[Conspiracy Defendant] could only be liable for conspiracy if he agreed to the *injury* to be accomplished; agreeing to the *conduct* ultimately resulting in injury is not enough.") (emphasis in original).
[191] *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1982)

     ***e.    There is no clear and specific evidence that damages occurred as a proximate result***

Finally, Plaintiffs must also establish that they suffered damages as a proximate result of the wrongful act underlying the conspiracy.[192] Any recovery for a conspiracy is based on the injury caused by the underlying tort[193] because the conspiracy is not in itself a harm meriting damages.[194] There is no clear and specific evidence that damages occurred as a proximate result of any alleged conspiracy.

### 4.    Respondeat Superior

The elements of respondeat superior are: (a) the Plaintiff was injured as the result of a tort; (b) the tortfeasor was an employee of the Defendant; and (c) the tort was committed while the employee was acting within the scope of employment.

     ***a.    There is no clear and specific evidence that the Plaintiffs were injured as a result of a tort***

To hold a Defendant vicariously liable under respondeat superior, the Plaintiffs must prove that they were injured as the result of a tort.[195] There is no clear and specific evidence that the Plaintiffs were injured as a result of any tort.

     ***b.    There is no clear and specific evidence that any alleged tortfeasor was an employee of the Defendants***

---

[192] *ERI Consulting Eng'rs, Inc.*, 318 S.W.3d at 881
[193] *Lesikar v. Rappeport*, 33 S.W.3d 282, 301-302 (Tex. App.- Texarkana 2000, pet. denied)
[194] *Deaton v. United Mobile Networks, L.P.*, 926 S.W.2d 756, 760 (Tex. App.- Texarkana 1996) (no damages for conspiracy because it is not independent cause of action), *rev'd in part on other grounds*, 939 S.W.2d 146 (Tex. 1997)
[195] *G&H Towing Co. v. Magee*, 347 S.W.3d 293, 296 (Tex. 2011)

The Plaintiffs must also establish that the alleged tortfeasor was an employee of the Defendant.[196] There is no clear and specific evidence that any alleged tortfeasor was an employee of the Defendants.

### c.   There is no clear and specific evidence that any alleged tort was committed while the employee was acting within the scope of employment

Finally, the Plaintiffs must establish that the employee was acting within the scope of employment when the tort was committed.[197] There is no clear and specific evidence that that any alleged employee of the Defendants were acting within the scope of their employment when the tort was committed.

### 5.   Exemplary Damages

Pursuant to §73.055(c) of the Texas Civil Practice & Remedies Code:

> "If not later than the 90th day after receiving knowledge of the publication, the person does not request a correction, clarification, or retraction, the person may not recover exemplary damages."[198]

Plaintiffs did not contact Defendants about the Broadcasts within the ninety-day requirement. Instead, Plaintiffs waited until April 11, 2018, almost a year after the alleged defamatory statements and broadcasts were published, and just weeks before filing suit.[199] Accordingly, any claim for exemplary damages is barred.[200]

## C.   Defendants are entitled to dismissal because they can prove by a preponderance of the evidence each essential element of their defenses

---

[196] *Baptist Mem'l Hosp. Sys. v. Sampson*, 969 S.W.2d 945, 947 (Tex. 1998)
[197] *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 757 (Tex. 2007)
[198] Tex. Civ. Prac. & Rem. Code §73.055(c)
[199] Exhibit C, Taube Aff., at ¶5 and C-2 and Exhibit B, ¶47
[200] Tex. Civ. Prac. & Rem. Code §73.055(c).  Plaintiffs' Original Petition claims that they are "also entitled to exemplary damages because the Defendants acted with malice." Because of their failure to follow the statutory ninety-day requirement as described above, this claim against Defendants is barred as a matter of law.

Even if Plaintiffs were able to produce clear and specific evidence of each of their claims for defamation, defamation per se, conspiracy and respondeat superior, this Court must still nonetheless dismiss each of their claims because Defendants can establish one or more valid defenses to Plaintiffs' claims by a preponderance of the evidence.[201]

## 1.      Statute of Limitations

The limitations period for an action for defamation is one year.[202] To the extent that Plaintiffs argue and/or claim that somehow the alleged "long history" of defamatory statements described and included in paragraphs 36-58 of Plaintiffs' petition, constitute independent claims, such claims are barred by the statute of limitations. The focus of a defamation inquiry is whether the alleged defamatory statement/broadcast (in this case, the April 22, April 28 and June 18, 2017, broadcasts) are *in and of themselves* defamatory.

## 2.      Opinion

Jones' statements as described by Plaintiffs are merely his opinions. His statement to reporters at the end of his April 28 custody news conference is obvious opinion. His opinion is that he does not trust "government" because they "stage things".

> "I think we should investigate everything because *the government* has staged so much stuff, and then they lie and say that I said the whole thing was totally fake when I was playing Devil's advocate in a debate. I said maybe the whole thing is real, maybe the whole thing is fake. They were using blue-screens out there… Yes, *the governments* stage things."[203]

While others may not share his opinion that governments "stage things", and more importantly if others' opinion is that Jones is 'crazy', that is not relevant. Indeed, judging another's opinions and judging them against the "mainstream" would impermissibly stifle the

---

[201] Tex. Civ. Prac. & Rem. Code §27.005(d)
[202] Tex. Civ. Prac. & Rem. Code §16.002(a)
[203] Plaintiffs' Original Petition, at ¶23 (emphasis added)

free **thoughts** of **everyone**.[204] His opinion does not become actionable defamation simply because others disagree with it. Indeed, if the **reasons** some distrust government become relevant for defamation, then anyone at any time can be liable for defamation if they state distrust of the government and their **reasons** are not "acceptable".

Likewise his statements on April 22 question the government and CNN (and other mainstream media "if these are known liars") are filled with his opinions (that the mainstream media and government are not trustworthy and have misled the country to do morally wrong things).

> "And then we've got Anderson Cooper, famously, not just with the flowers blowing and a fake, but when he turns, his nose disappears repeatedly because the green-screen isn't set right. And they don't like to do live feeds because somebody might run up. CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in supposedly Syria. And all we're saying is, if these are known liars that lied about WMDs, and lied to get us in all these wars, and back the Arab Spring, and Libya, and Syria, and Egypt, and everywhere else to overthrow governments, and put in radical Islamicists… if they do that and have blood on their hands, and lied about the Iraq War, and were for the sanctions that killed half a million kids, and let the Islamicists… attack Serbia, and lied about Serbia launching the attach, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory? If you're not Dory from 'Finding Dory,' you know, the Disney movie. Thank god you're so stupid, thank god you have no memory. It all goes back to that."[205]

Plaintiffs – and perhaps the majority - may disagree with Jones' conclusions he has reached and opinions he has expressed based on those conclusions, but that does not lead to defamation claims for **false** statements. To the extent that Plaintiffs disagree with what they consider to be "facts" in this statement, considering these statements as a whole, it is clear to a reasonable reader/listener that the statements are merely opinion and personal surmise built upon those facts. Others may find these and other of Jones' statements unpleasant but even caustic,

---

[204] "His thoughts inhabit a different plane from those of ordinary men; the simplest interpretation of that is to call him crazy." ― Juliet Marillier, *The Dark Mirror*
[205] Plaintiffs' Original Petition, at ¶14

abusive, unflattering and offensive speech is not necessarily defamatory nor is speech that hurts the plaintiffs' feelings or is annoying, irksome or embarrassing defamatory.[206]

Furthermore, when one states a fact upon which he or she bases the opinion, or the opinion is based upon facts that are common knowledge, or the facts are readily accessible to the recipient, these fall into the category of pure opinion.[207] Even if not directed at CNN and the government, as they were, at most these statements were rhetorical hyperbole.[208]

Just as his statements on April 22 and April 28, the statements that NBC broadcast on June 18 were not defamatory and were merely opinions.

"I do think there's some cover-up and manipulation."

"...it looks like a drill."

"they don't get angry...(about dead Iraqis children and illegals)"

Neither are these statements factual nor are they defamatory. They are just Jones' opinions.

As stated above, whether a particular statement is a protected expression of opinion or an actionable statement of fact is a question of law for this Court.[209] "All assertions of opinion are protected by the first amendment of the United States Constitution and article I, section 8 of the Texas Constitution."[210] In determining whether a statement is that of an opinion, "the Court should: (1) analyze the common usage of the specific language to determine whether it has a precise, well understood core of meaning that conveys facts, or whether the statement is indefinite and ambiguous; (2) assess the statement's verifiability, that is, whether it is objectively

---

[206] *Barker v. Hurst*, 2018 Tex. App. LEXIS 4555 at 18 (Tex. App. – Houston [1st Dist.] June 21, 2018
[207] *Lizotte v. Welker*, 45 Conn. Supp. 217, 709 A. 2d 50, 59(Conn. Super. Ct 1996) cited by *Farias v. Garza*, 426 SW 3d 808, 819 (Tex. – App. San Antonio 2014, pet. denied)
[208] *Farias v. Garza*, 426 SW 3d 808, 819 ("secret, illegal and corrupt" and "blatant coverup attempt" were held to be rhetorical hyperbole)
[209] *Carr*, 776 S.W.2d at 570
[210] *Carr*, 776 S.W.2d at 570

capable of being prove true or false; (3) consider the entire context of the article column, including cautionary language; and (4) evaluate the kind of writing or speech as to its presentation as commentary or 'hard' news."[211]

### 3.    Infowars is not liable

Infowars, LLC has no relationship to Plaintiffs' claims. It does not own or operate the domain name or website located at http://www.infowars.com. It has never employed Alex Jones or Owen Shroyer. It has never had authority over or control of the content of the broadcasts including any of the allegedly defamatory broadcasts.[212]

### D.    Conclusion

The true gravamen of Plaintiffs' claim is that it is simply too hurtful for others, including Jones, to question aspects of the events surrounding the most tragic and sorrow-filled day in their lives. Others, understandably sympathetic to Plaintiffs' tremendous loss and in admiration of their perseverance and pursuit of their goals, likewise may feel repulsed by Jones' expressions and may be supportive of Plaintiffs' claims against Defendants. Clearly, to many, his speech is offensive. Just as clearly, speech can never be silenced because it offends or is unpopular.

During arguments before the United States Supreme Court in the emotion-laden case of Albert Snyder for defamation against protesters at his marine son's funeral, Justice Ginsburg asked if the First Amendment must tolerate "exploiting this bereaved family." The protesters carried signs saying "Thank God for Dead Soldiers" and "You're Going to Hell." The case pit the right of the father to grieve privately against the protesters' right to say what they want, no matter how offensive. The ACLU's position was clear even though it abhorred the content of the speech.

---

[211] *Yiamouyiannis v. Thompson*, 764 S.W.2d 338, 341 (Tex. App.- San Antonio 1988, writ denied)
[212] Exhibit B, ¶45

"The First Amendment really was designed to protect a debate at the fringes. You don't need the courts to protect speech that everybody agrees with, because that speech will be tolerated. You need a First Amendment to protect speech that people regard as intolerable or outrageous or offensive — because that is when the majority will wield its power to censor or suppress, and we have a First Amendment to prevent the government from doing that.[213]

Faced with the obvious and critical tension between the father's right to grieve in private and the First Amendment rights of the protesters to say such offensive and vile expressions, the Supreme Court held 8 to 1 for the protesters.[214] Recognizing this painful conflict between free speech and Mr. Snyder's terrible loss, the Court wrote:

"If there is a bedrock principle underlying the First Amendment, it is that government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable…indeed the point of all speech protection…is to shield just those choices of content that in someone's eyes are misguided, or even hurtful."[215]

"Speech is powerful. It can stir people to action, move them to tears of both joy and sorrow, and – as it did here – inflict great pain. On the facts before us, we cannot react to that pain by punishing the speaker. As a nation, we have chosen a different course – to protect even hurtful speech on public issues to ensure that we do not stifle public debate."[216]

———————

Because this suit is based on, relates to or is in response to the Defendants' exercise of their First Amendment rights, the TCPA applies. Because the Plaintiff's cannot provide clear and specific evidence of each element of each of their claims, this suit must be dismissed. This is especially so because Defendants have produced a preponderance of evidence establishing each element of their affirmative defenses.

---

[213] Exhibit B-40 ACLU Legal Director Steven Shapiro on NPR (https://www.aclu.org/blog/free-speech/protecting-outrageous-offensive-speech)
[214] *Snyder v. Phelps*, 562 U.S. 443 (2011)
[215] *Snyder* at 458
[216] *Id*. at 460-461

## VII.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Defendants respectfully requests that the Motion be granted and the Court grant them such other and further relief as the Court deems equitable, just and proper.

RESPECTFULLY SUBMITTED,

GLAST, PHILLIPS & MURRAY, P.C.


_____/s/ Mark C. Enoch_____
Mark C. Enoch
State Bar No. 06630360
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:    972-419-8366
Facsimile:    972-419-8329
fly63rc@verizon.net


ATTORNEY FOR DEFENDANTS


## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of June, 2018, the foregoing was sent via email and via efiletxcourts.gov's e-service system to the following:


Mark Bankston
Kaster Lynch Farrar & Ball
1010 Lamar, Suite 1600
Houston, TX 77002
713-221-8300
mark@fbtrial.com


_____/s/ Mark C. Enoch_____
Mark C. Enoch

NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 345th JUDICIAL DISTRICT |

## <u>AFFIDAVIT OF ALEX E. JONES</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned notary public, on this day personally appeared Alex E. Jones, known to me to be the person whose name is subscribed below, and who on his oath, deposed and stated as follows:

1.      My name is Alex E. Jones. I am over the age of 21 years, have never been convicted of a felony or crime involving moral turpitude, am of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts herein stated and they are true and correct.

2.      Regarding Plaintiffs' claims about the June 18, 2016 NBC video, I had no authority over or say in whether that would be broadcast and if so, what parts of my previous interview with Ms. Kelly would be aired. I recall that I spent more than 14 hours that day with the NBC crew and Ms. Kelly. I recall that I was interviewed by her while



EXHIBIT

*A*

the camera was recording for more than 10 plus hours. When it was aired, NBC played less than 18 minutes of my interview with Ms. Kelly. The excerpts that she and NBC chose to air did not accurately reflect my opinions that I expressed during the interview. I believe that the selective editing of the video was done to purposely mischaracterize my comments and opinions in order to increase their ratings.

3.      I am the sole member of Defendant Free Speech Systems, LLC and the sole member of Infowars, LLC.

Further Affiant Sayeth Not.

_____
Alex E. Jones

SWORN TO and SUBSCRIBED before me by Alex E. Jones on June 26 , 2018.

_____
Notary Public in and for
the State of Texas

My Commission Expires:

4-21-2022
_____



TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791368

NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 345th JUDICIAL DISTRICT |

## AFFIDAVIT OF DAVID JONES

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

BEFORE ME, the undersigned notary public, on this day personally appeared David Jones, known to me to be the person whose name is subscribed below, and who on his oath, deposed and stated as follows:

1.     My name is David Jones. I am over the age of 21 years, have never been convicted of a felony or crime involving moral turpitude, am of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts herein stated and they are true and correct.

2.     In preparing for this affidavit, I reviewed internet sites, articles and videos published on the internet and found several that are relevant to the issues in this case.

3.     I downloaded these articles and/or printed them directly from the internet websites. All of the attached exhibits are true and correct copies of the online articles.



EXHIBIT

B

4.      Attached to this affidavit marked as Exhibit B-1 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

5.      Attached to this affidavit marked as Exhibit B-2 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

6.      Attached to this affidavit marked as Exhibit B-3 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

7.      Attached to this affidavit marked as Exhibit B-4 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

8.      Attached to this affidavit marked as Exhibit B-5 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

9.      Attached to this affidavit marked as Exhibit B-6 is a true and correct copy of an article posted on the website described on the exhibit at the described url address

shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

10.     Attached to this affidavit marked as Exhibit B-7 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

11.     Attached to this affidavit marked as Exhibit B-8 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

12.     Attached to this affidavit marked as Exhibit B-9 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

13.     Attached to this affidavit marked as Exhibit B-10 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

14.     Attached to this affidavit marked as Exhibit B-11 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

15.     Attached to this affidavit marked as Exhibit B-12 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

16.     Attached to this affidavit marked as Exhibit B-13 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

17.     Attached to this affidavit marked as Exhibit B-14 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

18.     Attached to this affidavit marked as Exhibit B-15 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

19.     Attached to this affidavit marked as Exhibit B-16 is a thumb drive containing a true and correct copy of a video of CBS This Morning posted at the following url address: https://www.youtube.com/watch?v=orh-bte19qA dated November 14, 2017. This video is a true and correct copy of the video on that website as of the date of this affidavit.

20.     Attached to this affidavit marked as Exhibit B-17 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

21.     Attached to this affidavit marked as Exhibit B-18 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

22.     Attached to this affidavit marked as Exhibit B-19 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

23.     Attached to this affidavit marked as Exhibit B-20 is a thumb drive containing a true and correct copy of a video posted on the Sessions Law Firm website at the following url address: https://www.thesessionslawfirm.com/takeaways-sandy-hook-victims-lawsuit-remington-bushmaster. This video is a true and correct copy of the video on that website as of the date of this affidavit.

24.     Attached to this affidavit marked as Exhibit B-21 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

25.     Attached to this affidavit marked as Exhibit B-22 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

26.     Attached to this affidavit marked as Exhibit B-23 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

27.     Attached to this affidavit marked as Exhibit B-24 is a true and correct copy of an article posted on the website described on the exhibit at the described url address shown. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

28.     Attached to this affidavit marked as Exhibit B-25 is a thumb drive containing a true and correct copy of a video of Ms. De La Rosa's (then Pozner) address to the Connecticut State Legislature, the URL address is: https://www.youtube.com/watch?v=MyYWTbkurIQ.  This video is a true and correct copy of the video on that website as of the date of this affidavit.

29.     Attached to this affidavit marked as Exhibit B-26 is a thumb drive containing a true and correct copy of a video of Ms. De La Rosa's speech on the steps of the Connecticut State Capital.  This video was found at the URL address https://vimeo.com/183824842.  This video is a true and correct copy of the video on that website as of the date of this affidavit.

30.     I did a Google search via Safari on June 22, 2018 of the term "sandy Hook Conspiracies" and it generated 4,160,000 articles. On that same day, I searched the term "Sandy Hook shootings gun control" and that Google search yielded 5,930,000 articles. Also on that date I searched the terms "Veronique Pozner gun control" and "Leonard Pozner gun control" and Google reported 39,500 and 582,000 articles respectively. A search I conducted on that same day of the term "Veronique De La Rosa gun control" yielded 451,000 resulting articles.

31.     Attached hereto marked as Exhibit B-27 is a true and correct copy of an article posted on the www.Honr.com website at http://nymag.com/selectall/2016/12/sandy-hook-parent-fights-an-emboldened-conspiracy-culture.html. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

32.     Attached hereto marked as Exhibit B-28 (and inserted into the Motion is a true and correct copy of a screen shot photo of Anderson Cooper on the phone with "Len Pozner" taken from a video interview between the two at https://www.youtube.com/watch?v=P-L5qkS4NSM. The exhibit is a true and correct screen shot taken from that video as of the date of this affidavit.

33.     Attached hereto marked as Exhibit B-29 is a true and correct copy of a screen shot photo taken from a video at https://www.youtube.com/watch?v=MyYWTbkurIQ. The exhibit is a true and correct screen shot taken from that video as of the date of this affidavit.

34.    Attached hereto marked as Exhibit B-30 is a true and correct copy of a screen shot photo taken from a video at https://www.youtube.com/watch?v=MyYWTbkurIQ. The exhibit is a true and correct screen shot taken from that video as of the date of this affidavit.

35.    Exhibit 31 was supplied by counsel.

36.    Attached hereto marked as Exhibit B-32 is a true and correct copy of a screen shot photo taken from a video at https://www.youtube.com/watch?v=dLuefNBZWPo. The exhibit is a true and correct screen shot taken from that video as of the date of this affidavit.

37.    Attached hereto marked as Exhibit B-33 is a true and correct copy of a screen shot photo taken from a video at https://www.youtube.com/watch?v=4xQ6zcBvPhE. The exhibit is a true and correct screen shot taken from that video as of the date of this affidavit.

38.    Attached hereto marked as Exhibit B-34 is a thumb drive containing and true and correct copy of a video posted at https://www.cnn.com/videos/us/2018/04/19/sandy-hook-parent-alex-jones-lawsuit-cooper-intv-sot-ac.cnn.The video contained on this exhibit is a true and correct copy of that video as of the date of this affidavit.

39.    Attached hereto marked as Exhibit B-35 is a true and correct copy of an article by Mr. Pozner posted at http://nymag.com/selectall/2016/12/sandy-hook-parent-fights-an-emboldened-conspiracy-culture.html. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

40.     Attached hereto marked as Exhibit B-36 is a true and correct copy of Mr. Halbig's Facebook post of Wolfgang Halbig at https://www.facebook.com/WolfgangWHalbig. This exhibit is a true and correct copy of the pages on that website as of the date of this affidavit.

41.     Attached hereto marked as Exhibit B-37 is a true and correct copy of a Complaint filed by Mr. Pozner against Wolfgang Halbig posted at https://courtrecords.lakecountyclerk.org/ShowCaseWeb/sci/docket/document.     This exhibit is a true and correct copy of the Complaint on that website as of the date of this affidavit.

42.     Attached hereto marked as Exhibit B-38 is a true and correct copy of part of the first page of The Alex Jones Channel on Youtube at https://www.youtube.com/user/TheAlexJonesChannel. This exhibit is a true and correct copy of the pages on that website as of the date of this affidavit.

43.     Attached hereto marked as Exhibit B-39 is true and correct transcription of the NBC/Megyn Kelly interview of Alex Jones on June 18, 2017. I have watched the broadcast and compared it to this transcription and it is a true and correct transcription.

44.     Attached hereto marked as Exhibit B-40 is a true and correct copy of an article by posted at https://www.aclu.org/blog/free-speech/protecting-outrageous-offensive-speech. This exhibit is a true and correct copy of the article on that website as of the date of this affidavit.

45.     Attached hereto marked as Exhibit B-41 is a true and correct transcription of the NBC/Megyn Kelly interview on the Today Show of Neil Heslin and Mark

Bankston posted at https://www.today.com/video/father-of-slain-sandy-hook-student-alex-jones-must-come-clean-on-his-lies-1214528067835. I have watched the video and compared it to this transcription and it is a true and correct transcription.

46.     I am the Manager of HR and Corporate Governance of Free Speech, LLC ("FSS"). I have worked in this position since 2013. In that role I have become knowledgeable about FSS's business activities, operations and staff. I have personal knowledge and knowledge based on my access to and review of corporate records. Defendant Infowars, LLC does not own or operate the domain name or website located at http://www.infowars.com. Defendant Infowars, LLC has never employed Alex Jones or Owen Shroyer and has never had authority over or control of the content of the broadcasts. In particular, Defendant Infowars, LL did not have authority over or control of the content of any of the broadcasts which are alleged in Plaintiffs' claims to have been defamatory.

47.     I also know that the first time Defendants received any letter objecting to any of the broadcasts claimed to be defamatory in the suit is on April 11, 2018. A true and correct copy of that first letter is attached to the Taube affidavit as Exhibit C-2. Prior to that time, neither Plaintiffs nor any other person on their behalf complained about the broadcasts referred to in Plaintiffs petition. C-2 was received by Defendants more than 90 days after the last complained-of broadcast.

48.     Attached hereto marked as Exhibit B-42 is a true and correct transcription of the July 20, 2017 video broadcast in which statements were made that are alleged by

Plaintiffs to have been defamatory. I have watched the video of that broadcast and compared it to this transcription and it is a true and correct transcription.

49.     Attached hereto marked as Exhibit B-43 is a true and correct transcription of the April 22, 2017 video broadcast in which statements were made that are alleged by Plaintiffs to have been defamatory. I have watched the video of that broadcast and compared it to this transcription and it is a true and correct transcription.

50.     Attached hereto marked as Exhibit B-44 is a true and correct copy of the Plaintiff's Original Petition and Request for Disclosure filed in cause number D-1-GN-18-001835, styled "*Neil Heslin vs. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer*." I have reviewed the document and it is a true and correct copy of the original received in that proceeding.

Further Affiant Sayeth Not.

_____
David Jones

SWORN TO and SUBSCRIBED before me by David Jones on June 25th, 2018.

_____
Notary Public in and for
the State of Texas

My Commission Expires:

4-21-2022

TIMOTHY JAMES FRUGE
Notary Public, State of Texas
Comm. Expires 04-21-2022
Notary ID 129791368

AFFIDAVIT OF DAVID JONES – Page 11

6/20/2018, 2:33 PM

Sandy Hook | HONR Network - Sandy Hook honor network



Home     NEWS     Call to ACTION >     Blog     Links >     About Us >     Donate



EXHIBIT

B-1

1 of 5

### The Sandy Hook Tragedy Didn't End at Sandy Hook – You Can Help End It Now

We bring awareness to the cruelty and criminality of abusive activity that victims and their families are shockingly subjected to following violent mass tragedies like Sandy Hook.  We refer to those who wittingly and publicly defame, harass, and emotionally abuse victims of high-profile mass tragedies as "hoaxers," due to their irrational belief that these tragedies are government-staged hoaxes, and their victims are paid crisis actors.

Existing laws make it very difficult and costly to prosecute hoaxers, which only emboldens them to spread defamation and disinformation, as well as employ intrusive and threatening behavior with relative impunity.  We are working toward affecting positive changes to existing laws as well as the creation of new legislation, so that society can hold these abusers personally accountable for their actions, providing much-needed relief to the victims and their families.

In the aftermath of horrific tragedies such as the mass shootings at Sandy Hook Elementary School, the Orlando Pulse nightclub, Santa Barbara, the Aurora Theater, and even the Boston Marathon bombing, the "hoaxer" element of society

(who ironically call themselves "truthers") have seized on what they see as an opportunity to advance their conspiracy theorist mindset upon the masses by posting speculation and disinformation on internet blogs, social media sites, and YouTube. The core of their belief is that violent mass tragedies were simply staged events, perpetrated by the government to more easily limit civil liberties, especially those involving the second amendment.

Rather than focusing their irrational scrutiny and accusations on the authorities they believe to be responsible, hoaxers take the path of least resistance, harassing and emotionally abusing the victims' family members online, on the telephone, and even in person (see _Sandy Hook Denier Arrested After Death Threats Made to Parent of Victim_). This practice allows them to feel as though they are advancing their views while staying safely away from the clutches of the authorities. Hoaxers take a cowardly and malicious approach to being heard, with little regard for those they harm in the process.

There is a critical social necessity to force hoaxers into alternative avenues to express these extreme and harmful ideas, which don't directly impact victims' family members or anyone else involved in the daily management of the tragedies. In many cases, emergency service workers and witnesses are not spared from the hoaxers' hostility and harassment.

**HONR Network is a _501.c.3 non-profit_ organization dedicated to Stopping the Continual and Intentional**

**Torment of Victims.**

## Useful Links

- Home
- News
- Call to ACTION
  - Facebook
  - YouTube
  - Twitter
  - PayPal
  - Blogger
  - Imgur
- Blog
- Links
  - My Sandy Hook Family
  - Sandy Hook Facts

261 S Main Street
#322
Newtown ,CT
06470

## Useful Links

- Who believes in conspiracy theories and why
- How Hoaxers determine False Flag
- Why people believe in conspiracy theories
- Why do people believe in conspiracy theories
- Why Rational

## Mission

Families in grief have the right to do so in peace and dignity. Regrettably, victims' families are being cheated out of this basic human dignity and being subjected to unspeakable harassment on a daily basis. We need to band together as a community of caring individuals and act to stop these abusers from

- Wolfgang Halbig Biography

people buy into Conspiracy theories

- Fake News Website

- Names of Hoaxers in your family

- About Us

- **Donate**

- Contact Us

inflicting any further harm to people who have committed no crime and simply want to be left alone to grieve their loved ones and live out the rest of their lives in peace.

Read more

Copyright © www.honr.com . All Rights Reserved.



# NEWS - HONR Network





EXHIBIT

B-2

22-01021-hcm   Doc#1-3   Filed 04/18/22   Entered 04/18/22 12:34:52   Exhibit B   Pg 101 of 419



**Sandy Hook Father Fights Conspiracy Theories That Emerge After Mass Shootings**



# Truthers: When Conspiracy Meets Reality

In this special report, we explore conspiracy movements that target friends and families of victims in mass tragedies — from the 2012 shooting at Sandy Hook Elementary to the one at Pulse nightclub ...





## How Jewish Family Of Sandy Hook Victim Was Driven Out Of Boca Raton

**B**

### Sandy Hook dad battles truthers nearly five years after massacre





## The hoaxers harassing Las Vegas victims

The news crews move on but the impact of a mass shooting such as the one in Las Vegas can last a lifetime for the injured and the families of the victims left grieving for their loved ones. Most ...

## BBC Radio – The Sandy Hook Deniers

A paranoid conspiracy theory has acquired a new and disturbing power in America, and it has been spread by an alternative media outfit that has been linked to President Trump. Twenty-six people, ...

## BBC Trending: The Sandy Hook Hoaxers

Sandy Hook to Trump: 'Help us stop conspiracy theorists' It was one of the worst school shootings in American history, but some people insist that the Sandy Hook massacre never happened. ...

## Sandy Hook Truthers are the worst

Lenny Pozner's young son died in the Sandy Hook mass killing. Conspiracy theorists believe the killing was staged. Pozner's efforts to educate them, to prove that his son died, only ...

## The Father taking on the Sandy Hook Troll

22-01021-hcm   Doc#1-3   Filed 04/18/22   Entered 04/18/22 12:34:52   Exhibit B   Pg 104 of 419

Listen in pop-out player Four years ago, a gunman walked into the Sandy Hook
Elementary School in Newtown in the American state of Connecticut and shot
dead 20 children and six adults. The youngest ...

## Sandy Hook dad fights lies about murdered son

Here is the reality that Lenny Pozner faces every day: On a Friday morning four
years ago, Lenny dropped off his son, Noah, at Sandy Hook Elementary School in
Newtown, Conn. It was three weeks after ...

## Noah lebt nicht mehr – Süddeutsche Zeitung

Noah und 19 weitere Kinder sterben an diesem Tag, es ist der 14. Dezember
2012, ebenso sechs Angestellte der Schule, die Mutter des Attentäters und auch
der Attentäter selbst, er tötet sich ...

## The Sandy Hook Hoax – New York

On December 14, 2012, Lenny Pozner dropped off his three children, Sophia,
Arielle, and Noah, at Sandy Hook Elementary School in Newtown, Connecticut.
Noah had recently turned 6, and on the drive ...

## USA – Honouring Noah

Veronique Pozner has "cried enough tears to fill an ocean" in the past three
years. Her six-year-old son Noah was ripped from her by a man with a military
style assault rifle at Sandy Hook ...

## FOREIGN CORRESPONDENT – Honouring Noah

Veronique Pozner has "cried enough tears to fill an ocean" in the past three
years. Her six-year-old son Noah was ripped from her by a man with a military
style assault rifle at Sandy Hook ...

## Honouring Noah ABC

Veronique Pozner has "cried enough tears to fill an ocean" in the past three

years. Her six-year-old son Noah was ripped from her by a man with a military-style assault rifle at Sandy Hook ...

## What Kind of Person Calls a Mass Shooting a Hoax?

A Year and a half after the mass shooting at Sandy Hook Elementary School in Newtown, Connecticut, Lenny Pozner called to set up a meeting with Wolfgang Halbig. The 68-year-old security consultant ...

## Father of Little Boy Murdered at Sandy Hook Speaks

The loss of a child is a pain few parents can imagine. For those whose children were brutally murdered at the Sandy Hook Elementary School (SHES) on December 14, 2012, in Newtown, Connecticut, that ...

22-01021-hcm  Doc#1-3  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B  Pg 106 of 419

**Sandy Hook dad battles truthers nearly five years after Newtown massacre: 'I'm not the type to turn a blind eye'**

*Nancy Dillon*



Leonard Pozner with his son Noah who died at Sandy Hook in 2012. (Courtesy of Leonard Pozner)

Every morning, Sandy Hook dad Lenny Pozner opens his sock drawer to get dressed — and there they are.

His dead son's striped pajamas, Batman costume and green flip-flops mixed in with his own fresh laundry.

"Every day I open it, and every day he's sort of present when I go through that ritual," Pozner told the Daily News. "Noah is never far from my mind. I'm always focusing on Noah."

Noah was the youngest of the 20 innocent children and six adults gunned down on Dec. 14, 2012, at Sandy Hook Elementary in Newtown, Conn.

The adorable 6-year-old with apple cheeks and an irresistible smile arrived on campus that day with his twin sister Arielle and older sibling Sophia — and within an hour, his tiny body was riddled with bullets from a Bushmaster AR-15.

Five years later, Lenny Pozner still feels an unfathomable void. That's something he expected.

EXHIBIT
B-3
tabbies



Noah Pozner, 6, was one of the victims in the Sandy Hook elementary school shooting in Newtown, Conn., on Dec. 14, 2012. (Uncredited/ASSOCIATED PRESS)

What he didn't expect were the still-unrelenting attacks from people he's never even met.

Photos of Noah and the other victims continue to get picked apart online by so-called Sandy Hook "truthers" — conspiracy theorists who claim the massacre was staged by crisis actors.

Pozner, 50, tried to ignore the cruelty at first, but by 2014, he founded HONR Network, an organization that actively combats online abuse of victims of public shootings.

- News

**Daily News covers on mass shootings since Sandy Hook**

"I guess I'm just not the type to turn a blind eye and pretend it doesn't exist," Pozner told The News.

He's now fighting the hate and misinformation on many fronts. He flags content for removal, files police reports, pursues civil litigation – and publicly calls people out.

"This is my battle. I didn't pick it. It picked me," he said.

It stands to reason Pozner's work might compound his grief, opening him up to further abuse from online trolls who relish an engaged target.



(HONR Network)

But Pozner believes the problem is only getting worse, and soon his daughters will be old enough to venture onto the Internet unchaperoned.

The sisters were in adjacent rooms when their brother was murdered. He hopes they don't remember much, but he knows eventually they'll seek answers.

"They were in a war zone, where people were dying and screaming," he said. "They have that soundtrack somewhere deep in their minds."

Even before Sandy Hook, wild conspiracy theories were becoming an expected ancillary to mass-casualty events.

Arielle Pozner, Noah's sister, at Noah's grave. (Courtesy Leonard Pozner)

Indeed, Sandy Hook denier Alex Jones landed a primetime interview with NBC's Megyn Kelly in June. Two months later, actor Scott Baio retweeted a meme suggesting the mom of slain Sandy Hook teacher Vicki Soto was the same crisis actor posing as the mom of Charlottesville car attack victim Heather Heyer.

After some backlash, Baio apologized for pushing the outrageous meme, but Soto's sister said it was hard to forgive.

"To be honest, it's heartbreaking," Jillian Soto told The News in August. "My family has been attacked over and over. What people don't understand is that no matter what they believe, every time this comes up, it rips my family apart."

When a New York man who acknowledges Sandy Hook took place but pushes other conspiracy theories online started sparring with HONR more than a year ago, Pozner refused to back down. He reported the man to police.

(New York Daily News)

The exchange quickly turned "very dark," he said.

The man emailed the manager of Pozner's former Florida apartment complex in October 2016 and accused Pozner of exploiting "children" online.

In March, the man's sister contacted Boca Raton cops to claim Pozner targeted her 11-year-old daughter by posting a photo of the minor without consent, police reports obtained by The News said.

The woman's accusations were ultimately deemed "unfounded," an April police report confirmed.

Pozner later identified the woman on his blog and claimed she knowingly filed "a fraudulent report targeting the parent of a victim of a violent crime." The detective on the case thought that was too much.

According to Pozner, Detective John Turek "yelled" at him during a "menacing" call, threatened to arrest him and triggered his diagnosed post-traumatic stress disorder.

Veronique Pozner, mother of Noah Pozner, arrives at his gravesite for his burial at the B'nai Israel Cemetery in Monroe, Conn., on Dec. 17, 2012. (SHANNON STAPLETON/Reuters)

"I took the post down immediately. I'm not butting heads with law enforcement. My work isn't really about that, but it bothers me," Pozner told The News. "Why shouldn't people be shamed when attacking others this way? I have every right to take such action to deter others from harassing victims."

Pozner filed a complaint against Turek with Boca Raton police and sent an email to the city's mayor. He got a letter in late August saying an investigation found "no evidence" Turek violated department policy.

"At a minimum, I want Detective Turek sent for retraining," Pozner said. "I was the victim of a really bizarre, false report, but he spun it around and turned me into the aggressor targeting her. Really all I did was post something in my defense."

A police spokesman disagreed with Pozner's position.

(New York Daily News)

"This case was a suspicious incident and never became a criminal investigation," Mark Economou told The News.

He said Turek warned Pozner he might be in violation of a cyberstalking statute if he didn't leave the woman alone but also expressed "he was sorry for the loss of his son."

There's no question Pozner has received a crash course on criminal jurisdictions and the law while processing his personal pain.

In June, 57-year-old Lucy Richards of Florida was sentenced to five months in federal prison for death threats against Pozner.

In civil court, Pozner is still pressing his lawsuit filed two years ago against truther Wolfgang Halbig.

Halbig, 70, is a main champion of the theory the hundreds of schoolchildren, parents, teachers, police and firefighters at Sandy Hook staged the tragedy and fabricated bloodshed to spur gun control.

Officials are on the scene outside of Sandy Hook Elementary School in Newtown, Conn., where authorities say a gunman opened fire inside an elementary school on Dec. 14, 2012. (Julio Cortez/AP)

When he saw an opportunity, Pozner sued Halbig in 2015 for posting his address, email and phone number online.

Halbig has largely represented himself in the case and turned the process into a "circus," Pozner said. Next month, Pozner is due to sit for a deposition. Halbig is pressing the court for permission to videotape it.

"He wants to get me on camera to further the truther circus, to get YouTube videos and pound his chest and make money," Pozner said.

"I've wasted $30,000 trying to get something done," he said of the lawsuit.

Asked why he doesn't just abandon the legal action, Pozner said it's a tough call.

"If I drop it, Wolfgang will be running up and down streets with a flag screaming victory. It's very tragic and disturbing to allow him to gain any more ground in his twisted endeavor," he said.

(HONR Network)

During interviews with The News, Pozner's voice was soft and melancholy, belying the ferocity of his online crusade.

He and his team of HONR volunteers actively hunt down abusive content and engage with its posters on a near daily basis.

After Virginia TV reporter Alison Parker was fatally shot during a live broadcast, her family hooked up with HONR to combat unauthorized postings of the graphic video recorded by the deranged gunman.

"Lenny and his volunteers have done a great job on my behalf. There's a lot less content of Alison on YouTube because of their work," Alison's dad, Andy Parker, told The News.

He said Pozner is much more aggressive than he could ever be.

For his part, Pozner said he's paying a personal price, but he believes the work is necessary.

(New York Daily News)

"I'm sort of this targeted, victimized nomad at this point," he said. "I've moved twice this year alone."

He has no plans to relent, not while social media platforms "give voice to people who don't think in a healthy way" and allow them to link up and amplify toxic rhetoric, he said.

"In the past, their message would not have spread as quickly and infected the thoughts of younger people. But now the momentum is huge," he said.

# Sandy Hook father Leonard Pozner on death threats: 'I never imagined I'd have to fight for my child's legacy' | US news

*Hadley Freeman*

Noah Pozner was reluctant to go to school that day. A mischievous little boy, who had celebrated his sixth birthday three weeks earlier, he stayed in bed too long and dragged his feet getting ready. "I said to him: 'Come on, Noah, we gotta get moving," his father, Leonard (also known as Lenny) recalls, having thought about the morning of 14 December 2012 so often he can almost talk about it mechanically. But the drive was fun: Noah, his twin sister, Arielle, and older sister, Sophia, listened to Gangnam Style, one of Noah's favourite songs. Noah always sat in the back seat and Leonard tickled his ankle as he drove along. At school, Noah jumped out, his backpack in one hand, his jacket in the other. He was wearing a Batman shirt and Spider-Man trainers. "I said: 'I love you, have a great day,' and that was the last thing I ever said to him," says Pozner. After all, he adds, "Not even Batman could have stopped an AR-15."

Noah was the youngest victim of the Sandy Hook elementary school shooting, murdered about half an hour after his father dropped him off. A sweet-faced, big-eyed, brown-haired boy, his tiny body took multiple bullets. His jaw was blown off, as was his left hand, and his beloved Batman shirt was soaked with blood. For his funeral, his mother, Veronique, insisted he have an open casket.



"I want the world to see what they did to my baby," she said at the time.

Today, Pozner tries to look on the bright side. "I could have lost three kids that



EXHIBIT
B-4

day because the other two were in rooms adjacent to Noah's classroom. They were all in the shooter's footprint."

Even in a country all too used to mass shootings, the merciless killing in Newtown, Connecticut of 20 six- and seven-year-olds, along with six of the school's employees, retains a terrible hold on the US's imagination, gripping the memory after too many other shootings have faded away. For most, it is too horrible to mention without a shudder. But for a tenacious few, it is too horrible to believe, and soon after Noah was killed, when Pozner thought he had already seen the worst of humanity, he came into contact with the latter group.

Just days after the massacre, when the US was still reeling from the tragedy, and Pozner himself was, he says, "pretty much in a catatonic state", the theories started spreading: Sandy Hook had never happened, it was staged by actors, the children had never existed, it was a ruse by President Obama/the anti-gun movement/the "New World Order global elitists". So-called Sandy Hook truthers – Pozner prefers the term hoaxer – pored over photos of the families and children on social media, triumphantly pointing to any visual similarities they could find between the dead children and living ones. The families were harassed by hoaxers, online and off, insisting that they stop their fake grieving. When Pozner roused himself from his catatonic grief to post photos of Noah online, hoaxers would leave comments: "Fake kid", "Didn't die", "Fucking liar".

Pozner and I speak by phone. His voice is sad and heavy, but he talks easily. He and Veronique were separated at the time of the shooting, sharing custody of their kids. They reunited in the wake of Noah's death, but that soon fell apart. Pozner has moved half a dozen times since Noah's death, always staying near Veronique and their daughters, and is moving again soon after our interview. Partly, this is because each move is a new start, "and I need that sometimes", he says. But it is also because he has to keep ahead of the people who, for the past five years, have been sending him death threats, purely because his son was killed in Sandy Hook.

The week before our interview, a judge issued a warrant for the arrest of Lucy Richards. She is alleged to have sent messages to Pozner, including one that read: "Death is coming to you real soon and nothing you can do about it." That was bad, Pozner agrees, but not necessarily the most unsettling. After all, others have put photos of his house on the web and reported him to child-protection services. "This is the world I deal with now," says Pozner.

I started corresponding with Pozner in September 2016, after I read an article about him in a US magazine. He saw me tweeting about it and got in touch. I was surprised at how grateful he seemed for my sympathy about Noah. But then I remembered that he had spent countless hours dealing with people telling him that he should exhume his son's corpse to prove its existence. I told Pozner that, having lost someone in 9/11, I understood how painful it is for people to use your tragedy for their own self-indulgent obsession. He thanked me again.

Pozner himself used to be into conspiracy theories. When he lived in

Sandy Hook father Leonard Pozner on death threats: I never imagined...    https://www.theguardian.com/us-news/2017/may/03/sandy-hook-scho...

Connecticut, he often had to commute to New York and would listen to rightwing radio hosts such as Alex Jones and Michael Savage on the long drives. "I'm self-employed, an entrepreneur. I was always looking for more information so I could get an edge on the next guy, to get a better idea of the geopolitical perspective," Pozner says. Once he got used to Jones's "raspy voice" he liked him especially: "Alex Jones appears to think out of the box. He's entertaining."

Arguably, more than anyone, Jones is responsible for spreading the theory that the Sandy Hook massacre was fake. His radio shows and website, InfoWars.com, have an audience of more than eight million, and they specialise in the kind of conspiracies that had intrigued Pozner: was 9/11 an inside job? Was the US government involved in the Oklahoma City bombing?

On 27 January 2013, Jones told his audience: "In the last month and a half, I have not come out and said this was clearly a staged event. Unfortunately, evidence is beginning to come out that points more and more in that direction."

"I wasn't very verbal at that point, but I managed to send Alex Jones an email," says Pozner. He wrote: "Haven't we had our share of pain and suffering? I used to enjoy listening to your shows. Now I feel that your type of show created these hateful people and they need to be reeled in!"

He got a reply from Jones's assistant, who said: "Alex has no doubt this was a real tragedy." But Jones' thinking seemed to change. In 2015, he told his audience: "Sandy Hook is synthetic, completely fake, with actors; in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids, and it just shows how bold they are, that they clearly used actors."

The year before InfoWars.com ran a story headlined: "FBI says no one killed at Sandy Hook."

The US has a long history of conspiracy theories. The majority of Americans today don't believe Lee Harvey Oswald acted alone in killing John F Kennedy. Pozner says the Sandy Hook hoaxers are different because previously there were "no targets". I say this isn't quite right: John F Kennedy Jr found conspiracies about his father's assassination so painful, he would leave the room when people started swapping them over the dinner table, and those of us who knew people who died in 9/11 will have all had similar experiences. He clarifies and says what he means is that the most hardcore conspiracy theorists can now, thanks to the internet, easily track down and personally target those affected by the tragedy. But an even bigger change is that those who are promoting the most crackpot of theories are no longer relegated to the weird, dark fringe. Rather, they are swimming in the mainstream, thanks to one man in particular.

In 2015, Donald Trump went on to Alex Jones's show for a half-hour interview. At the end of the show, Trump said to the man who once claimed the government is putting chemicals into the water to turn people gay and stop them from having children: "I just want to finish by saying your reputation's amazing. I will not let

you down, you will be very, very impressed, I hope. And I think we'll be speaking a lot … You'll be very proud of our country."

Trump is very comfortable with conspiracy theorists. Steve Bannon, of course, made his name with Breitbart News, the conservative news website known for its hyped-up reporting of conspiracies. His original choice for national security adviser, General Mike Flynn, was notorious for tweeting conspiracy theories, such as that Hillary Clinton was involved with child-sex trafficking, and he claimed the Democrats wanted to impose sharia law in Florida. His adviser, Roger Stone, has claimed that Chelsea Clinton had multiple plastic surgeries as a teenager to disguise her true paternity. Trump's deputy campaign manager, David Bossie, made a 2008 documentary, Hillary: the Movie, which reported the allegation, among other things, that Hillary Clinton had the cat of a woman who made claims of sexual harassment against Bill Clinton killed.

Mike Cernovich is another conspiracy theorist who, by rights, should only be known among the most misogynistic and angry. He was one of those responsible for spreading the so-called "pizzagate" story, which claimed that Hillary Clinton and other top-level Democrats were running a child sex ring out of a pizza parlour in DC. In December, a man fired a rifle inside the restaurant, determined to find the alleged child sex slaves he had read about online. In early April, he published a blog claiming the former national security adviser Susan Rice had engaged in illegal surveillance activity. In fact, his blog revealed nothing more than that there were longstanding and well-known concerns about surveillance. Nonetheless, he received an endorsement from Trump's counsellor, Kellyanne Conway, and Donald Trump Jr tweeted: "Congrats to @Cernovich for breaking the #SusanRice story. In a long gone time of unbiased journalism he'd win the Pulitzer, but not today!"

And then there is Trump himself, a man whose greatest political triumph before winning the presidency was promoting the "birther" conspiracy theory, which revealed only Trump's apparent inability to believe black people can be born in the US. In the months since he was inaugurated, he has merrily promoted conspiracy theories with the enthusiasm of a devoted InfoWars fan. These have included: 3m votes in the election were cast illegally; the media is covering up acts of terrorism; Obama tapped his phone while president. Then there are his longstanding theories about vaccinations ("AUTISM") and climate change ("a hoax").

Earlier this year, the Newtown school board sent Trump a letter, asking him to denounce Alex Jones and the other Sandy Hook hoaxers, and to state definitively that Sandy Hook happened: "Jones repeatedly tells his listeners and viewers that he has your ears and your respect. He brags about how you called him after your victory in November. He continues to hurt the memories of those lost, the ability of those left behind to heal," the school's board wrote. Two months on, they have yet to receive a response.

Pozner says this doesn't bother him, not really: "I don't want to have anything to do with Donald Trump or the crowd he surrounds himself with."

I ask how he feels about stories such as pizzagate going mainstream. "It feels like I've been proven right – hoaxers need to be handled, not ignored. It's like a brushfire: you need to shape it and direct it. But if you leave it alone, it will burn down your forest, and it has reached all the way to the White House," he says.

Since 2014, when he started to engage with the world again, Pozner has been trying to shape his brushfire. At first, he tried to engage with the hoaxers and some, he found, were young mothers who simply couldn't allow themselves to believe someone could look a six-year-old in the eyes and shoot him in the head. Pozner had a lot of sympathy with them, as he felt the same way. Others, he says, are "just kids who get sucked into this world and they feel more confident about themselves, more certain, and they feed off the echo chamber of info, usually from websites. And they get taken in, hook, line and sinker." One such hoaxer recently posted a comment beneath one of the online tribute videos to Noah: "You criminals need to be boiled in faeces."

Pozner realised quickly that there was no point in arguing with these hoaxers, so instead he attacks through copyright law. Every day, he Googles Noah's name to see if anyone has put up a photo or video of his son without his permission and, if so, he files copyright claims. Thanks to Pozner's dedication and experience as an IT consultant, he has scrubbed Noah's search results of toxic-hoaxer content. He has sued other hoaxers for invasion of privacy, and successfully petitioned a Florida university to fire a professor, James Tracy, for hoaxing. (Tracy has sued for wrongful termination.) He also founded the HONR Network, which helps grieving families deal with online abuse, and it lobbies YouTube, Google and Facebook to stop hosting such abuse. It has also turned the tactics of some of the most persistent hoaxers on the hoaxers themselves, demanding they answer endless banal questions about their personal lives as if trying to catch them out, just as they do of the Sandy Hook families. Veronique, he says, supports his work, but she doesn't have the stomach for it herself. I ask if his campaign has been a means for him to channel his grief and anger about the death of his son.

"It may appear that way, but it's not a healing journey – it's taxing and draining, and I don't think there's a healing aspect to being drained this way. Maybe [I do this] because I was bullied when I was younger, so I have a low tolerance to being pushed around. But I never imagined I'd have to fight for my child's legacy. I never imagined life without any of the children at all."

Pozner says that, if he hadn't lost Noah, he might well have believed the pizzagate conspiracy: "I would not have been as immediately dismissive of it, that's for sure. History books will refer to this period as a time of mass delusion. We weren't prepared for the internet. We thought the internet would bring all these wonderful things, such as research, medicine, science, an accelerated society of good. But all we did was hold up a mirror to society and we saw how angry, sick and hateful humans can be."

So what can we do, I ask, now that more of us are realising we can't just ignore these people?

"It's too late, and things have gone too far. The whole Amazon is on fire. When I was dealing with these people in 2014 and 15, you could utilise their stories and turn them around. I don't know if you can even do that now," he says. "Lawmakers don't know how to deal with this. Police don't know how to police the internet, they haven't been trained, they just tell you to turn off the computer. And people who do police the internet, they are looking for credit card scams worth millions of dollars. For 4Chan trolls, this is their playground."

He pauses for a moment: "I used to be able to change the channel when stories about these kinds of people were on. I now don't have the luxury to do that, and when I lost Noah, I woke up and realised that people who spread these stories are more interested in propagating fear than getting at the truth. And the human cost of that is phenomenal."

# Sandy Hook Massacre 3rd Anniversary: Two parents target FAU conspiracy theorist

*Lenny and Veronique Pozner*

It's been three years since we last embraced our precious little boy, Noah. At six-years-old, he was the youngest child murdered at the Sandy Hook Elementary School. While our family may have managed to live through this tragedy, the passage of time has nowhere near dimmed the vivid memory of that day nor made it any less difficult for us to cope with the pain and anguish of losing our only son.

The heartache of burying a child is a sorrow we would not wish upon anyone. Yet to our horror, we have found that there are some in this society who lack empathy for the suffering of others. Among them are the conspiracy theorists that deny our tragedy was real. They seek us out and accuse us of being government agents who are faking our grief and lying about our loss.

Each new high-profile act of violence inspires more conspiracies and creates new victims of harassment and defamation, whether it be the Boston Bombing, the terrorist attacks in Paris or the most recent massacre in San Bernardino, CA. In that instance, a lawyer for the family of the shooters said Sandy Hook did not happen. And don't get us started on Donald Trump and his rantings on the Alex Jones radio show. It is obvious by the demographics of the show's audience that Trump appeared as a guest looking for votes from the conspiracy crowd.

Although many of these tormentors persecute us behind anonymous online identities, some do so openly and even proffer their professional credentials in an attempt to lend credence to their allegations.  In this piece we want to focus on someone who is chief among the conspiracy theorists -- Florida Atlantic University Professor James Tracy.

A plethora of conspiracies arose after Sandy Hook, but none received as much mainstream publicity as Tracy, who suggested that the shooting never occurred and the Obama administration had staged the "event" to prepare the country for strict gun control measures.

EXHIBIT

B-5



Lucy Richards, who is accused of sending death threats to a Sandy Hook parent whose son was murdered in the Sandy Hook massacre, wants to plead guilty.

Lucy Richards, who is accused of sending death threats to a Sandy Hook parent whose son was murdered in the Sandy Hook massacre, wants to plead guilty.

SEE MORE VIDEOS

More than 800 news organizations covered the story of his denial. As a result, this professor achieved fame among the morbid and deranged precisely because his theories were attached to his academic credentials and his affiliation with FAU. Tracy has enjoyed tremendous success from this exposure and has since leveraged it into a popular Internet blog and radio program. Worse yet, it has elevated his status and fame among the degenerates that revel in the pleasure of sadistically torturing victims' families.

It cannot be denied that Tracy has carved out a significant presence in the same Sandy Hook "hoax" conspiracy movement that has inspired a wave of harassment, intimidation and criminal activity against our family and others.

In fact, Tracy is among those who have personally sought to cause our family pain and anguish by publicly demonizing our attempts to keep cherished photos of our slain son from falling into the hands of conspiracy theorists.

Tracy even sent us a certified letter demanding proof that Noah once lived, that we were his parents, and that we were the rightful owner of his photographic image. We found this so outrageous and unsettling that we filed a police report for harassment. Once Tracy realized we would not respond, he subjected us to ridicule and contempt on his blog, boasting to his readers that the "unfulfilled request" was "noteworthy" because we had used copyright claims to "thwart continued research of the Sandy Hook massacre event."

His blog post was echoed dozens of times on conspiracy websites, including one maintained by Tracy's colleague and frequent collaborator James Fetzer, a Holocaust denier who expounded upon Tracy's article by stating that our refusal to respond to this obscene ultimatum "implies that Noah did not die at Sandy Hook and confirms that Lenny is a fraud."

Although FAU issued a "reprimand" to Tracy for the irresponsible and insensitive comments he made in late 2012, he has shown no remorse and continues to conceive conspiracy theories out of each new mass shooting. While Tracy may now limit mention of his association with FAU, it has not gone unnoticed by the press.

After Tracy spouted yet another ridiculous theory concerning the Washington Navy Yard shooting of 2013, Education Editor Eric Owens of the Daily Caller cited the professor in declaring that "Florida Atlantic University remains and apparently always will be the worst place in America to go to college."

When do the interests of the college and its students take precedence over the tenure of a professor who has clearly proven himself in violation of the university's own policy? The FAU Academic Affairs Faculty Handbook clearly states that "A faculty member's activities which fall outside the scope of employment shall constitute misconduct only if such activities adversely affect the legitimate interests of the University,"

In an April 2013 Huffington Post article, Heather Coltman, interim dean of the

College of Arts and Letters, clearly states that "Tracy's earlier posting has resulted in a number of negative consequences for FAU, including a large number of parents who withdrew their children's applications to FAU, a student whose parent asked that she be withdrawn from his class and a donor who withdrew his support to the Department of History."

It matters not if Tracy simply refrains from mentioning FAU when defaming murdered Americans and their families. There is ample evidence to demonstrate that his extracurricular misconduct has already adversely affected FAU's reputation and will continue doing so as long as he continues down this path.

It is time FAU reassess if their priorities properly reflect the best interests of their staff, donors and — most importantly — their students. "The First Amendment guarantees freedom of speech, but the Constitution does not guarantee that you can't be fired for expressing your beliefs as part of your job," says the National Education Association. "The courts could decide either way and the burden of proof shifts sharply to the professor."

FAU has a civic responsibility to ensure that it does not contribute to the ongoing persecution of the countless Americans who've lost their loved ones to high-profile acts of violence.

*Veronique and Lenny Pozner are the parents of Noah Pozner, one of the 20 children killed in the December 14, 2012, Sandy Hook massacre. Lenny founded the HONR Network, aimed at combating conspiracy theorists on mass shootings.*





Newtown Action Alliance

Mark    Home    Find Friends    2

**Newtown Action Alliance**
@NewtownActionAlliance

Home
**Posts**
About
Videos
NAA Twitter
Photos
Community
Reviews
Take Action!
Online Store
Events

Create a Page

Like    Follow    Share

Donate    Send Message

**Newtown Action Alliance**
November 12, 2013 · Sandy Hook, CT ·

Veronique Pozner, mother of first-grader Noah who was the youngest victim of the Sandy Hook School shooting, is asking "why no progress on guns?"

"If there isn't some kind of change in the national consciousness by 6 and 7-year-old children being gunned down in the sanctity of their school, then I think we have lost true north in this country," Noah's mother, Veronique Pozner, said after her son was murdered. "Our compass is broken."

Instead of a developing national consciousness, we see a divide on America's gun culture that is hardening like cold steel. According to a list compiled by CNN, Alabama, Arizona, Arkansas, Idaho, Kansas, Kentucky, Maine, Mississippi, North Dakota, Oklahoma, South Dakota, Tennessee, Utah, Virginia, West Virginia and Wyoming have approved laws loosening gun restrictions in the past year.

Read more: http://forward.com/.../after-newtown-why-no-progress-on-guns/...



VERONIQUE POZNER
"HOW MANY MORE MUST DIE?"

VIMEO.COM
**Veronique Pozner – Forward 50**
Veronique Pozner was consumed with grief after the murder of her son in...

Like    Comment    Share

105                                          Most Relevant

20 Shares                              14 Comments

Write a comment...

**Erin Matthews** I really don't understand, I cannot believe that the US have not changed laws. Please come and visit us in Canada. We really are free here and do not need those guns!!!!
Like · Reply · 4y

Cause in Newtown, Connecticut
Always Open
ABOUT NEWTOWN ACTION ALLIANCE

**Newtown Action Alliance's mission:**

Newtown Action Alliance is a Newtown-based, national grassroots organization formed after the Sandy ...

See More

**Community**                          See All

👥 Invite your friends to like this Page
👍 16,289 people like this
✓ 15,838 people follow this

**About**                               See All

💬 Typically replies within an hour
   Send Message
🌐 www.newtownaction.org
📁 Cause · Nonprofit Organization
🕐 Hours
   Always Open
✏️ Suggest Edits

**Related Pages**

 **Coalition to Stop G...**      Like
   Nonprofit Organization

**March on Washington ...**              Like
   Community Organization

CAGV **Connecticut Against G...**        Like
   Nonprofit Organization

**Pages Liked by This Page**

 Chat (4)

EXHIBIT
B-6



Mark    Home    Find Friends    2

...m having a hard time understanding why no ...ce has ever been brought forward that shootings ...d at Sandy Hook.

1

... coming, Veronique. One key thing that needs to ... out some of the idiot Congressmen who are paid ...r better yet, change that practice altogether.) ...appening. It will take some time. Sadly, there is

2

## Newtown Action Alliance
@NewtownActionAlliance

Home

Posts

About

Videos

NAA Twitter

Photos

Community

Reviews

Take Phone

Online Store

Events

Create a Page

---

Bureau of Alcohol, To...    Like

Everytown for Gun Sa...    Like

English (US) · Español · Português (Brasil) ·
Français (France) · Deutsch

Privacy · Terms · Advertising · Ad Choices ·
Cookies · More
Facebook © 2018

---

4y
14 Replies

...as it gets closer to the one year my heart melts because I to don't see anything happening? For the world to come together when it happened there was hope, love and peace. Not a day goes by that I don't think of the families who lost a loved one. I ...yday.... Something has to change to protect young children against a violent act. We are Newtown We choose Love!

1

Like · Reply · 4y

Mat Foster Put the vote on the ballot.    2

Like · Reply · 4y

Kathleen N Larry Stanley My heart breaks a little each time I hear someone say that they should be able to own assault weapons. I'm so sorry that so many don't understand. I wish that this wasn't real. k

5

Like · Reply · 4y

Douglas Page I believe nothing will happen until the bodies are shown. Until America actually sees that this is not just another 'movie' with no blood or grief nothing changes. It's exploitative, of course. That's the whole point. But until the stark horror is shaken in the public's face, the gun bubbas will have their way.

Like · Reply · 4y

Johanna Fredrics I agree. I really thought that Newtown was the last straw. I wrote, signed, shared, everything I thought we were supposed to do to make them listen. I don't know what else will wake the politicians and the NRA out of its twisted fetish with guns. Bless all of the families and the angels that watch over us, now. We are sorry we are failing you.

Like · Reply · 4y

Julia A Conway And the laws have not been put in front of the people, but rather in front of small groups of legislators not representing the majority.

7

Like · Reply · 4y

Steven R. Gogliettino another amazingly courageous angel mom

3

Like · Reply · 4y

Michael Walsh Newtown has had a 110% increase in pistol permits so far this year. That should tell you something.

2

Like · Reply · 4y

11 Replies

Aldwin Gordula Why is there no progress on guns? Simple. Look at the NRA and the gun manufacturers.

13

Like · Reply · 4y

5 Replies

Scott Gove This country needs some moral teaching. How can we notact when 30,000 people have died since 12/14/12? These children memories shouldn't be tossed aside we need to ramp up pressure on congress to act... god bless veronique pozner and all the families of Newtown ct 26 , I not giving up , we will get this done 🖤🖤🖤🖤

1

Like · Reply · 4y

Chat (4)

Mark    Home    Find Friends                    2



**Posts**

**Like Page**

Create a Page

r All Victims of Gun Violence will be
:opal Church on Capitol Hill,

nts/

:                    **Share**

event.

y in Chester, Connecticut.

e    Celebrate
e    the Rising Tide
t    of Democracy
:t

Chester Fairgrounds

Chat (4)

Mark   Home   Find Friends

Interested



## Newtown Action Alliance

@NewtownActionAlliance

of the estimated 857 million

make us safer.

Posts

About

Videos

Twitter

Community

Reviews

Take Action

Online Store

### Guns

ricans own 393 million...

Create a Page

Share

ho stood with the NRA to



re Senate after months of

Chat (4)

Mark    Home    Find Friends                    2

Share



3

## Newtown Action Alliance

dont oppose AWB's and
**@NewtownActionAlliance**

Home

**Posts**

About

Videos

your tattoo it on your face.



**unlawful possession of a**

Share

Most Relevant

arter at job interviews.
2

vitable endpoint.
2

Alabama.

Share

Most Relevant

**Chat (4)**

Mark    Home    Find Friends                    2



Newtown Action
Alliance
@NewtownActionAlliance

Home

**Posts**

About

Videos

NAA Twitter

Photos

Community

Reviews

Take Action!

Online Store

Events

Create a Page

Chat (4)

Top Five

**Veronique Pozner**

<u>Next Profile</u>

In the wake of the Newtown, Conn. shooting, one mother, Veronique Pozner, became a voice for gun control and an emissary of grief for a nation trying to comprehend the scope of the tragedy.

Pozner's 6-year-old son, Noah, was the youngest victim of Adam Lanza's December 14, 2012 rampage, which took the lives of 19 other students and six teachers and faculty members at Sandy Hook Elementary School. Lanza also killed his mother and himself. It was the second deadliest shooting by a lone gunman in American history, after the 2007 Virginia Tech shooting.

Three days after the massacre, Pozner eulogized Noah at his funeral, which was officiated by Rabbi Shaul Praver of Congregation Adath Israel. "The sky is crying and the flags are at half-mast. It is a sad, sad day. But it is also your day, Noah, my little man," she said, giving the public its first glimpse of her unusual ability to describe her own overwhelming grief, even as she was living it.

Pozner, 46, would go on to become one of the most vocal Newtown parents, giving interviews with CNN's Anderson Cooper and, joined by her family, with People Magazine. She described Noah as an energetic boy with long lashes, who asked questions about God and humanity, and whose best friend was his twin sister, Arielle, who survived in a nearby classroom.

Pozner also provided the public with a portrait of Jewish mourning. In an hour-long interview with the Forward nine days after the shooting, Pozner, who converted to Judaism in 1992, described how sitting shiva with her family gave her structure in those first harrowing days. She insisted on burying Noah in a tallit, even though he had not yet reached bar mitzvah age. She celebrated Hanukkah with Noah the night before he died, sharing the last photo of her son with a Connecticut panel on gun control in January. "It


EXHIBIT

B-7

tabbies

shows him holding up a lit Hanukkah candle and staring and smiling into its flame," she told the panel. "I will forever cherish this photograph. He looked so innocent and full of wonder. He was cheated of his full potential. I can now only dream of the man he would have become."

Pozner's candor struck a nerve with the public. Her decision to view Noah's body before the funeral — and her insistence that Connecticut Governor Dannel Malloy do the same — prompted readers and commentators to compare her to Mamie Till Mobley, who demanded that her son, Emmet Till, have an open-casket funeral. "[Noah] looked like he was sleeping," said Pozner. "But the reality of it was under the cloth he had covering his mouth there was no mouth left. His jaw was blown away. I just want people to know the ugliness of it so we don't talk about it abstractly, like these little angels just went to heaven. No. They were butchered.

They were brutalized. And that is what haunts me at night."

Pozner's words appear to have resonated with Connecticut leadership, too. In April, the state legislature heeded the calls of Pozner and the other Newtown parents for gun control and passed the strictest gun control laws in the nation, including a ban on the sale of gun magazines with a capacity of more than 10 rounds.

Before Newtown, Pozner was a private citizen leading a quiet life as an oncology nurse and mother. On December 14, 2012, she was involuntarily thrust into the limelight. But rather than shy away from the media onslaught, Pozner made the Herculean effort, as Rabbi Praver said, of communicating her grief to the public. In so doing, she kept Newtown and gun control on the national agenda.

Read more: https://forward.com/series/forward-50/2013/veronique-pozner/

BUSINESS
INSIDER         TECH        FINANCE        POLITICS        STRATEGY        <         >

# Newtown Victim's Mom Accuses Adam Lanza's Mother Of 'Gross Irresponsibility'

**AP** John Christoffersen, Associated Press Jan. 16, 2013, 5:08 PM

DANBURY, Conn. (AP) — In one dream, 6-year-old Noah brushes his teeth at the sink, his dark hair wet. He looks directly at his mother and says, "Mommy, I'm having fun." In



Veronique Pozner  AP Photo/Jessica Hill

another, Veronique Pozner gives birth atop a mountain, is handed the infant by a midwife and walks down a long flight of stairs back to a village. But she drops the baby.

"When I got to the bottom, the baby was dead," Pozner says, crying.

Since the massacre last month at Sandy Hook Elementary School, Pozner has struggled with the gaping hole left by the loss of her energetic, affectionate son. She has tried to help her other children cope and make sense of the senseless. And she has managed to lead her family in pushing for reforms from the White House.

"What's the alternative?" the 45-year-old oncology nurse told The Associated Press in an interview this week. "Not getting out of bed? I don't think Noah would want to see me like that, although sometimes it is hard to get out of bed."

Gunman Adam Lanza killed his mother at home, shot his way into the school Dec. 14, killed 20 first-graders and six educators, and committed suicide as police arrived.



RECOMMENDED FOR YOU

Share your opinion — Become a BI Insider today

VIDEOS YOU MAY LIKE          by Taboola

What an expert on con artists thinks of Donald Trump

RICHARD BRANSON: We've just 'got to give Donald Trump and his team three months, six mont...

Jon Stewart takes over for Stephen Colbert to tell Trump supporters they 'don't own' America

'Really?': A reporter calls out Huckabee's claim that 'countless' FBI employees were happy with Come...

FROM THE WEB          by Taboola

Addison, Texas: This Unbelievable, Tiny Company Is Disrupting a $200 Billion Industry
EverQuote Insurance Quotes

If You Have Excellent Credit, Texas Will Pay Off Your Mortgage
Mortgage Quotes | Fetcharate



EXHIBIT
B-8

"I think he had a mother who at best was blind; at worst aided and abetted him," she says. "Maybe she wanted to compensate for his feelings of inadequacy by letting him handle weapons of mass carnage and taking him to shooting ranges. I think there was gross irresponsibility, and I'd like to think that maybe she was just as unwell as he was to have allowed someone as obviously compromised as he was to have access."

Those who knew Nancy Lanza have described her as a good, devoted mother.

Pozner was at her job in nearby New Britain when she heard a report of a shooting at the school. She rushed there and found her two daughters — including Noah's twin, Arielle — but Noah's class was unaccounted for. As she waited, she noticed clergy members among the parents and began to fear the worst.

"Just in my heart of hearts I knew something really bad had happened," she says. She asked if it was a hostage situation. No. "I asked them if it was a morgue up there," she says.

At some point, she was told 26 people had been killed, including 20 children.

"It was kind of like being told when you wake up from a routine operation, 'I'm sorry, but you're now paralyzed below the neck and you're going to have to learn to live for the rest of your life like that,'" Pozner says.

She went into denial at first, thinking Noah was just hiding at school. Relatives and friends offered support. Visiting a makeshift memorial helped, too. She recently took her children out of town for a few days, and the family is getting counseling.

"But I find that grief finds me no matter how busy I keep," she says. "It's a very strange process. It just blindsides you when you least expect it."

Pozner's family has submitted a detailed proposal to a White House task force, recommending a range of legal reforms including federal grants to review security at public schools and requiring gun owners to lock weapons if mentally ill or dangerous people could access them otherwise.

Pozner also says it's not right that the law protects the release of any mental health information on the gunman. She says she plans to challenge that because it could shed light.

"Those are all answers that I feel that we're entitled to," she says.

The family also is suggesting a new law requiring people to notify police within 24 hours if they know about an imminent threat of harm or death made by a person who has access to guns or explosive devices.

"I've just been in deep admiration of her strength and her ability to try to do something positive and to try to make a difference out of what happened," says Pozner's brother, Alexis Haller. "She's an inspiration really for the whole family."

Pozner says she is not ready to go back to work yet. These days, she has a tattoo near her wrist with angel wings and her son's name, his birth date of Nov. 20, 2006, and the day he died, Dec. 14, 2012.

"He was just a very expressive little boy," Pozner says. "He was just a bundle of energy."

She thinks of her son's facial expressions, of him asking for
a snack after school. Days before the massacre, he had
come downstairs to see her shortly after being put to bed.

"I just wanted to give you one more hug," Noah said.

"Why is your pajama top off?" his mother asked.

"So I can feel your heart better," he replied.

Noah loved Star Wars and SpongeBob. He was especially
close to his twin, who escaped the shooting unharmed
along with 7-year-old sister Sophia.

Arielle continues to talk about Noah in the present tense.
Among donations the family received was a stuffed animal
they call Noah bear.

"Every time Arielle hugs it, she says it doesn't feel anything
like her brother, but she does enjoy having it around,"
Pozner says.

Her children are filled with questions. Why did it happen?
Where is the shooter now? Can he still hurt Noah and the
other victims?

"I tell them, 'Just like some people can be very sick in their
bodies, some people can be very sick in their souls, and
they don't think the same way other people do and they
can't feel other people's pain,'" Pozner says.

She assures them the gunman can't bother Noah and the
other children anymore.

She took her children back to school in neighboring
Monroe this week for the first time since the shooting. On
the drive, Sophia asked her not to play music on the radio
because it makes her cry.

Pozner says she was reassured to see police at the school and believes such a presence can act as a deterrent.

"I don't think it's an accident that he picked an elementary school," Pozner says, noting there were "no large members of the wrestling team to be able to tackle him down in the parking lot."

## SEE ALSO: Conspiracy Theorists Are Harassing A Man Who Sheltered Students After The Newtown Shooting »

More:   Sandy Hook Shooting    Newtown    Gun Control    Veronique Pozner

RECOMMENDED FROM THE WEB                    Sponsored Links by Taboola

Say Goodbye to iPhone: This Could Be 40X Better

5 Online Dating Sites that Actually Work

Twins Born In 2010 Grow up To Be Most Beautiful In The World

Forrest Gump Author Reveals What Jenny Actually Died From

Born Before 1985? Texas Will Pay Off Your Mortgage

Addison, Texas: This Brilliant Company Is Disrupting a $200 Billion Industry

Addison: This Meal Service is Cheaper Than Your Local Store

**10 Cars That Impressed Us the Most in 2017**

**1 Year After Loss, Celine Dion Makes An Unexpected Announcement**

**Enter Your Name, Wait 10 Seconds, Brace Yourself**

RECOMMENDED FOR YOU

POWERED BY SAILTHRU



**GE is getting booted from the Dow Jones industrial average: Here are the members of the original 1896 index**



**This map shows the US really has 11 separate 'nations' with entirely different cultures**



**26 things under $20 we use every day**



**What marijuana really does to your body and brain**

* Copyright © 2018 Insider Inc. All rights reserved. Registration on or use of this site constitutes acceptance of our Terms of Service, Privacy Policy and Cookies Policy.

Sitemap | Disclaimer | Commerce Policy | Coupons | Made in NYC | Stock quotes by finanzen.net

International Editions: UK | DE | AUS | FR | IN | IT | JP | MY | NL | SE | PL | SG | ZA | ES

# Full Transcript — The Forward

*Ben Fractenberg*

***The following is the full text of remarks delivered by Veronique Pozner at a
Connecticut panel on gun control in Hartford.***

My name is Vernoique Pozner, I am the mother of Noah Pozner. I speak today on
his behalf. I want to tell you that last Friday, I dropped of my daughters, Sophia
and Arielle, at the new Sandy Hook Elementary School, which has been relocated
to Monroe.

The weather was frigid, as you all know. Parents were rushing their children in,
school buses were lined up to unload their passengers and I kissed each of my
girls goodbye in front of their respective classrooms. I then headed off to B'nai
Israel Cemetery on Moose Hill Road to visit the grave of our son, Noah.

As fate would have it, Noah is buried only a five minute drive away from the new
school where his older sister and twin sister now attend. I had decided to bring a
teddy bear to Noah on this frigid Friday and I placed it on his little grave site.

Noah was our 6-year-old force of nature. He will never get to see the new school
in Monroe, he lies forever motionless in the earth. He will never get to attend
middle school or high school, kiss a girl, attend college, pick a career path, fall in
love, marry, have children or travel the world.

Never will he feel the sunlight on his face, the companionship of a family who
adores him, the taste of a good meal or to get to dig a hole all the way to China, as
he strove to do every summer day at the beach.

Noah loved being alive, he took large hungry bites out of every day. His
inquisitive mind was always seeking answers. Sometimes he was like a young
philosopher. One day he asked me, 'if God created the universe, then who created
him?'

Another question he asked several times haunts me to this day. He used to ask,
'If there are bad guys out there, why can't they just wake up one day and decide
to be good.' I didn't always have the answers that Noah was looking for. I'm
fortunate enough to have four surviving children. My two youngest made it out of
Sandy Hook Elementary School physically unscathed that day. Sophia, who's in
second grade, tells us that the number 14 will forever be unlucky for her, so much
so that she hates the thought of turning that age some day. She also dislikes
calenders as that is what she was working on when the — and I quote — 'loud
popping sounds that took Noah away started.'

Arielle, his twin, that she wishes he was next to her, huddling in the small

EXHIBIT

B-9

bathroom, where her class hid, instead of being out in the open at the mercy of the fury being unleashed on the children and adults across the hallway. She tells me she's scared that she'll forget what her twin Noah sounded and looked like. She said to me the other night, 'Mommy, if I forget what it was like to play with Noah, does it mean he'll forget me too? I don't want that to happen. When I'm happy, I want him to know it,' she told me.

And then she added, 'also when I'm sad, or mad.' I reassured her that as her twin, he would forever be linked to her, no matter what.

Noah's loss has led my husband and I to think about and discuss guns and their legislation more that we ever have before. As an outcome of these discussions, I would like to submit our views for your consideration.

It is our feeling that assault weapons should be comprehensively banned in the state of Connecticut. Weapons which are designed to inflict as much lethal damage as possible have no place in the hands of civilians and ought to be restricted to law enforcement and the military.

The equation is terrifyingly simple: Faster weapons equal more fatalities. There should be no grandfathering of such weapons once a ban is implemented. Possession of any assault weapon regardless of the date of purchase ought to be illegal.

Mandatory surrender of these newly illegal firearms with financial compensation as was done in Australia, ought to be given serious consideration. A comprehensive ban would prevent gun manufacturers from cleverly tweaking such weapons to conform to state laws. Limiting high-capacity magazines is also very important, but alone is not sufficient to effect any significant changes.

This action is necessary because as long as these kinds of weapons are able to be purchased by civilians, individuals will use them to kill innocent people.

In this case, the permit holder evidently was Nancy Lanza, who's life ended at the hand of her own son Adam. However the very fact that an individual close to a permit holder can gain access to these types of weapons and use them as tools of mass carnage demonstrates that such weapons have no place in our society. Noah and the 25 other victims whose lives ended tragically that day were stripped of life liberty and the pursuit of happiness. This is not about the right to bear arms, it is about the right to bear weapons with the capacity for mass destruction. Speed kills, as with motor vehicles.

Which brings me to our next point: Just as each motor vehicle is required to be registered whether bought from a dealer or from a private sale, all firearms without exception, should be registered. Everyone who drives a car has to be tested and licensed to ensure public safety. The same should be required of gun owners. In addition, motor vehicle owners are required to carry liability insurance on their vehicles. Again, the same should apply to gun owners. This would shift the onus of evaluating risks involved onto the private sector. The use

of firearms results in the deaths of more than 30,000 Americans annually. There is no question they're inherently and profoundly dangerous to our society.

Consequently owners should bear the risk and ultimate socio-economic costs. When a individual purchases a motor vehicle, there their insurance underwriters their risk, according to their age, driving record, type of vehicle, frequency and location of usage, and a multitude of other factors. For instance a driver with prior DUI convictions may not be insurable at all.

Similarly, one should be required by law to have a policy in place before applying in place to be required for a gun permit. Every potential seller will have to verify the policy is in place before making a transaction.

Additionally, just as each gallon of gasoline we consume is taxed in order to finance the maintenance of our transportation infrastructure, or each pack of cigarettes is taxed to fund tobacco-related health education and disease research, it seems reasonable to impose a substantial tax on ammunition to help pay for extra security needed in school s to protect our children and others from those who would threaten their safety.

The requirement of secure storage pf firearms in particularly in homes where minors reside and the imposition of serious civil and criminal liability for damage arising from insecure storage is another point i wish to make. the same penalty should apply for damages resulting from the loaning out of weapons, i.e. by law only the registered licensed permit holder of any given firearm should have access to and use of that firearm.

I would like to show you the last picture taken of our son Noah. It was taken the night before he was murdered, Thursday, Dec. 13, before our world was changed forever.

It shows him holding up a lit Hanukkah candle and staring and smiling into its flame. I will forever cherish this photograph. He looked so innocent and full of wonder. He was cheated of his full potential. I can now only dream of the man he would have become.

I also would like to show you a paper cut out of a turkey made this past Thanksgiving. Admittedly he was no Picasso. On each feather, he was asked to write something he was thankful for.

He wrote electricity, books, friends and family. But its the center feather that really draws me in. He wrote 'the life I live.'

What happened in Sandy Hook on Dec. 14 2012 destroyed Noah's life and the lives of so many others. We must change for the better to prevent the likelihood of a tragedy of this magnitude from ever shattered the lives of innocence and their families ever again.

We owe it to our children and their families. The time is now. Let the state of

Connecticut become an agent for change with respect to gun safety. Our little man, and every other child and adult who died that day, deserve it.

# newstimes

https://www.newstimes.com/local/article/Newtown-families-file-wrongful-death-suit-against-6010819.php

# Newtown families file wrongful death suit against town, school board

## Lawsuit against town, school board calls security measures inadequate

By Rob Ryser  Updated 12:00 am, Tuesday, January 13, 2015

ADVERTISEMENT

Content was blocked because it was not signed by a valid security certificate.

For more information, see "About Certificate Errors" in Internet Explorer Help.



**IMAGE 1 OF 8**

Neil Heslin and Scarlett Lewis, parents and co-administrators of the estate of Jesse McCord Lewis, are plaintiffs in a civil lawsuit against the town of Newtown, the Board of Education and the Sandy Hook
... more



EXHIBIT

B-10

The parents of two first-graders killed in the **Sandy Hook Elementary School** shootings have filed a wrongful death lawsuit against the town and the **Board of Education**, alleging security measures were inadequate.

The 66-page lawsuit was filed by the parents of slain first-graders Jesse Lewis and Noah Pozner. The town was served with the lawsuit on Friday.

The suit claims the school's lockdown and evacuation plan was practiced, but never implemented on the day of the shooting, which "resulted in the death of 20 students." The suit also alleges the school failed to train a substitute teacher about the lockdown procedure and didn't give her a key that would have allowed her to lock the classroom once she heard gunshots being fired on the morning of Dec. 14, 2012.

The substitute, **Lauren Rousseau**, and all but one of her students were killed when 20-year-old **Adam Lanza** entered the unlocked classroom with a semi-automatic rifle. Lanza killed 20 students and six educators before shooting himself.

The lawsuit argues that Lanza was able to get into the locked building because he was able to shoot his way through a large plate-glass window next to the locked front doors.

ADVERTISEMENT

Content was blocked because it was not signed by a valid security certificate.

For more information, see "About Certificate Errors" in Internet Explorer Help.

As a result, the lawsuit says, the locked front doors were irrelevant.

The suit also faults the school for having classroom doors that could only be locked from the outside with keys, leaving teachers vulnerable to the intruder.

The lawsuit seeks more than $15,000 in damages.

ADVERTISEMENT

Content was blocked because it was not signed by a valid security certificate.

For more information, see "About Certificate Errors" in Internet Explorer Help.

The plaintiffs in the lawsuit are the estates of Lewis and Pozner. Their parents, **Neil Heslin**, **Scarlett Lewis** and **Leonard Pozner** are the administrators. They could not be reached Monday for comment.

"We are hopeful that the town of Newtown's elected and hired representatives will work with these families, who have already suffered, and continue to suffer unimaginable loss, to help resolve this matter in the most efficient and constructive way possible," said **Donald Papcsy**, a Norwalk lawyer and Sandy Hook resident who is representing the families.

"As residents of the town, we all either have, or are going to have, students in our Sandy Hook schools, and we promote the idea of learning from the past and protecting our children in the future."

First Selectman Pat Llodra declined to comment on the lawsuit, except to say it had been referred to the town's insurance company and the town attorney.

Town Attorney **David Grogins** also declined to comment. School board members did not immediately respond Monday to requests for comment.

The estates of Lewis and Pozner were among nine families of victims killed at Sandy Hook and one teacher who was injured who filed a lawsuit last month in state court against the maker and sellers of the Bushmaster AR-15 rifle that Lanza used in the shooting, saying the gun should not have been sold for civilian use because of its overwhelming firepower.

Reports by state police and the state child advocate said Lanza's parents, educators and others missed signs of how deeply troubled he was and opportunities to steer him toward more appropriate treatment for his mental health problems.

Lanza's obsessions with firearms, death and mass shootings have been documented by police files, and investigators previously concluded the motive for the shootings may never be known.

The **Newtown Board of Selectmen** voted last week to recommend demolishing the Lanza home, which the town acquired last month from the bank that was holding the mortgage. The town's **Legislative Council** is expected to discuss the issue at its next meeting on Jan. 21.

The **Associated Press** contributed to this report. rryser@newstimes.com; 203-731-3342

## Recommended For You

**McIlroy seeks by-the-numbers win in second visit to Travelers Championship**

**State in the dark about where immigrant children might be housed**

© 2018 Hearst Communications, Inc.

HEARST



(/)
**houtwalls.com/pledgeCart3/?campaign=AEF72C98-4288-41E3-82D1-5553FDD1A4AE&source=)**

Live Radio · News and Music
Classical Music Overnight          LOADING…

# Newtown Asks Judge To Dismiss Sandy Hook Negligence Suit

By DAVIS DUNAVIN (/PEOPLE/DAVIS-DUNAVIN)  •  JAN 10, 2018

Tweet (http://twitter.com/intent/tweet?url=http%3A%2F%2Fwww.tinyurl.com%2F76qoedd&text=Newtown%20Asks%20Judge%20To%20Dismiss%20Sandy%20Hook%20Negligence%20Suit)

Share (http://facebook.com/sharer.php?u=http%3A%2F%2Fwww.tinyurl.com%2F76qoedd&t=Newtown%20Asks%20Judge%20To%20Dismiss%20Sandy%20Hook%20Negligence%20Suit)

Google+ (https://plus.google.com/share?url=http%3A%2F%2Fwww.tinyurl.com%2F76qoedd)

Email (mailto:?subject=Newtown%20Asks%20Judge%20To%20Dismiss%20Sandy%20Hook%20Negligence%20Suit&body=http%3A%2F%2Fwww.tinyurl.com%2F76qoedd)



EXHIBIT
B-11



(http://mediad.publicbroadcasting.net/p/wshu/files/styles/x_large/public/201801/poznersandyhook_apjessicahill_1

*Veronique Pozner places her hand next to artwork made by her son Noah before a 2013 legislative*
*subcommittee reviewing gun laws in Hartford. Noah Pozner was among those killed in the 2012 mass*
*shooting at Sandy Hook Elementary School in Newtown.*

JESSICA HILL / AP

Listen
0:47

A superior court judge in Connecticut is deciding whether to toss out a lawsuit filed by
parents of two children killed in the 2012 Newtown school shooting. The suit says Newtown
and its school district were negligent in its response to the shooting.

The plaintiffs are the parents of Jesse Lewis and Noah Pozner, two first-graders killed in the
shooting. Their lawsuit alleges the school failed to order a lockdown, which might have
saved lives.

Lawyers for the town said in court Monday that teachers were forced to make split-second decisions in a harrowing situation and said it was insulting to blame them for the deaths. Twenty children and six educators were killed in the shooting at Sandy Hook Elementary School on December 14, 2012.

TAGS:   CONNECTICUT (/TERM/CONNECTICUT)    GUN VIOLENCE (/TERM/GUN-VIOLENCE)

SANDY HOOK ELEMENTARY SCHOOL SHOOTING (/TERM/SANDY-HOOK-ELEMENTARY-SCHOOL-

SHOOTING)

- Tweet (http://twitter.com/intent/tweet?url=http%3A%2F%2Fwww.tinyurl.com%
2Fy76qoedd&text=Newtown%20Asks%20Judge%20To%20Dismiss%20Sandy%20Hook%20Negligence%
20Suit)

- Share (http://facebook.com/sharer.php?u=http%3A%2F%2Fwww.tinyurl.com%2Fy76qoedd&t=Newtown%
20Asks%20Judge%20To%20Dismiss%20Sandy%20Hook%20Negligence%20Suit)

- Google+ (https://plus.google.com/share?url=http%3A%2F%2Fwww.tinyurl.com%2Fy76qoedd)

- Email (mailto:?subject=Newtown%20Asks%20Judge%20To%20Dismiss%20Sandy%20Hook%20Negligence%
20Suit&body=http%3A%2F%2Fwww.tinyurl.com%2Fy76qoedd)

(http://www.npr.org)

(http://www.bbc.com)

(http://www.pri.org)

(http://www.americanpublicmedia.org)



(https://www.prx.org/)

(https://www.facebook.com/WSHUpublicradio)

(https://twitter.com/wshupublicradio)

(https://www.instagram.com/wshupublicradio/)

(http://www.sacredheart.edu)

Contact Us (http://wshu.org/contact-us)

Privacy Policy (http://wshu.org/privacy-policy)

EEO Documentation (http://wshu.org/eeo-public-file-report)

CPB Report (http://wshu.org/cpb-report)

FCC Public Files (https://publicfiles.fcc.gov/)

FCC Public Files Help (mailto:info@wshu.org)

Contest Rules (http://wshu.org/contest-rules )

© 2018 WSHU

LOCAL

TRAFFIC




**Wednesday**
High 81° Low 62°


**Thursday**
High 82° Low 58°


**Friday**
High 72° Low 55°


INSULATION • MOLD TESTING • ENERGY AUDITS
THE ENERGY STORE
CALL US TODAY! 888-840-6641
WWW.THE-ENERGYSTORE.COM
Financing Available
No Monthly Interest
if Paid in Full within
18 Months*
*Call The Energy Store for Details
synchrony

☰

CONTACT US



# Judge Dismisses 12/14 Wrongful Death Lawsuit

## Published: May 11, 2018

Andrew Gorosko    🚩 **Front Page** and **Latest News**    🕐 **1 month ago**

🏷️

**Attorney Donald Papcsy, Board Of Education, Connecticut Supreme Court, Jesse Lewis, Judge Robin Wilson**

Larger | Smaller                    Email This



EXHIBIT

B-12

tabbies

Printable Version

# RECENT STORIES

» Golfers Support Scholarship Association In Annual Tournament

» Prisoner Death At Garner Ruled Homicide

» Main Street Rally Saturday To Protest Parent-Child Separation Policy

» Artist Finds 'Harmony' In Humanity And Nature

» NHS Class Of 2018 Graduates

» Reminder: Newtown Schools Are Closing Early Today

» History Brought To Life By Middle Gate Fourth Graders


NEW HAVEN — A Superior Court judge this week dismissed a longstanding wrongful death lawsuit stemming from the December 2012 shooting incident at Sandy Hook School. Through that lawsuit, the estates of two of the first graders killed in the incident sought money damages in a liability claim against the Town of Newtown and the Newtown Board of Education.

In a summary judgement dated May 7, Judge Robin Wilson wrote "Emergencies, by their very nature, are sudden and often rapidly evolving events, and a response can never be one hundred percent scripted and directed, and is a specific reason why police officers have been afforded broad discretion… To say that the faculty and staff of the school were to act in a prescribed manner in responding to an emergency situation would likewise be illogical and in direct contradiction to the very purpose of governmental immunity: allowing for the exercise of judgement without fear of second-guessing."

In her 29-page decision, Judge Wilson concluded that "The defendants are immune from liability."

Of the lawsuit's dismissal, First Selectman Dan Rosenthal said May 9, "Our counsel is in the process reviewing the judge's ruling, and as it is still arguably a pending legal matter, it wouldn't be appropriate for me to comment at this time."

Attorney Donald Papcsy, who represents the plaintiffs, which are the Estates of Noah Pozner and Jesse Lewis, said that the plaintiffs will appeal Judge Wilson's decision. Attorney Devin Janosov also represented the plaintiffs.

In a statement, Mr Papcsy said, "This ruling, which every parent should read, should serve as notice to all parents of young boys and girls: Our children are not safe in public schools."

"From our neighbors in Sandy Hook, to the young men and women of Parkland, the legislatures and judicial systems have decided for all of us that, even when the facts support a total breakdown of school security protocol, the 'immunity' laws are used as an excuse to prevent parents from holding them accountable," Mr Papcsy added.

"We brought this action to change that, not just for the parents who lost their children's lives in the Sandy Hook incident, but for all children. We will continue to fight for this cause so that, someday, we can live in a world where we know our children are going to come home at the end of the school day," Mr Papcsy said.

In June 2017, the defendants sought to have the wrongful death lawsuit dismissed.

In the defendants' motion to dismiss the lawsuit, attorney Charles Deluca, representing the defendants, wrote, in part, "The defendants are entitled to governmental immunity pursuant to [applicable state law]." Also, the defendants claimed that "The plaintiffs have failed to produce the requisite expert testimony to support their claims." Attorney Monte Frank also represented the defendants.

The plaintiffs requested and received repeated delays in responding to the defendants' motion to dismiss.

"The plaintiffs acknowledge that the... case is one of unprecedented notoriety, as well as carnage, speculation, press coverage... However, [the] plaintiffs believe that if [applicable] law is followed as drafted, and the court refrains from attempting to answer the questions of material fact that exist in the... case, and instead just seeks to determine if such questions of fact exist, as the law in Connecticut dictates, that it will be clear that the plaintiffs should be permitted to proceed on their claims to a jury for a determination of the multitude of factual issues which exist in the... case," according to plaintiffs' objection to defendants' motion to dismiss the lawsuit.

In the shooting incident, a 20-year-old gunman shot his way into the school on the morning of December 14, 2012, where he killed 20 first graders and six adults. The gunman then shot and killed himself as police approached. Before going to the school, the gunman had shot and killed his mother at their Sandy Hook home. The plaintiffs filed the lawsuit in January 2015.

In June 2016, the estates of Pozner and Lewis offered to settle the lawsuit provided that each plaintiff received a payment of $5.5 million from the defendants. The defendants did not accept that offer.

The Pozner-Lewis lawsuit alleged there was insufficient security in place in the school and its grounds, allowing the shooter to forcibly enter the building and then enter two classrooms and shoot and kill people within those classrooms. The 66-page lawsuit lists a variety of reasons why the plaintiffs consider the school system to have been negligent on December 14, 2012, resulting in the many deaths there. The various allegations focus on the school system not having sufficient security measures in place to prevent the deaths.

The lawsuit states, "They [officials] failed to provide a security guard or any other type of law enforcement personnel to assist in the implementation of the [security] policies and procedures should an intruder enter the building, while leaving a large enough non-safety glass window directly to the right of the locked outer doors of the school, making access to the building relatively simple, and [making] successful lockdown of the building virtually impossible."

The wrongful death lawsuit lodged by the estates of Pozner and Lewis is a separate lawsuit from another wrongful death lawsuit, which has been lodged by ten plaintiffs against Remington Outdoor Company, Inc, the manufacturer of the semiautomatic rifle that the gunman used in the shooting incident. The estates of Pozner and Lewis, however, are plaintiffs in both lawsuits.

The plaintiffs in the gun lawsuit are now seeking to have the state Supreme Court return that legal action to state Superior Court for a jury trial. A Superior Court judge had dismissed that lawsuit in the fall of 2016, resulting in the plaintiffs' Supreme Court appeal. The Supreme Court court heard oral arguments in the case in November 2017.

However, Remington having entered bankruptcy proceedings in March has postponed activity in the Supreme Court appeal.

**0 Comments**                                                                Sort by   Oldest

Add a comment...

Facebook Comments Plugin

# Related Articles

## BOE HONORS RETIREES, TOP STUDENTS, CABE AWARDEES

Eliza Hallabeck          Education          June 16, 2018, Saturday



*...Read Full Article*

# THE BEST VOICE FOR NEWTOWN

**The Newtown Bee**        Letters To The Editor
        June 12, 2018, Tuesday



*...Read Full Article*

# BOE ADDRESSES CONTRACT, 2018-19 CALENDAR; HEARS SEL REPORT

Eliza Hallabeck        Education        June 9, 2018, Saturday



*...Read Full Article*

# SCHOOL BOARD CELEBRATES PROFILES IN PROFESSIONALISM AWARDEES

Eliza Hallabeck        Education        June 1, 2018, Friday



*...Read Full Article*

SEARCH..





POSTS   COMMENTS   TAGS


ADMIRALS PILE UP
WOOD BAT LEAGUE
WINS
**7 hours ago**


GOLFERS SUPPORT
SCHOLARSHIP
ASSOCIATION IN
ANNUAL TOURNAMENT
**8 hours ago**


SUPPORT FOR SCHOOL
SAFETY OFFICERS
**8 hours ago**







22-01021-hcm  Doc#1-3  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B Pg 155 of 419





**FAITH**
Food Pantry of Newtown

## 46 Church Hill Rd, Newtown
(Behind St. Rose Church)

*Providing food to Newtown, CT residents who are in need*

Open: Tues. 9:30am-11:30am & Thurs. 6pm-7:30pm













HOME     NEWS     FEATURES     SPORTS     OPINIONS     CALENDAR

OBITUARIES     CLASSIFIED     SUBSCRIBE     LOGIN/SUBSCRIBER

SERVICES     CONTACT US, ABOUT US, HOW TO SUBMIT A PRESS RELEASE

PRIVACY POLICY     ARTICLE ARCHIVE

**THE NEWTOWN BEE | 5 CHURCH HILL ROAD | NEWTOWN CT 06470**
**203-426-3141**

Copyright ©2018 The Newtown Bee / All rights reserved

Digital Marketing / Rebel Interactive Group

# Sandy Hook Families' Suit Against Gun Maker Will Test Federal Law



State police Det. Barbara Mattson displays a Bushmaster semi-automatic weapon at a hearing at the Legislative Office Building in Hartford on Jan. 28, 2013. (Cloe Poisson)



By **Dave Altimari**

SHARE THIS



Newtown families sue gun manufacturer over Sandy Hook school shooting

**EXHIBIT**
**B-13**

DECEMBER 15, 2014, 8:06 PM

**T**he lawsuit filed Monday by victims of the Sandy Hook school shooting, seeking to hold liable the manufacturer of the Bushmaster AR-15 used in the massacre, will test the 2005 federal law designed to protect gun companies by using an exemption normally applied to car accident cases.

The lawsuit by families of nine students and adults killed and one surviving teacher who was shot several times by Adam Lanza will attempt to use what is known as the negligent entrustment exemption to the law. In a negligent entrustment case, a party can be held liable for entrusting a product, in this case the Bushmaster rifle, to another party who then causes harm to a third party,

"The court needs to decide whether they want to extend negligent entrustment from a retailer selling a gun to someone standing right in front of them to the theory that the manufacturer of the weapon is also responsible when the weapon they made is then sold by another party to a third person," Albany Law School Professor Timothy Lytton said Monday.

Lytton, who has written a book about the history of lawsuits against gun companies, said an example of negligent entrustment would be the sale of a weapon by a gun retailer to a suicidal person. A negligent entrustment lawsuit would claim the retailer should have known not to sell that person a gun.

Extending that to the gun manufacturer is unprecedented. Because it has never before been brought before a court, it is difficult to predict what will happen, according to Dennis Henigan, former vice president of the Brady Campaign to Prevent Gun Violence.

"Most state judges will want to find a way to allow these victims their day in court," Henigan said.

The wrongful death lawsuit filed at Superior Court in Bridgeport claims that the Bushmaster AR-15 used by Lanza to kill 26 people, including 20 first-graders on Dec. 14, 2012, inside Sandy Hook Elementary School, should not be sold to the public because it is a military assault weapon designed for war.

In addition to Bushmaster, the lawsuit names Camfour, a firearms distributor, and Riverview Gun Sales, where Nancy Lanza, the shooter's mother, purchased the Bushmaster in 2010.

"The AR-15 was specifically engineered for the U.S. military to meet the needs of changing warfare," said lawyer Josh Koskoff of Koskoff, Koskoff & Beider of Bridgeport. "The weapon was not designed for home defense or hunting. This weapon was designed to efficiently kill other human beings in combat."

But the lawsuit claims that Bushmaster is clearly aware that the AR-15 has become the weapon of choice for mass shootings.

"Time and again, mentally unstable individuals and criminals have acquired an AR-15 with ease, and they have unleashed the rifle's lethal power on our streets, our malls, our places of worship, and our schools," the lawsuit said.

Adam Lanza used the Bushmaster to shoot his way through the front glass of the school on Dec. 14, 2012. He was immediately confronted by school Principal Dawn Hochsprung and school psychologist Mary Scherlach. He killed them both as they ran into the hallway from a meeting room just outside the main office.

Natalie Hammond was in that same meeting and was shot several times but managed to crawl back into the room and barricade the door. Hammond is the 10th plaintiff in the lawsuit.

Lanza then entered two first-grade classrooms, where he killed 20 first-graders and four more school personnel, including two teachers, before killing himself with a pistol. Overall he fired 154 rounds from the Bushmaster in about five minutes.

Scherlach's husband, Bill, is one of the plaintiffs. In a statement released by a public relations firm, he said the lawsuit is necessary "to ensure that the gun industry is held to the same rules as every other industry."

"These companies assume no responsibility for marketing and selling a product [to] the general population, who are not trained to use it nor even understand the power of it," Scherlach said." I believe in the Second Amendment but I also believe that the gun industry should be brought to bear the same business risk that every other business assumes when it comes to producing, marketing, and selling a product."

The other plaintiffs are the families of eight others killed: teachers Victoria Soto and Lauren Rousseau; Rachel D'Avino, a special education teacher; and children Jesse Lewis, Dylan Hockley, Benjamin Wheeler, Daniel Barden and Noah Pozner.

Nicole Hockley, Dylan's mother, and Mark Barden, Daniel's father, declined to comment on the lawsuit during an appearance at the State Capitol with members of Congress to mark the second anniversary of the shootings and to reiterate the need for stronger federal gun laws.

Hockley has traveled to the White House and the state Capitol in Hartford to push for legislation, and she says there have been too many tragedies since then from gun violence.

"It's just not right," Hockley said Monday. "We are better than this as a people."

The Protection of Lawful Commerce in Arms Act, passed in 2005, generally shields licensed manufacturers, dealers, and sellers of firearms or ammunition from civil action "resulting from the criminal or unlawful misuse" of a firearm or ammunition, according to the Congressional Research Service.

22-01021-hcm  Doc#1-3  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B  Pg 163 of 419

There are six exceptions, including lawsuits brought against a seller for "negligent entrustment," defined in the law as "the supplying of a qualified product by a seller for use by another person when the seller knows, or reasonably should know, the person to whom the product is supplied is likely to, and does, use the product in a manner involving unreasonable risk of physical injury to the person or others."

The novel approach to suing the gun manufacturer in this case will surely be watched closely around the country and by lawmakers, Henigan said.

"I hope the Connecticut courts find a way for this lawsuit to go forward but if they don't it will be a powerful example of why we need to repeal the federal law," Henigan said.

Copyright © 2018, Hartford Courant

**This 'attr(data-c-typename)' is related to:** Laws and Legislation, Trials and Arbitration, Courts and the Judiciary, Automotive Industry, Traffic Accidents, Adam Lanza, Sandy Hook Elementary School



Search our site    SEARCH



p: 203-583-8634

✉ EMAIL   ESPAÑOL ›

Home  About Our Firm  Results  Lawyers & Staff  In the News  Practice Areas  Refer a Case  Blog  Contact

# Assault-Rifle Maker Asks Judge to Toss Sandy Hook Massacre Suit

A 2005 federal law was designed specifically to prevent gunmakers from being sued for mass killings like the one at Sandy Hook Elementary School, lawyers for the maker of the AR-15 assault weapon used in the attack told a Connecticut judge.

The suit over the massacre of 20 children and six educators hinges on an exception to the law that applies when a seller "negligently entrusts" a weapon to a buyer who is likely to use it in a crime.

Attorney James Vogt, a lawyer for the Remington Arms Co., said Monday in state court in Bridgeport that the exception is intended to apply to face-to-face retailers or individuals who sell guns. It can't be applied to a manufacturer, he said. The question of whether the AR-15 should be sold to the public should be dealt with by legislators rather than juries, he said.

The exception could only apply "if the retailer had known that Mrs. Lanza's son was mentally ill," Vogt said, referring to Nancy Lanza, the mother of shooter Adam Lanza.

About a dozen family members attended the packed hearing, which took on fresh meaning in the wake of last week's massacre of 49 people at a gay nightclub in Orlando, Florida, with a similar assault rifle -- the worst mass shooting in U.S. history.

**'Unsafe But Legal'**

### Practice Areas

Birth Injuries

Women's Issues

Medical Malpractice

Personal Injury

Defective and Harmful Products

Class Actions

Whistleblower

Commercial Litigation

Civil Rights

## How Can I Help You?

**Bold** labels are required.

Name

**E-mail**

Phone number

Brief case description

☐ **I have read the disclaimer.** Privacy Policy

**Submit**

EXHIBIT

B-14

"Aren't there other things that are unsafe but legal?" Vogt asked, using cigarettes as an example. He compared the situation to a car's being stolen and then used to run over a crowd of people, resulting in a suit against the dealer and automaker.

Bushmaster Firearms International, maker of the rifle, and parent Remington should have known that mass shootings like the 2012 attack might result from selling military-grade weapons with 30-round clips to civilians, plaintiffs' attorney Josh Koskoff said .

The AR-15 "was designed to be used in combat, and yet there it was on the floor, not of a battlefield, but of Vicki Soto's first grade classroom, having been used by a civilian," Koskoff said, referring to a 27-year-old teacher killed at Sandy Hook after attempting to hide her students in a closet and mislead the shooter. The rifle "did not get there by accident."

## The Stakes

A victory for the Sandy Hook families might provide a road map to success in court for victims in other mass shootings, despite a variety of laws in other states, including Florida, that offer even greater immunity to gunmakers.

Assault weapons were banned in Connecticut after the Sandy Hook assaults, and on Monday the U.S. Supreme Court declined to hear a challenge to the law. A federal ban on such weapons was passed in 2004 and expired a decade later. Renewed efforts by mostly Democratic lawmakers have repeatedly failed.

Congress in 2005 passed the Protection of Lawful Commerce in Arms Act, which shields gun companies from liability when crimes are committed with their products. The statute, backed by the National Rifle Association, has helped the industry win dismissal of other cases.

At Monday's hearing, Koskoff referred to legislators as "sheep" who lack sufficient knowledge about semiautomatic weapons that can be deadlier than fully automatic weapons banned in the U.S.

## Companies' Knowledge

Bushmaster and Remington "know what these weapons can do more than any congressman," Koskoff said.

Judge Barbara Bellis may take as long as three months rule in the Connecticut case. The suit has already proceeded further

VISIT OUR PERSONAL INJURY BLOG

May 25 - How to have safe travels during Memorial Day weekend

Mar 16 - Brain Injury Awareness Month

Jan 27 - Device maker claims to eliminate texting and driving

Dec 19 - Study links brain injuries and prison time

Sep 14 - New Studies on Medical Errors

Hot Topics
CLICK TO VIEW+

Refer a Case

Do You Have a Case?



Super Lawyers

LISTED IN

Best Lawyers

than others like it, with Bushmaster's attempt to end case on jurisdictional grounds rejected by Bellis in April. That ruling triggered a requirement for evidence to be exchanged, which may reveal internal e-mails and other documents at Bushmaster and Remington.

The case is Soto v. Bushmaster Firearms International LLC, 15-cv-6048103, Connecticut Superior Court (Bridgeport).

## Office Locations

**Bridgeport Office**
350 Fairfield Avenue
Suite 501
Bridgeport, CT 06604
Bridgeport Law Office Map



**New Haven Office**
27 Elm Street
New Haven, CT 06510
New Haven Law Office Map

**Danbury Office**
1 Moss Avenue
Danbury, CT 06810
Danbury Law Office Map

## Our Social Networks

Like 0   G+

Follow



## Serving the Following Areas

*From offices in Bridgeport, New Haven and Danbury, the attorneys at Koskoff Koskoff & Bieder, PC, represent clients throughout Connecticut.*

© 2012 by FindLaw. All rights reserved. Disclaimer | Site Map Privacy Policy | Legal Marketing® by FindLaw, a Thomson Reuters business.





# GUN OWNERS FOUNDATION

(/)

## Soto v. Bushmaster



May 30, 2017

Gun Owners of America and Gun Owners Foundation filed an *amicus* brief in the Connecticut Supreme Court in support of gun manufacturers Bushmaster and Remington, who had been sued by the families of the Sandy Hook shooting victims.

Click here to read the Gun Owners' brief in *Soto v. Bushmaster*. (/images/pdf/Soto-v.-Bushmaster-Amicux-Brief.pdf)

The plaintiffs in the case had brought a "negligent entrustment" claim, arguing that the AR-15 style rifle sold to Adam Lanza's mother should never have been sold because it was foreseeable that it would be used in the crime. However, as we pointed out, neither the manufacturer, distributor nor dealer did anything wrong with respect to this particular sale — the essence of a legal negligent entrustment claim. Rather, the plaintiffs instead were making the policy argument that no one should ever be permitted to sell any AR-15. In other words, they were asking judges to legislate to ban AR-15 style rifles.

Our brief also dispelled the false claims made by the plaintiffs about AR-15 style rifles. The plaintiffs had argued that AR-15s are "so powerful," yet as we pointed out, the .223/5.56 cartridge is on the low to medium end of most centerfire rifle calibers.

The plaintiffs had argued the AR-15 is "so accurate" that it's not even necessary to aim, but we argued that the platform is not any more inherently accurate than most other modern rifles, and in fact the lightweight bullet means other calibers far outclass it at distance.

The plaintiffs had argued that the AR-15 is "so destructive," yet as we argued, it doesn't hold a candle to most other popular calibers like the .308 and the .30-06.

Finally, the Plaintiffs had argued the AR-15 is a "feat of human engineering." Of course, the AR-15 is a well-designed and popular rifle, but it's nothing more than the latest in a long line of advancements in firearms technology. When the semi-automatic firearm, the lever action firearm, and the breech loading firearm were developed, each one was capable of much greater firepower than the firearms which proceeded them. Yet no one wants to ban the lever action .30-30.

The Sandy Hook shooting was a terrible tragedy. But the AR-15 is not to blame. Neither is Remington, Bushmaster, the distributor, or the dealer who lawfully and responsibly sold one to Adam Lanza's mother years before her son murdered her, stole her firearms, and used them for evil.

## Navigation

Henderson v. Silvester (/henderson)

Rodriguez v. United States (/rodriguez)

Johnson v. United States (/johnson)

Harris v. Silvester (/silvester)

Kolbe v. O'Malley (/kolbe-v-o-malley)

Heller v. District of Columbia (/heller)

Heien v. North Carolina (/heien)

Susan B. Anthony List v. Driehaus (/susan-anthony)

Abramski v. United States (/abramski-us)

When The BATF Pays A Visit (/batf)

**(/batf.htm)**





(http://ammo.com/donations)

8001 Forbes Place, Suite 102, Springfield, VA 22151

© 2018 Gun Owners Foundation

Back to Top

Exhibit B-16 is a thumb drive containing a true and correct copy of a video of CBS This Morning posted at the following url address:  https://www.youtube.com/watch?v=orh-bte19qA dated November 14, 2017



# As Sandy Hook Families Await State Supreme Court Ruling, Remington Files for Bankruptcy



State police Det. Barbara Mattson displays a Bushmaster semi-automatic weapon at a 2013 hearing at the Legislative Office Building. Remington, the maker of the weapon, filed for bankruptcy Sunday. (Hartford Courant file photo)

 By **Dave Altimari**

MARCH 26, 2018, 3:50 PM

**T**he bankruptcy filing by Remington Outdoor Inc., the company that makes the rifle used in the 2012 Sandy Hook Elementary School massacre, will force some of the victims' families to seek approval from a bankruptcy judge to let their legal fight against the nation's oldest gunmaker go forward.

Remington's weekend filing, which will turn the company over to its creditors to now operate, automatically "stays," or stops, any legal action against the company until it emerges from bankruptcy, experts said Monday.

Late Monday Remington's attorneys filed a motion in Connecticut court acknowledging the bankruptcy filing and its implications.

EXHIBIT
B-17

"As a result of the aforementioned bankruptcy filings, proceedings in this case are stayed," Stamford attorney Scott Harrington wrote in the motion.

A copy of the bankruptcy filing was submitted in the Connecticut case. The Sandy Hook families are one of eight pending litigations against Remington across the country.

The bankruptcy comes as the families of nine victims who were killed and a teacher who survived the shooting wait for the state Supreme Court to decide whether to uphold a lower court judge's decision to dismiss the lawsuit they brought against Remington or to overrule that decision and put the case back before a judge.

"We do not expect this filing to affect the families' case in any material way," said one of the families' lawyers, Katie Mesner-Hage of Koskoff Koskoff & Beider, in a prepared statement.

But legal experts said beyond stopping litigation against the company, the filing raises the question about what unsecured creditors, such as the families, could be awarded should they eventually win a judgment against Remington. Experts did say they believed the bankruptcy filing won't derail a decision by the state Supreme Court.

"The Sandy Hook families will need to file a motion asking the bankruptcy judge to lift the stay and to issue an order allowing the case to proceed in Connecticut," said Matthew Beatman of Zeisler & Zeisler of Bridgeport. "What often happens with cases like this is both parties will agree to let the case go forward and let the Supreme Court decide the issue."

Adam Lanza killed 26 people, including 20 first-graders, with a Bushmaster AR-15 after shooting his way through the front window of the school before killing himself. Lanza had killed his mother before going to the school.

The lawsuit was filed in January 2015 seeking to hold Remington liable, arguing it marketed the AR-15 to the public even though it knew it was designed for military use.

A Superior Court judge in Bridgeport dismissed the lawsuit in 2016, agreeing with attorneys for Remington that the lawsuit "falls squarely within the broad immunity" provided to gun manufacturers and dealers by the federal Protection of Lawful Commerce in Arms Act, or PLCAA.

The lawsuit also named Camfour Holding LLP, the gun's distributor, and Riverview Gun Sales Inc., the East Windsor gun shop where Nancy Lanza purchased the AR-15 right around her son's 18th birthday.

Under the plan filed in bankruptcy court in Delaware, Cerberus Capital Management LP, the private equity firm that controls Remington, will lose ownership and the creditors will take over the company.

Among its creditors are major financial institutions such as JPMorgan Asset Management and smaller companies such as Microbest Inc., a Waterbury-based company that makes parts for Remington's guns.

The Sandy Hook victims are listed as an unsecured creditor, as are several others that have lawsuits pending against the company.

Beatman said, as an unsecured creditor, the Sandy Hook families will need to file a claim of proof in bankruptcy court as well as a statement estimating how much the lawsuit may be worth.

"Bankruptcy creates the ultimate concern of how much can you collect from a claim," said Beatman. "You don't often get a full payment."

Georgetown Law Professor Heidi Feldman, who has been following the Sandy Hook lawsuit, said the timing of the bankruptcy filing was interesting. With both sides awaiting what could be a monumental state Supreme Court decision, Remington could use the bankruptcy filing to try and settle the case.

"This hits the pause button and perhaps Remington would reach out for a settlement rather than gamble on the Supreme Court ruling in their favor. What Remington could be hoping is, if they settle then no court ruling would be issued and they wouldn't have to worry about an unfavorable ruling that could impact gun companies across the country or at the very least send the case back to the state court and allow discovery to begin, which they also don't want," Feldman said.

Remington's attorneys have steadfastly argued that PLCAA protects them from the families' lawsuit.

The bankruptcy filing comes about a month after the latest mass school shooting. The Parkland, Fla., shooting that killed 17 has spurred an intense campaign for gun control, including marches across the country this past weekend.

Some national companies, including Walmart and Dick's Sporting Goods, have announced they will not sell semi-automatic weapons to anyone under the age of 21.

Remington, a North Carolina company with roots dating to 1816, has lined up $100 million with lenders to continue operations. It remains unclear what will happen to its 3,500 or so employees as it reorganizes.

Panic sales that drove revenue for gunmakers ever higher evaporated with President Donald Trump's arrival in the White House. Late Sunday, according to records from the bankruptcy court of the district of Delaware, Remington agreed to a prepackaged deal that would give holders of the company's $550 million term loan an 82.5 percent stake, according to a release. Third-lien note holders will take 17.5 percent of Remington and four-year warrants get a 15 percent stake.

Cerberus Capital Management, which acquired the company in 2007 as gun sales began to boom, tried to sell it less than a week after the Sandy Hook shooting. There were no takers.

In 2017, firearm background checks, a good barometer of sales, declined faster than in any year since 1998, when the FBI first began compiling that data.

But there were clear signs that gun sales, even as production increased, were already in decline. That is partially because a larger percentage of guns in the U.S. are owned by an increasingly small group of people.

According to a recent study by Harvard University and Northeastern University, the number of privately-owned guns in America grew by more than 70 million — to approximately 265 million — between 1994 and 2015. But half of those guns are owned by only 3 percent of the population.

That smaller base of what are sometimes referred to as "super-owners" has made the industry more unstable.

In 2015, Colt Holdings Co., another storied gunmaker, filed for Chapter 11 bankruptcy protection.

Profit growth at Sturm, Ruger & Co. is under severe pressure and the company's shares are down 18 percent this year.

Some of Wall Street's heaviest hitters are stepping into the national debate on guns as investment firms ask firearms makers what they are doing about gun violence.

BlackRock is a major shareholder in gunmakers Sturm Ruger, American Outdoor Brands, and Vista Outdoor Brands. About a week after the shooting in Parkland, BlackRock said it wanted to speak with the three firearms makers about their responses to the tragedy. It's also looking into creating new investment funds for investors that exclude firearms makers and retailers.

*Information from the Associated Press is included in this story.*

Copyright © 2018, Hartford Courant

**This article is related to:** Adam Lanza

Politics

# Sandy Hook Families Make Last-Ditch Plea to Save Gun Lawsuit

By Erik Larson

November 14, 2017, 10:44 AM CST
*Updated on November 14, 2017, 3:16 PM CST*

▶ Lawyer argues that case isn't covered by federal immunity

▶ Adam Lanza killed children, adults with an assault weapon



Judges on Connecticut's highest court repeatedly pressed an attorney for Remington Arms Co. about why advertisements for its AR-15 semiautomatic rifle touted its ability to "single-handedly" overcome "forces of opposition."

"If it's used for hunting or for target practice, what's the purpose of that?" Justice Richard Palmer asked Tuesday at a packed hearing in the Connecticut Supreme Court, where families seek to revive a lawsuit against the company over the 2012 Sandy Hook Elementary School massacre by Adam Lanza using the company's assault weapon.

EXHIBIT

B-18

22-01021-hcm  Doc#1-3  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B  Pg 175 of 419



People speak on the steps of the Connecticut supreme court on Nov. 14 after a hearing to revive their lawsuit. *Photographer: Erik Larson/Bloomberg*

"It's not clear to me what type of target practice requires one to really eviscerate a target," Palmer said, adding that the families described the weapon as a "killing machine."

James Vogts, Remington's attorney, said that the ads were intended to build interest in the gun, which he said can also be used for self defense.

"If I felt the need to have a firearm to protect myself and my family, I'd certainly want to choose the weapon that would force the opposition to bow down," Vogts said. He also said that the weapon is "being used to hunt deer at this very moment all across the country."

The hearing in Hartford ended without a ruling. A decision in favor of the victims won't be a final victory, as the case would be sent back to the lower court for further proceedings and eventually a trial.

## Family Position

After the hearing, some of the families gathered on the courthouse steps. Ian Hockley, whose six-year-old son Dylan was killed in the attack, blasted Remington's sale of Bushmaster military-style weapons to civilians without the type of extensive training and psychological screening that's required for a soldier to be issued such a weapon in the military.

"The manufacturer of the Bushmaster takes no such precautions when unleashing their product in the civilian market," Hockley said. "They could not care less what happens to their guns once the cash is in the bank, showing their utter disregard for the lives this weapon takes."

Lawyers for the family members have asked the court to revive the suit that was dismissed last year by Judge Barbara Bellis in Bridgeport, Connecticut. She ruled that it was blocked by the federal Protection of Lawful Commerce in Arms Act, or PLCAA, which bars gun companies from being held liable for crimes committed with their products.

The statute, backed by the National Rifle Association, has helped the industry defeat similar cases, with the Sandy Hook suit perhaps the highest-profile example. Opponents say easy access to guns is to blame for continued mass shootings in the U.S., including the Oct. 1 massacre of 58 people at a concert in Las Vegas and the slaughter just a month later of 26 people in a Texas church.

On Tuesday, at least five people are dead, including the gunman, after a shooting in Northern California's Tehama County, according to CNN.

The Sandy Hook case hinges on an exception to the federal immunity law that applies when a seller "negligently entrusts" a weapon to a buyer who is likely to use it in a crime. Remington argues the exception is intended to apply to face-to-face transactions involving retailers and individuals -- not to manufacturers.

The families' argument seeks a novel way around the federal immunity provision. Even by getting the suit to trial, the families hope to gain access to gunmakers' internal communications, which may aid others seeking to pursue similar suits growing out of gun violence.

The massacre at Sandy Hook was caused "solely by the criminal misuse of a weapon by Adam Lanza," Bellis said in last year's ruling. "This action falls squarely within the broad immunity provided by PLCAA."

The families have argued Bushmaster Firearms International LLC, maker of the rifle, and parent Remington should have known that mass shootings such as the attack at the Sandy Hook school might result from selling military-grade weapons with 30-round clips to civilians.

Connecticut Justices to Hear High-Stakes Sandy Hook Gun Case

The group contends that the gunmaker's disregard for what was likely to happen was equivalent to gun retailers selling weapons to customers who they knew were likely to commit a crime -- a scenario that isn't protected by the 2005 federal law shielding gun manufacturers.

"They marketed the weapon for exactly what it was," plaintiffs attorney Josh Koskoff said in court, adding that Remington even used product placement to get its weapon in first-person-shooter video games played by Lanza.

Koskoff said the use of the AR-15 in so many mass shootings was foreseeable by the company and that Remington sought to maximize sales by marketing them to susceptible young men such as Lanza, who killed 20 children and six adults at the school on Dec. 14, 2012.

When Lanza prepared for his massacre that morning, he put on tactical gear, taped 30-round magazines together and reached for a weapon that Remington should never have made available to him, Koskoff said.

"The weapon he needed for his mission was never in doubt," he said. "Remington may never have known, but they had been courting him for years. The courtship between Remington and Adam Lanza is at the heart of this case."

The company has argued that the question of whether the AR-15 should be sold to the public should be dealt with by legislators rather than juries.

Assault weapons were banned in Connecticut after the Sandy Hook shooting. In June, the U.S. Supreme Court declined to hear a challenge to the law. A federal ban on such weapons was passed in 2004 and expired a decade later. Renewed efforts by mostly Democratic lawmakers to reinstate it have repeatedly failed.

The case is Soto v. Bushmaster Firearms International LLC, 15-cv-6048103, Connecticut Superior Court (Bridgeport).

*(Adds California shooting.)*

Terms of Service
Trademarks Privacy Policy
©2018 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices    Contact Us Help



# CCDL Blog

Connecticut Citizens Defense League, Inc. Blog

# Soto v. Bushmaster

Posted on June 20, 2017 by Chris

**FOR IMMEDIATE RELEASE**

**Connecticut Citizens Defense League Files Brief Opposing Lawsuit that Seeks to Make Gun Manufacturers Liable for Gun Crimes Because Firearms are "too Dangerous" for Law-abiding Citizens**

June 20, 2017  (Groton, CT)

The Connecticut Citizens Defense League (CCDL) has filed an *amicus curiae* brief in the Connecticut Supreme Court opposing an attempt to impose legal liability on the manufacturers and sellers of the firearm used in the Sandy Hook tragedy. The Supreme Court case (Soto v Bushmaster), brought by lawyers representing the estates of several victims of the shooting, is based on the novel theory that the firearm used in the shooting is "too dangerous" to sell to ordinary, law-abiding citizens, and that the makers of the gun should thus be on the hook whenever it is misused to cause injury. But as CCDL's brief points out, the particular type of firearm used by Adam Lanza at Sandy Hook in fact has about *one-fourth* as much firepower as many ordinary hunting rifles, because it uses lightweight ammunition. And crime statistics show that ordinary handguns are *over fifteen times more likely* to me used by "mass shooters" than the model of firearm chosen by Lanza. If the defendants are held liable in this case, then, it will set a precedent that would expose businesses to legal liability *each time they sell virtually any type of firearm* in Connecticut.

The State Superior Court rejected the Plaintiffs' theory, noting that it "would be a dramatic change in tort doctrine." But the Plaintiffs have now appealed to the Supreme Court.

"The implications of the radical theory of tort law advanced by Plaintiffs' lawyers in this case are dangerous and breathtaking," said Scott Wilson, President of CCDL. "When you realize that by every empirical measure, the type of firearm at issue in this case is *less* dangerous and *less* likely to be used in any kind of violent crime, including mass shootings, than an ordinary hunting rifle or handgun, it becomes clear that this is just the latest effort in the long-running campaign by anti-gun activists to make the manufacturers of *any* firearm liable simply because criminals or the mentally unstable misuse their product." But the Second Amendment protects the right to sell firearms to

lawful citizens, according to multiple federal court decisions; and a federal statute also generally forecloses attempts to make firearm manufactures and retailers liable for the misuse of the firearms they sell, so long as the sale itself was lawful. "Plaintiffs' effort to choke off the sale of virtually all ordinary firearms is contrary to both the Constitution and federal law," Mr. Wilson said. "CCDL hopes that our brief will help the Supreme Court to recognize the truly radical—and unconstitutional—implications of this lawsuit."

The full brief can be downloaded here: CCDL-Amicus-AS-FILED (pdf)

**SHARE THIS:**

 Facebook      Twitter     G+ Google      Email      More

This entry was posted in **Litigation**, **Press Release** and tagged **Amicus Curiae**, **Scott Wilson**, **Soto v Bushmaster** by Chris. Bookmark the **permalink [http://ccdl.us/blog/2017/06/20/soto-v-bushmaster/]** .

4 THOUGHTS ON "SOTO V. BUSHMASTER"

richard4301
on June 20, 2017 at 7:51 pm said:

Good move, CCDL. Thank you, Scott, and supporting staff.

Richard Burton
on June 20, 2017 at 10:55 pm said:

None of the parents from Sandy Hook should drive any car, because the car might commit a crime while thier behind the wheel !

Mark
on June 21, 2017 at 7:17 am said:

What a great organization we have in CCDL! Thank you for helping protect my/our right!

22-01021-hcm  Doc#1-3  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B Pg 181 of 419

chris
on June 21, 2017 at 7:20 pm said:

Nice to see all the support Remington is getting! WTG everyone!

# Comments are closed.

Exhibit B-20 is a thumb drive containing a true and correct copy of a video posted on the Sessions Law Firm website at the following url address: https://www.thesessionslawfirm.com/takeaways-sandy-hook-victims-lawsuit-remington-bushmaster.

**EXHIBIT**

B-20

**Pic🔘Your NPR Station**
There are at least two stations nearby

**shootings in newtown, conn.**

NEWSCAST                    LIVE RADIO                    SHOWS

# Transcript: President Obama At Sandy Hook Prayer Vigil

December 16, 2012 · 10:39 PM ET



President Obama speaks at an interfaith vigil for the shooting victims from Sandy Hook Elementary School on Sunday at
Newtown High School in Newtown, Connecticut.

*Getty Images*

*Transcript of President Obama's speech at the interfaith vigil in Newtown, Conn.,
Dec. 16 in honor of the victims of the shootings at Sandy Hill Elementary. Source:
White House*

**EXHIBIT**

**B-21**

Thank you. (Applause.) Thank you, Governor. To all the families, first responders, to the community of Newtown, clergy, guests — Scripture tells us: "...do not lose heart. Though outwardly we are wasting away...inwardly we are being renewed day by day. For our light and momentary troubles are achieving for us an eternal glory that far outweighs them all. So we fix our eyes not on what is seen, but on what is unseen, since what is seen is temporary, but what is unseen is eternal. For we know that if the earthly tent we live in is destroyed, we have a building from God, an eternal house in heaven, not built by human hands."

## Listen: President Obama at Newtown, Conn., Memorial Service

LISTEN     QUEUE

Download

We gather here in memory of twenty beautiful children and six remarkable adults. They lost their lives in a school that could have been any school; in a quiet town full of good and decent people that could be any town in America.

Here in Newtown, I come to offer the love and prayers of a nation. I am very mindful that mere words cannot match the depths of your sorrow, nor can they heal your wounded hearts. I can only hope it helps for you to know that you're not alone in your grief; that our world too has been torn apart; that all across this land of ours, we have wept with you, we've pulled our children tight. And you must know that whatever measure of comfort we can provide, we will provide; whatever portion of sadness that we can share with you to ease this heavy load, we will gladly bear it. Newtown — you are not alone.

As these difficult days have unfolded, you've also inspired us with stories of strength and resolve and sacrifice. We know that when danger arrived in the halls of Sandy Hook Elementary, the school's staff did not flinch, they did not hesitate. Dawn Hochsprung and Mary Sherlach, Vicki Soto, Lauren Rousseau, Rachel Davino and Anne Marie Murphy — they responded as we all hope we might respond in such terrifying circumstances — with courage and with love, giving their lives to protect the children in their care.

We know that there were other teachers who barricaded themselves inside classrooms, and kept steady through it all, and reassured their students by saying "wait for the

good guys, they're coming"; "show me your smile."

And we know that good guys came. The first responders who raced to the scene, helping to guide those in harm's way to safety, and comfort those in need, holding at bay their own shock and trauma because they had a job to do, and others needed them more.

And then there were the scenes of the schoolchildren, helping one another, holding each other, dutifully following instructions in the way that young children sometimes do; one child even trying to encourage a grown-up by saying, "I know karate. So it's okay. I'll lead the way out." (Laughter.)

As a community, you've inspired us, Newtown. In the face of indescribable violence, in the face of unconscionable evil, you've looked out for each other, and you've cared for one another, and you've loved one another. This is how Newtown will be remembered. And with time, and God's grace, that love will see you through.

But we, as a nation, we are left with some hard questions. Someone once described the joy and anxiety of parenthood as the equivalent of having your heart outside of your body all the time, walking around. With their very first cry, this most precious, vital part of ourselves — our child — is suddenly exposed to the world, to possible mishap or malice. And every parent knows there is nothing we will not do to shield our children from harm. And yet, we also know that with that child's very first step, and each step after that, they are separating from us; that we won't — that we can't always be there for them. They'll suffer sickness and setbacks and broken hearts and disappointments. And we learn that our most important job is to give them what they need to become self-reliant and capable and resilient, ready to face the world without fear.

And we know we can't do this by ourselves. It comes as a shock at a certain point where you realize, no matter how much you love these kids, you can't do it by yourself. That this job of keeping our children safe, and teaching them well, is something we can only do together, with the help of friends and neighbors, the help of a community, and the help of a nation. And in that way, we come to realize that we bear a responsibility

for every child because we're counting on everybody else to help look after ours; that we're all parents; that they're all our children.

This is our first task — caring for our children. It's our first job. If we don't get that right, we don't get anything right. That's how, as a society, we will be judged.

And by that measure, can we truly say, as a nation, that we are meeting our obligations? Can we honestly say that we're doing enough to keep our children — all of them — safe from harm? Can we claim, as a nation, that we're all together there, letting them know that they are loved, and teaching them to love in return? Can we say that we're truly doing enough to give all the children of this country the chance they deserve to live out their lives in happiness and with purpose?

I've been reflecting on this the last few days, and if we're honest with ourselves, the answer is no. We're not doing enough. And we will have to change.

Since I've been President, this is the fourth time we have come together to comfort a grieving community torn apart by a mass shooting. The fourth time we've hugged survivors. The fourth time we've consoled the families of victims. And in between, there have been an endless series of deadly shootings across the country, almost daily reports of victims, many of them children, in small towns and big cities all across America — victims whose — much of the time, their only fault was being in the wrong place at the wrong time.

We can't tolerate this anymore. These tragedies must end. And to end them, we must change. We will be told that the causes of such violence are complex, and that is true. No single law — no set of laws can eliminate evil from the world, or prevent every senseless act of violence in our society.

But that can't be an excuse for inaction. Surely, we can do better than this. If there is even one step we can take to save another child, or another parent, or another town, from the grief that has visited Tucson, and Aurora, and Oak Creek, and Newtown, and communities from Columbine to Blacksburg before that — then surely we have an obligation to try.

In the coming weeks, I will use whatever power this office holds to engage my fellow citizens — from law enforcement to mental health professionals to parents and educators — in an effort aimed at preventing more tragedies like this. Because what choice do we have? We can't accept events like this as routine. Are we really prepared to say that we're powerless in the face of such carnage, that the politics are too hard? Are we prepared to say that such violence visited on our children year after year after year is somehow the price of our freedom?

All the world's religions — so many of them represented here today — start with a simple question: Why are we here? What gives our life meaning? What gives our acts purpose? We know our time on this Earth is fleeting. We know that we will each have our share of pleasure and pain; that even after we chase after some earthly goal, whether it's wealth or power or fame, or just simple comfort, we will, in some fashion, fall short of what we had hoped. We know that no matter how good our intentions, we will all stumble sometimes, in some way. We will make mistakes, we will experience hardships. And even when we're trying to do the right thing, we know that much of our time will be spent groping through the darkness, so often unable to discern God's heavenly plans.

There's only one thing we can be sure of, and that is the love that we have — for our children, for our families, for each other. The warmth of a small child's embrace — that is true. The memories we have of them, the joy that they bring, the wonder we see through their eyes, that fierce and boundless love we feel for them, a love that takes us out of ourselves, and binds us to something larger — we know that's what matters. We know we're always doing right when we're taking care of them, when we're teaching them well, when we're showing acts of kindness. We don't go wrong when we do that.

That's what we can be sure of. And that's what you, the people of Newtown, have reminded us. That's how you've inspired us. You remind us what matters. And that's what should drive us forward in everything we do, for as long as God sees fit to keep us on this Earth.

"Let the little children come to me," Jesus said, "and do not hinder them — for to such belongs the kingdom of heaven."

Charlotte. Daniel. Olivia. Josephine. Ana. Dylan. Madeleine. Catherine. Chase. Jesse. James. Grace. Emilie. Jack. Noah. Caroline. Jessica. Benjamin. Avielle. Allison.

God has called them all home. For those of us who remain, let us find the strength to carry on, and make our country worthy of their memory.

May God bless and keep those we've lost in His heavenly place. May He grace those we still have with His holy comfort. And may He bless and watch over this community, and the United States of America. (Applause.)

## Get The Stories That Grabbed Us This Week

Illuminating storytelling, deep investigations, intriguing discoveries - these are the NPR stories you don't want to miss.

What's your email?

SUBSCRIBE

By subscribing, you agree to NPR's terms of use and privacy policy.

More Stories From NPR



**NEWS**

Sandy Hook Killer's Father Wishes His Son Hadn't Been Born



ALL THINGS CONSIDERED

*In Newtown, Making Promises To Transform A Tragedy*

# Popular on NPR.org

22-01021-hcm Doc#1-3 Filed 04/18/22 Entered 04/18/22 12:34:52 Exhibit B Pg 190 of 419



POLITICS

Trump Signs Order To End Family Separations



ANALYSIS

Family Separation Is Trump's Immigration Policy. Here's Why He Won't Own It

22-01021-hcm Doc#1-3 Filed 04/18/22 Entered 04/18/22 12:34:52 Exhibit B Pg 191 of 419



NATIONAL

What We Know: Family Separation And 'Zero Tolerance' At The Border



WORLD

U.S. Announces Its Withdrawal From U.N. Human Rights Council

# NPR Editors' Picks

22-01021-hcm   Doc#1-3   Filed 04/18/22   Entered 04/18/22 12:34:52   Exhibit B Pg 192 of 419



NATIONAL

## Trump's Executive Order On Family Separation: What It Does And Doesn't Do



NATIONAL

## The Last 'Zero Tolerance' Border Policy Didn't Work



ASIA

'Born Independent,' Taiwan's Defiant New Generation Is Coming Of Age



EUROPE

Hungary Passes 'Stop Soros' Laws, Bans Aid To Undocumented Immigrants

**shootings in newtown, conn.**

READ & LISTEN                        CONNECT

**Home**                              **Newsletters**

**News**                              **Facebook**

**Arts & Life**                       **Twitter**

**Music**                             **Instagram**

**Podcasts**                          **Contact**

**Programs**                          **Help**


ABOUT NPR                            GET INVOLVED

**Overview**                          **Support Public Radio**

**Finances**                          **Sponsor NPR**

**People**                            **NPR Careers**

**Press**                             **NPR Shop**

**Ombudsman**                         **NPR Events**

**Corrections**                       **Visit NPR**


terms of use

privacy

sponsorship choices

text only

© 2018 npr

**abc**NEWS

Video
Live
Shows
Good Morning America Good Morning America
World News Tonight World News Tonight
Nightline Nightline
20/20 20/20
This Week This Week
The View The View
What Would You Do? What Would You Do?
ABC News Features ABC News Features
:::

U.S.
ABC News Features
Politics
International
Entertainment
Lifestyle
Health
Virtual Reality
Investigative
Technology
Weather
Sports
Privacy PolicyPrivacy Policy
Your CA Privacy RightsYour CA Privacy Rights
Children's Online Privacy PolicyChildren's Online Privacy Policy
Interest-Based AdsInterest-Based Ads
Terms of UseTerms of Use
Contact UsContact Us

Yahoo!-ABC News Network | © 2018 ABC News Internet Ventures. All rights reserved.

Menu         LOG IN

Search Headlines, News and Video...





WATCH    5 years after tragedy, family members of Sandy Hook shooting victims work for change

Shannon Watts, a mother of five who became a gun control activist in the wake of the shooting at Sandy Hook Elementary School, thought her advocacy work was going to be over shortly after it began.

### Interested in Gun Control?

Add Gun Control as an interest to stay up to date on the latest Gun Control news, video, and analysis from ABC News.

Gun Control        + Add Interest

On Dec. 15, 2012, the day after 20 students and six educators were killed by a shooter in Newtown, Connecticut, she started a Facebook group that eventually became Moms Demand Action for Gun Sense in America.

"I have never been impacted by gun violence personally," Watts, who lives in Colorado, told ABC News. "I was just incredibly angry after the Sandy Hook shooting because I was seeing pundits on television saying the solution to the horrific tragedy there was arming teachers. And just as an American and as a mom, I knew that wasn't right."

Many, like her, thought the killing of children and teachers would be a turning point in the fight for gun control. But months later, two major pieces of legislation — the Assault Weapons Ban of 2013 and the Manchin-Toomey Amendment, which would have required universal background checks for firearm sales — failed to pass the Senate.

EXHIBIT

B-22



Shannon Watts, pictured, started a Facebook group the day after the Sandy Hook shooting and that group has turned into a nati... **more +**

"I can remember thinking, 'Our work here is done. We tried really hard, and we weren't able to pass this law,'" Watts said of the Manchin-Toomey Amendment's failure.

But rather than quit the fight, she said, her group and "all of these brilliant, type-A women" who were motivated to change laws after the shooting instead "started pivoting to the states."

**Taking it to the states**

The state level is where the majority of the action on gun legislation has happened in the past five years. All told, since Sandy Hook, there have been 210 laws enacted to strengthen gun safety, according to the Giffords Law Center to Prevent Gun Violence.

That includes background check laws in four states that didn't have them before and expansions of existing background check laws in seven others, bringing the total to 18 states and the District of Columbia with background checks in place, according to the center.

22-01021-hcm   Doc#1-3   Filed 04/18/22   Entered 04/18/22 12:34:52   Exhibit B   Pg 197 of 419



President Barack Obama is accompanied by former lawmaker Gabrielle Giffords, vice president Joe Biden and family members ... **more +**

"Now 49 percent of Americans live in states with expanded background check laws," said Avery Gardiner, a co-president of the Brady Campaign to Prevent Gun Violence.

"In some states, people are considerably safer than they were five years ago from gun violence, but that's not true at the federal level. Overall as a nation, people are dying at far too great a rate," Gardiner added.

Watts is far from alone in being motivated to act after Sandy Hook. Chris Murphy, D-Conn., was elected to move up from the House of Representatives to the Senate five weeks before the shooting. He said he was standing on a train platform on his way to Manhattan to take his young children to see the Rockettes when he learned what happened.

"My life changed in December 2012. It's not that I wasn't emotionally connected to the issues I worked on prior to Sandy Hook, but there's something different when 20 schoolkids are murdered in your backyard," he told ABC News.



Sen. Chris Murphy, D-Conn. speaks on the floor of the Senate on Capitol Hill in Washington D.C., Wednesday, June 15, 2016, wh... **more +**

"My kids were just a little bit younger than the kids that were killed, so this was personal," he added.

Over the course of the past five years, Murphy has been outspoken in his calls for gun safety. In the last 12 months alone, he has sponsored one piece of federal legislation and co-sponsored nine other bills related to guns.

But federal legislation is not where gun control advocates have seen the most success. He pointed to state-level laws, electing politicians who support tightened gun laws, and ballot referendums as meaningful ways that changes have been made.

# HOW BACKGROUND CHECKS CHANGED AFTER SANDY HOOK

⬤ **STATES THAT HAD BACKGROUND CHECKS BEFORE SANDY HOOK**

◒ **STATES THAT ADDED BACKGROUND CHECKS AFTER SANDY HOOK**

◑ **STATES THAT EXPANDED EXISTING BACKGROUND CHECKS AFTER SANDY HOOK**



\* NEVADA PASSED BACKGROUND CHECK MEASURES IN 2016 BUT THEY HAVE NOT YET BEEN ENACTED.

6/20/2018                    How gun laws have changed in the 5 years since Sandy Hook - ABC News
22-01021-hcm  Doc#1-3  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B  Pg 200 of 419
Source: Giffords Law Center to Prevent Gun Violence

"We've found that referendums are a very potent tool," Murphy said.

Referendums and ballot initiatives were what led to major changes in certain states, with all but one gun regulation-related measure passing.

Background checks were passed in Washington and Nevada, although the Nevada law has yet to be enacted. A referendum in California led to a number of regulation expansions, including background checks on certain ammunition purchases and requirements for reporting lost or stolen firearms. The referendum that failed was a background check measure in Maine.

"Change is going to be very hard in Washington, and I think it's likely that we're going to continue to look at referendums as a way to make change," Murphy said.



A overall view of the exhibit floor at the National Rifle Association's (NRA) annual meetings and exhibits show in Louisville, Kentu... **more +**

**Wins for Second Amendment advocates**

The 2013 failures of the Assault Weapons Ban and the Manchin-Toomey Amendment stand out as the two biggest blows to federal gun control legislation, but gun rights advocates have celebrated other legislative wins since the Sandy Hook shooting as well.

A National Rifle Association spokesperson said that while the group and its members felt that they were playing defense during the Obama administration, they now can switch to offense with the Republican majorities in the House and Senate and Donald Trump in the

White House. Trump has made his support of the NRA clear, becoming the first president since Ronald Reagan to address the group as president.

Most recently, the House of Representatives passed the Concealed Carry Reciprocity Act, allowing people who have a concealed carry permit from one state to use it in all other states. The NRA hailed it as a victory on Dec. 6.

"This vote marks a watershed moment for Second Amendment rights," Chris Cox, the executive director of the NRA's Institute for Legislative Action, said in a statement.



President Donald Trump stands with National Rifle Association (NRA) President Wayne LaPierre, right, and NRA-ILA Executive Dir... more +

He went on to call the act's passage in the House "the culmination of a 30-year movement recognizing the right of all law-abiding Americans to defend themselves and their loved ones, including when they cross state lines."

Aside from the Concealed Carry Reciprocity Act, an NRA spokesperson told ABC News, Trump's appointment of Supreme Court Justice Neil Gorsuch, Attorney General Jeff Sessions and Interior Secretary Ryan Zinke were all victories for Second Amendment supporters.

Gorsuch's appointment is seen as a win in that during his 2017 confirmation hearing, he called the Supreme Court's decision in District of Columbia v. Heller "the law of the land." In that case the Supreme Court ruled in 2008 that a handgun ban in Washington, D.C., stipulating that guns be kept unloaded and disassembled violated residents' rights to bear arms in their homes for self-defense. Gun rights advocates worried before the 2016 presidential election that if Hillary Clinton won, she would appoint a justice with a narrower view of the Second Amendment.

Zinke and Sessions have rolled back gun regulations in their departments.

Zinke signed an order in September that expanded hunting and fishing and types of ammunition allowed on federal lands. The order was met with praise from gun rights groups.

In October, Sessions' Justice Department narrowed the federal definition of "fugitive from justice" to apply only to people with outstanding arrest warrants who cross state lines, as opposed to those who remain in the state where they are wanted, according to a memo that has been verified by a DOJ official for ABC News.

With that narrower definition, tens of thousands of names were removed from the FBI's National Instant Criminal Background Check System, or NICS, which is used to determine whether someone is prohibited under federal law from buying firearms.

A DOJ official told ABC News that since changing the definition, the FBI's criminal justice information systems division has issued further guidance to those who input fugitive data into the background check system.

"The Justice Department is committed to working with law enforcement partners across the country to help ensure that all those who can legally be determined to be prohibited from receiving or possessing a firearm be included in federal criminal databases," the official said.

Gun control advocates, like Gardiner at the Brady Campaign, are opposed to the change to the definition of a fugitive.

"Why would you make it easier for people who are fleeing police to buy guns?" Gardiner asked.



Moms demand action for gun sense in America carry a banner at the San Diego Pride Parade.

**Rate of change**

Laura Cutilletta has worked at the Law Center to Prevent Gun Violence for 15 years. The group joined with former Rep. Gabby Giffords in the wake of Sandy Hook and is now known as the Giffords Law Center to Prevent Gun Violence. Cutilletta said she has noticed a definite change in attitudes about guns the last five years.

"The public, even though they've always been in support of strengthening gun laws, it hasn't always been obvious to the public just how bad our gun laws are," Cutilletta told ABC News. "So when Newtown happened, people couldn't help but notice because it was such a horrific event, and people became more educated, more aware, and became mobilized to do something about it."

That was the case for Watts, whose group, Moms Demand Action for Gun Sense in America, now has 4 million members and chapters in each state.

And it was the case for Murphy.

"I'm embarrassed by the fact that I didn't work on the issue of gun violence before Sandy Hook," he said, adding that it makes him want to "kick himself" for not acting on the issue sooner.

"My eyes were opened to the broader epidemic after Sandy Hook," Murphy added.

*Correction: A previous version of this story misstated the name of Watts' group. It is Moms Demand Action for Gun Sense in America.*

**Sponsored Stories**

Recommended by



**27 Photos That Will Make You Say, "There Is No Way This Is In Walmart"**
Offbeat



**[Photos] She Begged Him For Years To Clean Up His Look, When He Did The Results Were Astounding**
Absolutehistory



**[Gallery] Inconsiderate Neighbor Blocks Woman's Driveway Until 'Tough' Man Teaches Him A Lesson**
Scribol



**The 30 Worst Failed Chain Restaurants That No One Misses**
Ice Pop

---

Comments

---

**ADD INTERESTS**

Customize your news feed by choosing the topics that interest you.

| Immigration | + Add Interest | Donald Trump | + Add Interest |
|---|---|---|---|
| Congressional panel respond to 'zero-tolerance' immigration policy | | Trump holds campaign rally in Minnesota | |
| Trump signs executive order he says will keep immigrant families together | | 'I didn't like the sight': Trump signs executive order ending family separation | |

Lawmakers struggle to agree
on immigration fix ahead of
House votes Thursday

Trump says he will sign
'something' soon to keep
immigrant families together

What are 'tender age'
shelters?

SPECIAL REPORT: Trump says
he will act to keep families
together

# Heartbreaking stories of children impacted by border crisis

By **MEGHAN KENEALLY**　Jun 20, 2018, 4:48 PM ET



WATCH　Protestors, politicians demand change on immigration policy

T    names are a mystery and in some cases, their faces are too.

**Interested in Immigration?**

Add immigration as an interest to stay up to date on the latest immigration
news, video, and analysis from ABC News.

Immigration                                            + Add Interest

But the stories of the children caught in the crosshairs of the "zero
tolerance" policy at the border are resonating with people across the
country.

Here are some of the stories of children whose experiences have
captured the nation's attention.

**The girl pictured crying for her mother**



A two-year-old Honduran asylum seeker cries as her mother is searched and detained near the U.S.-Mexico border on June 12, ... more +

One of the most iconic images of the border crisis featured a 2-year-old girl from Honduras.

John Moore, a special correspondent and senior staff photographer for Getty Images, took the photo after spotting the girl in her mother's arms while he was participating in a ride-along with Customs and Border Protection agents in Texas.

He saw a group of roughly 20 mothers and children late on June 12, "gathered on a dirt road" in a part of the Rio Grande Valley and, upon approaching the group, he saw the girl in her mother's arms.

Moore said that he saw that the mother was breastfeeding her daughter "to keep her calm" and that, later, one of the agents asked the mother to put her daughter down.

"Once the mother put her on the ground she started screaming immediately," Moore said.

The mother and daughter were taken away from the scene together, and because their names are unknown, it remains unclear if they were separated, though the policy mandates that if the mother faced charges they would be separated.

Read more about Moore's experience here.

**The boy put in foster care with American parents**

When a 9-year-old Guatemalan boy arrived at a Michigan foster care home, he was so afraid he couldn't eat.

22-01021-hcm   Doc#1-3   Filed 04/18/22   Entered 04/18/22 12:34:52   Exhibit B   Pg 206 of 419

Over time, the boy, whose name has not been released, confided to his foster parents that he and his father had escaped violence and poverty in their homeland only to be greeted with more hardship when they arrived at the U.S.-Mexico border, where the boy watched his dad being taken from him in handcuffs.

"When he came to us, he was extraordinarily fearful,"said Jen, the new foster mother of the boy, who asked ABC News not to use her last name to protect the family's privacy. "He came in all-black clothes, we learned, because he traveled at night with his dad and they didn't want to be seen."

The child handed them a piece of paper from a packet his mother had sewn into his pants before he and his father left home. The paper contained phone numbers of people his family knew in the United States, as well his mother's phone number in Guatemala.

While a Michigan caseworker was collecting the father and son's intake information, she called the mom's phone and she answered.

"He was overcome," said Jen. "He couldn't talk. He was crying so hard he was almost to the point of being sick."

Over the past eight months, the boy, now 10, opened up - telling caseworkers the story of his and his father's treacherous journey to what they thought would be the land of promise.

Read more about the boy's journey here.

**The heartbreaking audio**



Meet the young girl heard sobbing for separated family

The recording first reported and released by ProPublica of crying children in one of the shelters included the voices of a number of distraught children, and one of them has since been identified.

Alison Jimena Valencia Madrid is a 6-year-old girl who fled gang violence in El Salvador with her mother.

She's heard on the tape asking an official in Spanish, "Are you going to call my aunt so that when I'm done eating, she can pick me up?"

She memorized her aunt's phone number, and the aunt told ProPublica that she was allowed to make the phone call, but it was still heartbreaking.

"She's crying and begging me to go get her. She says, 'I promise I'll behave, but please get me out of here. I'm all alone,'" the aunt told ProPublica.

Watch our video report about her story here.

| Comments |
| --- |

22-01021-hcm   Doc#1-3   Filed 04/18/22   Entered 04/18/22 12:34:52   Exhibit B   Pg 208 of 419



Healthcare Pros | Home Pros | Health Watch | Cool Guys Wear Gowns | Watch Live

**76°**
Few Clouds
Midlothian    **FULL FORECAST**

**EXHIBIT**
tabbies **B-23**

Search

# Fear of gun control fueling several conspiracy theories

(RNN) - As the gun control debate heats up in America, several conspiracy theories have gained traction online claiming that the Sandy Hook shooting was a hoax and even that President Barack Obama has ordered assassinations of gun rights advocates - all so the government can take away people's guns.

The theories have little if any hard evidence backing their claims. But with the power of social media, blogs, and a growing fear among gun rights activists that the Second Amendment is under attack, the claims have proliferated and many online have expressed belief that the charges are credible.

The Sandy Hook hoax has been propelled by a video that has gone super-viral with approximately 10 million views in just one week.

The video claims that there was at least one more shooter in the attack, that the grieving parents are actors playing a part, and web pages making reference to the shooting - including Facebook memorial pages for victims - were created before the attack took place.

The claims have been debunked on several websites, including Snopes.com, mainly by simply pointing to the lack of evidence.

But another theory has been circulating, and it is about as strange as the Sandy hook hoax conspiracy.

## Rumors of anti-gun "death squads" assassinating gun advocates

The other theory floating on the internet has not drawn as much attention as the "Sandy Hook hoax," but it has become a staple topic on websites and blogs that often talk about government cover-ups and conspiracies, such as Infowars.com and NaturalNews.com.

This theory centers on the recent deaths of two popular personalities among gun enthusiasts: John Noveske, the owner of Noveske Rifleworks and a well-respected figure in the gun industry and Keith Ratliff, a gun manufacturer and weapons importer who helped produce FPS Russia, a YouTube channel featuring weapons demonstrations that has had more than 500 million views - good enough for top 10 on the social media site.

The two men - both only in their 30s - died within two days of each other.

Noveske died in a car crash on Jan. 5. And two days before that, Ratliff was found dead in his weapons-making business with a bullet in the back of his head.

Infowars.com has been at the center of the rumor. It is a site run by Alex Jones, a popular radio host who has been praised for his coverage of U.S. drone activity but has also drawn ridicule for making claims about such things as juice boxes being part of a government plan to turn kids into homosexuals. He has devoted much web space to this theory, as has NaturalNews.com, a site devoted to news about alternative theories to politics and health, and EUTimes.com, a site that the Southern Poverty Law Center alleges has ties to white supremacists.

The theory argues that Noveske and Ratliff were targeted because they had great influence in the gun industry and were public about their beliefs that the Obama administration wants to restrict gun rights.

The *EU Times* goes one step further, claiming "Obama death squads" made the hits, citing an unnamed and unlinked to report by Russian security forces.

The publication claims that in the weeks before his death, Noveske made several Facebook posts critical of gun control talk in the aftermath of the Sandy Hook massacre. He also posted a statement by a friend arguing that mass shooters were under the control of psychotropic drugs - a statement several proponents of this theory claim to be the "post that got him killed."

Ratliff's death was ruled a homicide by authorities in his home state of Georgia, but no official explanation has yet to be delivered.

According to the *EU Times*, the death squads aim to send a "chilling message to all who oppose their plan to totally disarm the American people."

The belief that a Sandy Hook hoax and two deaths of gun rights proponents were conducted as a plan to create more gun control to disarm the American public has attracted support from many corners, including Infowars and Natural News commenters. And Noveske's Facebook page is full of people arguing that he died as a result of a conspiracy.

One commenter wrote: "It's a [expletive] government conspiracy to make guns look dangerous so they can come take them from us! I live out in the sticks and raised on shotguns and so is all my family. Come and get it boys. I will die before I disarm! DONT TREAD ON ME!"

Another wrote: "...Noveske was murdered by the government because he spoke the truth about the government and Big Pharma being corrupt psychopaths and the government murdered him because the government does not want people to wake up and realize that the government and Big Pharma are in fact lying to the public all the time."

Many of the comments and articles point fingers at the recent National Defense Authorization Act, which has been roundly criticized for allowing citizens to be detained indefinitely and, some argue, allows the president to maintain a "kill list" that can include American citizens.

But even though Ratliff's death was no question a homicide, there seems to be little talk of a conspiracy to kill him outside of NaturalNews and EUTimes. A look at their FPS Russia's Facebook page hardly mentions anything about a conspiracy.

And the star of the videos, Kyle Myers, tweeted: "...lots of crazy rumors out there."

No matter what one thinks of the rumors, they have had consequences outside of the gun control debate.

According to Hartford, CT, TV station WFSB, Gene Rosen, a 62-year-old man who took care of six children after they escaped the Sandy Hook carnage, has been harassed and threatened by conspiracy theorists.

*Copyright 2013 Raycom News Network. All rights reserved.*

## SPONSORED STORIES

Recommended by



**Alienware Amplifier Review: It Turbo-Boosted A Laptop With Titan X Graphics**
*Alienware*



**Alienware Alpha R2 Review: Big Screen Gaming In A Little Package**
*Alienware*



**[Photos] Celeb Couples You Didn't Realize Have Huge Height Differences**
*Direct Expose*



**Plan Your Summer Vacation to the Mediterranean in All-Inclusive Luxury; Find A Cruise Now**
*Regent Seven Seas Cruises*



**New Tax Law Could Mean Big Changes For Retirees**
*Fisher Investments*

**$63 Trading Program Beats Billionaire Investors**
*The Oxus*



**Ever look yourself up? This new site is addicting, enter your name**
*TruthFinder*



**[Gallery] Details You Didn't Know About The Amanda Knox Case**
*Travel Chaser*

## SPONSORED CONTENT

Want to Nurture Your Child's Writing? Try These 10 Tips *Sylvan Learning*

5 Ways Moms Can Create an Almost-Perfect Homework Space for Kids *Sylvan Learning*

How HPE Is Enabling an Edge-Centric, Could-Enabled and Data-Driven World *Hewlett Packard Enterprise*

[Photos] Daughter Returns From School Starved, Mom Learns Teacher Has Been Messing With Her Lunch *materniyweek.com*

Diet Expert Tells All: "It's Like A Powerwash For Your Insides" *Gundry MD*

## WE RECOMMEND

Man killed in apparent farm accident, authorities say

This Louisiana city is older than the pyramids

Boy, 10, shot in head at VA birthday party

9-year-old accidentally shot after family friend kills rattlesnake

Police: Man found in cemetery with 5 girls, 2 unconscious

Recommended by

FCC Public File
publicfile@nbc12.com

EEO Report
Closed Captioning

SEARCH

NEWS    WEATHER    SPORTS    VIDEO    TRAFFIC    ON YOUR SIDE    12 ABOUT TOWN    ABOUT US    RVA TODAY

VIRGINIA NEWS NOW

Privacy Policy    Terms of Service    Ad Choices

Subscribe to The Trace's Newsletter

× Close

# The Trace

June 20, 2018

- Facebook
- Twitter
- Email



Noah Pozner's sister at his grave in Newtown, Connecticut. [Lenny Pozner ]

MASS SHOOTING

# A Grieving Sandy Hook Father's Five-Year Battle Against Mass-Shooting Hoaxers

## Conspiracy theorists say the Newtown massacre was staged. Lenny Pozner has made it his life's work to protect the honor of his murdered son.

by **Mike Spies**   · **@mikespiesnyc**   ·December 12, 2017

Our profile of Lenny Pozner was reported two years ago, during the lead-up to the third anniversary of the Newtown shooting. Since this article's publication, his battle against the Sandy Hook hoaxers has produced some victories. Meanwhile, the major social media platforms have failed to halt new campaigns of harassment launched by conspiracy theorists against families who've lost loved ones during the gun massacres in San Bernardino, Orlando, Las Vegas, and elsewhere.

A year and a half after the mass shooting at Sandy Hook Elementary School in Newtown, Connecticut, Lenny Pozner called to set up a meeting with Wolfgang Halbig. A 68-year-old security consultant, Halbig was the de facto leader of a community of conspiracy theorists, known as hoaxers, who claimed that the shooting had been staged by the government. To the hoaxers, the 26 victims — one of whom was Pozner's 6-year-old son, Noah — were fictional characters.



EXHIBIT
B-24



*Lenny Pozner in an undated photo with his son, Noah.*

It was May 28, 2014, and Pozner, an IT consultant, was in Florida on business. He hoped to sit down with Halbig at a coffee shop near his home in Orlando, Florida. He wanted to talk to him face-to-face about Noah, who was his only son and never far from his mind. On December 14, 2012, the day of the shooting, Pozner had been the one to drop Noah off at school. As they drove, they listened to "Gangnam Style," Noah's favorite song. When they arrived, Pozner said, "Have a fun day," and watched as his child headed inside, fiddling with his backpack and brown jacket.

Ever since his son's death, Pozner had been dealing with the hoaxers. It was his habit to regularly post photos of Noah, a happy boy with soft blue eyes and a wide smile, on his Google Plus page. He would put up pictures of Noah hugging his twin sister, or playing on the beach, or showing off the tooth he lost less than two weeks before he was murdered. The hoaxers would see these images and offer comments: "Where's Noah going to die next?" read one. Another commenter, seemingly believing that Pozner had been recruited to help perpetuate the myth of the shooting, asked, "How much do you get paid?"

Pozner was one of the rare Sandy Hook parents who confronted those who questioned his child's murder. In response to their comments, he posted online his son's birth and death certificates. He shared the medical examiner's report and one of Noah's report cards. The hoaxers said the records were counterfeits.

Pozner remained undaunted. He thought that perhaps if he could show Halbig the documents in person, he and the rest of the hoaxers might at last relent. "I wanted to be as transparent as possible," Pozner says. "I thought keeping the documents private would only feed the conspiracy."

When Pozner did not receive a reply from Halbig, he contacted Kelley Watt, one of the more aggressive hoaxers who showed up on his Google Plus page. Watt wrote back on Halbig's behalf. "Wolfgang does not wish to speak with you," her note said, "unless you exhume Noah's body and prove to the world you lost your son."

Giving up on a meeting with Halbig, Pozner looked to engage in some sort of dialogue with the people who, around this time, made him their chief target. (One video montage that started making the rounds showed images of Noah set to a soundtrack of pornographic sounds.) In June 2014, Pozner accepted an invitation to join a private Facebook group called Sandy Hook Hoax. He told its members that he was willing to answer their questions. "I think I lasted all of eight minutes," he recalls. One participant said, "Man, I'm gonna have to coach you up if you wanna go on TV and make money, Lenny." Another typical attacker proclaimed, "Fuck your fake family, you piece of shit."

Pozner eventually realized that, for Halbig and his brethren, this was a game without end. His efforts to combat them became a mission. "I'm going to have to protect Noah's honor for the rest of my life," he says.

Every modern atrocity or disaster has its attendant conspiracy theories. Their shared thesis is that governments, needing a way to keep the populace in fear, orchestrate mock calamities, using the tools of the state to cover their tracks. Within 24 hours of the recent mass shooting in San Bernardino, California, videos claiming the event was "staged" surfaced on YouTube and received thousands of clicks.

It was the same in 2007, after a senior at Virginia Tech killed 32 people and wounded 17 others in the worst mass shooting in American history up to that time. The record death toll fed rumors that "black ops" must have been behind the incident. Five years later, in the wake of an attack on a movie theater in Aurora, Colorado, Alex Jones, who runs the popular conspiracy site InfoWars, implied that the gunman was in cahoots with the government, pointing listeners to his graduate student work at a "government-funded

A Grieving Sandy Hook Father's Five-Year Battle Against Mass-Shooting Hoaxes

neuroscience program," not mentioning the **fact** that, like most graduate programs, it receives plenty of private funding, as well. In one of the darker ironies America has recently produced, the sheriff investigating the October 2015 mass shooting at Umpqua Community College in Oregon was found to have shared mass-shooting conspiracy theories on Facebook.

Yet even amid this terrible canon, the conspiracy theories that sprang up after Sandy Hook have been exceptional. Less than a month after the shooting, a video called "The Sandy Hook Shooting — Fully Exposed" had received 10 million views on YouTube. Driving some of these hoaxers, in part, was a panic over new firearms restrictions. An infamous conspiracy theorist named James Fetzer called the Newtown attack a "FEMA drill to promote gun control." The National Rifle Association **laid the groundwork** for such sentiments. In February 2012, Wayne LaPierre, the group's executive vice president, described then-first-term President Obama's hidden agenda: "Get re-elected and, with no more elections to worry about…erase the Second Amendment from the Bill of Rights and excise it from the U.S. Constitution."

In the wake of the massacre, Halbig started the website sandyhookjustice.com. He touted his credentials as a former security director for schools in Seminole County, Florida, and claimed he worked on the official investigation into the mass shooting at Columbine High School in 1999. He said his knowledge of security protocols and procedures provided him with a singular ability to analyze what happened that day in Newtown, and highlight what he believed to be the government's many lies. Other hoaxers rallied around Halbig's alleged resume, and donated tens of thousands of dollars to his GoFundMe account. On his show, Alex Jones championed him as a "leading expert" on Sandy Hook.

# Support Our Work

## Help us tell the story of America's gun violence crisis.

Donate Now    **Donate Now**

Halbig became known for asking a set of 16 questions that he argued proved the event was staged, carried out by "crisis actors," whom the government pays to pose as victims during emergency preparedness drills. Halbig claimed the authorities could not provide him with answers that, in fact, were available to the public in the Connecticut State Police report on the shooting. For instance, he wanted to know why paramedics and EMTs weren't allowed to enter the school (they were), and why helicopters weren't used to transport victims to the hospital (with the exception of four wounded, who were taken by ambulance, the rest were dead). Supplied with those facts, he and the hoaxers insisted they had to be fiction, given their source. The whole point, after all, is that the government can never be trusted.

Frustrated by their inability to rattle government officials, hoaxers began attacking the families of victims, accusing them of being "treasonous" government operatives. To press their case, they designated themselves authorities on the physiology of grieving. The parents didn't appear sad enough in interviews, they argued; therefore, they could not possibly have lost children. "They aren't behaving the way human beings would act," the conspiracy theorist **Jay Weidner said** on his radio show. Hoaxers also latched onto time-stamping errors on certain victims' memorial pages, which, because of a common Google bug, made it seem like they were set up the before the massacre. The hoaxers found a photo of a little girl taken after the shooting. Mistaking its subject for her dead sister, they held it up as proof that the victim was still alive.

The conspiracy movement's personal attacks show no sign of abating. **Early this November**, a 32-year-old man was arrested for accosting the sisters of Vicki Soto, a slain teacher, at a Newtown charity event; he wanted to ask them whether a family photo of theirs had been photoshopped.

For the hoaxers, no private moment has been sacred. At one point, they vigorously picked over the details of Noah's funeral. Prior to the ceremony, the family had opened Noah's casket for a private viewing, which was reported in the news. It's not an unusual custom for Jewish families, but hoaxers alleged it was against the laws of the religion, which somehow helped substantiate their claim that Noah wasn't real.

It was around this time that Pozner began to fight back. Halbig's sandyhookjustice.com had by then drawn a benificent counterbalance, blogs like sandyhookfacts.com, devoted to debunking every crackpot claim put forward by the hoaxers, whom they referred to as "conspiratards." Pozner began to work with the blogs'

authors, who had no connection to Newtown or its residents, beyond a shared disgust with Halbig's campaign. "This became my catharsis, my path to healing," Pozner says. "It was how I was getting the pain out of me."

I know that the more garbage that is out there, the more it ages over time, the more the myth becomes accepted as a disgusting historical fact that tries to dismiss the existence of my child. I mean, damn it, his life had value. He existed. He was real."

## Lenny Pozner

Pozner also began filing police reports against his harassers. The reports would never go anywhere, but Pozner didn't care. He put the documents online. "So the hoaxers could see what I was doing," he says. Often, it was enough to cause people to take down the offensive content in question.

During the summer of 2014, two months after Pozner had suggested they meet in Florida, he filed a complaint against Halbig with the Florida attorney general. "I wanted the AG to know he was a fraud," Pozner says. The complaint read, "Mister Halbig is soliciting donation[s] from people to fund his uncovering the Hoax at Sandy Hook… As a parent of a child that was murdered on 12-14-12 in Sandy Hook Elementary school, I feel his scam is just plain wrong."

After Halbig learned of the complaint, he tried calling Pozner several times, leaving messages on his voicemail. He sounded alarmed, and said it was "urgent" that they speak. Halbig denies reaching out, but Pozner saved the voicemails and phone records from that period. I asked Halbig about the discrepancy. "That's very strange," he told me. "Never called him in my life."

On December 16, 2014, shortly after the two-year anniversary of Newtown, Taliban gunmen opened fire at a school in Peshawar, Pakistan, killing 141 people. Soon after, a poster of Noah inexplicably appeared at a vigil there. "I assume it was done out of solidarity," Pozner says.

Halbig and the hoaxers made much of this development. They began to sarcastically refer to Noah as the boy who was "killed twice." Halbig splashed the pictures all over sandyhookjustice.com. Then, in early 2015, he escalated his attacks, posting Pozner's complaint to the attorney general on his website. The complaint contained all of Pozner's contact information.

"So I sued him in September," Pozner says.

The injunction required Halbig to remove the complaint from the Internet. Instead, Halbig took down his entire website. Pozner was pleased with the result, until a month later, when Halbig launched a new website, where he resumed what he calls his "investigation." Last week, Halbig used the site to recirculate photos of Noah that had previously appeared online.

"He does it to mess with me," Pozner says. "It's a taunt." He alerted Godaddy, which hosts the site, that Halbig was violating its terms of service. The photos have since been removed.

To further his cause, Pozner has created an organization, called **the HONR Network**, whose goal is to "bring awareness to Hoaxer activity" and "prosecute those who wittingly and publicly defame, harass, and emotionally abuse the victims of high profile tragedies." Since there is no criminal law that protects families like Pozner's from the darker impulses of the Internet, he and his volunteers — folks he met virtually, when he began debunking — perform a slow and painful task. Whenever a video or a screed appears online attacking the victims of a horrible event, they alert venues like YouTube that their rules have been broken. The victories have been small. Though they've removed hundreds of links from the Internet, there are countless more like them.

"I know that the more garbage that is out there, the more it ages over time, the more the myth becomes accepted as a disgusting historical fact that tries to dismiss the existence of my child," says Pozner. "I mean, damn it, his life had value. He existed. He was real. How dare they."

In November, the HONR Network released an ebook on Halbig, called "The Hoax of a Lifetime." The volume runs more than 100 pages, and digs deeply into his past. One of the things the group reports is that it could find no evidence that Halbig ever worked on an official investigation related to Columbine. But that is not the most interesting revelation. It seems Halbig's tenure as director of security for Seminole County schools was rather unremarkable, save for one particular incident: in 1997, a student stole his gun. He expressed embarrassment to the *Orlando Sentinel*. "I mean, gosh, I'm the director of security," he said.

Halbig, for his part, insists he's just an investigator with good intentions.

"I'm not a conspiracy theorist," he assured me. "I don't even know what a hoaxer is."

### An update from staff writer Mike Spies

*One of the eeriest aspects of Lenny Pozner's story is how it anticipated the current political climate. It seemed inconceivable, way back when I first met Pozner in 2015, that even the most committed conspiracy theorist could be so contemptuous of the truth and so flagrantly cruel to its adherents. Today, it can feel like objective reality is at constant risk of being swamped by the dark fantasies and manipulations of the fringe. "I kept saying, 'They're growing, they're growing.' I kept saying, 'It's like a brush fire that needs to be contained,'" Pozner recently told me. "Now, because it was ignored, it's not on the edge; it's dead center. It's burned into the Capitol."*

*Over the past two years, Pozner has not flinched from the fight that has become his life's work. Days after our story first ran, a leading hoaxer whose actions Pozner had helped to expose was <u>fired</u> from his professorship at a Florida college. Another hoaxer who made death threats against Pozner has <u>received prison time</u>. Pozner shared his experiences in a lengthy 2016 New York magazine profile, <u>risking</u> further troll swarms as he accepted a higher public profile. He and the hundreds of volunteer online monitors he has organized have <u>convinced</u> YouTube and other web giants to remove hoaxer content. Their work has also directed scrutiny toward the corporate practices that facilitate the proliferation of vile conspiracy theories in the first place. He hopes one day to successfully lobby for a law designating the families of mass shootings as a protected class, which would make attacks on them a hate crime.*

## Support Our Work

### Help us tell the story of America's gun violence crisis.

Donate Now    **Donate Now**

Exhibit B-25 is a thumb drive containing a true and correct copy of a video of Ms. De La Rosa's (then Pozner) address to the Connecticut State Legislature, the URL address is: https://www.youtube.com/watch?v=MyYWTbkurIQ

EXHIBIT

B-25

B-26 is a thumb drive containing a true and correct copy of a video of Ms. De La Rosa's speech on the steps of the Connecticut State Capital.  This video was found at the URL address https://vimeo.com/183824842

**EXHIBIT**

tabbies

B-26

# select all



EXHIBIT
B-27

December 14, 2016 8:57 am

## Sandy Hook Parent Lenny Pozner Is Fighting an 'Emboldened' Conspiracy Culture

By **Reeves Wiedeman**

**Share** [f] Share [t] Tweet    Comment



Photo: Courtesy of Lenny Pozner

Today marks the anniversary of the massacre at Sandy Hook Elementary School, a tragedy that comes with a number of horrifying superlatives: the deadliest school shooting in U.S. history, the third-deadliest shooting of any kind, and the first major American tragedy subjected to the full force of the internet's conspiratorial machinery in real time.

Four years on, the genuinely crackpot notion that the attack was a staged hoax — that no one died — has persisted, and the harassment of victims and their families in the name of investigating the idea shows little sign of abating. In the past month, a 57-year-old Florida woman named Lucy Richards was indicted on charges of sending death threats to Lenny Pozner, whose son Noah was killed at Sandy Hook, and a hoaxer who lives in New York City was arrested on similar charges. Pozner, whom I wrote about this past summer, has devoted the last several years of his life to fighting Sandy Hook hoaxers like Richards and Wolfgang Halbig, a Florida man who has relentlessly pestered the town and its families for further proof that their children actually died. Last week, Halbig told me that he had decided to move to Newtown for six months, in order to further his investigation, and later sent an email to me and many others with his travel itinerary. On Facebook, he said he planned to be there for today's moment of silence honoring the 26 murdered children and adults. Several Newtown residents told me that if Halbig does show up, they have plans for him, too.

Conspiracy theories, in the age of Trump, have moved from the fringes of our culture to the center of it. The president-elect is not a hardened conspiracy theorist, but appears to be something even more insidious: someone who wields conspiracies to his benefit, discarding them when they no longer serve his purpose but never seeing any need to make a principled stand against misinformation that doesn't work to his benefit. During the Republican primary, a locally prominent Florida preacher named Carl Gallups, who had repeatedly called Sandy Hook a fabrication, introduced Trump at a rally in Pensacola. The campaign published a press release proudly announcing the endorsement, but when Media Matters and the Trace reported Gallups's views on Sandy Hook,

the campaign, which was leading Florida polls by a wide margin, deemed Gallups's support expendable and quickly retracted its praise. "The campaign was not aware of this individual's personal views, which we do not share or support," Trump spokesperson Hope Hicks said in a statement. And yet Trump has embraced Alex Jones, the conspiracy-mongering founder of InfoWars, of whom Trump declared during an appearance on Jones's radio show, "Your reputation is amazing. I will not let you down." Gallups wasn't worth the trouble, but Jones and his millions of viewers apparently were, and still are. Jones says that Trump called to thank him after the election.

We have traditionally been able to depend on our leaders to refute and reject conspiratorial thinking, but the president-elect has shown little sign of tempering his embrace of conspiracies when they prove beneficial. Traditional journalism can bring sympathy for the victims among the already sympathetic, but doesn't seem capable of doing much to counter the fringes of conspiratorial thinking: As soon as my piece was published, it immediately became part of the conspiracy itself, as hoaxers took to the comments section and my email inbox insisting that I was covering up the truth just like the rest of the media. Lenny Pozner began his campaign with patient person-to-person outreach, reasoning with commenters on message boards, answering questions, and converting a number of people who weren't hardened hoaxers, but that strategy has its obvious limitations.

Pozner and others have since taken to inflicting real-world consequences on the most egregious hoaxers, mostly online. Pozner has removed hundreds of YouTube videos, blog posts, and even entire websites by patiently filing a variety of complaints, most often copyright requests against sites who use a family photo of his son without his permission. Pozner said that since Trump's election it seems that the hoaxer movement has been "emboldened." While Alex Jones largely dropped Sandy Hook after Pozner removed a Sandy Hook–related video from his site last year — among hardened Sandy Hook hoaxers, Jones actually is viewed as a traitor who abandoned the cause — since Trump's election, Jones has begun talking about it again. Meanwhile, the internet's gatekeepers continue to respond to the problem haltingly, seemingly uncertain of what exactly they should be doing. "My hatred for Google and YouTube and Facebook has increased 1,000 percent since you and I spoke last," Pozner told me last week. "They are the ones who cause me all the stress when I try to take the ugliness down."

In the face of most criticisms, the tech world has up to now fallen back on an ethos of unrestrained freedom — that people have a right to say and do most anything they please, and that the purpose of technology is here to allow them to do things that they've always wanted but haven't had the means. That seemingly noble goal has allowed Silicon Valley to avoid seriously considering the negative impacts of the otherwise liberating systems they create. There were Columbine conspiracy theorists, too, but in the early days of the internet, there was nowhere for them to gather. Now, there are services cropping up specifically to aid the spread of conspiracy theories: A number of white-supremacist figures have moved from Twitter, which had begun kicking some of them off, to Gab, a service that claims it won't ban much of anything shy of posting child pornography or threatening terrorism, so users can feel free to promote the Sandy Hook hoax, along with other conspiracies, with impunity and without evidence. Last month, when Pozner finally convinced a hosting service to drop a particular virulent conspiracy-theory site — after filing 20 separate complaints — the site received an offer of help from an outfit called "Tin Foil Web Design," which identifies as a collective of web designers and marketing strategists "who long ago took the red pill." (Its owners declined to comment, saying they do not give interviews to "pressistutes.")

While Pozner is relieved that the issue is getting more attention, he doesn't see it getting better in the near term, and believes wholesale changes, perhaps even legal ones, may be necessary. "There are no rules," Pozner said, of life on the internet. "At some point we're all gonna have to lose some rights so the internet can be more manageable, or it's just gonna be a crazy place." Doing so is complicated — how to distinguish between fake news, conspiracy theories that become defamatory or threatening, and honest Woodwardian and Bernsteinian investigation? — and may not be possible to parse with an algorithm. It turns out that some of humanity's worst impulses might just need humans to solve them.

A first step might be to recognize that while the vast majority of people are not delusional enough to show up at a pizzeria with a gun, or visit grieving families on the anniversary of their children's murder, the problem of truthless speculation has become much wider spread than we'd care to acknowledge. Kim Snyder, who directed the recent documentary *Newtown*, told me recently that despite generally glowing reviews, two-thirds of the citizen ratings on her film's IMDb page are one-star reviews, almost all of them accompanied by hoaxer rants. Those people are the extreme, willing to devote actual time and energy to smearing anything and anyone related to Sandy Hook. But Snyder had also met a young graphic designer with a nose ring at a screening in Beaver Creek, Colorado, who sat through 85 minutes of Newtown residents pouring out their grief only to walk up to Snyder afterward and ask if there was any truth to rumors she had heard about the hoax. Snyder had a similar experience at another screening in Martha's Vineyard.

Since my story on Pozner came out, I've heard this story dozens of times from people who have had an otherwise well-educated and thoughtful friend or family member who has shocked them by admitting that they weren't sure Sandy Hook happened. "I've been saying it from the beginning," Pozner said. "The hoax thing is like a brush fire. It hasn't been contained, and we can't just leave it alone because it will keep burning, and it will eventually show up and it will burn through your town." When I joined Wolfgang Halbig on one of his investigatory trips to Newtown this summer, I watched as a woman recognized Halbig from across the street, then started walking toward him. I expected an angry confrontation — several Newtown residents had relayed dark fantasies about what they would do if they found themselves in Halbig's presence — but instead the woman shook Halbig's hand and thanked him. Later, she told me that she had moved to Newtown after the shooting, with her husband and kids. The woman, who begged me not to disclose her name, now lives less than a minute from the school, and knew people who had lost children, but still wasn't sure about the whole thing. "I think something happened that is being covered up," she said. Rather than believe the lived experience of her neighbors' grief, she was more convinced by stuff she had read on the internet.

*Related*

**Lenny Pozner Believed in Conspiracy Theories. Until His Son's Death Became One.**

LATEST NEWS

6/22/2018 AT 3:00 P.M.

**What Iran and Russia's Telegram Ban Means for Secure Messaging Apps**



6/22/2018 AT 1:18 P.M.

**Uber Driver in Fatal Autonomous Crash Was Watching Hulu Behind the Wheel**



6/22/2018 AT 11:55 A.M.

**YouTube Launches Channel Memberships in Effort to Keep YouTubers Happy**



6/22/2018 AT 11:38 A.M.

**Tesla Files Lawsuit Against Whistle-blower**



6/21/2018 AT 3:20 P.M.

**Intel CEO Ousted Over Relationship With Employee**



6/20/2018 AT 4:49 P.M.

**Instagram Announces IGTV With Botched Livestream and Foie Gras**



6/20/2018 AT 12:10 P.M.

**A List of ICE Employees Scraped From LinkedIn Was Removed by Medium and GitHub**



6/19/2018 AT 3:45 P.M.

**Facebook Users Troll State Department Over 'Family Travel Hacks' Event**



6/19/2018 AT 1:05 P.M.
## Amazon's Alexa Is Your Next Hotel Concierge



6/19/2018 AT 10:52 A.M.
## Facebook Researchers Use Powerful AI to Fix Blinking in Photos



6/19/2018 AT 8:44 A.M.
## Miranda Kerr, Like You, Didn't Like Her Husband's Redesigned Snapchat



6/18/2018 AT 4:11 P.M.
## Astrology, the World's Oldest, and Newest, Meme Trend



6/18/2018 AT 3:33 P.M.
## Amazon Investors to Amazon: Please Stop Doing Business With Cops



6/15/2018 AT 4:17 P.M.
## Russian Cybersecurity Firm Severs Ties With Europol Over 'Malicious' Activity



6/15/2018 AT 3:09 P.M.
## I Saw Jake Paul Live and All I Got Was a Creeping Sense of Existential Dread



6/15/2018 AT 1:11 P.M.
## When It Comes to News, Users Are Switching From Facebook to Other Facebook



6/14/2018 AT 6:33 P.M.

## Facebook's Policy Head Is Leaving the Company



6/14/2018 AT 5:08 P.M.
## Instagram Will No Longer Notify People When You Screenshot Their Stories



6/14/2018 AT 2:34 P.M.
## Apple Closes Security Loophole, Sets Up Another Fight With Law Enforcement



6/14/2018 AT 1:35 P.M.
## This Vermont Librarian Took Equifax to Court ... and Won



**Sign In to Comment**

## select all

NEWSLETTERS    ABOUT US    CONTACT US    MEDIA KIT    WE'RE HIRING    TRADEMARK

PRIVACY    TERMS    AD CHOICES

© 2018, NEW YORK MEDIA LLC. VIEW ALL TRADEMARKS



EXHIBIT

_B-28_



**EXHIBIT**

tabbies

B-29



EXHIBIT

B-30

tabbies'



 Neutral
As of: June 24, 2018 2:36 PM Z

## *Trinity Wall St. v. Wal-Mart Stores, Inc.*

United States Court of Appeals for the Third Circuit

April 8, 2015, Argued; July 6, 2015, Opinion Filed

No. 14-4764

**Reporter**
792 F.3d 323 *; 2015 U.S. App. LEXIS 11549 **; Fed. Sec. L. Rep. (CCH) P98,566

TRINITY WALL STREET v. WAL-MART STORES, INC., Appellant

**Subsequent History:** US Supreme Court certiorari dismissed by *Trinity Wall St. v. Wal-Mart Stores, Inc., 136 S. Ct. 499, 193 L. Ed. 2d 363, 2015 U.S. LEXIS 7164 (U.S., 2015)*

**Prior History: [**1]** Appeal from the United States District Court for the District of Delaware. (D.C. Civil Action No. 1-14-cv-00405). District Chief Judge: Honorable Leonard P. Stark.

*Trinity Wall St. v. Wal-Mart Stores, Inc., 2015 U.S. App. LEXIS 6072 (3d Cir. Del., Apr. 14, 2015)*

## Core Terms

shareholder, ordinary business, proposals, company's, No-Action, excludable, products, operations, proxy, staff, policies, transcend, policy issue, retailer, matters, subject matter, reputation, social policy, brand, materials, oversight, day-to-day, guns, issues, decisions, relates, solicitation, raises, selling, merchandising

## Case Summary

### Overview

HOLDINGS: [1]-A major retailer could exclude from its proxy materials under the ordinary business exclusion in *17 C.F.R. § 240.14a-8(i)(7)*, adopted under the authority of *15 U.S.C.S. § 78n(a)*, a shareholder proposal seeking to require the development of standards for determining whether to sell firearms and other products that might pose risks to the public and to the company's reputation and brand value; [2]-Although the proposal addressed a significant social policy issue, it did not transcend the

company's ordinary business operations because weighing safety concerns regarding large numbers of products was a routine business matter for retailers and because consideration of the risk that certain products posed to the company's economic success and reputation for good corporate citizenship was enmeshed with how the company ran its business and the retailer-consumer interaction.

### Outcome
Order reversed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Summary Judgment Review > Standards of Review

*HN1*[ ] **Summary Judgment Review, Standards of Review**

A district court's order granting a motion for summary judgment is reviewed de novo.

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

*HN2*[ ] **Burdens of Proof, Movant Persuasion & Proof**

A corporation seeking summary judgment bears the burden of establishing as a matter of law that it properly excluded a shareholder proposal from its proxy

792 F.3d 323, *323; 2015 U.S. App. LEXIS 11549, **1

materials under an exception to *17 C.F.R. § 240.14a-8*.

inclusion in the corporation's proxy materials.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

## HN3[⤓] Postoffering & Secondary Distributions, Proxies

A shareholder that is unable to attend a company's annual meeting is not disenfranchised. It can vote its shares by proxy by empowering an attending shareholder to do so on its behalf. Vote by proxy has become an indispensable part of corporate governance because the realities of modern corporate life have all but gutted the myth that shareholders in large publicly held companies personally attend annual meetings. A public company that solicits proxies must distribute a proxy statement to each of its shareholders in advance of the annual shareholder meeting. The statement is an informational package that tells shareholders about items or initiatives on which they are asked to vote, such as proposed bylaw amendments, compensation or pension plans, or the issuance of new securities. The proxy card, on which the shareholder may submit its proxy, and the proxy statement together are the proxy materials.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

## HN4[⤓] Postoffering & Secondary Distributions, Proxies

Through its proxy materials, a company solicits proxies—hence the term "proxy solicitation." Congress, under the Securities Exchange Act of 1934, has given the U.S. Securities and Exchange Commission (SEC) oversight of the proxy context. Securities Exchange Act § 14(a) (*15 U.S.C.S. § 78n(a)*) renders unlawful the solicitation of proxies in violation of the SEC's rules and regulations, which are codified at *17 C.F.R. § 240.14a-1 et seq.* The SEC's proxy rules are concerned with assuring full disclosure to investors of matters likely to be considered at shareholder meetings. To that end, the SEC has adopted *17 C.F.R. § 240.14a-9*, which prohibits false or misleading statements made in any proxy statement, form of proxy, notice of meeting or other communication. It has interpreted the rule to require companies to provide shareholders with the opportunity to submit proposals to management for

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

## HN5[⤓] Postoffering & Secondary Distributions, Proxies

*17 C.F.R. § 240.14a-8* mandates subsidized shareholder access to a company's proxy materials, requiring reporting companies to print and mail with management's proxy statement, and to place on management's proxy ballot, any proper proposal submitted by a qualifying shareholder. The idea was to provide shareholders a way to bring before their fellow stockholders matters of shareholder concern that are proper subjects for stockholders' action under the laws of the state under which the company] was organized, and to have proxies with respect to such proposals solicited at little or no expense to the security holder.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

## HN6[⤓] Postoffering & Secondary Distributions, Proxies

A primary means to urge corporate reform is the shareholder proposal, which communicates not only shareholders' interest in a company's financial performance, but also their interests and preferences concerning a wide range of issues, such as the board's structure and oversight of important policies, sustainability, and ethical performance. The hard part, however, is soliciting votes to pass a proposal—especially where the motivation is to raise awareness of a policy issue. A shareholder can garner support in one of two ways. It can pay to issue a separate proxy statement, which must satisfy all the disclosure requirements applicable to management's proxy statement. Or the shareholder can go the *17 C.F.R. § 240.14a-8* route and have the company include its proposal (and a supporting statement) in the proxy materials at the company's expense.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

## HN7[⤓] Postoffering & Secondary Distributions,

**Proxies**

Though the *17 C.F.R. § 240.14a-8* option is financially advantageous, it does not create an open forum for shareholder communication. *Section 240.14a-8* restricts the company-subsidy to shareholders who offer proper proposals. A proper proposal is one that does not fit within one of the exclusionary grounds of *§ 240.14a-8*—which are both substantive and procedural.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

*HN8*[ ] **Postoffering & Secondary Distributions, Proxies**

The procedural exclusions of *17 C.F.R. § 240.14a-8* protect the solicitation process without regard to a proposal's content. For example, the proponent must have continuously held at least $2,000 in market value, or 1 percent, of the company's securities entitled to be voted on the proposal at the meeting for at least one year by the date it submits the proposal. *§ 240.14a-8(b)(1)*. It can submit no more than one proposal to a company for a particular shareholders' meeting. *§ 240.14a-8(b)(2)(i)*. And the proposal, including any accompanying supporting statement, may not exceed 500 words. *§ 240.14a-8(d)*.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

*HN9*[ ] **Postoffering & Secondary Distributions, Proxies**

The substantive exclusions of *17 C.F.R. § 240.14a-8* are the most frequently used (and most litigated). They include (1) the proper subjects exclusion, which exists if the proposal is not a proper subject for action by shareholders under the law of the jurisdiction of the company's organization, as provided in *§ 240.14a-8(i)(1)*; (2) the false or misleading exclusion, which allows companies to bar proposals that are too vague under *§ 240.14a-8(i)(3)*; (3) the substantially related exclusion, which says that a proposal is excludable if it relates to operations which account for less than 5 percent of the company's total assets (and net earnings and gross sales) at the end of its most recent fiscal year, and is not otherwise significantly related to the company's business, as set forth in *§ 240.14a-8(i)(5)*;

and (4) the ordinary business exclusion, which disallows a proposal that deals with a matter relating to the company's ordinary business operations, as stated in *§ 240.14a-8(i)(7)*.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

*HN10*[ ] **Postoffering & Secondary Distributions, Proxies**

If a company wants to invoke one of the grounds provided in *17 C.F.R. § 240.14a-8* to exclude a proposal, the process is as follows. First, it must notify the shareholder in writing of the problem with the proposal within 14 days of receiving it and inform the shareholder that it has 14 days to respond. *§ 240.14a-8(f)(1)*. If the company finds the shareholder's response unpersuasive and still wants to exclude the proposal, it then must file with the staff of the U.S. Securities and Exchange Commission's Division of Corporate Finance the reasons why it believes the proposal is excludable no later than 80 days before the company files its proxy materials with the Commission. *§ 240.14a-8(j)(1)*. In this letter, the company may also ask the staff for a no-action letter to support the exclusion of a proposal. If the shareholder wants to respond, it can file a submission noting why exclusion would be improper. *§ 240.14a-8(k)*. The staff will respond in one of two ways: (1) with a no-action letter, specifying that the company may omit the shareholder proposal under the exclusion(s) it relied on; or (2) that it is unable to concur with the company. A shareholder dissatisfied with the staff's response can pursue its rights against the company in federal court.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

*HN11*[ ] **Postoffering & Secondary Distributions, Proxies**

The ordinary business exclusion has been called the most perplexing of all the *17 C.F.R. § 240.14a-8* bars. This stems from the opaque term "ordinary business," which is neither self-defining nor consistent in its meaning across different corporate contexts. Neither the courts nor Congress have offered a corrective. Rather, and from the beginning, *§ 240.14a-8* jurisprudence—both in quality and quantity—has rested almost exclusively with the U.S. Securities and Exchange

Commission (SEC). In both its role as umpire and rule-maker, the SEC has provided various iterations of formal interpretive guidance.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

HN12[⬇] Postoffering & Secondary Distributions, Proxies

The U.S. Securities and Exchange Commission has summarized two considerations that guide how to apply the ordinary business exclusion in 17 C.F.R. § 240.14a-8(i)(7). The first relates to the subject matter of the proposal. Certain tasks are so fundamental to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight. Examples of this include the management of the workforce, such as the hiring, promotion, and termination of employees, decisions on production quality and quantity, and the retention of suppliers. Yet proposals relating to such matters but focusing on significant social policy issues generally would not be considered to be excludable, because such issues typically fall outside the scope of management's prerogative. The second consideration relates to the degree to which the proposal seeks to micromanage the company by probing too deeply into matters of a complex nature that shareholders, as a group, would not be qualified to make an informed judgment on, due to their lack of business expertise and lack of intimate knowledge of the company's business. It comes into play where the proposal seeks intricate detail, or seeks to impose specific time-frames or methods for implementing complex policies.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

HN13[⬇] Postoffering & Secondary Distributions, Proxies

The term "ordinary business" in 17 C.F.R. § 240.14a-8(i)(7) refers to matters that are not necessarily ordinary in the common meaning of the word and is rooted in the corporate law concept providing management with flexibility in directing certain core matters involving the company's business and operations.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

HN14[⬇] Postoffering & Secondary Distributions, Proxies

A court employs a two-part analysis to determine whether a shareholder proposal deals with a matter relating to the company's ordinary business operations. 17 C.F.R. § 240.14a-8(i)(7). Under the first step, the court discerns the subject matter of the proposal. Under the second, the court asks whether that subject matter relates to the company's ordinary business operations. If the answer to the second question is yes, the company must still convince the court that the proposal does not raise a significant policy issue that transcends the nuts and bolts of its business.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

HN15[⬇] Postoffering & Secondary Distributions, Proxies

The U.S. Securities and Exchange Commission has given a consistent nod to substance over form and has shown a distaste for clever drafting. It matters little how a shareholder styles its proposal; the emphasis should always be on its substance. Thus, even when a shareholder's proposal asks for the development of a specific policy—and not a review, report or examination—a court still asks whether the subject matter of the action it calls for is a matter of ordinary business.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

HN16[⬇] Postoffering & Secondary Distributions, Proxies

A retailer's approach to its product offerings is the bread and butter of its business. Product selection is a complicated task influenced by economic trends, data analytics, demographics, customer preferences, supply chain flexibility, shipping costs and lead-times, and a host of other factors best left to companies' management and boards of directors. Though a retailer's merchandising approach is not beyond shareholder comprehension, the particulars of that

792 F.3d 323, *323; 2015 U.S. App. LEXIS 11549, **1

approach involve operational judgments that are ordinary-course matters. A proposal need only relate to a company's ordinary business to be excludable. *17 C.F.R. § 240.14a-8(i)(7)*. It need not dictate any particular outcome. In short, so long as the subject matter of the proposal relates—that is, bears on—a company's ordinary business operations, the proposal is excludable unless some other exception to the exclusion applies.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

*HN17*[ 🔻 ]  **Postoffering & Secondary Distributions, Proxies**

There is a significant social policy exception to the default rule of excludability for proposals that relate to a company's ordinary business operations. For the U.S. Securities and Exchange Commission's staff, this means that when a proposal's underlying subject matter transcends the day-to-day business matters of the company and raises policy issues so significant that it would be appropriate for a shareholder vote, the proposal generally will not be excludable under *17 C.F.R. § 240.14a-8(i)(7)*.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

*HN18*[ 🔻 ]  **Postoffering & Secondary Distributions, Proxies**

An inquiry regarding the significant social policy exception to the ordinary business exclusion is best split into two steps. The first is whether the proposal focuses on a significant policy (be it social or corporate). If it does not, the proposal fails to fit within the social-policy exception to the *17 C.F.R. § 240.14a-8(i)(7)* exclusion. If it does, the court reaches the second step and asks whether the significant policy issue transcends the company's ordinary business operations.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

*HN19*[ 🔻 ]  **Postoffering & Secondary Distributions, Proxies**

Where a proposal's underlying subject matter transcends the day-to-day business matters of the company and raises policy issues so significant that it would be appropriate for a shareholder vote, the proposal generally will not be excludable under 17 C.F.R. § 14a-8(i)(7). What this means is that, to shield its proposal from the ordinary business exclusion, a shareholder must do more than focus its proposal on a significant policy issue; the subject matter of its proposal must transcend the company's ordinary business. This refers to a policy issue that is divorced from how a company approaches the nitty-gritty of its core business. Thus, the transcendence requirement plays a pivotal role in the social-policy exception calculus. For major retailers of myriad products, a policy issue is rarely transcendent if it treads on the meat of management's responsibility: crafting a product mix that satisfies consumer demand. This explains why the U.S. Securities and Exchange Commission's staff, almost as a matter of course, allows retailers to exclude proposals that concern the sale of particular products and services. On the other hand, if a significant policy issue disengages from the core of a retailer's business (deciding whether to sell certain goods that customers want), it is more likely to transcend its daily business dealings.

Securities Law > Postoffering & Secondary Distributions > Proxies > General Overview

*HN20*[ 🔻 ]  **Postoffering & Secondary Distributions, Proxies**

The essence of a retailer's business is deciding what products to put on its shelves—decisions made daily that involve a careful balancing of financial, marketing, reputational, competitive and other factors. The emphasis management places on safety to the consumer or the community is fundamental to its role in managing the company in the best interests of its shareholders and cannot, as a practical matter, be subject to direct shareholder oversight. Although shareholders perform a valuable service by creating awareness of social issues, they are not well-positioned to opine on basic business choices made by management. It is thus not surprising that the staff of the U.S. Securities and Exchange Commission's Division of Corporate Finance consistently allows retailers to omit proposals that address their product menu. A policy issue does not transcend a company's ordinary business operations where it targets day-to-day

792 F.3d 323, *323; 2015 U.S. App. LEXIS 11549, **1

decision-making.

Securities Law > Postoffering & Secondary
Distributions > Proxies > General Overview

HN21[↴]  **Postoffering & Secondary Distributions,
Proxies**

A policy matter relating to a product is far more likely to
transcend a company's ordinary business operations
when the product is that of a manufacturer with a narrow
line. Here the staff of the U.S. Securities and Exchange
Commission's Division of Corporate Finance often will
decline a no-action request. But the outcome changes
where those same policy proposals are directed at
retailers who sell thousands of products. The reason for
the difference is that a manufacturer with a very narrow
product focus—like a tobacco or gun manufacturer—
exists principally to sell the product it manufactures. Its
daily business deliberations do not involve whether to
continue to sell the product to which it owes its reason
for being. As such, a stop-selling proposal generally is
not excludable because it relates to the seller's very
existence. Quite the contrary for retailers. They typically
deal with thousands of products amid many options for
each, precisely the sort of business decisions a retailer
makes many times daily. Thus, and in contrast to the
manufacturing context, a stop-selling proposal
implicates a retailer's ordinary business operations and
is in turn excludable.

Securities Law > Postoffering & Secondary
Distributions > Proxies > General Overview

HN22[↴]  **Postoffering & Secondary Distributions,
Proxies**

A company can omit a shareholder proposal concerning
its reputation or brand when what the proposal seeks is
woven with the way the company conducts its business.

**Counsel:** Theodore J. Boutrous, Jr., Esquire (Argued),
Gibson Dunn, Los Angeles, CA; Philip A. Rovern,
Esquire, Matthew E. Fisher, Esquire, Angela C.
Whitesell, Esquire, Potter, Anderson & Corroon,
Wilmington, DE; Adam H. Offenhartz, Esquire, Aric H.
Wu, Esquire, Gibson Dunn, New York, NY, Counsel for
Appellant.

Christopher M. Foulds, Esquire, Joel E. Friedlander,
Esquire (Argued), Jeffrey M. Gorris, Esquire,

Friedlander & Gorris, Wilmington, DE, Counsel for
Appellee.

Robert A. Long, Jr., Esquire, Keir D. Gumbs, Esquire,
David B. H. Martin, Esquire, Reid Hooper, Esquire, Ali
Mojibi, Esquire, Covington & Burling LLP, Washington
DC; Stacy Linden, Esquire, Peter Tolsdorf, Esquire,
American Petroleum Institute, Washington, DC, Counsel
for Amicus Appellants, American Petroleum Institute,
Business Roundtable, Chamber of Commerce of the
United States of America.

Cory Andrews, Esquire, Richard A. Samp, Esquire,
Washington Legal Foundation, Washington, DC,
Counsel for Amicus Appellant, Washington Legal
Foundation.

Richard L. Wyatt, Jr., Esquire, **[**2]** Neil K. Gilman,
Esquire, Steven M. Haas, Esquire, Scott H. Kimpel,
Esquire, J. Steven Patterson, Esquire, Hunton &
Williams LLP, Washington, DC; Linda Kelly, Esquire,
Patrick Forrest, Esquire, National Association of
Manufacturers, Washington, DC, Counsel for Amicus
Appellant, National Association of Manufacturers.

William B. Chandler, III, Esquire, Bradley D. Sorrels,
Esquire, Ian R. Liston, Esquire, Wilson, Sonsini,
Goodrich & Rosati, P.C., Wilmington, DE; Gideon A.
Schor, Esquire, Wilson, Sonsini, Goodrich & Rosati,
P.C., New York, NY; Deborah R. White Retail Litigation
Center, Inc., Arlington, VA, Counsel for Amicus
Appellant, Retail Litigation Center Inc.

Paul J. Lockwood, Esquire, Elisa M.C. Klein, Esquire,
Skadden, Arps, Slate, Meagher & Flom LLP,
Wilmington, DE; Brian V. Breheny, Esquire, Hagen J.
Ganem, Esquire, Skadden, Arps, Slate, Meagher &
Flom LLP, Washington, DC; Darla C. Stuckey, Esquire,
Society of Corporate Secretaries and Governance
Professionals, Inc., New York, NY, Counsel for Amicus
Appellant, Society of Corporate Secretaries and
Governance Professionals Inc.

Jeffrey W. Golan, Esquire, Lisa M. Port, Esquire,
Barrack, Rodos & Bacine, Philadelphia, PA, Counsel
for **[**3]** Amicus Appellee, Robert F. Kennedy Center
for Justice & Human Rights.

Maureen Barden, Esquire, Philadelphia, PA; Richard J.
Davis, Esquire, New York, NY, Counsel for Amicus
Appellees, Mark Barden, Jacqueline Barden, Ian
Hockley, Nicole Hockley, Bill Sherlach, Leonard Pozner,
Veronique Pozner, Gilles Rousseau, Law Center to
Prevent Gun Violence.

Rolin P. Bissell, Esquire, John J. Paschetto, Esquire,
Benjamin Potts, Esquire, Young, Conaway, Stargatt &

MARK ENOCH

792 F.3d 323, *323; 2015 U.S. App. LEXIS 11549, **3

Taylor, Wilmington, DE, Counsel for Amicus Appellee (Corporate and Securities Law Professors): Lynn Stout, Jayne Barnard, William A. Birdthistle, Norman D. Bishara, Margaret M. Blair, Douglas M. Branson, James D. Cox, Michael B. Dorff, Lisa M. Fairfax, Tamar Frankel, Brandon L. Garrett, Kent Greenfield, Daniel J.H. Greenwood, Jon Hanson, Thomas Lee Hazen, Robert C. Hockett, Robert J. Jackson, Jr., Lyman Johnson, Renee M. Jones, Thomas W. Joo, Donald C. Langevoort, Patricia A. McCoy, Donna M. Nagy, Lisa H. Nicholson, Charles R.T. O'Kelley, Saule T. Omarova, Stefan J. Padfield, Alan R. Palmiter, Frank Partnoy, Brian J.M. Quinn, Margaret V. Sachs, Cindy A. Schipani, Jennifer Taub, Kelly Y. Testy, Cheryl L. Wade, David H. Webber, Cynthia Williams, [**4] Adam Winkler.

**Judges:** Before: AMBRO, VANASKIE, and SHWARTZ, Circuit Judges. SHWARTZ, Circuit Judge, with whom Judge VANASKIE joins as to Part III, concurring in the judgment.

**Opinion by:** AMBRO

## Opinion

[*326] OPINION OF THE COURT

AMBRO, Circuit Judge

Table of Contents


Go to table1

[*327]

## I. INTRODUCTION

"[T]he secret of successful retailing is to give your customers what they want." Sam Walton, SAM WALTON: MADE IN AMERICA 173 (1993). This case involves one shareholder's attempt to affect how Wal-Mart goes about doing that.

Appellant Wal-Mart Stores, Inc., the world's largest retailer, and one of its shareholders, Appellee Trinity Wall Street—an Episcopal parish headquartered in New York City that owns Wal-Mart stock—are locked in a heated dispute. It stems from Wal-Mart's rejection of Trinity's request to include its shareholder proposal in

Wal-Mart's proxy materials for shareholder consideration.

Trinity's proposal, while linked to Wal-Mart's sale of high-capacity firearms (guns that can accept more than ten rounds of ammunition) at about one-third of its 3,000 stores, is nonetheless broad. It asks Wal-Mart's Board of Directors to develop and implement standards for management to use in deciding whether to sell a product that (1) "especially endangers public safety"; (2) [**6] "has the substantial potential to impair the reputation of Wal-Mart"; and/or (3) "would reasonably be considered by many offensive to the family and community values integral to the Company's promotion of its brand." Standing in Trinity's way, among other things, is a rule of the Securities and Exchange Commission ("SEC" or "Commission"), known as the "ordinary business" exclusion. _17 C.F.R. § 240.14a-8(i)(7) ("Rule 14a-8(i)(7)")._ As its name suggests, the rule lets a company omit a shareholder proposal from its proxy materials if the proposal relates to its ordinary business operations.

Wal-Mart obtained what is known as a "no-action letter" from the staff of the SEC's Division of Corporate Finance (the "Corp. Fin. staff" or "staff"), thus signaling that there would be no recommendation of an enforcement action against the company if it omitted the proposal from its proxy materials. See _Wal-Mart Stores, Inc., SEC No-Action Letter, 2014 SEC No-Act. LEXIS 259, 2014 WL 409085, at *1 (Mar. 20, 2014)._ Trinity thereafter filed suit in federal court, seeking to enjoin Wal-Mart's exclusion of the proposal. See _Trinity Wall Street v. Wal-Mart Stores, Inc., 75 F. Supp. 3d 617, No. 14-405-LPS, 2014 U.S. Dist. LEXIS 165431, 2014 WL 6790928 (D. Del. Nov. 26, 2014)._ The core of the dispute is whether the proposal was excludable under the ordinary business exclusion. Although the District Court initially denied Trinity's request, it handed the church a [*328] victory on the merits some seven [**7] months later by holding that, because the proposal concerned the company's Board (rather than its management) and focused principally on governance (rather than how Wal-Mart decides what to sell), it was outside Wal-Mart's ordinary business operations. Wal-Mart appeals, seeking a ruling that it could exclude Trinity's proposal from its 2015 proxy materials and did not err in excluding the proposal from its 2014 proxy materials.

Stripped to its essence, Trinity's proposal—although styled as promoting improved governance—goes to the heart of Wal-Mart's business: what it sells on its shelves.

792 F.3d 323, *328; 2015 U.S. App. LEXIS 11549, **7

For the reasons that follow, we hold that it is excludable under *Rule 14a-8(i)(7)* and reverse the ruling of the District Court.[1]

## II. FACTS & PROCEDURAL HISTORY

Public companies publish and circulate a proxy statement in advance of their annual shareholders' meeting. The statement "includes information about items or initiatives on which the shareholders are asked to vote[.]" *Apache Corp. v. Chevedden, 696 F. Supp. 2d 723, 727 (S.D. Tex. 2010)* (citation omitted). It can also include shareholder proposals—a **[\*\*8]** device that allows shareholders to ask for a vote on company matters. Predictably, companies don't easily surrender control of their proxy statement and often lean on an SEC rule to justify excluding a given shareholder proposal. But doing so can trigger a protracted legal battle that escalates from an exchange of views before the SEC to a federal lawsuit. This is one such case.

### A. Trinity Objects to Wal-Mart's Sale of Assault Rifles.

Trinity's roots extend back centuries. Its St. Paul's Chapel is the oldest public building in continuous use in New York City and is where George Washington worshiped after his first inauguration. In 1705, the church was the beneficiary of the lower Manhattan farm of Queen Anne of England, instantly making it very wealthy.

The story isn't much different today. Trinity continues to be one of the wealthiest religious institutions in the United States, with a balance sheet of over $800 million in assets and real estate valued at approximately $3 billion. *See* Letter from Trinity Wall Street CFO Accompanying Trinity's 2013 Financial Statements (undated), *available at* *https://www.trinitywallstreet.org/sites/default/files/miscell aneous/LetterfromtheCFOaccompanyingthe2013Financi alStatem* ents.pdf . Its strong financial footing, according to Trinity, empowers it to "pursue a mission **[\*\*9]** of good works beyond the reach of other religious institutions." Trinity Br. 16. Part of that mission is to reduce violence in society.

Alarmed by the spate of mass murders in America, in particular the shooting at Sandy Hook Elementary School in December 2012, Trinity resolved to use its investment portfolio to address the ease of access to rifles equipped with high-capacity magazines (the weapon of choice of the Sandy Hook shooter and other mass murderers). Its principal focus was Wal-Mart.

During its review of Wal-Mart's merchandising practices, Trinity discovered what it perceived as a major inconsistency. Despite the retailer's stated mission to "make a difference on the big issues that **[\*329]** matter to us all," Trinity Br. 11, it continued in some states to sell the Bushmaster AR-15 (a model of assault rifle). Trinity also perceived Wal-Mart as taking an unprincipled approach in deciding which products to sell. For example, despite its position on the AR-15, Wal-Mart does not sell adult-rated movie titles (*i.e.,* those rated NC-17) or similarly rated video or computer games. Nor does it sell to children under 17 "'R' rated movies or 'Mature' rated video games." Trinity Br. 12. Wal-Mart **[\*\*10]** also doesn't sell "music bearing a 'Parental Advisory Label'" because of concerns about the music containing "strong language or depictions of violence, sex, or substance abuse." *Id.* And apparently due to safety concerns, it has stopped selling (1) handguns in the United States; (2) high-capacity magazines separate from a gun; and (3) guns through its website. Trinity Br. 13. Trinity attributes these perceived inconsistencies to the "lack of written policies and Board oversight concerning its approach to products that could have momentous consequences for both society and corporate reputation and brand value[.]" Trinity Br. 16.[2]

### B. Trinity's Shareholder Proposal.

Trinity pressed Wal-Mart to explain its continued sale of the Bushmaster AR-15. Wal-Mart's response was as follows:

---

[1] Because of the time-sensitive nature of this appeal, we were unable to give a full rationale for a ruling on the date we entered judgment in favor of Wal-Mart. This opinion does so.

[2] In its brief and again at oral argument, Wal-Mart answered Trinity's characterization of its sales practices and referred us to its "Safe and Compliant Product Policy" and its "Product Safety and Compliance" division, which "administers programs to identify, mitigate, and monitor risks associated with general merchandise." Reply Br. 4. Wal-Mart also noted that a Board Committee is already tasked with "reviewing the Company's reputation with external constituencies and recommending to the Board any proposed changes to the Company's policies, procedures, and programs **[\*\*11]** as a result of such review." *Id.* (citing J.A. 47) (alterations omitted).

MARK ENOCH

There are many viewpoints on this topic and many in our country remain engaged in the conversations about the sale and regulation of certain firearms. In areas of the country where we sell firearms, we have a long standing commitment to do so safely and responsibly. Over the years, we've been very purposeful about finding the right balance between serving hunters and sportsmen and ensuring that we sell firearms responsibly. Wal-Mart's merchandising decisions are based on customer demand and we recognize that most hunters and sportsmen use firearms responsibly and wish to continue to do so . . . .

While there are some like you, Rev. Cooper, who ask us to stop selling firearms, there are many customers who ask us to continue to sell these products in our stores.

J.A. 255-56.

Unmoved, Trinity drafted a shareholder proposal aimed at filling the governance gap it perceived. The proposal, which is the subject of this appeal, provides:

Resolved:

Stockholders request that the Board [**12] amend the Compensation, Nominating and Governance Committee charter . . . as follows: "27. Providing oversight concerning [and the public reporting of] the formulation and implementation of . . . policies and standards that determine whether or not the Company should sell a product that:

1) especially endangers public safety and well-being;

2) has the substantial potential to impair the reputation of the Company; and/or

3) would reasonably be considered by many offensive to the family and community [*330] values integral to the Company's promotion of its brand."

J.A. 268.

The narrative part of the proposal makes clear it is intended to cover Wal-Mart's sale of certain firearms. It provides that the

oversight and reporting is intended to cover policies and standards that would be applicable to determining whether or not the company should sell guns equipped with magazines holding more than ten rounds of ammunition ("high capacity magazines") and to balancing the benefits of selling such guns against the risks that these sales pose to

the public and to the Company's reputation and brand value.

Id.

The proposal also included a supporting statement asserting in relevant part that

[t]he company respects family [**13] and community interests by choosing not to sell certain products such as music that depicts violence or sex and high capacity magazines separately from a gun, but lacks policies and standards to ensure transparent and consistent merchandizing decisions across product categories. This results in the company's sale of products, such as guns equipped with high capacity magazines, that facilitate mass killings, even as it prohibits sales of passive products such as music that merely depict such violent rampages.

. . . .

While guns equipped with high capacity magazines are just one example of a product whose sale poses significant risks to the public and to the company's reputation and brand, their sale illustrates a lack of reasonable consistency that this proposal seeks to address through Board level oversight. This responsibility seems appropriate for the Compensation, Nominating and Governance Committee, which is charged with related responsibilities.

J.A. 268-69.[3]

The purpose of the proposal, as explained by the Reverend James H. Cooper, Trinity's Rector, is to

allow[] the company to make a transparent choice considering both the business and ethical (community impact) aspects of the matter. Anti-violence concerns can be broadly considered,

---

[3] In this context, the proposal is similar to that of a shareholder proposal submitted to Wal-Mart in December 2000 to halt its sale of "handguns and their accompanying ammunition, in any way (e.g.[,] by special order)." *Wal-Mart Stores, Inc., SEC No-Action Letter, 2001 SEC No-Act. LEXIS 330, 2001 WL 253625, at *1 (Mar. 9, 2001)*. Like [**14] Trinity, the submitting shareholder maintained that it was "inappropriate for a 'family store' to sell handguns in any way." *2001 SEC No-Act. LEXIS 330, [WL] at *4*. As here, the Corp. Fin. staff issued a no-action letter allowing Wal-Mart to exclude the proposal from its proxy materials because it related to its "ordinary business operations (i.e., the sale of a particular product)." *2001 SEC No-Act. LEXIS 330, [WL] at *6*.

including for example the sale of video games glorifying violence, as well as other merchandising decisions that are inconsistent with the well-being of the community and/or Wal-Mart's brand value and desired reputation.

Trinity Br. 18-19 (citation omitted).

## C. Wal-Mart Seeks a No-Action Letter from the SEC.[4]

On January 30, 2014, Wal-Mart notified Trinity and the Corp. Fin. staff of its belief that it could exclude the proposal from its [*331] 2014 proxy materials under *Rule 14a-8(i)(7)*. Trinity predictably disagreed, stating that its proposal didn't "meddl[e] in ordinary course decision-making" but focused on "big picture oversight and supervision that is the responsibility of the Board." J.A. 280. In support of that assertion, Trinity offered three reasons why its proposal was not excludable:

1. [it] addresses corporate governance through Board oversight of important merchandising policies and is substantially removed from particularized decision-making in the ordinary course of business;
2. [it] concerns the Company's standards for avoiding community harm while fostering public safety and corporate ethics and does not relate exclusively to any individual product; and
3. [it] raises substantial issues of public policy, namely a concern for the safety and welfare of the communities served by the Company's stores.

J.A. 280. Trinity also touted the proposal as: not dictating "the specifics of how that Board oversight will operate [**16] or how best to report publically on the policies being followed by the Company and their implementation," J.A. 281; not seeking to "determine what products should or should not be sold by the Company," *id.;* allowing policy development "not by shareholders, but by management, using its knowledge and discretion," *id.;* and addressing "the ethical responsibility of the Company to take account of public safety and well-being, and the related risks of damage to the Company's reputation and brand," J.A. 283.

On March 20, 2014, the Commission's Corp. Fin. staff issued a "no-action" letter siding with Wal-Mart. It noted that "there appears to be some basis for [Wal-Mart's] view that [it] may exclude the proposal under *rule 14a-8(i)(7)*, as relating to [its] ordinary business operations[,]" because "[p]roposals concerning the sale of particular products and services are generally excludable under [the rule]." *Wal-Mart Stores, Inc., SEC No-Action Letter, 2014 SEC No-Act. LEXIS 259, 2014 WL 409085, at *1 (Mar. 20, 2014).* Consequently, the staff would "not recommend enforcement action to the Commission if Walmart [sic] omits the proposal from its proxy materials in reliance on *rule 14a-8(i)(7)*." *Id.*

Because no-action letters are not binding—they reflect only informal views of the staff and are not decisions on the merits—Trinity's proposal still had [**17] life.

## D. Trinity Takes its Fight to Federal Court: Round One.

On April 1, 2014, and just 17 days before Wal-Mart's proxy materials were due at the printer, Trinity filed a declaratory judgment action against Wal-Mart in the District of Delaware. It sought a declaration that "Wal-Mart's decision to omit the proposal from [its] 2014 Proxy Materials violates *Section 14(a) of the 1934 Act* and *Rule 14a-8.*" *Trinity, 2014 U.S. Dist. LEXIS 165431, 2014 WL 6790928, at *2* (internal citation omitted). The relief it requested was twofold:

1. A permanent injunction to prevent Wal-Mart from excluding its proposal from its 2015 proxy materials; and
2. A preliminary injunction to prevent it from printing, issuing, filing, mailing or otherwise transmitting proxy materials in connection with its 2014 Annual Meeting that do not contain the shareholder proposal submitted by Trinity.

*Id.*

Because of the April 17 deadline, the District Court held an emergency hearing on Trinity's preliminary injunction request. At the hearing the Court described Trinity's burden as "heavy," the remedy it was [*332] seeking as "extraordinary," and the time frame within which it had to rule as "highly expedited." *Id.* It didn't help Trinity's cause that the SEC had already sided with Wal-Mart.

It's very clear that the SEC [**18] has had hundreds of opportunities to consider questions like this. I have not. While the SEC may only have a few

---

[4] In the words of the SEC, a "no-action letter is one in which an authorized staff official indicates that the staff will not recommend any enforcement action to the Commission if the proposed transaction described in the incoming correspondence is consummated." [**15] *Procedures Utilized by the Division of Corporate Finance for Rendering Informal Advice, Release No. 6,253, 1980 SEC LEXIS 443, 1980 WL 25632, at *1 n.2 (Oct. 28, 1980).*

792 F.3d 323, *332; 2015 U.S. App. LEXIS 11549, **18

hours or whatever to put into each of these, I have roughly the same amount of time. You come to what you know is an extremely busy court. We have given this expedited attention. It comes to us with a no action conclusion from the SEC staff . . . You come to me, you have the burden [of] asking for extraordinary relief, and I need to find that it's likely that at the end of the trial, whenever we get there, I'm going to disagree with the SEC staff.

*2014 U.S. Dist. LEXIS 165431, [WL] at *3* (brackets omitted).

Viewing the proposal as one dealing "with guns on the shelves and not guns in society," the Court, in a ruling from the bench, held that the proposal related to an "ordinary business matter" and was thus excludable under *Rule 14a-8(i)(7)*. *Id.* It explained that

[t]he proposal [] expressly and . . . importantly states that the requested "oversight and/or reporting is intended to cover policies and standards that would be applicable [to] determining whether or not the company should sell guns equipped with magazines holding more than 10 rounds of ammunitions, high capacity magazines." And I tried to emphasize it's my added emphasis on **[**19]** "sell."

. . . .

While the specific proposal is crafted as one directed solely to policy and oversight and therefore arguably arises in the difficult and seemingly novel perhaps intersection between ordinary business . . . on the [one] hand [and corporate governance] on the other hand, ultimately I'm not persuaded that I'm likely to conclude at the end of the day on the merits that it therefore does not fall within the exception given the rule for ordinary business.

*Id.* (emphases omitted). The Court also gave weight to the SEC's "expertise" and "lengthy experience" involving proxy contests. *Id.*[5]

Although the favorable ruling allowed Wal-Mart to exclude Trinity's proposal from its 2014 proxy materials, it had not yet prevailed on the merits.

---

[5] To be sure, the Court did not suggest that staff no-action letters get automatic deference; just that *"under the circumstances,* . . . some deference [was] merited." J.A. 110 (emphasis added).

**E. Round Two**.

Wal-Mart thereafter moved to dismiss both counts of Trinity's amended complaint. It contended that Trinity's challenge to Wal-Mart's exclusion of the proposal from the retailer's 2014 proxy materials (count 1) was moot, see *2014 U.S. Dist. LEXIS 165431, [WL] at *4*, and the challenge to Wal-Mart's **[**20]** *"reasonably anticipated* 2015 violation of *Section 14(a)* and *Rule 14a-8"* (count 2) wasn't ripe, *2014 U.S. Dist. LEXIS 165431, [WL] at *5* (emphasis added). The District Court granted Wal-Mart's motion only in part. It disagreed on mootness, but agreed on ripeness. Most notably, however, and in direct tension with its earlier decision, the Court on summary judgment held that the proposal was *not* excludable under *Rule 14a-8(i)(7)*.

With more time to deliberate, the Court concluded that, although the proposal "could (and almost certainly would) shape what products are sold by Wal-Mart," it is "best viewed as dealing with matters that are *not* related to Wal-Mart's ordinary **[*333]** business operations." *2014 U.S. Dist. LEXIS 165431, [WL] at *8* (emphasis added). Thus *Rule 14(a)-8* could not block its inclusion in Wal-Mart's proxy materials. The Court fastened its holding to the view that the proposal wasn't a directive to management but to the Board to "oversee the development and effectuation of a Wal-Mart policy." *2014 U.S. Dist. LEXIS 165431, [WL] at *9*. In this way, "[a]ny direct impact of adoption of Trinity's proposal would be felt at the Board level; it would then be for [it] to determine what, if any, policy should be formulated and implemented." *Id.* Stated differently, the day-to-day responsibility for implementing whatever policies the Board develops was outside **[**21]** the scope of the proposal.

In the alternative, the Court held that even if the proposal does tread on the core of Wal-Mart's business—the products it sells—it "nonetheless 'focuses on sufficiently significant social policy issues'" that "transcend[] the day-to-day business matters" of the company, making the proposal "appropriate for a shareholder vote." *2014 U.S. Dist. LEXIS 165431, [WL] at *9* (brackets & emphasis added). Among the policy issues the District Court noted are "the social and community effects of sales of high capacity firearms at the world's largest retailer and the impact this could have on Wal-Mart's reputation, particularly if such a product sold at Wal-Mart is misused and people are injured or killed as a result." *Id.*

The Court also found helpful how "Trinity [] carefully

792 F.3d 323, *333; 2015 U.S. App. LEXIS 11549, **21

drafted its proposal . . . to not dictate what products should be sold or how the policies regarding sales of certain types of products should be formulated or implemented." *2014 U.S. Dist. LEXIS 165431, [W] at *10*. It stressed the difference between Trinity's proposal and the generally excludable proposals that ask a company to report on its "policies and reporting obligations regarding possible toxic and hazardous products offered for sale." *See id.* ("Each of these proposals **[**22]** requested policies or information— such as information on the companies' efforts to minimize exposure to toxic substances, attempts by the companies to secure supply chains, options for alternative safer products, and encouraging suppliers to reduce or eliminate harmful substances—which directly impacted the ordinary business operations of the companies involved far more than Trinity's proposal would directly impact Wal-Mart.").[6]

Finally, the District Court addressed Wal-Mart's secondary argument that Trinity's proposal is excludable under *Rule 14a-8(i)(3)* for being "so inherently vague or indefinite that neither the stockholders voting on the proposal, nor the company in implementing the proposal (if adopted), would be able to determine with any reasonable certainty exactly what actions or measures the proposal requires." *2014 U.S. Dist. LEXIS 165431, [WL] at *11* (quoting *SEC Staff Legal Bulletin No. 14B, 2004 SEC No-Act. LEXIS 732, 2004 WL 3711971, at *4 (Sept. 15, [*334] 2004)*). It acknowledged that "Wal-

_____

[6] As to Wal-Mart's reliance on the Corp. Fin. staff's grant of its no-action request, "a factor to which the Court [] accorded significant weight at the preliminary injunction stage," it declined to accord the staff's action any weight because "[i]t is undisputed that the final determination as to the applicability of the ordinary business exception is for the Court alone to make." *Id.* (citation omitted). It also explained the shift from its earlier ruling:

> At that earlier time Trinity was seeking "extraordinary relief" and the Court's analysis was . . . rushed as well as truncated. In fact, a mere ten days passed between the filing of the motion and the oral argument and the Court's ruling on it. Under the tight time constraints, the Court did not even permit full **[**23]** briefing on the preliminary injunction motion. As . . . noted at that time, "one hopes that if the case proceeds, I'll at least have more time to reflect further on the argument." Having now had the benefit of that time for reflection, as well as the invaluable assistance of additional briefing and oral argument, the Court sees the issues in the way it has explained here.

*2014 U.S. Dist. LEXIS 165431, [WL] at *11.*

Mart is undoubtedly correct that the 'broad variety of products offered by [it] and the numerous customers, employees and communities around the world with whom [it] works' mean that 'there is no *single* set of 'family and community values' that would be readily identifiable as being 'integral to the company's promotion of its brand.'" *Id.* (emphasis in original, bold **[**24]** omitted). But it doesn't "follow from this that shareholders voting on the proposal, or the Committee in implementing it (if approved), would be unable to determine with reasonable certainty what the Committee needs to do." *Id.* "Instead, it merely illustrates . . . that the [p]roposal properly leaves the details of any policy formulation and implementation to the discretion of the Committee, showing once more that [it] does not dictate any particular outcome or micro-manage Wal-Mart's day-to-day business." *Id.*

Wal-Mart appeals from both of the Court's holdings on the merits.

The District Court had jurisdiction under *28 U.S.C. § 1331* and *15 U.S.C. § 78aa*. We have jurisdiction under *28 U.S.C. § 1291*. Trinity's request to enjoin Wal-Mart from excluding the proposal from its 2015 proxy materials is ripe, as Trinity resubmitted its proposal for inclusion in Wal-Mart's 2015 proxy materials and Wal-Mart again rebuffed its request. HN1[↑] We review the District Court's order granting Trinity's motion for summary judgment *de novo.* As it did below, HN2[↑] Wal-Mart bears the burden of establishing as a matter of law that it properly excluded the proposal under an exception to *Rule 14a-8. See AFSCME v. Am. Int'l Grp., Inc., 462 F.3d 121, 125 (2d Cir. 2006)*.

## III. REGULATORY BACKGROUND

### A. The Proxy Statement

HN3[↑] A shareholder that is unable to attend **[**25]** a company's annual meeting isn't disenfranchised. It can vote its shares by proxy by empowering an attending shareholder to do so on its behalf. Vote by proxy has "become an indispensable part of corporate governance because the 'realities of modern corporate life have all but gutted the myth that shareholders in large publicly held companies personally attend annual meetings.'" *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc., 821 F. Supp. 877, 881 (S.D.N.Y. 1993)* (brackets omitted) (quoting *Stroud v. Grace, 606 A.2d 75, 86 (Del. 1992))*; *see also Proposed*

792 F.3d 323, *334; 2015 U.S. App. LEXIS 11549, **25

*Amendments to Rule 14a-8, Exchange Act Release No. 19,135, 1982 SEC LEXIS 691, 1982 WL 600869, at *2 (Oct. 14, 1982)* ("1982 Proposing Release") (noting that "with the increased dispersion of security holdings in public companies, the proxy solicitation process rather than the shareholder's meeting itself [] [became] the forum for shareholder suffrage").

As discussed above, a public company that solicits proxies must distribute a proxy statement to each of its shareholders in advance of the annual shareholder meeting. The statement is an informational package that tells shareholders "about items or initiatives on which [they] are asked to vote, such as proposed bylaw amendments, compensation or pension plans, or the issuance of new securities." *Apache Corp., 696 F. Supp. 2d at 727* (citation omitted). "The proxy card, on which the shareholder may submit its proxy, and the proxy statement together are the 'proxy **[**26]** materials.'" *Id.* (citing *17 C.F.R. § 240.14a-8(j)*).

## B. Proxy Solicitation

HN4[⬆️] Through its proxy materials, a company solicits proxies—hence the term "proxy solicitation." Congress, under the Securities Exchange Act of 1934, gave the SEC oversight of the proxy context. *See* 3 Thomas Lee Hazen, Treatise on the Law of Securities **[*335]** Regulation § 10.1[1] (6th ed. 2009) (describing the 1934 Act as a congressional response to the uptick of "great corporate frauds [that] had been perpetrated through management solicitation of proxies that did not indicate to the shareholders the nature of any matters to be voted upon"). "*Section [] 14(a) of the [1934 Act]* renders unlawful the solicitation of proxies in violation of the SEC's rules and regulations, which are codified at *17 C.F.R. § 240.14a-1 et seq.*" *Amalgamated Clothing & Textile Workers Union, 821 F. Supp. at 881*; *see also J.I. Case v. Borak Co., 377 U.S. 426, 431, 84 S. Ct. 1555, 12 L. Ed. 2d 423 (1964)* ("The purpose of *§ 14(a)* is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation.").

The SEC's "proxy rules are concerned with assuring full disclosure to investors of matters likely to be considered at shareholder meetings." Hazen at § 10.2[1]. To that end, the SEC adopted "*Rule 14a-9*, which prohibits 'false or misleading' statements made in any proxy statement, form of proxy, **[**27]** notice of meeting or other communication." *Amalgamated Clothing & Textile Workers Union, 821 F. Supp. at 882* (citing *17 C.F.R. §*

*240.14a-9(a)*). It has interpreted the rule to "require companies to provide shareholders with the opportunity to submit proposals to management for inclusion in the corporation's proxy materials." *Id.*

To complement *Rule 14a-9*, the Commission promulgated *Rule 14a-8* "to catalyze what many hoped would be a functional 'corporate democracy.'" Alan R. Palmiter, *The Shareholder Proposal Rule: A Failed Experiment in Merit Regulation, 45 Ala. L. Rev. 879, 879 (1994)*. HN5[⬆️] The rule mandates subsidized shareholder access to a company's proxy materials, requiring "reporting companies . . . to print and mail with management's proxy statement, and to place on management's proxy ballot, any 'proper' proposal submitted by a qualifying shareholder." *Id. at 886*; *cf. Roosevelt v. E.I. Du Pont de Nemours & Co., 958 F.2d 416, 421, 294 U.S. App. D.C. 198 (D.C. Cir. 1992)* (R.B. Ginsburg, J.) (maintaining that *Rule 14a-8*'s "right to be informed" is complementary to but distinct from *Rule 14a-9*'s "ban on misleading statements in proxy solicitations"). The idea was to provide shareholders a way to "bring before their fellow stockholders matters of [shareholder concern]" that are "proper subjects for stockholders' action under the laws of the state under which [the Company] was organized," *1982 Proposing Release, 1982 SEC LEXIS 691, 1982 WL 600869, at *3*, and to "have proxies **[**28]** with respect to such proposals solicited at little or no expense to the security holder," *1982 SEC LEXIS 691, at *2*.

## C. Shareholder Proposals

HN6[⬆️] A primary means to urge corporate reform is the shareholder proposal, which "communicate[s] not only [shareholders'] interest[] in a company's financial performance, but also show their interests and preferences concerning a wide range of issues, such as the board's structure and oversight of important policies, sustainability, and ethical performance." Brief of *amici curiae* Corporate and Securities Law Professors 2. The hard part, however, is soliciting votes to pass a proposal—especially where the motivation is to raise awareness of a policy issue. *See* James R. Copeland, *Getting the Politics Out of Proxy Season*, Wall St. J., A11 (Apr. 23, 2015) ("Not one of the 1,150 shareholder proposals concerning social or policy issues since 2006 got the support of a majority of voting shareholders over board opposition.").

A shareholder can garner support in one of two ways. It can "pay to issue a separate proxy statement, which

792 F.3d 323, *335; 2015 U.S. App. LEXIS 11549, **28

must satisfy all the disclosure requirements applicable [*336] to management's proxy statement." *Apache Corp., 696 F. Supp. 2d at 727* (citation omitted). Or the shareholder can go the *Rule 14a-8* route and have the company include [**29] its proposal (and a supporting statement) in the proxy materials at the company's expense. *See id. at 728.*

## D. Exclusion of Shareholder Proposals

*HN7*[↑] Though the *Rule 14a-8* option is financially advantageous, it does not "create an open forum for shareholder communication." Palmiter at 886. *Rule 14a-8* restricts the company-subsidy to "shareholders who offer 'proper' proposals." *Id. at 879*; *see also* 17 C.F.R. § 240.14a-8 ("This section addresses when a company must include a shareholder's proposal in its proxy statement and identify the proposal in its form of proxy when the company holds an annual or special meeting of shareholders."). A "proper" proposal is one that doesn't fit within one of *Rule 14a-8*'s exclusionary grounds—which are both substantive and procedural.

*HN8*[↑] The procedural exclusions of the rule "protect the solicitation process without regard to a proposal's content[.]" Palmiter at 886. For example, the proponent "must have continuously held at least $2,000 in market value, or 1%, of the company's securities entitled to be voted on the proposal at the meeting for at least one year by the date [it] submit[s] the proposal." *17 C.F.R. § 240.14a-8(b)(1)*. It can "submit no more than one proposal to a company for a particular shareholders' meeting." *Id.* at *§ 240.14a-8(b)(2)(i)*. And the "proposal, including any accompanying supporting statement, [**30] may not exceed 500 words." *Id.* at *§ 240.14a-8(d)*.

*HN9*[↑] The rule's substantive exclusions, by contrast, are "the most frequently used (and most litigated)." Palmiter at 890. They include (1) the "proper subjects" exclusion, which exists "[i]f the proposal is not a proper subject for action by shareholders under the law of the jurisdiction of the company's organization," *17 C.F.R. § 240.14a-8(i)(1)*; (2) the "false or misleading" exclusion, which allows companies to bar proposals that are too vague, *id.* at *§ 240.14a-8(i)(3)*; (3) the "substantially related" exclusion, which says that a proposal is excludable if it "relates to operations which account for less than 5 percent of the company's total assets [and net earnings and gross sales] at the end of its most recent fiscal year . . . , and is not otherwise significantly related to the company's business," *id.* at *§ 240.14a-*

*8(i)(5)*; and, most relevant for purposes of this opinion, (4) the "ordinary business" exclusion, which disallows a proposal that "deals with a matter relating to the company's ordinary business operations," *id.* at *§ 240.14a-8(i)(7)*. See Palmiter 890.

*HN10*[↑] If a company wants to invoke one of these grounds to exclude a proposal, the process is as follows. First, it must notify the shareholder in writing of the problem with the proposal within [**31] 14 days of receiving it and inform the shareholder that it has 14 days to respond. *Id.* at *§ 240.14a-8(f)(1)*. If the company finds the shareholder's response unpersuasive and still wants to exclude the proposal, it then must file with the Corp. Fin. staff the reasons why it believes the proposal is excludable no later than 80 days before the company files its proxy materials with the SEC. *Id.* at *§ 240.14a-8(j)(1)*. In this letter, the company may also ask the staff for a no-action letter to support the exclusion of a proposal. *See* Donna M. Nagy, *Judicial Reliance on Regulatory Interpretation in S.E.C. No-Action Letters: Current Problems and a Proposed Framework*, 83 Cornell L. Rev. 921, 939 (1998) ("Although *Rule 14a-8* merely prescribes notification and filing requirements, virtually all companies that decide to omit a shareholder proposal seek a no-action letter in support [*337] of their decision."). If the shareholder wants to respond, it can file a submission noting why exclusion would be improper. *17 C.F.R. § 240.14a-8(k)*.

The staff will respond in one of two ways: (1) with a no-action letter, specifying that the company may omit the shareholder proposal under the exclusion(s) it relied on; or (2) that it is "unable to concur" with the company.[7] A shareholder dissatisfied with the staff's [**32] response can, as Trinity did here, pursue its rights against the company in federal court.[8]

_____

[7] "[B]efore the SEC staff makes a decision on *Rule 14a-8* noaction requests, there are at least three levels of attorney review by a 'task force' dedicated to reviewing *Rule 14a-8* no-action requests[.]" *See* Wal-Mart Br. 37-38 (outlining layers of review); *see also Apache Corp. v. New York City Emps.' Ret. Sys., 621 F. Supp. 2d 444, 448 n.3 (S.D. Tex. 2008)* (describing no-action review process) (citing Thomas P. Lenke, *The SEC No-Action Letter Process*, 42 Bus. Law. 1019, 1027-28 (1987)).

[8] Although rare, the Commission itself may choose to review a no-action letter. Even then, its determination would become a final order only if it "impose[d] an obligation, den[ied] a right or fix[ed] some legal relationship as a consummation of the administrative process." *Amalgamated Clothing & Textile*

## E. SEC Interpretive Releases on the "Ordinary Business" Exclusion

HN11[↑] The ordinary business exclusion has been called the "most perplexing" of all the 14a-8 bars. *See* Daniel E. Lazaroff, *Promoting Corporate Democracy and Social Responsibility: The Need to Reform the Federal Proxy Rules on Shareholder Proposals*, 50 Rutgers L. Rev. 33, 94 (1997) [**33] . This stems from the opaque term "ordinary business," which is neither self-defining nor consistent in its meaning across different corporate contexts. Neither the courts nor Congress have offered a corrective. Rather, and "[f]rom the beginning, Rule 14a-8 jurisprudence—both in quality and quantity—has rested almost exclusively with the [SEC] . . . ." Palmiter at 880. In both its role as umpire and rule-maker, the SEC has provided various iterations of formal interpretive guidance.[9] Because they inform our analysis, we discuss each in turn.

### 1. The 1976 Proposing Release

The Commission's initial frustration with the ordinary business exclusion was management's reliance on it to omit proposals "that involve matters of considerable importance to the issuer [*i.e.*, the company] and its security holders." [**34] Proposed Amendments to Rule 14a-8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders, Release No. 9,343, 1976 SEC LEXIS 1290, 1976 WL 160410, at *7 (July 7, 1976) ("1976 Proposing Release"). It proposed two modifications to address this concern. The first was a textual alteration to clarify that a proposal is

---

Workers Union v. S.E.C., 15 F.3d 254, 257 (2d Cir. 1994) (citations & internal quotation marks omitted); *see also* Hazen, *supra* at § 10.8[1][A][2] (noting that Commission review is appropriate only where it involves "matters of substantial importance and where the issues are novel or highly complex").

[9] Each of the SEC's interpretive releases was adopted after notice and comment and thus merits our deference. As the Supreme Court has explained, "[j]ust as we defer to an agency's reasonable interpretation of the statute when it issues regulations in the first instance, . . . the agency is entitled to further deference when it adopts a reasonable interpretation of the regulations it has put in force." Fed. Express v. Holowecki, 552 U.S. 389, 397, 128 S. Ct. 1147, 170 L. Ed. 2d 10 (2008); *see also* Dep't of Labor v. E. Associated Coal Corp., 54 F.3d 141, 147 (3d Cir. 1995) ("We accord greater deference to an administrative agency's interpretation of its own regulations than to its interpretation of a statute.") (citations omitted).

excludable "only if it deals with a 'routine, day-to-day matter relating to the conduct of the ordinary business operations of the issuer.'" [*338] 1976 SEC LEXIS 1290, [WL] at *8. (The rule's then-extant language provided that a proposal was excludable if it consisted of a "recommendation or request that [] management take action on a matter relating to the conduct of the ordinary business operations of the issuer." 1976 SEC LEXIS 1290, [WL] at *7 (internal quotation marks omitted).) The second was a new standard to distinguish "routine" (excludable) from "important" matters (not excludable). *See* 1976 SEC LEXIS 1290, [WL] at *8. In the SEC's view, management teams generally handle "mundane matters" while boards of directors are responsible for high level decision-making. It thus proposed the following standard: "Will it be necessary for the board of directors . . . to act on the matter involved in the proposal?" *Id.* If the answer was no, the proposal dealt with a routine business matter and was thus excludable. *See id.*

### 2. The 1976 Adopting Release

Commenters attacked the textual modification and new standard [**35] as unworkable. As to the new language, the criticism was that many routine, day-to-day business matters "would necessarily deal with ordinary business matters of a complex nature that shareholders, as a group, would not be qualified to make an informed judgment on, due to their lack of business expertise and their lack of intimate knowledge of the issuer's business." Adoption of Amendments Relating to Proposals by Security Holders, Release No. 12, 999, 1976 SEC LEXIS 326, 1976 WL 160347, at *10 (Nov. 22, 1976) ("1976 Adopting Release"). It also "would be difficult to administer because of the subjective judgments that necessarily would be required in interpreting it." *Id.* Regarding the new standard, the Commission relented to the criticism that "board practices relating to the delegation of authority to management personnel vary greatly, and there would, therefore, be no consistency in applying such a standard." 1976 SEC LEXIS 326, [WL] at *11; *see also id.* ("The potential lack of consistency of the proposed standard is a fatal drawback, in the Commission's view. And, since no other reasonable standard for making the requisite distinctions is readily apparent, the Commission believes that the provision would be difficult, if not impossible, to administer on a satisfactory basis."). It thus opted for a tweak of the [**36] text of the exclusion and offered fresh interpretive guidance.

For the former, it deleted any reference to management; the exclusion thus read, much like it does now, that a

proposal is excludable if it "deals with a matter relating to the conduct of the ordinary business operations of the issuer." Id. Regarding the new guidance, the SEC maintained that the exclusion should be "interpreted somewhat more flexibly than in the past" and reaffirmed that the term "ordinary business operations" has been wrongly interpreted to "include certain matters which have significant policy, economic or other implications inherent in them. For instance, a proposal that a utility company not construct a nuclear power plant has in the past been [wrongly] considered" to be excludable. Id. Therefore, "proposals of that nature, as well as others that have major implications, will in the future be considered beyond the realm of an issuer's ordinary business operations." Id.

3. The 1982 Proposing Release

The SEC took a fresh look at the ordinary business exclusion in 1982 in reviewing the staff's then-prevailing view on proposals that ask a company to (1) prepare a report to shareholders or (2) recommend that [**37] a special committee be formed to examine a particular area of its business. See *1982 Proposing Release, 1982 SEC LEXIS 691, 1982 WL 600869, at *17*. The staff asserted that, as a category, such proposals were not excludable even if the subject matter of the report or examination involved an ordinary [*339] business matter because, in its view, a company doesn't disseminate reports to shareholders or establish special committees as part of its ordinary business operations. See id.

The SEC agreed to address the objection launched by commenters that the staff's "interpretation [] rais[es] form over substance." Id. It thus proposed for consideration "whether it would be more appropriate to consider in each instance whether the type of information sought by the proposal involves the ordinary business operations of the issuer and to disregard whether a proposal requests the preparation and distribution of a report or the formation of a special committee." Id.

4. The 1983 Adopting Release

After notice and comment, the Commission formalized its adoption of the proposed "significant change in the staff's interpretation" of the exclusion. Amendments to *Rule 14a-8* Under the Securities Exchange Act of *1934 Relating to Proposals by Security Holders, Release No. 20,091, 1983 SEC LEXIS 1011, 1983 WL 33272, at *7 (Aug. 16, 1983)* ("1983 Adopting Release") ("Because [the [**38] staff's] interpretation raises form over

substance and renders the provisions of [the ordinary business exclusion] largely a nullity, the Commission has determined to adopt the interpretive change set forth in the Proposing Release."). It thus directed the staff to "consider whether the subject matter of a special report or the committee involves a matter of ordinary business; where it does, the proposal will be excludable." Id.

5. The 1997 Proposing Release

The SEC revisited the ordinary business exclusion in the late 1990s to tackle proposals "relating simultaneously to both an 'ordinary business' matter and a significant social policy issue." *Amendments to Rules on Shareholder Proposals, Release No. 39,093, 1997 SEC LEXIS 1962, 1997 WL 578696, at *12 (Sept. 18, 1997)* (the "1997 Proposing Release"). The interpretive snag was that the "fairly straightforward mission" of the rule was ill-suited to address contemporary social issues and "provided no guidance" on how to treat proposals raising such issues. Id. This difficulty showed itself when the staff allowed a company (Cracker Barrel Old Country Stores) to exclude a proposal that asked it to "prohibit discrimination on the basis of sexual orientation." *New York City Emps.' Ret. Sys. v. S.E.C., 45 F.3d 7, 9 (2d Cir. 1995)*. In handling the proposal, the staff espoused the view, which the Commissioners of the SEC deemed untenable, [**39] that employment-related proposals—regardless whether they raise a social issue—are categorically excludable. See *Cracker Barrel Old Country Store, Inc., SEC No-Action Letter, 1992 SEC No-Act. LEXIS 984, 1992 WL 289095, at *1 (Oct. 13, 1992)* ("[T]he Division has determined that the fact that a shareholder proposal concerning a company's employment policies and practices for the general workforce is tied to a social issue will no longer be viewed as removing the proposal from the realm of ordinary business operations of the registrant. Rather, determinations with respect to any such proposals are governed by the employment-based nature of the proposal."). To end this practice, the SEC declared that "employment-related proposals focusing on significant social policy issues could not automatically be excluded under the 'ordinary business' exclusion." 1997 Proposing Release, *1997 SEC LEXIS 1962, 1997 WL 578686, at *13*. And going forward, "the 'bright line' approach for employment-related proposals established by the Cracker Barrel position would be replaced by a case-by-case analysis that prevailed previously." Id.

In a final note of guidance, *HN12*[⬆] the Commission summarized the two considerations that guide how to apply the ordinary business exclusion. "The first relates

792 F.3d 323, *339; 2015 U.S. App. LEXIS 11549, **39

to the subject matter of the proposal. Certain [*340] tasks are so fundamental [**40] to management's ability to run a company on a day-to-day basis that they could not, as a practical matter, be subject to direct shareholder oversight." *1997 SEC LEXIS 1962, [WL] at *14*. According to the SEC, examples of this "include the management of the workforce, such as the hiring, promotion, and termination of employees, decisions on production quality and quantity, and the retention of suppliers." *Id*. Yet "proposals relating to such matters but focusing on significant social policy issues generally would not be considered to be excludable, because such issues typically fall outside the scope of management's prerogative." *Id*. "The second consideration relates to the degree to which the proposal seeks to 'micro manage' the company by probing too deeply into 'matters of a complex nature that shareholders, as a group, would not be qualified to make an informed judgment on, due to their lack of business expertise and lack of intimate knowledge of the (company's) business.'" *Id*. It comes into play where "the proposal seeks intricate detail, or seeks to impose specific time-frames or methods for implementing complex policies." *Id*.

6. The 1998 Adopting Release

Yet again the SEC declined to modify the language of the [**41] rule, perhaps afraid to unleash unintended consequences. Although "the legal term-of-art 'ordinary business' might be confusing to some shareholders and companies," it posited, the risk that practitioners "might misconstrue [a] revision[] as signaling an interpretive change" was too great to ignore. *Amendments to Rules on Shareholder Proposals, Release No. 23, 200, 1998 SEC LEXIS 1001, 1998 WL 254809, at *2 (May 21, 1998)* ("1998 Adopting Release"); *see also id*. ("Indeed, since the meaning of the phrase 'ordinary business' has been developed by the courts over the years through costly litigation and essentially has become a term-of-art in the proxy area, we recognize the possibility that the adoption of a new term could inject needless costs and other inefficiencies into the shareholder proposal process."). It elected simply to reverse the staff's 1992 *Cracker Barrel* no-action letter, thus "return[ing] to a case-by-case analytical approach," *1998 SEC LEXIS 1001, [WL] at *4*, and commented that

> [w]hile we acknowledge that there is no bright-line test to determine when employment-related shareholder proposals raising social issues fall within the scope of the "ordinary business" exclusion, the staff will make reasoned distinctions

in deciding whether to furnish "no-action" relief. Although [**42] a few of the distinctions made in those cases may be somewhat tenuous, we believe that on the whole the benefit to shareholders and companies in providing guidance and informal resolutions will outweigh the problematic aspects of the few decisions in the middle ground.

*Id*. It also reaffirmed that *HN13*[⬆] the term "ordinary business" continues to "refer[] to matters *that are not necessarily 'ordinary' in the common meaning of the word*" and "is rooted in the corporate law concept providing management with flexibility in directing certain core matters involving the company's business and operations." *1998 SEC LEXIS 1001, [WL] at *2* (emphasis added).

With that background, we move to the merits of WalMart's appeal.

## IV. ANALYSIS

The principal issue we address is whether Trinity's proposal was excludable because it related to Wal-Mart's ordinary business operations. In doing so, we evaluate the District Court's primary and alternative holdings. To repeat, it held that Trinity's proposal doesn't meddle in the nuts-andbolts of Wal-Mart's business because it was a directive to the Board (rather than management) to set standards to [*341] guide certain merchandising decisions. And in the alternative the proposal is not excludable because it [**43] implicates a significant social policy—the sale of high-capacity firearms by the world's largest retailer —that transcends Wal-Mart's ordinary business. In this case (and we agree with the Commission that our determination counsels a case-by-case inquiry) we conclude that the proposal is excludable under the ordinary business proviso and that the significant social policy intended by the proposal is here no exception to that exclusion.[10]

_____

[10] A majority of the members of this panel (Judges Shwartz and Vanaskie) also hold that the proposal (which Trinity declined to divide into separate parts) is excludable for being unduly vague under *Rule 14a-8(i)(3)*. I decline to join that holding. Wal-Mart's vagueness objection was first raised in the District Court and not before the SEC in seeking a noaction letter. And before us it devoted little attention to the argument. I thus think it not prudent to reach the vagueness question in this instance.

MARK ENOCH

## A. Trinity's Proposal Relates to Wal-Mart's Ordinary Business Operations.

HN14[↑] We employ a two-part analysis to determine whether Trinity's proposal "deals with a matter relating to the company's ordinary business operations[.]" *17 C.F.R. § 240.14a-8(i)(7)*. Under the first step, we discern the "subject matter [**44] of the proposal. *See 1983 Adopting Release, 1983 SEC LEXIS 1011, 1983 WL 33272, at *7*. Under the second, we ask whether that subject matter relates to Wal-Mart's ordinary business operations. *Id.* If the answer to the second question is yes, Wal-Mart must still convince us that Trinity's proposal does not raise a significant policy issue that transcends the nuts and bolts of the retailer's business.

1. What is the subject matter of Trinity's proposal?

Beginning with the first step, we are mindful of *HN15*[↑] the Commission's consistent nod to substance over form and its distaste for clever drafting. As it reaffirmed in the 1982 and 1983 Releases, it matters little how a shareholder styles its proposal; the emphasis should always be on its substance. To illustrate its point, the SEC invoked the staff's disparate treatment of two proposals where the Commission thought the outcome should have been the same:

> [T]he staff, in a letter to Castle & Cooke . . . *agreed* with the company that a proposal requesting that it alter its food production methods in underdeveloped countries could be excluded under [the ordinary business exclusion] since [it] specified the steps management should take to implement the action requested . . . [**45] . [Years later], however, the proponent instead asked the company *to appoint a committee to review* foreign agricultural operations with emphasis on the balance between labor and capital intensive production. The staff *refused* to apply the rule to this provision because the appointment of a special committee to study the company's foreign agricultural operations is a matter of policy.

*1982 Proposing Release, 1982 SEC LEXIS 691, 1982 WL 600869, at *17 n.49* (emphases added). In the SEC's view, a directive to Castle & Cooke to alter its food production methods in underdeveloped countries was the functional equivalent of a request for committee review of those methods. *See id.* Because the staff concurred that the former was excludable, it should have reached the same result as to the latter. Thus, even though Trinity's proposal asks for the development

of a specific merchandising policy—and not a review, report or examination—we still ask whether the *subject matter* of the action it calls for is a matter of ordinary business. [*342] Applying that principle, we part ways with the District Court. We perceive it put undue weight on the distinction between a directive to management and a request for Board action. In the [**46] District Court's view, if the proposal had directed management to arrange its product assortment in a certain way, it would have been excludable. But because it merely asked the "*Board* [to] oversee the development and effectuation of a Wal-Mart policy," it was not. *Trinity, 2014 U.S. Dist. LEXIS 165431, 2014 WL 6790928, at *9* (emphasis and bold in original); *see also id.* ("Any direct impact of adoption of Trinity's proposal would be felt at the Board level; it would then be for the Board to determine what, if any, policy should be formulated and implemented."). The concern with this line of reasoning is that the SEC in its 1976 Adopting Release rejected the proposed bright line whereby shareholder proposals involving "matters that would be handled by management personnel without referral to the board . . . generally would be excludable," but those involving "matters that would require action by the board would not be." *1976 Proposing Release, 1976 SEC LEXIS 1290, 1976 WL 160410, at *8*. Thus, though the District Court's rationale and holding are not implausible, we do not adopt them.

Distancing itself from the District Court's formal approach, Trinity argues that the subject matter of its proposal is the improvement of "corporate governance over strategic matters [**47] of community responsibility, reputation for good corporate citizenship, and brand reputation, none of which can be considered ordinary business," Trinity Br. 39, and the focus is on the "shortcomings in Wal-Mart's corporate governance and oversight over policy matters," *id.* at 33. We cannot agree. As the National Association of Manufacturers points out, Trinity's contention, like the District Court's analysis, relies "on how [the proposal] is framed and to whom, rather than [its] substance." Brief of *amicus curiae* Nat'l Assoc. of Mfrs. 15. Contrary to what Trinity would have us believe, the immediate consequence of the adoption of a proposal—here the improvement of corporate governance through the formulation and implementation of a merchandising policy—is not its subject matter. If it were, then, analogizing to the review context, the subject matter of a review would be the review itself rather than the information sought by it. *See 1982 Proposing Release, 1982 SEC LEXIS 691, 1982 WL 600869, at *17*. For example, under Trinity's position, the subject matter of a proposal that calls for a

report on how a restaurant chain's menu promotes sound dietary habits would be corporate governance as opposed to important [**48] matters involving the promotion of public health. Yet that is the analysis the SEC disavowed in adopting the suggestions made in the 1982 Proposing Release. The subject matter of the proposal is instead its *ultimate* consequence—here a potential change in the way Wal-Mart decides which products to sell. Indeed, as even the District Court acknowledged, if the company were to adopt Trinity's proposal, then, whatever the nature of the forthcoming policy, it "could (and almost certainly would) shape what products are sold by Wal-Mart[.]" *Trinity, 2014 U.S. Dist. LEXIS 165431, 2014 WL 6790928, at *9.*

This view of the subject matter of Trinity's proposal finds support in a well-established line of SEC no-action letters.[11] The [*343] most instructive is the no-action letter issued to Sempra Energy in January 2012. The proposal there urged the Board "to conduct an independent oversight review each year of the Company's management of political, legal, and financial risks posed by [its] operations in any country that may pose an elevated risk of corrupt practices." *Sempra Energy, SEC No-Action Letter, 2012 SEC No-Act. LEXIS 31, 2011 WL 6425347, at *2 (Jan. 12, 2012).* As Trinity does here, the proposing shareholder framed the subject matter of its proposal as targeting the company's governance of a certain type of risk: "the political, legal, and financial risks" [**49] inherent in the company's operations in countries "posing an elevated risk of corrupt practices," *id.,* which could ultimately trigger a Foreign Corrupt Practices Act prosecution. *Cf.* Trinity Br. 40 (maintaining that its proposal addresses the

governance of the "risks to society and Wal-Mart should a product, after it is sold, cause harm to [its] customers or its brand and reputation") (quotation marks omitted). But, as here, the staff granted no-action relief because, "although the proposal requests the board to conduct an independent oversight review of Sempra's management of particular risks, the underlying subject matter of these risks appears to involve ordinary business matters." *Sempra Energy, 2012 SEC No-Act. LEXIS 31, 2011 WL 6425347, at *1; see also The Home Depot, Inc., SEC No-Action Letter, 2008 SEC No-Act. LEXIS 62, 2008 WL 257307, at *1, *2 (Jan. 25, 2008)* (granting no-action relief where the proposal asked Home Depot's Board to publish a report outlining the company's product safety policies and describing what management is doing to address recent product safety concerns because it related to "Home Depot's ordinary business operations (i.e., the sale of particular products)"); *Family Dollar Stores, Inc., SEC No-Action Letter, 2007 SEC No-Act. LEXIS 630, 2007 WL 3317923, at *1 (Nov. 6, 2007)* (same where proposal asked for a report "evaluating Company policies and procedures for systematically minimizing customers' exposure to toxic substances and hazardous [**50] components in its marketed products" because it relates to Family Dollar's "ordinary business operations (i.e., sale of particular products)"); *Walgreen Co., SEC No-Action Letter, 2006 SEC No-Act. LEXIS 638, 2006 WL 5381376, at *1 (Oct. 13, 2006)* (same for proposal asking for a report "characterizing the extent to which the company's private label cosmetics and personal care products lines contain carcinogens, mutagens, reproductive toxicants, and chemicals that affect the endocrine system and describing options for using safer alternatives," because the subject matter of the proposal related to Walgreen's "ordinary business operations (i.e., the sale of particular products)").[12]

The staff's consistent focus on the underlying subject matter of a proposal is instructive. So too is Trinity's failure to cite any authority for its view of the subject matter of its proposal. *See* Trinity Br. [*344] 37-42. For us, the subject matter of Trinity's proposal is how Wal-Mart approaches merchandising decisions involving

---

[11] Wal-Mart argues that although no-actions letters are generally not entitled to deference, the staff's no-action letter here *is* because it is "consistent with both the SEC's guidance on *Rule 14a-8(i)(7)* and the SEC staff's prior no-action letters." Reply Br. 13. Although we disagree with the view that the letter holds any persuasive value, we do give the staff's body of no-action letters "careful consideration as 'representing the views of persons who are continuously working with the provisions of the statute [the regulation in our case] involved.'" *Donaghue v. Accenture Ltd., No. 03-8329, 2004 U.S. Dist. LEXIS 16073, 2004 WL 1823448, at *3 (S.D.N.Y. Aug. 16, 2004)* (brackets, citation & quotation marks omitted); *see also* Nagy *supra at 1002* (maintaining that whether [**51] "the staff has consistently maintained a particular regulatory interpretation in no-action letters over a long period of time is relevant" to whether the interpretation should merit some deference, as "consistent, longstanding staff positions may signal Commission approval of these positions").

---

[12] In keeping with its emphasis on the subject matter of a proposal, the staff often denies no-action relief where the proposal merely calls for the Board to establish a committee to oversee risk generally. *See, e.g., PepsiCo, Inc., SEC No-Action Letter, 2012 SEC No-Act. LEXIS 146, 2012 WL 542708, at *1 (Feb. 16, 2012)* (denying no-action relief where the proposal merely asked the company to establish "a Risk Oversight Committee of the Board of Directors").

792 F.3d 323, *344; 2015 U.S. App. LEXIS 11549, **50

products that (1) especially endanger public-safety and well-being, (2) have the potential to impair the reputation of the Company, and/or (3) would reasonably be considered by many offensive to the family and community values [**52] integral to the company's promotion of the brand. A contrary holding—that the proposal's subject matter is "improved corporate governance"—would allow drafters to evade *Rule 14a-8(i)(7)*'s reach by styling their proposals as requesting board oversight or review. *See* Reply Br. 10. We decline to go in that direction.

2. Does Wal-Mart's approach to whether it sells particular products relate to its ordinary business operations?

Reaching the second step of the analysis, we ask whether the subject matter of Trinity's proposal relates to day-to-day matters of Wal-Mart's business. Wal-Mart says the answer is yes because, even though the proposal doesn't demand any specific changes to the make-up of its product offerings—a point on which Trinity hangs its hat, *see* Trinity Br. 38 ("[The proposal] is not a 'stop selling' proposal. Nor does it require intricate reports on Wal-Mart's products.")—it "seeks to have a [B]oard committee address policies that could (and almost certainly would) shape what products are sold by Wal-Mart." Reply Br. 9 (internal quotation marks omitted). That is, Trinity's proposal is just a sidestep from "a shareholder referendum on how [Wal-Mart] selects its inventory." Brief of *amicus curiae* [**53] the Nat'l Assoc. of Mfrs. at 11. And thus its subject matter strikes at the core of Wal-Mart's business.

We agree. *HN16*[↑] A retailer's approach to its product offerings is the bread and butter of its business. As *amicus* the National Association of Manufacturers notes, "Product selection is a complicated task influenced by economic trends, data analytics, demographics, customer preferences, supply chain flexibility, shipping costs and lead-times, and a host of other factors best left to companies' management and boards of directors." *Id.* at 12; *see also* Brief of *amicus curiae* Retail Litig. Ctr., Inc. 11 ("The understanding of consumer behavior and careful tailoring of product mix is central to the success or failure of a given retailer."). Though a retailer's merchandising approach is not beyond shareholder comprehension, the particulars of that approach involve operational judgments that are ordinary-course matters.

Moreover, that the proposal doesn't direct management to stop selling a particular product or prescribe a matrix to follow is, we think, a straw man. *See* Trinity Br. 38;

*Trinity, 2014 U.S. Dist. LEXIS 165431, 2014 WL 6790928, at *10* ("Trinity has carefully drafted its Proposal. . . . not [to] dictate which products should be sold or how the policies regarding sales of certain [**54] types of products should be formulated or implemented."). A proposal need only *relate* to a company's ordinary business to be excludable. Cf. *17 C.F.R. § 240.14a-8(i)(7)* (exclusion is proper where a proposal deals with a matter "*relating* to the company's ordinary business operations") (emphasis added). It need not dictate any particular outcome. To make the point even clearer, suppose that Trinity's proposal had merely asked Wal-Mart's Board to *reconsider* whether to continue selling a given product. Though the request doesn't dictate a particular outcome, we have no doubt it would be excludable under the SEC's 1983 Adopting Release, as the action sought relates to Wal-Mart's ordinary business operations. This is so even though it doesn't suggest any changes. The same is true here. In short, so long as the subject matter of the proposal *relates*—that is, **[*345]** bears on—a company's ordinary business operations, the proposal is excludable unless some other exception to the exclusion applies.

Failing all of this, Trinity retreats to friendlier territory. It contends that, even if the subject matter of its proposal concerns Wal-Mart's ordinary business operations, it focuses on a significant and transcendent social policy [**55] issue: Wal-Mart's approach to the risk that the sale of a product can cause "harm to [its] customers or its brand and reputation." Trinity Br. 40; *see also id.* at 44 ("There are various products especially dangerous to reputation, brand value, or the community that a family retailer such as Wal-Mart should carefully consider whether or not to sell, and the proposal addresses the transcendent policy issue of under what policies and standards and with what Board oversight Wal-Mart handles these merchandising decisions."). We address that issue next.

**B. Trinity's Proposal Does Not Focus on a Significant Policy Issue that Transcends Wal-Mart's Day-to-Day Business Operations.**

As discussed above, *HN17*[↑] there is a significant social policy exception to the default rule of excludability for proposals that relate to a company's ordinary business operations. For the SEC staff this means that when "a proposal's underlying subject matter transcends the day-to-day business matters of the company and raises policy issues so significant that it would be appropriate for a shareholder vote, the

proposal generally will not be excludable under *Rule 14a-8(i)(7)*." *SEC Staff Legal Bulletin No. 14E, 2009 SEC No-Act. LEXIS 825, 2009 WL 4363205, at *2 (Oct. 27, 2009)*.

The difficulty in this case is divining [**56] the line between proposals that focus on sufficiently significant social policy issues that transcend a company's ordinary business (not excludable) from those that don't (excludable). Even the Commission admits that the social-policy exception "raise[s] difficult interpretive questions." *1997 Proposing Release, 1997 SEC LEXIS 1962, 1997 WL 578696, at *13*. No doubt that is because the calculus is complex. Yet we cannot sidestep what some may deem an unreckonable area. Thus we wade in.

We think *HN18*[⬆] the inquiry is again best split into two steps. The first is whether the proposal focuses on a significant policy (be it social or, as noted below, corporate). If it doesn't, the proposal fails to fit within the social-policy exception to *Rule 14a-8(i)(7)*'s exclusion. If it does, we reach the second step and ask whether the significant policy issue transcends the company's ordinary business operations.

1. Does Trinity's proposal raise a significant social policy issue?

We first turn to whether Trinity's proposal focuses on a "sufficiently significant" policy issue like "significant [employment] discrimination." *1998 Adopting Release, 1998 SEC LEXIS 1001, 1998 WL 254809, at *4*. The District Court said yes because the proposal at its core dealt with "the social [**57] and community effects of sales of high capacity firearms at the world's largest retailer." *Trinity, 2014 U.S. Dist. LEXIS 165431, 2014 WL 6790928, at *9*. However, even Trinity concedes its proposal "is not directed solely to Wal-Mart's sale of guns." Trinity Mot. for Summ. J. 17 (ECF No. 38, filed Jun. 18, 2014). Rather it asks Wal-Mart's Board to oversee merchandising decisions for *all* "products especially dangerous to reputation, brand value, or the community that a family retailer such as Wal-Mart should carefully consider whether or not to sell." Trinity Br. 44. *See also* Brief of *amici curiae* Corporate and Securities Law Professors 14-15 (arguing that the "ethical and social policy implications" of "[s]elling [*346] products that endanger public safety, Wal-Mart's reputation, and [its] core values," are "easily on par with employment discrimination, which the SEC's 1998 Release deemed a sufficiently significant policy issue to warrant inclusion of shareholder proposals relating to

it").

Wal-Mart, on the other hand, contends that neither the Commission nor its staff has ever countenanced "such a broad and nebulous concept of significant policy issue." Reply Br. 21. We disagree. True enough, the Commission has adopted what can only be described as a "we-know-it-when-we-see-it" [**58] approach, *see* Palmiter at 910 (describing the Commission's "shifting approach to social/political proposals" as the "most dramatic and prominent example of SEC inconstancy" under *Rule 14a-8*). Yet it is hard to counter that Trinity's proposal doesn't touch the bases of what are significant concerns in our society and corporations in that society. Thus we deem that its proposal raises a matter of sufficiently significant policy.

Our concurring colleague, Judge Shwartz, would allow Wal-Mart to exclude Trinity's proposal because it doesn't focus on the retailer's sale of guns with high-capacity magazines. As she points out, it instead focuses on the broader issue of the company's commitment to public safety through the sale of products that can be especially dangerous to the community. Concurring Op. at 6-7 ("The 'public safety' component of the proposal could cover many products, especially in light of the amount of products Wal-Mart offers, and thus might require [it] to develop policies and standards for thousands of goods."). And because this policy issue has the potential to bring "thousands" of products under its umbrella—not just guns with high-capacity magazines—it does not "as a whole 'focus'" on a significant [**59] policy issue. *Id.* at 7 (alterations omitted).

Our colleague also believes that the second and third parts of Trinity's proposal do not raise issues of significant import. She claims that Wal-Mart's management of risk to its brand value (the proposal's second part) and its reputation as a family retailer (the third part) relate to matters that, "while certainly important to shareholders seeking a return on their investment," are "not of broad societal concern." Concurring Op. at 7. Thus, she posits, these parts of the proposal relate to policy issues the exception doesn't deem significant. The trouble is the social-policy exception—despite its name—is not so limited.

The good news is we come to the ultimate conclusion of Judge Shwartz—that Trinity's proposal is excludable under the ordinary business bar—but take a different path. We are more persuaded by the view that, because the proposal relates to a policy issue that targets the

792 F.3d 323, *346; 2015 U.S. App. LEXIS 11549, **59

retailer-consumer interaction, it doesn't raise an issue that *transcends* in this instance Wal-Mart's ordinary business operations, as product selection is the foundation of retail management.

2. Even if Trinity's proposal raises a significant policy issue, does that [**60] issue transcend Wal-Mart's ordinary business operations?

To repeat, *HN19*[↑] where "a proposal's underlying subject matter transcends the day-to-day business matters of the company *and* raises policy issues so significant that it would be appropriate for a shareholder vote, the proposal generally will not be excludable under *Rule 14a-8(i)(7)*." *SEC Staff Legal Bulletin No. 14E, 2009 SEC No-Act. LEXIS 825, 2009 WL 4363205, at *2 (Oct. 27, 2009)* (emphasis added). What this means is that, to shield its proposal from the ordinary business exclusion, a shareholder must do more than focus its proposal on a significant [*347] policy issue; the subject matter of its proposal must "transcend" the company's ordinary business. *See 1998 Adopting Release, 1998 SEC LEXIS 1001, 1998 WL 254809, at *4.* The Commission used the latter term, we believe, to refer to a policy issue that is divorced from how a company approaches the nitty-gritty of its core business. *See SEC Staff Legal Bulletin No. 14E, 2009 SEC No-Act. LEXIS 825, 2009 WL 4363205, at *3* (maintaining that CEO succession-planning "raises a significant policy issue regarding the governance of the corporation that transcends the day-to-day business matter of managing the workforce"). Thus, and contrary to the position of our concurring colleague, we think the transcendence requirement plays a pivotal role in [**61] the social-policy exception calculus. Without it shareholders would be free to submit "proposals dealing with ordinary business matters yet cabined in social policy concern." *Apache Corp. v. New York City Emps.' Ret. Sys., 621 F. Supp. 2d 444, 451 n.7 (S.D. Tex. 2008)* (rejecting the argument that "whether a proposal implicates significant social policy is the dispositive inquiry").

For major retailers of myriad products, a policy issue is rarely transcendent if it treads on the meat of management's responsibility: crafting a product mix that satisfies consumer demand. This explains why the Commission's staff, almost as a matter of course, allows retailers to exclude proposals that "concern[] the sale of particular products and services." *Rite Aid Corp., SEC No-Action Letter, 2015 SEC No-Act. LEXIS 296, 2015 WL 364996, at *1 (Mar. 24, 2015).* On the other hand, if a significant policy issue disengages from the core of a

retailer's business (deciding whether to sell certain goods that customers want), it is more likely to transcend its daily business dealings.

To illustrate the distinction, a proposal that asks a supermarket chain to evaluate its sale of sugary sodas because of the effect on childhood obesity should be excludable because, although the proposal raises a significant social policy issue, the request is too entwined with the fundamentals of the daily activities of a [**62] supermarket running its business: deciding which food products will occupy its shelves. So too would a proposal that, out of concern for animal welfare, aims to limit which food items a grocer sells. *Cf., e.g., Amazon.com, Inc., SEC No-Action Letter, 2015 SEC No-Act. LEXIS 310, 2015 WL 470145, at *1 (Mar. 27, 2015)* (allowing Amazon to exclude proposal that asked it to "disclose to shareholders any reputational and financial risks that it may face as a result of negative public opinion pertaining to the treatment of animals used to produce products it sells" because the "proposal relates to the products and services offered for sale by the company"); *Papa John's Int'l, Inc., SEC No-Action Letter, 2015 SEC No-Act. LEXIS 150, 2014 WL 7406254, at *1 (Feb. 13, 2015)* (same for proposal that encouraged the pizza franchise to "expand its menu offerings to include vegan cheeses and vegan meats in order to advance animal welfare, reduce its ecological footprint, expand its healthier options and meet growing demand for plant-based foods").

By contrast, a proposal raising the impropriety of a supermarket's discriminatory hiring or compensation practices generally is not excludable because, even though human resources management is a core business function, it is disengaged from the essence of a supermarket's business. *See Wal-Mart Stores, Inc., SEC No-Action Letter, 2004 SEC No-Act. LEXIS 298, 2004 WL 326494, at *1 (Feb. 17, 2004)* (denying no-action relief where proposal asked for a report documenting "the distribution [**63] of [] equity compensation by the recipient's race and gender and discuss[ing] recent trends in equity compensation granted to women and employees of color"). The same goes for proposals asking for information on the environmental effect of constructing [*348] stores near environmentally sensitive sites. *See, e.g.,* Jenny Staletovich, *Developer Defends Walmart in Rare Forest,* The Miami Herald (Sept. 12, 2014), *available at http://www.miamiherald.com/news/local/environment/arti*

*cle2092364.html* .[13]

With those principles in mind, we turn to Trinity's proposal. Trinity says it focuses on "*both* corporate policy and social policy"—specifically, [**64] the "transcendent policy issue of under what policies and standards and with what Board oversight Wal-Mart handles [] merchandising decisions" for products that are "especially dangerous to [the company's] reputation, brand value, or the community." Trinity Br. 44 (emphasis in original). "In an age of mass shootings, increased violence, and concerns about product safety," Trinity argues, "the [p]roposal goes to the heart of Wal-Mart's impact on and approach to social welfare as well as the risks such impact and approach may have to Wal-Mart's reputation and brand image and its community." *Id.* at 43.

But is how a retailer weighs safety in deciding which products to sell too enmeshed with its day-to-day business? We think it is in this instance. As we noted before, HN20[⬆] the essence of a retailer's business is deciding what products to put on its shelves—decisions made daily that involve a careful balancing of financial, marketing, reputational, competitive and other factors. The emphasis management places on safety to the consumer or the community is fundamental to its role in managing the company in the best interests of its shareholders and cannot, "as a practical matter, be subject to direct shareholder [**65] oversight." *1998 Adopting Release, 1998 SEC LEXIS 1001, 1998 WL 254809, at *4*. Although shareholders perform a valuable service by creating awareness of social issues, they are not well-positioned to opine on basic business choices made by management.

It is thus not surprising that the Corp. Fin. staff consistently allows retailers to omit proposals that address their product menu. For example, it has indicated that a proposal trying to stop a retailer from

selling or promoting products that connote negative stereotypes is excludable. *See, e.g., Federated Dep't Stores, Inc., SEC No-Action Letter, 2002 SEC No-Act. LEXIS 493 2002 WL 975596, at *13 (Mar. 27, 2002)* (allowing the retailer to omit a proposal asking for a report on its "efforts to identify and disassociate from any offensive imagery to the American Indian community in products, adverting [*sic*], endorsements, sponsorships and promotions"). It has done the same for proposals aiming to restrict a retailer's promotion of products that pose a threat to public health, *see e.g., Wal-Mart Stores, Inc., SEC No-Action Letter, 2002 SEC No-Act. LEXIS 494, 2002 WL 833445, at *1 (Apr. 1, 2002)* (agreeing with Wal-Mart that it could exclude a proposal asking it to explain "its rationale for not adopting in developing nations the same policies restricting the promotion and marketing of tobacco products as in the United States"); *Walgreen Co., SEC No-Action Letter, 2006 SEC No-Act. LEXIS 638, 2006 WL 5381376, at *1-2 (Oct. 13, 2006)* (same for proposal asking for a report regarding "the [**66] extent to which the company's private label cosmetics and personal care product lines contain carcinogens, mutagens, reproductive toxicants, [*349] and chemicals that affect the endocrine system"), as well as those proposals targeting a retailer's approach to product safety. *See, e.g., Wal-Mart Stores, Inc., SEC No-Action Letter, 2008 SEC No-Act. LEXIS 340, 2008 WL 670182, at *1 (Mar. 11, 2008)* (Wal-Mart may exclude a proposal requesting a "report on the company's policies on nanomaterial product safety"); *The Home Depot, Inc., SEC No-Action Letter, 2008 SEC No-Act. LEXIS 80, 2008 WL 257300, at *2* (allowing company to exclude a proposal encouraging it "to end its sale of glue traps because they are cruel and inhumane to the target animals and pose a danger to companion animals and wildlife"); *The Home Depot, Inc., SEC No-Action Letter, 2008 SEC No-Act. LEXIS 62, 2008 WL 257307, at *7* (same for proposal asking for an "evaluation of company policies and practices relating to product safety").

For further support of the view that a policy issue does not transcend a company's ordinary business operations where it targets day-to-day decision-making, we look to the difference in treatment of stop-selling proposals sent to retailers and those sent to pure-play manufacturers. HN21[⬆] A policy matter relating to a product is far more likely to transcend a company's ordinary business operations when the product is that of a manufacturer with a narrow line. Here the staff often will decline a no-action [**67] request. *See, e.g., Philip Morris Companies, Inc., SEC No-Action Letter, 1990 SEC No-Act. LEXIS 335,, 1990 WL 286063, at *1 (Feb. 22, 1990)*

---

[13] Our concurring colleague says our suggested test is untenable for deciding whether a proposal fits within the social-policy exception because she believes our test requires that a proposal be "completely" divorced from a company's ordinary business. Concurring Op. at 3. Nowhere do we suggest that to come within the exception a proposal must raise a policy issue that is completely unrelated to a day-to-day business matter. If that were so, then a proposal relating to a retailer's discriminatory hiring practices would be excludable, as hiring is a fundamental business decision. We agree with the Commission that such a proposal is not excludable.

792 F.3d 323, *349; 2015 U.S. App. LEXIS 11549, **67

(denying no-action relief as to proposal that requests the Board to amend the company's charter to provide that it "shall not conduct any business in tobacco or tobacco products"); *Sturm, Ruger & Co., Inc., SEC No-Action Letter, 2001 SEC No-Act. LEXIS 342, 2001 WL 258493, at *1 (Mar. 5, 2001)* (same where proposal asks the Board to provide a report on company policies and procedures focused on reducing gun violence in the United States).

But the outcome changes where those same policy proposals are directed at retailers who sell thousands of products. *See Wal-Mart Stores, Inc., SEC No-Action Letter, 2001 SEC No-Act. LEXIS 330, 2001 WL 253625, at *6 (Mar. 9, 2001)* (allowing Wal-Mart to exclude a proposal aimed at stopping its sale of handguns and accompanying ammunition[] in any way (e.g. by special order)" because it relates to "Wal-Mart's ordinary business operations (i.e., the sale of a particular product")"; *see also Rite Aid Corp., SEC No-Action Letter, 2009 SEC No-Act. LEXIS 286, 2009 WL 829472, at *1 (Mar. 26, 2009)* (same for proposal asking for a report on the company's response "to rising regulatory, competitive and public pressures to halt sales of tobacco products"); *Walgreen Co., SEC No-Action Letter, 1997 SEC No-Act. LEXIS 907, 1997 WL 599903, at *1 (Sept. 29, 1997)* (same for proposal requesting that Walgreen stop the sale of tobacco in its stores, as it "is directed at matters relating to the conduct of the Company's ordinary business operations (i.e., the sale of a particular product")").

The reason for the difference, in our view, is that a manufacturer with a very narrow [**68] product focus—like a tobacco or gun manufacturer—exists principally to sell the product it manufactures. Its daily business deliberations do not involve whether to continue to sell the product to which it owes its reason for being. As such, a stop-selling proposal generally isn't excludable because it relates to the seller's very existence. Quite the contrary for retailers. They typically deal with thousands of products amid many options for each, precisely the sort of business decisions a retailer makes many times daily. Thus, and in contrast to the manufacturing context, a stop-selling proposal implicates a retailer's ordinary business operations and is in turn excludable. Although Trinity's proposal is not strictly a stop-selling proposal, it still targets the same basic [*350] business decision: how to weigh safety risks in the merchandising calculus.[14]

Trinity's claim that its proposal raises a "significant" and "transcendent" *corporate* policy is likewise insufficient to fit that proposal within the social-policy exception to exclusion. *See* Trinity Br. 47. The relevant question to us is whether Wal-Mart's consideration of the risk that certain products pose to its "economic success" and "reputation for good corporate citizenship" is enmeshed with the way it runs its business and the retailer-consumer interaction. We think the answer is yes. Decisions relating to what products Wal-Mart sells in its rural locations versus its urban sites will vary considerably, and these are quintessentially calls made by management. Wal-Mart serves different Americas with different values. Its customers in rural America want different products than its customers in cities, and that management decides how to deal with these differing desires is not an issue typical for its Board of Directors. Indeed, catering to [**70] "small-town America" is how Wal-Mart built its business. *See* Sam Walton, SAM WALTON: MADE IN AMERICA 50 (1993) ("It turned out that the first big lesson we learned was that there was much, much more business out there in small-town America than anybody, including me, had ever dreamed of."). And whether to put emphasis on brand integrity and brand protection, or none at all, is naturally a decision shareholders as well as directors entrust management to make in the exercise of their experience and business judgment.

We also agree with Wal-Mart's contention (and seemingly the position of the Corp. Fin. staff) that *HN22*[ ] a company can omit a shareholder proposal concerning its reputation or brand when what the proposal seeks is woven with the way the company conducts its business. *Cf. FedEx Corp., SEC No-Action Letter, 2014 SEC No-Act. LEXIS 327, 2014 WL 2358714, at *1 (July 11, 2014)* (allowing FedEx to omit a proposal that asked for a report addressing how the company "can better respond to reputational damage from its association with the Washington D.C. NFL

---

from a [line of] [] no-action letter[s], [we] risk[] setting a legal precedent based on a rationale that the SEC never in fact advocated." Nagy at 1006. Fortunately, our word is not the last. If our interpretation is flawed, the Commission can issue new (binding) interpretative guidance to correct us. *Cf. Levy v. Sterling Holding Co., LLC, 544 F.3d 493, 502 (3d Cir. 2008)* (explaining [**69] that a court of appeals is not free to ignore the SEC's interpretation of one of its ambiguous rules even where the court of appeals had previously interpreted the rule and its interpretation is at odds with that of the Commission) (citing *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 976, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005)*).

---

[14] We recognize that in "extrapolat[ing] an interpretive rationale

franchise team name controversy" because it "relates to the manner in which FedEx advertises its products and services"); *see also Equity Lifestyle Props., Inc., SEC No-Action Letter, 2013 SEC No-Act. LEXIS 139, 2012 WL 6723114, at *1 (Feb. 6, 2013)* (same for proposal asking the Board to prepare a report on, among other things, "the reputational risks [**71] associated with the setting of unfair, inequitable and excessive rent increases that cause undue hardship to older homeowners on fixed incomes," as "the setting of prices for products and services is fundamental to management's ability to run a company on a day-to-day basis"); *Bank of America Corp., SEC No-Action Letter, 2010 SEC No-Act. LEXIS 198, 2010 WL 4922465, at *1 (Feb. 24, 2010)* (same for proposal asking Bank of America's Board to publish a report describing the bank's policy regarding the "funding of companies engaged predominantly in mountain top removal coal mining and an assessment of the policy's efficacy in reducing [greenhouse [*351] gas] emissions and in protecting [its] reputation," as it "addresses matters beyond the environmental impact of [its] project finance decisions, such as [its] decisions to extend credit or provide other financial services to particular types of customers"); *Dean Foods Co., SEC No-Action Letter, 2007 SEC No-Act. LEXIS 324, 2007 WL 754960, at *1 (Mar. 9, 2007)* (same for proposal requesting that an independent committee of the Board "review the company's policies and procedures for its organic dairy products and report to shareholders on the adequacy of the policies and procedures to protect the company's brands and reputation and address consumer and media criticism," because this concerns the company's "ordinary business operations (i.e., customer relations [**72] and decisions relating to supplier relationships)").

We thus hold that, even if Trinity's proposal raises sufficiently significant social and corporate policy issues, those policies do not transcend the ordinary business operations of Wal-Mart. For a policy issue here to transcend Wal-Mart's business operations, it must target something more than the choosing of one among tens of thousands of products it sells. Trinity's proposal fails that test and is properly excludable under *Rule 14a-8(i)(7)*.

## V. CONCLUSION

Although a core business of courts is to interpret statutes and rules, our job is made difficult where agencies, after notice and comment, have hard-to-

define exclusions to their rules and exceptions to those exclusions. For those who labor with the ordinary business exclusion and a social-policy exception that requires not only significance but "transcendence," we empathize. Despite the substantial uptick in proposals attempting to raise social policy issues that bat down the business operations bar, the SEC's last word on the subject came in the 1990s, and we have no hint that any change from it or Congress is forthcoming. As one former SEC commissioner has opined, "it is neither fair nor reasonable [**73] to expect securities experts [like the Commission and its staff] to deduce the prevailing wind on public policy issues that have yet to be addressed by Congress in any decisive fashion." *Commissioner Criticizes Subjectivity, Inconsistency in SEC Review of Proposals*, BNA Corp. Couns. Wkly., 2-3 (Mar. 31, 1993) (quoting remarks of Comm. Richard Y. Roberts). That remains true today.

We have no doubt that the Commission is equipped to collect "relevant data and views regarding the best direction for its regulatory policy." Nagy at 993. We thus suggest that it consider revising its regulation of proxy contests and issue fresh interpretive guidance. In the meantime, we hold here that Trinity's proposal is excludable from Wal-Mart's proxy materials under *Rule 14a-8(i)(7)*.

**Concur by:** SHWARTZ

## Concur

SHWARTZ, Circuit Judge, with whom Judge VANASKIE joins as to Part III, concurring in the judgment.

I agree with the Majority that Wal-Mart may omit Trinity's proposal from the company's proxy materials. I write separately, however, for two reasons. First, while I agree with my colleagues that the proposal is excludable based on the ordinary business exclusion, I believe that the test that it has fashioned for determining when an exception to this [**74] exclusion applies may remove many company actions over which shareholders should have a say from shareholder oversight. Second, I write to explain that both the ordinary business and the vagueness exclusions support exclusion of the entire proposal.[1]

---

[1] Trinity declined to omit any component of the proposal, Tr. of Oral Arg. at 39-40, and thus sought approval of the proposal in its entirety. Accordingly, each component of the proposal must

792 F.3d 323, *351; 2015 U.S. App. LEXIS 11549, **74

[*352]  I

SEC *Rule 14a-8* requires a public company to include a shareholder proposal "in its proxy statement . . . when [the company] holds an annual or special meeting of shareholders," *17 C.F.R. § 240.14a-8*, in recognition of the fact that, "with the increased dispersion of security holdings in public companies, the proxy solicitation process rather than the shareholder's meeting itself ha[s] become the forum for shareholder suffrage," *Proposed Amendments to Rule 14a-8, Exchange Act Release No. 19135, 1982 SEC LEXIS 691, 1982 WL 600869, at *2 (Oct. 14, 1982)* (the "1982 Proposing Release"). The rule thus "affords shareholders access to management proxy solicitations," both "to sound out management views and to communicate with other shareholders on matters of major import." *Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc., 821 F. Supp. 877, 882 (S.D.N.Y. 1993)* (internal quotation marks, citation, and alteration omitted). Such access, however, is not [**75] unfettered. In addition to eligibility and procedural requirements, SEC *Rule 14a-8* is "limited by thirteen content-based exceptions," *id.*, two of which Wal-Mart argues apply here: *Rule 14a-8(i)(7)* and *Rule 14a-8(i)(3)*.

*Rule 14a-8(i)(7)* allows a company to exclude proposals that "deal[] with a matter relating to the company's ordinary business operations." *17 C.F.R. § 240.14a-8(i)(7)*. The SEC has explained that the determination of whether a particular shareholder proposal implicates a company's ordinary business operations "rests on two central considerations": (1) whether the "subject matter" of the proposal involves "tasks . . . fundamental to management's ability to run a company on a day-to-day basis"; and (2) "the degree to which the proposal seeks to 'micro-manage' the company by probing too deeply into matters of a complex nature upon which shareholders . . . would not be in a position to make an informed judgment." *Amendments to Rules on Shareholder Proposals, Release No. 23200, 1998 SEC LEXIS 1001, 1998 WL 254809, at *4-5 (May 21, 1998)* ("1998 Adopting Release").

There is an exception to this exclusion. Specifically, proposals "relating to" ordinary business operations "but focusing on sufficiently significant social policy issues . . . generally would not be considered excludable," notwithstanding their relationship to ordinary business, "because the proposals would transcend the [**76] day-

to-day business matters and raise policy issues so significant that it would be appropriate for a shareholder vote." *1998 SEC LEXIS 1001, [WL] at *4*. The Majority would limit proposals invoking the "significant social policy exception" to only those concerning matters that are "disengaged from the essence of" a company's business, Maj. Op. at 52, and reads the 1998 Adopting Release to require a proposal that focuses on a significant social policy issue to be completely "divorced from how a company approaches the nitty-gritty of its core business," Maj. Op. at 50; see also id. ("[T]o shield its proposal from the ordinary business exclusion, a shareholder must do more than focus its proposal on a significant policy issue; the subject matter of its proposal must 'transcend' the company's ordinary business."). In my view, this reading is inconsistent with the plain text of the 1998 Adopting Release.

The 1998 Adopting Release provides that, to avoid running afoul of the ordinary business exclusion, a proposal "relating to" a company's ordinary business must "focus[] on" a "sufficiently significant social policy issue." *1998 Adopting Release, 1998 SEC LEXIS 1001, 1998 WL 254809, at *4*. If it does, "it generally would not be considered excludable, [**77] [*353] because the proposal[] would transcend . . . day-to-day business matters." Id. As this passage makes clear, whether a proposal focuses on an issue of social policy that is sufficiently significant is not separate and distinct from whether the proposal transcends a company's ordinary business. Rather, a proposal is sufficiently significant "because" it transcends day-to-day business matters. Id. Thus, the SEC treats the significance and transcendence concepts as interrelated, rather than independent.

The 1998 Adopting Release also does not require that a proposal be "disengaged from the essence of" a company's business, Maj. Op. at 52, such that a company is insulated from any submission relating to the "crafting [of] a product mix that satisfies consumer demand," Maj. Op. at 51. Indeed, the 1998 Adopting Release expressly permits a shareholder to submit a proposal that relates directly to ordinary business matters, including "decisions on production quality and quantity, and the retention of suppliers," so long as it "focus[es] on" an issue of "sufficiently significant social policy." *1998 Adopting Release, 1998 SEC LEXIS 1001, 1998 WL 254809, at *4* (acknowledging that "[c]ertain tasks," including those related to production [**78] and suppliers, "are so fundamental to management's ability to run a company on a day-to-day basis" that they are not "subject to direct shareholder oversight," but

be nonexcludable for it to comply with SEC *Rule 14a-8*.

792 F.3d 323, *353; 2015 U.S. App. LEXIS 11549, **78

recognizing that "proposals relating to such matters but focusing on sufficiently significant social policy issues" generally are not excludable). Thus, to "transcend" ordinary business, as that term is used in the 1998 Adopting Release, a proposal need not be divorced from ordinary business, as the Majority proposes, but instead must focus on a policy issue that in some "transcend[ent]" way trumps ordinary business in importance. See id.; see also *Adoption of Amendments Relating to Proposals by Security Holders, Release No. 12999, 1976 SEC LEXIS 326, 1976 WL 160347, at *11 (Nov. 22, 1976)* (noting that proposals including "certain matters which have significant policy, economic, or other implications," like "the economic and safety considerations attendant to nu[cl]ear power plants," are "of such magnitude" that they should be "considered beyond the realm of an issuer's ordinary business operations," despite their relationship to such operations).

In addition to conflicting with SEC guidance, the Majority's test for the "significant social policy exception" to the ordinary business exclusion is inconsistent with the purpose of *§ 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.* (the "Exchange [**79] Act"), and *Rule 14a-8*. When Congress enacted the Exchange Act, it sought to ensure "fair corporate suffrage." *J.I. Case Co. v. Borak, 377 U.S. 426, 432, 84 S. Ct. 1555, 12 L. Ed. 2d 423 (1964)*. One way such suffrage is protected is through accurate proxy solicitations. Id. Congress authorized the SEC to generate rules that would advance this goal. See *15 U.S.C. § 78n*. To this end, it promulgated *Rule 14* to provide guidelines for shareholder proposals, including those that raise social issues. As the Commission noted in the 1998 Adopting Release, "shareholder proposals on social issues may improve investor confidence in the securities markets by providing investors with a sense that as shareholders they have a means to express their views to the management of the companies in which they invest." *1998 Adopting Release, 1998 SEC LEXIS 1001, 1998 WL 254809, at *19*.

The Majority's test, insofar as it practically gives companies carte blanche to exclude any proposal raising social policy issues that are directly related to core business operations, undermines the principle of fair corporate suffrage animating *Rule 14a-8*: shareholders' "ability to exercise their right—some would say their **[*354]** duty—to control the important decisions which affect them in their capacity as . . . owners of [a] corporation." *Med. Comm. for Human Rights v. SEC, 432 F.2d 659, 681-82, 139 U.S. App.*

*D.C. 226 (D.C. Cir. 1970)* (footnote omitted). *Section 14(a)* of the Exchange **[**80]** Act ensures that "[a] corporation is run for the benefit of its stockholders and not for that of its managers," *SEC v. Transamerica Corp., 163 F.2d 511, 517 (3d Cir. 1947)*, and "Congress intended by its enactment of *[§] 14* . . . to give true vitality to the concept of corporate democracy," *Med. Comm. for Human Rights, 432 F.2d at 676*. Permitting shareholders to vote on important social issues, including those that may be closely related to a company's ordinary business, is consistent with these principles, and I would not interpret the ordinary business exclusion to prohibit it.

II

All that said, Trinity's proposal as written is excludable under the ordinary business exclusion because it lacks the focus needed to trigger the "significant social policy" exception. To qualify for this exception, Trinity's proposal must focus on a significant policy issue. Trinity's proposal asks the Board to amend the Committee charter to require that it create policies and standards for determining whether Wal-Mart should sell a product that: (1) "especially endangers public safety and well-being"; (2) "has the substantial potential to impair" Wal-Mart's reputation; and/or (3) "would reasonably be considered by many to be offensive to the family and community values integral to" Wal-Mart's brand. J.A. 268. Although **[**81]** the proposal states that it is for "determining whether or not [Wal-Mart] should sell guns equipped with magazines holding more than ten rounds of ammunition . . . and [for] balancing the benefits of selling such guns against the risk that these sales pose to the public and to [Wal-Mart's] reputation and brand value," J.A. 268, the full text shows that it is not directed solely to Wal-Mart's sale of guns.

The proposal has three separate components. The "public safety" component of the proposal could cover many products, especially in light of the amount of products Wal-Mart offers, and thus might require Wal-Mart to develop policies and standards for thousands of goods. While WalMart's sale of guns with high-capacity magazines may raise a significant social policy issue concerning public safety, not all products that may fall within the proposal do so. Thus, while the first component of Trinity's proposal may raise a significant issue of social policy, insofar as it touches on the sale of guns equipped with high capacity magazines, we cannot say that the proposal as a whole "focus[es] on" such an issue. *1998 Adopting Release, 1998 SEC LEXIS 1001, 1998 WL 254809, at *4*. Accordingly, Trinity may not avail itself of **[**82]** the "significant social policy

exception" to the ordinary business exclusion.

Similarly, the second and third components of the proposal could cover many products. They are also problematic for other reasons. The second component seeks standards for determining whether Wal-Mart should sell a product that may impair the company's reputation. How Wal-Mart would like others to view it is a unique company interest, and while certainly important to shareholders seeking a return on their investment, it is not of broad societal concern. The third component, which asks the Board to consider whether the sale of a product would impact its brand, also focuses on matters of interest to the company but not society at large. Thus, these components cover matters relating to Wal-Mart's ordinary business operations, do not present a social policy issue, and render the entire proposal excludable.

[*355] III

There is an additional problem with the third component of the proposal: it is vague and thus excludable under _Rule 14a-8(i)(3)_. _Rule 14a-8(i)(3)_ permits a company to exclude shareholder proposals that are "so vague and ambiguous that the issuer and security holders would not be able to determine what action the proposal is contemplating," [**83] _1982 Proposing Release, 1982 SEC LEXIS 691, 1982 WL 600869, at *13_. The rationale for excluding a shareholder proposal that is "vague and ambiguous" is twofold: (1) shareholders are entitled to know the breadth of the proposal on which they are asked to vote; and (2) the company must be able to comprehend what actions or measures the proposal requires of it. See _Dyer v. SEC, 287 F.2d 773, 781 (8th Cir. 1961)_; _N.Y.C. Emps. Ret. Sys. v. Brunswick, 789 F. Supp. 144, 146 (S.D.N.Y. 1992)_.

As previously stated, the third component of the proposal that asks the Committee to formulate policies and standards for the sale of products that "would reasonably be considered by many to be offensive to the family and community values integral to" Wal-Mart's brand. J.A. 268. While Trinity argues that this component simply asks the Committee to consider whether a product may negatively impact its brand, the proposal, as written, measures that impact based upon what "many" view as "offensive" to "family and community values." Trinity attempts to link these terms back to what Wal-Mart has said about its values, including the "Save Money, Live Better" tag line, but these buzz words fail to provide any concrete guidance as to what constitutes "many" or what "family values"

should be considered. Thus, this component of the proposal does not inform [**84] the shareholders of the breadth of the subject on which they would be asked to vote nor does it make clear what the Company would be required to do if it were adopted. For this reason, the proposal is also excludable under _Rule 14a-8(i)(3)_.

IV

I therefore concur in the judgment.

MARK ENOCH

792 F.3d 323, *355; 2015 U.S. App. LEXIS 11549, **84

**Table1** (*Return to related document text*)

I. INTRODUCTION

II. FACTS & PROCEDURAL HISTORY

A. Trinity Objects to Wal-Mart's Sale of Assault Rifles

B. Trinity's Shareholder Proposal

C. Wal-Mart Seeks a No-Action Letter from the SEC

D. Trinity Takes its Fight to Federal Court: Round One

E. Round Two

III. REGULATORY BACKGROUND

A. The Proxy Statement

B. Proxy Solicitation

C. Shareholder Proposals

D. Exclusion of Shareholder Proposals

E. SEC Interpretive Releases on the "Ordinary Business" Exclusion

1. The 1976 Proposing Release

2. The 1976 Adopting Release

3. The 1982 Proposing Release

4. The 1983 Adopting Release

5. The 1997 Proposing Release

6. The 1998 Adopting Release

IV. ANALYSIS

A. Trinity's Proposal Relates to Wal-Mart's Ordinary Business Operations

1. What is the subject matter of Trinity's proposal?

2. Does Wal-Mart's approach to whether it sells particular products relate to its ordinary business operations?

B. Trinity's Proposal Does Not Focus on a Significant Policy Issue that Transcends Wal-Mart's Day-to-Day Business Operations [**5]

1. Does Trinity's proposal raise a significant social policy issue?

2. Even if Trinity's proposal raises a significant policy issue, does that issue transcend Wal-Mart's ordinary business operations?

V. CONCLUSION

**Table1** (*Return to related document text*)

MARK ENOCH



EXHIBIT

B-32





EXHIBIT
B-33
tabbies

Exhibit B-34 is a thumb drive containing and true and correct copy of a video posted at https://www.cnn.com/videos/us/2018/04/19/sandy-hook-parent-alex-jones-lawsuit-cooper-intv-sot-ac.cnn.

EXHIBIT

B-34

# Sandy Hook Dad: Expose, Shame Sandy Hook 'Hoaxer' Alex Jones In Public



The conservative radio personality has dismissed the 2012 Sandy Hook Elementary School shooting as a hoax. (June 13, 2017)

EXHIBIT

B-35

By **LENNY POZNER**

JUNE 14, 2017, 12:15 PM

**E**ditor's note: Late Friday, an internal memo from Connecticut's NBC affiliate WVIT, obtained by The Courant, said the Megyn Kelly interview of Alex Jones would not be aired locally.

I have observed collective outrage on social media at the upcoming broadcast of Megyn Kelly's interview with Alex Jones on NBC. The alt-right radio and internet personality and conspiracy theorist, on more than one occasion, has proffered the outrageous claim that the Sandy Hook Elementary School shooting on Dec. 14, 2012, was an elaborately staged, government perpetrated hoax in the interest of gun control.

The narrative alleges that the 26 victims and their parents, the police and first responders, and the majority of the town were actually crisis actors on the government's payroll. This despite the widespread availability of legitimate information to the contrary. Jones and his fellow "hoaxers" have up until now spread this thoroughly debunked theory in the darkest corners of the media, shamelessly exploiting a tragedy to make a quick buck. Now, to the dismay of rational society, Jones landed the mainstream media interview of a lifetime.

As a parent of one of the murdered students, Noah Pozner, I have battled with online platforms hosting hoaxer content for nearly five years. Through my lengthy and tumultuous experience, I know that alternative facts are not declining and they certainly aren't going away. This problem isn't fading with time or through the conscious and deliberate dismissal by mainstream society of the hoaxers' anomalous hypotheses. On the contrary, the problem is steadily growing.

Inflammatory personalities such as Alex Jones make a living peddling conspiratorial rhetoric and anti-government propaganda that appeals to a specific audience. Some are drawn to the hoax narrative because they cannot deal with the fact that small, innocent children were slaughtered at a school. That would entail having to accept the reality that this could happen to their family. It's much more comfortable to believe that women and children did not die and that the government they love to loathe is coming for their guns. But then there are those who are far removed from the average conspiracy enthusiast with a passing interest in 9/11 and UFO cover-ups. These cult followers are malicious, potentially dangerous and have no capacity for human empathy.

People like these by the tens of thousands are flocking to charismatic con men like Jones, with cultish reverence and conviction. With the aid of media platforms such as alternative talk radio, YouTube, Google, Facebook and Twitter, scores more are being reached and indoctrinated into the cult of delusional lunacy every day.

What does anyone suppose is the right thing to do about this malevolent phenomenon? Many will say, "Just ignore them." "Don't give them the attention they crave." "Don't provide them with any notoriety, and they will fade away." This approach is ineffective and feeds the movement rather than diminishing it. Unimpeded, this mindset and worldview spread across the internet like a virus.

The hoaxer ideology must be challenged, discredited and disparaged. Many of the deniers of the Sandy Hook shooting are also deniers of the Boston Marathon                                                       t. Many are also holocaust deniers, and some even deny that the Earth is round and that men landed on                                                       ies from individual to individual; from the harmless, deluded recluse all the way to the rabid psychopath

Several articles have documented my experience with harassment, torment and threats. Unfortunately, I'm not the only family member of a victim of a violent mass casualty event to experience the consequences of hoaxer free speech, which more accurately amounts to hate speech. Many of the families of the victims live with constant harassment, and not just on social media. Several families receive threatening telephone calls regularly, and in some cases they are followed, confronted and recorded in videos that are posted on YouTube for the world to see. Some of these videos include footage of their homes, causing great concern for the safety of their families. How are any of us supposed to grieve the loss of our loved one when hoaxers are constantly accusing and tormenting us over the lies of Alex Jones and others of his ilk who see a financial opportunity for themselves in our tragedy?

One of my tormentors was arrested without incident and recently sentenced to jail time. But the individual who showed up at the Comet Pong Pizza shop in Washington, D.C., with an AR-15, vowing to save the children enslaved in the alleged child sex trafficking ring known as "Pizzagate," could have easily brought a very tragic outcome. The growing danger to society is undeniable and must be addressed. To sit complacently in silence is to allow this sick movement to grow and change the history of humanity to something patently false.

The current climate of "alternative facts" will give way to "alternative history" if we allow the village idiots to grow in number and take over the town.

The exposure of Jones and his lunatic fringe to the masses is inevitable. Only then will this disturbing cult of insanity be exposed and dealt with by mainstream society. The government and the police are bound by the first amendment to honor the conspiracy theorists' right to free speech. Society, however, is free to despise, renounce, shame and shun them; to administer social justice in response to their repugnant worldview and wicked deeds. Hoaxers need to be rejected and shamed by their families, their neighbors, their bosses, their co-workers, their friends and their communities. I see no other way to control the spread of their evil and delusional ideology.

Alex Jones has demonstrated that he has the respect and ear of our president, as disturbing as this may be to the majority of responsible citizens. Therefore, Alex Jones is undeniably newsworthy. No amount of public outrage is going to turn the media's attention away from him and his delusional conspiracy theories. The very fact that Jones has some semblance of influence over our president's thinking speaks to my position that we should challenge his warped and pernicious views out in the open public forum. Let him have his 15 minutes under the bright lights. Maybe then people will see the monster that he truly is.

*Lenny Pozner lives in Palm Beach County, Fla.*

Copyright © 2018, Hartford Courant

**This article is related to:** Shootings, Homicide, Sandy Hook Elementary School Shooting, Sandy Hook Elementary School

Wolfgang W. Halbig





**NOT ON THE WAY**   **NOT OUTSIDE**   **NOT INSIDE**

### Wolfgang W. Halbig
@WolfgangWHalbig

Home
Posts
Photos
About
Community

Like    Follow    Share

Write a post...

 Write a post...

Photo/Video    Tag Friends    Check in

### Posts



**Public Figure**

**Community**    See All
Invite your friends to like this Page
1,914 people like this
2,095 people follow this

**About**    See All
Typically replies within an hour
Send Message
www.sandyhookjustice.com
Public Figure
Suggest Edits

**Related Pages**

 **Sandy Hook Hoax**    Like
Personal Blog

 **Sibel Edmonds' Boilin...**    Like
News & Media Website

 **Antifa South Florida**    Like
Nonprofit Organization

**Pages Liked by This Page**

 **InfoWars**    Like

 **Kevin Laprade**    Like

 **Alex Jones**    Like
Chat (5)

**Wolfgang W. Halbig** shared a video.
June 22 at 8:16 AM ·

Let's show these people that we are not putting up with it any longer! We can see right through their fake BS events!



5,844 Views

**We Are Change Orlando**    Like Page
June 20 at 8:11 AM ·

School safety expert Wolfgang Halbig presents documents showing #SandyHook Elementary was closed months before the shooting.

#TheSmokingGunOfSandyHook #WolfgangHalbig #WeAreChangeOrlando

Like    Comment    Share

176    Most Relevant

69 Shares

 Write a comment...
View all 30 comments


EXHIBIT
B-36

Wolfgang W. Halbig





### Wolfgang W. Halbig
@WolfgangWHalbig

Home

Posts

Photos

About

Community

June 18 at 10:24 PM

Wolfgang Halbig has stunning evidence that Sandy Hook elementary school was closed months before the massacre.

https://fellowshipoftheminds.com/.../wolfgang-halbig-has-stu.../

Worksheet A No: 1392404      Student Count: 5802
Weighted Product (Sum. Column B): 2320.8          Shared Discount: 40%

1. Name of School: CENTRAL ADMINISTRATIVE OFFICE
2. Entity Number: 16043307         NCES: 09 02910 xxxxx
   New School Construction: N        Administrative Entity N
3. Urban or Rural: Urban
4. Total # of Students : 0         5. # of Students Eligible for NSLP: 0
5. %Students Eligible for NSLP (#5 / #4):
7. Discount % from Discount Matrix: 40%      8. Weighted Product for Calculating Share Discount (#4 * #7): 0
9. Entity Sub-Type: Non-Instructional Facility     10. Alt. Disc. Mech: N

1. Name of School: CHALK HILL MIDDLE SCHOOL
2. Entity Number: 5783         NCES:
   New School Construction: N        Administrative Entity N
3. Urban or Rural: Urban
4. Total # of Students : 521        5. # of Students Eligible for NSLP: 22
5. %Students Eligible for NSLP (#5 / #4): 4.222%
7. Discount % from Discount Matrix: 40%      8. Weighted Product for Calculating Share Discount (#4 * #7): 208.4

FELLOWSHIPOFTHEMINDS.COM

**Wolfgang Halbig has stunning evidence that Sandy Hook Elementary School was closed months before 'massacre'**

Like           Comment           Share

138                                Most Relevant

111 Shares

 Write a comment...

View all 27 comments

See All

Privacy · Terms · Advertising · Ad Choices
Cookies · More
Facebook © 2018

## Photos



Screen Shot 2017-05-31 at 8.20.56 AM





See All

Chat (5)



| Wolfgang W. Halbig |
|---|



**Wolfgang W. Halbig**
@WolfgangWHalbig

**Home**

Posts

Photos

About

Community

 **Wolfgang W. Halbig**
January 12 ·

I NEED YOUR EYES TO HELP VERIFY THAT THE PICTURE YOU ARE LOOKING AT ARE THE SAME GIRL.

PLEASE HELP THIS OLD MAN SINCE MY EYES ARE NOT WHAT THEY USED TO BE AND I DO NOT WANT TO BE WRONG.

WAITING FOR YOUR HELP.



Screen Shot 2017-05-31 at 8.20.56 AM

        Like              Comment              Share

        98                              Most Relevant

9 Shares

 Write a comment...

 **Jonella Moore** Because of the distance measured between eyes and between bottom nose and upper lip, this is 99% sure the same person- though think the picture on the right is a younger version. Shape of left ear is also same shoe on both and if you note how the earlobe hangs it look the same.

Like · Reply · 17w                                        5

      **Jonella Moore** Shape, not shoe, lol. Autocorrect
     Like · Reply · 17w                              1
     View more replies

 **Ben Ramey** Wolfgang.. It appears to be; however, it's inconclusive. The photos are not great quality & resolution, & at different distances w/ no clear references for scale. The best evidence in these pictures might be the teeth - but it would take some skilled work to make a credible determination about them, for the same reasons.

Like · Reply · 23w                                        7

     View previous replies

      **Ben Ramey** With children, teeth change as well. Is the screenshot time/date the same as BOTH photos? Unknown information at the moment.
     Like · Reply · 23w                              2
     View more replies

View more comments

 **Wolfgang W. Halbig**
January 8 ·

STOP WATCHING CNN UNLESS YOU THINK IT IS A COMEDY STATION.

WHY DO I SAY THAT?

                                                    Chat (5)

Wolfgang W. Halbig 



**Wolfgang W. Halbig**
@WolfgangWHalbig

Home

Posts

Photos

About

Community

### Federal Criminal Enforcement

It is a crime for one or more persons acting under color of law willfully to deprive or conspire to deprive another person of any right protected by the Constitution or laws of the United States. (18 U.S.C. §§ 241, 242). "Color of law" simply means that the person doing the act is using power given to him or her by a governmental agency (local, State, or Federal).

Like          Comment          Share

71                                    Most Relevant

22 Shares

 Write a comment...

 **Romeo Lee** "It's so cold.....I tune to CNN for some hot air."

Mr. Halbig, thank you for your efforts and bravery. I've been reading your articles since the Sandy Hook Spectacle. As a Sept. 11th witness and survivor, I can say with 100% certainty that our world... See More

Like · Reply · 23w                          10

    **Michael Abler** Not to mention that building 6 had a 200 ft. Dia hole in the middle from aiming the particle beams...

   Like · Reply · 23w                       3

   View more replies

 **Dixie Doodle** it's not just CNN OR MSNBC- BUT FOX IS FAKE TOO- MSM is all fake when it comes to major shooting, major bombs, propaganda to: lead us into war (assad has never gassed his own people), steal our gun rights, steal more of our freedoms (patriot act after... See More

Like · Reply · 18w                          4

   1 Reply

View 15 more comments

 **Wolfgang W. Halbig**
January 8 ·

I am dedicating this video on behalf of President Trump's announcement of the top Fake News organizations.

The National/ Local Televison News organizations read their scripts knowing that you are NOT smart enough to catch on.

https://m.youtube.com/watch?v=1gqYcQTpq_c

Chat (5)

Wolfgang W. Halbig

 



## Wolfgang W. Halbig
**@WolfgangWHalbig**

Home

Posts

Photos

About

Community

Like      Comment      Share

102                  Most Relevant

36 Shares

 Write a comment...

 **Matt Kinnane** Trump can only do so much. He knows the truth about the moon landing, 911, Sandyhook, texas church shooting and the Vegas shooting. If he reveals too much he may wind up like JFK. He has to play the role of POTUS. There are people higher than him who call all the shots. They have bought off every politician, Hollywood and every news media outlet. The swamp runs deep.....very deep!

Like · Reply · 23w        18

View previous replies

      **Lisa Finney Johnson** David Cooper, he's for real, we are so fortunate to have him

     Like · Reply · 23w        7

     View more replies

 **Steven Meader** Here is a list of the names cathyinconn said died .
CathyinConn
CathyinConn
1 day ago... See More

Like · Reply · 21w        1

     **Steven Meader** cathyinconn is saying that Nate Wheeler is the older brother of Benjamin Wheeler and that Jake Hockley is the brother Dylan Hockley . Check and see if the Dylan Hockley and Nate Wheeler had brothers .

     Like · Reply · 21w        1

     View more replies

View 15 more comments

See More

Chat (5)

IN THE CIRCUIT COURT OF THE FIFTH JUDICIAL CIRCUIT IN AND FOR
LAKE COUNTY, FLORIDA

LEONARD POZNER, Individually,                           CASE NO.:

      Plaintiff,

v.

WOLFGANG HALBIG, Individually,

      Defendant.

_____/

## COMPLAINT

COMES NOW, Plaintiff, Leonard Pozner, ("Mr. Pozner") by and through his undersigned

counsel, and hereby sues Defendant Wolfgang Halbig, ("Mr. Halbig"), and states as follows:

## JURISDICTION AND PARTIES

1. Mr. Pozner is an individual residing in Palm Beach County, Florida and is sui juris.

2. Mr. Halbig is an individual residing in Lake County, Florida and is sui juris.

3. At all times material hereto, Mr. Halbig's actions leading to this suit occurred on Mr.

    Halbig's website up in the World Wide Web, accessible in and from the State of Florida.

4. This is an action for injunctive relief under various acts of Mr. Halbig taking place in Lake

    County, Florida, and as such, this Court has original jurisdiction over this case.

## CONDITIONS PRECEDENT

5. All conditions precedent to the institution of this suit and the Counts contained herein have

    either occurred, and/or have been excused and/or waived by the parties.

1

EXHIBIT

B-37

## FACTUAL BACKGROUND

6.  At all times material hereto, Mr. Pozner was the father of Noah Pozner.

7.  On or about December 14, 2012, Noah Pozner, six years old at the time, was a student at Sandy Hook Elementary School ("Sandy Hook") in Newtown, Connecticut.

8.  On or about December 14, 2012, Noah Pozner was attending Sandy Hook.

9.  On or about December 14, 2012, there was a shooting (the "Shooting") at Sandy Hook.

10. On or about December 14, 2012, Noah Pozner was one of the victims shot at the Shooting and died as a result thereof.

11. Official authorities investigated the Shooting and closed the investigation thereafter.

12. Official authorities have never concluded, have never found evidence, and have never suspected that the Shooting was a fraud or any attempt on the part of the government or any other person to defraud anyone.

13. Mr. Halbig, contrary to what official authorities have already established, created a fictitious corporation and a website (the "Website") for same, allegedly focused on exposing the truth behind the Shooting at Sandy Hook.

14. Mr. Halbig's fictitious corporation and the Website will not be named herein so as to avoid further spreading Mr. Halbig's false allegations.

15. Through his fictitious corporation, Mr. Halbig asks visitors to monetarily contribute and assist in finding the truth of the Shooting. The information for donations is on the Website, which states that donation checks are to be made payable to Sandy Hook Justice and mailed to the address provided in the Website.

16. When Mr. Pozner learned of Mr. Halbig's fictitious corporation and of the Website, Mr. Pozner immediately emailed, on or about June 9, 2014, Florida Attorney General Pam

2

Bondi ("Attorney General Bondi") to express his concerns about Mr. Halbig's actions and about the Website.

17. On or about June 18, 2014, Staff from Attorney General Bondi's office responded, through email, to Mr. Pozner regarding the email he had sent her on or about June 9, 2014.

18. By means unknown to Mr. Pozner, and on a date unknown to Mr. Pozner, Mr. Halbig obtained the email Mr. Pozner sent to Attorney General Bondi on or about June 9, 2014, as well as Attorney General Bondi's responsive email from or on about June 18, 2014 to Mr. Pozner (collectively known as the "Correspondence"). The Correspondence will not be attached hereto so as to stop it from further spreading publicly but Mr. Pozner is willing to produce it in camera.

19. The Correspondence contains personal information including, but not limited to, Mr. Pozner's address, phone number, and email address.

20. Without Mr. Pozner's and/or Attorney General Bondi's consent, Mr. Halbig, or someone acting on his behalf or with the same managerial access to the Website, uploaded the Correspondence to the Website.

21. Anyone with an internet connection has access to the Website and upon visiting the Website will have access to the Correspondence uploaded therein.

22. Anyone accessing the Correspondence uploaded therein will be able to read the Correspondence in its entirety, including its contents and personal information contained therein.

23. Upon learning that the Correspondence had been made public on the Website without authorization, Mr. Pozner contacted his undersigned counsel, Marcus Law Center, LLC, (the "Undersigned").

3

24. On or about June 30, 2015, the Undersigned sent a certified letter to Mr. Halbig, demanding him to remove the Correspondence from the Website.

25. Mr. Halbig never responded to the certified letter nor did he remove the Correspondence from the Website.

26. To date, the Correspondence remains on the Website and freely accessible by the Public.

27. Mr. Pozner seeks to obtain a temporary and permanent injunction against Mr. Halbig so that he is court ordered to remove the Correspondence from the Website and to discontinue publishing its contents any further.

28. Mr. Pozner has no other legal or equitable relief available to him other than to seek a temporary and permanent injunction against Mr. Halbig.

29. Mr. Pozner has suffered impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering due to Mr. Halbig's actions, including, but not limited to, maintaining and operating the Website to publish controversial information related to Mr. Pozner.

30. Mr. Pozner reserves the right to amend this Complaint to seek punitive damages upon a finding that Mr. Halbig's actions were willful and wanton.

31. Mr. Pozner has been forced to retain the undersigned counsel to bring this action and has agreed to pay said law firm its reasonable fees and costs in handling this matter.

32. Mr. Pozner is entitled to receive the full amount of attorney's fees and costs to prosecute this complaint on all counts pursuant to Florida Statute §57.105 as Mr. Halbig does not have any justifiable defense to this action.

## COUNT I
## TEMPORARY AND PERMANENT INJUNCTION

33. Mr. Pozner realleges and reavers each and every allegation contained in paragraphs 1-33 as if fully stated herein.

34. Through certified mail sent to Mr. Halbig on or about June 30, 2015, demand was made to Mr. Halbig to remove the Correspondence uploaded to the Website.

35. To date, the Correspondence remains online at the Website, accessible to anyone who visits the Website.

36. The Correspondence contains personal information about Mr. Pozner which Mr. Pozner does not want in public hands.

37. Because Mr. Halbig has not taken the Correspondence off the Website after due demand has been made, irreparable injury to Mr. Pozner will result if the temporary and permanent injunction is not granted.

38. Mr. Pozner has no alternate legal relief other than to seek a temporary and permanent injunction against Mr. Halbig to remove the Correspondence from the Website and to prevent future publishing in any way of personal information related to Mr. Pozner by Mr. Halbig and/or by and through the Website.

39. Mr. Pozner has a clear legal right to the requested relief as the nature of the information Mr. Pozner wants to remove from public grasp is personal to him.

40. An injunction against Mr. Halbig will serve the public's welfare in that Mr. Halbig will cease to make personal information available to the public on a website, the Website, where false and controversial information is being promulgated.

**WHEREFORE**, Mr. Pozner requests that this Honorable Court grants a temporary and permanent injunction against Mr. Halbig and/or anyone acting on his behalf to remove the

Correspondence from the Website and to further prevent Mr. Halbig and/or anyone acting on his behalf from publishing the contents of the Correspondence and the personal information contained therein related to Mr. Pozner, award Mr. Pozner attorney's fees, court costs, interest, and such other and further relief as this Honorable Court deems just and proper under the circumstances.

Respectfully submitted,

MARCUS LAW CENTER, LLC
2600 Douglas Road
Suite 1111
Coral Gables, Florida 33134
Telephone (305) 507-1203
Facsimile (305) 507-1204

Alan K. Marcus, Esq.
Florida Bar 266116
amarcus@marcuslawcenter.com

6



EXHIBIT

B-38

tabbies®

| Megyn Kelly: | 00:00 | First tonight, our report on the incendiary radio host Alex Jones. For years, Jones has been spreading conspiracy theories, claiming for instance that elements of the US government allowed the 9/11 attacks to happen, and that the horrific Sandy Hook Massacre was a hoax. Some thoght we shouldn't broadcast this interview because his baseless allegations aren't just offensive; they're dangerous. But here's the thing. Alex Jones isn't going away. Over the years, his YouTube channel has racked up 1.3 billion views. He has millions of listeners and the ear of our current President. We begin our report with his reaction to the recent terrorist attack in Manchester, England. |
|---|---|---|
| Speaker 2: | 00:52 | Alex Jones was nearly 5,000 miles away from Manchester, England when a suicide bomber killed 22 people at a concert less than four weeks ago. Despite the distance, and with few facts known, Jones did what he often does--jumped mouth first into controversy. |
| Alex Jones: | 01:08 | A big bomb goes off at a pop-stars rock concert bombing a bunch of liberal trendies. |
| Megyn Kelly: | 01:13 | You said it was a bunch of "liberal trendies" who were killed, the same people who are promoting open borders and bringing Islamists in. |
| Alex Jones: | 01:22 | Yes. |
| Megyn Kelly: | 01:23 | In response to which many people looked at the victims, many of whom were 15, 14, there was a little- |
| Alex Jones: | 01:30 | I know, I'm sorry I didn't blow 'em up. I know. But I did something bad though? |
| Megyn Kelly: | 01:33 | No, that you had suggested that [crosstalk 00:01:35] |
| Alex Jones: | 01:35 | No no no no no no no. Because, 'cause- |
| Megyn Kelly: | 01:36 | an eight-year-old, right? There was Saffie-Rose Roussos, eight years old, that she was a liberal trendy, 'cause that what you said about the victims, is what has people upset. |
| Alex Jones: | 01:46 | No that's ... No no no. The media misrepresenting and clipping that the way you did. I got home at like 6:00, heard about it, the age of the victims weren't even known, but they were saying it was jihadi, and I said, "How crazy is it that liberal trendies are now the victims?" And then I start going and looking. Of course |


EXHIBIT
B-39

| | | |
|---|---|---|
| | | if there's kids being killed by Muslims I'm not saying that, that, that it's their fault. |
| Megyn Kelly: | 02:07 | That pattern--reckless accusation followed by equivocations and excuses--is classic Alex Jones. |
| Alex Jones: | 02:14 | They can just carte blanche go anywhere they want- |
| Megyn Kelly: | 02:16 | He has spent nearly two decades on the fringe, shouting his conspiracy theories into any microphone he could get in front of. Here is on Austin Community Television in 2001. |
| Alex Jones: | 02:27 | Tyranny is enveloping the globe. |
| Megyn Kelly: | 02:29 | He and his company Infowars have been steadily gaining followers for years, producing radio shows and webcasts which reach millions a month. But Jones' influence hit new heights when he attracted a very famous fan, then-presidential candidate Donald Trump. |
| Donald Trump: | 02:46 | I just want to finish by saying your reputation's amazing. |
| Megyn Kelly: | 02:49 | In December 2015, Mr. Trump appeared on Jones' radio program, offering praise and promises. |
| Donald Trump: | 02:56 | I will not let you down. You will be very very, uh, impressed, I hope, and I think we'll be speaking a lot. |
| Megyn Kelly: | 03:03 | Separately, both men had supported the false statement that Barack Obama was not a natural-born citizen. |
| Alex Jones: | 03:09 | Donald Trump is searching- |
| Megyn Kelly: | 03:11 | And they've had more in common since. |
| Alex Jones: | 03:14 | I agree with Trump on that. He agrees with me. [inaudible 00:03:17] me articles, "He's following Alex on coal, he's following Alex on guns, he's following Alex on borders." |
| Megyn Kelly: | 03:23 | The 2016 campaign was good for Infowars. Its YouTube monthly views reached 83 million in November 2016, more than five times higher than the previous November, and when Mr. Trump won, Alex Jones found himself with access to the seat of power. Infowars got a temporary White House press pass for the first time, and Jones says Mr. Trump called him after the election to thank him for his help. |

| | | You have said that it's surreal to say something on Infowars and then hear it come out of the President of the United States' mouth a couple days later. |
|---|---|---|
| Alex Jones: | 03:55 | I mean, that has happened, but, um- |
| Megyn Kelly: | 03:59 | Do you think he's watching? |
| Alex Jones: | 04:00 | I mean, I know Trump watches and sees the clips and things. |
| Megyn Kelly: | 04:03 | We did find indications of that. On July 22nd, 2015, Infowars put up this video, claiming it showed drug trafficking across the US-Mexico border, although we don't know what it actually shows. |
| Speaker 5: | 04:15 | We actually witnessed a drug smuggling operation from Mexico into the US. |
| Megyn Kelly: | 04:22 | Three days later, Mr. Trump gave this speech in Iowa. |
| Donald Trump: | 04:25 | Big story, it's all over the place now. Guys swimming across ... And big bags of stuff--it's drugs--swimming across the river. |
| Megyn Kelly: | 04:35 | This was Infowars previewing the first presidential debate between Donald Trump and Hillary Clinton. |
| Alex Jones: | 04:41 | I think she's going to show up and uh, on drugs though. She's going to be whacked out. |
| Megyn Kelly: | 04:45 | And Mr. Trump's take, not long after. |
| Donald Trump: | 04:48 | We should take a drug test prior, 'cause I don't know what's going on with her. |
| Megyn Kelly: | 04:54 | Donald Trump ally and frequent Infowars guest Roger Stone underscored the connection between Jones and the Trump campaign in a tweet last spring. It read, "MSM elites don't see that Alex Jones and Infowars reach millions of Donald Trump supporters and helped make the Trump revolution." |
| Alex Jones: | 05:12 | Donald Trump calls me secretary and says, "Donald Trump, like to talk to you Mr. Jones. You like to talk to him?" Yes, boom. |
| Megyn Kelly: | 05:16 | While Jones has boasted of his contact with the President on his radio show, he downplayed it in his interview with us, claiming the mainstream media, or MSM, has exaggerated their connection. |

| Alex Jones: | 05:27 | I think my influence on Trump is way way lower than what MSM has said. |
| Megyn Kelly: | 05:32 | Well what kind of access do you have? |
| Alex Jones: | 05:33 | He's just called sometimes and, and talked about politics or thanked me. Stuff like that. That's it. |
| Megyn Kelly: | 05:38 | Would you describes yourself as friends? |
| Alex Jones: | 05:41 | No. |
| Megyn Kelly: | 05:42 | Friendly? |
| Alex Jones: | 05:43 | Sure. |
| Megyn Kelly: | 05:45 | And how many times has you called you? |
| Alex Jones: | 05:45 | I don't want to get into all that. |
| Megyn Kelly: | 05:49 | What is it do you think about Alex Jones that President Trump finds so amazing? |
| Charlie Sykes: | 05:53 | That's a scary question. |
| Megyn Kelly: | 05:54 | Charlie Sykes is a conservative writer and contributor to NBC news. He's been critical of President Trump. |
| Charlie Sykes: | 06:01 | Obviously there's a conspiratorial turn in the President's thinking, in his imagination, and those darker impulses are fed into by, ah, Alex Jones. |
| Megyn Kelly: | 06:11 | Jones speaks to his listeners for hours a day, six days a week. His rants can be vulgar and hate-filled, like this one directed at a member of Congress. |
| Alex Jones: | 06:21 | Schiff looks like the arc type ... arctypal ... and there's something about this fairy hopping around, bossing everybody around trying to intimidate people like me and you. I want to tell Congressman Schiff and all the rest of 'em ... You want to sit here and say that I'm a ... Russian? You get in my face with that I'll beat your ... ass you son of a bitch. |
| Megyn Kelly: | 06:42 | Jones began developing his conspiracy theories as a teenager. He grew up the oldest child of a dentist and a homemaker and went to high school in Austin, Texas. |

| Alex Jones: | 06:51 | I read a lot of history books when I was a kid, and I, and I also had family that was educated, so I mean, I just knew how things actually worked versus what the news was saying sometimes. |
|---|---|---|
| Megyn Kelly: | 06:59 | After a brief stint in community college, Jones found his calling at public access TV in Austin. He went into business for himself, founding Infowars in 1999. Many doubted his prospects, but he's now worth millions. |
| Alex Jones: | 07:13 | I'm Alex Jones your host- |
| Megyn Kelly: | 07:15 | Infowars makes most of its money by selling products like male supplements. |
| Alex Jones: | 07:20 | [inaudible 00:07:20] just come off of me, and soon there'll be nothing left. |
| Megyn Kelly: | 07:24 | The main pitchman? Jones himself. |
| Alex Jones: | 07:26 | I mean, it costs 45, 50 million dollars a year to run this. |
| Megyn Kelly: | 07:29 | How much money is being made? |
| Alex Jones: | 07:31 | Well the money that's made is pretty much just put back in the thing. |
| Megyn Kelly: | 07:34 | Jones uses that money to spread his message, a message that has caused enormous pain. |
| Charlie Sykes: | 07:40 | What he has done is he has injected this sort of toxic paranoia into the mainstream of conservative thought in a way that would have been inconceivable a couple of decades ago. We're talking about somebody who traffics in some of the sickest, most offensive types of theories. |
| Megyn Kelly: | 07:59 | At the top of that list is Jones' outrageous statement that the slaughter of innocent children and teachers at Sandy Hook Elementary School, one of the darkest chapters in American history, was a hoax. |
| Neil Heslin: | 08:15 | I lost my son. I buried my son. I held my son with a bullet hole through his head. |
| Megyn Kelly: | 08:18 | Neil Heslin's son Jesse, just six years old, was murdered, along with 19 of his classmates and six adults on December 14th, 2012, in Newtown, Connecticut. |

| Neil Heslin: | 08:32 | I dropped him off at 9:04. That's when we dropped him off at school with his book bag. Um, hours later I was picking him up in a body bag. |
|---|---|---|
| Megyn Kelly: | 08:45 | Alex Jones repeatedly claimed that the shooting never happened. Here he is on Infowars in December 2014. |
| Alex Jones: | 08:52 | But it took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. |
| Megyn Kelly: | 08:58 | You said, "The whole is a giant hoax. How do you deal with a total hoax? It took me about a year with Sandy Hook to come to grips with the fact that the whole thing was fake. I did deep research, and my gosh, it just pretty much didn't happen." |
| Alex Jones: | 09:15 | At, at, at that point, and I do think there's some cover-up and some manipulation, that is pretty much what I believed, and then I was also going into devil's advocate, but then we know there's mass shootings and these things happen, so again- |
| Megyn Kelly: | 09:26 | You're, you're trying to have it all ways, right? |
| Alex Jones: | 09:28 | No, I'm not! |
| Megyn Kelly: | 09:29 | If you wrongly went out there and said it was a hoax, that's wrong. |
| Alex Jones: | 09:33 | But I already answered your question was, listeners and other people are covering this. I didn't create that story. |
| Megyn Kelly: | 09:39 | But Alex, the parents, one after the other, devastated, the dead bodies that the coroner autopsied- |
| Alex Jones: | 09:49 | And they blocked all that and they won't release any of it. That's, that's unprecedented- |
| Megyn Kelly: | 09:53 | All of the parents decided [crosstalk 00:09:54] |
| Alex Jones: | 09:53 | Even the reports. |
| Megyn Kelly: | 09:53 | To come out and, and lie about their dead children? |
| Alex Jones: | 09:57 | I didn't say that. |
| Megyn Kelly: | 09:57 | What, what happened to the children? |

| Alex Jones: | 09:59 | I will sit there on the air and look at every position and play devil's advocate. |
| Megyn Kelly: | 10:03 | Was that devil's advocate: "It ... The whole thing is a giant hoax. The whole thing was fake." |
| Alex Jones: | 10:11 | Yes, because I remember in, even that day if I go back from memory, them saying, "But then some of it looks like it's real," but then what do you do when they've got the kids going in circles, in and out of the building with their hands up. I've watched the footage, and it looks like a drill. |
| Megyn Kelly: | 10:25 | When you say parents faked their children's death, people get very angry. |
| Alex Jones: | 10:33 | Yeah, well that's ... Oh I know, but they don't get angry about the half million dead Iraqis from the sanctions, or they don't get angry about [crosstalk 00:10:38]. |
| Megyn Kelly: | 10:37 | That's a dodge. |
| Alex Jones: | 10:39 | No no, it's not a dodge. The media never covers all the evil wars it's promoted- |
| Megyn Kelly: | 10:43 | That doesn't excuse what you did and said about Newtown. You know it. |
| Alex Jones: | 10:46 | But I ... Here's the difference. Here's the difference. I looked at all the angles of Newtown and I made my statements long before the media even picked up on it. |
| Megyn Kelly: | 10:56 | In our interview we asked Jones numerous times what he now believes, and he never completely disavowed his previous statements. |
| Alex Jones: | 11:04 | I tend to believe that children probably did die there, but then you look at all the other evidence on the other side, I can see how other people believe that nobody died there. |
| Megyn Kelly: | 11:13 | Of course, there is no evidence on the other side. After President Trump took office, the Newtown Board of Education wrote to him, imploring the President to try to stop Jones and other hoaxers like him, saying "Jones continues to spread hate and lies towards our town." Almost four months later, according to the Board Chairman, the President has yet to respond. |

The lies about Sandy Hook have had real-world consequences. Just this month, a Florida woman was sentenced to five months in prison for sending death threats to a Sandy Hook parent. Her defense attorney says she was primarily motivated by Infowars. Other victims' family members have been harassed or threatened too. The families say that Jones' words have caused lasting pain, and they fear the harassment will continue.

| | | |
|---|---|---|
| Neil Heslin: | 12:04 | You know, it's disrespectful to me, or in fact I did lose my son, and, and the 26 other families lost somebody, and I take that very personal. |
| Megyn Kelly: | 12:13 | You know this piece is going to air on Father's Day. |
| Neil Heslin: | 12:16 | Correct. |
| Megyn Kelly: | 12:17 | What is your message to him? |
| Neil Heslin: | 12:19 | I think he's blessed to have his children to spend the day with, speak to, um ... I don't have that. |
| Alex Jones: | 12:33 | Hate everybody- |
| Megyn Kelly: | 12:33 | The consequences of Jones' actions are not limited to Sandy Hook. |
| Alex Jones: | 12:38 | Pizzagate as it's called is a rabbit hole that is horrifying to go down. Now- |
| Megyn Kelly: | 12:43 | In 2016, Jones promoted a conspiracy theory known as Pizzagate. Infowars claimed a child sex ring was being run by Democrats out of a number of businesses, and specifically pointed to a Washington DC pizzeria. |
| Alex Jones: | 12:57 | You've got to go to infowars.com and actually see the photos and videos inside these places. |
| Megyn Kelly: | 13:02 | Jones encouraged his listeners to investigate the case themselves, and one did, bringing a semi-automatic rifle to the shop and firing several rounds. No one was hurt and the shooter was arrested. The pizza shop owner wrote a letter asking Jones to apologize. Facing the possibility of a lawsuit, he did. |
| Alex Jones: | 13:21 | We regret any negative impact our commentaries may have had on Mr. Alefantis, Comet Ping Pong, or its employee. |

| Megyn Kelly: | 13:29 | Another apology came just this spring. Chobani Yogurt sued Jones after Infowars fanned the lie that Chobani employees committed a sexual assault in Idaho. |
| --- | --- | --- |
| Alex Jones: | 13:40 | On behalf of Infowars, I regret that we mischaracterized Chobani- |
| Megyn Kelly: | 13:44 | You misstated facts about Chobani and its owner which you could have found out if you'd just had a reporter do a little shoe-leather reporting, pick up the phone, call, check out the facts. You never would've had to retract that or apologize. |
| Alex Jones: | 13:56 | Well, this is my statement on that. We know that that was basically a PR event, and, and what happens is you've got a year of reporting on the reported sexual assault- |
| Megyn Kelly: | 14:05 | All of which has nothing to do with Chobani |
| Alex Jones: | 14:06 | Yeah, I know, you're not going to let me get it out, are you? |
| Megyn Kelly: | 14:08 | I'm going to let you get it out. I just want to make sure the record's straight 'cause I don't want to smear the man. You are the one that said that you were wrong about Chobani. You said that. |
| Alex Jones: | 14:16 | Well that's because they chose to go after me, and so I simply pointed out that we were reporting other people's reports that were not entirely accurate, and for that we were sorry, 'cause it was true. |
| Megyn Kelly: | 14:29 | You don't sound very sorry. |
| Alex Jones: | 14:31 | Um, well, the media said stuff about the settlement that wasn't true. |
| Megyn Kelly: | 14:35 | But you said things about Chobani and its owner that were not true. Are you sorry? |
| Alex Jones: | 14:43 | I, I'm going to tell you again. There was ... The media really was upset, that they that, that there was a hoax- |
| Megyn Kelly: | 14:48 | It's not the media. |
| Alex Jones: | 14:49 | And so what they did- |
| Megyn Kelly: | 14:51 | You. Are you sorry? |

| | | |
|---|---|---|
| Alex Jones: | 14:51 | And so what they did, so what the media did, and we know it was the media, and we have the PIs and the law firms, and we're working on it right now, let's just say Chobani was real happy to get out of that lawsuit. |
| Megyn Kelly: | 15:04 | But the lawsuit makes clear Infowars was the only media outlet to report the lie that forced Jones to apologize, and with that apology, Chobani considers the matter closed. |
| | | Do you think of yourself as a journalist? |
| Alex Jones: | 15:19 | I have some journalists that work for me and I do journalistic work and I've broken a lot of big stories and I understand the basics of it. |
| | | I need to find the line of London thing. |
| Megyn Kelly: | 15:26 | In the Infowars studio, there's no script. Instead, it's a freewheeling spin through piles of articles straight off the internet. |
| Alex Jones: | 15:34 | 95% of what we cover is looking at a news article and then discussing it. |
| Megyn Kelly: | 15:40 | Well, but you know, if you just look at an article and discuss it, it's garbage in, garbage out, right? If you haven't ascertained the veracity of that article, and it's all BS and then you spend two hours talking about it, then you've put out a bunch of misinformation. I'm just trying to figure out what the vetting process is. |
| Alex Jones: | 15:52 | No, I mean, we all get Hillary was 15 points ahead, okay. And and and we all, we all get mainstream media has got a big problem. |
| Megyn Kelly: | 16:00 | The Infowars staffers we met have free reign to cover whatever they like with virtually no oversight. We spoke with some of Jones' employees including Owen Shroyer. |
| | | How do you, on a day-to-day basis, figure out what you're going to do. |
| Owen Shroyer: | 16:15 | I wake up, I look at the news, I, uh, pray, I rarely get directives from Alex or my boss. They pretty much just leave it up to me. |
| Megyn Kelly: | 16:23 | Is that what you consider yourself to be--a journalist? |

| Owen Shroyer: | 16:27 | I don't like calling it that. I just, I'm just a human. I'm just a human that's looking for truth, so I'm trying to reach out and be what the people want. |
| Megyn Kelly: | 16:35 | When you say "people," who do you mean? |
| Owen Shroyer: | 16:37 | The deplorables. The flyover country. The forgotten American. |
| Donald Trump: | 16:41 | We're going to get to work immediately for the American people. |
| Megyn Kelly: | 16:45 | With the election of Donald Trump, Alex Jones has plans to expand Infowars; more studios, more shows, more employees, more influence. |
| Alex Jones: | 16:55 | I said the 91, I said the war is just begun, so this a ... We've just got a beachhead, and so that's just the start of the war for me. |
| Megyn Kelly: | 17:05 | And Alex Jones goes into battle with a powerful ally. Just two weeks ago, the Trump/Pence campaign emailed this message to supporters. Notice at the bottom, it's a link to Infowars. |
| Lester Holt: | 17:18 | Hey NBC news fans, thanks for chkecing out our YouTube channel. Subscribe by clicking on that button down here, and click on any of the videos over here to watch the latest interviews, show highlights, and digital exclusives. Thanks for watching. |

Protecting Outrageous, Offensive Speech | American Civil Liberties Union



DONATE

# Protecting Outrageous, Offensive Speech



EXHIBIT

tabbies

B-40



By Suzanne Ito, ACLU
OCTOBER 6, 2010 | 4:15 PM

TAGS: Free Speech, Rights of Protesters

Today, the Supreme Court heard oral arguments in a crucial First Amendment case.

Most people are at least somewhat aware of Fred Phelps and his Westboro Baptist Church, notorious for protesting military funerals with its "God Hates Fags" and "Thank God for Dead Soldiers" signs. Albert Snyder, the father of slain Iraq war soldier Matthew Snyder, sued Phelps after he protested at Matthew's funeral.

The protestors consulted with the police beforehand, and stood where they were instructed.

The district court jury was told that they could hold Phelps liable in this case if they found the speech at Matthew Snyder's funeral protest outrageous or offensive. And that's exactly what happened: following the jury trial, Snyder was awarded $5 million for the intentional infliction of emotional distress. Phelps appealed that decision to the 4th Circuit Court of Appeals and won; the appeals court found Phelps' speech was protected by the First Amendment.

Snyder appealed that decision, which brought the case, *Snyder v. Phelps*, before the Supreme Court this morning. The ACLU filed a friend-of-the-court brief in the case urging the Supreme Court to uphold the 4th Circuit's

reversal. We argue that the standard used in district court to determine whether Phelps could be held liable encourages the suppression of unpopular speech, and is clearly at odds with the First Amendment.

To be clear: the ACLU strongly disagrees with the protestors' message in this case. But even truly offensive speech is protected by the First Amendment. As ACLU Legal Director Steven Shapiro told NPR this morning:

> "The First Amendment really was designed to protect a debate at the fringes. You don't need the courts to protect speech that everybody agrees with, because that speech will be tolerated. You need a First Amendment to protect speech that people regard as intolerable or outrageous or offensive — because that is when the majority will wield its power to censor or suppress, and we have a First Amendment to prevent the government from doing that.

You can read a transcript of this morning's oral arguments here. (PDF).

The First Amendment was designed to protect offensive and unpopular speech. It is in hard cases like this where our commitment to free speech is most tested, and most important.



**VIEW COMMENTS (15)**

Fight for everyone's rights -
support the ACLU.

DONATE NOW

# RELATED STORIES



This Is How Net
Neutrality Will
End
JUNE 6, 2018



A TV Mega-
Merger That's
Bad for the First
Amendment
JUNE 19, 2018



# STAY INFORMED

Your email address

ZIP code

## JOIN OUR NEWSLETTER

PUBLICATIONS

MULTIMEDIA

MEDIA

CONTACT

DONATE

USER AGREEMENT    PRIVACY STATEMENT    ACCESSIBILITY

This is the website of the American Civil Liberties Union.
Learn more about the American Civil Liberties Union and its affiliated organization, the American Civil Liberties Union
Foundation.
© 2018 ACLU

WE THE PEOPLE DARE TO CREATE A MORE PERFECT UNION

| Megan Kelly: | 00:00 | (Crowd cheering) |
|---|---|---|

Good morning, everyone. Welcome to the program. I'm Megan Kelly, and we begin this Thursday morning with a story that shook the nation to the core, and is now back in the headlines.

Two families of Sandy Hook victims have just filed two separate defamation lawsuits, taking a stand about controversial info wars, radio host, Alex Jones. One lawsuit was filed by the parents of Noah Pozner. The other was filed by Neil Heslin, whose son, Jesse, was just six years old when he was killed.

The parents are fighting back, now, about what they say has been years of mental anguish, caused, they say, by Jones's long history of harassing the Sandy Hook families. For years, Jones has been making claims that the Sandy Hook massacre was a hoax, and that the parents and the media were acting, and it is not just Sandy Hook.

James has taunted many other grieving families over the years. He has said that the September 11th terror attacks were an inside job, more recently he claimed that Parkman's Stoneman Douglas shooting, that the survivor, David Hog, he says was a crisis actor. During the 2016 campaign, President Trump admitted that he was a fan of Alex Jones's, and even appeared on his radio program.

Prior to our NBC news piece on Jones last summer, the Trump White House had actually been pushing out information taken directly from Info Wars. In their newly filed lawsuit, Noah Pozner's parents say that Info Wars defamed them by claiming that Noah's mother faked an interview in New Town with CNN's Anderson Cooper, just a week after the shooting.

Alex Jones repeatedly claimed that Anderson Cooper was not actually even in New Town, Connecticut, conducting interviews with the grieving parents, and less than a year ago, Jones was still, still calling into question the credibility of those interviews. Watch.

| Alex Jones: | 01:52 | They glitch, their recycling of a green screen behind him, when he turns, his nose disappears repeatedly because the green screen isn't set right. |
|---|---|---|

| Megan Kelly: | 02:05 | Something that can happen to any anchor when you're reporting live from the field, there's a video glitch, it has nothing to do with the green screen. Neil Heslin, too, has been a |
|---|---|---|



EXHIBIT
B-41

|  |  | repeated target of Info Wars and had a message for Alex Jones when I interviewed Neil last July. |
|---|---|---|
| Neil Heslin: | 02:22 | I lost my son. I buried my son. I held my son with a bullet hole through his head. I dropped him off at 9:04, that's when we dropped him off at school. With his book bag. Um, hours later, I was, picking him up in a body bag. |
| Megan Kelly: | 02:44 | Because nothing is sacrosanct to Alex Jones, he and his team renewed their attacks on Heslin and others last summer, again claiming that Neil is a liar. Take a listen to their show. |
| Speaker 4: | 02:58 | Fact checkers on this have said, can not be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events, and a coroner's testimony, that is not possible. |
| Alex Jones: | 03:18 | The coroner said none of the parents were allowed to touch the kids or see the kids, and maybe they're meaning at the school. I'm sure, later, maybe the parents saw their children. The point is, that, because the media lies so much, you can't blame the public asking questions, and you can't ban free speech of people who are asking questions. |
| Megan Kelly: | 03:37 | Joining me now for his first interview since filing his lawsuit. Neil Heslin, along with his attorney, Mark Bankston. Thank you both so much for being here, Neil. Good to see you again. |
| Neil Heslin: | 03:45 | You're welcome, thanks. |
| Megan Kelly: | 03:46 | So, why now? Why after all the years of his attacks on you? Why now? |
| Neil Heslin: | 03:52 | Well, it-it's kind of building responsibility. It's going on for four and a half, five years, uh, the lies, uh, the trauma that he imposes, the pain and suffering with, uh, with the lies he peddles, and uh, to say that Sandy Hook was a hoax, and it never happened, it's an outright lie. It's a total, disrespect myself, my son, the individuals who lost their lives that day. |
|  |  | But it extends so much further than that. It, it's a disrespect to the community, and the law enforcement, the first responders. Um, it just, it's not right, and he needs to, it needs to stop. |
| Megan Kelly: | 04:40 | Mark, as we just said, it's not just Sandy Hook, but he has been going after the Sandy Hook parents from the beginning. And I know that the Pozners have been, a woman went to jail for |

issuing death threats to them, after listening to Jones on Info Wars.

She's been banned from listening to them anymore, to Alex Jones, and she's sent to prison, and even that hasn't stopped him.

| | | |
|---|---|---|
| Mark Bankston: | 05:05 | No, it has not. There's no sign that he's going away. You know, these families tried to ignore him for years. Thought that, that would be the good strategy, not give him any air. And we see that doesn't work, because he's not going away. He's been given, just a Washington correspondent, he's given White House press credentials. |

Claims to have the president's ear. Um, we, we think it's time for this to end, and that's why we brought these suits. Because it's also just not about the Sandy Hook parents, either. You know, these parents have seen what happens to them for five years, being tormented. And now they're seeing it happen to the Parkland parents.

It's, it's time for this to end, and that's why we've brought this suit.

| | | |
|---|---|---|
| Megan Kelly: | 05:38 | So, what do you want out of it, Neil? I mean, are, are you looking for money damages from him, or what would you like? |

| | | |
|---|---|---|
| Neil Heslin: | 05:44 | I, I want him to clear the air on it, come clean with the whole thing. I want an apology, um, I want my name cleared by him, and not just to his followers, to society in general. |

And, uh, a letter of retraction was sent to him with no other claims that it did not happen, I want him to admit to it, and, come clean on his lies.

| | | |
|---|---|---|
| Megan Kelly: | 06:12 | Because what he does, I believe, to protect himself, he tries to protect himself legally, is, he equivocates. He says, I believe the whole thing is a hoax, and then he says, but, it might've happened. But some people didn't believe it didn't, and he tries to go back and forth, and, and I believe, having practiced law for a decade, Mark, you tell me,  that's him trying to cover his backside, for when people like you file a complaint. |

So he can say, I never said it was factual, it was a matter of opinion, first amendment, free speech.

| | | |
|---|---|---|
| Mark Bankston: | 06:42 | You know, I don't know if you, if, you saw his 10, 12 minute rant that he posted after these lawsuits were filed, but it was exactly that, Megan. It, you know, you look at that, and what it was was just a lie on top of a lie. To say that he's never said this, when he has, repeatedly, for five years. |
| | | He keeps saying his words are taken out of context, but you can listen to him for 10, 12 minutes at a time, just rail about these insane theories. And what you heard yesterday, you didn't hear anything that was taking responsibility for his actions. |
| Megan Kelly: | 07:09 | No, he doesn't do that. |
| Mark Bankston: | 07:10 | That's not in his playbook. What that was, and you heard him mention, I've spoken to my lawyers, no less than 10 times. That statement was nothing more than an attempt to avoid his responsibility, and we are not going to let that happens. |
| Megan Kelly: | 07:21 | He says, he talks about how, it didn't happen, it didn't happen, playing devil's advocate. Devil's advocate, which truer words were never spoken. I mean, that's exactly what he, what he is doing. |
| | | What has it done to your life? I mean, what happens when he goes on these terrors? |
| Neil Heslin: | 07:38 | Well, emotionally it bothers you. It's hurtful. Um, it opens, continues to open the wound more and more, uh, but, you know, to have somebody come up to me, and, and say how sorry they are about my loss, and then, a second later, look me in the eye, and say, do I think Sandy Hook really happened. |
| | | I, I mean, this is, it's something that shouldn't happen. And, uh, but it becomes a public threat, and, uh, you know, a safety of society. He's out peddling these lies like a carnival barker, and, it, it, puts people like myself, the Pozners, and other families at risk. |
| Megan Kelly: | 08:26 | In danger. In danger. |
| Neil Heslin: | 08:28 | No, where, Lucy Richard, she acted out, um. |
| Megan Kelly: | 08:31 | That's the woman that went to jail. |
| Neil Heslin: | 08:32 | Went to jail. |
| Megan Kelly: | 08:33 | For threatening the Pozners. |

| Neil Heslin: | 08:34 | Yeah, and she threatened, uh, you know, death. |
|---|---|---|
| Megan Kelly: | 08:39 | He, he's ginned up a lot, a lot of hate. Um, one man, after, after watching Info Wars and listening to Alex Jones, went up, with a gun, to Comet Pizza, in Washington DC. Remember that? I remember this guy in DC, in the pizzeria, because he was believing that this was some pedophile ring, run by Hillary Clinton and John Pedesta, this happened during the 2016 campaign. |
| | | I, I know, Mark, do you represent this other, this other man that went to Charlottesville as a counter protester to fight against the white supremacists, who Alex Jones dismissed as, working for George Soros, and a paid actor. I mean, over and over, he disparages people, and then, it, there have, there are real life consequences to these people. |
| Mark Bankston: | 09:18 | Well, actually, Megan, um, uh, the Georgetown school of Law, is helping out with the representation of Mr. Gilmore up in Virginia, and they filed a suit not too long ago. Uh, and our firm has actually filed an additional suit, where a poor young man in Boston was falsely accused of being the Parkland shooter, and his picture spread across the internet. |
| | | And he's been suffering for harassment, and this is a young man who's never even been to Florida. |
| Megan Kelly: | 09:41 | But what about, you know, as a, defamation is very hard to prove, um, because the first amendment is so strong and cherished in our country. So, what about the defense? 'Cause, if you can prove it was just opinion, and you weren't stating it as a matter of fact, it can be a defense in defamation? |
| | | So, how do you get past that? |
| Mark Bankston: | 09:58 | Well, first of all, I would say that, you know, we like to encourage debate in this country, and if you have something to say about public figures, or people who are involved in making policy for this country, have at it, say whatever you want. You know, Alex Jones has said in the past, and, and that's fine. It's, it's what our country's about. |
| | | But when it comes to private individuals, you can't just lie about them. You cannot just spread lies that hurt their lives. And, in this case, sure, defamation is sometimes hard to prove against media outlets, because most media outlets have some semblance of journalistic integrity. |

Here, this is textbook defamation. He made unequivocal false statements about both of our clients. Uh, and then, then, the consequences of that are so severe, that I don't believe I've ever seen anything like this, and in our opinion, that this is our most vile act of defamation in the history of American media.

| | | |
|---|---|---|
| Megan Kelly: | 10:45 | I'm sure, I hardly need to say that there is zero question you held your son just as you told me, and every clear thinking American out there, believes that, Neil. We all believe that. |

Hold on, because I just want to tell the audience that, we did reach out to Alex Jones for reaction, uh, to Neil's appearance and these lawsuits filed against him and his company, uh, we received no response. Uh, he did address the lawsuits on Tuesday on his YouTube channel, here's what he said.

| | | |
|---|---|---|
| Alex Jones: | 11:14 | I had many debates, and that, both sides of the discussion on, and would, state, devil's advocate, that it happened exactly as they said it happened. But I've been telling the parents for years, I believe their children died, and quite frankly, they knows that. |

So, I don't know why I continually, then, see them on the news, saying, why does Alex Jones say, my child didn't die, when I'm not saying that. The media continues to misrepresent what I've said. Especially in the last four years. The lawsuits that have been filed, my lawyers have actually reviewed all the videos, previous to this, because we knew this was coming, and, the suits will be thrown out.

They will be dropped, because they have no merit.

| | | |
|---|---|---|
| Megan Kelly: | 11:57 | I'll give you the last word, Neil. |
| Neil Heslin: | 12:00 | I, I want to add to that, too, with the lies, and, the propaganda he peddle. He makes a lot of money off that. And profits off of it, and, uh, he's profiting off of my loss, and a tragedy that, affected me. That's not right, either. Um, but I'm not, I'm not backing out of this lawsuit, I'm, if it comes to a knockdown drag out fight in the Travis County Courthouse, that's what it'll be. |
| Megan Kelly: | 12:31 | And there is a real question about how long he can continue this within [inaudible 00:12:36]. Thank you. |

(Audience clapping).

| | | |
|---|---|---|
| Speaker 1: | 00:00:02 | Waging war on corruption. It's Alex Jones. (singing) |
| Alex Jones: | 00:00:09 | Ladies and gentleman, this is such an incredible time to be politically alive. So much change, so much being discovered, so much good happening, but also so much bad. Riveting! Amazing! We've seen the death of David Rockefeller. We've seen the death of Zbigniew Brzezinski. David |
| | | Rockefeller was the modern architect of corporate world neocolonialism, crony capitalism, world government. Dead 2017. His top henchman, his top operative Brzezinkski dead, and now John McCain fighting for his life, whereas I never wish any harm on a living creature and have empathy. This is a man that funded Al-Qaeda in Arab spring that killed over a million people and blew up hundreds of churches, killing hundreds of thousands of Christians. So he has lived a life of serving death and serving the destruction of America, and now he is in line to meet his maker, and I hope he gets right with God. |
| | | Talking about Russia hysteria, Mueller's expanded probe to Trump businesses. This is a witch hunt to infinity and beyond. Here's some of the Democrats and Republicans in their hysteria. |
| Bob Barr: | 00:01:17 | If it weren't serious it would be funny, uh, some of the what I call the, uh, the post-factual statements that, uh, that the left, uh, makes continuously. The problem partly is that if you say something, whether it is true or false, whether it is outrageous or rational, if you simply say something over, and over, and over again people actually start to believe it and will act on it. |
| Speaker 2: | 00:01:45 | Fox is a propaganda network. It- it functions off of the idea of breaking people up into teams, so they are aiding and abetting the enemy. They are aiding and abetting those people we are- are currently at war at with, uh, the Russians. |
| Howard Stern: | 00:02:00 | If I hear one more conservative talking about, like, all of this ... I don't know what happened to conservatives. They were the guys who were anti-Russia, who were like, "Well, it's not so ... The Russians aren't so bad." You know, because they're defending Trump, and I'm like, "Are you out of your ... mind? This guy kills journalists for having an opinion or for d- digging into the facts or disagreeing with them. |
| Speaker 3: | 00:02:21 | [crosstalk 00:02:21] |
| Howard Stern: | 00:02:21 | They back, uh, terrorist governments. They ... hate us. They're our enemy. |



EXHIBIT

B-42

tabbies*

| | | |
|---|---|---|
| Alex Jones: | 00:02:27 | That's McCain that backed the terrorists. |
| Howard Stern: | 00:02:29 | And you know what? Do not be talking to Russians and getting any kind of help from them. |
| Speaker 3: | 00:02:33 | That's the [crosstalk 00:02:33] |
| Speaker 4: | 00:02:34 | How dare you take a phone call. |
| Speaker 3: | 00:02:35 | You don't talk to them. |
| Howard Stern: | 00:02:35 | Right. |
| Speaker 3: | 00:02:35 | Say- |
| Speaker 5: | 00:02:36 | I think what we're learning, uh, with the Trump Junior meeting is when you meet with any Russians you're meeting with Russian intelligence and therefore, President Putin. |
| Speaker 6: | 00:02:47 | This is a reality that will become the only reality until this country rids itself of Donald John Trump. He is not a President. He is a puppet put in power by Vladimir Putin. |
| Maxine Waters: | 00:03:00 | Uh, so many of us are attempting in every way that we possibly can- |
| Alex Jones: | 00:03:04 | No, you're the puppets. |
| Maxine Waters: | 00:03:05 | ... uh, to- |
| Alex Jones: | 00:03:06 | You're the enemies. |
| Maxine Waters: | 00:03:07 | ... unveil the criminal activity, the unconstitutional activity of this President and his family. |
| Alex Jones: | 00:03:15 | Russia kicked out the oligarchs. |
| Maxine Waters: | 00:03:17 | I have dubbed them- |
| Alex Jones: | 00:03:17 | That's the only things we have in common. |
| Maxine Waters: | 00:03:19 | ... the, uh, criminal clan a long time ago, and as many of you know, I stepped out a long time ago and said I thought he should be impeached. |
| Speaker 7: | 00:03:28 | The- the investigation, it- it's not ... uh, nothing is proven yet, but we- we're now beyond obstruction of justice in terms of |

what's being investigated. This is moving into perjury, false statement, uh, and even into potentially treason.

| Speaker 6: | 00:03:41 | The nation and all of our freedoms hang by a thread, and the military apparatus of the country is about to be handed over to scum who are beholden to scum. Russian scum. |
|---|---|---|
| Alex Jones: | 00:03:53 | Yup, they had their foot on the neck of Russian for a long time, the Hollywood crowd, the globalists, and now they want us. |
| Speaker 6: | 00:04:01 | Resist. Peace. |
| Alex Jones: | 00:04:03 | Ladies and gentlemen, thank you so much for joining us on this live Thursday global transmission. The 20th day of July 2017. We've known that Mueller is a operative of the deep state who covered up the Clinton's, the Bush's, and the globalists committing unbelievable crimes. He sat back as FBI Director, as did Comey, while the Clintons got tens of billions of dollars to specifically sell out US infrastructure, US minerals, US energy, US technology, including defense. We're talking about nuclear reactors, an ICBM launch and re-entry technology to China and North Korea, and that's all mainstream news. That's confirmed. |

Illegal servers. Unbelievable crimes. Pedophile parties. None of it, none of it being prosecuted. And now Trump got the word yesterday, and he came out and he said, "Listen, your special council investigative powers are to look into Russia collusion in the election," which there is none. It's not collusion to have his son meeting with somebody about dirt on Hillary. That's called doing your job. The Democrats all did that and they admit that. But now Mueller announces this morning on the heels of Trump, Mueller expands probe to Trump business transactions, and now it's a criminal investigation to find out if Trump or any of his associates ever had contact with a Russian, including renting Russians apartments in New York, DC, Miami, Florida. You name it.

I mean, that's the proof now. Now it's gonna be they rented apartments or sold apartments to Russians when Russia, since they become quasi-free-market have thousands and thousands of millionaires and close to 100 billionaires buying ships, buying yachts, buying helicopters. They've bought 'em from all the different elites. They gave Hillary Clinton 100 plus million dollars into her foundation. 30-something million to the Podestas for uranium, but none of that matters. Those are deals where Hillary's in the email saying, "I'm gonna meet with the Chinese ambassador. Put the money in the account, and I'll meet with

him on policy." Boom! Arrest her! That's when she was Secretary of State.

If Trump gets caught doing something like that, caught with the Chinese ambassador or the Russian ambassador saying, "Give me money." If he ... Uh, if- if Rex Tillerson, the counterpart of Hillary, was in meetings and in- and in Wikileaks saying, "You give the money to the foundation and I'll meet and get that policy done with you next week," you put the money in and you get the policy out, classic bribery, I would call for Rex Tillerson to be put in prison for 50 years. If you give somebody military secrets it's called treason and you get your next hung 'til your vertebrae pop, until you crap your pants and die.

But it doesn't matter. I've got three clips from yesterday, David Knight and Owen did a great job, I was listening to the show, uh, workingcation, and there are the clips with Democrats on TV saying the entire administration, Rex Tillerson, you name it are all guilty of treason for trying to go into Russia and get great deals on all their rare earth minerals, their oil, their gas, their brains, their engineers. Of course, we should be working with Russia! We're capitalists. That's what we do. They're capitalists now.

But all the left that was always in love with Russia back when they were communist ... Hollywood, Howard Stern, all of it, literally say, "You don't talk to Russians. Any Russian is a Russian agent. Any Russian is like talking to Putin." These are quotes from CNN, MSNBC, Congressman Quigley, Howard Stern.

And now Trump shuts down CIA program to arm Syrian rebels that the Pentagon five years ago told Obama to stop doing, and said, "We're not going to go along with your military invasion of Syria because you are putting in Al-Qaeda, Al-Nasra, which is all the same group, now ISIS. And you are throwing a quasi-Christian country, one of the only Muslim countries that actually is inclusive and is secular, you're going to overthrow that when they didn't attack us? An-" And does what the military, what the Pentagon is saying ... The Pentagon's telling him, "Sir, the CIA, at the top," not in the middle and the bottom, a lot of those folks are actually Patriots, but at the top is big globalist foundation, big New World Order, anti-America. Carnegie, Ford endowment, skull and bones, Yale, Harvard. That's who set up the CIA in '47. It's a shadow globalist government. That's declassified. That's admitted now.

Barry Goldwater talked about it in the '50s and '60s. And so they said, "Mr. President, you wanna beat ISIS and not have our

soldiers, green berets, and people getting killed every week over there fighting ..." There's been lots of training accidents with Navy SEALs and Army soldiers dying. Lots of plane loads going down and blowing up, which is a classic tactic to cover up the real number that are dead. I don't think it's even needed to be done. Just report on what's happening. And Trump's like, "We still have agencies funding the rebels when 98% in congressional hearings they've confirmed 98%, the intel is unanimous, are Al-Qaeda, are Al-Nasra, are Wahhabists?" Wahhabists out of Saudi Arabia, the dominant religion of Islam, the dominant sect, that's what Al-Qaeda, Al-Nasra, ISIS is. It's all the same black flag, all the same Arabic g- uh, writing. All the same slogans, the same people, the same system, the same plan, the same global operation, the same cancer.

So Trump kills that yesterday and they go even more ape. Look at this Washington Post Headline. Trump Ends Covert CIA Program to Arm Anti-Assad Rebels in Syria: A Move Sought By Moscow. Yes, five years ago, General Dempsey, the Chairman of the Joint Chiefs, went to Obama on Saturday night, we reported it a year before it was in the news, it was confirmed, our sources, both on and off air. Colonel Shaffer was one of them. And they come to them and they say, "We're not gonna be the Al-Qaeda's air force," and then Senator Cruz comes out, and Rand Paul comes out and says the same thing. And they say, "This is wrong. We've got a deal with the Russians to let them come in, kick Al-Qaeda and ISIS out, then they will remove themselves but they'll keep their deepwater port they've always had in the Mediterranean, their only one, and then Assad will step aside after elections."

We're now five years later and Assad is now making noises of stepping aside after elections. They gotta deal with what's left of America in the Pentagon to not be immoral and to not put Al-Qaeda in charge of there. That's what happened, and then they turn around and act like Trump's a Russian again. Well, yes, they're ... A deal was made by our military and by people in our government with Russia. We told you first. Sy Hersh, Pulitzer Prize winner has been on three years after we broke it to say we broke it, we were right. I'm not bragging. It's just that's a hat tip. Do you understand?

They think you're stupid. They've launched a bunch of fake chemical attacks to blame it on Assad. Because Obama said, "I'll go in if you use chemicals." Why would he ever do that when he's winning and now ISIS is almost beaten? And now they're coming out pushing this garbage, and saying now they're looking into all his finances. Oh, did ... Was there any campaign

finance violations. The FBI's looking into that. Not about Russia. They're looking at bank accounts. They're looking at transactions, they're looking at everything to "find money laundering", to find any discrepancies in campaign money, and they'll call any mistakes they find money laundering.

Hillary can openly commit mass crimes. Go to Morocco and get 12 million and then sell out her whole phosphate industry, and use taxpayer money, as we reported, to send 90 million there to pay to move our jobs. That's okay, but Trump actually turns our economy on, restores our republic, follows what the Pentagon a- actually has a plan to defeat the globalists, and they call him a Russian agent. The only truth is Russia pulled out from the control of the globalists. Russia is breaking free of the New World Order partially. We are too and other nations are saying, like the UK, and Iceland, and Sweden, and Denmark, and Australia, and Brazil, and all these other places are saying, "We wanna be free too! We want a nation-state that's for our interest, not to be looted by robber barons like Zuckerberg and Bezos."

And then they call it Russia. Russia, to make it something foreign so every nation trying to pull out from globalism, be it Italy, Greece, Spain, Catalonia, they can say, "Oh, you don't really wanna pull out. The Russians made you do that." And they build the Russians up like they're superheroes. When we come back we're gonna look at McCain and his brain tumor.

| | | |
|---|---|---|
| Speaker 1: | 00:14:05 | KDR- |
| Alex Jones: | 00:14:06 | I'm gonna get into John McCain and his fast-acting, very aggressive brain tumor he had removed yesterday, and how Tim Kaine calls him the- the chairman of [inaudible 00:14:19] operations, uh, because that's exactly what- what he is. That's coming up. But something I wanted to mention to everybody here and I want it to sink in for the listeners of this transmission, we're on over 200 radios stations, and we're on Facebook, and Google, and YouTube, and a lot of other video platforms, and on every platform the Democrats and the liberals have organized into groups that go around making false copyright claims and false community claims. Now, I've announced, and I don't wanna do this 'cause I'm litigious, I have to. The next person that files a slap suit, the next person that files a fake suit for publicity, I'm gonna come down on them like a ton of bricks to defend my free speech and my rights.

'Cause people sue me to get publicity and then they wanna drop the suits right away. In fact, they wanna pay me money to drop |

the suits, but it has to all be secret. That's how this works. And then there's this whole meme put out that I'm fake news and all this garbage, so I understand now I can't get out of the suits, I've gotta counter-sue people. So whoever wants to line up next, I'm going to sue you, and I mean really sue you. Depositions, everything. And I'm gonna announce this. The next person puts a fake copyright strike, I swear to God on my children I am going to sue you and I'm gonna sue your companies, and I am gonna come after you politically with 100% of the law. You got that?

'Cause during the break, they didn't tell me when I was doing my workcation we had the community guidelines, a whole swarm of folks come through and they're ... YouTube is announcing that they're looking at shutting down and- and- and basically kicking us off YouTube for people complaining that I've reported on Sandy Hook and had Wolfgang Halbig, a former school, uh, safety administrator on, for a debate about whether the official story was true or not. Then the media misrepresents what I say, saying that I say it never happened, when I've looked at both sides, but it doesn't matter.

I have my right ... If I was an idiot, black nationalist, racist, I could be a racist black person. If I wanted to be a KKK person, an idiot, I could be that as long as I don't hurt innocent people. And if I wanted to say that I don't believe that babies out of incubators and had their brains bashed out to get us in the Iraq war, which is true, didn't happen, it's my right to say it. And then I can question big PR events like Sandy Hook when there are major anomalies like them saying none of the parents were allowed to see their kids that day at the school. Then they had people on NBC saying they held their kid dead at the school.

People see that. They see blue screens. They see kids going in circles in and out the building. They say it looks like a drill. Why were no rescue choppers sent? Why were port-a-potties there an hour later? Uh- uh- uh, I'm not saying it didn't happen because I'm not sure. I don't wanna go that far. I've gotta be sure. I have a right to question that. But regardless, they wanna shut our channel down because of three-year-old videos, but see, I can't find out who did that specifically. I can sue, and they know ... They know I've already got the law firm that's in DC and others ready. They know I'm going to sue whoever files a fake copyright claim again.

I am going to sue you. I cannot wait. Because people put these fraudulent claims out constantly. It's amazing, and I'm done. I'm done playing games with all these people because I'm gonna

defend the First Amendment and I'm going to come after the people that violate it. This is a microcosm, uh, going back 10 years ago. I was even on access TV anymore here in Austin where I started 20-something years ago, but they were getting rid of free speech. They were banning libertarians and conservatives, and I sued them, got the evidence what was happening, and out of that came a criminal investigation, and the director of it was found guilty of embezzling over $300,000 and sent to the state pen in East Texas. Huntsville. He only spent a couple years, but ... And it went higher than that in the city, but they killed the investigation.

So I'm- I'm not a litigious person, but if I do come after you legally you're going to- you're going to understand. And Google got caught hiring a company to de-list us, and- and they got caught and they had to pull back. They admitted they did it, and they had us de-listed two weeks ago where you couldn't see Info Wars at the top. And I told them, "I'm gonna sue you privately," and they put it back up at the top because they understand I have the audience not just the money and we're gonna expose you bullies. You understand? Next person, you're sued, so line up. You wanna get in a big, fat lawsuit with me, whoever you are, I don't care who you are, you make up crap, you lie about us, you try to take my free speech and gag me, and take my speech so you can have your way with my family and my children, it isn't happening anymore.

Now, we got a little comfortable around here too with just having our rights taken. We're like, "Yeah. Well, yeah, they're bullying us, saying we have no free speech. Let's just go back to sleep." Wake up everybody. We're in a fight against the globalists. They're trying to put our pri- our- our president in prison. They're making up ... They're funding radical Islamists and terrorists and saying our president's a Russian agent because he didn't wanna fund Al-Qaeda. If they're able to shut us down, they're gonna shut everybody else down. If they're able to say Trump's a Russian agent with no proof, they're gonna go after everybody. It's gonna be a new inquisition. This is a total war, people!

Ladies and gentlemen, the way the new globalist system works is if anyone is offended by what you say or do, there's no judge, there's no jury, you're kicked off YouTube, you're kicked off Facebook, you're kicked off Twitter. And then under the Chinese model that's Zuckerberg's pushing, you have an internet ID that puts your real-world activities that are tracked digitally by companies and corporations, from your gas bill to, you know,

going to eat at McDonald's into an algorithm and then it gives you a score about what type of person you are.

Last year they made a, uh, black mirror special, a show basically about how nightmarish that future would be, but this is their plan. So later in the broadcast, we're gonna have an article on infowars.com about strikes on Info Wars blocking our live streaming right now on YouTube, on our regular YouTube channel, the Alex Jones channel, with millions of views because we had the headline Zero Heads Discovers Anomaly in Alex Jones' Headpiece. And it's us showing Megyn Kelly talking to the father of one of the victims, saying he went and held his dead son there at the school. And then it cuts to the coroner and everybody saying no one was allowed to go in and see the kids.

Now, we just said, "See, that's why people ask questions." It's a very nice little piece, but see, oh, you're not allowed to even sit there and point that out. And then there's other ones from years ago. Sandy Hook Victim Dies Again in Pakistan, which shows the photo of one of the kids with people in Pakistan holding up his picture saying he died in a terror attack over there. Clearly showing that was some PR event over there where they were just printing off images of kids and using it. We weren't even saying that- that man's child didn't die. We're saying, look at how there's these other PR events just like the dead babies in the incubators.

But they're using Sandy Hook and they're using the victims and their families as a way to get rid of free speech in America. That's the plan. Hillary said it back during the campaign. She was gonna get into office. This was gonna be their move. They called for, you know, ongoing criminal investigations, uh, the FBI last week into myself, Matt Drudge, and Breitbart with no proof at the Federal Elections Commission. And then the Republicans on the commission killed the ongoing congressional hearings but still, they have the FBI going around doing a counter-espionage investigation to see if we're funded by Russians. Welcome to the witch hunt, folks.

People say, "Wow. How are you taking it?" I'm taking it great because the ... I mean, I'm engaging the globalists that have high-jacked our country. I'm engaging the globalists that are trying to bankrupt us, and turn our power off, and- and jack up our prices, and make us feudal serfs. We're fighting for America in a 21st-century war, ladies and gentlemen, and it takes getting past the intimidation and getting in their face. That's where the victory is. Getting past the political correctness, getting past being called names.

It's not our fault they call us names. It's their fault. They discredit themselves. They're the scum. They're the anti-fallout beating up peaceful people in the streets of America and shooting cops in the back. They're the ones engaging in this, not us. They're the ones that wanna get rid of free-market. They're the ones that hate Christians. They're the ones that call us flyover country and better clingers. They're the ones pushing racial division, not us, and worldwide humanity's awakening. The tide of globalism's going out. Corrupt neoliberalism is hated worldwide and globalist owned publications admit that they're in trouble, but they say, "We've gotta stir up even greater division now."

This is a rearguard action while they basically escape the countries they've destroyed. The New World Order is dead and signifying that is David Rockefeller,  Zbigniew Brzezinski, and now John McCain. I wonder if they'll announce soon that there's a very fast-acting brain tumor in George Soros.

The world is watching. The world is waiting as the clock ticks down on judgment on these type of individuals. I wish no harm upon them, their miserable souls, but they've dealt death. They've dealt corruption. They've dealt anti-American activities, anti-Christian activities. I mean, McCain openly funded the Al-Qaeda ISIS rebels, met with them, and now he's got a fast-acting brain tumor. I'm gonna talk about that in a few minutes.

But listen, the fact that they're trying to shut us down, the fact that they're trying to ban our speech, the fact that they're trying to set those precedents, that's a badge of honor. That's a badge of courage. That will only make Info Wars bigger, this entire Streisand Effect. If our enemies are successful shutting one of our big YouTube channels, I guarantee you it will only make everything we do and everything we cover that much more explosive.

Our YouTube channels, with a combined four billion views, and if you count all the other videos out there it's tens of billions that other people have on their platforms because I'm copyright free, you can post our material as long as you don't try to monetize it or take it out context. And I- and I even leave that alone 99% of the time. As long as you're fighting the globalists, I- I ... people post it. And every time they try to suppress us we only get bigger.

I mean, just last week looking at six or seven videos that we produced or videos I was in, we had over 30 million views just of videos I was in last week. They don't have any way to compete

with that. They don't know what to do. Take PewDiePie, last time I checked he has close to 18 billion views on one YouTube channel and almost 60 million subscribers, and he was never political but they tried to call him racists, and evil, and bad to- to- to prepare to shut him down because the big network executives and folks are jealous that he is able to actually have his free speech and do what he wants. And they're scared he might start becoming political, he might do something.

Just like in China they put you in prison or execute you if you're caught Photoshopping Winnie the Pooh with the Chinese president. That somehow became popular over there. It was friendly. It was nice. Folks thought it was cute. You go to prison for that in China. Well, they don't like PewDiePie, but his YouTube channels, one channel has almost 16 billion, the other has a couple more billion. Almost 18 billion views. They are threatened by 18 billion views.

Nickelodeon's average show only has a couple hundred thousand people viewing, but young people and teenagers watch PewDiePie. They don't watch all the Disney programming as much as they watch PewDiePie over in Sweden who's his own guy. Of course, PewDiePie's big crime is playing my videos and Paul Watson's videos, and that's the type of thing that scares them, so they say, "Oh, we're gonna demonetize you. Oh, we're not gonna let people share your videos," and it only backfires.

So I'm gonna get into McCain and the rest of it, but here's the bottom line. When I saw you need to sp- spread articles, and videos, and material, and information we put out, folks, it's a war. They're actively, in mainstream news, talking about how they need to shut us down and how we're dangerous. They're in Washington Post admitting yesterday that we're wildly popular and are exploding as old media's dying. They don't know what to do, and a lot of new media says, "Oh, great. We'll be bigger if Alex Jones isn't around."

That is the most ignorant thinking on the planet. We're in a non-zero sum game. Everyone that is promoting libertarian free-market ideas is only expanding and making the world a better place culturally, economically, spiritually. We're in a war against authoritarianism. We're not in competition. I'm not in competition with Sean Hannity. I'm not in competition, uh, with Matt Drudge. I'm not in competition with WorldNetDaily. I'm not in competition with Breitbart. I'm in a total war against the globalists allied with orthodox radical Islam that admits it wants

to extinguish the free-market open free societies classical liberalism, and they wrap it all in the term liberalism.

We're in a total and complete war and we're beginning to win, so the enemy's going from their stealth approaches to openly saying, "Silence us," openly saying they're gonna gin up evidence the everybody that opposes them is a Russian agent, or if you don't back Al-Qaeda or ISIS you're a Russian agent. That's in the Washington Post today, and you say it doesn't make sense. They don't care. They only wanna cover for their own people to say we're outsiders and we're bad and to persecute us.

This is classical authoritarianism, so I'm gonna tell you right now, if you wanna fight the globalists, take every article on infowars.com, take every video, copy them to your channel. Put them on your own platform. Play them on your local radio station. You're a station owner, take our broadcast if you're- if you're re-airing it at night put it on primetime. And listeners, support those local stations. We're in a war. Even if it's just calling them and letting them know or sending them $100 dona-

PART 1 OF 6 ENDS [00:30:04]

| Alex Jones: | 00:30:00 | More. Even if it's just calling them and letting them know or sending them $100 donation. And buy products at infowarstore.com so we can do more to have our own platforms. It costs me like 50 grand a month on average just to stream out to millions of people every day at infowars.com with our own streams that we're about to upgrade and make even better. They're pretty good but I'm going to make it even better. We're about to renegotiate a whole nother deal for our streams.

And try to get a better price. The point is, it costs money. People say, "Oh, well just have your own videos or have your own social network or do your own thing." We, we're, we're trying here, we're fighting as hard as we can but we need your financial support and we make it easy. Great supplements, great nutraceuticals, great patriot apparel, great water filtration systems, great air purifier systems, great game changing products at very competitive prices. Most of it made right here in America. Infowarsstore.com.

And ladies and gentlemen, we have the summer mega specials that are going to have to end today. I have a whole new group of specials tomorrow, but if you want DNA force's 20% off, if you want X two, if you want these products, if I had the specials |

I was going to do, and Jiminy Cricket, somebody came in here and got in my pile. Here, I found it right here, I'm in a bad mood right now folks. Super male vitality and survival shield X two specials are ending today. Quantities are running low so act now and save 30% off, and we have shipping through the month of July, but it's about to end, and I had to already end the product ... the brain force plus. Already had to end that special because it was close to selling out. I'm going to have to end the super male vitality, or female vitality, the X two survival shield, and a bunch of the other products that are 20 to 40% off right now at infowarsstore.com or by calling toll free triple 8, 253-3139.

We have a little bit of brain force left, it'll be probably a month or so until more comes in so I, I, just before stuff sells out now I just go back to regular price, which is already discounted 10%. We've also got some other new products also now available at infowarslife.com, uh, like our new whey protein that is made by the, one of the largest, biggest respected organic suppliers in the country and five to 10 dollars less that you'll find for the very same whey, we're private labeling that you can buy in major health food stores. But whey is known as the best protein there is from milk. It's organic, it's supercharged, it's got the glutathione and some of the other amazing things in it, but it's got the type of glutathione you can actually absorb. Glutathione is absolutely critical. Find out why going back to the time of Hypocrites, thousands of years ago, the father of modern medicine, he said whey was the most important food and one he prescribed to his patients.

True whey protein contains nine essential amino acids your body needs but cannot produce itself. So, check it out for yourself ladies and gentlemen, it's got CLA, it's got so many other great products and it's supporting American dairy farmers right here at home and it's also grass fed with non GMA RBGH, that's the growth hormone, free. Infowarslife.com or triple 8 253-3139. But as I said, we're going to have to end the specials, this is 25% a- off out of the gates with the new info wars whey protein, we also have 25% off out of the gates of Cave Man, the ultimate bone broth formula that's been sold out for months, it's now back in stock as well and it's also, uh, chalk full of bee pollen, chocolate mushroom, tumeric root and many other super foods and it is the most concentrated, from our research, bone broth formula out there. The ancients were obsessed with bone broth, this is truly amazing, it comes from chicken bones and this is now the number one bone broth seller in the country. Research it for yourself, Cave Man is now back in stock

at Infowarslife.com or triple 8 253-3139. That's triple 8, 253-3139.

We'll have some new specials tomorrow on some of the other supplements that we do have in stock, uh, but I'm going to have to end that special today. Again, if you want the X two or if you want super male vitality or some of the other products that are 25 to 40% off, infowarslife.com or triple 8 253-3139. You can, uh, again, just know this, they hate us, they hate our guts, Hilary hates our guts, Obama hates our guts, they're all coming after us, doing everything they can to destroy us and I just have faith in God and I have faith in you, but beyond financially supporting us and getting great products you need, if you'll just commit on your email list and on Facebook and on Twitter and on YouTube and on every platform to just point out Info Wars is under attack, Info Wars is the tip of the spear, if they can shut them down, if they can shut them up they'll shut everybody up.

And in the face of this, that's why I'm launching all these new broadcasts and all these new shows and all these new Facebook channels and all these new YouTube channels and we're launching Periscope channels and we're launching other third party channels and we're keeping our video streams and expanding them and we're launching a new website tomorrow, I'm going to make that announcement now and I'm going to come back in the next segment and, uh, announce the $20,000 winner of the meme contest, just to honor you, the great memes you've made that are fighting the globalist.

But whatever you do, get in the information war today, and expose these enemies because they are now openly expanding the, uh, quote espionage probe of Trump to all of his financials, all of his associates of financials and saying anything, a check that bounced, they're going to try to move for impeachment against the president, but he has the house, the senate, the legislative, obviously the executive, the judicial, so these scumbags don't matter, unless they can brain wash us into accept it, he needs to move against them for their criminal activities now. They're sell outs to communist China, they're sell outs to Russia, he needs to take the gloves off right now and the word is, he's getting ready to.

So Hillary and Obama and Clapper and Brendan, all you, you want to fight, get ready for a fight, McCain.

| Speaker 8: | 00:36:35 | In a land of timeless beauty, he was a man of piece. |

| Speaker 9: | 00:36:42 | Fake media tried to stop us from going to the White House but I'm president and they're not. |
| Speaker 8: | 00:36:56 | But when they threatened his world and the woman he loved, he was driven to war. |
| Speaker 10: | 00:37:07 | I don't like [inaudible 00:37:16] they turned the freaking [inaudible 00:37:19]. |
| Speaker 9: | 00:37:07 | Get them out of here. Get out. |
| Speaker 11: | 00:37:24 | Go home to mommy. Go home. Bye. |
| Speaker 9: | 00:37:34 | You are fake news. |
| Alex Jones: | 00:38:12 | Trump Nation made both these great memes. [inaudible 00:38:16] the winner. If you're a radio listener, infowars.com/show. |
| Speaker 12: | 00:38:20 | Super hero landing. You're going to do a super hero landing. Wait for it. |
| Alex Jones: | 00:38:25 | Remember, they're trying to sensor all this you're saying. |
| Speaker 12: | 00:38:28 | Super hero landing. That's really hard on your knees. Very impracticable, they all do it. You're a lovely lady, but I'm saving myself for [inaudible 00:38:35] that's why I brought him. |
| Speaker 13: | 00:38:36 | I prefer not to hit a woman, so please- |
| Speaker 12: | 00:38:44 | I mean, that's why I brought [inaudible 00:38:51]. Oh no, finish your Tweet. It's na- that's fi- just give us a second. There you go, hash tag it. Go get them, Tiger. |
| Speaker 14: | 00:39:04 | The season premier begins tonight. |
| Alex Jones: | 00:39:10 | That's Trump Nation and I want to get whoever made those videos on and I want to hire you. I told Paul Watson he could pick the winner and personally, I think the Brave hart one is the winner, I would say the one you're about to see that won is second place and then the last one, with the dead pool, that'd be third place, but Trump Nation did not win, but Trump Nation, I want to hire whoever did the editing. I want you working for us. You work for Trump Nation, too, they're great folks, but David Knight didn't win a report contest five years ago, but he did win a reporter job, now he's going to launch his big syndicated show that the word is, well over 50 stations are |

ready to pick it up the first week when it starts on August 22nd. It'll probably get hundreds of affiliates. So very, very excited. See where he is now? So just because you enter and don't win doesn't mean that you lose. So we're gong to go to break and come back and I'm going to play the winner, according to Paul Watson, and I think it's excellent, it's very well done, it's a very close second, I don't think it's the best, but you know what? Paul Watson was the judge. Believe me, we got thousands and thousands of video memes, thousands and thousands more, something like eight plus thousand once the contest, uh, you know, time ended last Wednesday. So we're going to now start going through all these and posting them, promoting them, and exposing the globalists and fighting for free speech. The answer to them trying to shut us up is to just intensify what you're doing.

But listen, don't take the broadcast for granted. I keep explaining that. They are doing everything they can to take our sponsors, to kick us off YouTube. It, it, it is just out of control what's going on. And then I'm going to get into McCain, all of it. There's these huge new second hour, tell everybody tune in, it's an active resistance. We can overpower them.

| Speaker 15: | 00:39:10 | You are listening to GCA- |
|---|---|---|
| Alex Jones: | 00:41:08 | But you've gotta take action, [crosstalk 00:41:11]- the animating [inaudible 00:41:12] of liberty. You are the resistance and I salute you. Feeling good, feeling right. All right, I gotta stop it. Yeah, these ladies, they had a plan. (laughs) Dennis Hastart had a plan too, didn't he? Grab your kids and rape them. So does the pope's deputy. He got over 100 kids reported. Procured them out to all the little devil worshiping rape gangs. Those devil worshipers love to get those priest robes and rape kids. It's all part of defiling everything, overthrowing reality, destroying the, the flower of the youth. |

Until they die and enter hell. Now, let's get to the winner. Drum roll ladies and gentlemen. The winner by contested decision, Chris Killer did a great job putting this together. He's launching a new YouTube channel, don't dox me, bro, that is a great name. I want to work with this guy. I want to work with him, too. I want to tell you, he's a close second, but he, he's the winner, $20,000 to don't dox me, bro.

Name of the video, he only sent it to us, he never uploaded it yet, now he's doing what we did, uh, it is official Info wars CNN meme war 20k winner. I'm going to reupload it to Facebook with a cool name, I mean, what is it? Trump is our Toto, Trump

broke the Matrix, um, Trump flipped the paradigm. Trump exposed that we're living in a false realty? I mean, I don't know. Here is the winner of the 2017 round one meme war.

20K winner announced.

| | | |
|---|---|---|
| Speaker 16: | 00:43:39 | [inaudible 00:43:39] You are fake news. |
| Speaker 17: | 00:43:40 | How? |
| Speaker 18: | 00:43:40 | He is the one. |
| Alex Jones: | 00:44:29 | Once you know they're a joke, it's all over. You're a better cleaner. I'm just going to make sure you got sterilized. Break the floor up. No, who do you think you are? The world belongs to us. I went to this late. We're going to come back and play it all, we got a special guest, we got a ton of news, we'll talk about McCain straight ahead. |

Micheal Snyder is with us for the next 30 minutes. The founder and one of the owners of Compound Media who just went to Iraq to actually witness the final days of Al- Qaeda and Isis under President Trump and the military's bombardment. He'll be joining us as well. Micheal Snyder's written a story today that's up on infowars.com and on his website, Micheal Snyder for congress dot com. Getting Trump elected was not enough. We need 1000 liberty candidates to run for office all over the nation and he's doing it. I think it's in Utah. With his millions of readers and followers. And whether he wins or loses, he wins by participating, by educating people in the process.

The democrats are in the news today swearing they're going to take Texas. Yeah, by fraud. So realize what we're going to live under if the globalists win. The republican establishment has killed the appeal of Obama care, because they wrote it. [inaudible 00:45:43] democrats. Big banks wrote Obama Care bipartisanly to screw you. They're on CSPAN bragging saying, "Thank God you're so dumb."

Health care is worse than it's ever been. It's designed to wreck it. In fact, here's Senator Rand Paul talking about it.

| | | |
|---|---|---|
| Rand Paul: | 00:46:00 | The insurance industry doubled their profit under Obama Care. They made six billion a year before Obama Care, they now make 15 billion. My concern is that we're going to pass a republican bill and we're going to make their profits 30 billion a year. It's not the job of government to be dolling out money to private |

industry, so what I've said is that, if you insist that you want it, they should put that on a separate bill that the democrats like, democrats typically like spending bills, put it on a spending bill and put the repeal, make it more of a repeal bill and I'll vote for it. But, uh, and I still think it's not perfect, but I'll vote for something less than perfect as long as it's not obnoxious, and obnoxious to me is subsidizing rich corporations.

Alex Jones:            00:46:41            That's right, that use government to make you buy it and then limit competition to jack the price up and then the left runs around ... one year after Obama Care got partially implemented three years ago, I was reading the Wall Street Journal on an airplane and it was, it was insurance companies bragging. It was like headline, "Lobbyist love Obama Care." It was like, globally, our profit's up 47% just on the America people's backs. Worldwide, 47% increase in profits. It was like 2015. I mean, galactic level screw jobs.

Now joining us is Micheal Snyder who is so on target. I mean, I saw CNN with the headlines, "Trump's done 900 plus tweets since he was elected six months ago but no major legislation." Because most of what they've done is executive tyranny. TPP, open boarders, carbon taxes. He's devastated them. We've got a supreme court justice that isn't a total communist. We've got 69%. It was 63%, down illegals coming across and felons are down even more.

Deportations of felons way up. Uh, the economy trying to battle back. I mean, I don't want to just sit here and cheer lead Trump, but it's a total war. They have the FBI, former director, brought in by the democrats and the globalists, uh, put in there, uh, by Sessions that I guess balked and chocked and I gotta agree with Trump. I mean, you know, Sessions has been going after them for all the crimes they committed. We're a five or six special counsels or criminal counsels, uh, special prosecutors, not just counsels, should be all over Hilary because if Trump did something, which he hasn't, it, it, it's like a microscope finding a little dot of dirt while a whole cess pool, uh, sewage treatment plant which is oceans of sludge, uh, it, it, it makes the hedge spin.

And now, Mueller is saying that they're looking at all the finances of all his campaign, all his associates, all his businesses, you're going to find something. I've got 70 something crew members, they're great people, I bet people bounce checks, I bet there's some folks smoking some pot, I bet somebody did something wrong before. I mean, imagine if you had tens of thousands of employees. This, this is a new word for dragnet,

fishing expedition, witch hunt to infinity, Micheal Snyder, this is an incredible time to be alive, is it not?

| Michael Snyder: | 00:49:10 | It really is, Alex, and you know, people need to understand that we are in a war because the establishment, they want to destroy Donald Trump, it's kind of like a foreign body has invaded the system and they want to get that foreign body out of their system- |

| Alex Jones: | 00:49:22 | And they know they're losing, they know they're losing, so they're going to go after everybody. Once they get him, it's everybody else. This is a death battle. Sorry. |

| Michael Snyder: | 00:49:30 | Oh you're right, Alex, that's why they're going after you. They want to shut Info Wars da- down because they know how effective you've been. They want to shut me down, the economic collapse blog, they want to shut all of us in the alternative media down. They want to get rid of us because they saw the power we had in the last election. So we're actually in a war for the future of this country and we don't have to settle for the future of the globalist. You know, I lik- I talked to a lot of people that are awake and they're saying, "Oh, the globalist, they're too, they're too powerful, we can't defeat them. One world government is coming." |

Well you know what? We don't have to settle for that. We don't have to, we don't, we don't have to just sit back and take whatever they take. You know, our founding fathers, if, if we would have had a defeatist attitude back then, if our founding fathers had said, "No, we can't take on the mighty British empire." The rest of the world thought we were crazy when our founding fathers said, "We're going to take on the mighty British empire, we're going to declare independence." They put everything on the line, and because they did, because they were willing to risk it all, the United States of America exists today.

| Alex Jones: | 00:50:24 | Take, take, take Vietnam. Ho, Ho Chi Mihn first wanted to be, be a, uh, capitalist, he was a communist, uh, during world war two, he was our ally, they didn't want to make a deal with him because the the, the french and others wanted the opium and to exploit the classically free market, Vietnamese. And so despite the fact that we spent the equivalent of trillions of dollars, uh, hundreds of thousands of [inaudible 00:50:47], we couldn't beat them because they refused to submit and they had a communist ideology. |

If you refuse to submit with a Christian, conservative, libertarian, free market, Renascence, you cannot be defeated.

| Michael Snyder: | 00:50:59 | That, and that now, that's what we need to do, we need to work together and that's why I love Info Wars so much, because you're all about working together. Those that love liberty, those that love freedom, those that love the constitution. If we work together, we can win. Donald Trump showed us that, that we can win the presidency. Here in Idaho, if everybody listening to this program today that lives in my district votes for me, I'm going to win no matter what. We just gotta get everybody out to the poles and involved because we are going to win because we have the numbers. We're waking more people up every day. My websites, your websites, your show, people all over the country, we're raising up an army and we can do this, if we work together. |
|---|---|---|
| Alex Jones: | 00:51:35 | And by the way, uh, you know, I have a small crew, I've been meaning to do it, will you call my crew today? I want to carry your books, uh, because I've read several, they're all excellent, but, uh, you're living a life that really matters, things like that, and you're doing just such important work and again, I'm so glad that despite the fact you had been successful in your own private business and successful in education, and successful, uh, you know, in news, that you're running for congress. I mean, this is really such a manly thing to do, and I don't mean to be cheesy, being manly means putting your family on the line, putting your name out there, and, and getting engaged and involved. |
| | | Because you've got a great family, I know, so we just admire what you're doing, Micheal. |
| Michael Snyder: | 00:52:13 | Well thank you, Alex, and even though I just announced I'm running officially two weeks ago, the attacks are already coming in. They're already attacking me, they're attacking the people I'm associated with, and, and so, I'm already ... it's kind of like walking into a hornet's nest, but we've gotta do this, because, they, I believe this is the most critical time, if, if, if they end up, if the democrats take control, if they impeach Trump, if they get rid of him and they, you know, they start shutting down alternative media, we could lose everything. But, if, if 1000 people all over the country start running for office, taking back state legislatures, taking back congress, taking back the powers of structure all over the country, we could have a revolution and turn this country back to limited government, liberty, freedom, the second amendment, the things we care about, the things we've been fighting about for seven years. |
| | | You know, Alex, my articles have been appearing on Infowars.com for seven years now. We've been fighting |

together, we've been fighting this battle, we've been trying to wake people up, you know, and now we need to go to the next stage because now the war has got hotter than ever before and if we don't win, the, the, the elite, the globalists, they are going to try to en- entirely destroy us.

| | | |
|---|---|---|
| Alex Jones: | 00:53:24 | You're absolutely right, Micheal Snyder, let's talk about the Mueller situation because Trump has gotta go with his instincts. He's absolutely right. They got bamboozled, they got hoodwinked, they got stampeded, and I really like Senator Sessions into this recusal so that his deputy could then put Mueller in. If it was somebody else that wasn't best friends with Comey, didn't cover up for the Bush's and the Clintons, then I would say, "Okay, have a special counsel" |

If Mueller presided for a decade over some of the greatest abuses bipartisanly we've ever seen, he took off the list radical Islam and would not let the FBI investigate radical Jihadis and basically ordered them to stand down, that's confirmed. This guy is a globalist. You've got Brennan, you've got Clapper, they're all just incredibly arrogant. I want to get into that, but first let's get into McCain.

I don't wish harm on anybody and I've had family that have had cancer and brain tumors. It's no joke. I also know from a friend who had a brain tumor and didn't make it, they got very aggressive, very paranoid the last year of their life before they even knew they had a brain tumor and it killed them in about two months once they learned about it. Uh, McCain has been acting very erratic the last year, he's been acting very crazy. Remember back at the Comey hearing people said, even his own supports said something's wrong with him.

But this is a guy that was part of the Keating Five. This is a guy who want's to say that everybody that's against him is a Russian agent. This is a guy who funded Al-Nusra, Al-Qaeda, and Isis and went and met with them in Syria and admitted it. This is a guy on the news who is proxy saying Trump's a Russian agent. That's in the Washington Post today, uh, because he, eh, is working with Russia to take out Isis and Al-Qaeda, that predates Trump getting in. The Pentagon made that deal. So now battling radical Islam and you're supposedly Isis, or, or, or battling radical Islam, you're supposedly, uh, a, a, a, a Russian agent, that's the Washington Post saying that today, this has reached new levels. He's got this brain tumor, some people might say it's foul play, they do have viral based weaponized cancer. You can actually spray on somebody and they can breath and it actually does create these type of cancers in the cerebral context, but you

know, McCain's old, and, uh, this is probably naturally occurring, uh, though brain cancers of this type have magically increased. SV-40 that's in a lot of the, uh, vaccines, uh, you know, has also been linked to this. That's one reason this cancer has increased.

So we can use his tragedy to hopefully inform some people you know, I hope McCain get right with God, I don't wish any harm against any living thing. I don't take pleasure, uh, uh, you know, out of a cow dying even if I eat a steak. Uh, but you know, and, and I don't take pleasure in an evil person having a brain tumor because I still have empathy for them but talk about an omen. David Rockefeller, the founder of modern world government, founder of the modern UN, uh, David Rockefeller dead this year, [inaudible 00:56:22] one of this generals, uh, for world government dead and, and now we see, uh, McCain, you know, the current ... Tim Cain called him the leader of their movement, their, their chairman, and he his quarterbacking the attempt to stop, uh, the make America great again movement, so this is an omen.

What do you make, uh, and I just wonder, will George Soros get fast acting cancer, not delivered by patriots and the CIA, but by God?

| | | |
|---|---|---|
| Michael Snyder: | 00:56:51 | Well Alex, a lot of these, [inaudible 00:56:52] comes a lot of these globalists, they are getting older, they're dinosaurs now and they, they're starting to die off, they're starting to retire and so we need to replace them with fresh blood, with, but with McCain, I found it interesting that he has brain cancer because something else that's been linked to cancer are cell phones and what I've been finding out is that, a- as I've been digging into this a- you know, what you, members of congress, they spend more time out of their day on the phone than anything else. In fact, when new members of congress, when they go, what they're told is they're supposed to spend about two hours a day on the floor and in committee actually doing their jobs, and they're actually supposed to spend about four hours a day on the phone, dialing for dollars, 60 minutes did a big expose of this where what they do, they spend more, our members of congress, when they're working, they spend more time during the day, uh, dialing for dollars, they spend more time during the day, uh, calling people up asking for money than anything else. |

And that's when they're working. Members of congress only, uh, for example, the house will-

| | | |
|---|---|---|
| Alex Jones: | 00:57:50 | Exactly, and Johnny Cochran died from the type of brain tumor that's associated with cell phones. It was concerned decades |

ago in rat studies that it does heat up the DNA, it causes it to rattle and then it breaks the chains, then that causes mutations in the brain tissue. Everybody should be using hands free. No one should let their kids, uh, you know, be on these unless they're using a hands free or blue tooth and it's still dangerous. Uh, you're absolutely right, but notice, the Atlantic can say did it give him a brain tumor because they're establishment media. If we say cell phones are linked, it's a conspiracy theory, but they are having that debate now.

| Michael Snyder: | 00:58:24 | Oh, it's very true. And, and so people, people need to be aware, when you're holding that cell phone up to your head for you know, endless hours, you're literally cooking your brain on, at a very low level. But, uh, you know, me- but these members of congress, they spend more time on the phone than anything. If that's when they're working. Er, the, the, the house of representatives, Alex, will only be in session for 147 days this year. That means they have 218 days off. They work, they work for less than three days a week, and when they're working, like I said, most of the time they're on the phone. The republicans and the democrats, they're not allowed to make calls directly from their own offices, so they've got these giant call centers very close to the capital. |
|---|---|---|

And what they do, wa- the reason why you almost always see the house chamber or the senate chamber empty, because they're all over at these call centers, they're calling people trying to raise money for the el- next election, trying to keep the establishment in power, that's how congress really works.

| Alex Jones: | 00:59:16 | That's right, and major courts have ruled that cell phones are causing brain cancer. It's a fact, just like glyphosate literally grows cancer, but they told us it was healthy to drink. This is incredible. Why have the elites allowed glyphosate, cell phones, all of this, all this wifi, all of it, when they know specifically it rattles DNA into pieces, then when you have DNA in pieces, that is a mutation, cancer of course is the most classic mutation with malignant tumors. |
|---|---|---|

| Michael Snyder: | 00:59:43 | Well I think for the sa- some of the same reasons why they are putting fluoride in the water. They know fluoride is a neurotoxin. They know that it has effects on the development of young children, they know that it's dumbing down the population but they're putting it in there anyway. They say, oh, it's good for our teeth, when it shows no, it actually causes some very serious conditions for teeth, now we- |
|---|---|---|

PART 2 OF 6 ENDS [01:00:04]

| | | |
|---|---|---|
| Michael Snyder: | 01:00:00 | So, no, it actually causes some very serious conditions for teeth. Now we got children all over the country with those little white spots on their teeth. That's from the fluoride in the water. |
| Alex Jones: | 01:00:09 | And the American Dental Association says children under six should not brush their teeth with fluoride and the media calls me a conspiracy theorist when that's the American Dental Association, six years ago, forced to come out and say that in like 2011. People can pull that up. And admitting it increases bone cancer in boys. Admittedly causes lower IQ's, Harvard study. But they don't care, they just call us conspiracy theorists. |
| Michael Snyder: | 01:00:34 | Yeah or Alex, vaccines in California, where they passed that bill making it mandatory to have vaccines if you want to go to a public school. Now they want to bring out a bill where it's gonna make it mandatory for every child in California to get vaccines. You know what, and these, these laws are starting to spread all over the nation. There's talk that they want to start pushing 'em here, in Idaho a deeply red state. We've gotta fight this we've gotta let people know. These vaccines, you know, uh, uh, that, why, why has autism just exploded because of these vaccines. Kids are getting shot with these, these vaccines, and one day- |
| Alex Jones: | 01:01:04 | And by the way, there are thousands of studies admitting that Thimerosal causes autoimmune results in the brain and other things and they just say conspiracy, conspiracy, our vaccine is safe and effective. Never hurt anybody. The, the, the insert say's it can kill you or cause an autoimmune disorder or give you type I diabetes by killing your pancreas. On and on and on and on and on and on and on. But people won't read the insert. They just say conspiracy theory! It doesn't matter while you were talking we put Scientific American on. We put even the Washington Post on. Even CNN on. Even Newsweek, admit all this now. We've been totally vindicated. |
| | | But they pre-tell you it won't hurt you to make you comfortable so that your brain decides it's safe, like them tellin' folks cigarettes were good for your lungs in the forties and fifties. Even though they knew it caused cancer. So that you go ahead and get addicted to the cell phones. Go ahead and give em to your kids and then later to cover their ass, they tell you actually, it kills ya. So I tell ya, very diabolical plan by these lawyers. |
| Michael Snyder: | 01:02:03 | Yeah and then something else that's in our water Alex is all the pharmaceutical drugs.  Where, you know, We're the most drugged up society in the history world. But all that gets in the water and so a major study was done not to long ago where they looked at the water, they looked for traces of |

pharmaceutical drugs and they found that more than half of the water systems in the entire country have more than twenty four different pharm ... traces of pharmaceutical drugs in them.

| | | |
|---|---|---|
| Alex Jones: | 01:02:27 | And it's causing massive mutations in mam ... mammals, amphibians, fish, you name it. And they make big jokes out of that as well. Since you mentioned it, let's go ahead and go to this clip. Former director of National Intelligence, James Clapper totally sold out the country. Trump is making Russia great again. Uh, uh in, in Ukraine, I mean, Soros overthrew an elected government. They started a civil war. Russia jut took control of the east and their pipelines, this is making Russia great again. Here it is. |
| Chris Matthews: | 01:02:55 | Do you think, uh, our President's helping, uh Russia be great again? |
| James Clapper: | 01:03:01 | Uh, in a, in (laughs) yeah in a way I guess, he is. Uh, particularly, if, uh, as Putin, you know gets his way in a Syria. And if nothing is done to push back on the Russians in the Ukraine um, yes. |
| Alex Jones: | 01:03:21 | Helping the Russians push back in Ukraine when George Soros and the State Department of Obama over-threw the elected government. Look at this Washington Post headline "Trump End's Covert CIA Program to Arm Anti Assad Rebels in Syria, A Move Sought by Moscow." A, sought by our Pentagon that testified to Congress in close session five years ago, that we then had guests on and was later confirmed. Uh, yes. Russia is against radical Islam too. Yes, we shouldn't be funding the very rebels were fighting. I mean, again, if Trump puts his shoes on right, they claim the Russians did it. If Trump doesn't want everybody to live under Islamic rule, it's the Russians. Yes the Russians are against radical Islam too. What do you make of this, Michael Snyder? |
| Michael Snyder: | 01:04:03 | Well I'm so glad that Trump made that move. It's a giant step in the right direction. But you know what the neo-cons, both Democrats and Republicans, they want us to be the police of the world. And that's why we need more people like Ron Paul who says we can't be the police of the world. First of all we can't afford to do that and secondly when we keep poking our nose in everywhere, then we have to send our boys and girls over there to bleed and die, and you know and, and, and the rest of the world starting to hate us 'cause we're constantly interfering or constantly starting wars. Were constantly the military industrial com, com, complex, constantly wants more war. They constantly want more ... |

Alex Jones:          01:04:36          And finally Trump is over there cleaning up Obama's mess in the middle east, cleaning up the North Korean mess. It's a president pragmatically, actually pro free market and not a pedophile and not out to get us. Michael Snyder for congress.com. Folks should support ya. And get involved in that. It's we the people that are backing you if you win, not the Russians. Again they're telling us we're all losers. You didn't know the Russians had your wife have that baby too. And when you breathe Mr. Snyder, it's not you breathing, the respirator is provided by the Russians as well. And when I got up this morning and made eggs for my family, that was the Russians as well. Ladies and gentleman you didn't elect Trump, it was the Russians. Michael Snyder, thank you so much. We have the founder of the Rebel Media straight ahead, stay with us.

(singing)

Only way the globalist can win is if you remain asleep.

(singing)

I'm committed.

(singing)

Sworn to avenge.

( singing)

I'm Alex Jones, your host.

(singing)

And I am the sentinel. We're all, no matter what color we are or where we came from, if we want justice. If we love truth. If we love to take care of the innocent. If we want to be honorable. If we wanna be strong. If we wanna take on bullies. Then that's the spirit God put in ya. That's the light shining out in the dark. Were all brothers and sisters in that fight.

We're getting our next guest on. Got a bunch of other guests today. Ton of news to get to. But there's no doubt now, their coming after Trump. The corrupt, evil Mueller, who covered up for just outrageous Islamic terror, crimes, Clinton corruption, espionage for the communist Chinese. Is now saying their going to look into every bank account, every transaction stuff that's non-Russia related. Tryin to bring down President Trump,

because he told the special interest that had hijacked our country and transferred the power to the TPP and to NAFTA and GATT and these international agreements. He said "no! We're not turnin off all our coal when nobody else does. We're not gonna have wide open borders and order the border patrol not to stop people comin across illegally." And that's down sixty-nine percent. And so they're panicking.

Now briefly, we've got free shipping until the end of July. And we're selling out a lot of the best selling items like Super-Male Vitality, uh, X2, Brain Force Plus. So I'm already stopped selling Brain Force Plus at thirty percent off. I ju, just had to, 'cause we're about to sell out. Probably be out of it for like a month. Um, so those specials are gonna end today on Super Male on X2, the good halogen, that goes in and obviously blocks the bad halogen fluoride. It's amazing. It's the cleanest, purest Iodine out there from deep earth crystal sources. We have Caveman it's the ultimate bone broth, Paleo diet formula. And by Paleo diet, I mean what the ancients ate across the board knowing the bones, uh, had all the trace minerals, the elements in it. The co-factors, the stem cells, all of it. Then you got the chaga mushroom and the rest of it in there. It's simply the very best out there. The tumeric, the bee pollen and many other high quality ingredients that help. For healthy muscles, bones, fights free radicals and so much more.

Caveman is back in stock after being sold out for months and this is now the top bone broth seller in the country. And bone broth as you know is very, very hot. But compared to just something you cook on your stove this is very, many, many, many, many, many times more concentrated. It is chocolate naturally flavored. It's all organic. Infowarslife.com. Caveman is back in stock and, and other brands of bone broth formulas are, in some cases twice as much. Usually about 20 percent more. So it's also a very, very good deal, then you're funding this operation, our expansion.

Infowarslife.com, infowarsstore.com or triple eight, two-five-three, three-one, three niner. But a lot of the specials are going to have to end today, the free shipping continues throughout the month. Take advantage of that. We now have one of the top manufacturers of organic whey. From grass fed non GMO cattle. With none of the growth hormones, non of it. We now have one of the top brands in the country, lets us private label it and again it is way less expensive than it would be in stores. Buying it direct from us, private label, true whey protein.

We know we're under a microscope plus we want you to get great products so you come back and get em again. It's a win-win. This is one of the top makers in the country. We private label it. It's super high quality totally tested. True whey protein, premium quality with nine essential amino acids just came out today. Infowarslife.com or triple eight, two-five-three, three-one, three-nine.

And they do have community guidelines, like the old Soviet Union. Oh the community doesn't like you, you're gone now. And, and, and google's in trouble for doing this. They got anti-trust suits going on where they let leftists groups and they expunge the internet for Hillary and cover up all her corruption and Obama and the rest of it. Where they let these little knighted groups, these little super mods go round and say "oh we find this offensive," "we find that offensive." And then just put a strike on your account and their set to shut down our channel. Which is, I've already told google before and the last time they pulled this and they backed off. Lawsuits ready. We've got your internal documents, where you hired the company to de-list us, we've got a bunch of other stuff too. Which is fine.

And I know it's a big, huge corporation and everything else, you let your little communist mods go around and do that. You give us the standing take down the channel with billions of views and you are going to have a big publicized, big fat juicy successful lawsuit on your butt. And you think the stuff in Europe's big, just get ready. And I, I don't want to sue people, but it's all ready and I'm done. So you people thinking your having a victory out there trying to shut us down, just get ready. And the next person puts a false copyright claim in too. I'm, I, I, I promised and it's ready. And I'm going to sue you. It's gotta be done. I've made the decision. I'm done.

Oh and people that like to sue us and then secretly pay us to, to drop the lawsuit. I figured that scam out where you want to make it look like were fake news, you're gonna get sued too. Anybody else false lawsuits you're getting sued. Guaranteed! Set your watch and warrant by it, put it in the bank, you can guarantee it! You can guarantee it!

Now joining us is an individual who was successful in libertarian, conservative media in Canada. And of course inside shenanigans went on to blow that up, uh and he joins us, Ezra Levant, founded therebel.media. It reaches hundreds of millions of people, now, every month. They've had their share of folks tryin to censor them and shut em down. They're international. I really admire their lineup of folks. From Tommy Morrison, right

through to Gavin McIness and so many others. But again I'm not in competition with the rebel, I'm glad they're there. We're in this together. Therebel.media subscription base, just like you buy our products to support us, you just subscribe with them. And you're building a new media and the more of us there are the better. The safer it is. (laughs)

So he just got back. We almost sent Joe Biggs to do this but it fell through. And, and, and other groups were involved. To go in with other former special forces and some patriots, we'll just leave it at that. Uh, I don't know about other groups, not this particular one. Uh, but, I know for a fact Eric Prince does good stuff out there. They call him a mercenary, he's not in my view. To expose the pedophile rings, you name it. I don't know if that's the group financed him, but to go in and actually save Christians being murdered, slaughtered, put into sex slavery, in the few cities left that ISIS slash Al Qaeda has control of, so that's something I know Erik Prince has been doing for years, behind the scenes. Saving thousands and thousands of Christians every few months. Well this gentleman went into Iraq into the most dangerous areas. Ezra Levant, he just got back so uh we wanna thank him for his courage and what he's doing to talk about this.

And the Washington Post saying Trump's a Russian agent today, basically, for going along with the Pentagon program that's five years old, of not backing ISIS and telling em the Democrats "no." They're now saying that that's a Russian program helping Moscow, that we're not backing the lobbyists, ISIS Al Nusra, Al Qaeda. Well you just came back from there, where they admittedly sometimes rape little girls to death! So Ezra Levant founder of therebel.media, thanks for joining us.

| Erik Levant: | 01:13:16 | Well Alex, it's a pleasure to be here and, and first of all, thank you for your kind words about the rebel. You're a real trail blazer in alternative media and that's what we need these days. To cover stories that are off the official narrative. And Alex, the media and politicians and diplomats never stop talking about Muslim migrants, they call them Syrian refuges. Most aren't Syrian, most aren't true refugees. But ignored are the Christian refuges who are actually at risk of genocide. Here's a quick fact for ya. In two-thousand seventeen, the official United Nations budget to help Muslim refugees is four point seven billion dollars. But no one is waging a genocide against Muslims. There's no ethnic cleansing of Muslims. But there is ethnic cleansing of Christians in the middle east. And they're not even allowed to go to these UN refugee camps 'cause those UN refugee camps are dominated by Muslim extremists. The |

Christians, if they flee there, will be violently assaulted there. So these Christians are forgotten and we went to these ancient Christian towns where they're literally being ethnically cleansed by Muslim terrorists.

| | | |
|---|---|---|
| Alex Jones: | 01:14:32 | Break it down because this is simply amazing. These are the forgotten people. |

| | | |
|---|---|---|
| Erik Levant: | 01:14:36 | Yeah.  I mean these are ancient Christians who actually still pray in Aramaic, that is Jesus's language. Some of these Christian communities have been there for fourteen hundred, fifteen hundred, sixteen hundred years. And it used to be a Christian area. Just like Egypt used to be Christian, just like Turkey used to be Christian, Istanbul used to be called Constantinople. But over time, wave after wave of Muslim jihad, has ethnically cleansed the Christians. They kill the men and they take the women as rape slaves. Because that is officially permitted in the Koran. And so we, I met a Yazidi woman in Germany, when I was on another trip, Yazidi's are not Christian's. They're not Muslim's they're, uh, uh individual ethnicity. But they have blond hair and blue eyes, Alex. So the Muslim terrorists prides these women as rape slaves. I met a Yazidi rape slave, who said she lost track after she was raped two hundred and forty times. And ya have to understand in the Islamic state that's not a crime. That's actually officially sanctioned. That's one of the ways they pay their terrorists is in stolen property- |

| | | |
|---|---|---|
| Alex Jones: | 01:15:55 | And Linda Sarsour won't even come out and criticize it. |

| | | |
|---|---|---|
| Erik Levant: | 01:15:59 | No. And what breaks my heart Alex, is I went to these Christian towns and I saw these all Christian refugee camps. These people are completely ignored. Politicians, the media, diplomats, NGO's they favor the Muslim refugees but they ignore the Christians. I say, we've gotta sort the lambs from the wolves, Alex. Most of the people flooding into Europe are not lambs. They're wolves. |

| | | |
|---|---|---|
| Alex Jones: | 01:16:26 | Well even Interpol admitted eighty percent are military aged men, but expanding on that, I've seen the statistics. Where less than one percent, in fact it was just a few sub-points of the refugees are Christian, and then Obama jokingly about a year ago, said "well we just can't only let in the Christians. We gotta let in the Muslims." But in truth he laughed about it, because he knows the U.N. program discriminates and doesn't even let Christians get out, because they're slated for extermination. Why is that? |

| | | |
|---|---|---|
| Erik Levant: | 01:16:56 | Well it goes back to the Koran, the Koran talks about converting any infidels. And so when we were in Iraq we saw an Islamic |

state edict. Remember the Islamic state is like a proto country, so they have judicial announcements they're called fatwas. And any Christians in these little towns, these little towns that have been there for more than a thousand years, Alex, they, they're given an ultimatum. Either flee, uh, pay the jizya tax out of submission or be killed by the sword. So this is rooted in the Koran. And they kill the men, they rape the women. I went to a church in the little Christian town of Batnaia, that was conquered by ISIS, held by, for two years and only recently liberated. The Christians have not yet returned to this ancient town. I went into the church and I saw anti-Christian graffiti, like "we will kill you," "leave or be killed," " this is muslim property," "there are no Christians allowed in the Islamic state." It was written in arabic, but it was also written in German. And that tells me Alex that there were German muslims that went to Iraq to rape and plunder and desecrate these churches.

| Alex Jones: | 01:18:22 | And under this whole Islamic rebellion Arab spring that the democrats, the globalists, NATO and others, the UN have been behind publicly. Military aged men go like on hajj basically, but jihad were it's like a pillaging, raping vacation where they go out to earn their bones and have their rights of passage, raping, killing, murdering. I mean this is all admitted and the UN brags that this is all a part of their replacement plan for Europeans. I mean, why is the left so in love with orthodox Islam? |

| Erik Levant: | 01:18:59 | Well, I suppose it's the same reason why the left was so sympathetic to the Soviets during the cold war. Leftists always side with the most acute enemy of western civilization. Until the fall of the Berlin wall, leftists sided with the Soviets. Um, because they thought, well that's the counter-weight to western civilization. Today it's radical Islam. It, so it's not just that the radical Islam is the enemy of the west, it also is an opportunity for these virtue signaling leftists to show how open minded they are that they will tolerate their own enemies. Which, so, what's so ironic to me, and this is what I never understand Alex- |

| Alex Jones: | 01:19:38 | That's why we've seen a lot of these leftists women go to be the sex pleasure objects. Including quite attractive women from all over Europe and the US, go to literally live in fleas and ticks with guys that wipe their butts with their left hands and just stink like pig demons. But they just, women just go and worship the filthiness and worship the the, the fleas and ticks and lice. I'm no- I mean I'm not kidding, these women are just loving this. Because I guess, their so cuckold from men groveling and kissing their butts in the west and putting em on a pedestal, they don't like that. But to be savagely just treated like slaves, they love it. |

| | | |
|---|---|---|
| Erik Levant: | 01:20:14 | It's terrifying in Mosul, which is the big city that the Islamic state recently lost to allied forces. There were some Canadian women who voluntarily went out there. They either go to be halal prostitutes to service these men or their duped in some way or they're, or they want to be part of the jihad. It's really troubling, but you make a good point. A lot of these, uh, terrorists, they come from the west, go to Syria and Iraq. They get a taste of terrorism, rape, murder, defacing Christian objects- |
| Alex Jones: | 01:20:50 | And then they come back to Europe and go to the anti racism concerts to openly rape and the police just stand there and guard the raping and then judges rule, well this is a muslim, he's allowed to rape it's his culture. |
| Erik Levant: | 01:21:01 | Well and the thing is their coming back as battle hardened veterans in a way. Because they, they did it in Iraq and Syria, so they've tasted blood and whatever moral compunction they might have had, they're over it, so they're numb to violence, they, they love it, they practice it and now they've returned to the west. And throughout Europe and we've seen this terrorist attacks in Belgium and France in particular have been from Isis terrorists who learn their trade in Iraq and Syria and have come back to the west- |
| Alex Jones: | 01:21:34 | And you know what's crazy? We have Ezra Levant the founder of the rebel.media, amazing uh, uh, television, radio network, news-site that's reaching tens of millions a day now. We were not exaggerating. I can't come up with words to describe how much worse it is than were saying because by the minute more insanity comes out. I mean we have videos at in Sweden and Germany of them holding women down and lines of men raping them and the police are fifty feet away and do nothing. I mean, it, it's, I, I mean they literally rape little kids in pools and the police say well that's their culture. I, I mean it is just insane asylum. Ins-eh-ye-I-I-I'm just wondering, and meanwhile, their saying Trump's a Russian agent because he just killed the Obama program to arm Isis. |
| | | We'll be right back, stay with us. |
| | | Ezra Levant, (singing) therebel.media, the founder of it. He's heading back on soon about his whole story, you know having his successful, uh, kind of the Fox news of Canada but more libertarian. Uh that all got shut down and then it was successful and he started this a year and a half ago or so. But, but just getting back to Iraq and what's happening, as the final cities of the liberal globalists Saudi Arabian backed ISIS Fall. We have the Washington Post saying "Trump Ends Covert CIA Program to |

Arm Anti Assad Rebels in Syria, a Move Sought by Moscow."
Well the Pentagon said stop doing it five years ago, to Obama.
So, just because Russia is aligned, not wanting to back radical
Islam, blowing up every church, sex slavery-ing everyone. How
does that make Trump bad? I've got democrats all over the
news saying no one is allowed to talk to Russians. Why Trump at
a dinner at the G20 talked to Putin? It was a dinner! They seated
his wife by him! The G20 did it on purpose probably to say
Trump was some agent. They're trying to paralyze the
president. How do you think all this is going?

Erik Levant:    01:23:29    Yeah, well, I tell ya, it has been terrifying that all of these so-
called militias in Syria, they have undermined Basher Assad who
I'm not gonna say he was a good man in any way, but he was at-
at least a protector of the Christians. Same way, eh I mean,
without him look at the anarchy. Same thing in Libya. Muammar
Qaddafi not a liberal civil-right's lover, like we expect in the
west, but at least he held back the Islamist wave. Same with
Hosni Mubarak in Egypt. So we ... we made the perfect the
enemy of the good. I'm not saying I would like to live under any
of these Arab dictators. But the hell that was unleashed when
they were toppled, was far worse, and let me say the Christian
community in Iraq, it really is being ethnically cleansed. That's
why we went over there. Alex, I'm a jew and so I looked at this
ethnic genocide against Christians through the eyes of someone
who understood the holocaust and I see so many analogies.
And-

Alex Jones:    01:24:36    Or the Armenian genocide. It touches everybody's heart to just
see people being, whole families hunted down, the men killed
the women raped, murdered thrown away.

Erik Levant:    01:24:46    Well and that's the thing. Armenia was just north of there. So
these Christians have a really tough go. So we went there to
document the Christian genocide and to bring a little bit of
humanitarian relief. And if people want to see our videos they
can go to savethechristians.com, we've put up about fifteen
videos, including from these destroyed churches. You can see
them at savethechristians.com and if you want to help with our
humanitarian efforts, you can do that too. It's a, and, and I want
to tell the story of these Christians, 'cause so many people
ignore it. They're obsessed with the muslim refugees. No one's
killing muslims in an-

Alex Jones:    01:25:22    You're absolutely right and again, the UN is basically not letting
Christians get out. We should do another video, remember
Obama laughing last year going "hah we can't let the Christians

|  |  | out, we can't just take care of them." No he's blocking them on purpose, because he is a closet Islamist. It's been proven. |
|---|---|---|
| Erik Levant: | 01:25:39 | Yup. Well, and, and hopefully those numbers will change now that Donald Trump is, a, choosing the refugees. But so far- |
| Alex Jones: | 01:25:45 | But like you said, the Christians can't go to refugee camps to begin with, 'cause they'll be killed by the religion of peace! |
| Erik Levant: | 01:25:51 | Yeah, that's true. Well, listen Alex, I, I appreciate you spreading the word about this and thank you for your kind words. We're gonna keep up this fight, because it's the one group it's okay to demonize in western civilization is Christians and it not, it ought not to be that way. And I know you stand up for their civil rights and we do to my friend. |
| Alex Jones: | 01:26:10 | Absolutely. Well, uh folks can find out more again at therebel.media, and I absolutely for the nightly news wanna get you back on and review some of the boil down or highlights of the amazing video you've got posted, this is real journalism and dangerous. So thanks for doing that, uh Ezra Levant. |
| Erik Levant: | 01:26:29 | Thank you my friend. |
| Alex Jones: | 01:26:29 | Alright, hour number three. Were gonna get to a ton of news items ahead, more on McCain, more on the witch hunt against Trump. More on the economy, so much more- |
| Speaker 19: | 01:26:39 | Thank you for listening to [inaudible 01:26:39]. |
| Alex Jones: | 01:26:38 | We've got john Rappaport comin up too, stay with us. |
|  |  | At the bottom of the hour, I'm gonna take some of your phone calls. We're gonna be joined by Jon Rappaport comin up here in the next segment [inaudible 01:26:47] and the host of Fourth Hour. |
|  |  | John McCain, you know I'm not a fake, and so, I'm not gonna sit here and tell you that I am having nightmares over the fact that John McCain has a big fat brain tumor, or had it removed and that it's probably not gonna be operable. And that he won't be with us for too much longer. So not gonna lie to you and tell you I'm losing sleep over it. But I'm also not gonna tell you I'm glad he's dying. 'cause I'm not. I'm very sad for John McCain. He's a very, very twisted person. He's been compromised since the Keating Five, which was totally illegal. Ripping people off with fake bonds. And you go back to Hanoi Hilton where he was |

taken care of for given em all the secrets. That's been confirmed. The guy is not a hero in my view. Of course Donald Trump knows that when he said that McCain's no hero. His dad was an admiral. The head of the pacific fleet. He's a consummate insider. But that said death is the great equalizer. And I don't take pleasure when I heard David Rockefeller died. I don't take pleasure when I heard Zbigniew Brzezinski died. I won't take pleasure when I hear that George Soros is dead. But I'll tell yeah this, I will feel relief. Because these are very, very, very, very bad people.

And I'm not gonna play along with everybody, that's virtue signaling saying oh, our hopes and prayers go out to John McCain ... and just for the mere reason of sounding like I'm a loving compassionate person, because its hard to say nice things about john McCain when he's so evil and funded Al Qaeda and funded Isis and get all this. The bible says, pray for your enemies. So I can't help but say pray for John McCain. But I don't even like saying it, I'm just being honest. But I guess pray he wakes up. Pray he, ya know, jus, turns around, and that there's some good left in him. And that he, repents for funding and, and, and supporting the massive middle eastern destabilization turning radical Islam loose on other muslims Christians, you name it.

I mean it's just, the guy he quarterback, as Tim Caine said, he was, is the chairman. Let's pull up Tim Caine's tweet. I saw it last night at about seven thirty, right when it went out. I was searching McCain news, when the brain tumor news broke. There it is. Thinking about my hero. My chairman. My friend John McCain. Stay strong. His chairman. 'Cause let me tell you something. He is chairing, not just committees, he's chairing the operation to bring down the Make America Great Movement and to put the deep state back in full control. And he's all about bringing in radical Muslims and going after our guns and he supported original Obama care.

But of course we haven't seen Obama care repealed. Because it's what the republican scumbags at the top wanted. They're the same ones against Trump. The never-Trumper filth. The, the, they have some good rhetoric. They some good talk.

PART 3 OF 6 ENDS [01:30:04]

Alex Jones:          01:30:00          Th- th- th- they have some good rhetoric, they have some good talk, but they don't deliver. So, the media will probably edit what I've said about McCain, take it out of context and say I'm glad he's dying. I'm not. I've told you what I really think. It's

nuanced because it, the world is complex. I don't like McCain, but on a spiritual level, it feels like bad luck to me to say, you know, he's getting what's coming to him or something like that hypothetically because I don't take pleasure in it, but when somebody is a convicted pedophile or been caught with hundreds of kids, like Sandusky, uh, and, and, and, and the deputy pope and people and they're particularly in priest robes because you know they love to care out the satanism that way because it's more blasphemous and it, they're just such defilers that ... I mean, I'm glad when pedophiles die.

I'm glad when child kidnappers die. And I'm not a violent person, I don't enjoy violence but my very instincts are very sharp towards these people and I've always said, you know, when they convict these folks of pedophilia, they convict these people of kidnapping kids, I personally, I will flip the switch to run electricity through their brains.

800-259-9231. Coming up at the start of the bottom of the hour segment, I will play a video that YouTube says violates their community standards for pointing out an article by Zero Hedge, that pointed out an anomaly in an NBC news report concerning Sandy Hook. And so I'm going to air this again and I'm going to challenge that it doesn't violate, uh, the rules as being selectively enforced and that's it's a form of civil rights violation of the first amendment and discrimination. It's just like a big, uh, credit card processing company that we're looking at suing, I just have to do this. I have to start some lawsuits against violators just to, just to fight for my rights.

They told us, "We're not going to let you process credit cards and debit cards with us even though you have a, you know, Triple A standing, five star rating, absolutely established 22 year credit card processing company, that has the other big three credit card processors hooked into our system, not just PayPal, we're not going to let, do business with you," and they were dumb enough in emails to say, "Because of our political views."

You think a gay couple can sue and win money because somebody wouldn't make a cake but then you guys say because of my political views and what's misrepresented that I am not allowed to engage in commerce? You people are crazy. I've run this by litigators, top law firms, it's win, win, win, win, win. And I don't want the money from these suits. I don't want two years and then they get to depose me and I get to depose them. But, I'm going to, I'm going to subpoena CEOs and people. I'm gonna start going after folks because I can't put up with it anymore.

So we're going to air what YouTube says you're not allowed to see. Coming up, it's only four minutes long, it's Owen Shroyer with a zero hedge headline. And we're going to go to your phone calls with our guests, John Avaport. But hey, good luck guys because I'm launching more shows, more video platforms, our own video platform has millions and millions of viewers, every few days, we're not backing down, we're not giving up, we're getting more affiliates across the United States because America is done being intimidated. America is done bowing. America is done being called racists because you didn't want Obama Care written by insurance companies and republican fat cats to screw everybody over with the democrats.

American's across the board of every political strip, of every skin color, of every religious background including Muslims that don't want to be under radical orthodox Islam are sick of oppression and we want freedom and we want it now. Coming up the bottom of the hour, I'll show you the letter from YouTube and what they say is not allowed. We're going to play the evil video. Zero Hedge discoveries anomaly in Alex Jones's hit piece. And all it is is Owen Shroyer playing two clips off the news side by side. And if they can sensor that and if they can shut us down for that, they can shut anybody down and Twitter announced today< "We've begun 10 times the censorship we were doing last year of anybody criticizing people we don't like." They can have the left sing kill Trump, kill me, whatever, but let me tell you, you call somebody a liar, you call somebody an idiot, oh, they're going to shut you down. They got their trendy CEO up there. They got their trendy ... yeah, click on that for TV viewers. This is how it's happening.

Notice YouTube and Twitter and Facebook are all announcing the massive censorship launces now. Well, Google, we have the internal purchase order, millions of dollars to shut down Info Wars, saying Ron Paul's not credible, saying that the Syrian rebels were caught launching their own chemical attack and reading a UN report. No, it's that Ron Paul is credible and they said, 'Due to him opposing a Syrian war, and Jones having on these guests, we're going to delist him. But we're going to do it secretly because it's not credible.' And they listed Ron Paul and that I then played a clip of a congressman, and that it was, that it was too influential. They said, "He, he plays a congressman and then he plays Ron Paul and then he, he has a Sy Hurst clip and it's just not credible."

Because it's admitted that the Syrian rebels launched at least three chemical attacks. Congress has had hearings on it and confirmed it. The UN admits it, be se- because it was so credible

that I went bam, bam, bam, here's the clips, and said, "We shouldn't get in a longer war and deep state wanted, that." Then they shut it down. There it is, Ron Paul, zero chance Asad behind chemical weapon's attack in Syria, likely a false flag. I played that clip, I play Cy Hurst and I played a sitting congressman saying the same thing, and because it had consensus and because they showed the UN report, and then we showed the rebels admitting they did it, because it was so credible, they put out a multimillion dollar contract to delist me. And then guess what? Congress is investigating it and so is the White House for antitrust, that case.

And you notice now, that contract's been canceled and google came out a week later and said, "We did that on accident, we're canceling that contract." And then they started relisting us. Well, does Google think I'm dumb? When you've got your little knighted social justice warriors that are given these little chevrons? They actually give them little shield symbols and their email that they're super mods and then they can go ban our videos. (laughs) I can't wait to depose them. I can't wait to get their ISPs and drag them into court. You unamerican trash.

You want to shut us up because we are credible. You want to shut us up because you know we're pulling back the curtain. Look right here, Trump ends covert CIA program to arm anti Asad rebels in Syria, a move sought by Moscow, the Washington Post. Our pentagon five years ago on record, went to Obama and said, "We're not going to be part of being their air force." And said no, and then worked with the Russians to clear out the bad rebels and now Asad's preparing to have elections and leave.

And because our patriot military didn't go along with the deep state, we stopped a wider war. Now YouTube calls them YouTube heroes where you gain points going around shutting down free speech and you get directives, Google owns YouTube, they hire an outside group that then goes and then gives the orders to the mods so that Google can claim they weren't behind it. It's like hiring somebody to rob your neighbor's house or I guess kill your wife or something.

So, so, but you didn't do it yourself, you see. And they admit all this like we're idiots. Don't you know people, even though these are encoded emails are giving us the information? Showtips@infowars.com, whistleblowers@infowars.com, if you're working as part of these groups to do this, send us the data. This is how we're going to defeat deep state.

(laughs) Joining us is Jon Rappoport at nomorefakenews.com, he had that name 15 years ago for his website. He worked for some of the biggest TV and, uh, networks and news gathering and news papers as investigative journalist until he got de-disgusted with it over 20 years ago, he's a film maker, author, artist, you name it, nomorefakenews.com, and he joins us to break this down. What do you call this moment we've reached? Because they're coming for us, but every time they do, it causes a Streisand effect.

| | | |
|---|---|---|
| Jon Rappoport: | 01:39:17 | Yeah, that's exactly what it is. And because more and more people are waking up, and coming to the defense. You know, seeing what's really happening. They're fading. They keep trying and trying and trying but you know, these poles that show that six percent of the people are really interested or concerned about this whole Russia collusion insanity story that's being promoted and so on, all this give them a clue. They're operating in this gigantic echo chamber and hoping to convince people that because they all tell the same lies to each other, that other people are interested. Well it turns out that most of the people don't care. |
| Alex Jones: | 01:39:59 | I have a name for that. It's called a circle jerk. |
| Jon Rappoport: | 01:40:01 | Yeah. They don't give a crap about any of this. (laughs) You know? And so this gets exposed time and time again and the liars keep on lying. They can't turn back now. You know, it's like when you're, you've already jumped off the cliff and now you say, "Gee I wish I hadn't jumped off the cliff. I don't think that was such a great idea. Is there any way I can turn around in space and walk back up to it?" No, you're already falling. So what are you going to do on the way down? You're just going to keep screaming the same lies over and over and over again until you hit bottom. |
| Alex Jones: | 01:40:34 | So it's like Wiley Coyote when he runs out on the edge of a cliff and realizes he's already run too far and a second later- |
| Jon Rappoport: | 01:40:40 | Right. |
| Alex Jones: | 01:40:40 | He drops. They've already kind of hit that point, but what do they have to lose? |
| Jon Rappoport: | 01:40:43 | (laughs) Your guys are really quick here. They're putting it up and the screen already. Yeah. There is he off the, uh, too late. Couldn't do it. Couldn't come back. Hovered in midair for a second. |

| Alex Jones: | 01:40:57 | You said three or four years ago with Piers Morgan that it was a crack in the façade, it pulled back, people got deprogrammed for a moment, Trump's like a 10,000 times better than that moment, they are so panicked, don't they get that even if they destroy him, Toto already pulled the curtain back? |
|---|---|---|
| Jon Rappoport: | 01:41:11 | Yeah, they don't, they're hoping that's not true, but it is, you see, because as I keep saying, time and time again, it's, don't just think it's Trump. You know, it's everybody. It's everybody who wants freedom and demands it, freedom from surveillance, censorship, oppressive laws, child protective services, medical cartel, mandates that you have to get vaccinated with poisons. I mean, you can just stretch out the whole nine yards. It's everybody who's sick and tired of the government intruding on their lives and causing them pain, suffering and death saying, "We've had enough. Now we want something positive." Those people, all of us, we're not going anywhere. Where is there to go? |
| Alex Jones: | 01:41:58 | And there's nothing the globalist can do to convince us to go back with them. It's over. |
| Jon Rappoport: | 01:42:03 | Yeah. There's no way that you know, they can say, "Well come back on our side because we didn't really mean that or you know, we're not as bad as you think." No, they're worse than we think and we know that. I mean, we've had them in our sights for a long time. |
| Alex Jones: | 01:42:17 | How many top Catholics and university heads are caught running giant child rape operations? |
| Jon Rappoport: | 01:42:23 | Yeah, how many do we need before we understand the whole picture there? |
| Alex Jones: | 01:42:26 | These are literal devil worshiping pedophiles, folks. That's why they're into GMO and fluoride and poison and cancer and evil, because they literally are demon possessed. And I'm, I'm not kidding. I mean, it, when you come down to it, these are, these are just evil people. We'll be back. |
| | | Ladies and gentleman, we are back live, I'm your host Alex Jones, Jon Rappoport's our guest, he's got a bunch of issues he wants to get into. You know, Bill Clinton invited Russia to interfere on a US presidential election publicly. (laughs) Tell them to have the EU, the Saudi's, the pope, uh, all these foreign companies saying, "Don't elect Trump." I mean, it's just crazy that they keep pushing, pushing all of this, but just minutes ago, |

OJ Simpson walked out of his parole hearing, it's over, uh, and the word is they're probably going to go in, deliberate and then decide to release him after nine years in prison for stealing back some of his me- memorabilia in a, in a robbery, and I, I'm not an OJ Simpson fan, I, I'm just telling you folks that he spends nine years, Dennis Hastart rapes little boys, procures them for the republican party and others, they cover it up and he gets 13 months in federal prison and then is suing one of the people that he admittedly raped.

He carried the kids across state lines, reportedly. Uh, but he wants his money back. So again, what's wrong with this world? It's not that Simpson's black that he's been persecuted, uh, compared to Hastert, it's that he's not an elitist. You better believe if Simpson's crime was rapping little kids, he probably never even would have been in prison.

Instead, his crime is being an average citizen pretty much, uh, and not being involved in an elite type of criminal operation. What do you make of all this, Jon Rappoport of No More Fake News?

| | | |
|---|---|---|
| Jon Rappoport: | 01:44:19 | Well I think there's ... oh God, where do we start here? I mean, it's basically about Hastart and all the other pedophiles. They protect each other. They're in positions of power. They are the ones who can take a priest from here, uh, let's move him to Tasmania or you know, the arctic so that he's never prosecuted. Let's collude with politicians, fellow politicians who are also involved in the pedophile networks so that the case never goes to court or some small time bit player gets sent to jail but none of the elites ever get to jail. |
| Alex Jones: | 01:44:56 | So it's a big club and we ain't in it- |
| Jon Rappoport: | 01:44:57 | Exactly. |
| Alex Jones: | 01:44:57 | Why historically in every ancient culture is there a cult that takes over, whether it's African, meso-america, Europe, Asia, in certain periods, cults take over, build temples, and then rape and kill children. You know, in the bible they talk about different tribes taking virgins and killing them. Well virgins just means children. Why does this keep, uh, through sociology, anthropology, psychology, archeology, why does it keep raising it's ugly head? What's at the bottom of the rabbit hole? |
| Jon Rappoport: | 01:45:28 | You know, you said these people are evil. I don't think you really have to go much further than that. I mean, you can analyze why |

and so on and you can give lots of reasons, that's easy to do. But evil people turn out to be evil. That's what they are.

| Alex Jones: | 01:45:46 | And the more they get away with, the more they do. |

| Jon Rappoport: | 01:45:48 | Yeah, of course. And then it piles up. In other words, whatever thrill they get out of being evil, it's not enough so they have to go further. And they have to keep on going. This amount of control and destruction is not enough. We have to expand it. And that's where they actually commit suicide. Because it gets to a point where the people are fed up and have had enough because they see what's actually going on and we're at that cross road when we talk about what the globalists are doing. |

| Alex Jones: | 01:46:18 | I agree, because you said they're in their own echo chamber, they even admit that now. Everyone's even turning ... I mean it was like 20 something percent a few months ago thought Russia was important, now it's six percent in their own Gallup poles, everyone I know knows it's a total joke and, and, and so what comes next? They're in their echo chamber, they're getting more extreme, they're going to try to remove Trump, what's going to happen? |

| Jon Rappoport: | 01:46:39 | Well they're just going to continue to beat the drum any possible way they can. I'm sure that they're going to get some more psychiatrists to try to come forward and say that he's mental ill and he's incompetent to serve, uh, the reason that they're not filing impeachment proceedings is because they know they don't have a chance. So they're looking around desperately to try to find something and all they can do right now is to keep on screaming about the Russia story because they don't really have anything else. And when it's reported that fewer people are coming across the southern border, for example, and certain you know, progress is being made along that front, because with open borders, you just can't vet who's coming into the country, uh, then there's a whole lot of people that are very, uh, ha- happy about that. So that makes it even worse for them. They don't know what to do. |

| Alex Jones: | 01:47:34 | That's right, because, because, eh, they can't kill the economy quick enough to blame Trump, plus they now know they're getting the blame anyways for trying it, but they can't help themselves, like you said, they're Wiley Coyote ran over the edge. When we come back though, Muller has said, "Okay, I can't find any Russia stuff." He's going to look at every Trump associate, every campaign person's finances, total drag net, total fishing expedition, what does Trump do at this point with this rogue element, what do we do? |

All right, we got well over two million subscribers on just one of our YouTube channels that a fan made five, six years ago, Dave Thomas, not of Wendy's, his name's really Dave Thomas. Great guy, he, he works for us now. From Oregon where he's a chicken farmer with his family. Who's your daddy. Does he live in a free country like me? It always, during the break, I was talking to the crew, they're like, uh, we're, uh, they're glad I'm really considering having to sue Google and YouTube and other people that put in false copyright claims because this isn't Russia during the old Soviet Union, this isn't communist china, we have free speech in this country. And I'm sick of people with false copyright claims they never back up once I file, once I file a challenge to it, they never put up or shut up and file suit on me.

And then now they claim that I'm harassing Sandy Hook families because the media said I am and the media said I said go harass their families. And then they take down our videos where I actually clarify going back three, four years ago that I simple questioned because our media lied about dead babies in incubators and said they got their brains bashed out and so my listeners didn't buy the official story, so we looked at it and I said, "I don't know the truth." I'm not ready to say kids didn't die and point my finger at parents and say they're liars.

Is there a blue screen when Anderson Cooper's face disappearing? Are there kids going in circles in the video shots? Did they hold back the helicopters? Did they have porta pottys there in an hour and a half? Did they run it like a big PR operation? Do they get all these conflicting stories in the media? Absolutely. And we have a right to question it. If, if they said there were new babies thrown out of incubators in some country and we questioned it because they've lied before and it turned out that they did actually kill babies somewhere, would I then hate the families that lost their babies? No. I'm questioning known liars in the media.

But in the 1990 event where they said hundreds of babies had their brains bashed out and their skulls kicked in, there were no babies. There were no incubators. It was a red shirt to bring us into a war and now over a million Iraqis have died of starvation, a half million under the Clinton's intensified sanctions that were children.

But see, we don't humanize those Iraqi children and we overthrew a secular government that had swimming pools and movie theaters and Play Boy sold in the stores. I'm not saying that's a great thing or a good thing or a bad thing, the point was it was becoming westernized. The globalists don't want that.

They destroyed it. And they put radical Islamist in charge. But see, I'm not supposed to sit here and have a big thought like that. I looked at the five videos that they have said are evil and bad, and put a strike on us to shut the channel down, zero hedge discovered anomaly in Alex Jones hit piece. That's what they're saying we're not allowed to question. So let's play the censored report with Owen Shroyer analyzing other people's reports and playing the anomaly and asking the question and quite frankly, the father sees, he needs to clarify, NBC needs to clarify because the coroner said none of the parents were allowed to touch the kids or see the kids and maybe they meaning at the school, I'm sure later maybe the parents saw their children. The point is, is that because the media lies so much, you can't blame the public asking questions and you can't ban free speech of people that are asking questions and for us to simply look at the Megyn Kelly public even where someone sat down and was interviewed and to politely discuss it. If you ban that, you ban free speech in total. Very, very dangerous. Here it is.

| | | |
|---|---|---|
| Owen Shroyer: | 01:52:01 | So folks now, here's another story. You know, I don't even know if Alex knows about this to be honest with you. Alex, if you're listening and you want to, uh, or if you just want to know what's going on, Zero Hedge has just published a story Megyn Kelly fails to fact check Sandy Hook, Sandy Hook father's contradictory claim in Alex Jones' hit piece. |

Now again, this, this broke, I think it broke today. I don't know what time, but featured in Megyn Kelly's expose, Neil Heslin, a father of one of the victims, during the interview described what happened the day of the shooting and basically what he said, the statement he made, fact checkers on this have said cannot be accurate. He's claiming that he held his son and saw the bullet hole in his head. That is his claim.

Now, according to a timeline of events and a coroner's testimony, that is not possible. And so, one must look at Megyn Kelly and say, "Megyn, I think it's time for you to explain this contradiction in the narrative because this is only going to fuel the conspiracy theory that you're trying to put out, in fact." So, and here's the thing, too.

You would remember ... let me see how long these clips are. You would remember if you held your dead kid in, in your hands with a bullet hole. That's not something that you would just misspeak on. So let's role the clip first, Neil Heslin telling Megyn Kelly of his experience with his, with, uh, with his kid.

| | | |
|---|---|---|
| Megyn Kelly: | 01:53:52 | At Sandy Hook elementary school, one of the darkest chapters in American history, was a hoax. |
| Neil Heslin: | 01:54:00 | I lost my son. I buried my son. I held my son with a bullet hole through his head. |
| Megyn Kelly: | 01:54:07 | Neil Heslin's son, Jesse, just six years old, was murdered, along with 19 of his classmates and six adults on December 14, 2012 in Newton, Connecticut. |
| Neil Heslin: | 01:54:19 | I dropped him off at 9:04 that's when we dropped him off at school with his book bag. Um, hours later, I was picking him up in a body bag. |
| Owen Shroyer: | 01:54:33 | Okay, so making a pretty extreme cl- claim that would be a very thing vivid in your memory, holding his dead child. Now here is an account from the coroner that does not collaborate with that narrative. |
| Speaker 20: | 01:54:49 | Uh, we did not bring the bodies and the families into contact. We took, uh, pictures of them, um, uh, of their facial features. You have, uh, uh, it's easier on the families when you do that. Uh, there is, uh, a time and a place for up close and personal in the grieving process, but to accomplish this, uh, we felt it would be best, uh, to do it this way and, uh, you can sort of, uh, you can control situation, uh, depending on your photographer and I have very good photographers. Uh, but, uh- |
| Speaker 21: | 01:55:28 | It's gotta be hard not to have been able to actually see her. |
| Speaker 22: | 01:55:34 | Well, at first I thought that and I had questioned maybe wanting to see her. |
| Owen Shroyer: | 01:55:44 | Okay. So just another question that people are now going to be asking about Sandy Hook. The conspiracy theorist on the internet out there that have a lot of questions that are yet to get answered, I mean, you can say whatever you want about the event, that's just a fact. So, there's another one. Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. (laughs) So now they're fueling the conspiracy theory claims. Unbelievable. We'll be right back with more. |
| Alex Jones: | 01:56:10 | All right, now that's the full clip that's been censored on YouTube that's hateful and evil they say and that we're harassing people with. It's national television. It's a piece attacking me. Okay? That's a clip from a national piece televised everywhere, misrepresented what I said about Sandy Hook. I'm |

not allowed to respond to a report about me that isn't even accurate and then you've got CNN and MSNBC both with different groups of parents and the coroner saying we weren't allowed to see our kids basically ever, what they sound like they're saying, but we see a father, a grieving father saying that he dropped him off with a book bag, got him back in a body bag.

And, and, and, you know, regardless, Bloomberg said they don't let a good crisis go to waste. So did the White House Chief of Staff Robert Manuel at the time. And, and bottom line there was massive PR around this. This was used to blame the American people to say gun owners were at blame for this and to, and that we had killed these children. So that's why America rejected it and said it was fake because in total, saying gun owners are responsible for what somebody on Prozac does is, is, is not true. If I kill somebody with a car on purpose, it's not your fault because you own a car that I did something wrong with a car. Like, if I stabbed my neighbor with a butcher knife, or you do, then we're not guilty for, for what another person does. So we're sick of this.

Do mass shootings happen? Absolutely. Can I prove that New Haven didn't happen? No. So I've said for years, we've had debates about it, that I don't know, but you can't blame people for asking. But now, in a national Megyn Kelly NBC headpiece that another publication, very respected, Zero Hedge, comes out and breaks, I'm not even allowed to report on a report about me from NBC and Zero Hedge with my other reporter who didn't harass anybody. That was a month ago. He said, "I wouldn't hold my breath looking for a response." We've not seen a clarification. I'm the one that called him up after I saw the show that night and I said, "You know Owen?" And we're going to go back to our guest, could be that, you know, we need to get clarification on what went on, and I couldn't ever find out. The stuff I found was they never let them see their bodies. That's kind of what's weird about this, but maybe they did.

So, I, I'm sure it's all real. But for some reason, they don't want you to see those clips together.

Nomorefakenews.com, he hosted an hour a week, going to be hosting a lot more soon, I gotta get it set up with him, uh, but, uh, he's here with us, of course it's Jon Rappoport, Jon what do you make of this?

Jon Rappoport:     01:58:54     (laughs) Just, report on the report on the report on the report is suddenly you know, licenses to take away access. You can't do that. Absolutely not. Absolutely inappropriate. Inappropriate,

right? Because there is an unanswered question. So where does that leave us? Well, let's say that somebody decides to publish on YouTube a whole list of the ingredients in vaccines. You know, here it is from the CDC. And I have a question because if you'll notice, there's aluminum, aluminum, aluminum, aluminum, aluminum, and now here is a statement from official organization, medical organizations about how neurotoxic aluminum is that's being injected this way and I'm asking questions about this. Well, that ... let's throw that away, too. That's no good. We can't have a video like that. We can't have that either. I mean, as you say, if they're going to th- if they're going to throw out that-

PART 4 OF 6 ENDS [02:00:04]

| Jon Rappoport: | 02:00:00 | That either. I mean, as you say. If they're going to throw, if they're going to throw out that video by Shroyer, then everything is up for grabs. You can't say anything that wouldn't be censored if somebody wants to censor it. |
|---|---|---|
| Alex Jones: | 02:00:14 | Well, I'm not supposed to ask you because of this intimidation. What do you think about Sandy Hook? I mean, I said it has more holes in it- |
| Jon Rappoport: | 02:00:14 | Yeah. Right. |
| Alex Jones: | 02:00:19 | Than ... I said it has more holes than Swiss cheese. I'm not personally attacking anybody. Just like, as I said, if a new baby incubator story came out, I would question it. It may come out that the new attack on babies is real. But am I bad? Am I attacking individual parents because I question the media that runs hoaxes? |
| Jon Rappoport: | 02:00:38 | And here's the other thing because they have to find their hook to come after you. You know? You've covered what? In all the years you've, you've been in in it for what it is? I don't know. 15,000, 20,000 stories. Okay. So let's find one that we can twist. Make it incredibly controversial. And make it sound like he's some sort of an inhuman monster. And now let's push that on national television. And say, "You see folks. You see what we're dealing with here. With the so called independent media." I mean, that's the other aspect of this. Which is completely insane. You know?

If there was anybody rational at any of these networks, they would sit down with you and they would say, "Well, apparently you're a very controversial figure. And also apparently you have |

untold millions. I mean, it just keeps getting bigger of listeners. So what is it that you stand for? Why are you so popular? What are you saying?" And, you know, a long forum interview. And then they would bring in and say, "Well, here's a story you covered. And this is what you said."

| Alex Jones: | 02:01:50 | Listen I told them I thought the kids probably did die and that we were simply questioning because the babies in the incubators, they wouldn't put it. They won't let me even say that- |

| Jon Rappoport: | 02:01:50 | That's right. |

| Alex Jones: | 02:01:59 | That, that, that they've twisted it and I, because they want to take off what I really said. And then say false things about me so I can't respond. |

| Jon Rappoport: | 02:02:06 | Exactly. So if you say, "Well, let's compare the Sandy Hook thing to the incubator baby thing." They're not even going to put that on television. They don't want to hear that. They don't want to say, "Well, gee. He does have an analogy. No. No. We don't want to even consider that because people are going to realize hey. Well. Yeah. That was a totally fake story about how the, the war in Iraq was, uh, promoted and launched. So he has a right to question what happened at Sandy Hook or what happened anywhere about anything." I mean, come on. What's, what's the story here? You ask a question. You ask a number of questions. And all of a sudden you're censored for that. |
| | | These people want you to get down on your hands and knees and pray to ABC, NBC, CBS, CNN. Etc. Etc. That's what they want. Just like Chris Como says on CNN, in what has to be for me one of the most insane things ever uttered by anybody. "You the public don't have a right to look at these leaked emails. Only we the media can. And then we tell you what to think and then you accept it." |

| Alex Jones: | 02:03:18 | (laughs). He actually said it just like that. |

| Jon Rappoport: | 02:03:20 | Right. And people, you know? The, people all over the world. Like if I was walking through an airport where they have these contracts from CNN and I heard that, I'd say, "Forget about my flight. I'm dropping my bags. I got to watch this idiot. This is unbelievable." Right? You know? Where does this guy come from? |

| | | |
|---|---|---|
| Alex Jones: | 02:03:37 | He goes further. He goes, "You're not allowed to. It's illegal. No. No. We're allowed to and then you get it from us." I mean, he actually the most, when I saw that clip first the day it happened, I thought it was a joke. And we went back and found the full context. |
| Jon Rappoport: | 02:03:50 | (laughs). |
| Alex Jones: | 02:03:50 | I mean he really talked to them like they're three year olds. |
| Jon Rappoport: | 02:03:53 | Yeah. He really means that. You say well, this is a guy that, you know? Megan. Hello. Interview Chris Como. Okay? Find out what makes this incredible moron tick. You know? I mean, where did you come up with this idea? We the media will tell you what it means. Otherwise you have no access to it. I mean, where did, where was he hatched? How did he come in to being as some sort of reporter? I mean, do they just, I know his name is Como so he's from the political family. Right? But I mean, they just grab them off the street and say, "You're our anchor." When you say something like that? I mean, there we see what the media is actually thinking about themselves. |
| Alex Jones: | 02:04:40 | Exactly. I want to go to some phone calls. I'm going to skip this break so we have some more time with John Rappaport. But just briefly, Pooty Pie has like 15 plus billion views on one channel. And a couple billion on another. And other channels. I mean, it, it's, it's 18 billion views. And it's bigger than all comedy channels, entertainment stuff together. And he never was political. I'd only seen some of it. But they hate the fact that his main demographic is about 18 and younger. But I've seen his stuff. It's pretty funny. Even when he makes fun of me. |
| | | Uh. Regardless in the, in the, in the, in the marketplace of ideas, he's winning. They begin to call him racist, Hitler, say shut him down. Because the big executives are jealous. The Zucker's of the world. That he has something they don't have. He has the real star appeal. They've all failed. Nothing they force feed works. So I've talked to a lot of these folks. Not Pooty Pie. But others. All these big channels. Including a lot of big kind of main line, uh, liberal channels that are independent. They're getting targeted and shut down. And it's a bullying. And then YouTube comes along behind the scenes and says, "Work with us. Start doing a few things we want. We'll fully monetize you and help you." So it's muscling. Stop saying that Pootie Pie and others. |
| | | They're scared of you because they saw you putting down our stuff at Watson's. They know you could turn around and somebody like you could be a thousand times more successful |

than even myself or Donald Trump. They don't know who the Pootie Pie is that's just kind of doing their own thing. Whose, who then clicks because there's this algo rhythm awakening. So Pootie Pie needs to know they're always going to envy you and try to shut you down. The answer is really take your destiny in your hands. Don't just be super popular and have all the super hot girlfriends. And make 30 million dollars a year. Or whatever. Really change the destiny of the world. And, and, and if it's not going to be Pootie Pie, it's going to be somebody else. Because I turned down 10 million dollars a year. 16, 17 years ago. Sounds like a lot of money. It's nothing. Money means nothing once you get self sufficient.

They use it to control you. To always feel like you're going to arrive someday if you were just with them. Now it's not saying money is bad to have. It's just that it is not your God. They try to keep money limited. Resources limited so they can be the gatekeeper between that. Right now though OJ's verdict is coming in. Dennis Hastert goes free after 13 months. We'll see if, uh, OJ does for, uh, robbery. Uh. Already serving nine years. Let's go to that feed live.

| | | |
|---|---|---|
| Speaker 23: | 02:07:10 | And I concur with Commissioner Corda. And grant parole. And in addition, our decision, although difficult, is fair and just. |
| Speaker 24: | 02:07:22 | I concur with the Commissioner, uh, Corda and agree to grant parole. |
| Speaker 23: | 02:07:29 | Um. Mister Simpson. Before I cast my vote. Um. I want to let you know that we believe that we're a fair board. We believe that we're a consistent board. Um. I will let you know that that consistency also goes to parole. And, um, we do not look kindly upon parole violations. Um. And if I cast my vote to grant and it, and it concludes the hearing, uh, our expectation would be that you not violate even the simplest condition of parole. Having said that, um, I am prepared to cast the vote. I am prepared to ask the commissioners to set conditions. Um. If, if that happens, um, we will produce an order sometime in the next 15 to 20 minutes that will be faxed to you or presented to you at the institution. And it will become a public record. So based on all of that, um, Mister Simpson I do vote to grant parole when eligible. And that will conclude this hearing. |
| OJ Simpson: | 02:08:37 | Thank you. |
| Alex Jones: | 02:08:37 | You know? Simpson looked arrogant and somewhat corrupt before. But after nine years in prison, he looks very genuine. Very contrite. And he looks very, like he has a lot of, I never |

studied his genetic background. But I think he has a lot of native american in him or something. Because he looks, uh, a lot of native american now that he's lost a lot of weight. Uh. But, uh, but there you go. Nine years in prison for robbing back some of his own memorabilia. I'm not defending what he did. But there was a dispute. Um. And then I've never done it myself. But sometimes in business you get a little bit mad. People screw you over. And I'm not saying that's what happened there. The wife thing. All that. Both sides. They tried to set him up. He probably did it. It's just a mess.

Crime of passion. Yeah. I mean, basically cut their heads off. Or I mean he was found civilly guilty. The point is it's hard to hate him when these globalists are committing all these crimes. John McCain's funding Al Qaeda and ISIS. They're murdering Christians by the hundreds of thousands. And then all these pedophiles are going free. Um. We haven't scripted this. We're live. We're going to go to your phone calls. Shawn, Josh, Andrew, Dustin, and others. But what is your view John Rappaport?

| | | |
|---|---|---|
| Jon Rappoport: | 02:09:45 | You know I just thought what would happen if he put up a YouTube video with Hastert being released. Next to OJ. See maybe that would be censored too. Oh. Oh. Oh. Oh. We don't want any comparisons of this. No. No. Just side by side. The last two minutes of this from Simpson. And Hastert pedophile, he gets off. Let's present that. Let's show, you know? What do you think of this folks? You think this sounds fair? Does this sound equitable? Does this sound like the justice system is actually working? When this guy serves nine years and this guy serves, what? 13 months? Really. Unbelievable. |
| Alex Jones: | 02:10:27 | Well, I know if you look at Simpson, you can't fake that. He looked real humanity, really upset. Really wanting to get out. I mean, you, you can't hide that. That was real. And then you look at somebody like, like, uh, you know? Mister blue eyes over there. At, at the republican party. Paul Ryan. He just radiates I'm a psychopath. |
| Jon Rappoport: | 02:10:44 | (laughs). Yeah. |
| Alex Jones: | 02:10:47 | We're going to go to break here in a moment and take a few calls. John Rappaport. No more fake news dot com. Before we go any further, ladies and gentlemen, we need your financial support. They're trying to shut us down. I want to expand. Not just stay the same size. Because we're going to expand or be destroyed. It, it, there is no staying the same size. We need you to go to infowarstore.com. Where we have amazing [inaudible |

02:11:04]. Free shipping for another 10 days or so. And a bunch of the stuff. Like super male, which is this great concentrated herbs. The X2. The amazing good, uh, halogen. Uh the deep Earth clean iodine. Not the garbage iodine that you get in the store. You know? Probably eat holes in your belly. Infowarslive.com has it all but it a lot of the specials got to end today. Just like brain force had to end a few days ago because it's about to sell out.

I'll have some new specials tomorrow. But these are our best sellers. They're still no sale right now infowarslive.com. Or triple 8-2-5-3-3-1-3-9. But that's how we fund ourselves. Over 75 percent of the funding is you buying products. CNN is fake news. On the back, infowars is real news. Great shirt to meet like minded people, to spread the word, to stand up for free speech. Caveman is back in stock. [inaudible 02:11:52]. Knock out the fungus and stuff in your gut. [inaudible 02:11:55] the probiotic. It's back. Now we've got our new super high quality whey. That I haven't even had time to get into yet today. It's our new product launch today. Haven't even launched it because so much is happening.

So we'll take your phone calls coming up. I appreciate you holding. We don't get to everybody, I'm going to send everybody a keg of this, uh, new premium whey protein. It's from one of the biggest high quality manufacturers. Hormone free, grass fed, uh, cows would produce the milk. True whey, uh, protein. Super high quality. Infowarslive.com. Or triple 8-2-5-3-3-1-3-9. No reviews yet because it just came out today. But we have tens of thousands of reviews by third party site power reviews and others. On average four point eight stars. No one else that we've seen has it. Infowarslive.com. Infowardsstore.com is the umbrella site.

But even if you can't buy the product from us to help support the broadcast, just spread the link. Spread the articles. Spread the videos because we are fighting everyday to simply stay here and keep putting the truth out. And we'll change the world because of your support. Hour number four. With your calls. Anthony Cumia. The conclusion of no more fake news dot com with John Rappaport. Stay with us.

Alright look. I hogged the airtime. I gave the number out 30 minutes ago. I haven't gone to your calls. I apologize. It's Rappoport is our guest. Let's talk to Shawn in New York then Josh in other. Shawn, you're on the air. Shawn? We're going to let you go. Let's go to Josh in Colorado. Josh, you're on the air.

| | | |
|---|---|---|
| Bob Barr: | 02:13:28 | Hey guys. Uh. Long time listener. Um. I just wanted to talk to you about future technology. Um. I'm an independent researcher. I led an energy movement. And I, I'm seeing something that's coming. Um. There's a break away civilization. And they have revolutionary energy technologies. They're going to build three printed robots. They're engineering robots into bio mechanical with dogs. I had to leave the movement because of the weird stuff I was starting to hear. There is something really strange going on in this world. And- |
| Alex Jones: | 02:14:02 | Yeah. I know. They got computers that predict the future. I mean they've got computers that predict the future. Then you can control the future. They've had [inaudible 02:14:09] for 30 plus years they admit. And, and now they're admitting it all but, but not showing it so that's the big question. Have we already reached the Atlantean moment? Whatever they've discovered they're on such power trips. They act like we just don't even exist anymore. Then there's Trump in the middle of it trying to rally billions of people against it. Uh. |
| | | Rappaport what do you think is going on? |
| Jon Rappoport: | 02:14:32 | They have tremendously advanced artificial intelligence in terms of systems. Because that's what they're trying to do to the planet. Here we've got these systems and we're going to impose them on you. You are the little units that we put in to the slots of our systems. So naturally when you have that viewpoint and that's what you want to make the world into. One gigantic machine. Then you're going to use artificial intelligence and robots and androids and everything automatic that you can get your hands on. |
| Alex Jones: | 02:15:04 | And I said they're using the artificial replacement of us to make us obsolete as a way to dictate the terms of our surrender to the technocracy. This has been designed to make us obsolete. To dictate what's left of the middle class. Accepting the extermination and phase out of the general public. And that's the admitted plan. Josh? |
| Bob Barr: | 02:15:24 | Well, it's, it's being shown in Hollywood if you have the eyes to see what the new energy technologies are going to be. And how actual natural energy works. They, uh, they've actually really engineered it. They don't want anybody that's done it independently to be funded. They're funding their own people to come up through this system. And they're going to put the information out that the, the way they want it to- |

| Alex Jones: | 02:15:47 | Sure. I mean, that's what they do. They always have quote, you know, the billionaire guy. The Bill Gates. The whatever. The Zuckerberg. That pops up. That's been partially declassified as the free market front so people don't even understand what's happening. It's all Trojan horsed. |
|---|---|---|
| Bob Barr: | 02:16:00 | They can actually synthetically create most elements nowadays with nano technology and nano super [crosstalk 02:16:07]. |
| Alex Jones: | 02:16:07 | Well, when I was a kid, in, in, in third grade they talked about those big machines they've got that create the new elements. I mean, alchemy is now real. You want to comment on that Rappaport? |
| Jon Rappoport: | 02:16:16 | Yeah. You can go all they way back to IG carbon. The infamous Nazi cartel of the 1930's. That was their whole program. To be able to synthesize, you know? They were talking about oil and rubber and so forth. But basically these guys that they had over there wanted to synthesize anything from anything else. That was their plan. That was their program. That's the whole idea is the synthesize existence basically. |
| Alex Jones: | 02:16:43 | We're seen as like an infestation of weavles or something that's eating their resources. But then they've trained us to be like the weavles. So that, so that we follow that form. And I'm just like, whoa. This is uncool. |
| Jon Rappoport: | 02:16:54 | Yeah. Who wants that? We want individuals who are free, strong, alert, creative, independent. |
| Alex Jones: | 02:17:01 | Hey Josh. Give us your name and number. If you want to give us documentation because I want to start talking to more deep tech people not just deep state. Because deep tech is the bottom of deep state. So if you want to give us your info I'd like to see documentation and have you on. I mean, hell. They tried to hire my dad to build cyborg's in the 80's. It wasn't even that special. They were trying to hire all the top oral surgeons that were doing implants at the time because that was new. Uh. Am-, amazing John Rappaport. Thank you so much my friend. We'll talk to you soon. |
| Jon Rappoport: | 02:17:26 | Thank you Alex. |
| Alex Jones: | 02:17:27 | Powerful always to have him on bantering back and forth. I'm going to introduce Anthony Cumia. Of the Anthony Cumia show on Twittercompoundmedia.com. You know? He had big popular [inaudible 02:17:43] syndicated radio. And got kicked off that. |

And then of course he, uh, hosted the Opie and Anthony show and he criticized Black Lives Matter. Killing cops literally. And he was fired off of that. So now he's got his own compound media with a lot of other hosts that's very, very popular and successful but the reason I raise that is YouTube, for us showing Megan Kelly interviewing one of the fathers of a Sandy Hook victim saying he held his son after he was shot. Then we show CNN and MSNBC saying the coroners didn't let people get to their kids. And we said, "That's why people question."

We're not even questioning that kids died. That's been questioned. Our listeners question it. We're simply saying this is why people question it. Showing a zero edge story. That's been removed. And they said they're looking at banning us on YouTube. That story is up on infowars.com. If they do that to us, they can do it to anybody. So we've got to stand up against this. And we've got to understand they're doing this because we're destroying them because of their own lies.

Six percent of Americans in a big gallop poll think Russia's a big story but this globalist that took radical Islam off of the FBI's list when they're investigating a mosque or Al Qaeda or ISIS. They can't even say they're investigating an Islamic group. Mueller who covered for the Clintons. All of it. Bush. All of it. Saudi role 9-11. All of it. He now has expanded it to all of Trump's associates. All his businesses. All of his buildings to see quote if they rent any condos or sold stuff to Russians. Or campaign money. Or just money laundering period. Which they could call bouncing a check.

So it's gone from witch hunt to the greatest fishing expedition that history has ever seen. And our pentagon five years ago came to Obama when we first broke this. They said we're not going to be Al Qaeda's air force. This is ISIS. And Trump comes in and he's like we're going to defeat ISIS, which he said he'd do in 2016. Now six months in, it's basically in two cities. 95 percent defeated. Trump ends covert CIA program that was Obama and McCain funding these cribs to arm anti Assad rebels in Syria. A move sought by Moscow. And of course they said that at the G20 event two days of dinners and lunches, that G20 sat Melania next to Putin. And then Trump came over and talked to him in front of world leaders with a Japanese, uh, interpreter that could speak Russian and English. And asked a few questions. And, and, you know? Talked to him. And they're calling that a secret Russian meeting.

That's what you do at diplomatic dinners. And so now the new talking point from Howard Stern, heaven love him. Not a bad

guy. Been on his show. Whatever. To CNN and NBC is you don't talk to Russians. If you talk to a Russian, close quote. That's the talking points. All over the news. You're a Russian agent. So this is the, meant to paralyze Trump. Anthony I want you to take over and host this hour. It's why you're here. [inaudible 02:20:54] media dot com. But it's not working. But they don't care. They're just going to continue to move forward to try to impeach the president. And I agree with him.

Sessions, you know, shouldn't have recused himself. And Sessions has been a good guy on many fronts. But I mean where are his juevos? Why aren't we seeing special prosecutors or indictments of the Clintons when they got money from Russia? I mean, I've got an article right here. Bill Clinton, remember back when he called for Russia to interfere in our elections? I, I mean these, everything they say Trump's done, they've done. And I'm sick of putting up with them and almost no one supports him. You know?

It came out that the bots, the computers, the Google algo rhythms knew that Trump was going to win. He was 15 points ahead. Hillary tried to steal it but failed. And now they're saying, "Oh he's only, you know, 55 points of 50. Or 47 points in the polls." You know it's 60, 65. In fact the corporate bots show he's at about 60.

They have put a dent on him with some people. But it doesn't matter. I mean, this is so epic, what do you expect him to do now? And I'm turning it over to you. Go ahead my friend.

| Owen Shroyer: | 02:21:56 | I'm stunned that anybody still looks at what is main stream media traditional news. Which, uh, by the way is newsertainment. Uh. That anybody believes this is news anymore. What, what has to happen before everybody in this country says, "We are being so bamboozled by mainstream media that I will not accept one thing." If I saw something transpire in front of me that is, uh, classified as news. And then saw an accurate depiction of it on mainstream media, I still wouldn't believe it. We need people to realize at this point that they are feeding you. They are feeding you an agenda driven menu. |
| --- | --- | --- |
| Alex Jones: | 02:22:41 | Well, they said the sky was blue. I would go out and look at it for myself. |
| Owen Shroyer: | 02:22:45 | I sta-, and if I saw it was blue, I still wouldn't believe it. |

| | | |
|---|---|---|
| Alex Jones: | 02:22:48 | (laughs). |
| Owen Shroyer: | 02:22:49 | They're proving themselves on a daily basis that they are, uh, fake news. |
| Alex Jones: | 02:22:55 | So where do they go now? Because I really want to know your opinion on this. I, I just, where do they go now that's six percent believe their BS? |
| Owen Shroyer: | 02:23:00 | Uh. Uh. I honestly think people need to go to alternative sources for, for their news. And, and are we supposed to believe the polls? Are we supposed to believe the news after they were proven, uh, liars over the course of the entire campaign and election? Now we're supposed to believe that that Trump is 50 percent or under 50 percent? Or 30 percent I hear in certain, uh, circles? And, and we're supposed to go, "Oh. Oh yeah. Sure." |
| | | When, when will we all realize that this is a TV show? All news shows are a TV show. |
| Alex Jones: | 02:23:37 | It's the Truman Show. |
| Owen Shroyer: | 02:23:38 | Just like Game of Thrones. And everything else you enjoy to watch. They're making money. Putting on a program. And that program is driven by what more people will watch. Has nothing to do with fact anymore. Nothing. |
| Alex Jones: | 02:23:51 | I agree. But it's also what the corporations owning that media want because sure. Some of it's for ratings but, and that's come out in the memos. You're right. But it's also about what will get them ratings that the boss's are authorizing? Kind of those two points go together. Because I mean imagine. Uh. True information is super popular. Or people will at least trying to tell the truth. So I think what really handicaps them is they're trying to get ratings with a few things they're allowed to do. |
| Owen Shroyer: | 02:24:16 | Yeah. Well, when you see something like, uh, what? Kate, Katie Couric is saying fake news is ripping apart, uh, America at the seams. She's part of it. How, how, they're trying to- |
| Alex Jones: | 02:24:29 | They had an MSNBC piece a month ago- |
| Owen Shroyer: | 02:24:32 | Take all their personalities because they know- |
| Alex Jones: | 02:24:33 | They had, uh, and I'm leaving because i just can't stop listening to you. But I just got to make this point. A month ago they had |

Brian Williams with a report on fake news on MSNBC. This is the king of fake. It's like having Hitler running a holocaust museum. I'm sorry. Go ahead and take over Anthony.

Owen Shroyer:     02:24:49     (laughs). Absolutely Alex. It's insanity. The hypocrisy. The, the blatant insult to the American people that they do certain things to say look how stupid you are. That you're actually buying this. And we keep pumping out this garbage. And, and you will buy I. Uh. Its insulting. It's, it's blatant, uh, dishonesty to the American people. Yet so many still eat it up. Uh. And, and, and it, like I said, Katie Couric saying that fake news is ripping, uh, America apart at the seams. Katie Couric was the one, uh, doing, uh, a special on guns in this country. That edited, uh, and took a, uh, comment uh from a panelist that was, uh, in the documentary completely out of context. To change. Absolutely change what the person was saying.

That is fake news. And now she's saying that it's ripping America apart? Their only defense is to go out there and try to make the people believe they're the ones that aren't fake news. And people like Alex. And myself. And, uh, Gavin McGinnis and all the other people that are presenting facts to you and allowing you to voice your opinions on them are the fake news. And we're the dangerous ones. We're dangerous to them. I agree with that. We're dangerous to them. But how is it dangerous to inform the American people. Give them the absolute facts and then let them build their own opinions on it. When you watch mainstream media these days, you don't get the news. You get people's, uh, uh, interpretation based on the company that owns that, uh, news organization. Uh. And what their agenda is.

That's what you're getting. And, uh, believe me it is a far cry from the facts when it finally, uh, reaches, uh, the American people. Uh. And I'm talking about everything. Look, I appear on Fox News. Uh. On, uh, various programs over there. But I am not, uh, one of these people that take everything that goes on over there as gospel either. They have their agenda. Just like CNN and MSNBC and all of them. We really need to separate ourselves from mainstream media. And, and look elsewhere for, uh, uh, the facts of a story. It's not easy. It's not easy to find, uh, factual information on a lot of stories.

But look. That's part of it. It's very easy to sit down and watch some of these shows and see these, uh, uh, beautiful, beautiful stunning talking heads. Uh. Blathering on. Uh. Uh. About uh what, what they, uh, are feeding you as news. Uh. But you're not getting the full story. Uh. Donald Trump's presidency has been, uh, the campaign and the presidency has been just an

amazing example of, uh, the mainstream media saying, "Well, throw it all out the window. We don't care about cred, credibility anymore. What we care about is our agenda. And putting it across."

So when years ago there was this plausible deniability that there was some type of journalistic integrity. Uh. Now it's completely gone. There is no. I can't imagine anyone with any sense or brains in their head actually believing that it's the news. So what you get. Yes. Absolutely. The greatest witch hunt in American political history. We, uh, listen to people. Um. That have, that have absorbed what mainstream media is feeding them on, uh, Trump, the election, what he's done since he's been elected. His accomplishments. He Russia thing. And people actually believe this speculation and innuendo, and outright lies. They believe it as fact. They go on social media. It spreads it's tentacles. And, uh, it becomes the new truth.

And, and people will argue and debate you based on absolute lies. And you try to, uh, uh, inform them. Uh. Because you've done your research. And, and, uh, they don't want to believe it because they've been infected, infected by mainstream media and the, the crap that they're spreading around as, uh, as real news. Uh. Back in a couple of, uh, seconds. Don't go anywhere. Anthony Cumia for infowars.

Thank you. Hey summer specials ending soon. Super male vitality and survival shield. X2 specials ending today. Quantities are running low. So act now to save 30 percent off each product. Caveman is back at 25 percent off. Secret 12 is back. 25 percent off. DNA force is back at 20 percent off. Get, uh, health support pack micro, micro, uh, uh, ZX and biome defense 50. That's 30 percent off. Living defense. 20 percent off. Pro pure G2.0 traveler is 30 percent off Z shield 30 percent off. [inaudible 02:29:55] select stor able food 30 to 40 percent off. Plus free shipping store wide. Many of these products are going to sell out soon so now is the t-

PART 5 OF 6 ENDS [02:30:04]

| Owen Shroyer: | 02:30:00 | ...store-wide. Many of these products are gonna sell out soon, so now is the time to secure your order at infowarsstore.com. |
| --- | --- | --- |
| Owen Shroyer: | 02:30:10 | Hello, people. How you doing? Um, man, if, if, if, if you need any proof that, uh, the media will do anything to make Donald Trump look bad, um you're out of your mind. It's, it's all out there. We see it. Uh, this is no longer, um, uh, uh, a fact finding. This is a, like they said, a witch hunt, a fishing expedition, um, |

but something a little more light, something lighter transpired last week when Trump complimented Emanuel, uh, Macron, uh, complimented his wife, the, um, of course, uh, French President, Emanuel Macron. Uh, they were together, over there in uh, in uh, France. And Donald Trump told uh, his wife, uh, told Macron's wife, "Hey, you look good! You're in good shape. Beautiful."

And the media loses its mind. Loses its mind, saying that this was terrible, this was uh, inappropriate, my god, sexist, misogynistic, blah, blah, blah. Um, get this, get this, it's 2017, I believe, right? Yeah, 2017. Complimenting a woman is now just completely off limits. What, does, does it take a lot to really think this through and see how insane this has gotten? And, and, and, and try your hardest to reverse this? I do believe ... now I haven't done much research on this, but I do believe men have been complimenting women for millennia. I honestly believe ... now you could, you could uh, argue why. You could argue, hey is the guy, uh, complimenting the woman uh, because she's uh, beautiful? That he appreciates this? Is he trying uh, does he has some nefarious uh, ideas perhaps? He's trying to uh, go out with her or something?

That's up for debate. But the, the, what isn't up for debate is that for the existence of man and women, men have been complimenting women, I'm sure it happened in a cave somewhere, "Oh dear, you look wonderful. That pelt, that pelt is marvelous on you." Uh, but, but here in 2017 we've reached an insane crescendo of, of political correctness garbage that a world leader can no longer compliment the uh, beauty of another world's, lea- worl- world leader's wife. Uh, so the media lost its mind.

When, when are we all gonna see this? I, look, I'm no amazing visionary here. I, I don't believe I'm seeing things long before, uh, the rest of humanity. So when I see something like this, and see the level of madness that we've reached, uh, not only in this country but in the, in the whole world, uh, I, I, I wonder how many people are also seeing this and what we are gonna do to combat it. Because this is, if this was just one instance, uh, you know, it would be a funny laugh and you'd blow it off and be like, okay. But this is a symptom of a disease that is going on in, in uh, this country and, and the world, of political correctness run amok, fake news, and this, uh, uh, crucifixion of our president, Donald Trump.

Uh, you know when they get to the level of "Donald Trump complimented a woman and that's a problem," that they really

have run out of things to uh, to say about him. Uh, you know, they're still going with the Russia thing, which we'll get into in, in a moment. I love how Trump is handling that. Um, I don't like how he's handling some other things, we'll also uh, get into that. I uh, I enjoy the, the uh, dressing down he's giving Sessions, I like that whole thing. But uh, if you can't compliment a woman in 2017, we're done. We're done as a race of, of, uh, people and humans. Be back in a second, don't go anywhere. Anthony Cumia in for InfoWars.com.

| Owen Shroyer: | 02:34:46 | Welcome back. |
|---|---|---|

| Owen Shroyer: | 02:34:49 | Bad bad thing. Welcome back, uh, Anthony Cumia, InfoWars.com, uh, I wanna talk about um, Trump blasting Jeff Sessions, Attorney General uh, Jeff Sessions. Uh, Trump said if he knew Jeff Sessions was gonna recuse himself from this Russia investigation, he wouldn't have hired him. And again, ah! They're losing their minds in the media, losing their minds. Uh, isn't it refreshing to have, uh, an honest politician at the helm in the presidency? Isn't it refreshing? Uh, the media would have you believe this is one of the uh, biggest liars that's ever held office, uh, Donald Trump. I see him as one of the most honest people ever to hold the office, because he will say, "Look, this Jeff Sessions, if I knew he wasn't gonna be uh, loyal and uh, he was gonna recuse himself, I never would've hired him." |
|---|---|---|

And a lot of people would think, "Wow, maybe you should've kept that under wraps, maybe you shouldn't have said that." I love it. I love that uh, he's speaking his mind and telling the American people how he feels about certain things. And you know what? He's right! You hire a guy as your Attorney General who is supposed to look into uh, he's, he's like the head, uh, muckity muck as far as law goes in the, in this country. And now you have an investigation about Russian collusion, and again there has never been any proof that Donald Trump was involved in any collusion uh, with Russia, to um, influence the election in any way.

So why recuse yourself? It's another instance that we have seen, uh, oh my god so many times, of the GOP bowing down uh, to the Left and the media, and the uh, the mob, the pitchfork and torch wielding mob that uh, will never be satisfied. "Oh you recused yourself, and we'll put this guy in. Yeah, we're still not satisfied." Uh, wow, uh, I am convinced Donald Trump could come up with a cure for cancer, and the headline would be, "Donald Trump Puts Millions of Doctors Out of Work." That seems to be, uh, his destiny, is to just be

criticized on every single thing he's done or wants to do uh, in this country.

But yeah, you got an Attorney General that you uh, you give the job to, you want something called loyalty. Now that is a dirty word I guess, in Washington, I don't know why. Um, it, it, if you put a team together, just calling it a team kind of, uh, makes you think that they would be loyal to, to the, the team, um. You put a team together, you want everyone on that team to be loyal. Not to a point where they're going to break the law for you, uh, or cover up any, anything you've done, but was there any proof that Donald Trump was involved in, in any kind of collusion with the Russian government uh, for the election? To, to influence the election? No.

So then why would Jeff Sessions recuse himself if not for one thing, the pressure from people that want to see Donald Trump fail ... fail. They wanna see him arrested, they wanna see him strung up, um, in some cases I guess uh, thrown off a cliff? Is that what Rosie O'Donnell uh, was doing? She was saying that Donald Trump should be thrown off a cliff and apparently there was some type of um, game where uh, Donald Trump gets pushed off of a, a cliff and uh, she was, she was very excited about that. Again, the hypocrisy on the Left is insane.

Um, but you want loyalty. You want uh, your team to back you and back your uh, policies and ideas. But for some reason, uh, the left sees that as some type of Nazi Hitler thing to do. I don't, I don't know. Things have become bad words. Loyalty, nationalism. Nationalism is horrible. This used to be something that was looked at with pride, there was a pride in your nation. Uh, every day ... I remember going to school, you would never dream of not putting your hand on your heart and, and, and pledging your allegiance to the flag. I didn't even know what it meant as a kid, uh, "And to the republic for which it stands." I used to think, for which it stands was one word. It sound like someplace in Russia, for which it stands.

But I didn't know what it meant, like, word for word, but I knew it, uh, it, it, its essence was that uh, we lived in America, it was a great nation, and we were proud of uh, our country. Well, now uh, that's a bad word too. That's a bad word, to be proud of your country, to be proud that you're American, to be proud of your heritage, for certain people is uh, a bad thing. You're not, you're not allowed to be proud of um, of uh, achievements that people of your heritage have made over the years, because that's, yes, very good everyone, racist. It's racist to be uh, proud of things that your ancestors have uh, have achieved.

We are only supposed to look at the horribleness, uh, and, and pain that we have dished out over uh, uh, the course of our, our history. Um, other people though have free reign to just uh, talk about their, their pride and their culture. Um, which brings me to something else that uh, I just, just remembered that is absolutely insane.

There is a uh, a movie coming out that looks fantastic, Dunkirk. This is the story uh, in 1940, right about, it's uh, you know, sort of the beginning of World War II, um, British sol- soldiers were trapped on the beach by the Nazis, and um, uh, it was about uh, 400 thousand of them. And they were, their backs to the ocean man. That is the worst position you wanna be in. And uh, and uh ... people from England, from uh, the U.K. came over, on their own personal boats and anything they could carry people in and evacuated all those British uh, soldiers, off of the beach. Just an amazing story, I'm so glad it's being told and done, uh, in this fashion. I love historic movies like this.

Well, there's a problem folks, there's a problem. Uh, the problem is, not enough diversity in the cast! No women, and no people of color. Someone in USA today actually wrote this as a review of the movie, that that was an issue. Again, we've reached this insane point in our, uh, uh, history where an accurate depiction of a historical event is not good enough because it's being portrayed accurately. (Laughs) Is this a hate movie? Is this hate cinema because there aren't enough women or people of color in it?

I gotta tell ya, I wasn't there, but I've uh, done a lot of uh, research on old W W II, and um, that beach was full of a lot of pasty skinned Brits that uh, needed to get off the beach. And a lot of pasty skinned Brits went and got them, that's about it. And as far as the enemy goes, well, they were Nazis. Not gonna find a lot of uh, people of color, uh in that Messerschmitt, Messerschmitt that's uh, flying over the uh, beach. But again, it's a problem.

Diversity for the sake of diversity. It ... they, it makes no sense, uh, especially with a, a movie that is trying to uh, base itself in fact. Um, but again, that's where we are. That's where we are. We, we ... we are constantly told that we need diversity, that diversity is our greatest strength, and um, if it, if something works out well with a diverse group of people, that's wonderful. But that isn't because it was diverse (laughs), you see. Why are we, uh, always being led to believe that that's um, that's the truth.

Uh, yeah, there it is, the complaints that people again- look at that picture, uh, let me try to see, that's an actual picture of some of the soldiers from, uh, back in 1940. Uh, yeah, I don't see many women, I don't see many people of color. Yeah, yeah, wow, an accurate depiction is now a terrible thing. Do you see how we're being lied to? And do you see this indoctrine- we always think of college campuses as being the place that this indoctrination is going on, and oh it is. But college kids, let's be real, are stupid.

They're kids. Uh, they're gonna say dumb things. I never went to college, but I was a dopey kid, and I did stupid things, I believed stupid stuff, and I said stupid stuff. So you can almost cut them some slack for their moronic statements, and this, their moronic belief system, uh, of what this country and world is all about.

When you see things like this, and things that are advertised on uh, uh, TV commercials, TV shows, that is an indoctrination that is being fed to everyone, not just impressionable children. We are being told that um, straight white men are the dumbest people you'll ever find. I have uh, wonderful, uh, evening text sessions, with the, uh, inimitable Gavin McInnes. On a nightly basis we trade videos (laughs) and uh, texts of commercials and TV shows and stuff that just depict straight white men as the world's idiotic little clowns, walking around incapable of doing anything.

Something as simple, I believe there's an insurance company, uh, that's doing a commercial now, where a guy suggests this ... obviously he's married to the woman, he's white and he's a man. Straight white male. He makes this insane assumption that he might've been able to fix a leaky pipe in the ceiling. Well his wife has to say, "No!" Cuts him off, yells "No" at him, and he's just kinda, "Yeah. Yeah I'm a guy, I couldn't possibly fix a pipe or paint a ceiling."

And again, you might go, "Oh Anthony, why be so serious? Whey get so worked up over?" Because it's constantly happening. There it is. Look, look, he's just trying ... he looks at the pipe, with a dumb face of course, he's like, "I might be able to fix that." And then "No!" She just yells no. Like he's gonna try to perform brain surgery. "Maybe I could cut our kid's head open and perform br-" "No!" It's a pipe, lady, relax.

But this is constant. It's a constant, uh, uh, nonstop buffet we're being fed of this uh, propaganda and indoctrination. Nothing and no one could be honest to, uh, the American people. Uh, another prime example of this, uh, John McCain. John McCain

is, I'll say it, pretty ill. (Laughs) he's pretty sick. Um, we just learned he has brain cancer. Uh, God bless. Uh, he's got brain cancer.

Now, every single time a politician goes into the hospital, for anything, we are told, "Everything's fine. He has a splinter in his head, we pulled it out and he's joking with the staff already." You know, it's always some nice, funny scenario. And then as time goes by, they feed us the inevitable horrid truth that uh, you know, he's got one foot in the grave and another on a skateboard.

Uh, but they cannot be honest with us. The politicians and the mainstream media are incapable of being honest with us, and I feel it's because they deem us too stupid, and uh, sensitive to accept the truth about anything, so it has to be fed to us in, in stages like you would, like you would tell a, uh, a child about an impending divorce of their parents. You don't just go, "Yeah! Me and your mom are splitting up." It's gotta be done gently. They treat us like children.

Um, and this has been done constantly. If you remember when um, Ronnie Reagan was shot, uh, years ago, we uh, we were pretty much told, "You know, he caught the bullet, he threw it, he joked with the staff and uh, was back at the White House." Uh, for a while, for a while we were, we were told that. And it turns out that guy was just about dead. Uh, when you watch documentaries on the Reagan uh, attempted assassination now, you realize it was a grave situation. But even as far back as that, they just lied to us and um ... it hasn't stopped, it has only gotten worse. Only gotten worse.

The investigation that's going on, the Russia investigation by um, Mueller, the um, guy in charge, the, the uh, guy in charge of the investigation, there he is, Robert Mueller. Um, he's now investigating Trump's business dealings and uh, business transactions. Where did this come from? How is this relevant uh, to the investigation? Did they find something that made it relevant to the investigation? That's, that's important, I believe. Uh, if they did find something, oh, uh, Trump colluded, he said, uh, "We'll take this info and I'll give you this, and we will exchange, uh, things that are valuable to each other, and uh, that'll be great." Yeah, that would be a problem.

I've heard or seen nothing that proves that happened between him, or Trump Junior, or anyone else in Trump's organization that that happened. You'd be hard pressed to um, to find that on mainstream media though, they're making all kinds of uh,

accusations and speculations that are being fed to you on social media as fact. But uh, now they're looking into business dealings. Does anyone remember uh, what Trump did before he was president? Anyone? You? Who should I pick, you, alright you, who? What did he do?

That's right, he was a business man! He did business! He wasn't a career politician, that's why he won the election by the way. Being a businessman, a world, global businessman, he did business with, anyone? Yes, world leaders and world organizations! Absolutely, very good. So (laughs) so you can't then say he was uh, doing anything inappropriate just for doing business with other uh, countries. That's what business people do. Now again if there were any um, illicit or inappropriate dealings, that's another thing. Again, nothing has come forward that shows there was.

So if you have a life politician, lifetime politician that is doing business with foreign governments, that might get you like, "Huh, maybe something's going on here." But if you have a businessman doing business, that's called success. That's called doing what he was supposed to do. And the fact that they are now, they got their grimy, uh, paws in, in that whole thing is um, par for the course, and astounding. But typical of what we've seen. Uh, we'll be back in a very short moment, don't go anywhere. Anthony Cumia in at InfoWars.com.

Thank you so much, deep voice guy. Love that guy. Uh, yes, welcome back, Anthony Cumia in at InfoWars.com. Uh, I wanna finish up uh, today with uh, praise the Lord and pass the ammunition, OJ's out. The Juice is loose, ha ha! Uh, he's not out yet, I believe uh, they have to ... boy that's gotta be tough, huh? Like you know you're out, I believe October, beginning of October OJ will be released. He's been paroled after nine years in prison for um, armed robbery, kidnapping, knocking down people's mailboxes, driving through back yards. Got a girl in the car, that's a [inaudible 02:53:04]. Uh, Sheriff [inaudible 02:53:06] Justice. Uh, yeah, he's um, he's gonna get out, he's been paroled.

Uh, the parole hearing was interesting. Uh, OJ does not shut up. He's gonna, he's gonna be arrested for talking people to death uh, when he gets out, it must be um, it must be odd after nine years you're gonna be out and about and famous. Like you know, most people, they get out of prison and uh, might remember an old guy named Brooks. They put him in the uh, in the grocery store, he was bagging groceries. Then he went back

to his house and uh, carved "Brooks was here," and then hung himself. Uh, I don't see OJ doing that.

But it's gotta be weird, you get out of prison, you're on parole, a probation, um, and, uh, uh, and your paroled, and um, you're famous, you're OJ. That's crazy! But uh, he is out and he's gotta wait now, what is it July through August, September ... he's gotta wait like a couple of months. That's gotta be the hardest time. Remember when Quint in Jaws was talking about when uh, that big old PBY came flying down, and he goes, "That's when I was most scared. Thinking it was my turn." Like, right before you get on the plane you think that last, you're the last one the shark's gonna get? Like, OJ's gotta be scared that he's gonna get shanked or something.

He better not skew, steal any um, any of the white supremacist's cookies or anything in, in prison. He just better do some, some easy time. Or could you see if he gets in a fight and winds up killing somebody? Like OJ has to kill somebody in prison, and they're just like, "Yeah, you're in there forever now OJ, sorry. You killed someone." Um, well OJ Simpson paroled after nine years, uh, the, the humorous note, he did kill two people, remember? Remember when he killed two people?

Uh, I, I didn't think he was gonna get out, I was watching the hearing and uh, OJ does not seem to place uh, responsibility on himself. He went off about the episode that happened in that Las Vegas hotel room where him and uh, a bunch of other guys uh, burst in the room to co- reclaim what he said was his sports memorabilia, uh, with a guy with a gun, uh, they held people against their will, and uh, took this merchandise back. Um, and from what I was watching on the hearing, OJ seemed to blame everyone in the room except OJ (laughs).

But, you know, in the uh, wisdom of the uh, panel, that uh, was in front of OJ, uh, they let him go. His uh, daughter made a statement saying that uh, OJ is um, a great guy, just wants to spend time with his kids. And the victim of the crime testified in OJ's defense, and said that in the interim between the crime and now they have, re uh, kindled their friendship and everything is uh, hunky dory. So I am really looking forward to OJ on Twitter, Facebook OJ. OJ actually said, uh, he might do a podcast or uh, a, web, uh, show of some sort. A bl, b- a vlog. I am ... I am there, regardless of what this maniac, murderer does, I will watch.

Uh, thank you so much for tuning in. Thank you to Alex Jones for having me. Um, Anthony Cumia, over at

compoundmedia.com, in right now and uh, loving every minute of it at InfoWars.com, I'll see you in a couple of weeks.

PART 6 OF 6 ENDS [02:56:46]

| Alex Jones: | 00:01:41 | Aborted babies incinerated to heat UK hospitals. Soylent green, ladies and gentlemen, is made out of people. |
| --- | --- | --- |
| Speaker 2: | 00:01:50 | But now, children are literally being passed to the furnace in order to fuel hospitals in the UK. They're being sacrificed on the altar of efficiency and prosperity. |
| Speaker 3: | 00:02:01 | What is the secret of Soylent green? |
| Speaker 4: | 00:02:07 | The powdered flesh from dead babies. Some people believe it can cure disease. |
| Speaker 5: | 00:02:12 | Because of its enormous popularity, Soylent green is in short supply. Remember, Tuesday is Soylent Green day. |
| Speaker 6: | 00:02:19 | The supply of Soylent Green has been exhausted. You must evacuate the area. |
| Speaker 7: | 00:02:25 | Today is Tuesday! |
| Alex Jones: | 00:02:29 | The family court ruled that the shareholders of PepsiCo, [McDolderberg 00:02:31] Group Company, are not allowed to know, uh, what they're using the baby parts f-for in the flavoring, but we already know. So, enjoy the flavor. |
| Speaker 8: | 00:02:42 | We're gonna get the real solution, which is going to be a combination of death panels and sales taxes. |
| Bill Maher: | 00:02:46 | I'm consistently pro-death. I'm for assisted suicide. I'm for regular suicide. I'm for whatever gets the freeway moving. |
| Speaker 10: | 00:02:53 | Is spending a million dollars on that last three months of life for that patient, would it be better not to lay off the, those 10 teachers and to make that part of the medical costs? But that's called the death panel, uh, and you're not supposed to have that discussion. |
| Speaker 11: | 00:03:09 | They told me to, uh, to say that they were sorry, but, you had become unreliable. |
| Speaker 2: | 00:03:24 | Is this the kind of society that you want to live in? Any kind of society that would do this to its children will do it to its senior citizens, it will do it to its dissidents. That kind of society will also eventually turn on its police, on its army, on its prison guards, on the [prislings 00:03:40] and the collaborators who make that possible. This is nothing but a suicide cult. |



EXHIBIT
B-43

| Speaker 12: | 00:03:48 | The scoops are on their way. The scoops are on their way. I repeat, the scoops are on their way. |
| Speaker 13: | 00:03:54 | You will find out why Soylent green means life. You will find out why Soylent green means death. |
| Speaker 14: | 00:04:01 | We've got to stop them. Come on! |
| Speaker 3: | 00:04:01 | What is the secret of Soylent green? |
| Speaker 14: | 00:04:01 | Soylent green is people! |
| Alex Jones: | 00:04:12 | We got to tell 'em. |
| Speaker 15: | 00:04:12 | Next thing they'll be breeding us like cattle. |
| Alex Jones: | 00:04:12 | We got to warn 'em. |
| Speaker 15: | 00:04:16 | We got to tell 'em. |
| Alex Jones: | 00:04:20 | Next, they'll be breeding us like cattle, and that's the point we've gotten to. First off, my friends, Donald Trump has had his attorney general come out, Jeff Sessions, and say the number one priority right now is going after Julian Assange and "leakers". |
| | | Well, you're not a leaker when you're exposing criminal activity in an out of control, rogue government. And it was WikiLeaks and the great patriots in our government that leaked the information that helped get the truth out about the Democratic Party and the Republican establishment that put Donald John Trump into office. |
| | | We always hear Donald Trump's this incredibly loyal person, an honorable man that stands up for what he believes in. He's done that on many promises. He said he would, he would, he would, he would carry out, but quite frankly, the disloyalty of making it the top priority or demonizing Julian Assange and others, is amazing. |
| | | It's Donald Trump that said, "I don't know who's got these emails, I don't know where missing emails are, she's covering up 30 something thousand of them, but if Russia does have them, Russia release 'em!" Because they change the subject to Russia being bad instead of why did Hillary have all these illegal servers and was doing all this illegal stuff that other governments and people were getting into. Exactly! |

I'm not a Republican, I'm not a Democrat. I couldn't stand George W. Bush. I couldn't stand Bill Clinton or Barack Obama, because they were globalists. They were elitist. They were selling the people out. I'm somebody that really tries to get to the heart of the matter of what's going on even though it's painful to try to cover some of these topics, and even though it's very, very upsetting to see the media take out of context what we cover, what we say, and what we do to demonize us and to lie about us.

I've seen that in the last few weeks at a level I've never seen it before. Pure and total deception. I go on Joe Rogan's podcast a few months ago, number one podcast he's ever done, number one podcast ever period. Now, over 60 million downloads conservatively. For one podcast. A four hour one at that, or three hours, 45 minutes.

And we say, "We don't agree with Trump. He's got big problems, like grabbing 'em by the you know what. Yeah, none of us agree with that, but you can see how the media took it out of context and acted like he was jumping out of a bush grabbing women. These are women throwing themselves on him, so I wouldn't call it rape, but it's still, you know, not good behavior to say, 'Yeah, you can just grab 'em.' But that's how animals basically behave and we're mammals."

It's all over the news again. Alex Jones defends Donald Trump. They'll play the clip, but on both ends of it, ladies and gentlemen, they will not show you Joe Rogan, myself, Eddie Bravo saying we, Trump is wrong, Trump shouldn't have done it, Trump does a lot of bad things. Those are quotes.

And I've sat there with newspapers and even talked to the newspapers and said, "Here's the full clip." We're live on air here. Teleprompter free, all the bad allergies in the air, excuse my coughing.

And I've sat right there, and said, "Here's the full clip," and they don't care. They laugh at me. They absolutely laugh at me and they think it's all a big, giant joke. Yeah, they laughed last year, they laugh thi-this year, they cut it out of context and they lie.

Ladies and gentlemen, I would never do that to somebody. And, in fact, when we've gotten pieces of news that we've discovered have been taken out of context that we were given, we come out and do a retraction. And then the media runs around saying, "Oh, they admit they're fake! Th-They did a retraction!"

No, it's because we're not fake. When we get more information and learn we were wrong about something that we come out and talk about it. Now, I'm going to get into some new Sandy Hook information here today. Newtown, the massacre. I'm gonna break it down, some of the new developments and what's been happening in the media.

And the first thing I want to play, though, before I get into this, to kick this off, and I'm gonna get back to the Donald Trump later, it all ties together, is Madeline Albright on 60 Minutes with Lesley Stahl 14 years ago, 15 years ago saying, "500000 Iraqi kids dying was a reasonable price to pay," and I'm going to tie that into Sandy Hook, and so much more straight ahead. Here's Madeline Albright.

| Lesley Stahl: | 00:08:39 | We have heard that a half a million children have died. I mean, that's more children that when, in, in Hiroshima. And, and, you know, is the price worth it? |
|---|---|---|
| Madeleine A.: | 00:08:57 | I think this is a very hard choice, but the price, we think the price is worth it. |
| Alex Jones: | 00:09:06 | So, so, there you go. It's a good price, it's worth it. That's 500000 Iraqi children, the 1991 war was wrong. Turns out Saddam was a CIA operative who was ordered to attack Iran in the Iran/Iraq war, ordered to attack Kuwait, given the green light, US ambassador told him it was okay. But what am I getting at here? |

Why is this so important? Because we all know they got us into that war saying babies were in incubators and got thrown out on the floor, and their brains kicked out. That was by a young lady who was a PR firm daughter, 15 years of age, in acting lessons, who'd never been to Kuwait.

We then got lied to about WMDs in 2003. And we've been lied to over and over again with this latest chemical attack, where they caught the rebels as usual, bragging about how they launched the chemical attacks, and then we cover it, and the media says we're Russian agents or Assad agents, when in 2013, Congress and the UN came out and said the rebels had been caught launching a chemical attack.

Where's the left criticizing Trump for doing that? You're not there. Then some will say, "Oh, what you don't like Trump?" No, I like him on most issues, I think the Syria thing and other things are very, very questionable. That's what I'm getting at here. We

don't choose sides except for the truth, and it doesn't mean it's easy to find sometimes, ladies and gentlemen, because there's a lot of research has to go into this.

So, we're not just sound bites here. And this isn't about defending Info Wars or myself, it's about the audience and, and, and new viewers who've only heard lies about us, understanding that we're really giving you in-depth research and showing you where we got the research, so you can verify this for yourself.

Now, what's the new Newtown info, and how does this tie into the tragic event that happened on Obama's watch? The media, since day one, has said that I said the attacks never happened, when you can go and find myself and Rob Due and everybody else that works around here, in more than seven debates we've done, with both sides, people that think the official story was as exactly as it happened, and former top school security training experts, law enforcement folks like Wolfgang Halbing saying he believes nothing happened.

Quite frankly, I've said I don't know the truth, but if you've got a government caught lying about WMDs that causes wars that killed millions of people, and hundreds of thousands of children from starvation, that Bill Clinton intensified, and people that launch fraudulent wars against Syria, all based on lies, and they do this over and over again, I don't want them to sit there and shake their finger at me, like I'm a demon that doesn't care about children being shot in mass shootings.

I believe mass shootings happen. I believe people get killed by guns. I know the statistics. It's like the 14th or 15th, depending on the year, uh, cause of death. D-drowning's higher, uh, car wrecks are higher, cancer's higher. We all know that. But, for unnatural death, it's, it's, it's not even in the top ten, and that's counting the suicides into it.

But still, it's an issue, and no one's denying that. But we've had Islamicists run people over with cars lately in, in Stockholm, Sweden and other areas, and they say, "Let's ban cars," instead of Islamicists coming in.

They won't even say it's Islamicists when they- they'll say it's a, a, a Swede ran over somebody. His name's like Akbar whatever from, as usual, Syria or s- um, Somalia, I mean it, it's the same story, and I've got stacks of MSM saying Trump's wrong for even saying that this latest attack in England, latest attack in Paris, killing police, running over people, you name it, was Islamic.

"Media meltdown over Trump correctly calling Paris attack terror, Islamic," of, it, it, it was. They have riots every night of the week, basically, burning down cities. Tourism's almost dead in France now. They've got millions of Islamicists running around.

It's, my crew was there last year. You can't walk around at night by the Eiffel Tower without Muslims coming up and physically assaulting you. And I don't want to fight with the Muslims. The point is, you can't go to their countries. They won't let you walk down the street there. If you're a Christian or a Jew, they'll kill you. You're gay they'll kill you.

So, the media says I'm anti-gay because I don't want Muslims killing them. So, here's my new Sandy Hook information. There have been, and, and I'm not exaggerating, 5000 articles, because I can look in Google news, type in Sandy Hook Alex Jones, and do an aggregate search of the last year, over 5000 articles saying I believe that the moon landings never happened, they'll probably clip that out, I do believe they happened.

They, they falsely claim that I said the moon landings never happened. They don't show the clip. They claim that I believe that, uh, the Loch Ness Monster is real. Stuff like that. Okay Hundreds and hundreds and hundreds and hundreds and hundreds a week.

Now, thousands in the last year, and here is Patient Zero article we found. "Donald Trump and the 'Amazing' Alex Jones" New Yorker Magazine. This has got to be the most plagiarized story in history because I looked at everything from the L.A. Times, the Associated Press, to everything else I've ever seen, with Patient Zero, and they all lift the exact paragraph and don't even change it. This is the most crazy thing I've ever seen.

Now, look at this. "September 11th attacks". "Jones's amazing reputation arises mainly from his high-volume," uh, "insistence that the national tragedies such as the September 11 terror attacks, the Oklahoma City bombing, Sandy Hook elementary school shooting and the Boston Marathon bombing were all inside jobs, false flags, or ops secretly perpetrated by the government to increase its tyrannical power and, in some cases, seize guns. Jones believes that no one was actually hurt at Sandy Hook - those were actors - and that the Apollo 11 moon landing footage was fake."

Now, you notice, there's not links here. Now, let's talk about this. This has been in 5000 articles since then, conservatively,

that I know of. A lot of stuff doesn't end, end up on the Internet. It's, it's in newspapers physically or on TV.

Just like you've seen, uh, more than 5000, 6000, 7000 articles the last week and a half about me saying I've come out and said I'm fake. I've come out and said I don't believe in anything I say. Never said that. There's no audio, there's no video, there's no nothing. People come out and say that I believe, a few years ago, when I wore a lizard mask as a joke, the Gaur, G-Gaur from, from Star Trek, and, and, and did a joke spoof comedy piece, they say I really believe that I'm a lizard and that I'm insane, and that I deserve to be locked up in a mental institution.

That's coming up, uh, they say that about Trump, too, and I go, "Dude, I'm doing a skit like anyone else does, like Glenn Beck does, or, like John Stewart does." And they go, "Oh my god, you admit you're fake!" And you go, "No, I didn't." And they just, all the people on the street walk up and go, "You, you admit you're an actor?" And I go, "No, no. Uh, sometimes when I do comedy pieces, like the one where Leanne, the headline from last year is, "Alex Jones turns against Trump, now supports Hillary."

Leanne Macadou didn't really beat me up. That was a joke. Or where Leanne likes to wear her Chihuahua on her back, and sh-and, and we were making a joke about it kept petting her back, and people were walking down the halls like people were petting her rear end, she, and she said, "We ought to do a joke video," so we did one. That's not real. Okay? That's not real. Okay? When I was in [inaudible 00:17:07] with Keanu Reaves and stuff, and, and I said, "I'm a government agent," and uh, and then I get killed. That's, that's not real. People back then thought that I was admitting that I was a government agent then.

Ladies and gentlemen, being a government agent's a dime a dozen. It's 1000 times cooler that we built Info Wars organically on our own, with our blood, sweat, and tears and don't censor people, and our crew can say what they want and do what they want, and, a-a-as long as they have documentation. But we are the open, most free news organization, in, that anybody has ever seen, basically.

But, when I wear a hat of being in a movie, basically playing myself, or I play the part of Cobra Co- I mean that's when articles were, "He believes he's Cobra Commander."

No, I did that the 2008 election, making a joke to both McCain and Obama were criminals, in my view. And so, it didn't matter

who you voted for because they were all launching wars and wanted more, more destruction. I mean, uh, e-e-e-even a two year old understands that sometimes mommy plays the part of, you know, a character playing with blocks and toys, or sometimes mommy acts like she's a dinosaur, or daddy does, or sometimes daddy plays, you know, cowboys and Indians in the backyard, or Batman and Robin.

I mean, that's, they talk to you like you're two years old, and you go, "Alex said he's fake when he's Cobra Commander." Because, again, the media is going around saying I'm insane, and need to be put in a mental institution, literally. Because I do, uh, they say I'm a paranoid because of this video. And then it comes out, of course, no one ever diagnosed me of that, or ever said that to me. They're just lies.

But, but, but that's what's going on. I do these videos where I'm paranoid, they show it on the national news, they make jokes about it, Colbert and everybody else make jokes and show me doing this, and say, "Look how crazy he is," deceiving their audience.

I was making fun of people that are paranoid, that are spying on all their fellow citizens thinking they're Islamic terrorists instead of just controlling the borders and not letting people in who are affiliated with terrorists. Now, I know our regular listeners know this. They're like, "Alex, stop talking down to us. We understand you're using satire and comedy. We know you're serious 90+% of the time, but sometimes you put a top hat on and play the part of the head of Goldman Sachs ripping people off, that you don't mean what you're saying.

But again, they're trying to psychologically inoculate people out there that have never seen or heard the show, so that they just believe that I'm a actor, and don't mean what I'm saying, or I am completely insane, when I play the part of John [Cordisack 00:20:02] interviewing myself.

People go, "Are you crazy? Do you have double personalities?" Uh, no, it's called a skit. It's about high school level. I played the part of the Devil being pro-abortion. People then got freaked out and said, I even had one employee almost quit, they go, "That was really scary. How can you talk like that about how wonderful abortion is for Satan?" And I was illustrating how it's bad, by playing the part of Satan.

It does not mean that I literally bel- want to worship Satan. Do you understand? But you know what? I backed off on satire the

last few years, because people are so serious now, they want me to be more serious, but I do so little of that, I think I need to do more of it with like a warning before it. Parental, s- uh, warning, viewer discretion advised. You're about to see satire and comedy and other illustrations, not to deceive you, but to get you to think and realize.

Because if I just get up here and say, "Read the vaccine insert. It says it can kill you, it says it can brain damage you, to have a secret vaccine fund to cover all the vaccine damage, which is admitted to exist, but the details are secret, uh, please learn about how it's this ultimate way to put the government in your body. Please research how learned immunity is real, but also has great dangers. Please learn about how the elite don't vaccinate. Here's mainstream news articles," no one listens.

But if I get up there in a devil mask or a lizard mask and say, "I want you to take vaccines and I don't want you to read the insert because you need to trust the government and do what I say, and don't worry about all the secret experiments giving people syphilis in vaccines and cancer viruses. Uh, you know, just please take the shots. Please take the shots. Please take the shots. Please, just trust me, drink the fluoride water, don't look at the Harvard studies that say it can brain damage you and lowers IQ, on average, 10 points for every few years you drink it."

Then, everybody listens. Then it gets 5 million views. I do a serious video, it gets 100000, well, here's Harvard, here's UT, here's MIT, here's Stanford, here's, here's this medical school. Cancer rates up 10000% in pediatrics. Why are the kids getting cancer? Why is cancer up 3000%? No one cares when I'm showing the Journal of Medicine and WebMD, but man, I put on a lizard outfit, have that on the impact of fluoride on neurological development in children? I get massive, massive, massive, massive, massive views.

And then people get warned. So they're saying, "What do we do about this guy reaching 35 million people a year ago, 45, 50, 60 million conservatively elite now, what do we do? Well, he's, he's done some comedy pieces. Let's come out and say, 'Look, he's an actor. He's fake.' And look, he's blown up quite a bit on air, so let's edit all that together and say he must be crazy. And then let's take everything from him. And let's take his sponsors, let's take his advertisers, let's, let's, let's take everything he's got." And that's what they did.

Every major channel, every major news channel in the country has been saying for over a week and a half that I admit I'm fake and that I'm not real. Because they've shown clips of me dressed up in a clown outfit saying really scary stuff, and say, "This man is psychotic. We've got to take everything away from him." Think about that. And then I sit here, bound to not even let, be able to speak about all the things I'm going through, and then I say, "I was playing the part of the Joker," and they go, "Oh my god, everything you said was fake."

Let me tell you something, everything I said as the Joker was true, but from the other side. "Take your shots. It's good. It's good to die. Don't read the insert. It's good to drink fluoride water. It's good to love big government. It's good to lose your freedoms. It's good to support communism." That's done to warn people.

And everything I say is documented. You don't have to believe me, I'm showing you where the media's saying Donald Trump's crazy for saying the attacks in Paris, with a bunch of people getting killed last week, or the week before that in, in Stockholm, Sweden, or the week before that in London, England, or the week before that in Brussels, Belgium, and, and, and 238 dead in the last, uh, year or so, couple years in, in France from terrorist attacks, and AP, Fresno shooting, uh, k-, uh, uh, changes the words from "Allahu Akbar", removes Islam reference.

I mean, that's happening! They're the fake news, they're the ones deceiving. When I tell you Madeleine Albright went on multiple programs and said it was a good price to pay, 500000 dead kids, I show you a clip. If I say George Soros said he wasn't ashamed of being a Nazi collaborator, I show the clip. If I said it, I might as well play it up. You guys, t-got two guys running the show that makes Takes 5 on the weekend.

A- we have guests on. We don't pre-screen what they're going to say. Callers, we don't screen what you're going to say, like other shows. Y-Everybody knows that. So, why? We're so real, they say we're fake.

So, here's the new Sandy Hook information. They have got the people that don't believe anything the government says mad at me because I'm saying I don't know exactly what happened. Sandy Hook's so inconclusive. You've got the mainstream media saying, and thousands of articles, that I believe nobody died. Then I see Tweets Oberman and Tweets from everybody else, saying, "He goes and harasses families. He sues families. He gets

in their faces. He says their kids didn't die." I've never been the Newtown, I've never got in their faces. I've said, "I believe kids died," but then I've said I've seen Devil's advocate, w-we've done debates that no kids died, and that it's all made up, because the media has been caught making things up.

We've had debates where I said both sides, and they cut it knowing that. You can go watch the full deals. Just like Pizzagate, Megan Kelly, I said, "I don't know if Hillary really was involved in all this pedophilia as it said in the Wikileaks. Some of them the pizza place." But I said, "I know she said I came, I saw, he died in Libya. I know they made a country that was stabilizing and working with the West to have them come out of dark eight years before, it's like 14 years ago now, a bit longer, and she fed a radical Jihadist how to put hundreds of thousands of women in slavery in North Africa and Syria, and tens of thousands under the age of like seven years old, the little kids getting gang raped.

Just sh-show me the Al Jazeera from last week, also International Business Times, tens of thousands of women in Libya being sold on slave blocks into slavery, video of it, International Business Times. I've seen national pundits make fun of me when I talk about the government allowing Islamicists to sell women on slave blocks. They go, " What's a slave block?"

"The migrant slave trade's booming in Libya. Why is the world ignoring it?" Well, our government came in, took out the secular government, quasi-sanctioned it, put it around [inaudible 00:27:11] the slave trade's back for men, women and children by the Muslims. They started the modern slave trade. They taught us how to build, but nobody ever says it because they're the Muslims.

What do you think a harem is? It's a bunch of kidnapped women. You watch any Women's March, Muslims are leading it with women wearing hajibs everywhere. And the Muslims are just completely loving it.

They showed it in International Business Times. It actually has video on the site of the women being sold. It's, it's something, actually ripped their clothes off, I'm not going to show that part, but they just rip their clothes off and the men are just standing there like, "Ughh," most misogynistic, enslaving a woman I've ever seen, but that's okay, because it's Muslims.

Open Europe up, bring them in, cover up the rapes, cover up the murders, cover it all up. So, this is, this is what I'm getting out of Sandy Hook. Here's the new info. It just hit me. Islamicists

love the left. Five million have been brought into Europe. Merkel's covering it all up.

It's all going on. It's intensifying. The, the, the, the, the liberals love infanticide. Uh, they, they kill more people, less people on the highway. Bill Maher earlier. They're heating hospitals all over the West with the bodies of babies. We broke that 10 years ago, people couldn't believe it. Now, it's mainstream news.

Uh, they're selling infanticide. The big liberal professors want to kill kids up to age three. This is all going on. You see up there? "Migrants are being sold in markets at a rate of around $200 to $500 a head." Look at that. As they come up through Africa through Libya trying to get to Southern Europe, Italy, Greece, Macedonia, and they, and there's a link in there somewhere that goes to footage that's too graphic to show.

And they make jokes saying I'm crazy, the Muslims aren't doing it, it's not true. And, um, and when the Muslims shoot, kill, or run people over or bomb them, the news says it's not Islamic, like the 160 dead yesterday in Afghanistan.

So here are these holier than thou people, when we question CNN, who, supposedly, is at the site of Sandy Hook, and they've got, in one shot, leaves blowing and flowers that are out, and you see the leaves blowing, and they go- they glitch. They're recycling a, a green screen behind them.

Uh, you've got, who's the female lawyer used to be on CNN? Uh, f-fake southern accent or whatever? She's on there with cars driving in a cul-de-sac in circles and you see, it's the same cars going in circles.

And then we've got Anderson Cooper, famously, not just with the flowers blowing in the fake, but when he turns, his nose disappears repeatedly, because he green screen isn't set right. And they don't like to do live feeds because somebody might run up.

CNN did that in the Gulf War and admitted it. They just got caught two weeks ago doing it in, supposedly, Syria, and then the green screen cuts out and they got, you know, phones ringing. And all we're saying is, if these are known liars that lied about WMDs and lied to get us into all of these wars and backed the Arab Spring, and Libya, and Syria, and Egypt, everywhere else to overthrow governments and put in radical Islamicists, if

they do that and have blood on their hands, and lied about the Iraq war, and for the sanctions that killed a half million kids, and let the Islamicists attack Serbia, and lied about Serbia launching the attack, when it all came out later that Serbia didn't do it, how could you believe any of it if you have a memory and you're not Dory from Finding Dory, you know, the Disney movie?

Thank God you're so stupid, thank God you have no memory. It all goes back to that. Now you go on and on about the wars, the lies, the racial attacks they cover up that are on white people, and I'm not black/white, but just this weekend, they have Science is Real marches everywhere, and here in Austin, they have signs, officially saying "White Men Run Science, that's Why they Don't Believe in Global Warming."

No, white men run the global warming scam and want carbon taxes for the Davos group at 100 trillion every decade. And white men want to cut Africa and Latin America and Asia's f-food and water off. "Earth Day is Too White and Out of Touch With Reality."

Now, there's your New Republic headline. This is such a racist, anti-western culture. There's only 7% white people. They hate themselves. They're dying, they're gone, don't worry, they have 1.2 replacement rate, the West is dead. Hey, let's at least pass the West and free market and some good ideas on to the rest of the people.

I get it, white folks don't want to have kids, they're self-loathing, they've been sterilized by the water. Kill yourselves if that's what you want. But don't sit there and tell me how much you love the Earth and then lie about me and say that I hate the children of Sandy Hook and I hate the parents and I think all the parents are liars and nobody died. I did an investigation, because you can't believe one word comes out of MSM.

And we hate debates with both sides, but I read the headlines today about how I'm attacking families, never a link, never to video, to make the media and the government and the system look like they're good, look like they're the good guys, when they're the blood thirsty war mongers posing as liberals and as mainline conservatives that have been pushing all of this. But you can see Megan Kelly, where I'm talking about Hillary funding Islamicists in slavery, and murder, and little girls being sold, and how she is directly responsible for hundreds of thousands of dead people and thousands of children sold into

sex slavery, and then they say, "And Alex Jones says this is happening in a pizza place in D.C. Here's the poor victim."

Then they take me going, to clarify, "No, the media focus on the pizza place. I looked at it, said it the, the, the lot of the, uh, news and the info wasn't accurate. We didn't create it, and they say, "Oh my god, Jones is to blame for all of it. Pedophilia exists nowhere on Earth." That's the new thing.

And Salon magazine comes out and says, "Pedophilia is good." So, I want to tell Jeff Sessions something here. Trump is good on his foreign policy. I'm gonna shoot a second live video here in a moment, but I want to bifurcate it here for a second, or demarcate it. I should say divide it. Saying the number one priority's going after leakers, it's leakers that exposed the globalists and CNN rigging the polls and rigging the debates for Hillary at MSNBC and all their criminal activity, and the Democrats talking about how to make us poor and dumb and how to keep us in the dark, these are quotes, and all the horrible evil, and let's have the kids in the hot tub, and, you know, and, and $65000 of succulent hot dogs for the president.

That means male prostitutes. That's fine with me, that's, I'm not, I'm not judging the president for that, the point is, that's there. They don't attack any of the real stuff that's in the WikiLeaks, they just attack whistle blowers now, and they sit there and they attack, and, and, and create straw men or stocking horses or, or, or paper tigers, uh, that, that aren't what I said or did, to then misrepresent.

And, you know, here's the good thing. They miscalculated. Every time media creates new hoaxes against us, and says we're the Devil, we're the liars, we're the scum of the Earth, people do research and they find out it's not true, and we've never seen the traffic to infowars.com and prisonplanet.com [inaudible 00:34:30] not even during the election.

We've never seen the traffic and the new people coming to the site. I mean, during the election night, we had more for that, that day. There was like 30 million in one day, 80-something million the whole week. But, this is people checking my name, checking articles, people come up to me in the street, some of them come up, have been mean, but most people have come up and said, "Man, I didn't used to like you or anything, but I went and looked all this up and found that you were telling the truth. You know, I found out what you really said. I saw on the news that you didn't even know your kids' names. You know, I

saw Colbert say that, and then I went and looked at the evidence, and it was you didn't know the name of a teacher."

So, it just goes on and on and on that the system thought they could sit there while I've been silenced, and then misrepresent everything we say and everything we do, but people themselves have gone out and researched it for themselves.

So, we have had a record visitors and record support and record purchases of the products that are excellent. Water filtration, [inaudible 00:35:35] supplements, T-shirts. We're not funded by sponsors, they took those away, the network that I'm on, the radio show, that has ads, I have some ads that are on there, but it's, it's almost all our products now. They're coming after that. You see all the articles demonizing them.

But they're high quality, so people see what happened, but just getting back to Sandy Hook. Why is one headline we have running for this on Facebook "The Vampires of Sandy Hook Exposed" or revealed? The vampires are the corporate media. Whatever happened there, one way or the other, which means usually in the media, but they say don't let a good crisis go to waste, that was the White House Chief of Staff when Sandy Hook happened.

There's b-b-d-bm emails from Bloomberg the day before to these national anti-gun groups saying, "Get ready. Get ready to move tomorrow." This should be investigated. All I'm saying is, you should investigate what really happened. Most fake mass shootings, they have shooters and then killer patsy. We know that's happened before. They've been caught before. False flag's a household name.

I tend to believe that's what happened. But real mass shootings happen. I'm not saying real kids didn't die. We've entertained the idea, because the majority of people online don't believe the official story, because they've been lied to so much and seen our government launch wars that killed millions on lies, so they killed 20-something kids?

But you watch the blue screens, and you watch the fake stuff. And, and, and, uh, again, who was that? Who was the blonde lady, it was the l-l-the lawyer on CNN forever? Um, and then she had, well we have a video where the cars are driving in circles, and you see they're driving in circles around her. Now, was it Greta van Sesteren. It's the blonde chick with the, with the Southern accent. What was her name? Well, we have it in there.

And the cars drive in circles for like 20 minutes while she's doing an interview to say she's there and it's the same cars. I mean, it's just, it's just crazy. And it does, it doesn't matter. Everybody knows about it.

There's so many of these blonde female lawyer fired from CNN. She's on for 10 years. Eh, it d- it doesn't matter. Hell, I can look it u- shut it down. I don't want to look. I don't want to know. Eh, the crew's great. Just, let's not. Eh, it, it doesn't matter.

The point is, is that everybody knows they lied about WMDs, everybody knows that, that stuff went on, everybody, i-it's in our normal reel about Sandy Hook being fake. You, you know w- why people question it, okay?

Now, the crew's doing a great job, I just get so r-overloaded with information. Why do I call these people vampires? It's because they've been caught lying over and over and over and over and over and over and over and over and over again to get us into big, bloody, blood-thirsty wars and they make jokes about a 500000 dead kids, and Hillary makes jokes about "I came, I saw, he died." So, you destabilized a first world country. The only one except for South Africa in the continent of Africa, and the whole thing falls apart.

And then you're up there never getting in trouble and John McCain's meeting with the Al-Qaeda ISIS rebels, and they destabilized that country. We overthrow our allies in Egypt and put ISI and Muslim Brotherhood in charge there. They blow up basically ever church in the country.

Our media won't even say when Islamicists are are attacking us, and won't even call it Islamist, and say Trump's crazy when he says it's Islamist. And all these serious things are going on and you sit there posing like you love everybody while you're pushing abortion, while you're pushing infanticide, while you're pushing euthanasia, while you're pushing this death culture with Bill Gates saying if you kill an old lady, you can hire 10 teachers. No, you give more services, more quality, more of an economy f- the economy rises, not the other way, as long as it's free market. You create a crony capitalist or socialist system, it does the d- the opposite.

So, understand that and understand there is a hit out on Info Wars to assassinate my character by lying and creating a s- a, a artificial Alex Jones, a straw man that is not me, that is an imposter, to b- go out there and misrepresent what's happening and what's going on and what's unfolding.

And they think you're incredibly stupid. Now I've got a video of Gold Four propaganda, babies in incubators, that I want to play. And the other one's CNN caught reading off a script in false flag video montage I want to play. And I'm gonna come back, and we're gonna stop the live feed, I'm gonna come back later with another feed in just a few minutes, but this is so critical, because it came out later no babies were thrown out of incubators, this is made up. That's admitted.

I mean, they got us, that was 1991, uh, then it was, uh, 2003, on and on and on, on and on and on, the rebels got caught launching chemical attacks three years ago, they got caught against yesterday, Ron Paul comes out, says it's happening, and Google begins banning me. We got an internal leak from Google saying they've been ordered to go through and ban us, saying it's fake news, that Ron Paul's not credible, and we cannot have Ron Paul on saying that he believes it's a false flag, that the rebels have been caught before, and the UN says it was the rebels, and so does the Associated Press.

And they said, because Alex is gaining credibility, this proves what we said, ban it. Because it's fake news. Then it got leaked a day later, they said, "Okay, we did it. We're gonna stop." But they're not stopping. "Google says rogue vendor violated guidelines by instructing coworkers to rate InfoWars as untrustworthy site."

We are way more trustworthy than CNN. We're trying to tell the truth. Do we make mistakes? Absolutely! But it's not about InfoWars. If they can shut us down, if they can demonize us, if they can win this fight, they can shut everybody else down. And that's why spreading the links to InfoWars.com, the articles, the videos, uh, that's why sending out the links, that's why sharing infowars.com/show.

I know most of you know that, but it's a critical war. Start your own website, start your own blog, whatever it is, use Facebook, Twitter, and Google to pull to your own platform, your own site. They want to make it easy on their platforms so they control it, they censor it. That's in their own documents. Like Matt Drudge said when he visited a year and a half ago, we've got to build our own sites again. We've got to go back to the future.

The future isn't sitting on Facebook where it reads your eye movements and then types for you. So you don't even need to talk anymore. First it's don't type, then it's talk, now it's don't even talk. As language implodes, we need to go back to being human. Are calculators great? Yes, but nobody since Texas

Instruments came out with one 40 years ago knows how to do math anymore.

They didn't let us have calculators in school, now that's all they've got. It's an example of how some progress brings us back. Like, uh, flying in a space ship to Mars in a year. 14, 15 month mission, and Mars is close to the Earth. Does it make your body stronger or weaker? Makes it weaker. You're in a high-tech spaceship, but you're going to an environment that has less gravity as well. We need the gravity of mental exercise, of physical exercise, of intellectual exercise or we implode and we fall apart. We become Dory the fish that has a seven second memory.

Everything is memory, everything is remembering space time continuum, what happened five years ago, that's experience, that's knowledge. If you, lo- let me explain something, there's information, there's knowledge. I'ma show people a graph here, okay? Here's information, okay? When you're five years old. Okay? You can interface the internet, you can speak, you can do amazing things, but you don't know from life experience how to trust the info, whether it's accurate or not. You don't have the time or the memory of when you're 75 before average cognitive decline begins to make you more like a child.

Because you see, you're once the man or woman, twice the child. You start out with low cognitive ability, you go to a peak of training, experiences, life, revelations, you hit a peak, and then your brain cells begin to die, you begin to do less and less, you begin to become a child again. Once the man, that's William Shakespeare, twice the child. You're only once the man. You're twice the child. No one's ever done that graph, but believe me, that's how it works.

Now, here it is in life going up, but if you don't have memory, if you don't train yourself to have a long attention span, that's the best part of life, having a long, deep attention span. If you don't do that, you're transient, you don't care, you, you're not involved, you don't develop the neural pathways, in your entire life, this is a five year old, on average, by the time, it wasn't just Jews, in most European cultures and others, all, even in China it's the same, at 13 years of age, they would normally do a cultural test to see if you were a man, and then, and then pass you into manhood or womanhood the next year or the next year. It was like school that was done by the local priest, the shaman, the tribal leaders.

[inaudible 00:44:38] the culture at 12, 13, or 14, you would go through testing or through rituals of hunting, of, of of science, of, of different tests by the different elders to see if you were an adult yet. When you were, when they said you were an adult, then you could decide to leave your parents' house, leave somewhere else, do something else, go join an uncle in another, you know, tribe, uh, 100 miles away, whatever, or you could get married, stay in the tribe, whatever you wanted, or wait.

But you had to decide if you were going to be a man or a woman and leave or stay. Now, normally, by about the time you hit about 16, you were always kicked out unless you had special needs. Ladies and gentlemen, they're telling people now that 35 is the new adult. 35 is the peak in physical and mental overall prowess. You then gain knowledge up to this level, but, but, but, but by then, the 35, you are at your peak, women and men, you are at your peak, peak, peak, peak, peak, peak, peak.

But if they arrest your development, and most men I know, our crew's not like this, because that's who gravitated towards this, I'm not bragging, it's just true, most men at 35 act like they're 16. They still want to hang out mainly with men, they want to get the approval of man, they act like boys, they wear sports jerseys, they want to play, they want to party all day, they're not serious minded.

And most of them at 35, what do they not have? They don't have children. You're supposed to have children by 16 in every culture, biologically. You're not having them by 16, there's something wrong with you. Oh, but see, there's college, the priesthood you got to get into, and then by then, oh, you got to make money because you're in debt. Oh, you don't have time for kids. It's all pretty much by the books by the 20s, don't have time for kids, you're trying to get out of debt.

Oh, you're 40, you're finally halfway out of debt. Oh, you want to have some fun now? Oh, you're trying to find a woman, oh, she's barren. She's doing the same thing. By the time you figure out you want to live, by the time you hit 16 at 40, and I'm giving you the big knowledge here folks, at 40, on average, and I do this by design, you are now the equivalent of a 16 year old.

When I was 16, I didn't want to party anymore, I didn't want to play games anymore, I grew up. I'd already been in the fights, all the big rituals, I'd already had, probably, uh, I hate to brag, it's, I'm not bragging, it's actually shameful, probably 150 women or more, that's conservative, I'd had over 150 women, I'd already been in fights with full grown men, I was already dating college

girls by the time I was 15 years old. I was already a man at 16. At 21, I was a leader. At 21, I had a radio show on one of the biggest stations in town, and by 22, I had top ratings. By 23, I was syndicated. By 24, I had my son. At 24, I had a son, I had a beginnings of a media empire, I was reaching millions of people, and everybody couldn't believe it.

Ladies and gentlemen, Thomas Jefferson was leading Virginia by 24. Thomas Jefferson had four college degrees by 22. Thomas Jefferson was designing architecture by 20, building and getting contracts by 22. Thomas Jefferson wrote the Declaration of Independence and the Constitution. Thomas Jefferson was the leader of the Illuminati by 34 worldwide.

I don't mean the modern, devil-worshiper Illuminati. That's the counterfeit of the real "Illuminated", and they were masonic, they weren't devil worshipers. I'm not masonic, but, you know, historical fact.

Now, I, I'm sorry. I said this is the secrets of Sandy Hook here. I don't want to finish up, so let's get to the families. I've got one more quick video I want to do live. But you have to understand, ladies sand gentlemen, very few people ever even get to 75, which is biblically, how long a man's appointed to live, and notice, it's still the average life expectancy today, despite our technology. In the Bible, 75.

But access to all this info doesn't do anything if you don't have the experience and then the spiritual connection, which creates the knowledge. We'll stop right there.

And I'm not bragging about my success. It's normal. I was not arrested in my development. All the art types were unlocked at a very young age because of rites of passage that were still taking place when I was a young man, that are no longer even available to most people. The rites of passage are all being removed, and yes, brutal, brutal fights was one of the rites of passage. Sex was a rite of passage. Having access to literature and a-art and culture and history and the occult and Christianity, all of it, was a rite of passage.

Other rituals I was a part of were all rites of passage. Elders constantly explaining things to me was rites of passage. They're stealing the future, so am I bad questioning a government known for lying, a media known for lying, that lies, that gets us into wars that kill millions of kids, that are obsessed with abortion and cultures of death and all this evil? To question them? Absolutely, I'm right.

Did I say nobody died, it's all bull? Yeah, they took the clip out of context, and, and, when I was in Devil's advocate in a debate. I didn't say that's what I believe. I said I could see both sides. They hope you don't see the truth. They hope you don't research it, they hope you don't find out for yourself.

Because they think you're stupid and want to defeat you. Now, I know you understand that, and many of you are more advanced and smarter than I am. We've got to reach out to those that have been put in arrested development and are like children so that they can bloom and blossom, because that's how we're going to have a future.

I'm gonna end this video with a couple videos together. Gulf War propaganda, babies in incubators, and then false flag video montage. Then I'm gonna come back briefly with the fact they want to put Donald Trump in a mental institution and we know why they want to do it, here exclusively, uh, we're gonna break it down.

But the bottom line is, the vampires of MSN and corporate media and that whole system are the ones feeding off the dead children of all these mass shootings and these tragedies, some of which, the government and other groups have been caught being involved in, to go to us that have ethics and care about kids, and get us to give up our guns and our right to self-defense, as if we somehow did it. They project their crimes and these horrors on us when they're the ones in Chicago, New York and other victim disarmament zones, who have the highest crime rates in the world, like Mexico does as a country, they do as cities, because they, the elites have guns, but the people don't, and they're the ones that are literally behind the carnage and the sadness and the enslavement.

And that's why they're the vampires of Sandy Hook, the people that feed off those deaths, and use it to take our Second Amendment and more of our rights, and we see through it and how they back all these crimes worldwide, and just how nasty they are. Here are these reports, and I'll be right back with another live feed.

| Speaker 18: | 00:52:17 | They took the babies out of the incubators. Took the incubators, and left the children to die on the cold floor. |
| Speaker 19: | 00:52:26 | You can only ask how these animals can commit such barbaric and inhuman acts and then deny that these acts ever took place. |

| | | |
|---|---|---|
| Speaker 20: | 00:52:35 | Premature infants in incubators were sentenced to die by having the incubators removed. |
| Speaker 21: | 00:52:49 | The hardest thing was burying the babies. I, myself, buried 30 newborn babies that had been taken, uh, from their incubators. |
| Speaker 22: | 00:53:07 | Now is the time to check regression of this ruthless dictator, whose troops have bayoneted pregnant women and have ripped babies from their incubators in Kuwait. |
| Speaker 18: | 00:53:18 | How can I not think of my nephew who was born premature and might have died that day as well. |
| Speaker 23: | 00:53:23 | And they had kids in incubators, and they were thrown out of the incubators, so that Kuwait could be systematically dismantled. |
| Speaker 24: | 00:53:31 | We interrupt our regular program schedule to bring you the following special report from ABC News in Washington. |
| Lyndon Johnson: | 00:53:50 | As president and Commander in Chief, it is my duty to the American people to report that renewed hostile actions against United States ships on the high seas in the Gulf of Tonkin have today required me to order the military forces of the United States to take action [inaudible 00:54:15] |
| Speaker 26: | 00:54:16 | In retaliation to this unprovoked attack on the high seas, our forces have struck the bases used by the [inaudible 00:54:23] patrol craft. |
| Speaker 27: | 00:54:24 | That could allow a president to wage war in Vietnam. |
| Speaker 28: | 00:54:28 | Israel claims the attack was accidental. Some former US Naval Officers say it was on purpose, and they described a very [inaudible 00:54:35] part of a continuum of coverage. |
| Speaker 29: | 00:54:38 | Well, I know we can't be very specific given these restrictions, but, uh, within those parameters, what did you see? |
| Speaker 30: | 00:54:42 | Well, what I saw, I didn't see anything hit. I look, very, I looked straight above us, it was a gun patrol coming from my right to my left, and there's a cloud of, uh, something, it looked like it might have been [inaudible 00:54:54] but let's say- |
| Speaker 31: | 00:54:55 | There's a statement I make today backed up by sources, solid sources, these are not assertions, but we're giving you are facts and conclusions based on solid intelligence. |

| George W. Bush: | 00:55:13 | Saddam Hussein is a homicidal dictator who is addicted to weapons of mass destruction. |
| Hillary Clinton: | 00:55:20 | We came, we saw, he died. |
| Barack Obama: | 00:55:24 | Ten days ago, the world watched in horror as men, women, and children were massacred in Syria in the worst chemical weapons attack in the 21st century. |
| John Kerry: | 00:55:36 | The Assad regime and only undeniably, the Assad regime unleashed an outrageous chemical attack against its own citizens. |
| Barack Obama: | 00:55:47 | Now, after careful deliberation, I have decided that the United States should take military action against Syrian regime targets. |
| John Kerry: | 00:55:55 | We can tell you beyond any reasonable doubt that our evidence proves the Assad regime prepared for this attack. |
| Nikki Haley: | 00:56:04 | Yesterday morning, we awoke to pictures, to children, foaming at the mouth, suffering convulsions, being carried in the arms of desperate parents. |
| Donald Trump: | 00:56:19 | On Tuesday, Syrian dictator, Bashar al-Assad launched a horrible chemical weapons attack on innocent civilians. |
| Speaker 38: | 00:56:31 | What is your message to President Assad? |
| Speaker 39: | 00:56:33 | The world is watching, but war doesn't do anything. |
| Donald Trump: | 00:56:39 | Assad choked out the lives of helpless men, women, and children. |
| Nikki Haley: | 00:56:45 | We know that yesterday's attack bears all the hallmarks of the Assad regime's use of chemical weapons. |
| Speaker 40: | 00:56:53 | We see these beautiful pictures are night, from the decks of these two US Navy vessels in the Eastern Mediterranean. I'm blinded by the beauty of our weapons, uh, and they are beautiful pictures. |
| Speaker 24: | 00:57:06 | This live, special report has come to you from ABC News Washington. |
| Speaker 41: | 00:57:10 | Below there, I almost look stupid. |

| Alex Jones: | 00:57:16 | Dude, America kicked Hillary's ass and the Democratics, not the damn Russians. Can you give me some credit here? We're the big swinging Johnson, bro, not the Russians! Get that through your head! We're back! You understand? |
|---|---|---|
| Speaker 42: | 00:57:30 | Microaggression. |
| Speaker 43: | 00:57:32 | Cultural appropriation. |
| Speaker 44: | 00:57:34 | Offensive. Offensive. Offensive. Ensive. |
| Maxine Waters: | 00:57:39 | My millennials, stay woke! |
| Speaker 46: | 00:57:46 | In ancient times, man roamed the Earth in a constant state of hunting or being hunted. Introducing Caveman. Where cutting edge science meets ancient, simple nutrients. Secure your bottle right now at infowarsstore.com |
| Alex Jones: | 00:57:59 | Um, transmission, come back with another, um, transmission on Trump and some key intel dealing with North Korea, them always wanting to put him in a mental institution, uh, and more. But they did find it. It's Nancy Grace! That's in a longer piece we did with, with, f-with, eh, with, bet, a fake set of cars driving in circles at Sandy Hook. |
| | | And all I'm saying is look at this, and they want to change the subject and say, "He says no kids died!" And then edit tapes. She's not gonna talk about Hillary backing Islamicists killing small children, and then they say that I said that was happening in a pizza place. And, and we've had national news have to do retractions on that. |
| | | So, this happens over and over and over and over again, ladies and gentlemen. But I wanted to bring Rob Dou in, uh, on Sandy Hook, uh, also Travis Night's welcome to pop in. I mean, it's just crazy to see this level of them hitting us with the same stuff. "He doesn't believe in the moon land-" [inaudible 00:58:56] haven't said, and then they'll, uh, they'll mix in with other stuff, and then misrepresent what we're saying. |
| Rob Dou: | 00:59:04 | Yeah, hey Alex, um, uh, the whole Sandy Hook thing is a quagmire because of the way the media and the officials were so secret about everything, and that's where people started questioning. That's the big thing. They were saying, "Anybody who says anything on the Internet, i- a, gets caught with it, we're gonna go after them. |

They come out, first day, they have the wrong name of supposed shooter. They have his older brother, and they have guns that they're pulling out, then they're pulling guns out of cars, they're finding people in the back woods that are dressed up in SWAT gear.

Alex Jones: 00:59:34 And that's on helicopter footage, and they say it never existed, and they la-later admit it does, and then the school was closed 'til that year, and then the videos, it's all rotting and falling apart, and nobody's even in it, and the kids are going in circles in and out of the buildings with their hands up, and then they never called rescue choppers, ex- I mean exactly.

Rob Dou: 00:59:51 Yeah, there's a lot of, a lot of weirdness. There's some, some supposed dash, uh, camera where the people are smiling and getting their lunches ready, the police officers. You ca- You think, you're, you're gonna have smiling police officers at a time when peop- you know, they're supposedly bringing out 20 dead kids, and they're smiling and getting their lunches ready on top of a police car.

Alex Jones: 01:00:10 And they had Port-A-Potties being delivered an hour after it happened for the big media event.

Rob Dou: 01:00:14 Yeah. Yeah, it's, I'm, I'm amazed at, and, and then, you know, we've never seen, there's never been any even blurred photos of any bodies or anything. We've seen every other incident where there's dead bodies [crosstalk 01:00:27]

Alex Jones: 01:00:27 They sure showed us the nerve gas kids in Syria, didn't they?

Rob Dou: 01:00:29 Yeah, oh yeah, well, we didn't even get blurred images with the dead kids in Syria. We got, we got crisp photos.

Alex Jones: 01:00:36 We got video.

Rob Dou: 01:00:37 We got, you know, UN photos being held up, uh, with, we showed that clip with Nikki Haley, so we had plenty of stuff with those kids, no kids being shown in Yemen, that Saudi Arabia's bombing right now. We don't know-

Alex Jones: 01:00:48 What do you make of the media saying we're all actors, this is all a big sock puppet. It's all fake, uh, nobody's real, none of the news is real? Anybody can see what we're covering's real here all day. Our guests are real, I mean, y- you've been working here, what, eight, nine years? We ever told you what to do, or is it controlled? Am I controlled? Is there a teleprompter, Rob?

| Rob Dou: | 01:01:06 | Definitely no teleprompters. We have certain subjects that we may concentrate on overall, but we're, it's like, get out there, find the news, and here's our, you know, our spin is libertarian conservative if we had a spin, and all that is, to me, is what's, what's true. It's, it's honesty and truth, you know? |
|---|---|---|
| Alex Jones: | 01:01:23 | Yeah, all we get is globalist, new world order, brainwashing trash. I just thought of this. Can we play something off YouTube? What, uh, what's the name of that really funny site that edits my videos together? Placebond, PlacePong? |
| Rob Dou: | 01:01:33 | What, he's done one with, um, with you, with Caveman that's pretty funny. |
| Alex Jones: | 01:01:38 | No, no, but how do you, how do you say it? Is it Place? |
| Rob Dou: | 01:01:40 | Play, Placeboing. |
| Alex Jones: | 01:01:42 | Placeboing. Can we go there? And, and, and not download, but maybe play the one that's called "Oh So Trendy"? |
| Rob Dou: | 01:01:47 | Alright. |
| Alex Jones: | 01:01:47 | Because I've literally had the media now confront me and say, "Is this real?" And I'm like, "How do you even? Of course it's real, it's a funny video. |
| Rob Dou: | 01:01:57 | Yeah, it's right here. |
| Alex Jones: | 01:01:58 | Uh, where, where, where I sit there and I make jokes, and I have fun, and they edit it together, and then people say, "Is..." Yes, it's real comedy, like Richard Pryor, and then the guy's talented and edits it together. Like, I've had the media ask me, "Do you believe in goblins? You said you don't want Trump to, you know, get caught in bed with a goblin." |
| | | Instead of a swamp, I, you know, I say it's like Mordor, he's going in, he's gotta, he's may get some blood on him, but I don't want him to get in bed with a goblin. And so, then I asked the audience, "Do you really think I'm talking about real goblins?" But that's what we've gotten to. |
| | | In fact, uh, the say guy did, did that got millions of views. He also did the Obama if, if, if, if, if, if, if, if, bing bong, bing bong, so I'm gonna play this because it's comedy, then I'm gonna end this piece, the, the, this live, I'm gonna reset, get focused, because I went a little bit off track here, and I'm gonna come and cover |

this huge Trump news. So, on Facebook and YouTube, get ready. In about 10 minutes after this is over, I'm coming back for one more piece. It's Saturday night, and myself and Owen Schroyer are back tomorrow, 4-6 PM with the Sunday transmission. Are we ready gentlemen?

It starts with "Rip me off! I'm a trendy!" I want to be ripped off by the system. That's who's ripping you off is the globalists, that's who's lying to you, that's who runs the IRS, that's who runs the geoengineering, that's who runs the wars, that's who runs Al-Qaeda is the globalists, and they're crapping their pants because nationalism, from Le Pen to Farrage to Trump, nobody's perfect, is rising. Here it is.

(singing)

I mean that's, that's what we're dealing with here and I'm sick of it.

Uh, uh, uh, uh. That's called satire, and it illustrates how dumb I think so-called trendies are, following the system. You're not trendy, you're not avant-garde, you're conformist, death cult dumbasses. That's it for this live transmission, back live in 10 minutes, infowars.com, and on the enemy platform, Facebook and YouTube.

Not getting what humans always thought was key, the bone broth, (singing)

Rob Dou:          01:04:47          This is the, this is, I can say, without a doubt, at least in my experience,

4/16/2018 10:16 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Selina Hamilton

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 261ST DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

---

## PLAINTIFF'S ORIGINAL PETITION AND REQUEST FOR DISCLOSURE

Plaintiff NEIL HESLIN files this original petition against Defendants, ALEX JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and OWEN SHROYER, and alleges as follows:

### DISCOVERY CONTROL PLAN

1. Plaintiff intends to seek a customized discovery control plan under Level 3 of Texas Rule of Civil Procedure 190.4.

### PARTIES

2. Plaintiff Neil Heslin in an individual residing in the State of Connecticut.

3. Defendant Alex E. Jones is a resident of Austin, Texas. He is the host of radio and web-based news programing, including "The Alex Jones Show," and he owns and operates the website InfoWars.com. Mr. Jones can be served at his place of business, InfoWars, 3019 Alvin Devane Blvd., Suite 300-350, Austin, TX 78741.

1



EXHIBIT

B-44

4.     Defendant InfoWars, LLC is a Texas limited liability company with principal offices located in Austin, Texas. It may be served at the address of its attorney, Eric Taube, at 100 Congress Avenue, 18th Floor, Austin, TX 78701.

5.     Defendant Free Speech Systems, LLC is a Texas limited liability company with principal offices located in Austin, Texas. It may be served at the address of its registered agent, Eric Taube, at 100 Congress Avenue, 18th Floor, Austin, TX 78701.

6.     Defendant Owen Shroyer is an individual residing in Travis County. At all times relevant to this suit, Mr. Daniels has been a reporter for InfoWars. Mr. Shroyer can be served at the address of his employer, InfoWars, 3019 Alvin Devane Blvd., Suite 300-350, Austin, TX 78741.

## JURISDICTION & VENUE

7.     The damages sought in this case exceed the minimum jurisdictional limits of Travis County District Courts.

8.     Venue is proper in Travis County, Texas, because a suit for damages for defamation may be brought in the county in which a defendant resided at the time of filing, or the domicile of any corporate defendant, at the election of the plaintiff. *See* Tex. Civ. Prac. & Rem. Code §15.017.

## FACTUAL BACKGROUND

9.     Plaintiff Neil Heslin is the father of deceased minor J.L., a victim of the December 14, 2012 Sandy Hook Elementary School Shooting.

2

10.     This case arises out of accusations by InfoWars in the summer of 2017 that Plaintiff was lying about whether he actually held his son's body and observed a bullet hole in his head. This heartless and vile act of defamation re-ignited the Sandy Hook "false flag" conspiracy and tore open the emotional wounds that Plaintiff has tried so desperately to heal.

11.     This conspiracy theory, which has been pushed by InfoWars and Mr. Jones since the day of the shooting, alleges that the Sandy Hook massacre did not happen, or that it was staged by the government and concealed using actors, and that the parents of the victims are participants in a horrifying cover-up.

12.     During the June 18, 2017 profile of Jones for her NBC show *Sunday Night with Megyn Kelly*, Ms. Kelly interviewed Plaintiff about the claims made by Jones in the past, including that "the whole thing was fake" and "a giant hoax."[1] Addressing this hateful lie, Plaintiff told Kelly, "I lost my son. I buried my son. I held my son with a bullet hole through his head."[2]

13.     On June 26, 2017, InfoWars' broadcast featured a segment hosted by reporter Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for Plaintiff to have held his son and see his injury.

14.     During the broadcast, Shroyer said, "The statement [Plaintiff] made, fact-checkers on this have said cannot be accurate. He's claiming that he held his son

---

[1] https://www.realclearpolitics.com/video/2017/06/18/full_video_megyn_kelly_interviews_alex_jones.html
[2] *Id.*

3

and saw the bullet hole in his head. That is his claim. Now, according to a timeline of events and a coroner's testimony, that is not possible."[3]

16.     As support for these defamatory statements, Shroyer played video footage where the local medical examiner informed reporters that the slain students were initially identified using photographs rather than in person.

16.     Shroyer also stated, "You would remember if you held your dead kid in your hands with a bullet hole. That's not something you would just misspeak on."[4]

17.     Stroyer continued by stating that Plaintiff was "making a pretty extreme claim that would be a very thing vivid in your memory, holding his dead child."[5]

18.     "The conspiracy theorists on the internet out there have a lot of questions are that are yet to be answered. You say whatever you want about the event, that's just a fact."[6]

19.     At the conclusion of his report, Shroyer stated, "Will there be a clarification from Heslin or Megyn Kelly? I wouldn't hold your breath. [Laugh]. So now they're fueling the conspiracy theory claims. Unbelievable."[7]

20.     The underlying point or gist of Shroyer's report is that Plaintiff's version "is not possible" and "cannot be accurate," and that Plaintiff was lying about the circumstances of his son's tragic death for a nefarious and criminal purpose.

---

[3] https://www.infowars.com/zero-hedge-discovers-anomaly-in-alex-jones-hit-piece/
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*

4

21.     Shroyer's report was manifestly false. In addition, a minimal amount of research would have caused any competent journalist not to publish the defamatory accusation. According to contemporary news accounts, the bodies of the victims were released from the medical examiner into the custody of the families.[8] Funerals where the children's bodies were in the custody of their parents were widely reported on by the press.[9]

22.     On July 20, InfoWars programming featured a segment hosted by Alex Jones in which Shroyer's report was re-broadcast in full. When introducing the segment, Jones demanded that Plaintiff "clarify" what actually happened.

23.     After showing the segment, Jones said he told Shroyer, "I could never find out. The stuff I found was they never let them see their bodies. That's kind of what's weird about this. But maybe they did. So I'm sure it's all real. But for some reason they don't want you to see [Shroyer's segment]."[10]

24.     Regarding the Sandy Hook shooting, Jones said, "Can I prove that New Haven [sic] didn't happen? No. So I've said, for years, we've had debates about it, that I don't know. But you can't blame people for asking."[11]

25.     Mr. Jones was lying. In the five years following the tragedy, he has repeatedly and unequivocally called the Sandy Hook shooting a hoax.

---

[8] https://patch.com/connecticut/newtown/police-no-motive-emerging-in-newtown-school-shooting
[9] http://abcnews.go.com/US/photos/sandy-hook-moment-silence-18026580/image-18045101; https://www.washingtonpost.com/politics/funerals-for-newtown-massacre-victims-begin/2012/12/17/ffd0a130-486d-11e2-820e-17eefac2f939_story.html?utm_term=.0ccbbb4af100
[10] https://www.mediamatters.org/blog/2017/07/21/alex-jones-sandy-hook-dad-needs-clarify-whether-he-actually-held-his-son-s-body-and-saw-bullet-hole/217333
[11] *Id.*

5

**BACKGROUND TO INFOWARS' 2017 DEFAMATORY STATEMENTS**

26.     In order to appreciate the full defamatory impact and the extent of the

mental anguish caused by InfoWars' 2017 statements, it is necessary to understand

InfoWars' long history of harassing the Sandy Hook parents with defamatory lies.

InfoWars' 2017 statements are but the latest in a series of false, hurtful, and

dangerous assertions about Plaintiff and the parents of the other victims.

27.     In 2013, Jones called the shooting "staged" and said, "It's got inside job

written all over it."[12]

28.     In March 2014, Jones said, "Folks, we've got video of Anderson Cooper

with clear blue-screen out there. [Shaking head]. He's not there in the town square.

We got people clearly coming up and laughing and then doing the fake crying. We've

clearly got people where it's actors playing different parts for different people, the

building bulldozed, covering up everything. Adam Lanza trying to get guns five

times we're told. The witnesses not saying it was him…I've looked at it and

undoubtedly, there's a cover-up, there's actors, they're manipulating, they've been

caught lying, and they were pre-planning before it and rolled out with it."[13]

29.     In May 2014, InfoWars published an article titled: "CONNECTICUT

TRIES TO HIDE SANDY HOOK TRUTH."[14]

---

[12] https://www.mediamatters.org/blog/2013/04/15/alex-jones-on-boston-blasts-us-govt-is-prime-su/193635; https://www.mediamatters.org/embed/clips/2016/11/29/51289/gcn-alexjones-20130409-sandyhook
[13] https://www.mediamatters.org/embed/clips/2016/11/29/51283/gcn-alexjones-20140314-shooting
[14] https://www.infowars.com/connecticut-tries-to-hide-sandy-hook-truth/

30.     In September 2014, InfoWars published an article titled: "FBI SAYS NO ONE KILLED AT SANDY HOOK."[15]

31.     In December 2014, Jones said on his radio program, "The whole thing is a giant hoax. How do you deal with a total hoax? It took me about a year, with Sandy Hook, to come to grips with the fact that the whole thing was fake. I did deep research."[16]

32.     In the same December 2014 broadcast, Jones continued: "The general public doesn't know the school was actually closed the year before. They don't know they've sealed it all, demolished the building. They don't know that they had the kids going in circles in and out of the building as a photo-op. Blue screen, green screens, they got caught using."[17]

33.     Jones made similar comments in January 2015, stating on InfoWars: "You learn the school had been closed and re-opened. And you've got video of the kids going in circles, in and out of the building, and they don't call the rescue choppers for two hours, and then they tear the building down, and seal it. And they get caught using blue-screens, and an email by Bloomberg comes out in a lawsuit, where he's telling his people get ready in the next 24 hours to capitalize on a shooting. Yeah, so Sandy Hook is a synthetic, completely fake with actors, in my view, manufactured. I couldn't believe it at first. I knew they had actors there, clearly, but I thought they killed some real kids. And it just shows how bold they are

---

[15] https://www.infowars.com/fbi-says-no-one-killed-at-sandy-hook/
[16] https://www.realclearpolitics.com/video/2017/06/18/full_video_megyn_kelly_interviews_alex_jones.html
[17] https://www.mediamatters.org/embed/clips/2016/11/29/51292/gcn-alexjones-20141228-sandyhook

that they clearly used actors. I mean they even ended up using photos of kids killed in mass shootings here in a fake mass shooting in Turkey, or Pakistan. The sky is now the limit."[18]

34.     Mr. Jones' statement about Pakistan refers to a conspiracy theory Jones helped spread involving deceased minor child N.P., a Sandy Hook victim whose photograph appeared at vigil for children slain a school attack in Peshawar. On the day of the Peshawar incident, a Pakistani woman created a collage of photographs of young people killed in school attacks and posted it to Facebook with the caption "They Went to School and Never Came Back."[19] Because the Peshawar shooting occurred very close to the anniversary of the Sandy Hook massacre, she included a picture of a child from the latter event, along with pictures of Peshawar victims.[20] That collage was then printed out and cut up into the individual photographs displayed by mourners at a vigil for the Peshawar victims.[21]

35.     In the same month, January of 2015, InfoWars published an article titled: "MYSTERY: SANDY HOOK VICTIM DIES (AGAIN) IN PAKISTAN."[22] The article states: "A large-scale attack on a school in Peshawar, Pakistan, last month left 132 school children and 10 teachers dead. Among the alleged victims emerged the familiar face of [deceased minor N.P.], one of the children supposedly killed in the December 2012 Sandy Hook school shooting in Newtown, Connecticut." InfoWars'

---

[18] https://www.mediamatters.org/embed/clips/2016/11/29/51290/gcn-alexjones-20150113-shooting
[19] https://www.snopes.com/fact-check/info-boors/
[20] Id.
[21] Id.
[22] https://www.infowars.com/mystery-sandy-hook-victim-dies-again-in-pakistan/

story was meant to reinforce Mr. Jones' persistent lie that N.P. and the other victims of the shooting, such as Plaintiff's son J.L., are not real.

36.　In July 2015, Mr. Jones stated on InfoWars: "But you've got green-screen with Anderson Cooper, where I was watching the video, and the flower and plants were blowing in some of them, and then they blow again the same way. It's looped. And then his nose disappears. I mean, it's fake. The whole thing is...I don't know what happened. It's kind of like if you see a hologram at Disney World in the Haunted House. You know? I don't know how they do it, but it's not real. When you take your kids to see the Haunted House and ghosts are flying around, it's not real, folks. It's staged. I mean, a magician grabs a rabbit out of his hat. I know he's got a box under the table that he reaches in and gets the rabbit. I don't know what the trick is here. I've got a good suspicion. But when you've got Wolfgang Halbig...He believed it was real. People called him. He went and investigated. No paperwork, no nothing. It's bull. And now an FBI retired agent, who retired, you know, with decorations. I mean, [InfoWars reporter Rob] Dew, this unprecedented."[23]

37.　In the same month, InfoWars published an article titled: "MEGA MASSIVE COVER UP: RETIRED FBI AGENT INVESTIGATES SANDY HOOK."[24]

38.　In January of 2016, Florida resident Lucy Richards left threatening voicemail messages and sent violent emails to Leonard Pozner, a fellow Sandy Hook parent and personal friend of Plaintiff Neil Heslin. The threats included messages

---

[23] https://www.mediamatters.org/embed/clips/2016/11/29/51284/gcn-alexjones-20150707-shooting
[24] https://www.infowars.com/mega-massive-cover-up-retired-fbi-agent-investigates-sandy-hook/

9

stating: "you gonna die, death is coming to you real soon" and "LOOK BEHIND YOU
IT IS DEATH."[25] When Richards was later sentenced, Senior U.S. District Judge James
Cohn stated: "I'm sure [Leonard Pozner] wishes this was false, and he could
embrace [N.P.], hear [N.P.'s] heartbeat and hear [N.P.] say 'I love you, Dad'...Your
words were cruel and insensitive. This is reality and there is no fiction. There are no
alternative facts."[26] As part of her sentence, Ms. Richards will not be permitted to
access a list of conspiracy-based websites upon her release, including InfoWars.[27]
Ms. Richard's arrest and sentencing are an ominous reminder to the Plaintiff of the
danger posed by InfoWars' continuing lies about Sandy Hook.

39.     In November 2016, Mr. Jones appeared on InfoWars and ranted about
false Sandy Hook claims for twenty minutes.[28]

40.     During the November 2016 video broadcast, Mr. Jones stated: "That
shows some kind of cover-up happening. And then I saw Anderson Cooper -- I've
been in TV for twenty-something years, I know a blue-screen or a green-screen --
turn and his nose disappeared. Then I saw clearly that they were using footage on
the green-screen looped, because it would show flowers and other things during
other broadcasts that were moving, and then basically cutting to the same piece of

---

[25] https://www.nbcnews.com/news/us-news/conspiracy-theorist-arrested-death-threats-against-sandy-hook-parent-n693396
[26] http://www.nydailynews.com/news/crime/judge-hands-sandy-hook-truther-prison-sentence-article-1.3229754
[27] https://www.buzzfeed.com/claudiakoerner/a-conspiracy-theorist-will-serve-time-for-threatening-a
[28] https://www.youtube.com/watch?v=MwudDfz1yAk

footage...Then we see footage of one of the reported fathers of the victims, Robbie

Parker, doing classic acting training."[29]

41.  The gist of these statements was that the Sandy Hook parents, including Plaintiff Neil Heslin, are participating in a sinister manipulation plan to fool the public.

42.  During the November 2016 broadcast, Jones played video footage of Anderson Cooper interviewing Sandy Hook parent Veronique De La Rosa, at which point Jones stated: "We point out clear chromakey, also known as blue-screen or greenscreen being used, and we're demonized. We point out that they're clearly doing fake interviews."[30] This false statement was likewise used to support Mr. Jones' vicious lie.

43.  Towards the end of the November 2016 broadcast, Mr. Jones stated: "Why should anybody fear an investigation? If they have nothing to hide? In fact, isn't that in Shakespeare's Hamlet? Methinks you protest too much...This particular case, they are so scared of investigation. Everything they do ends up blowing up in their face, so guys are going to get what you want now. I'm going to start re-investigating Sandy Hook and everything else that happened with it."[31]

44.  Mr. Jones concluded the video by stating: "So, if children were lost at Sandy Hook, my heart goes out to each and every one of those parents. And the people who say they're parents that I see on the news. The only problem is, I've

---

[29] *Id.*
[30] *Id.*
[31] *Id.*

watched a lot of soap operas. And I've seen actors before. And I know when I'm watching a movie and when I'm watching something real."[32]

45.    The November 2016 video broadcast was entitled, "Alex Jones Final Statement on Sandy Hook." It was Plaintiff's hope that the title was accurate, and that Mr. Jones would finally end his reckless attacks on the Sandy Hook parents and his assertions that they were liars and actors engaged in a fraud on the American people.

46.    As horrifying as the November 2016 broadcast was, its promise of being the "Final Statement" gave hope to Plaintiff that his harassment and defamation by Mr. Jones might be coming to an end after four long years.

47.    Those hopes were soon dashed. Instead, InfoWars made continuing defamatory comments in 2017 as outlined above.

48.    Mr. Jones also made additional comments in April of 2017 which repeated the claims which form the rickety structure of Mr. Jones' colossal lie about Sandy Hook, including the allegation that fellow Sandy Hook parent Veronique De La Rosa conducted a fake interview with Anderson Cooper to hide the truth, while telling his viewers not to "believe any of it."[33]

---

[32] *Id.*
[33] https://www.youtube.com/watch?v=rUn1jKhWTXI

49.    On June 18, 2017, Mr. Jones made additional comments when interviewed by Megyn Kelly, during which he stated: "I do think there's some cover-up and some manipulation."[34] The following exchange took place:

> MEGYN KELLY: But Alex, the parents, one after the other, devastated. The dead bodies that the coroner autopsied ...
>
> ALEX JONES: And they blocked all that. And they won't release any of it. That's unprecedented.[35]

50.    Jones and Kelly also had the following exchange:

> JONES: But then what do you do, when they've got the kids going in circles, in and out of the building with their hands up? I've watched the footage. And it looks like a drill.
>
> MEGYN KELLY: When you say, "parents faked their children's death," people get very angry.
>
> ALEX JONES: Yeah, well, that's - oh, I know. But they don't get angry about the half million dead Iraqis from the sanctions. Or they don't get angry about all the illegals pouring in.[36]

51.    Shortly following the Megyn Kelly interview, on June 26, 2017, InfoWars reporter Owen Shroyer made the defamatory statements referenced above.

52.    As such, the broadcasts made by InfoWars on June 26, 2017 and July 20, 2017 defaming Mr. Heslin did not occur in isolation. Rather, the statements were a continuation and elaboration of a years-long campaign to falsely attack the

---

[34] https://www.realclearpolitics.com/video/2017/06/18/full_video_megyn_kelly_interviews_alex_jones.html
[35] *Id.*
[36] *Id.*

13

honesty of the Sandy Hook parents, casting them as participants in a ghastly conspiracy and cover-up.

53.     By making renewed accusations about Plaintiff in 2017, InfoWars breathed new life into this conspiracy and caused intense emotional anguish and despair. For that reason, Plaintiff brings this suit against Defendants.

## CAUSE OF ACTION

**I.      Defamation and Defamation *Per Se***

54.     All previous allegations are incorporated by reference.

55.     Plaintiff is a private individual and is neither a public official nor a public figure.

56.     The June 26, 2017 and July 20, 2017 broadcasts by Defendants were false, both in their particular facts and in the main point, essence, or gist in the context in which they were made.

57.     The June 26, 2017 and July 20, 2017 broadcasts by Defendants, while defamatory in their own right, were also continuations and elaborations of an underlying defamatory assertion which Defendants have advanced since 2013, namely that Plaintiff has lied to the American people about the death of his son and has participated in a horrifying criminal cover-up.

58.     In viewing the June 26, 2017 and July 20, 2017 broadcasts, a reasonable member of the public would be justified in inferring that the publications implicated the Plaintiff.

59.     The June 26, 2017 and July 20, 2017 broadcasts were also defamatory because they are reasonably susceptible to a defamatory meaning by innuendo. A reasonable person, reviewing the statements in question, could conclude the Plaintiff was being accused of engaging in fraudulent or illegal activity. In context, the gist of the statements could be construed as defamatory to the Plaintiff by an average member of general public.

60.     Defendants' defamatory publications were designed to harm Plaintiff's reputation and subject the Plaintiff to public contempt, disgrace, ridicule, or attack.

61.     Defendants acted with actual malice. Defendants' defamatory statements were knowingly false or made with reckless disregard for the truth or falsity of the statements at the time the statements were made.

62.     Defendants' defamatory statements were not privileged.

63.     Defendants' defamatory statements constitute defamation *per se*. The harmful nature of the defamatory statements is self-evident. The defamatory statements implicate the Plaintiff in heinous criminal conduct. False implications of criminal conduct are the classic example of defamation *per se*.

64.     Defendants publicly disseminated the defamatory publications to an enormous audience causing significant damages to the Plaintiff.

65.     Defendants' defamatory publications have injured Plaintiff's reputation and image, and they have exposed Plaintiff to public and private hatred, contempt, and ridicule.

66.    In light of their prior experience with these kind of reckless statements, Defendants knew that their publication could cause Plaintiff to suffer harassment and potential violence.

67.    Defendants' defamatory publications have and will continue to cause harm to Plaintiff. Due to Defendants' conduct, the Plaintiff has suffered and continues to suffer substantial damages in an amount to be proven at trial.

## III.    Conspiracy

68.    All previous allegations are incorporated by reference.

69.    Defendants acted together, as a cabal, to accomplish their campaign of defamation. Defendants had a meeting of the minds on the object or course of action underlying their pattern of recklessly defamatory publications.

70.    As a result of this meeting of the minds, Defendants collectively committed the unlawful overt acts detailed above.

71.    Defendants are jointly and severally liable for the injuries Mr. Heslin suffered due to Defendants' wrongful actions.

## IV.    Respondeat Superior

72.    All previous allegations are incorporated by reference.

73.    When InfoWars employees acted in the manner described in this Petition, they did so as agents of InfoWars and within the scope of their authority from Mr. Jones.

74.     InfoWars and Alex Jones are liable for the damages proximately caused by the conduct of employees and agents, including Owen Shroyer, pursuant to the doctrine of *respondeat superior*.

## DAMAGES

75.     Plaintiff has suffered general and special damages, including a severe degree of mental stress and anguish which has disrupted his daily routine and caused a high degree of psychological pain.

76.     Plaintiff has also suffered damage to his reputation and image, both up to the present and into the future.

77.     Because Defendants' conduct amounts to defamation *per se*, Plaintiff is also entitled to an award of presumed damages.

78.     Plaintiff is also entitled to an award of nominal damages and a judgment clearing his name.

79.     Plaintiff is also entitled to exemplary damages because the Defendants acted with malice.

80.     Plaintiff is also entitled to pre-judgment and post-judgment interest, costs of court, and attorney's fees.

81.     Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiff is seeking relief in excess of $1,000,000.

## JURY DEMAND

82.    Plaintiff demands a jury trial and tenders the appropriate fee with this petition.

## REQUEST FOR DISCLOSURE

83.    Plaintiff requests that Defendants disclose, within 50 days of the service of this request, the information or material described in Rule 194.2.

## PRAYER

WHEREFORE PREMISES CONSIDERED, Plaintiff Neil Heslin asks that the Court issue citation for each Defendant to appear and answer, and that Plaintiff be awarded all the damages set forth above, and to grant whatever further relief to which Plaintiff is justly entitled.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
KYLE W. FARRAR
State Bar No. 24034828
WILLIAM R. OGDEN
State Bar No. 24073531
1010 Lamar, Suite 1600
Houston, Texas 77002
713.221.8300 Telephone
713.221.8301 Fax

18

# CIVIL CASE INFORMATION SHEET

CAUSE NUMBER *(FOR CLERK USE ONLY):* _____  COURT *(FOR CLERK USE ONLY):* _____

STYLED  NEIL HESLIN VS. ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and OWEN SHROYER

(e.g., John Smith v. All American Insurance Co; In re Mary Ann Jones; In the Matter of the Estate of George Jackson)

A civil case information sheet must be completed and submitted when an original petition or application is filed to initiate a new civil, family law, probate, or mental health case or when a post-judgment petition for modification or motion for enforcement is filed in a family law case. The information should be the best available at the time of filing.

| 1. Contact information for person completing case information sheet: | | Names of parties in case: | Person or entity completing case information sheet is: |
|---|---|---|---|
| Name:<br><br>Mark D. Bankston | Email:<br><br>mark@fbtrial.com | Plaintiff(s)/Petitioner(s):<br><br>NEIL HESLIN | ☒ Attorney for Plaintiff/Petitioner<br>☐ *Pro Se* Plaintiff/Petitioner<br>☐ Title IV-D Agency<br>☐ Other: |
| Address:<br><br>1010 Lamar, Ste. 1600 | Telephone:<br><br>(713) 221-8300 | | Additional Parties in Child Support Case: |
| City/State/Zip:<br><br>Houston, Texas 77002 | Fax:<br><br>(713) 221-8301 | Defendant(s)/Respondent(s):<br><br>ALEX E. JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC, and OWEN SHROYER | Custodial Parent:<br><br>Non-Custodial Parent: |
| Signature:<br><br>/s/ Mark D. Bankston | State Bar No:<br><br>24034828 | [Attach additional page as necessary to list all parties] | Presumed Father: |

## 2. Indicate case type, or identify the most important issue in the case *(select only 1)*:

| Civil | | | Family Law | |
|---|---|---|---|---|
| **Contract** | **Injury or Damage** | **Real Property** | **Marriage Relationship** | **Post-judgment Actions (non-Title IV-D)** |
| *Debt/Contract*<br>☐ Consumer/DTPA<br>☐ Debt/Contract<br>☐ Fraud/Misrepresentation<br>☐ Other Debt/Contract:<br><br>*Foreclosure*<br>☐ Home Equity—Expedited<br>☐ Other Foreclosure<br>☐ Franchise<br>☐ Insurance<br>☐ Landlord/Tenant<br>☐ Non-Competition<br>☐ Partnership<br>☐ Other Contract: | ☐ Assault/Battery<br>☐ Construction<br>☒ Defamation<br>*Malpractice*<br>☐ Accounting<br>☐ Legal<br>☐ Medical<br>☐ Other Professional<br> Liability:<br><br>☐ Motor Vehicle Accident<br>☐ Premises<br>*Product Liability*<br>☐ Asbestos/Silica<br>☐ Other Product Liability<br> List Product:<br><br>☐ Other Injury or Damage: | ☐ Eminent Domain/<br> Condemnation<br>☐ Partition<br>☐ Quiet Title<br>☐ Trespass to Try Title<br>☐ Other Property:<br><br>**Related to Criminal Matters**<br>☐ Expunction<br>☐ Judgment Nisi<br>☐ Non-Disclosure<br>☐ Seizure/Forfeiture<br>☐ Writ of Habeas Corpus—<br> Pre-indictment<br>☐ Other: | ☐ Annulment<br>☐ Declare Marriage Void<br>*Divorce*<br>☐ With Children<br>☐ No Children<br><br><br>**Other Family Law**<br>☐ Enforce Foreign<br> Judgment<br>☐ Habeas Corpus<br>☐ Name Change<br>☐ Protective Order<br>☐ Removal of Disabilities<br> of Minority<br>☐ Other: | ☐ Enforcement<br>☐ Modification—Custody<br>☐ Modification—Other<br>**Title IV-D**<br>☐ Enforcement/Modification<br>☐ Paternity<br>☐ Reciprocals (UIFSA)<br>☐ Support Order<br><br>**Parent-Child Relationship**<br>☐ Adoption/Adoption with<br> Termination<br>☐ Child Protection<br>☐ Child Support<br>☐ Custody or Visitation<br>☐ Gestational Parenting<br>☐ Grandparent Access<br>☐ Parentage/Paternity<br>☐ Termination of Parental<br> Rights<br>☐ Other Parent-Child: |
| **Employment** | **Other Civil** | | | |
| ☐ Discrimination<br>☐ Retaliation<br>☐ Termination<br>☐ Workers' Compensation<br>☐ Other Employment: | ☐ Administrative Appeal<br>☐ Antitrust/Unfair<br> Competition<br>☐ Code Violations<br>☐ Foreign Judgment<br>☐ Intellectual Property | ☐ Lawyer Discipline<br>☐ Perpetuate Testimony<br>☐ Securities/Stock<br>☐ Tortious Interference<br>☐ Other: | | |
| **Tax** | *Probate & Mental Health* | | | |
| ☐ Tax Appraisal<br>☐ Tax Delinquency<br>☐ Other Tax | *Probate/Wills/Intestate Administration*<br>☐ Dependent Administration<br>☐ Independent Administration<br>☐ Other Estate Proceedings | ☐ Guardianship—Adult<br>☐ Guardianship—Minor<br>☐ Mental Health<br>☐ Other: | | |

## 3. Indicate procedure or remedy, if applicable *(may select more than 1)*:

| | | |
|---|---|---|
| ☐ Appeal from Municipal or Justice Court<br>☐ Arbitration-related<br>☐ Attachment<br>☐ Bill of Review<br>☐ Certiorari<br>☐ Class Action | ☐ Declaratory Judgment<br>☐ Garnishment<br>☐ Interpleader<br>☐ License<br>☐ Mandamus<br>☐ Post-judgment | ☐ Prejudgment Remedy<br>☐ Protective Order<br>☐ Receiver<br>☐ Sequestration<br>☐ Temporary Restraining Order/Injunction<br>☐ Turnover |

## 4. Indicate damages sought *(do not select if it is a family law case)*:

☐ Less than $100,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorney fees
☐ Less than $100,000 and non-monetary relief
☐ Over $100, 000 but not more than $200,000
☐ Over $200,000 but not more than $1,000,000
☒ Over $1,000,000

Rev 2/13

NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND<br>VERONIQUE DE LA ROSA, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 345th JUDICIAL DISTRICT |

## <u>AFFIDAVIT OF ERIC J. TAUBE</u>

STATE OF TEXAS          §
                        §
COUNTY OF TRAVIS   §

BEFORE ME, the undersigned notary public, on this day personally appeared Eric J. Taube, known to me to be the person whose name is subscribed below, and who on his oath, deposed and stated as follows:

1.     My name is Eric J. Taube. I am over the age of 21 years, have never been convicted of a felony or crime involving moral turpitude, am of sound mind, and am fully competent to make this affidavit. I have personal knowledge of the facts herein stated and they are true and correct.

2.     I am the registered agent of Free Speech Systems, LLC and InfoWars, LLC. On May 2, 2018, as registered agent, I was served with the petition in this case. Because of my involvement as registered agent and because of my discussion with



EXHIBIT

C

representatives of Plaintiffs' law firm, I have personal knowledge of the facts stated herein.

3.      On May 25, 2018, I called Plaintiffs' counsel, Mark Bankston, to request a short extension of time for Defendants to file answers in this case. He was not available and therefore I spoke with Mr. Ogden at Plaintiffs' law firm and requested this extension. He told me that he would speak with "his team" and they would then respond. I never heard back from Mr. Ogden.

4.      On May 25, 2018, I received a letter from Mr. Bankston that referenced my discussion with Mr. Ogden and denied my request. A true and correct copy of that letter is attached hereto, marked as Exhibit 1.

5.      Attached hereto and marked as Exhibit 2 is a true and correct copy of a letter I received as registered agent for Free Speech Systems, LLC and InfoWars, LLC on April 11, 2018 from Plaintiffs' counsel Mark Bankston.

Further Affiant Sayeth Not.


_____
Eric J. Taube

SWORN TO and SUBSCRIBED before me by Eric J. Taube on June _21_ , 2018.

ANN MARIE JEZISEK
Notary Public, State of Texas
My Commission Expires
March 22, 2019

Notary ID # 2855985-2

_____
Notary Public in and for
the State of Texas

My Commission Expires:

3/22/19

From:                                            05/25/2018 16:09    #879 P.002



TEXAS | FLORIDA

May 25, 2018

*Via Facsimile: 512-472-5248*

Mr. Eric Taube
Registered Agent for Free Speech Systems, LLC
Waller Lansden Dortch & Davis, LLP
100 Congress Ave., Ste. 1800
Austin, Texas 78701

Re:    Cause No. D-1-GN-18-001842, *Leonard Pozner and Veronique De La Rosa vs. Alex E.
       Jones, et al.*, In the 345th District Court of Travis County, Texas.

Dear Mr. Taube,

I understand from discussions with my associate Mr. Ogden that you contacted my office today asking that my clients grant a favor to Mr. Jones and Infowars by allowing them an extension of time to file an answer to the lawsuit brought by the Pozners. It is my understanding that Mr. Jones has requested we grant him this favor because he has not yet been able to secure counsel to defend him against these claims.

Frankly, Mr. Jones' failure to secure legal representation is none of our concern. We expect Mr. Jones and Infowars to file a timely answer regardless of when he is able to locate an attorney willing to defend him. Additionally, in light of the years of torment Mr. Jones has inflicted on my clients, and in light of his continuing slander against my clients and our law firm, we have absolutely no inclination to do any favors for Mr. Jones. Indeed, during Mr. Jones' unhinged rant broadcast yesterday on Infowars, Mr. Jones referred to the members of my law firm as "devil-people." His request for an extension is therefore denied.

Furthermore, Mr. Jones needs to understand that the only focus of our law firm is to safeguard the interests and well-being of our clients. We will never take any action in this suit which provides Mr. Jones any benefit at their detriment. As such, there will be no favors or extensions in this case. This case will proceed according to the Texas Rules of Civil Procedure, and we expect Mr. Jones to comply with the commands of the law.

Finally, I would like to note that for the record that our law firm is committed to transparency through the pendency of these lawsuits. For that reason, we plan to make available to the general public and media copies of all correspondence and pleadings which arise in this lawsuit, including this letter.

Sincerely,

Mark D. Bankston
Kaster Lynch Farrar & Ball

1010 Lamar St. | Suite 1600 | Houston, Texas 77002 | p 713.221.8300 | 800.311.1747 | f 713.221.8301

**EXHIBIT**

**1**

tabbies



KASTER LYNCH
FARRAR & BALL LLP

TEXAS | FLORIDA

April 11, 2018

*Via Electronic Mail: Eric.Taube@wallerlaw.com*
Alex Jones
Free Speech Systems, LLC
InfoWars, LLC
c/o Eric Taube
100 Congress Avenue, 18th Floor
Austin, TX 78701

<strong>Re: Defamatory Publications</strong>

To Whom It May Concern:

      I write to inform you that our office represents Leonard Pozner and Veronique De La Rosa (formerly Veronique Pozner) in a claim for damages against Alex Jones, Free Speech Systems LLC, and InfoWars LLC arising from defamatory statements. My clients are the parents of Noah Pozner, a victim of the Sandy Hook massacre.

      On April 22, 2017, InfoWars broadcast a video entitled "Sandy Hook Vampires Exposed." This broadcast was defamatory. It contained a repetition and elaboration of the same attacks Mr. Jones has made about the honesty and identity of the Sandy Hook parents for years. For example, during this broadcast, Mr. Jones alleged that Veronique De La Rosa participated in a faked "blue-screen" interview with Anderson Cooper conducted at a remote location, and that viewers should not believe any of the Sandy Hook story due to the faked interview. These assertions were manifestly false.

      On April 28, 2017, Mr. Jones made statements at a press conference again indicating that Mrs. De La Rosa participated in a faked "blue-screen" interview in the aftermath of Sandy Hook. This assertion was likewise manifestly false.

      On June 13, 2017, Mr. Jones posted a video to the InfoWars Facebook page in which he once again promoted his untrue claims about Mrs. De La Rosa's alleged faked "blue-screen" interview on CNN, and told his viewers there had been a cover-up. This assertion was likewise manifestly false.

      On June 26, 2017, InfoWars' broadcast featured a segment hosted by reporter Owen Shroyer in which Shroyer claimed to have reviewed evidence showing it was impossible for fellow Sandy Hook parent Neil Heslin to have held his son's body and see his injury. This broadcast was meant to reinforce and support the underlying lie that the Sandy Hook parents are fakes. This assertion was likewise manifestly false.

      Over the past four years, InfoWars has also made statements -- far too numerous to effectively discover and catalog -- which are consistent with the above statements in 2017, including repeated references to the alleged faked "blue-screen" interview, references to a sinister re-opening of the school, references to individuals found in the woods with SWAT gear, allegations casting doubt on the death of certain victims, as well as general allegations that nobody died. The gist of these statements is that my clients are liars. These prior statements are evidence of InfoWars' egregious defamatory intent when it later made statements in 2017. We are aware of such notable prior statements from April 2013, March

**EXHIBIT**
2

2014, May 2014, September 2014, December 2014, January 2015, July 2015, and November 2016, although we are sure there are many others as yet unknown. Each of these statements addresses the same core set of false statements conveyed by the 2017 statements, which my clients now demand you correct as provided by Sec. 73.055 of the Texas Civil Practice & Remedies Code.

Specifically, my clients demand that InfoWars immediately and publicly acknowledge that it has spread false information about them and made false accusations about their conduct following the tragedy. My clients demand that InfoWars publicly admit it made false statements about a "blue screen" faked interview with Anderson Cooper. My clients also demand that InfoWars publicly admit that they are not "crisis actors" or otherwise involved in any kind of conspiracy to cover up the truth about the Sandy Hook massacre or the death of their son.

Finally, my clients demand that you take immediate steps to ensure the preservation of the following items:

- All communications within InfoWars relating to my clients, the above broadcasts, or the Sandy Hook shooting.

- All communications between any employee or representative of InfoWars and any third parties relating to my clients, the above broadcasts, or the Sandy Hook shooting.

- All notes, drafts, or documents relating to my clients, the above broadcasts, or the Sandy Hook shooting.

- All documents reflecting policies or editorial standards for the factual vetting of information published by InfoWars, as in effect on April 22 – June 26, 2017.

You are further notified that the destruction or loss of these items may constitute spoliation of evidence under Texas law.

I ask that you respond immediately, detailing the steps InfoWars will be taking to comply with each of the above demands.

Most sincerely,

Mark Bankston

**6/27/2018 1:48 PM**
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001842**
**Hector Gaucin-Tijerina**

## GLAST, PHILLIPS & MURRAY

A PROFESSIONAL CORPORATION

**MARK C. ENOCH, J.D., M.B.A.**
(972) 419-8366
fly63rc@verizon.net

BOARD CERTIFIED – CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL
SPECIALIZATION

14801 QUORUM DRIVE, SUITE 500
DALLAS, TEXAS 75240-6657

(972) 419-8300
FACSIMILE  (469) 206-5022
_____

June 27, 2018

*Via efiling*

Clerk, 345th District Court
Travis County
1000 Guadalupe, 5th floor
Austin, TX 78701

Re:   **Vacation/Unavailability Letter;** *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC;* Cause No. D-1-GN-18-001842, 345th District Court, Travis County, Texas

Dear Clerk:

I will be on vacation/unavailable on the following dates:

July 14 – August 1
August 12 – August 22

Please do not schedule any hearings or court trial dates during this time-frame. By copy of this letter I am requesting that opposing counsel not schedule any hearings or depositions during this time period as well.  Thank you for your attention to this matter.

Very truly yours,

/s/ Mark C. Enoch

Mark C. Enoch

MCE:mji
cc:   Mr. Mark D. Bankston (*via e-service*)

6/28/2018 3:34 PM
**Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Sandra Henriquez**



June 28, 2018

*Via E:File*

345th District Clerk
Travis County, Texas
1000 Guadalupe Street
Austin, Texas 78701

   Re: **Vacation/Unavailability Letter**; Cause No. D-1-GN-18-001842, *Leonard Pozner and Veronique De La Rosa vs., Alex E. Jones, InfoWars, LLC, Free Speech Systems, LLC*, In the 345th Judicial District Court of Travis County, Texas.

Dear Sir or Madam:

   I will be on vacation/unavailable on the following dates:

   August 2, 2018, through August 10, 2018.

   Please do not schedule any hearings or court trial dates during this time frame.  By copy of this letter, I am requesting that opposing counsel not schedule any hearings or depositions during this time-period as well.  Thank you for your attention to this matter.

      Most sincerely,

      Mark Bankston

cc: **BY ELECTRONIC TRANSMISSION:** service@fullenweider.com
  Mr. Randall B. Wilhite
  Fullenweider Wilhite, P.C.
  4265 San Felipe Street, Ste. 1400
  Houston, Texas  77027

  **BY ELECTRONIC TRANSMISSION:** fly63rc@verizon.net
  Mr. Mark C. Enoch
  Glast, Phillips & Murray, P.C.
  14801 Quorum Drive, Ste. 500
  Dallas, Texas  75254

6/29/2018 10:01 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001842**
**Terri Juarez**

# GLAST, PHILLIPS & MURRAY
### A PROFESSIONAL CORPORATION

**MARK C. ENOCH, J.D., M.B.A.**
(972) 419-8366
fly63rc@verizon.net

BOARD CERTIFIED – CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL
SPECIALIZATION

14801 QUORUM DRIVE, SUITE 500
DALLAS, TEXAS 75240-6657

(972) 419-8300
FACSIMILE  (469) 206-5022
_____

June 29, 2018

*Via efiling*

Clerk, 345th District Court
Travis County
1000 Guadalupe, 5th floor
Austin, TX 78701

      Re:    **Amended Vacation/Unavailability Letter;** *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, Infowars, LLC, and Free Speech Systems, LLC;* Cause No. D-1-GN-18-001842, 345th District Court, Travis County, Texas

Dear Clerk:

      I will be on vacation/unavailable on the following dates:

July 14 – August 1
August 12 – August 26

      Please do not schedule any hearings or court trial dates during this time-frame. By copy of this letter I am requesting that opposing counsel not schedule any hearings or depositions during this time period as well.  Thank you for your attention to this matter.

                 Very truly yours,

                 */s/ Mark C. Enoch*

                 Mark C. Enoch

MCE:mji
cc:    Mr. Mark D. Bankston (*via e-service*)

**6/29/2018 4:17 PM**
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001842**
**Hector Gaucin-Tijerina**

NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 345th JUDICIAL DISTRICT |

## <u>NOTICE OF HEARING</u>

Please take notice that a hearing on Defendants' Motion to Dismiss under the Texas Citizens' Participation Act (*filed June 26, 2018*) will be heard by the Court on its Central Docket on **Wednesday, August 1, 2018 at 2:00 p.m.** Three (3) hours have been allotted for this hearing. The hearing will be held at the Heman Marion Sweatt Travis County Courthouse located at 1000 Guadalupe, Austin, Texas 78701.

GLAST, PHILLIPS & MURRAY, P.C.

*/s/ Mark C. Enoch*

Mark C. Enoch
State Bar No. 06630360

GLAST, PHILLIPS & MURRAY, P.C.
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
Telephone:   972-419-8366
Facsimile:   972-419-8329
fly63rc@verizon.net

ATTORNEYS FOR DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document has been served upon the parties listed below via email and via efile.txcourts.gov's e-service system on June 29, 2018:

Mark Bankston
Kyle Farrar
Kaster, Lynch, Farrar & Ball, LLP.
1010 Lamar, Suite 1600
Houston, Texas 77002

/s/ Mark C. Enoch
Mark C. Enoch

# GLAST, PHILLIPS & MURRAY
### A PROFESSIONAL CORPORATION

**MARK C. ENOCH, J.D., M.B.A.**
(972) 419-8366
fly63rc@verizon.net

BOARD CERTIFIED – CIVIL TRIAL LAW
TEXAS BOARD OF LEGAL
SPECIALIZATION

14801 QUORUM DRIVE, SUITE 500
DALLAS, TEXAS 75240-6657

(972) 419-8300
FACSIMILE (469) 206-5022

Filed in The District Court
of Travis County, Texas

JUL 0 3 2018

At_____0955 A M.

Velva L. Price, District Clerk

June 27, 2018

*Via First Class Mail*

Travis County 345th
 Judicial District Clerk
P.O. Box 679003
Austin, TX 78767-9003

> *Re:*   *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones,
> Infowars, LLC, and Free Speech Systems, LLC*; Cause No. D-1-
> GN-18-001842, 345th District Court, Travis County, Texas

Dear Clerk

On June 26, 2018 counsel for Defendants in the captioned case filed (1) Defendants' First Amended Answer; and (2) Defendants' Motion to Dismiss under the Texas Citizens' Participation Act. Several of the exhibits to these two filings are video exhibits. Pursuant to the instructions received from your office, we have enclosed a file-stamped copy of each of these filings along with thumb drive containing the video exhibits to each.

If there are any questions please do not hesitate to contact my assistant, Melanie Illig, at 972-419-8347. Thank you for your assistance.

Very truly yours,

*Mark C. Enoch/mgi*

Mark C. Enoch

:mji
enclosures

cc:   Mr. Mark Bankston

(2 - thumb drive)



Filed in The District Court
of Travis County, Texas,

JUL 19 2018

At _____ M.
Velva L. Price, District Clerk

**LORA J. LIVINGSTON**
Local Administrative Judge

Travis County Courthouse
P. O. Box 1748
Austin, TX 78767

**DISTRICT COURTS**

(512) 854-9309
FAX (512) 854-9332

July 19, 2018

Mark Bankston
Kaster, Lynch, Farrar & Ball, LLP
1010 Lamar, Suite 1600
Houston, Texas 77002
*Via email: mark@fbtrial.com*

Mark C. Enoch
Glast, Phillips & Murray, PC
14801 Quorum Drive, Suite 500
Dallas, Texas 75254-1449
*Via email: fly63rc@verizon.net*

**Re: Cause No. D-1-GN-18-001842;** *Leonard Pozner and Veronica De La Rosa vs. Alex E. Jones, et al; in the 345th Judicial District, Travis County, Texas*

Dear Counsel:

I have reviewed the request for an assignment to a particular judge pursuant to Travis County Local Rule 2.6 and the response. Such requests are best evaluated at the very beginning of a case. Given your upcoming setting, I will not grant the request at this time. However, I am willing, if requested, to reconsider the request after a decision is made on the matters pending in August.

Sincerely,

LORA J. LIVINGSTON
Local Administrative Judge
Travis County, Texas