## EXHIBIT B  (contd.)

**Copy of All Filings with State Court**

9/15/2021 8:47 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001842**
**Lisa Guerrero**

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 459th DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 459th DISTRICT COURT |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | 459th DISTRICT COURT |
| *Defendants* | § | |

## PLAINTIFFS' MOTION FOR PROTECTION REGARDING MARC RANDAZZA

Plaintiffs file this Motion for Protection to prohibit Defendants from allowing out-of-state attorney Marc Randazza or any member of his staff access to confidential documents, testimony, expert reports, or any witnesses in this litigation. For good cause, Plaintiffs show as follows:

## SUMMARY

On September 10, 2021, Plaintiffs learned that for the previous two months, Mr. Randazza failed to disclose that he has been in possession of confidential settlement documents in the *Lafferty* case. Two months ago, Mr. Randazza was sent these documents by frequent InfoWars guest and former *Lafferty* defendant Wolfgang Halbig. Mr. Halbig, who had entered a confidential settlement, sent these documents in obvious violation of contractual obligations. During the two months Mr. Randazza was secretly in possession of the documents, the court in *Lafferty* entered multiple orders regarding the confidential settlement in which it ruled that the materials were inappropriate for discovery and could not be inquired about. During this time, Mr. Randazza and his junior attorney did not inform the court they were secretly in possession of those settlement documents. After two months of concealing his possession of the confidential documents, essentially wasting the court's time, Mr. Randazza then instructed his junior attorney to make a public filing describing aspects of the agreement's contents in an unredacted pleading.

Mr. Randazza has been acting behind-the-scenes coordinating the Sandy Hook litigation from the beginning, a fact he revealed in his recent application to appear *pro*

*hac vice*. During those three years, the litigation in both forums has been a non-stop catastrophe. Plaintiffs do not desire to proceed in this case unprotected from Mr. Randazza's future antics. Plaintiffs' need for protection is especially acute given the events of the past several months.

Prior to this latest event, a lack of respect for confidentiality orders by Mr. Randazza and his junior attorney Mr. Wolman was already demonstrated when protected deposition information was filed this summer in the *Lafferty* case. Indeed, the *Lafferty* court described the "baseless argument" concerning confidentiality duties put forth by Mr. Wolman as "frightening." Moreover, there is a record of Mr. Randazza trafficking in wrongfully obtained information from litigation adversaries in the past, and there is also a record showing Mr. Randazza has threatened and intimidated participants in litigation, including a witness who gave testimony in this case. In short, any access to confidential materials or witnesses by Mr. Randazza poses risks to legitimate interests and virtually guarantees more collateral distractions.

For all of these reasons, Plaintiffs have brought this Motion for Protection as it concerns Mr. Randazza specifically. Plaintiffs ask the court to an enter an order prohibiting Defendants from allowing Mr. Randazza or his law office access to any confidential discovery documents, confidential expert reports, or confidential testimony in this litigation. Plaintiffs also ask the Court to prohibit Defendants from having Mr. Randazza make any manner of contact with any potential witness in this case given his prior conduct. Finally, Plaintiffs ask this Court to prohibit any contact

between Mr. Randazza and any of Defendants' expert witnesses who review confidential material.

## LEGAL STANDARD

While this Court cannot prevent Mr. Jones from soliciting the legal advice of out-of-state counsel, it can limit access to discovery and witnesses. These powers arise under Rule 192.6 and under the Court's inherent powers to safeguard the proceedings. Under Rule 192.6, this Court may enter an order protecting any person from whom discovery is sought. Such an order can be used "[t]o protect the movant from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights." Tex. R. Civ. P. 192.6(b). The Rule also authorizes the Court to "make any order in the interest of justice." *Id.* Further, under the Government Code, all courts have the inherent power to "require that proceedings be conducted with dignity and in an orderly and expeditious manner and control the proceedings so that justice is done." Tex. Govt. Code Sec. 21.001(b).

## ARGUMENT

I.     **There is Good Cause for Protection Given that Mr. Randazza Concealed his Possession of Confidential Settlement Documents Specifically Referenced in Court Orders.**

In the *Lafferty* case, Mr. Randazza has caused another significant controversy when he failed to disclose his possession of confidential documents at the heart of court orders for two months and then filed a public notice describing aspects of the agreement. The problem was explained in a Motion to Seal by the *Lafferty* plaintiffs:

This Court barred the Jones defendants from obtaining or inquiring into matters related to settlement. *See* Dkt. 378.10 (ordering that "no inquiry may be made regarding any settlement between the plaintiffs and Halbig, including but not limited to the terms or value of those settlements, nor may any testimony be offered in that regard"); Dkt. 389.00 (barring Jones defendants from seeking information related to settlement and ruling it "not a proper line of inquiry"). In their filing of Thursday, September 2, Dkt. 454.00, they indicated that, for the past 55 days, they have been in possession of documents covered by these orders.

Instead of advising the plaintiffs or the Court of this fact in a non-public forum, they gratuitously described aspects of those materials' contents in a public filing. These materials were provided to the Jones defendants in violation of a binding contractual agreement. This Court has repeatedly ruled that the Jones defendants are not entitled to them and ordered that they may not inquire into them. Nonetheless, in the 55 days since receiving the materials, the Jones defendants failed to advise the plaintiffs or the Court that these materials were in their possession.

The plaintiffs have requested that the Jones defendants treat the materials as Highly Confidential – Attorneys Eyes Only under the Protective Order. They have refused this request. Additionally, they have refused the plaintiffs' requests that they provide the plaintiffs with the materials and destroy any copies of them wrongfully in their possession.[1]

The *Lafferty* court's orders denying discovery of the agreement were entered on July 2, 2021 and July 21, 2021.[2] Yet Mr. Randazza gained possession of the confidential documents on July 9th, and concealed his possession for two months until mid-September.[3] All while the Court and the parties were litigating the issue, Mr.

---

[1] Exhibit 1, *Lafferty* Plaintiffs' Motion to Seal, p. 1-2.
[2] *See Lafferty* Dkt. 378.10; 389.00. Available at:
http://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=UWYCV186046436S
[3] Exhibit 2, *Lafferty* Defendants' Notice of Receipt of Settlement Documents (Redacted), p. 2.

Randazza kept his possession of the documents a secret from the Court. In their publicly filed notice, Defendants claimed that that Mr. Randazza "determined that Defendants had no obligation to make this disclosure," but that "Attorney Randazza opined that making the disclosure [in a public unredacted filing] would be the most honorable course of action."[4] In the exhibit attached to this Motion, Plaintiffs have redacted the portions of Defendants' Notice which describe the agreement since that Notice is currently subject to a Motion to Seal in *Lafferty*.

Separate and apart from the issue of whether a party must inform its adversary when it has acquired its confidential documents through another's misdeed, Mr. Randazza's handling of this situation is alarming. Defendants' public unredacted notice was clearly inappropriate, and Mr. Randazza's lack of candor for two months while discovery orders were being litigated is also extremely concerning. These events, and Mr. Randazza's past conduct discussed below, provide good cause for specific protection. Such an order will help avoid further collateral litigation.

## II. There is Good Cause for Protection Because InfoWars Recently Violated the *Lafferty* Protective Order.

Mr. Randazza, through his junior attorney Jay Wolman, is overseeing litigation in *Lafferty,* where they are joined by a local attorney. Mr. Wolman, an employee of Randazza Legal Group, is licensed in Connecticut, so the *Lafferty* court did not have the option of preventing his appearance. As part of the many shenanigans in that case,

---

[4] Exhibit 2, *Lafferty* Defendants' Notice of Receipt of Settlement Documents (Redacted), p. 2.

the *Lafferty* attorneys were recently found to have violated a protective order after having argued they had no duty to comply with the order. In an order on August 6, 2021, the *Lafferty* court described these events and the "frightening" arguments of Mr. Randazza's junior attorney:

> In the midst of taking the first deposition of a plaintiff, the defendants Free Speech Systems LLC, Infowars LLC, Infowars Health LLC, and Prison Planet TV LLC (Infowars), filed a motion to depose Hillary Clinton, using deposition testimony that had just been designated as "Confidential-Attorneys Eyes Only," and completely disregarding the court ordered procedures...
>
> In short, Infowars, having advocated for a court ordered protective order, filing no less than three versions, having recited in writing the good cause bases for the issuance of the protective order, and having no objection to the plaintiffs' proposed modification, now takes the absurd position that the court ordered protective order circumvents the good cause requirements of Practice Book 13-5, did not need to be complied with, and should not be enforced by the court. <u>This argument is frightening</u>. Given the cavalier actions and willful misconduct of Infowars in filing protected deposition information during the actual deposition, <u>this court has grave concerns</u> that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public.[5]

In this case, Plaintiffs will be at greatly increased risk of injury if Defendants are permitted to allow Mr. Randazza and his firm access to confidential documents, testimony, and expert reports. Plaintiffs cannot show good cause to designate the entirety of confidential discovery as "Attorneys Eyes Only," nor is such a solution

---

[5] Exhibit 3, August 6, 2021 Order in *Lafferty*.

workable. But the record does show good cause for an order prohibiting any access by Mr. Randazza or his law firm specifically, given their prior conduct.

### III. There is Good Cause for Protection Because Mr. Randazza has Previously Trafficked in Wrongfully Obtained Confidential Information.

Good cause for specific protection is further supported by evidence of Mr. Randazza's history of trafficking in illegitimate confidential information. One such episode occurred when Mr. Randazza was pursuing a file-sharing company. During that lawsuit, Mr. Randazza acquired pilfered confidential information about his opponent's business from a photographer named James Grady who assisted in Randazza's case against the file-sharing company.

In an email, Grady told Randazza that he "pay[s] a guy – call him a forensic investigator" who was able to gain access to confidential information from the target company, including "corporate papers" and "emails."[6] Grady made it clear the information was not legitimately obtained, telling Randazza that his source "didn't get the info at Walmart in the course of normal commerce."[7] In a later email, Randazza asked Grady to testify, but told him, "I need you to consider what happens if the judge wants to know where you got your information."[8] While Randazza wanted Grady to have an answer ready for the judge, Randazza didn't care if the information was obtained in violation of ethical rules. Randazza told Grady that if the information

---

[6] Exhibit 4, Emails between Randazza and James Grady filed in in *Randazza v Excelsior*, U.S. Bankruptcy Court for the District of Nevada, No. 15-01193-ABL, Doc. 144-10, p. 1.
[7] *Id.*
[8] *Id,* p. 3.

came from a "disgruntled Oron employee" or a "jilted lover" with access to the company's confidential documents, he felt that was "great."[9]

Likewise, the findings from the Excelsior/Liberty Arbitration confirm Mr. Randazza trafficking in pilfered information. During that trial, the Arbitrator found evidence of "Mr. Randazza's assisting Datatech, including via forwarding fruits of a disclosed (unnamed) computer hacker."[10] In doing so, Mr. Randazza was "[k]nowingly forwarding illegally 'hacked' computer data to counsel for another company."[11] These events provide good cause to limit his access in this litigation.

## IV. There is Good Cause for Protection Because Mr. Randazza has Already Intimidated a Witness in this Case.

As the Court may recall, Plaintiffs' brief opposing Mr. Randazza's pro hac vice motion included declarations from Alexandrea Merrell and Mike Postle discussing an abusive phone call they had with Mr. Randazza. In the week after the filing of those declarations, Mr. Randazza began repeatedly contacting Mr. Postle by email, issuing menacing threats about lawsuit and perjury.

First, on July 29, 2021, Mr. Randazza emailed Mr. Postle stating, "It is my intention to file a lawsuit against you for violation of Cal. Penal Code § 637.2."[12] Mr. Randazza threatened this lawsuit due to Mr. Postle allegedly recording Mr. Randazza's abusive call. This was a strange threat because Mr. Randazza should have

---

[9] *Id.*
[10] Exhibit 5, Interim Arbitration Award in *Randazza v. Excelsior Media Corp., et al.*, p. 18.
[11] *Id.,* p. 8.
[12] Exhibit 6, Declaration of Mike Postle, p. 3.

been overjoyed that the call was recorded, since it would have proved his alleged innocence. Instead, Mr. Randazza was angry and threatened Mr. Postle with a lawsuit, stating, "I am willing to grant you 24 hours in which to try to resolve this without filing suit against you."[13]

Mr. Postle responded by denying that he had recorded any calls, and asked Mr. Randazza to leave him alone, stating that he "[didn't] see a reason for you to contact me."[14] When Mr. Randazza learned that the call was not recorded, he switched tactics, now claiming Mr. Postle had committed perjury. In his next email, Mr. Randazza stated, "Well, you both lied in claiming that I called her a 'cunt.'"[15] Mr. Randazza told Mr. Postle, "So, how do you want to handle your perjury?"[16] Mr. Postle responded again, clearly upset by Mr. Randazza's accusation and his threat. Mr. Postle again asked Mr. Randazza to cease contact:

> As I have said before, I find you beyond unprofessional and yet again, there's no need to have contact with you unless it is specifically for court business. These threats are NOT court business.[17]

Mr. Postle also stated, "I didn't lie, you did say that."[18] Mr. Postle expressed his dismay that Mr. Randazza was "coming at me out of personal anger with a clear vendetta."[19] Mr. Postle then repeated his request that Mr. Randazza cease contact:

---

[13] *Id.*
[14] *Id.,* p. 4
[15] *Id.,* p. 5.
[16] *Id.*
[17] *Id.,* p. 6.
[18] *Id.*
[19] *Id.*

> There's really no reason to contact me other than to continue harassing and threatening me. You've admitted that "because things have been made personal" and that "it's a big mistake on my part," it's very clear why you're still coming at me.[20]

Mr. Randazza refused to honor Mr. Postle's second demand to cease communicating with him about his declaration. Instead, Mr. Randazza again wrote to Mr. Postle, demanding that Mr. Postle "send a letter to the court" recanting his testimony.[21] Otherwise, Mr. Randazza pledged "to take action" and stated that he was "not going to let that rest."[22] Mr. Randazza also added:

> Indeed, I did say "fucking liar" – I will never deny that. But, I certainly did not call her a "fucking bitch" nor a "fucking cunt" (There is a non zero chance that I *thought* those things, but they never came out of my mouth)[23]

Mr. Randazza insisted that "I won't let this go."[24] Mr. Randazza then told Mr. Postle, "So, your move."[25] Mr. Randazza closed by threatening Mr. Postle, stating, "You can dig in…and enjoy the 'effect' as you put it."[26] As Mr. Postle noted in his email, Mr. Randazza had previously emailed Mr. Postle on June 15, 2021, telling Postle, "You decided to make it personal with me. That wasn't smart." A copy of that email was also attached to Postle's declaration.[27]

---

[20] *Id.*
[21] *Id.,* p. 7-8.
[22] *Id.*
[23] *Id.,* p. 8.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.,* p. 11.

In addition, a few weeks after Mr. Postle gave Plaintiffs' counsel his March 2021 declaration about his call with Mr. Randazza, Mr. Postle was harassed again when Mr. Randazza posted a public message to Mr. Postle on Twitter which included a court document with his home address and phone number along with a link to a video of a group of mafiosos beating up a man in a bar.[28]

There actions are consistent by those described by Florida attorney Paul Berger, who testified that "Mr. Randazza screamed, threatened, and berated the undersigned and my client without provocation."[29] Mr. Berger testified that Mr. Randazza "threatened to beat me up and send [his Jewish client] to the Gaza Strip."[30] Mr. Randazza admits that he later taunted the client using Hebrew.[31]

## CONCLUSION

The record described above provides good cause for protection. Mr. Randazza and his junior attorney are not appearing before this court, and Plaintiffs share the *Lafferty* court's "grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses."[32] To safeguard against future injury, and to ensure an unambiguous record for future sanctions if necessary, Plaintiffs ask the Court to an enter an order prohibiting Defendants from allowing Mr. Randazza or his law office access to any confidential discovery documents, confidential expert

---

[28] *See* https://twitter.com/marcorandazza/status/1378069741055660040
[29] Exhibit 7, Declaration of Paul Berger, p. 7.
[30] *Id.*
[31] *Id.*
[32] Exhibit 3, August 6, 2021 Order in *Lafferty*.

reports, or confidential testimony in this litigation. Plaintiffs also ask the Court to prohibit Defendants from having Mr. Randazza make any manner of contact with any potential witness in this case given his prior conduct. Finally, Plaintiffs ask this Court to prohibit any contact between Mr. Randazza and any of Defendants' expert witnesses who review confidential material.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with opposing counsel concerning this motion, but I have been unable to confirm whether Defendants are opposed.

_____
MARK D. BANKSTON

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2021 the forgoing document was served upon all counsel of record via electronic service.

_____
MARK D. BANKSTON

# D-1-GN-18-001835

| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 459th DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

# D-1-GN-18-001842

| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 459th DISTRICT COURT |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | |

# D-1-GN-18-006623

| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | 459th DISTRICT COURT |
| *Defendants* | § | |

---

## ORDER ON PLAINTIFFS' MOTION FOR PROTECTION
## REGARDING MARC RANDAZZA

---

On this day, the Court considered Plaintiffs' Motion for Protection Regarding Marc Randazza.

Given the evidence and arguments in Plaintiffs' Motion, including problems with confidentiality in the similar *Lafferty* lawsuit in Connecticut as well as Mr. Randazza's questionable prior conduct with respect to confidential materials, this Court finds there is good cause to grant the relief requested as it concerns confidential documents, testimony, or expert reports. The Court therefore ORDERS that Defendants are prohibited from allowing Mr. Randazza or his law office access to any discovery documents, expert reports, or testimony which is designated as confidential in this litigation. Likewise, the Court ORDERS that Defendants are prohibited from allowing any contact between Mr. Randazza and any of Defendants' expert witnesses who review confidential material.

In addition, the Court finds that given evidence in the record relating to Mr. Randazza's past behavior, including his intimidating behavior towards a witness who gave testimony in this case, there is good cause to grant the relief requested as it concerns contact with witnesses. The Court therefore ORDERS that Defendants are prohibited from having Mr. Randazza make any manner of contact with any potential witness in this case, other than employees of the Defendants

Dated _____, 2021.


_____
Hon. Maya Guerra Gamble

| | | |
|---|---|---|
| **NO.    X06-UWY-CV-18-6046436-S** | **:** | **SUPERIOR COURT** |
| **ERICA LAFFERTY, ET AL.** | **:** | **COMPLEX LITIGATION DOCKET** |
| **V.** | **:** | **AT WATERBURY** |
| **ALEX EMRIC JONES, ET AL.** | **:** | **SEPTEMBER 3, 2021** |

_____

| | | |
|---|---|---|
| **NO.    X-06-UWY-CV18-6046437-S** | **:** | **SUPERIOR COURT** |
| **WILLIAM SHERLACH** | **:** | **COMPLEX LITIGATION DOCKET** |
| **V.** | **:** | **AT WATERBURY** |
| **ALEX EMRIC JONES, ET AL.** | **:** | **SEPTEMBER 3, 2021** |

_____

| | | |
|---|---|---|
| **NO.    X06-UWY-CV-18-6046438-S** | **:** | **SUPERIOR COURT** |
| **WILLIAM SHERLACH, ET AL.** | **:** | **COMPLEX LITIGATION DOCKET** |
| **V.** | **:** | **AT WATERBURY** |
| **ALEX EMRIC JONES, ET AL.** | **:** | **SEPTEMBER 3, 2021** |

### MOTION FOR ORDER REGARDING AND TO SEAL THE JONES DEFENDANTS' NOTICE OF POSSESSION OF DOCUMENTS

This Court barred the Jones defendants from obtaining or inquiring into matters related to settlement. *See* Dkt. 378.10 (ordering that "no inquiry may be made regarding any settlement between the plaintiffs and Halbig, including but not limited to the terms or value of those settlements, nor may any testimony be offered in that regard"); Dkt. 389.00 (barring Jones defendants from seeking information related to settlement and ruling it "not a proper line of inquiry"). In their filing of Thursday, September 2, Dkt. 454.00, they indicated that, for the past 55 days, they have been in possession of documents covered by these orders.

Instead of advising the plaintiffs or the Court of this fact in a non-public forum, they gratuitously described aspects of those materials' contents in a public filing. These materials were

1

provided to the Jones defendants in violation of a binding contractual agreement. This Court has repeatedly ruled that the Jones defendants are not entitled to them and ordered that they may not inquire into them. Nonetheless, in the 55 days since receiving the materials, the Jones defendants failed to advise the plaintiffs or the Court that these materials were in their possession.

The plaintiffs have requested that the Jones defendants treat the materials as Highly Confidential – Attorneys Eyes Only under the Protective Order. They have refused this request. Additionally, they have refused the plaintiffs' requests that they provide the plaintiffs with the materials and destroy any copies of them wrongfully in their possession. To protect these materials and their interests, the plaintiffs therefore move for a court order designating that these materials be treated as Highly Confidential – Attorneys Eyes Only while the plaintiffs consider further appropriate relief.

Additionally, the plaintiffs move that the Jones defendants' filing advertising these materials, Dkt. 454.00, be sealed. Under Conn. Practice Book § 11-20A(c), a filing or document may "be sealed . . . if the judicial authority concludes that such order is necessary to preserve an interest which is determined to override the public's interest in viewing such materials." In doing so, the court "shall first consider reasonable alternatives to any such order and any such order shall be no broader than necessary to protect such overriding interest." *Id.* The traditional presumption in favor of public access "applies only to 'judicial documents.'" *Rosado v. Bridgeport Roman Cath. Diocesan Corp.*, 292 Conn. 1, 42 (2009). A "judicial document" is a filing on which the court could "rely on in support of its adjudicatory function." *Id.* at 46.

Because the Jones defendants' Notice is "not marked in support of any motion or other determination of the court and, therefore, could not have been relied upon in the course of adjudicatory action," it is not a "judicial document," and the presumption of public access does

2

not apply. *Id.* at 51–52 (holding same for certain documents). The public has no legitimate interest in viewing information that this Court has already found is "not proper inquiry" and "literally . . . a fishing expedition," and therefore cannot be material to any adjudication in the case. 7/2/21 Hrg. Tr. 49–51, Dkt. 398.00, July 7, 2021. Moreover, there is an overriding interest in preserving the confidentiality of information obtained in violation of a binding contract, and whose revelation would constitute a flouting of the Court's own determination that it may not be sought or obtained in the case. In the alternative, the Court could seal the Notice and order the filing of a version in which any description of the materials referenced is redacted.

     For all the foregoing reasons, the plaintiffs' motion should be granted.

THE PLAINTIFFS,

By:   */s/ Matthew S. Blumenthal*
CHRISTOPHER M. MATTEI
ALINOR C. STERLING
MATTHEW S. BLUMENTHAL
KOSKOFF KOSKOFF & BIEDER
350 FAIRFIELD AVENUE
BRIDGEPORT, CT  06604
asterling@koskoff.com
cmattei@koskoff.com
mblumenthal@koskoff.com
Telephone:   (203) 336-4421
Fax:   (203) 368-3244
JURIS #32250

## **CERTIFICATION**

This is to certify that a copy of the foregoing has been emailed and/or mailed, this day, postage prepaid, to all counsel and *pro se* appearances as follows:

**For Alex Emric Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC:**
Jay Marshall Wolman, Esq.
100 Pearl Street, 14th Floor
Hartford, CT 06103
jmw@randazza.com
P: 702-420-2001

Norman A. Pattis, Esq.
Kevin Smith, Esq.
Pattis & Smith, LLC
383 Orange Street, First Floor
New Haven, CT  06511
P:  203-393-3017
npattis@pattisandsmith.com
ksmith@pattisandsmith.com

**For Genesis Communications Network, Inc.**
Mario Kenneth Cerame, Esq. (and via USPS)
Brignole & Bush LLC
73 Wadsworth Street
Hartford, CT  06106
mario@brignole.com
mcerame@brignole.com
P: 860-527-9973

*/s/ Matthew S. Blumenthal*
CHRISTOPHER M. MATTEI
ALINOR C. STERLING
MATTHEW S. BLUMENTHAL

Randazza Legal Group, PLLC
100 Pearl Street, 14h Floor, Hartford, CT 06103 Tel: 702-420-2001

| DOCKET NO: UWY-CV-18-6046436-S : | SUPERIOR COURT |
|---|---|
| ERICA LAFFERTY, ET AL., | COMPLEX LITIGATION DOCKET |
| VS. | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | SEPTEMBER 2, 2021 |

| DOCKET NO: UWY-CV-18-6046437-S : | SUPERIOR COURT |
|---|---|
| WILLIAM SHERLACH, | COMPLEX LITIGATION DOCKET |
| VS. | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | SEPTEMBER 2, 2021 |

| DOCKET NO: UWY-CV-18-6046438-S : | SUPERIOR COURT |
|---|---|
| WILLIAM SHERLACH, ET AL., | COMPLEX LITIGATION DOCKET |
| VS. | AT WATERBURY |
| ALEX EMRIC JONES, ET AL. | SEPTEMBER 2, 2021 |

## NOTICE OF RECEIPT OF SETTLEMENT DOCUMENTS

On July 2, 2021, the Court issued an Order (*Lafferty* Entry No. 389.00) as to whether the defendants could inquire, *inter alia*, as to the plaintiffs' settlement with former defendant, Wolfgang Halbig. The Court ruled it was "not a proper line of inquiry", without prejudice to re-briefing the issues in writing.

On July 21, 2021, the Court issued an order allowing the commission for the deposition of Mr. Halbig (*Lafferty* Entry No. 378.10) stating that "no inquiry may be made regarding any settlement between the plaintiffs and Halbig, including but not limited to the terms or value of those settlements, nor may any testimony be offered in that regard".

Although Defendants Alex Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, have endeavored to abide the foregoing rulings, and

have done so, without prejudice to their position that such information is discoverable, Mr. Halbig has apparently not felt so bound.

Unsolicited, on July 9, 2021, Mr. Halbig transmitted to Defendants' counsel eight documents purporting to be the Covenant Not to Sue & Settlement Agreeement [sic] ████████

████████████████████████████████████████████████████████████████████

████████▌ ████████████████████████████████████. By their terms, ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

Why Mr. Halbig decided to send these unsolicited documents to Defendants' counsel is unknown, and Plaintiffs may fully explore his motive at his upcoming deposition. Plaintiffs' counsel should be well familiar with Mr. Halbig's penchant for sending unsolicited emails. But, upon receipt, Defendants' counsel sought the advice of ethics counsel as to how to handle these documents, considering the effect of the Court's order and undersigned counsel's ethical obligations to Defendants and Plaintiffs.

To avoid any question of impropriety, ethics counsel has now advised the undersigned to file the instant notice. Ethics counsel, the undersigned, and Attorney Marc Randazza (consistent with Rule 5.1 of the Rules of Professional Conduct) determined that Defendants had no obligation to make this disclosure. Attorney Randazza opined that making the disclosure would be the most honorable course of action. Defendants have determined that the disclosure is appropriate to avoid any possible prejudice or surprise to Plaintiffs.

Dated: September 2, 2021                          Respectfully submitted,
                                                  ALEX EMRIC JONES, INFOWARS, LLC,
                                                  FREE SPEECH SYSTEMS, LLC,

---

[1] As the Court is aware, the Bankruptcy Court determined that Ms. Lafferty's settlements with Mr. Halbig and Midas Resources are void. The Bankruptcy Court further ordered that the settlement funds be deposited with the Clerk of this Court.

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

INFOWARS HEALTH, LLC, PRISON PLANET TV, LLC

By: /s/ Jay M. Wolman
Jay M. Wolman – Juris #433791 of
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103
P: 702-420-2001
F: 305-437-7662
jmw@randazza.com
*Counsel for Defendants Alex E. Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC*

And

/s/Norman A. Pattis
Norman A. Pattis
PATTIS & SMITH, LLC
Juris No. 423934
383 Orange Street
New Haven, CT 06511
V: 203-393-3017
F:  203-393-9745
npattis@pattisandsmith.com
*Counsel for Defendants Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC*

## **CERTIFICATION**

I hereby certify that a copy of the above was mailed or electronically delivered on this 2nd day of September 2021 to all counsel and pro se parties of record and that written consent for electronic delivery was received from all counsel and pro se parties of record who were electronically served including:

Alinor C. Sterling
Christopher M. Mattei
Matthew S. Blumenthal
KOSKOFF KOSKOFF & BIEDER
350 Fairfield Avenue
Bridgeport, CT 06604
<asterling@koskoff.com>
<cmattei@koskoff.com>
<mblumenthal@koskoff.com>
*Attorneys for Plaintiffs*

Mario Cerame, Esq.
Brignole, Bush & Lewis
73 Wadsworth Street
Hartford, CT 06106
<mcerame@brignole.com>
*Attorneys for Defendant*
*Genesis Communications Network, Inc.*

/s/ Jay M. Woman 433791
Jay M. Wolman

Randazza Legal Group, PLLC
100 Pearl Street, 14₍ₕ₎ Floor, Hartford, CT 06103 Tel: 702-420-2001 Fax: 305-437-7662

ORDER    421277

DOCKET NO: UWYCV186046436S

LAFFERTY, ERICA Et Al
   V.
JONES, ALEX EMRIC Et Al

SUPERIOR COURT

JUDICIAL DISTRICT OF WATERBURY
   AT WATERBURY

8/5/2021

ORDER

ORDER REGARDING:
07/06/2021 394.00 MOTION FOR ORDER

The foregoing, having been considered by the Court, is hereby:

ORDER:

By written stipulation, and unless the court orders otherwise, parties can agree to modify discovery procedures. See Connecticut Practice Book Section 13-32. In these consolidated cases, the defendants Alex Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC ("the Jones defendants") did just that. Additionally, they took their agreement with the plaintiffs a step further and asked the court to issue a protective order pursuant to Practice Book Section 13-5 and approve their joint discovery stipulation. The Jones defendants filed no less than three versions of a proposed protective order for the court's approval, see entry numbers 177,181,183, and 185, asserting that they were asking for the same discovery protection that would have been in place in federal court had the cases not been remanded back to state court. They indicated, correctly, that discovery materials are not filed with the court and as such are not ordinarily available to the public. The court ultimately approved the stipulation of the parties, which complied with all relevant requirements of the Connecticut Practice Book and which, inter alia, set forth the procedure by which sensitive confidential information obtained through pretrial discovery would be handled and, if necessary, filed with the court. The order provided that of all or part of a deposition transcript could be designated as confidential by counsel for the deponent or designated party, by requesting such treatment on the record at the deposition or in writing no later than thirty days after the date of the deposition. It set forth simple procedures by which the designation of "confidential" could be subsequently challenged, and how confidential information could be filed with the court. Importantly for the purposes of this motion, the protective order clearly prohibited discovery information designated as confidential from being filed with the court until such time that the court had ruled on the designating party's motion under Practice Book Section 11-20A. The Jones defendants did not oppose the plaintiffs' June 8,2021 motion to modify the protective order, which recited a good cause basis for the modification and which added a "Confidential- Attorneys Eyes Only" designation to the above mentioned procedures. Based upon the written motions filed by the plaintiffs and the Jones defendants, the court, in entering the protective orders, found good cause for both the issuance of the original protective order and its modification. In support of the motion for protective order, the Jones defendants identified their privacy interests in sensitive proprietary information including proprietary business, financial, and competitive information that they maintain as trade secrets, proprietary business and marketing plans, marketing data, web analytics, sales analytics, and/or other web traffic data, and marketing data or analytics. They referred to the "unique" business model that makes them competitive and successful. The plaintiffs, in support of the modification to the protective order, identified their privacy interests in their medical histories, psychiatric records,and private social media accounts. In the midst of taking the first deposition of a plaintiff, the defendants Free Speech Systems LLC, Infowars LLC, Infowars Health LLC, and Prison Planet TV LLC (Infowars),filed a motion to depose Hillary Clinton, using deposition testimony that had just been designated as "Confidential-Attorneys Eyes Only," and completely disregarding the court ordered procedures. At no point prior to filing the Clinton motion did Infowars profess ignorance of the procedures they had proposed and which were court ordered to be followed, nor have they since taken

any steps to correct their improper filing. If Infowars was of the opinion that the plaintiffs' designation was unreasonable and not made in good faith, the solution was to follow the court ordered procedure to challenge the designation, not to blatantly disregard it and make the confidential information available on the internet by filing it in the court file. The court rejects Infowars' baseless argument that there was no good cause to issue the protective orders, where both sides recited, in writing, detailed justification for a good cause basis. In short, Infowars, having advocated for a court ordered protective order, filing no less than three versions, having recited in writing the good cause bases for the issuance of the protective order, and having no objection to the plaintiffs' proposed modification, now takes the absurd position that the court ordered protective order circumvents the good cause requirements of Practice Book 13-5, did not need to be complied with, and should not be enforced by the court. This argument is frightening. Given the cavalier actions and willful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public. The court will address sanctions at a future hearing.

Judicial Notice (JDNO) was sent regarding this order.

421277

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

**From:** James Grady Photo
**To:** mjr@randazza.com
**Subject:** Re: Oron
**Date:** Wednesday, June 06, 2012 4:56:01 PM

Marc,

I am in Virgin Islands shooting until the 16th.

Oron is not a huge problem for me but I can toss in $5000. Not much, but its a start.

I pay a guy - call him a forensic investigator - to dig past Domains by Proxy and things like that. He called me today while I was sitting in FT Lauderdale airport with the info. Haven't seen it myself yet but the guy has never been wrong.

I didn't have great connection.... but basic are

Russian, living in FL 10 years.

Married.

My guy has seen corporate papers.

My guys says he has seen emails from guy upset about Forumophelia domain name being on hold after complaint about false whois data. Dated May 2012.

Its legit. We have the guy.

But, my guy didn't get the info at Walmart in the course of normal commerce.

I'll be in touch with him now that I have better reception and hope to update you soon. Please understand I am on a photo shoot trip, Villa full of models, so can't dedicate many minutes until home on 16th.

On 6/6/2012 10:14 AM, mjr@randazza.com wrote:
> I have a complaint drafted and delivered to them.
>
> They are jerking me around.
>
> Corbin Fisher is ready to go. I need some more participants to help fund
> the thing. Do you have anyone who is ready to shit or get off the pot? I
> have a few parties who keep saying yes, but they haven't committed.
>
> How certain are you of the owner's identity and location? Their lawyer
> is telling me that they are in Hong Kong. Of course, I don't buy it, but
> what's your back up for that information?
>
>
> -------- Original Message --------
> Subject: Oron
> From: GroupFivePhotosports <jamesgradyphoto@gmail.com
> <mailto:jamesgradyphoto@gmail.com>>



DEFENDANT'S EXHIBIT 396

> Date: Wed, June 06, 2012 8:08 am
> To: mjr@randazza.com <mailto:mjr@randazza.com>
>
> Trying to get a group together to go after Oron.
>
> Know anybody that wants in?
>
> By the way... The REAL owner of Oron, PornBB and Forumophilia is a
> Russian living in Jacksonville, FL. Been there 10 years, recently
> married, etc.
>
> Jimmy

MJR 013992220

| | |
|---|---|
| **From:** | James Grady Photo |
| **To:** | mjr@randazza.com |
| **Subject:** | Re: Witness in case |
| **Date:** | Monday, June 25, 2012 6:33:36 PM |

OK, I shall work all that out. Be there whatever day you wish.

On 6/25/2012 7:31 PM, mjr@randazza.com wrote:
> Ok, I need:
>
> 1) You to develop a report, everything you know about Oron.
> 2) You to consider what happens if the judge wants to know where you
> got your information.  As far as I know, it was lawfully obtained.  You
> certainly got it lawfully.  If the source is a disgruntled Oron
> employee, great.  Jilted lover, great.  Hacker, problematic.
> 3) Need you here on July 3.  Probably a day or two before.
>
>
> -------- Original Message --------
> Subject: Re: Witness in case
> From: James Grady Photo <jamesgradyphoto@gmail.com
> <mailto:jamesgradyphoto@gmail.com>>
> Date: Mon, June 25, 2012 6:30 pm
> To: mjr@randazza.com <mailto:mjr@randazza.com>
>
>
> Sure -- whatever you need.
>
> On 6/25/2012 7:21 PM, mjr@randazza.com <mailto:mjr@randazza.com> wrote:
> > you interested in coming down to Vegas for the hearing on July 3
> > (probably beforehand to prepare) to be a star witness in this case?
> >
> >
>



DEFENDANT'S
EXHIBIT
399

MJR 013367

Hon. Stephen E. Haberfeld
JAMS
555 W. 5th St. , 32nd Fl.
Los Angeles, CA 90013
Tel: 213-253-9704
Fax: 213-620-0100

Arbitrator

JAMS

MARC J. RANDAZZA,                    )     JAMS No. 1260002283
             Claimant,           )     INTERIM ARBITRATION AWARD
                  )
   v.                                )
                  )
EXCELSIOR MEDIA CORP., a Nevada      )
Corp.; LIBERTY MEDIA HOLDINGS, LLC,  )
a California limited liability company; and )
JASON GIBSON, individually           )
                  )
          Respondents.            )
_____ )

I, THE UNDERSIGNED ARBITRATOR --- in accordance with the arbitration provision in Section 8 of the Contract For Employment Agreement As General Counsel Between Marc J. Randazza and Excelsior Media Corp., dated June 6/10, 2009 ("employment agreement"), and based upon careful consideration of the evidence, the parties' written submissions and applicable law, and good cause appearing --- make the following findings, conclusions, determinations ("determinations") and this Interim Arbitration Award, as follows:

## DETERMINATIONS

1.  The determinations in this Interim Arbitration Award include factual determinations by the Arbitrator, which the Arbitrator has determined to be true and necessary to this award. To the extent that the Arbitrator's determinations differ from any party's positions, that is the result of determinations as to relevance, burden of proof considerations, and the weighing of the evidence.

2.  The Arbitrator has jurisdiction over the subject matter and over the parties to the arbitration which are as follows: Claimant and Counter-Respondent Marc J. Randazza ("Mr. Randazza"), Respondents and Counterclaimants Excelsior Media Corp. ("Excelsior"), Liberty Media Holdings, LLC ("Liberty"), and Respondent Jason Gibson. [1]

3.  On February 9, 10, 11, 12 and 13, 2015, the Arbitrator held in-person evidentiary sessions on the merits of the parties' respective claims, counterclaims and contentions. All witnesses who testified did so under oath and subject to cross-examination. All offered exhibits were received in evidence.

4.  This Interim Arbitration Award is timely rendered. See Order of June 1, 2015.

5.  The following is a summary of the Arbitrator's principal merits determinations:

---

[1] Except as otherwise stated or indicated by context, "E/L" shall be used to reference Excelsior and Liberty, collectively and interchangeably for convenience in this Interim Arbitration Award, only. Nothing should be inferred or implied that there is any determination, or basis for any determination, that either or both of those entities are "alter egos" of Jason Gibson or of any person or entity. Mr. Randazza failed to sustain his burden of proof that either Excelsior or Liberty were or are "alter egos" of Respondent Jason Gideon or of any person or entity. Mr. Gideon will be dismissed as a party in this arbitration. See Interim Arbitration Award, Par. 9, at p. 29, infra.

2

A.    Mr. Randazza voluntarily ended his employment by Excelsior and Liberty.

B.    Mr. Randazza's employment by Excelsior and Liberty was not involuntarily terminated by Excelsior, Liberty or at all.[2]

C.    Whether or not Mr. Randazza's employment by E/L was terminated voluntarily by Mr. Randazza or involuntarily by E/L, the principal proximate cause for the ending of Mr. Randazza's employment was Mr. Randazza's breaches of fiduciary duty and the covenant of good faith and fair dealing, implied in his employment agreement, as an employee, executive and general counsel of E/L. The precipitating events which led to the end of Mr. Randazza's employment was Mr. Gideon's having first learned on August 13, 2012 that Mr. Randazza had been involved in and successfully concluded negotiations for a bribe in the amount of $75,000, to be paid to Mr. Randazza by the other side in connection with resolution of high-importance litigation, commonly referred to as the "Oron litigation," which had been initiated and pursued on behalf of E/L by Mr. Randazza, as E/L's counsel of record.    The first indication of that was Mr. Gideon's noticing a provision included in an execution copy of an Oron settlement agreement, presented to him for signature by Mr. Randazza on that date, and Mr. Gideon's inquiring of Mr. Randazza about that provision.

After initial contacts with Mr. Randazza concerning what Mr. Gideon discovered in the Oron settlement agreement, communications and relations between Messrs. Gideon and Randazza noticeably chilled during Mr. Randazza's remaining employment, which ended on August 29, 2012.

---

[2] While not accepting Mr. Randazza's "core contentions" concerning the end of his employment by E/L, the Arbitrator agrees with Mr. Randazza's assertion that "The nature of Mr. Randazza's departure from Excelsior is central to several of his causes of action, and crucial to the defenses Respondents raise" --- including whether there was a breach of contract, wrongful termination, constructive termination and/or retaliatory termination. Reply at p. 7:12-15. As also stated elsewhere herein, none of those claims were proven.

3

The chilled relations, including greatly reduced communication, was in stark contrast with the custom and practice of Messrs. Gibson and Randazza, practically right up to August 13, 2012, being in regular, frequent, cordial and occasionally sexually-peppered communication with each other by face-to-face meetings, texting and emails.

That Mr. Gideon's reaction was not feigned or a pretext for anything asserted by Mr. Randazza in his competing narrative are shown by the following:

1. A sudden and significant reduction of those previously primarily electronic (i.e., email and text) communications --- beginning only after Mr. Gideon learned of the $75,000 bribe --- with Mr. Randazza sending Mr. Gideon unresponded-to emails attempting to attempting to salvage and revive his communications and relationship with Mr. Gideon.

2. Mr. Randazza beat a hasty retreat, in an attempt to salvage the situation by offering to pay the bribe money over to E/L, when initially confronted by Mr. Gideon concerning the "bribe" provision in the Oron settlement agreement, presented for Mr. Gideon's signature.

3. Mr. Gideon did not timely sign the execution copy of the Oron settlement agreement, as negotiated and presented to him by Mr. Randazza.

D. The ending of Mr. Randazza's employment E/L was not --- as contended by Mr. Randazza --- (1) constructive discharge, proximately caused by Mr. Gibson becoming distant and out-of-communication with Mr. Randazza, which made it difficult or impossible for Mr. Randazza to get needed instructions or direction in his employment by E/L as their general counsel, leading to Mr. Randazza's August 29, 2012 email of resignation from employment, or (2) retaliatory termination, which was caused by Mr. Randazza's having "expressed his feelings" of having been "upset, betrayed, offended, and

stressed" anything of a sexual nature whatsoever — including, as highlighted during hearing, a pornographic video shot in Mr. Randazza's office in April, 2012 or a homosexual oral copulation allegedly performed by Mr. Gideon and another E/L executive in the backseat of Mr. Randazza's car, which allegedly greatly upset Mr. Randazza while he was driving his passengers back from a party aboard Mr. Gideon's boat on August 9, 2012.

E.    The immediately foregoing Determination's repeated use of the word "allegedly" is because it is not necessary to resolve a conflict of evidence as to whether the alleged sexual act in Mr. Randazza's car actually occurred or the degree of upset it caused Mr. Randazza, if it actually occurred.  That is because the Arbitrator has determined that — contrary to Mr. Randazza's central contentions in this arbitration — the factual and legal cause of the end of Mr. Randazza's employment had nothing whatsoever to do with anything having to do with alleged sexual activity in Mr. Randazza's car — alone or taken together with a pornographic shoot which, without dispute, occurred in his office, without prior notice to Mr. Randazza, but which the evidence shows did not occur as alleged, was not strongly or even negatively reacted to by Mr. Randazza as initially alleged and did not, as shot or shown, include a photograph of Mr. Randazza's family, as initially presented by Mr. Randazza.

The foregoing determination includes that anything relating to sex — including in connection with a filmed video in Mr. Randazza's E/L office or in the back seat of his car — had nothing whatsoever to do with any decision — which the Arbitrator has determined was neither made or considered — to terminate Mr. Randazza's E/L employment. 2012.  There was no E/L contrived pretext or any retaliation by E/L in connection with the cessation of Mr. Randazza's E/L employment, which was entirely voluntary on

/////
/////

5

Mr. Randazza's part.[3]  For those reasons, the Arbitrator has determined that Mr. Randazza failed to sustain his burden of proof required to establish his claims of and relating to anything having to do with sex — e.g., sexual harassment, hostile work environment, constructive termination, retaliatory termination, etc.

F.    As stated above — and as picked up and amplified later in the Determinations portion of this Award — since the outset of the arbitration, Mr. Randazza made highly-charged, sexually-based "core allegations" and his claimed strong reactions to them in support of his statutory and contractual claims, which were in the main disproved or not proved.  That failure of proof undermined and impaired Mr. Randazza's credibility concerning all of his

/////
/////
/////

testimony and his claims and related contentions.[4]  The evidence established at hearing was that Mr. Randazza intended that his allegations would induce

---

[3] The same is true with respect to Mr. Randazza's contention(s) that Mr. Gideon's discovery of Mr. Randazza having been involved with and negotiating a $75,000 "bribe" in connection with a settlement of the Oron litigation was a pretext for an earlier-formed intention by Mr. Gideon to end Mr. Randazza's E/L employment.

[4] Mr. Randazza's credibility was also undermined by the variance between his testimony and positions at hearing and his written Nevada State Bar submission concerning the Oron litigation $75,000 bribe — including what, if anything, Mr. Gideon knew about it and when, and who solicited the bribe in the first instance.

Mr. Randazza's credibility was also undermined by the variance between his testimony and his EEOC submission.  At hearing, Mr. Randazza admitted that the EEOC complaint contained errors, but tried to explain them away by saying that he did not prepare it. That is not a sufficient excuse or explanation, in the circumstances.

Resolving a credibility-related issue presented in the post-hearing briefs concerning asserted testimonial evasiveness implied by Mr. Randazza's body positioning and whether he had eye contact with the Arbitrator (as asserted by Mr. Randazza in his Reply), throughout his extensive testimony at hearing and primarily on cross-examination, the Arbitrator observed that Mr. Randazza sat sideways in his chair, relative to Claimant's counsel's table — with his back to (i.e., 180 degrees away from) his own counsel and 90 degrees away from Respondent's counsel — albeit with his seated body positioned toward the part of the wall behind and to Mr. Randazza's left from

Mr. Gideon to authorize a settlement financially favorable to Mr. Randazza,

based on Mr. Randazza's belief at the time — and ultimately proven incorrect —

that Mr. Gideon would so settle, rather than have to litigate true or false

allegations relating to his own sexuality, sexual activity, and the pornographic

nature of E/L's business. Mr. Randazza's miscalculation, as aforesaid, led to an

---

where the Arbitrator was seated. Mr. Randazza almost always listened to questions and answered in that position — leaning well forward and looking down or straight ahead into "middle distance" in the direction of the wall behind where the Arbitrator was seated. Mr. Randazza rarely answered a question on cross-examination with sustained eye contact with either the questioning attorney or the Arbitrator.

The Arbitrator has determined, based on the evidence, that Mr. Randazza solicited the bribe in the first instance, attempted to negotiate with Oron's counsel ways and means whereby it would be concealed from and not become known by E/L, and disclosed it to E/L, per Mr. Gideon, for the first time only on August 13, 2013, when the settlement documentation prepared and presented for Mr. Gideon's signature on behalf of E/L by Oron's counsel surfaced a $75,000 retainer payment to Mr. Randazza.

The Arbitrator has further determined that E/L never gave Mr. Randazza permission or consent to solicit, negotiate or accept the $75,000 bribe,* or any bribe or any other payment other than payment of all proceeds being solely for the benefit of and deposited to the account of his clients/principals, E/L.

[*On August 13, 2013, Mr. Gideon handwrote an arrow and "Who gets this" next to the $75,000 payment provision in the copy of the execution copy of the Oron settlement agreement presented to him by Mr. Randazza. The Arbitrator credits that notation as being first notice to and genuine surprise expressed by Mr. Gideon about any Oron settlement payment not being made directly to E/L.

[That notation also was the genesis of a rapid unraveling of the theretofore close professional and personal relationship, symbolized by Mr. Gideon's sharply reducing communications with Mr. Randazza and Mr. Randazza's repeated and ultimately unsuccessful efforts to salvage his situation, by attempting to re-establish direct contact with Mr. Gideon. As previously stated, the Arbitrator has not accepted Mr. Randazza's central contention and narrative that this state of affairs, triggered on August 13, 2012, was manufactured by Mr. Gideon and served as a convenient or other pretext for an earlier-decided termination of Mr. Randazza's employment.]

The Arbitrator has not accepted that E/L's knowledge of or informed consent to any such situation can be implied by non-objection and silence in response to an unspecific, Delphic allusion in one of Mr. Randazza's emails prior to August 13, 2012 or to Mr. Randazza's after-the-fact, self-serving reference to alleged earlier communications, wherein Mr. Randazza claimed in the later email to have "fully disclosed...overtures about that."

In addition, except for admissions, anything which Mr. Randazza and his opposing counsel in the <u>Oron</u> litigation, Val Gurvitz, communicated to each other lacked credibility, because Mr. Randazza testified that he and Mr. Gurvitz routinely lied to each other in their settlement communications.

7

ultimately successful counterattack by E/L, via counterclaims in this arbitration, centering on ethical and legal challenges to Mr. Randazza's conduct as E/L's general counsel and litigation counsel during his employment by E/L. Mr. Randazza's alleged misconduct consisted of engaging in ethically-prohibited negotiations with adverse parties, including concerning monetary "bribes" to "conflict (Mr. Randazza) out" from future litigation, further damaging E/L's recovery in the Oron litigation by knowingly forwarding illegally "hacked" computer data to counsel for another company, without authorization and in contravention of an E/L settlement agreement, engaging in other prohibited conflicts of interest, including representing competitors of E/L, not disclosing and not obtaining informed written client consents from E/L where actual or potential conflicts of interest arose, working and not disclosing that he was working as a practicing lawyer on non-E/L matters during his employment significantly in excess of what was contractually permitted, spoliation of evidence to cover up the foregoing and his undisclosed intention to resign from E/L's employment, including via planning and causing the deletion of legal files and other relevant data from E/L-owned computers, taking control of client funds, in form of Oron litigation settlement proceeds, and refusing to unconditionally release the same to E/L.

    G.    As stated above, Mr. Randazza voluntarily ended his employment by E/L. The principal evidence of that consisted of (1) Mr. Randazza's August 29, 2012 email to Mr. Gideon, (2) days before sending Mr. Gideon his August 29 email, Mr. Randazza cleaned out his personal belongings from his office, (3) shortly after Noon on August 28 --- and more than 24 hours before sending his August 29 email to Mr. Gideon --- Mr. Randazza had his corporate laptop computer "wiped" the first of four times during his last week of employment, and (4) before that, Mr. Randazza was overheard to say "Fuck this shit, I quit," following a company "happy hour" event.

8

H.    In his August 29, 2012 email to Mr. Gideon, Mr. Randazza stated that he could no longer represent the Company, i.e., E/L.[5]  In the circumstances then known, Mr. Gideon and other E/L executives with whom he consulted reasonably, and not hastily,[6] concluded from their review of Mr. Randazza's August 29, 2012 email that Mr. Randazza had resigned from his employment. Their conclusion was proven accurate by facts which became known after Mr. Randazza's departure.  Any actions taken by them based on that reasonable belief did not result in any involuntary termination of Mr. Randazza's E/L employment.

I.    The lack of absolute, unquestionable, pristine clarity in    Mr. Randazza's August 29, 2012 carefully worded and crafted email that he    was resigning his employment was deliberate.

J.    In addition to Mr. Randazza's disputed, disproved and unproved allegations of sexual conduct engaged in or authorized by is important evidence which established that Mr. Randazza was not either (1) a target of any discriminatory or conduct which created a hostile work environment, because of his being a heterosexual or "straight" male, or (2) offended by any of the sexually-related conduct of which he has complained.

K.    Prior to and subsequent to agreeing to go "in house" as E/L's general counsel, Mr. Randazza was outside counsel to several companies engaged in Internet pornography, including videos and stills available on openly homosexual websites.  Since at least the date of the commencement of his employment as E/L's inside general counsel through his last day of E/L employment, Mr. Randazza knew of and was not in any way uncomfortable with Mr. Gideon's gay sexual orientation — which was also that of most, but not all,

---

[5] Mr. Randazza also said he could "potentially" work to wind up his E/L pending matters.   The Arbitrator interprets the inclusion of that to be part of Mr. Randazza's crafted effort to both resign and leave open his attempt to engage Mr. Gideon directly.
[6] The Arbitrator has not accepted Mr. Randazza's assertion that "Respondents hastily decided to call that [August 29, 2012 email] a resignation." Mr. Randazza's Reply at p. 7:20-21.

of E/L's other executives — and the frequent seasoning of business and socially-related conversation and written communications with crude gay and other sexual terms, references and allusions, which Mr. Randazza also used.[7] Mr. Randazza was not embarrassed to be seen or filmed in full undress at a poolside business-social event at Mr. Gideon's home. Mr. Randazza permitted and encouraged his children to have warm personal relationships with Mr. Gideon, who they called "Uncle."

     L.    The evidence was that the only complaints which       Mr. Randazza had concerning the pornographic filming in his offices in April 2012 — four months before the end of his employment — were that (1) he was not given the courtesy of advance notice of the shoot and (2) after the shoot was completed, Mr. Randazza's office was not restored to just the way it had been before the office was prepped for filming.

     The preponderance of disputed evidence was not that Mr. Randazza complained to Mr. Gideon centering on or in any way reasonably relating to sexual discrimination or harassment or a hostile work environment based on sex, including "male-on-male" sex, which has been recognized as a basis for a legal claim. Accordingly, allegedly involuntary termination of Mr. Randazza's employment, based on Mr. Randazza's April 2012 complaint about the filming of pornography in his office — which did not constitute statutorily "protected activity" — is not includible as a component for a statutory claim that he had been fired in retaliation for making that complaint. Mr. Randazza's complaint about the allegedly personally offensive oral copulation of Mr. Gideon

---

[7] For example, Mr. Randazza admitted that he used the term "butthurt" — which he alleged that Mr. Gideon used to demean his expression of feelings about the pornographic filming in his office. In a series of texts about the shoot, Mr. Randazza texted, in a crude possible sexual/legal "double entendre," "Don't jizz on my briefs." Mr. Randazza has admitted that "The Arbitrator has seen many texts and emails from Mr. Randazza with informal, rough, vulgar content." Reply at p. 10:9-10. In making a different point, Mr. Randazza concedes by assertion that "Respondents [have] conceded that jokes and banter were common in the office."

in the back seat of his car on August 9, 2012 was not genuinely or deeply felt and was made primarily for tactical reasons. Therefore, the end of Mr. Randazza's employment was not and was not the product of anything retaliatory, in violation of public policy (e.g., engaging in protected activity), as a matter of law.

Moreover, the preponderance of the evidence is that Mr. Randazza had advance notice of the filming of a pornographic video in his office and that he did not either object or indicate that the noticed shoot was in any way objectionable or offensive to him. That evidence is the playful exchange of texts between Messrs. Randazza and Gideon concerning the intended shoot and the testimony of the director of the shoot, Chaz Vorrias, who testified that he advised Mr. Randazza of the shoot in advance and received no objection from Mr. Randazza.[8]

M.   Contrary to the strong impression created by Mr. Randazza's pre-Arbitration Hearing narrative of allegations, there was no evidence that any photograph(s) of his wife or children or anything personal of or concerning Mr. Randazza or any member of his family, or in any way reasonably violative of their respective personal privacy, were used or visible in the video. The (possible) visibility of a painting on the wall of Mr. Randazza's office, which was painted by Mr. Randazza's wife, is not to the contrary.

In the circumstances, there was no action taken which was either statutorily offensive or hostile.

N.   Mr. Randazza's California Labor Code-based claims --- for Excelsior's failure to (1) pay him his final wages in August 2012 (2nd Claim) or (2) reimburse and indemnify his for business expenses incurred by him in during 2012 (1st Claim) --- fail as a matter of law. The same is true for Mr. Randazza's

---

[8] Mr. Vorrias testimony was not unfair surprise, Mr. Vorrias's admitted deletion of his emails with Mr. Randazza was done without knowledge of their significance in connection with the dispute underlying this arbitration and, in the event, is not attributable to either Excelsior or Liberty, because he was not a managing agent of either entity.

claim for payment of all of his wage-related claims --- including payment of raises, bonuses and repayment of his $25,000 loan. That is because --- at all times relevant to those California Labor Code claims, since June 2011, Mr. Randazza worked and lived in Nevada, to which Mr. Randazza relocated, as did E/L, in order to continue as E/L's general counsel. As stated or indicated in a pretrial ruling bearing on the same issue, (1) the California Labor Code, presumptively, does not apply extraterritorially,[9] and does not apply to the facts and circumstances of this case, and relatedly, (2) that determination, concerning Mr. Randazza's non-contractual claims, is unaffected by the California-as-governing-substantive-law provision of Mr. Randazza's employment agreement with Excelsior, which applies and controls only as to breach-of-contract claims and not, as in this instance, Mr. Randazza's statutory claims.[10]

In the event, Mr. Randazza was properly compensated for all services as to which he has asserted statutory and contractual claims.[11]

O.     Mr. Randazza's claim for unpaid wages and penalties under Nevada NRS Sec.608.050 (3rd Claim) fails as a matter of law, because there is no private right of action for enforcement of that statute. It is therefore not necessary to decide whether the a claim has been stated under that statute.

P.     As to Mr. Randazza's contractual claims --- which are governed by the Employment Agreement, including the provision that California law governs its interpretation and enforcement, etc. --- (1) Mr. Randazza is not entitled to a contractual severance payment, because he voluntarily resigned his

---

[9] Sullivan v. Oracle Corp. , 51 Cal.4th 1191, 12016 (2011); Wright v. Adventures Rolling Cross Country, Inc., 2012 U.S. Dist. LEXIS 104378 (N.D. Cal. 2012) (presumption against extraterritorial application of state law applies to unpaid wage claims under California Labor Code, plus "situs of the work" is the most important factor in determining extraterritoriality, trumping residency and where wages are paid).
[10] See, e.g., Narayan v. EGL, Inc. , 616 F.3d 895, 899 (9th Cir. 2010).
[11] For example, Mr. Randazza's bonuses were to be based on net and gross amounts (which he acknowledged prior to the end of his employment), claimed compensation raises were discretionary. Whatever Mr. Randazza was paid as compensation and bonuses is subject to the remedy of disgorgement.

employment,[12] (2) Mr. Randazza is not entitled to any payment for expenses in connection with the annual International Trademark Association Conference, which he did not attend, and (3) Mr. Randazza's bonuses were to be paid on "net" amount, not "gross" amounts, as contended by Mr. Randazza. In the event, E/L has been legally excused from any obligation to make any further contractual payment, by reason of Mr. Randazza's material breaches of contract with respect to the his obligations under the same contract, Mr. Randazza's employment agreement. That is so under contract law principles --- separate and apart from equitable principles, which are also applicable to contract claims, including the equitable doctrine of unclean hands, which is applicable to Mr. Randazza's contract claims.

Q. Turning to E/L's counterclaims, Mr. Randazza owed fiduciary duties to E/L, because he was their in-house general counsel and their attorney of record in judicial civil actions, and an E/L executive and employee. As such, Mr. Randazza owed E/L, as his clients, employers and principals, the highest duty of loyalty and honesty in the performance of his professional and executive obligations. That duty --- among other things --- included legal and ethical duties of acting honestly and solely for the benefit of his clients/employers/principals, avoiding acting inconsistently with those duties, and where actual or potential conflicts of interests existed to make full written disclosure of the same and to obtain informed written consents from his clients/principals as to each and every such conflict of interest. Each and all of Mr. Randazza's ethical duties owed to his principals/clients was a legal fiduciary duty owed to them. Mr. Randazza violated those fiduciary duties owed by him to E/L, as his principals/clients/employers --- including by the following:

---

[12] See Pars. 5(A), (B) and (G), supra, concerning Mr. Randazza's having voluntarily ended his E/L employment, including via and as evidenced by written and verbal and non-verbal conduct. Mr. Randazza was contractually entitled to payment equivalent to 12-week severance only if his employment was involuntarily terminated.

(1) engaging in negotiations for monetary bribes to be paid to him — including the "Oron $75,000" which Mr. Gideon noticed, without Mr. Randazza's affirmative disclosure of it —— which would result in his being "conflicted out" of future litigation or any disputes with parties then and/or in the future with

/////
/////
/////

interests adverse to E/L's interests (e.g., Oron, TNA),[13] (2) taking control for his personal benefit of, and refusing to relinquish control over, Oron settlement funds — all of which ought to have been for the benefit and under the direction and control of his principals/clients E/L, before and after the end of his employment and representations on behalf of E/L --- (3) Mr. Randazza's ordering and causing the deliberate "wiping" of his and legal assistant's corporate laptops, as an integral part of his planned resignation as E/L's General

---

[13] It is irrelevant that none of Mr. Randazza's negotiations concerning bribes — including the Oron bribe — resulted in an actual bribe payment. See Mr. Randazza's Reply at pp.4:24-5:1: "Yet despite years of discovery in this matter, Respondents have not been able to point to a single 'bribe' paid to Mr. Randazza, or a single consummated deal between him and the opposing party."* The Arbitrator has accepted, as an admission by Mr. Randazza that "he repeatedly engaged in these 'bribe' negotiations," but the Arbitrator has not accepted Mr. Randazza's testimony and further contention that he did so "because they were par for the course in dealing with counsel for infringers and because engaging in them was the best way to soften up the other side and get more money for respondents." Id., at p. 5:2-5.

In this arbitration, Mr. Randazza has established a virtually unbroken pattern of asserting a legal/fiduciary variant of the sports cliché, "No harm, no foul." The Arbitrator has not accepted those assertions — including, for example, a professional or fiduciary duty has been violated, whether spoliation has been committed, etc.

Counsel and outside counsel of record, and (4) Mr. Randazza's continuing and undisclosed (and thus unconsented-to) legal work for clients (e.g., Bang Bros., XVideos, XNXX, Porn Garian, Titan Media, Kink), whose interests were actually and potentially adverse to E/L's interests.[14]

R.    The Arbitrator respectfully disagrees with Mr. Randazza's expert witnesses, who respectively testified that, under both Nevada and California rules of ethics and/or professional responsibility, there were no violations of fiduciary duty, if and because they concluded that there was no resulting harm.

The "fact of damage" or proximate cause is not an essential element of either "duty" or "breach of duty" --- but rather a separate element of a claim or cause of The Arbitrator's disagreement with Mr. Randazza's expert witnesses centers

Whether or not Mr. Randazza's breaches of fiduciary duty proximately resulted in damages sustained by Excelsior, Liberty or both of them --- as a matter of sound public policy --- Mr. Randazza should not be allowed to retain any pecuniary or legal benefit resulting from or closely connected to those breaches.

For example, Mr. Randazza has included in his defense of his admitted deletion of files and other legal information via multiple wipings of company-owned computers the assertion that Respondents have not been able to show any damage resulting from those multiple wipings.  This is another of Mr. Randazza's assertions in this arbitration of "No harm, no foul" --- which the Arbitrator has not accepted, primarily because of the violations of duties constituting and/or including fiduciary duties.  Ethical and other violations of

---

[14] Mr. Randazza's legal work for non-E/L clients --- independent of the violations of Mr. Randazza's ethical and fiduciary duties --- were significantly beyond the contractually-permitted scope under his employment agreement.  The Arbitrator may award the equivalent to amounts of funds ordered to be immediately turned over by Mr. Randazza to E/L.  See Interim Arbitration Award, Par.

fiduciary duties do not require "fact of harm" to be shown by a preponderance of the evidence or otherwise.

Moreover, in the circumstances of (1) multiple ethical violations having been shown to have been committed by Mr. Randazza --- including negotiating for and in the instance of the <u>Oron</u> settlement agreeing to a "bribe" to be conflicted out of future litigation with adverse settling parties and other conflicts of interest --- and (2) Mr. Randazza's ethical challenges shown in this arbitration, there should be a presumption of "fact of harm" caused to E/L by Mr. Randazza's conduct and, additionally, a presumption of Mr. Randazza's intention to harm his clients by wiping everything off of his and his legal assistant's company-owned computers.

As E/L's inside general counsel and employee, Mr. Randazza had a legal and fiduciary duty --- no later than when his employment ceased, regardless of whether or not with or without cause and/or by whom ended --- to deliver every file and other piece of data and/or information --- complete, intact and undeleted, unmodified and immediately accessible and usable by E/L. That included all files and data stored on the computers entrusted to Mr. Randazza and his legal assistant Erika Dillon for their use by and on behalf of E/L. Because of his noncompliance, indeed resistance to compliance with those duties, they continued and continue to the day of the rendering of this award --- including beyond Mr. Randazza's belated and resisted turnover of one of the laptop computers --- because another laptop entrusted to Mr. Randazza remains unreturned. Those continuing fiduciary duties owed by him to E/L exist, including by reason of his exclusive control over the computers and thus superior knowledge of what was on each computer's hard drive before and after he had everything on the returned laptops completely and multiply deleted --- including prior and in contemplation of his planned resignation on August 29, 2012.

In the circumstances, Mr. Randazza's generalized and unspecified claims of privacy — in attempted justification of his ordered complete and multiple wipings of company-owned computers — cannot be accorded weight or credibility. By the same token, that ordered conduct raises an inference that whatever was deleted was known and intended by Mr. Randazza to be harmful to him and any claims and contentions which he might make in any dispute with E/L — i.e., deliberate spoliation, in addition to conversion.

Mr. Randazza cannot escape liability for spoliation or conversion — or, additionally, violation of his fiduciary duties as an employee, executive and general counsel of E/L, by reason of the same conduct — by claiming, as he has, that Respondents have not shown any specific or tangible injury by reason of his conduct in causing company-owned computers to be completely wiped of all data prior to their resisted and belated return. In the circumstances — and paraphrasing former Defense Secretary Donald Rumsfeld — neither Respondent should bear any burden or responsibility to come forward with any evidence of damage, when they do not know what they do not know. As stated above — with his actual exclusive knowledge of what was on the computers' hard drives, before and because he ordered them to be completely wiped and, in the instance of his returned laptop, multiply wiped before ultimate return — Mr. Randazza committed spoliation of evidence, as well as improper conversion of his employer's files, data and equipment and, in so doing, also violated his fiduciary duties owed to E/L.

S.  The closure of the Nevada State Bar's file on the grievance filed by E/L has not been given any weight in this arbitration. The reasons for that are manifold, several of the most significant of which include the following: (1) the State Bar did not reach the merits of E/L's grievance, (2) even if it would have, the standard of evaluation would have been "clear and convincing evidence," rather than the standard applicable in this arbitration of "preponderance of the evidence," (3) Mr. Randazza's response to E/L's grievance contained at least one

17

material misrepresentation acknowledged during an evidentiary session in this arbitration (that he stopped representing XVideos in 2009), (4) the Nevada State Bar closed its file with an express statement that it has "no authority to take any action which could affect the outcome of any civil disputes or litigation, (5) many of the issues and much of the evidence presented in this arbitration (identities of represented entities, retainer and billing records, emails, etc.) was not available to be presented by E/L in support of its grievance (e.g., Mr. Randazza's assisting Datatech, including via forwarding fruits of a disclosed (unnamed) computer "hacker").

T.     E/L was damaged in at least the amount of $275,000, by reason of the Oron resettlement, as a direct and proximate result of events being set in motion by Mr. Randazza's violations of fiduciary duty and other duties, by his having secretly negotiated a $75,000 bribe to conflict himself out from suing Oron in the future.

U.     Mr. Randazza was unjustly enriched in the amount of $60,000. Of that amount, $55,000 was paid to and received by Mr. Randazza's law firm, rather than E/L, in connection with (1) Mr. Randazza's ostensibly pro bono representation in connection with the so-called "Righthaven cases," of which E/L was generally aware and consented to (A) with the understanding and on the condition that Mr. Randazza was acting as a faithful, compensated E/L employee, including in compliance with his employment agreement, with costs of the representation advanced by E/L, including compensation as employees of Mr. Randazza and his legal assistant Erika Dillon, and (2) unaware that compensation was to be or actually paid to Mr. Randazza, via his law firm, until after the fact, indeed after Mr. Randazza's resignation from E/L employment.[15] Mr. Randazza also received $5,000 from James Grady, in connection with E/L's Oron litigation. Although Mr. Randazza testified, without corroboration, that

---

[15] Of the $60,000 paid and received, (A) $55,000 was court-awarded attorneys' fees, which were paid to Mr. Randazza's law firm, and (B) $5,000 was paid by James Grady.

Mr. Grady's payment was used for <u>Oron</u> litigation expenses, Mr. Randazza did not disclose the receipt of the Grady $5,000 payment to E/L. In the circumstances, and under principles of unjust enrichment, all compensation paid to or for the benefit of Mr. Randazza should have been paid directly to E/L or turned over to E/L by Mr. Randazza — neither of which was done, immediately or ever.

V.    Mr. Randazza materially breached his employment agreement with Excelsior by (1) acting as an attorney in connection with the TNAFlix litigation and the MegaUpload case, his concurrent representation of XVideos and/or XNXX during his employment by Excelsior and (2) spending significantly excessive time on non-Excelsior/Liberty matters beyond contractually-permitted time under his employment agreement with Excelsior and by failing to wind down his non-Excelsior/Liberty legal activities, as also provided in Mr. Randazza's employment agreement.[16]

The extent of Mr. Randazza's contractual material breaches made them also breaches of fiduciary duty — regardless of whether or not those breaches of fiduciary duty were conflicts of interests, as some were.

W.    Disgorgement of compensation paid by E/L to Mr. Randazza is an available remedy, which is appropriate in the circumstances of Mr. Randazza's clear and serious violations of fiduciary duty owed to E/L, and within the Arbitrator's discretion, based on the evidence in this arbitration.[17]

---

[16] Mr. Randazza materially breached his employment agreement with Excelsior by maintaining a private law practice, with billed hours shown to be in excess of that permitted by that agreement, performing non-E/L legal services during the time he could and should have been performing services as E/L's General Counsel, and by failing or refusing, consistent with ethical duties and requirements, to reduce and taper off to zero his professional services for clients other than his employer, E/L.

The extent of Mr. Randazza's contractual material breaches made them also breaches of fiduciary duty — regardless of whether or not those breaches of fiduciary duty were conflicts of interests, as some were.

[17] See <u>Burrow v. Arce</u>, 997 S.W.2d 229 (Tex. 1999) ("<u>Burrow</u>")(remedy of forfeiture/disgorgement upheld, including court discretion to determine whether some or all compensation paid to attorney who breached fiduciary duty of loyalty owed to

///// 
///// 
/////

There is no requirement that causation or "fact of damage" be shown.[18] There is no valid reason to distinguish between an executive who is "in house" general

---

client to be forfeited or disgorged, where clear and serious violation(s) of fiduciary duty shown).

[18] That is because, among other reasons, one of the primary purposes of a remedy like forfeiture/disgorgement for breaches of fiduciary duty is to deter, not reward and to remove incentives of fiduciary disloyalty — including by denying the benefits of disloyalty, regardless of provable or even actual harm to the principal, including after payment of compensation. As the Texas Supreme Court pertinently stated in Burrow in connection with the remedy of forfeiture/disgorgement as a deterrent and disincentive for an attorney or other agent to breach of fiduciary duty:

"Pragmatically, the possibility of forfeiture of compensation discourages an agent from taking personal advantage of his position of trust in every situation, no matter the circumstances, whether the principal may be injured or not. The remedy of forfeiture removes any incentive for an agent to stray from his duty of loyalty based on the possibility that the principal will be unharmed or may have difficulty proving the existence of amount of damages."

The California cases cited by Claimant are distinguishable. Frye v. Tenderloin Housing Clinic, Inc., 38 Cal.4th 23 (2006)("Frye"), Slovensky v. Friedman, 142 Cal.App. 4th 1518 (2006) ("Slovensky"). The appellate court's conclusion in Slovensky was based on its misreading and/or misstatement of the Supreme Court's holding and the basis and reasoning for its holding in Frye — which was, in effect, a "one-off" opinion strongly driven by the facts and public policy considerations articulated and emphasized by the Supreme Court in the opinion. The Slovensky court's mistake is highlighted by its reliance on what it called the "Frye rule" — which was no such thing, or at least not as stated and relied on by the court in Slovensky.

There would be little or no reason for the remedy of disgorgement, if there was a so-called "Frye rule" as misstated by the Slovensky court and urged by Mr. Randazza. If fact of damage and extent of damages must be proven by a preponderance of the evidence, in order to obtain disgorgement, that remedy would be rendered duplicative of the remedy of compensatory damages, except in name only. Moreover, the strong public policy to deter and remove any incentive for clear and serious violations of fiduciary duty - where injury to the client or other principal might be difficult or impossible to prove, as a matter of compensable damages - would be severely undermined.

In Frye , the California Supreme Court appears to have been offended by the plaintiff/client's overreach in the circumstances. The Court determined not that the remedy of disgorgement was legally unavailable but, rather, that its application — in the

counsel and other corporate executives with respect to the availability of the remedy of forfeiture/disgorgement of compensation for breaches of fiduciary duty.[19]  While it might be less easy to determine the appropriate amount of disgorgement --- because, for example, the compensation paid is not a fixed percentage, as in an all-or-nothing legal or brokerage contingency fee arrangement,  contractual hourly arrangements, etc. --- that is not a disqualifying factor or consideration.   Considerations of proportionality and non-overlap with an award under other remedies are applicable.

Disgorgement will be applied to E/L-paid compensation received by Mr. Randazza in connection with litigation and other engagements on behalf of non-E/L clients --- in material breach of contract, while employed by E/L and beyond the significantly limited scope of his employment agreement (in terms of subject matter and time) and/or, in all events, in violation of his professional and fiduciary duties owed to his principal/client/employer, E/L.  See Par. 1(V), above.

None of the expert witnesses who testified concerning breaches of legal ethics and fiduciary duties by attorneys and remedies for such breaches opined that disgorgement is unavailable in all instances.  The Arbitrator had the

---

special context of a technical failure to properly register for the practice of law by a public interest non-profit organization, engaged in what the Court considered to be important, worthy public interest work, expressly supported by the Court (including by affirming very substantial statutory attorneys' fees awards, as stated in that opinion) --- was "grossly disproportionate to the wrongdoings" of the defendant there and therefore "would constitute a totally unwarranted windfall" to the plaintiff there. 38 Cal.4th, at p. 50. Frye, therefore, is distinguishable from the facts of this case.

Because the basis for its opinion was wrong, Slovensky is distinguishable or, more aptly, inapplicable to Mr. Randazza's proven clear and serious ethical and fiduciary breaches in this case.

[19] See Zakibe v. Ahrens & McCarron, Inc., 28 S.W.3d 373, 385-386 (Mo. Ct. App. 2000) (executive's breaches of fiduciary duty resulted affirmed forfeiture of his right to "all compensation, including bonuses and severance pay to which he may have been entitled"); Riggs Investment Management Corp. v. Columbia Partners, LLC, 966 F. Supp. 1250, 1266-1267 (DDC 1997) (former chairman and CEO of corporation forfeited all salary, bonuses and other compensation paid from the time disloyal action began, as determined by the appellate court, to date of end of employment six months later).

sense, however, that Mr. Joseph Garin came close to opining that causation and/or "fact of damage" caused by an assumed breach of an ethical/fiduciary duty is or should be a prerequisite to the imposition of disgorgement, with which opinion the Arbitrator respectfully disagrees (if that is Mr. Garin's opinion).[20]   In so opining, Mr. Garin (as did Mr. Randazza's California expert witness, Ms. Ellen Peck) testified that --- based on information provided by Mr. Randazza --- there was not a single instance of an ethical violation, with which the Arbitrator also respectfully agrees, based on all of the evidence adduced at hearing.

See Burrow v. Arce, 997 S.W.2d 229 (Tex. 1999) and Restatement of Agency 3d, Sec. 8.01 comment d(2).

X.     While Mr. Randazza's obtaining Mr. Gideon's signature on the promissory note for Mr. Randazza's $25,000 loan to E/L for Hong Kong legal fees was rife with ethical infirmities, in the exercise of the Arbitrator's discretion, the Arbitrator will not void the underlying loan.  However --- again in the exercise of the Arbitrator's discretion --- the Arbitrator will limit the benefit of that decision to allowing Mr. Randazza to assert an offset, under this paragraph, to any and all amounts awarded on E/L's counterclaims, up to a maximum amount of $25,000 (i.e., no interest) — which right of offset shall be conditional upon Claimant's transfer to Respondent Liberty of all Oron settlement-related and other E/L funds held in Claimant's attorney trust account,[21] plus interest at the legal rate of ten percent (10%) per annum from August 29, 2012.

Y.     E/L are the prevailing parties in this arbitration.  As such one or both of Respondents is or may be entitled to contractual attorneys fees under the employment agreement.[22]

---

[20] Mr. Garin conceded, on cross-examination, that Section 37 of the Restatement 3rd of The Law Governing Lawyers does not say that a showing of actual monetary loss is required for disgorgement of attorney compensation.
[21] See Interim Arbitration Award, Pars. 4 & 5, at p. 28, infra.
[22] See Interim Arbitration Award, Pars. 8 at pp. 28-29, infra.

## INTERIM ARBITRATION AWARD

Based upon careful consideration of the evidence, the applicable law, the parties' written submissions, the Determinations hereinabove set forth, and good cause appearing, the Interim Arbitration Award in this arbitration is as follows:

1.      Claimant and Counter-Respondent Marc J. Randazza ("Claimant") shall take nothing by any of his claims set forth in his Amended Arbitration Demand.

2.      Claimant shall pay Respondent(s) the following sums and amounts, as and for monetary damages in connection with Respondents' counterclaims.   Said amounts are exclusive and non-duplicative of any amount separately and additionally awarded to Respondents as part of the remedy of disgorgement.  See below.

Said amount includes the amount of $275,000, plus pre-award interest from August 13, 2012, at the legal rate of ten percent (10%) per annum, as and for monetary damages in connection with the resettlement of the Oron litigation, as a direct and proximate result of Claimant's violations of fiduciary duty in connection with his negotiating for a $75,000 "bribe" (to conflict him out of future representation against Oron) as part of the resolution of the Oron litigation.

Said amount will include the amount of $60,000, by which amount Claimant was unjustly enriched --- in that Claimant (via his law firm), rather than either Respondent received (A) $60,000 in connection with Claimant's ostensibly pro bono representation in connection with the Righthaven cases, while compensated for Claimant's time spent on the representation as employee, in the course of his employment, as to which representation the costs were advanced by Claimant's employer, and (B) received from James Grady in connection with the Oron litigation.

Said amount will include the amount of $3,215.98 --- as and for Respondents' expenses reasonably incurred in connection with QUIVX forensic

23

examination and attempted restoration of data on employer-owned laptop computers and an iPhone used and returned, as applicable, by Claimant and Erika Dillon. In addition, an amount yet to be determined, in the exercise of the Arbitrator's discretion, will be awarded for Claimant's spoliation and conversion of Excelsior's and Liberty's files and other data contained on employer-owned laptop computers entrusted to Claimant and Erika Dillon during their employment by Respondents or either of them. The additional amount awarded will be set forth in a further and/or amended interim arbitration award and/or in the final arbitration award.

3.     Claimant shall pay Respondent Excelsior the amount of $197,000.00 --- as and for disgorgement of an appropriate amount of Claimant's employment compensation (including salary and bonuses) paid under his employment agreement).

The awarded amount under this paragraph is non-duplicative of and does not overlap with any amount award as monetary damages under any other paragraph of this Interim Award.

The amount awarded under this paragraph does not include disgorgement based on Claimant's post-employment violations of fiduciary duty. That is because it appears to the Arbitrator that they are instances of Respondents having rights without a remedy --- as the limits of case law on disgorgement do not extend to post-employment violations of fiduciary duty.

Disgorgement shall be based on Claimant's violations of fiduciary duty ---including as acting as an attorney in connection with the TNAFlix litigation and the MegaUpload case, Claimant's concurrent representation of XVideos and/or XNXX during his employment by Excelsior and spending excessive, undisclosed, time on non-Excelsior/Liberty matters far beyond contractually-permitted time under his employment agreement.

4.     Claimant is hereby ordered forthwith (i.e., within ten (10) days of the date of the issuance of this Interim Arbitration Award) to turn over to

Respondents all <u>Oron</u>-related funds and, further, an additional $30,000 of non-<u>Oron</u>-related client funds of Respondents --- which funds have been held in Claimant's attorney trust account --- plus pre-award interest at the legal rate of ten percent (10%) per annum from August 29, 2012.

     5.     An accounting of Claimant's attorney trust account is hereby ordered --- including to ensure compliance with Paragraph 4 hereof. The accounting shall be performed by a qualified third-party accountant and/or accounting firm appointed and/or approved by the Arbitrator. The cost and expense of which shall be borne solely by Claimant --- although Respondents may advance the funds necessary for the accounting, subject to ordered reimbursement by Claimant. Claimant is hereby ordered to cooperate fully with the ordered accounting.

     6.     Claimant is hereby ordered to return the as-yet-unreturned company-owned laptop to Respondents' counsel forthwith --- and in no event later than ten (10) days from the date of the issuance of this Interim Arbitration Award.

     7.     Respondent shall be awarded as damages or costs reasonably incurred with this litigation, expenses reasonably incurred by QVIX or similarly qualified expert vendor --- up to a maximum of $3,500 --- in connection with the vendor's performance of successful and/or attempted retrieval of data a report to the Arbitrator of what, if anything was deleted from the computer and when.

     8.     Respondents and Counterclaimants Excelsior Media Corp. and Liberty Media Holdings, LLC shall be afforded the right in this arbitration to establish their rights --- if any, and according to proof --- to contractual attorney's fees and costs.

     Counsel for the parties are ordered to immediately commence and diligently conduct and conclude meet-and-confer communications and to submit to the Arbitrator within ten (10) days of the issuance of this Interim Arbitration

Award an emailed proposed briefing and hearing schedule for any application for contractual attorney's fees and costs.

    9.      Respondent Jason Gideon will be dismissed as a party to this arbitration.

    Subject to further order and/or a further and/or amended interim arbitration award, and the Final Arbitration Award, this Interim Arbitration Award, including the Determinations hereinabove set forth, is intended to be in full settlement of all claims, issues, allegations and contentions, on the merits, submitted by any party against any adverse party in this arbitration.  Subject to the immediately preceding sentence, claims and requests for relief not expressly granted in this Interim Arbitration Award are hereby denied.

Dated: June 3, 2015

                              STEPHEN E. HABERFELD
                                   Arbitrator

26

July 29, 2021 email that I received from Marc Randazza



22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 59
of 1044
July 29, 2021 email I received from Marc Randazza (cont.)



injunctions preventing the use of illegally obtained information. Cal. Penal Code § 637.2(b).

It is my intention to file a lawsuit against you for violation of Cal. Penal Code § 637.2.

However, I am willing to grant you 24 hours in which to try to resolve this without filing suit against you.

You may feel free to call me to discuss. I do not consent to recording the call unless we discuss that before the recording begins.

July 29, 2021 email that I sent in response to Marc Randazza



22-01021-hcm Doc#1-10 Filed 04/18/22 Entered 04/18/22 12:34:52 Exhibit B contd. Pg 61
July 25, 2021 email I received from Marc Randazza
of 1044



**.ıl** Verizon 🤶      5:48 PM      71% 🔋

18 Messages

**‹ Inbox**    SERVICE OF COURT DOCU... ⌃ ⌄

**MR**   **Marc Randazza**     12:13 PM
To: Dream Seat ›

Well, you both lied in claiming that I called her a "cunt" -- I had a third party in the room, who could hear my end of the conversation. So, how do you want to handle your perjury?

On Thu, Jul 29, 2021 at 3:09 PM Dream Seat

Show Quoted Content

wrote:

--

**Marc John Randazza, JD, MAMC, LLM⁺ | Randazza Legal Group**
2764 Lake Sahara Drive, Suite 109, Las Vegas, NV 89117
30 Western Avenue, Gloucester, MA 01930
2 S Biscayne Boulevard, Suite 2680, Miami, FL 33131
Tel: 702-420-2001 | Email: mjr@randazza.com
Firm Offices - Las Vegas | Miami | New England

5

July 29, 2021 email that I sent to Marc Randazza



**Verizon** LTE ⚡     ⚘ 9:22 PM     ⬩ 37% ⚡

❮ Sent    **SERVICE OF COURT DOCU...** ⌃ ⌄

As I have said before, I find you beyond unprofessional and yet again, there's no need to have contact with you unless it is specifically for court business. These threats.. are NOT court business.

Are you saying that on a professional call, as a court officer, when speaking to a lady from a victim's advocacy non-profit, you did scream that she was a fucking bitch and a fucking liar, just not a "cunt"? Classy.. and many others would agree if they have to know.

Anyway, I didn't lie, you did say that and since the "3rd party" that you claim was in your office is the same 3rd party you claim never had a GoFundMe with Brill on your behalf, who works with you, I don't think a court is going to give much credence to that claim, especially to someone...

Frankly, I don't know why you are still focusing on me since the judge said that your "services" were worth less than $27k and you received over $27k from the GoFundMe you and your office set up to cover those fees.

There's really no reason to contact me other than to continue harassing and threatening me.
You've admitted that "because things have been made personal", and that "it's a big mistake on my part" it's very clear why you're still coming at me.

You can be done with me, or you can keep stubbornly coming at me out of personal anger with a clear vendetta. But every cause will have an effect. So... At this point, I don't really care what you.

🗑      🗁      ↩      ✑

July 29, 2021 email that I received from Marc Randazza



July 29, 2021 email that I received from Marc Randazza (cont.)



statement, under penalty of perjury.

And I am not going to let that rest - however, I will let it rest on one condition - that you admit that it was not true. and I won't use that against you. You need do nothing more than send a letter to the court stating that you made an error. That indeed, I did say "fucking liar" -- I will never deny that. But, I certainly did not call her a "fucking bitch" nor a "fucking cunt" (There is a non zero chance that I *thought* those things, but they never came out of my mouth)

I'm not even sure what you thought you had to gain by lying about that. But, I will not tolerate the lie, and I won't let this go. So, your move. You can end it by telling the truth. Or, you can dig in ... and enjoy the "effect" as you put it.

8

July 29, 2021 email that I sent to Mr. Randazza



22-01021-hcm Doc#1-19 Filed 04/18/22 Entered 04/18/22 12:34:52 Exhibit B contd. Pg 66 of 1044

June 15, 2021 email that I received from Marc Randazza



.ıll Verizon 📶 ❄️    5:46 PM    71% 🔋

18 Messages

**< Inbox   SERVICE OF COURT DOCU...** ∧ ∨

DS   **Dream Seat**    6/15/21
Mr Randazza, I will let the court tel...

📄 **Siri found new contact info**    ⊗
Marc Randazza mjr@randazza.com  add...

MR   **Marc Randazza**    6/15/21
To: Dream Seat >

Mr. Postle:

My issue with you is that you're dishonest. I don't really care that you're a card cheat. I mean, I certainly look down on a man who cheats at cards. But, the kind of man who cheats at cards *and* physically abuses women, that's just not a real man in my eyes.

As far as representation, yes, you have every right to an attorney. You had one. You had a really good one. My issue with HONR is that it's involvement

🗑️    📁    ↩️    ✏️

June 15, 2021 email that I received from Marc Randazza (cont.)



As far as representation, yes, you have every right to an attorney.  You had one.  You had a really good one.   My issue with HONR is that it's involvement in this case has nothing to do with you - but has to do with a collateral attempt to influence another case.  And, Ms. Merrell most certainly was trying to "play lawyer" for you.  No, that's not permitted.

Don't lie that you have any interest in "mutual respect."  We tried that route.  You decided to make it personal with me.

That wasn't smart.

## The Florida Bar
## Inquiry/Complaint Form

**PART ONE**  (See Page 1, PART ONE – Complainant Information.):

Your Name:  Paul Berger

Organization:

Address:  1015 Spanish River Road, Apt. 408

City, State, Zip Code: Boca Raton, FL 33432

Telephone:  561-414-4570

E-mail:  paul@hurricanelawgroup.com

ACAP Reference No.:

Have you ever filed a complaint against a member of The Florida Bar:  Yes ☐  No ☒

If yes, how many complaints have you filed?

Does this complaint pertain to a matter currently in litigation? Yes ☒  No ☐

**PART TWO**  (See Page 1, PART TWO – Attorney Information.):

Attorney's Name:  Marc Randazza

Address:  3625 S Town Center Dr.

City, State, Zip Code: Las Vegas, NV 89135

Telephone:  702-420-2001

**PART THREE**  (See Page 1, PART THREE – Facts/Allegations.):  **The specific thing or things I am complaining about are: (attach additional sheets as necessary)**

See Part Three Attached

**PART FOUR**  (See Page 1, PART FOUR – Witnesses.):  **The witnesses in support of my allegations are: [see attached sheet].**

**PART FIVE**  (See Page 1, PART FIVE – Signature.):  **Under penalties of perjury, I declare that the foregoing facts are true, correct and complete.**

Paul Berger
_____
Print Name

_____
Signature

6/8/1025
_____
Date

## PART THREE   Facts/Allegations

As described below, I, Paul Berger, allege that Marc Randazza has violated rules of the Florida Bar governing attorney ethics and conduct in Florida. The facts that support these allegations are as follows:

I am an attorney representing a corporate client, Roca Labs, Inc. ("Roca"). Attorney Marc Randazza represents Opinion Corp and Consumer Opinion Corp. These entities operate a website pissedconsumer.com  Mr. Randazza's clients are collectively referred to as Pissed Consumer. Roca is involved in litigation with  Pissed Consumer. I provided legal services to assist Roca in dealing with false, malicious and defamatory information placed about Roca on pissedconsumer.com.

On **August 12, 2104,** Pissed Consumer filed suit against Roca in the U.S. District Court in the Southern District of New York. At the time the lawsuit was filed attorney Marc Randazza of the Randazza Legal Group was representing Pissed Consumer (Mr. Randazza was not counsel in New York, attorney Ron Coleman represented Pissed Consumer).  I am not licensed to practice law in New York and did not file an appearance in this matter.  This case was voluntarily dismissed.

On **August 20, 2014,** Roca filed suit against Pissed Consumer in Twelfth Judicial Circuit in and for Sarasota County, Florida.  I was an attorney of record on the suit. The matter was then removed to the U.S. District Court for the Middle District of Florida where it is presently ongoing. Mr. Randazza is the lead attorney for Pissed Consumer. I am lead counsel on the case.

On **September 15, 2014,** Mr. Randazza emailed Michael Masnick, the founder of TechDirt about Roca in an effort to find a class representative "to serve Roca right" (see below). Mr. Randazza was asking Mr. Masnick to solicit clients for him and for other law firms to serve as a plaintiff against Roca (In Mr. Juravin's Bar Complaint against Mr. Randazza, he asserts that essentially Mr. Masnick was providing free advertising for Mr. Randazza). TechDirt is a technology website that claims 1.5 million monthly viewers.  Mr. Randazza and Mike Masnick are friends and Mr. Masnick has published numerous negative articles about Roca Labs and myself.  There is no reason for a technology magazine to publish anything about the

undersigned. The only reason is the request from Mr. Randazza.

## Roca Labs
1 message

**Marc Randazza** <mjr@randazza.com>                                    Mon, Sep 15, 2014 at 8:12 PM
To: Michael Masnick ▓▓▓▓▓▓▓▓

Mike,

Is it something you'd do, ask anyone reading your post if they've been threatened by Roca Labs?

I'm defending Pissed Consumer. I'd really like some threatened parties as witnesses.

Further, i think there's a hell of a class action here - and finding the right class rep would be a good way to serve
Roca right.

--

**Marc John Randazza, JD, MAMC, LLM·** | Randazza Legal Group
3625 South Town Center Drive | Las Vegas, NV 89135
Tel : 702-420-2001 | Fax : 305-437-7662
Email: mjr@randazza.com | Website www.randazza.com

        Since the email, TechDirt published a series of articles deriding Roca and portraying Mr.
Randazza as a legal champion (articles available upon request). Mr. Randazza augmented by
artificial stimulus the publicity normally resulting from his law practice, seeing to it that his
successes are broadcast and magnified. At the same time he took to the media to smear my
reputation. A search on TechDirt shows dozens of articles linked to my name or about me
(articles available upon request). These articles were published because of Mr. Randazza.

        On **September 19, 2014,** Mr. Randazza sent me an email that consisted only of the Latin
phrase *murum aries attigit* (Email attached as **Exhibit 1**). Mr. Randazza has written a blog about
the use of this phrase (Attached as **Exhibit 2**). I interpreted this cryptic email as a threat against
myself and Roca by Mr. Randazza[1]. I felt it was Mr. Randazza's announcement that he was
going to war with me and that he would show me no mercy. I also interpreted it as a command
that I surrender immediately. I sincerely believe that Mr. Randazza's goal is to put both myself
and my client out of business.

        On **September 28, 2014,** Mr. Randazza issued a Tweet comparing me to Joe Rakofsky
and Charles Carreon. Mr. Rakofsky was an attorney who had one of his cases declared a mistrial

---

[1] *Murum Aries Attigit* was a warfare policy attributed to Mark Antony advocating "no mercy" toward Pompey and the
Optimates. The policy was said to act as a deterrent against resistance to those about to be besieged. It was an incentive
for anyone who was not absolutely sure that they could withstand the assault to surrender immediately, rather than face
the possibility of total destruction.

by the Judge because of his apparent lack of courtroom knowledge (his first trial was a murder case). Mr. Carreon was an attorney who sued an Internet publisher and lost trying to protect his reputation online and who has a history of bar complaints. I have no relationship with either attorney and was not aware of either attorney until the Tweet by Mr. Randazza.



On **January 24, 2015**, Mr. Randazza publically called myself and every other attorney providing legal services to Roca Labs "idiots." Mr. Randazza has repeatedly called me an idiot, stupid and other derogatory and unprofessional terms.



@joshuamking @adamsteinbaugh It is not defamatory, but as Roca is represented by total idiots, they'll sue you anyway. Because Florida.

9:18 PM · 24 Jan 2015

Mr. Randazza uses social media websites such as Twitter and his friends at media outlets such as TechDirt to promote himself, smear my reputation and hurt my legal practice. Mr. Randazza's countless number of social media activities about myself ranges from stating that Roca Lab's legal team (including myself) would be a good fit for radical terrorists to stating that "Some Fucker put Roca Labs Shit in my kid's candy bag!" (social media activity upon request).

On **May 6, 2015,** mandatory mediation took place between Roca and Pissed Consumer in a different matter (*Roca Labs, Inc. v. Opinion Corp et. al.* Case No: 8:14-cv-2096-T-33EAJ). After the conclusion of mediation outside the building Mr. Randazza became enraged at Don Juravin and myself. Mr. Randazza screamed, threatened, and berated the undersigned and my client without provocation. He screamed at both of us and threatened violence against both Mr. Juravin and myself. He threatened to beat me up and send Mr. Juravin to the Gaza Strip. Mr. Juravin is Jewish and his family lives in Israel. After screaming and berating Mr. Juarvin and myself for several minutes Mr. Randazza walked to his vehicle and proceeded as if he was leaving (screaming curses at us as he left).

Rather than driving away, he stopped his vehicle, got out of the car and began to scream at Mr. Juravin and myself and made more threats of violence against us. He stated that he would ruin Mr. Juravin and sue him for millions of dollars. He then drove off in his car. The mediator, Mr. Michael Kahn, Esq., a Member of the Florida Bar (482 N. Harbor City Blvd., Melborne, FL 32935 Tel. 321-242-2564) witnessed the entire event.

On **May 8, 2015,** Mr. Randazza posted a blog on his website with the Hebrew phrase רוקה הוא מאוד נפגע מאוד (translation: "Roca Labs is very hurt"). The message was directed specifically at Mr. Juravin and was more hate speech. A brief search of Mr. Randazza's hundreds of blog posts failed to find any other titles written in Hebrew.

On **June 3, 2015,** during a conference call Mr. Randazza repeatedly berated the undersigned, calling me an idiot, stupid and a "sorority girl". After the call I sent an email to Mr. Randazza notifying him that I would not have any telephone calls that were not recorded to ensure professional behavior (email available upon request).

I am requesting the Committee investigate the above allegations against Marc Randazza to determine whether his conduct violates the Rules of the Florida Bar.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 57254214
Status as of 9/17/2021 3:04 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 9/15/2021 8:47:03 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 9/15/2021 8:47:03 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 9/15/2021 8:47:03 AM | SENT |

9/15/2021 8:12 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001842**
**Lisa Guerrero**

## D-1-GN-18-001835

| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 459th DISTRICT COURT |

## D-1-GN-18-001842

| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |

---

### PLAINTIFFS' UNOPPOSED MOTION FOR PROTECTIVE ORDER OF CONFIDENTIALITY

---

Plaintiffs file this Unopposed Motion for Protective Order of Confidentiality, and would show the Court as follows:

1.      In January 2019, Defendants moved this Court to enter a Protective Order of Confidentiality under Tex. R. Civ. P. 192.6 in the *Lewis* case. After modifying certain sections, this Court entered a Protective Order on February 25, 2019, a copy of which is attached as "Exhibit 1."

2.      Plaintiffs have proposed that the same protective order be entered in the *Heslin* and *Pozner* cases, and Defendants are unopposed.

3.      Just as in *Lewis,* there is good cause for a protective order because the parties may produce sensitive documents. Specifically, Plaintiffs anticipate producing medical records which include private mental health information.

4.      As such, Plaintiffs ask that this Court enter an order adopting the *Lewis* Protective Order in the *Heslin* and *Pozner* cases.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with counsel of record about this motion, and they are unopposed to the entry of the *Lewis* Protective Order in these cases.

_____
MARK D. BANKSTON

## CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2021 the forgoing document was served upon all counsel of record via electronic service.

_____
MARK D. BANKSTON

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 459th DISTRICT COURT |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |

---

## ORDER ON MOTION FOR PROTECTIVE ORDER OF CONFIDENTIALITY

---

On this day, the Court considered Plaintiffs' Unopposed Motion for Protective Order of Confidentiality. The Court finds there is good cause to grant the Motion, and hereby ORDERS that the February 25, 2019 Protective Order entered in the *Lewis* matter shall apply to the *Heslin* and *Pozner* cases.

Dated _____, 2021.


_____
Hon. Maya Guerra Gamble

# Exhibit 1
# Lewis Protective
# Order

Filed in The District Court
of Travis County, Texas

FEB 25 2019

At _____ 2:30 P.M.
Velva L. Price, District Clerk

NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 98th JUDICIAL DISTRICT |

## PROTECTIVE ORDER OF CONFIDENTIALITY

In order to preserve the rights of litigants in these proceedings to claim the confidentiality of certain documents to be produced in discovery by the parties, the Court orders as follows:

1.      This Protection/Confidentiality Order governs all discovery, and all information disclosed, produced, or submitted by any party to any other party in connection with this lawsuit during the course of discovery.

2.      This Order is entered for purposes of this lawsuit and shall remain in full force and effect until such time as the Parties agree in writing otherwise or the Court enters a different order. This Court shall retain jurisdiction to make amendments and modifications to this Order as the Court may deem appropriate, as well as to resolve any disputes.

### TERMS

3.      "Discovery includes all written discovery, request for production, interrogatories, requests for admissions, requests for disclosure, oral depositions, deposition transcripts, oral or

video recording of a deposition, depositions on written questions to third parties, and subpoenas to third parties, and other documents exchanged between the parties for the purpose of sharing information regarding the facts of the case.

4.     "Confidential Information" means information that constitutes a trade secret, reveals valuable and sensitive proprietary data or commercial information, or otherwise qualifies for legal protection under Texas law.

5.     "Confidential Discovery" means discovery or any materials within the scope of Tex. R. Civ. P. 192 to be produced or otherwise disclosed by the parties in this case and which also contains Confidential' Information.

6.     "Similar InfoWars Sandy *Hook* Lawsuit" means any other lawsuit in which any of the Defendants have been sued on the basis of their conduct relating to the Sandy *Hook* Elementary School Shooting.

7.     Reference   to   Plaintiff,   Defendants,   or   the   Parties   to   this Protective/Confidentiality Order also includes reference to any other person or entity acting on any Party's behalf or in concert or in participation with any Party, directly or indirectly, to the extent that any discovery in this lawsuit requires a person or entity other than Plaintiff or Defendants to produce documents or tangible things or give testimony.

8.     "Producing Party" shall mean a Party to this lawsuit that produces documents, information and/or tangible things.

## DESIGNATION OF CONFIDENTIAL DISCOVERY

10.     A document or tangible thing that the Producing Party determines in good faith to be Confidential Discovery can be claimed as confidential by (1) stamping the word "CONFIDENTIAL" or "ATTORNEY'S EYES ONLY" on the document, or (2) using any other

PROTECTIVE ORDER OF CONFIDENTIALITY -- Page **2** of **8**

reasonable method agreed to by the Parties. Such stamping shall not obscure any writings on the documents.

11.     In the event a Producing Party inadvertently fails to mark a confidential document as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY," that Producing Party or any Party may: (1) notify counsel of record for every other Party in writing specifically identifying the material, and (2) provide a replacement copy of the document(s) marked "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY."

12.     Testimony and information disclosed at a deposition of a Party or any other witness may be designated "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" during the deposition, and within thirty (30) days following the depositions, any Party may designate any information disclosed during a deposition as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY." For the thirty (30) days following any deposition, the Parties must treat all of the deposition testimony and exhibits and other documents produced at any deposition as "ATTORNEYS' EYES ONLY."

13.     By designating a document as Confidential Discovery pursuant to paragraphs 9, 10 or 11, the Producing Party represents that it has made a bona fide, good faith determination that the document does, in fact, contain Confidential Information.

## CHALLENGING DESIGNATION

14.     Any Party may contest the designation of any document, information or tangible things as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" by requesting in writing that the Producing Party change the designation. If the Parties are unable to reach an agreement on the designation of such challenged documents within five (5) business days, the

Party challenging the designation may at any time thereafter seek an order to alter the status of the challenged designation.

14. Until any dispute over designation is ruled upon by the presiding Judge, the designation will remain in full force and effect, and the documents, tangible things, testimony and information will continue to be accorded the confidential treatment required by this Protective Order.

## AUTHORIZED USE OF CONFIDENTIAL DISCOVERY

15. Confidential Discovery shall be used solely for the purposes of this lawsuit and shall not be disclosed or made available to any person(s) other than those persons specified herein. Persons who may have access to documents or other information designated as "CONFIDENTIAL" shall include only the following persons:

> a. The Parties, and the Producing Party, if other than Plaintiff or Defendants;
>
> b. The Plaintiffs in any Similar InfoWars Sandy Hook Lawsuit.
>
> c. Counsel of record for the Parties, and counsel for the Producing Party, if other than Plaintiff or Defendants, and their respective employees;
>
> d. Counsel of record for the Parties in any Similar InfoWars Sandy Hook Lawsuit, and their respective employees.
>
> e. Consultants or experts retained in connection with this lawsuit provided that such consultant or expert shall acknowledge and

PROTECTIVE ORDER OF CONFIDENTIALITY -- Page **4** of **8**

accept the terms of this Protective / Confidentiality Order by first signing the attached Exhibit "A";

  f.  Consultants or experts retained in connection with any Similar InfoWars Sandy Hook Lawsuit provided that such consultant or expert shall acknowledge and accept the terms of this Protective / Confidentiality Order by first signing the attached Exhibit "A."

  g.  Court personnel; and

  h.  Court reporters and videographers who first acknowledge and accept the terms of this Protective/Confidentiality Order by signing the attached Exhibit "A."

16. All such signed Exhibits "A" completed by persons under subparts (c) or (e) shall be immediately served on all Defendants' and Plaintiff's counsel.

17. Any documents, testimony, information or tangible things designated as "ATTORNEYS' EYES ONLY" shall be used solely for the purpose of this lawsuit and any Similar InfoWars Sandy Hook Lawsuit and shall not be disclosed or made available to any person(s) other than those persons specified below. Persons who may have access to documents or other information designated as "ATTORNEYS' EYES ONLY" shall include only the following persons:

  a. Counsel of record for the Parties, and counsel for the Producing Party, if other than Plaintiff or Defendants, and their respective employees;

  b. Counsel of record for the Parties in any Similar InfoWars Sandy Hook Lawsuit, and their respective employees.

PROTECTIVE ORDER OF CONFIDENTIALITY -- Page **5** of **8**

18. If a Party is required (by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to produce documents or information that have been designated "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY," such Party will provide written notice immediately to every other Party, and the Producing Party in order to allow time to object to such production and otherwise seek protection.

## INSPECTION OF CONFIDENTIAL DISCOVERY

19. Except as provided herein, each person to whom Confidential Discovery containing confidential information is disclosed or made available shall first be advised of the existence and the contents of this Order. Confidential Discovery may only be inspected or revealed by the Parties to the persons listed in paragraph 15 and 17 herein, provided that the disclosing Party is responsible to ensure that any person or entity who receives such Confidential Discovery shall maintain the document as confidential as set forth in this Order.

20. Any mediator in this case or any Similar Travis County InfoWars Lawsuit may be provided Confidential Discovery so long as the Confidential Discovery is being disclosed pursuant to confidential settlement negotiations and the mediator returns the Confidential Discovery at the end of the mediation without making duplications/copies.

## FILINGS OR HEARINGS IN THE PUBLIC RECORD

21. If a party wishes to include a document, or portions of a document marked as "Confidential" or "Attorney's Eyes Only" in a pleading or other paper to be filed with the Clerk, that party shall serve the pleading or other paper on opposing parties but shall not file it. Service alone shall constitute filing for the purpose of any deadline. For 7 days following service, no party shall file the pleading or other paper with the Clerk except pursuant to a

PROTECTIVE ORDER OF CONFIDENTIALITY -- Page **6** of **8**

ruling on a motion for a Temporary Sealing Order under Rule 76a. Immediately thereafter, if no motion for a Temporary Sealing Order has been granted, the party who served the pleading or other paper shall file it unsealed with the Clerk.

22.     If a party wishes to offer a document, or portions of a document marked as "Confidential" or "For Counsel Only" in evidence, any party may, at the time the document is offered, move for a Temporary Sealing Order.

## ORDER DOES NOT WAIVE CERTAIN RIGHTS

23.     This Protective/Confidentiality Order shall not be deemed a waiver of (i) any right to object to any discovery requests on any grounds; (ii) any right to seek an order compelling discovery with respect to any discovery request; (iii) any right at any proceeding in this lawsuit to object to the admission of evidence on any ground; (iv) any right of a Party to use its own documents and translate them with complete discretion and/or (v) the right to seek a modification of this Protective/Confidential Order.

24.     Designation of a document or other information as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" is not evidence that the document, other information or tangible thing is in fact confidential. A party's failure to object to another Party's designation of any document or other information as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" shall not be evidence or an admission that the designated document, tangible things or information is in fact confidential.

## RETURN OF CONFIDENTIAL DISCOVERY

25.     Within thirty (30) days after the conclusion of this lawsuit including all appeals, the Parties, their counsel as well as anyone who has executed Exhibit "A" are hereby Ordered to return to the Producing Party all testimony, including deposition transcripts, and

PROTECTIVE ORDER OF CONFIDENTIALITY -- Page **7** of **8**

all other documents or information that was produced to them and designated "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" and all copies thereof. It will be a direct violation of this Order if anyone retains any Confidential Discovery (whether marked "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY") or any portion thereof after this thirty (30) day period.

26.     This Order will not be used in any manner or form, directly or indirectly, as evidence in any trial or any hearing, other than to resolve any issue related to the enforcement of any provisions of the Order.

SIGNED this 25th day of February, 2019.

_____
PRESIDING JUDGE

## EXHIBIT "A"

NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 53rd JUDICIAL DISTRICT |

## ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____, declare and state under penalty of perjury that:

1.    I have received a copy of the Protective/Confidentiality Order in this lawsuit, which Order was entered on _____, 2019, and which copy is attached to this document. I have been provided with a copy of this document.

2.    I have carefully read and understand all of the provisions of the Protective/Confidentiality Order.

3.    I will comply with all of the provisions of the Protective/Confidentiality Order.

4.    I will hold in confidence, will not disclose to anyone not qualified under the Protective/Confidentiality Order, and will use only for the purposes of this lawsuit, any material designated "CONFIDENTIAL" (hereafter "Confidential Material") as defined in the Protective/Confidentiality Order, that is supplied to me.

5.    I will return each item of Confidential Material to the attorney who provided such document or tangible thing to me on the attorney's request. Moreover, I will deliver any copies, abstracts, summaries, notes or other records regarding the contents of any Confidential Material to the attorney who provided such Confidential Material to me on the attorney's request. I will not thereafter retain any Confidential Material or any portion or excerpts thereof.

6.      I understand that if I violate the provisions of the Protective/Confidentiality Order, I will be in violation of a Court Order and subject to sanctions, contempt or other remedies that may be imposed by the Court and potentially liable in a civil lawsuit for damages.

7.      I hereby submit to the jurisdiction of the 53rd Judicial District of Travis County, Texas for the purposes of enforcement of the Protective/Confidentiality Order.


I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.


Dated: _____

_____

Signature

_____

Title or Position

Attachment: Copy of the Signed
Protective/Confidentiality Order

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 57252853
Status as of 9/17/2021 2:43 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 9/15/2021 8:12:54 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 9/15/2021 8:12:54 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 9/15/2021 8:12:54 AM | SENT |

9/15/2021 8:37 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001842**
**Jonathan Sanders**

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 459th DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 459th DISTRICT COURT |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | 459th DISTRICT COURT |
| *Defendants* | § | |

## PLAINTIFFS' NOTICE REGARDING STATUS OF DISCOVERY

Come now Plaintiffs, and file this Notice to update the Court regarding the status of discovery and Defendants' conscious indifference:

1.      In oral hearing on August 31st, Defendants' counsel promised the Court that discovery responses in the *Pozner* case would be served within 14 days. That did not occur as promised. In addition, prior to the hearing Defendants were ignorant of their lack of responses to discovery required by the 2018 order in *Heslin*. To date, no responses have been made, even though Defendants were again reminded at the hearing that they had previously been held in contempt for failing to answer.

2.      On September 2nd, counsel for the parties met and conferred by Zoom. Defendants' counsel agreed that he would respond the following week with dates for the depositions required by the 2018 *Heslin* discovery order, and that those depositions would occur before the end of the month. Defendants failed to respond the following week with dates, nor have Defendants offered dates as of today.

3.      Defendants have not responded to Requests for Disclosure in *Lewis* and *Heslin*. Nor have Defendants supplemented any existing discovery responses. Basic information continues to be withheld. Individuals with knowledge of relevant facts remain unidentified, making discovery impossible.

4.      Today, pursuant to the Discovery Control Plan agreed to by Defendants months ago, Plaintiffs designated their experts with all these issues unresolved.

5.      Also today, two additional Motions to Compel were filed in *Heslin* and *Lewis* concerning failure to comply with post-remand discovery requests.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2021 the forgoing document was served upon all counsel of record via electronic service.

_____

MARK D. BANKSTON

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 57253699
Status as of 9/18/2021 2:59 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 9/15/2021 8:37:33 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 9/15/2021 8:37:33 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 9/15/2021 8:37:33 AM | SENT |

9/15/2021 9:30 AM
**Velva L. Price**
**District Clerk**
**Travis County**
**D-1-GN-18-001842**
**Jonathan Sanders**

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 459th DISTRICT COURT |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | |

## PLAINTIFFS' DESIGNATION OF EXPERTS

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Leonard Pozner and Veronique De La Rosa, Plaintiffs and files this their Designation of Expert Witnesses, Supplementation of Interrogatories, Request for Production and Request for Disclosures and in supplementation of all prior discovery requests requesting identification of fact and expert witnesses, as follows:

I.

### **Plaintiffs' Fact and Non-Retained Medical Experts**

Caron Renaissance
And Custodians of Medical and Billing Records
7789 NW Beacon Square Boulevard
Boca Raton, Florida 33487
(561) 241-7977
*Medical Provider for Veronique De La Rosa*

CVS Pharmacy
And Custodian of Billing Records
Pharmacy Privacy Office
One CVS Drive, Mail Code B120
Woonsocket, RI 02895
*Pharmacy Provider for Veronique De La Rosa*

Newton Youth & Family Services
And Custodians of Medical and Billing Records
15 Berkshire Road
Sandy Hook, CT 06482
(203) 270-4335
*Medical Provider for Leonard Pozner*

Michelle L. Rivera-Clonch, PhD., LMHC, NCC
And Custodians of Medical and Billing
6900 Tavistock Lakes Boulevard, Ste. 400
Orlando, Florida 32827

Dean John Rotondo, MD, PA
And Custodians of Medical and Billing Records
399 Camino Gardens Boulevard, Ste. 200
Boca Raton, Florida 33432
*Medical Provider for Veronique De La Rosa*

Leslie Rouder, LCSW
And Custodians of Medical and Billing Records
21643 Cypress Road
Boca Raton, Florida 33433
(561) 706-1274
*Medical Provider for Veronique De La Rosa*

Silver Lining Psychiatry
And Custodians of Medical and Billing Records
3724 Winter Garden Vineland Road
Winter Garden, Florida 34787
*Medical Provider for Veronique De La Rosa*

Linda Tepper, LCSW
And Custodians of Medical and Billing Records
7777 Glades Road, Suite 205
Boca Raton, Florida 33434
(561) 288-3876
*Medical Provider for Leonard Pozner*

Iliana Torres, MS, LMHC
Agape Therapy Institute
And Custodians of Medical and Billing Records
37 N. Orange Ave., Suite 1100
Orlando, Florida 32801
(407) 900-8633
*Medical Provider for Leonard Pozner*

All medical care providers listed above may testify regarding matters contained in their records and depositions. Their observations, diagnosis, opinions, prognosis, facts, physical and clinical examinations, and tests done, reviewed or relied upon are incorporated herein by reference. This includes opinions regarding Plaintiff's pain, mental anguish, medical care, medical expenses, limitations, physical impairment, or any other medical issue in this case. The Custodians of Records will authenticate the records.

Plaintiff is unaware of the general substance of these experts' mental impressions and opinions, as they are treating physicians and custodians of records. However, presumably the general substance of these experts' impressions and opinions would be as contained in their respective records.

## Plaintiffs' Retained Experts

Fred Zipp
University of Texas School of Journalism
300 W Dean Keeton St
Austin, TX 78712
(512) 471-1845

Mr. Zipp is a former newspaper editor and journalism professor. He will offer his expertise concerning the standards of care in news reporting, and he will opine on how those standards were recklessly disregarded in this case. Mr. Zipp will opine that Defendants ignored elementary precautions in journalism. Mr. Zipp will also opine that Defendants entertained serious doubts about the accuracy of their statements. Mr. Zipp will analyze the facts and circumstances of the publications which show that Defendants were motivated by a desire to avoid the truth and to inflict harm on Plaintiff. Materials reviewed by Mr. Zipp are being produced as SANDY HOOK-000001-000642. Mr. Zipp has also reviewed the March 4, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Free Speech Systems, and the November 27, 2019 deposition of Paul Watson. Mr. Zipp has also reviewed the YouTube video clips described in his affidavits submitted in response to Defendants' TCPA Motions. Mr. Zipp has also reviewed Plaintiff's petition. Mr. Zipp's curriculum vitae is attached hereto as Exhibit "1."

Becca Lewis
Stanford University, Department of Communication
Building 120, Room 110
450 Jane Stanford Way
Stanford, CA 94305
(650) 723-1941

Ms. Lewis is an academic researcher in the field of media technologies and online discourse, with a focus on media manipulation and disinformation. Ms. Lewis will offer her expertise on digital political subcultures, internet celebrity, and online news platforms. Ms. Lewis will testify about InfoWars' cultural footprint and role in the online media ecosystem. Ms. Lewis will opine that Defendants' actions were a substantial factor

in the spread of false facts about the Sandy Hook shooting. Materials reviewed by Ms. Lewis are being produced as SANDY HOOK-000643-002142. Ms. Lewis has also reviewed the March 4, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Alex Jones, and the November 27, 2019 deposition of Paul Watson. Ms. Lewis has also reviewed the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly In Alex Jones Hit Piece" and the April 22, 2017 video entitled "Sandy Hook Vampires Exposed." Ms. Lewis has also reviewed Plaintiff's petition. Ms. Lewis' cirruculum vitae is attached as Exhibit "2."

Dr. Roy Lubit
165 West End Ave #3k
New York, NY 10023
(917) 846-7829

Dr. Lubit is a forensic psychiatrist with expertise in the impact of stress and emotional trauma. Dr. Lubit will testify about Plaintiff's mental injury and the psychological stresses involved from Defendants' false statements and denial of Plaintiff's trauma. Dr. Lubit will opine that Defendants' actions were a substantial factor in Plaintiff's severe mental anguish and continuing grief. Dr. Lubit will testify about his evaluation of Plaintiff. Dr. Lubit will also review any medical records produced in this suit. Dr. Lubit's curriculum vitae is attached as Exhibit "3."

## II.

Plaintiffs reserve the right to supplement this designation with additional designations of experts within the time limits imposed by the Court or any alterations of same by subsequent Court Order or agreement of the parties, or pursuant to the Texas Rules of Civil Procedure and/or the Texas Rules of Civil Evidence.

## III.

Plaintiffs reserve the right to elicit, by way of cross-examination, opinion testimony from experts designated and called by other parties to the suit. Plaintiffs express their intention to possibly call, as witnesses associated with adverse parties, any of Defendants' experts.

IV.

Plaintiffs reserve the right to call undesignated rebuttal expert witnesses whose testimony cannot reasonably be foreseen until the presentation of the evidence against Plaintiffs.

V.

Plaintiffs reserve the right to withdraw the designation of any expert and to aver positively that any such previously designated expert will not be called as a witness at trial, and to re-designate same as a consulting expert, who cannot be called by opposing counsel.

VI.

Plaintiffs reserve the right to elicit any expert opinion or lay opinion testimony at the time of trial which would be truthful, which would be of benefit to the jury to determine material issues of fact, and which would not be violative of any existing Court Order or the Texas Rules of Civil Procedure.

VII.

Plaintiffs hereby designate, as adverse parties, potentially adverse parties, and/or as witnesses associated with adverse parties, all parties to this suit and all experts designated by any party to this suit, even if the designating party is not a party to the suit at the time of trial.  In the event a present or future party designates an expert but then is dismissed for any reason from the suit or fails to call any designated expert, Plaintiffs reserve the right to designate and/or call any such party or any such experts previously designated by any party.

VIII.

Plaintiffs reserve whatever additional rights they might have with regard to experts, pursuant to the Texas Rules of Civil Procedure, the Texas Rules of Civil Evidence, the case law construing same, and the rulings of the trial court.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
(713) 221-8300 Telephone
(713) 221-8301 Fax

**ATTORNEY FOR PLAINTIFFS**


**CERTIFICATE OF SERVICE**

I hereby certify that on 15th day of September, the forgoing document was served upon all counsel of record via electronic service.

Eric J. Taube
Kevin W. Brown
Waller, Landsen, Dortch & Davis, LLP
100 Congress Ave., Suite 1800
Austin, Texas 78701
Email:  eric.taub@wallerlaw.com
Email:  kevin.brown@wallerlaw.com

_____

MARK D. BANKSTON

# EXHIBIT "1"

# Fred Zipp

2219 Holly St.
Austin TX 78702
fred.zipp@yahoo.com
512.589.4593

## Experience

| Editor in residence, University of Texas | 2012-2021 |
Department of Journalism

Austin American-Statesman                1998-2011
Editor (2009-2011), managing editor (2000-2009), assistant managing editor (1998-2000)

The Palm Beach Post                      1987-1998
Metro editor (1992-1997), news editor (1991-1992), deputy metro editor (1990-1991), assistant metro editor (1987-1990)

Austin American-Statesman                1984-1987
City editor (1986-1987), sports editor (1985-86), sports copy editor (1984-1985)

Beaumont Enterprise                      1979-1984
Assistant city editor (1982-1984), various reporting positions (1979-1982)

## Education

New York University                      1978-1979
   Masters degree program, Department of French and Italian

University of Paris IV                    1977-1978
   Film analysis and semiotics

Duke University                          1973-1978
   A.B., history and French
   Graduated magna cum laude

## Professional development and affiliations

Headliners Foundation of Texas           2013-present
   Governor; chair, professional excellence committee

American Society of News Editors         2000-2011

Served on First Amendment Committee; assisted in the organization of the first Sunshine Week promoting open, transparent government throughout the United States

Freedom of Information Foundation of Texas          2000-2011
Director and officer
Edited revised edition of the Freedom of Information Handbook

Completed numerous professional development programs in leadership, management and craft skills through the Poynter Institute, American Press Institute, Cox Enterprises

# EXHIBIT "2"

# REBECCA C. LEWIS

Department of Communication - Stanford University
Stanford, CA 94305-2050
beccalewis@protonmail.com

## EDUCATION

**Stanford University,** Department of Communication
    PhD Candidate in Communication Theory and Research, September 2018 – present
    Advisor: Fred Turner

**University of Oxford,** Oxford Internet Institute
    MSc in the Social Science of the Internet, graduated November 2016
    Thesis: *"Candidates of Instagram: Social Media Imagery in the 2016 U.S. Presidential Primaries"*

**Columbia University,** Columbia College
    BA in Film Studies, graduated May 2011
    Thesis: *"Going Viral: The Role of YouTube Sensations in a Culture of Memes"*

## FELLOWSHIPS AND AFFILIATIONS

**Stanford University,** Stanford Graduate Fellowship
    Gerhard Casper Fellow, September 2018 – present

**University of North Carolina at Chapel Hill,** Center for Information, Technology, & Public Life
    Graduate Affiliate, September 2020 – present

**Data & Society Research Institute**
    Research Affiliate, September 2018 – present

**Lightspark Foundation,** Impact Guild
    Impact Guild Fellow for Social Good, 2020

## REFEREED JOURNAL PUBLICATIONS

2021. Lewis, Rebecca and Angèle Christin. "Platform Drama: 'Cancel Culture,' Celebrity, and the Struggle for Accountability on YouTube." Accepted with revisions at *New Media & Society*.

2021. Christin, Angèle and Rebecca Lewis. "The Drama of Metrics: Status and Hierarchies Among YouTube Drama Creators." *Social Media + Society*. https://doi.org/10.1177/2056305121999660

2021, February 3. Lewis, Rebecca, Alice Marwick, and William Parton. "'We Dissect Stupidity and Respond to It': Response Videos and Networked Harassment on YouTube." *American Behavioral Scientist*. https://doi-org.stanford.idm.oclc.org/10.1177/0002764221989781

2019, October 17. Lewis, Rebecca. "'This is what the news won't show you': YouTube creators and the reactionary politics of micro-celebrity." *Television and New Media*. https://doi.org/10.1177/1527476419879919

1

## WHITE PAPERS AND PUBLIC POLICY REPORTS

2018. Lewis, Rebecca. *Alternative Influence: Broadcasting the Reactionary Right on YouTube.* New York: Data & Society Research Institute. https://datasociety.net/library/alternative-influence/
Covered by *The New York Times, The Guardian, Columbia Journalism Review,* and on *NPR Weekend Edition*

2017. Marwick, Alice and Lewis, Rebecca. *Media Manipulation and Disinformation Online.* New York: Data & Society Research Institute. https://datasociety.net/library/media-manipulation-and-disinfo-online/
Covered by *The New York Times, The Guardian, CNN, The Today Show,* and *Business Insider*

## BOOK CHAPTERS

2019. Donovan, Joan, Becca Lewis, and Brian Friedberg. "Parallel Ports: Sociotechnical Change from the Alt-Right to Alt-Tech." In *Post-Digital Cultures of the Far Right: Online Actions and Offline Consequences in Europe and the US* (Maik Fielitz and Nick Thurston, eds.). Verlag, Bielefeld: Transcript Press.

2017, December 15. Lewis, Rebecca and Alice Marwick. "Taking the red pill: Ideological motivations for spreading online disinformation." *Understanding and addressing the disinformation ecosystem.* Philadelphia, PA: First Draft News. https://firstdraftnews.org/wp-content/uploads/2018/03/The-Disinformation-Ecosystem-20180207-v2.pdf

## REFEREED PRESENTATIONS

2021, August 5. Lewis, Rebecca and Angèle Christin. "Platform Drama: 'Cancel Culture,' Celebrity, and the Struggle for Accountability on YouTube." *American Sociology Association Media Preconference*, held remotely.

2020, May 21. Lewis, Rebecca, Alice Marwick, and William Partin. "'We Dissect Stupidity and Respond to It: Response Videos and Networked Harassment." *International Communication Association Annual Meeting*, held remotely.

2019, October 3. Lewis, Rebecca and Leon Yin. "Far-Right YouTube and Search Engine Optimization: Manipulations in 'Ranking Cultures.'" *Association of Internet Researchers*, Brisbane, Australia.

2019, September 7. Lewis, Rebecca. "Performed Persona Scams: Deceptive Personal Branding and Shifting Concepts of Fraud on Social Media Platforms." *Meeting of the Society for the Social Studies of Science*, New Orleans, LA.

2019, August 13. Friedberg, Brian and Rebecca Lewis. "Parallel Ports: Sociotechnical Change from the 'Alt-Right' to Alt-tech." *American Sociology Association*. New York City, NY.

2019, May 28. Davison, Patrick, Rebecca Lewis, and Alice Marwick. "'You Are the Meme Militia': How Alt-Right Digital Media Perpetuates White Supremacy." *International Communication Association Annual Meeting*, Washington, DC.

2

2019, March 15. Lewis, Rebecca. "Celebrity, Fandom, and the Source Credibility of Political Influencers." *Eastern Sociological Society Annual Meeting*, Boston, Massachusetts.

2018, August 10. Lewis, Rebecca. "Candidates of Instagram: Political Image-Building and the Co-optation of Micro-Celebrity Online." *American Sociology Association Media Preconference*, Philadelphia, Pennsylvania.

## INVITED PRESENTATIONS

2021, August 20. "Researching far-right movements online: an introduction to methods." Presentation at the Institute for Research on Male Supremacism's Summer Institute on Contesting Supremacism, held remotely.

2021, July 17. "Authoritarian cults, media indoctrination, and shared psychosis." Panel presentation at the World Mental Health Coalition Project for National Healing Series, held remotely.

2021, June 23. "Radicalization: From conspiracy theories to violent extremism." Panel discussion at the Atlantic Council's 360/Open Summit, held remotely. https://www.youtube.com/watch?v=_tThGy3FH-8

2021, June 11. "Racism and Radicalization in the Digital Age: A Robust Response." Keynote speech at the National Council of Urban Education Associates 2021 Virtual Summer Meeting, held remotely.

2021, January 26. "How did we get here? Where do we go next? Information, media & U.S. democracy." Panel discussion at the University of North Carolina Chapel Hill's CITAP Center, held remotely.

2020, December 11. "Hate Not Found: The Politics of De-platforming the Far Right." Panel presentation at public conference in Berlin, Germany, joined remotely.

2020, November 16. "Internet hate speech: What can we do?" Panel presentation at Middlebury College, held remotely.

2019, October 13. "Alternative Influence: Broadcasting the Reactionary Right on YouTube." Presentation at Cultural Formations of the 'Alt-Right' Symposium, University of Michigan, Ann Arbor, MI.

2019, April 17. "The Fake News Cycle: Searching for Truth in the Digital Age." Panel presentation at Washington University, St. Louis, MO.

2018, October 12. "What is the FATE of Platforms? Fairness, Accountability, Transparency and Ethics Under Review." Panel presentation at Concordia University, Montreal, Quebec.

2018, April 13. "Media Manipulation and the Online Far-Right." Annual Faculty Symposium: Techno Cultures in the 21st Century. Borough of Manhattan Community College, New York, NY.

3

2018, March 8. "Looking past the facts: a sociotechnical approach to fake news, media manipulation, and the far-right alternative press." Presented with Alice Marwick at University of North Carolina at Chapel Hill.

2017, December 15 – 16. Lewis, Rebecca and Marwick, Alice. "Taking the Red Pill: Ideological Motivations for Spreading Online         Disinformation." Understanding and Addressing the Disinformation Ecosystem, University of Pennsylvania Annenberg School for Communication, Philadelphia, PA.

2017, December 4. "Media Manipulation and Disinformation." Nouvelles Pratiques du Journalisme 2017. Sciences Po École de Journalisme**,** Paris, France.

2017, September 25. "Comparative Lessons from Violent Extremism and Far-Right Subcultures." Perspectives on Why Audiences Are Susceptible to Disinformation. National Endowment for Democracy**,** Washington, D.C.

## **RESEARCH & PROFESSIONAL POSITIONS**

**Data & Society,** New York, New York
Affiliated Researcher, September 2018 – present
Full-time Researcher, February 2017 – August 2018
*Media Manipulation Project*
- Lead Researchers: danah boyd, Founder and President of Data & Society; Alice Marwick, Associate Professor of Communication at UNC Chapel Hill; and Joan Donovan, Research Director of the Shorenstein Center on Media, Politics, and Public Policy
- Project explored the manipulation of public discourse by state and non-state actors on social media platforms, with particular focus on the media manipulation tactics of online far-right extremists in the United States

**University of Oxford,** Reuters Institute for the Study of Journalism
Research Assistant, October 2015 – January 2016
*Online News and Digital Intermediaries Project*
- Lead Researchers: Rasmus Kleis Nielsen, Director of Research and Sarah Anne Gantner, Research Fellow
- Project focused on the effects of digital intermediaries (such as Google, Facebook, and Twitter) on traditional news media organizations and government policies

**Crimson Hexagon**, Boston, MA; October 2011 – August 2015
Crimson Hexagon delivers social media data analytics for corporations and research institutions. It is powered by technology developed by Professor Gary King at the Harvard Institute for Quantitative Social Science.

*Director of Social Impact, August 2014 – August 2015*
- Founded and led the company's Social Impact Program, which provided academic, not-for-profit researchers with grants in the form of access to the ForSight social media analytics platform
*Client Services Manager, August 2011 – August 2014*
- Established social media research methodologies with clients and taught them social media analysis techniques

## EDITORIALS AND POPULAR PRESS

2021, August 2. "Space-Cowboys: What Internet history tells us about the inevitable shortcomings of a tech-bro led Space Race." *Tech Policy Press*. https://techpolicy.press/space-cowboys-what-internet-history-tells-us-about-the-inevitable-shortcomings-of-a-tech-bro-led-space-race/

2021, January 17. "The Trump ban across social media wasn't censorship – it was a series of editorial decisions by media companies that call themselves social platforms." *Business Insider*. https://www.businessinsider.com/trump-ban-wasnt-censorship-it-was-an-editorial-decision-2021-1

2020, December 11. "I warned in 2018 YouTube was fueling far-right extremism. Here's what the platform should be doing." *The Guardian*. https://www.theguardian.com/technology/2020/dec/11/youtube-islamophobia-christchurch-shooter-hate-speech

2020, January 7. "All of YouTube, Not Just the Algorithm, is a Far-Right Propaganda Machine." *Medium FFWD*. https://ffwd.medium.com/all-of-youtube-not-just-the-algorithm-is-a-far-right-propaganda-machine-29b07b12430

2019, October 9. "It's Easy to Despair and Do Nothing After the Halle Synagogue Shooting. But We Shouldn't." *Medium FFWD*. https://ffwd.medium.com/its-easy-to-despair-and-do-nothing-after-the-halle-synagogue-shooting-but-we-shouldn-t-34faf86ff48d

2019, June 9. "YouTube's Bungled PR Announcements Made Carlos Maza's Harassment Worse." *VICE Motherboard*. https://www.vice.com/en/article/evyqnz/youtubes-bungled-pr-announcements-made-carlos-mazas-harassment-worse-steven-crowder

2018, November 20. "Why Influence Matters in the Spread of Misinformation." *Data & Society: Points*. https://points.datasociety.net/why-influence-matters-in-the-spread-of-misinformation-fc99ee69040e

2018, October 4. "Forget Facebook, YouTube videos are quietly radicalizing large numbers of people – and the company is profiting." *NBC News THINK*. https://www.nbcnews.com/think/opinion/forget-facebook-youtube-videos-are-radicalizing-millions-young-people-company-ncna916341

2018, March 22. "Black Panther and the Far-Right." *Data & Society Media Manipulation: Dispatches from the Field*. https://medium.com/@MediaManipulation/black-panther-and-the-far-right-e83facb735bb

2017, June 13. "Megyn Kelly Fiasco is one more instance of far-right outmaneuvering media." *Columbia Journalism Review*. https://www.cjr.org/tow_center/megyn-kelly-alex-jones.php

2017, May 18. "The Online Radicalization We're Not Talking About." *New York Magazine: Select All*. https://nymag.com/intelligencer/2017/05/the-online-radicalization-were-not-talking-about.html

## SELECTED MEDIA APPEARANCES

2021, July 6. "Episode 3: Talking About Garbage." *Does Not Compute Podcast* at University of North Carolina's Center for Information, Technology, and Public Life. https://citap.unc.edu/does-not-compute/episode-3/

2021, March 2. "Planet YouTube." *In Land of the Giants: The Google Empire*. https://www.vox.com/land-of-the-giants-podcast

2021, January 21. "How YouTube Normalizes Right-Wing Extremism w/Becca Lewis." *Tech Won't Save Us with Paris Marx*. https://podcasts.apple.com/us/podcast/how-youtube-normalizes-right-wing-extremism-w-becca-lewis/id1507621076?i=1000506047370

2020, September 18. "The Alternative Influence Network, with Rebecca Lewis." *I Don't Speak German Podcast*. https://idontspeakgerman.libsyn.com/65-the-alternative-influence-network-with-rebecca-lewis

2020, June 4. "Social media unites and divides us. How should we respond?" *NPR Marketplace Tech*. https://www.marketplace.org/shows/marketplace-tech/social-media-george-floyd-protests-misinformation-community/

2019, August. "Infinite Evil: The Incubators of Online Hate." *Stuff NZ: Circuit*. https://interactives.stuff.co.nz/2019/circuit/infinite-evil-documentary/

2019, March 22. "How far-right influencers thrive on YouTube." *Front Burner CBC*. https://www.cbc.ca/radio/frontburner/how-far-right-influencers-thrive-on-youtube-1.5066532

2019, March 19. "More extremists are getting radicalized online. Whose responsibility is that?" *NPR Marketplace Tech*. https://www.marketplace.org/2019/03/19/extremists-are-being-radicalized-online-whose-responsibility-is-it/

2019, March 18. "Salvaging ourselves." *Sh!tpost Podcast*. https://soundcloud.com/shtpostpodcast/salvaging-ourselves-31819-ft-becca-lewis

2019, January 9. "Is YouTube radicalizing its users?" *NPR WHYY Radio Times*. https://whyy.org/segments/is-youtube-radicalizing-its-users/

2018, November 27. "Critics Say YouTube Hasn't Done Enough to Crack Down on Extremist Content." *NPR All Things Considered*. https://www.npr.org/2018/11/27/671285261/critics-say-youtube-hasnt-done-enough-to-crack-down-on-extremist-content

2018, September 23. "Alternative Influence: Broadcasting the Reactionary Right on YouTube." *NPR Morning Edition*. https://www.npr.org/2018/09/23/650861652/alternative-influence-broadcasting-the-reactionary-right-on-youtube

2017, November 10. "Popping the Red Pill: Inside a digital alternate reality." *CNN Business*. https://money.cnn.com/2017/11/10/technology/culture/divided-we-code-red-pill/index.html

## SELECTED PRESS COVERAGE

2021, August 3. Tiffany, Kaitlyn. "Left-Wing Activists Are Bringing Back MAGA Twitter." *The Atlantic.* https://www.theatlantic.com/technology/archive/2021/08/patriottakes-and-future-resistance-twitter/619645/

2021, July 7. Hayden, Michael Edison. "'We Make Mistakes': Twitter's Embrace of the Extreme Far Right." *Southern Poverty Law Center Hatewatch.* https://www.splcenter.org/hatewatch/2021/07/07/we-make-mistakes-twitters-embrace-extreme-far-right

2021, June 30. Wong, Julia Carrie. "From viral videos to Fox News: how rightwing media fueled the critical race theory panic." *The Guardian.* https://www.theguardian.com/education/2021/jun/30/critical-race-theory-rightwing-social-media-viral-video

2020, August 18. Tiffany, Kaitlin. "How Instagram Aesthetics Repackage Qanon." *The Atlantic.* https://www.theatlantic.com/technology/archive/2020/08/how-instagram-aesthetics-repackage-qanon/615364/

2020, July 11. Herrman, John. "Who Gets the Banhammer Now?" *The New York Times.* https://www.nytimes.com/2020/07/11/style/online-communities-social-media-bans-reddit-youtube-twitch-facebook.html?referringSource=articleShare

2019, July 25. Sankin, Aaron. "YouTube said it was getting serious about hate speech. Why is it still full of extremists?" *Gizmodo.* https://gizmodo.com/youtube-said-it-was-getting-serious-about-hate-speech-1836596239

2019, June 8. Roose, Kevin. "The Making of a YouTube Radical." *The New York Times.* https://www.nytimes.com/interactive/2019/06/08/technology/youtube-radical.html

2019, June 5. Roose, Kevin and Kate Conger. "YouTube to Remove Thousands of Videos Pushing Extreme Views." *The New York Times.* https://www.nytimes.com/2019/06/05/business/youtube-remove-extremist-videos.html

2019, January. Turner, Fred. "Machine Politics: The rise of the internet and a new age of authoritarianism." *Harper's Magazine.* https://harpers.org/archive/2019/01/machine-politics-facebook-political-polarization/

2018, November 24. Editorial Board. "The New Radicalization of the Internet." *The New York Times.* https://www.nytimes.com/2018/11/24/opinion/sunday/facebook-twitter-terrorism-extremism.html

2018, September 24. Klein, Ezra. "The rise of YouTube's reactionary right." *Vox.* https://www.vox.com/policy-and-politics/2018/9/24/17883330/dave-rubin-ben-shapiro-youtube-reactionary-right-peterson

2018, September 19. Ingram, Matthew. "YouTube's secret life as an engine for right-wing radicalization." *Columbia Journalism Review.* https://www.cjr.org/the_media_today/youtube-conspiracy-radicalization.php

2018, September 18. Solon, Olivia. "YouTube's 'alternative influence network' breeds rightwing radicalization, report finds." *The Guardian*. https://www.theguardian.com/media/2018/sep/18/report-youtubes-alternative-influence-network-breeds-rightwing-radicalisation

## TEACHING EXPERIENCE

Teaching Assistant, Stanford University
COMM 1B: Media, Culture, and Society (Professor Fred Turner) – Winter 2020
COMM 154-254: The Politics of Algorithms (Professor Angèle Christin) – Fall 2019
COMM 124-224: Lies, Trust, and Technology (Professor Jeffrey Hancock) – Winter 2019

Published syllabi
2017. Media Manipulation and Disinformation Online Syllabus. Data & Society. https://datasociety.net/pubs/oh/DataAndSociety_Syllabus-MediaManipulationAndDisinformationOnline.pdf

# EXHIBIT "3"

## **CURRICULUM VITAE**

Roy H. Lubit MD, Ph.D.
165 West End Ave.  Suite 3K
New York, NY 10023
917-846-7829
roylubit@rcn.com

UNDERGRADUATE EDUCATION

JUNE 1975     BA, Cornell University, Ithaca, NY.
              Academics: double major in history and chemistry.


MEDICAL EDUCATION

June 1979     MD, New York University School of Medicine, New York, NY.


POSTDOCTORAL TRAINING IN PSYCHIATRY

6/79-6/83      Psychiatry Residency, Yale University School of Medicine, New Haven, CT.

7/83-6/85      Child Psychiatry Residency, The Children's Hospital, Boston, MA.

7/85-6/87      Advanced Psychotherapy Fellowship, Adams House, Boston, MA.

7/01-6/02      Forensic Psychiatry Fellowship, St. Vincent's Hospital, New York, NY.


INTERNATIONAL RELATIONS
1997          Ph.D. in Political Science, GSAS, Harvard University, Cambridge.
              Dissertation explored impact of organizational learning on international conflict.


CERTIFICATIONS
Diplomate, American Board of Psychiatry and Neurology, 1984.
Diplomate, American Board of Child and Adolescent Psychiatry, 2003.
Diplomate, American Board of Forensic Psychiatry, 2003.
New York State Medical License 205720-1.
National Board of Medical Examiners, 1980.

FORENSIC QUALIFICATIONS

Special expertise in evaluating emotional trauma, civil rights (section 1983 actions), child custody evaluations, brain injury, psychological/psychiatric malpractice and critiquing forensic evaluations

Board Certifications
- Psychiatry and Neurology
- Child Psychiatry
- Forensic Psychiatry

Declared an Expert in Psychiatry and/or child psychiatry in:
- Bronx Family Court            Bronx Supreme Court
- Brooklyn Family Court                 Brooklyn Supreme Court
- Manhattan Family Court                 Manhattan Supreme Court
- Queens Family Court          Queens Supreme Court
- Richmond County Supreme Court      Suffolk County Supreme Court
- Westchester County Court              Norfolk County Superior Court in  Massachusetts
- Butler County Virginia Court   Manhattan Criminal Court
- Federal court, NY Eastern District

Organizational Affiliations:
- Consultant to Children and Law Committee of Association of the Bar of the City of NY

Publications

- Ethics in Psychiatry in Sadock B. and Sadock V. (eds.) Comprehensive Textbook of Psychiatry. 9th edition. Phil: Lippincott, Williams & Wilkins. (in press.)

- Ethics in Psychiatry (with Eth S. and Ladds B.) in Sadock B. and Sadock V. (eds.) Comprehensive Textbook of Psychiatry. 8th edition. Phil: Lippincott, Williams & Wilkins. (2004)
- Forensic Psychiatric/Psychological Assessments  (in preparation).
- Forensic Evaluation of Trauma Syndromes by Lubit R, Hartwell N, van Gorp WG,  Eth S. in *Child and Adolescent Psychiatric Clinics of North America*. 2002 Oct; 11(4):823-57.
- Juvenile Delinquency, (with Billick) in Rosner (ed.) Principles and Practice of Forensic Psychiatry (2003).
- Child Custody Evaluations in K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins (2005).
- Diagnosis and Treatment of Trauma on Children in K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins (2005).

Presentations

- Lectures on Ethics to Child Psychiatry Fellows at Einstein School of Medicine Winter 2009
- Assessing Forensic Evaluations Rose Seminar, Minneapolis September 11, 2008
- "Family Courts and Child Custody: A System Needing Change: Zigler Center at Yale April 11, 2008
- "Child Abuse Evaluations" Symposium sponsored by Children and Family Law Committee of the Bar Association of the City of NY, January 23, 2008
- "Doing Forensic Evaluations" Joint Conference of the British Arab Psychiatric Association and American Arab Psychiatric Associations in Bahrain April 16, 2006.
- Evaluation of Psychiatric Trauma: International Congress on Law and Psychiatry, 7/7/05, Paris
- Evaluation of Sexual Abuse Allegations: International Congress on Law and Psychiatry, 7/7/05, Paris
- Problems in Child Custody Evaluations Dateline NBC April 15, 2005
- "Evaluating Child Custody Evaluations: Contested Allegations of Domestic Violence, Child Abuse, Superior Parenting Skills" Women's Bar Association of State of New York; June 8, 2004; Brooklyn, NY.
- "Doing Child Custody Evaluations" Bronx 18B Lawyers Retreat; Nov 2003; Mystic, CT.
- "Parental Alienation Syndrome" Bronx 18B Lawyers Retreat; Nov 2003; Mystic, CT.

*Roy Lubit CV page 3*

<u>CLINICAL EXPERIENCE</u>

| | |
|---|---|
| 1984-present | Private practice (child, adult and forensic psychiatry). |
| 2006-2008 | Clinical Faculty NYU School of Medicine, Dept of Child Psychiatry and Mt Sinai School of Medicine |
| 2003-2004 | Assistant Professor of Psychiatry, Mt. Sinai School of Medicine, Dept of Child Psychiatry |
| 2002-2003 | National Child Traumatic Stress Network, funded by SAMHSA and Assistant Professor of Psychiatry, Saint Vincents Hospital, NY Medical College, Dept of Child Psychiatry<br>  •   Consortium for Effective Trauma Treatment, funded by NY Times Foundation . |
| 2001-2002 | Forensic Psychiatry Fellow, Saint Vincents Hospital, New York Medical College |
| 2001 | ADD and Behavioral Disorders Clinic: Child and Adult Psychiatry. |
| 1999-2001 | Sabbatical from psychiatry to work as a management consultant for PricewaterhouseCoopers. |
| 1998-1999 | Psychiatrist, Jewish Board of Family and Children's Services. |
| 1997-1998 | On-call work for On-Site Psychiatric Services at various hospitals including Metro-West Medical Center and Faulkner Hospital. |
| 1996-1997 | Vinfen Corporation-Child and adult psychiatry at Fall River State Hospital and Beverly Hospital. |
| 1993-1996 | Psychiatrist, on-call and locum tenens ward coverage Charles River Hospital, Solomon Carter Fuller and Corrigan Mental Health:.<br>Different summers I went wherever there was the greatest need.  During the academic year I returned to my research and teaching. |
| 1987-1992 | Psychiatrist for Scoville and Schwager which placed me at various state hospitals they staffed including Danvers State, Northhampton State, Cape and the Islands, Solomon Carter Fuller.  I served as Acting Medical Director at Danver's State and at Cape and the Islands.  As noted above, I went wherever there was the greatest need, and during the academic year I returned to research and teaching. |

4

PUBLICATIONS

Book Chapters

Psychotropic medications and crime: The seasoning of the Prozac defense. With Michael Welner and Jada Stewart (in press) In Mozayani, A & Raymon, L. (Eds.) Handbook of Drug Interactions: A Clinical and Forensic Guide. Humana Press: New York, NY.

Ethics in Psychiatry in Sadock B. and Sadock V. (eds.) Comprehensive Textbook of Psychiatry. 9th edition. Phil: Lippincott, Williams & Wilkins 2009.

Assessing and Treating Traumatized Children in Hosen, Responding to Traumatized Children. Palgrave 2006.

Cognitive Therapy of Children with PTSD, IBID

Child Custody Evaluations in K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins (2005).

Diagnosis and Treatment of Trauma on Children in K. Cheng and K. Myers (ed.) *Child and Adolescent Psychiatry: The Essentials*. Lippincott Williams & Wilkins (2005).

Using Emotional Intelligence To Deal With Difficult People and Organizations in Osland S. et al (eds) The Organizational Behavior Reader (7th ed) Saddle River: Prentiss Hall.

Children, Disasters, and the September 11th World Trade Center Attack (with Eth S.) in Norwood A and Ursano B (eds.) *Trauma and Disaster Response and Management*.  Wash DC: APA Annual Review of Psychiatry, Volume 22, 2003.

Forensic Evaluation of Trauma Syndromes by Lubit R, Hartwell N, van Gorp WG,  Eth S. in *Child and Adolescent Psychiatric Clinics of North America*. 2002 Oct; 11(4):823-57.

Ethics in Psychiatry (with Eth S. and Ladds B.) in Sadock B. and Sadock V. (eds.) Comprehensive Textbook of Psychiatry. 8th edition. Phil: Lippincott, Williams & Wilkins. (2004)

Office Politics (with Gordon R) in Kahn J. (ed.) *Mental Health and Productivity in the Workplace*. 2002.

Adolescent Moral Development (with Billick S.) in Rosner R. (ed.) Textbook of Adolescent Psychiatry (2003).

Juvenile Delinquency, (with Billick S.) in Rosner S. (ed.) Principles and Practice of Forensic Psychiatry (2003).

Child Custody Evaluations in Forensic Psychiatric/Psychological Assessments (in prep.)


Articles

Post Traumatic Stress Disorder in Children in eMedicine World Medical Library, 2010.

Acute Treatment of Disaster Survivors in eMedicine World Medical Library, 2010.

Post Concussive Syndrome. eMedicine World Medical Library, 2010.

Borderline Personality Disorder.  eMedicine World Medical Library, 2010.

Sleep Disorders. eMedicine World Medical Library, 2009

Child Abuse and Neglect: Reactive Attachment Disorder.  eMedicine World Medical Library, 2009.

5

Review of Anxiety Disorders in eMedicine's Depression & Anxiety Feature Series, July 2006.

Impact of Trauma on Children (with Rovine D, DeFrancisci Land Eth S.) *Journal of Psychiatric Practice* v9 #2 128-138 (March 2003).

Helping Disaster Survivors.  E-Medicine World Medical Library, 2001.

PTSD in Children.  E-Medicine World Medical Library, 2001.

Preserving Children's Protection While Enhancing Justice for Parents in Abuse and Neglect Evaluations by Lubit R., Billick S. & Pizarro R. *APPL Journal* V 30 No 2 (July 2002) pp287-290.

The Long Term Organizational Effects of Narcissistic Managers and Executives.  *Academy of Management Executive*, Spring 2002.

Tacit Knowledge and Knowledge Management: The Keys to Competitive Advantage. *Organizational Dynamics, winter 2001*.

The Crimean Imbroglio. *East European Review*, August 1995.

The Effects of Drugs on Decision-Making (with Bruce Russett). *Journal of Conflict Resolution*, March 1984.


Books

Forensic Psychiatric/Psychological Assessments with Len Goodstein Ph.D. (in preparation).

Coping with Toxic Managers and Subordinates: Using Emotional Intelligence to Survive and Prosper (2003) Prentiss-Hall.

Developing Emotional Intelligence (in preparation)


Other Publications

"Using Emotional Intelligence to Deal with Difficult Client Personnel (and Colleagues)"Consulting to Management in press June 2004 v15 #2

"The tyranny of toxic managers: An emotional intelligence approach to dealing with difficult personalities" Ivey Business Journal, spring 2004

"Curbing the Tide of Islamic Radicalism in Europe" White Paper requested by CIA 1/1/04.

Psychiatrist's Role in Involuntary Hospitalization. Commentary 2.  Available at: http://www.virtualmentor.org or http://www.ama-assn.org/ama/pub/category/11103.html

Book Review (with Billick S.) of *Handbook of Neurodevelopmental and Genetic Disorders in Children*, edited by Sam Goldstein Ph.D. and Cecil Reynolds Ph.D. (New York: The Guildford Press, 1999) for *The Journal of Psychiatry & Law*.

Book Review (with Eth S.) of *Children's Interests/Mother's Rights: The Shaping of America's Child Care Policy*, by Michel S (New Haven: Yale University: 1999) for *Psychiatry* .

Book Review of *The Big Five* by Alexander Saveliev. *MeiMO* (Journal of the Institute for International Economics and International Relations), winter 1996.

Book Review of *Hidden Illness in the White House* by Kenneth Crispell and Carlos Gomez. *Politics and the Life Sciences,* February 1991.

Seven Easy Peaces (with Catherine Perlmutter). *Children Magazine*, Rodale Press, September 1988.

## PRESENTATIONS

Assessing Forensic Evaluations, CME talk to Nassau County Bar Association December 15, 2010
Interview on Parental Alienation by Sarah Wallace of ABC Television November 30, 2010
Canadian Broadcasting Company, interviewed on television concerning Chilean Mining Disaster: August 24, 2010
Canadian Broadcasting Company, interviewed by 8 of their radio stations concerning Chilean Mining Disaster: August 24, 2010

Quoted in The McChrystal Effect: Mouthing Off To Your Boss Can Get You Fired: on ABCnews.com June 24, 2010 http://abcnews.go.com/Business/MindMoodResourceCenter/mouthing-off-boss-fired/story?id=10993015&page=2

Interviewed by Dow Jones concerning authoritarian managers. April 7, 2010

Lectures on Ethics to Child Psychiatry Fellows at Einstein School of Medicine Winter 2010

Lectures on Psychiatry for Navy Physicians (ADHD, PTSD, Forensic Psychiatry, Ethics in Psychiatry, Clinical Assessment of Children, Severe Personality Disorders), Columbia, Missouri October 11 and 12, 2009.

Use of Narratives and Storytelling in Treating PTSD, Trauma Psychiatry & Psychology, International Center For Psychosocial Trauma, Columbia, Missouri September 30, 2009

Lectures on Ethics to Child Psychiatry Fellows at Einstein School of Medicine Winter 2009

Impact of the Lehman Crisis on People, Fox Business News, September 15, 2008

Assessing Forensic Evaluations Rose Seminar, Minneapolis September 11, 2008

Developing Emotional Intelligence Rose Seminar Minneapolis September 11, 2008

"Assessing and Dealing With Corporate Threats" at ATAP North East Chapter, June 23, 2008.

"Family Courts and Child Custody: A System Needing Change: Zigler Center at Yale April 11, 2008

"Sex Abuse Evaluations" Symposium sponsored by Children and Family Law Committee of the Bar Association of the City of NY, January 23, 2008

"Experiencing the Trauma of 9/11 and Understanding the Recovery" University of Missouri-Columbia International Center for Psychosocial Trauma" St Louis June 29, 2006.

"Doing Forensic Evaluations" Joint Conference of the British Arab Psychiatric Association and American Arab Psychiatric Associations in Bahrain April 16, 2006.

"Evaluation and Treatment of PTSD in Children" Joint Conference of the British Arab Psychiatric Association and American Arab Psychiatric Associations in Bahrain April 16, 2006.

"Evaluation and Treatment of PTSD in Children" The First Annual Medical Conference of the International Iraqi Medical Association; Dubai, UAE April 12, 2006.

"Doing Forensic Evaluations" The First Annual Medical Conference of the International Iraqi Medical Association; Dubai, UAE April 12, 2006.

"Assessing and Treating Emotional Trauma" at International Academy of Law and Mental Health; Paris July 2005.

8

"Assessing Sexual Abuse Allegations" at International Academy of Law and Mental Health; Paris July 2005.

"New Thoughts on Leadership Development" at Society of Human Resource Management annual national meeting; San Diego June 20, 2005

"Dealing w. Toxic Managers" at NJ OD Network; Sharing Day; May 9, 2005

Problems in the Child Custody System on Dateline NBC April 15, 2005

"Group Dynamics and Decision Disasters" at annual meeting of In2In Thinking Network: Los Angeles, April 9, 2005

"Assessment of Dangerousness" Hudson River Psychiatric Hospital February 2, 2005

"Improving the Quality of Evaluations for Sexual Abuse" Queens ACS lawyers; January 10, 2005.

"Improving the Quality of Child Custody Decisions " The Second National Battered Mother's Custody Conference; Albany; January 8, 2005.

"Evaluating Forensic Child Custody Evaluations" to Women's Bar Association of the State of New York; June 8, 2003; Brooklyn, NY.

"Assessing Dangerousness" Grand Rounds at Hudson River Psychiatric Center 4/7/04.

"Radical Islam in Europe: Ideological, Psychological and Political Foundations and Potential Responses" invited presentation to Workshop on Radical Islam in Europe sponsored by CIA Office of Russian and European Analysis; McLean, VA Dec 12, 2003.

"Rethinking the Role of Psychology in Understanding Terrorism" invited presentation to Psychology of Terrorism Workshop sponsored by CIA Counterterrorism Center, Office of Terrorism Analysis; McLean, VA Nov 21, 2003.

"Assessment and Treatment of Traumatized Children" Grand Rounds MSSM Pediatrics Nov 20, 2003

"Phenomenology, Psychopathology and Treatment of Emotional Trauma" Grand Rounds Walter Reed Army Hospital, Nov 19, 2003

"Assessment and Treatment of Traumatized Children" Grand Rounds Pediatrics Elmhurst Hospital Nov 17, 2003

With John Kastan "Organization of Disaster Mental Health Services in Post 9/11 New York City" Annual Meeting of APHA, San Francisco, November 15-19, 2003

"Doing Child Custody Evaluations" Bronx 18B Lawyers Retreat; Nov 2003.

"Parental Alienation Syndrome" Bronx 18B Lawyers Retreat; Nov 2003.

"Wide Ranging Impact of Emotional Trauma on Children"; William Allanson White Psychoanalytic Institute Sept 25, 2003

"Violence in the Workplace" UPN 9, 7/25/03.

"Terrorism" Chair of Panel, International Society of Political Psychology; Boston July 8, 2003.

"Mind of the Modern Day Terrorist" Paper Panel on Understanding Terrorism at the International Society of Political Psychology; Boston July 8, 2003.

"Limiting the Trauma of Terrorism" Paper Panel on Political Violence and Trauma at the International Society of Political Psychology Boston; July 8, 2003

"Children and Disasters" American Psychiatric Association, San Francisco, May 20, 2003.

"Treatment of Trauma" Grand Rounds, Hudson River Psychiatric Institute, April 23, 2003

"Evaluation and Treatment of Children After Disasters" at Families, Trauma and Forensic Psychiatry Symposium at Walter Reed Army Hospital, April 16, 2003

"Children and Disasters" Maryland APA, April 9, 2003.

"Ethics in Psychiatry" Grand Rounds, Hudson River Psychiatric Institute, February 26, 2003

Chair of panel on "Biological and Chemical Terrorism" at John Jay College's symposium on Homeland Security After 9/11.  January 23, 2003.

"Assessment and Treatment of Traumatized Children", Children's National Medical Center, Dec 11, 2002.

"Children's Needs and Obstacles to Meeting Them After Disasters", LA Child Development Center. November 23, 2002

"School Based Mental Health Screening" International Society of Traumatic Stress Studies November 10, 2002

"Assessment of Traumatized Children and Adolescents" International Society of Traumatic Stress Studies November 7, 2002

"Suicide and Suicide Prevention in Children and Adolescents" Safehorizon. Nov 5, 2002

"Fundamentalism and Terrorism" Group for the Advancement of Psychiatry November 1, 2002

Bereavement and Trauma: Assisting Adolescents After Loss, Covenant House, NYC October 25, 2002

"Living With Uncertainty and Violence: Helping Youth Cope With Trauma" JBFCS Symposium. Oct 7, 2002.

"Treatment of Emotional Trauma" Beth Israel Hospital, 3 half-day sessions in Sept. and Oct. 2002.

"Impact of 9/11" BBC Sept 12, 2002

"Long term impact of 9/11", NPR Sept 8, 2002

"Recognizing Troubled Children" Private Schools (HALB and HAFTR) September 3, 2002.

"Recognizing Troubled Children" NYC School Nurses, August 27, 2002

"Coping with Stress in the Modern World" NY Life Insurance, August 22, 2002

"Ethics and Leadership" Brookings Institution, Washington DC July 30, 2002.

"Treatment of Children Who Lose Parents" Easthampton Camp. July 10, 2002

"Assessing the Impact Of 9/11 On Children in Schools" Meeting of NYC school psychiatrists and supervising nurses. June 28, 2002

"Impact of WTC Disaster on Firefighters" CBS Evening News May 26, 2002

"Psychological Impact of Trauma" for Montclair NJ School District. May 16, 2002

"Origins of Delinquent Behavior" at Update on Juvenile Delinquency for Society for Adolescent Psychiatry. May 11, 2002

"Impact of Violence On Child Development and Remedial Strategies" at Conference on "Responding to the crisis…Partnering for Violence Prevention" Summit Country Children Services. April 16, 2002

"Terrorism, Trauma and Treatment Options" for the S. Michigan branch of the International Society for the Study of Dissociation Annual Conference Livonia Michigan. April 12, 2002.

Public Radio WNYC: 20 minute interview on psychiatric impact of WTC Disaster, 1/18/02.

"Healing a Traumatized City", invited speaker at the symposium on "The Trauma of Terror in Children", Dec 1, 2001 sponsored by the Southern California Society of Child and Adolescent Psychiatry and the Southern California Psychiatric Society.

NY1 Television: 1 hour interview program on psychiatric impact of WTC Disaster, 12/19/01.

Disaster Recovery: Worked with CEOs and HR to help companies recover from Sept 11, 2001 disaster. Also gave presentations to groups of 5 to 170 workers: First American Title, NYC, Sept. 14; Costa Kondylis, NYC, Sept 14; Credit Lyonnais, NYC Sept 21; Financial Models, NYC, Sept 21; Coalition for the Homeless. Oct 3; Sadlier Publishing Oct 4; Queller, Fisher, Dienst Oct 10; Village Voice, Oct 17; May Davis Investment Bank, Nov. 5; NY Life Nov 12; Jacqueline Onassis H.S., Oct 19; PS 89, Nov 6; H.S. of Economics and Finance Nov 14, 2001.

"Juvenile Delinquency" invited speaker, Tri-State Forensic Psychiatry Review Course, 3/2/01.

Chairman of panel on "Political Psychology and War", annual meeting of the International Society of Political Psychology, Washington, DC 6/21/85.

"Altered Metabolic States and Decision-Making", annual meeting of the International Society of Political Psychology, Toronto 6/25/84.

Discussant on papers on the "Effects of Alcohol and Drugs on Leadership Behavior", annual meeting of the International Society of Political Psychology, Toronto 6/27/84.

11

## ORGANIZATIONAL AFFILIATIONS

| | |
|---|---|
| 2004-present | Consultant to Association of the Bar of the City of NY Children and Law Committee |
| 2007-present | Consultant to Accountability Review Panel of NYC Administration for Children's Services |
| 2008-present | Member of the Forensic Panel (forensic psychiatrists who peer review their cases) |
| 2007-present | Giveanhour-offering services to war veterans needing PTSD treatment |
| 2005-2006 | Disaster and Trauma Issues Committee of Am Acad of Child and Adolescent Psych |
| 2006-present | Dept of Child Psychiatry, NYU School of Medicine |
| 2004-present | Dept of Psychiatry, Mt Sinai School of Medicine |
| 2004-2006 | American Academy of Child and Adolescent Psychiatry |
| 2004-2005 | NY State Interdisciplinary Forum on Mental Health and Family Law |
| 2004-present | Consultation Cadre of the School Mental Health Project of UCLA |
| 2003-present | Consortium for Research on Emotional Intelligence in Organizations |
| 2002-2004 | Senior Consultant on Psychoeducation and Program Development, Center for Social and Emotional Education (www.csee.net) |
| 2002-2003 | Senior Researcher, Center on Terrorism and Public Safety. John Jay College, CUNY |
| 2003-2005 | Consultant to International Relations and Terrorism Committees of the Group for the Advancement of Psychiatry |
| 2002-2004 | Manhattan Task Force to End Child Abuse and Domestic Violence |
| 2001-2003 | National Child Traumatic Stress Network |
| 2001-2003 | New York Times Consortium for Effective Trauma Treatment |
| 1985-1991 | Institute of Social and Behavioral Pathology, fellow. |
| 1981-1988 | American Psychiatric Association, member. |
| 1983-1987 | International Society of Political Psychology, member. |
| 1982- present | Yale Edward Zigler Center in Child Development and Social Policy |

## AWARDS

| | |
|---|---|
| 1990-1991 | Harvard-MacArthur Scholar in International Security. |

12

*Roy Lubit CV page 12*

ORGANIZATIONAL DEVELOPMENT EXPERIENCE

1999-2001    Consulted to: Mitsubishi, Delta Airlines, PricewaterhouseCoopers, Morgan Stanley, Sadlier Publishing, First American Title, Costa Kondylis, Credit Lyonnais, Financial Models, Coalition for the Homeless.

1999-2001    Management consultant in PricewaterhouseCoopers' Strategic and Organizational Change practice.

1997-1998    Visiting Scholar at Columbia Business School, New York, NY.

1997    Ph.D. in Political Science, GSAS, Harvard University, Cambridge.
Ph.D. dissertation on the role of learning and politics in organizational change.

TEACHING EXPERIENCE

2005-    Supervisor for residents in child psychiatry, NYU School of Medicine Department of Psychiatry

2003-2004    Supervisor for residents in child psychiatry and medical students at Mount Sinai School of Medicine

2001-2003    Supervisor for residents in psychiatry at St. Vincent's Hospital.

2001    Adjunct Assistant Professor, Zicklin School of Business, New York, NY.
Taught course on Managerial and Leadership Skills in the MBA program.

1990-1996    Teaching fellow at Harvard University, for International Conflicts in the Modern World, Ethics and International Relations, Europe After 1945, and The Stalin Era.

1998    Teaching assistant at Columbia Business School, for Organizational Behavior and Building the Learning Organization.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 57256693
Status as of 9/18/2021 3:07 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mark Bankston | 24071066 | mark@fbtrial.com | 9/15/2021 9:30:00 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 9/15/2021 9:30:00 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 9/15/2021 9:30:00 AM | SENT |

Filed in The District Court
of Travis County, Texas

AR    SEP 27 2021
At    3:30    P M.
Velva L. Price, District Clerk

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |

## ORDER ON PLAINTIFFS' MOTION TO COMPEL AND MOTION FOR SANCTIONS

On this day, the Court considered Plaintiffs' Motion to Compel and Motion for Sanctions. The Court finds that the motions should be granted.

### BACKGROUND

On May 29, 2018, Plaintiffs served written discovery on Defendant Free Speech Systems, LLC. Twenty-eight days after service of the requests, Defendants filed a TCPA Motion, which was subsequently denied and appealed. Following remand, Defendants failed to provide responses.

One month after remand, on July 2, 2021, Plaintiffs wrote to the Defendants inquiring about the overdue responses. Plaintiffs offered an additional 14 days for Defendants to provide responses, in which case Plaintiffs agreed to waive any complaint about their timeliness. That same day, Defendants' counsel requested that Plaintiffs' counsel provide a copy of the *Pozner* discovery requests. More than three

weeks later, on July 27, 2021, with no responses provided, Plaintiffs brought the instant motion. Defendants have never answered the discovery requests.

## FINDINGS

The Court find that Defendants unreasonably and vexatiously failed to comply with their discovery duties. The Court finds that Defendants' failure to comply with discovery in this case is greatly aggravated by Defendants' consistent pattern of discovery abuse throughout the other similar cases pending before this Court. Prior to this latest discovery failure, Defendants repeatedly violated this Court's discovery orders in *Lewis v. Jones, et al.* (D-1-GN-18-006623), *Heslin v. Jones, et al.* (D-1-GN-18-001835), and *Heslin v. Jones, et al.*[1] (D-1-GN-18-004651), all of which are related cases involving Defendants' publications about the Sandy Hook Elementary School shooting. Defendants also failed to timely answer discovery in *Fontaine v. InfoWars, LLC, et al.* (D-1-GN-18-1605), a similar defamation lawsuit involving Defendants' publications about the Stoneman Douglas High School shooting. The Court also notes that Defendants have repeatedly violated discovery orders in *Lafferty v. Jones,* a similar defamation lawsuit brought by a different set of Sandy Hook parents in the Superior Court of Connecticut. The Court finds that Defendants' discovery conduct in this case is the result of flagrant bad faith and callous disregard for the responsibilities of discovery under the rules.

---

[1] Subsequently consolidated with D-1-GN-18-001835.

It is clear to the Court that discovery misconduct is properly attributable to the client and not the attorney, especially since Defendants have been represented by seven attorneys over the course of the suit. Regardless of the attorney, Defendants' discovery abuse remained consistent.

For these reasons, it is accordingly ORDERED that sanctions be assessed Defendants, including the following remedies allowed under Rule 215:

( )    an order disallowing any further discovery of any kind by the Defendants.

( )    an order charging all of the expenses of discovery or taxable court costs against the Defendants;

( )    an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order; to wit,

_____

_____

_____.

( )    an order refusing to allow the Defendants to support or oppose designated claims or defenses, or prohibiting them from introducing designated matters in evidence.

☒    a judgment by default against the Defendants, as this Court has considered less sanctions and determined they would be inadequate to cure the

3

violation in light of the history of Defendants' conduct in this Court. In reaching its decision, this Court has considered lesser remedies before imposing sanctions that preclude Defendants' ability to present the merits of their liability defense. However, the Court has more than a sufficient record to conclude that an escalating series of judicial admonishments, monetary penalties, and non-dispositive sanctions have all been ineffective at deterring the abuse. This Court rejects lesser sanctions because they have proven ineffective when previously ordered. They would also benefit Defendants and increase the costs to Plaintiffs, and they would not adequately serve to correct the Defendants' persistent discovery abuses. Furthermore, in considering whether lesser remedies would be effective, this Court has also considered Defendants' general bad faith approach to litigation, Mr. Jones' public threats, and Mr. Jones' professed belief that these proceedings are "show trials."

It is further ORDERED that Defendants shall pay reasonable attorney's fees in connection with Plaintiffs' Motion. Plaintiffs shall submit evidence regarding the reasonable value of the time expended by their attorneys related to their Motion.

Dated **September 27**, 2021.

Hon. Maya Guerra Gamble

10/11/2021 4:48 PM
**Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Gilberto Diaz Rios**

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | 459th DISTRICT COURT |

---

### PLAINTIFFS' MOTION TO MODIFY SEPTEMBER 27, 2021 ORDER

Plaintiffs files this Motion to Modify the Court's September 27, 2021 Order, and would show the Court as follows:

### ARGUMENT

Plaintiffs' original proposed order, submitted to the Court prior to the hearing, did not account for events following the hearing. As such, if the following facts were relevant to the Court's decision, Plaintiffs request this paragraph be included in the Order:

> On August 30, 2021, the day prior to the scheduled hearing, Defendants filed a Response assuring the Court that discovery would be provided, and they asked for 14 days before determining if sanctions were warranted. The following day at oral hearing, Defendants repeated this assurance. Three weeks later, on September 23, 2021, Plaintiffs' counsel notified the Court that no discovery responses had been provided.

Plaintiffs anticipate that Defendants will appeal the Court's Order at some point. Given the importance of the Order, Plaintiffs hope to ensure that it reflects all the conduct considered by the Court, including the post-hearing failure to provide discovery. If the Court did not consider these post-hearing events, Plaintiffs recognize that their Motion should be summarily denied.

A motion to modify, correct, or reform a judgment is permitted under Tex. R. Civ. P. 329b(g). Plaintiffs' motion is timely because it is being filed within 30 days of the court's judgment. *DeGroot v. DeGroot*, 260 S.W.3d 658, 662 (Tex. App.—Dallas 2008, no pet.). Here, if the post-hearing failure to provide discovery was considered by the Court making its decision, then there is good cause for the modification.

### PRAYER

Plaintiffs pray that this Court grant their Motion to Modify and enter an Amended Order consistent with "Exhibit 1."

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____
MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

## CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with Defendants' counsel of record and confirmed that Defendants are opposed to this motion.

_____
MARK D. BANKSTON

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2021 the forgoing document was served upon all counsel of record via electronic service.

_____
MARK D. BANKSTON

# D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |

## AMENDED ORDER ON PLAINTIFFS' MOTION TO COMPEL AND MOTION FOR SANCTIONS

On this day, the Court considered Plaintiffs' Motion to Compel and Motion for Sanctions. The Court finds that the motions should be granted.

### BACKGROUND

On May 29, 2018, Plaintiffs served written discovery on Defendant Free Speech Systems, LLC. Twenty-eight days after service of the requests, Defendants filed a TCPA Motion, which was subsequently denied and appealed. Following remand, Defendants failed to provide responses.

One month after remand, on July 2, 2021, Plaintiffs wrote to the Defendants inquiring about the overdue responses. Plaintiffs offered an additional 14 days for Defendants to provide responses, in which case Plaintiffs agreed to waive any complaint about their timeliness. That same day, Defendants' counsel requested that Plaintiffs' counsel provide a copy of the *Pozner* discovery requests. More than three

weeks later, on July 27, 2021, with no responses provided, Plaintiffs brought the instant motion.

On August 30, 2021, the day prior to the scheduled hearing, Defendants filed a Response assuring the Court that discovery would be provided, and they asked for 14 days before determining if sanctions were warranted. The following day at oral hearing, Defendants repeated this assurance. Three weeks later, on September 23, 2021, Plaintiffs' counsel notified the Court that no discovery responses had been provided.

## FINDINGS

The Court find that Defendants unreasonably and vexatiously failed to comply with their discovery duties. The Court finds that Defendants' failure to comply with discovery in this case is greatly aggravated by Defendants' consistent pattern of discovery abuse throughout the other similar cases pending before this Court. Prior to this latest discovery failure, Defendants repeatedly violated this Court's discovery orders in *Lewis v. Jones, et al.* (D-1-GN-18-006623), *Heslin v. Jones, et al.* (D-1-GN-18-001835), and *Heslin v. Jones, et al.*[1] (D-1-GN-18-004651), all of which are related cases involving Defendants' publications about the Sandy Hook Elementary School shooting. Defendants also failed to timely answer discovery in *Fontaine v. InfoWars, LLC, et al.* (D-1-GN-18-1605), a similar defamation lawsuit involving Defendants' publications about the Stoneman Douglas High School shooting. The Court also notes

---

[1] Subsequently consolidated with D-1-GN-18-001835.

that Defendants have repeatedly violated discovery orders in *Lafferty v. Jones,* a similar defamation lawsuit brought by a different set of Sandy Hook parents in the Superior Court of Connecticut. The Court finds that Defendants' discovery conduct in this case is the result of flagrant bad faith and callous disregard for the responsibilities of discovery under the rules.

It is clear to the Court that discovery misconduct is properly attributable to the client and not the attorney, especially since Defendants have been represented by seven attorneys over the course of the suit. Regardless of the attorney, Defendants' discovery abuse remained consistent.

For these reasons, it is accordingly ORDERED that sanctions be assessed Defendants, including the following remedies allowed under Rule 215:

( )    an order disallowing any further discovery of any kind by the Defendants.

( )    an order charging all of the expenses of discovery or taxable court costs against the Defendants;

( )    an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order; to wit,

_____

_____

_____.

( )   an order refusing to allow the Defendants to support or oppose designated claims or defenses, or prohibiting them from introducing designated matters in evidence.

( **X** )   a judgment by default against the Defendants, as this Court has considered lesser sanctions and determined they would be inadequate to cure the violation in light of the history of Defendants' conduct in this Court. In reaching its decision, this Court has considered lesser remedies before imposing sanctions that preclude Defendants' ability to present the merits of their liability defense. However, the Court has more than a sufficient record to conclude that an escalating series of judicial admonishments, monetary penalties, and non-dispositive sanctions have all been ineffective at deterring the abuse. This Court rejects lesser sanctions because they have proven ineffective when previously ordered. They would also benefit Defendants and increase the costs to Plaintiffs, and they would not adequately serve to correct the Defendants' persistent discovery abuses. Furthermore, in considering whether lesser remedies would be effective, this Court has also considered Defendants' general bad faith approach to litigation, Mr. Jones' public threats, and Mr. Jones' professed belief that these proceedings are "show trials."

It is further ORDERED that Defendants shall pay reasonable attorney's fees in connection with Plaintiffs' Motion, which are being awarded by separate order.

Dated _____, 2021.

_____
Hon. Maya Guerra Gamble

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 58077118
Status as of 10/21/2021 3:40 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 10/11/2021 4:48:44 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/11/2021 4:48:44 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/11/2021 4:48:44 PM | SENT |

No. **D-1-GN-18-001842**

Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Sandra Santos

| | | |
|---|---|---|
| LEONARD POZNER AND | : | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | : | |
| | : | |
| vs. | : | TRAVIS COUNTY, TEXAS |
| | : | |
| ALEX E. JONES, INFOWARS, LLC, | : | |
| AND FREE SPEECH SYSTEMS, LLC | : | 345TH JUDICIAL DISTRICT |

## NOTICE OF DELIVERY

RE: **Agape Therapy Institute (Medical/Psychiatric)**

I, _____**Cris Garza**_____, Notary Public in and for the State of Texas, hereby certify pursuant to the Rule 203, Texas Rules of Civil Procedure,

1. That this Deposition by Written Questions of **Susan Deane**, the Custodian of Records for the above named is a true and exact duplicate of the records pertaining to **Leonard Pozner**, given by the witness named herein, after said witness was duly sworn by **Amanda Barngrover** ;

2. That the transcript is a true record of the testimony given by the witness;

3. That $ **259.65** is the charge for the preparation of the completed Deposition by Written Questions and any copies of exhibits, charged to Attorney for **Plaintiff, Mark D. Bankston, TBA # 24001430;**

4. **That the deposition transcript was submitted on 09/11/2021 9:00AM.** to the witness for examination, signature and return to the officer by a specified date;

5. That changes, if any made by the witness, in the transcript and otherwise are attached thereto or incorporated therein;

6. That the witness returned the transcript;

7. That the original deposition by Written Questions and a copy thereof, together with copies of all exhibits was delivered to **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 1117 Herkimer Street Houston**, 77008 who Noticed the first questions for safekeeping and use at trial;

8. That pursuant to information made a part of the records at the time said testimony was taken, the following includes all parties of record:
   **Bradley Reeves (Reeves Law, PLLC) 512-318-2484**
   **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 713-221-8301**
and
9. A copy of this Notice of Delivery was served on all parties shown herein.

GIVEN UNDER MY HAND AND SEAL OF OFFICE ON 09/24/2021 .

**Discovery Resource**
**1511 West 34th Street**
**Houston, TX 77018**
**713-223-3300 Fax713-228-3311**



Notary Public in and for the State of Texas

93512.007

CRIS GARZA
MY COMMISSION EXPIRES
JUNE 23, 2025
NOTARY ID: 126941309

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 58046125
Status as of 10/22/2021 2:13 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 10/10/2021 5:50:12 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/10/2021 5:50:12 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/10/2021 5:50:12 PM | SENT |

No.  D-1-GN-18-001842

10/11/2021 12:00 AM

Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Sandra Santos

| | | |
|---|---|---|
| **LEONARD POZNER AND** | : | IN THE DISTRICT COURT OF |
| **VERONIQUE DE LA ROSA** | : | |
| | : | |
| **vs.** | : | TRAVIS COUNTY, TEXAS |
| | : | |
| **ALEX E. JONES, INFOWARS, LLC,** | : | |
| **AND FREE SPEECH SYSTEMS, LLC** | : | 345TH JUDICIAL DISTRICT |

## NOTICE OF DELIVERY

RE:  **Agape Therapy Institute (Billing)**

I, __**Cris Garza**__, Notary Public in and for the State of Texas, hereby certify pursuant to the Rule 203, Texas Rules of Civil Procedure,

1.  That this Deposition by Written Questions of **Susan B. Deane**, the Custodian of Records for the above named is a true and exact duplicate of the records pertaining to **Leonard Pozner**, given by the witness named herein, after said witness was duly sworn by____**Amanda Barngrover**____;

2.  That the transcript is a true record of the testimony given by the witness;

3.  That $ **191.00** is the charge for the preparation of the completed Deposition by Written Questions and any copies of exhibits, charged to Attorney for **Plaintiff**, Mark D. Bankston, TBA # 24001430;

4.  **That the deposition transcript was submitted on  09/11/2021 9:00AM.** to the witness for examination, signature and return to the officer by a specified date;

5.  That changes, if any made by the witness, in the transcript and otherwise are attached thereto or incorporated therein;

6.  That the witness returned the transcript;

7.  That the original deposition by Written Questions and a copy thereof, together with copies of all exhibits was delivered to **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 1117 Herkimer Street Houston, 77008** who Noticed the first questions for safekeeping and use at trial;

8.  That pursuant to information made a part of the records at the time said testimony was taken, the following includes all parties of record:
   **Bradley Reeves (Reeves Law, PLLC) 512-318-2484**
   **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 713-221-8301**
and
9.  A copy of this Notice of Delivery was served on all parties shown herein.

GIVEN UNDER MY HAND AND SEAL OF OFFICE ON  09/22/2021 .

**Discovery Resource**
**1511 West 34th Street**
**Houston, TX 77018**
**713-223-3300 Fax713-228-3311**



Notary Public in and for the State of Texas

93512.008

CRIS GARZA
MY COMMISSION EXPIRES
JUNE 23, 2025
NOTARY ID: 126941309

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 58046125
Status as of 10/22/2021 2:13 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 10/10/2021 5:50:12 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/10/2021 5:50:12 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/10/2021 5:50:12 PM | SENT |

10/22/2021 3:43 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Jessica A. Limon

## CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 261st JUDICIAL DISTRICT |

## CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## <u>DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO CONSOLIDATE</u>

Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

(collectively "Defendants"), file this response to Plaintiffs' Motion to Consolidate, and would show unto the Court as follows:

**SUMMARY OF RESPONSE**

The Court should deny Plaintiffs' motion to consolidate these cases. The Court should decline to consolidate these matters, because doing so would undoubtedly compromise Defendants' rights to a fair trial, cause extreme prejudice to Defendants, and almost certainly create a significant risk that an unfair outcome against Defendants would occur because of prejudice. *See In re Gulf Coast Bus. Dev. Corp.,* 247 S.W.3d 787, 794-95 (Tex. App.—Dallas 2008, orig. proceeding); *see also* TEX. R. CIV. P. 174. Plaintiff's motion to consolidate basically confirms that such prejudice is inevitable. Despite Plaintiffs' asserting claims with either 1 or 2-year statutes of limitations (defamation versus intentional infliction of emotional distress), Plaintiffs' motion telegraphs that they believe they are entitled to parade "the entire five years of InfoWars' recklessly false statements" in front of a single jury, pulling at heartstrings in the hopes of landing a massive exemplary-damages verdict. *See* Mtn. at 2.

The intense nature of the Plaintiffs' claims against Defendants clearly demonstrate that consolidation would result in a manifest injustice against Defendants and violate their right to a fair trial. Moreover, certain Plaintiffs' claims, particularly the IIED claims, require proof of specific intent to inflict emotional distress on a particular Plaintiff, not general claims that statements were made regarding a group that constitute IIED as to individuals in that group. Even if commonality of certain facts in these various cases points to consolidation being convenient, those convenience factors are substantially outweighed by the risk of an unfair outcome against Defendants because of the extreme prejudice Defendants would face, particularly in the context of the claims in this lawsuit. Thus, the Court should decline to consolidate these cases and deny

2

Plaintiff's motion to consolidate.

**LEGAL STANDARD**

Consolidation of cases is governed by Rule 174 of the Texas Rules of Civil Procedure,

which provides:

> (a) Consolidation. When actions involving a common question of
> law or fact are pending before the court, it may order a joint hearing
> or trial of any or all the matters in issue in the actions; it may order
> all the actions consolidated; and it may make such orders concerning
> proceedings therein as may tend to avoid unnecessary costs or delay.

TEX. R. CIV. P. 174(a). Although TEX. R. CIV. P. 174 gives the trial court broad discretion to

consolidate cases, the trial court's discretion is not unlimited. *In re Shell Oil Co.,* 202 S.W.3d 286,

290 (Tex. App.—Beaumont 2006, no pet.) (orig. proceeding) (citing *Womack v. Berry,* 291 S.W.2d

677, 683 (Tex. 1956)). As stated by the Texas Supreme Court in *Womack*:

> The express purpose of the rule is to further convenience and avoid
> prejudice, and thus promote the ends of justice. When all of the facts
> and circumstances of the case unquestionably require a separate trial
> to prevent manifest injustice, and there is no fact or circumstances
> supporting or tending to support a contrary conclusion, and the legal
> rights of the parties will not be prejudiced thereby, there is no room
> for the exercise of discretion.

*Womack,* 291 S.W.2d at 683. Courts must balance the judicial economy and convenience that may

be gained by consolidation against the possibility that consolidation may cause delay, prejudice,

or jury confusion. *In re Shell Oil Co.,* 202 S.W.3d at 290 (citing *Dai-Briar Corp. v. Baskette,* 833

S.WW.2d 612, 615 (Tex. App.—El Paso 1992, no writ)). "If the convenience factors are

substantially outweighed by the risk of an unfair outcome because of prejudice or confusion, then

the trial court abuses its discretion in granting consolidation." *Id.* at 616. The dominant

consideration is whether the trial will be fair and impartial to all parties. *In re Ethyl Corp.,* 975

S.W.2d 600, 614-15 (Tex. 1998). If consolidation will prejudice the complaining party, the trial

court should not consolidate. *Gulf Coast,* 247 S.W.3d at 794-95. These lawsuits are the precise type of "extraordinary" cases that should preclude consolidation due to the extreme risk of prejudice to Defendants. Moreover, these cases do not truly involve the same "transactions" and consolidation would also lead to juror confusion as it pertains to damages of these individual plaintiffs. As such, the Court should deny Plaintiffs' motion to consolidate.

## ARGUMENT AND AUTHORITIES

**1)      The Claims Do Not Relate to the Same Transaction.**

Plaintiff's motion fails to provide any actual evidence to support its conclusory contention that the Plaintiffs' claims relate to the same transaction. The only "support" for this argument is Plaintiffs' bald assertion that "the five years of InfoWars' conduct is admissible in each case for the purposes of assessing punitive damages" and the unsupported contention that "the expert testimony offered for each claim will be largely duplicative." *See* Mtn. at 3. It should be noted that Plaintiffs incorrectly presume they are entitled to seek and obtain exemplary damages due to the current liability default-judgment orders from the Court. Yet, Plaintiffs are not actually entitled to seek exemplary damages, even with the Court's default judgment rulings. While Plaintiffs have asserted defamation and IIED claims, the *gravamen* of their claims is for defamation—meaning the IIED claims should be dismissed because IIED is merely a "gap filler" when no other remedy is available. *Creditwatch, Inc. v. Jackson,* 157 S.W.3d 814, 816 (Tex. 2005) (Holding that "intentional infliction of emotional distress is a 'gap filler' tort never meant to supplant or duplicate existing statutory or common-law remedies.").

Plaintiffs' pleadings clearly demonstrate that the IIED claims are dependent upon the allegedly defamatory statements and conduct of Defendants. In other words, the "extreme and outrageous conduct [Defendants] are alleged to have engaged in is making allegedly defamatory

4

statements about Plaintiffs. *Patel v. Patel,* No. 14-18-00771-CV, 2020 WL 2120313, at *19 (Tex. App.—Houston [14th Dist.] May 5, 2020, no pet.). Here, because Plaintiffs' IIED claims depend on the allegedly defamatory statements of Defendants, Plaintiffs have another remedy, and thus the IIED claims are not available to them. This is important because since the only real claims Plaintiffs have are for defamation, whether they are entitled to seek exemplary damages is governed by the Texas Defamation Mitigation Act ("TDMA"). *See* TEX. CIV. PRAC. & REM. CODE §73.051. Under the TDMA, if a person asserting a claim for defamation does not submit a request to the Defendant(s) for a correction, clarification, or retraction within ninety (90) days of the publication of the alleged defamatory statements, then the person "may not recover exemplary damages." *Id.* at § 73.055(c).

In this case, none of these Plaintiffs ever issued a request to any of the Defendants for a correction, clarification, or retraction within the requisite time period provided under the law. As a result, Plaintiffs are not entitled to seek exemplary damages, and thus there is no commonality of damages between the Plaintiffs, since they must each prove their own individual, unique actual damages. Therefore, consolidation of these cases into a singular trial should not occur because each Plaintiff's alleged damages and the source of those alleged damages is distinct from the other Plaintiffs. In fact, the only commonality pointed to by Plaintiffs as a basis for consolidation is that the alleged "five years of Infowars' conduct is admissible in each case for the purpose of assessing punitive damages,"[1] so absent any ability to recover exemplary damages (due to preclusion under the TDMA), there is insufficient commonality as to each Plaintiff's alleged damages to support consolidation.

---

[1] It should be noted that Plaintiffs are in no way entitled to present evidence of alleged conduct that occurred outside of the applicable limitations periods—1 year for defamation, and 2 years for IIED. But what is clear is that Plaintiffs and their counsel fully intend on doing so purely for the purpose of inflaming a jury and prejudicing Defendants to such an extent that Defendants would not receive a fair trial.

As the movants seeking consolidation, Plaintiffs have the evidentiary burden to establish commonality of law or facts sufficient to support consolidation. Yet Plaintiffs have provided no actual evidence of commonality beyond mere conclusory statements in their motion which certainly does not constitute evidence under Texas law. Because there is insufficient commonality between the Plaintiff's claims, and more specifically commonality as to the actual damages allegedly incurred by each Plaintiff, consolidation is simply not supported such that the Court should deny Plaintiffs' motion.

**2)     Defendants would and will suffer extreme prejudice and manifest injustice to such an extent that Defendants would not receive a fair trial if these matters are consolidated.**

While it may be more convenient to try these cases together, the extreme risk of prejudice to Defendants should preclude the Court consolidating these matters for trial. "In deciding whether to consolidate, the trial court must balance the judicial economy and convenience that may be gained by consolidation against the risk of an unfair outcome because of prejudice or jury confusion." *Owens-Corning Fiberglas Corp. v. Martin,* 942 S.W.2d 712, 716 (Tex. App.—Dallas 1997, no writ). Plaintiffs laughably contend that there is only a "trivial risk of prejudice" to Defendants if consolidation were to occur, when Plaintiffs and their counsel know all too well that the chances of Plaintiffs obtaining a significant damages verdict would be significantly increased if these matters were consolidated, since it would not force the Plaintiffs to approach their claims and damages individually, but rather would allow them to paint with broad strokes and blend the experiences of each Plaintiff together to inflame and anger the jury to the extreme prejudice of Defendants.

Here, any convenience factors for consolidation are substantially outweighed by the risk of an unfair outcome because of prejudice or confusion. *In re Levi Strauss Co.,* 959 S.W.3d 700, 702 (Tex. App.—El Paso 1998, no writ). Consolidation of these matters would be improper

because the individual Plaintiffs each allege they were harmed by different acts of Defendants—they do not all allege to have been injured by a single act of the Defendants. *Id.* at 703. In addition, because of the varying claims between the Plaintiffs and their distinct alleged damages, prejudice in the form of potential jury confusion is also extremely likely. *Id.; see also Dal-Briar,* 833 S.W.2d 612.

More importantly, if the Court allows consolidation of these cases, that will allow the jury to "impermissibly 'bootstrap' the evidence from one case into the other, thereby causing confusion and prejudice to [Defendants]." *Id.* Thus, this Court should find that the potential benefits of consolidation do not outweigh the potential prejudice to Defendants, and therefore deny Plaintiffs' motion to consolidate.

Finally, the fact that the undersigned suggested consolidation for discovery purposes in no way equates to consolidation for trial being the appropriate course of action. Time and time again throughout this case, Plaintiffs' counsel has consistently used totally unrelated comments by counsel to mislead the Court and to justify whatever goal Plaintiffs' counsel has at that time. A review of the email attached as an exhibit to Plaintiffs' motion—the only "evidence" provided by Plaintiffs in support of their motion to consolidate—clearly shows that only discovery inefficiencies were being discussed. There is not one mention of the cases being consolidated for all purposes, including trial. And the logic and benefits that would have been gained has Plaintiffs agreed to consolidate discovery are obvious. But the Court should not allow Plaintiffs—who were opposed to consolidation of discovery and used that to their advantage to obtain default-judgment rulings—to now completely reverse their position to consolidate these matters for trial.

All in all, the tremendous risk of prejudice and manifest injustice to Defendants, and the high likelihood that Defendants would not receive a fair trial in violation of their rights. If this

Court were to consolidate these matters, Defendants would face an imminent loss of substantial rights that could not be cured by ordinary appellate remedies. Instead, the jury will simply return a verdict upon each claim, and whether jurors reached any individual verdict because of evidence admitted as relevant to another case; or whether jurors believed that because four plaintiffs alleged the same wrongs, there must be some misdeeds by Defendants based upon sheer numbers; or whether the jury simply hesitated to return a verdict for one plaintiff without finding for all four, will never be ascertainable. Thus, the possibility of obtaining meaningful appellate review on the propriety of consolidation would be negligible and almost uncurable. *See* Dal-Briar, 833 S.W.2d at 617.

An unbiased review of the balance of judicial economy and convenience gained by consolidation against the possibility of delay, prejudice, or jury confusion caused by consolidation in this situation unequivocally demonstrates that the convenience factors are substantially outweighed by the risk of an unfair outcome because of prejudice or confusion. *Id.* at 616. Consolidation would almost certainly lead to the trial being patently unfair to Defendants and entirely partial to Plaintiffs. Because the consideration of whether the resultant trial will be fair and impartial to all parties is the "dominant consideration in consolidation, the only appropriate outcome of this motion is for the Court to deny Plaintiffs' motion to consolidate. *In re Ethyl Corp.,* 975 S.W.2d at 614-15.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants ask the Court to conduct the appropriate balancing analysis and recognize that there is truly no discretion here—the Court must deny Plaintiffs' motion to consolidate these three (3) separate lawsuits to avoid the substantial prejudice and manifest injustice Defendants will face if consolidation is granted. As such,

Defendants pray the Court deny Plaintiffs' motion to consolidate these cases for trial, along with such other and further relief to which Defendants may be justly entitled.

Dated: October 22, 2021.

Respectfully submitted,

By: ___/s/ Bradley J. Reeves_____ _
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 22, 2021.

Mark Bankston                                    *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

                                    */s/ Bradley J. Reeves*
                                    Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58466986
Status as of 10/26/2021 8:05 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Bradley Reeves | | brad@brtx.law | 10/22/2021 3:43:13 PM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 10/22/2021 3:43:13 PM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 10/22/2021 3:43:13 PM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 10/22/2021 3:43:13 PM | SENT |
| Mark Bankston | 24071066 | mark@fbtrial.com | 10/22/2021 3:43:13 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/22/2021 3:43:13 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/22/2021 3:43:13 PM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 261st JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

**[PROPOSED] ORDER ON PLAINTIFFS' MOTION TO CONSOLIDATE**

On the 25th day of October, 2021, came to be heard Plaintiffs' Motion to Consolidate. The Court, having considered the Motion, Defendants' response thereto, along with the arguments of counsel, finds that the risk of an unfair outcome because of prejudice or confusion substantially outweighs the convenience factors of consolidating these cases. As such, the Court hereby DENIES Plaintiffs' Motion to Consolidate. It is therefore:

ORDERED that Plaintiffs' Motion to Consolidate is hereby DENIED in its entirety.

SIGNED ON THIS THE _____ DAY OF _____, 2021.

_____
HONORABLE JUDGE MAYA GUERRA GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

**REEVES LAW, PLLC**

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
702 Rio Grande St., Suite 203
Austin, TX 78701
brad@brtx.law
Telephone:       (512) 827-2246
Facsimile:       (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58466986
Status as of 10/26/2021 8:05 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Bradley Reeves | | brad@brtx.law | 10/22/2021 3:43:13 PM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 10/22/2021 3:43:13 PM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 10/22/2021 3:43:13 PM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 10/22/2021 3:43:13 PM | SENT |
| Mark Bankston | 24071066 | mark@fbtrial.com | 10/22/2021 3:43:13 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/22/2021 3:43:13 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/22/2021 3:43:13 PM | SENT |

10/25/2021 9:19 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Nancy Rodriguez

## CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 261st JUDICIAL DISTRICT |

## CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## <u>DEFENDANTS' RESPONSE TO PLAINTIFFS'<br>MOTION FOR LEAVE TO CONDUCT NET WORTH DISCOVERY</u>

Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

(collectively "Defendants"), file this response to Plaintiffs' Motion for Leave to Conduct Net Worth Discovery, and would show unto the Court as follows:

### RESPONSE

Plaintiffs' motion for net-worth discovery should be denied as they have not shown themselves to be entitled to exemplary damages as required by Texas law. For a party to be entitled to net-worth discovery, they must demonstrate a substantial likelihood of success on the merits of a claim for exemplary damages. *See* TEX. CIV. PRAC. & REM. CODE §41.0115. Despite Plaintiffs' contentions to the contrary, the fundamental legal issue of whether Plaintiffs' claims for intentional infliction of emotional distress ("IIED") are viable in the face of their defamation claims for the same alleged actions should preclude this Court from ordering net-worth discovery. The *gravamen* of Plaintiffs' claims is indeed for defamation, meaning that their IIED claims should be dismissed because IIED is merely a "gap filler" when no other remedy is available. *Creditwatch, Inc. v. Jackson,* 157 S.W.3d 814, 816 (Tex. 2005). Plaintiffs' pleadings clearly demonstrate that the IIED claims are dependent upon allegedly defamatory statements and conduct of Defendants. In other words, the "extreme and outrageous conduct [Defendants] are alleged to have engaged in is making allegedly defamatory statements about Plaintiffs." *Patel v. Patel,* No. 14-18-00771-CV, 2020 WL 2120313, at *19 (Tex. App.—Houston [14th Dist.] May 5, 2020, no pet.).

Here, because Plaintiffs' IIED claims depend on the allegedly defamatory statements of Defendants, Plaintiffs have another remedy, and thus these IIED claims should not be available to them. This is important, particularly in the context of the instant motion, because since the only truly viable claims are for defamation, whether Plaintiffs are entitled to seek exemplary damages is governed by the Texas Defense Mitigation Act ("TDMA"). *See* TEX. CIV. PRAC. & REM. CODE §73.051. Under the TDMA, if a person asserting a claim for defamation does not submit a request

to the Defendant(s) for a correction, clarification, or retraction within ninety (90) days of the publication of the alleged defamatory statements, then the person "may not recover exemplary damages." *Id.* at §73.055(c). In these cases, none of the Plaintiffs ever issued a request to any of the Defendants for a correction, clarification, or retraction within the requisite time period provided under the law. As such, Plaintiffs are not entitled to seek exemplary damages pursuant to the TDMA, and consequently are not entitled to conduct net-worth discovery.

Alternatively, even if the Court does find that Plaintiffs have met their burden of demonstrating a "substantial likelihood" of success on their claim for exemplary damages, the scope of the discovery Plaintiffs have requested is far too broad. For example, Plaintiffs have requested the Court order discovery for: (1) a list of all assets transferred in any manner since April 16, 2018; (2) any balance sheets or financial statements reflecting [Defendants'] net worth since April 16, 2018; (3) production of any federal or state tax returns with W-2 statements in the last five years; and (4) the vague permission for Plaintiffs "to inquire about Defendants' net worth at any future depositions." for protection is possibly one of the most bizarre motions the undersigned has seen in his legal career. All of these requests go far beyond what is allowable under Texas law. Under Texas law, with respect to net-worth discovery, generally only "financial documents pertaining to current net worth are relevant." *In re Jacobs,* 300 S.W.3d 35, 44-45 (Tex. App.—Houston [14th Dist.] 2009, orig. proceeding) (concluding trial court abused its discretion by ordering relators to produce two years of net-worth information beyond relators' current net worth); *see also In re House of Yahweh,* 266 S.W.3d 688, 673 (Tex. App.—Eastland 2008, orig. proceeding) (holding trial court erred in failing to limit discovery to relators' current balance sheets because earlier balance sheets would not be relevant to relators' current net worth). More to the point, a court "should not allow discovery of tax returns" if there are other adequate methods to

ascertain net worth. *In re Brewer Leasing, Inc.,* 255 S.W.3d 708, 714 (Tex. App.—Houston [1st Dist.] 2008, orig. proceeding); *see also In re Garth,* 214 S.W.3d 190, 194 (Tex. App.—Beaumont 2007, orig. proceeding) (trial court abuses its discretion by requiring production of tax returns when trial court's order also requires production of financial statements regarding net worth of party because tax returns are typically of little value in showing net worth since they only show assets); *see also Marcesca v. Marks,* 362 S.W.2d 299, 301 (Tex. 1962) (orig. proceeding) ("It is self-evident that the maximum protection of privacy is unattainable if trial courts [do] not exercise their discretion to safeguard from discovery those portions of income tax returns which are irrelevant and immaterial, and it is our view that failure to exercise such discretion is arbitrary action.").

A court must "scrupulously examine discovery requests for income tax returns to balance privacy rights and the pursuit of justice." *In re Vaughan,* No 13-18-00541-CV, 2019 WL 962381, at *7 (Tex. App.—Corpus Christi Feb. 27, 2019, orig. proceeding). "[T]rial courts should not allow discovery of private financial records, such as tax returns, when there are other adequate methods to ascertain" the information sought from those returns." *In re Vaughan,* 2019 WL 962381 at *5. As a result, the party seeking tax returns must show that the information "cannot be discovered through other, less-intrusive means than the income tax returns." *Id.* (citing *In re Beeson,* 378 S.W.3d 8, 13 (Tex. App.—Houston [1st Dist.] 2011, orig. proceeding)). This is because "[f]ederal income tax returns are not material if the same information can be obtained from another source." *In re Sullivan,* 214 S.W.3d 622, 624-25 (Tex. App.—Austin 2006, orig. proceeding).

Here, Plaintiffs' requests for net-worth discovery go well beyond that allowed by law. They do not seek information for Defendants' current net worth, but also seek financial information and tax returns dating back to as far as 2016. Plaintiffs are simply not entitled to this overly broad

4

scope of net-worth discovery, particularly regarding Defendants' tax returns. There are certainly ample ways for Plaintiffs to obtain this same information as to Defendants' current net worth without the need for these private tax returns being produced in discovery, and Plaintiffs have failed to carry their extreme burden demonstrating their entitlement to these tax returns.

### PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants ask the Court to deny Plaintiffs' motion for leave to conduct net-worth discovery, or in the alternative to significantly limit the scope of such net-worth discovery, along with such other and further relief to which Defendants may be justly entitled.

Dated: October 25, 2021.

Respectfully submitted,

By:   _/s/ Bradley J. Reeves_   _
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 25, 2021.

Mark Bankston                                          *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

    */s/ Bradley J. Reeves*
Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58485157
Status as of 10/27/2021 2:30 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 10/25/2021 9:19:09 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/25/2021 9:19:09 AM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/25/2021 9:19:09 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/25/2021 9:19:09 AM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants*, | § | 261st JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants*, | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants*, | § | 459th JUDICIAL DISTRICT |

**[PROPOSED] ORDER ON PLAINTIFF'S
MOTION FOR LEAVE TO CONDUCT NET-WORTH DISCOVERY**

On the 25th day of October, 2021, came to be heard Plaintiff's Motion for Leave to conduct

Net-Worth Discovery. The Court, having considered the Motion, Defendants' response thereto, along with the arguments of counsel, finds that Plaintiffs have not carried their burden and as such DENY Plaintiffs' motion. It is therefore:

ORDERED that Plaintiffs' Motion for Leave to Conduct Net Worth Discovery is hereby DENIED in its entirety.

SIGNED ON THIS THE _____ DAY OF _____, 2021.

_____
HONORABLE JUDGE MAYA GUERRA
GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

**REEVES LAW, PLLC**

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
702 Rio Grande St., Suite 203
Austin, TX 78701
brad@brtx.law
Telephone:      (512) 827-2246
Facsimile:      (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58485157
Status as of 10/27/2021 2:30 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 10/25/2021 9:19:09 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/25/2021 9:19:09 AM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/25/2021 9:19:09 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/25/2021 9:19:09 AM | SENT |

10/25/2021 9:19 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Nancy Rodriguez

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 261st JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PROTECTION REGARDING MARC RANDAZZA**

Defendants, Alex E. Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

4818-4596-0670.1

(collectively "Defendants"), file this response to Plaintiffs' Motion for Protection Regarding Marc Randazza, and would show unto the Court as follows:

<strong><span style="font-variant:small-caps">Response</span></strong>

Plaintiffs' motion for protection is possibly one of the most bizarre motions the undersigned has seen in his legal career. Despite there being absolutely no reason for this motion to have been filed, Plaintiffs' counsel felt compelled to do so in furtherance of his bizarre vendetta against Mr. Randazza. For the (brief) reasons set forth herein, the Court should deny Plaintiffs' motion for protection, and Defendants request the Court strongly consider whether Plaintiffs' counsel should be sanctioned for this frivolous, intentionally misleading, motion that serves no legitimate purpose and is simply a waste of the Court's time.

Plaintiffs' motion is nonsensical and intentionally makes statements Plaintiffs' counsel knows are false. This is just another in a series of pot-shots Plaintiffs' counsel has taken at Mr. Randazza. It is bad enough that the Court denied Mr. Randazza's *pro hac vice* admission in these cases based on some of these same dishonest accusations set forth in Plaintiffs' instant motion. Now, without any objective threat of any conduct warranting their request, Plaintiffs and their counsel want to essentially wall off Mr. Randazza from any involvement in these cases, even in a consulting-type capacity, even though there is truly no legitimate basis for Plaintiffs to have any concerns. The Court should deny Plaintiffs' motion.

First, Mr. Randazza did not violate any court orders in the *Lafferty* matter regarding confidential settlement documents. As Plaintiffs' own exhibits to their motion demonstrate, Mr. Randazza was sent a copy of certain settlement documents by an outside party completely unsolicited. Mr. Randazza then hired ethics counsel to ensure that no ethical violations occurred, and even when that counsel determined disclosure was not necessary—since the documents would

2

not be used in the case based on that court's prior order—Mr. Randazza still made the decision to inform the Court of what had occurred in the interest of full disclosure and to ensure his actions were completely above board. In fact, a federal court considering these very same allegations found that these settlement documents were received "unsolicited" and that "the Connecticut Superior did not sanction either Mr. Randazza or his firm in response to this disclosure." *See* Ex. 1, Order in *Logan Cheng v. Wengui Guo*, 20 Civ. 5678, in the United States District Court for the Southern District of New York, dated October 5, 2021. Of course, Plaintiffs' motion does not reference or include any order from the *Lafferty* court finding any violation of court orders in that case. Plaintiffs' sensationalist language implying anything to the contrary is nothing more than a misleading attempt to further bias and prejudice the Court against Defendants and their counsel.

Plaintiffs' accusation that Mr. Randazza or anyone in his office violated a protective order in *Lafferty* is equally erroneous. Plaintiffs' motion claims that Jay Wolman, an attorney with Mr. Randazza's office who is one of the counsel involved in the *Lafferty* matters, violated a protective order by filing a motion referencing deposition testimony that had just been designated as "Confidential-Attorneys Eyes Only." Yet, that is completely incorrect. Mr. Wolman, nor anyone else in Mr. Randazza's office, had anything to do with the filing of the motion complained of by Plaintiffs. That motion was filed by local counsel without the knowledge of Mr. Wolman or Mr. Randazza. Plaintiffs' claim that Mr. Randazza's office had anything to do with this alleged violation of a protective order is simply false, and regardless, this shows no meritorious basis for Plaintiffs in this case to need any sort of protection from Mr. Randazza personally.

Plaintiffs also intentionally mislead the Court in their claim that Mr. Randazza has "previously trafficked in wrongfully obtained confidential information." Just as they falsely claimed in response to Mr. Randazza's *pro hac vice* motion that was incorrectly denied by this

Court, Plaintiffs rely solely upon an arbitration award that has never been confirmed and is a legal nullity that should be given no weight by this Court. It should be noted that this same arbitration that Plaintiffs rely upon was vacated by a federal court. Moreover, Plaintiffs' own exhibits demonstrate Mr. Randazza used information he properly obtained as part of his duty to represent his clients and that he committed no misconduct. The information Plaintiffs' point to was obtained from a third party by James Grady, the person who told Mr. Randazza about this information. Grady did not disclose or suggest there was anything improper about how the information was obtained. The emails also clearly demonstrate that Mr. Randazza told Grady there would be no issues in using this information so long as it had been obtained legitimately, but that there would be problems if, for example, a hacker had obtained it. One must keep in mind that this was an email thread where Mr. Randazza planned on presenting Grady as a witness in that litigation regarding this information, where Grady was expected to testify as to his source of this information. It would have been an extremely poor maneuver for Mr. Randazza to voluntarily place a witness on the stand if he truly had any concern that the material in question was illegally obtained.

Finally, Plaintiffs again put forth falsehoods with their claim that Mr. Randazza has "already intimidated a witness in this case." Plaintiffs refer to perjurious allegations made by a pro se plaintiff and a third party who was committing the unlicensed practice of law by acting as legal counsel for Mike Postle—an accused card cheat being sued for millions for improperly obtained gambling winnings through his cheating— in *Postle v. Brill*, Case No. 34-2020-00286265 (Sacramento Cty. CA Sup. Ct.). Alexandrea Merrell of the HONR Network was lying, as Mr. Randazza did not call her a sexist slur during a call with Postle in which Merrell was impermissibly acting as legal counsel despite not having a law license. *See* Declaration of Cassidy S. Curran in

Postle v. Brill ["Curran Brill Decl."], attached as Exhibit 14 to the Reply to Response to Mr. Randazza's *Pro Hac Vice* motion. In that case, a disgruntled litigant was facing a large attorneys' fees award because of Randazza's effective advocacy. To try and discredit his fee application, Merrell and Postle lied to the court about Mr. Randazza's statements. It is also worth noting that Merrell works for one of the Plaintiffs in this case—Leonard Pozner. She committed the unlicensed practice of law, to interfere in a case that Mr. Randazza was working on, and then committed perjury—this is Plaintiffs' counsel's "source" to support their meritless motion.

Importantly, this precise situation and the allegations at issue in Plaintiffs' motion have already been reviewed by certain federal courts and ultimately been rejected. Soon after this Court denied Mr. Randazza's *pro hac vice* admission without reason, Plaintiffs' counsel—either on his own violition or at the behest of at least one of his clients, Mr. Pozner—began parading around the country and inserting themselves into any other case where Mr. Randazza had been granted admission *pro hac vice.* They succeeded in convincing certain opposing parties to move to revoke Mr. Randazza's *pro hac vice* admission based on the same lies they have stated in the instant motion. Yet, thankfully, the federal court in those matters saw through the façade of these allegations, and while the Court admonished Mr. Randazza's tone and language in some of his correspondence, the Court correctly found that the "unadjudicated charge of witness intimidation [is not] a basis for sanctioning Mr. Randazza," and it reached the "same conclusion with respect to other allegations levied against Mr. Randazza in the Texas proceeding." *See* Ex. 1.

Plaintiffs' motion should be denied. The Court has already relied upon these same allegations and lies to deny Mr. Randazza's *pro hac vice* admission in these cases. But it should not allow Plaintiffs to pre-emptively wall off Mr. Randazza—who is indeed counsel for the Defendants regardless of whether he is admitted *pro hac vice* in this Court—on the basis of pure

speculation and conjecture. There is simply no good cause for the relief Plaintiffs have requested.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Defendants ask the Court to deny Plaintiffs'

motion for protection regarding Marc Randazza, along with such other and further relief to which

Defendants may be justly entitled.

Dated: October 25, 2021.

Respectfully submitted,

By:      */s/ Bradley J. Reeves*
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 25, 2021.

Mark Bankston                                        *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

                                      */s/ Bradley J. Reeves*
                                      Bradley J. Reeves

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LOGAN CHENG,

                              Plaintiff,

                    -v.-

WENGUI GUO,

                              Defendant.

---

20 Civ. 5678 (KPF)

**ORDER**

KATHERINE POLK FAILLA, District Judge:

The Court is in receipt of the parties' submissions regarding Mr.
Randazza's *pro hac vice* admission for this case. (Dkt. #66-71). Defendant
Wengui Guo now requests that the Court revoke Mr. Randazza's admission.
(*See* Dkt. #68, 70). This Court received a similar application in another matter
in which Mr. Randazza was admitted *pro hac vice*, wherein it concluded that
Mr. Randazza had not been unforthcoming with his disclosures in his
application for *pro hac vice* admission and that the additional context provided
by the moving party's submissions did not warrant reconsideration of Mr.
Randazza's admission for that case. *See Maron* v. *The Legal Aid Society*, No. 21
Civ. 5960 (KPF), Dkt. #41 (S.D.N.Y. Oct. 4, 2021). For substantially similar
reasons, the Court declines to revoke Mr. Randazza's admission *pro hac vice* for
this case. Nonetheless, as in its decision in *Maron*, the Court again wishes to
express its concern regarding certain of Mr. Randazza's actions, including
certain allegations against him that were detailed in Defendant's submissions.
For good measure, the Court will address Defendant's arguments below.

*First*, Defendant observes that while Mr. Randazza disclosed that he was denied *pro hac vice* admission in a case pending before the Connecticut Superior Court, he failed to disclose that he was also denied *pro hac vice* admission in a parallel case pending in Texas state court. (Dkt. #68 at 1). The Court cautions Mr. Randazza to be more comprehensive in his *pro hac vice* applications going forward, but does not find that this omission warrants revocation of his admission in this matter.

*Second*, Defendant asserts that Mr. Randazza has been accused of threatening a witness in the Texas state-court proceeding. (Dkt. #68 at 2). Following the Court's review of the record in that case, it finds that Mr. Randazza's communications may be understood as expressing a concern over a potential violation of California's two-party consent law. (*See* Dkt. #68-3 at 9-10). To be sure, the Court finds Mr. Randazza's tone and language in certain of his correspondence to be wholly unbecoming of an officer of the court. Regardless, the Court does not perceive unadjudicated charges of witness intimidation to be a basis for sanctioning Mr. Randazza in the instant proceeding at this time. It reaches the same conclusion with respect to the other allegations levied against Mr. Randazza in the Texas proceeding. (*See generally* Dkt. #68-3).

*Third*, Defendant urges the Court to consider other conduct engaged in by Mr. Randazza and his law firm in the Connecticut state-court case. In particular, Defendant notes that Mr. Wolman filed a notice in the Connecticut proceeding reporting that Mr. Randazza's law firm had obtained documents

2

relating to a settlement entered into by the Connecticut plaintiffs and a former defendant in the case, after the Connecticut Superior Court issued several orders prohibiting Mr. Randazza's clients from requesting documents related to this settlement.  (Dkt. #68 at 2).  The Court has reviewed the notice, which represents that these settlement documents were "unsolicited."  (Dkt. #68-3 at 21-22).  Moreover, it appears that the Connecticut Superior Court did not sanction either Mr. Randazza or his firm in response to this disclosure.  The Court will not do so here.

*Lastly*, Defendant refers the Court to the submission of a defendant in *Maron* v. *The Legal Aid Society*, discussing the disciplinary proceedings that resulted in Mr. Randazza's twelve-month suspension by the Supreme Court of the State of Nevada in 2018.  (Dkt. #68 at 3 (referencing No. 21 Civ. 5960, Dkt. #28)).  As in *Maron*, Defendant asks the Court to consider in its entirety the amended complaint that precipitated the Nevada disciplinary proceedings. (*Id.*).  That amended complaint asserted a total of nine ethical violations against Mr. Randazza, and the matter was resolved when Mr. Randazza admitted to two of these ethical violations.  (*Id.*).  While the Court finds all of the alleged breaches of Mr. Randazza's ethical and professional obligations concerning, it declines to reconsider his *pro hac vice* admission based on unadjudicated and disputed allegations.  Mr. Randazza has already faced sanctions in multiple jurisdictions for the ethical violations to which he pleaded guilty, and the seven additional counts in the amended complaint are merely allegations to which Mr. Randazza has not admitted.  The Court does not consider the additional

3

context provided by the defendant in *Maron* to justify its revocation of Mr. Randazza's *pro hac vice* admission.

For the foregoing reasons, the Court DENIES Defendant's request for a pre-motion conference regarding his anticipated motion to revoke Mr. Randazza's *pro hac vice* admission. However, the Court should in no way be understood as condoning or trivializing any of the serious allegations contained in Mr. Randazza's disciplinary record. Mr. Randazza appears to have repeatedly toed ethical lines, and the Court remains concerned about the recency of certain allegations against Mr. Randazza. The Court reserves the right to revisit this decision if additional developments in this or other cases render it appropriate for the Court to do so.

SO ORDERED.

Dated: October 5, 2021
New York, New York

*Katherine Polk Failla*

KATHERINE POLK FAILLA
United States District Judge

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58485157
Status as of 10/27/2021 2:30 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 10/25/2021 9:19:09 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/25/2021 9:19:09 AM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/25/2021 9:19:09 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/25/2021 9:19:09 AM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants*, | § | 261st JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants*, | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants*, | § | 459th JUDICIAL DISTRICT |

## [PROPOSED] ORDER ON PLAINTIFF'S
## MOTION FOR PROTECTION REGARDING MARC RANDAZZA

On the 25th day of October, 2021, came to be heard Plaintiff's Motion for Protection

Regarding Marc Randazza. The Court, having considered the Motion, Defendants' response thereto, along with the arguments of counsel, finds that Plaintiffs' motion should be in all things DENIED. It is therefore:

ORDERED that Plaintiffs' Motion for Protection Regarding Marc Randazza is hereby DENIED in its entirety.

SIGNED ON THIS THE _____ DAY OF _____, 2021.

_____
HONORABLE JUDGE MAYA GUERRA GAMBLE

**APPROVED AS TO FORM**
**AND ENTRY REQUESTED:**

**REEVES LAW, PLLC**

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
702 Rio Grande St., Suite 203
Austin, TX 78701
brad@brtx.law
Telephone:     (512) 827-2246
Facsimile:      (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58485157
Status as of 10/27/2021 2:30 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 10/25/2021 9:19:09 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/25/2021 9:19:09 AM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 10/25/2021 9:19:09 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/25/2021 9:19:09 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/25/2021 9:19:09 AM | SENT |

10/25/2021 9:41 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Nancy Rodriguez

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants*, | § | 459th JUDICIAL DISTRICT |

## DEFENDANTS' RESPONSE TO PLAINTIFFS'
## MOTION TO MODIFY SEPTEMBER 27, 2021 ORDER

Defendants, Alex E. Jones; Infowars, LLC; and Free Speech Systems, LLC (collectively "Defendants"), file this response to Plaintiffs' Motion to Modify September 27, 2021 Order, and would show unto the Court as follows:

### RESPONSE

Plaintiffs' motion should be denied because there is no good cause or meritorious reason to modify the prior order entered by the Court—unless the Court were to modify the order to reconsider entering a default judgment on liability as to Defendants. Plaintiffs continue their track record or being "fast and loose" with the facts and are now seeking to have the Court modify its order to include improper findings of fact that are in no way merited. Plaintiffs' take extreme liberties with what was stated in Defendants' prior response and by counsel at the hearing on this matter. Plaintiffs claim that the Defendants filed a response "assuring the Court that discovery would be provided and they asked for 14 days before determining if sanctions were warranted." That is not what was stated or represented to the Court. What actually was stated, and what was repeated at the oral hearing, was Defendants' request that the Court grant them fourteen (14) days

within which to supplement their discovery responses, if necessary, prior to the Court rendering a decision on any sanctions. The Court declined to give Defendants that opportunity, and instead proceeded to harshly sanction Defendants with the Court's default-judgment ruling.

Plaintiffs have no legal justification for requesting any modification to the Court's September 27, 2021 order. It already gave Plaintiffs everything they wanted and then some, since Plaintiffs had not actually moved for a default judgment but instead had only sought monetary sanctions in this case. Regardless, the Court's prior order already sets forth what the Court considered in making its ruling. There is no legitimate basis to further modify that order to allow Plaintiffs to obtain additional after-the-fact findings of fact that are both immaterial and flat out incorrect.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Defendants request the Court deny Plaintiffs' Motion to Modify September 27, 2021 Order, along with such other and further relief to which Defendants may be justly entitled.

Dated: October 25, 2021.

Respectfully submitted,

By: ___/s/ Bradley J. Reeves_____ _
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on October 25, 2021.

Mark Bankston                                     *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

                                                 */s/ Bradley J. Reeves*
                                               Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58486634
Status as of 10/27/2021 2:40 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 10/25/2021 9:41:28 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/25/2021 9:41:28 AM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 10/25/2021 9:41:28 AM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 10/25/2021 9:41:28 AM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 10/25/2021 9:41:28 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/25/2021 9:41:28 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/25/2021 9:41:28 AM | SENT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

**[PROPOSED] ORDER ON PLAINTIFFS'
MOTION TO MODIFY SEPTEMBER 27, 2021 ORDER**

On the 25th day of October, 2021, came to be heard Plaintiffs' Motion to Modify September 27, 2021 Order. Compel and Motion for Sanctions. The Court, having considered the Motion, Defendants' response thereto, along with the arguments of counsel, finds that the Plaintiffs' motion should be DENIED. It is therefore:

ORDERED that Plaintiffs' motion to modify September 27, 2021 order is DENIED in its entirety.

SIGNED ON THIS THE _____ DAY OF _____, 2021.

_____
HONORABLE JUDGE MAYA GUERRA
GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

**REEVES LAW, PLLC**

By: ___ */s/ Bradley J. Reeves* _____
Bradley J. Reeves
Texas Bar No. 24068266
702 Rio Grande St., Suite 203
Austin, TX 78701
brad@brtx.law
Telephone:      (512) 827-2246
Facsimile:       (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 58486634
Status as of 10/27/2021 2:40 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Mark Bankston | 24071066 | mark@fbtrial.com | 10/25/2021 9:41:28 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 10/25/2021 9:41:28 AM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 10/25/2021 9:41:28 AM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 10/25/2021 9:41:28 AM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 10/25/2021 9:41:28 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 10/25/2021 9:41:28 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 10/25/2021 9:41:28 AM | SENT |



# COURT OF APPEALS

### THIRD DISTRICT OF TEXAS

P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
www.txcourts.gov/3rdcoa.aspx
(512) 463-1733

DARLENE BYRNE, CHIEF JUSTICE
MELISSA GOODWIN, JUSTICE
THOMAS J. BAKER, JUSTICE
GISELA D. TRIANA, JUSTICE
CHARI L. KELLY, JUSTICE
EDWARD SMITH, JUSTICE

JEFFREY D. KYLE, CLERK

Filed in the District Court
Of Travis County, Texas
NOVEMBER 10, 2021
At 6:01 PM
Velva L. Price, District Clerk

November 10, 2021

Mr. Mark Bankston
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer
Houston, TX 77008
* DELIVERED VIA E-MAIL *

Mr. Bradley J. Reeves
Reeves Law, PLLC
702 Rio Grande Street, Suite 306
Austin, TX 78701
* DELIVERED VIA E-MAIL *

RE:     Court of Appeals Number:     03-21-00570-CV
        Trial Court Case Number:     D-1-GN-18-001835; D-1-GN-18-006623; D-1-GN-18-001842

Style:     In re Alex Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer

Dear Counsel:

Relator's petition for writ of mandamus was filed in this Court on the date noted above.

Very truly yours,

JEFFREY D. KYLE, CLERK

BY: *Jackalyn Berron*

Jackalyn Berron, Deputy Clerk

cc:     The Honorable Velva L. Price
        The Honorable Maya Guerra Gamble
        Mr. William R. Ogden

FILE COPY

**COURT OF APPEALS**

FOR THE

**THIRD DISTRICT OF TEXAS**

P.O. BOX 12547, AUSTIN, TEXAS 78711-2547
(512) 463-1733

Filed in the District Court
Of Travis County, Texas
NOVEMBER 17, 2021
At 6:01 PM
Velva L. Price, District Clerk

Date:            November 17, 2021

Appeal No.:      03-21-00570-CV
Trial Court No.: D-1-GN-18-001835; D-1-GN-18-006623; D-1-GN-18-001842

Style:           In re Alex Jones; Infowars, LLC; Free Speech Systems, LLC; and
                 Owen Shroyer

---

The enclosed opinion was sent this date to the following persons:

The Honorable Billy Ray Stubblefield
Administrative Judge
Williamson County Courthouse
405 Martin Luther King, Box 2
Georgetown, TX 78626
* DELIVERED VIA E-MAIL *

The Honorable Velva L. Price
Civil District Clerk
Travis County Courthouse
P. O. Box 1748
Austin, TX 78767
* DELIVERED VIA E-MAIL *

Mr. William R. Ogden
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer St
Houston, TX 77008
* DELIVERED VIA E-MAIL *

Mr. Mark Bankston
Kaster Lynch Farrar & Ball, LLP
1117 Herkimer
Houston, TX 77008
* DELIVERED VIA E-MAIL *

The Honorable Maya Guerra Gamble
459th District Court
P. O. Box 1748
Austin, TX 78767
* DELIVERED VIA E-MAIL *

Mr. Bradley J. Reeves
Reeves Law, PLLC
702 Rio Grande Street, Suite 306
Austin, TX 78701
* DELIVERED VIA E-MAIL *

# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

### NO.  03-21-00570-CV

Filed in the District Court
Of Travis County, Texas
NOVEMBER 17, 2021
At 6:01 PM
Velva L. Price, District Clerk

**In re Alex Jones; Infowars, LLC; Free Speech Systems, LLC; and Owen Shroyer**

### ORIGINAL PROCEEDING FROM TRAVIS COUNTY

### M E M O R A N D U M   O P I N I O N

The petition for writ of mandamus is denied.  *See* Tex. R. App. P. 52.8(a).

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Filed:  November 17, 2021

12/27/2021 3:25 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Alyssa Butler

# D-1-GN-18-001835

| NEIL HESLIN | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 261st DISTRICT COURT |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

# D-1-GN-18-001842

| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

# D-1-GN-18-006623

| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC | § | 98th DISTRICT COURT |
| and FREE SPEECH SYSTEMS, LLC | § | |

**PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSITION**

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................................1

ARGUMENT ......................................................................................................................1

I.    InfoWars has Repeatedly Refused to Present a Corporate Representative...................................................................................................1

II.    InfoWars Failed to Present a Corporate Representative for a Fourth Time.......................................................................................................8

    A.    The materials provided to Ms. Karpova and her lack of preparation time were a farce .......................................................8

    B.    Ms. Karpova was not prepared to testify about sourcing and research for the videos described in Plaintiffs' petitions................11

    C.    Ms. Karpova was not prepared to testify about individuals involved in the production of the videos described in Plaintiffs' petitions .....................................................................23

    D.    Ms. Karpova was not prepared to testify about internal editorial discussions regarding InfoWars' coverage of the Sandy Hook Elementary School shooting.................................24

    E.    Ms. Karpova was not prepared to testify about the company's knowledge of the Plaintiffs...........................................26

    F.    Ms. Karpova was not prepared to testify about the documents produced by the company in response to Plaintiffs' discovery requests ......................................................................31

    G.    Ms. Karpova was not prepared to testify about efforts made by the company to preserve potential evidence........................32

    H.    Ms. Karpova was not prepared to testify about the audience reach of the videos described in Plaintiffs' petitions.........................34

    I.    Ms. Karpova was not prepared to testify about the company's business structure and relationship with other parties.................36

III.    Mr. Jones' Deposition Further Demonstrates Defendants' Bad Faith ...........37

IV.     InfoWars has the Resources to Properly Prepare its Corporate Designee .. 38

V.      This Court Should Enter All Remedies at its Disposal ........................................ 40

        A.     Preclude further discovery under Rule 215(b)(1) ............................ 40

        B.     Award all litigation costs under Rule 215(b)(2) ................................ 40

        C.     Enter evidentiary findings under Rule 215(b)(3) ............................. 41

        D.     Assess punitive monetary sanctions for outrageous discovery
               abuse ............................................................................................................ 41

CONCLUSION ........................................................................................................................ 42

CERTIFICATE OF SERVICE ............................................................................................. 43

CERTIFICATE OF SERVICE ............................................................................................. 43

## INTRODUCTION

Following the default judgment entered by this Court, Plaintiffs sought discovery on the remaining issues to be decided by the jury concerning punitive and compensatory damages. In addition to written discovery (which is the subject of a pending sanctions motion), Plaintiffs sought depositions of the Defendants, including a corporate representative of Free Speech Systems, LLC. On December 3rd, the company produced Daria Karpova as its corporate representative to testify about eight topics. Ms. Karpova was completely unprepared to testify about the designated topics, ultimately making a mockery of the deposition.

While sanctionable in isolation, this conduct is truly egregious given that Defendants have repeatedly refused to produce a prepared corporate designee on three prior occasions. For these non-appearances, Defendants incurred sanctions, a contempt finding, and ultimately a default judgment. Throughout this case, Defendants' open disrespect for the judicial process has been on full display, and they have now made the conscious decision to sabotage the remainder of the proceedings. Every sanction ever entered by this Court has been completely ineffective at altering Defendants' conduct. As such, Plaintiffs asks the Court to take forceful measures to balance the playing field for their upcoming damages trial, including an award of all litigation costs, preclusion of further discovery, evidentiary findings relating to the corporate deposition topics, and punitive monetary sanctions.

## ARGUMENT

### I.     InfoWars has Repeatedly Refused to Present a Corporate Representative.

Throughout these lawsuits, InfoWars has consistently evaded its obligation to provide corporate testimony. First, on August 31, 2018, this Court ordered a corporate

deposition in Mr. Heslin's defamation case, but InfoWars refused to comply with the order, and the Court ultimately assessed sanctions the following year for the non-appearance.[1]

On January 25, 2019, the Court again ordered discovery in the *Lewis* case, but that process turned into a complete farce. Ms. Lewis was forced to take depositions without any document production. Even worse, when InfoWars produced Rob Dew as a corporate representative, InfoWars failed to prepare him to give any testimony whatsoever on behalf of the company. In oral hearing, Judge Jenkins chastised "the failure of the defendants to present an InfoWars corporate representative who has a clue about InfoWars as a corporation," noting that "it was a pretty meaningless deposition."[2]

On October 18, 2019, this Court ordered Defendant to produce a corporate representative for a third time in Mr. Heslin's IIED case. In response, InfoWars again chose Rob Dew to testify about two topics: 1) "Sourcing and research for the videos described in Plaintiff's petition," and 2) "Internal editorial discussions regarding Free Speech Systems' coverage of the Sandy Hook Elementary School shooting."[3] Once again, Mr. Dew was completely unprepared to discuss either topic. For example, Mr. Dew gave the following testimony about a March 2014 video from Plaintiff's petition:

> Q.    Who did the research for that one?
> A.    I don't know.
> Q.    What steps did you take to find out?
> A.    Since we don't have that video, I don't know what -- I'd
>        have to see the video to jog my memory of what's in it.
>        ...
> Q.    You don't have this video is your testimony, and by you,
>        you mean Free Speech Systems?
> A.    I didn't have it in any of the searches that I made.

---

[1] *See* October 18, 2019 *Heslin* Order on Plaintiff's Motion for Contempt Under Rule 215 (assessing sanctions of $25,875).

[2] Exhibit 1, April 3, 2019 Transcript in *Lewis,* p. 30; p. 34.

[3] Exhibit 2, November 26, 2019 Deposition of Rob Dew, 3:16-20.

Q.      How long did you spend looking for the sources or the video or the researcher for "Sandy Hook: False Narratives Versus the Reality?"

A.      For that particular video, maybe 15 minutes.

Q.      Are you aware that in this case you produced this video to me?

A.      Okay.

...

Q.      So you have it in your possession, correct?

A.      I don't know if I have it in my possession.[4]

When Mr. Dew testified regarding a May 13, 2014 from Plaintiff's petition, he speculated on its content without knowing what was in the video:

Q.      Who did the research for this video?

A.      I would imagine Wolfgang Halbig did the research for that.

Q.      Again, I'm not asking you to imagine.

A.      Okay. I'll say Wolfgang Halbig, school safety expert, that was Wolfgang Halbig.

Q.      How do you know he did the research – excuse me. Did anyone else research any of the information that went into this episode?

A.      That is most likely an interview between Wolfgang Halbig and Alex Jones.

Q.      You don't even know what's in this video, do you?

A.      No.[5]

Mr. Dew testified in the same way about a December 27, 2014 video from Plaintiff's petition:

Q.      What was the source of the information in this one?

A.      I don't know.

Q.      Do you know what information is in this video?

A.      No.

Q.      Are you prepared to discuss the research that was in the video which you don't know what it's about?

A.      No.[6]

---

[4] *Id.* at 52:3-53:15.
[5] *Id.* at 54:3-18.
[6] *Id.* at 56:6-13.

Mr. Dew gave the same testimony regarding a December 29, 2014 video from

Plaintiff's petition:

> Q.    Have you ever seen this one?
> A.    I'd probably know it if I saw it.
> Q.    Sitting here -- have you seen it in the last year?
> A.    No.
> Q.    Did you do anything to prepare where the information
>       came from in this video that you don't know what it's
>       about?
> A.    No.
> Q.    You have no -- is it fair to say you don't know who the
>       source of the information is that's in this video?
> A.    That would be fair.[7]

Mr. Dew gave the same testimony regarding a January 13, 2015 video from Plaintiff's

petition:

> Q.    Have you seen this video in the last year?
> A.    I have not seen it in the last year.
> Q.    Are you prepared to discuss the research that went into
>       the information that was put in this video?
> A.    No.
> Q.    Are you prepared to tell us the source of information for
>       this video?
> A.    No.[8]

This testimony continued for video after video through 2015, 2016, and 2017. For

each of the additional videos, Mr. Dew admitted he was not prepared, even including the

crucial 2017 "Sandy Hook Vampires Exposed" video:

> Q.    Who researched the information for that video?
> A.    I would say myself and Alex did.
> Q.    What were your sources?
> A.    I believe a Megyn Kelly interview.[9]
>       ...
> Q.    Are you aware that on April 22nd, 2017, that the Megyn
>       Kelly interview hadn't even happened yet?

---

[7] *Id.* at 56:15-57:3.
[8] *Id.* at 57:5-13.
[9] *Id.* at 72:17-20.

A.   Oh, it hadn't happened yet? Okay.

Q.   Fair to say you're not prepared to discuss this video?

A.   I'm -- must be confused with another Sandy Hook vampire video.

Q.   Fair to say you're not prepared to discuss the one from April 22nd, 2017? Yes?

A.   Correct.[10]

Mr. Dew was likewise unprepared to testify regarding the employees who were involved in Sandy Hook research. For each employee inquired about, Mr. Dew testified that he was not "prepared to testify as to [the employee's] involvement with sourcing and researching for the videos in plaintiff's petition."[11] Mr. Dew further testified that he was unprepared to discuss InfoWars' editorial discussions about Sandy Hook:

Q.   We know that from your answers related to the videos and not knowing the sources of the information or any of the researchers, that any discussion that would have involved that -- those people that did that, you're not prepared to discuss that, correct?

A.   That's correct.[12]

Q.   Did you take any steps to prepare yourself to discuss whether or not there are any editorial discussions that were had between anyone at Free Speech Systems outside your purview?

A.   No.[13]

Moreover, Mr. Dew acknowledged that editorial discussions could be contained within documents, but he admitted he did not use any documents to help prepare for the deposition:

Q.   If there are discussions out there within Free Speech Systems' documents that were produced in this case that have editorial discussions in there, that's something you should know about, correct?

---

[10] *Id.* at 72:24-73:9.
[11] *Id.* at 15:6-8; *see also* p. 15-26.
[12] *Id.* at 77:6-11.
[13] *Id.* at 78:8-15.

> A.     If you're saying I reviewed every e-mail that was sent around the office during those time periods, I didn't do that.
> Q.     You didn't review any e-mails preparing for today?
> A.     That's correct.
> Q.     Do you think you should have?
> A.     I was relying on the advice of my attorney.[14]

Mr. Dew's testimony showed that Defendants intentionally failed to prepare him to offer testimony. Given their prior experience failing to prepare Mr. Dew in the *Lewis* case, Defendants understood their obligation to prepare their corporate designee. On December 20, 2019, this Court assessed sanctions and held Defendants in contempt for their third non-appearance.[15] In a set of companion orders, the Court assessed $100,000 in monetary sanctions.[16] The Court noted:

> Defendants' failure to produce a corporate representative who was prepared to testify about a) sourcing and research for the videos described in Plaintiff's petition and b) internal editorial discussions regarding Free Speech System, LLC's coverage of the Sandy Hook Elementary School shooting should be treated as contempt of court. Defendants have been continuously represented in this case by competent Texas counsel. The same counsel who represented Defendants at the October 17 hearing...are representing Defendants now, with one additional attorney recently appearing. Surely this Court can assume that Defendants' counsel fulfilled their professional obligation to insure that Defendants understood this Court's October 18 order. And the order itself is clear and unmistakable, easily understood by any competent reader. On the record presented, the Court concludes that Defendants intentionally disregarded the October 18 order. The Court notes that a client's refusal to cooperate with an attorney may rise to good cause for the attorney's withdrawal under Texas Disciplinary Rule of Professional Conduct 1.15(b).[17]

---

[14] *Id.* at 80:16-81:7.
[15] *See* December 20, 2019 Order on *Heslin* Motion for Sanctions (awarding sanctions of $65,825).
[16] *See* December 20, 2019 Order on Defendants' Rule 91(a) Motion (awarding additional $34,323.80).
[17] *See* December 20, 2019 Order on *Heslin* Motion for Sanctions, p. 2.

During the 2019 hearing, Defendants' counsel promised to address the discovery situation despite the pending appeal. Yet even upon remand in 2021, Defendants spent the entire summer ignoring the situation, eventually resulting in the Court entering the default judgment which it had held under advisement since 2019.

During the default judgment hearing on August 31, 2021, this Court inquired about the necessity of further discovery, noting that "[m]y concern is you need this discovery even for a damages trial."[18] The Court also noted that "if [plaintiffs] are trying to get punitive damages, [they] probably do need more discovery."[19] Plaintiffs' counsel responded that "after this hearing and I have more of an understanding of what the scope of discovery is like going forward, then we'll serve new discovery requests and depositions that we may need."[20]

## II.  InfoWars Failed to Present a Corporate Representative for a Fourth Time.

Following the default judgment, Plaintiffs sought discovery for the remaining issues to be decided by the jury. In addition to written discovery (which is the subject of a pending sanctions motion), Plaintiffs also sought the deposition of Free Speech Systems, LLC, which was cross-noticed in all three cases. The company was instructed to designate a witness to testify about the following topics:

- Sourcing and research for the videos described in Plaintiffs' petitions.

- Individuals involved in the production of the videos described in Plaintiffs' petitions.

- Internal editorial discussions regarding InfoWars' coverage of the Sandy Hook Elementary School shooting.

- The company's knowledge of the Plaintiffs.

---

[18] Exhibit 3, August 31, 2021 hearing transcript, p. 73.
[19] *Id.,* p. 74.
[20] *Id.,* p. 75.

- The audience reach of the videos described in Plaintiffs' petitions.

- The documents produced by the company in response to Plaintiffs' discovery requests.

- Efforts made by the company to preserve potential evidence.

- The company's business structure and relationship with other parties.

These topics included not only the topics about which Mr. Dew had failed to testify before, but additional topics relating to punitive and compensatory damages. No objections were made to any topic. The deposition was originally set for November 4, 2021. However, due to a medical emergency in the family of Defendants' counsel, the deposition was postponed to December 3, 2021. At deposition, the company produced Daria Karpova as its corporate representative. Ms. Karpova, an InfoWars producer and manager, was completely unprepared to testify on any of the eight topics.

## A.    The materials provided to Ms. Karpova and her lack of preparation time were a farce.

Ms. Karpova testified that her preparation for the deposition consisted of the following:

- "Maybe an hour" on December 1st with Bradley Reeves.[21]
- "A couple of hours" on December 2nd with Marc Randazza.[22]
- One hour preparing by herself.[23]

---

[21] Exhibit 4, November 3, 2021 Deposition of Free Speech Systems, LLC, at 5:8.

[22] *Id.* at 4:1. Mr. Randazza's conduct in preparing the corporate designee and appearing at Mr. Jones' deposition creates tension with Texas statutes regarding the unauthorized practice of law by performing these services in Texas for a particular proceeding in a Texas case. The Government Code defines the "practice of law" to include not only court appearances, but also a "service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge." Tex. Govt. Code 81.101. "The statutory definition is not exclusive. Courts inherently have the power to determine what is the practice of law on a case-by-case basis. The practice of law embraces, in general, all advice to clients and all action taken for them in matters connected with the law." *Green v. Unauthorized Practice of Law Comm.,* 883 S.W.2d 293, 297–98 (Tex. App.—Dallas 1994, no writ) (internal citations omitted).

[23] *Id.* at 11:8.

Ms. Karpova brought a small file folder to the deposition containing the "documents that [Ms. Karpova] reviewed prior to this deposition."[24] Those documents "represent the total universe of documents that [Ms. Karpova] had prepared for before the deposition."[25] The folder contained the following:

- Wikipedia articles for "False flag,"[26] "The Reichstag Fire,"[27] and "Pearl Harbor advance-knowledge conspiracy theory."[28]

- A post from "HistoryToday.com" summarizing the sinking of the USS Maine in 1895.[29]

- An anonymous blog post from "DC Clothesline" which purported to contain biographical information about Wolfgang Halbig, an InfoWars source.[30]

- A bio of Dr. Steve Pieczenik, an InfoWars guest, from "StevePieczenik.com."[31]

- An article from "LoveTheTruth.com" entitled "I Think Sandy Hook Was a Massive Elaborate Hoax."[32]

- Two news articles with "interesting information regarding the victim's mother and her request to have an open casket,"[33] which Ms. Karpova felt was relevant because it was "unconscionable" and "horrific."[34]

---

[24] *Id.* at 9:20.
[25] *Id.* at 10:19-21.
[26] *Id.* at 19:9.
[27] *Id.* at 21:17.
[28] *Id.* at 27:8.
[29] *Id.* at 25:24.
[30] *Id.* at 27:23.
[31] *Id.* at 29:17.
[32] *Id.* at 28:11.
[33] *Id.* at 30:18.
[34] *Id.* at 32:22; 33:4.

Mr. Karpova also testified that she met briefly with the other prior corporate representatives designated by InfoWars, but she did not acquire any relevant information from those discussions:

> Q.  You met with Mr. Dew and talked to him about the topics you'd be speaking about today?
> A.  Briefly.
> Q.  What's briefly? What does that mean?
> A.  I basically sort of ran through the topics and asked him if I was going to say anything, if he had any information for me and he said no.[35]
> ...
> Q.  Okay. Who's the other corporate rep you know?
> A.  Michael Zimmerman.
> Q.  Okay. Did you get any information from Mr. Zimmerman?
> A.  No.[36]

In sum, Ms. Karpova's preparation was completely lacking. She only had short meetings with counsel, did not meet any employees who gave her information, and the materials she did review were frivolous, unreliable, and largely irrelevant. Later in the deposition, after prompting from her counsel, Ms. Kaprova claimed she reviewed additional documents, but she testified that those documents were not relevant to the deposition topics:

> Q.  There are documents that you have reviewed prior to this deposition that you did not bring to this deposition?
> A.  I did not think they were relevant to the specific points.[37]

As shown below, Ms. Karpova was unable to testify about *any* of the topics for the deposition. The lack of preparation she was given demonstrates InfoWars' continuing disrespect for the legal process, causing irreparable prejudice to the upcoming trial.

---

[35] *Id.* at 7:16-22.
[36] *Id.* at 8:6-10.
[37] *Id.* at 40:16-20.

**B.    Ms. Karpova was not prepared to testify about sourcing and research for the videos described in Plaintiffs' petitions.**

Ms. Karpova had not been prepared to testify about the videos in Plaintiffs' petitions.

Prior to the deposition, Ms. Karpova did not review any of the videos:

> Q.    Topic number one is the sourcing and research for the videos described in plaintiffs' petitions. When was the last time you watched those videos? Back up. I made an assumption there. Have you watched the videos in plaintiffs' petition ever in your history at InfoWars?
>
> A.    I've watched some of them.
>
> Q.    Okay. So one thing we can say is that in preparation for this deposition you didn't watch those videos, correct?
>
> A.    (No response.)
>
> Q.    I'm sorry, Ms. Karpova, is that a difficult question for you to answer?
>
> A.    Well, I've already answered some of the videos.
>
> Q.    Right. No. I understand that you have in your history at InfoWars since 2015, you've probably on occasion seen some of these videos. I understand that. What I'm asking you is since the date you were told you were giving this deposition in November and you were preparing for this deposition, you haven't watched any of these videos, right?
>
> A.    I have not.[38]

Ms. Karpova did not even know if she had reviewed the Plaintiffs' Petitions which describe the videos:

> Q.    When that topic number one says sourcing and research for the videos described in Plaintiffs' Petitions, have you seen the Plaintiffs' Petitions?
>
> A.    Briefly.
>
> Q.    Okay. They're not in this folder, are they?
>
> A.    No.[39]
>
> ...
>
> Q.    But in terms of Plaintiffs' Petitions, is that something you looked at before this deposition?
>
> A.    I honestly can't recall.[40]

---

[38] *Id.* at 35:22-36:16.
[39] *Id.* at 22:5-11.
[40] *Id.* at 22:18-20.

When faced with basic questions about the videos in Plaintiffs' Petition, it immediately became apparent that Ms. Karpova could not testify:

> Q.  Do you see that paragraph 14 identifies the January 27, 2013 video entitled, "Why People Think Sandy Hook is a Hoax"?
> A.  Yes.
> Q.  Okay. You're familiar with the claims made in that video, right?
> MR. REEVES:  Objection; form.
> A.  I don't recall the exact video.
> Q.  And so sitting here today, you're not familiar with the claims made in that video.
> A.  No.[41]
> ...
> Q.  And do you see in paragraph 25 it discussing a September 25, 2014 video entitled "Connecticut PD Has FBI Falsify Crime Statistics," correct?
> A.  Yes.
> Q.  Okay. First of all, are you familiar with the claim that InfoWars has made that the FBI either falsified crime statistics or admitted that nobody died at Sandy Hook?  Are you familiar with those claims?
> A.  As far as it's quoted here in this paragraph, the company believes that to be the case.
> Q.  No. What I'm asking, Ms. Karpova, is based on the title and this talking about FBI falsified crime statistics. Are you personally right now familiar with that claim made by InfoWars?
> A.  Personally I'm not.
> Q.  Okay. Did you talk to anybody about that claim?
> A.  No.
> Q.  Okay. So this video and its title, you don't really understand where that comes from, right?
> A.  No.[42]
> ...
> Q.  Does paragraph 29 contain a video that you're supposed to talk about under topic number one?
> A.  Yes.
> Q.  The video is December 27, 2014, entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," correct?
> A.  Yes.
> Q.  What lawsuit is being talked about?
> A.  I don't know for sure.

---

[41] *Id.* at 47:21-6.
[42] *Id.* at 77:1-15.

Q. Well, at least this one we're lucky because I do. Do you know Wolfgang [Halbig] sued Leonard Pozner, that they were in a lawsuit together?

A. Yes.[43]

...

Q. Well, first of all, we know that you didn't know that this video referred to that lawsuit. You didn't know what lawsuit it was. So you also, I would take it, you haven't done any research to determine what that lawsuit is or anything about it, right?

A. I haven't reviewed that lawsuit, no.

Q. Or anything that has to do with what this video said about the lawsuit, right?

A. I mean, if you ask me specifically? Because you're saying anything. If you ask me a specific point, then I may or may not recall.

Q. Sure. What truth about the Sandy Hook massacre could this lawsuit reveal? What did the video have to say about that?

A. Well, based on the quotes here in this paragraph, you know, the truth would be -- I mean something to do with it not being the way the mainstream news reported.

Q. Okay. Help me understand. The lawsuit could reveal something that's different than the mainstream media. That's your answer? Is that -- am I understanding --

A. Different than what the mainstream media finally reported about the incident. I believe it took a year for the State of Connecticut to release the final report on the event.

Q. What does that have to do with the lawsuit? I'm confused. What -- what's the lawsuit having to do --

A. Are you asking me what it could've --

Q. Well, let's --

A. So that truth might have been something that contradicted the report that the State of Connecticut had issued.

Q. You have no idea, do you? You say "might." You don't have any idea.

A. Yeah, we don't have a record of that.

Q. Yeah. And you -- when you got this petition and you read it and you saw there was a video entitled "Lawsuit Could Reveal Truth About Sandy Hook Massacre," you did nothing to figure out what that lawsuit was or what it could reveal, did you?

A. Huh-uh. No. Not specifically.[44]

...

Q. You see here this talks about a March 4, 24 2015 video entitled "New Bombshell Sandy Hook Information Inbound"?

A. Yes.

Q. What was the bombshell information?

---

[43] *Id.* at 94:25-95:14
[44] *Id.* at 96:13-98:8.

A.   The bombshell information was the new statement -- information Mr. Halbig had brought on that show is what I can infer.

Q.   Which is what? What's the bombshell?

A.   I wouldn't know the details of it.

Q.   So when you had this video to try to figure out what was the sourcing and the research that went into it, you don't even know what the bombshell information was that is described in the title of the video, correct?

A.   Well, any new information would be bombshell. So just because it says bombshell, there -- there might have been a lot of information in that video which there's no way I can remember what was in that video exactly.

Q.   Well, I mean, it's not a matter of you not remembering. You never watched it, right?

A.   Not recently.

Q.   Right. And so -- and you didn't do anything to try to get prepared on it for this deposition, right?

MR. REEVES:  Objection; form.

A.   No.

Q.   You haven't read any documents about this video.

A.   No.

Q.   And you haven't talked to any employees about this video.

A.   No.

Q.   Have you tried to talk to Mr. Halbig about this video?

A.   No.[45]

When it became clear Ms. Karpova could not testify about research and sourcing for these claims, Plaintiffs' counsel confirmed that she was unprepared to testify about _any_ of the videos in Plaintiffs' Petitions:

Q.   I want to cover some of the things we talked about in this first video to see if they apply for every video because I think we might be able to save some time. Alright? And you can tell me if we can or we can't. But from what I understand about that first video is, A, you didn't watch it and, B, you didn't talk to any of the employees involved in making it. That's correct, right?

A.   Yes.

Q.   Okay. Is that true for all the videos?

A.   Yes.

Q.   Okay. And in terms of understanding what claims were made in the videos, is that the same that you don't know what claims were made in the videos for all the videos?

---

[45] _Id._ at 113:23-115:8.

A.   Correct.[46]

Despite having no preparation, Ms. Karpova frequently speculated about the source

for the videos, but she admitted she was making guesses, not giving testimony from

knowledge or preparation. Indeed, Plaintiffs' counsel frequently had to correct Ms. Karpova

when her guesses were not true:

> Q.   So sitting here today, you couldn't tell me who the sources were for the claims that you don't know, correct?
> A.   From -- I would assume they were either Mr. Halbig or Pieczenik, because these were the two sources that were -- that had pertained to the videos.[47]
> ...
> Q.   Okay. And you are telling me you're making this assumption that this must have something to do with Wolfgang Halbig or Dr. Steve Pieczenik. But do you know if either of those individuals had ever been on InfoWars by 2013?  Do you know?
> A.   Not for a fact I do not know. I could find that information if that was a question that I knew I had to prepare for.[48]
> ...
> Q.   But for these videos, where Wolfgang Halbig or Dr. Steve Pieczenik had never said anything about Sandy Hook until at least 2014, you don't know what the sources for these videos are, do you?
> A.   I would say no.[49]

Yet throughout the deposition, Ms. Karpova continued to speculate with no actual

knowledge behind her answers:

> Q.   Ma'am, I just want you to understand, before we answer any more questions, that Wolfgang Halbig didn't even start investigating Sandy Hook until 2014. So when I have you here under oath saying that this must come from Wolfgang Halbig, I'm a little concerned. So I just want to stop and make sure we're not making assumptions, that we're answering the questions based on the knowledge that we have. Okay? And the reality is that when it comes to whether "the evidence was overwhelming," one, you don't know what evidence is even being talked about in that statement, do you?

---

[46] *Id.* at 54:9-25.
[47] *Id.* at 48:7-12.
[48] *Id.* at 49:5-12.
[49] *Id.* at 51:13-17.

A. I don't.

Q. Okay. Two, you don't know where any of that alleged evidence came from, do you?

A. No. It's been a long time, though. Correct.

Q. That's why I'm taking this deposition. And sitting here today, you can't do it, can you? You cannot tell me what evidence is being talked about in paragraph 17?

A. No.[50]

Continually through the deposition, Ms. Karpova seemed eager to speculate that Wolfgang Halbig was the source for particular claims made by InfoWars, but her testimony was not correct:

Q. Do you see where it says they had kids going around in circles in and out of the building as a photo op?

A. Yes.

Q. Do you know the company source on that?

A. I believe it should be -- the company believes it to be Wolfgang Halbig.

Q. Well, it's interesting, you know, because -- have you watched Alex Jones' deposition the first time I took it?

A. Parts of it.

Q. Okay. Did you watch the part about the kids allegedly going in circles around the video with the building? Have you seen that?

A. I don't remember that specifically.

Q. Okay. Because here's the thing. And I'm -- just again, to try to make sure that you're answering questions that you know the answer to, we already know where that one came from. We had a deposition, and we put the video up. And there's kind of an infamous YouTube video made by just some random YouTuber, some conspiracy person, and it's called the "Going in Circles" video. And it has -- it's actually not Sandy Hook Elementary at all. It's a firehouse down the street. It's not kids going in and out of the building, but it's actually adults and young teenagers. But there's this video of this circle of people going from the front to the back. And we talked about all this in deposition. It comes from a YouTube video. It doesn't come from Mr. Halbig. It doesn't come from Mr. Fetzer. It doesn't come from any of these people. But when you sit here and you say, well, I can infer it can came from Mr. Halbig, you can allow for me the possibility that those answers aren't correct, right?

---

[50] *Id.* at 60:25-61:21.

A.  Well, you can also infer that the source for the video was either Mr. Halbig or Fetzer, as you just mentioned. You don't know where the video came from.

Q.  You don't know, do you?

A.  No, you don't know.

Q.  You don't know, right?

A.  Just as you don't know.

Q.  Right. So we're just all speculating here today, right? We have no idea what's going on.

A.  You're speculating yourself.[51]

Ms. Karpova could not even give any testimony on the specific claims quoted verbatim in Plaintiffs' Petitions:

Q.  When it comes to trying to figure out who [Mr. Jones is] even talking about here in terms of "actors playing different parts of different people," you didn't do anything to figure that out, correct?

A.  Correct.

Q.  You didn't ask Alex about this statement or this video, correct?

A.  Correct.[52]

...

Q.  So do you see in that paragraph it's talking about "photos of kids that are alive that they say died?"

A.  Yes, I see that paragraph.

Q.  Do you know what photo they're talking about?

A.  From what I can infer, it was probably a photo that -- or photos that were going around that people were talking about online.

Q.  Sure. You have no idea what they are. I mean, you're guessing, right? Right?

A.  To the best of my knowledge. There's no way to tell what they were.

Q.  You have no personal knowledge about this, correct?

A.  Well, there's no way to go back to that video because we don't keep those kinds of records of every show. Of any show.

Q.  You didn't talk to any of the employees, did you?

A.  It's hard to tell who worked on that day.[53]

...

Q.  Do you see where it says "DHS an hour and a half later with a time stamp put up signs saying 'sign in here?'"

A.  Yes.

Q.  Do you know where that came from?

---

[51] *Id.* at 101:13-103:8.

[52] *Id.* at 73:5-12.

[53] *Id.* at 79:5-22. This answer contradicts Ms. Karpova's other testimony, in which she testified "I have a list of people who were working on that day." *See* 52:20.

A. No.

Q. Okay. They had a statement that said, "They had Porta Potties being delivered within an hour and a half." Do you see where it says that? It's also in that first paragraph.

A. Yes.

Q. Do you know where that came from?

A. No.

Q. In the third paragraph, the first sentence, do you see where it says "We have the emails from the city council back and forth and the school talking about it being shut down a year before?" Do you see that?

A. Yes.

Q. ...Does the company know if those emails actually exist?

A. No, it doesn't.

Q. Do you know what the company source for saying that was?

A. No.[54]

When confronted with her lack of preparation, Ms. Karpova asked if she could review each video at the deposition before answering:

A. Can we review the video right now?

Q. No. I'm not going to play a 2-hour video for you right now, no.

A. But you expect me to know what's going on in every video?

Q. Uh-huh. I do. I do, Ms. Karpova. And I expected Rob Dew to do the same thing when he showed up to the deposition to talk about sourcing and research and he didn't do that twice.

MR. REEVES:  Object to the sidebar.

Q. So I do -- I want to make sure this witness understands what she's here to do today and my questions, what they are. I do expect you to have done your homework and know what was in those videos, yes, ma'am, I do. So for instance in this video, there's a claim made about Charles Jaco. Do you know who he is?

A. No.

Q. Okay. So you wouldn't be able to talk to me in any way about the claims made about Charles Jaco in the January 27, 2013 video?

A. No.[55]

During a break in the deposition, Defendants' counsel requested extra time for the

break because Ms. Karpova is a nursing mother and needed time to pump, which Plaintiffs

---

[54] *Id.* at 120:19-121:19.

[55] *Id.* at 51:20-52:17.

were happy to oblige. However, Defendants also used this extra time to attempt to show Ms.

Karpova the remaining videos during the break. Yet even after this mid-deposition crash

course screening, Ms. Karpova could not meaningfully answer questions about the videos:

> Q. Do you see there it's talking about an April 22, 2017 video called "Sandy Hook Vampires Exposed"?
> A. Yes.
> ...
> Q. Okay. Did you watch that video? I mean, unless you've watched it in the last couple of hours, you haven't watched it, right, for this deposition?
> A. I'm familiar with the video.
> Q. Did you watch it in preparing for this deposition, though?
> A. Yes, I believe so.
> Q. Okay. When did you watch it?
> A. Earlier today.
> Q. Earlier today when?
> A. During the break.
> Q. Oh. So during the break when it became apparent that you hadn't watched these videos, you went and tried to watch this video?
> A. Yes.
> Q. You didn't watch the whole thing, though, did you?
> A. No.
> Q. Because it's a 45-minute video, right?
> A. It's a lengthy video.
> Q. Yeah. So you didn't watch this video.
> MR. REEVES:  Objection; form.
> Q. You watched pieces of this video, correct?
> A. Correct.
> Q. How many pieces did you watch? How many minutes total did you watch of this video?
> A. I did not count.
> Q. So you have no idea, sitting here today, how long it was, when it was just a couple of minutes ago?
> A. I did not count the amount of minutes I watched.
> Q. Okay. Was it more than 5 minutes?
> A. I'm not sure.
> Q. Okay. So you just watched the video within the last 20 minutes; and you're not sure if you watched more than 5 minutes of it, correct?
> MR. REEVES:  Objection; form.
> Q. Is that correct?
> A. I didn't time the amount of minutes I watched.[56]

---

[56] *Id.* at 122:21-124:23.

...

Q. Do you see it talks about a June 13, 2017 video entitled "Media Refuses to Report Alex Jones' Real Statements on Sandy Hook"?

A. Yes.

Q. Is that another one you were just shown during the break?

A. Yes.

Q. Okay. Is it fair to say that what happened is that every video past this in the petition, that you went and tried to watch a little piece of it before you came back into this room?

MR. REEVES: Objection; form.

A. This video I watched in its entirety.

Q. Okay. So when did you watch that?

A. During the break.[57]

...

Q. Where does this come from, this picture? Where does it come from?

A. This is a still from the show.

Q. Do you know what show?

A. Not specifically. It doesn't have the date year.

Q. Okay. It's the one you just apparently watched a couple of minutes ago. You don't remember seeing this?

A. Not this part specifically.

Q. Okay. So you maybe didn't even watch this part of the video?

A. I watched the video.

Q. Okay.

A. I don't remember this specific --

Q. Okay. A large portion of that video is Mr. Jones going over these questions. Do you remember that from the video you just watched?

A. Yes.[58]

...

Q. This talks about an October 26, 2017 video called "JFK Assassination Documents to Drop Tonight." Is that another one that you just looked at at the break?

A. Yes.

Q. Okay. How much of that one did you watch?

A. That's a long video. I watched parts of it.

Q. You understand that doesn't help me, right? That that's not helping me understand what you've watched. You understand that?

A. I understand that.

Q. Okay. So when I'm asking you the question, this is a -- it's an hour long video, isn't it? It might be a full 4-hour episode. Do you know?

A. I don't know the exact timestamp on that, but I know it's a long video.

Q. How did you decide what part of it to watch?

---

[57] *Id.* at 126:8-23.

[58] *Id.* at 127:14-128:7.

A.   I skimmed through it.[59]

...

Q.   Do you see the part about the CIA visiting Lanza for recruiting? Not on the petition. In the video you watched?

A.   No.

Q.   It's in the petition. I'm asking if you saw it in the video.

A.   Yes.

Q.   You did see that part?

A.   Yes.

Q.   What was the company source for that?

A.   Again, that was based on previously sourced information Alex -- from his guests, as well as other reports.

Q.   Ms. Karpova, no, it was not. And I -- please, can you stop guessing? Because I need you to understand if you watched that video, you'd understand that this video was done because a new set of documents was declassified by the FBI on that date, and Lee Ann McAdoo did a report on InfoWars talking about those documents. It didn't come from Mr. Halbig. The testimony you gave is just not correct, is it?

MR. REEVES:  Objection; form. She didn't say anything about Mr. Halbig.

Q.   Alright. Let me adjust to your objection. This didn't come from prior videos, did it, Ms. Karpova? Or do you know?

A.   The company believe it did come from previously sourced material.

Q.   Okay. So when I talk about Lee Ann McAdoo doing this report on the documents that were declassified on that day, on October 26, 2017, do you have any idea what I'm talking about? Is that new information to you, or do you know what I'm talking about?

A.   I -- I have some information about it.[60]

...

Q.   Well, I'm asking you about the statement that the CIA recruited Lanza which you said came from prior videos. But that's not true, because that piece of information was in that released report that day, correct? Or do you know?

A.   I do not know.[61]

Ms. Kaprova could not even answer basic questions about the sourcing of the most recent video in Plaintiffs' Petition:

Q.   In 2017 did the company believe that Jim Fetzer was a reliable source of information?

A.   At that time there was controversy regarding that individual.

---

[59] *Id.* at 132:25-133:17.

[60] *Id.* at 134:2-135:12.

[61] *Id.* at 137:3-8.

Q. In 2017 InfoWars published a video that relied on Mr. Fetzer, correct?

MR. REEVES:  Objection; form.

A. Okay.

Q. That's true?

A. You're telling me that? I --

Q. I'm actually -- no.  You need to tell me, Ms. Karpova, because you're here to talk to me about the sourcing and researching in plaintiffs' petition of those videos. Is that one of the videos you watched when y'all took the break?

A. The Owen Shroyer video?

Q. Yeah.

A. Yes, I've seen that video before.

Q. Of course. Yeah. You knew you were going to testify about it.

A. What is the --

Q. My question is, that was in 2017?

A. Uh-huh.

Q. It relied on Jim Fetzer. It had material from Jim Fetzer, correct?

A. I don't know where Owen got that material.[62]

Ms. Karpova also testified that despite her lack of preparation, the company did not feel it needed to do anything else to prepare her for the deposition:

Q. When the company knew that it had to produce testimony about these videos in the plaintiffs' petition, the company did not feel it was worthwhile to have employees review, watch, catalog and figure out what was said and make that available to you, correct?

A. The company believes that I have sufficient knowledge to testify regarding these matters.[63]

Ms. Karpova's testimony was even worse than the unprepared testimony previously given by Rob Dew. Indeed, many of the questions on this topic were the exact same questions from the prior depositions. Despite understanding not only the topic, but the specific questions being asked, the company did not prepare Ms. Karpova. To excuse her lack of preparation, Ms. Karpova claimed the topic was impossible to answer:

Q. Ms. Karpova, did you just assert for me that that topic was too broad to be answered correctly? Is that what you told me?

---

[62] *Id.* at 256:2-257:3.
[63] *Id.* at 118:19-119:1.

A. When it comes to -- yes, for -- for all intents and purposes, yes.

Q. So when I ask you I want to know the sourcing for a video at InfoWars, you can't figure that out? That's too broad?

A. Sourcing can mean a lot of different things. It can -- can you be more specifically what you mean by sources?

Q. I think you know what it means, don't you? Right? What a source is? What do you think a source is?

A. Where you get a particular information.[64]

In sum, the deposition resulted in no actual information regarding the videos or the sources and research for the claims made by the company.

### C.  Ms. Karpova was not prepared to testify about individuals involved in the production of the videos described in Plaintiffs' petitions.

On the second topic, Ms. Karpova had not been prepared and could not give testimony about which employees were involved in the creation of the videos or what roles they played. Even worse, Ms. Karpova testified that she possessed a list of which employees were working at specific times, but she did not bring the document to the deposition, so she could not answer specific questions:

Q. Can you tell me what employees were involved in researching that video? Who came up with those claims in that video?

A. I have a list of people who were working on that day. From that list I could tell you who might have been in production for that day.

Q. So the best we can tell you is -- the best we can figure out is who might have been working in the production side at that date, correct?

A. Yes.

Q. Okay. Have you talked to any of those people before your deposition today?

A. No.[65]

InfoWars employs a sizeable writing, editing, and production staff, many of whom contributed to the company's coverage of Sandy Hook. Unlike Ms. Karpova, those employees

---

[64] *Id.* at 50:11-25.
[65] *Id.* at 52:18-53:5.

possess first-hand knowledge of the research and sourcing for the videos. Ms. Karpova admitted that she had every opportunity to speak to those employees, but she chose not to do so.

> Q.  But for any of the videos that we're going to talk about today, for any of the videos in Plaintiffs' Petitions, you had a list of who was working at InfoWars at that time, correct?
> A.  Yes.
> Q.  And you could have interviewed those employees, correct?
> A.  I could have.
> Q.  And you didn't, correct?
> A.  Correct.[66]

As a result of her lack of preparation, Ms. Karpova continuously disclaimed any knowledge of what employees were involved in researching InfoWars' claims:

> Q.  And again, just like our prior answers, you don't know what employee researched the information to create the claims in this video, correct?
> A.  Correct.[67]

In sum, Ms. Kaprova was completely unprepared to offer any testimony about the role played by InfoWars' employees in this case.

> **D.  Ms. Karpova was not prepared to testify about internal editorial discussions regarding InfoWars' coverage of the Sandy Hook Elementary School shooting.**

Ms. Karpova was required to prepare to testify about InfoWars' editorial discussions about its Sandy Hook coverage, but Ms. Karpova made no such preparations. In fact, she did not prepare because Ms. Karpova testified that "we did not – we do not have editorial discussions regarding Sandy Hook."[68] This statement is so wildly false that Plaintiffs' counsel made sure to confirm her testimony:

---

[66] *Id.* at 52:22-54:6.
[67] *Id.* at 58:9-12.
[68] *Id.* at 87:7-8.

> Q.  Did I hear you say InfoWars never had editorial discussions on
>     Sandy Hook?
> A.  Correct.
> Q.  Okay. That's not true, though, right? People inside InfoWars have
>     talked about Sandy Hook from an editorial standpoint a lot, correct?
> MR. REEVES:  Objection; form.
> A.  Negative.[69]

Ms. Karpova also confirmed that she understood the topic. She testified that "an
editorial discussion would be an internal conversation about what type of information,
angles to go with live on air or website or anywhere else."[70] After confirming Ms. Kaprova
understood the topic, Plaintiffs' counsel again confirmed her testimony:

> A.  You asked me about the editorial discussions --
> Q.  Right.
> A.  -- of Sandy Hook.
> Q.  And there's never been any -- was that your testimony?
> A.  Yes.[71]

Plaintiffs' counsel further confirmed that if any editorial discussions *did* exist, Ms.
Karpova was unprepared to talk about those discussions:

> Q.  If there were conversations between editors having editorial
>     discussions about whether the sources they were using for Sandy
>     Hook were reliable or not, are those discussions you're prepared to
>     talk about today?
> A.  I have no knowledge of those discussions.[72]
> ...
> Q.  So I take it by that same token, you have never seen any documents
>     in which one editor or high person in InfoWars, a writer, editor --
>     let's say editor or producer is talking to another management-level
>     employee and saying I'm really worried about our Sandy Hook
>     sources, you've never seen any documents like that?
> A.  Not specifically like that, no.[73]

---

[69] *Id.* at 104:9.
[70] *Id.* at 105:1-3.
[71] *Id.* at 106:8-13.
[72] *Id.* at 109:15-19.
[73] *Id.* at 109:20-110:2.

InfoWars' editorial discussions about Sandy Hook have been a central focus of the evidence offered by Plaintiffs throughout this case. In fact, Plaintiffs' recent Motion for Leave to Serve Net Worth Discovery contained a 50+ page recitation of evidence relating to internal editorial discussions. Indeed, one of the most oft-cited documents in this lawsuit, having been featured in every deposition and numerous briefs, is an email from InfoWars' chief editor telling another editor that he warned Ms. Jones that his sources on Sandy Hook were "batshit crazy."[74] The depositions and briefing in these cases have featured dozens of documents containing editorial discussions of Sandy Hook. Ms. Karpova was not prepared to address any of these discussions, denying that they even existed.

### D. Ms. Karpova was not prepared to testify about the company's knowledge of the Plaintiffs.

Ms. Karpova could not testify about the company's knowledge of the Plaintiffs or the documents produced concerning the Plaintiffs. For example, Defendants provided a set of electronic documents a few days before this Court's October 25, 2021 sanctions hearing. Included in those documents were folders containing documents specific to the four plaintiffs. The folder for Mr. Pozner contained a single document: a 187-page comprehensive background report on Mr. Pozner and dozens of his relatives. When asked about this document, Ms. Karpova could not provide any testimony:

> Q. Have you ever seen that? Have you seen that before today?
> A. No, I have not.
> Q. So in terms of the document, a single document that was recently produced to me about Leonard Pozner, you've never seen.
> A. If this is the single document you're talking about.
> Q. That's it. Uh-huh.
> A. No.
> Q. Okay. Do you see where it says FSSTX dash 8085544?
> A. Yes.

---

[74] *Id.* at 252:14.

Q.   Okay. You don't know what this is, do you? If I wanted to ask you what is this, you couldn't tell me.

A.   It looks like a background information.

Q.   Right. I mean, I can figure that out, right? Like, we can look at the top at the table of contents right here, and it says "For Licensed Investigator Purposes Only." Do you see where it says that?

A.   Yes.

Q.   And then do you see where it says "Leonard Pozner Comprehensive Report?

A.   Yes.

Q.   Do you see where it has all these entries about all this information about Leonard Pozner?

A.   Yes.

Q.   This is a lot of knowledge that the company has in its possession concerning Leonard Pozner. You'd agree with that?

A.   Yes.[75]

...

Q.   Do you see where it says page 66 for possible relatives? Can you flip to page 66 in that document for me?

A.   (Witness complies.)

Q.   This is a bunch of people's personal information, isn't it?

A.   Yes.

Q.   And you can't tell me why the company has this, can you?

A.   I don't know.

Q.   So when it comes to testifying about the company's knowledge of Leonard Pozner, which you can now see, it is extremely extensive, you're not prepared to testify about that today, right?

MR. REEVES:  Objection; form.

A.   Well, the company was asked for the knowledge of the plaintiffs.

Q.   Uh-huh. Lenny Pozner is a plaintiff, right?

A.   This is what they produced about the knowledge of the plaintiff.

Q.   Right. I understand that. I asked for a request for production of documents. Then I asked for your testimony. Part of the reason I asked for your testimony and the knowledge of the plaintiffs is because you produced to me -- your company produced to me -- a 187 page comprehensive background report on Leonard Pozner, and I wanted to know why. And I wanted to ask questions about that document. I wanted to know what was inside of it. I wanted to know the information that the company had and what they did with it. You can't answer any of that, can you?

A.    Well, this is -- just looks like a typical, like, investigation report done on a person.

Q.   You have no idea where it comes from, do you, Ms. Karpova? None, right?

---

[75] *Id.* at 219:19-220:24.

> A.   This is a document that you were provided by the company.
> Q.   Yeah. Where did the company get it? Do you know?
> A.   (No response.)
> Q.   So you don't know, correct?
> A.   Are you talking about specific people? No.
> Q.   You have no -- let's make this really clear. You have zero knowledge
>       about this document, none whatsoever, correct?
> A.   Not other than it being an investigation report on Leonard Pozner.
> Q.   Which you have seen now –
> A.   Back -- background -- background information.
> Q.    Which you have now seen for the very first time, correct?
> A.   Yes.[76]

Ms. Karpova was also unable to give testimony concerning the videos made by the

company about Mr. Pozner:

> Q.   You know Mr. Jones did a video in February 15, 2015 about Mr.
>       Pozner. You know that, right?
> A.   I don't have the video in front of me.[77]
>       ...
> Q.   You understand InfoWars took Mr. Pozner's address and put it on
>       air to its viewers. You know that, right?
> MR. REEVES:  Objection; form.
> Q.   Or do you not know that?
> A.   I do not have the record of it right now.[78]

Ms. Karpova was also unable to give any testimony about the correspondence the

company has had with Mr. Pozner:

> Q.   Have you seen the email Leonard Pozner wrote to the company
>       weeks after the shooting? Have you seen it?
> A.   I don't have the recollection of it.
> Q.   So in terms of trying to get up to speed on the company's knowledge
>       of the Plaintiffs in terms of complaints that Leonard Pozner may
>       have made to InfoWars, you haven't seen those, have you?
> A.   I haven't seen the email you're talking about.
> Q.   Right. Yeah. You know that both Paul Watson and Alex Jones, like,
>       worked on responses to send to Leonard Pozner? Have you seen
>       those?
> A.   I've seen, like I said, a lot of documents.

---

[76] *Id.* at 221:9-223:2-11.
[77] *Id.* at 145:8-11.
[78] *Id.* at 145:24-146:4.

Q.  I'm not asking you --
A.  (Cross-talk.)
Q.  So that's what I'm asking you. When you got prepared to talk to me about the company's knowledge of the Plaintiffs, you haven't even seen the correspondence that InfoWars has had with that Plaintiff, right?
A.  I have not.
Q.  You don't deny Mr. Pozner complained to InfoWars about its coverage within weeks of the shooting, right? You do acknowledge that. The company acknowledges that. The company has that knowledge. Or do you not know if the company has that knowledge?
A.  I don't have specific dates of his complaints.[79]

Ms. Karpova admitted that when it comes to the company's knowledge of the Plaintiffs and the "documents [Defendants] produced as it relates specifically to those four clients," she has only "[c]ursory knowledge of Leonard Pozner and no knowledge of the other people."[80] In fact, Ms. Karpova admitted she was not prepared to testify about the company's knowledge of any other Plaintiff:

Q.  What about Scarlett Lewis, do you know what the company has in terms of information about Scarlett Lewis?
A.  No.
Q.  Do you know what information the company has about Neil Heslin?
A.  No.
Q.  Do you know what information it has about Veronique De La Rosa?
A.  No.[81]

Defendants have twice produced a small collection of documents regarding Ms. De La Rosa, Ms. Lewis, and Mr. Heslin -- first in 2019 and again in 2021 -- but Ms. Karpova was unaware of these documents. Ms. Karpova also denied InfoWars had gathered information on Mr. Heslin:

Q.  Are you sitting here and telling me today the company hasn't produced documents on those folks?
A.  No, the company has no knowledge.

---

[79] *Id.* at 217:2-218:3.
[80] *Id.* at 219:1-7.
[81] *Id.* at 223:12-21.

> Q. Really? Okay. So InfoWars' employees weren't researching materials
> about Mr. Heslin?
> A. There are -- there's no records of any employees researching things
> like that that --
> Q. Yeah, there are. Unfortunately for you, Ms. Karpova, there definitely
> are.[82]

Ms. Karpova's testimony is contradicted by Defendants' document production.
Among the few documents produced by InfoWars discussing Mr. Heslin are multiple emails
showing that InfoWars anchor David Knight was researching hit-pieces about Neil Heslin's
past immediately after Mr. Heslin's appearance on Megyn Kelly in 2017. These documents
were later discussed in Mr. Jones' deposition.[83] Defendants also produced documents about
the other Plaintiffs, but Ms. Karpova had no awareness of those documents.

Finally, Ms. Kaprova admitted that the only materials she reviewed in preparing to
testify about the company's knowledge of the Plaintiffs were two articles about Noah Pozner
having an open casket at his viewing service:

> Q. The only two pieces of documentation that you have reviewed for
> this deposition about the Plaintiffs are two articles, both of which
> discuss in the article Noah Pozner's open-casket funeral, correct?
> A. Yes.[84]
> ...
> Q. Okay. So when it comes down to the documents that you reviewed
> for this deposition about the Plaintiffs, the only information that
> you're really gleaning from this that's useful to this deposition
> concerns Noah Pozner's open casket and the appearance of his body,
> correct?
> A. It was useful to some of the points.
> Q. I'm not asking what it's useful for. I'm asking you that of all the
> documents that you reviewed about the plaintiffs, the only piece of
> information that you have had gleaned from those documents that
> is relevant to this deposition concerns Noah Pozner's open-casket
> funeral and the appearance of his body, correct?
> A. These are the articles that I had chosen to bring.

---

[82] *Id.* at 224:16-25.
[83] Exhibit 5, December 4, 2021 Deposition of Alex Jones, 71:8-73:24.
[84] Exhibit 4, December 3, 2021 Deposition of Free Speech Systems, LLC, at 34:8-12.

> Q. So that is correct, right?
> A. (No response.)
> Q. Let's try it this way. You can't give me another piece of information
>    out of either of those two articles that you believe is relevant to this
>    deposition, right, other than Noah Pozner's open-casket funeral and
>    the appearance of his body?
> A. Correct. Those are the articles for it, yes.
> Q. And those are the only articles that you've reviewed about the
>    plaintiffs in preparation for this deposition, correct?
> A. Yes.[85]

With a trial on damages approaching, one of the chief purposes of this deposition was to discover what knowledge and information Defendants possessed about the Plaintiffs. Due to Ms. Karpova's lack of preparation, those discussions were impossible, irreparably prejudicing Plaintiffs' trial.

### E.     Ms. Karpova was not prepared to testify about the documents produced by the company in response to Plaintiffs' discovery requests.

Throughout the deposition, Ms. Karpova showed she was unfamiliar with Defendants' document production. As shown above, she totally uninformed as it concerned documents about the Plaintiffs. She was also unprepared to testify about numerous documents which have featured prominently in the case. Even worse, she testified that she did not review any documents produced in the case. After prompting from her counsel, Ms. Karpova later claimed that she *did* review documents relating to this topic, but she could not identify those documents, nor did she bring them to the deposition. Ms. Karpova testified as follows:

> Q. You thought it was important to bring articles about Noah Pozner's
>    open-casket funeral, but did not think you should bring documents
>    that you reviewed relevant to topic number four, correct?
> A. Correct.[86]
> ...
> Q. Would the documents fit in this folder (indicating)? Would they all
>    fit in here do you think?

---

[85] *Id.* at 34:19-35:21.
[86] *Id.* at 41:16-21.

A.  I think so.
Q.  Okay. So you wouldn't need, say, like this to hold all them all. You could hold them all -- not in a banker's box like this, but in a manila folder like this, correct? Is that accurate?
A.  Yes.
Q.  Now, surely you remember some of those documents, right?
A.  I'm not sure.[87]
...
Q.  So sitting here today you can't identify any of the documents you reviewed. So you're not going – none of your testimony today is going to be based on those documents, correct?
A.  Not -- not off the top of my head.[88]

Ms. Karpova was also unprepared to speak to any specifics regarding the document production, nor could she address which requests InfoWars' produced documents.[89] Due to her lack of preparation, Plaintiffs was unable to secure testimony on this topic.

**F.  Ms. Karpova was not prepared to testify about efforts made by the company to preserve potential evidence.**

Ms. Karpova could not answer questions about Defendants' document preservation efforts. Ms. Karpova did not know when a letter went out through the company issuing a litigation hold.[90] Ms. Karpova also had no knowledge of document preservation requests from the Plaintiffs or the company's actions in response to those requests:

Q.  Let me ask you this. Has the company ever received any correspondence from the plaintiffs saying please preserve evidence? Do you know?
A.  I don't have any documents on that that I understand.
Q.  Okay. So in terms of getting ready to testify about efforts made to preserve documents, you have not seen any correspondence from the plaintiffs or their counsel asking to preserve documents?
A.  I have not. Point number five has anything to do with efforts made by the company to preserve potential evidence.
Q.  Right. And here's what I'm getting at, Ms. Karpova, is that I want to know when the plaintiffs served a request to preserve documents

---

[87] *Id.* at 44:6-19.
[88] *Id.* at 46:1-5.
[89] *See, e.g., id.* at 229-233.
[90] *Id.* at 242:11.

back in April of 2018, one, if you have seen it, and two, if the company
actually did anything. And from what I understand, you didn't ever
see that correspondence, right?

A.   I haven't.[91]

In addition, Ms. Karpova knew nothing about efforts made to preserve InfoWars'

various internal communication systems.

Q.   You know who Rocket.Chat is, right?
A.   Yes.
Q.   Okay. Is the company still using that?
A.   Yes.
Q.   Do you know when Rocket.Chat was searched?
A.   No.
Q.   Okay. Do you know when it was preserved?
A.   No.
Q.   Okay. What about Yahoo Messenger, do you know when that was
used? Was that used during the events of this lawsuit?
A.   No, don't know.
Q.   Okay. What about Slack, was Slack used during the events of this
lawsuit, since 2013?
A.   I'm not sure.
Q.   Okay. Was any efforts made to preserve any messaging systems like
Slack?
A.   I don't know for sure.
Q.   Okay. What about things like Basecamp? Do you know what
Basecamp is?
A.   Yes.
Q.   Okay. Was anything done to preserve Basecamp?
A.   I don't know any Basecamp associations with InfoWars.
Q.   Okay. Let me ask you this. Does InfoWars -- have they used
Basecamp? Have employees used that to communicate with each
other?
A.   No, not that I know of.
Q.   Okay. Not that you know of, right?
A.   I've never heard of Basecamp being a communication platform for
InfoWars employees.
Q.   I hadn't either. And it was strange because we requested -- obviously
we requested and asked for it, what are your communication
platforms. Whatever, that's a whole other story. But I recently got
produced a document from Paul Watson that talks about his
Basecamp communications with another employee. And I'm just

> wondering when was Basecamp used.  But you aren't familiar with
> Basecamp?
>
> A.   No.
>
> Q.   Okay. So by the same token if were there any efforts made to
> preserve Basecamp messages, you don't know what those steps
> were?
>
> A.   No.[92]

Each of these issues has come up in prior corporate depositions and in the parties'

briefing. Nonetheless, Ms. Karpova had not been prepared to give any testimony on this topic.

### G.    Ms. Karpova was not prepared to testify about the audience reach of the videos described in Plaintiffs' petitions.

Ms. Karpova made no efforts to learn any information relevant to the audience reach

of the videos in Plaintiffs' petitions. Ms. Karpova could not identify everywhere the videos

appeared or were disseminated by InfoWars, and she made no attempts to secure audience

size information for any of the different mediums:

> Q.   InfoWars is currently broadcast on over 200 radio stations, correct?
>
> A.   Around there.
>
> Q.   Okay. What did you do to go find out their viewership and audience
> for those dates?
>
> A.   There would be no information.
>
> Q.   How do you know that? Who did you ask? Have you gone to -- let me
> back this up. How many of those radio stations did you make
> requests to?
>
> A.   I didn't.
>
> Q.   Okay. Did you do anything to figure out what those radio stations
> audienceship was at the time those videos were broadcast?
>
> A.   No.
>
> Q.   Okay. At the time of the videos described in the plaintiffs' lawsuit,
> how many over-the-air television stations from 2013 to 2018?
>
> A.   I don't have the exact number.
>
> Q.   So if I wanted to establish what the audience reach was of over-the-
> air television broadcast of InfoWars, you can't help me with that
> because you don't even know how many there are in terms of over-
> the-air television, right?
>
> A.   Well, the topics asked for specific videos and the reach of those
> videos.

---

[92] *Id.* at 245:14-247:8.

Q.  Uh-huh. And those videos were broadcast on over-the-air television, right?

A.  I would say during -- well, not necessarily. Some of the videos could have been posted as standalone videos.

Q.  A lot of "coulds" in this room. We don't know, do we? Right? So we know -- one thing we do know is at least some of them were broadcast over-the-air television, right?

A.  Yes.[93]

...

Q.  How many cable packages was InfoWars carried on between 2013 to 2019?

A.  That wasn't part of the questions. I could have found that information for you from an Affiliate Relations person.

Q.  Part of InfoWars' audience reach is the people that it reaches over cable packages, right?

MR. REEVES:  Objection; form.

Q.  Isn't that true?

A.  That is a very specific question pertaining to a department, a particular department that would need to be --

Q.  And you didn't go do that?

A.  No. That wasn't in the scope of the questions.

Q.  So in terms of the audience reach of these videos that was reached on any cable packages, you don't have any information on that for me today?

A.  No.

Q.  Okay. How many OTT services -- well, first of all, do you know what an OTT service is?

A.  What is it?

Q.  Over-the-top.

A.  Okay.

Q.  Over-the-top box systems.

A.  Okay.

Q.  Like, I think one example might be, like, Roku.

A.  Okay.

Q.  That would be an example of an OTT system. InfoWars has frequently promoted that it's on multiple OTT systems, right?

A.  But the company would have no -- the company would keep no track of those kinds of views.

Q.  But you don't know if that information is accessible, do you?

A.  There's no information for me that.

Q.  Well, let's fist figure out the first thing that I might need if I'm going to try to figure out the audience reach was, which is how many OTT packages is InfoWars included on?

A.  I would have to go back and check on that.

---

[93] *Id.* at 225:16-227:3.

Q. So in terms of the reach -- the audience reach of the audience that was reached through those OTT packages, InfoWars has no information to offer today.

A. Correct.[94]

In order to answer questions about the audience reach and various mediums of distribution, Ms. Karpova claimed she would have to talk to employees in InfoWars' Affiliate Relations department. This answer by Ms. Karpova was especially surprising since InfoWars' Affiliate Relations department was discussed at length in connection with Plaintiffs' pending sanction motion regarding post-remand written discovery. In that briefing, Plaintiffs showed how InfoWars' evasive answers about its audience reach and channels of distribution were not made in good faith given the existence of InfoWars' Affiliate Relations department. Plaintiffs' briefing even included public statements made by the manager of InfoWars' Affiliate Relations department. These matters were also discussed at oral hearing, where Plaintiffs' counsel again raised the problems with InfoWars' written discovery on this topic. Nonetheless, Ms. Karpova was unprepared to address these issues and had not spoken with Affiliate Relations about where InfoWars videos were distributed and what audiences they reached.

### H. Ms. Karpova was not prepared to testify about the company's business structure and relationship with other parties.

As this Court may recall from both the Sandy Hook lawsuits and the *Fontaine* case, Plaintiffs have faced immense difficulty in securing information about the business of structure of Mr. Jones' companies. Plaintiffs had no better success in Ms. Karpova's deposition. Ms. Karpova was unprepared to testify regarding the basic facts about InfoWars,

---

[94] *Id.* at 227:10-229:3.

LLC. For example, Ms. Karpova did not know if InfoWars, LLC was a holding company.[95] However, Defendants admitted in the *Furie* copyright litigation that InfoWars, LLC "is an intellectual property holding company." *Furie v. Infowars, LLC,* 401 F. Supp. 3d 952, 970 (C.D. Cal. 2019). Likewise, Ms. Karpova denied that InfoWars, LLC was a subsidiary of Free Speech Systems.[96] Yet more than two years ago, Defendants' counsel stated InfoWars, LLC would be considered as "a subsidiary of Free Speech Systems" for the purposes of this litigation.[97] Because Ms. Karpova did not even understand InfoWars, LLC or its purpose as a holding company, it was clear she was unprepared to testify about the company.

### III.    Mr. Jones' Deposition Further Demonstrates Defendants' Bad Faith.

Mr. Jones appeared for deposition the day after Ms. Karpova. During his belligerent testimony, the first words out of Mr. Jones' mouth again made clear his utter contempt for these proceedings:

> I know that my seventh amendment rights were violated by a political show trial. Yes, I do know that.[98]

Mr. Jones later testified that:

> The death penalty sanction with all the stuff we produced I believe was a fraud. And it's because they're scared of the real evidence coming out and want to be able to tell a jury that this man is guilty, now you decide how guilty.[99]
> ...
> I know I didn't get a jury trial. I know a judge said I was guilty. I don't believe that I live in the Soviet Union.[100]

---

[95] *Id.* at 244:16-24.
[96] *Id.* at 244:2-4.
[97] Exhibit 1, April 3, 2019 Hearing Transcript in *Lewis,* p. 33.
[98] Exhibit 5, December 4, 2021 Deposition of Alex Jones, 1:23-25.
[99] *Id.* at 11:17-22.
[100] *Id.* at 13:22.

Mr. Jones testified that if this Court's conduct "isn't fraud, then nothing is."[101] Mr. Jones also blew off his obligations by claiming that he did not spend much time thinking about the discovery requests served by Plaintiffs' counsel:

> Q. You remember we talked in that last deposition about the Bloomberg email where Bloomberg sent an email out to his people, said get ready in the next 24 hours, there's going to be a big event? You remember that?
> A. That was a news story, yeah.[102]
> ...
> Q. And then you remember you told me you could find it for me. Right?
> A. Yeah, I believe I said that.
> Q. And then you never gave it to me, did you?
> A. To be honest with you, Bankston, you don't really inhabit much in my mind.
> Q. I know, yeah. You don't have much respect for any of this process, do you? None of it?
> A. I don't think you have respect for America or anything.[103]

It is abundantly clear from Mr. Jones' own statements that he has no respect for this process and does not intend on complying with his obligations as it concerns these lawsuits. Despite all of this Court's prior interventions (and indeed because of them), Mr. Jones intends to proceed in bad faith through the remainder of this case, asserting that these cases are a political show trial after having sabotaged the proceedings.

## IV.     InfoWars has the Resources to Properly Prepare its Corporate Designee.

Given the resources at its disposal, InfoWars had no excuse for its failure to prepare its deponent. During the deposition, Ms. Karpova was questioned about a document reflecting revenue to the InfoWars.com online store between 2016 and 2018.[104] Ms. Karpova testified that the sales revenue reflected in the document during that period was in excess of

---

[101] *Id.* at 12:22.
[102] *Id.* at 22:5-10.
[103] *Id.* at 22:17-23:1.
[104] Exhibit 4, December 3, 2021 Deposition of Free Speech Systems, LLC, at 239:17.

$165 million.[105] The document shows that InfoWars' revenue figures rose even after its social media "deplatforming" in August of 2018.[106] Yet even assuming no growth in revenue in 2019-2021, it would appear InfoWars has generated another quarter billion dollars in revenue during the three years of this lawsuit solely from online sales in the InfoWars.com store. This does not even account for InfoWars' numerous other revenue streams, which has included advertisers, click-through promotion revenue, Amazon.com sales, Ebay.com sales, YouTube monetization, donation drives, and others. According to its net worth interrogatory answer, Free Speech Systems, LLC appears to possess in excess of $50 million in capital, which it claims it owe in its entirely to "PQPR Holdings, Inc.," another shell company registered by attorney Eric Taube which is owned and controlled by Alex Jones.[107] In his own net worth interrogatory answer, Mr. Jones' noted significant assets, including equity interest in excess of $50 million, an interest note in excess of $25 million, and over $6 million in various other assets, cash, and cryptocurrency.[108] Given the history of this suit and Mr. Jones' lack of candor, Plaintiffs also expect that he has additional assets squirreled away, likely in some other shell company as yet undisclosed.

In short, Mr. Jones' operation is not a small business or a "mom and pop" company. Instead, it is one of the most lucrative media enterprises on the planet, acting as a full-time informercial for massive sales of dietary and herbal supplements. InfoWars has the resources to properly participate in corporate discovery and take the steps necessary to prepare its designee or multiple designees.

---

[105] *Id.* at 240:3.
[106] Exhibit 6, Revenue Spreadsheet, FSSTX-086589.
[107] Exhibit 7, Free Speech Systems, LLC Answer to Net Worth Interrogatory;
*see also* https://opencorporates.com/companies/us_tx/0801863807
[108] Exhibit 8, Alex Jones' Answer to Net Worth Interrogatory.

**V.      This Court Should Enter All Remedies at its Disposal.**

Little more can be said about Defendants' ceaseless pattern of discovery abuse that has not already been said. Defendants have sabotaged Plaintiffs' case at every step of the proceedings, undeterred by repeated sanctions and contempt findings. Even after the severe sanction of a liability default, Defendants' bad faith obstruction continues, now sabotaging the remaining issues in the case. Obviously, Plaintiffs ask the Court to grant this motion and award reasonable expenses caused by Defendants' conduct. In addition, Plaintiffs request the following remedies:

**A.      Preclude further discovery.**

Rule 215(b)(1) authorizes this Court to enter "an order disallowing any further discovery of any kind or of a particular kind by the disobedient party." In this case, where Defendants have flagrantly sabotaged Plaintiffs' discovery at every step, Defendants should not reap the reward of any further discovery from the Plaintiffs. To preserve fairness, this Court should address Defendants' ceaseless contempt by terminating discovery.

**B.      Award all litigation costs under Rule 215(b)(2).**

Plaintiffs have expended extraordinary effort pursing discovery for years, only to be met by consistent obstruction and bad faith. Plaintiffs should not be forced to absorb those expenses. This Court has already awarded some of the attorney's fees related to discovery, but Plaintiffs have incurred numerous other expenses and court costs over the course of the litigation. This Court is empowered under Rule 215(b)(2) to address this inequity by entering "an order charging all or any portion of the expenses of discovery or taxable court costs or both against the disobedient party or the attorney advising him." Such an award is appropriate given Defendants' ceaseless obstruction.

C.    **Enter evidentiary findings under Rule 215(b)(3).**

These depositions have been sought since they were ordered by the Court in August
2018 yet ignored by Defendants. In particular, the corporate deposition was the last
available avenue to secure necessary information relating to Plaintiffs' claims for punitive
and compensatory damages. By repeatedly sabotaging this process, Defendants have
prejudiced Plaintiffs' ability to introduce evidence on the topics of the corporate deposition.
It should be remembered that Plaintiffs' ability to take a meaningful corporate deposition
had already been severely hamstrung due to Defendants' false and evasive answers to post-
remand written discovery. Under Rule 215(b)(3), this Court is authorized to order that
"designated facts shall be taken to be established for the purposes of the action." Here, the
Court should enter an order instructing the jury that relevant facts relating to the eight
corporate deposition topics should be taken as established in favor of the Plaintiffs.

D.    **Assess punitive monetary sanctions for outrageous discovery abuse.**

In addition to awards of attorney's fees, the Court can award punitive monetary
sanctions. "Trial courts have discretion to impose monetary sanctions within limits" so long
as those sanctions are "directed toward remedying prejudice caused to the innocent party."
*CHRISTUS Health Gulf Coast v. Carswell,* 505 S.W.3d 528, 541 (Tex. 2016). In awarding a
punitive monetary sanction, a trial court must "explain its rationale behind the amount
imposed as monetary sanctions or the relationship between the sanctions and particular
conduct." *Id.* At 540. In *RH White Oak,* the Court of Appeals upheld the following justification
for awarding punitive monetary sanctions in addition to attorney's fees:

> The egregiousness and repetitiveness of Defendants' egregious
> perjury and misconduct exhibits Defendants' total disregard for
> and disrespect of the integrity of this Court and our judicial
> system. The Court finds that Defendants can pay monetary

> sanctions, if ordered by the Court. Again, Defendants' perjury and misconduct go to the heart of this case, is egregious, exceptional and exemplifies a pattern of misconduct and disregard for truth which is not to be tolerated. Additional monetary sanctions are just, appropriate and there is a direct relationship between the egregiousness and repetitiveness of Defendants', their perjury and misconduct and this sanction because this is an exceptional case of perjury and misconduct, not about failing to produce one document or one lie, but a mountain of evasiveness, lack of candor, concealment, numerous outright lies, and total disregard for truth, which is the foundation of our judicial system based on truth, rules and litigants' compliance with those rules. Accordingly, additional monetary sanctions are appropriate, just and not excessive.

*RH White Oak, L.L.C. v. Lone Star Bank,* 14-16-00840-CV, 2018 WL 4925118, at *6 (Tex. App.—Houston [14th Dist.] Oct. 11, 2018) (remanded by agreement, Feb. 8, 2019). In this case, every corrective step taken by the Court and other courts have been ineffective at altering or deterring Mr. Jones' contempt for these lawsuits. As such, a severe monetary penalty is now justified to address Mr. Jones' determined efforts to sabotage this process.

## CONCLUSION

For all of the reasons above, Plaintiffs ask this Court to grant their motion and enter all appropriate remedies, as reflected in Plaintiffs' Proposed Order.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

**CERTIFICATE OF CONFERENCE**

I hereby certify that I conferred with opposing counsel about this Motion, and they are opposed.

_____
MARK D. BANKSTON

**CERTIFICATE OF SERVICE**

I hereby certify that on December 15, 2021, the forgoing document was served upon the Court and all counsel of record via e-mail. The document was not filed on that date, pursuant to Protective Order, pending potential action on a Motion to Seal. No action having been taken, the document has now been filed on December 27, 2021.

_____
MARK D. BANKSTON

# Plaintiffs' Proposed Order

# D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 261st DISTRICT COURT |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

# D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

# D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC | § | 98th DISTRICT COURT |
| and FREE SPEECH SYSTEMS, LLC | § | |

## ORDER ON PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE DEPOSTION

On this day, the Court considered Plaintiffs' Motion for Sanctions Regarding Corporate Deposition. For the reasons below, the Court finds that the Motion should be granted.

1

## BACKGROUND

Defendants' pattern egregious discovery abuse is well-detailed in the many prior orders of this Court,[1] but a brief history of Plaintiffs' attempts to take a corporate deposition is as follows:

On August 31, 2018, the Court ordered Defendants to appear for depositions in Mr. Heslin's defamation claim (D-1-GN-18-001835). Defendants refused to appear for the depositions or respond to written discovery. After Plaintiff filed a Motion for Sanctions, Defendants initiated an appeal.

On January 25, 2019, this Court ordered Defendants to respond to court-approved discovery requests and appear for depositions in Ms. Lewis' IIED case (D-1-GN-18-006623). Defendants presented Rob Dew as a corporate designee, who was unable to give any testimony. The Court chastised "the failure of the defendants to present an InfoWars corporate representative who has a clue about InfoWars as a corporation," noting that "it was a pretty meaningless deposition." Defendants agreed to stipulate to Plaintiff's petition

---

[1] In addition to discovery abuse in these cases, the Court has considered Defendants' consistent pattern of bad faith litigation tactics and discovery abuse in other cases and courts. First, as described in this Court's prior orders, InfoWars has also committed discovery abuse in *Fontaine v. InfoWars, LLC, et al.* (D-1-GN-18-1605), a defamation lawsuit relating to the Stoneman Douglass High School shooting. In that case, InfoWars failed to timely answer written discovery. After InfoWars provided untimely and evasive responses, Mr. Fontaine was forced to bring a motion to compel InfoWars' compliance, for which this Court awarded sanctions and attorney's fees on September 15, 2021. The Court also notes that Defendants have repeatedly violated discovery orders in *Lafferty v. Jones,* a similar lawsuit brought after the instant cases by a different set of Sandy Hook parents in the Superior Court of Connecticut, ultimately resulting in a default judgment on liability several weeks after this Court's entry of default judgment. The Court further notes that Defendants have been sanctioned by the Texas Court of Appeals for bringing a frivolous appeal in Mr. Heslin's case. Finally, as noted in the Court's default judgment order, Mr. Jones has publicly declared that he considers these lawsuits to be a "show trial," showing clear signs that Defendants' discovery violations are the result of bad faith. Mr. Jones' recent deposition confirmed these signs, during which Mr. Jones testified about his indifference to his discovery obligations.

for the purposes of the TCPA motion and voluntary pay $8,100 in attorney's fees to avoid sanctions at that time.

Following the events in *Lewis,* the premature appeal in Mr. Heslin's defamation case was dismissed for lack of jurisdiction. Upon remand to this Court in the fall of 2019, InfoWars again refused to respond or appear for deposition. On October 18, 2019, this Court assessed sanctions of $25,875, while also ruling that Plaintiff's burdens were taken as established for the purposes of the TCPA motion.

On October 18, 2019, this Court ordered Defendants to appear for deposition in Mr. Heslin's IIED case (D-1-GN-18-004651).[2] Again, Rob Dew was produced as the corporate designee. Again, Mr. Dew had not been prepared and was unable to offer any meaningful testimony. On December 20, 2019, the Court assessed sanctions totaling $100,000 and held the Defendants in contempt for intentionally disobeying the order. At that time, the Court held a default judgment under advisement based on representations by Defendants that discovery would be promptly supplemented during the appellate stay.

All of the cases were remanded in June 2021. Defendants had not taken any steps to address the discovery situation during the appeal, and for the next three months following remand, Defendants ignored Plaintiffs' demands for compliance. On September 27, 2019, this Court issued a default judgment on liability and awarded attorney's fees of $45,925.

## THE DECEMBER 3, 2021 CORPORATE DEPOSITION

Following the default judgment, Plaintiffs again sought the Defendants' depositions to secure testimony relevant to the trial on compensatory and punitive damages. Defendants produced Daria Karpova for the deposition. The transcript of Ms. Karpova's deposition

---

[2] Subsequently consolidated with D-1-GN-18-001835.

shows that she was not prepared to discuss any of the eight topics for which she had been designated. Her testimony as a whole demonstrated profound disrespect for the discovery process. Ms. Karpova's lack of preparation was flagrant and egregious, especially given the repeated refusal to prepare a designee. Plaintiffs have now faced four non-appearances at corporate depositions on the issues at the heart of their claims despite every remedial action taken the Court, including the severe sanction of default and over $165,000 in cumulative attorney's fees.

### FINDINGS

. The Court finds that, once again, Defendants have intentionally thwarted the legitimate discovery process in these cases. There is no other way to interpret the refusal to prepare Ms. Karpova as anything but obstruction of the highest order. The egregiousness and repetitiveness of Defendants' obstruction exhibits a total disregard for and disrespect of the integrity of this Court and our judicial system. Plaintiffs' discovery of facts necessary to properly present their claim for damages has been irreparably prejudiced in virtually all respects. Absent severe action from this Court, Defendants will ultimately profit from their sabotage of the discovery process.

The Court therefore ORDERS that:

1.      Pursuant to Rule 215(b)(1), the Court disallows any further discovery by Defendants. Any obligation of the Plaintiffs to respond to any pending discovery is terminated.

2.      Pursuant to Rule 215(b)(2), the Court orders that Defendants shall pay all of the expenses of discovery and taxable court costs in these lawsuits. Within 30 days of this Order, Plaintiffs shall submit evidence setting forth any court costs or attorney's fees relating

to discovery or discovery motions, excepting those costs or attorney's fees which were already awarded in any prior order of the Court.

3.      Pursuant to Rule 215(b)(3), the Court orders that designated facts shall be taken to be established for the purposes of the action. Specifically, the jury will be instructed that any factual dispute between the parties relating to the following corporate deposition topics shall be taken as established in favor the Plaintiffs:

- Sourcing and research for the videos described in Plaintiffs' petitions.
- Individuals involved in the production of the videos described in Plaintiffs' petitions.
- Internal editorial discussions regarding InfoWars' coverage of the Sandy Hook Elementary School shooting.
- The company's knowledge of the Plaintiffs.
- The audience reach of the videos described in Plaintiffs' petitions.
- The documents produced by the company in response to Plaintiffs' discovery requests.
- Efforts made by the company to preserve potential evidence.
- The company's business structure and relationship with other parties.

4.      The Court orders that Defendants shall pay additional punitive monetary sanctions in the amount of $_____. The Court finds that there is a direct relationship between additional monetary sanctions and the egregiousness and repetitiveness of Defendants' obstruction. Defendants' pattern of discovery abuse is a truly exceptional case and exemplifies a course of misconduct which must be deterred lest future litigants pursue the same path. Given the outrageous nature of the misconduct, the total failure of prior sanctions, and the massive prejudice to Plaintiffs' claims, the Court finds that additional monetary sanctions are appropriate, just, and not excessive. Defendant shall pay this sanction within 30 days of this Order.

Dated _____, 2021.


_____
Hon. Maya Guerra Gamble

# Exhibit 1

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
249 of 1044

1

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUME
TRIAL COURT CAUSE NO. D-1-GN-18-006623

SCARLETT LEWIS                    )  IN THE DISTRICT COURT
                                  )
      Plaintiff                   )
                                  )
                                  )
VS.                               )
                                  )  TRAVIS COUNTY, TEXAS
                                  )
ALEX E. JONES, INFOWARS,          )
LLC, AND FREE SPEECH              )
SYSTEMS, LLC                      )
                                  )
      Defendants                  )  53RD JUDICIAL DISTRICT


      ----------------------------------------------------


      EXCERPT FROM HEARING ON MOTION FOR SANCTIONS


      ----------------------------------------------------


      On the 3rd day of April, 2019, the following

proceedings came on to be heard in the above-entitled

and numbered cause before the Honorable Scott H.

Jenkins, Judge presiding, held in Austin, Travis County,

Texas;

      Proceedings reported by machine shorthand.

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 250 of 1044

2

1                    **A P P E A R A N C E S**

2

    FOR THE PLAINTIFF:

3

         MARK D. BANKSTON
4        SBOT NO. 24071066
         WILLIAM OGDEN
5        SBOT NO. 24073531
         KASTER, LYNCH, FARRAR & BALL
6        1010 Lamar, Suite 1600
         Houston, Texas  77002
7        (713) 221-8300

8

9   FOR THE DEFENDANTS:

10       ROBERT BARNES *(Admitted Pro Hac Vice)*
         BARNES LAW
11       601 South Figueroa Stree, Suite 4050
         Los Angels, California  90017
12       (213) 330-3341

13       RICHARD E. YOUNG
         SBOT NO. 22204800
14       GLAST, PHILLIPS & MURRAY
         14801 Quorum Drive, Suite 500
15       Dallas, Texas  75254
         (972) 419-8300

16

17

18

19

20

21

22

23

24

25

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
251 of 1044

3

1

**I N D E X**

2

**VOLUME 1**

3

**EXCERPT FROM HEARING ON MOTION FOR SANCTIONS**

4

**APRIL 3, 2019**

5

|                                            | Page | Vol. |
| ------------------------------------------ | ---- | ---- |
| Argument by Mr. Barnes...............       | 4    | 1    |
| Further Argument by Mr. Bankston.....       | 39   | 1    |
| Rule 11 Agreement....................       | 53   | 1    |
| Adjournment.........................        | 54   | 1    |
| Court Reporter's Certificate.........       | 55   | 1    |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
252 of 1044

30

1 allegation made by the plaintiffs is true, they cannot

2 bring this claim as a matter of law as an intentional

3 infliction of emotional distress claim.  I'm sure the

4 answer to this is going to be yes.  That would mean if

5 that's -- that's true as to all defendants.  So they

6 don't need to worry anymore either about the failure of

7 the defendants to present an InfoWars corporate

8 representative who has a clue about InfoWars as a

9 corporation.

10          MR. BARNES:  That's correct, Your Honor.

11          THE COURT:  Because you heard me say,

12 golly, if they prevail as to the other defendants, you

13 shouldn't be able to kick out InfoWars because they

14 haven't been able to get information about InfoWars.

15          MR. BARNES:  That's correct, Your Honor.

16          THE COURT:  But that's taken care of

17 because it's subsumed within the concession, the broad

18 concession you made earlier.

19          MR. BARNES:  Yes, Your Honor.

20          THE COURT:  Okay.

21          MR. BARNES:  And one additional component

22 of that, I had offered the plaintiffs Mr. Jones to be

23 the InfoWars guy.

24          THE COURT:  Say that once again.  I'm

25 sorry.

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
253 of 1044

31

```
 1            MR. BARNES:  I'm sorry, Your Honor.

 2            THE COURT:  No, it's me.  It's me.

 3            MR. BARNES:  I'm sorry.  Oh, I had offered

 4  the plaintiffs prior to the deposition -- what happened

 5  is on March the 11th, that Monday, the person who had

 6  signed the interrogatories for InfoWars, LLC had -- I

 7  can't disclose -- had a medical emergency that he

 8  actually was hospitalized for.

 9            THE COURT:  One of the exhibits was some

10  really generic statement by a doctor, but I saw that.

11            MR. BARNES:  I was trying to avoid --

12  there's strict HIPAA limitations on what I can say.

13            THE COURT:  I understand.

14            MR. BARNES:  But it was a serious

15  emergency.  So then I realized we needed to sub them

16  out.  So one thing that I offered plaintiff's counsel

17  was I said Alex Jones will be available on the 20th when

18  they were -- to be the InfoWars representative when they

19  were also doing other depositions.  They declined.

20            THE COURT:  They declined to have Alex

21  Jones be the corporate rep for InfoWars?

22            MR. BARNES:  For the -- on the -- yes,

23  Your Honor, on the 20th.  They said they wanted to go

24  forward on the 15th.  So I assumed, to be honest with

25  you, that they --
```

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
254 of 1044

32

```
 1              THE COURT:  Let me make sure I understand
 2   it, not that this matters anymore in light of your
 3   global concession you've made in this hearing.  You
 4   offered when to make Alex Jones the corporate rep for
 5   InfoWars and they declined?
 6              MR. BARNES:  I believe on -- I believe it
 7   was March the 12th, Your Honor.
 8              THE COURT:  And why did they not want Alex
 9   Jones to be the corporate rep for InfoWars?  He would be
10   the person most knowledgeable about InfoWars.
11              MR. BARNES:  That he would be available
12   for that on the 20th, and they wanted the corporate rep
13   to be deposed on the 15th.
14              THE COURT:  Which was the schedule.
15              MR. BARNES:  Absolutely.
16              THE COURT:  I see.  So you weren't
17   offering to make Alex Jones the corporate rep on the
18   date that had already been ordered for the corporate rep
19   deposition.  You wanted to postpone it and make him the
20   corporate rep on a later date.
21              MR. BARNES:  That's correct, Your Honor.
22              THE COURT:  So it was really the timing, I
23   guess I'll hear, to the extent it matters anymore on
24   that.
25              MR. BARNES:  Yes, Your Honor.
```

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
255 of 1044

33

 1                    THE COURT:  Okay.

 2                    MR. BARNES:  And the way I interpreted it

 3    is -- Rob Dew is the director of production for Free

 4    Speech Systems.  He handles all the -- getting the

 5    broadcasts together.  So I -- and he was already going

 6    to be the person for Free Speech Systems.  So I thought,

 7    oh, really what they want to get into is how did the

 8    broadcast happen, what information was relied on.  So

 9    that's why I had him designated as InfoWars.  And I was

10    the one that confirmed that it's only a paper entity.

11    It was formed many years ago originally with the

12    intentions of putting the website into InfoWars.  That

13    never functionally happened.  Then the divorce

14    proceeding started, so he's advised just to freeze

15    everything.

16                    I think to the degree it makes it easier,

17    we'll probably just make InfoWars, LLC -- rather than

18    dissolve it, just make it a subsidiary of Free Speech

19    Systems.  That simplifies it across the board.  But

20    there was no goal or objective of trying to not have

21    someone available.  I thought they were looking at just

22    the production side, this is the same guy that knows the

23    production side, so I'll produce him.  And because he

24    was relying upon me for his information about InfoWars,

25    that was where he didn't go into detail on that aspect.

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
256 of 1044

34

1 But there was no goal whatsoever to have someone

2 unavailable for those purposes.  It's just an entity

3 that only exists on paper, and all Alex Jones could say

4 is the exact same thing.  It exists on paper.  The

5 lawyers did it.

6               THE COURT:  Well, he'd say more than that

7 witness.  I mean, the part of the transcript I read, he

8 was clueless about InfoWars.

9               MR. BARNES:  Yeah, I mean, he has very

10 limited --

11               THE COURT:  The deponent just knew nothing

12 about InfoWars, so it was a pretty meaningless

13 deposition in terms of explicating InfoWars as an

14 entity.

15               MR. BARNES:  It only exists on paper, so

16 there's not -- like I didn't know what else --

17               THE COURT:  I understand, but he didn't

18 even really explain that, but okay.

19               MR. BARNES:  Oh, yeah.  That's because I

20 thought they were really having him there for the other

21 purposes.

22               THE COURT:  Okay.

23               MR. BARNES:  There was, again, no goal or

24 objective to in any way withhold information or anything

25 else.  So, again, we'll accommodate the plaintiffs

# Exhibit 2

CAUSE NO. D-1-GN-19-004651

| | | |
|---|---|---|
| NEIL HESLIN | * | IN THE  DISTRICT  COURT |
| | * | |
| VS. | * | |
| | * | OF TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, | * | |
| LLC, and FREE SPEECH | * | |
| SYSTEMS, LLC | * | 261ST JUDICIAL DISTRICT |

**********************************

VIDEOTAPED ORAL DEPOSITION OF

ROB DEW

November 26, 2019

**********************************

VIDEOTAPED ORAL DEPOSITION OF ROB DEW, produced as

a witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and numbered cause

on the 26th of November, 2019, from 1:27 p.m. to

3:22 p.m., before Micheal A. Johnson, RDR, CRR, CSR,

Certified Shorthand Reporter in and for the State of

Texas, reported by machine shorthand, at the law offices

of Burnett Turner, 6034 West Courtyard Drive, Suite 140,

Austin, Texas pursuant to the Texas Rules of Civil

Procedure and the provisions stated on the record or

attached hereto.



**Page 2**

```
1              APPEARANCES
2  ON BEHALF OF THE PLAINTIFF
   NEIL HESLIN:
3
   Bill Ogden
4  Mark D. Bankston
   FARRAR & BALL, LLP
5  1117 Herkimer Street
   Houston, Texas 77008
6  (713) 221-8300
   bill@fbtrial.com
7  mark@fbtrial.com
8
   ON BEHALF OF THE DEFENDANTS
9  ALEX E. JONES, INFOWARS, LLC
   AND FREE SPEECH SYSTEMS, LLC:
10
   T. Wade Jefferies
11 THE LAW FIRM OF T. WADE JEFFERIES
   401 Congress Avenue, Suite 1540
12 Austin, Texas 78701
   (512) 201-2727
13 twadejefferies@twj-law.com
14
   VIDEOGRAPHER:
15
   Robie Rowley
16
17 ALSO PRESENT:
18    Brooke Binkowski
19
20
21
22
23
24
25
```

**Page 3**

```
1              INDEX
               ROB DEW
2           November 26, 2019
3
   APPEARANCES                      2
4
   PROCEEDINGS                      5
5
6
   EXAM NATION OF ROB DEW:
7
   BY MR. OGDEN                     5
8
9
   CHANGES AND SIGNATURE           92
10
   REPORTER'S CERTIFICATION        94
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1          DEPOSITION EXHIBITS
                ROB DEW
2           November 26, 2019
3
   NUMBER        DESCRIPTION        MARKED
4
   Exhibit 1    Order on Plaintiffs' Motion    6
5                for Expedited Discovery in
                 Aid of Plaintiff's Response
6                to Defendants' TCPA Motion
7  Exhibit 2    04/24/2018 E-mail, Rob Dew     67
                 to Melinda Flores, et al.
8                Heslin (19-4651) - 000627
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1              PROCEEDINGS
2         THE VIDEOGRAPHER:  We are on the record.
3  This is the videotaped deposition of Rob Dew.  Today's
4  date is November 26, 2019, and the time is 1:27 p.m.
5         Would you please swear in the witness.
6              ROB DEW
7  having been first duly sworn, testified as follows:
8              EXAMINATION
9  BY MR. OGDEN:
10    Q.  Please state your name.
11    A.  Rob Dew.
12    Q.  Mr. Dew, what -- why are you here today?
13    A.  You guys have questions for me.
14    Q.  Do you have -- can you tell us what your
15 understanding is about what those questions are going to
16 be about?
17    A.  They have to do with the Sandy Hook lawsuit.
18    Q.  Okay.  You're here as a corporate
19 representative.  You understand that?
20    A.  Yes.
21    Q.  And you've testified on behalf of -- as a
22 corporate representative before, correct?
23    A.  Correct.
24    Q.  As you sit here right now, who are you a
25 corporate representative for?
```

6

1    A. Free Speech Systems.
2        (Deposition Exhibit 1 marked for
3        identification.)
4    Q. (BY MR. OGDEN)  I'm going to hand you
5  Exhibit 1.
6    A. Okay.
7    Q. Have you seen Exhibit 1 before?
8    A. I've seen a lot of these.  Let me just look
9  through it real quick.
10   Q. And to shortcut this, I can tell you it's at
11 the bottom of page 1, top of page 2.
12   A. Bottom of page 1, top of page 2, yes.
13   Q. Those are the topics.  It's double-sided.
14   A. Okay.  Right.  Okay.
15   Q. Which of the four topics listed at the bottom
16 of page 1 and top of page 2 of Exhibit 1 are you
17 prepared to discuss today?
18   A. I am prepared to discuss a), Sourcing and
19 research for the videos descr bed in Plaintiff's
20 petition, and b), Internal editorial discussions
21 regarding Free Speech Systems's coverage of Sandy Hook
22 Elementary School shooting.
23   Q. What did you do to prepare for your deposition
24 testimony today regarding sourcing and research for the
25 videos described in plaintiff's petition?

7

1    A. Not much, other than speak with my attorney.
2    Q. Did you look at any documents?
3    A. I looked at this document, and that's it in
4  terms of preparing for this.
5    Q. Did you ta k to any fellow employees?
6    A. Other than Alex Jones, I think, no.
7    Q. You would agree with me there are a number of
8  employees that were researchers or were involved in the
9  sourcing process of getting Sandy Hook information,
10 correct?
11   A. There was -- yeah, I would agree there's more
12 than one employee doing that.
13   Q. Why didn't you talk to any of them?
14      MR. JEFFERIES:  Objection, form.
15      Go ahead.
16   A. Talk to any of the employees?  I would say most
17 of the employees that were there back then are not there
18 now.
19   Q. (BY MR. OGDEN)  Okay.  Is Buckley Hamman still
20 there?
21   A. No.
22   Q. Is Nico?
23   A. No.
24   Q. Is Darrin McBreen?
25   A. He is still there.

8

1    Q. Did you talk to him?
2    A. We share an office, but we don't -- so I have
3  talked to Darrin McBreen.  I don't -- it wasn't about
4  preparing for this -- for this at all.
5    Q. Are you prepared to testify as to the
6  discussions Darrin McBreen has had with individuals at
7  Free Speech Systems regarding the sourcing and research
8  for videos descr bed in plaintiff's petition?
9    A. Am I -- repeat that again.  Am I prepared to --
10   Q. You understand Topic a) in Exhibit 1?
11   A. Right.
12   Q. Are you prepared to give testimony today
13 regarding Darrin McBreen as it applies to Topic a)?
14   A. That depends on what your question would be.
15 I'm not sure if I have the answer to any questions about
16 Darrin McBreen.
17   Q. What type of information and research -- excuse
18 me.  What type of research did Darrin McBreen do
19 regard -- involving the videos in plaintiff's petition?
20   A. I wouldn't consider him a researcher.
21   Q. Has he ever done research?
22   A. He has done research, but I --
23   Q. Has he done Sandy Hook research?
24   A. Not that I know of.  He does -- he makes
25 graphics and makes things look good on video.

9

1    Q. He also does research, though?
2    A. He does when he does his own stuff, his own
3  reporting.
4    Q. Did you ask him if he's done research for Sandy
5  Hook?
6    A. No, I didn't ask him that.
7    Q. So you don't know whether or not he's done
8  research for Sandy Hook?
9    A. I can't remember any videos he was involved
10 with making.
11   Q. Right.  That wasn't my question, though.
12 Because I'm not asking you personally.  I'm asking you
13 as the corporate representative, and you were tasked
14 with preparing yourself to discuss Topic a) as it
15 applies to the entire company.
16      So my question is, are you prepared to discuss
17 the research that Darrin McBreen was involved with
18 regarding Sandy Hook?
19   A. I would say no.
20   Q. Okay.  Josh O, does that ring a bell?
21   A. Josh O.  In what context?
22   Q. In -- as an employee for InfoWars.
23   A. As an employee.  There was a Josh that used to
24 work there.
25   Q. Doesn't work there anymore?

10

1  A.  No.
2  Q.  Okay.  Jakari Jackson?
3  A.  He does not work there.
4  Q.  Melissa Melton?
5  A.  Does not work there.
6  Q.  Marcos Morales?
7  A.  He does still work there.
8  Q.  Did you speak with Marcos Morales about
9  sourcing and research that he did for videos described
10  in plaintiff's petition?
11  A.  No, I did not speak with him.
12  Q.  So you would agree you're not prepared to
13  discuss the research that Marcos Morales has done for
14  the videos described in plaintiff's petition?
15  MR. JEFFERIES:  Objection, form.
16  THE WITNESS:  Answer?
17  MR. JEFFERIES:  Yeah.
18  A.  To my knowledge, Marcos Morales did not do any
19  research with regards to Sandy Hook.
20  Q.  (BY MR. OGDEN)  Right.  But I'm not asking you
21  about your knowledge.  I'm asking you what you did --
22  whether or not you prepared yourself to give me an
23  answer on behalf of the company today.
24  A.  Sure.  And what I'm saying is, if I know they
25  didn't do anything, I didn't go ask them if they did

11

1  anything.
2  Q.  Has Marcos Morales ever done any research for
3  Sandy Hook?
4  A.  Not to my knowledge.
5  Q.  So is that a yes or a no?
6  A.  That's a not to my knowledge that he's done it.
7  Q.  So you don't know, correct?
8  A.  I don't know that he -- I do know that he
9  hasn't made any videos.  He may have been in on a live
10  presentation, but like maybe cut switching the cameras,
11  but he's not a -- he's not a -- someone we would rely on
12  for research.  He's someone that is more of a technical
13  operator.
14  Q.  Okay.
15  A.  So that's why I would never have asked him
16  anything about it.
17  Q.  Has Marcos Morales ever done any research
18  regarding Sandy Hook?
19  A.  Not that I know of.
20  Q.  Did you ask him?
21  A.  I did not ask him.
22  Q.  So you don't know?
23  A.  I think I explained my position on that.
24  Q.  Do you know or not?  Let me clear it up.
25  A.  Okay.

12

1  Q.  Does Free Speech Systems know whether or not
2  Marcos Morales has done research on Sandy Hook regarding
3  the videos in plaintiff's petition?
4  A.  I don't think he's been involved in any of
5  that.
6  Q.  I didn't ask whether or not you thought.  I
7  asked whether or not Free Speech Systems knows whether
8  or not Marcos Morales has done any research for the --
9  pertaining to the videos in plaintiff's petition?
10  A.  I can't answer that.
11  Q.  And that's because you don't know on behalf of
12  the company?
13  A.  Well, going back to the best of my knowledge, I
14  do not know.
15  Q.  You understand that when you were tasked as the
16  corporate representative on that topic, that you had a
17  duty to prepare yourself to discuss that topic?  Do you
18  know that?
19  A.  I didn't understand that.
20  Q.  Okay.  Nobody has explained that to you --
21  A.  No.
22  Q.  -- prior to right now?
23  A.  Prior to right now.
24  Q.  You were under the impression you were to come
25  in here, sit down and testify as to what you know

13

1  personally and that's it?
2  A.  No, that's not what I understood.  I understood
3  that I was the corporate representative.  But I did not
4  know I was supposed to go talk to Marcos Morales.
5  Q.  What did you think you were supposed to do?
6  A.  Well, Marcos Morales didn't have anything to do
7  with any of the production work.  So I don't know how
8  that -- it's like asking the janitor, you know, if they
9  did any research.
10  Q.  When it comes to sourcing, InfoWars has an
11  e-mail address that it puts out where tips can be sent,
12  correct?
13  A.  We used to, yes.
14  Q.  You understand that there's a lot of documents
15  that were produced in the Lewis case, correct?
16  A.  Uh-huh.
17  Q.  Is Marcos -- did Marcos ever answer any of
18  those e-mails?
19  A.  I don't know.  I didn't look at all the
20  e-mails.
21  Q.  Did he ever open them and forward them to other
22  employees of InfoWars or Free Speech Systems?
23  A.  Okay.  I see what you're getting at.  At the
24  end of a show, there are titles and descriptions that go
25  out and those might have been sent to Marcos at some

14

1  time.
2      Q.  My question was a little different.
3      A.  But it's not having to do with research.  It's
4  about a show, how you put a show out on the Internet.
5      Q.  My question was a little different.  Did Marcos
6  ever answer -- ever open e-mails that came in on the
7  information -- you know, we'll call it the hotline, the
8  e-mail address that was out that people could send in
9  tips, did Marcos ever open those and then forward them
10  to people based on what was in there?
11      A.  That is possible, that he might have done that.
12  If I forwarded something for the show people to, say,
13  hey, check this out for the show, if I forwarded it to
14  like a host, then he might have been in on there because
15  he is the director of the show.
16      Q.  I asked you whether or not he personally
17  forwarded it to other employees.
18      A.  That, I don't know.
19      Q.  So you don't know whether or not he was
20  involved with any sourcing of the video -- regarding the
21  videos in plaintiff's petition?  And I'm not trying to
22  trip you up.  I just want a yes or no.
23      A.  I don't know.
24      Q.  David Ortiz?
25      A.  What about him?

15

1      Q.  Does he still work at Free Speech Systems?
2      A.  No.
3      Q.  Kristi, K-r-i-s-t-i, no last name?
4      A.  No.
5      Q.  Lydia, L-y-d-i-a, no last name?
6      A.  No.
7      Q.  Do you recognize the name?
8      A.  I do recognize the name.
9      Q.  But she does not work there anymore?
10      A.  No.
11      Q.  Travis Knight?
12      A.  He does still work there.
13      Q.  Okay.  And Travis Knight was involved at least
14  in part with some of the Sandy Hook videos, correct?
15      A.  I think when he first came in, he would have
16  been at that time editing the shows and so there may
17  have been e-mails sent to him that had Sandy Hook in the
18  title.  He may have got -- I don't know if he got -- if
19  he was getting tips.  I don't think he was getting any
20  tips through our tip system because that only went to a
21  few people, mainly the writers.  But, no, I don't -- I
22  don't think he would have been involved.
23      Q.  You don't think or he was -- he was or he
24  wasn't?
25      A.  On an administrative level, he might have had

16

1  something pass through.
2      Q.  Again, I'm not asking whether he might have.
3  Does Free Speech Systems know whether or not Travis
4  Knight was involved in research or sourcing of the
5  videos in plaintiff's petition?
6      A.  No.
7      Q.  Did you ask -- did you talk to Travis Knight in
8  preparing for today?
9      A.  I did not.
10      Q.  Alejandra Gutierrez?
11      A.  Are you asking if she still works there?
12      Q.  Yes.
13      A.  She still works there.
14      Q.  She's a lead producer, correct?
15      A.  She might have been before.  I don't think
16  she's a lead producer now.
17      Q.  Okay.  What's her position now?
18      A.  She does graphics and edits stuff for social
19  media.
20      Q.  Did you speak with her about whether or not she
21  had any -- she was involved with any sourcing or
22  research regarding the videos pertain -- contained in
23  plaintiff's petition?
24      A.  No, definitely not.
25      Q.  Was Alejandra Gutierrez involved with the

17

1  sourcing or research in plaintiff's petition?
2      A.  Not to my knowledge.
3      Q.  Does Free Speech Systems know whether or not
4  Alejandra Gutierrez had any involvement with any
5  sourcing or any research with regards to the videos
6  contained in plaintiff's petition?
7      A.  I don't believe she was hired -- I don't think
8  she was around for most of that, but I couldn't tell
9  you.
10      Q.  So the answer's you don't know?
11      A.  That's the answer.
12      Q.  Richard Gaines?
13      A.  Richard Gaines.  He does not work there.
14      Q.  Wilson Bondesen?
15      A.  He does still work.
16      Q.  He does?  And we know at this point that Wilson
17  was involved with tips coming in and sources giving
18  information.  Did you speak with Wilson prior to today
19  about your testimony?
20      A.  No.
21      Q.  Are you prepared to testify as to Wilson
22  Bondesen, B-o-n-d-e-s-e-n's involvement with sourcing
23  and researching for the videos in plaintiff's petition?
24      A.  No, I'm not.  If you could show me something, I
25  can look at it and tell you if it was germane or not.

18

1    Q. Jerome Corsi?
2    A. He was a guest for -- I don't know if he -- he
3  was hired briefly for -- during the election.
4    Q. Did he have any involvement with any research
5  or sourcing of the video -- for the videos contained in
6  plaintiff's petition?
7    A. Not -- I don't think when he was an employee.
8    Q. When he wasn't an employee, did he have any?
9    A. He might have.  I don't know.  I'm sure he's on
10 a Wolfgang Halbig e-mail.
11   Q. And I'm asking these as these are all prior
12 employees, but the topic is not only as to employees.
13 You understand that, correct?  It's any researching or
14 sourcing for the videos described in the petition.
15   A. I misunderstood with Corsi.  I thought you were
16 talking about when he was an employee.
17   Q. Are you prepared -- is Free Speech Systems
18 prepared to give testimony today as to Jerome Corsi's
19 involvement with sourcing and research for the videos
20 described in plaintiff's petition?
21   A. I guess it would depend on what question you
22 asked.
23   Q. All right.  I'll give you an example.  Was
24 Mr. Corsi involved with any sourcing or research for the
25 videos contained in plaintiff's petition?

19

1    A. I think that's still a broad, generalized
2  question.
3    Q. Right.
4    A. Do you have anything more detailed?
5    Q. You can give me any answer if he was involved
6  in any way, if you know.
7    A. I don't know.
8    Q. Okay.  And you didn't prepare yourself in any
9  way to discuss whether or not --
10   A. Mr. Corsi.
11   Q. -- whether or not Mr. Corsi was involved in
12 sourcing or researching these videos in plaintiff's
13 petition?
14   A. That's correct.
15   Q. Daria Karpova or Daria?
16   A. She still works there.
17   Q. Is it Daria or Daria?
18   A. It's Daria.
19   Q. Daria.  Is she still the technical director?
20   A. No.  She's probably moved up to lead producer
21 of the show, of Alex's show.
22   Q. Was -- did you speak with her about your
23 testimony today?
24   A. No.
25   Q. Are you prepared -- is Free Speech Systems

20

1  prepared to discuss Daria Karpova's involvement with
2  sourcing and research for the videos described in
3  plaintiff's petition?
4    A. You could ask me questions.  I'll tell you what
5  I know.
6    Q. Was Daria Karpova involved with researching or
7  sourcing any of the videos contained in plaintiff's
8  petition?
9    A. Not to my knowledge.  Other than booking guests
10 or something like that.
11   Q. And again, you answered with not to my
12 knowledge, but I'm asking is Free Speech Systems
13 prepared to discuss whether or not she was involved with
14 sourcing or researching the videos contained in
15 plaintiff's petition?
16   A. Whether she was involved.  I don't think she
17 was involved.
18   Q. And again, I'm not asking whether or not you
19 think she was.  I'm asking Free Speech Systems whether
20 or not she was.  It's a yes, no or I don't know.
21   A. I don't know.
22   Q. Moving on.  Zach Drucker, is he still employed?
23   A. No.
24   Q. Did Zach Drucker have any involvement with any
25 sourcing or research for the videos described in

21

1  plaintiff's petition?
2    A. I don't know.
3    Q. Did you take any steps to find out one way or
4  the other whether or not he did?
5    A. No.  He wouldn't have been on my radar to do
6  that.
7    Q. Why is that?
8    A. Because he was more of a technical person.
9    Q. I understand that.  However, it seems like
10 there were a couple of technical people that we've
11 discussed so far that might have, you just don't know.
12   A. Well, they've had -- a lot of these -- I think
13 when Zach came in, Sandy Hook was not really being
14 reported on.
15   Q. What year was that?
16   A. I think 2014 or sometime.  We stopped -- maybe
17 2015.  I don't have an exact date.
18   Q. You don't have the year; you just know that
19 that's when Zach was around?
20   A. No, I know when Zach was around, he wouldn't
21 have been involved in getting tip -- he wouldn't have
22 been on a tip line or anything like that.
23   Q. Did he get any sources or do any research
24 regarding Sandy Hook and the videos contained in
25 plaintiff's petition?

22

1    A.  Are you considering receiving an e-mail on a
2  giant e-mail blast, garnering tips or research?  Is that
3  what you're referring to?
4    Q.  If in any way they relate to the videos
5  contained --
6    A.  Because that -- what I feel is going on, you're
7  going to ask me --
8    Q.  Let's stop here.
9    A.  Okay.
10    Q.  He's going to throw stuff at both of us if we
11  talk over each other because he's trying to write down
12  every word.
13    A.  Sure.
14    Q.  If you'll let me finish my question, I'll let
15  you finish your answer.
16    A.  Sure.
17    Q.  That way we can give him a break on that.
18       So yes, I am asking you whether -- yes, that --
19  my question includes whether or not he received an
20  e-mail that had information that inevitably went into
21  one of the videos contained in plaintiff's petition.
22    A.  I don't know.
23    Q.  Did you take any steps to figure out whether or
24  not he was involved?
25    A.  No, I did not.

23

1    Q.  Sam Montoya, is that person still employed?
2    A.  Uh-huh.
3    Q.  What does Sam Montoya do?
4    A.  He edits videos and he was -- he's a production
5  assistant on some of the live shows.
6    Q.  Has Sam Montoya done any research for Sandy
7  Hook that is contained in the videos in plaintiff's
8  petition?
9    A.  I don't know.
10    Q.  Did you take any steps to find out?
11    A.  No.
12    Q.  Harrison Smith?
13    A.  He still works there.
14    Q.  What does Harrison do?
15    A.  He is a fill-in host and he does reports.
16    Q.  Was he involved -- was he involved in sourcing
17  or research for the videos described in plaintiff's
18  petition?
19    A.  Do you have the list around real quick?
20    Q.  What list?
21    A.  The list in the plaintiff's petition.  I can
22  just look at the dates real quick on them.  It's
23  possible he was.
24    Q.  Okay.  When you say "it's poss ble," that's
25  just -- that's -- again, Free Speech Systems does not

24

1  know one way or the other whether or not Harrison Smith
2  was involved with sourcing or research for the videos
3  descr bed in plaintiff's petition?
4    A.  That's correct.
5    Q.  Okay.  Andrew Thompson, still employed with
6  Free Speech Systems?
7    A.  Yes, he still works there.
8    Q.  What does he do?
9    A.  He's a video editor.
10    Q.  Okay.  Did he --
11    A.  And a cameraman.
12    Q.  Was he in any way involved with sourcing and
13  research for the videos described in plaintiff's
14  petition?
15    A.  I can guarantee you he was not.
16    Q.  Okay.  And how do you come to that guarantee?
17    A.  Because he's only been there for a year.  Maybe
18  a year and a half.
19    Q.  Okay.  My next question is, we just went
20  through a list of names of -- one, two, three, four,
21  five, six, seven -- looks like ten people that -- at
22  least ten people that Free Speech Systems is not aware
23  one way or the other whether they were involved with
24  resource -- researching or sourcing the videos in
25  plaintiff's petition.  So the follow-up to that is, who

25

1  was involved in sourcing and researching the information
2  that is contained in the videos described in plaintiff's
3  petition?
4    A.  That works at Free Speech Systems?
5    Q.  Anyone.
6    A.  I would go back to --
7    Q.  Let's start with you.
8    A.  Okay.
9    Q.  You were involved?
10    A.  I was involved.
11    Q.  How about Alex?
12    A.  Alex.
13    Q.  Alex was involved.  And that's Alex Jones?
14    A.  Correct.
15    Q.  All right.  Owen Shroyer?
16    A.  Yeah.  I mean, he did that one video, but he
17  didn't come around until after the election -- or right
18  before the election.
19    Q.  Your uncle?
20    A.  He went to a meeting well after everything
21  occurred.
22    Q.  There's a --
23    A.  I did interview him.
24    Q.  There's a video that references your uncle's
25  beliefs and opinions regarding Sandy Hook, correct?

26

1    A.  No, I think his opinions and beliefs are
2  regarding the meeting that was taking place there and he
3  was told by a lot of his neighbors that he should go up
4  there to that meeting.  That had nothing to do with us.
5    Q.  So when Alex Jones went on the air and said,
6  we've talked to a former FBI agent retired and he says
7  all of this is fake, that's not your uncle being
8  involved in sourcing information for these videos?
9    A.  No.  That might have been Alex's interpretation
10  of what I told him.  What my uncle specifically said was
11  that I've never been to a meeting with government people
12  where nobody knows nothing.  That's what he said.
13    Q.  Okay.  And Alex just took that and kind of ran
14  with it in his own words?
15    A.  You'd have to ask him what he did with that.
16  But that's -- I wrote -- you know, I wrote down -- I
17  mean, I don't know where the notes are, but I wrote
18  down -- because I talked to him in front of a dry
19  cleaner.
20    Q.  So the video we're talking about involving the
21  information that Alex claims is from your uncle, that's
22  in plaintiff's petition, correct?
23    A.  I believe so.
24    Q.  And your uncle, at least in part, was the
25  source of some of that information, correct?

27

1    A.  He was the source of him going to the meeting
2  and his impressions of the meeting.
3    Q.  He didn't stop there.  He then relayed those
4  impressions to you, who relayed them to Alex, correct?
5    A.  I actually called my uncle.
6    Q.  Right.  He relayed those impressions to you and
7  you relayed them to Alex, who put them on the air,
8  correct?
9    A.  Yes.
10    Q.  In your -- is it your understanding that that
11  is his involvement in the sourcing of the information in
12  these videos?
13    A.  I don't think I was questioning whether he was
14  a source or not.  I was questioning whether -- we'd have
15  to go back and -- whatever you said didn't sit right
16  with reality.
17    Q.  Okay.  Let me ask you a question.  What does
18  the word "sourcing" mean to you?
19    A.  I guess -- well, there's many ways to get --
20  there's many ways that you would get a source.  You can
21  get it from a piece of video, an article, an e-mail tip,
22  eyewitness testimony, security camera footage, receipts,
23  interviews.
24    Q.  Instead of giving examples, let me just ask you
25  this.  Is your understanding of sourcing, sourcing is

28

1  where the information comes from; is that fair?
2    A.  That's fair to say.
3    Q.  Okay.  Who -- earlier you mentioned writers,
4  correct?
5    A.  Uh-huh.
6    Q.  And you said that those were mainly the
7  individuals who would come into possession of tips on
8  the information e-mail address, correct?
9    A.  Uh-huh.
10    Q.  Who were the writers that worked on Sandy Hook?
11    A.  Adon Salazar, Paul Watson, Aaron Dykes.
12    Q.  Is that E-r or A-a-r?
13    A.  A-a-r.
14    Q.  Got Adon, Paul and Aaron.  Anyone else?
15    A.  Those are ones that I know that definitely
16  wrote articles about Sandy Hook.
17    Q.  How about David Knight?
18    A.  I wouldn't consider him a writer, but he's --
19  he's probably done something.
20    Q.  What about Nico?
21    A.  No, he was just a producer.  I mean, he would
22  have --
23    Q.  Jonathan Rappaport?
24    A.  Rappaport didn't work for us.  He was a
25  contributor, I guess you could say.  We've probably

29

1  published -- republished his articles.
2    Q.  Okay.  So he would be considered a writer for
3  Sandy Hook information that he published?
4    A.  Uh-huh.
5    Q.  Kurt Nimmo?
6    A.  Yes, but he doesn't -- so he doesn't work
7  there, yeah.  That would be another one.
8    Q.  He does not work there anymore?
9    A.  Correct.
10    Q.  What was his position with InfoWars -- excuse
11  me, with Free Speech Systems?
12    A.  He was a writer, and at one point he was the
13  webmaster.
14    Q.  The webmaster?
15    A.  Yeah.  At one point, but I don't know how -- I
16  don't know when that was.  It was probably even before I
17  got there.
18    Q.  Why doesn't he work there anymore?
19    A.  It's kind of personal.  I think he just wanted
20  to move out of the state of Texas.
21    Q.  Okay.
22    A.  Because that's what he did.  I don't know.
23    Q.  Dan Bidondi?
24    A.  Is it whether he still -- he does not work for
25  us anymore.

30

1    Q. Correct. My question is, was Dan Bidondi's
2  writing ever published by InfoWars or by Free Speech
3  Systems?
4    A. It's possible we put an article which had
5  contained a video under his byline, but that would be --
6  I don't know if he actually wrote an article.
7    Q. Today you're tasked with having sourcing and
8  research for all the videos described in plaintiff's
9  petition.
10   A. Uh-huh.
11   Q. How many videos are there?
12   A. I would say upwards of 30.
13   Q. What are they?
14   A. I couldn't name them all right now.
15   Q. Are you prepared to discuss each one and how
16  they were sourced and researched?
17   A. If you could give me the name, I could then
18  tell you about it. The one I have the most familiarity
19  with is why people don't believe Sandy Hook is a hoax.
20   Q. Okay. Let's start there, Why People Think
21  Sandy Hook is a Hoax. What steps did you take to
22  prepare yourself right now to speak on behalf of Free
23  Speech Systems about the sourcing and research involved
24  for this video?
25   A. I scanned through the final video because

31

1  that's what we have.
2    Q. Okay. Who was in charge -- who was tasked with
3  researching this video?
4    A. It was Alex and myself.
5    Q. No one else?
6    A. If anybody was ancillary involved, it was me
7  and Alex who put the project together.
8    Q. And I'm not asking who put the project
9  together. I'm asking who researched the story and
10  gave -- and brought information in that was ultimately
11  used in the project?
12   A. Right. And unfortunately I couldn't go back
13  and tell you who might have handed Alex an article or
14  who might have brought him a video in terms of that
15  detail, but it was -- the stuff me and Alex sat down and
16  went through and looked at the different pieces, then we
17  laid out how we were going to make that video.
18   Q. Okay. The source of the information, who was
19  in charge of sourcing that?
20   A. Like I said, that would have been Alex and
21  myself. Alex would have had ultimate editorial control.
22   Q. Who -- was it you or Alex who originally found
23  the video and noticed what was later claimed by
24  Mr. Jones to be blue screen?
25   A. From what I remember, somebody sent that in to

32

1  us that -- either that morning or the day before.
2    Q. And somebody had just e-mailed it in?
3    A. They e-mailed it in and said look, it looks
4  like it's blue screen, and they sent a horrible video
5  that was blown up on YouTube. And I do specifically
6  remember looking for the original -- finding the best
7  source we could find on that, because CNN did not have
8  the video on their website and it was -- I do remember
9  it was a different website that wasn't CNN that had the
10  video and it was the best-looking quality. And so --
11   Q. What website was that?
12   A. I couldn't tell you.
13   Q. Did you --
14   A. Couldn't tell you to this day. But it was a
15  website that was grabbing news feeds. They were like an
16  aggregator. I don't remember the name and it was -- you
17  know, I grabbed the video and then we had the video.
18   Q. Who sent in the original source?
19   A. I'm sure it's in one of those e-mails. I don't
20  know. I don't remember. But it would have been an
21  e-mail that I clicked on that came through, I don't
22  know, the tip system. I don't know if it was -- I don't
23  remember if it was directly addressed to me or if it was
24  through the tip system.
25   Q. What steps did you take to prepare yourself

33

1  today to speak on behalf of Free Speech Systems as to
2  who was the source of the video from Sandy Hook -- from
3  Why People Think Sandy Hook is a Hoax?
4    A. I told you, I scanned through the video and
5  looked at it.
6    Q. So you just watched the video?
7    A. Uh-huh. And a lot of it brought back the
8  memories of what I remember of putting it together.
9    Q. Right. And again, you're here on behalf of
10  Free Speech Systems, and you had a responsbility today
11  to be prepared to discuss the source of the information
12  in that video, correct?
13   A. Sure. I think I'm telling you everything that
14  I know and that what happened.
15   Q. It's not everything you know, Mr. Dew. It's
16  everything Free Speech Systems knows. So if there is an
17  e-mail out there that you claim has been produced to us,
18  who is it from, what date, what's it say?
19   A. I don't know.
20   Q. Did you look for it in preparing for today?
21   A. No, I did not.
22   Q. Why?
23   A. I don't know if our system goes back that far.
24  That would have been sometime in January, maybe, of
25  2013.

34

1    Q.  So if I just looked at an e-mail from
2  January 27th, 2013, the system definitely goes back that
3  far, right?
4    A.  I don't know if I have access to all my e-mails
5  back that far.
6    Q.  So you're only checking your e-mails when you
7  were preparing for today; you weren't checking the
8  e-mails that are in the possession of Free Speech
9  Systems who you're currently sitting here as?
10    A.  That's correct.
11    Q.  Okay.  Do you believe, sitting here right now,
12  that you're prepared to discuss the sourcing and
13  research that went into Why People Think Sandy Hook is a
14  Hoax?
15    A.  Yes, I do because I edited the video.
16    Q.  Okay.  Who was the source?
17    A.  I don't know.  It's probably an anonymous
18  person.
19    Q.  Who did that --
20    A.  I can tell you this.  The video they sent me is
21  not the video we used.
22    Q.  I didn't ask that.  I asked who your source of
23  the information was and you don't know who that was,
24  correct?
25    A.  Well, I could say I'm the source because I went

35

1  and found the original video.
2    Q.  Okay.  From where?
3    A.  I don't remember the name of the site.
4    Q.  So you don't remember the name of the source?
5    A.  That had the video?  They probably don't exist
6  anymore.
7    Q.  Probably or they don't?
8    A.  I don't know.
9    Q.  Right.  And what I'm saying is, you're not
10  prepared to discuss whether or not they are?
11    A.  When you grab -- I mean, I can see why it makes
12  a difference in your case, but when we were making the
13  video, it did not matter where the source came from
14  because we had the actual video and it was Anderson
15  Cooper and I believe Neil -- not Neil Heslin.  The
16  Pozner -- Mr. Pozner's ex-wife at the time.
17    Q.  You don't even -- you don't know her name?
18    A.  Veronica or Veronique, something I ke that.
19    Q.  Okay.  And I'm aware that at the time you were
20  getting this information, no one at InfoWars cared where
21  it came from; but you were tasked with finding out where
22  it came from and you aren't prepared for that, correct?
23    A.  I don't think you could find out.
24    Q.  Why?
25    A.  I'm sure the source doesn't exist anymore.

36

1    Q.  You're sure?
2    A.  I myself am sure.  For Free Speech, no, I don't
3  know.
4    Q.  Okay.  What type of research did you and/or
5  Alex do to determine whether or not there was a blue
6  screen behind Anderson Cooper?
7    A.  What type of research?  I think looking at
8  whether something is a blue screen or not comes from
9  years of doing blue screen work, and Alex -- I'm not
10  speaking for Alex, but I was in the room when he looked
11  at it and he said that's blue screen.
12    Q.  Have you ever seen Alex work with a blue
13  screen?
14    A.  Uh-huh.
15    Q.  You have a blue screen at the studio?
16    A.  We have a green screen at the studio.  But he's
17  worked with blue screen at Access Television.
18    Q.  How do you know?
19    A.  Because I've seen him there and he told me he
20  did and I've seen his shows, many years working at
21  Access.
22    Q.  Have you seen his nose disappear?
23    A.  Alex's nose?
24    Q.  Yeah.
25    A.  I don't think I've ever seen his nose

37

1  disappear.
2    Q.  Okay.  So it was Alex's expertise on the blue
3  screen, not yours?
4    A.  Correct.
5    Q.  So all the research would have been done by
6  him?
7    A.  Uh-huh.
8    Q.  And he didn't really do any research.  He just
9  looked at it and said, well, I've never seen that
10  before, so it must be a blue screen?
11    A.  You'd have to ask him on that, but yes.  I
12  mean, I was there when he said it and he said that's
13  blue screen.
14    Q.  I'm asking you because you're sitting here
15  today on behalf of the company and it's your job to know
16  what research he did.
17    A.  And then later he said he's looked at
18  thousands -- or he's done -- maybe he said hundreds of
19  hours of blue screen video at Access Television.
20    Q.  I don't know what that means.
21    A.  Well, when you've got the blue screen behind
22  you and --
23    Q.  Oh, no, I know what you meant.  I don't know
24  how in any way that was responsive.
25    A.  I guess from his experience, he was drawing out

38

1 that he could -- he determined that that was blue
2 screen.
3     Q. And I'm not -- again, I'm not asking you to
4 guess. You said, I guess that was his. I'm asking --
5 you were tasked with knowing.
6     A. Right. And that's what he said later, that he
7 had done hours in Access Television in front of a blue
8 screen and he knows what it looks like.
9     Q. But that was after the video went up?
10    A. Yeah, that was probably after the video. Yes.
11 I would say it's after the video.
12    Q. Okay. Before the video went up and you put
13 this out there as fact?
14    A. He looked at it and said that was blue screen.
15    Q. That was enough for you?
16    A. That was enough for me.
17    Q. And that was enough for Free Speech Systems?
18    A. The reason there is a Free Speech Systems is
19 because of Alex Jones.
20    Q. That wasn't my -- you didn't answer my
21 question. My question was, Free Speech Systems is okay
22 with Alex Jones looking at something, saying it to be
23 the gospel and then putting it up on the Internet for
24 millions to see?
25    A. It was his -- I think it's his free speech

39

1 right to say that that's what he thinks it is.
2     Q. And my question was Free Speech Systems is okay
3 with that?
4     A. Correct.
5     Q. Do you have any journalistic principles in
6 writing, for everybody to review and adhere to before
7 they put content up for millions to see?
8     A. I think with Alex, it's -- he puts up what he
9 feels he wants to put up, and I'm not sure -- it depends
10 on when he's got the journalistic hat on or when he's
11 got his -- when he's got his -- he's a commentator,
12 where he's being a pundit. There's different hats he
13 wears and I think he changes them out frequently.
14    Q. Okay. Do you remember when I deposed you a few
15 months ago?
16    A. Uh-huh.
17    Q. We had a conversation about Free Speech Systems
18 and what their roles are generally.
19    A. Uh-huh.
20    Q. You remember that?
21    A. Yeah.
22    Q. And I asked you whether or not -- what portion
23 of Free Speech Systems was journalism and what portion
24 was not, and you said the majority of what we do is
25 journalism. You remember that?

40

1     A. Yeah, because we're presenting the news of
2 what -- of what is going on in the world and we're
3 either showing videos or reading other people's articles
4 or...
5     Q. And you -- when you're presenting the news,
6 there's principle -- there's a responsibility that a
7 company has for that, right?
8     A. Yeah.
9     Q. What responsibility is that?
10    A. To get the truth at best you can.
11    Q. As the best you can. Are there steps in place
12 to ensure that you do get the truth out there, that you
13 don't make a mistake?
14    A. Well, I don't think anybody's infallible of
15 making -- not making a mistake. I mean, mistakes have
16 been made in the past and we've owned up when we've made
17 mistakes.
18    Q. Which mistake is that? I'll give you some
19 examples.
20    A. Okay. Give me some examples.
21    Q. Mistake or not mistake: Anderson Cooper was in
22 front of a blue screen?
23    A. The only reason I would say it's not
24 100 percent is because somebody asked him if he was
25 there and he denied being at the funeral.

41

1     Q. You know that's not true.
2     A. No, there's video of it. There's video of a
3 guy asking him during a taping of a show; he said, hey,
4 were you at the funeral and he goes, no, I wasn't.
5     Q. Right. He wasn't at -- inside the funeral.
6 You understand that -- you've been a corporate
7 representative for Free Speech Systems in other lawsuits
8 in Texas, correct?
9     A. Uh-huh.
10    Q. And I'm involved with those, correct?
11    A. I'm sure you are.
12    Q. You understand that an expert who has decades
13 of service in the FBI in video forensics determined that
14 that was not a blue screen but was simply video
15 compression. Did you know that?
16    A. I've heard people say stuff. You know, the FBI
17 also said they put photos of two guys who supposedly
18 bombed the Boston marathon and said they didn't know who
19 they were when they'd interviewed them. So the FBI lies
20 a lot, yeah.
21    Q. So you don't trust the FBI?
22    A. I don't really trust much in the government.
23    Q. Okay.
24    A. That comes out of the government.
25    Q. Do you trust anonymous sources on 4chan?

42

1    A. I don't know if I've ever used an anonymous
2  source on 4chan.
3    Q. Do you know that's where the picture of Marcel
4  Fontaine was found and used?
5    A. Are you talking -- who's Marcel Fontaine?
6    Q. You don't know who Marcel Fontaine is? He's
7  the poor individual that lives in Massachusetts that
8  InfoWars randomly put up his picture saying he was
9  responsible for the Florida Parkland mass shooting.
10       THE WITNESS: So we're talking about a
11  different case now?
12    Q. (BY MR. OGDEN) Absolutely.
13    A. Oh, we are. Okay. Well, I didn't put that up,
14  but from my understanding --
15    Q. I'm not asking you whether you put it up. I'm
16  asking if Free Speech Systems is okay trusting an
17  anonymous source that is completely unverifiable and
18  using that information, but not trusting the FBI? Is
19  that what you're testifying to?
20    A. What I'm testifying to is that it's been our
21  experience that the FBI has lied many times to cover
22  up -- cover their own ass, essentially.
23    Q. Did you tell your uncle that?
24    A. Yeah, I've told him that. I told him I don't
25  like how they go find poor guys and set them up and,

43

1  like, hey, we're going to -- do you want to go bomb
2  something, here's a bomb, let's do this. I
3  don't agree with that. I think that's -- that's not the
4  way to have a world that works.
5    Q. Okay. You -- earlier you mentioned that you
6  broadcast information as it comes in, right?
7    A. Sometimes, yes.
8    Q. What --
9    A. Sometimes it's live.
10    Q. What are the sources that you do trust for
11  information that you put out to the public?
12    A. Well, I mean, like I say, sometimes we've used
13  CNN, but we also think CNN lies. But we've taken CNN
14  and we've looked at their videos. And early on, when --
15  say there's an article on some site, you go to the link,
16  you click to the source and you go down and find it.
17    Q. Okay. Dan Bidondi's articles that were
18  republished, you trusted those, right?
19    A. It depends on what you're --
20    Q. I'm talking about every article related to
21  Sandy Hook that Dan Bidondi submitted that InfoWars
22  republished. You trusted all of those as reliable
23  sources, correct?
24    A. I think we republished videos. I'm not sure
25  that Dan Bidondi wrote actual articles, although he may

44

1  have had a name on the byline.
2    Q. Okay. You trusted all the videos that he made,
3  which are just videos of him talking. That was a
4  reliable source to Free Speech Systems, but the FBI is
5  not. True?
6    A. No, I'm not going to say the FBI is wrong in
7  all cases. I think there's lot of good people in the
8  FBI. But we've also seen that they like to cover their
9  own ass.
10    Q. Who at Free Speech Systems is in any way
11  qualified to break down an FBI investigation and
12  determine whether or not it's true?
13    A. What, do you have to have a degree to break
14  down an FBI investigation?
15    Q. No, I'm just asking who's qualified to do all
16  this. Because to be in the FBI, yes, you do have to
17  have a degree.
18    A. I don't think I understand your question.
19    Q. Yeah. Name someone at Free Speech Systems
20  that's qualified to break down an FBI investigation and
21  determine that it's wrong. You can start with just one
22  name. This is getting slightly uncomfortable.
23    A. Is it?
24    Q. Start with one name and then we'll go to see if
25  you have two.

45

1    A. Okay. Well, I think Alex Jones could break
2  down an FBI investigation and look at it and figure out
3  whether it's true or false, and I think he's done that
4  in the past.
5    Q. Has he ever gotten it wrong?
6    A. About anything?
7    Q. About -- about an FBI investigation that he
8  says was not true that turned out it was.
9    A. Well, sometimes it takes a while for these
10  things to come out. But I think we just heard that the
11  gas attack on the Syrian Kurds, that I don't know if --
12  whether the FBI had anything to do with it, but that it
13  was done and we had to go invade Syria and then it came
14  out, no, somebody made it up; that there was no chlorine
15  gas found at all. So these things do happen. And so
16  when we see them, we don't always take everything at
17  face value for what comes out.
18    Q. Sure. But I wasn't asking about that. I was
19  asking about the FBI.
20    A. I know. But we went to the Parkland shooting
21  too for a second. So I mean, seems l ke we're going all
22  over the place.
23    Q. Right. But the FBI is the Federal Bureau of
24  Investigation and they only have jurisdiction here.
25    A. Right. And, you know, so Sandy Hook happened

46

1 in 2012. 2013 we had the Boston bombing, just a few
2 months later. And they showed pictures up on the TV and
3 said, we don't know who these guys are; you need to help
4 us find them. And one of the guys was someone they had
5 interviewed twice and they had interviewed his mother.
6 And the Russians had even contacted the FBI saying, hey,
7 this guy is traveling to Turkmenistan or something and
8 getting training under an assumed name. And so for the
9 FBI to get up there and say, we don't know who these
10 guys are, when they do, is dishonest and they put a
11 whole city in a panic to do that.
12     Q. You took the report from the Boston bombing
13 that the FBI did and you broke it down and determined
14 what? What are you saying?
15     A. I'm saying when they showed the pictures of the
16 two boys that they had on camera and they're saying they
17 didn't know who they were, they were lying. They did
18 know who they were.
19     Q. Okay.
20     A. That's what I'm saying.
21     Q. And you understand at times matters of national
22 security can allow --
23     A. Oh, that's right. There's always that, yes. I
24 understand.
25     Q. Okay. I'm just making sure --

47

1     A. There's always national security. I know.
2     Q. Just making sure we are on the same page.
3         April 9, 2013, video, Obama Gun Grabbing Psyop
4 Speech of Evil. Does that ring a bell?
5     A. Can you describe what the video looks l ke?
6 Some of these we don't have anymore because they --
7 they've been taken off YouTube.
8     Q. Sure. The video had to do with an employee of
9 Free Speech Systems warning the viewers that recent mass
10 shootings were actually a government operation and Sandy
11 Hook was an inside job. Who did the research for that
12 information?
13     A. Who -- do you know who the -- do you have the
14 video? Is there somebody talking on it?
15     Q. Yes. His name is Alex Jones.
16     A. Okay. So then it was his -- it's what he
17 determined.
18     Q. Where did he get that information?
19     A. From -- I think from years of looking at
20 government operations. At the time that's what he felt.
21     Q. What I'm asking is, what are the sources of
22 information that he relied on to come to that
23 conclusion?
24     A. I think he relied on articles that they were
25 going to use -- when he saw the script of, hey, now we

48

1 have to start going after the guns, we have to start
2 going after the guns, which happens pretty much in
3 every shooting, there's a call to take and disarm
4 American citizens. And so as stewards of the Second
5 Amendment, we feel it is our duty to stand up against
6 those and Obama did want to go after guns.
7     Q. You're a steward of the Second Amendment?
8     A. And while he says that, while he's sitting
9 there crying over those kids, he's also bombing children
10 in other countries with drones. So we were just
11 pointing that out.
12     Q. You used that information to say that Sandy
13 Hook was an inside job? Based on what?
14     A. I think at the time they were being -- I don't
15 know how old you are, but when this stuff was coming
16 out, there wasn't as many sources on the Internet to --
17 Twitter wasn't very big. They weren't putting out a lot
18 of information. And the state government of Connecticut
19 was not putting out a lot of information and they were
20 going after people -- or they were saying at least -- I
21 don't know if they were going after people. They were
22 saying, if anybody puts out wrong information, we're
23 coming after you and to us, that was a red flag.
24     Q. Isn't that a good policy?
25     A. It depends on what's --

49

1     Q. Can you give me --
2     A. That would be a good policy if that was their
3 real intent. I'm not sure -- I think their real intent
4 was covering up something that they felt went wrong and
5 they didn't want anybody to know about.
6     Q. Okay. Sitting here today, we have all the
7 reports and you've had plenty of time to go through it.
8 What was it? What did they get wrong or what were they
9 hiding? Or are you going to sit here like Mr. Jones has
10 said and say, yeah, we got this one wrong?
11     A. See, we're going back and forth. In the
12 present day, I believe kids were shot and killed.
13     Q. Which part of the story --
14     A. And I believe kids were shot and killed in the
15 beginning. Okay. And if you look at our articles, we
16 always talked about the victims. We were never
17 disparaging towards the parents.
18     Q. Do you -- you've seen the video of Mr. Jones
19 mocking Robbie Parker's father by mocking him crying as
20 a grieving father. Surely --
21     A. Robbie Parker's father? I don't know if I've
22 ever seen a video of Robbie Parker's father.
23     Q. I mean, Robbie Parker. Excuse me. You've seen
24 the video of Mr. Jones mocking Robbie Parker about
25 crying over his dead son, right?

50

```
1     A.  I don't know if I've seen that video.
2     Q.  So you're not prepared to talk about that video
3  that's listed in plaintiff's petition that you had a
4  duty to prepare for today?
5     A.  I am not prepared to ta k about that video of
6  Robbie Parker crying over his son.
7     Q.  Oh, no, of Mr. Jones mocking Robbie Parker
8  crying over his son.
9     A.  I'm not.
10    Q.  Okay.  What about the video that you and
11 Mr. Jones are in where you throw up maps related to
12 where Lenny Pozner lives?  You don't think --
13    A.  I don't think -- I don't think he lives in a
14 U-Haul storage facility.  I think that's what that --
15 that's l ke a mai box place.
16    Q.  Right.  You put up a photograph and map to all
17 your viewers of where Mr. Pozner picks up his mail.
18    A.  I don't even know if he picks up his mail
19 there.  That's something you're saying.
20    Q.  If you weren't targeting Mr. Pozner by doing
21 that, why else would you put it up?
22    A.  At the time I believe -- this is what I
23 believe.  Mr. Pozner was getting videos pulled off
24 YouTube, for whatever reason, you'd have to ask him what
25 his reasons were, and then I think it listed the HONR
```

51

```
1  Network and we were showing where the HONR Network is
2  located.
3     Q.  Why?
4     A.  That it wasn't a building; it was a PO box
5  place.
6     Q.  And on that show you told your audience that
7  you knew the leader of the HONR Network is Mr. Pozner,
8  correct?
9     A.  Because we got a -- I think we even got a
10 YouTube takedown notice and it had his name on there.
11    Q.  Any of the YouTube videos that were taken down,
12 were any of them true?
13    A.  I'd have to look at the video, but I believe
14 the information we were putting out was accurate at the
15 time.
16    Q.  I'm not asking you if it was accurate at the
17 time.  I'm asking you if the -- actually, we'll back up.
18 The videos that the HONR Network had taken down, were
19 those true, sitting here today?
20    A.  I'd have to see the video to know whether --
21 sitting here today, whether I think it was true.  I
22 think a lot of it he pulled down just because they were
23 giving him carte blanche to pull down whatever he
24 wanted.
25    Q.  And you're just making that up.  You have no
```

52

```
1  evidence of that, correct?
2     A.  I have no evidence.
3     Q.  Okay.  And I just wanted to make sure.  Again,
4  we're sitting here as you make up information and spread
5  it.
6     A.  As I make up information and spread it.  Okay.
7     Q.  April 16, 2013, Shadow Government Strikes
8  Again.  What was -- who did the research for that video?
9     A.  I believe Alex Jones did.
10    Q.  Why do you believe that?
11    A.  Can you describe what was in the video?
12    Q.  No, it was your job to be prepared to discuss
13 it.
14    A.  Okay.
15    Q.  Who did the research -- excuse me, why do you
16 believe Alex Jones did the research?
17    A.  Because it sounds l ke a video that he would
18 have titled.
19    Q.  What was the source of the information?
20    A.  Probably hundreds of articles.
21    Q.  I'm not asking you probably.  As Free Speech
22 Systems, what specific sources were relied upon to make
23 that video?
24    A.  I don't know if we have that video in our
25 possession anymore.
```

53

```
1     Q.  Not an answer to my question.  Yes, no or I
2  don't know.
3     A.  Okay.
4     Q.  The sources used to make that video, Shadow
5  Government Str kes Again?
6     A.  I don't know.
7     Q.  March 14, 2014, Sandy Hook, False Narrative
8  Versus the Reality.  Who did the research for that one?
9     A.  I don't know.
10    Q.  What steps did you take to find out?
11    A.  Since we don't have that video, I don't know
12 what -- I'd have to see the video to jog my memory of
13 what's in it.
14    Q.  Okay.  What was the source of the information
15 in that video?
16    A.  L ke I -- I'll refer to my previous answer.
17    Q.  You don't have this video in your testimony,
18 and by "you," you mean Free Speech Systems?
19    A.  I didn't have it in any of the searches that I
20 made.
21    Q.  Okay.  Where did you search?
22    A.  Actually, some of these I actually went on the
23 Internet to see if people had reposted them and I didn't
24 find anything at the time because that's usually how we
25 find stuff that got erased, people repost our stuff.
```

54

1    Q. How long did you spend looking for the sources
2 or the video or the researcher for Sandy Hook, False
3 Narratives Versus the Reality?
4    A. For that particular video, maybe 15 minutes.
5    Q. Are you aware that in this case, you produced
6 this video to me?
7    A. Okay.
8    Q. Yet you're not prepared to discuss it?
9    A. The problem is, and I think I discussed this in
10 the last deposition, we don't have video -- the titles
11 that you're using -- you're referring to YouTube titles,
12 and those aren't always what the video file is named
13 when it gets uploaded.
14    Q. Mr. Dew, you gave me this video. Free Speech
15 Systems produced this to me, not YouTube.
16    A. I understand that.
17    Q. So you have it in your possession, correct?
18    A. I don't know if I have it in my possession.
19    Q. How on earth could Free Speech Systems produce
20 a video to me and it not be in your possession? One,
21 you had it and then you spoliated it, which is the
22 destruction of evidence --
23    A. No.
24    Q. -- or, two, you never had it yet somehow
25 magically produced it to me. Which one of those is

55

1 probably more accurate? Or three, you're just not
2 prepared to discuss it?
3    A. I'm not prepared to discuss it.
4       MR. JEFFERIES: Objection, form.
5    Q. (BY MR. OGDEN) May 13th, 2014, "'Bombshell,
6 Sandy Hook massacre was a DHS illusion,' says school
7 safety expert."
8       Who did the research for this video?
9    A. I would imagine Wolfgang Halbig did the
10 research for that.
11    Q. Again, I'm not asking you to imagine.
12    A. Okay. I'll say Wolfgang Halbig; school safety
13 expert, that was Wolfgang Ha big.
14    Q. How do you know he did the research -- excuse
15 me. Did anyone else research any of the information
16 that went into this episode?
17    A. That is most likely an interview between
18 Wolfgang Halbig and Alex Jones.
19    Q. You don't even know what's in this video, do
20 you?
21    A. No.
22    Q. Okay. We'll just skip to the next one, then.
23    A. Okay.
24    Q. September 25th, 2014, Connecticut PD has FBI
25 Falsely -- Falsify Crime Statistics. Who did the

56

1 research for this video -- actually, strike that.
2       What's this video about? Without guessing.
3 Without guessing.
4    A. Without guessing. That video is -- that video
5 is about the FBI not including the murders in Newtown --
6    Q. Okay.
7    A. -- in their crime statistics.
8    Q. Who appears in this video?
9    A. Alex Jones.
10    Q. Anyone else?
11    A. I couldn't tell you.
12    Q. Were any of the writers involved in any of this
13 information?
14    A. I think one of the writers probably brought
15 that information to Alex.
16    Q. Again, I'm not asking probably. I'm asking
17 what Free Speech Systems knows or doesn't know. And if
18 so, which writer?
19    A. I don't know which writer, but that's how Alex
20 would have gotten that information for that particular
21 video.
22    Q. Okay.
23    A. Because I believe there's an article based on
24 that too.
25    Q. So you don't know anybody else that would have

57

1 appeared in this video?
2    A. No.
3    Q. In the last year, have you seen this video?
4    A. No.
5    Q. Okay. December 27, 2014, Lawsuit Could Reveal
6 Truth about Sandy Hook Massacre. It's kind of an ironic
7 title, right? Who gave the research -- excuse me. What
8 was the source of the information in this one?
9    A. I don't know.
10    Q. Do you know what information is in this video?
11    A. No.
12    Q. Are you prepared to discuss the research that
13 was in the video, which you don't know what it's about?
14    A. No.
15    Q. Okay. December 29th, 2014, America, The False
16 Democracy. Have you ever seen this one?
17    A. I'd probably know it if I saw it.
18    Q. Sitting here -- have you seen it in the last
19 year?
20    A. No.
21    Q. All right. Did you do anything to prepare
22 where the information came from in this video that you
23 don't know what it's about?
24    A. No.
25    Q. You have no -- is it fair to say you don't know

58

1  who the source of the information is that's in this
2  video?
3      A. That would be fair.
4      Q. Okay. January 13, 2015, Why We Accept Gov't
5  Lies -- "government" spelled gov't. Do you know -- have
6  you seen this video in the last year?
7      A. I have not seen it in the last year.
8      Q. Are you prepared to discuss the research that
9  went into the information that was put in this video?
10     A. No.
11     Q. Are you prepared to tell us the source of
12 information for this video?
13     A. No.
14     Q. March 4th, 2015, New Bombshell, Sandy Hook
15 Information Inbound. What's this video about?
16     A. What was the date again, March 14th --
17     Q. March 4th, 2015.
18     A. That probably has to do with --
19     Q. Again, not probably.
20     A. Oh, I'm sorry. I'm not prepared to talk about
21 it.
22     Q. You can't tell us, sitting here today, what
23 that new bombshell was?
24     A. It was probably information that came out of
25 one of those meetings.

59

1      Q. Again, not probably. I want to know what it
2  was, what it was not or you don't know.
3      A. I don't know.
4      Q. Okay. July 7th, 2015, Government is
5  Manufacturing Crises. Do you know what this video is
6  about?
7      A. From its title, I would suggest -- it would
8  suggest that the government is manufacturing a crisis.
9      Q. And again --
10     A. It's about the Hegelian dialectic.
11     Q. Okay. When is the last time you saw this
12 video?
13     A. Probably when I made it.
14     Q. And I'm not asking probably. I'm asking when.
15 Did you -- did you review it preparing for your
16 testimony today?
17     A. No.
18     Q. And you -- when you were preparing for your
19 testimony, you knew that you would be responsble for
20 discussing the sourcing and research that went into the
21 videos described in plaintiff's petition, such as this
22 one, correct?
23     A. I'm not sure if I ever had a meeting on that,
24 no.
25     Q. I'm not asking you if you had a meeting. I'm

60

1  asking if you did anything at all to prepare yourself to
2  discuss this video and the source and research that went
3  into it?
4      A. That video, no.
5      Q. Okay. July 7th, 2015, Retired FBI Agent
6  Investigates Sandy Hook Mega Massive Cover Up. Do you
7  know what the source of all the information is -- was
8  that went into this video?
9      A. I couldn't tell you everything, but I would say
10 the primary source is -- was the interview I did with my
11 uncle.
12     Q. Okay. What information -- when was the last
13 time you saw this video?
14     A. Probably when it was made.
15     Q. Are you prepared to discuss the sourcing and
16 research that went into it?
17     A. Parts of it, I can discuss.
18     Q. Okay. What all is in this video? Well,
19 actually back up. I can break this down into better --
20 easier questions for you.
21        The ambulance came -- "Ambulances came an hour
22 and a half later." What's the source of that
23 information?
24     A. That might have been Wolfgang Halbig.
25     Q. Again, not asking might. I want definitive

61

1  answers. One, I know; two, I don't know. Do you know?
2      A. I don't know.
3      Q. Okay. Speaking of Wolfgang Halbig, you and I
4  can agree, probably not the best source of information,
5  right?
6      A. At the time, I don't think we made -- we looked
7  at his past and determined that he was credible.
8      Q. Right. But hindsight is 50/50.
9      A. Sure. Hindsight is 50/50, hindsight is 20/20,
10 whatever you want to say. But what -- I think what
11 gave -- what garnered Wolfgang credibility is when the
12 Florida State Police went to his house and told him to
13 stop asking questions, and that to us is a red flag.
14     Q. Right. Because when the police department goes
15 to somebody and says, stop harassing these people,
16 that's a red flag?
17     A. At the time I don't know if he was harassing
18 people. I think he just had his 13 questions or
19 whatever he had. Which I don't think it had anything to
20 do with the families.
21     Q. Again, with regards to Wolfgang Halbig and his
22 involvement with the families, we spoke in depth at our
23 last deposition together, about Jonathan Reich?
24     A. I don't remember speaking in depth about
25 Jonathan Reich.

62

1    Q. All right. Let's do it now.
2    A. But I remember you asking about him and I
3  didn't know who he was.
4    Q. Do you know who he is now?
5    A. No.
6    Q. Have you done any research to find out all of
7  the people that were harassed by Free Speech Systems and
8  their affiliates?
9    A. All the people that were harassed?
10        MR. JEFFERIES: Objection, form.
11    A. No, I didn't do any research in to -- because
12  we were never advocating harassment of anybody.
13    Q. (BY MR. OGDEN) Really?
14    A. I don't think --
15    Q. In your last deposition --
16    A. I don't think I ever said harass anybody.
17    Q. In your last deposition, you told me that
18  Wolfgang Halbig -- excuse me, that Dan Bidondi, another
19  affiliate, was fired because of what he did at Sandy
20  Hook, right? You remember that?
21    A. He was -- I think he was fired before Sandy
22  Hook.
23    Q. Before Sandy Hook happened?
24    A. I know he was gone before -- he was gone -- I
25  would have to look at his employment records, but the

63

1  Boston bomb- -- he was gone for a while, and then when
2  he was in Delaware during the Boston bombing, someone
3  mentioned that he was close by so Alex had him go report
4  on what was going on.
5    Q. And then quickly after you saw what he did to
6  those people, it was uploaded to the Internet and it had
7  an InfoWars tag on it, surely after you saw that, that's
8  when you think, Bidondi needs to be disassociated from us
9  completely, right?
10        MR. JEFFERIES: Objection, form.
11    A. When he came -- I think when he went to those
12  meetings and then was going to the people outside of the
13  meeting -- anything we told him to do was never to go
14  harass people; it was to cover what was going on in the
15  meeting.
16    Q. (BY MR. OGDEN) Right. But you could see in
17  the videos that he was giving you that he was harassing
18  people and, in fact, was doing very little investigative
19  journalism.
20        MR. JEFFERIES: Objection, form.
21    A. The only video I saw him harassing was a
22  lawyer.
23    Q. (BY MR. OGDEN) You understand that Mr. Bidondi
24  is also a semi-professional wrestler, correct?
25    A. A professional wrestler was the governor of

64

1  Minnesota. Okay. What does that have to do with it?
2    Q. Just asking whether or not you were aware that
3  Mr. Bidondi was a semi-professional wrestler?
4    A. Okay. So does that disqualify him from asking
5  questions?
6    Q. No, not at all. In fact, it gets me to my next
7  question. When you saw the video of him harassing that
8  lawyer, did you think he was being more of a journalist
9  or more of a semi-professional wrestler?
10    A. I would say more of a semi-professional
11  wrestler. I mean, he was asking him questions.
12    Q. Shortly after that video, he was fired because
13  of what he was doing to those people?
14    A. He wasn't -- he was doing contract work for us.
15  We would either accept or not accept his reports.
16    Q. And after that, you stopped accepting all
17  reports and stopped responding to him, according to your
18  deposition testimony last time we spoke?
19    A. I would have to look at the dates of
20  everything, but, yes, that sounds right.
21    Q. Okay. So it's weird that we were produced in
22  this case for the first time, an e-mail that you're
23  involved with that has Dan Bidondi being fired for how
24  he was acting at a Donald Trump rally in 2016. Fun
25  fact, right?

65

1    A. That is a fun fact.
2    Q. All right. Let's get back to this list of
3  videos that we're not going to be able to discuss.
4  November 18th, 2016, Final Statement on Sandy Hook. You
5  remember this one?
6    A. That was after Hillary Clinton brought it back
7  up into the purview, that Alex Jones was running around
8  talking about Sandy Hook all the time.
9    Q. Right. Now, you understand that prior to this,
10  Alex Jones had been speaking about this -- he had spoken
11  about this five months before that and prior to that
12  38 separate times and that's just the ones we know of.
13    A. Uh-huh. In how many years? It was six years
14  at the time.
15        MR. JEFFERIES: Just answer the question.
16    Q. (BY MR. OGDEN) I'm going to tell you that it
17  was almost four years.
18    A. Okay.
19        MR. BANKSTON: Almost three. It was
20  December -- gotcha.
21        MR. OGDEN: Almost four years.
22    Q. (BY MR. OGDEN) Who did the research on that
23  video?
24    A. What was the video again?
25    Q. Final Statement on Sandy Hook.

66

1    A. That was something that me and Alex put
2  together.  So we did the research on it.
3    Q. What were the sources that y'all used?
4    A. News articles and video.
5    Q. From where?
6    A. Probably from previous videos that we had done.
7    Q. Again, not probably.  I'm asking for specifics
8  because you have a duty, sitting here today, to be very
9  specific with me on what Free Speech Systems knows.
10  Okay?  What news articles did you rely on?
11    A. I don't know.
12    Q. What news articles do you read that you find
13  reliable, if you don't trust the FBI's reports?
14    A. So you're saying the FBI has never lied to us
15  before?
16    Q. Not at all.
17        MR. JEFFERIES:  Just answer the question.
18    Q. (BY MR. OGDEN)  What I'm asking you is, where
19  do you even start looking for reports if they're not
20  videos that you can see and dissect; but if it's just a
21  written report, what do you trust?
22    A. Who do I trust?
23    Q. And that's Free Speech Systems, I'm asking.
24    A. I think we have pointed out that some -- some
25  outlets are reliable at certain times and they're not.

68

1    A. Yeah.
2    Q. And that deals with Free Speech Systems
3  informing Dan Bidondi to stop representing himself as a
4  reporter, after an incident at a Trump rally in Rhode
5  Island, correct?
6    A. Yeah.  Yeah, that's what it says.
7    Q. And that was not in 2013 or '14, that was
8  actually halfway through 2016.
9    A. Yeah.
10    Q. In your last deposition that you had with me,
11  you were tasked with ta king about the employment of
12  Mr. Bidondi and you told us under oath, swearing to God,
13  that he was fired because of his actions and conduct
14  related to videos of him related to the Sandy Hook and
15  Newtown, Connecticut.
16    A. Right.
17    Q. But when I read this e-mail, it seems that you
18  actually fired him well after that date for something
19  related to Donald Trump and his campaign.  Fair?
20    A. Well, there's several people at InfoWars who
21  have been fired and hired at different times, and I
22  don't think we ever considered him fully an onboard
23  employee.  He was more of a contractor, because we were
24  paying invoices to a contractor.
25    Q. Right.  And we talked about that at your last

67

1  Even the FBI can be reliable.
2    Q. Okay.  Who gets to cherry-pick when an outlet
3  is reliable --
4    A. I think --
5    Q. -- you or Alex?
6    A. Alex Jones makes that editorial decision.
7    Q. Okay.  Do you ever question him?
8    A. I think I've questioned him a couple times.
9    Q. How did that go for you?
10    A. I'm still working.
11        MR. OGDEN:  All right.  I think this is a
12  good time to take a break.  His hands have got to be
13  tired.  Off the record.
14        THE VIDEOGRAPHER:  Going off the record at
15  2:41 p.m.
16        (Recess taken from 2:41 p.m. to 2:53 p.m.)
17        THE VIDEOGRAPHER:  We are back on the
18  record at 2:53 p.m.
19        (Deposition Exhibit 2 marked for
20         identification.)
21    Q. (BY MR. OGDEN)  I'm going to hand you
22  Exhibit 2.  Exh bit 2 is an e-mail from you to Tim
23  Flores.
24    A. Looks like it says Melinda Flores.
25    Q. Melinda Flores and Tim, correct?

69

1  deposition and that's exactly what you said, except you
2  told me that he had been fired immediately after that
3  video of him harassing those people and the lawyers at
4  the courthouse in Newtown.  Remember that?
5    A. Uh-huh.
6    Q. Okay.  That wasn't exactly true, was it?
7    A. Well, and then he came back after -- I think
8  what happened is, he got some congressman to tell him
9  to -- I don't know if he told him to shut the F up, or
10  something like that, and he had video of it.  And it was
11  during a gun -- Second Amendment legislation going
12  through Delaware.  And so I think he got brought back on
13  in that capacity to be -- allow for him to produce
14  reports for us again.
15    Q. Okay.
16    A. But he was never hired back in terms of -- he
17  was never hired back in terms of full-time employment.
18    Q. Right.  But you contracted with him, after you
19  told me that you cut ties with him completely within a
20  text message, that's what you testified to under oath
21  swearing to God --
22    A. Right.  And at the time we had cut ties
23  completely with him.
24    Q. Yeah, but at the time I asked you that
25  question, you had also recontracted with him all the way

70

1  up until December of 2015 and paid him in January and
2  then also sent him messages all the way up through June
3  of 2016 regarding his -- him being a contractor for Free
4  Speech Systems.  But none of that was in your answer,
5  right?
6        A.  I'm not sure if you -- what the answer -- or
7  what the question was at the time, but what -- from what
8  I remember, is that Dan Bidondi would go in and out of
9  the good graces, because I don't think he was even
10  hired -- he wasn't even there at the time of Sandy Hook.
11  And then he came back and then he was gone again.  And
12  that's all with Alex's purview.
13       Q.  What do you mean, the time of Sandy Hook?
14       A.  Well, there's this massive time since 2012
15  where --
16       Q.  Through when?
17       A.  I would say maybe 2015.  I mean, I'm not saying
18  we didn't do any videos after that.  I'm saying somebody
19  might have called and done it; and then when Hillary
20  Clinton brought it back up on the campaign trail, I
21  think Alex saw the lawsuit attacks that were being set
22  up.
23       Q.  Okay.  Let's break down that answer.
24       A.  Okay.
25       Q.  Earlier this year you told me that you

71

1  terminated him completely and disassociated yourself
2  when he harassed the lawyers at the courthouse in
3  Newtown, Connecticut.  However, today you told me that
4  he was -- that was disgusting and we disassociated
5  ourselves at the time, but then he came into our good
6  graces because he got a congressman in Delaware to curse
7  at him.  That's the credentials that allows you to get
8  back into the good graces of InfoWars?
9        A.  Well, it depends on what the context is, but
10  that could be politics.
11       Q.  And this context was the Second Amendment,
12  right?
13       A.  Uh-huh.
14       Q.  And you said earlier that you considered
15  yourself a Second Amendment steward?
16       A.  Uh-huh.
17       Q.  Are you in a well-regulated militia?
18       A.  I don't think you have to be in a
19  well-regulated militia to be a Second Amendment steward.
20       Q.  Right.  I was just asking which part of the
21  Second Amendment you were a steward of?
22       A.  That the right to bear arms shall not be
23  infringed.
24       Q.  And "bear" arms is not the animal, but it's
25  actually the ability to bear arms to protect yourself

72

1  against tyranny.
2        A.  What do you mean the animal?
3        Q.  Have you ever heard of bears?
4        A.  Yeah, I've heard of bears.
5        Q.  Okay.  I just wanted to make sure that you
6  weren't confused, because we've had a lot of confusion
7  in this room today on the questions.
8             MR. JEFFERIES:  Objection.
9        Q.  (BY MR. OGDEN)  With the -- we'll get back to
10  the topics that you were prepared for -- or were
11  supposed to be prepared for today.  July 7 -- excuse me.
12  November 18th, 2016, Final Statement on Sandy Hook.  You
13  remember that one?
14       A.  (Nods head.)
15       Q.  And that video was a compilation of a number of
16  videos we've already gone through, correct?
17       A.  Correct.
18       Q.  So it's safe to say you have no idea who
19  researched or sourced that information?
20       A.  Well, Alex and I researched and sourced the
21  information.
22       Q.  From prior videos, correct?
23       A.  Uh-huh.
24       Q.  We just went through all those prior videos and
25  you don't know who researched or sourced those, so the

73

1  information may have been compiled by you to make this,
2  but the source of that information is unknown to Free
3  Speech Systems, as we sit here today, correct?
4        A.  Correct.
5        Q.  Now, fast-forward four months, April 22nd,
6  2017, after the final statement, that was our last
7  video, is Sandy Hook Vampires Exposed.  Do you remember
8  that video?
9        A.  I do remember that video.
10       Q.  Who researched the information for that video?
11       A.  I would say myself and Alex did.
12       Q.  What were your sources?
13       A.  I believe a Megyn Kelly interview.
14       Q.  Any others?
15       A.  And then I believe previous videos that we
16  produced.
17       Q.  Are you aware that on April 22nd, 2017, that
18  the Megyn Kelly interview hadn't even happened yet?
19       A.  Oh, it hadn't happened yet?  Okay.
20       Q.  Fair to say you're not prepared to discuss this
21  video?
22       A.  I'm -- must be confused with another Sandy Hook
23  vampire video.
24       Q.  Okay.  Fair to say you're not prepared to
25  discuss the one from April 22nd, 2017?  Yes?

74

1      A.  Correct.
2      Q.  Okay.  Let's go to June 13th, 2017.  It's the
3   55th video.  Media Refuses to Report Alex Jones' Real
4   Statements on Sandy Hook.  Who researched the
5   information on this video?
6      A.  Alex.
7      Q.  How do you know that?
8      A.  Because I think by that time, Alex had
9   apologized several times to the families and -- and what
10  was the date on that again?  I don't know if that was
11  right around -- we did a video right around Father's
12  Day.
13     Q.  June 13th, 2017.
14     A.  So I'm not sure if that was Father's Day or
15  not, but he did put out a special Father's Day message
16  around that time to the families --
17     Q.  And no one --
18     A.  -- apologizing for whatever -- I don't know
19  how -- however many times it was, he apologized again.
20     Q.  Who else from Free Speech Systems researched
21  for that video?
22     A.  It would have just been me and Alex.
23     Q.  Earlier you said it was only Alex.  Now it was
24  you and Alex?
25     A.  Well, I put the stuff together.  So I would

75

1   consider -- I would consider what I would -- what I'm
2   doing, sourcing the other videos.
3      Q.  Okay.  And were those other videos the ones
4   that I've described already?
5      A.  Probably -- yes.  Some of them were.  I'm sure
6   some of them might have been from a different name or
7   something.
8      Q.  Okay.  Have you produced the ones with
9   different names?
10     A.  What do you mean?
11     Q.  Well, you said some of them would be.  I
12  listened --
13     A.  I'm sure some of those would have been on the
14  list that we talked about.  I'm sure there's others on
15  the list that we didn't talk about that are in your
16  possession, that we might have pulled video from.
17     Q.  Okay.  And you're sure they're in my
18  possession?
19     A.  You know, most of our video library got wiped
20  out with YouTube, and so whatever is left is still
21  around and whatever's not is not.
22     Q.  Okay.  However, the June 13, 2017, you said
23  that you compiled and sourced -- or sourced this video
24  from other videos.  At least the videos we've gone
25  through today that were involved in that, you don't know

76

1   the source of that information, correct?
2      A.  Correct.
3      Q.  And October 26, 2017, JFK Assassination
4   Documents to Drop Tonight.
5      A.  Okay.
6      Q.  Do you remember that video?
7      A.  No, I don't remember that video.
8      Q.  It's fair to say that then you were -- you're
9   not prepared to discuss the source of the information
10  related to Sandy Hook in that video?
11     A.  Correct.
12     Q.  It's fair to say that you're also not prepared
13  to discuss the research that went into the information
14  in that video relating to Sandy Hook?
15     A.  That's correct.
16     Q.  All right.  Let's move to the second topic that
17  you were tasked with being prepared to discuss.  Topic 2
18  is, "Internal editorial discussions regarding Free
19  Speech Systems LLC's coverage of the Sandy Hook
20  Elementary School shooting."
21     A.  Uh-huh.
22     Q.  What did you do to prepare yourself?
23     A.  Spoke with my attorney.
24     Q.  Anything else?  And let me cut you off there.
25  If there's any information that -- in your answer that

77

1   regards a conversation you've had with your attorney, I
2   don't want you to disclose that to me.
3      A.  Okay.  Then that is all.
4      Q.  Did you review any documents?
5      A.  Just a couple of -- I believe the one I looked
6   at earlier.  I don't know if this is the one.
7      Q.  Did you review any e-mails?
8      A.  No.
9      Q.  Did you review any text messages?
10     A.  No.
11     Q.  Did you review any memorandums?
12     A.  I don't think we have anything from that.
13     Q.  Did you speak with any of the employees that
14  are still at InfoWars that may have been related to
15  Sandy Hook in any way?
16     A.  No.
17         MR. JEFFERIES:  Objection, form.
18     Q.  (BY MR. OGDEN)  Did you speak to Paul Watson?
19     A.  No.
20     Q.  We know that from your answers related to the
21  videos and not knowing the sources of the information or
22  any of the researchers, that any discussion that would
23  have involved that -- those people that did that, you're
24  not prepared to discuss that, correct?
25     A.  That is correct.

78

1    Q. Okay. Outside of that, what does the term
2  "editorial discussion" mean to you?
3    A. Well, an editor is someone who determines
4  what's going up on a website, either fixing -- either
5  verifying a fact or fixing the context of something or
6  making sure it's grammatically correct.
7    Q. Okay. And I apologize, my question was a
8  little -- probably confusing. But I didn't ask what an
9  editor was. I asked what an editorial discussion was.
10   A. Well, those are discussions that people who are
11  making editorial decisions, those are the discussions
12  they would have.
13   Q. What's an editorial decision?
14   A. Saying -- looking at -- so the essence of an
15  editorial decision would be -- and we can go back to the
16  green screen thing. Looking at it and going, I believe
17  that's green screen; we're going to do a video on this
18  saying that's green screen. So at that time, Alex made
19  an editorial decision to create that video.
20   Q. Other than that editorial discussion that you
21  were involved with, are you prepared to discuss any
22  editorial discussions that you were not involved in?
23   A. Not that I was not involved in.
24   Q. Did you take any steps to prepare yourself to
25  discuss whether or not there are any editorial

79

1  discussions that were had between anyone at Free Speech
2  Systems outside your purview?
3    A. No.
4    Q. Okay. With regard to an editorial discussion
5  that leads to an editorial decision, if someone at Free
6  Speech Systems comes and says, I want to go on air and
7  say Sandy Hook Elementary School was actually shut down
8  and wasn't an operating school at the time of the
9  shooting, what discussion would have to happen -- excuse
10  me. What -- how would that person then be able to
11  actually put that on air? What has to happen?
12   A. I think what you're referring to is Wolfgang
13  Halbig and I'm -- Alex doesn't do preinterviews with
14  people. So if somebody comes on and says they have a
15  bombshell to drop or whatever, I mean, a lot -- so a lot
16  of the headlines are written after the interview is
17  done. So we don't go in and say, oh, we've got
18  Wolfgang, he's going to present this information. So
19  I'm not sure how -- in terms of that, that sounds like
20  that came from Wolfgang Halbig.
21   Q. Okay. Do you believe that Wolfgang Halbig is a
22  good source of information?
23   A. Well, at the time I think we did believe he was
24  a good source of information.
25   Q. What time was that?

80

1    A. I think the Sandy Hook period, from the time of
2  the incident to -- till we stopped having him on, which
3  I don't know the exact date.
4    Q. So 2013, '14 and some of '15 --
5    A. Yeah.
6    Q. -- you thought Wolfgang Halbig was a good
7  source of information?
8    A. Uh-huh.
9    Q. Did anybody at Free Speech Systems voice
10  concerns about Wolfgang Halbig being crazy?
11   A. Not that I -- not to my knowledge.
12   Q. Would that have been an editorial discussion?
13   A. Yeah, I think that would have been an editorial
14  discussion.
15   Q. What about Mr. Fetzer, Jim Fetzer?
16   A. Yeah, I don't know if we ever had Jim Fetzer on
17  the show.
18   Q. You definitely relied on his information,
19  correct, a multitude of times?
20   A. I don't know. Fetzer didn't I ke Alex, as far
21  as I know.
22   Q. It's fair to say that there were definitely
23  editorial discussions that were had about Fetzer's
24  reliability as a source, correct?
25   A. I don't know if Fetzer ever came into the

81

1  picture at that time.
2    Q. If there are discussions out there within Free
3  Speech Systems' documents that were produced in this
4  case that deal -- that have evidence -- excuse me,
5  editorial discussions in there, that's something that
6  you should know about, correct?
7    A. If you're saying I reviewed every e-mail that
8  was sent around the office during those time periods,
9  no, I didn't do that.
10   Q. You didn't review any e-mails preparing for
11  today?
12   A. That's correct.
13   Q. All right. Do you think you should have?
14   A. I was relying on the advice of my attorney.
15   Q. With how this deposition has gone so far, do
16  you think you've prepared enough?
17   A. I'm not going to answer that.
18   Q. Okay. I want to ask you, with your testimony
19  that you gave me earlier this year versus -- it was in
20  March -- versus the testimony that you have given me
21  today, does it all coincide with each other?
22   A. I think maybe, except for some of the
23  miscommunications on what we consider employment status
24  with Dan Bidondi.
25   Q. So if we go back and read that transcript where

82

1 the nice court reporter in March was writing down every
2 word and it was clear that we were talking about
3 contractor work with him, can you -- do you still stand
4 by the statements you gave to me in March?
5 A. Well, it's poss ble that they were -- I didn't
6 have all the information in front of me at the time.
7 Q. Do you understand that back in March, as well
8 as today, you have a legal duty to be prepared to
9 discuss the topics that I give you? Do you know that?
10 A. Sure. But I don't know if that means -- I
11 don't know every question you're going to ask me.
12 Q. Right. But you know the topics. One of --
13 A. I don't know if Dan Bidondi was a topic in
14 the -- in any of the documents that I saw.
15 Q. You know that Dan Bidondi was a source of
16 information regarding Sandy Hook, at least to some
17 extent, correct?
18 A. In terms of after going up there and reporting
19 on those --
20 Q. In terms of that --
21 A. -- those meetings, yeah.
22 Q. -- in terms of sending e-mails in, in terms of
23 having back-and-forth discussions with people from Free
24 Speech Systems, you understand that Dan Bidondi was a
25 source of information and specifically that -- was a

83

1 source of information that you and Mr. Jones used to
2 make videos and spread that information to millions of
3 people?
4 A. In some small part, he had a -- I wouldn't
5 consider him a major investigator into Sandy Hook.
6 Q. Sitting here today, does Free Speech Systems
7 acknowledge that it spread a multitude of mistruths to
8 millions of people regarding the families and children
9 at Sandy Hook Elementary School in December of 2012?
10 MR. JEFFERIES: Objection, form.
11 A. I think we made some mistakes and I think we've
12 acknowledged those mistakes and -- but we never told
13 anybody to go after anybody's families, we never wanted
14 to -- we never wanted to hurt the families. We see
15 events like these, and they're current -- it happens
16 even today, when these events happen, the next thing
17 that comes out of a politician's mouth is, we've got to
18 start grabbing people's guns.
19 Q. (BY MR. OGDEN) As a journalist, don't you have
20 the duty to be right and not first?
21 A. Well, we're not always wearing journalistic
22 hats. Sometimes we're commenting on something.
23 Q. So when you're commenting on something, you can
24 just make it up and it doesn't matter?
25 A. No, you can say your opinion.

84

1 Q. In any way is that differentiated on air? Does
2 Mr. Jones say, here, I'm just going to make stuff up;
3 here, you should trust me because we're truth in
4 journalism?
5 MR. JEFFERIES: Objection, form.
6 Q. (BY MR. OGDEN) Does he do that?
7 A. I think he doesn't play devil's advocate as
8 much anymore because of instances like these, where
9 we're at today.
10 Q. Did you know that a woman in Florida was
11 inspired by InfoWars to harass one of my clients to the
12 point she went to federal prison?
13 A. I mean, somebody was inspired by Bernie Sanders
14 to go shoot a bunch of congressmen.
15 Q. Did you know that?
16 A. No, I've heard of the case. Yeah. I don't
17 remember her name, but --
18 Q. Do you take any respons bility for that?
19 A. No, I'm not respons ble for what someone else
20 does.
21 Q. If someone relies on the misinformation that
22 you have spread over the course of six years, to the
23 point where they believe you because you keep telling
24 them over and over again that you are the truth in
25 journalism and they take what you have as the truth and

85

1 they act upon it, you don't have any respons bility for
2 that?
3 MR. JEFFERIES: Objection, form.
4 A. I don't think we were covering Sandy Hook as
5 much as you'd l ke to think we were.
6 Q. (BY MR. OGDEN) I just ripped off 61 videos
7 spanning from 21 minutes to over three hours long.
8 A. Okay. And I bet that three-hour long video,
9 we're not talking about Sandy Hook the entire time. We
10 also do three hours a day every day and two hours on
11 Sunday, plus we're doing an hour live every night and
12 then there's the multitude of other live videos that are
13 going on. There's a lot of video content that's being
14 produced, and you're looking at a very small percentage
15 of it.
16 Q. Right. I don't even know if these are all your
17 Sandy Hook videos. These are just the ones that I could
18 find.
19 A. You can thank YouTube for that. You can thank
20 YouTube and Facebook and everybody else.
21 MR. JEFFERIES: Answer the question.
22 Q. (BY MR. OGDEN) You don't even know if we're --
23 if I'm talking about all the videos, do you?
24 A. I don't think anybody knows.
25 Q. The three-hour video --

Rob Dew - 11/26/2019

86

1    A. I don't even think God knows all the videos
2 because they're gone. They don't exist anymore.
3    Q. The three-hour video that you just mentioned,
4 we probably weren't ta king about Sandy Hook the whole
5 time, you don't know because you didn't review it to
6 prepare for today, did you?
7    A. No, I did not.
8    Q. So you don't know. That's just you making
9 something up and spreading it to people?
10    A. No, that's not what I'm doing.
11    Q. Then what are you doing?
12    A. The same thing you're doing.
13    Q. I'm asking questions.
14    A. Oh.
15    Q. What are you doing?
16    A. Okay.
17    Q. When you say something and you're not sure if
18 it's true but you sit here under the penalty of perjury
19 and swear to God that it is the truth, what is that
20 other than lying?
21    A. I'm not lying.
22    Q. Then what is it called when you make up
23 something that you aren't sure of when you've sworn to
24 tell the truth and the complete truth? What is that
25 called, in your mind?

87

1    A. I am not lying. We're having -- you're asking
2 me questions, but we're also having back and forth on a
3 multitude of topics.
4    Q. We are having back and forth on a multitude of
5 topics. I'm just asking you questions and expecting you
6 to answer them truthfully. And l ke I said at the
7 beginning and like I said at the beginning of the last
8 time you and I spoke on the record, don't guess.
9 Because, one, it's not fair to anybody in this room;
10 and, two, it's -- there's no journalistic integrity in
11 doing it. Okay?
12    A. Is that a question?
13    Q. My last question is, sitting here today on
14 behalf of the company, are you proud of the work that
15 you did -- that Free Speech Systems did on Sandy Hook
16 Elementary School and the shooting that happened in
17 December 2012?
18    A. I think our reporting stopped what was going to
19 be a lot of antigun legislation coming down.
20    Q. You didn't answer my question.
21    A. So I am proud of it.
22    Q. My question was: Are you proud of the
23 information that you spread about Sandy Hook from 2012
24 to 2017 as a company? Is that what you want to be
25 remembered for?

88

1    A. I don't think we're going to be remembered for
2 Sandy Hook.
3    Q. What do you think you're going to be remembered
4 for?
5    A. I don't know. That's what you want. I know
6 that.
7    Q. Simple question. I can repeat it if you'd
8 like. What do you think InfoWars and Free Speech
9 Systems is going to be remembered for, other than the
10 Sandy Hook misinformation that was spread over the
11 course of over half a decade?
12    A. I think we'll be remembered about a lot more
13 than that. And other than a few -- having a few people
14 on that said it didn't happen, I mean, I don't think I
15 ever questioned that kids died at that location.
16    Q. I know that you said you're proud of stopping
17 some legislation that was never put in place, but are
18 you ashamed of the wrongs that you guys spread?
19    A. Well, I mean --
20        MR. JEFFERIES: Objection, form.
21    A. -- we didn't -- we didn't kill those kids. We
22 didn't cause the situation to happen. We were just
23 actively looking at it and looking at a bunch of
24 different angles and some of those angles were wrong.
25 And I'm not going to sit here and say that we're bad

89

1 people, because we didn't make this thing happen. We
2 didn't cause it to happen. We didn't give the kid the
3 drugs, we didn't give the kid the access to all the
4 stuff. We didn't have -- you know, I think a lot of
5 this would have been solved had they put out security
6 footage showing the guy entering the building. They
7 never did that. Then they go, well, we didn't have it.
8 We saw it in Columbine. So when you see red flags l ke
9 that, you start asking questions and I'm not ashamed of
10 asking questions and I don't think anybody should be
11 ashamed of asking questions, even yourself.
12    Q. (BY MR. OGDEN) If any of my clients were in
13 the room right now, would you apologize to them?
14    A. I would apologize for the loss of their kids,
15 yes, I would.
16    Q. You wouldn't apologize for spreading a bunch of
17 information that was wrong about the circumstances of
18 their kids' death, to millions of people for years, to
19 the point where some of them had to move? You wouldn't
20 apologize to them?
21    A. Well, we didn't turn it into a media spectacle.
22 It was already turned into a media spectacle. We were
23 just talking about it. Are you going to ask these
24 people who were -- you know, the cameras that were --
25 people that were sticking cameras in their faces every

90

1 time they turned around and sneezed and all the
2 interviews they with doing?  They made themselves
3 politic -- public figures.  That's what they did.
4      Q.  Absolutely.  If I get the opportunity, I'm
5 absolutely going to ask those people if they're sorry.
6 But I'm asking you right now.  Are you?
7      A.  I'm sorry for the loss of their kids,
8 definitely am.  I would never want that to happen to
9 anybody.
10      Q.  And again, are you sorry for spreading a bunch
11 of lies and impacting their life over a decade after
12 they had to experience the one thing no parent should
13 ever have to do?
14           MR. JEFFERIES:  Objection, form.
15      A.  At the time I think what we were putting out we
16 thought was correct information at the time.
17      Q.  (BY MR. OGDEN)  And you were wrong, correct?
18      A.  On some instances, we were wrong.
19      Q.  And are you sorry for that?
20      A.  Am I sorry for being wrong?  No.  People get
21 wrong -- get things wrong all the time.
22           MR. OGDEN:  Okay.  I appreciate your time.
23           THE WITNESS:  Thanks.
24           THE VIDEOGRAPHER:  This concludes the
25 deposition at 3:22 p.m.  We are off the record.

91

1 (Deposition concluded at 3:22 p.m.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

92

1           CHANGES AND SIGNATURE
2 WITNESS: ROB DEW   DATE OF DEPOSITION: 11/26/2019
3 PAGE/LINE      CORRECTION      REASON FOR CHANGE
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

93

1           I, ROB DEW, have read the foregoing deposition
2 and hereby affix my signature that same is true and
3 correct, except as noted herein.
4
5
6 _____
6           ROB DEW
7
8 STATE OF _____ )
9 COUNTY OF _____ )
10
11      Before me, _____, on this day
12 personally appeared ROB DEW known to me (or proved to me
13 under oath through _____
14 (description of identity card or other document) to be
15 the person whose name is subscribed to the foregoing
16 instrument and acknowledged to me that they executed the
17 same for the purposes and consideration therein
18 expressed.
19      Given under my hand and seal of office this
20 _____ day of _____, 2019.
21
22           _____
23           NOTARY PUBLIC IN AND FOR
           THE STATE OF_____
24
25 My Commission Expires: _____

94

```
1          CAUSE NO. D-1-GN-19-004651
2    NEIL HESLIN          *  IN THE  DISTRICT  COURT
                          *
3    VS.                  *
                          *  OF TRAVIS COUNTY, TEXAS
4    ALEX E. JONES, INFOWARS,  *
     LLC, and FREE SPEECH  *
5    SYSTEMS, LLC          *  261ST JUDICIAL DISTRICT
6
7          REPORTER'S CERTIFICATION
             DEPOSITION OF ROB DEW
8            November 26, 2019
9
10         I, Micheal A. Johnson, Certified Shorthand
11   Reporter in and for the State of Texas, do hereby
12   certify to the following:
13         That the witness, ROB DEW, was duly sworn by
14   the officer and that  he transcript of the oral
15   deposition is a true record of the testimony given by
16   the witness;
17         That the deposition transcript was submitted
18   on _____, to the witness or to the attorney
19   for the witness for examination, signature and return to
20   me by _____;
21         That the amount of time used by each party at
22   the deposition is as follows:
23         Mr. Bill Ogden - 01:42:43
           Mr. T. Wade Jefferies - 00:00:00
24
25         That pursuant to information given to the
```

95

```
1    deposition officer at the time said testimony was taken,
2    the following includes counsel for all parties of
3    record:
4         Mr. Bill Ogden, Attorney for Plaintiff
          Mr. Mark D. Bankston, Attorney for Plaintiff
5         Mr. T. Wade Jefferies, Attorney for Defendants
6         I further certify that I am neither counsel
7    for, related to, nor employed by any of the parties or
8    attorneys in the action in which this proceeding was
9    taken, and further that I am not financially or
10   o herwise interested in the outcome of the action.
11        Further certification requirements pursuant to
12   Rule 203 of TRCP will be certified to after they have
13   occurred.
14        Certified to me this 1st day of
15   December, 2019.
16
17
18        _____
            Micheal A. Johnson, CSR, RDR, CRR
19   Texas Certification No. 5891
            Expiration Date:  01/31/2021
20   Firm Registration No. 528
            Integrity Legal Support Solutions
21   PO Box 245
            Manchaca, Texas 78652
22   (512) 320-8690
            (512) 320-8692
23
24
25
```

96

```
1        FURTHER CERTIFICATION UNDER RULE 203 TRCP
2         The original deposition was/was not returned
3    to the deposition officer on _____;
4         If returned, the attached Changes and
5    Signature page contains any changes and the reasons
6    therefor;
7         If returned, the original deposition was
8    delivered to Bill Ogden, Custodial Attorney;
9         That $_____ is the deposition officer's
10   charges to the Plaintiff for preparing the original
11   deposition transcript and any copies of exhibits;
12        That  he deposition was delivered in
13   accordance with Rule 203.3, and that a copy of this
14   certificate was served on all parties shown herein and
15   filed wi h the Clerk.
16        Certified to by me this _____ day of
17   _____, 2019.
18
19        _____
            Micheal A. Johnson, CSR, RDR, CRR
20   Texas Certification No. 5891
            Expiration Date:  01/31/2021
21   Firm Registration No. 528
            Integrity Legal Support Solutions
22   PO Box 245
            Manchaca, Texas 78652
23   (512) 320-8690
            (512) 320-8692
24
25
```

# Exhibit 3

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
284 of 1044

1

1                    REPORTER'S RECORD
                    VOLUME 1 OF 1 VOLUME
2

3    NEIL HESLIN,              )  IN THE DISTRICT COURT
                              )
4         Plaintiff           )  TRAVIS COUNTY, TEXAS
                              )
5    VS.                       )  459TH JUDICIAL DISTRICT
                              )
6    ALEX E. JONES, INFOWARS,  )
     LLC, ET AL.,              )  TRIAL COURT CAUSE NO.
7                              )  D-1-GN-18-001835 AND
          Defendant           )  D-1-GN-19-004651
8

9    LEONARD POZNER AND        )  IN THE DISTRICT COURT
     VERONIQUE DE LA ROSA,     )
10                             )  TRAVIS COUNTY, TEXAS
          Plaintiff           )
11                             )  459TH JUDICIAL DISTRICT
     VS.                       )
12                             )
     ALEX E. JONES, INFOWARS,  )  TRIAL COURT CAUSE NOS.
13   LLC, ET AL.,              )  D-1-GN-18-001842
                              )
14        DEFENDANTS           )

15
     SCARLETT LEWIS,           )  IN THE DISTRICT COURT
16                             )
          Plaintiff           )  TRAVIS COUNTY, TEXAS
17                             )
     VS.                       )  459TH JUDICIAL DISTRICT
18                             )
     ALEX E. JONES, INFOWARS,  )
19   LLC, ET AL.,              )  TRIAL COURT CAUSE NO.
                              )  D-1-GN-18-006623
20        DEFENDANTS           )

21
     --------------------------------------------------------
22

23
          MOTION TO COMPEL; MOTION FOR SANCTIONS
24

25

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 285 of 1044

73

1    non-appearing attorney, who's acting as corporate

2    counsel.  He's general counsel.  He's essentially the

3    party.  He is their corporate lawyer.

4            And you have these attorneys who come in who

5    are put in these awkward positions, like you can see

6    Mr. Pattis really found himself in an awkward position

7    there.  And each of these attorneys will then come and

8    the next local counsel will blame it on the local

9    counsel before.  And so here we have Mr. Reeves again,

10   who is the latest series in that, and I'm expecting,

11   just like Mr. Jefferies, he will blame the one before

12   him.  But what you'll see is the consistent behavior of

13   party itself.  And that is the reason why we think

14   anything more at this point just becomes ridiculous.

15           So what we're asking is the default judgment

16   and to let a trial proceed forward just on whether

17   Jones' conduct merits punitive damages; what the

18   compensatory damages are; and, if there is a punitive

19   damages finding, what the punitive damages should be.

20   And that's what we're asking for today, Your Honor.

21           THE COURT:  So, I printed out your proposed

22   orders.  I haven't read them yet because I didn't know

23   they were there until this morning.

24           My concern is you need this discovery even

25   for a damages trial.  So, are you asking me to default

22-01021-hcm Doc#1-10 Filed 04/18/22 Entered 04/18/22 12:34:52 Exhibit B contd. Pg 286 of 1044

74

1　liability and order the discovery still be responded to

2　again?

3　　　　　MR. BANKSTON:　It's interesting.　I do think

4　you're right, that there will need to be some damages

5　discovery from therein that's directed towards them.　I

6　don't honestly think it's ever -- I'm going to get

7　much.　And I don't -- let me put it this way, I don't

8　think the discovery that was, um, issued under the

9　court's prior discovery orders, which was TCPA-directed

10　discovery, all that goes to my burdens.　So I don't

11　think we've served any discovery yet that would be

12　subject to these orders that would be damage related.

13　　　　　Certainly if we go forward and there's

14　something going on with damages that we need to bring

15　to the court, you know, for -- we could have that.　But

16　I'm just kind of hoping that we can go forward and at

17　least put on a damages trial, even if they don't

18　produce us anything.

19　　　　　THE COURT:　Right.　I mean you can, but my

20　question is just, if you're trying to get punitive

21　damages, you probably do need more discovery.

22　　　　　MR. BANKSTON:　I think that's true.

23　　　　　Well, I'm going to tell you, Your Honor, I

24　think I have enough to prove punitive damages right

25　now.　I do.

22-01021-hcm Doc#1-10 Filed 04/18/22 Entered 04/18/22 12:34:52 Exhibit B contd. Pg 287 of 1044

75

 1              THE COURT:  Okay.  You might want more, let's

 2     put it that way.

 3              MR. BANKSTON:  I do.  Exactly.  Correct, Your

 4     Honor.

 5              THE COURT:  Okay.  But your position is

 6     you'll file that later.

 7              MR. BANKSTON:  Right.

 8              Right, if we need -- if, for instance, after

 9     this hearing and I have more of an understanding of

10     what the scope of discovery is like going forward, then

11     we'll serve new discovery requests and depositions that

12     we may need.  I think that would be very limited.

13              THE COURT:  Okay.  All right.  Thank you.

14              Mr. Reeves.

15              MR. REEVES:  Okay.  Thank you, Your Honor.

16              You know, Mr. Bankston, he kind of merged

17     everything together and I feel like, for at least my

18     purposes, the best way to approach this is individually

19     with each motion so that we can make sure that we have,

20     you know, a clear understanding of each particular

21     motion, what is requested here.

22              The first thing I want to say is that, you

23     know, the statement at the very end where he pulled out

24     where I asked you to give me basically a chance to deal

25     with the discovery issue is from a brief in Pozner,

# Exhibit 4

1          ROUGH DRAFT

2      The stenographic notes taken in the within

3  proceeding have been translated instantaneously into

4  their English equivalents through a computerized process

5  called realtime translation.  A rough draft, in ASCII

6  format, is available to all counsel.  The text as seen

7  herein of these proceedings is unedited and uncertified

8  and may contain untranslated stenotype, misspelled

9  proper names and technical words, occasional reporter's

10  notes, and/or nonsensical English word combinations.

11  These will be corrected on the final certified

12  transcript upon its delivery to you in accordance with

13  our standard delivery terms, or on an expedited basis,

14  as requested.

15      The rough draft is intended only for the purpose of

16  augmenting counsel's notes and is not intended to be

17  used or cited in any court proceeding as representing a

18  final edited and proofread transcript.

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  This is the deposition

2  of Daria Karpova, the date is December 3, 2021.  The

3  time is 10:53 a.m.

4          You may swear in the witness.

5          (Oath administered remotely by the reporter

6  located in San Antonio, Texas, to the witness located in

7  Austin, Texas)

8          MR. BANKSTON:  Do you want us to announce

9  appearances?

10          THE REPORTER:  That would be great.

11          MR. BANKSTON:  Yeah.  Okay.  Mark Bankston

12  questioning for the plaintiffs.

13          MR. REEVES:  Brad Reeves for the

14  defendants.

15          Before we begin, Mark, I'd like to go ahead

16  and see if we have the same stipulations yesterday

17  morning that this is subject to the already entered

18  protective order in the Louis case and the pending ones

19  in the Heslin and Pozner and De La Rosa matters.

20          MR. BANKSTON:  So agreed.

21          MR. REEVES:  Alright.

22              DARIA KARPOVA,

23  having been duly affirmed, was examined and testified as

24  follows:

25                  EXAMINATION

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          3

1  BY MR. BANKSTON:

2      Q.  Ma'am, could you tell the jury your name and

3  what you do for a living?

4      A.  Daria Karpova.  I'm a producer for InfoWars.

5      Q.  When were you first told you'd be giving this

6  deposition?

7      A.  I don't recall the exact date, but I believe it

8  was a few weeks ago.

9      Q.  Sometime in November you think.

10      A.  Yes.

11      Q.  Okay.  Do you know what you're here to testify

12  about?

13      A.  It is my understanding I'm here on behalf of

14  Free Speech Systems.

15      Q.  Have you been provided with topics you're going

16  to testify about?

17      A.  Yes.

18      Q.  Okay.  Did you meet with your attorney before

19  this deposition?

20      A.  Yes.

21      Q.  When did you do that?

22      A.  Yesterday.

23      Q.  Was that the first time you met this attorney?

24      A.  Yes.

25      Q.  How long did you spend with him?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          4

1      A.  A couple of hours.

2      Q.  And when I say when you met with your attorney,

3  I'm speaking about Bradley Reeves seated across from me.

4  Have you met with any other attorneys?

5      A.  Yes.

6      Q.  What other attorneys have you met with?

7  Well -- actually, hold on.  Because -- let me back up

8  here.

9          Have you met with any other attorneys regarding

10  your preparation for your testimony here today?

11      A.  Yes.

12      Q.  Okay.  What attorneys are that?

13      A.  Isn't it privileged?

14          MR. REEVES:  Excuse me?  You can talk about

15  whom -- the attorneys you met with.  Do not speak about

16  the discussions you had.

17      A.  Okay.  Mr. Randazza.

18      Q.  (By Mr. Bankston)  Okay.  You met with

19  Mr. Randazza.  When did you do that?

20      A.  That was yesterday.

21      Q.  Is he in the room with Mr. Reeves?

22      A.  No.  That was the day before.

23      Q.  Okay.  I thought you met with Mr. Reeves

24  yesterday.

25      A.  You asked me about the attorney.  That's what I

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        5

1  thought you meant.  So I was referring to Mr. Randazza.

2      Q.  Have you ever meet with Mr. Reeves?

3      A.  The day before.

4      Q.  Okay.  Okay.  So actually the day before

5  yesterday you actually met with Mr. Reeves.

6      A.  Correct.

7      Q.  Okay.  How long did you meet with Mr. Reeves?

8      A.  Maybe an hour.

9      Q.  Okay.  Mr. Randazza, did you meet with him in

10  Austin or was that over some sort of technology

11  situation?

12      A.  In person.

13      Q.  Okay.  That was in Austin, though?

14      A.  Yes.

15      Q.  Okay.  So let me make sure I have it straight

16  now.

17          Yesterday you met with Mr. Randazza for a

18  couple of hours.  And the day before you met with

19  Mr. Reeves for a couple of hours.

20      A.  And I didn't time the meetings, but that's what

21  I approximate, yes.

22      Q.  Sure, sure.  Okay.  So let me just make sure I

23  understand.

24          And -- and as -- let me also just as a warning,

25  sort of a caution.  We're going to have conversation

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        6


1  today that is not exactly natural or normal.  If we were

2  talking to each other, say, outside of this room, just

3  in a room together, there's a good chance that we'd be

4  able to anticipate each other's questions and answers,

5  finish each other's sentences, be able to jump in and

6  start answering before I was done with my question

7  because you'd know what I was saying.  We do this all

8  the time in -- in normal conversation.  It's not rude or

9  anything.  I'm not saying you're interrupting me or

10  anything.  But in a deposition, she's go to write

11  everything down.  And it makes it real -- it makes it

12  super difficult for her if we're ever talking at the

13  same time.  And so we kind of have to do this unnatural

14  thing where you have to, like, wait a second until I'm

15  done with question and then answer.  So it kind of seems

16  unnatural, but I'll try to remind you if we're talking

17  over each other.  I'm sure if we do it really bad, she's

18  going to remind us.  Remember, that she's -- she's not

19  paid by any -- she's not part of the case.  She's not

20  associated with the parties.  She has no interest in

21  this.  So she's just trying to do her job.  So I'm going

22  to make sure we try to do that for her.

23      A.  Thank you.

24      Q.  With -- I want to make sure I have it down

25  correctly, that in terms of you meeting with lawyers to

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        7

1  prepare for this deposition, that consists of

2  Mr. Randazza yesterday for what you think is a couple

3  of hours and Mr. Reeves the day before for what you

4  think is a couple of hours.

5      A.  Correct.

6      Q.  Okay.  Tell me anybody else that you have

7  spoken to about what you plan to testify about here

8  today.

9      A.  I've consulted with two former corporate reps

10  in regards to whether I was missing any information.

11  They said that I wasn't.  I've also consulted with HR

12  regarding some of the topics for the information that I

13  was going to need for this.  And that's it.

14      Q.  Who was the first corporate rep?

15      A.  Rob Dew.

16      Q.  Okay.  You met with Mr. Dew and talked to him

17  about the topics you'd be speaking about today?

18      A.  Briefly.

19      Q.  What's briefly?  What does that mean?

20      A.  I basically sort of ran through the topics and

21  asked him if I was going to say anything, if he had any

22  information for me and he said no.

23      Q.  How long did you talk to him?

24      A.  I'd say 15, 20 minutes.

25      Q.  Okay.  And Mr. Dew didn't have any other

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        8


1  information for you?

2      A.  No.

3      Q.  So nothing here that you say today is going to

4  be coming from Mr. Dew?

5      A.  No.

6      Q.  Okay.  Who's the other corporate rep you know?

7      A.  Michael Zimmerman.

8      Q.  Okay.  What -- did you have -- did you get any

9  information from Mr. Zimmerman?

10      A.  No.

11      Q.  How long did you talk -- excuse me.  I'm sorry.

12      A.  Yeah, he was pretty much the same type of

13  meeting.

14      Q.  Okay.  So -- and I take it by when you say

15  "same type of meeting," you asked him if there was any

16  information that you needed to know about any of these

17  topics and he said, no, I don't have anything?

18      A.  Correct.  Yes.

19      Q.  Again, I'm going to caution you.

20      A.  I'm sorry.

21      Q.  Yeah, it's -- we'll get used to it.  I promise.

22  It's going to be a long day.  So we'll get used to it.

23  But let me ask that question again.

24          What I'm taking you're saying is that you met

25  with Mr. Zimmerman for a brief period of time, asked him

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT         9


1  if he had any information about these topics and he told

2  you he did not have any information about these topics

3  to give you.

4      A.  He told me that I already had the information.

5  He didn't have anything new to add.

6      Q.  So how did Mr. Zimmerman know what information

7  you had?

8      A.  I believe I had read the topics that are on

9  that sheet of paper in front of --

10      Q.  Okay.  So in other words, after reading those

11  topics to Mr. Zimmerman and wanting to know if he had

12  any additional information he could give to you, he

13  said, no, you should have everything?  Is that the basic

14  sum of it?

15      A.  Yes.

16      Q.  Okay.  Now, I understand -- I've been given a

17  folder.  Do -- do you recognize this folder that I'm

18  holding right here?

19      A.  Yes.

20      Q.  Okay.  I've been told that these are documents

21  that you reviewed prior to this deposition.

22      A.  Yes.

23      Q.  Okay.  So you have taken the documents that

24  you've prepared yourself for today and put them in this

25  folder?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          10


1      A.  Correct.

2      Q.  Okay.  I want to right now -- no, let's do them

3  individually.

4              (Discussion off the record)

5              (Exhibit 1 introduced)

6      Q.  (By Mr. Bankston)  Okay.  So, ma'am, what I'm

7  going to do is I'm going to put a sticker on this folder

8  itself, and we're going to mark that as Exhibit 1.

9  Okay.  And I want to talk to you about some of the

10  documents in here.

11          Let me -- let me ask you this too.  So these

12  documents that you prepared and the conversations that

13  you've had with counsel and the conversations you've had

14  with your corporate representative, the two corporate

15  representatives, excuse me, that would be the total

16  universe of people that you've spoken to about the

17  deposition.  Is that right?

18      A.  Yes.

19      Q.  Okay.  And these documents here represent the

20  total universe of documents that you had prepared for

21  before the deposition.  Is that correct?

22      A.  Yes.

23      Q.  Okay.  Can you tell me the amount of time that

24  you have spent on -- let me back it up this way.

25          I -- I would assume -- or maybe I'm not

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        11


1  correct, so let me know.  But I would assume that in

2  addition to meeting with the attorneys and speaking to

3  the corporate representatives, you also spent time, say,

4  reviewing these documents, right?

5      A.  Some time, yes.

6      Q.  How much time do you think you spent reviewing

7  these documents?

8      A.  I'd say an hour.

9      Q.  Okay.  So the -- the things that we see here in

10  Exhibit 1, these are things that you personally, outside

11  of the company of lawyers and outside the company of

12  corporate representatives prior, you spent about an hour

13  reviewing this material?

14    A.  Correct.

15    Q.  Okay.  And is there anything else that I'm not

16  talking about yet that you have done to prepare or

17  gather information for this deposition?

18    A.  Can you repeat the question?

19    Q.  Yeah.  Sure.  Let me try to rephrase it.

20       We have talked about reviewing documents.

21  We've talked about talking to people.  There's --

22  there's no other people or documents, other than the

23  people we've already talked about?

24    A.  (No response.)

25    Q.  Is that correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        12


1    A.  The -- yeah.  One of the topics for this

2  meeting today that I prepared included personnel for

3  particular dates of the videos, which I had inquired

4  from HR about.  She had provided me with some personnel,

5  which I thought I had printed out, but they're still in

6  my email.  Which when I looked through the folder, it

7  wasn't there.  So they're still in my folder.  I mean in

8  my email.  So if you need that, I could potentially

9  print that out.

10    Q.  Those documents are things that you used to

11  determine who was working at the company --

12    A.  Correct.

13    Q.  -- at what -- again --

14    A.  I'm sorry.  I'm sorry.

15      Q.  And I know -- again, I know you're not doing it

16  on purpose.  And because -- I have the feeling you try

17  to be an efficient person and you know exactly what I'm

18  asking.  So you wanted to be compliant.

19      A.  I apologize.

20      Q.  No, you're -- you're fine.  Trust me.  But I

21  will -- I will stop you and remind you when that happens

22  just because I'm trying to make sure this record is

23  good.  I'm glad you brought that up because I did forget

24  about the HR person.

25          And can you tell me that person's name?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        13


1      A.  Melinda.

2      Q.  Is it maybe Flores?

3      A.  Yes.

4      Q.  Okay.  So Melinda Flores is the HR person you

5  talked about.  And you were -- did you feel like you

6  were able to get information about who was working at

7  different times?

8      A.  Yes.

9      Q.  Okay.  Okay.  Before we dive into those

10  documents, I want to talk just a little bit more about

11  you.

12          Can you first -- first, can you tell me a

13  little bit about your educational background, what that

14  looks like?

15      A.  I have a bachelor's degree in applied

16  engineering.

17    Q.  Where's your degree from?

18    A.  Expression College for Digital Arts.

19    Q.  Excuse me.  I'm sorry.  I didn't catch that.

20    A.  Expression College for Digital Arts.

21    Q.  Gotcha.  Okay.

22       And is that your only secondary education?

23    A.  Yes.

24    Q.  Okay.  Can you -- is InfoWars -- let me back

25  that up.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        14


1       When did you start working with -- with Free --

2  oh.  I'm making assumptions.

3       Is your employer Free Speech Systems, LLC?

4    A.  Yes.

5    Q.  Okay.  When did you start working for them?

6    A.  I believe October 2015.

7    Q.  Okay.  Between your secondary education and

8  InfoWars, did you have other jobs?

9    A.  Here and there.

10    Q.  Can you walk me through those, through your

11  resume?

12    A.  Due to the nature of my education, what it

13  required, I would have regular gigs here and there.  So

14  it wasn't a -- one single employer.  At times I would

15  have several employers during the course of, say, a

16  couple of months.  Then I would just take regular gigs.

17  What I'm talking about is sound engineering, light,

18  sound, different production roles, different gigs for

19  music composition.  So things like that.

20      Q.  Okay.  So these jobs were not permanent

21  employment, but you had contract work, in other words,

22  between different people?

23      A.  Yes.  That's right.

24      Q.  Okay.  And when you say audio production, are

25  we talking music production?  Are we talking for

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        15


1  entertainment, video, news?  What -- what kind of things

2  are we talking about?

3      A.  Conferences.  Anything that had to do with

4  audio.  Again -- conferences, concerts, music concerts.

5  Again, anything that had to do with audio, I would be

6  engineering that.

7      Q.  Okay.  When you were first hired by Free Speech

8  Systems, what was your job title?

9      A.  I believe it was assistant producer, which is a

10  title that is given to everybody on production.  And my

11  specific role was the sound -- sound board because that

12  was my background and I was put in that position.

13      Q.  Now -- and today your job title would just be

14  producer?

15      A.  Yes.

16      Q.  Okay.  Have you had any other job titles at

17  InfoWars?

18      A.  No.

19      Q.  How much does InfoWars pay you a year?  Or

20  actually, let me -- I'm sorry.  Let me back that up for

21  a second.

22       Are you paid as a salaried employee or hourly

23  employee?

24     A.  Salary.

25     Q.  Okay.  Then the same question.  What do you

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        16


1  make yearly for InfoWars?

2     A.  About 125,000.

3     Q.  Okay.  I have in -- in looking into InfoWars

4  itself, I have occasionally seen reference, usually

5  outside the company, of you being referred to as

6  Mr. Jones' executive assistant.  Is that a role you

7  play, or is that -- have they got that wrong?

8     A.  I wouldn't know where that's coming from.

9     Q.  Okay.  That's what -- again, it's outside the

10  company.  And I think a lot of people say a lot of

11  things about InfoWars without really knowing what it is.

12  And so sometimes I may think that I know something about

13  what's going on with InfoWars.  Please feel free to

14  correct me.

15       You would con -- I take it as a producer,

16  your -- the main functions of your job is to ensure or

17  to facilitate the creation of the video and audio

18  broadcast that InfoWars creates.  Is that right?

19     A.  No.  I would say it is my job to facilitate the

20  live broadcast.

21    Q.  Okay.

22    A.  And production thereof.  Preproduction as well.

23    Q.  Okay.  So things like -- let's try to separate

24  this out.

25        InfoWars does a live show pretty much every

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        17


1  day?

2    A.  Correct.

3    Q.  Okay.  And then that -- that live show is

4  sometimes distributed through other channels like the

5  internet, correct?

6    A.  Yes.

7    Q.  For instance, you know Banned.Video.

8    A.  Yes.

9    Q.  You -- you understand what that is.

10        Do you have any involvement in running that

11  website?

12    A.  No.

13    Q.  Okay.  So in other words, the live production

14  side and the internet side, those are -- would you

15  describe those as two different parts of the business?

16    A.  I'm not sure how to answer that.

17    Q.  Well, what I'm interested in is the amount of

18  overlap between the people who are working with you to

19  create the live show every day and the people who are

20  running the website and putting articles and videos on

21  the website and Banned.Video.  Is there overlap --

22  significant overlap between those two groups?

23    A.  I would say no.

24    Q.  Okay.  And do you have -- as a producer, I -- I

25  take it you have managerial authority over different

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       18


1  employees.  Is that right?

2    A.  Yes.

3    Q.  Okay.  If there's somebody doing something

4  involved in the live show and they're doing it

5  incorrectly, you have the power to tell them to do it

6  differently, correct?

7    A.  Correct.

8        MR. REEVES:  Mark, one sec.  I just want to

9  stipulate -- note for the record that I don't believe

10  this covered by any of the topics in your deposition

11  notice for the corporate representative.  Just for

12  purposes of the record to denote that.  I'm not

13  otherwise going to stop you from asking them.  But I

14  just wanted to note that.

15        MR. BANKSTON:  Right, right.

16    Q.  (By Mr. Bankston)  Do you have managerial

17  authority or -- I guess maybe managerial isn't even the

18  right word.

19        Do you have power and authority to tell the

20  people who are running the website what to do?

21    A.  No.

22    Q.  Okay.  Okay.  I want to talk to you now about

23  some things in Exhibit 1.

24          (Discussion off the record)

25          (Exhibit 1A introduced)

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          19


1      Q.  (By Mr. Bankston)  Okay.  I've marked this as

2  1A.  You recognize that, correct?

3      A.  Yes.

4      Q.  That's a document that you reviewed prior to

5  this deposition, right?

6      A.  Correct.

7      Q.  That is the Wikipedia entry for false flag,

8  correct?

9      A.  Yes.

10      Q.  Okay.  Can you tell me why you looked at this

11  document?

12      A.  I thought it would be a good idea to bring it

13  as a reference to some of the points for topic number

14  one.

15          If I could have the list of topics, that would

16  help me to identify the exhibits.

17      Q.  I understand what you're saying.  In fact,

18  let's do that.  I'm going to mark this as 1B.

19          (Exhibit 1B introduced)

20      Q.  (By Mr. Bankston)  And what I'm handing you

21  right now is titled Plaintiff's Third Amended Notice of

22  Taking the Oral and Video Deposition of the Corporate

23  Representative of Free Speech Systems, LLC.  And I'll go

24  ahead and just give you the paper with the topics on it

25  so you can see.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      20

1    A.  Thank you.

2    Q.  Now, hopefully you can refer to that.

3        And when you were referring to topic one, you

4  were talking about the sourcing and research for the

5  videos described in plaintiffs' petition?

6    A.  May I just take a minute?

7    Q.  Sure.

8    A.  Yes.  Correct.

9        (Exhibit 1C introduced)

10   Q.  (By Mr. Bankston)  I've handed you 1B [sic].

11  Do you recognize that?

12   A.  Yes.

13   Q.  That is the Wikipedia entry for the Reichstag

14  Fire, correct?

15   A.  Yes.

16   Q.  Again -- yeah, I know.  I'm going to have to

17  keep reminding you, but it's okay.

18       MR. REEVES:  Didn't you mark the depo

19  notice as 1B?

20       MR. BANKSTON:  You are absolutely right,

21  Brad.  You sure are.

22       MR. REEVES:  Do you want to just make this

23  2?

24       MR. BANKSTON:  Yeah.  No.  I can --

25       MR. REEVES:  And you can keep -- and you

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      21

1  keep the article --

2         MR. BANKSTON:  Yeah, that'll work.  This

3  was in the folder is the only reason I was --

4         MR. REEVES:  Oh.  Whatever you want to do,

5  man.

6         MR. BANKSTON:  Yeah, I just wanted to have

7  everything in 1 be the documents that she reviewed.

8         MR. REEVES:  Yeah, that's fine.

9         MR. BANKSTON:  So what I am going to do

10  since that was 1B, what we're going to do is I'm

11  actually going to make this 1C.  So now I have handed

12  you what I've marked as 1C, which you recognize,

13  correct?

14      A.  Correct.

15      Q.  And that is the Wikipedia entry for the

16  Reichstag Fire, correct?

17      A.  Yes.

18      Q.  Okay.  The Reichstag Fire was a Nazi party

19  arson attack, correct?

20      A.  Correct.

21      Q.  Okay.  Can you tell me why this is relevant to

22  the case?

23      A.  The same answer as for the previous exhibit.  I

24  thought it would be a document pertaining to some of the

25  points in topic number one as an example of false flags.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        22


1      Q.  So in other words -- let's try to put it this

2  way.  In some of the videos in plaintiffs' petition,

3  there are statements made about false flags, correct?

4      A.  Which petition are you referring to?

5      Q.  I'm -- well -- okay.  When -- when that topic

6  number one says sourcing and research for the videos

7  described in plaintiffs' petitions, have you seen the

8  plaintiffs' petitions?

9      A.  Briefly.

10      Q.  Okay.  They're not in this folder, are they?

11      A.  No.

12      Q.  Okay.  So this folder actually doesn't

13  represent everything that you've reviewed for this

14  deposition, right?

15      A.  These are just appointed documents that I

16  thought would be good to have for me personally to refer

17  to some of the topics here.

18      Q.  Okay.  But in terms of plaintiffs' petitions,

19  is that something you looked at before this deposition?

20      A.  I honestly can't recall.

21      Q.  You can't recall if you've seen the plaintiffs'

22  petitions?

23      A.  I've seen a lot -- a lot of documents.

24      Q.  Have you --

25      A.  I'm not -- since I don't have a legal

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        23


1  background, it's -- I'd have a hard time recalling right

2  now exactly which one was which.

3    Q.  Which document was which document you mean?

4    A.  Yes.

5    Q.  Okay.

6         MR. REEVES:  Mark, without waiving

7    attorney-client privilege, I'll stipulate that she has

8    seen the petitions.

9         MR. BANKSTON:  I don't need you to do that.

10   I don't need you to testify for her, Brad.

11        MR. REEVES:  I'm not testifying.

12        MR. BANKSTON:  Please don't do that again.

13        MR. REEVES:  Okay.

14        MR. BANKSTON:  I need to question her about

15   what she prepared for.

16        MR. REEVES:  That's fine.  That's fine.

17        MR. BANKSTON:  Alright.

18        MR. REEVES:  I'm not trying to testify for

19   her.

20        MR. BANKSTON:  But you absolutely are,

21   Brad.  And please don't do that again.

22        MR. REEVES:  Mark, I'm not.  I'm -- you can

23   think what you want, but I'm --

24        MR. BANKSTON:  I'm going to make it for the

25   record right now.  I'm questioning this witness about

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        24


1    what she has reviewed for the deposition under her

2    duties to prepare for this deposition and counsel has

3    just answered for her.

4         MR. REEVES:  I have not.

5          MR. BANKSTON:  And I -- and I object to

6  that.  And I don't like it and I don't want it to

7  continue.

8          MR. REEVES:  Alright.

9     Q.  (By Mr. Bankston)  We can then say that there

10  are other documents besides what's in this folder that

11  you've reviewed that I don't have in front of me,

12  correct?

13     A.  Well, can I add something to the previous

14  point?

15     Q.  Sure.  I'm not sure what you mean.

16     A.  You were asking me specifically a reference to

17  false flag from a petition that I've seen.  When I was

18  trying to recall that, I do not recall in the petition

19  that specific reference.  It might have been there, but

20  I don't recall from all the documents that I've seen.

21          Now, the reason I brought these again is to

22  help me present some of the points when answering these

23  topics in this petition

24     Q.  Sure.  No, I understand that.

25     A.  Yeah.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        25


1     Q.  What I'm -- what I'm trying -- you know, first

2  of all, I -- before we get back to my question.  Now

3  that I know that in addition to these documents -- your

4  counsel tells me that you've reviewed the petitions,

5  right?  Are there anything else that I need to know

6  about?

7      A.  I don't believe so.

8      Q.  Okay.  In terms of my question was for the

9  videos described in plaintiffs' petition, do they

10  reference false flags?

11      A.  Repeat that again, please.

12      Q.  The videos described in plaintiffs' petitions,

13  do they reference false flags?

14      A.  I'm not sure of that exact wording.

15          (Exhibit 1D introduced)

16      Q.  (By Mr. Bankston)  Okay.  I'm putting to you

17  1D.  Do you recognize that?

18      A.  Yes.

19      Q.  Where does -- can you read the website at the

20  bottom?  What website does that come from?

21      A.  historytoday.com.

22      Q.  Okay.  So this is a HistoryToday article about

23  the sinking of the Maine, correct?

24      A.  Correct.

25      Q.  Okay.  The USS Maine was a 19th century

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        26


1  warship, correct?

2      A.  Correct.

3      Q.  Okay.  And that warship exploded in Havana

4  Harbor, correct?

5      A.  Correct.  Sorry.

6      Q.  No problem.  Let me ask that again.

7          That warship exploded in Havana Harbor,

8   correct?

9       A.  Correct.

10      Q.  There is significant historical evidence to

11  suggest that that ship was intentionally exploded by the

12  United States Government.  That's correct?

13      A.  There is a controversy about it I would say.

14      Q.  In other words, what I'm -- what I'm wondering

15  is from reading that article, did you come away with the

16  idea that there is substantial evidence; in other words,

17  non-trivial evidence which people could use to support

18  the idea that the USS Maine was intentionally destroyed

19  by the United States Government?

20      A.  I would say one could infer that.

21      Q.  Okay.  Can you tell me why that particular

22  article is relevant to your testimony today?

23      A.  It could be viewed as an example of false

24  flags.

25      Q.  Okay.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      27


1       A.  Throughout history.

2       Q.  I'm going to put in front of you 1E.

3           (Exhibit 1E introduced)

4       Q.  (By Mr. Bankston)  You recognize that, correct?

5       A.  Yes.

6       Q.  A Wikipedia entry for the Pearl Harbor

7   advance-knowledge conspiracy theory, correct?

8       A.  Correct.

9      Q.  Is this the same answer as the other documents?

10     A.  Yes.

11     Q.  Okay.  So this is another example of

12  potentially -- well, let me ask you -- back up.

13         Would you call this is a false flag, for

14  instance, if -- let me rephrase that question.

15         If the allegations about this conspiracy theory

16  are true, would you consider that a false flag?

17     A.  I would say so, yes.

18          (Exhibit 1F introduced)

19     Q.  (By Mr. Bankston)  Okay.  Alright.  I'm going

20  to put in front of you 1F.  Do you recognize that?

21     A.  Yes.

22     Q.  Can you explain what that is?

23     A.  Yes.  It is an article that was archived from

24  the website D.C. Clothesline which includes Mr. Halbig's

25  biography, which I wanted to have on hand.

   UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT     28


1      Q.  Okay.  So this is just biographical information

2  about one of InfoWars's sources?

3      A.  Correct.

4          (Exhibit 1G introduced)

5      Q.  (By Mr. Bankston)  Okay.  Now, I'll put in

6  front of you what I've marked as 1G.  Do you recognize

7  that?

8      A.  Yes.

9      Q.  Okay.  Can you explain what that is?

10     A.  One second.

11        So this is another article that contains

12  information regarding the questions that Mr. Halbig had

13  regarding Sandy Hook.

14      Q.  Okay.  There's also some information about

15  Mr. Jones in there too, correct?

16      A.  There might be.  I didn't read the entire

17  article.

18      Q.  Okay.  So you didn't actually review this

19  entire document?

20      A.  Not in its entirety.

21      Q.  Did you go find this document?

22      A.  Yes.

23      Q.  Okay.  And so how did you come across this

24  document?  How did you find it?

25      A.  I was looking for Mr. Halbig's questions

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        29


1  regarding Sandy Hook.

2      Q.  Okay.  Do you feel like you have an

3  understanding now of Mr. Halbig's questions regarding

4  Sandy Hook?

5      A.  Yes.

6      Q.  Okay.

7            (Discussion off the record)

8            (Exhibit 1H introduced)

9      Q.  (By Mr. Bankston)  Alright.  I'm going to show

10  you what I've marked as 1H.  Do you recognize that?

11      A.  Yes.

12    Q.  That's from Dr. Steve Pieczenick's website,

13  isn't it?

14    A.  Yes.

15    Q.  Okay.  And that's basically a biography of

16  Dr. Steve Pieczenick?

17    A.  Correct.

18    Q.  Okay.  You wanted to have that because Steve

19  Pieczenick is somebody who has appeared on InfoWars at

20  one point to talk about Sandy Hook?

21    A.  Correct.

22        (Exhibit 1I introduced)

23    Q.  (By Mr. Bankston)  Okay.  Okay.  I'm going to

24  show you now what I've marked as 1I.  Do you recognize

25  that?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      30


1    A.  Yes.

2    Q.  That's a Guardian article, right?

3    A.  Correct.

4    Q.  Guardian's a newspaper in Britain.  Am I right

5  about that?

6    A.  Yes.

7    Q.  Okay.  This article says -- its headline says:

8  Sandy Hook father, Leonard Pozner, on death threats:  I

9  never imagine having to fight for my child's legacy,

10  correct?

11    A.  Correct.

12    Q.  What did you need this article for in your

13  testimony today?  Or let me -- that's not a good

14 question.

15       Why did you feel you wanted to review this

16 article for your testimony today?

17    A.  One second, please.

18       The reason I wanted to have this article is

19 that I thought one of the victim's mother -- there was

20 interesting information regarding the victim's mother

21 and her request to have an open casket for the funeral.

22    Q.  Why is that interesting to you?

23    A.  It seems to me that the motivation for doing so

24 would be to exploit a child's death for a political

25 agenda.

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      31


1    Q.  Might another reason for it is because a bunch

2 of people are saying that child is fake?  Couldn't that

3 be a reason for it?

4    A.  I don't know.

5    Q.  Sitting here right know, if your child -- let's

6 back up.

7       You -- you just had a baby, right?

8    A.  Yes.

9    Q.  Okay.  Let's say 6 years from now your child

10 walks into an elementary school and is massacred in a

11 gun violence incident and some news organizations are

12 saying that your child is fake, can you see that a

13 possible way to combat that would be to have an

14 open-casket funeral for your child?

15    A.  No.

16    Q.  That's not something you would ever consider?

17    A.  No.

18    Q.  Could you imagine how somebody else could

19 consider that?

20    A.  Not if they have a heart and know political

21 agenda.

22    Q.  Okay.  So you think that this Jewish family's

23 choice to have an open-casket funeral for their child

24 was politically motivated.

25        MR. REEVES:  I'm going to object as being

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        32


1 outside of scope for corporate representative testimony.

2        MR. BANKSTON:  That's fine.

3        THE REPORTER:  Sir, could you please speak

4 up.

5        MR. REEVES:  I'm sorry.  This is Brad

6 Reeves.  I objected to this as being outside the scope

7 of the corporate representative testimony.

8        But you can go ahead -- otherwise go ahead

9 and answer.

10        (Discussion off the record)

11    Q.  (By Mr. Bankston)  Yeah.  You have a question.

12 I don't know if you answered it or not.

13    A.  What was the question?

14        MR. BANKSTON:  Madam Court Reporter, can

15 you read back my last question?

16        (Court reporter read requested portion)

17     A.  What does being Jewish have anything to do with

18  this?

19     Q.  (By Mr. Bankston)  I'm not here to answer your

20  questions, ma'am.

21     A.  I don't know.  My answer is -- my personal

22  opinion, I find it unconscionable.  That's something

23  that I would never bring myself to doing.

24     Q.  People have open-casket funerals every day,

25  don't they?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        33


1     A.  Yes.

2        However, considering the circumstances and how

3  the child was disfigured, based on these articles, I

4  find that just horrific.

5        (Exhibit 1J introduced)

6     Q.  (By Mr. Bankston)  Okay.  Here's another

7  article about that, right, Exhibit 1J?

8     A.  Yes.

9     Q.  So you actually pulled two separate articles

10  about Noah Pozner's funeral having an open coffin,

11  correct?

12     A.  I pulled this one article because it was linked

13  in the Guardian, and I wanted to make sure I have the

14  sources for where I got the articles from.

15     Q.  Okay.  And so of all the documents that you

16  reviewed regarding the plaintiffs, the only ones you've

17  reviewed that you chose to go review were two articles

18  about Ms. Pozner choosing to have an open casket for her

19  son, correct?

20      A.  That wasn't the reason why I reviewed the

21  article.

22      Q.  That's not what I'm asking you, Ms. Karpova.

23          I'm asking you of all the documents you

24  reviewed about the plaintiffs before this deposition,

25  the only two that you did review are articles that

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        34

1  discuss Noah Pozner's funeral having an open casket,

2  correct?

3      A.  They happened to mention that.  But that's the

4  only -- that's not the only thing they discussed.

5      Q.  I'm not saying that.  I'm not -- I understand

6  what you're saying.  Let's make it even broader then for

7  you.

8          The only two pieces of documentation that you

9  have reviewed for this deposition about the plaintiffs

10  are two articles, both of which discuss in the article

11  Noah Pozner's open-casket funeral, correct?

12      A.  Yes.

13      Q.  Okay.  Tell me any other information from those

14  articles that you believe is relevant to this deposition

15  today.

16      A.  I've already mentioned that -- the state of the

17  physical body that the child had for the -- for the

18  open-casket ceremony describes that.

19      Q.  Okay.  So when it comes down to the documents

20  that you reviewed for this deposition about the

21  plaintiffs, the only information that you're really

22  gleaning from this that's useful to this deposition has

23  to con -- concerns Noah Pozner's open casket and the

24  appearance of his body, correct?

25      A.  It was useful to some of the points.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          35


1      Q.  I'm not asking what it's useful for.  I'm

2  asking you that of all the documents that you reviewed

3  about the plaintiffs, the only piece of information that

4  you have had gleaned from those documents that is

5  relevant to this deposition concerns Noah Pozner's

6  open-casket funeral and the appearance of his body,

7  correct?

8      A.  These are the articles that I had chosen to

9  bring.

10      Q.  So that is correct, right?

11      A.  (No response.)

12      Q.  Let's try it this way.  You can't give me

13  another piece of information out of either of those two

14  articles that you believe is relevant to this

15  deposition, right, other than Noah Pozner's open-casket

16  funeral and the appearance of his body.

17      A.  Correct.  Those are the articles for it, yes.

18      Q.  And those are the only articles that you've

19  reviewed about the plaintiffs in preparation for this

20  deposition, correct?

21     A.  Yes.

22     Q.  Okay.  Topic number one is the sourcing and

23  research for the videos described in plaintiffs'

24  petitions.  When was the last time you watched those

25  videos?  Back up.  I made an assumption there.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          36


1          Have you watched the videos in plaintiffs'

2  petition ever in your history at InfoWars?

3     A.  I've watched some of them.

4     Q.  Okay.  So one thing we can say is that in

5  preparation for this deposition you didn't watch those

6  videos, correct?

7     A.  (No response.)

8     Q.  I'm sorry.  Ms. Karpova, is that a difficult

9  question for you to answer?

10     A.  Well, I've already answered some of the videos.

11     Q.  Right.  No.  I understand that you have in your

12  history at InfoWars since 2015, you've probably on

13  occasion seen some of these videos.  I understand that.

14  What I'm asking you is since the date you were told you

15  were giving this deposition in November and you were

16  preparing for this deposition, you haven't watched any

17  of these videos, right?

18     A.  I have not.

19          (Discussion off the record)

20     Q.  (By Mr. Bankston)  Okay.  Alright.  In

21  preparing for -- to talk about the videos in plaintiffs'

22  petition, do you have an idea sitting here right now how

23  many there are?

24    A.  Roughly.

25    Q.  How many are there?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        37


1    A.  A couple of dozen maybe.

2    Q.  Okay.  And did you ever compile a list of those

3  for any reason?

4    A.  Not personally.

5    Q.  Okay.  No outside of the petition in other

6  words, right?  What I'm asking you is did you sit down

7  and ever write them down or type them all out?

8    A.  No.

9    Q.  Okay.  When you say "not personally," did

10  somebody give you a list of the videos?

11        MR. REEVES:  Objection.

12        I'm going to -- to the extent you received any

13  information in discussions with your attorneys, that is

14  privileged.  So -- if there is information that

15  you -- that that occurred outside of your attorneys, you

16  may answer that question; otherwise, that information is

17  privileged and I instruct you not to answer on that.

18    Q.  (By Mr. Bankston)  Is there any information

19  that you can disclose to me that is outside of your

20  attorney's instruction?

21    A.  No.

22        (Exhibit 2 introduced)

23    Q.  (By Mr. Bankston)  Okay.  Let me give you what

24   I've marked as Exhibit 2.  You recognize that, right?

25      A.  May I review it?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          38

1               THE REPORTER:  Could you repeat that?

2      A.  May I have a second to review it?

3      Q.  (By Mr. Bankston)  Yes, you may.

4           (Discussion off the record)

5      A.  Yes.

6      Q.  (By Mr. Bankston)  You do recognize this

7  document?

8      A.  I believe I've seen this before.

9      Q.  You believe you've seen it before.

10      A.  I've seen a lot of documents.

11      Q.  I understand that.

12         Well, I mean, we know how many documents you've

13  seen.  They were in this folder, right?  Correct?

14      A.  Yes.

15      Q.  Okay.  So when you say a lot of documents, you

16  mean Exhibits 1A through 1I, right?

17      A.  (No response.)

18      Q.  Correct?

19      A.  I've seen some exhibits from my attorney, which

20  is privileged.

21      Q.  Okay.  Okay.  Ms. Karpova, at one point I asked

22  you if these were the documents you reviewed for this

23  deposition.  You testified yes to me.  And then we found

24  out you reviewed the plaintiffs' petitions or at least

25  your attorney said you reviewed the plaintiffs'

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          39

1  petitions.  So I asked you at that point are there any

2  other documents that I need to know about and you told

3  me no.  Are you now changing that testimony?

4       A.  I didn't understand your question because the

5  topic for -- one of the topics for this deposition today

6  includes the question about the documents produced by

7  the company.

8       Q.  Okay.  So have you reviewed documents relating

9  to your deposition today for that topic?

10      A.  That would be between my attorney.

11      Q.  If your attorney wants to instruct you that you

12  are not going to tell me about the documents you

13  reviewed before this deposition, he can do that.

14           MR. REEVES:  If you have -- that's -- you

15  are not to discuss any conversations that you've had

16  with attorneys.  That is privileged information.

17  Documents that you have reviewed in preparation for

18  this, is not.  Unless they're provided directly to you

19  from your attorneys as far as -- you know,

20  correspondence.  But if it's documents that were

21  produced or anything like that that you reviewed, that

22  is information he can -- you should tell him.

23      Q.  (By Mr. Bankston)  So let's try this one more

24  time.

25           Can you tell me in addition to the plaintiffs'

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          40

1  petition and Exhibit 1A through 1I or 1J, can you tell

2  me what documents you reviewed to prepare for your

3  deposition today?

4     A.  I don't recall -- I don't have a list of all

5  the documents that I looked at.

6     Q.  That's not great.

7        MR. REEVES:  Objection to the sidebar.

8     Q.  (By Mr. Bankston)  So in other words there are

9  more documents than this, but these are just the ones

10  that you decided to bring, correct?

11        MR. REEVES:  Objection; form.

12     A.  I've already answered that question.

13     Q.  (By Mr. Bankston)  I don't think you have,

14  ma'am.

15        And what I -- what I'm specifically asking you

16  about, there are documents that you have reviewed prior

17  to this deposition that you did not bring to this

18  deposition.

19     A.  I did not think they were relevant to the

20  specific points.

21     Q.  Okay.  So now let's get back to this.

22        I thought you had just told me that there was a

23  topic on here, a specific point on here about the

24  documents that have been produced in discovery, that you

25  reviewed documents that were relevant to that topic.

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      41

1  Are you saying now that the documents you reviewed

2  aren't relevant to that topic, or they are relevant to

3  that topic?

4      A.  I did not think they were relevant to -- to

5  bring to this deposition.

6      Q.  You thought it was relevant to bring an article

7  about Noah Pozner's open-casket funeral, but you didn't

8  think it was relevant to bring the very documents you

9  reviewed to prepare for topic number six?  Is that

10  correct?

11      A.  I would say topic number four is what I'm

12  referring to.

13      Q.  Okay.  Topic number four is the one about the

14  company's documents?

15      A.  Yes.

16      Q.  Okay.  So let me ask that question again.

17          You thought it was important to bring articles

18  about Noah Pozner's open-casket funeral, but did not

19  think you should bring documents that you reviewed

20  relevant to topic number four, correct?

21      A.  Correct.

22      Q.  Okay.  And so sitting here today, taking your

23  deposition, there's no way for me to know if you

24  reviewed regarding topic number four, is there?

25      A.  (No response.)

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        42


1      Q.  Right?

2      A.  (No response.)

3    Q. Do you understand my question?

4    A. Yes, I understand your question. I would say

5  the documents that I reviewed were sent to me by my

6  attorney.

7    Q. Okay. I mean, how does that tell me whether I

8  can or cannot know what they are. That doesn't help me

9  answer that question, right? The question is, sitting

10  here right now in this deposition room where I'm here to

11  ask you questions for the company, there's no way for me

12  to know what those documents are --

13    A. Well, I would assume that you guys would have

14  those documents.

15    Q. Okay. Again, I'm going to caution you not to

16  answer over me. Okay?

17      If you thought we had these documents, why did

18  you bring those?

19    A. Because these are the documents that I know you

20  don't have.

21    Q. How do you know I don't have those?

22    A. Because these are supplementary articles that I

23  thought would be helpful for me in answering some of the

24  points personally.

25    Q. Okay.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT    43


1    A. These are not the documents that have to do

2  with any official legal documents.

3    Q. Okay. So -- in terms of -- let's just make

4  sure we understand.

5        We now know that there are documents that you

6   have reviewed that are not here today that I don't know

7   what they are regarding topic number four.  Are there

8   any other topics where there are documents that you

9   reviewed that I don't have here today?

10      A.  No.

11      Q.  Okay.  Regarding the documents that you

12  reviewed on topic number four, was that during your hour

13  that you prepared for the deposition on your own or did

14  you review those documents during your meeting with

15  counsel?

16      A.  No.

17      Q.  Okay.  So in other words we had your couple of

18  hours with Mr. Reeves the day before yesterday, your

19  couple of hours with Mr. Randazza yesterday and then

20  about your hour on your own.  And during all -- during

21  all those times are the times in which you reviewed

22  documents that were relevant to topic number four.

23      A.  Yes.

24      Q.  Okay.  How many documents?

25      A.  I don't have the count, the exact count.  I

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        44


1   didn't count them.

2       Q.  Okay.  You can understand how that's not

3   helpful to me, right?  I don't have any idea of the

4   universe or size of documents that you've reviewed.  So

5   would you be able to --

6      How about let's do it this way?  Would the

7  documents fit in this folder (indicating)?

8          MR. REEVES:  Objection; form.

9      Q.  (By Mr. Bankston)  Would they all fit in here

10  do you think?

11      A.  I think so.

12      Q.  Okay.  So you wouldn't need, say, like this to

13  hold all them all.  You could hold them all -- not in a

14  Banker's box like this, but in a manila folder like

15  this, correct?  Is that accurate?

16      A.  Yes.

17      Q.  Now, surely you remember some of those

18  documents, right?

19      A.  I'm not sure.

20      Q.  You -- okay.  So the documents you reviewed

21  for -- for topic number four, sitting here today you

22  can't identify any of them for me.

23      A.  I don't want to make a mistake.  Not off the

24  top of my head.

25      Q.  Okay.  So in other words, whatever's in those

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        45


1  documents -- because you can't even identify them --

2  whatever's in them is not going to be relevant to your

3  testimony here today.  You're not going to be giving me

4  information from those documents I take it.

5          MR. REEVES:  Objection; form.

6      Q.  (By Mr. Bankston)  Correct?

7      A.  Well, the information -- the relevant

8  information would be pertaining to question -- to topic

9  number four.

10     Q.  Right.

11        But if you can't even remember what the

12  documents are, you're not going to be able to tell me

13  what's in them, right?

14        MR. REEVES:  Objection; form.

15     Q.  (By Mr. Bankston)  Ms. Karpova, is there

16  something difficult to understand about that?

17        MR. REEVES:  Objection; form.  Let her

18  answer the question.

19     A.  The documents are pertaining to the discovery

20  requests that you guys have requested, right?  So you

21  should know what's in them.

22     Q.  (By Mr. Bankston)  I know what's in them.  I

23  know.  Trust me, I do.

24     A.  Right.

25     Q.  Right.  I want to know if you do.

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        46


1        So sitting here today you can't identify any of

2  the documents you reviewed.  So you're not going -- none

3  of your testimony today is going to be based on those

4  documents, correct?

5     A.  Not -- not off the top of my head.

6     Q.  Okay.  So that's what I'm saying.

7        Right now you're giving testimony.  You

8  understand that?

9      A.  Yes.

10      Q.  It's coming off the top of your head, right?

11  You understand that?

12      A.  Yes.

13      Q.  There's not somebody with a teleprompter back

14  there, right?

15      A.  Correct.

16      Q.  Okay.  Everything that's coming right now is

17  coming right out of your brain.

18      A.  Yes.

19      Q.  Right?

20          And since you cannot tell me what those

21  documents are and what they say off the top of your

22  head, that's not going to be part of your testimony

23  today, correct?

24          MR. REEVES:  Objection; form.

25      A.  I would say not specifically what's in those

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       47


1  documents because there's no way I can remember the

2  amount of documents and what's in them.

3      Q.  (By Mr. Bankston)  Right.

4          And they're not here today, right?

5      A.  I did not print them up, no.

6      Q.  Right.

7          So they're not going to be part of your

8  testimony, right?

9          MR. REEVES:  Objection; form.

10      A.  (No response.)

11    Q.  (By Mr. Bankston)  Correct?

12       I'm sorry.  Like -- we're going to be here a

13  long day today.

14       MR. BANKSTON:  No.  I need to go a little

15  bit longer.

16    Q.  (By Mr. Bankston)  I think I got what I needed

17  from that.  I don't need you to answer that question.

18       Okay.  Can you look at Exhibit 2 for me and can

19  you go to paragraph 14?

20    A.  (Witness complies.)

21    Q.  Do you see that paragraph 14 identifies the

22  January 27, 2013 video entitled, "Why People Think

23  Sandy Hook is a Hoax"?

24    A.  Yes.

25    Q.  Okay.  You're familiar with the claims made in

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        48


1  that video, right?

2       MR. REEVES:  Objection; form.

3    A.  I don't recall the exact video.

4    Q.  (By Mr. Bankston)  And so sitting here today,

5  you're not familiar with the claims made in that video.

6    A.  No.

7    Q.  Okay.  So sitting here today, you couldn't tell

8  me who the sources were for the claims that you don't

9  know, correct?

10    A.  From -- I would assume they were either

11  Mr. Halbig or Pieczenik, because these were the two

12 sources that were -- that had pertained to the videos.

13    Q. Okay. First of all I'm going to tell you,

14 Ms. Karpova, do not make assumptions for me. I -- so

15 here's the thing that I need you to understand. You're

16 here to testify for the corporation, right? You

17 understand that? You're not -- there's sometimes

18 questions I'm going to ask you personally, what you

19 personally think or know. When I ask you questions

20 about the corporation when you're here testifying,

21 there's basically three answers you can have, which is I

22 know and here's the answer, the corporation knows this;

23 the corporation does not know this; or I, Daria Karpova,

24 do not know if the corporation knows or does not know.

25 Do you understand those three types of answers?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      49

1    A. Yes.

2    Q. Okay. So in this particular situation, you

3 don't know what claims are made in that video, correct?

4    A. I don't.

5    Q. Okay. And you are telling me you're making

6 this assumption that this must have something to do with

7 Wolfgang Halbig or Dr. Steve Pieczenik. But do you know

8 if either of those individuals had ever been on InfoWars

9 by 2013? Do you know?

10    A. Not for a fact I do not know. I could find

11 that information if that was a question that I knew I

12 had to prepare for.

13    Q. Well, we asked you for the sourcing -- I mean,

14  look at topic number one.  Do you see what topic number

15  one says?

16     A.  Right.  This question is very broad and hard to

17  understand what is even wanted.  So I did my best

18  preparing -- in good faith preparing to answer these

19  topics.

20     Q.  Well, it sounds like your attorney should have

21  objected to it if it was overbroad and in bad faith.  I

22  get that.

23        MR. REEVES:  Do you realize that you cannot

24  object like that, Mark.  So if you wouldn't -- you don't

25  need to tell her what her attorney should or shouldn't

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        50


1  have done.  Why don't you just go ahead and answer your

2  question.

3        MR. BANKSTON:  Well, if she wants to have

4  legal arguments with me today, we're going to discuss

5  what those legal --

6        MR. REEVES:  She's not having legal

7  arguments with you.  Just ask you question.

8        MR. BANKSTON:  She -- Brad, Brad.  Don't

9  interrupt my testimony.

10        MR. REEVES:  Don't harass the witness.

11     Q.  (By Mr. Bankston)  Ms. Karpova, did you

12  just -- did you just assert for me that that topic was

13  too broad to be answered correctly?  Is that what you

14  told me?

15    A.  When it comes to -- yes, for -- for all intents

16  and purposes, yes.

17    Q.  So when I ask you I want to know the sourcing

18  for a video at InfoWars, you can't figure that out?

19  That's too broad?

20    A.  Sourcing can mean a lot of different things.

21  It can -- can you be more specifically what you mean by

22  sources?

23    Q.  I think you know what it means, don't you,

24  right, what a source is?  What do you think a source is?

25    A.  Where you get a particular information.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        51


1    Q.  Right.

2        And you understand that claims were made in

3  these videos, right --

4    A.  Uh-huh.

5    Q.  -- about Sandy Hook?  And they came from

6  somewhere, right?

7    A.  They came from Alex Jones.

8    Q.  So Alex Jones is the source for the information

9  in these videos.

10    A.  It -- it depends.

11    Q.  It does.  And that's why I brought you here

12  today, right?

13        But for these videos, where Wolfgang Halbig or

14  Dr. Steve Pieczenik had never said anything about

15  Sandy Hook until at least 2014, you don't know what the

16  sources for these videos are, do you?

17     A.  I would say no.

18     Q.  Okay.  There's a claim made in this video -- I

19  don't know how -- let me put it this way.

20     A.  Can we review the video right now?

21     Q.  No.  I'm not going to play a 2-hour video for

22  you right now, no.

23     A.  But you expect me to know what's going on in

24  every video?

25     Q.  Uh-huh.  I do.  I do, Ms. Karpova.  And I

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        52


1  expected Rob Dew to do the same thing when he showed up

2  to the deposition to talk about sourcing and research

3  and he didn't do that twice.

4          MR. REEVES:  Object to the sidebar.

5          MR. BANKSTON:  So I do -- I want to make

6  sure this witness understands what she's here to do

7  today and my questions, what they are.

8     Q.  (By Mr. Bankston)  I do expect you to have done

9  your home work and know what was in those videos, yes,

10  ma'am, I do.

11         So for instance in this video, there's a claim

12  made about Charles Jacob.  Do you know who he is?

13     A.  No.

14     Q.  Okay.  So you wouldn't be able to talk to me in

15  any way about the claims made about Charles Jacob in the

16  January 27, 2013 video?

17     A.  No.

18    Q. Okay. Can you tell me what employees were

19 involved in researching that video? Who came up with

20 those claims in that video?

21    A. I have a list of people who were working on

22 that day. From that list I could tell you who might

23 have been in production for that day.

24    Q. So the best we can tell you is -- the best we

25 can figure out is who might have been working in the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        53


1 production side at that date, correct?

2    A. Yes.

3    Q. Okay. Have you talked to any of those people

4 before your deposition today?

5    A. No.

6    Q. Okay. So in other words, if you had a list of

7 people who were working that day and you could, it would

8 be within your power to do so, to walk down to wherever

9 they work in your building and say, hey, this video

10 right here from January 27, 2013, when you were working

11 that day, did you have anything to do with any of these

12 claims made in that video? You could do that, couldn't

13 you?

14    A. Some of those people on the list do not work

15 for the company anymore.

16    Q. Okay. But some of them do, don't they?

17    A. Some do.

18    Q. Yeah. And you could do that, couldn't you?

19    A. It depends on the video. I'm not sure about

20  this video, who specifically worked that day.

21    Q.  Sure.

22        But for any of the videos that we're going to

23  talk about today, for any of the videos in plaintiffs'

24  petition, you had a list of who was working at InfoWars

25  at that time, correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        54


1    A.  Yes.

2    Q.  And you could have interviewed those employees,

3  correct?

4    A.  I could have.

5    Q.  And you didn't, correct?

6    A.  Correct.

7    Q.  Okay.  Can you go to paragraph 16 for me?

8  Actually, hold on.  Before we go on to this next video.

9        One of the things that you -- I want to cover

10  some of the things we talked about in this first video

11  to see if they apply for every video because I think we

12  might be able to save some time.  Alright?  And you can

13  tell me if we can or we can't.

14        But from what I understand about that first

15  video is, A, you didn't watch it and, B, you didn't talk

16  to any of the employees involved in making it.  That's

17  correct, right?

18    A.  Yes.

19    Q.  Okay.  Is that true for all the videos?

20    A.  Yes.

21    Q.  Okay.  And in terms of understanding what

22  claims were made in the videos, is that the same that

23  you don't know what claims were made in the videos for

24  all the videos?

25    A.  Correct.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        55

1    Q.  Okay.  So look at paragraph 16 for me.  And

2  that one talks about an April 9, 2013 video called

3  "Obama Gun Grabbing Psyop Speech of Evil," correct?

4    A.  Correct.

5    Q.  Okay.  So in this video -- for instance, that

6  petition in front of you says -- alleges -- let me back

7  up.

8        When I say that the plaintiff alleges something

9  in a petition, you understand that that is my client's

10  saying that this happened.  That's -- and so part of the

11  whole court process is to figure out whether any of that

12  is true, right?  Do you get that?

13    A.  Uh-huh.

14    Q.  Okay.  So when I say that they're alleging

15  this, I'm not going to tell you that what is being said

16  here is fact.  You know, that may be for you to decide,

17  right?  But when I'm talking about allegations, I just

18  wanted you to understand what I meant by that.

19        But here in paragraph 16 talking about that

20  video, this plaintiff, this petition alleges that

21  Mr. Jones said that those recent mass shootings were a

22  government operation and that Sandy Hook was an inside

23 job.  You see where it alleges that, correct?

24      A.  Uh-huh.

25      Q.  Sitting here today can you tell me whether

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        56


1 that's true or not?

2           MR. REEVES:  Objection; form.  Can you

3 rephrase that, please, Mark?  I'm not sure what

4 you're --

5           MR. BANKSTON:  Yeah.

6      Q.  (By Mr. Bankston)  So the plaintiffs allege

7 that Mr. Jones in that video told his viewers that the

8 recent mass shootings were a government operation and

9 that Sandy Hook was an inside job.  That's what the

10 plaintiffs allege happened.  Is that true?  Is that what

11 he said in that video?  Or can you tell?

12     A.  If I had the video in front of me, I would be

13 able to tell you.

14     Q.  Or if you had watched the video prior to this

15 deposition and looked into the research and sourcing of

16 it you could tell me, correct?  Is that correct?

17     A.  If that was something that's among the topics,

18 yes, I would have.

19     Q.  Sure.

20         So --

21     A.  But because the topic was so broad, there was

22 no way I could have known that I had to go point by

23 point in this original petition.

24      Q.  Did you raise that -- did you raise that issue

25  with your attorneys?  Did you bring to them -- to the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        57

1  attention I can't do this?

2             MR. REEVES:  Objection.

3             Don't talk to -- anything about you talked

4  to your attorneys about.

5      Q.  (By Mr. Bankston)  Okay.  Did you express to

6  anybody at the company I can't do this?

7      A.  I can't do what?

8      Q.  Answer topic number one.

9      A.  I'm answering it to the best of my ability.

10     Q.  Okay.  But you've told me it can't be answered,

11  correct?  It's too broad.  There's no way you could do

12  this, right?  Is that correct or not correct?

13     A.  Well, if we are going point by point, as you

14  are right now, then, correct.

15     Q.  Yeah.

16            So, I mean, in your mind when the plaintiffs

17  requested a representative of the company to talk about

18  the sourcing and the research of the videos that made

19  claims in plaintiffs' petition, did you think they'd be

20  uninterested in the claims made in the videos?

21     A.  It would -- it would -- it's -- it's pretty

22  much impossible to figure out on that particular day of

23  the -- what was the sourcing.  We don't have that kind

24  of documentation for every show or every video.

25     Q.  But you didn't go ask any of the employees

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          58

1  involved, did you?  Correct?

2      A.  Correct.

3      Q.  Okay.  Go to paragraph 17 for me.

4      A.  (Witness complies.)

5      Q.  Do you see where there it talks about the

6  April 16, 2013 video entitled "Shadow Government Strikes

7  Again," correct?

8      A.  Yes.

9      Q.  Okay.  And again, just like our prior answers,

10  you don't know what employee researched the information

11  to create the claims in this video, correct?

12      A.  Correct.

13      Q.  Okay.  There's a quote there in the petition

14  that's being alleged.  It says:  They state Sandy Hook.

15  The evidence is just overwhelming, and that's why I'm so

16  desperate and freaked out.

17          Do you know if that's an accurate quote from

18  Mr. Jones?

19      A.  I don't know for a fact, no.

20      Q.  Okay.  So it's fair to say when you reviewed

21  the petitions for these plaintiffs' videos and they had

22  quotations from Mr. Jones, you didn't do anything to try

23  to verify those quotations, correct?

24      A.  Correct.

25      Q.  Okay.  The company now admits -- actually, let

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          59

1 me go back for a second.

2     When we have a statement like this from

3 Mr. Jones, did you ask Mr. Jones about any of these

4 statements?

5     A. No.

6     Q. And prior to taking this deposition from the

7 time you learned in November that you were going to be

8 giving this deposition to the present day, have you

9 talked to Mr. Jones about what your testimony's going to

10 be in this room?

11     A. No.

12     Q. Okay. The company now admits -- okay. Let me

13 go back to the statement you were just looking at,

14 right? Do you see that, the evidence is just

15 overwhelming?

16     A. Yes.

17     Q. The company now admits there was not

18 overwhelming evidence in April 2013 that

19 Sandy Hook -- that the government staged Sandy Hook.

20     MR. REEVES: Objection; form.

21     Q. (By Mr. Bankston) The company admits that now?

22     MR. REEVES: Objection; form.

23     A. To the best of our knowledge.

24     Q. (By Mr. Bankston) To the best of your

25 knowledge today, sitting here today --

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT     60

1     A. Yes.

2      Q.  -- the company to the best of its knowledge

3  admits there was not overwhelming evidence in 2013?

4          MR. REEVES:  Objection; form.

5      Q.  (By Mr. Bankston)  Correct?

6      A.  To the best of our knowledge at that time, we

7  thought that there was overwhelming evidence based on

8  the expert witnesses that we were interviewing.

9      Q.  Okay.  Who was -- who are those?

10     A.  Mr. Halbig and Mr. Pieczenik.

11     Q.  Ma'am, neither of them had been on the show by

12  2013.  So can you tell me who the experts actually were

13  for this video?

14     A.  If it wasn't a direct interview, it must have

15  been information coming from them.

16     Q.  It must have been.

17         You're certain that the information in this

18  video came from -- you're testifying under oath that the

19  information in this video came from Steve Pieczenik or

20  Wolfgang Halbig?

21     A.  I wouldn't be able to say for sure, but I know

22  they were the two expert witnesses that were the key

23  people where Alex had concluded -- you know, made his

24  conclusions from.

25     Q.  Okay.  Ma'am, I just want you to understand,

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       61

1  before we answer any more questions, that Wolfgang

2  Halbig didn't even start investigating Sandy Hook till

3  2014.

4      So when I have you here under oath saying that

5  this must come from Wolfgang Halbig, I'm a little

6  concerned.  So I just want to stop and make sure we're

7  not making assumptions, that we're answering the

8  questions based on the knowledge that we have.  Okay?

9      And the reality is that when it comes to

10  whether the evidence was overwhelming, one, you don't

11  know what evidence is even being talked about in that

12  statement, do you?

13  A.  I don't.

14  Q.  Okay.  Two, you don't know where any of that

15  alleged evidence came from, do you?

16  A.  No.  It's been a long time, though.  Correct.

17  Q.  That's why I'm taking this deposition.

18      And sitting here today, you can't do it, can

19  you?  You cannot tell me what evidence is being talked

20  about in paragraph 17.

21  A.  No.

22  Q.  Okay.

23      MR. REEVES:  Mark, let's go ahead and take

24  a break.  We've been going for a little --

25      MR. BANKSTON:  I've got one more question

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      62

1  on this video.

2      MR. REEVES:  Alright.

3  Q.  (By Mr. Bankston)  Regardless of what the

4  company thought in 2013, sitting here today the company

5  will now admit there was not overwhelming evidence in

6  2013 that Sandy Hook was staged, correct?

7  　　　　MR. REEVES:  Objection; form.

8  　A.  I think I already answered that question.

9  　Q.  (By Mr. Bankston)  I think what you had told

10  me -- and let me make sure I understand your answer --

11  was that at the time you believed there was evidence.

12  　A.  At the time the company believed there was

13  evidence.

14  　Q.  Correct.

15  　　　Today, though, today sitting here right now

16  with the benefit of everything that's happened, with the

17  benefit of everything that's happened in this suit, will

18  the company now admit today there was not overwhelming

19  evidence that the government staged Sandy Hook in 2013?

20  　A.  The company believed that at that time there

21  was.  Now the company does not believe --

22  　Q.  Right.  So now the company --

23  　A.  -- that there is.

24  　Q.  I'm sorry.  Go ahead and finish your answer.

25  　A.  Sorry.  Yeah.

　　　UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT　　　63

1  　Q.  Okay.  But now -- I'm just trying to confirm

2  because I think I understand what your answer was.  But

3  now today the company admits there was not overwhelming

4  evidence?

5  　A.  Correct.

6        MR. BANKSTON:  Okay.  Alright.  We can take

7  a break.

8        THE VIDEOGRAPHER:  The time is 12:03 p.m.

9  We are off the record.

10       (Recess from 12:03 p.m. to 12:28 p.m.)

11       THE VIDEOGRAPHER:  The time is 12:28 p.m.

12  we are on.

13       MR. BANKSTON:  Alright.  I have -- I just

14  wanted to let you know I had taken Exhibits 1A through

15  1J, they're back in this folder.  If you need them at

16  any time, please feel free to pull them out.

17       I want to show you right now what I'm going

18  to mark as Exhibit 3.

19       (Exhibit 3 introduced)

20    Q.  (By Mr. Bankston)  Have you seen this document

21  before?

22    A.  I do not remember seeing that.

23    Q.  Okay.  This was produced to us without a Bates

24  number on it.  Back up.

25       I didn't -- you were -- you understand -- okay.

   UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        64


1  I'm sorry.

2        One of the topics you were supposed to prepare

3  for was documents produced by the company, correct?

4    A.  Yes.

5    Q.  So you understand that the company has produced

6  documents at several different points over the past

7  3 years?

8    A.  Correct.

9    Q.  Okay.  You understand that the first time that

10  the company produced documents back in 2018, they didn't

11  have any numbers on the bottom here.  Did you know that?

12    A.  I didn't.

13    Q.  Okay.  Have you ever seen documents reviewed in

14  this case that say FSSTX and a long number at the end of

15  them at the bottom?

16    A.  Yes.

17    Q.  Okay.  This document doesn't have anything like

18  that, okay, because that's the way it was produced.

19       Can you look at this and tell me whether this

20  is an email that came from your files?  Is there any way

21  for you to do that?

22    A.  Can you specify from my files?

23    Q.  I'm sorry.  What I mean to say your files, I

24  mean the company's.  Is this -- is this a Free Speech

25  Systems' email?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       65


1    A.  It appears so.

2    Q.  Okay.  So Nico, that's a Free Speech Systems'

3  employee?

4    A.  Yes.

5    Q.  He -- he was a frequently liaison of

6  Mr. Halbig, correct?

7    A.  Yes, that's my understanding.

8    Q.  Okay.  This email is dated February 25, 2014,

9  correct?

10      A.  Yes.

11      Q.  And this is Mr. Halbig sending his resume and

12  bio to InfoWars?

13      A.  It appears so, yes.

14      Q.  Okay.  And Mr. Halbig says:  Nico, here is some

15  information on me that you guys can check out, Wolfgang,

16  and he gives his phone number, correct?

17      A.  Yes.

18      Q.  Okay.  Do you have any reason to believe that

19  InfoWars had any dealings with Mr. Halbig before this

20  date?

21      A.  I don't know for sure.

22      Q.  Okay.  So let me make sure I ask this in a

23  couple of ways.  Okay?

24         First of all, when you give that answer, when

25  you say I don't know for sure, that's based on your

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      66


1  personal knowledge, Daria Karpova, correct?  That's what

2  you're saying?

3      A.  I'm saying that --

4      Q.  I think maybe --

5      A.  I'm saying -- sorry.

6      Q.  Let me try to help clarify because I think it

7  may be helpful to your answer.

8         What I'm trying to say is when you give the

9  answer of I don't have any reason to believe that we've

10  had -- I don't have any basis to say that InfoWars had

11  contact with Mr. Halbig before that date, is that based

12  on just your own personal knowledge or is that based on

13  information somebody else has given you?

14       MR. REEVES: Objection; form. That wasn't

15  testimony given, but --

16    A. As far as -- as far as the company knows,

17  we -- if there wasn't a record produced before this

18  date, then we don't know if there was communication with

19  Halbig before this date or not.

20    Q. (By Mr. Bankston) Okay. I want to also just

21  before we move on to something else, I want to clear

22  up -- I made a representation to you, and I don't think

23  it was quite accurate. Okay? We had talked about

24  Wolfgang Halbig and when he appeared on the show, and I

25  made a representation about that, okay, and about him

      UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      67


1  being on in 2014. But I also made a representation

2  about Dr. Steve Pieczenik, that at the time I was

3  speaking of, he hadn't been on the show until 2014. We

4  did a little checking, and it appears from what we can

5  figure out that Dr. Steve did something on Sandy Hook on

6  InfoWars in March of 2013. We don't have that video.

7  But I just want to represent to you that that -- what I

8  represented to you before probably isn't accurate

9  because it looks like now there's a video out there that

10  we don't know about that was in March of 2013. But in

11  terms of -- and we were talking about in January of

12    2013.

13          But just for going forward, I want you to

14    understand that -- that we -- I don't want to represent

15    to you that he wasn't there before March 2013.  Do you

16    understand what I'm saying?

17      A.  I understand.

18      Q.  Okay.  Alright.

19      A.  Thank you.

20      Q.  Okay.  Can you go to paragraph 20 for me in

21    Exhibit 2?  Okay.  And Exhibit 2 being Mr. Heslin's

22    petition.  And paragraph 20 talks about a March 14, 2014

23    video entitled "Sandy Hook, False Narratives vs. The

24    Reality."  Do you see where it talks about that?

25      A.  Yes.

          UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        68


1      Q.  Okay.  First let's -- I want to go through some

2    of these videos.  We had talked about -- one thing -- is

3    it true that one thing you can't do here for me today is

4    for each of these videos in this petition -- actually,

5    no.  Let's just go through them a little bit this way.

6          For instance, in this video, March 14, 2014,

7    you would not be able to tell me the specific claims

8    that were made in that video, right?

9      A.  As far as the quotes specifically written here

10    or anything else?

11      Q.  No.  Anything that was claimed about

12    Sandy Hook.  Do you know anything, what was claimed

13    about Sandy Hook in that video?

14    A.  Well, to the company's understanding, the

15  quotes that are presented in this petition appear to be

16  accurate.

17    Q.  Okay.  Beyond what's quoted in this petition,

18  sitting here today, you can't tell me about anything

19  else that was claimed in that video.

20    A.  No.

21    Q.  Okay.  Well, let's talk about what we do at

22  least know.

23       You see a quote there that says we've clearly

24  got people where it's actors playing different parts of

25  difficulty people?  Do you see where it says that?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       69

1    A.  Yes.

2    Q.  Okay.  The company, sitting here today, agrees

3  that was a ridiculous thing to say.

4       MR. REEVES:  Objection; form.

5    Q.  (By Mr. Bankston)  Correct?

6    A.  At the time of the event, with all the

7  information that was coming in, as well as Alex's

8  previous research, as he is a history buff of the false

9  flags that we discussed earlier, it is the company's

10  understanding that he was entitled to his commentary and

11  opinions in this matter.

12    Q.  Okay.  So in other words, the company does not

13  agree it was ridiculous to say we've clearly got people

14  where it's actors playing different parts of different

15  people, correct?

16      MR. REEVES:  Objection; form.

17      A.  Again, this was Alex's commentary.  I'm not

18  sure if the company can agree or not.  It's not a

19  person.  It's not a human being that can agree or not.

20  So as far as this quote from Alex Jones at the time, I

21  already answered that question.

22      Q.  (By Mr. Bankston)  Okay.  Well, you're here as

23  the corporate representative today, correct?

24      A.  Uh-huh.

25      Q.  Correct?

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        70


1      A.  Correct.

2      Q.  Okay.  And you've been asked to give testimony

3  in response to my questions today, correct?

4      A.  Correct.

5      Q.  Speaking from what the company knows or does

6  not know.

7      A.  Correct.

8      Q.  Okay.  The company has opinions on the people

9  who works for it, correct?

10      MR. REEVES:  Objection; form.  Can you

11  please point out to where that's a topic in your

12  deposition notice?

13      MR. BANKSTON:  That's not a topic of my

14  deposition notice, no.

15      MR. REEVES:  Okay.  Well, then she's not

16  here to test -- she's here testifying as a corporate

17  representative on the noticed topics.  If you're asking

18  questions outside of that, she can certainly answer.

19  But that is not on behalf of the company.

20        MR. BANKSTON:  I can give you a running

21  objection to the entire --

22        MR. REEVES:  If you'd like to do that,

23  that's great.

24        MR. BANKSTON:  Yeah.  For every question

25  that I ask, you don't have to stop anymore to do that.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        71


1        MR. REEVES:  Okay.  I'm not trying to

2  interrupt.

3        MR. BANKSTON:  No, I understand.  I

4  understand you're trying to preserve your record.  But I

5  know we're going to be here forever if we don't do stuff

6  like --

7        MR. REEVES:  Okay.  No -- that's fine.

8    Q.  (By Mr. Bankston)  Alright.  So does --

9  let's -- actually, let's -- let me -- let withdraw that

10  question and I'll ask it this way.

11        Do you have any information for me here sitting

12  today what the source of the information it was that

13  allowed Mr. Jones to conclude that we've clearly got

14  people playing -- excuse me -- where he was able to

15  conclude we've clearly got people where it's actors

16  playing different parts of different people?

17    A.  A lot of the information that Alex had

18 commentary upon came from meshoo (phonetic) media,

19 videos, articles. There's no way to have access to

20 that -- to every single piece of that information at

21 this point. It would be hard, even the day before, to

22 have access to whatever the sourcing was for Alex at

23 that particular time.

24     Q. It's true that you didn't do anything to try to

25 figure out that, correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT    72

1     A. Based on my knowledge of the work flow,

2 day-to-day work flow that we've had for years and years,

3 I can make an educated guess because I've been in this

4 position and I can tell you of the typical sourcing that

5 is done for each show --

6     Q. Okay.

7     A. -- and Alex's commentary on it.

8     Q. Okay. So in answer to my question, you

9 didn't -- in preparation for this deposition, you didn't

10 do anything to try to figure that out in terms of what

11 the source was for that statement. That's correct.

12     A. Not for this specific quote. I can tell you

13 the general sourcing that we have, that we utilized in

14 preparation for the shows, as well as during the shows.

15 That's my expertise as a day-to-day person who's

16 involved in production.

17     Q. Okay. You can't tell me -- can you tell me

18 what actors -- can you tell me what people were being

19 alleged to be actors?

20    A. Based on this quote, there's no way to tell.

21    Q.  And based on what you -- and you have done

22  nothing in preparation for this deposition to determine

23  that, correct?

24    A.  That wasn't part of the questions that I was

25  asked --

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          73

1    Q.  I'm not --

2    A.  -- to prepare for --

3    Q.  Ma'am, I'm not asking what you were or were not

4  asked to do.  We'll figure that out.  I want to know

5  factually.  You -- when it comes to trying to figure out

6  who he's even talking about here in terms of actors

7  playing different parts of different people, you didn't

8  do anything to figure that out, correct?

9    A.  Correct.

10    Q.  You didn't ask Alex about this statement or

11  this video, correct?

12    A.  Correct.

13    Q.  You don't know any of the employees who may

14  have researched and come up with this idea that there

15  was actors playing different parts of different people,

16  do you?

17    A.  This -- to me this doesn't appear as a research

18  that's coming from a particular employee that's feeding

19  Alex any information.  This appears to me as Alex's

20  opinions and commentary on the situation that he

21  is -- has in front of him that he's watching based on

22  the main street news reporting, other sources that he

23  might have had at that time.

24      Q.  Okay.  But you're guessing.

25      A.  Educated guess, yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      74


1      Q.  Right.

2          So there's two situations that could happen

3  when Alex Jones is going to say something like this on

4  air.  Situation one is that some employee has found

5  something online, some video, some articles, something

6  that he thinks shows that there's actors playing

7  different parts of different people and he takes that to

8  Alex and Alex goes and puts that on the air.

9          And situation two is Alex Jones himself saw

10  something that made him arrive at this conclusion.

11          One of those two things is most certainly what

12  happened, correct?

13      A.  Not necessarily.  It could be that one of those

14  things happened.  But number one that you mentioned is

15  unlikely in my opinion, just from working for years in

16  the same environment and knowing the work flow.  Again,

17  Alex's commentary could have been -- I'm not sure what

18  his commentary was based on.  It's just hard to -- it's

19  hard to say in this particular case.

20      Q.  Okay.  Do you know who was working on this day

21  in the production department?

22      A.  I have a list of people who were working on

23 that day, and I can refer potentially who were working

24 in production. Even that is not for sure because at any

25 time a person could have or could have not been there.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        75

1     Q. Okay. If you needed to -- if I asked you right

2 now who was there, would you need to look at a document

3 to do that, to figure out who was there?

4     A. If the document is in my email, yes.

5     Q. Okay. And that's not here on this table, is

6 it?

7     A. No.

8     Q. Okay. You can go to paragraph 23 for me.

9     A. (Witness complies.)

10     Q. Do you see where it talks about a May 20 -- a

11 May 13, 2014 video entitled "Bombshell Sandy Hook

12 Massacre Was a DHS Illusion Says School Safety Expert"?

13     A. Yes.

14     Q. That school safety expert, that's Wolfgang

15 Halbig, correct?

16     A. Yes.

17     Q. He's the source for this video?

18     A. It appears so.

19     Q. Okay. Do you -- are you -- are you familiar

20 with claims made in this video about CNN and a

21 (indiscernible) broadcast involving (indiscernible)?

22     A. Say it again, please.

23     Q. Are you aware of claims made in this video

24  about CNN and the first Gulf War and a blue screen?

25      A.  Yes, I recall -- I recall that incident.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      76

1      Q.  Okay.  And you -- tell me what you

2  understand that allegation about CNN and the first Gulf

3  War and the blue screen could be?

4      A.  The allegation is that Anderson Cooper used a

5  green screen to report.

6      Q.  Okay.  Do -- do you think that Anderson Cooper

7  was at the first Gulf War?

8      A.  No.

9      Q.  Okay.  So that's probably not what that is,

10  right?

11      A.  That's the only thing that I can recall having

12  to do with CNN and a reporter.

13      Q.  Okay.  So any discussion about what CNN was

14  doing during the Gulf War in Iraq in terms of a blue

15  screen in that video is something that you do not

16  understand the researching or sourcing for, correct?

17      A.  I do not recall.

18      Q.  Okay.  Can you go to paragraph 25?  And do you

19  see in paragraph 25 it discussing a September 25, 2014

20  video entitled "Connecticut PD Has FBI Falsify Crime

21  Statistics," correct?

22      A.  Yes.

23      Q.  Okay.  First of all, are you familiar with the

24  claim that InfoWars has made that the FBI either

25  falsified crime statistics or admitted that nobody died

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        77

1  at Sandy Hook?  Are you familiar with those claims?

2      A.  As far as it's quoted here in this paragraph,

3  the company believes that to be the case.

4      Q.  No.

5        What I'm asking, Ms. Karpova, is based on the

6  title and this talking about FBI falsified crime

7  statistics.  Are you personally right now familiar with

8  that claim made by InfoWars?

9      A.  Personally I'm not.

10      Q.  Okay.  Did you talk to anybody about that

11  claim?

12      A.  No.

13      Q.  Okay.  So this video and its title, you don't

14  really understand where that comes from, right?

15      A.  No.

16      Q.  Okay.  So you wouldn't know what employee came

17  up with this idea that the FBI falsified crime

18  statistics.

19      A.  There wouldn't be an employee that came up with

20  that specific idea.  That's a show title.  That's based

21  on the information that's discussed in the video.

22  That's how we title the videos.

23      Q.  Do you think this allegation -- I mean, you

24  don't know if this allegation came from inside or

25  outside the company, do you?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        78

1      A.  It came from either that interview with

2  Mr. Halbig that was included in this video or a source

3  that Alex Jones had.

4      Q.  Have you ever seen the article about this,

5  about FBI says nobody killed at Sandy Hook?

6      A.  I might have.  I don't remember now.

7      Q.  Okay.  It's an InfoWars' article?

8      A.  I don't remember.

9      Q.  Did you know it was the third most popular

10  InfoWars' article ever?

11      A.  No.

12      Q.  Okay.  And that's not -- none of those claims

13  are something that you can testify about today.

14          MR. REEVES:  Objection; form.  The -- I

15  know we have a running objection, but again that's not

16  part of the notice of deposition.

17      A.  Which claims specifically?

18          MR. BANKSTON:  I'm sorry.  Are you

19  objecting that her testifying about not being able to

20  talk about the claim made in this video is not part

21  of --

22          MR. REEVES:  No.

23          MR. BANKSTON:  Okay.  I'm confused on

24  what --

25          MR. REEVES:  I'm talking about the article,

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      79

1  about the article.

2          MR. BANKSTON:  Okay.  We'll get to that

3   later.

4          MR. REEVES:  Okay.

5      Q.  (By Mr. Bankston)  So do you see in that

6   paragraph it's talking about photos of kids that are

7   alive that they say died?

8      A.  Yes, I see that paragraph.

9      Q.  Do you know what photo they're talking about?

10     A.  From what I can infer, it was probably a photo

11  that -- or photos that were going around that people

12  were talking about online.

13     Q.  Sure.

14         You have no idea what they are.  I mean, you're

15  guessing, right?  Right?

16     A.  To the best of my knowledge.  There's no way to

17  tell what they were.

18     Q.  You have no personal knowledge about this,

19  correct?

20     A.  Well, there's no way to go back to that video

21  because we don't keep those kinds of records of every

22  show.  Of any show.

23     Q.  You didn't talk to any of the employees, did

24  you?

25     A.  It's hard to tell who worked on that day.  We

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        80


1   don't have record of that either.

2      Q.  You know who wrote the article that went along

3  with this video, don't you?

4   A.  No, no idea.

5   Q.  You'd be able to figure that out if you wanted

6  to, though, couldn't you?

7   A.  If that article had a name on -- of the author,

8  it would be there, yes.

9   Q.  Okay.  So we don't know what employee was

10  responsible for bringing this information to the

11  company's attention, whether it was Alex Jones or

12  another employee, correct?

13   A.  Correct.

14   Q.  Okay.  Do you know if this has to do with the

15  Super Bowl picture?  Do you know what I mean when I say

16  "Super Bowl picture"?

17   A.  I think -- can you be more specific?

18   Q.  Yeah.

19      Do you know about Wolfgang Halbig sending the

20  company a Super Bowl picture?

21   A.  I do not know that.

22   Q.  Okay.  Let me attach No. 4.

23       (Discussion off the record)

24       (Exhibit 4 introduced)

25   Q.  (By Mr. Bankston)  And while he's looking -- I

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       81

1  may have already asked you this.  But on September 25,

2  2014, for that video on that day, you don't know what

3  employees were working that day to be involved in making

4  that video?

5    A.  I can be -- I can potentially infer who were

6  active during the production of this video based on a

7  record of employed personnel on that day.  But I

8  couldn't tell you specifically if they were in the room

9  at that specific moment because we don't keep records of

10  things like that.

11    Q.  Can you tell -- can you tell me who was working

12  that day?

13    A.  If I can have access to my email.

14    Q.  Never mind.

15    Okay.  So let me just make sure for the record.

16  There's nothing on the table right now that's going to

17  be able to help you answer the question of who was in

18  that room that day making that video?

19    A.  Because we don't keep track of that

20  information, correct.

21    Q.  Wait.  No.

22    From what I understand, you do keep track of

23  that information; and if you had access to it, you could

24  answer it.  But you don't have access to it as you sit

25  in that chair?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        82


1    A.  No.  I said I can infer from a list of

2  employees who might have been there at that particular

3  time.

4    Q.  Okay.  And then from that list you could

5  perhaps go interview those employees, correct?

6    A.  Yes.

7    Q.  Okay.  And you didn't do that, correct?

8    A.  (No response.)

9        (Discussion off the record)

10       (Exhibit 4 introduced)

11   Q.  (By Mr. Bankston)  I'm going to show you what

12  I've marked as Exhibit 4.  Can you take a quick look at

13  that real quick and then let me know if you've seen it

14  before?

15   A.  Yes.

16   Q.  You have seen this document before?

17   A.  I have not seen -- I don't recall seeing that

18  specifically.  Like I said, I've reviewed a lot of

19  documents.

20   Q.  Alright.  I'm just trying to make sure -- have

21  you or have you ever seen this document?

22   A.  I don't recall reading this particular exchange

23  with Mr. Halbig and Nico.

24   Q.  Okay.  I'm going to start at the bottom here.

25  And this is -- this document that I'm reading from you

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        83


1  is marked FSS Texas, FSSTX, dash 039429.  And you will

2  see at the bottom email Mr. Halbig writes to Nico.  Do

3  you know who Nathaniel Folks is, the person he copies?

4    A.  No.

5    Q.  Okay.  Nico, though, is an InfoWars' employee.

6    A.  Yes.

7    Q.  What's his job title at this time?

8      A. He's not employed by Free Speech Systems.

9      Q. At this time.

10     A. Oh. At this time? He would be the head

11 producer.

12     Q. Nico's no longer employed by InfoWars?

13     A. Correct.

14     Q. Does InfoWars possess his last known contact

15 information?

16     A. Yes.

17     Q. Okay. Mr. Halbig in this email states: Nico,

18 the picture of the Sandy Hook Elementary School choir is

19 one of the keys. Other pictures are great for

20 discussion. These are the CT CRIME pictures. Wolf.

21      Have I read that correctly?

22     A. Yes.

23     Q. Okay. Nico responds and says: Got the Super

24 Bowl picture. Thank you for sending. We will be

25 having -- we will be calling you on Skype at 1:00 p.m.

      UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      84


1 Eastern Time. How long will you be available for the

2 interview today? Thanks, Nico.

3      Have I read that correctly?

4     A. Yes.

5     Q. Okay. And then the final email says: As long

6 as you and Alex can put up with me. Wolfgang.

7      I read that correctly?

8     A. Yes.

9     Q.  Okay.  Does this help you refresh your memory

10  about what the Super Bowl picture is?

11     A.  Are you asking me personally right now?

12     Q.  If you can answer either on behalf of the

13  company or you can answer on behalf of yourself, let me

14  know either way.

15     A.  If the Super Bowl picture wasn't produced by

16  the company, then we don't have a record of that -- of

17  the picture.  Personally I -- over the years I've

18  seen -- I might have seen the Super Bowl picture.

19     Q.  Okay.  Let's find out.

20          (Discussion off the record)

21          (Exhibit 5 introduced)

22     Q.  (By Mr. Bankston)  Alright.  I'm going to show

23  you what I've marked as Exhibit 5.  Can you take a look

24  at that picture for me?

25     A.  (Witness complies.)

       UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        85


1     Q.  Do you see at the bottom corner where it says

2  FSSTX.0446 -- 476?

3     A.  Yes.

4     Q.  Okay.  Have you seen this picture before?

5     A.  Personally I have not.

6     Q.  Okay.  This was a document though you can tell

7  from the number at the bottom that was produced by the

8  company, correct?

9     A.  Yes.

10     Q.  Okay.  Can you read what it says at the very

11  top of the picture, the white text?

12      A.  "10 Sandy Hook Children found alive and well."

13      Q.  Okay.  This -- does the company now admit that

14  this picture is outrageous?

15          MR. REEVES:  Objection; form.

16      A.  This picture was produced by a guest we've had

17  on the show who thought it was relevant material.

18      Q.  (By Mr. Bankston)  Okay.

19      A.  We don't -- we don't tell our guests what to

20  say or what not to say.

21      Q.  Now, this is something that Nico thanked

22  Mr. Halbig for, correct?

23      A.  Sure.  It appears so.

24      Q.  Does the company -- and when the company in its

25  editorial discussions is discussing things like this,

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        86


1  right, when you have employees of the company discussing

2  a picture of a Super Bowl choir which is being contended

3  to be the pictures of dead children who are actually

4  alive, does the company have an opinion sitting here

5  today about whether those editorial discussions were

6  responsible or not?

7          MR. REEVES:  Objection; form.

8      A.  The expert guest that we had on the show,

9  Wolfgang Halbig, thought that it was an appropriate

10  supplementary material to bring to the interview.  With

11  all the information that we had on Wolfgang Halbig

12  regarding his extensive bio and knowledge in the subject

13  matter that he was going to be discussing, we had no

14  reason to believe that this would be an inappropriate

15  picture if -- we -- if that's something he wanted to

16  bring to the interview and talk about, he's allowed to

17  do that.  We -- we allow that with the guests.

18      Q.  When InfoWars has a source like Mr. Halbig,

19  he's going to bring him on and Alex Jones is going to

20  repeat the things he says.  Let me back up.

21        You'll agree with me, Alex Jones has frequently

22  repeated the things Mr. Halbig has claimed without

23  Mr. Halbig even being on the show, right?

24      A.  Mr. Halbig was a subject matter expert, so Alex

25  would defer to his opinion.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        87


1      Q.  Sure.

2        And one thing that you'll agree with me that

3  the company would have in its editorial discussions on

4  Sandy Hook needs to do is continually assess and

5  reassess the credibility of the experts it's relying on,

6  correct?

7      A.  We did not -- we do not have editorial

8  discussions regarding Sandy Hook, nor did we ever have

9  them.  And to the best of our knowledge, this was the

10  foremost expert on the matter of school shootings,

11  school safety at the time.  And we did our best to bring

12  the top person in the business to state his opinion on

13  the subject matter.

14      Q.  Who vetted Wolfgang Halbig's bio, bio and

15  background?  Who did that?

16      A.  This is -- specifically vetted?  I'm not sure

17  who vetted.

18      Q.  Okay.

19      A.  It -- since Nico was the producer, he probably

20  was the person who vetted.

21      Q.  Alright.  So when InfoWars was assessing

22  Wolfgang Halbig's credibility and whether he should be

23  somebody who should be relied on as to an expert, one of

24  the pieces of information that they had in order to make

25  that credibility assessment was this picture of a Super

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        88

1  Bowl choir that Wolfgang Halbig was contending was

2  actually secretly the murdered children of Sandy Hook

3  who are actually killed.  That's one of the things that

4  InfoWars had in its possession to assess his

5  credibility, correct?

6      A.  I wouldn't say so.  This -- from -- from this

7  exchange, it appears that this is a supplementary

8  material that Wolfgang wanted to have for the interview.

9  His bio, his credentials is an entirely different thing

10  from the materials that he wants to bring to talk about.

11      Q.  Well, what I'm saying is if there's an expert

12  and you've been relying on them, the guy's supposed to

13  be a school safety shooting expert, whatever it is,

14  alright, you're relying on him and then just

15  hypothetically that person starts saying absolutely

16  crazy things and it's pretty clear they're going off

17  their rocker, maybe they were even credible at one time,

18  but suddenly they start saying a bunch of crazy things,

19  to the company, when it's deciding whether to put stuff

20  on about Sandy Hook, it needs to -- it -- it should

21  consider whether what the things its expert is saying

22  are crazy, correct?

23      A.  Well, if he's the expert on the subject matter

24  and -- who knows a lot more on the subject than any of

25  us working at Free Speech Systems, it would be

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        89


1  reasonable to believe that we would want to listen

2  what -- what -- or consider the information that he is

3  bringing.

4      Q.  What exactly in Wolfgang Halbig's history and

5  expertise makes him an expert that you should defer to

6  on whether this picture of the Super Bowl choir is

7  actually pictures of children who were murdered?

8      A.  Well, that's a good question.  That's why I

9  brought his bio, which I would like to read.

10      Q.  You'd just like to read it into the record, or

11  what?

12      A.  Yes.

13          And the reason that we brought him on the show

14  is for his long credential of being an expert on school

15  shootings, on school safety.

16      Q.  Does he have credentials in the photographic

17  forensic analysis of potential murdered children who are

18  actually being used as crisis actors?

19    A.  I don't know that specific credential.

20    Q.  Yeah.  Okay.

21      Do you personally sitting here, you looking at

22  this, it's crazy, right?

23    A.  I'm not here to talk about my personally

24  opinions.

25    Q.  I'm asking you, though.  Yeah, you are.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        90


1      MR. REEVES:  Objection; form.

2    Q.  (By Mr. Bankston)  Yeah, is -- this is crazy,

3  right?

4      MR. REEVES:  Objection; form.  Don't answer

5  that question.

6      MR. BANKSTON:  Yeah.  Are you instructing

7  asking her not to answer --

8      MR. REEVES:  I'm instructing her not to --

9      MR. BANKSTON:  -- whether this was produced

10  by a rationale, sane, human being?

11      MR. REEVES:  That's what you asked her the

12  first time.

13      MR. BANKSTON:  Then let me do that

14  question.

15    Q.  (By Mr. Bankston)  Will you admit sitting here

16  right now, this was not created by a rationale, sane

17  human being, or are you going to tell this jury that

18  this is created by a rationale, sane human being?

19      A.  I don't have an opinion -- a personal opinion

20  on it.

21      Q.  So you see this picture and in trying to

22  determine whether it was created by a sane, rationale

23  human being, you look at it and go I have no strong

24  feelings either way, correct?

25      A.  I'm not a psychiatric medical expert to

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      91


1  determine who is sane and who isn't.

2      Q.  Is this the kind of picture that if somebody

3  gave you that you would say this is a person that I

4  think is trustworthy and credible?  Is that something

5  you would say?

6      A.  It depends where I'm at, what information I

7  have.  We're talking -- we're talking the date 2015

8  where Wolfgang Halbig came on the show.  I -- judging

9  from this conversation, I don't know what Nico looked at

10  or knew about what Wolfgang was going to talk about or

11  bring on the show.  So if -- from -- from the workload

12  that we have, if a guest sends me material that they

13  want to discuss and this guest has long credentials in

14  the subject matter that they want to talk about, then I

15  would thank them for sending me the information just

16  like Nico did.  I don't see anything wrong with that.

17      Q.  You would -- if somebody sent you this while

18  you were doing reporting, you would thank them for it?

19      A.  I don't know.  It depends on the circumstances.

20    Q.  Okay.  Well, the circumstances --

21    A.  I wasn't there when Nico was having this

22  exchange, what information he had at the time.

23    Q.  Well, I'm asking you what if you had this

24  information, a picture that says at the top,

25  "10 Sandy Hook Children found alive and well" and

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        92


1  they're the Super Bowl choir in front of millions of

2  people?  Would you look at that and go, man, I'm glad

3  I -- they sent me that?

4    A.  Personally I would rather think that those kids

5  were alive than -- than having -- because the tragedy of

6  kids being murdered for no reason, the innocence of

7  those children who didn't deserve what -- that -- that

8  kind of fate, I would hold out hope to the last bit of

9  my soul hoping and praying that that picture was -- that

10  was something that would possible, for those kids to be

11  alive.

12    Q.  So if you think about it, from your point of

13  view --

14    A.  Yeah.

15    Q.  -- if you think about it, if the parents, if my

16  clients saw this picture, it should give them a lot of

17  hope, right?  They should -- they should react really

18  positively to this with a lot of hope inside, right?

19        MR. REEVES:  Objection; form.

20    Q.  (By Mr. Bankston)  Is that what you're saying?

21      A.  I'm not those parents.  I'm looking at it as an

22  outsider.  And I would much rather -- and I don't know a

23  person with a heart who'd rather think -- who'd rather

24  believe that the kids are dead versus that the kids

25  might be alive.  I would say it's reasonable for a

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        93


1  person with a heart to have that sort of optimism as I'm

2  sure Alex wanted to believe, that those kids -- if there

3  was any possibility that the kids were not dead, that he

4  was going to grab on to it because that's a much better

5  proposition to have in your heart and mind than to -- to

6  realize that they weren't.

7      Q.  So Alex Jones, according to how the company

8  view things in terms of your Sandy Hook coverage,

9  Alex Jones said the kids didn't really die and they were

10  really alive in part because he has such a big heart and

11  a lot of hope and optimism, correct?

12          MR. REEVES:  Objection; form.

13      A.  Yes.

14      Q.  (By Mr. Bankston)  Okay.  There was nothing in

15  your mind, in the company's mind, nasty, vindictive,

16  negative about any of these statements, about the kids

17  still being alive, right?

18          MR. REEVES:  Objection; form.

19      A.  Absolutely not.

20      Q.  (By Mr. Bankston)  Okay.  Was it -- would it be

21  responsible journalism to show this picture to millions

22  of people?

23          MR. REEVES:  Objection; form.

24      A.  It's possible journalism is the ability to dig

25  for information and present it in a truthful way to the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          94

1  audience and let them be the judge of that information.

2  As long as the information is truthful, to the best of

3  our knowledge, that's what responsible journalism is and

4  that's what we did.

5      Q.  (By Mr. Bankston)  So if you were to show this

6  picture to millions of people, the picture that says

7  10 Sandy Hook Children found alive and well and has a

8  bunch of names superimposed on them, that would be good

9  journalism, right?

10          MR. REEVES:  Objection; form.

11      A.  Again, I already answered that this was the

12  supplementary material that the expert guest wanted to

13  show, send us and it was appropriate for us to -- I'm

14  not sure if it was shown on the screen or not, but -- as

15  a company we didn't -- I don't believe we censored

16  anything that Wolfgang wanted to say.

17      Q.  (By Mr. Bankston)  Let me go back to our

18  petition there, Exhibit 1.  Or is that -- is that

19  Exhibit 1?  I'm sorry.  I didn't -- it might be 2?

20  Yeah -- okay.  Can you look at Exhibit 2 for me?  And go

21  to paragraph 29.

22          Paragraph 29 talks about one of the videos

23  discussed in topic number one, correct?

24     A.  (No response.)

25     Q.  Ms. -- Ms. Karpova, I'm just asking you.  Does

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          95

1  paragraph 29 contain a video that you're supposed to

2  talk about under topic number one?

3     A.  Yes.

4     Q.  Okay.  The video is December 27, 2014, entitled

5  "Lawsuit Could Reveal Truth About Sandy Hook Massacre,"

6  correct?

7     A.  Yes.

8     Q.  What lawsuit is being talked about?

9     A.  I don't know for sure.

10     Q.  Well, at least this one we're lucky because I

11  do.

12         Do you know Wolfgang sued Leonard Pozner, that

13  they were in a lawsuit together?

14     A.  Yes.

15     Q.  Okay.  You understand the company was helping

16  Wolfgang Halbig raise money to use in court against

17  Mr. Pozner.  Do you know that?

18     A.  I'm not sure of the details of -- of the

19  raising of the money for Mr. Halbig's lawsuit.

20     Q.  Can you read that for me?  I'm sorry.  The

21  reasoning, is that what you said?

22     A.  What was your question?

23     Q.  My question is, the company was helping

24  Wolfgang Halbig raise money to use in court against

25  Mr. Pozner, correct?

1     A.  Yeah.  The company doesn't have details in

2   terms of the said money being raised for -- for court.

3     Q.  I think -- wouldn't the more accurate be --

4   answer be you, Daria Karpova, does not know if the

5   company has information relating to whether they were

6   raising money for Wolfgang Halbig's lawsuit?

7     A.  If the documents regarding that weren't

8   produced by the company, then the company does not know

9   because it didn't keep the record.

10     Q.  Do you know if any such records exist?

11     A.  I might have -- it might have been part of the

12   reviewed documents that I've looked at.  I'm not sure.

13     Q.  Well, first of all, we know that you didn't

14   know that this video referred to that lawsuit.  You

15   didn't know what lawsuit it was.  So you also, I would

16   take it, know you haven't done any research to determine

17   what that lawsuit is or anything about it, right?

18     A.  I haven't reviewed that lawsuit, no.

19     Q.  Or anything that has to do with what this video

20   said about the lawsuit, right?

21     A.  I mean, if you ask me specifically?  Because

22   you're saying anything.  If you ask me a specific point,

23   then I may or may not recall.

24     Q.  Sure.

25        What truth about the Sandy Hook massacre could

1  this lawsuit reveal?  What did the video have to say

2  about that?

3      A.  Well, based on the quotes here in this

4  paragraph, you know, the truth would be -- I mean

5  something to do with it not being the way the main

6  stream news reported.

7      Q.  Okay.  Help me understand.

8        The lawsuit could reveal something that's

9  different than the mainstream media.  That's your

10  answer?  Is that -- am I understanding --

11      A.  Different than what the mainstream media

12  finally reported about the incident.

13        I believe it took a year for Connecticut -- the

14  State of Connecticut to release the final report on the

15  event.

16      Q.  What does that have to do with the lawsuit?

17  I'm confused.  What -- what's the lawsuit having to

18  do --

19      A.  Are you asking me what it could've --

20      Q.  Well, let's --

21      A.  So that truth might have been something that

22  contradicted the report that the State of Connecticut

23  had issued.

24      Q.  You have no idea, do you?  You say "might."

25  You don't have any idea.

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        98


1      A.  Yeah, we don't have a record of that.

2    Q.  Yeah.

3        And you -- when you got this petition and you

4  read it and you saw there was a video entitled lawsuit

5  could reveal truth about Sandy Hook massacre, you did

6  nothing to figure out what that lawsuit was or what it

7  could reveal, did you?

8    A.  Huh-uh.  No.  Not specifically.

9    Q.  Okay.  That video also you'll see in the last

10  line, the plaintiff's alleged that the video says that

11  the event was undertaken as a satanic ritual by global

12  elites.  Do you know if that's accurate?  Not that -- do

13  you know if the claim -- in other words, do you know if

14  it's accurate that that was said in the video?

15    A.  I have no reason -- the company has no reason

16  to believe that that wasn't said.  And on that point I

17  would say that that's -- that is a commentary opinion of

18  Alex Jones at that time.

19    Q.  Wait, wait, wait.  Hold on.

20        How do you know Alex Jones said that?  I mean,

21  you don't -- you didn't watch the video, right?

22    A.  Not recently, no.

23    Q.  Okay.  And it says the video also featured

24  claims.  It doesn't say Mr. Jones said that, does it?

25    A.  It does not.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      99


1    Q.  And you're not going to be able to offer me any

2  helpful testimony about that, are you?  You don't know

3  who said it or who researched it, right?

4    A.  Sorry.

5        Judging from the paragraphs it mentions,

6  Mr. Jones is the only one who's mentioned in this

7  paragraph regarding the video.  It doesn't mention any

8  other guests.  So -- which is why I would infer that the

9  claims that are made in the video are made by Mr. Jones.

10   Q.  Which is to say you don't have knowledge,

11  you're making a guess?

12   A.  Not specifically, correct.

13   Q.  Okay.  Thank you.

14       Can you go to paragraph 30 for me?

15   A.  (Witness complies.)

16   Q.  You see that talks about a December 29, 2014

17  video entitled "America the False Democracy," correct?

18   A.  Yes.

19   Q.  Okay.  Do you see where it says Mr. Jones

20  stated that he did deep research?

21   A.  Yes.

22   Q.  Did Mr. Jones do deep research, or was that

23  false?

24   A.  If he said that he did deep research, then he

25  must have done deep research.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      100

1    Q.  Because everything Alex Jones says is true.  He

2  does not lie on air, correct?

3    A.  He believes everything he says.

4    Q.  Okay.  That's --

5          MR. BANKSTON:  No, I'm okay.

6      Q.  (By Mr. Bankston)  Do you see where it says the

7  general public doesn't know the school was actually

8  closed the year before?

9      A.  Yes.

10      Q.  You can't tell me the company source on that,

11  can you?

12      A.  I could -- I know that those are one of the

13  claims made by Mr. Halbig, so I can make an educated

14  guess and say those -- that knowledge Alex got from

15  Mr. Halbig.

16      Q.  Okay.  Do you know what employee researched or

17  vetted that claim?

18      A.  I wouldn't know at this point, no.

19      Q.  Okay.  Can you -- can you even affirm for me

20  that that claim was vetted in any way before it hit

21  InfoWars' public broadcast?

22      A.  We relied on the expert guests to provide that.

23      Q.  Right.

24          And you've already testified you don't know who

25  vetted Wolfgang Halbig, correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       101

1      A.  I don't know for sure, but I already said that

2  as producer Nico must have done that.

3      Q.  And you don't know what Nico did to vet him,

4  correct?

5      A.  No.

6      Q.  You have not spoken with Nico?

7      A.  No.

8      Q.  You can -- you know how to get in touch with

9   him, correct?

10     A.  I have last known contact information.

11     Q.  Did you try it?

12     A.  No.

13     Q.  Okay.  Do you see where it says they had kids

14   going around in circles in and out of the building as a

15   photo op?

16     A.  Yes.

17     Q.  Yeah.

18        Do you know the company source on that?

19     A.  I believe it should be -- the company believes

20   it to be Wolfgang Halbig.

21     Q.  Well, it's interesting, you know,

22   because -- have you watched Alex Jones' deposition the

23   first time I took it?

24     A.  Parts of it.

25     Q.  Okay.  Did you watch the part about the kids

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        102

1   allegedly going in circles around the video with the

2   building?  Have you seen that?

3      A.  I don't remember that specifically.

4      Q.  Okay.  Because here's the thing.  And I'm --

5   just again, to try to make sure that you're answering

6   questions that you know the answer to, we already know

7   where that one came from.  We had a deposition, and we

8  put the video up.  And there's kind of an infamous

9  YouTube video made by just some random YouTuber, some

10  conspiracy person and it's called the going in circles

11  video.  And it has -- it's actually not Sandy Hook

12  Elementary at all.  It's a firehouse down the street.

13  It's not kids going in and out of the building, but it's

14  actually adults and young teenagers.  But there's this

15  video of this circle of people going from the front to

16  the back.  And we talked about all this in deposition.

17  It comes from a YouTube video.  It doesn't come from

18  Mr. Halbig.  It doesn't come from Mr. Fetzer.  It

19  doesn't come from any of these people.  But when you sit

20  here and you say, well, I can infer it can came from

21  Mr. Halbig, you can allow for me the possibility that

22  those answers aren't correct, right?

23      A.  Well, you can also infer that the source for

24  the video was either Mr. Halbig or Fetzer, as you just

25  mentioned.  You don't know where the video came from.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      103


1    Q.  You don't know, do you?

2    A.  No, you don't know.

3    Q.  You don't know, right?

4    A.  Just at you don't know.

5    Q.  Right.

6        So we're just all speculating here today,

7  right?  We have no idea what's going on.

8    A.  You're speculating yourself.

9     Q.  Yeah, it does appear so.

10        MR. REEVES:  Objection to sidebar.

11        MR. BANKSTON:  I'm not going to try to get

12  sidebars admitted, Brad.  You know that.  If you

13  think --

14        MR. REEVES:  I don't care.

15        MR. BANKSTON:  Let me tell you --

16        MR. REEVES:  Stop abusing the witness.

17        MR. BANKSTON:  If you think I'm harassing

18  this witness too much considering the quality of

19  testimony and the respect we've been given, then you can

20  call the court or stop this deposition right know;

21  otherwise, I don't need these -- the interruption of the

22  flow of the deposition.

23     Q.  (By Mr. Bankston)  During this time, this time

24  being 2014, right, December 2014 -- so even in 2015 --

25  during this time -- hold on.  Let me back up because I

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      104


1  do need to address something you said earlier.

2        Did I hear you say InfoWars never had editorial

3  discussions on Sandy Hook?

4     A.  Correct.

5     Q.  Okay.  That's not true, though, right?  People

6  inside InfoWars have talked about Sandy Hook from an

7  editorial standpoint a lot, correct?

8        MR. REEVES:  Objection; form.

9     A.  Negative.

10     Q.  (By Mr. Bankston)  Okay.  During this time

11  people inside of InfoWars were using the term crisis

12  actor to describe the events of Sandy Hook, correct?

13      A.  I don't have any record of that as a company.

14      Q.  You've never seen a document in the case where

15  people inside of InfoWars were using the term crisis

16  actor, correct?

17      A.  As it pertained to Sandy Hook?

18      Q.  Sure.

19      A.  Editorial discussions?

20      Q.  Uh-huh.

21      A.  I don't recall right now.

22      Q.  So, for instance, one thing -- okay.  First --

23  yeah, let's go back for a second.

24          What's an editorial discussion?

25      A.  An editorial discussion would be an internal

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      105

1  conversation about what type information -- of

2  information, angles to go with live on air or website or

3  anywhere else.

4      Q.  In 5 years of covering Sandy Hook, nobody at

5  InfoWars ever had any conversation like that, correct?

6  That's what you're saying?

7      A.  Wait.  Repeat that question, please.

8      Q.  In the 5 years that InfoWars covered

9  Sandy Hook, nobody had a conversation like that ever.

10  Is that what you're testifying to?

11      A.  In terms of editorial discussion with the

12  staff, the company doesn't have records on that that I

13  can recall.  In 2015, at some point before these

14  lawsuits were brought on, Alex had told the staff to

15  halt the potential discussion about Sandy Hook on air,

16  granted Sandy Hook was a tiny, tiny, tiny, tiny, tiny

17  percentage of the information, news, commentary,

18  opinions that's covered on the show.  I mean, a tiny

19  percentage.  Because what you -- what these -- you --

20  you guys are trying to make it sound like that's all

21  that InfoWars had been talking about for 5 years, and

22  that's not the case at all.  Sandy Hook, again, takes a

23  fraction of a percent of the information that we had

24  covered.  And at some point in 2015, Alex decided that

25  it wasn't a good idea because of all the controversy

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        106

1  that's going on.  I don't know what his -- I don't know

2  where he was basing his opinions on, but at some point

3  he decided that it wasn't a good direction to continue

4  to comment on Sandy Hook.  And that was before you guys

5  even brought any of the lawsuits.

6      Q.  Okay.  Do you know what question you're

7  answering?

8      A.  You asked me about the editorial discussions --

9      Q.  Right.

10      A.  -- of Sandy Hook.

11      Q.  And there's never been any and -- was that your

12  testimony?

13      A.  Yes.

14     Q.  So -- and my -- it's your understanding that,

15  no, there has been?

16     A.  No, I just clarified on what I said by there

17  not being any and what happened, the specific

18  point -- what specific -- Alex Jones saying that he does

19  not want to see any reporters discussing Hook anymore.

20     Q.  Okay.  So let's -- let's unpack all of that.

21        First of all, Mr. Jones putting a ban on future

22  Sandy Hook materials going on there, when did that

23  happen?

24     A.  Sometime in 2015.

25     Q.  So it wasn't actually a real ban, was it?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       107


1  Because there's a lot of InfoWars stuff about Info --

2  about Sandy Hook after 2015, isn't there?

3        MR. REEVES:  Objection; form.

4     Q.  (By Mr. Bankston)  Right?

5     A.  Not a lot, no.  As I -- as I just said,

6  Sandy Hook takes a fraction of the information that we

7  cover.

8     Q.  Okay.  So, yeah, let's go to that one.

9        What did you look at to come to that

10  conclusion?

11     A.  My experience at the company, the daily show.

12     Q.  How many videos do you think InfoWars made

13  about Sandy Hook?

14     A.  A fraction of all the videos that we produced.

15    Q.  How many?

16       MR. REEVES:  Objection; form.

17    A.  I don't know the exact number.

18    Q.  (By Mr. Bankston)  What fraction?  Do you know?

19  I mean, I don't -- I'm trying to understand -- if you

20  understand that it's a tiny fraction, right, what --

21  what number would -- would constitute a tiny fraction?

22  Like, what ballpark are we talking about?  How many

23  videos --

24    A.  Well, you have to separate the videos and the

25  broadcasts.  During the 4-hour broadcast, Alex may

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       108


1  mention -- might have mentioned Sandy Hook for a

2  few minutes during the 4-hour period of the show.  When

3  you're talking about the videos that get posted to the

4  website from that particular show, I don't know how many

5  videos could have be produced from that.  It depends on

6  the show.

7    Q.  I've been trying to find out for 3 years.

8  Today you can't help me with that, can you?

9    A.  Well, I believe the videos have been -- the

10  Connecticut case and other functions.

11    Q.  Why -- so you -- no, I know why you believe.

12  (Indiscernible) ask about that.  Never mind.  Don't

13  worry about it.

14       MR. BANKSTON:  Can you give me Tab 38?

15    Q.  (By Mr. Bankston)  Oh.  Ms. Karpova, talking

16  about editorial discussions.  Let me give you a

17 hypothetical. Okay? Let's say you got an InfoWars'

18 producer, editor, somebody in that kind of a role and

19 he's talking to another producer, an editor in that kind

20 of a role, right? And he says to him hypothetically,

21 hey, look, these people we're relying on for Sandy Hook

22 coverage, god, they're not good, these people are not

23 reliable, man, I think we've got a big problem, that's

24 an editorial discussion. That would be if that

25 happened, right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        109

1        MR. REEVES: Objection; form.

2    A. If it's a conversation between two employees,

3 I'm not sure how to classify that.

4    Q. (By Mr. Bankston) I mean, two editors having a

5 discussion about the material they're covering and the

6 reliability of their source, that's almost the

7 definition of an editorial discussion, isn't it?

8        MR. REEVES: Objection; form.

9    A. Well, a company-level editorial discussion or

10 department level would infer that the particular

11 decisions that come out of the discussion are

12 implemented as policy on something.

13    Q. (By Mr. Bankston) Let me just ask you this.

14    A. Yeah.

15    Q. If there were conversations between editors

16 having editorial discussions about whether the sources

17 they were using for Sandy Hook were reliable or not, are

18  those discussions you're prepared to talk about today?

19      A.  I have no knowledge of those discussions.

20      Q.  You -- so I take it by that same token, you

21  have never seen any documents in which one editor or

22  high person in InfoWars, a writer, editor -- let's say

23  editor or producer is talking to another

24  management-level employee and saying I'm really worried

25  about our Sandy Hook sources, you've never seen any

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       110


1  documents like that?

2      A.  Not specifically like that, no.

3      Q.  Okay.

4          (Discussion off the record)

5          (Exhibit 6 introduced)

6      Q.  (By Mr. Bankston)  I'm going to show you what

7  I've marked as Exhibit 6.  You'll see down at the bottom

8  right-hand corner there's a label on it that says

9  FSSTX 075327?

10      A.  Yes.

11      Q.  Do you see that?  Okay.

12          Up at the top do you see that this is an email

13  from Nico to Rob Dew?

14      A.  Yes.

15      Q.  Okay.  Do you see what the subject is?

16      A.  Yes.

17      Q.  Can you read it for me?

18      A.  Ebola, Sandy Hook crisis actor clips attached.

19      Q.  As of this date, 2014/10/19.  That's the date

20   of the email?

21      A.  Yes.

22      Q.  As of this date, employees inside of, InfoWars

23   such as Nico, were engaged in discussions of another

24   employee, like Rob Dew, using the term crisis actor in

25   relation to Sandy Hook, correct?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        111


1      A.  I don't see any discussion being held here.

2      Q.  I mean, he wrote the words Ebola, Sandy Hook

3   crisis actor clips attached.  That's a statement, right?

4      A.  That is a statement that could have been the

5   names of the clips.

6      Q.  No.  The attachment's have the names of the

7   clips, don't they?  It's got a PDF and it's got a name,

8   doesn't it?

9      A.  Yes.  But one has nothing to do with the other.

10      Q.  Alright.  Who knows, right?  We've never looked

11   at the attachment, have we?

12      A.  Well, here's -- here's what I can tell this is.

13      Q.  Uh-huh.

14      A.  This subject matter has to do with the clips,

15   with earlier clips that must have been attached for the

16   names of the clips.  The attachment here, the way the

17   email system works is that you -- if you, like, reply to

18   an email, it will keep the same subject, but you can

19   reply with another attachment or an entirely other

20   conversation and it will still keep that subject if you

21  don't start a new email thread.  So if you just reply to

22  a subject of an email as a thread, even if your

23  attachments have nothing to do with the subject matter,

24  that's -- that's a possibility here.

25      Q.  The subject will say re, R-E, with a colon

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      112


1  after it, right, if it's a reply?  Right?

2      A.  Sometimes.

3      Q.  Okay.  So would it be your contention that,

4  look, despite there being the word crisis actor in the

5  scene, that's not, like, something InfoWars' employees

6  would joke about with each other, right?

7      A.  No.

8      Q.  That would be extremely inappropriate to make

9  jokes about Sandy Hook crisis actors, like, laugh it up

10  about that?

11          MR. REEVES:  Objection; form.

12      Q.  (By Mr. Bankston)  That would be inappropriate,

13  right?

14      A.  In what context?

15      Q.  For your employees -- let's say -- you have

16  managerial responsibilities, right?

17      A.  Yes.

18      Q.  Let's say you found out that two of your

19  subordinate employees were trading emails back and forth

20  joking about sacrificing Sandy Hook crisis actors, would

21  you find that inappropriate?

22          MR. REEVES:  Objection; form.

23     Q.  (By Mr. Bankston)  Or are you okay with that?

24         MR. REEVES:  Objection; form.

25     A.  It's a hypothetical situation.  It would have

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        113

1  to be -- I would have to be there, look at the

2  conversation, look at the circumstances.  I can't just,

3  like, give you a blanket statement.

4     Q.  (By Mr. Bankston)  Right.  So if I was -- if I

5  was one of your subordinates and I came to you and I

6  said, hey, look, Ms. Karpova, I don't want to be a

7  tattletale, but I overheard some employees and they were

8  making jokes about sacrificing Sandy Hook crisis actors

9  and I think that's messed up and can you do something

10  about that, or would you say, I'm sorry, I don't have

11  enough information or would you do something?

12         MR. REEVES:  Objection; form.

13     A.  I would probably do something if that was

14  brought to my attention in this direct kind of way.

15     Q.  (By Mr. Bankston)  Okay.  Would it make a

16  difference whether that person was related to

17  Alex Jones?

18     A.  No.

19     Q.  Okay.  Can you go to paragraph 36 of Exhibit 1?

20  I'm sorry.  Excuse me.  I keep doing that.  Can you go

21  to paragraph 36 of Exhibit 2?

22     A.  (Witness complies.)

23     Q.  Okay.  You see here this talks about a March 4,

24  2015 video entitled "New Bombshell Sandy Hook

25  Information Inbound"?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        114

1    A.  Yes.

2    Q.  What was the bombshell information?

3    A.  The bombshell information was they knew

4  statement -- information Mr. Halbig had brought on that

5  show is what I can infer.

6    Q.  Which is what?  What's the bombshell?

7    A.  I wouldn't know the details of it.

8    Q.  So when you had this video to try to figure out

9  what was the sourcing and the research that went into

10  it, you don't even know what the bombshell information

11  was that is described in the title of the video,

12  correct?

13    A.  Well, any new information would be bombshell.

14  So just because it says bombshell, there -- there might

15  have been a lot of information in that video which

16  there's no way I can remember what was in that video

17  exactly.

18    Q.  Well, I mean, it's not a matter of you not

19  remembering.  You never watched it, right?

20    A.  Not recently.

21    Q.  Right.  And so -- and you didn't do anything to

22  try to get prepared on it for this deposition, right?

23        MR. REEVES:  Objection; form.

24    A.  No.

25    Q.  (By Mr. Bankston)  You haven't read any

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        115

1  documents about this video.

2      A.  No.

3      Q.  And you haven't talked to any employees about

4  this video.

5      A.  No.

6      Q.  Have you tried to talk to Mr. Halbig about this

7  video?

8      A.  No.

9      Q.  Okay.  Will you go to paragraph 38?

10     A.  (Witness complies.)

11     Q.  Do you see where it says a July 7, 2015 video

12  entitled "Government is Manufacturing Crises"?

13     A.  Yes.

14     Q.  Okay.  Do you see where there's a quote there

15  that says if they did kill kids, they knew it was

16  coming, stocked the school with kids, killed them and

17  then had the media there and that probably didn't even

18  happen.  Do you see that quote?

19     A.  Yes.

20     Q.  What does stocked the school with kids mean?

21  Do you know what that means?

22     A.  Well, just judging on common sense here from

23  the sentence, that would probably mean the kids were in

24  the school.  They were put in the school.

25     Q.  By who?  Do you know?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        116

1    A.  Whoever was involved in the operation.

2    Q.  What do you mean by operation?  What is that?

3    A.  Well, Mr. Jones is talking about Sandy Hook was

4  staged.  So the staged operation would make sense.  The

5  staged operation of Sandy Hook, that's what I mean.

6    Q.  So the idea here is there was -- there was a

7  school and it was empty, it didn't have students going

8  to it, and then it was -- some nefarious actors arranged

9  for children to be put into the school for the purposes

10  of killing them?  Am I understanding this correct?

11    A.  From -- from what I can tell here, it is either

12  they were -- the kids were put in an empty school or the

13  school was filled with more kids than there normally are

14  in school.

15    Q.  And you don't know which one, right?

16    A.  No.  Again, this looks like Alex Jones'

17  opinion, commentary.

18    Q.  And you don't know what it was based on, right?

19    A.  (No response.)

20    Q.  Right.

21    A.  Not in details.  But most likely based on all

22  the information that he had acquired and reviewed at

23  that point.  That was his honest opinion.

24    Q.  Again, you're guessing, aren't you?  There

25  could have been, before he made this statement, a very

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        117

1  specific video he's referring to or a very specific

2  piece of evidence.  And you don't know that, do you?

3    A.  The company doesn't have a record of that

4  because we don't keep such records.

5    Q.  Wait a second.

6      The company has the video, doesn't it?

7    A.  (No response.)

8    Q.  Right?

9    A.  Yes.

10    Q.  So you could have watched the video and

11  determined if he was referring to something specific,

12  couldn't you?

13    A.  Well, you -- this quote from Alex to me sounds

14  like an opinion.

15    Q.  But again, that's your guess, right?

16    A.  Yes.

17    Q.  Okay.  If there was an employee who had

18  researched some material who had brought it to Mr. Jones

19  for this video, you wouldn't know that, would you?  You

20  would have no ability to tell me that.

21    A.  Based on my educated guess, this wouldn't be

22  the case in a statement like this.

23    Q.  Again, you're just guessing, right.  There is

24  no -- it is possible, right, that -- that somebody could

25  have brought Alex Jones some material that caused him to

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      118


1  say this thing, right?  That's possible.

2    A.  Very unlikely in this particular video.

3     Q.  Right.

4         But I'm -- I'm asking you to testify what you

5  know is true.  And you don't know, do you?

6     A.  I'm testifying to what is -- I -- I think I

7  know to the best of my ability in good faith.

8     Q.  Well, right.  I know you're guessing because

9  you want to give me an answer, and I appreciate you

10  trying to give me an answer.  But I want to make clear

11  that you had information you could have looked at and

12  you did not look at, correct?  Some of the -- some of

13  the gaps -- in other words, the video, you could have

14  looked at the video and you did not, right?

15     A.  There were a lot of videos, and there's no way

16  I could remember all these details --

17     Q.  And -- okay.  Let's --

18     A.  -- about the videos.

19     Q.  Let's put it this way.  When the company knew

20  that it had to produce testimony about these videos in

21  the plaintiffs' petition, the company did not feel it

22  was worthwhile to have employees review, watch, catalog

23  and figure out what was said and make that available to

24  you, correct?

25     A.  The company believes that I have sufficient

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       119


1  knowledge to testify regarding these matters.

2     Q.  Okay.

3         MR. REEVES:  Let's go ahead and take a

4  break.

5      MR. BANKSTON:  Okay.

6      THE VIDEOGRAPHER:  The time is 1:38 p.m.

7  We are off.

8      (Recess from 1:38 p.m. to 2:56 p.m.)

9      THE VIDEOGRAPHER:  The time is 2:56 p.m.

10  We are on.

11     Q.  (By Mr. Bankston)  Alright.  Can you pull out

12  Exhibit 2 for me again.  And let's go to paragraph 39.

13     A.  (Witness complies.)

14     Q.  Do you see this is talking about a July 7, 2015

15  video entitled "Retired FBI Agent Investigates

16  Sandy Hook Mega Massive Coverup"?

17     A.  Yes.

18     Q.  Okay.  That retired FBI agent, that's Rob Dew's

19  uncle?

20     A.  Yes.

21     Q.  Do you see in this claim where it says the

22  ambulances came an hour and a half later, that that was

23  claimed in the video?  Do you see where it says that?

24  It's the second sentence.  Do you see that sentence?

25     A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      120


1      Q.  Okay.  What was your source on that?

2      A.  Previous discussions with Halbig and with

3  Pieczenik.

4      Q.  Are you guessing on that, or do you know that

5  for a fact?

6    A.  I don't know for a fact.

7    Q.  Right.

8       You were guessing, because that actually came

9  from Mr. Fetzer.  That's in his book, "Nobody Died at

10  Sandy Hook."  So can I just admonish you one more time?

11  Can we please not guess during this deposition?  It's

12  okay to say I don't know.

13    A.  Okay.

14    Q.  You can say the company knows, here's the

15  answer, the company doesn't know or I don't know if the

16  company doesn't know or doesn't know.  But your guesses

17  are not what we need today.  Okay?

18    A.  Yes.

19    Q.  Okay.  Do you see where it says DHS an hour and

20  a half later with a time stamp put up signs saying sign

21  in here?

22    A.  Yes.

23    Q.  Do you know where that came from?

24    A.  No.

25    Q.  Okay.  They had a statement that said they had

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        121


1  Porta Potties being delivered within an hour and a half.

2  Do you see where it says that?  It's also in that first

3  paragraph.

4    A.  Yes.

5    Q.  Do you know where that came from?

6    A.  No.

7    Q.  In the third paragraph, the first sentence, do

8   you see where it says we have the emails from the city

9   council back and forth and the school talking about it

10   being shut down a year before?  Do you see that?

11       A.  Yes.

12       Q.  Do you know if those emails actually exist?

13   Let me rephrase that.

14          Do you know if the company -- does that company

15   know if those emails actually exist?

16       A.  No, it doesn't.

17       Q.  Do you know what the company source for saying

18   that was?

19       A.  No.

20       Q.  Okay.  Can you move on to paragraph 44 for me?

21   Do you see it talks about a November 26th video,

22   November '18, the 26th, entitled "Final Statement on

23   Sandy Hook," right?

24       A.  Yes.

25       Q.  Do you know the claims that were made during

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        122


1   that video?

2       A.  I'm familiar with the video.

3       Q.  Okay.  In that video -- do you know about the

4   claim made in that video, that the Sandy Hook Elementary

5   School website had no internet traffic for 3 to 4 years

6   before the incident?

7       A.  Yes.

8       Q.  Okay.  Do you know where that came from?

9     A.  Yes.

10    Q.  Where did that come from?

11    A.  The Wayback Machine archive for the website for

12  the school.

13    Q.  Okay.  And where did Mr. Jones get that?

14    A.  The Wayback Machine.

15    Q.  Do you know if he got that from Mr. Fetzer?

16    A.  I don't know.

17    Q.  Do you know if that's in Mr. Fetzer's book?

18    A.  No.

19    Q.  Okay.  Can you go to paragraph 54 for me?

20    A.  (Witness complies.)

21    Q.  Do you see there it's talking about an

22  April 22, 2017 video called "Sandy Hook Vampires

23  Exposed"?

24    A.  Yes.

25    Q.  Do you understand that that is the video that

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       123


1  Mr. Pozner and Ms. De La Rosa based their defamation

2  claim on?  Did you know that?

3     A.  Okay.

4     Q.  Did you know that?  When preparing for this

5  depo did you know that?

6     A.  Yes.

7     Q.  Okay.  Did you watch that video?  I mean,

8  unless you've watched it in the last couple of hours,

9  you haven't watched it, right, for this deposition?

10    A.  I'm familiar with the video.

11    Q.  Did you watch it in preparing for this

12  deposition, though?

13    A.  Yes, I believe so.

14    Q.  Okay.  When did you watch it?

15    A.  Earlier today.

16    Q.  Earlier today when?

17    A.  During the break.

18    Q.  Oh.  So during the break when it became

19  apparent that you hadn't watched these videos, you went

20  and tried to watch this video?

21    A.  Yes.

22    Q.  You didn't watch the whole thing, though, did

23  you?

24    A.  No.

25    Q.  Because it's a 45-minute video, right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      124

1    A.  It's a lengthy video.

2    Q.  Yeah.

3      So you didn't watch this video.

4        MR. REEVES:  Objection; form.

5    Q.  (By Mr. Bankston)  You watched pieces of this

6  video, correct?

7    A.  Correct.

8    Q.  How many pieces did you watch?  How

9  many minutes total did you watch of this video?

10    A.  I did not count.

11    Q.  So you have no idea, sitting here today, how

12 long ago it was, when it was just a couple of minutes

13 ago?

14    A. I did not count the amount of minutes I

15 watched.

16    Q. Okay. Was it more than 5 minutes?

17    A. I'm not sure.

18    Q. Okay. So you just watched the video within the

19 last 20 minutes; and you're not sure if you watched more

20 than 5 minutes of it, correct?

21       MR. REEVES: Objection; form.

22    Q. (By Mr. Bankston) Is that correct?

23    A. I didn't time the amount of minutes I watched.

24    Q. So that is -- I'm not asking you the exact time

25 or if you timed it. I'm saying do you know if you

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        125

1 watched more or less than 5 minutes.

2    A. I believe more.

3    Q. Okay. Do you think you watched more than

4 10 minutes?

5    A. I'm not sure.

6    Q. Okay. You understand that that video -- did

7 you watch the part in that video where they talked about

8 the police finding people in the back woods dressed up

9 in SWAT gear?

10    A. I recall seeing that.

11    Q. 20 -- just a few minutes ago?

12    A. Yes.

13    Q. Okay. And do you know where the company got

14 that claim?

15     A.  As far as the company's under -- understanding,

16 it's based on the previous videos that were watched by

17 Alex and statements that were made by Halbig.

18     Q.  So that's talking about -- you're talking about

19 the prior videos we've been talking about today in this

20 petition?

21     A.  Correct.

22     Q.  The ones you don't know the sources for,

23 correct?

24     A.  Correct.

25     Q.  Okay.  You understand that in that video

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        126


1 Mr. Jones claims the school had been closed for years?

2 Did you watch that part?

3     A.  Yes.

4     Q.  Okay.  Where did he get that information?

5     A.  Mr. Halbig.

6     Q.  Okay.  Can you go to paragraph 55 for me?

7     A.  (Witness complies.)

8     Q.  Do you see it talks about a June 13, 2017 video

9 entitled "Media Refuses to Report Alex Jones' Real

10 Statements on Sandy Hook"?

11     A.  Yes.

12     Q.  Is that another one you were just shown during

13 the break?

14     A.  Yes.

15     Q.  Okay.  Is it fair to say that what happened is

16  that every video past this in the petition, that you

17  went and tried to watch a little piece of it before you

18  came back into this room?

19          MR. REEVES:  Objection; form.

20     A.  This video I watched in its entirety.

21     Q.  (By Mr. Bankston)  Okay.  So when did you watch

22  that?

23     A.  During the break.

24     Q.  Okay.  Do you remember how long that video is?

25     A.  Around 20 minutes or so.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      127


1     Q.  Okay.  So you have a copy of it here in the

2  building.

3     A.  Yes.

4     Q.  Correct?  Okay.

5          (Discussion off the record)

6          (Exhibit 7 introduced)

7     Q.  (By Mr. Bankston)  Alright.  Ms. Karpova, I'm

8  showing you what I've marked as Exhibit 7.  You

9  recognize that now I would assume?

10     A.  Yes.

11     Q.  Okay.  What is this?  What are you looking at

12  right now?

13     A.  This is an excerpt from a Zero Hedge article.

14     Q.  No.  Like, where does this come from, this

15  picture?  Where does it come from?

16     A.  This is a still from the show.

17     Q.  Do you know what show?

18     A.  Not specifically.  It doesn't have the date

19  year.

20     Q.  Okay.  It's the one you just apparently watched

21  a couple of minutes ago.  You don't remember seeing

22  this?

23     A.  Not this part specifically.

24     Q.  Okay.  So you maybe didn't even watch this part

25  of the video.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        128


1     A.  I watched the video.

2     Q.  Okay.

3     A.  I don't remember this specific --

4     Q.  Okay.  A large portion of that video is

5  Mr. Jones going over these questions.  Do you remember

6  that from the video you just watched?

7     A.  Yes.

8     Q.  Okay.  Alright.  So you do remember Mr. Jones

9  talking about these questions.

10     A.  Yes.

11     Q.  Alright.  I want to ask you about a couple of

12  them.

13        When it says why does the Sandy Hook Elementary

14  School website have zero traffic for 4 years, that's not

15  true, correct?  The company admits that's not true.

16        MR. REEVES:  Objection; form.

17     Q.  (By Mr. Bankston)  Correct?

18    A.  This is a statement -- this is a question that

19 Alex had at the time.

20    Q.  Right.

21       And he's making a statement, isn't it?  Isn't

22 he.  Alright.  He's saying that the school had no

23 website traffic for 4 years.

24    A.  Correct.

25    Q.  Right.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        129

1       That's not true, correct?  The company admits

2 that's not true.

3       MR. REEVES:  Objection; form.

4    A.  It was true according to the source that he

5 had.

6    Q.  (By Mr. Bankston)  What do you mean it was true

7 according to the source that he had?  What does that

8 mean?

9    A.  He was referring to the Wayback Machine of the

10 traffic recording from the website.

11    Q.  And that's not true, correct?

12    A.  What's not true?

13    Q.  The website -- the school website did not have

14 zero traffic for 4 years, that's not true.  The company

15 admits that's not true, correct?

16    A.  Again, the -- Alex Jones is asking the question

17 based on the source he was showing in the video of the

18 Wayback Machine that lists the traffic being zero for

19 4 years.

20    Q.  Okay.  First of all, his source -- then let's

21  just go at it this way.  His source was wrong, correct?

22  The company admits that.  Mr. Halbig is wrong about

23  that.

24         MR. REEVES:  Objection; form.

25    Q.  (By Mr. Bankston)  Correct?

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        130


1         MR. BANKSTON:  Brad, I might --

2    A.  The company admits that Alex Jones believed

3  that there was zero traffic for 4 years, which was a

4  source at the time.

5    Q.  (By Mr. Bankston)  You understand that's not my

6  question, right?  I just want to make sure.  Do you

7  understand the question?

8    A.  Repeat the question again, please.

9    Q.  Sure.

10        Mr. Jones' source, Mr. Halbig, was wrong about

11  there being zero traffic for 4 years to the school

12  website, correct?

13        MR. REEVES:  Objection; form.

14    A.  Yes.

15    Q.  (By Mr. Bankston)  Do you see down in the

16  second to the last bullet point it says why didn't they

17  let paramedics and EMTs into the building after

18  27 children were declared dead in 8 minutes?  Do you see

19  that?

20    A.  Yes.

21    Q.  Literally nothing about that statement is true,

22  correct?

23        MR. REEVES:  Objection; form.

24    A.  That was Alex's understanding at the time based

25  on the claim made by Halbig.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      131

1    Q.  (By Mr. Bankston)  Okay.  And you're positive,

2  you're testifying under oath that Mr. Halbig made this

3  claim and not somebody else?  You know that for a fact?

4    A.  Yes.

5    Q.  Okay.  Mr. Fetzer didn't say that?  That's not

6  a Mr. Fetzer claim?

7    A.  Mr. Fetzer could have said that, but there was

8  also statements made by Halbig.

9    Q.  Okay.  It's true -- the company admits it's

10  true that Mr. Jones under -- you've heard it's

11  Mr. Jones' understanding of what his source said.  You

12  now admit -- the company now admits it's not true,

13  correct?  Paramedics were in that building, right?

14    A.  Correct.

15    Q.  Okay.  It's also true that 27 children didn't

16  die, correct?

17    A.  Correct.

18    Q.  Okay.  And they weren't declared dead in

19  8 minutes, were they?  That's not correct.  The company

20  admits that?

21    A.  Correct.

22    Q.  Okay.

23          (Discussion off the record)

24     Q.  (By Mr. Bankston)  Can you go to paragraph 61

25  for me?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       132


1     A.  Let me add to the previous statement.

2        These questions here are questions, they're not

3  statements.

4     Q.  Alright.  So let me ask you this, Ms. Karpova.

5     A.  Right.

6     Q.  If I say you beat your newborn baby, why --

7  that's a statement, right?  And that would be, like, a

8  false statement, right?

9     A.  Right.

10     Q.  If I say to you, Ms. Karpova, why do you beat

11  your newborn baby, have I made a statement?

12     A.  Well, you're asking -- well, I mean, it could

13  be -- in this case, yes.

14     Q.  Right.

15        So when Mr. Jones asks why were no paramedics

16  allowed in the building, he's saying no paramedics were

17  allowed in the building, correct?

18     A.  Correct.  And he's basing that on reports that

19  he's read and seen.

20     Q.  Right, that are wrong.  The company now admits

21  are wrong, right?

22     A.  Correct.

23     Q.  Okay.  You can go to paragraph 61 for me now.

24     A.  (Witness complies.)

25     Q.  This talks about an October 26, 2017 video

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          133

1  called "JFK Assassination Documents to Drop Tonight."

2  Is that another one that you just looked at at the

3  break?

4     A.  Yes.

5     Q.  Okay.  How much of that one did you watch?

6     A.  That's a long video.  I watched parts of it.

7     Q.  You understand that that doesn't help me,

8  right?  That that's not helping me understand what

9  you've watched.  You understand that?

10     A.  I understand that.

11     Q.  Okay.  So when I'm asking you the question,

12  this is a -- it's an hour long video, isn't it?  It

13  might be a full 4-hour episode.  Do you know?

14     A.  I don't know the exact timestamp on that, but I

15  know it's a long video.

16     Q.  How did you decide what part of it to watch?

17     A.  I skimmed through it.

18     Q.  So you just randomly picked some places to

19  watch?

20     A.  No, not randomly.

21     Q.  How would you know to -- what parts to got to?

22  How would they not be random?  Do you have a document

23  that tells you what's in the video?

24     A.  I just know based on the time segments where --

25  where to go in the play head.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        134

1    Q.  Okay.  Alright.

2        Do you see the part about the CIA visiting

3  Lanza for recruiting?  Not on the petition.  In the

4  video you watched.

5    A.  No.

6    Q.  It's in the petition.  I'm asking if you saw it

7  in the video.

8    A.  Yes.

9    Q.  You did see that part?

10    A.  Yes.

11    Q.  What was the company source for that?

12    A.  Again, that was based on previously sourced

13  information Alex -- from his guests, as well as other

14  reports.

15    Q.  Ms. Karpova, no, it was not.  And I -- please,

16  can you stop guessing?  Because I need you to understand

17  if you watched that video, you understand that this

18  video was done because a new set of documents was

19  declassified by the FBI on that date and Lee Ann McAdoo

20  did a report on InfoWars talking about those documents.

21  It didn't come from Mr. Halbig.  The testimony you gave

22  is just not correct, is it?

23        MR. REEVES:  Objection; form.  She didn't

24  say anything about Mr. Halbig.

25    Q.  (By Mr. Bankston)  Alright.  Let me adjust to

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        135

1  your objection.

2  This didn't come from prior videos, did it,

3  Ms. Karpova?  Or do you know?

4  A.  The company believe it did come from previously

5  sourced material.

6  Q.  Okay.  So when I talk about Lee Ann McAdoo

7  doing this report on the documents that were

8  declassified on that day, on October 26, 2017, do you

9  have any idea what I'm talking about?  Is that new

10  information to you, or do you know what I'm talking

11  about?

12  A.  I -- I have some information about it.

13  Q.  And you understand that from Ms. McAdoo's

14  article, the allegation was made that the CIA tried to

15  recruit Lanza.  Did you know that?

16  A.  I cannot tell for sure.

17  Q.  You cannot tell for sure if you knew, is that

18  what you're telling me?  I mean, you either knew or you

19  didn't, right, Ms. Karpova?  This thing I just told you

20  about Lee Ann McAdoo, did you know it before I told it

21  to you?

22  A.  The specific part about inferring

23  the -- that -- those documents that were dropped that

24  she was talking about, I do not recall the specific part

25  about that CIA visits Adam Lanza and recruited him based

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       136

1  on those documents.

2     Q.  How long -- okay.  So you were watching this

3  video, right, in the break?

4     A.  Uh-huh.

5     Q.  How long was Mr. Jones talking about Sandy Hook

6  in that video?  How much total footage do you think you

7  watched about Sandy Hook in that video?

8     A.  I'm not sure.

9     Q.  Would you say it's less than 2 minutes?

10    A.  No.

11    Q.  You think that Mr. Jones talked about

12  Sandy Hook for more than 2 minutes in that video.

13    A.  I'm not sure exactly how long.

14    Q.  Okay.  Do you understand it was -- I'm just

15  going to represent to you it was an extremely brief

16  conversation mentioning Ms. McAdoo's article.  And do

17  you remember Mr. Jones saying, well, you know sometimes

18  I don't even see what's out there on infowars.com, I

19  didn't check and somebody had to tell me about this

20  article and it was a total surprise to me.  Do you

21  remember him saying that?

22    A.  Yes.

23    Q.  Okay.  So we can agree that the source for this

24  video is the article that he's talking about that he

25  just looked at, correct?

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      137


1     A.  I'm sure that article was a source for him

2  given some of the statements that he made.

3    Q.  Well, I'm asking you about the statement that

4  the CIA recruited Lanza which you said came from prior

5  videos.  But that's not true, because that piece of

6  information was in that released report that day,

7  correct?  Or do you know?

8    A.  I do not know.

9    Q.  Okay.

10        (Discussion off the record)

11        (Exhibit 8 introduced)

12    Q.  (By Mr. Bankston)  I hand you what I've marked

13  as Exhibit 8.  You're going to see that this is a

14  document marked FSSTX-075755.

15    A.  Yes.

16    Q.  This is a November 26, 2013 email.  Do you see

17  that?

18    A.  Yes.

19    Q.  Do you know who changeshorses@aol.com is?

20    A.  I do not.

21    Q.  Okay.  Robd is Rob Dew, right?

22    A.  Yes.

23    Q.  Kurt, who's that?

24    A.  Kurt Nimmo.

25    Q.  Okay.  And what's his position at this time?

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        138


1    A.  He was a writer.

2    Q.  Okay.  Do you see where it has a link here?

3  The subject says check out Sandy Hook final report?

4    A.  Yes.

5    Q. And then there's an underlined hyperlink that

6 says "Sandy Hook Final Report" in the body of the email?

7    A. Yes.

8    Q. So the company will admit that it has been

9 provided information of the final report as early as

10 2013, correct?

11    A. Yes. So the -- the final report provided

12 from -- from the State of Connecticut, correct.

13    Q. From the Connecticut State Police, correct? Do

14 you know that that's who issued it?

15    A. Yes.

16    Q. Okay.

17          (Discussion off the record)

18          (Exhibit 9 introduced)

19    Q. (By Mr. Bankston) I'm putting this email in

20 front of you now that I've marked as Exhibit 9. Do you

21 see that?

22    A. Yes.

23    Q. Okay. It is marked FFSTX-075999. Is that

24 correct?

25    A. Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      139


1    Q. Okay. And from what you can see here, this is

2 another communication with Rob, Kurt and this

3 changeshorses@aol.com person, correct?

4    A. Yes.

5    Q. Okay. And -- and here what is being provided,

6  what Rob is attempting to get is a copy of the

7  Sandy Hook 911 tapes, correct?

8      A.  May I have a second?

9      Q.  Yeah, go ahead and read the email.

10     A.  Okay.

11     Q.  Okay.  So this is an email in which Rob Dew is

12  attempting to get the 911 tapes?

13     A.  Yes.

14     Q.  Okay.  And that was on December 5, 2013?

15     A.  December 4th you mean, it says here?

16     Q.  Okay.  I think there's another, like -- let's

17  see.

18          (Discussion off the record)

19     Q.  (By Mr. Bankston)  Yeah, the email from the

20  changeshorses person is from the 4th and then the email

21  from Mr. Dew is from the 5th, correct?

22     A.  Correct.

23          (Exhibit 10 introduced)

24     Q.  (By Mr. Bankston)  Okay.  Ms. Karpova, I've

25  given you an email which I've marked as Exhibit 10

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        140


1  labeled at the bottom FSSTX-012708.  Is that correct?

2      A.  Correct.

3      Q.  You'll be looking here -- before we get into

4  this email real quick, you would agree with me that the

5  InfoWars website occasionally requires moderation.  Do

6  you understand what I mean by that?

7      A.  Yes.

8    Q.  Okay.  Occasionally in the company's editorial

9  discussions about Sandy Hook, the company would have to

10  decide whether certain material was appropriate to leave

11  on the InfoWars website or take it off the website,

12  correct?

13          MR. REEVES:  Objection; form.

14    A.  The website gets moderated for spam as far as I

15  know in the comments.

16    Q.  (By Mr. Bankston)  Okay.  Well, let's take a

17  look at this email because it's not about spam.  Okay?

18        This email -- the original message is from Matt

19  at InfoWars.  Who is Matt W?

20    A.  Matt Weber (phonetic).

21    Q.  Okay.  What was his job title in 2014?

22    A.  Assistant producer.

23    Q.  What about Louis S, who's that and what's his

24  job title?

25    A.  Writer.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        141


1    Q.  Okay.  So Matt writes to Louis and says:  Hello

2  Louis.  Can you do me a favor?  Just got a phone call

3  from my friend Johnny Walker.  Some people are posting

4  some bullshit about how he was involved in the

5  Sandy Hook shooting last year, including some personal

6  stuff about John.  They did the thing about a year ago.

7  Apparently there are more than one Johnny Walker in the

8  world.  Last time it involved going through his Facebook

9   page and pointing out friends with Jewish names and

10  things like that.  John is a character who was not even

11  in the Sandy Hook time zone.  If you see it, could you

12  take care of it for him?  Thanks, Matt W.

13          That's what the email says?

14      A.  Yes.

15      Q.  Okay.  The reply from Louis says:  The site has

16  been acting weird and not letting me search.  If you can

17  give me an article or user name involved, let me know.

18  Otherwise if I see it, I will get on it, with a winky

19  smiley face, correct?

20      A.  Yes.

21      Q.  This email was sent on May 15th -- the two

22  emails are May 14th to May 15th of 2014, correct?

23      A.  Yes.

24      Q.  Okay.  So the company can admit that a friend

25  of an InfoWars employee named Mr. Walker got tied to a

           UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      142

1   Sandy Hook allegation according to Matt, correct?

2       A.  Correct.

3       Q.  Okay.  And so Matt and Louis were okay with

4   deleting the stuff about Mr. Walker, correct?

5       A.  As a comment being posted that misidentifies a

6   person, yes.

7       Q.  Right.

8           But since my clients weren't friends with

9   anybody at InfoWars, they couldn't get similar comments

10  removed from the InfoWars forums, could they?

11          MR. REEVES:  Objection; form.

12      A.  What you're referring to is a public case.

13  This is a private person who gets misassociated with the

14  event.  Sandy Hook was a public story.

15      Q.  (By Mr. Bankston)  So you think all the parents

16  are fair game?

17          MR. REEVES:  Objection; form.

18      A.  People asking questions, having discussions,

19  that's what's called free speech in a public case.

20      Q.  (By Mr. Bankston)  You think telling lies about

21  people and saying they're a crisis actor and their kid

22  didn't exist, is that free speech?

23          MR. REEVES:  Objection; form.

24      Q.  (By Mr. Bankston)  If it's false, is that free

25  speech in InfoWars eyes'?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      143

1      A.  If it's something that is knowingly false, we

2  don't -- we don't allow that.  We do, to the best of our

3  ability, allow truthful comments only.

4      Q.  (By Mr. Bankston)  Mr. Pozner asked y'all to

5  stop posting these kind of comments, didn't he?

6          MR. REEVES:  Objection; form.

7      A.  Say that again, please.

8      Q.  (By Mr. Bankston)  Mr. Pozner asked InfoWars to

9  stop posting comments like this on its website about

10  him, right?

11      A.  Are you referring to a specific document

12   Mr. Pozner --

13      Q.  I've got a few in mind, but I was wondering

14   what you knew about if the InfoWars -- one of your --

15   one of your topics is the knowledge of the plaintiffs,

16   right?

17      A.  Correct.  But you've asked me to comment on a

18   specific post regarding Mr. Pozner that he asked to be

19   removed?

20      Q.  No.  I'm asking you in general.  Like, not for

21   anything specific.

22         Do you know sitting here today if Mr. Pozner

23   has asked the company to remove content about him from

24   the InfoWars' website?

25      A.  Yes.  And as far as I know, that's been done.

           UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        144


1      Q.  Wait.  When -- when Mr. Pozner complained, you

2   think InfoWars did something about it?

3      A.  Well, are you referring -- which date are you

4   referring to?

5      Q.  I'm asking any time.

6         What are you referring to?

7      A.  I don't have a record -- I don't have a record

8   of that information.

9      Q.  Well, what were you referring to when you said,

10   yes, we did take care of it?  What are you talking

11   about?

12      A.  I was referring to the previous comment that I

13   made regarding Alex Jones requesting that the on air

14  personalities not make comments regarding Sandy Hook.

15      Q.  Okay.  So from your point of view is what

16  you're telling me is that at some point Mr. Jones put a

17  ban on Sandy Hook materials on air and you believe that

18  was in response to Mr. Pozner asking him to do that?

19      A.  In part.

20      Q.  Okay.  Why do you think that -- what -- what

21  information do you have that made you think that, or are

22  you speculating right now?

23      A.  It was the company's understanding -- it was

24  the company's understanding that there were questions

25  and controversies involved in the case and Mr. Pozner

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      145


1  was unhappy with the coverage.  Alex Jones made the

2  decision to not continue with the coverage.

3      Q.  So his YouTube channel wouldn't get deleted,

4  right?  That's why he did it, right?

5          MR. REEVES:  Objection; form.

6      A.  No.  We had no idea that the channel would be

7  deleted.  That came as a surprise.

8      Q.  (By Mr. Bankston)  You -- you know Mr. Jones

9  did a video in February 15, 2015 about Mr. Pozner.  You

10  know that, right?

11      A.  I don't have the video in front of me.

12      Q.  But, I mean, you know that happened.  You know

13  Mr. Jones went on air, complained about the honor

14  network and the complaints that they made to YouTube,

15  said that they were an anti-free speech system -- an

16  anti-free speech organization --

17      A.  Correct.

18      Q.  -- put Mr. Pozner's address on the air with a

19  map.  You know that happened, right?

20      A.  I don't recall that specific part.

21      Q.  You don't know that part of this lawsuit?

22      A.  You're asking me about the video.

23      Q.  That's what I'm asking you.

24          You understand InfoWars took Mr. Pozner's

25  address and put it on air to its viewers.  You know

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      146

1  that, right?

2          MR. REEVES:  Objection; form.

3      Q.  (By Mr. Bankston)  Or do you not know that?

4      A.  I do not have the record of it right now.

5      Q.  Okay.

6          (Discussion off the record)

7      Q.  (By Mr. Bankston)  You know who Dan Bidondi is,

8  right?

9      A.  Yes.

10      Q.  Okay.  He was a reporter working for InfoWars

11  who was sent to Connecticut multiple times, right?

12      A.  In some capacity.

13      Q.  What capacity?  What do you mean?  What does

14  that mean?

15      A.  A reporter.

16      Q.  He went there as a reporter, right?

17        There's no reason to qualify that.  InfoWars

18  sent him there as a reporter to cover Sandy Hook, right?

19      A.  I don't have a record right now as of S2 how

20  much of his work was done on his own volition as opposed

21  to InfoWars giving him the directions to do that.  I

22  think it was a combination of that.

23      Q.  Weren't you personally involved, right after

24  getting sued, of trying to get all the documents

25  together about Mr. Bidondi, when his invoices were, when

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        147


1  he was fired?  Wasn't that you?

2      A.  No.

3      Q.  Okay.  If somebody was to represent that was

4  you, they would not be -- be inaccurate?

5      A.  I'm sorry?

6      Q.  If someone was to represent that you were the

7  person who went and got all Halbig's -- excuse me.

8        If someone was to represent that you were the

9  person who went and gathered up all of Mr. Bidondi's

10  invoices, tried to figure out why he got fired after

11  being sued in 2018, if somebody was to say you were the

12  person who did that, they wouldn't be accurate, they'd

13  be mistaken.

14        MR. REEVES:  Objection; form.

15      A.  Yes.

16      Q.  (By Mr. Bankston)  In editorial discussions

17  about Sandy Hook, how did InfoWars feel about

18  Dan Bidondi's reporting in Newtown?

19    A.  The company doesn't have records of that.

20    Q.  So you didn't go pull any documents.  I

21  understand that.  Right?

22        So is your answer for me I can't tell you, I

23  don't know, I don't know how the company felt about it?

24  Is that your answer?

25    A.  Yes.

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        148


1    Q.  Okay.  There were people who were working with

2  Dan Bidondi at that time, correct?

3    A.  (No response.)

4    Q.  I mean -- let's make this easy.  There were

5  people inside of InfoWars who communicated with Dan

6  Bidondi about his assignments, right?

7    A.  Yes.

8    Q.  Okay.  They knew what he was doing in

9  Sandy Hook, right?

10    A.  To some degree, yes.

11    Q.  Okay.  There were people who watched his

12  reports.

13    A.  Yes.

14    Q.  Somebody watched it before you put it on the

15  air, right?

16    A.  Yes.

17    Q.  Okay.  So there are people currently employed

18  by InfoWars who probably have a pretty good

19  understanding of how the company in its editorial

20  discussions felt about Dan Bidondi's reporting.  You'd

21  agree with me about that?

22          MR. REEVES:  Objection; form.

23      A.  I would have to see specific conversations, if

24  there's a record of conversations.

25      Q.  (By Mr. Bankston)  Well, look.  You know that

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        149


1  Rob Dew was in touch with Dan Bidondi and sent him down

2  to Connecticut.  You know that, right?

3      A.  I know Rob Dew has had conversations with Mr.

4  Bidondi.

5      Q.  And he didn't give you any information about

6  Mr.  Bidondi before this deposition, did he?

7      A.  He did not.

8      Q.  Okay.  You know Mr. Jones has seen Dan

9  Bidondi's videos from -- from his reporting, right?  He

10  aired them during the episodes he was hosting, right?

11      A.  Yes.

12      Q.  Okay.  Mr. Jones might have some feelings about

13  what Mr. Bidondi did, right?

14      A.  He might.

15      Q.  Yeah.

16          But I -- you aren't going to be able to tell me

17  any of those, are you?

18      A.  I wasn't asked to provide that information.

19      Q.  Okay.  Mr. Bidondi is a person who has

20  definitely come up in editorial discussions about

21  Sandy Hook, correct?

22          MR. REEVES:  Objection; form.

23      A.  Define editorial discussions.  They're -- as

24  far as we -- our understanding from the previous

25  definition of that word, of that concept, no.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        150


1      Q.  (By Mr. Bankston)  Well, I'm -- I'm assuming

2  that you know what editorial discussions mean.  Because

3  nobody asked me if -- that they thought they didn't

4  understand what that meant.

5          And are you telling me right now you're not

6  sure what editorial discussions means?

7      A.  No.  We've already gone through this, and I

8  answered you what an editorial discussion was.

9      Q.  Right.

10          And So we know that when editors and producers

11  were talking about Sandy Hook, they were making

12  decisions about things like whether to send Dan Bidondi

13  there, right?  That's a decision they made, correct?

14      A.  It -- a decision could have been made by one

15  person upon which that was the sole responsibility to

16  make that decision.

17      Q.  We don't know, do we?  We have no idea in that

18  editorial discussion about Dan Bidondi and his coverage.

19  We don't know, do we?

20      A.  That's why I'm talking -- I'm telling you

21  there's no record of it.  If it was a specific person,

22  like you mentioned Rob Dew, that sent him there or there

23  was a combination of people, I -- the company has no

24  record of that.

25      Q.  It has employees who know it, though, doesn't

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      151


 1  it?

 2      A.  Know what?

 3      Q.  Employees who personally dealt with Dan

 4  Bidondi.  You're not one of those people, though, right?

 5      A.  No.

 6      Q.  Okay.  But there are people who personally

 7  dealt with Dan Bidondi.

 8      A.  Yes.

 9      Q.  You didn't talk to them about their editorial

10  discussions about his reporting, did you?

11      A.  No.

12      Q.  Okay.

13          (Discussion off the record)

14          (Exhibit 11 introduced)

15      Q.  (By Mr. Bankston)  I'm going to show you what

16  I've marked as Exhibit 11.  You'll see that this is also

17  a document that was produced without a number at the

18  bottom of the page.  Do you see that?

19      A.  Yes.

20      Q.  Okay.  But what we're looking at here, this

21  appears from the format and even the names involved and

22  everything about it, this appears to be a document that

23  existed in InfoWar's email system that was produced to

24   us in this lawsuit, correct?

25      A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      152


1      Q.  So what you'll see in the bottom email -- and I

2   want to give you a chance to read it really quick.  But

3   this -- when he says hey, Rob, this is Dan Bidondi

4   talking.  Hey, Rob, can I do an MOS tomorrow?

5           Before we go into anything else.  And MOS, is

6   that man on the street?

7      A.  Yes.

8      Q.  Okay.  And that's a sort of interview where he

9   might just go up and try and talk to random people?

10      A.  Yes.

11      Q.  Okay.  So I want you to just -- because I think

12   you may want to -- just go ahead and read that email

13   real quick.  It's not real relevant to what we're going

14   to be talking about.  But if you can take a chance to

15   look at it.

16      A.  Okay.

17      Q.  Okay.  So -- and then what we see basically

18   here is some proposed questions that he wants to ask

19   random people on the street, right?

20      A.  Yes.

21      Q.  And in the follow-up email from Rob Dew, he

22   doesn't want Dan to do that, right?

23      A.  Correct.

24      Q.  Right.

25           It's going to be old by the time they can air

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      153

1  it, correct?

2      A.  Yes.

3      Q.  Okay.  So he says go to Sandy Hook, we will

4  cover that, correct?

5      A.  Yes.

6      Q.  Okay.  So it was an intentional choice by

7  Mr. Dew to want to get Dan Bidondi to go to Sandy Hook,

8  correct?

9      A.  Yes.  I guess it was in the news.  And the

10  nature of -- on the -- of the beast so to speak on the

11  news, the 24-hour news cycle expires really fast.

12      Q.  How was -- excuse me.  I'm sorry.

13          How was Sandy Hook in the news on 7/7/2015?

14  What had happened that put it in the news?

15      A.  I don't have -- I don't have the record of that

16  right now.

17      Q.  Right.

18          So you don't know that it had anything to

19  do --

20      A.  Sandy Hook has been in the news despite the

21  fact that Alex has not mentioned it in years.  And it

22  keeps being put in the news as if Alex was the one who

23  was the purveyor of the Sandy Hook news, the Sandy Hook

24  and him talking about the parents, yet it's the

25  mainstream media who keeps mentioning the parents and

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      154

1  tormenting the parents with the entire situation.

2      Q.  When you say "purveyor" -- when you say go to

3  Sandy Hook, we will cover that, InfoWars is being the

4  purveyor through almost -- almost 3 years after

5  Sandy Hook is being the purveyor of Sandy Hook coverage,

6  correct?

7      A.  No.

8      Q.  What -- what is that then?  Is he saying that

9  we're going to cover it and not air it?  He intends to

10  put whatever Dan Bidondi does on the air, correct?

11      A.  It depends if the report is good or not.

12      Q.  And then again, in answering this question,

13  you've speculated out of thin air that there was

14  something going on around January 7, 2015 that put this

15  in the news, that made it timely.  But that was pure

16  speculation.  You have no idea what that might be,

17  correct?

18      A.  That's the nature of our news.  That's how we

19  do news.  If there's something in the news, then we'll

20  cover it.

21      Q.  Yeah.  Y'all were going to make news.  Do you

22  understand that?  You were sending Dan Bidondi there to

23  Wolfgang Halbig.  Do you know what they did there?

24      A.  No.

25          (Discussion off the record)

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       155


1          (Exhibit 12 introduced)

2      Q.  (By Mr. Bankston)  Let me show you what I've

3  marked as Exhibit 12.  This is an email you received,

4  correct?

5      A.  Yes.

6      Q.  Okay.  I'm going to go through the email with

7  you really quick.

8          Now, you'll notice at the bottom here we have a

9  Bates number.  It says Heslin 19-4651-000661, correct?

10     A.  Yes.

11     Q.  Now, one of the problems you're going to see in

12  this document is that unfortunately the way your former

13  attorneys decided to produce it it cuts off.  You notice

14  how that line cuts off there at the end?  We can't read

15  what that long line says, right?

16     A.  Right.

17     Q.  Okay.  I'm going to try to do my best, though,

18  okay?

19          And what we have here is that we

20  have -- alright.  What we have here is from

21  truthradio9990@hotmail.com [sic].  And this was

22  something sent to Rob Dew at InfoWars, right?

23     A.  Right.

24     Q.  Okay.  So we have this email here from Dan

25  Bidondi stating someone you may want to get in that

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      156


1  documentary on Sandy Hook, and it says forward, Dan.

2  Alex announced that he is going to do a Sandy Hook doc

3  film.  Sheila Matthews, who you met at Hartford at a

4  Halbig hearing, is a friend of mine who lives in the

5  next town.  And I'm going to guess that says over.  And

6  we don't know what it says after that.  Then it says

7  Sheila asked me to provide you with her telephone

8  number.  And it gives a telephone number, right?

9     A.  Right.

10     Q.  Okay.  And then Rob sends it to you.  And this

11  is April 24, 2018, correct?

12     A.  Correct.

13     Q.  And he says if Alex wants to go the Sandy Hook

14  route, he may want to get this lady on, correct?

15     A.  Yes.

16     Q.  Okay.  So this is just shortly after the

17  company was sued, right?

18     A.  Yes.

19     Q.  That's why he wants to make this documentary,

20  right?

21     A.  I'm not sure of the exact reasons for Alex

22  wanting to do a documentary.

23     Q.  What is the Sandy Hook route?  What is that?

24     A.  I'm -- well, the way we do -- since Rob is

25  recommending a guest for the show, that would be Alex's

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT    157

1  decision if he wanted to have this guest on or not.

2     Q.  Well, I think you know that the Sandy Hook

3  route is about how he was going to respond to this

4  lawsuit, whether he was going to make this documentary

5  film.  Do you understand that?

6         MR. REEVES:  Objection; form.

7     A. That's your conjecture.

8     Q. (By Mr. Bankston)  I'm asking you.  That

9  documentary film that was made in response to this

10  lawsuit, that's what he was planning on doing.

11     A. I don't have a record of a documentary film on

12  Sandy Hook.

13     Q. Do you understand that immediately after this

14  lawsuit was filed, that Alex Jones was talking about

15  making a documentary that proved it was all fake?  Did

16  you know that?

17     A. That's a conjecture too.  We don't know what

18  the documentary film he wanted to do was about.

19     Q. Well, I'm asking you.  That's what I'm saying.

20  I'm asking you.

21        Wasn't it about Sandy Hook being faked?

22     A. There were never editorial, quote, discussions

23  about what was going to be in the film.

24     Q. When -- he sent you a subject line that says

25  Bidondi, Sandy Hook documentary, what did you think that

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      158

1  meant?

2     A. You were asking me about what was going to be

3  in that Sandy Hook documentary.

4     Q. Sure.

5     A. And I answered you that there was no

6  discussions of specific topics of the Sandy Hook

7  documentary.

8      Q.  Right.

9      A.  It could have been about anything that had to

10  do with Sandy Hook, whether Alex was trying to present

11  his case or -- it's just -- again, I don't want to

12  speculate.

13      Q.  I understand.  That's the answer to your last

14  question.

15          My next question is, when Rob Dew sends you an

16  email that says Bidondi, Sandy Hook documentary, what

17  did you think that meant?

18      A.  I don't understand the question.

19      Q.  When you get an email from Rob Dew, it's part

20  of your job duties to understand your employee's

21  communicating with you, correct?

22      A.  Yes.

23      Q.  So when you got this email did you just, like,

24  not pay attention to it, or did you form an opinion

25  about what it's about?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        159

1      A.  No.  I don't think you understand how the

2  production works --

3      Q.  Okay.

4      A.  -- at the company.  So I'm trying to explain to

5  you.

6          This looks as if Rob Dew is suggesting a guest

7  for the show.

8      Q.  But the show is not a documentary, right?  A

9  documentary is something separate from the show.

10      A.  The subject matter is from the previous email,

11  not the email that's -- this is a forwarded email to me

12  with information about the guest that's being discussed

13  in the previous email.

14      Q.  Again, I don't see where there's any talk about

15  a guest.  Can you point me to where there's a guest?

16      A.  Yeah.  Sheila asked me to provide you with her

17  telephone number.

18      Q.  Sure.

19       Is she going to be a guest?  What tells you

20  here she's going to be a guest?

21      A.  It says right there.

22      Q.  Where?  Where does it say guest?

23      A.  Sheila Matthews, who you met in Hartford at

24  Halbig hearing, is a friend of mine who lives in next

25  town over.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      160


1      Q.  Maybe he just wants her to talk to him?  Maybe

2  Sheila Matthews has some information that would be

3  bombshell for the Sandy Hook documentary.

4      A.  Well, what I'm -- what I'm -- so I'm trying to

5  clarify to you, because you don't seem to understand how

6  the operations work, I'm telling you the reason Rob

7  Dew's sending me this email is to consider this guest in

8  case Alex wants to have her on the show.

9    Q.  There's -- there's no talk of the show here.

10   There's talk of a Sandy Hook documentary.  Let's back up

11   for a second.

12          MR. REEVES:  Hold on.  Hold on.  Hold on.

13   Please let him ask you the questions and answer them to

14   the best of your ability, please.

15          MR. BANKSTON:  Okay.

16          MR. REEVES:  Thank you.

17   Q.  (By Mr. Bankston)  When -- when this is talking

18   about -- let's talk about InfoWars and how it works,

19   right?  Because I better get that cleared up because I

20   don't know how it works, right?

21          But there's a show called the Alex Jones show,

22   right?

23   A.  Yes.

24   Q.  There's also a showed called, like, "The War

25   Room" with Owen Shroyer.

       UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       161


1    A.  Yes.

2    Q.  Right?

3          There was a David Knight show at one point,

4    right?

5    A.  Yes.

6    Q.  There is also, though, an entirely different

7    department of people who work on things like documentary

8    films, somebody like Rob Jacobson, right?

9    A.  That was one of his jobs.

10   Q.  And he doesn't work on the show, right?  He

11  didn't do show work.  He did documentary work, correct?

12      A.  Not on a regular basis I would say.

13      Q.  Okay.  So you understand that there have been

14  documentary films made by Alex Jones.

15      A.  Yes.

16      Q.  They're not a show, are they?

17      A.  No.

18      Q.  Okay.  So when you're telling me in this email

19  that there is talk of a guest on a show, there's no talk

20  in this email from Mr.  Bidondi about a guest or the

21  show, is there?  There's talk about a documentary,

22  right, and somebody he may want to talk to.

23      A.  Yes, he may want to get this lady on.

24      Q.  Now, that's what Rob is saying, right?

25      A.  Right.

         UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       162


1       Q.  Rob is saying he wants to get this lady on.

2  Get her on what?

3       A.  The show.

4       Q.  Where do you get that from?

5       A.  That's how we communicate.

6       Q.  Alright.  Well -- so she's not going to be in

7  the documentary?

8       A.  I have no idea if she was going to be in the

9  documentary.

10      Q.  Wouldn't the fact --

11      A.  They're not talking about the documentary here.

12     Q.  The email subject line is Sandy Hook

13  documentary, ma'am.

14     A.  I've already explained that for you.

15     Q.  Okay.  So despite the fact that it's emailed

16  Sandy Hook documentary, despite the fact that Dan

17  Bidondi said that Alex Jones announced that he is going

18  to do a Sandy Hook documentary film, you insist this

19  email is about the show.

20         MR. REEVES:  Objection; form.

21     Q.  (By Mr. Bankston)  Is that your testimony?

22     A.  The guest that's mentioned in the email with

23  the subject matter Sandy Hook documentary to Rob Dew

24  includes information about a person that has to do in

25  some way with Sandy Hook.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        163

1      Q.  Does the --

2      A.  Rob Dew looks at that email, he forwards me the

3   email with the subject matter.  It's going to be

4   forwarded the way it was sent to him.

5      Q.  Uh-huh.

6      A.  He is sending me this information so that I can

7   take a look at the guest that's being suggested, that I

8   can run this guest by Alex and find out if Alex wants to

9   have this guest on the show or not.

10     Q.  Tell me what you did to figure out who this

11  guest was and how to pitch it to Alex?

12     A.  I have no recollection of this guest whatsoever

13  because I -- from -- from -- you're asking me in my

14  capacity as a producer for this specific email?

15     Q.  I'm asking you about actually editorial

16  discussions of Sandy Hook.  So I'm actually asking you

17  as the company.

18     A.  There was no -- there was no response to this

19  email that I provided.

20     Q.  If Rob Dew was sending to you a source from Dan

21  Bidondi, the Truth Warrior, we can be fairly certain

22  that that guest was going to support the idea that

23  Sandy Hook was fake, right?  That's a fair assumption?

24          MR. REEVES:  Objection; form.

25          Don't answer that question.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      164


1          MR. BANKSTON:  Why not?

2          MR. REEVES:  Because that's extremely

3  misleading.

4          MR. BANKSTON:  That's not a proper basis to

5  object -- to --

6          MR. REEVES:  That is entirely.  Go read the

7  rule.

8          MR. BANKSTON:  Madam Court Reporter, can

9  you read my question back?

10          (Court reporter read requested portion)

11          MR. BANKSTON:  Have her answer the question

12  or I will move for sanctions?  I will -- I will move to

13  compel that answer.  That if you're not having her

14  answer that question, it's very clear what you're trying

15  to hide.  I want her to answer the question.

16        MR. REEVES:  I don't appreciate the

17  threats.

18        MR. BANKSTON:  It's not a threat, Brad.

19        MR. REEVES:  It is a threat, and I don't

20  really appreciate it.  You know what?

21        MR. BANKSTON:  Look at where we are in this

22  case, Brad.

23        MR. REEVES:  Go ahead.  Go ahead.  If you

24  know the answer to the question, proceed with answering

25  the question.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        165


1      A.  I get sent a lot of guests on a daily basis.

2  There's no way for me to know this specific guest would

3  be pro Sandy Hook conspiracy theory or the official

4  version.  Because if you've watched other videos of

5  Alex Jones, he would have people on the show who would

6  disagree that it was staged.  And they -- and he allowed

7  that debate.  Even -- even Wolfgang Halbig was on the

8  show at the same time with a person that disagreed with

9  him and that was a debate.  And Alex allowed both sides

10  to be public with their statements.

11      Q.  (By Mr. Bankston)  Okay.  First, that happened

12  once, correct?  There's never been any other debate or

13  guest who supported the idea that Sandy Hook was real,

14  correct?

15      A.  Alex multiple times has said that he didn't

16  know what exactly happened in Sandy Hook, that he

17 believed many kids died, but that there was a cover-up.

18 He said it multiple times. And he said it was in the

19 public's best interest and in the best interest of those

20 children to find out the exact truth that happened and

21 how those kids died.

22      Q. Yeah, that doesn't answer the question of

23 whether more than one debate with guests who supported

24 Sandy Hook being real. That's a whole bunch of stuff of

25 what Alex Jones said at some point that you think he

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      166


1 said. I'm asking you --

2      A. Oh, no. He said that.

3      Q. I -- that's not the question, though,

4 Ms. Karpova.

5          The question is, was there more than one debate

6 with a guest who supported the idea that Sandy Hook was

7 real. Has that ever happened, other than the one time

8 that they brought Keith Johnson on and railroaded him

9 with Wolfgang Halbig?

10          MR. REEVES: Objection; form.

11      Q. (By Mr. Bankston) Ever?

12      A. From my recollection as a producer, there have

13 been callers calling into the broadcast that were

14 allowed to state their opinions that were disagreeable

15 with Alex Jones.

16      Q. That's not a guest, though, is it?

17      A. If a caller is being allowed on the show.

18    Q.  You know what a guest is.  That's not a guest.

19    A.  Well, sure.

20    Q.  That's not somebody who's been booked to come

21  on the show.

22    A.  Sure.

23    Q.  Right.

24       There is never, other than Keith Johnson, when

25  he was brought in with Wolfgang Halbig, there has never

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       167

1  been a person who's been a guest on the show who said

2  that Sandy Hook was real, correct?

3    A.  Yes.

4    Q.  Additionally, when it comes to Dan Bidondi, you

5  may not -- you may not know what other guests may have

6  said, you may not know whatever, but you know Dan

7  Bidondi believes Sandy Hook was fake, correct?  The

8  company knows that.

9    A.  Dan Bidondi had questions about Sandy Hook

10  just -- just like Alex, just like other people.

11    Q.  When you say questions, when Dan Bidondi does

12  stuff like chase people down on the street and yell at

13  them these are the people who covered up Sandy Hook,

14  they're criminals, you're all going to jail, do you

15  think those are questions?  Do you believe that?

16       MR. REEVES:  Objection; form.  On what

17  topic of the depo notice does this cover?

18       MR. BANKSTON:  We're in editorial

19  discussions about Dan Bidondi, which is -- and I'm

20  also -- Brad, she's copied on that email.  This is

21  personally to her.  So if you --

22          MR. REEVES:  I understand that.  I'm asking

23  you --

24          MR. BANKSTON:  You already have a running

25  objection to both, to anything that's outside --

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       168


1           MR. REEVES:  You just asked the question

2  about the -- about the company's position on it.  So I'm

3  allowed to reiterate --

4           MR. BANKSTON:  And you have a running

5  objection on every one of those questions.

6           MR. REEVES:  But that is a misleading

7  question that you're going to ask her what the company

8  believes whenever she is over -- when you know that is

9  outside the scope.  And so I'm allowed --

10          MR. BANKSTON:  You can object to it, and

11  you already have.

12          MR. REEVES:  And I just did.

13          MR. BANKSTON:  And it's running.  So

14  please --

15          MR. REEVES:  Great.  Well I objected

16  anyway.  So go for it.  If you have a problem with me

17  reasserting my objection despite having a running one

18  overall --

19          MR. BANKSTON:  I do.

20          MR. REEVES:  I have -- I have a problem

21  with you asking misleading questions, asking for the

22  company's position on a person when that's clearly not

23  covered by the scope of these deposition topics with

24  someone who is here to testify on the topics on behalf

25  of the company.  That is a misleading way to approach

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      169

1  the questions with this witness.

2     Q.  (By Mr. Bankston)  You know what Dan Bidondi

3  believes about Sandy Hook, don't you, you personally,

4  Daria Karpova?

5     A.  I do not.

6     Q.  You don't know?

7     A.  I personally do not.

8     Q.  No.

9        As an InfoWars producer here to testify on

10  behalf of the company, you also didn't do anything to

11  prepare to know what Dan Bidondi did, right?  That's not

12  part of the topics you were asked to talk about today?

13     A.  I know Dan Bidondi had questions and believed

14  that there was a cover-up in the Sandy Hook case, which

15  he did his hardest to try and investigate, as a good

16  reporter would.

17     Q.  You -- you are testifying here right now

18  Dan Bidondi is a good reporter.  Is that what you're

19  testifying to?

20     A.  Insofar as him trying to investigate what

21  happened, to find the truth.  That's what a good

22  reporter's supposed to do.

23    Q.  Have you seen any videos of Dan Bidondi in

24  Connecticut and what he did?  Have you ever watched him?

25    A.  (Indiscernible.)

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          170


1    Q.  You might not be the best person qualified to

2  talk about whether Dan Bidondi was a good reporter in

3  Newtown, are you?

4          MR. REEVES:  Objection; form.  That's not

5  what she said.

6          MR. BANKSTON:  That's why I'm asking her a

7  question, Brad.

8    Q.  (By Mr. Bankston)  I'm asking you, you may not

9  be the best qualified person to talk about what

10  Dan Bidondi did in Newtown, correct, you Daria Karpova,

11  InfoWars employee?

12    A.  My definition of a good reporter is somebody

13  who seeks the truth and is going to great lengths in

14  order to find it.

15    Q.  So you don't -- you -- but you can admit to me

16  right now you don't know what Dan Bidondi did in

17  Newtown.

18    A.  His specific actions I don't know.  But you

19  just mentioned what --

20    Q.  Do you know about St. Rose of Lima Catholic

21  School in Newtown, what Dan Bidondi and Wolfgang Halbig

22  did there?

23    A.  Not off the top of my head.

24     Q.  Okay.

25          (Discussion off the record)

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT     171


1          (Exhibit 13 introduced)

2     Q.  (By Mr. Bankston)  I'm showing you what I've

3 marked as Exhibit 13.  Do you recognize that?

4     A.  I haven't seen this document before.

5     Q.  Okay.  So you understand that -- like we were

6 talking about earlier, the company has produced sets of

7 documents and pieces over the course of 3 years, right?

8     A.  Yes.

9     Q.  Okay.  I'll represent to you that, like, what

10 you're looking at right now, you'll see FSSTX-082669.

11 Okay?

12     A.  Yes.

13     Q.  Which would represent to you this is the 82,669

14 page that InfoWars has produced in this lawsuit.

15          I'll represent to you this was produced to me

16 extremely recently, like, in the last little bit.  And

17 you understand that InfoWars was ordered to produce

18 analytics about their website, right?

19     A.  Yes.

20     Q.  Do -- do you know anything about what was

21 produced?  Do you know what analytics were produced to

22 the claims?

23     A.  Website traffic.

24     Q.  Right.

25          I mean, obviously that's what analytics are.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      172

1  Do you know what actual analytics -- where they came

2  from, what was produced, any of that?

3      A.  It came from the IT department with the

4  software they use for analytics.

5      Q.  Right.

6          This isn't an InfoWars document, right?

7  This was not -- this is -- and this document was not

8  generated using InfoWars stuff, InfoWars products or

9  InfoWars --

10     A.  You'd have to talk to IT about that.

11     Q.  So you don't know the origin of this document,

12  right?

13     A.  I do not.

14     Q.  Alright.  I believe -- and I was hoping I could

15  ask you about this, because you're supposed to testify

16  about the documents you produced.  And I know there's

17  been a lot of documents, but I was hoping maybe the ones

18  that were just produced we could talk about.  But I

19  think this is a Google analytics document from Google.

20  Do you know if I'm right or wrong, or do you not know?

21     A.  I don't know.

22     Q.  Okay.  From what it looks like to me -- I

23  can't -- you see there's a date up at the top that says

24  January 1, 2012 to June -- June 16, 2019?

25     A.  Yes.

1     Q.  Okay.  That looks to be a period -- a period of

2  time in which these analytics was collected.  Do you

3  have any reason to dispute that?

4     A.  No.

5     Q.  Okay.  So what we have here is -- you see how

6  we have a column of pages that lists for each of these

7  URLs the total unique page views of that URL?

8     A.  Correct.

9     Q.  Okay.  Now, you'll notice that some of

10  the -- on this list here, it goes through -- this is

11  just the top 20 for the website.  You'll notice that

12  some of them have what I would call landing pages that

13  aren't specific to a certain story.  For instance,

14  infowars.com/category, infowars.com/watchalexjonesshow.

15  Do you know what I mean when I say that?

16     A.  Yes.

17     Q.  Okay.  And so none of those URLs are associated

18  with a specific story, correct?

19     A.  Correct.

20     Q.  The first URL that we would see that's

21  associated with a specific story is a URL titled

22  "Graphic Shocking Complete Video Shock From Virginia

23  Gunman's Point of View," correct?

24     A.  Yes.

25     Q.  Okay.  And the unique page views for that --

       UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        174

1  that article shown on this document is 4,265,000,

2    correct?

3      A.  Correct.

4      Q.  Okay.  If you look at the very next entry, that

5    is a story, right?  That would be No. 13, correct?

6    Because No. 8, 9, 10, 11 and 12 are not stories,

7    correct?

8      A.  Correct.

9      Q.  Okay.  And so No. 13 is "Boston Bombing

10   Culprits Found," correct?

11     A.  Correct.

12     Q.  Okay.  So No. 14 is "FBI Says No One Killed At

13   Sandy Hook," correct?

14     A.  Correct.

15     Q.  And that shows the unique page views of

16   3,301,616 people, right?

17     A.  Yes.

18     Q.  Okay.  So from this analytics chart, we can

19   determine that for that time period of June -- of

20   January 1, 2012 to June 16, 2019, the story, "FBI Says

21   No One Killed At Sandy Hook," was the third most popular

22   site and unique page views on the entire InfoWars

23   website.  The company would agree with that?

24          MR. REEVES:  Objection; form.

25     A.  Which story again?

          UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       175


1      Q.  (By Mr. Bankston)  No. 14 would be the third

2    most popular story in terms of unique page views ever

3  published on the InfoWars website during that period of

4  time.

5     A. According to this graphic, yes.

6     Q. Okay.

7        (Discussion off the record)

8     A. I mean, this -- this -- if we can go back to

9  this previous graphic real quick.

10       It does provide other information like how long

11  people were on that page, the bounce rate.  So I'm not

12  an analytics expert, so -- but I think that information

13  is important as well, other than the unique page views

14  that you tried to bring attention to.

15       MR. BANKSTON:  Object as nonresponsive.

16       (Exhibit 14 introduced)

17     Q. (By Mr. Bankston)  I'm going to show you what

18  I've marked as Exhibit 14.  You'll see this is a similar

19  chart, right, same date range?  January 20 -- January 1,

20  2012 to June 16, 2019?

21     A. Yes.

22     Q. Okay.  Now, this talks about landing pages.  Do

23  you see where it says that in the top left corner under

24  the words analytics?

25     A. Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      176


1     Q. Okay.  Now, here we also have landing pages and

2  numbers of sessions, correct?

3     A. Yes.

4     Q. Okay.  Now, on this one as well, for this type

5  of analytics charts in terms of sessions on InfoWars,

6  No. 8, "FBI Says No One Killed at Sandy Hook," is the

7  third most popular story in terms of sessions on

8  InfoWars, correct?

9      A.  Yes.

10     Q.  Okay.  Now, in terms of session duration -- do

11  you see where it says average session duration?

12     A.  Yes.

13     Q.  Okay.  Now, you see -- where it says "FBI Says

14  No One Killed on Sandy Hook, you have an average

15  duration of just under a minute, right?

16     A.  Yes.

17     Q.  But if you look at No. 11, Saudi Arabia Has

18  100,00 Empty Air-conditioned Tents That Can House

19  3 million People Yet Has Taken Zero Refugees, the

20  average session duration there was 16 seconds, right?

21  Correct?

22     A.  Yes.

23     Q.  And for other landing pages, say No. 9 listed

24  on the internet, you've got an average duration of

25  4 minutes and 28 seconds, right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      177

1      A.  Yes.

2      Q.  When someone clicks on the listen on the

3  internet link, that typically means they're going to

4  listen to the radio broadcast, right?

5      A.  Yes.

6     Q.  It's kind of expected they might be on there a

7  few more minutes than just reading the story.  That's

8  expected to InfoWars?

9     A.  (No response.)

10          MR. REEVES:  Objection; form.

11          (Discussion off the record)

12     Q.  (By Mr. Bankston)  Correct?

13     A.  What was the question?

14          MR. BANKSTON:  Madam Court Reporter, can

15  you help me out here and read that question back?

16          (Court reporter read requested portion)

17     A.  When people go to a stream to listen to the

18  stream, it's expected that they would be listening to

19  the stream as opposed to reading an article.

20     Q.  (By Mr. Bankston)  Okay.  Has InfoWars, when

21  making its editorial discussions and decisions about the

22  Sandy Hook coverage, has it ever attempted to use its

23  Sandy Hook stories and videos in a strategic way to

24  attract viewers?

25     A.  No.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        178

1     Q.  Okay.  The idea that we would make some video

2  uploads about Sandy Hook as a strategic measure, that's

3  not something that would be a -- would be a part of

4  InfoWars editorial sessions?

5     A.  Never.

6     Q.  Never?

7     A.  Never.

8          (Discussion off the record)

9          (Exhibit 15 introduced)

10     Q.  (By Mr. Bankston)  Let me show you what I've

11 marked as Exhibit 15.  Can you tell me who -- at the top

12 here -- well, actually, let me start at the bottom.  At

13 the bottom corner you see there's a mark that says

14 FSSTX-076069, correct?

15     A.  Yes.

16     Q.  Okay.  Now, can you tell me -- first, let's

17 just look at the top of the email.  Who is Darrin?

18     A.  Darrin McBreen.

19     Q.  And his title in 2015, do you know?

20     A.  Editor.

21     Q.  Okay.  And Rob Dew we've talked about, correct?

22     A.  Yes.

23     Q.  Louis S. we've talked about, right?

24     A.  Yes.

25     Q.  Okay.  The next other person that's on here is

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          179


1 Travis Knight.  Do you know who that person is?

2     A.  Yes.

3     Q.  Okay.  And do you know what their job position

4 is?

5     A.  Editor.

6     Q.  Okay.  And then this email is being sent from

7 Louis S. to Travis Knight, Rob Dew and Darrin.  And the

8 subject is video files for Facebook upload on

9  September 24, 2015.  That's correct?

10      A.  Yes.

11      Q.  Okay.  He asked them can I get these video

12  files for future strategic Facebook uploads, correct?

13      A.  Yes.

14      Q.  And one of the files that he is asking for is

15  "Why People Think Sandy Hook is a Hoax," correct?

16      A.  Yes.

17      Q.  Okay.  So we can tell from this email -- and

18  then Darrin follows up and says any luck finding these,

19  correct?

20      A.  Yes.

21      Q.  We can agree from this email that Editor Darrin

22  and Louis S. were attempting to use a video about

23  Sandy Hook being a hoax as a future strategic Facebook

24  upload, correct?

25      A.  It's one of the video -- one of the videos out

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        180


1  of eight videos that he's requesting.

2      Q.  Sure.

3          So it is one of the videos being used for

4  future strategic Facebook upload, correct?

5              MR. REEVES:  Objection; form.

6      A.  Yes.

7      Q.  (By Mr. Bankston)  Okay.

8          (Discussion off the record)

9              MR. BANKSTON:  Yeah.  Let's go ahead and

10  take a break.

11          MR. REEVES:  Alright.

12          THE VIDEOGRAPHER:  The time is 4:08 p.m.

13  we are off.

14          (Recess from 4:08 p.m. to 4:17 p.m.)

15          THE VIDEOGRAPHER:  The time is 4:17 p.m.

16  We are on.

17          (Exhibit 16 introduced)

18      Q.  (By Mr. Bankston)  Ms. Karpova, I'm handing you

19  what I've marked as Exhibit 16.  Alright.  Down at the

20  bottom it is labeled FSSTX-079546, correct?

21      A.  Yes.

22      Q.  Okay.  And this email was sent on April 16,

23  2015?

24      A.  Yes.

25      Q.  Okay.  We talked about Louis S., right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        181


1      A.  Yes.

2      Q.  And we've talked about Lee Ann before.  She's

3  Lee Ann McAdoo, right?

4      A.  Yes.

5      Q.  Okay.  She's an InfoWars reporter.

6      A.  She was, yes.

7      Q.  She was.

8          Okay.  At the time of this, were they both

9  reporters, editors?  What were they?

10      A.  Both who?

11      Q.  Both individuals on this email.

12     A.  Louis I think was a (indiscernible) editor.

13  Lee Ann was a reporter.

14     Q.  Okay.  This is a subject list called playlist

15  ideas, correct?

16     A.  Yes.

17     Q.  Importance was labeled high, correct?

18     A.  Yes.

19     Q.  The playlist ideas that are listed in this

20  video I'm going to read to you.  Okay?

21        Vaccines, already up.  When it's -- let's stop

22  there.  When it says "already up," would it be your

23  assumption from seeing documents at InfoWars, meaning

24  that that playlist has already been created and is

25  currently up on the internet?

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        182

1     A.  Yes.

2     Q.  Okay.  And then it says:  Police state,

3  InfoWars health, Alex Jones show, Second Amendment,

4  rants, celebrity, border, TSA, geoengineering/chem

5  trails, GMO, resistance, Boston bombing, Sandy Hook,

6  victories, winning, good news, correct?

7     A.  Yes.

8     Q.  Okay.  So from this list of playlist ideas, we

9  know that Sandy Hook was one of the ideas for playlists

10  that was being proposed inside of InfoWars during

11  editorial discussions, correct?

12        MR. REEVES:  Objection; form.

13     A.  One of many ideas for the YouTube playlist.

14     Q.  (By Mr. Bankston)  No.  I understand -- look, I

15  completely understand that when I ask a question, you

16  want to push back and give information you think is

17  going to be helpful.  I get that.

18         I know that there are other -- we just read

19  them all.  We read all these topics here.  But in a very

20  simple statement, we can understand that Sandy Hook was

21  one of these playlist ideas, correct?

22     A.  Well, I'm just trying to be more accurate

23  because you're trying to present more of a skewed point

24  to mis -- misrepresent how our operations work.  So I'm

25  trying to clarify that among -- Sandy Hook was among the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       183


1  topics for playlists that they were in the process of

2  organizing a YouTube channel for.

3     Q.  Yeah.  And one of the things you wanted to have

4  on that YouTube channel -- or at least one of the things

5  that the company did through its editor Louis here, is

6  they wanted to have a playlist about Sandy Hook, right?

7     A.  Sure.  This is relevant in 2015.

8     Q.  Right.

9         Because according to the company, 2-1/2 years

10  after Sandy Hook it was still a relevant thing to talk

11  about, right?

12     A.  The videos were archived.  They wanted

13  to class -- to categorize them for -- yeah.

14     Q.  Okay.  I didn't ask how the videos were

15 categorized.  I didn't ask any of that.  All I asked was

16 the company believes when it was doing its discussions

17 on Sandy Hook, that Sandy Hook 2-1/2 years after the

18 shooting was something that needed to be covered in the

19 news.

20     A.  What discussions about Sandy Hook?

21     Q.  The editorial discussions you've had in the

22 company about Sandy Hook.

23     A.  This lists the different topics.  There's no

24 discussion of Sandy Hook.

25     Q.  I know that.  I'm asking you about the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        184


1 editorial discussions in the company.  Because your

2 position is, for the company, that in its editorial

3 discussions, that it came to the conclusion that 2-1/2

4 years after the shooting Sandy Hook was a relevant topic

5 to be talking about on InfoWars, correct?

6     A.  It is one of the topics for playlists as you

7 know.

8     Q.  I'm not asking -- can you take that email --

9 see that stack of exhibits you have right now?

10     A.  Yes.

11     Q.  Can you put them aside just out of your view

12 for just a second?

13        Okay.  Now, editorial discussions inside of

14 InfoWars.  InfoWars made the decision that 2-1/2 years

15 after the shooting, that topic was a relevant thing to

16 be talking about on their news broadcast, right?

17    A.  Again, I would have to refer to the YouTube

18  channel with the playlists of Sandy Hook.

19    Q.  I'm not -- Ms. Karpova, I don't know if I can

20  make this any more clear.  I'm not asking about the

21  playlist anymore.

22    A.  Correct.

23    Q.  Alright.  I'm not -- we're done with that

24  document.  We're talking about something totally

25  different.  I don't care what happened in terms of the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        185


1  YouTube playlist.  What I'm asking is when InfoWars was

2  making editorial discussions about Sandy Hook, part of

3  those discussions included the conclusion that

4  2-1/2 years after the shooting, that event was a

5  relevant thing to be talking about on InfoWars, correct?

6        MR. REEVES:  Objection; form.

7    A.  False, because I already answered that

8  question.  We did -- do not -- did not have editorial

9  discussions about Sandy Hook.

10    Q.  (By Mr. Bankston)  Okay.  We've seen a couple

11  of emails here today with people talking about how

12  InfoWars should cover Sandy Hook, right?  Correct?

13    A.  There were a few emails mentioning Sandy Hook.

14    Q.  That's not what I asked you, Ms. Karpova.

15    A.  Can we go back to those emails and I'll --

16    Q.  They're all sitting in -- right in front of

17  you.

18    A.  Okay.

19    Q.  And I'm asking you, in your recollection of

20  what we've spoken about here today, we've had people

21  talking about how InfoWars should cover Sandy Hook.

22        Do you remember that email from Mr. Bidondi

23  that was forwarded to you?

24    A.  Yes.

25    Q.  That was a discussion about how you should

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        186


1  cover Sandy Hook, wasn't it?

2    A.  No.

3    Q.  It wasn't a discussion with Rob -- didn't you

4  tell me that Rob Dew was making a recommendation that

5  this is somebody Alex should have on the show about

6  Sandy Hook?

7    A.  He didn't say he should have it.  It was a

8  proposed guest.

9    Q.  Right.

10        So we're having some discussions about who

11  should be on the show, maybe we should have this lady.

12  That was a discussion that you were actually copied on,

13  correct?

14    A.  Yes.

15    Q.  Okay.  So we can drop this idea, can't we, that

16  there were no editorial discussions because we've seen

17  one that you were included on, right, Ms. Karpova?

18    A.  Now, that I'm looking also at this previous

19  email that we've discussed, it says video files for

20 future strategic Facebook uploads.  I just want to be

21 clear that I think what you're referring to as a

22 strategic upload refers to some kind of marketing scheme

23 for Sandy Hook analytics videos.  What this refers to is

24 a -- almost like an auto post that is scheduled for

25 future uploads.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       187


1        MR. BANKSTON:  Objection; nonresponsive.

2    Q.  (By Mr. Bankston)  Let's go on to talk about

3 Wolfgang Halbig.  Would you mind opening up your blue

4 folder for me?

5    A.  (Witness complies.)

6    Q.  Do you see that article on top?

7    A.  Yes.

8    Q.  That's something you brought today and you were

9 talking about how much -- you were talking about, like,

10 you wanted to read it today, right, to talk about

11 Wolfgang's qualifications?

12    A.  Yes, his bio specifically.

13    Q.  Right, his bio.  Okay.

14    A.  Yes.

15    Q.  So this article that you brought is what you

16 believe is -- you -- let me ask you this.  Is that

17 something that InfoWars had before you went and looked

18 for it for your deposition, or is that something you got

19 for your deposition to help you acquaint yourself?

20    A.  The latter.

21      Q.  Okay.  So before this deposition, InfoWars did

22  not have this document in its corporate files.

23      A.  Correct.  The files that I looked through that

24  I searched for Halbig's bio, I could not find anything.

25  As well as it seems like he's been memory-holed on the

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      188


1  internet as well.  So that's the only article that I

2  could actually find in an archive mode where it actually

3  listed his bio.

4      Q.  Did you go try to search Wolfgang Halbig on

5  Google?  Did you do that?

6      A.  Yes.

7      Q.  Okay.  So when you say he's been memory-holed,

8  I take it you're ignoring the dozens of mainstream

9  articles about Wolfgang Halbig, you don't want to use

10  the mainstream articles.

11      A.  No.  I'm talking specifically his bio and his

12  credentials have been memory-holed.

13      Q.  Okay.  There are mainstream articles that talk

14  about Wolfgang's credentials or his alleged credentials,

15  right?  Did you see any of those?

16      A.  I've looked at many of them, and I did not see

17  an actual biography of his accomplishments.

18      Q.  Okay.

19      A.  I've not seen, except for this article, which

20  is why I printed it.

21      Q.  So you brought us instead this Exhibit 1F

22  written by Dr. Eowyn.  Do you know who that is?

23    A. I do not -- I didn't bring it for the author.

24  I brought it for the bio that is included in this

25  article.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        189


1    Q. Right.

2        So you've got to -- you've -- one thing you

3  probably need to do when you say as a producer of a

4  journalistic organization, particularly when dealing

5  with a lawsuit like this and coming to testify is you

6  should probably try to figure out the voracity of the

7  bio being provided to you, right?

8        Do you have any faith sitting here today that

9  the information contained in that article is accurate?

10    A. Yes.  Because even the people who disagree with

11  Wolfgang Halbig admit that he has a lengthy bio that's

12  impressive.

13    Q. Who said that?

14    A. I've read it in different articles when I was

15  searching for his bio.

16    Q. I thought you said his bio's been

17  memory-holed.

18    A. Well, exactly.  They failed to (indiscernible)

19  his bio, but they do acknowledge that he's got an

20  extensive bio if that bio is covered accurately.  But I

21  could not find the actual bio because the bio was not

22  included, except for this article.

23    Q. You think it's covered accurately there?

24  That's what you think?

25    A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        190


1    Q.  Okay.  And the person who wrote that,

2  Dr. Eowyn, do you know who that is?

3    A.  No.

4    Q.  He doesn't have a last name, right?

5    A.  I do not believe that's the person who wrote

6  this art --

7    Q.  Go back and look at the first page.

8    A.  No, no, no.  I understand that the article was

9  posted by the said Dr. Eowyn.

10    Q.  Uh-huh.

11    A.  The bio that's been screen-shotted here -- it's

12  not even typed, it's screen-shotted from somewhere else.

13    Q.  From where?

14    A.  I do not have the source, the exact source

15  where it was printed from.

16    Q.  You have no idea where that came from.

17    A.  Well, like I said, people -- people who

18  disagree with Halbig and who criticize him admit that

19  his bio is impressive.

20    Q.  I -- I'm still waiting to see that.  Do you

21  have any information you can point me to that?  Anybody

22  you say who's an opponent of Halbig who admits that he

23  has an impressive bio.

24    A.  I would have -- I would have printed those

25  documents if that's what I thought I needed for you.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          191

1  But --

2      Q.  Instead --

3      A.  -- to my satisfaction -- I did the research;

4  and to my satisfaction, this bio checks out.

5      Q.  Let's talk about what satisfied you, which is

6  apparently a screen shot that you cannot identify where

7  it came from, printed an article by Dr. Eowyn who

8  did you -- who -- first of all, that's -- let me pull

9  this question back.

10         Did you know Dr. Eowyn wrote Chapter 2 of Jim

11  Fetzer's book, "Nobody Died at Sandy Hook"?  Did you

12  know that?

13     A.  No.

14     Q.  Okay.  Do you know what Fellowship of the Minds

15  is?

16     A.  No.

17     Q.  Okay.  Go to the last page of your article

18  there.

19     A.  (Witness complies.)

20     Q.  Do you see -- actually, the second to the last

21  page.  You'll see the very end of the article.

22         Do you see where it says who Dr. Eowyn is?

23     A.  Yes.

24     Q.  Who does it identify him as?

25     A.  The editor of Fellowship of the Minds.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          192

1     Q.  Okay.  Do you know about Mr. Fetzer being

2  involved in Fellowship of the Minds?

3     A.  No.  That has no real relevance to why I

4  brought this article.

5     Q.  Right.

6        So in other words, just like in normal InfoWars

7  practice, if you find the information you're looking

8  for, you don't really care where it came from, right?

9        MR. REEVES:  Objection; form.

10     A.  No, that's not true.

11     Q.  (By Mr. Bankston)  So you -- but you don't care

12  who this person -- author is, do you?  You didn't care

13  to find out.

14     A.  I -- the value of this article isn't the

15  opinion of the writer.  The writer has included the bio

16  that was taken from another source.

17     Q.  Which we have no idea what it is.

18        So wouldn't you say --

19     A.  If it's been memory-holed, we can't find it.

20  The official -- official Wolfgang Halbig's website is no

21  longer.  I'm sure it was there.  It was posted there at

22  some point.

23     Q.  Yeah, I'm sure Wolfgang Halbig has said a lot

24  of things about his credentials.  Do you think they're

25  all true?  Do you think Wolfgang Halbig is a reliable

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        193

1  source about his own credentials?

2      A.  I'm not responsible for making sure that the

3   claims for our guests are all accurate.

4      Q.  Thank you.

5      A.  They're responsible for providing their bios.

6      Q.  Thank you.

7         Let's look at --

8            (Discussion off the record)

9      Q.  (By Mr. Bankston)  One thing you can agree is

10   that Free Speech Systems helped Mr. Halbig raise money,

11   correct?

12     A.  I don't have any record of that.

13     Q.  Do you know if there are any documents produced

14   in this case like that?  Have you -- let me pull that

15   back.

16         Have you seen documents in this case relating

17   to whether or not InfoWars helped fund Mr. Halbig?

18     A.  Not that I can recall off the top of my head.

19     Q.  Okay.

20            (Discussion off the record)

21     Q.  (By Mr. Bankston)  At some point there was a

22   discussion inside InfoWars.  I don't know who had it,

23   but I'm going to go ahead and assume there was a

24   discussion inside InfoWars about whether we should be

25   using info -- Wolfgang Halbig as a source.  Do you

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      194


1   acknowledge that?

2            MR. REEVES:  Objection; form.

3      Q.  (By Mr. Bankston)  Or did that discussion never

4  happen?

5      A.  Yes.  Later -- years later there were questions

6  that arose about the cred -- the credibility of Halbig.

7      Q.  When?

8      A.  I don't have the exact date for that.

9      Q.  Well, look.  Here's the thing.

10      A.  Over the years things have come up that.

11      Q.  What kind of things?

12      A.  I don't have the exact things for you.

13      Q.  Okay.  So you're able to -- you brought me from

14  Fellowship of the Minds and the guy who wrote "Nobody

15  Died At Sandy Hook," you brought me a bio.  But in terms

16  of -- in terms of what facts y'all came up with that

17  were bad against topic, you can't point me to any of

18  those, right?

19      A.  At the time we had no reason to believe that

20  Mr. Halbig wasn't who he said he was in his bio.  His

21  bio was not being questioned by anybody out there.

22      Q.  The company -- for instance, let's put it this

23  way, right?  Wolfgang gives you his bio.  It looks

24  pretty good.  You go with it.  But what if somebody --

25  if somebody had come to the company and said, hey, watch

       UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      195


1  out, y'all really need to look out for Wolfgang Halbig

2  and his credentials, I don't think they are what he says

3  they are, I think you should doubt them, if the company

4  got a message like that, would it have done its due

5   diligence and tried to figure out if Mr. Halbig was

6   really qualified?

7        MR. REEVES:  Objection; form.

8     A.  Hypothetical?

9     Q.  (By Mr. Bankston)  Sure.

10    A.  Yes.

11    Q.  Yes.  Okay.

12        But because that didn't happen, the -- you're

13   testimony is here today the company had no reason to go

14   double-check Wolfgang Halbig's credentials.

15    A.  Well, no.  You're talking about after the fact.

16   When Wolfgang Halbig was a guest on the show, he

17   provided his credentials.

18    Q.  Right.

19    A.  There was nobody at the time who was coming out

20   and saying do not have this guest on.

21    Q.  Right, right.

22        So in other words your testimony is in the

23   absence of anybody doing that, right, InfoWars really

24   didn't have a reason to go double-check his credentials,

25   right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       196

1     A.  The company's general guideline for a producer

2   is to spot-check the biography.

3        (Discussion off the record)

4        MR. BANKSTON:  Brad, just so I don't have

5   to slow down, can I just confer with you on this

6  document?

7        MR. REEVES:  Sure.

8        MR. BANKSTON:  Okay.  So we have a document

9  here, and we don't have the second page.  But that's the

10  second page.  And I can print that little part out or I

11  can just read it to her and we can agree to put that in

12  a second.  I don't know what you want to do.  I can take

13  a break and print it ou.

14        MR. REEVES:  How about if -- will you

15  show --

16        MR. BANKSTON:  Yeah, yeah.  I'm going to

17  show it to her.  I'm just going to give her my computer.

18  Exactly.

19        MR. REEVES:  Read it to her and show her --

20        MR. BANKSTON:  In other words the document

21  that I'm going to show her is just a computer copy.

22        MR. REEVES:  Yeah, that's fine.

23        MR. BANKSTON:  Okay.  Alright.  I'm going

24  to go ahead and mark this?

25        (Discussion off the record)

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      197


1    Q.  (By Mr. Bankston)  Okay.  I'm going to give you

2  this for the stack, but I'm actually going to show it to

3  you by PDF.  Okay?  And the reason I'm going to show it

4  to you by PDF is because it cuts off.  Alright?  And it

5  has this little part right here.  So what I'm going to

6  do for you is I'm first just going to bring this up,

7  okay, so you can see the last part.  Okay?

8     A.  Okay.

9         (Exhibit 17 introduced)

10    Q.  (By Mr. Bankston)  Alright.  And that's what's

11  on that page.  Alright?

12        And so I want to read this together, the second

13  page of Exhibit 17 for you.  And you'll notice we'll

14  have to scroll up to see who wrote it, right?

15        You don't know who Robert Heath is, right?

16    A.  Say it again.

17    Q.  You don't know who Robert Heath is I would take

18  it?

19    A.  No.

20    Q.  Okay.  But he's writing to the writers at

21  infowars.com?

22    A.  Yes.

23    Q.  The subject is Wolfgang Halbig?

24    A.  Yes.

25    Q.  The date is March 14, 2014?

      UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      198


1     A.  Yes.

2     Q.  Okay.  Down here at the bottom we see this

3   document is marked FSSTX-040803, correct?

4     A.  Yes.

5     Q.  Okay.  Mr. Heath writes:  Dear Sir or Madam,

6   You would be well advised to check Wolfgang Halbig's

7   credentials.  Best wishes, Robert Heath.

8         I read that correctly?

9     A.  Yes.

10     Q.  Okay.  Now, I'm going to give you this.  This

11  is the remainder of the document.  Okay?

12          The person who replies back is Adan, correct?

13     A.  Yes.

14     Q.  Adan Salazar is a writer at Sandy Hook -- I

15  mean at -- excuse me.  Adan Salazar is a writer at

16  InfoWars, correct?

17     A.  Yes.

18     Q.  Adan Salazar has worked on Sandy Hook coverage

19  for InfoWars, correct?

20     A.  Yes.

21     Q.  Okay.  Adan Salazar writes and says:  Robert,

22  thanks.  But what on Earth do you mean?  The guy

23  seemingly has credentials up the wazoo.  Your email is

24  much to vague to follow up on.  Thanks, Adan.

25          Did I read that correctly?

      UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      199


1     A.  Yes.

2     Q.  Okay.  I'm going to read this next part of the

3  email.  And it says:  Dear Adnan -- and he's got his

4  name wrong, right?

5     A.  Right.

6     Q.  Okay.  And he says:  Thank you very much for

7  your attention and reply.  Yes, he "seemingly" has many

8  credentials.  But do you know that from any other source

9  than he himself?  I really hope he's genuine and that

10  I'm just being paranoid and wasting your time.  But have

11  you tried looking him up in Google as I have?  I don't

12  know, but doubt whether hat it would make a difference

13  that I'm in the UK.  But I use Google as worldwide.  I

14  find no trace of him except in connection with his

15  current activities on Sandy Hook.  For example, I cannot

16  find him on the list that exists of expert witnesses of

17  which he has categorically stated he was one concerning

18  Columbine.  I cannot find any reference to him prior to

19  2012 as a school safety expert or as a school principal.

20  As a comparison, all the teachers or head teachers and

21  principals that I know can easily find prior to 2012,

22  the same for a sample of the professionals I know.  I

23  tried the same sort of search for random people I do

24  know who have a much lower profile CV than Halbig and

25  get many results for them.  As you know, if one is, for

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       200

1  example, on a committee, no matter how small or local

2  and the meetings of a meet -- and the minutes of

3  a meeting are online, you'll find your name very quickly

4  on a simple name search, especially if it is an

5  uncommon.  I can't find a trace of him.  And he has an

6  unusual name, which should make it easier.  I will look

7  again now and spend more time and try to be more

8  resourceful in finding him in any context prior to 2012.

9  If he was using a pseudonym that could explain it.  But

10  why would someone looking for transparency do that.

11  What if he drags everybody along the line of "no

12  deaths," which Alex rightly didn't commit to.  Would not

13  all the questions and doubts be illustrated to the

14  public as just another crazy conspiracy theory if it was

15  exposed that definitely there were, in fact, deaths and

16  that Halbig was a con man?  Again, sorry to waste your

17  time if I have.  I will look again.  Best wishes,

18  Robert.

19      I've read that correctly?

20   A.  Yes.

21   Q.  Okay.  And from what we can tell here from this

22  email, this appears bio -- you have no reason to dispute

23  that this is a genuine and accurate email that came from

24  InfoWars' files, right?

25   A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      201

1    Q.  Okay.  Do you know if he was an expert of

2  Columbine?  Do you know if that's a lie or not?

3    A.  I don't know.

4    Q.  Okay.

5    A.  Is there a follow-up from Adan?

6    Q.  I don't know.  I don't know.  I will answer

7  you -- I told you I wouldn't answer questions for you

8  today.  I'll answer you that one.  I don't know.  I'd

9  love to know.  Don't know.

10      During the time that InfoWars was relying on

11  Wolfgang Halbig -- that's actually -- let's establish

12  that time period if you wouldn't mind.  We understand

13  that Wolf -- claims made by Wolfgang Halbig were being

14  published on InfoWars in 2014, correct?

15      A.  Yes.

16      Q.  Claims made by Wolfgang Halbig were being

17  published on InfoWars in 2015, correct?

18      A.  Yes.

19      Q.  2016, correct?

20      A.  (No response.)

21      Q.  It's what you told me about that final

22  statement video, right?  Remember we talked about that

23  earlier?

24      A.  Yes.

25      Q.  Okay.  2017, right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        202


1      A.  Uh-huh.

2      Q.  "Sandy Hook Vampires Exposed," correct?

3      A.  Yes.

4      Q.  Halbig stuff in there.

5          So during the time 2014 to 2017, when InfoWars

6  was publishing Wolfgang Halbig's claims, InfoWars had

7  received information that Halbig was directly harassing

8  the victims of the tragedy, correct?

9          MR. REEVES:  Objection; form.

10      A.  Is there a document that you're referring to?

11      Q.  (By Mr. Bankston)  I want to know what you know

12  about it.

13          Do you know if the company was aware that

14  Wolfgang Halbig was harassing people -- directly

15  harassing people anywhere between 2014 and 2017?

16    A.  No.

17    Q.  You don't know, right?  Okay.

18        (Exhibit 18 introduced)

19    Q.  (By Mr. Bankston)  I want to show you what I

20  have marked as Exhibit 18.  Do you see at the bottom of

21  that page there is a Bates number that says

22  FSSTX-039550, correct?

23    A.  Yes.

24    Q.  Alright.  Now, we can see this is an email from

25  Wolfgang Halbig, right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT     203

1    A.  Yes.

2    Q.  Okay.  Do you know why InfoWars has this email?

3    A.  May I read the email?

4    Q.  Yeah, go ahead and read the whole email and

5  we'll talk about it.

6    A.  Okay.

7    Q.  Okay.  So first of all, how do you -- how does

8  the company feel about this email?

9        MR. REEVES:  Objection; form.

10        MR. BANKSTON:  What's your objection?

11        MR. REEVES:  Vague.  How does the company

12  feel?  A company has feelings?

13        MR. BANKSTON:  Sure.  How does it feel?  No

14  problem.  That's good.

15    Q.  (By Mr. Bankston)  Yeah, how does the company

16  feel about this email?

17    A.  Mr. Halbig is asking -- it seems to be concern

18  for the well-being of this child.

19    Q.  Thank you, Ms. Karpova.

20        Let me actually -- I want to read this email

21  into the record so we can talk about it.  Okay.

22        Mr. Halbig writes:  Michelle, How could you and

23  your husband as responsible parents even allow your

24  precious child Josephine to attend that filthy and

25  deplorable looking school on December 14, 2012?  The

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        204


1  school, as you must know, is and was a toxic waste dump

2  as reported by the environmental consultants who

3  requested more money from city of Newtown leaders for

4  demolishing the school and transporting all the high

5  levels of lead paint, high levels asbestos and

6  especially the high levels of PCPs and the ground water

7  at Sandy Hook out of state.  Josephine, your child

8  should have expected more from you before that tragic

9  day as a parent.  You were supposed to protect her from

10  serious lifelong health risks when you send her to that

11  school every day.  Why would you as a parent and all

12  those other parents who supposedly lost a child to gun

13  fire allow their children as you did to serious toxic

14  waste.  This all unfolded before the first shot at that

15  school even occurred.  Did you not see the filth and

16  deplorable conditions when you went to that school, or

17  are you blind?  I do not understand unless you explain

18  it to me and the world why you and your husband failed

19  Josephine, who is a nonverbal child as you stated and

20  depended on you for her safety. She needed you to

21  protect her from all the serious health risks that you

22  sentenced her to on a daily basis. Now you talk about

23  school security. You have got to be joking. You have

24  all these experts on your staff who are now part of your

25  conspiracy. They should be ashamed of their actions in

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        205

1  supporting you. A mom puts her own child at risk on a

2  daily basis now the -- is now the expert on school

3  security? I look forward to meeting you one day when I

4  can take your deposition, not about the shooting, but

5  why you and your husband failed Josephine by sending her

6  to the filthy and deplorable school with all that toxic

7  waste. We call this child endangerment when you know of

8  the danger that you expose your child to serious

9  lifelong risks. We must -- you must know -- have known

10  without a doubt because the pictures do not L-I, which I

11  assume is lie. You put her life in serious risk every

12  day knowing how filthy and deplorable that school is. I

13  am enclosing photos that you must recognize since you

14  took your child to school. And having a child in

15  special needs, you would expect a school environment and

16  school climate that allows children to learn and

17  teachers to tech, which I believe is teach, right?

18  Please explain to me, if you can, why a school

19  principal, Don Hochspring [sic], would allow her school

20  to be so filthy and deplorable looking.  There is not

21  one female elementary school principal in the country

22  that would allow her school to be that filthy and

23  deplorable both inside and outside and most of all allow

24  her school to become a toxic waste dump, placing every

25  child and their school staff in serious lifelong health

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        206

1  risk, right?  All the pictures are taken by the major

2  crime squad from the Connecticut State Police.  Please

3  respond since you are now the expert on school security.

4  Wolfgang W. Halbig, www.sandyhookjustice.com.

5        I read that correctly?

6      A.  That's one of the interpretations?  I mean, the

7  inflections that you put on the email could be read in a

8  completely entirely different way.

9      Q.  A lot of different ways, right?

10     A.  Right.

11            (Discussion off the record)

12            (Exhibit 19 introduced)

13     Q.  (By Mr. Bankston)  Ma'am, I've put in front of

14  you what I've marked as Exhibit 19.  We're going to read

15  that together.

16        Do you see at the bottom it says FSXTX [sic]

17  dash 051348?

18     A.  Yes.

19     Q.  Okay.  So I'm going to go from the top here.

20        This is an email from Wolfgang Halbig, correct?

21    A.  Correct.

22    Q.  And it's to a lot of people, right?

23    A.  Yes.

24    Q.  Okay.  Do you see -- and I may have to try to

25  help you point on my document.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        207

1        Do you see about right in here, do you see some

2  InfoWars email addresses?

3    A.  Yes.

4    Q.  Do you see where it says Nico --

5    A.  Yes.

6    Q.  -- and all that?  Yeah.  Okay.

7        Now, I want to go to the date -- well, actually

8  let's talk about the subject line.  It says:  Anyone

9  needing the addresses for a visit to welcome them to

10  Florida, please call.  And this was a great day for me.

11  Who says that you cannot catch a big fish in Florida?

12        I read that correctly?

13    A.  The words are correct.

14    Q.  Okay.  The date is March 21, 2017, correct?

15    A.  Yes.

16    Q.  This is one month before InfoWars aired the

17  April 22, 2017 video "Sandy Hook Vampires Exposed,"

18  correct?

19    A.  Correct.

20    Q.  And that's the video we just talked about that

21  airs claims by Wolfgang Halbig, correct?

22    A.  Yes.

23    Q.  Okay.  So I'm going to read you this email, and

24  we'll read along together.  Let me try to be little more

25  flat in my affect too.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        208


1        Nick and Laura Phelps did a great job acting in

2  Newtown, Connecticut on December 14, 2012.  I visited

3  their home today at 1924 Westover Reserve Boulevard,

4  Windermere, Florida, 34786, thanks to Lieutenant

5  Vangehle telling me during my wellness check of Nick and

6  Laura Phelps, that they no longer live in Newton,

7  Connecticut and they are now Richard and Jennifer

8  Sexton.  Guess what?  He is totally right.  And can you

9  believe it, that my Newton Police Department guided me

10  in the right direction.  They have a beautiful home with

11  a three-car garage.  They were not home today, but the

12  good news was that the three adult females, moms with

13  their children standing outside their homes, observed me

14  and wanted to know what I was doing.  It is spring break

15  for Orange County Florida school children.  I showed

16  them this picture and told them that I did not want to

17  go to the wrong house to surprise Nick and Laura from

18  Newton, Connecticut, a/k/a Richard and Jennifer Sexton,

19  today.  It took a few minutes for them to look at the

20  pictures, and then they asked why I wanted to speak to

21  them.  I told them that I have been in Newton and wanted

22  to surprise them since they now live in Florida.  They

23  asked for my name, which I gave them as Wolfgang W.

24  Halbig.  They told me how I knew them, and I told them

25  that they had been on the national news and so I wanted

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      209

1  to meet them again.  Our conversation was all about

2  Newton, Connecticut.  So she said do you mind if I text

3  her.  I said absolutely not.  I waited about 10 minutes

4  only to learn that they did not know me, which surprised

5  me.  They verified the pictures and why she would text

6  them about Newtown, Connecticut and that someone from

7  there wanted to visit if they were not -- if they

8  were -- if they where not Nick and Laura Phelps, now

9  Richard and Jennifer Sexton.  At first I did not want to

10  enter since it is a gated community, but several people

11  told me just to go on in there, is no security guard at

12  the gates.  If there is CCTV, they will see me being

13  told to go in, and that is the only reason or I would

14  have not entered -- or I would not have entered.  Now

15  who says that law enforcement does not know what they

16  are doing?  Thank you, Connecticut Police Department.

17        Have I read that accurately?

18    A.  The words, yes.

19    Q.  Okay.  Can you -- was that -- can you give me

20  some guidance on how I should do the inflection for the

21  future?

22        A.  Just regular text.  Not pretending to be some

23  kind of movie character or a 13-year-old teenager

24  arguing with his brother.

25    Q.  Okay.  I tried to do it as robotically as

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          210

1  possible.

2      A.  Not robotically, just real (cross-talk)

3  conversation.

4      Q.  Okay.

5      A.  I can read it for you if you want me to.

6      Q.  No, that's okay.  I want you to flip the

7  page over.  Do you see that?

8      A.  Yes.

9      Q.  Read that part for me, the big white part at

10  the top.

11      A.  Sandy Hook hoax actors.

12      Q.  What does it say at the bottom?

13      A.  Playing the part of the grief stricken parents.

14      Q.  How does the company feel about this email?

15      A.  I have no feelings on this email.  Wolfgang

16  Halbig did his own investigation.

17      Q.  That email doesn't creep you out, you

18  personally?

19          MR. REEVES:  Objection; form.

20      A.  It creeps me out the way you're reading it,

21  yes.

22      Q.  (By Mr. Bankston)  It doesn't creep you out to

23  have Wolfgang Halbig showing up at these people's houses

24  and describing their three-car garage and all that

25  stuff, accusing them of being people they're not

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          211

1  actually are?  That doesn't -- that doesn't have any --

2  don't have any strong feelings one way or the other on

3  that?

4        MR. REEVES:  Objection; form.

5     A. (No response.)

6     Q. (By Mr. Bankston)  Correct?

7     A. Are you asking my personal opinion?

8     Q. Yeah, your personal opinion.

9     A. It strikes me as an impassioned man who is

10  doing an investigation of something he believes in his

11  own heart and he wants to get to the bottom of.

12    Q. Thank you, Ms. Karpova.

13        (Discussion off the record)

14        (Exhibit 20 introduced)

15    Q. (By Mr. Bankston)  I'm going to throw you in

16  front of -- put this document I'm putting in front of

17  you now I'm marking at Exhibit 20.  Let me see if I can

18  read this one any better.  We're looking at Free Speech

19  Systems Texas-053016.  Is that correct?

20    A. Yes.

21    Q. It's written by Wolfgang Halbig?

22    A. Yes.

23    Q. Okay.  The first person it is to is to Lenny

24  Pozner?

25    A. Yes.

   UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      212


1     Q. Okay.  I'm going to read you this email.

2        Actually, let's -- if you'd flip the page for

3  me.

4        A.  (Witness complies.)

5        Q.  And do you see how there's some more from

6  Wolfgang Halbig right there?

7        A.  Yes.

8        Q.  Okay.  So I want you to flip back and you'll

9  see at the bottom email it says from Wolfgang Halbig.

10       A.  Yes.

11       Q.  And again, there's a bunch of other people he's

12  sending this to?

13       A.  Yes.

14       Q.  Okay.  And then if we flip over onto the back,

15  I can read this.  Okay?

16            And the subject says:  Forward, clear no wires

17  helicopter view.

18       A.  Yes.

19       Q.  The email says the shadow shows an 11:45 a.m.

20  time period, just do not know the date, question mark?

21       A.  Yes.

22       Q.  And then it says flag at half mask, who ordered

23  that, question mark?

24       A.  Yes.

25       Q.  Only the governor can do that and he has not

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        213


1  even addressed the national news media, correct?

2        A.  Yes.

3     Q.  Okay.  Turn the email over.

4         Do you see there's another email from Lenny

5  Pozner right after that?

6     A.  Yes.

7     Q.  I'm going to go ahead and do inflection on this

8  because he's my client and I know he said this when he

9  said it.  It says can you please go fishing or play

10  bingo?

11        That's what it says on the page?

12     A.  Yes.

13     Q.  Okay.  And the next email it says:  Pozner, I

14  love this picture, don't you?  This is not December 14,

15  2012.  So what date did they practice for killing 20

16  children and 6 school staff members?  Practice makes

17  perfect they say.  What is the name of the police

18  officer who shot all those people inside the school on

19  December 14, 2012?  Dr. Wayne Carver has already been

20  onsite, so was Manfradonia, who was arrested that day

21  and let go.  No yellow warning tape on that huge

22  sinkhole.  And when Rosen gets interviewed on that

23  December 14, 2012, there is a yellow emergency tape

24  around the sink hole.  Only television magic can make

25  that happen.  Wolfgang.

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      214


1         I read that email correctly?

2     A.  Yes.

3     Q.  This is something that InfoWars had in its

4  corporate files, correct?

5    A.  Yes.

6    Q.  And, in fact, if you look at the last email

7  address at the top of the page, it says

8  robd@infowars.com, correct?

9    A.  Yes.

10    Q.  One of the other emails you'll see in the last

11  line of the to list is npattis@pattislaw.com, correct?

12  On the to line at the top of the page, the last line of

13  the to line.  Do you see npattis@pattislaw.com?

14    A.  Yes.

15    Q.  That's the company's lawyer, correct?

16    A.  Yes.

17    Q.  Was that the company's lawyer at the time?

18    A.  I don't know.

19    Q.  Okay.

20        (Discussion off the record)

21    Q.  (By Mr. Bankston)  So I'm --

22    A.  I can -- I just want to clarify.  These kinds

23  of emails that are being sent to people is something

24  that Halbig sends on a regular basis and they are not

25  read by people or staff.

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        215


1    Q.  Okay.  So the source that you were relying on

2  a month later, the emails he's sending to the company,

3  were ignored, correct?

4    A.  Well, we have a lot of emails.  But in the ones

5  that have this many addresses in the to lines and cc

6  usually go to spam.  So they're not even noticed.

7      Q.  You don't know that that went to spam.  You

8  don't know that, right?

9      A.  I know that these types of emails go to spam.

10  They were -- they weren't addressed to just one specific

11  person.

12      Q.  So if I have an email with all those to's on it

13  and it's replied to by InfoWars people, that would be

14  kind of inconsistent with that, wouldn't it?

15      A.  If they were replied to by an InfoWars person,

16  yes, but this person isn't replied to by an InfoWars

17  person.

18      Q.  Right.

19          But we know they're not going to spam because

20  y'all regularly communicate with Wolfgang Halbig when he

21  does this, right?  Do you agree with it or do you not

22  agree with that?

23      A.  No, because the email that is responded to is

24  addressed to specific people.

25      Q.  I'm not asking about that email.  I'm asking

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        216


1  when InfoWars communicates as regularly communicated

2  with Wolfgang Halbig on emails that copy a ton of people

3  like that.  That's something that's happened quite a bit

4  at InfoWars, correct?

5      A.  I haven't seen that.

6      Q.  Okay.  So in terms of trying to get acquainted

7  with the documents that the company has produced today,

8  you didn't see any of those documents, right?

9     A.  InfoWars personnel -- a specific person from

10  InfoWars is responding to a mass email like this.

11     Q.  Uh-huh.

12     A.  I do not seeing that.

13     Q.  Okay.  Let's talk about really quick -- oh,

14  man, there it is.

15        MR. BANKSTON:  Can you tell me how much

16  time we've used?

17        THE VIDEOGRAPHER:  Yeah, one second.

18        A little over 4 hours.

19        MR. BANKSTON:  Okay.

20     Q.  (By Mr. Bankston)  Okay.  One of the things

21  you're supposed to testify today about is the company's

22  knowledge of the plaintiffs, correct?

23     A.  Yes.

24     Q.  Okay.  The company knew about Leonard Pozner

25  within weeks of the shooting, correct?  Let's go through

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        217


1  it.  Withdraw the question.  Back up.

2        Have you seen the email Leonard Pozner wrote to

3  the company weeks after the shooting?  Have you seen it?

4     A.  I don't have the recollection of it.

5     Q.  So in terms of trying to get up to speed on the

6  company's knowledge of the plaintiffs in terms of

7  complaints that Leonard Pozner may have made to

8  InfoWars, you haven't seen those, have you?

9    A.  I haven't seen the email you're talking about.

10    Q.  Right.  Yeah.

11        You know that both Paul Watson and Alex Jones,

12 like, worked on responses to send to Leonard Pozner?

13 Have you seen those?

14    A.  I've seen, like I said, a lot of documents.

15    Q.  I'm not asking you --

16    A.  (Cross-talk.)

17    Q.  So that what I'm asking you.

18        When you got prepared to talk to me about the

19 company's knowledge of the plaintiffs, you haven't even

20 seen the correspondence that InfoWars has had with that

21 plaintiff, right?

22    A.  I have not.

23    Q.  You don't deny Mr. Pozner complained to

24 InfoWars about its coverage within weeks of the

25 shooting, right?  You do acknowledge that.  The company

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      218

1 acknowledges that.  The company has that knowledge.  Or

2 do you not know if the company has that knowledge?

3    A.  I don't have specific dates of his complaints.

4    Q.  So you can't tell me today if in 2013 the

5 company knew who Leonard Pozner was.  You can't tell me

6 that.

7    A.  The company had knowledge of Lenny Pozner, yes.

8    Q.  I want to show you something.

9        You understand that the company produced

10 documents from its own corporate files, right?

11    A.  Yes.

12    Q.  Okay.  And you understand that some of those

13  document requests asked for documents about my clients,

14  right?

15    A.  Yes.

16    Q.  Do you know who my clients are?  Can you name

17  them?  I have four clients.  Do you know who they are?

18  Yeah, it's on the notice.  I know -- from memory, you

19  don't.  You've got to pull this up, right?

20    A.  Yes.

21    Q.  Okay.  So now you can see it, right?  It's on

22  that.  Okay.

23        So you understand that InfoWars produced

24  documents about each of those four clients.

25    A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        219


1    Q.  Are you generally familiar with what documents

2  they produced as it relates specifically to those four

3  clients or what InfoWars' knowledge is?  It's not a lot.

4    A.  Yes.

5    Q.  Okay.  Do you see --

6    A.  Cursory knowledge of Leonard Pozner and no

7  knowledge of the other people.

8    Q.  Okay.  So you do know that documents were

9  produced that relate to Leonard Pozner.  I was given

10  specific documents that relate specifically to Leonard

11  Pozner.  Do you understand that?

12    A.  I don't have a list of specific documents for

13  you right now, yes.

14    Q.  Okay.  Actually, when I say InfoWars produced

15  documents, that's not accurate.  InfoWars produced a

16  document to me very, very recently --

17    A.  Okay.

18    Q.  -- okay, about Leonard Pozner.

19        Have you ever seen that?  Have you seen that

20  before today?

21    A.  No, I have not.

22    Q.  Okay.  So in terms of the document, a single

23  document that was recently produced to me about Leonard

24  Pozner, you've never seen.

25    A.  If this is the single document you're talking

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        220


1  about.

2    Q.  That's it.  Uh-huh.

3    A.  No.

4    Q.  Okay.  Do you see where it says FSXTX [sic]

5  dash 8085544?

6    A.  Yes.

7    Q.  Okay.  You don't know what this is, do you?  If

8  I wanted to ask you what is this, you couldn't tell me.

9    A.  It looks like a background information.

10    Q.  Right.  I mean, I can figure that out, right?

11  Like, we can look at the top at the table of contents

12  right here, and it says for license investigator

13  purposes only.  Do you see where it says that?

14      A.  Yes.

15      Q.  And then do you see where it says Leonard

16  Pozner comprehensive report?

17      A.  Yes.

18      Q.  Do you see where it has all these entries about

19  all this information about Leonard Pozner?

20      A.  Yes.

21      Q.  This is a lot of knowledge that the company has

22  in its possession concerning Leonard Pozner.  You'd

23  agree with that?

24      A.  Yes.

25      Q.  And some of the information that the company

        UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        221


1  has about Leonard Pozner in its knowledge include his

2  possible relatives, right?  Do you see that down near

3  the bottom of the list?

4      A.  Yes.

5      Q.  And possible likely associates and possible

6  associates, right?

7      A.  Yes.

8      Q.  Okay.  And, like, for instance, if we go to --

9  do you see where it says page 66 for possible relatives?

10  Can you flip to page 66 in that document for me?

11      A.  (Witness complies.)

12      Q.  This is a bunch of people's personal

13  information, isn't it?

14      A.  Yes.

15     Q.  And you can't tell me why the company has this,

16  can you?

17     A.  I don't know.

18     Q.  So when it comes to testifying about the

19  company's knowledge of Leonard Pozner, which you can now

20  see, it is extremely extensive, you're not prepared to

21  testify about that today, right?

22         MR. REEVES:  Objection; form.

23     A.  Well, the company was asked for the knowledge

24  of the plaintiffs.

25     Q.  (By Mr. Bankston)  Uh-huh.  Lenny Pozner is a

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        222

1  plaintiff, right?

2     A.  This is what they produced about the knowledge

3  of the plaintiff.

4     Q.  Right.  I understand that.  I asked for a

5  request for production of documents.  Then I asked for

6  your testimony.  Part of the reason I asked for your

7  testimony and the knowledge of the plaintiffs is because

8  you produced to me -- your company produced to me

9  187 comprehensive background report on Leonard Pozner

10  and I wanted to know why.  And I wanted to ask questions

11  about that document.  I wanted to know what was inside

12  of it.  I wanted to know the information that the

13  company had and what they did with it.  You can't answer

14  any of that, can you?

15     A.  Well, this is -- just looks like a typical,

16  like, investigation report done on a person.

17     Q.  You have no idea where it comes from, do you,

18  Ms. Karpova?  None, right?

19     A.  This is a document that you were provided by

20  the company.

21     Q.  Yeah.

22        Where did the company get it?  Do you know?

23     A.  (No response.)

24     Q.  So -- so you don't know, correct?

25     A.  Are you talking about specific people?  No.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT     223


1   I --

2     Q.  You have no -- let's make this really clear.

3        You have zero knowledge about this document,

4  none whatsoever, correct?

5     A.  Not other than it's being an investigation

6  report on Leonard Pozner.

7     Q.  Which you have seen now --

8     A.  Back -- background -- background information.

9     Q.  Which you have now seen for the very first

10  time, correct?

11     A.  Yes.

12     Q.  Okay.  What about Scarlett Lewis, do you know

13  what the company has in terms of information about

14  Scarlett Lewis?

15     A.  No.

16     Q.  Do you know what information the company has

17  about Neil Heslin?

18      A.  No.

19      Q.  Do you know what information it has about

20  Veronique De La Rosa?

21      A.  No.

22      Q.  Okay.  And let me make sure I'm clear about

23  this.  When you say you, that's you personally, Daria

24  Karpova don't know.  So in other words the answer to the

25  question on the company is you Daria Karpova don't know

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      224


1  what information the company has on any of those people.

2      A.  No, the company doesn't have information on any

3  of those people, other than the documents that have been

4  provided to you.

5      Q.  Okay.  So that's what I'm asking you.  What

6  does the company know?  Do you know what the company

7  knows about Ver --

8      A.  This is the document that was provided for

9  you -- to you.

10      Q.  Okay.  That was provided to me in response to

11  requests for Leonard Pozner.

12      A.  Right.

13      Q.  I'm asking you about Neil Heslin?

14      A.  No other information on other plaintiffs, the

15  company does not have.

16      Q.  Are you sitting here and telling me today the

17  company hasn't produced documents on those folks?

18      A.  No, the company has no knowledge.

19      Q.  Really?  Okay.

20          So InfoWars' employees weren't researching

21    materials about Mr. Heslin?

22      A.  There are -- there's no records of any

23    employees researching things like that that --

24      Q.  Yeah, there are.  Unfortunately for you,

25    Ms. Karpova, there definitely are.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      225

1          Let's just -- I'm moving off of this topic

2    because there's -- obviously nothing is going to be

3    accomplished here and we're running out of time.

4          What did you do to determine the total

5    audience reach of the videos in plaintiffs' petition?

6    What did you do?

7      A.  There's -- there's no way of finding out the

8    total reach of the audience because the YouTube channel

9    was deplatformed, as well as other media that the videos

10    could have been posted on.  We have a view count on

11    videos on banned.video.  But that just tells you how

12    many times the vide was watched, how many people watched

13    it.  In terms of videos being shared by other people,

14    there's no -- there's no way of figuring out what the

15    reach for that is.

16      Q.  How many -- InfoWars is currently broadcast on

17    over 200 radio stations, correct?

18      A.  Around there.

19      Q.  Okay.  What did you do to go find out their

20    viewership and audience for those dates?

21    A.  There would be no information.

22    Q.  How do you know that?  Who did you ask?  Have

23  you gone to -- let me back this up.

24        How many of those radio stations did you make

25  requests to?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      226

1    A.  I didn't.

2    Q.  Okay.  Did you do anything to figure out what

3  those radio stations audienceship was at the time those

4  videos were broadcast?

5    A.  No.

6    Q.  Okay.  At the time of the videos described in

7  the plaintiffs' lawsuit, how many over-the-air

8  television stations from 2013 to 2018?

9    A.  I don't have the exact number.

10    Q.  So if I wanted to establish what the audience

11  reach was of over-the-air television broadcast of

12  InfoWars, you can't help me with that because you don't

13  even know how many there are in terms of over-the-air

14  television, right?

15    A.  Well, the topics asked for specific videos and

16  the reach of those videos.

17    Q.  Uh-huh.

18        And those videos were broadcast on over-the-air

19  television, right?

20    A.  I would say during -- well, not necessarily.

21  Some of the videos could have been posted as standalone

22  videos.

23    Q.  A lot of coulds in this room.  We don't know,

24  do we?  Right?

25        So we know -- one thing we do know is at least

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        227

1  some of them were broadcast over-the-air television,

2  right?

3    A.  Yes.

4    Q.  Okay.  You didn't -- there's no way for you to

5  tell me anything about that, is there?

6    A.  No.

7    Q.  You didn't do anything to try to figure that

8  out, did you?

9    A.  I did the best I could.

10    Q.  How many cable packages was InfoWars carried on

11  between 2013 to 2019?

12    A.  That wasn't part of the questions.  I could

13  have found -- found that information for you from an

14  affiliate relation person.

15    Q.  Part of InfoWars audience reach is the people

16  that it reaches over cable packages, right?

17        MR. REEVES:  Objection; form.

18    Q.  (By Mr. Bankston)  Isn't that true?

19    A.  That is a very specific question pertaining to

20  a department, a particular department that would need to

21  be --

22    Q.  And you didn't go do that?

23    A.  No.  That wasn't in the scope of the questions.

24     Q.  So in terms of the audience reach of these

25  videos that was reached on any cable packages, you don't

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT     228

1  have any information on that for me today?

2     A.  No.

3     Q.  Okay.  How many OTT service -- well, first of

4  all.  Do you know what an OTT service is?

5     A.  What is it?

6     Q.  Over-the-top.

7     A.  Okay.

8     Q.  Over-the-top box systems.

9     A.  Okay.

10     Q.  Like, I think one example might be, like, Roku.

11     A.  Okay.

12     Q.  That would be an example of an OTT system.

13         InfoWars has frequently promoted that it's on

14  multiple OTT systems, right?

15     A.  But the company would have no -- the company

16  would keep no track of those kinds of views.

17     Q.  But you don't know if that information is

18  accessible, do you?

19     A.  There's no information for me that.

20     Q.  Well, let's fist figure out the first thing

21  that I might need if I'm going to try to figure out the

22  audience reach was, which is how many OTT packages is

23  InfoWars included on?

24     A.  I would have to go back and check on that.

25     Q.  So in terms of the reach -- the audience reach

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          229

1  of the audience that was reached through those OTT

2  packages, InfoWars has no information to offer today.

3      A.  Correct.

4      Q.  Okay.  Zero Hedge is one of the sources for

5  company Sandy Hook information.

6      A.  Yes.

7      Q.  Okay.  You understand that in Neil Heslin's

8  defamation case, this court ordered InfoWars to respond

9  on to discovery about Zero Hedge.  Do you know that?

10     A.  Okay.

11     Q.  Okay.  Do you know that that discovery was

12  never responded to?

13     A.  Okay.

14     Q.  Okay.  So in terms of the documents produced by

15  the company and as far the plaintiffs' discovery

16  request, the company admits that it refused to answer

17  discovery about what -- about Zero Hedge.  That's true?

18     A.  Well, that means we have no documents for that.

19     Q.  I don't think that's what that means.  Alright?

20  And I think -- I think if you want to say that's what

21  that means, it would actually be answering the question

22  and saying we have no documents.

23         But you understand that InfoWars never answered

24  those requests.  Did you know that?

25             MR. REEVES:  Objection; form.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          230

1    Q.  (By Mr. Bankston)  Were you aware of that?

2    A.  The company did the best to provide all the

3  documents requested.  And we have provided hundreds of

4  thousands of pieces of documents.

5    Q.  So the best the company can do is -- you take

6  it that not answering the questions themselves is the

7  best the company can do?

8    A.  The company did their best.

9    Q.  The same deal with ibankcoin.com.  That's a

10  source for InfoWars Sandy Hook video, isn't it?

11    A.  Uh-huh.

12    Q.  Okay.

13    A.  Yes.

14    Q.  No discovery has ever been answered on

15  iBankCoin, right?

16    A.  The company doesn't have any information.

17    Q.  I highly doubt that, Mr. Karpova.

18       MR. REEVES:  Objection; form.

19    Q.  (By Mr. Bankston)  One of the articles that was

20  relied on for Owen Shroyer's video about Mr. Heslin in

21  June of 2017 is an iBankCoin article, right?

22    A.  Alex Jones, as well as Owen, who does multiple

23  articles from websites.

24    Q.  And do you think there's nothing in InfoWars'

25  files relating to ibank.coin [sic]?  Is that your

   UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       231

1  testimony today?

2    A.  Define InfoWars' files.

3    Q.  Do you know what I mean when I say InfoWars'

4  files?  Do you not know what I mean -- is what --

5  InfoWars maintains files, right?

6    A.  Correct.

7    Q.  Right.  So it has documents.

8    A.  Emails.

9    Q.  Sure.

10    A.  Videos.

11    Q.  All sorts of things.  Pamphlets, star charts,

12  runes, block chains, diagrams, pictures.  All sorts of

13  things are at InfoWars' corporate files.  And there are

14  some in -- on ibankcoin.com in InfoWars' files, or are

15  you saying there's not?

16    A.  That were produced (indiscernible).

17    Q.  Okay.  You know who Dr. Wayne Carver is, right?

18    A.  The name sounds familiar.

19    Q.  Alright.  That's in -- also in Owen Shroyer's

20  video.  Did you watch Owen Shroyer's video about

21  Mr. Heslin?

22    A.  I have, yes.

23    Q.  Okay.  Is that one that you watched in the

24  break or did you watch that before?

25    A.  I've watched it before.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       232

1    Q.  Okay.  And Dr. Wayne Carver's a medical

2  examiner in Sandy Hook.  The company has documents on

3  him, doesn't it?

4      A.  All the documents that we have we have

5  produced.

6      Q.  You know Corey Skalanka is, right?

7      A.  No.

8      Q.  Okay.  Corey Skalanka is an associate of

9  Wolfgang Halbig who is a codefendant with InfoWars in

10  the Lafferty suit.  Does that refresh your memory on who

11  Corey Skalanka is now?

12      A.  No, not really.

13      Q.  Okay.  You would admit being a co-defendant

14  with Corey Skalanka in the Lafferty suit, the company

15  possesses documents about Corey Skalanka, correct?

16          MR. REEVES:  Objection; form.  Nothing to

17  do with the Texas cases here.

18          MR. BANKSTON:  It has to do with the

19  documents produced in response to our discovery request

20  and our discovery request for Corey Skalanka, which you

21  would know if you ever answered me.

22              I mean, Brad, this is the most

23  disrespectful deposition I've ever been in.  We've been

24  in two depositions where you presented the same -- your

25  company presented the same kind of deponent who didn't

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        233


1  know anything about what was being on these topics.  And

2  now for you to come in and to object to topics about I'm

3  asking about documents produced in my discovery request

4  and you tell me Corey Skalanka isn't responsive to this

5  case -- both of y'all need to get up to speed on what

6  this case is about.

7        MR. REEVES:  Excuse me.  First of all.  I

8  am objecting on the basis of you asking about the

9  Connecticut litigation.  I'm not ask -- I'm not saying

10  you have any -- I'm not objecting to you asking any

11  questions about your discovery requests.

12        Second of all, no one is trying to be

13  disrespectful here.  She's doing her best job.  And I

14  don't care whether you think she isn't or not, and I

15  don't really care what your personal opinions are on her

16  or not.  If you have a problem with it, which I'm sure

17  you -- you obviously do, you're going to try to do

18  something about it.

19        MR. BANKSTON:  And you know I'm going to,

20  Brad.

21        MR. REEVES:  And I -- and I want you to

22  maintain for the record that every one here has been

23  working as hard as they can to actually get you answers

24  that you want.  And I'm sorry that out of the hundreds

25  and thousands of pages of documents that you're asking

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      234


1  about specific ones that she doesn't have the exact

2  answer to.

3        MR. BANKSTON:  You haven't produced

4  hundreds of thousands of pages.

5        MR. REEVES:  Okay, man.  You know what?

6         MR. BANKSTON:  You haven't even answered

7  discovery, Brad.  So if you're going to sit here and

8  lecture me --

9         MR. REEVES:  I would like you to show me

10  the ones you're saying have not been responded to.

11         MR. BANKSTON:  What's that?

12         MR. REEVES:  Which ones are you saying have

13  not been responded to?

14         MR. BANKSTON:  You haven't responded to the

15  Pozner discovery in any shape or form.

16         MR. REEVES:  Have I been compelled by a

17  court order to actually respond to those documents?

18  Because I got defaulted, but I haven't actually seen a

19  motion to compel on it.

20         MR. BANKSTON:  Right.  And I'm proving all

21  that up right now.

22         MR. REEVES:  I understand that.  But I'm

23  unclear on if I'm defaulted on it and -- I'm unclear of

24  the obligations to actually supplement it.  But if

25  you -- if you to want to ask me to do that, then I'll do

   UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       235


1  that for you.

2         MR. BANKSTON:  I'm not asking that at all.

3  I'm asking her directly, that they haven't produced me

4  documents to my discovery request.  And I want them to

5  admit that they refuse to answer them.  And you've just

6  kept interrupting me about it.

7         MR. REEVES:  Okay.  Well, I'm sorry.  I

8   didn't mean to interrupt you.  I apologize.  That's not

9   my intent.  And I will --

10          Go ahead and answer the question to the

11  extent you can, please.

12      Q.  (By Mr. Bankston)  Alright.  The company does

13  possess documents about Corey Skalanka that would have

14  been responsive to plaintiffs' discovery request and

15  they refused to provide them, correct?

16      A.  That's not correct.  The company has provided

17  all the information they have.

18      Q.  That's --

19          MR. BANKSTON:  Brad, do you want to warn

20  your witness, or do you need to consult with her

21  outdoor -- outside or something?  Because that's --

22  that's not a true -- that's a false answer and I don't

23  want to get into that area.  I need an answers to this

24  question, and I -- that's, like, I don't know if you

25  want to go talk to her or something.  I'm trying to make

       UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        236


1   this easy for you.

2          MR. REEVES:  Let's take a minute and let me

3   confer with her and then come back to it.

4          MR. BANKSTON:  Tell you what.  Let's put

5   that question at the pin at the end because I really --

6   I wanted to get out of here at 5:30 for these people.

7   And I -- the latest we can stay is 6:00, and that's till

8   not going to give me enough time.  But let me get to the

9 rest of these questions.  And then if you-- let me have

10 you confer with her so I can ask her that question at

11 the end.

12     Q.  (By Mr. Bankston)  You're aware of a film that

13 the company hosted about Mr. Pozner called "We Need to

14 Talk About Sandy Hook"?  Do you know what that film is?

15     A.  No.

16     Q.  Okay.  Do you know who Independent Media

17 Solidarity Group is?

18     A.  No.

19     Q.  Okay.  The company is aware of other parents

20 who lost children at Sandy Hook besides my four clients,

21 correct?

22     A.  I don't have a document listing their names.

23     Q.  Right.

24         But you know there's other parents, right?

25     A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      237


1     Q.  Okay.  The company possesses documents about

2 some of those parents?

3     A.  Again, the answer's the same.  The company did

4 the best -- their best to provide the documents they had

5 in response to discovery.

6     Q.  So in terms of whether InfoWars has been

7 requested to produce documents about other parents than

8 the Pozner case, you wouldn't know whether those

9 documents have been produced or not, right?

10     A.  Again, the answer's the same.

11    Q.  Okay.

12         (Discussion off the record)

13         MR. BANKSTON:  Brad, this is an Excel

14  spreadsheet you produced to me.

15         MR. REEVES:  Okay.

16         MR. BANKSTON:  I printed it as a PDF.

17         MR. REEVES:  Alright.

18         MR. BANKSTON:  I have made two alterations

19  to the document, which I think will be for your benefit,

20  I have confidential attorneys eyes only at the top.

21         MR. REEVES:  Okay.

22         MR. BANKSTON:  I have labeled the Bates

23  number of this spreadsheet.  And I have added a 001

24  through page numbers on it too just to make it easier

25  for us to work with.

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       238


1    Q.  (By Mr. Bankston)  Are you familiar with the

2  documents produced by the company in response to the

3  plaintiffs' request regarding revenue data for the

4  company?

5    A.  No.

6    Q.  Okay.  I don't even know why I'm showing you

7  this, but whatever.

8         (Exhibit 21 introduced)

9    Q.  (By Mr. Bankston)  I'm going to show you what

10  I've marked Exhibit 21.  This is marked as FSXTX [sic]

11  dash 086589.  Do you see that?

12     A.  Yes.

13     Q.  Okay.  So you've never seen this document

14 before, right?

15     A.  No.

16     Q.  Okay.  I was produced this?  It's not labeled

17 on anything.  But from what it looks to me, that's what

18 it is.  As you'll see, there is a date column, right?

19     A.  Right.

20     Q.  There's some orders, right?

21     A.  Yes.

22     Q.  Sales items, correct?

23     A.  Yes.

24     Q.  Sales total?

25     A.  Yes.

       UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       239


1     Q.  Invoiced?

2     A.  Yes.

3     Q.  Refunded?

4     A.  Yes.

5     Q.  Sales tax?

6     A.  Yes.

7     Q.  Sales shipping?

8     A.  Yes.

9     Q.  Sales discount?

10     A.  Yes.

11     Q.  Canceled?

12     A.  Yes.

13     Q.  Okay.  My assumption would be that this

14  document is providing sales revenue information,

15  statistics from the infowars.com store.  Do you know if

16  that's accurate?

17      A.  Yes.

18      Q.  Okay.  Can you flip to the last page for me,

19  which actually would be on the back of the last page.

20  You can just turn the document around.

21          Do you see how there's a column that says

22  total?

23      A.  Yes.

24      Q.  Okay.  So this document reflects that during

25  the period of this document, that the total amount of

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      240


1  sales revenue from InfoWars and the infowars.com store

2  is $165,237,014.62, correct?

3      A.  Yes.

4              (Discussion off the record)

5              (Exhibit 22 introduced)

6      Q.  (By Mr. Bankston)  I'm showing you what I've

7  marked as Exhibit 22.  Have you ever seen that document?

8      A.  I have not.

9      Q.  Okay.  It says here amazon services, seller

10  central.  Am I correct that InfoWars sells products on

11  Amazon?

12      A.  Yes.

13      Q.  Can you flip to me to the page labeled -- and

14  its -- look at the Bates number, the red number down

15  here at the bottom.  Can you go to 5737  Alright.  This

16  document which is labeled FSSTX-086575.  Is that

17  correct?

18      A.  Yes.

19      Q.  Okay.  This document appears to me to reflect

20  that InfoWars made $1,355,664.30 in revenue from Amazon

21  and paid $421,973.69 in expenses.  Is that correct?

22      A.  It appears so from this document, yes.

23      Q.  Okay.  Would that be consistent with your

24  understanding, that InfoWars is doing about a million

25  dollars a year in sales every year on Amazon right now?

       UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       241


1      A.  No.  From my understanding, that Amazon

2  account -- I don't have that information.

3      Q.  Okay.  InfoWars sells things on eBay too?

4      A.  I don't know about that.

5      Q.  Okay.  When was the date -- I'm talking about

6  now efforts the company made to preserve evidence in

7  this case.  Do you know when the first litigation hold

8  letter was sent out to InfoWars' employees?

9      A.  There was a letter sent out, yes.

10      Q.  Do you know when the first litigation letter

11  was --

12      A.  I don't have -- oh, the date?

13      Q.  Yeah, when it happened.

14      A.  I don't know.

15      Q.  Do you know who sent it?

16      A.  Tim Fruge.

17    Q.  Okay.  And what did that letter say?  Do you

18 know?

19    A.  It requested the employees to search their

20 archives for anything having to do with Sandy Hook and

21 to preserve all the documents from that point on.

22    Q.  You're aware -- have you read the deposition of

23 Michael Zimmerman?

24    A.  No.

25    Q.  Okay.  Were you aware that during

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      242


1 Mr. Zimmerman's testimony we confirmed that in response

2 to Mr. Fruge's request to all the employees, not a

3 single employee returned a single -- not a single

4 employee returned a single document.  Were you aware of

5 that?

6    A.  I wasn't.

7    Q.  Okay.  If I was to -- it's my understanding

8 that Tim Fruge sent out this letter sometime in 2019.

9 Does that -- does that conflict with what you know, or

10 do you not know?

11    A.  No, I do not know for sure.  But I believe that

12 letter was sent out as soon as the request was made in

13 litigation.

14    Q.  Excuse me.  Say that again.

15    A.  So whenever it was requested for to -- for the

16 discovery, it --

17    Q.  Gotcha.

18          Well, that would make sense because the

19  discovery in this case was put off until spring of 2019.

20  It didn't really start in earnest until then.

21          But you understand the company had been sued

22  back in April of 2018, right?

23      A.  Yes.

24      Q.  So it would be fair to say that for almost a

25  year InfoWars took no action to preserve evidence from

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT          243


1  those employees.

2      A.  Well, they weren't requested to.

3      Q.  Really?  Are you sure about that?

4      A.  From my understanding.

5      Q.  Are you sure?

6      A.  Well, the -- as the request for discovery was

7  made.

8      Q.  Let me ask you this.  Has the company ever

9  received any correspondence from the plaintiffs saying

10  please preserve evidence?  Do you know?

11      A.  I don't have any documents on that that I

12  understand.

13      Q.  Okay.  So in terms of getting ready to testify

14  about efforts made to preserve documents, you have not

15  seen any correspondence from the plaintiffs or their

16  counsel asking to preserve documents.

17      A.  I have not.  Point number has -- point number

18  five has anything to do with efforts made by the company

19  to preserve potential evidence.

20      Q.  Right.  And here's what I'm getting at,

21  Ms. Karpova, is that I want to know when the plaintiffs

22  served a request to preserve documents back in April of

23  2018, one, if you have seen it, and two, if the company

24  actually did anything.  And from what I understand, you

25  didn't ever see that correspondence, right?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      244

1      A.  I haven't.

2      Q.  Okay.  InfoWars LLC, is that a subsidiary of

3  Free Speech Systems?

4      A.  No.

5      Q.  Okay.  Is that something you're stating from

6  something that you know personally or something somebody

7  told you?  You don't have to tell me anybody anything

8  told you, or who told you or what that.  I'm just -- is

9  that your personal knowledge, or is that something you

10  did preparing for the deposition?

11      A.  That's -- both.

12      Q.  Okay.  Okay.  So if somebody was to say that

13  InfoWars LLC is a subsidiary for Free Speech Systems,

14  they would be incorrect.  You're confident of that?

15      A.  Yes.

16      Q.  Okay.  InfoWars LLC is a holding company,

17  correct?

18      A.  InfoWars LLC is -- InfoWars LLC is a

19  single-member company owned.

20      Q.  I'm not asking how many people own it or how

21  many members there are.  I'm asking is it a holding

22  company.  Back up.

23       Do you know what a holding company is?

24  A.  I'm not sure.

25  Q.  Okay.  Alright.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      245

1            MR. REEVES:  Objection; form.  I don't even

2  know anything about a holding company.  So --

3            MR. BANKSTON:  Well, InfoWars sure does.

4            MR. REEVES:  As far as -- I don't know what

5  you're --

6            MR. BANKSTON:  You put it in a pleading,

7  Brad.

8            MR. REEVES:  I'm talking about what

9  you're -- what you mean by that.  I'm asking what you

10  mean by that.

11            MR. BANKSTON:  I want to know what InfoWars

12  means by that.  And I -- I really am kind of shocked

13  because that is in the pleading.  Okay.

14  Q.  (By Mr. Bankston)  Okay.  You know who

15  Rocket.Chat is, right?

16  A.  Yes.

17  Q.  Okay.  Is the company still using that?

18  A.  Yes.

19  Q.  Do you know when Rocket.Chat was searched?

20  A.  No.

21  Q.  Okay.  Do you know when it was preserved?

22  A.  No.

23     Q.  Okay.  What about Yahoo Messenger, do you know

24  when that was used?  Was that used during the events of

25  this lawsuit?

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        246

1     A.  No, don't know.

2     Q.  Okay.  What about Slack, was Slack used during

3  the events of this lawsuit, since 2013?

4     A.  I'm not sure.

5     Q.  Okay.  Was any efforts made to preserve any

6  messaging systems like Slack?

7     A.  I don't know for sure.

8     Q.  Okay.  What about things like Basecamp?  Do you

9  know what Basecamp is?

10     A.  Yes.

11     Q.  Okay.  Was anything done to preserve Basecamp?

12     A.  I don't know any Basecamp associations with

13  InfoWars.

14     Q.  Okay.  Let me ask you this.  Does InfoWars --

15  have they used Basecamp?  Have employees used that to

16  communicate with each other?

17     A.  No, not that I know of.

18     Q.  Okay.  Not that you know of, right?

19     A.  I've never heard of Basecamp being a

20  communication platform for InfoWars employees.

21     Q.  I hadn't either.  And it was strange because we

22  requested -- obviously we requested and asked for it,

23  what are your communication platforms.  Whatever --

24  that's a whole other story.  But I recently got produced

25  a document from Paul Watson that talks about his

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        247

1  Basecamp communications with another employee.  And I'm

2  just wondering when was Basecamp used.  But you aren't

3  familiar with Basecamp?

4      A.  No.

5      Q.  Okay.  So by the same token if were there any

6  efforts made to preserve Basecamp messages, you don't

7  know what those steps were?

8      A.  No.

9      Q.  Okay.  When it comes to the videos that

10  were -- okay.  First of all, when the company was first

11  sued in 2018, April 2018, the company possessed copies

12  of every video that it had ever made on Sandy Hook,

13  correct?

14      A.  Yes, efforts were made to archive all the

15  videos requested, yeah.

16      Q.  Currently InfoWars does not have access to all

17  the videos it made about Sandy Hook, correct?

18      A.  The videos which were deleted?

19      Q.  That you've lost.

20      A.  We couldn't locate?  Yes.

21      Q.  Yeah.  Okay.

22          What efforts were made to preserve those videos

23  before they were deleted?

24      A.  The videos that were available were preserved.

25  The videos that were not -- that were not --

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        248

1      Q.  I'm talking about when you had them all, back

2   when you still had them all.  From the time you were

3   sued -- let's stop for a second just to make sure you

4   understand this.

5          You understand that at the time the videos were

6   lost, when they were deleted, that was after InfoWars

7   had already been sued.  Do you get that?

8      A.  Okay.

9      Q.  Okay.  So during the period which InfoWars had

10  been sued up and to the point its videos were deleted,

11  what steps did InfoWars take to preserve those videos?

12      A.  We didn't anticipate for the YouTube channel to

13  be taken off -- offline.  And our archiving platform was

14  the YouTube channel.

15      Q.  Okay.  So in terms of what you did to preserve

16  it, the only thing you did to preserve it was just leave

17  it on YouTube, correct?

18      A.  Yes.

19      Q.  Okay.  Alright.  I do want to ask this question

20  and I'll circle back to it.

21          MR. BANKSTON:  And, Brad, if after I ask

22  this you want to take your witness out and talk to her

23  before answering the question, I normally would

24  obviously not be okay with that.  But in this specific

25  situation I would.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        249

1    Q.  (By Mr. Bankston)  Which is there were

2  documents requested from the company relating to Corey

3  Skalanka.  InfoWars refused to provide those documents,

4  correct?

5    A.  I don't know that to be the case.

6    Q.  Okay.  So in other words, let me -- let me put

7  it this way.  You sitting here right now do not know

8  whether InfoWars produced document relating to Corey

9  Skalanka or whether it answered discovery relating to

10  Corey Skalanka, correct?

11    A.  You're saying whether they refused to produce

12  documents.

13    Q.  Correct.

14    A.  The company has not refused to produce any

15  documents that they had.

16    Q.  Okay.  I mean -- you understand that if a court

17  order orders you to order -- answer discovery and it

18  never gets turned in, nobody ever answers it, you

19  understand that I could construe that as refusal, right?

20    A.  It's my understanding the documents were

21  produced.

22    Q.  Okay.  So from your -- let's make that -- that

23  maybe is what we need to get at.

24    From your understanding, Daria Karpova, coming

25  into this deposition today, your understanding is that

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       250

1  documents relating to Corey Skalanka have been produced.

2      A.  Again, I already said the documents that the

3  company had in possession were produced for discovery

4  purposes that were requested.

5      Q.  Okay.  So in other words, from what you

6  understand to be the discovery situation, there should

7  not be -- it should not exist that there are documents

8  produced in the Connecticut lawsuit about certain topics

9  that were also requested in Texas but weren't produced

10  in Texas.  That situation should not exist.

11      A.  Okay.  Say it again, please.

12      Q.  Sure.

13          Let's imagine for a second that there were

14  documents produced in Connecticut and those same

15  documents were produced in Texas but not -- were

16  requested in Texas but not produced.  You're saying that

17  situation should not exist because InfoWars has produced

18  everything.

19      A.  I don't know.

20      Q.  Okay.

21          MR. BANKSTON:  Let me take a break real

22  quick, bro.

23          THE VIDEOGRAPHER:  5:36 p.m., off record.

24          (Recess from 5:36 p.m. to 5:41 p.m.)

25          THE VIDEOGRAPHER:  The time is 5:41 p.m.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      251

1  We are on.

2      Q.  (By Mr. Bankston)  Ms. Karpova, I wanted to go

3  back to one of the things you testified about.  I had

4  asked you if you had ever seen any documents in which

5  InfoWars' editorial staff was making the assertion that

6  the sources that they were relying on for Sandy Hook

7  were unreliable.  And I remember you told me you don't

8  think you've seen any documents like that, right?

9  A.  I'd have to look at the document.

10  (Exhibit 23 introduced)

11  Q.  (By Mr. Bankston)  Yes.  That's what I wanted

12  to see if you had seen.  So I'm going to show you this.

13  I've marked this as Exhibit 23.  At the bottom corner it

14  says FSSTX-027766.  Is that right?

15  A.  Yes.

16  Q.  Okay.  And this is Paul Joseph Watson is who

17  it's from at the top, correct?

18  A.  Yes.

19  Q.  Buckley, that's a relative of Alex Jones,

20  correct?

21  A.  Yes.

22  Q.  Okay.  He worked at the company?

23  A.  Yes.

24  Q.  He had a managerial role?

25  A.  Yes.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        252


1  Q.  Okay.  Paul Watson, at this time was he the

2  head editor of InfoWars in 2015?

3  A.  He was an editor.

4  Q.  Okay.  He was the chief reporter at this point,

5  though, wasn't he?

6       A.  Yes.

7       Q.  Okay.  Subject is re, Sandy Hook.  Do you see

8  that?

9       A.  Yes.

10      Q.  Date is December 19, 2015?

11      A.  Yes.

12      Q.  Okay.  I'm going to read this from the bottom.

13  Okay?

14          At -- on December 17th Paul Joseph Watson

15  wrote:  Sent this to Alex.  This Sandy Hook is killing

16  us.  It's promoted by the most bat shit crazy people

17  like Rense and Fetzer who all hate us anyway.  Plus it

18  makes us look really bad to align with people who harass

19  the parents of dead kids.  It's going to hurt us with

20  Drudge and bringing bigger names to the show.  Plus, the

21  event happened 3 years ago.  Why even risk our

22  reputation for it?

23          Next Buckley responds:  I agree with you

24  100 percent.  We think it hurts our credibility

25  significantly.  I'll do what I can to head it off as

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        253


1  much as we can.  What was the latest incursion?  I

2  missed it.

3          Paul Joseph Watson writes back:  Adam -- and I

4  believe that may be Adan -- it may be a typo.

5       A.  Yes.

6      Q.  -- wrote another article implying that the

7  Pozner guy's son didn't die.  I think Alex had it out

8  with him and put a ban on future Sandy Hook stuff.

9          Have you ever seen that document before?

10     A.  I haven't seen this document, no.

11     Q.  Okay.  Now, you were aware, I believe -- is

12  this what you were referring to when you said Alex Jones

13  put a ban on Sandy Hook stuff?

14     A.  Yes.

15     Q.  Okay.  And that didn't stick, did it?

16     A.  Well, what I can say regarding that is Alex

17  allows different opinions on the platform.  Paul had a

18  different opinion.  Alex had a different opinion.

19  Everyone was -- that was -- people were still talking

20  about -- there were opinions on both sides.  So there

21  wasn't a specific -- you know, just again, free speech.

22     Q.  My question isn't about who can say what or any

23  of that kind of stuff.  My question is simply this.  If

24  Alex Jones put a ban on Sandy Hook in December of 2015,

25  it didn't last.  It didn't stick, right?  We've talked

     UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      254

1  about videos, multiple videos after this date about

2  Sandy Hook, correct?

3      A.  Well, I believe Alex was the subject matter in

4  those videos.  He was the one providing commentary in

5  them.

6      Q.  You know -- do you remember watching Owen

7  Shroyer's video about Neil Heslin?

8     A.  Right.  And what was the date on that?

9     Q.  That was 2017.  That didn't stick, did it?

10 Correct?

11    A.  It appears -- it appears that Owen had an

12 opinion about it, yes.

13    Q.  Okay.  Do you think any -- anybody else said

14 anything about Sand -- you've seen Rob Dew say things

15 about Sandy Hook after 2015 on InfoWars, right?

16    A.  (No response.)

17    Q.  You just watched "Sandy Hook Vampires Exposed."

18 He was talking in that, wasn't he?

19    A.  Yes.

20    Q.  Okay.  This email where Paul Watson says:  It's

21 promoted by the most bat shit crazy people like Rense

22 and Fetzer.  Does the company agree with Mr. Watson's

23 position or does it disagree with Mr. Watson's position?

24    A.  That's -- that's Paul's opinion.

25    Q.  That's not -- I know that.  I know that.  Does

         UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        255


1 the company agree with it or not?

2     A.  At this time it appears that Fetzer and Rense

3 would be a very questionable source of information.

4     Q.  Okay.

5          (Discussion off the record)

6     Q.  (By Mr. Bankston)  Okay.  In fact -- I'm just

7 going to ask you a question about this.  Do you remember

8 right after this suit happened, Nico sent you blog

9  material from Jim Fetzer?  Do you remember that

10  happening?

11      A.  After which?

12      Q.  After this lawsuit, a couple of months after

13  this lawsuit, Nico --

14      A.  From the summer of 2018?

15      Q.  From -- yeah, summer of 2018.

16      A.  Okay.

17      Q.  Do you remember Nico sending you blog material

18  from Jim Fetzer for you to look at?

19      A.  I don't specifically remember an email, but if

20  you want to show it to me.

21      Q.  I'm trying -- we've got to get out of here

22  unfortunately I think.  But I'm just wondering if you

23  had remembered that.

24      A.  But, I mean --

25      Q.  In other words, let me -- let me put the

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT      256


1  question this way.  Sure.  Let me put the question this

2  way.  In 2017 did the company believe that Jim Fetzer

3  was a reliable source of information?

4      A.  At that time there was controversy regarding

5  that individual.

6      Q.  In 2017 InfoWars published a video that relied

7  on Mr. Fetzer, correct?

8          MR. REEVES:  Objection; form.

9      A.  Okay.

10      Q.  (By Mr. Bankston)  That's true?

11    A.  You're telling me that?  I --

12    Q.  I'm actually -- no.  You need to tell me,

13  Ms. Karpova, because you're here to talk to me about the

14  sourcing and researching in plaintiffs' petition of

15  those videos.

16        Is that one of the videos you watched when

17  y'all took the break?

18    A.  The Owen Shroyer video?

19    Q.  Yeah.

20    A.  Yes, I've seen that video before.

21    Q.  Of course.  Yeah.  You knew you were going to

22  testify about it.

23    A.  What is the --

24    Q.  My question is, that was in 2017.

25    A.  Uh-huh.

UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT       257


1    Q.  It relied on Jim Fetzer.  It had material from

2  Jim Fetzer, correct?

3    A.  I don't know where Owen got that material.

4    Q.  Okay.  If Owen -- and so given your previous

5  answer, given that there was some -- InfoWars was aware

6  that there was some issues being raised with

7  Mr. Fetzer's credibility, that happened in the exact

8  same year that Owen published his video in 2017, right?

9    A.  Right.

10    Q.  So if Owen relied on -- if it did happen that

11  Owen's video contains material from Mr. Fetzer, it was

12  done so at a time where InfoWars knew there were issues

13  regarding his reliability, correct?

14      A.  Yes.

15          MR. BANKSTON:  Okay.  Thank you,

16  Ms. Karpova.  That's all I have for you today.

17          MR. REEVES:  Are you passing right now?

18          MR. BANKSTON:  Yeah.

19          MR. REEVES:  Alright.  We'll reserve.

20          THE VIDEOGRAPHER:  The time is 5:48 p.m.

21  we are off.

22          (Discussion off the record)

23          THE REPORTER:  Mr. Reeves, do you need to

24  purchase a copy of this deposition, sir?

25          MR. REEVES:  Yes, please.

    UNEDITED, UNCORRECTED, UNCERTIFIED ROUGH DRAFT        258


1          (Deposition completed 5:48 p.m.)

2          (Signature reserved)

3

4

5

6

7

8

9

10

11

12

13

# Exhibit 5

1

1        THE VIDEOGRAPHER:  We're on the record.

2   Today's date is Saturday, December 4th, 2021, and the

3   time is 10:38 a.m.  This is the videotaped deposition of

4   Alex Jones.  Will the court reporter please swear in the

5   witness.

6        THE REPORTER:  I'm Janet Hoffman, Texas

7   Certified Shorthand Reporter, No. 4208.  I am taking

8   this deposition by machine shorthand, and I am located

9   in Spring, Texas.  The witness is located in Austin,

10  Texas.

11       ALEX JONES,

12  having been first duly sworn, testified as follows:

13       MR. REEVES:  Mark, just for purposes of

14  the record, I would like to again have the same

15  stipulation that this is going to be subject to one

16  protective order that's entered into.  Do we have that

17  same stipulation?

18       MR. BANKSTON:  Plaintiffs will agree.

19            EXAMINATION

20  BY MR. BANKSTON:

21   Q.   All right.  Mr. Jones, you know about back in

22  September a default got granted against you.  Right?

23   A.   I know that -- that my seventh amendment

24  rights were violated by a political show trial.  Yes, I

25  do know that.

2

1    Q.   It's funny.  Let me show you what's been

2  marked as Exhibit 1 because you mailed it, man, right

3  off there, seventh amendment and default ruling.  Texas

4  judge tramples it.  Right?

5            (Exhibit 1 marked.)

6    A.   That's right.

7    Q.   Okay.  So in fact, as you see on that printoff

8  there, the way your screen kind of prints, it doesn't

9  print very well, so I'm going to actually show you a

10  full copy of that exhibit on this screen here.  Okay.

11  And now that can help you read it a little better.

12  Right?

13    A.   Yes.  And that's about my first amendment, one

14  of the other things you guys are attacking.  This is my

15  first amendment right to say that.

16    Q.   Oh, yeah, no, absolutely.  Have fun, man,

17  totally.  What I'm actually asking you about is:  In

18  that broadcast -- well, in that one, heck, right after

19  it happened, September 30th, you got on the show and

20  talked about it.  Right?

21    A.   I believe so.

22    Q.   October 1st, October 2nd, October 3rd, October

23  4th you were just talking about the default ruling.

24  Right?

25    A.   I did talk about it on some shows.

                           3


1    Q.   One of the things you kept saying on those

2  shows is "I barely covered Sandy Hook."  Correct?

3      A.   I mean, it's a bit of a very small part of

4  what I've done.  It's not my life, like you.  Yes.

5      Q.   Yeah.  And you said yes, I've done --

6  only covered it a few times.  Right?

7      A.   In the aggregate comparatively, yes.

8      Q.   You see how there's a comment on this article

9  right here that I have showing right now?  And you can

10  probably read it fully right here.

11      A.   What?  Are you BigDoggy?  Is that you?

12      Q.   No.  I have it on the screen.  It's not my

13  comment, no, sir.

14      A.   I don't know whose it is, but okay.

15      Q.   I don't know either.  I don't know who

16  BigDoggy is.

17      A.   I just know you're pretty famous for comments

18  on the internet, so --

19      Q.   I am.

20      A.   -- I was asking:  Are you BigDoggy?

21      Q.   No, I'm not BigDoggy.  Okay.  But again, I

22  don't know who BigDoggy is.  It could be Brad.  It could

23  be Mark.

24      A.   Could be you.

25      Q.   Could be you.  Well, actually --

                             4


1          MR. REEVES:  Please let him just ask you

2  questions and answer his questions.  I understand y'all

3    have contentious -- against the other.  But if you could

4    just let him ask questions and you answer, that would be

5    great.

6              THE WITNESS:  Sure.

7        Q.    I think we have a friendly relationship.

8    Don't you, Mr. Jones?  We've had some fun in these

9    depositions, haven't we?  Yeah.  So here's the thing, is

10   I don't think you're a BigDoggy.  And the reason it is

11   is because isn't BigDoggy saying, look, why does Alex --

12   and I'm going to quote BigDoggy here.  Let's get

13   BigDoggy on the record -- why does Alex say he barely

14   covered Sandy Hook?  We know that isn't true.  Alex

15   should just tell the truth.  He covered this extensively

16   many, many shows dedicated to this story.  BigDoggy is

17   right, isn't he?

18       A.    You should just call BigDoggy as a witness.

19       Q.    Well, I'm basically kind of doing that.

20       A.    I understand.  I don't know anything about

21   BigDoggy, so I can't speak for them.

22       Q.    But he's right?

23       A.    No.  In the aggregate, I barely covered Sandy

24   Hook.

25       Q.    How many videos did you do on Sandy Hook?

                                5

1        A.    I don't have that number in front of me.

2        Q.    Truth is it's probably around 100, isn't it?

3        A.    Well, if you count responding to you guys in

4    your lawsuits, yes.  Since then, I have covered it quite

5  a bit.

6      Q.   No.  I'm talking between the dates before you

7  were sued, from 2012 to 2018, about 100 videos.  Right?

8      A.   That's not the number I have.  I don't have

9  those numbers exactly in front of me, so I don't know.

10      Q.   Well, you only produced 55 of them to me.

11  Correct?  You know how many you produced to me.  Right?

12      A.   Well, we produce about 55 videos a day.

13      Q.   Right.  I'm not talking -- let's make sure

14  that you understand the difference between what you mean

15  by produced in your world, which means the collection of

16  people who get together and create an audio-visual

17  product which you distribute to the world and the

18  definition of produce in my world, which means that you

19  give me things.  And one of the things that you gave me

20  was 55 videos on Sandy Hook.  Okay?

21      A.   Okay.

22      Q.   So you did cover it many, many times.

23  Correct?

24      A.   I have covered it, yes.

25      Q.   All right.  So my question is:  If you're

6

1  going to get on your show and say you barely covered

2  Sandy Hook and you only covered it a few times, if

3  you're going to say that untrue stuff, why should this

4  jury believe you about anything?

5          MR. REEVES:  Objection.  Form.

6    Q.   Mr. Jones, you've been in enough depositions

7  now to know that when Mr. Reeves says Objection.  Form.,

8  you can go ahead and answer.  You already know that.  So

9  I'm just going to go ahead and ask you the question

10  again.  If you get on your show and you say "I barely

11  covered Sandy Hook.  I only covered it a few times" and

12  the truth is that you covered it many, many, many times,

13  why should this jury believe you about anything?

14         MR. REEVES:  Objection.  Form.  Go ahead

15  and answer if you can.

16    A.   Again, in my opinion, if you compare it to all

17  the things we've covered and done in the last ten years,

18  it was a very small thing that we covered at limited

19  points.  But I do four hours a day, and so things can be

20  cut up into different pieces.  Many videos have been

21  reedited by others countless times.  And there's really

22  no way for me to know.  I just know that -- that I've

23  covered it a lot more since these lawsuits and I've had

24  to talk about it so I can respond to it than I did

25  previous to that, and that it was -- it's not something

7

1  that made my career.  It's not something that made me

2  money.  It's not something that was my bailiwick, as you

3  have said.

4    Q.   Do you know what the most popular news story

5  on your website in page views is?  Do you know what it

6  is?

7    A.   No.

8      Q.   Okay.  I'm going to talk about that later.

9  Let's come back to that.  One of the things you just

10  talked about is that you have since this lawsuit has

11  started you've said some things about Sandy Hook.

12  Correct?

13      A.   I've said things about organizations and

14  groups to want to get rid of the first amendment trying

15  to use me as a case to do it.

16      Q.   Okay.  Well, what I'm really talking about is

17  you've said things about Sandy Hook itself.  Correct?

18      A.   I have -- I have talked about -- I mean, I

19  talked about the coverage surrounding it and the

20  lawsuits and that ongoing process, yes.

21      Q.   Okay.  Well, actually, I want to ask you about

22  a little something else.  Hold on.  Back up for a

23  second.  One thing that you have said a few times is

24  that in terms of when you did say that Sandy Hook was

25  completely take, synthetic, there were actors, et

                                    8


1  cetera, you've said that you've apologized for that.

2  Correct?

3      A.   Well, first off, I said I could see how people

4  see that.  And I also -- when people said please

5  apologize to us and I'd seen some of the anomalies that

6  I think were wrong, that weren't what people were

7  questioning online, then I'm, like, yeah, of course.

8  I'm sorry for questioning Sandy Hook, but it wasn't

9    intended, you know, in a false way. I mean, I really

10   thought maybe it didn't happen. And then the attacks

11   intensified and people began falsely saying that I was

12   currently saying those things and then exaggerating what

13   I'd said as a political weapon that Hillary Clinton was

14   using to beat me over the head with it in 2016 on record

15   and run national political ads against me playing edited

16   tapes of me talking about Sandy Hook.

17             MR. BANKSTON: Okay. First of all,

18   objection, nonresponsive.

19      Q.  Second of all, you -- Mr. Jones, you

20   understand this jury is going to watch the videos of you

21   saying unequivocally not "I see how people could think

22   this" but unequivocally saying Sandy Hook was

23   completely --

24      A.  Sure.

25      Q.  No, Mr. Jones.

                           9


1             MR. REEVES: Hold on. Let him finish.

2       Q.  You don't get to interrupt me. You understand

3    that, sir? You're here to answer questions for this

4    jury, and I want to you listen to the questions. You

5    know this jury is going to watch videos of you saying

6    multiple times over and over again Sandy Hook is

7    completely fake, completely synthetic. It is not real.

8    Right? And you're going to sit here in this chair and

9    say, oh, actually what I said, actually what I said is I

10   could see how some other people could think it was fake.

11  You know the jury is going to see those videos, and you

12  know they're going to hear your words.  Do you think

13  that they should take you seriously whatsoever when they

14  can see you saying the things you said you didn't say?

15      A.  I know --

16          MR. REEVES:  Objection.  Form.  Go ahead

17  and answer the question.

18      A.  I know that the jury is going to say I always

19  heard that people are innocent until proven guilty, not

20  guilty until proven how guilty they choose and that the

21  system is actually scared for me to put on evidence.

22  The truth is deep down I still have real questions about

23  Sandy Hook and a lot of the anomolies and the weird

24  stuff that's gone on and the CIA visiting Adam Lanza

25  before it happened and the FBI.  That was in mainstream

                                10

1  news and just all the bizarreness that went on, the

2  public still has real questions, just like they do about

3  Jussie Smollett or the Roe v. Wade baby that never

4  actually died or WMDs in Iraq or just the Gulf of Tonkin

5  or Operation Northwood or Bubba Wallace or you know so

6  many of these things that have had the most of these

7  hate crimes and type things end up being false flags.

8  So I still, when I look events, question and say could

9  this -- could this be staged.  We look for telltale

10  signs.  And that's because genuinely we've seen a lot of

11  staged things and a lot of fraud.  And so that is

12  something that I question abd something that I continue

13  to do.

14      Q.   Let's -- I want to show you a video.  We are

15  going to -- this is going to be Exhibit 2.

16            (Exhibit 2 marked.)

17      Q.   On -- I'm going to show you a little clip of

18  something you said on October 1st.  (Video playing)  All

19  right.  So now you're back to feeding your audience this

20  lie about Sandy Hook.  Right?

21            MR. REEVES:  Objection.  Form.

22      Q.   Correct?

23      A.   No, that's -- that -- I'm proud of the video

24  and I'm proud of my statement in its context that I'm

25  sure we'll be able to show the jury when we have time

                                11

1  to.  They will see what I had to say and see that I'm

2  speaking up for the American tradition of being able to

3  challenge authority of official stories that almost

4  always turn out to be at least partially wrong.

5      Q.   Please keep that promise in play of that whole

6  October 1st video.  Please keep that promise.

7      A.   Okay.

8      Q.   But second, what has happened here is now that

9  you got beat in court, now that a default has been

10  granted??

11      A.   I didn't get beat in court.  I got beat by an

12  organized crime syndicate.

13      Q.   Now that a default has been granted, you don't

14  have to pretend anymore, do you?  That's what's going

15  on.  Right?

16          MR. REEVES:  Objection.  Form.

17      A.  No, that's not what's happened.  The death

18  penalty sanction with all the stuff we produced I

19  believe was a fraud.  And it's because they're scared of

20  the real evidence coming out and want to be able to tell

21  a jury that this man is guilty, now you decide how

22  guilty.  Now, juries are supposed to decide if someone

23  is guilty or not, period, not how guilty they are.  So

24  you guys can try to do all your anti-free speech stuff.

25  All you're doing is waking up the American people.

12

1      Q.  All right.  So let's just be honest about what

2  this is.  You got mad after you got defaulted and you

3  lashed out by saying that Sandy Hook was fake again.

4  That's what happened.  Right?

5      A.  No.  I have privately -- I mean, I told my

6  crew I mean I've always said I really have real

7  questions about this but I can't a hundred percent prove

8  it was totally staged, but the CIA was definitely

9  involved.  And -- and that came out.  And then I was --

10  I was told again by high level folks in the CIA that it

11  was staged back at the time, and so I went with them and

12  also what Wolfgang Halbig said and others.  So I really

13  believed that it should be looked at.

14      Q.  You've repeatedly said that this is court

15 process, this lawsuit, what just happened --

16    A.   Uh-huh.

17    Q.   -- is all a sham because you turned everything

18 over.  And that court still defaulted you anyway.

19 Right?

20    A.   Yes.  Owen Shroyer, you never sent him one

21 deposition, one document request, one thing, and he was

22 defaulted along with me.  And if that isn't fraud, then

23 nothing is.

24    Q.   Okay.  Hold on.  I may have to pull this order

25 for you because I need you to understand this.  Do you

13

1 understand that in Ms. Neilhussen's case there was a

2 court order requiring Owen Shroyer to appear for

3 deposition?  Do you know that?

4    A.   I know he appeared for a deposition.

5    Q.   Yesterday.

6    A.   You asked for it after the default.

7    Q.   Hold on.  No, sir, Mr. Jones.  Do you

8 understand that there was an order on August 31st, 2018

9 asking Mr. -- requiring Owen Shroyer to appear for

10 deposition?  Did you know that?

11    A.   I don't know what you're talking about.

12    Q.   Yeah, you didn't know that.  So you got on

13 your show without even knowing what the discovery was.

14 Did you know in Mr. and Mrs. -- Mr. Pozner's case and

15 Mrs. De La Rosa's case, you understand they're suing

16 you.  Right?

17      A.   I've never said her name.  I'm never going to

18   say it.

19      Q.   I'm not asking you about what you said.  You

20   know they're suing you, don't you?  Correct?  Let's just

21   start there.  You know there's a lawsuit --

22      A.   I know I didn't get a jury trial.  I know a

23   judge said I was guilty.  I don't believe that I live in

24   the Soviet Union.

25      Q.   Mr. Jones, you're not answering questions.

14

1   Let's just admit it right now.  You're not answering

2   questions.  I'm asking you:  Do you know that Leonard

3   Pozner and Veronique de la Rosa sued you?  Do you know

4   that?

5      A.   Yes, yes.

6      Q.   Okay.  Do you know they served you discovery?

7      A.   I believe so, yes.

8      Q.   Yeah.  You know you didn't answer it ever?

9      A.   That's not true.

10      Q.    It is true, Mr. Jones.  And I'll bet when you

11   go back and talk to your lawyers you're going to find

12   out a lot of things you don't know.  I'm going to tell

13   you, Mr. Jones.  Not like you got a bad grade on your

14   homework.  Like you didn't turn it you.  You didn't know

15   that?

16      A.   What were the depositions we had and all the

17   81,000 documents?

18    Q.   That's in Mrs. Lewis' case.  That's when Mr.

19  Barnes came in.  And we'll get to that.  Let's talk

20  about that in a minute.  But first let's take on Mr.

21  Pozner and Mrs. De la Rosa's case.  You don't know that

22  you never answered discovery, do you?  You don't even

23  know that.  Correct?

24    A.   Again, I don't have that stuff in front of me.

25    Q.   Right.  Now let's talk about in Mr. Heslin's

                              15

1  case.  In that same order that required Mr. Shroyer to

2  show up to deposition, did you know it required you to

3  show up to deposition and your company to talk about Mr.

4  Heslin's defamation case?  Did you know that?

5    A.   I mean, I've showed up for these, so I don't

6  know what you're talking.

7    Q.   Yeah, you showed up for Ms. Lewis's case,

8  didn't you?

9    A.   Again, I don't have this in front of me so I'm

10  not sure what you're talking about.

11    Q.   Right.  How many depositions have you done

12  before today with me?

13    A.   Two.

14    Q.   Right.  How many lawsuits -- how many

15  different plaintiffs are suing you in Texas?

16    A.   I don't know.

17    Q.   Can you name the people who are suing you in

18  Texas?

19    A.   No.

20     Q.   Not surprising.

21     A.   Didn't ever name most of them to begin with.

22   They're the ones attached to me.

23     Q.   In Mrs. -- in Mrs. Lewis' case back when you

24   had Mr. Barnes handling discovery, things didn't go so

25   smoothly there, did they, according to an affidavit

16

1   written by you about Mr. Barnes.  Right?

2     A.   I don't have that in front of me.

3     Q.   Do you remember writing an affidavit up in

4   that Lafferty case basically saying Mr. Barnes messed

5   everything up and I've gotten rid of him?  Do you

6   remember that?

7     A.   I'm thinking I remember there was a memo.

8     Q.   Yeah.  You remember because you had to get on

9   the phone with somebody in Connecticut.  You didn't

10   actually sign that affidavit.  Somebody signed it with

11   your permission and there was a big hubaloo about it.

12   Do you not remember --

13     A.   I do remember something about that.

14     Q.   Yeah.  So you wrote an affidavit about Mr.

15   Barnes, how he botched discovery.  Right?  Correct?

16     A.   I believe so.

17     Q.   Yeah.  Okay.  So now let's go through it here.

18   You've got Mr. Pozner and Ms. De la Rosa's case where

19   you didn't even answer discovery.  You've got

20   Mr. Heslin's defamation case where you didn't show up

21  for defamation -- answer any discovery or show up for

22  deposition.  Neither did Mr. Shroyer, neither did the

23  company.  You've got Mrs. Lewis' case where you wrote an

24  affidavit saying your lawyer screwed it up, and you've

25  got Mr. Heslin's IED case, which you just got sanctioned

17

1  because you sent Rob Dew to the deposition and he

2  couldn't answer any questions.  And if all of those

3  things are true, when you get on to your show and you

4  tell your show that this is all just a kangaroo court

5  and you completely complied but got railroaded, that's

6  not true.  None of that's true.

7      A.   No, it is true.  I remember giving you guys

8  all sorts of stuff; then you would say you hadn't been

9  given it or it wasn't given the way you wanted it.

10  Just -- I mean, look, it should be on the issues of what

11  did I say on air.

12      Q.   It should be maybe -- and I asked you those

13  questions and you didn't answer them, Mr. Jones.  And

14  that's not fair, is it?  Mr. De la Rosa -- excuse me --

15  Ms. De la Rosa and Mr. Pozner have the right to ask you

16  questions.  Right?  Do you agree with that, or not?

17      A.   I mean, I've sat for these depositions.

18      Q.   You have not sat for a deposition for Mrs. De

19  la Rosa or Mr. Pozner.  And they have that right, don't

20  they?

21      A.   I don't know.

22      Q.   You don't think they deserve that?

23   A.   I don't -- I don't deserve a jury trial.  I'm

24  found guilty by a judge.

25   Q.   You remember when you told me in your November

18

1  2019 deposition, look, Mr. Bankston, I'm sorry.  I could

2  find those sources you were looking for if I had known

3  to look for them, but I didn't know what you were

4  talking about.  But yes, now that you've told me, I can

5  go find those sources.  Do you remember telling me that?

6   A.   Yes.

7   Q.   Okay.  I imagine you probably watched the

8  August 31st, 2021 default judgment hearing.  I would bet

9  that.  Right?

10   A.   No.

11   Q.   Okay.  So you don't -- everything that you

12  said about the judge and what went on in that hearing is

13  secondhand.  You didn't watch it?

14   A.   I read the newspaper articles.  It's not what

15  I've been doing.

16   Q.   Everything you said about Mr. Reeves, that was

17  secondhand about what he did in that hearing?

18         MR. REEVES:  Objection.  Form.

19   A.   I didn't watch the hearing.

20   Q.   You remember talking on your show about

21  Mr. Reeves.  Right?

22   A.   I mean, I remember talking about the newspaper

23  articles.

24     Q.   No.  You remember talking on your show about

25   the judge won't let you have the lawyer you want, so all

19

1   you have is a bunch of new lawyers who've rolled over

2   and go into court, and you did a mocking voice of Mr.

3   Reeves.  Do you not remember that?

4     A.   Well, I never -- yes.  My point was, is that

5   he didn't know that -- he wasn't ready for the case then

6   because they weren't letting my lawyer in.  And so

7   that's why he wasn't ready.  That's why he was new on

8   the case.

9     Q.   Yeah, new on the case, I understand.  But you

10   were mocking his performance in that courtroom.  Right?

11     A.   I mean, I guess you could say I wasn't happy

12   with what the newspapers' rendition of that performance

13   was.

14     Q.   And I'm going to tell you right there that's a

15   good lawyer.  Right?  That's a good lawyer.  Now, I'm

16   starting to wonder when you don't know that you haven't

17   even answered discovery, I'm kind of wondering what has

18   gone on before that.  I don't know.  Right?

19          MR. REEVES:  Object to this line of

20   questions because the discovery in the Pozner case is

21   the Free Speech Systems, LLC.  It's not Alex Jones.  I'm

22   just telling you --

23          MR. BANKSTON:  You know what the court

24   ruled on that.

25          MR. REEVES:  I understand --

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
552 of 1044

20

1          MR. BANKSTON:  You don't a hundred --

2   Brad, don't even raise that objection.  That's in bad

3   faith, and you know it.

4          MR. REEVES:  It's not in bad faith.

5          MR. BANKSTON:  The court has said

6   unequivocally on the record Alex Jones, Free Speech

7   Systems, Infowars, LLC, are all -- are all to be

8   considered one entity and all have equal --

9          MR. REEVES:  No.  -- question related to

10  certain information related to employees and things like

11  that because it -- that is not what she said about

12  discovery requests being one for Free Speech Systems

13  being discovered --

14         MR. BANKSTON:  You're sitting here right

15  now knowing about -- because I know now you are

16  brand-new counsel on the Fontaine ^  case.  There is a

17  motion to compel that was granted in that case.  That

18  describes all of this.  That describes all of how

19  Infowars, LLC, cannot get away with saying no, those

20  were requests for Free Speech Systems.  And neither can

21  Mr. Jones.  And if you want to raise that objection and

22  have it ruled on by the court, we'll do that.

23         MR. REEVES:  I'm just saying that the

24  discovery that you are referencing in the Pozner case

25  was discovery issued to Free Speech Systems, LLC, not to

1  Alex Jones, individually.

2         MR. BANKSTON:  All right.  You can say

3  that.  I'm just telling you -- you can put that on the

4  record.

5         MR. REEVES:  I want to make sure that the

6  record --

7         MR. BANKSTON:  Let's -- in fact, let's

8  make it -- let's make the record clear.  Right?

9     Q.   There was discovery served to the company that

10  you were the sole owner and member of -- correct? -- in

11  these cases?  That's happened.  Do you understand what

12  I'm saying?

13     A.   Yes, yes.

14     Q.   Okay.  You have access to every single

15  document Free Speech Systems has.  Correct?  Is there

16  any situation where I would ask you for a document in

17  Free Speech Systems' files and you would walk into the

18  offices of Free Speech Systems and anybody in Free

19  Speech Systems would tell you, no, Mr. Jones, you can't

20  have that document?  Is that something that could ever

21  happen?

22     A.   Any?  I don't understand how to answer that

23  question.

24     Q.   Sure you do.  If I'm telling you right now if

25  you walked into Free Speech Systems is there any

22

1  document you couldn't lay your hands on?  Is there

2  anything in the building, period, that you couldn't lay

3  your hands on?

4      A.   No.  I probably find anything I needed to.

5      Q.   Okay.  That's interesting, too, because you

6  remember we talked in that last deposition about the

7  Bloomberg email where Bloomberg sent an email out to his

8  people, said get ready in the next 24 hours, there's

9  going to be a big event?  You remember that?

10     A.   That was a new story, yeah.

11     Q.   Yeah.  And then we talked about it for a while

12  because you had brought that up to me.  You were, like,

13  look, I don't have the email itself.  That was something

14  I was reporting on.  I had -- there was a story about it

15  and I was reporting on it.  You remember that?

16     A.   I do.

17     Q.   And then you remember you told me you could

18  find it for me.  Right?

19     A.   Yeah, I believe I said that.

20     Q.   And then you never gave it to me, did you?

21     A.   To be honest with you, Bankston, you don't

22  really inhabit much in my mind.

23     Q.   I know, yeah.  You don't have much respect for

24  any of this process, do you?  None of it?

25     A.   I don't think you have respect for America or

                                23


1  anything.

2      Q.   You remember when I asked you to produce me

3  records that shows that the school was closed?  Do you

4  remember me asking you about that?

5      A.  I do.

6      Q.  And you remember you telling me you could give

7  it to me?

8      A.  I'm --

9      Q.  Remember that?

10      A.  I mean, I don't remember all the stuff in the

11  deposition.

12      Q.  All right.  You didn't give it to me, though,

13  did you?

14      A.  I don't remember.

15      Q.  Infowars is currently broadcast on over 200

16  radio stations?

17      A.  I don't have the number in front of me right

18  now.

19      Q.  If you had to ballpark it, what would you say?

20      A.  Something like that.

21      Q.  Okay.  How many over-the-air television

22  stations?

23      A.  I don't have a number.

24      Q.  Give me a ballpark on that.

25      A.  We're free to air.  Anybody can pick it up.

24

1      Q.  Right.  But over-the-air television stations

2  has -- there has to be an affiliate there who you have a

3  relationship with?

4      A.  No.

5      Q.   You're going to tell me that somebody is

6  broadcasting Infowars' programming over the air without

7  you knowing about it?

8      A.   Absolutely.  That's what free air is.

9      Q.   I don't think that's happening, Mr. Jones.

10  You think there are things going out on FCC airwaves

11  right now that are Infowars' broadcasts that in no way

12  you knew about?  You think that's happening?

13      A.   I just don't think you have the knowledge of

14  what free air means.

15      Q.   Okay.  I understand that, for instance,

16  Infowars is on cable -- certain cable packages.  Right?

17      A.   (Nods head.)

18      Q.   You may not even know about all the cable

19  packages.  Right?

20      A.   I don't --

21      Q.   Because, again, when you say it's free to air,

22  people -- you know what an OTT system is.  Right?

23      A.   I'm not really an engineer, but I just know

24  I'm free to air.

25      Q.   Right.  So OTT, over the top -- like, say, I

25

1  know you're not on it anymore, but, say, like a Roku

2  box.  Right?  It's possible that there are OTT systems

3  out there that are playing Infowars and you don't even

4  know about it.  Right?  That's a possibility.  Right?

5      A.   Yes.

6      Q.    But you think the same thing is true over the

7   over-the-air television?

8      A.    Yes.

9      Q.    Okay.  I want to play you a piece of audio

10  from your radio show.  So there's not going to be any

11  video to show you, but this is going to be Exhibit 3.

12              (Exhibit 3 marked.)

13     Q.    Let me play that for you now.  (Audio playing)

14  That's true?

15     A.    That's a guesstimation.

16     Q.    Conservative.  Right?  It's probably a little

17  higher than that.  Right?

18     A.    I don't know.

19     Q.    So --

20     A.    Depends on how you define the audience.  If

21  somebody tuned in once a month, once a year, once a day.

22     Q.    You're the one who said it, Mr. Jones.  You

23  tell me.

24     A.    It's a very short clip.  I need to know the

25  context.

                            26


1      Q.    You don't need to -- there's nothing else said

2   about audience in that entire clip.

3      A.    Okay.  Well, I haven't heard the whole clip.

4      Q.    It's an advertisement for some sort of pill or

5   something.  I'm asking you right now:  Is 10 percent of

6   America an accurate representation of Infowars' listener

7   show?  That's true.  Right?  Major media organization?

8      A.  I mean, I would say a larger percentage than

9  that agree with my world view.  But I mean, yeah, I

10  would say 10 percent of the country has watched

11  something I've done and has agreed with me.

12      Q.   And then globally another 10 percent.  Right?

13  Because you're -- let me put it this way:  Infowars'

14  programming is not bound by U.S. borders.  It's -- the

15  internet is everywhere.  Right?

16      A.  Uh-huh.

17      Q.   And so globally Infowars also has a very large

18  audience.  Right?

19      A.  Uh-huh.

20      Q.   Maybe 10 percent of the globe is listening in

21  to Infowars.  Right?

22      A.  I would imagine 10 percent of the people --

23  that's a -- that's -- that's more hyperbole, but the

24  English-speaking world?  Yeah, I would say so.

25      Q.   Hyperbole is something you're very familiar

                                27


1  with?

2      A.  Yes.  Talk radio is a big part of that, yeah.

3      Q.   Exactly.  When addressing that audience, your

4  United States in global audience, would you ever

5  intentionally lie to them?

6      A.  No.

7      Q.   Okay.  Let me play you another clip.  This is

8  going to be -- I'm going to play you Exhibit 4, and this

9   is another audit clip from your show.  (Recording

10  playing)

11          (Exhibit 4 marked.)

12  Q.   How many people have you physically killed?

13  A.   None.

14          MR. REEVES:  Objection.  Form.

15  Q.   You knew about Leonard Pozner within weeks of

16  the shooting.  Right?

17  A.   I think I knew of Leonard Pozner.

18  Q.   Right.  He had complained to Infowars about

19  its coverage within weeks of the shooting.  Right?

20  A.   Sometime later I learned of some

21  correspondence between him and I think one of crew

22  members.

23  Q.   So if anybody were to testify that you were

24  involved in responding to Mr. Pozner's correspondence,

25  that wouldn't be true?

                              28


1   A.   Would you refresh my memory?

2   Q.   I'm just saying if that happens.  I'm just

3   trying to --

4   A.   Say that again.

5   Q.   If somebody were to testify that you were

6   involved in the correspondence of Mr. Pozner in writing

7   the responses to him in the weeks after the shooting,

8   that wouldn't be true?

9   A.   I'd have to go back, but I remember inviting

10  him on the show when -- I think he emailed us -- I'm

11  going from memory on this -- he emailed us and I invited

12  him on the show.  That's what I remember.

13      Q.    Okay.  It's fair to say that Leonard Pozner

14  and Free Speech Systems have had an unfriendly

15  relationship over the years?

16      A.    No, I'm not -- I don't really follow what he

17  does, so...

18      Q.    You've done shows about him, so you do follow

19  him.  Correct?

20      A.    I mean, you'd have to refresh my memory.

21      Q.    So I will refresh your memory about what you

22  know about Mr. Pozner.  I'm going to show you what I've

23  marked as Exhibit 5.

24          (Exhibit 5 marked.)

25      Q.    Have you ever seen that before?

29

1      A.    No, not that I remember.  What is it?

2      Q.    That's the sole document you produced to me

3  just a couple, I guess, month or two ago in regard to

4  discovery requests for any documents you had regarding

5  Mr. Pozner.  That's the sole document that was in that

6  folder labeled Pozner.  That's it.  And that, you will

7  agree with me, appears to be a very large -- looks to be

8  about a 187-page comprehensive background report on Mr.

9  Pozner.  Correct?

10      A.    Well, I never ran a background report on

11  Pozner.  I've never even seen this.

12    Q.    I understand that you probably never even saw

13  that.

14    A.    Would somebody email us this and then we

15  opened --

16    Q.    I don't know, Mr. Jones.  You gave it to me.

17  What am I supposed to tell you about it?  I don't know.

18  You tell me.  That's what I got you --

19    A.    I did not -- I mean, we just go through the

20  email, most of it even unopened, and just send you guys

21  everything.

22    Q.    This isn't an email, is it?

23    A.    I would imagine -- well, I've never run a

24  background thing on Pozner.

25    Q.    All right.  Well, one thing we can agree on

                                        30

1   it, because if you look at the bottom of that document,

2   it says FSSTX.085544.  Correct?

3     A.    Yeah.

4     Q.    That's the Bates numbers y'all use when you

5   give me documents.  Right?

6     A.    Uh-huh.

7     Q.    So this document right here came from

8   Infowars' corporate files?

9     A.    I thought you said we haven't given you any

10  documents.

11    Q.    I've said you --

12    A.    Earlier you said we were defaulting; we gave

13  you nothing; we didn't even respond.

14    Q.  You gave me documents in the Lewis case in

15  response to document --

16    A.  I mean, listen, I'm just telling you I've --

17  I've never looked at this.

18    Q.  That's not what I'm asking you, Mr. Jones.

19    A.  But I remember hearing in the news about

20  something in Florida doing a background thing on him,

21  and so I figure something might have sent us this.  I'm

22  just guessing.  I shouldn't guess.  I don't know.

23    Q.  Yeah.  Do you think you should be guessing in

24  this deposition?

25    A.  No.  I just said -- you're right.  I don't

31

1  know what that is.

2    Q.  So let's not do that anymore.  But the first

3  thing that I'm asking you, the only question that I was

4  actually trying to ask you is:  It has a Bates number on

5  there that is the Bates number you put on your documents

6  that you give to me.  Right?

7    A.  I think, yes.

8        THE WITNESS:  I think this is ours.

9  Right?

10       MR. REEVES:  I can't answer questions.

11    Q.  You answer the question.

12    A.  Yes, this is ours.

13    Q.  Okay.  So one thing we can agree on is that in

14  the files of Free Speech Systems is a 187-page

15  investigator's comprehensive report on Leonard Pozner?

16     A.   According to you.

17     Q.   No, no, no, no, Mr. Jones, no, sir.  According

18  to you.  I want your testimony.

19     A.   I told you I've never seen this before.

20     Q.   I don't care if you've seen it before.

21     A.   Okay.

22     Q.   I'm saying you put -- this is your Bates

23  number on the bottom.  Correct?

24     A.   Yes.

25     Q.   Okay.  This came from Infowars' corporate

32

1  files?

2     A.   Okay.

3     Q.   So the company does follow Mr. Pozner?

4         MR. REEVES:  Objection to form.

5     Q.   Correct?

6     A.   No, I don't -- I don't know the -- I don't

7  know why -- if this out of our email or what.

8     Q.   What is Honor Network.  You know what that is.

9  Right?

10     A.   I think that's a fundraising mechanism that

11  he's involved in.  I have heard of that.

12     Q.   Fundraising mechanism.  How do you -- let's

13  start -- because I know you're not guessing because you

14  just said you weren't going to guess.  So where did you

15  hear that?  Who told you that?

16     A.   I can't remember exactly.  It was either news

17  articles about the tens of millions, hundreds of

18  millions of dollars raised by the Sandy Hook families.

19      Q.   Something like Sandy Hook Promise.  Right?

20      A.   And some controversy about where that money

21  goes.

22      Q.   Yeah.

23      A.   So I have heard about that.

24      Q.   Yeah.  Does Leonard Pozner have anything to do

25  with Sandy Hook Promise?

33

1       A.   Like I told you, I've heard of him and the

2   Honor Network.

3       Q.   Honor Network.

4       A.   I've heard that, and I've heard the other name

5   you said.  I don't know really --

6       Q.   You're just -- I mean, you heard some random

7   stuff and now you're trying to smear Mr. Pozner with it.

8   Right?  He has nothing to do with Sandy Hook Promise,

9   does he?

10          MR. REEVES:  Objection.  Form.

11      A.   You're asking me questions, so I don't know.

12      Q.   Yeah.  And I'm asking you what do you know

13  about Honor Network, and you just started telling me

14  some stuff.  But it's not anything you actually know.

15  Right?  You're just telling me things?

16          MR. REEVES:  Objection.  Form.

17      A.   No.  I told you that I heard that he's

18  involved with that.  I don't know -- I never talked

19  about it.

20      Q.   Let's go back to what you actually know about

21  Honor Network.  What is Honor Network, as far as you

22  know?

23      A.   I've been told it's something associated with

24  Mr. Pozner and charity but I --

25      Q.   Infowars has published articles talking about

34

1  the Honor Network.  Correct?

2      A.   I don't know that.

3      Q.   Infowars what has told its audience that Mr.

4  Pozner was behind Honor.  Correct?

5      A.   There's so much information we've put out, I

6  can't, without in front of me -- do you have it again to

7  refresh my memory?

8      Q.   I'm here asking you questions.

9      A.   I don't know.

10      Q.   Yeah, that's what I need.  I need "I don't

11  know."  That's what I want.  If you have an answer and

12  you either know or you don't know, just tell me.

13      A.   Okay.

14      Q.   That's how it works.

15          MR. BANKSTON:  Well, that ain't going to

16  work because that's how they produced.  Yeah, we'll save

17  that for another day.

18      Q.   Do you remember a video not made by Infowars

19  but one you chose after it got removed from YouTube to

20  put on the Infowars website?  And the video's name is We

21  Need to Talk About Sandy Hook.  Do you remember that

22  video?

23      A.   No.

24      Q.   Okay.  Do you know who Independent Media

25  Solidarity Group is?

35

1      A.   No.

2      Q.   Do you know who Peter Klein is?

3      A.   No.

4      Q.   Okay.  So as far as Infowars' hosting of --

5  let me put it this way:  Do you remember what the first

6  YouTube strike against Infowars over Sandy Hook was?

7      A.   No.

8      Q.   Okay.  I want to talk to you about what you

9  think is okay or not okay to do as it concerns Mr.

10  Pozner.  And so what I want to do is pretend for the

11  moment that I'm going to play the role of Infowars'

12  reporter/editor/writer, something like that.  And I've

13  come to your office and I've said, "Hey, Mr. Jones, I

14  want to publish something on the Infowars website, and

15  what I want to publish is the details of Mr. Pozner's

16  business.  I want to publish his business filings.  I

17  want to publish the address of all that."  Can I do

18  that?  Is that okay with you?

19      A.   I'm not going to answer hypothetical

20  questions.

21     Q.   So in your day-to-day business -- let me just

22  put it this way:  In your day-to-day business when

23  reporters come to you and ask you if they can do

24  something that they haven't yet done, those are

25  questions you cannot answer today?

                              36

1           MR. REEVES:  Objection.  Form.

2      A.   No, I can't answer your hypothetical question.

3      Q.   No.  I'm saying if I'm a reporter.  I'm not

4  asking you if my hypothetical -- it's not me asking the

5  question.  I'm saying if the reporter walked into your

6  office and wanted to publish the address details of Mr.

7  Pozner's business, could they do that?  What would you

8  say to them?

9      A.   It would depend on the context of it.

10     Q.    There are situations where that would be okay

11  because it depends on the context.  Correct?

12     A.   Yes.

13     Q.   Okay.  What about his home -- what about an

14  address that is not his business address, just an

15  address like his home address, his mailing address, any

16  of that?  Is that the same answer?

17     A.   It would depend on the actual circumstances.

18     Q.   Okay.  Do you believe that at any point in the

19  past, say, between 2012, 2016, have there been

20  circumstances that have arisen that would put into your

21  mind the feeling that it is justified to publish Mr.

22  Pozner's personal details?

23          MR. REEVES:  Objection.  Form.

24      A.  I'd have to have you give me specifics.

25      Q.  Well, I'm asking you in your memory of these

37

1   entire events.  Do you remember any specific situations

2   that you believe would justify publishing Mr. Pozner's

3   personal information?

4       A.  I never told my crew members or anybody to go

5   to anybody's houses or do any of that.  I remember some

6   controversy on the internet about his -- a U-Haul

7   parking lot where he claimed he lived, and we simply

8   pointed out -- I think Rod Dew did.  I'm going from here

9   here -- something to do with -- no, this report saying

10  this commentary on somebody else's report and then

11  pointing out that it was a U-Haul.  That's what my

12  memory -- that's what I remember.

13      Q.  You know U-Haul has mailboxes on it.  Right?

14  A lot of U-Haul places have PO boxes?  Did you know

15  that?

16      A.  I think so.

17      Q.  Okay.  So that's not weird, is it?  Somebody

18  to have an address at a U-Haul for a PO box, that's not

19  weird, is it?

20      A.  I mean, I answered you as much as I know.

21      Q.  No, that's not what I'm -- I'm not asking

22  about the facts.  I'm just asking right now:  If

23  somebody has a mailing address at a PO Box at a U-Haul,

24  that's not weird?

25     A.   I think we said that, yeah.

38

1     Q.   Okay.  So the point of your broadcast was to

2  say that that's not weird?

3     A.   I'd have to see it again.  I vaguely remember

4  it.

5     Q.   Like, you were trying to defend Mr. Pozner, is

6  what you're saying?

7     A.   I vaguely remember something about it.

8     Q.   Now, Mr. Pozner started in all of this

9  privately complaining to Infowars.  You agree with that.

10  He made a private complaint?

11     A.   I -- yes.

12     Q.   Okay.  And he was very polite about it, wasn't

13  he?

14     A.   It's been a long time since I saw the email,

15  but I think so.

16     Q.   Okay.  And when that didn't work, he

17  complained again but this time to YouTube.  You know

18  about that.  Right?

19     A.   I really don't remember.

20     Q.   You know Mr. Pozner complained to YouTube.

21  Right?

22     A.   No.  I mean, no.  I remember -- I remember

23  people said he was going around getting a lot of stuff

24  taken down all over the place and -- and --

25     Q.   It made you mad, didn't it?

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
570 of 1044

39

1    A.   No, no.  Actually, I told my crew members

2    Sandy Hook is a tar baby.  Stop covering it.  And then

3    it would just always come back like -- like a disease.

4    And so, I mean, long before you guys ever sued me, I

5    would scream at people if they even talked about it

6    because it's tar baby.  And that's why I've told you

7    I've just had to compartmentalize because it's just like

8    constant on the Sandy Hook, man, I killed the kids.  I

9    had people in Florida just a few months ago tell me you

10   killed those kids.  I went, "No, I didn't," just

11   whatever.  People don't know who Adam Lanza is.  They

12   think I killed the kids, so whatever.  I mean, I just --

13   you guys used it to deplatform me.  People think I

14   killed the kids, all this stuff.  Just do your worst.

15   Q.   What was my question?

16   A.   I've answered your question.

17   Q.   You don't know what it was.  You were just

18   talking.  You were just -- right?

19   A.   No.  I didn't know what your question was.

20   Q.   Right.  And so you just started talking

21   because you didn't even know what the question was

22   because you don't care.  Correct?

23   A.   Because it wasn't a clear question.

24        MR. REEVES:  Objection.  Form.

25   Q.   So here --

1   A.  No, I do care.  I care a lot.

2   Q.  Please let me give you --

3       MR. REEVES:  Hold on.  Stop.  There's a

4 court reporter.  There's no way she can take down what

5 both of y'all are saying.  Everybody take a breath.

6 Please let me him ask you questions.  Then answer his

7 questions.  And let's try to do this in as reasonable

8 method as possible.  And I would appreciate it if you

9 would just answer ask your questions instead of laughing

10 and instilling your own personal thoughts about his

11 testimony.  I would appreciate if you'd just ask your

12 questions so that he can answer them.  You're more than

13 happy -- welcome to disagree with him and point those

14 out, but your personal opinion on his answers is

15 something that is not appropriate.  And so I would just

16 ask if you'd please ask your questions, let him answer

17 them.

18       MR. BANKSTON:  I'm not going to be in

19 this deposition and pretend that what is happening here

20 is normal.  I am not going to guard my reactions to the

21 utter absurdity of what is happening.  That's not going

22 to happen.  All right?  This man is clearly not at all

23 showing any respect to the process of answering these

24 questions.  And I am not in any way -- I'm going to stay

25 civil during this deposition, but I am not going to be

41

1 met with this kind of absurdity and not react to it.

2 That won't happen.

3     Q.  I will give you the instruction, Mr. Jones,

4 that if you don't understand my question, if you think

5 it's not a clear question, don't answer the question.

6 Ask me to clarify the question.  If you answer a

7 question from now on, I'm going to assume that you

8 understood the question.  Do you understand that?

9     A.  Yes, I do.

10    Q.  All right.

11        MR. REEVES:  I'm going to object to all

12 that sidebar.  When you're ready to get down off your

13 soapbox and ask your questions, please proceed.

14        MR. BANKSTON:  Brad, this is not a

15 soapbox.  You understand what's happening in this room.

16 You understand what happened in this room yesterday.

17        MR. REEVES:  I want you to ask your

18 questions so that we can proceed with this deposition.

19 That's what I would like.  I would like you to not get

20 into an argumentative session with my client.  I would

21 like you to ask your questions so that he can answer

22 them.  I would appreciate that.

23        MR. BANKSTON:  All right.  We'll give it

24 another try.

25    Q.  You remember a video entitled Sandy Hook

42

1 victim dies again in Pakistan?  You remember that?

2     A.  Yes.

3    Q.   Tell me everything you can remember about what

4  the claims made in that video were.

5    A.   I don't remember enough about it to talk about

6  it.

7    Q.   Mr. Pozner was not happy with that video.  Do

8  you remember that?

9    A.   I don't remember anything with Mr. Pozner.

10    Q.   Okay.  You understand that the Sandy Hook

11  victim who was alleged to have died again in Pakistan is

12  Noah Pozner.  You know that.  Right?

13    A.   I believe the people in Pakistan had a photo

14  of him at the bombing or something, so I'd have to --

15  can you -- I can't answer the question because I don't

16  remember.

17    Q.   Okay.  Now, when it comes to Honor Network

18  attempting to have content removed, complaining to

19  YouTube, things like that, you've talked specifically on

20  your show about how you didn't like that.  Right?

21    A.   Well, this has happened over the last ten

22  years.

23    Q.   Sure.

24    A.   You want vague answers to the best of my

25  memory?

43

1    Q.   Yeah, I want -- Mr. Jones, I expected you to

2  somewhat, after now your third deposition, to maybe try

3  to get acquainted with the facts of this case and the

4  claims being made against you so that you could

5 meaningfully testify about them.  That's what I -- I

6 mean, honestly, I didn't actually expect that, but

7 that's what I would normally expect.  But what I'm

8 asking you right now, yes, is based purely on your

9 memory.

10           Do you have any memory that you ever got

11 on your show and said about the people who were having

12 content removed that you didn't like that?

13     A.   I do remember in general talking about that,

14 like, five, six years ago.

15     Q.   Right.  I think it went on a lot longer than

16 that, Mr. Jones, but some of it's in the past.

17     A.   I mena, I'm really against censorship, yes.

18     Q.   Yeah, I get that.  You called them bullies

19 too.  You remember that?

20     A.   I can't specifically remember that.

21     Q.   You remember saying you were going to fight

22 back?

23     A.   I don't specifically remember that, but I do

24 fight back against censorship.

25     Q.   You remember you said they stirred up a

44

1 hornet's nest?

2     A.   I don't remember any of that.

3     Q.   You remember you told them you're not a guy to

4 mess with?

5     A.   Maybe have the clip?  Show it to me.

6     Q.   No.  I'm asking you, Mr. Jones:

7     A.   I don't remember.

8     Q.   Of course I have the clip.  I'm asking you:

9  Do you remember saying that?

10    A.   No.

11    Q.   If you did say that, not a great thing to say

12  to parents who are upset who have lost their children.

13  Right?

14          MR. REEVES:  Objection.  Form.

15    A.   I mean, listen.  The American people are tired

16  of being blamed for shootings and being told that all

17  gun owners are to blame for things.  And so the

18  emotional response of people is to -- is to, basically,

19  be in denial.  And I've explained that psychology to

20  you.  And so I don't remember all that stuff.

21    Q.   Well, I didn't ask you if you remembered it.

22  My last question was:  If you were to tell parents who

23  were complaining because they didn't like seeing

24  pictures of their dead children on your television show,

25  if you were to tell those parents I'm not a person to

                        45

1  mess with, that's not a very good thing to tell them --

2  right? -- if that happened?

3     A.   I don't know the context --

4          MR. REEVES:  Objection.  Form.  Now

5  answer if you know the answer to the question.

6     A.   I mean, I don't know the context of what

7  you're saying.

8    Q.   What do you mean by context?  I don't

9  understand what that means.  Can you help me clarify?

10    A.   All I remember was telling my employees at

11  least five years ago don't talk about Sandy Hook, six

12  years ago.

13    Q.   I'm not -- again, Mr. Jones, I have just told

14  you I'm not asking about the past and what you remember.

15  I'm asking you:  If there were parents and they had lost

16  children and their photos had been on your show, and not

17  even Sandy Hook parents, just any parents, they've been

18  parents, they've lost children, grieving poor parents,

19  and they complained, maybe rightly or wrongly -- right?

20  -- like maybe you should ignore those complaints, maybe

21  you shouldn't, right, whatever it is, if you told them

22  I'm not a guy to mess with, that wouldn't be a good

23  thing.  Correct?

24       MR. REEVES:  Objection.  Form.

25    A.   I would need to know the context.  I don't

46

1  want to speculate, but I remember if they're on TV

2  showing pictures and saying we want to take your guns

3  and then people say we're sick of it, well, then we

4  should be able to talk about people that have made

5  themselves public figures.  But I don't know the

6  hypothetical circumstance.

7    Q.   Exactly.  So then when we're talking, it

8  depends on the context, doesn't it?

9     A.   Yes.

10    Q.   Okay.  So there are situations in which

11 parents who have lost their children who have their

12 pictures of their dead children shown on your show and

13 complained about that, there are contexts in which it

14 would be totally fine with you to say I'm not a person

15 to mess with.  Right?

16          MR. REEVES:  Objection.  Form.

17    A.   No, no.  I don't remember the exact -- I can't

18 answer something I don't know what you're talking about.

19    Q.   I'm asking you:  Is there -- is there possible

20 context where that would be okay or there's never a

21 possible context where that would be okay?

22    A.   I mean, there could -- see, I might have been

23 talking about YouTube itself or something.  I don't

24 know.  That's how -- your interpretation.

25    Q.   I'm not asking you about any specific

47

1 statement you've ever made.  I'm asking you again

2 hypothetically, not even about Sandy Hook parents.

3 Right?  I'm asking you:  Are there situations in context

4 where telling them I'm not a person to mess with is

5 okay, or is there never a context where that's okay?

6    A.   Yeah, I think people have a free speech right

7 to say don't mess with me.

8    Q.   Okay.  I'm going to show you what I've marked

9 as Exhibit 6.  Now, when --

10          (Exhibit 6 marked.)

11    Q.   When you see an email that begins "from

12  Jones," that's your dad.  Right?  You get emails from

13  your dad.  Right?

14    A.   Not very often, but yes.

15    Q.   That's your dad.  Right?

16    A.   I'm not sure.

17    Q.   Okay.  Well, we'll?

18    A.   Yes, it says David Jones right here.

19    Q.   Okay.  We're going to read through the whole

20  thing together.  Okay?  You see at the bottom there's a

21  label that says Heslin 19-4651-000862?  You see that?

22    A.   Yes.

23    Q.   Okay.  This is an email dated September 6,

24  2018.  Right?

25    A.   Yes.

48

1    Q.   That's after your suit.  Right?

2    A.   Yes.

3    Q.   The subject line -- well, let's first, it's

4  from your dad to Rob Dew.  Right?  Correct?

5    A.   Yes.

6    Q.   What does your dad do for you?

7    A.   He doesn't do anything anymore.

8    Q.   What did your dad do for you at the time of

9  this email?

10    A.   He was doing some HR and helping with product

11  development.

12    Q.    How did your dad go from being a dentist to

13  HR?  How did that happen?

14    A.    He'd done HR before for the dental companies.

15    Q.    Okay.  So you decided to bring him on when?

16    A.    Oh, ten years ago.

17    Q.    Okay.  So approximately 2011, that time

18  period, is when your dad joined the company?  Does he

19  have a managerial role at the company?  Can he tell

20  employees what to do?

21         MR. REEVES:  Objection.  Form.  Only

22  reason I -- can you can you please clarify the timeline?

23         MR. BANKSTON:  Yeah.  When he was working

24  there, I mean, you know.

25         MR. REEVES:  That's all I have --

                              49


1    A.    Yes.

2    Q.    Okay.  In this email to Rob Dew he says -- and

3  read along with me so you can make make sure I'm reading

4  it correctly.  Okay?  Actually, can you go ahead and

5  read this email for him?  I want to make sure that -- I

6  had some complaints about how I read an email yesterday,

7  so I want you to go ahead and read it for me.

8    A.    The Sandy -- okay.  This is from Jones,

9  subject, please help me find and get a copy of the video

10  of the U-Haul store.  We want to let people know where

11  they live.  Date, Thursday, 6 September 2018,

12  11:33:0500, CDT.  The Sandy Hook attorneys are claiming

13  that we tried to expose their addresses.  Evidently

14  there is a video of that claim that shows that was not

15  what we were doing.  Mr. Enoch wants a copy of that

16  since it's no longer available on YouTube.  He thinks it

17  and the apology should be made a part of a what really

18  happened landing spot to be used in public relations

19  reeducation.  David Jones for Alex.

20      Q.   And I believe it says, "Thanks David Jones for

21  Alex"?

22      A.   "Thanks David Jones for Alex."

23      Q.   All right.  So first of all, is there a video

24  that shows that that's not what you were doing?  Do you

25  know if that was ever discovered?

                          50

1       A.   Yes, I think there's a video of that.

2       Q.   Okay.  So if I wanted to have a video that

3   shows that what you were not trying to expose their

4   addresses, you'd be able to identify that video for me?

5       A.   I mean, I'm not -- I'm trying to guess what

6   this email is about, but yes.

7       Q.   Okay.  In truth, we know now that those

8   addresses were aired.  We can agree at least on that.

9   Right?

10      A.   The U-Haul?  Is that what you're talking

11  about?

12      Q.   Actually, multiple addresses, but yes.

13      A.   I do remember Rob Dew doing a show mentioning

14  some of that.

15    Q.   You were on that show.  You remember that.

16  Right?

17    A.   I haven't watched the video in a while.

18    Q.   Okay.  Do you remember right after Rob Dew

19  showing all that, I guess you don't remember saying that

20  I guess I'm going to have to go investigate them down in

21  Florida?  You don't remember that?

22    A.   I do remember saying that.

23    Q.   Yeah.  Okay.  Down at the bottom -- let's go

24  ahead and get this too.  This has a label that says

25  Heslin (19-4651)-00862.  Is that correct?

51

1    A.   Uh-huh.

2    Q.   Okay.  So this came from Free Speech Systems'

3  corporate files?

4    A.   Yes.

5    Q.   Okay.  All right.  When Neil Heslin -- okay.

6  First of all, you know who Neil Heslin is.  Right?

7    A.   Yes.

8    Q.   Okay.  So when Neil Heslin appeared on Megyn

9  Kelly's show in 2017, do you remember that?

10    A.   Yes.

11    Q.   Okay.  When he went on there and said he was

12  upset by the things you were saying about Sandy Hook,

13  did you believe him?

14    A.   I thought it was all done very theatrically in

15  a very canned way, but I do parents have pain about

16  their children.  But it was all done and had an

17  infomercial feel to it.  And that's my view of it.

18      Q.   Look, I don't care really what you think about

19  Megyn Kelly or NBC News run by the largest weapons

20  manufacturer in the world, you know.  Like, yes, they

21  make incredibly edited videos.  They -- it's a

22  complete -- I mean, I'm sure if you've ever seen an NBC

23  production with lights and cameras and staging that they

24  set up scenes, they do all this stuff, I know that.  I

25  know it looks like a video.  I'm not asking about NBC or

52

1  Megyn Kelly.  I just want to know about Neil Heslin.

2  Did you believe him?

3          MR. REEVES:  Objection.  Form.

4      A.   Believe him about what?

5      Q.   When he said he was upset about the things you

6  said about Sandy Hook, did you believe him?

7      A.   Yes, I believe him.

8      Q.   Okay.  You understood that if Infowars were --

9  okay.  So let me go back to the -- let me get you clear

10  on your day.  I want to take you back to the night that

11  you first saw that Megyn Kelly interview, which probably

12  was a surprise for you considering that it was not what

13  she represented it to you to be.  Correct?

14      A.   Yes.

15      Q.   Okay.  And on that night when you saw that

16  video and you saw Mr. Heslin saying those things, I want

17  to take you back to that date.  Okay?  And at that date

18  you understood that if Infowars were to make a video

19  saying Mr. Heslin could not have held his son, that

20  would be very upsetting to Mr. Heslin.  You understood

21  that?

22          MR. REEVES:  Objection.  Form.

23      A.  No, I did not understand that.

24      Q.  Okay.  Who -- do you know, sitting here today,

25  who made the choice for Owen Shroyer to put those claims

53

1  by Jim Fetzer on the air about Neil Heslin after the

2  Megyn Kelly interview?  Do you know who did that?

3      A.  It was a live show.  That's -- it's not a

4  video we made.  It was a live show, and I believe he

5  read a Zero Hedge article.  He just read an article.

6      Q.  About Jim Fetzer stuff.  Right?  You remember

7  that?

8      A.  I believe he was in the article.

9      Q.  Right.  And you understand that a video was

10  made for that and uploaded to YouTube on June 26, 2017?

11  Would you have any reason to dispute that?

12      A.  I'm not sure we would have our YouTube channel

13  then.

14      Q.  But you did.  You lost it in 2018.  You also

15  know that a month after Mr. Shroyer made that video you

16  then took that five-minute video from the live show and

17  played it on your show again.  You understand that?

18  You're being sued for that?

19      A.  I mean, yes, I guess.

20    Q.   Okay.  So whose decision was it, if you know,

21 for him to basically give more air to Mr. Fetzer's

22 claims?  Whose decision was that?

23    A.   It was Owen's decision.

24    Q.   Okay.  So the thing is I talked to him a

25 couple of days ago, and he said no, he didn't read it at

54

1 all or research it.  Somebody put it in front of him and

2 told him to do it.  He doesn't remember who, but he

3 doesn't do that.  I mean, he doesn't research stuff

4 himself.  Somebody puts it in front of him.  So let's

5 try to go at it this way.  If Owen is going to be doing

6 that video that day --

7    A.   I don't agree with that statement.

8    Q.   Okay.  Well, I mean, I'm -- again, talk to

9 Owen because he testified a couple of days ago.  Right?

10 But what I'm trying to figure out is if Owen's in that

11 studio that day because he's guesting for you that day,

12 how many people are in the studio right then to make

13 that show happen?  Like, how many people does it take to

14 get an Infowars episode live and going?

15    A.   Counting the host.

16    Q.   Yeah.  Counting Owen.  Right.  Tell me --

17    A.   About five.

18    Q.   Okay.  So who are the other four people?  Not

19 their names.  Like, what -- what -- what job functions

20 are they fulfilling?

21     A.   Their roles?

22     Q.   Yeah, exactly.

23     A.   You've got a producer and a radio.  That

24  doesn't mean like movies.  They don't pay for it and run

25  it.  Which means they, like, set up guests and make sure

55

1  and then that the show runs but they don't actually tell

2  them generally what to do.  And you'll have a camera

3  operator, you'll have a board operator, and then you'll

4  have one person researching, grabbing clips, news

5  articles, another person running a video switcher.  And

6  sometimes there might be an extra person in there

7  creating a radio log of just basic points that the

8  person was making on air in case they ever want to go

9  back and find any clips from the show.

10     Q.   Gotcha.

11     A.   Like, when we have a guest on, they'd say, oh,

12  that was interesting the guest said that.  Mark that.

13  And then the other day I'll look at the logs sometimes

14  and say, oh, I'm going to -- let's put that video up.

15     Q.   All right.  So let's talk about the people in

16  this room.  The camera person, the camera operator, in

17  general, is not going to have a lot of influence on the

18  content that goes on to the show.  Correct?

19     A.   Yes.

20     Q.   Okay.  Same true for the sound engineer on the

21  sound board?

22     A.   Yes.

23      Q.   Okay.  Same true for the logger.  Right?  For

24  you to make a radio log?

25      A.   Yes.

56

1      Q.   So the only two people in the room who are

2  probably going to have any influence on what goes in

3  front of the anchor to say are the producer and the

4  person who's researching and checking clips, and that

5  sort of thing.  Right?

6      A.   No, no.  The way -- the way it works is the

7  host is telling people what to play and what articles.

8  The host runs the shows.

9      Q.   So Owen should have been the one tho found the

10  Zero Hedge article?  That's what you're thinking?

11  That's how it would normally work?  He would have found

12  that article?

13      A.   Hundreds -- hundreds of articles -- this is

14  way I do it.  Other people don't do it this way.  I'm my

15  own, basically, producer, booker, everything.  So the

16  way I sit there and I print hundreds of articles or I

17  direct people to, and I just say go to these ten sites

18  and print everything on it because I like to have a

19  physical copy.  And then other people there have chosen

20  to do it the same way.  And then just constantly more

21  information is coming out as the day goes on.  And we

22  might -- kind of like a parrot eating.  I might, like,

23  throw away 90 percent of the stuff that's put in front

24  of me and then it just sits there and just, you know,

25  decide once they eat.  But the radio hosts run the show.

57

1  It's a radio show on TV.  It's a radio show.  It's not

2  journalism.  It's not, you know, in the main.  It's just

3  like Howard Stern or it's just like Rush Limbaugh.  And

4  you're playing clips; you're covering articles; you're

5  giving your opinion on things.

6          MR. REEVES:  Mark, can we take a short

7  break?

8          MR. BANKSTON:  Yeah.  Well, let me -- the

9  last line of questioning on that.

10      Q.   So I think a short way to do this, too, is to

11  say:  Of the people in that room who can have control

12  over the content or are likely to have control over the

13  content, it's the host, producer, and researcher.

14  Correct?

15      A.   Researcher?  There's --

16      Q.   Okay.  Maybe I messed up, then.  Let me go

17  back because I said the wrong thing.  Let me back that

18  up.  At one point you told me of the people in the room

19  is producer, camera, sound, a person doing radio log,

20  and then somebody who does -- pulls articles and

21  researches articles and clips and gets the clips ready.

22  Does that person have a name, a job role?  What is that

23  called?

24      A.   I come in -- the host sends to -- generally,

25  to the producer by email, by text, however they want,

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 588 of 1044

58

1  hey, we're going to play these clips or grab me this

2  clip.

3      Q.   So that person is less likely to have control

4  over the content.  That content is almost certainly

5  being -- usually being sent to them and saying, hey, can

6  you pull this and get it ready for the show.  Is that

7  kind of more --

8      A.   Yes.  The -- the -- the host is the captain of

9  the ship.

10     Q.   Gotcha.

11     A.   Sometimes they pop in and go, hey, there's a

12  standoff at the UN headquarters.  And I go, hey, give me

13  an article on that.  And then we're, like, okay.  NBC is

14  reporting.  Looks like it's a guy that wants to be

15  killed by a cop and we hope everything ends peacefully.

16  30 seconds on it.  The next thing is, oh, look.  A

17  federal court just ruled that they can't enforce

18  inoculations.  Oh, look.  An oil tanker just crashed.  I

19  mean, we're just talking about what's in the news.

20     Q.   Okay.  All right.  He wants to take a break,

21  so let's go ahead and do that.

22          THE VIDEOGRAPHER:  Going off the record.

23  Time is 11:38 a.m.

24          (Short recess.)

25          THE VIDEOGRAPHER:  We're back on the

1  record at 11:56 a.m.

2      Q.   Sitting here today, do you have an opinion, do

3  you have a thought, a conclusion, about whether Mr.

4  Heslin was telling the truth about holding his dead son?

5      A.   Looked convincing to me.

6      Q.   Wasn't as convincing to you, though, in 2017.

7  Right?

8      A.   I'm not sure what your question is, again.

9      Q.   You weren't as sure in 2017 that Mr. Heslin

10  held his child as you are today?

11      A.   You're talking about Owen, not me.  The issue

12  you're talking about with Owen is Owen.

13      Q.   No.  I'm talking about you getting on your

14  show in July 20th, 2017, and saying the stuff I heard

15  was they never let them have their kids.  You thought

16  Mr. Heslin wasn't telling the truth in 2017.  You were

17  not sure of that.  Correct?

18      A.   I was believing that Sandy Hook happened, and

19  then I saw the Megyn Kelly piece.  And everything I said

20  was edited the opposite of, basically, what I intended

21  to say.  And then it looked so scripted.  The way

22  everybody would -- it was, like, just the whole thing

23  looked like a TV production like a -- like a soap opera.

24  And I was, like -- I was, like, this looks so real.

25  It's, like -- but personally, I had questions about

60

1  that.  I mean, I did see that article after Owen covered

2  it.  And it did conflict with what the coroner said.

3  But again, I mean, I want to believe him.  I believe his

4  son died, I believe mass shootings happen, and I also

5  believe we have a right to question events because I

6  know we're lied to about them.  And that's where I

7  stand.  I said that to Megyn Kelly.  I said, I believe

8  that this attack happened and I can understand why it

9  hurt people's feelings.  Then she's, like, well, let's

10  go into the anomolies.  Let's go into why you questioned

11  it so I can be the villain again.  And then you just run

12  into this whole if Sandy Hook itself is not synthetic,

13  then how all the bureaucracy and the media and the

14  system came in and got it and that made it synthetic and

15  so that's why people then -- that's my thinking process

16  really started to think it probably didn't happen.

17          MR. BANKSTON:  Objection.  Nonresponsive.

18      Q.  Back in 2017 you had information, you had seen

19  information that caused you to doubt whether Mr. Heslin

20  really held his kid.  Correct?

21      A.  Yes, I did see an article questioning it.

22      Q.  Yeah.  And that information -- that

23  information was raised by Mr. Fetzer.  Correct?

24          MR. REEVES:  Objection.  Form.

25      A.  I don't -- I don't -- I don't have the article

61

1  in front of me.

2      Q.  Okay.  In 2017 Infowars, the company itself,

3  had an understanding that there was issues with

4  Mr. Fetzer's credibility.  Correct?

5           MR. REEVES:  Objection.  Form.

6     A.  I mean, I can't really speak to Mr. Fetzer's

7  credibility.

8     Q.  Okay.  Well, other people in your company have

9  spoken of Mr. Fetzer's credibility to you.  Correct?

10     A.  I don't recall.

11     Q.  You don't recall Paul Watson talking to you

12  about Jim Fetzer?

13     A.  No.

14     Q.  Okay.  If somebody -- if Paul Watson in

15  2015 -- is he your chief reporter by then?  Is he an

16  editor?  What is he?  Do you remember?

17     A.  Yeah, he was the head editor of Infowars, the

18  articles, the site itself.

19     Q.  Okay.  And he also did some hosting duties

20  too.  Right?

21     A.  Yes.

22     Q.  Okay.  If Mr. Watson -- let's just say again

23  that Mr. Watson, somebody whose opinion you respect, I

24  would assume.  Correct?

25     A.  Yes, sir.

                        62


1     Q.  Somebody you will -- if he -- if he brings you

2  something, you'll listen to him.  Right?

3     A.  Yes.

4     Q.  May not always agree with Mr. Watson.  Right?

5 A. Yes.

6 Q. But you'll listen to him?

7 A. Yes.

8 Q. If Mr. Watson had come to you in 2015 and told

9 you, Alex, Tim Fetzer is bat shit crazy, would you have

10 listened to him?  Would you have taken that into

11 consideration?

12 A. Yes.

13 Q. Would you have looked into Mr. Fetzer to make

14 your own determination if he was bat shit crazy before

15 relying on him again?

16 A. I don't remember the discussion.

17 Q. Okay.  But being the responsible journalist

18 you are, if you had received information that called

19 into doubt Mr. Fetzer's credibility, you would check in

20 and verify before ever relying on him again.  Correct?

21   MR. REEVES:  Objection.  Form.

22 A. I can't talk about hypotheticals that you're

23 discussing.  And I already told you that 98 percent of

24 what we do is cover news in the public domain and give

25 our opinion and commentary.  And so I am not a

63

1 journalist with the Wall Street Journal that writes

2 one-year-long investigative, you know, journalist

3 reports.  And so I'm a radio talk show host that puts

4 the show on TV.

5 Q. No, I understand you don't do year-long

6  reports.  I understand that.  You do five years of

7  coverage on Sandy Hook.  I understand that.  And it's

8  sporadic.  Right?  You're not -- you're not engaged

9  every day going into the office researching Sandy Hook

10  during those years, are you?

11      A.   No.  It's continued to -- to come up in the

12  press and then people would call in about it and things.

13  But I've, for at least five, six years have told the

14  crew I do not want to cover it and that I think Sandy

15  Hook happened.  I still had anomalies.  I have real

16  questions.  I genuinely questioned it, and the

17  statements that I made it up, that is, I would get

18  publicity off of it, are false.  That is false.

19      Q.   Okay.  Have you -- have you -- have you ever

20  had a chance to either read or watch Paul Watson's

21  deposition?

22      A.   No, I've not read it or watched it.

23      Q.   Okay.  There's something he said in that

24  deposition.  I want to run it by you.  Okay?  Which is

25  that Mr. Watson testified that you don't feel bound by

                                64


1  journalistic ethics.  Would you agree with that?

2      A.   No, I don't agree with that term or phrase.  I

3  do have ethics and I want to tell the truth and I try to

4  tell the truth, but I'm definitely wrong sometimes.  But

5  to say that I don't feel bound by journalistic ethics

6  because I am by ethics, that's -- I mean, I disagree

7  with my interpretation of that because I do have ethics.

8    Q.   Your chief -- okay.  So Paul Watson also

9  testified that he did not believe that how you acted

10  regarding Sandy Hook was decent or right.  How would you

11  respond to that?

12    A.   Well, I'm not running a cult.  And so the

13  people that work there, we disagree; we have debates on

14  air.  We -- we had debates about Sandy Hook, and I think

15  we concluded that we thought it probably happened well

16  before I was sued.  And so yeah, we're a radio show just

17  like guys in a barber shop arguing and debating.  That's

18  what it is.  It's like a barber shop on TV.

19    Q.   Well, so I want to ask you now is:  Are you

20  going to tell this jury that the way you acted regarding

21  Sandy Hook was decent and right?

22         MR. REEVES:  Objection.  Form.

23    A.   I mean, I have a first amendment right to

24  question big events.  I did not kill the children at

25  Sandy Hook.  And the families have sued the police and

                                 65


1  the teachers and the government and Remington and

2  everybody else.  And we're ten years later, and I'm not

3  the one bringing up Sandy Hook.  I'm not the one living

4  off Sandy Hook.  I'm not the one, you know, who -- who

5  is -- is in the main doing the things people claim I've

6  done or, quote, are continuing to do.  And I've been

7  beaten over the head with it.  It's been used to

8  deplatform me.  It's been used to dehumanize me.  It's

9 been used to try to sue us. I mean, we know the

10 families have said that we want to destroy Alex Jones,

11 we want him off air, we want him silenced. And so --

12     Q.   Which one of my clients said that?

13         MR. REEVES:  Objection.  Form.

14     A.   I would have to go pull it back up, but I've

15 seen the quotes in the press.

16     Q.   None of my clients have said that, Mr. Jones.

17 You're just making stuff up right now, and I'd prefer it

18 if you wouldn't just smear my clients in the middle of

19 this deposition.

20         MR. REEVES:  Objection.  Form.  No one

21 said it was your clients.

22         MR. BANKSTON:  Yeah, he's making a very

23 big impression here.

24     Q.   You're being really vague about it.  And so

25 that's why I'm asking you this question.  None of my

66

1 clients said that, did they?

2     A.   I can go pull up news articles where -- where

3 some of the Sandy Hook families have been quoted as

4 saying this.

5     Q.   I'm not asking you that, Mr. Jones.  I'm

6 asking a very specific question.  Not some of the Sandy

7 Hook parents.  I'm asking you:  Did any of my clients

8 say that?

9     A.   I wasn't specifically talking about your

10 clients.

11     Q.   Then the answer is no.  Correct?

12     A.   I'll have to go do a search, but it said quite

13   a bit.

14     Q.   But you have no problem just saying it out

15   loud in this deposition.  Right?

16          MR. REEVES:  Objection.  Form.

17     Q.   What I'm trying to get at is you have no

18   basis, sitting there right there in this chair, that my

19   clients said any of those things?

20     A.   Clients said what?

21     Q.   Any of the things you just said.

22     A.   Repeat them back.

23     Q.   That they want to destroy Alex Jones.

24     A.   Take Alex Jones off the air.

25     Q.   Take him off the air.

67

1     A.   Make him pay.

2     Q.   Oh, well, that.  Oh, Mr. Jones, we're here to

3   collect a debt.  A hundred percent we're going to make

4   you pay, but nobody here is talking about destroying you

5   or taking you off the air is the goal of this lawsuit.

6     A.   Oh, really?

7     Q.   Are they?  That's what I'm asking you.  Do you

8   have information, sitting here right now in this chair

9   under oath that that's true, that my clients said that.

10   Do you?

11     A.   I have seen news articles with quotes like

12  that and, if you want, I can later pull the specifics

13  for you.

14      Q.  From my clients.  That's your testimony under

15  oath?

16      A.  No, I didn't say from your clients.

17      Q.  Then that's what I'm asking you, Mr. Jones.

18  In this chair you're sitting right now under oath you

19  have no information that my clients said the kind of

20  comments you just referred to.

21          MR. REEVES:  Objection.  Form.

22      Q.  Correct?

23      A.  What were the comments, again?

24      Q.  I'm done answering your questions, Mr. Jones.

25  I've already given you a lot of latitude by trying to do

68

1  that for you.  Can you answer my question or not?  You

2  can say I can't answer that question.

3      A.  Sitting here, I don't have the specifics.

4      Q.  There we go.  Thank you.

5          MR. BANKSTON:  16 and 17.

6      Q.  Who's David Knight?

7      A.  David Knight is a talk show host.

8      Q.  Does he work for you right now?

9      A.  No.

10      Q.  Okay.  He did work for you recently?

11      A.  Yes.

12      Q.  When did he leave the company?

13      A.  If I remember correctly, about a year ago.

14    Q.   And then he's not come back in any way?  Are

15   y'all still doing videos with David Knight?

16    A.   No.

17    Q.   Okay.  David Knight did not  -- there was

18   some -- I don't know how to say this.  There was some

19   tension between David Knight and Dr. Steve Pieczenik.

20   You'd agree with that?

21    A.   I mean, I remember some.

22    Q.   David Knight and Steve Pieczenik did not get

23   along.  Right?

24    A.   I guess.

25    Q.   David Knight was incredibly critical of the

69

1   things Steve Pieczenik was saying about Sandy Hook.

2   Correct?

3    A.   No, I don't remember that.

4    Q.   Okay.  Can you tell me why David Knight isn't

5   with the company anymore?

6    A.   David was saying that he was being censored

7   and no one was censoring him.  And he was just unhappy

8   and so I fired him.

9    Q.   Okay.  I'm going to put in front of you what I

10   marked as Exhibit 7.  Now, one of the things you'll

11   notice about this document as you look down in the

12   bottom corners, there's no numbers, are there?  Bottom

13   corners of the document?

14          (Exhibit 7 marked.)

15    A.    No.

16    Q.    Blank page?  All right.  So this is -- I'm

17  going to represent to you this is a document that was

18  produced to me by your former lawyers that has no Bates

19  number on it.  Okay?  So I don't have an identification

20  number for you.  But looking at this email with David

21  Knight's name to and from, that's one of your employees

22  at that time, 2017?

23    A.    Yes.

24    Q.    Okay.  And I'm going to go ahead and read this

25  for you here.  This is -- the date is June 19th, 2017?

70

1    A.    Uh-huh.

2    Q.    Okay.  You remember that the Megyn Kelly

3  interview was in the summer of 2017.  Right?

4    A.    Yes.

5    Q.    Okay.  And in fact, one of the videos that

6  your company is being sued for is a June 26th video from

7  2017 that Owen Shroyer did; we've just been talking

8  about it.  Right?

9    A.    Yes.

10    Q.    And then in July you also did a video about

11  Mr. Heslin as well.  Correct?  That you're being sued

12  for?

13    A.    Yes.

14    Q.    So you do know you did make that July 20th

15  video about Mr. Heslin.  You know that, sitting here

16  today?

17    A.   Yeah, I did a live radio show, yes, this show.

18  I didn't make a video.

19    Q.   Well, I guess you didn't make the video but

20  somebody did.  Somebody made a video of that and

21  uploaded it to the YouTube channel at Infowars.  Right?

22    A.   Uh-huh.

23    Q.   So I don't -- what I'm trying to get, because

24  you've brought this distinction up a couple of times,

25  that, no, we're just a live radio show, it's not a

71

1  video.  But there are videos and they are uploaded to

2  YouTube.  Correct?

3    A.   They were, yes.

4    Q.   And in fact, the listenership for the radio

5  show could be totally different than who's watching the

6  YouTube video.  Correct?

7    A.   They are, yeah.

8    Q.   Yea.  Okay.  So now we have this video -- we

9  have this email from David Knight and it's from David

10  Knight to David Knight.  Right?

11    A.   Uh-huh.

12    Q.   So he's sending himself something.  Correct?

13    A.   I would guess.

14    Q.   Okay.  The subject line is, it says

15  Connecticut carry releases the troubled past of Neil

16  Heslin.  And then do you see that there is a link there

17  from ammoland.com?  Correct?

18      A.   Yes.

19      Q.   Okay.  And then it says sent from my iPad.

20  Right?

21      A.   Yes.

22      Q.   Okay.  And then this email here was sent to

23  himself at 6:12 p.m.  You see that?

24      A.   Yes.

25      Q.   Okay.  Everything I've said about this email

                                    72

1  is accurate?

2      A.   Yes.

3      Q.   Do you have any reason to think that this is

4  not a true and accurate email from Infowars's files?

5      A.   I don't know.

6      Q.   I don't know either.  You gave it to me and it

7  doesn't seen even have a Bates number on it, so that's

8  why I'm asking you.  Do you have any reason to dispute

9  this is a real email --

10      A.   No, I don't have any reason to dispute it.

11      Q.   Okay.  Have you ever been to ammoland.com?

12      A.   I've been there some.

13      Q.   Okay.  So you're familiar with what that site

14  is?

15      A.   Not -- actually, no.

16      Q.   Okay.

17      A.   I've just heard of it.

18      Q.   Let me show you this.  This is a similar email

19  which I've marked as Exhibit 8.

20          (Exhibit 8 marked.)

21     Q.  You see this says 6-18-2017?

22     A.  Yes.

23     Q.  Okay.  Just a couple of days before Owen

24  Shroyer did his video.  Correct?

25     A.  Yes.

73

1     Q.  Okay.  And do you remember that Megyn Kelly's

2  interview with your profile came out in June 19th, 2017?

3     A.  I don't remember.  I don't remember the date.

4     Q.  Okay.  So here we have again David Knight

5  sending an email to himself, David Knight.  Seekthetruth

6  80@yahoo, is that another one of David Knight's email

7  addresses?

8     A.  I don't know.

9     Q.  Okay.  You don't know who that is?

10    A.  No.

11    Q.  Okay.  It says subject, Neil Heslin, father of

12  Sandy Hook victim, faces criminal charges/news/

13  countrytimes.com [sic].  Right?

14    A.  Yes.

15    Q.  And then there's a Country [sic] Times article

16  link?

17    A.  Yes.

18    Q.  Okay.  And then Mr. Knight sent himself this

19  email at 2:56 in the morning?

20    A.  Yes.

21    Q.   Okay.  Do you have any reason to think that

22  this isn't a correct true and copy email that came out

23  of Infowars' files?

24    A.   No, I have no reason.

25    Q.   All right.  You know who Veronique de la Rosa

74

1  is.  Right?

2    A.   Yes.

3    Q.   Okay.  Video of her interview with Anderson

4  Cooper has been shown on Infowars many times.  Correct?

5    A.   Yes.

6    Q.   Okay.  The company believes she was a public

7  figure.  Correct?

8    A.   Yes.

9    Q.   Company believes you should have greater

10  latitude to comment on public figures.  Correct?

11    A.   Yes.

12    Q.   Part of the reason the company believed that

13  her interview was suspicious was because Ms. De la Rosa

14  had made statements in support of gun regulation.

15  Right?

16        MR. REEVES:  Objection.  Form.

17    A.   Yes.

18    Q.   So if the company was commenting on her

19  because of her public advocacy, then the company knew

20  who she was, obviously.  Right?

21        MR. REEVES:  Objection.  Form.

22    A.   I don't understand the specifics of what

23  you're asking.

24      Q.   I'm asking you:  Since you knew she was a

25  public figure, since you knew she had made gun advocacy

75

1  comments and that was part of the reason why it was

2  suspicious, the company knew who she was?

3      A.   Well, she put herself in the arena on

4  television.

5      Q.   Right.  I'm not disputing you on that, Mr.

6  Jones.  I'm not having an argument about that.  Right?

7  All I'm trying to come up with is at the moment that

8  Infowars put that video of her and her interview on the

9  air, Infowars knew who she was and knew she was, in your

10  eyes, a gun advocate -- a gun regulation advocate.

11  Right?

12      A.   You know, I don't remember back ten years ago.

13  I just really don't remember.

14      Q.   Well, I mean, you were totally fine just now

15  testifying to me that you knew she -- and believed she

16  was a public figure, that you knew that she had made

17  comments on gun advocacy.  Right?  You just testified to

18  that.

19      A.   That's what my memory serves a long time ago.

20      Q.   Right, right.  But I mean, again, if you're

21  going to make the argument that she's a public figure

22  and that part of what she was doing was suspicious based

23  on the things she was doing in her public advocacy, that

24  means you would have to know about her public advocacy.

25  Right?

76

1      A.   I don't have the specifics back at the time.

2      Q.   Okay.  Do you remember when talking about that

3  video -- okay.  So you know there's this thing in that

4  video about the -- Anderson Cooper's and the green

5  screen.  Right?  You remember that?

6      A.   Yes, I remember that.

7      Q.   Okay.  Do you remember them talking about

8  whenever you talked about that video too you would talk

9  about how the background behind them was looped and the

10  flowers would move the same way and that you could tell

11  it was looped?  Right?  Do you remember talking about

12  that?

13      A.   Yes.

14      Q.   Okay.  First of all, that's just not true.

15  Right?  There's no looped background?

16      A.   I was talking about several shots and things

17  we'd seen CNN done --

18      Q.   Ms. De la Rosa's interview that you were

19  talking about, there's no looped background.  Correct?

20      A.   That was ten years ago.  If you show me the

21  video and refresh my memory.

22      Q.   I'm asking you here because I brought you to a

23  deposition about the video that you -- we allege you

24  defamed her on.  And I'm wondering right now if you're

25  saying today -- is it going to be your contention to

1  this jury that that video had a looped background and

2  you were right?  Is that your contention or not?

3      A.   The video looked like it had been altered and

4  it did look like other shots CNN has done before where

5  they have the person in the studio and then the person

6  is there and they cut the pieces over each other.

7      Q.   I'm asking about if there's a looped

8  background.  Is there a looped background or not?  Is

9  that going to be a contention in this case or not?

10           MR. REEVES:  Objection.  Form.

11      A.   I'd have to see it again.

12      Q.   Okay.  One thing we do know, though, is you

13  were talking about how the leaves were blowing.  Right?

14  Because they're outside in that video.  You understand

15  what I'm saying?

16      A.   Uh-huh.

17      Q.   Okay.  And how if the leaves were blowing and

18  then suddenly they glitch and they go back to where they

19  were, that would show you there was a loop.  Right?

20  That's how you would know there was a loop.  Correct?

21      A.   Yes.

22      Q.   Okay.  So if there's wind blowing out there --

23  the other thing we know is that there's wind blowing on

24  the people if they were actually on the scene.  Right?

25  If there were people -- if there's wind blowing on the

1  flowers and the people are supposedly actually there,

2  there should be wind blowing on them too.  Right?

3      A.  Yes.

4      Q.  Okay.  So in that interview, Ms. De la Rosa's

5  hair is moving from the wind.  Do you understand that?

6  Do you disagree with that?

7      A.  I'd have to see the video again.

8      Q.  Okay.  So you don't know that.  But if her

9  hair is moving --

10      A.  Well, we're saying Anderson Cooper wasn't

11  there.

12      Q.  Woah.  Okay.  This is new to me.  Are you --

13  are you saying -- are you saying that Veronique de la

14  Rosa was standing in the Newtown square and Anderson

15  Cooper wasn't and they composited Anderson Cooper and

16  Veronique de la Rosa was either talking to nobody or

17  somebody in, like, a blue Jar Jar Binks suit?

18      A.  I believe Jar Jar Binks.

19      Q.  Do you know who that is?

20      A.  No.

21      Q.  Okay.  Don't worry about it.  Do you think

22  Veronique de la Rosa was there?  Back up.  When you made

23  those comments, when you were -- when you were

24  describing this Anderson Cooper blue screen, was it your

25  allegation that they were both on a studio in Atlanta

79

1  behind the blue screen --

2    A.   No, no.

3    Q.   -- or was it that Anderson Cooper wasn't there

4    but Veronique de la Rosa was there?

5    A.   I would have to -- like I told you, it was ten

6    years ago.  I would have to review the videos.

7    Q.   Okay.  So as far as the video you're being --

8    A.   I remember the nose disappearing and people

9    having a lot of questions saying that could be a blue

10   screen and looking at it and then some of the other

11   anomalies.

12   Q.   When was the last time you saw that video?

13   A.   Oh, a long time ago.

14   Q.   So here you are for your third deposition.

15   A.   I didn't know you were going to bring this up.

16   Q.   It really would be surprising for me to bring

17   up the video that you're being sued for defamation --

18   A.   Well, next time you bring it up I'll certainly

19   all done the research.

20   Q.   There isn't going to be a next time, Mr.

21   Jones.  Next time we see each other is going to be a

22   couple of months in a courthouse.

23   A.   Well, next time we see each other you'll be

24   able to bring this up.

25   Q.   No, we're not going to talk about that.

80

1    A.   Oh, okay.

2           MR. REEVES:  Please just let him ask you

3  questions.

4         MR. BANKSTON:  No.  He wants to answer --

5  I mean, he really wants to ask questions.  I'm happy to

6  answer them.

7         MR. REEVES:  Please just let him ask you

8  questions and you answer them so we can move on.

9      Q.   So one of two things has to be true if

10  Anderson Cooper is on a blue screen.  One of two things

11  has to be true.  Either Ms. De la Rosa is also on blue

12  screen or Ms. De la Rosa is in the town square and she's

13  not actually talking to Anderson Cooper.  One of those

14  two things has to be true if there is a blue screen.

15  Correct?

16      A.   How it would work is one person has an ear

17  piece; they're really talking to them.  They just

18  composite the person in so they're essentially together.

19  They generally do that kind of shot and you see how

20  they're far apart.  You can see blue screen sometimes.

21  That happens in a lot of shots.  And we may have been

22  wrong about that.  We weren't the ones that generated it

23  and the first to put it out.  We just simply gave

24  commentary and our views on it.

25      Q.   Okay.  If Ms. De la Rosa wasn't at Newtown --

                              81


1  let's go ahead and pretend for a moment that this was

2  all shot on blue screen, right, that Anderson Cooper is

3  not in the town square.  And let's also pretend that Ms.

4  De la Rosa isn't at the town square.  If that's the

5  case, somebody is going to have to be off screen with a

6  fan blowing her hair.  Right?

7            MR. REEVES:  Objection.  Form.

8     A.  Like I told you, it's hard to comment on

9  something that's not in front of me.

10     Q.  Uh-huh.  Does the company have any reason to

11  contend -- well, first let me ask it this way:  Do you

12  have any reason to contend that any of these parents

13  have been faking their distress over Infowars' actions

14  as it regards Sandy Hook?

15     A.  I did not kill their children and I didn't

16  visit Adam Lanza's house.  CIA did, and all the rest of

17  that.  And no one sued me back at the time when I was

18  actually talking about it.  It was once I became

19  extremely famous and Hillary Clinton made an issue about

20  it in campaign ads.  And then Trump won the election,

21  and then I became this big supercharged political target

22  as low-hanging fruit, and then they go, oh, he's the

23  Sandy Hook man.  And then the anti-gun control groups,

24  the democratic party basically attached themselves to me

25  so that every time I was in the news they could then

82

1  bring back up Sandy Hook for the gun control advocacy

2  that they have.  And that's what this long process

3  has -- has been.

4            MR. BANKSTON:  Okay.  First of all,

5  objection, nonresponsive.

6      Q.   Was any of that -- was any of that meant to be

7  a reason that you contend that thie Sandy Hook families

8  are faking -- or saying my clients are faking their

9  distress over --

10     A.   I do not think they are faking their distress.

11     Q.   Okay.  So their distress over what you said is

12  genuine?  You admit that?

13         MR. REEVES:  Objection.  Form.

14     A.   I mean, I would call it more hatred than

15  distress.

16     Q.   I think -- yeah, I think there's some feelings

17  of hatred.  Yeah, I do.  I think -- I think when -- for

18  instance, you can understand how when Neil Heslin has

19  spent the last moments with his little heroic child who

20  saved some lives that day looking him in the face with a

21  bullet hold in this head --

22     A.   I didn't kill him.

23     Q.   I know you didn't kill him.

24         MR. REEVES:  Please let him just ask

25  you --

83

1      Q.   Yeah, let's not interrupt me, Mr. Jones.  I

2  don't you didn't kill him.

3         MR. REEVES:  I've got my client -- I'm

4  handling my client.

5         MR. BANKSTON:  You're not, but I'm --

6  we'll see what we can do.

7      Q.   I'm asking you, Mr. Jones.  I'm not saying you

8  killed these kids.  Nobody is saying that you caused

9  that grief.  Let's make that really clear.  Nobody is

10  saying that.  These parents, though, were grieving over

11  the deaths of their children.  That's a thing that they

12  went through.  Has nothing to do with you.  You get

13  that?  Their grief over the death of their children has

14  nothing to do with you.  You get that?

15      A.  Except then through the gun control movement,

16  it was projected on gun owners blaming us for their

17  deaths, and we don't accept that.

18      Q.  I don't even know what that means, but --

19      A.  You know what it means.  Gun owners have all

20  been blamed.  You asked me to answer your question.  We

21  get blamed every time some crazy person on Prozac goes

22  and kills people that the CIA went and visited on

23  record.  And then -- and then we get blamed, and we're

24  tired of being blamed.  And so -- and so people start

25  really looking at these events and don't trust them.

84

1  And a lot of the times it turns out they are staged.

2  The Roe v. Wade baby never died.  Gulf of Tonkin never

3  happened.  The CIA did plan staged mass shootings and

4  mock funerals to -- at Star War with Russia and Cuba,

5  Operation Northwoods.  These are real things.

6      Q.  Judith Miller at the New York Times

7  collaborated with Ahmed Chalabi and basically invented

8  weapons of mass instruction that resulted in the death

9  of a million Iraqi civilians.  Right?

10    A.  Yes.

11    Q.  And whoever the journalist was who got to the

12  bottom of what Judy Miller and those neocons were doing,

13  that person deserves a Pulitzer and maybe a metal and

14  maybe Judith Miller deserves to be in jail.  Would you

15  agree with that?

16    A.  Yes.

17    Q.  Right?  And so that journalism that resulted

18  in that was really good journalism?

19    A.  Yes.

20    Q.  But there can also be really bad journalism

21  too like what Judith Miller did with the weapons of mass

22  destruction.  Right?

23    A.  The point is they lied on purpose about WMD's.

24  I made my opinion and legitimately thought it might not

25  have happened.

85

1    Q.  Right.

2    A.  Okay?  And I'm being honest with you about

3  that.  So here's the deal:  The court of public opinion

4  knows that people have a right to ask questions.  Now,

5  in hindsight, I saw the families.  It looked pretty

6  legitimate.  Some of the anomolies turned out to not be

7  true, and then I said I was sorry.  And then I got sued.

8  And so let's just not sit here and pretend that Alex

9  Jones is in red pajamas like the devil running around

10  attacking all these people when that's not the case.

11    Q.   Let's see if we can -- okay.  So if Neil

12  Heslin spent these last moments with his son, has this

13  cherished memory putting his hand through his son's

14  hair, and then he sees Mr. Shroyer and then you, right,

15  get on TV and draw serious doubt about whether he even

16  held his son, whether he's telling the truth, and he did

17  that after he had asked you to stop, you can understand

18  why that man might have some negative feelings about

19  you?

20    A.   And you can understand how he's on TV on an

21  actual program attacking us.

22    Q.   Yeah.  You know why he did that?

23    A.   Yeah.

24    Q.   Tell me why.  Why did he do that?

25    A.   Because Megyn Kelly went and organized the

86

1  whole thing for publicity to go after second amendment.

2  They stepped into this, used it for political purposes,

3  went after the American people, and then get surprised

4  when people think it might be staged or it might be

5  synthetic.

6    Q.   You think Neil Heslin went on national

7  television to ask you to stop as part of a plot to,

8  what, destroy the second amendment?

9    A.   No.  There are the interests behind it and the

10  money and the financing.

11    Q.   I don't care about those people.  I don't

12  represent any of these people.  I don't represent Megyn

13  Kelly.  If I had Megyn Kelly in this chair right now,

14  believe me I'd be talking to her about some things.

15      A.  Why don't you subpoena her and get the real

16  thing I said on that interview.

17      Q.  Don't you have it?  You have a full audio of

18  everything that happened when she came into your

19  building.  You never gave it to me, but you have it,

20  don't you?

21      A.  No.

22      Q.  Where's that tape?

23      A.  Well, would you like me to be specific?

24      Q.  Yeah.  Where's the tape?

25      A.  It was not -- that was not taped at the

                              87

1  office.  That was taped at a house they rented.

2      Q.  Oh, so they rented a house to do your actual

3  interview?

4      A.  Yes.

5      Q.  And then you didn't actually tape any part of

6  that?

7      A.  No.  Well, the crew member did not put their

8  phone on do not disturb, and so about a few minutes into

9  it someone calls and then their recording stops.  Just a

10  total -- the truth is we've got some good employees,

11  we've got some bad employees.  But it is slackerville

12  Austin.  And if anything, we're incompetent sometimes.

13  And so that's my crime, is we got so huge and big and

14  sometimes I'm just a regular guy on the radio and make

15  mistakes.

16      Q.   All right.  But you do have an audio recording

17  of you talking with Megyn Kelly about that interview?

18      A.   No.  Like I told you, it didn't --

19      Q.   No, no.  Before talking about the interview.

20  She came --

21      A.   Oh, yeah, I did record -- yeah.  Well, no.  I

22  interviewed her -- let me slow down here.  She called me

23  one day a few months before -- before she came to Austin

24  and did the interview that aired in the summer.  And

25  she -- she was driving in the car and she's, like, oh,

88

1  I'm such a big fan, oh, you're so wonderful.  And I knew

2  it was a setup and I didn't have a recorder on my phone.

3  So I said let me get back to my office.  So I got to my

4  office.  I had another iPhone, and then those -- that's

5  the thing I interviewed and put out on the internet to

6  show what she'd really said and really done.  That was

7  not a recording of her at the office.  That was a

8  recording of her setting up the interview with me.

9      Q.   Okay.  So you have audio of you and Megyn

10  Kelly?

11      A.   It was uploaded to YouTube and then they took

12  that channel down.  But I'm sure it's somewhere.

13      Q.   Okay.  And they took that channel down after

14  you were sued.  Right?

15      A.   Uh-huh.

16      Q.   Okay.  So at some point between when you were

17 sued and when they took that channel down you had audio

18 of you talking to Megyn Kelly.  Correct?

19      A.   Yes.  And that audio is public.  We put it out

20 unedited.  If you've want it, you've got it.

21      Q.   Where would I find it?

22      A.   I mean, if -- we've used that as the cloud.

23 We used YouTube as the cloud.

24      Q.   I get that.

25      A.   And so I didn't, like, organize stuff.  I'm

89

1 the --

2      Q.   No, no.  I'm not asking you that.

3      A.   I'm super unorganized.

4      Q.   I'm asking where can I find it.

5      A.   I would have to get online and go find Alex

6 Jones.  I forget even the headline of it.  It would take

7 some time, but not that long.

8      Q.   Okay.

9      A.   It would be like -- trying to remember.

10      Q.   Does the company have any reason to -- let me

11 ask you this way.  Let me do it you.  I don't want you

12 to speak for the company if you don't -- you can't speak

13 for everybody in the company.  Right?  Some people in

14 the company have different opinions.  Right?

15      A.   Yes.

16      Q.   Okay.  Do you have any reason to dispute that

17  these parents' grieving process over the past eight

18  years has been impacted by Infowars' actions as it

19  regards Sandy Hook?

20          MR. REEVES:  Objection.  Form.

21     A.   That's a hypothetical question.  I can't speak

22  to their emotions.

23     Q.   There's nothing hypothetical about it, Mr.

24  Jones.

25     A.   I did not kill their children.  They became

90

1  political and used that death to then -- for their

2  advocacy against the right to keep and bear arms.  And

3  so that directly put them in opposition politically with

4  me, and so they stepped into that political arena.

5     Q.   What did Leonard Pozner do politically about

6  guns?  What did he do?  Did he ever say anything about

7  guns publicly?

8     A.   I'm talking about the whole Sandy Hook

9  situation in general and then some of the parents.

10     Q.   Okay.  Did Scarlett Lewis ever say anything

11  about guns?

12     A.   I don't have it all in front of me.  I mean, a

13  lot of these people never even said their names.

14     Q.   Okay.  But again, I want to go back not to,

15  like, what they may have done.  I'm asking you:  Do you

16  have any reason, sitting here today, to think that their

17  grieving process was unaffected by Infowars' actions as

18 it regards Sandy Hook?

19     A.  No.  I think it was affected, and then it gave

20 them someone to hate and to continue on again.  So I

21 wish I never would have gotten in the middle of it.

22     Q.   Right.  So if for five straight years Infowars

23 is telling millions of people that Sandy Hook is fake

24 and that the controversy then stays alive, you

25 understand it might be hard for my clients to have

91

1 disclosure on the death of their children?

2     A.  Five straight years --

3         MR. REEVES:  Objection.  Form.

4     A.  -- is a false statement.

5     Q.  Really?  Okay.  So we know you said false --

6 we know --

7     A.  Straight years means --

8         MR. REEVES:  Hold on.  Hold on, please.

9 Let him ask you the question.

10     Q.   So we know in 2012 right when it happened you

11 got on TV and started talking about it being staged.

12 Right?  We know that?

13     A.   Soon thereafter I had questions.

14     Q.   No, Mr. Jones.  I don't understand this whole

15 thing about questions.  I don't get this.  If you say

16 Sandy Hook is fake, that's not a question.  Right?

17     A.   That was -- that was years later.  There's a

18 quote of me saying I can see how people think it's

19 absolutely fake.

20    Q.   There's no quote of you saying I can see how

21  people -- that doesn't exist.  You keep repeat that.  It

22  doesn't exist.

23    A.   Okay.  Well, that's what I remember.

24    Q.   In our last deposition, I showed you clip

25  after clip of you saying it's totally synthetic,

92

1  completely made up with actors.  At first, I thought

2  they killed real kids, but nope, they didn't.

3    A.   That's -- that's -- that's -- that was my --

4    Q.   That's what you said.

5    A.   Yeah.

6    Q.   Yeah.  And you did that in 2014.  You did it

7  -- you did it in 2013.  You did it in 2014.  You did it

8  in 2015.  You did it in 2016.  You did it in 2017.

9  Correct?

10        MR. REEVES:  Objection.  Form.

11    A.   I'd have to go back and look, but I definitely

12  said that I had serious questions about it and could see

13  how it was staged with all the bizarreness around it,

14  I'll tell you.

15    Q.   No.  Mr. Jones, let me just make something

16  really clear.  If you had gone on and said, man, Sandy

17  Hook looks weird.  There's a bunch of weird stuff going

18  on.  God, it's weird.  Look at this weird thing.  This

19  thing is weird and I don't know what's going on and

20  somebody needs to answer these questions, we wouldn't be

21 here today.  Okay?  The reason -- the statements that I

22 want to talk to you about is you admit that over those

23 five years you repeatedly without equivocation said it

24 was fake, that children didn't die, there were actors

25 playing the different parts of different people.  You

93

1 said those things.  Can you now just admit that for the

2 jury that you said them?  They're going to see the

3 videos.  Can you --

4     A.   Well, sure.  Then they should investigate

5 Sandy Hook themselves.

6          MR. REEVES:  Objection.  Form.

7     A.   They should look into it themselves and see

8 why people ask questions.  You hope they don't.

9     Q.   No.  I really hope they do.

10    A.   Okay.

11    Q.   I really hope they do.  You're aware of

12 Mr. Fetzer's book Nobody Died At Sandy Hook?

13    A.   I've not read it.

14    Q.   Infowars promoted it, though.  Right?

15    A.   I don't remember.

16         MR. BANKSTON:  Give me the tabloid.

17    A.   Can we stop and get a cup of coffee real quick

18 and maybe go to the bathroom?  Just five minutes?

19    Q.   Yeah, if it's five minutes.

20    A.   Okay.  Thanks.

21         THE VIDEOGRAPHER:  Going off the record,

22 12:31 p.m.

23          (Short recess.)

24          THE VIDEOGRAPHER:  We are back on the

25  record at 12:35 p.m.

94

1     Q.   Before we broke, we had talked about whether

2  Infowars had ever promoted or directed people to Jim

3  Fetzer's book, tried to get more viewership for Jim

4  Fetzer's book, and you weren't aware of that.  Right?

5     A.   Not in my memory.

6     Q.   Okay.  I'm going to show you what I've marked

7  as Exhibit 9, and I'm going to go through this whole

8  thing with you to see if it reflects your memory.  Okay?

9  Or if it refreshes your memory.  You'll see at the

10  bottom corner there is a notation that says

11  FSSTX-01923 --

12     A.   I do see that.

13     Q.   I need to finish for the court reporter before

14  you say do you see that.  Do you see a notation that

15  says FSSTX-019237?

16     A.   Yes.

17     Q.   Okay.  Up at the top we see that there's an

18  exchange of emails here.  The -- let's start at the

19  bottom email, and you'll see how the original message is

20  a message from James Fetzer to Allan Powell cc'ing Rob

21  Dew and James Tracy.  Do you see where I'm referring to

22  there?

23     A.   Yes.

24      Q.   Okay.  And then in Mr. Fetzer's email is a

25  copy of an email that he was sent earlier by a name

95

1  named Allan Powell down at the bottom.  Right?

2      A.   Uh-huh.

3      Q.   Do you know who Allan Powell is?

4      A.   No.

5      Q.   Okay.  And you know who James Tracy is,

6  though.  Right?  He's one of the professors you said was

7  an expert on Sandy Hook that you relied on?

8      A.   No.  I was talking about -- talking about

9  Wolfgang Halbig and Steve Pieczenik.

10      Q.   Okay.  You don't remember Paul Watson

11  interviewing Michael Tracy about crisis actors?

12      A.   I do remember Paul interviewing a professor.

13      Q.   Yeah, who said that there were crisis actors

14  at Sandy Hook?  Did you not know that was his claim?

15      A.   Oh, I remember that -- him now, yes, yeah.  He

16  was all over the news, yes.

17      Q.   Okay.  I want to start at the bottom with

18  Allan Powell's email.  And he says Rob, Jim Fetzer put

19  together a book on Sandy Hook to which I contributed two

20  chapters.  Amazon have decided they won't handle it.  I

21  think Jim would agree to it being distributed by

22  Infowars free as a PDF.  We were both just on the

23  phone -- we were both just on the Jeff Rense show today,

24  and Jim gave that right of distribution to Jeff.  Would

25  you see if Alex would have Jim and Jim Tracey on to

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 624 of 1044

96

1  promote the book and talk a bit about the still running

2  sore of Sandy Hook?  I spoke to Jim Fetzer about this

3  today and said he will speak to you.  If you flip over

4  onto the back part of the page, you can see it says

5  Cheers, Allan Powell?

6     A.  Yes.

7     Q.  Okay.  So did I read that email correctly?

8     A.  Yes.

9     Q.  Okay.  The next message is from Jim -- okay.

10  Before we go on to Jim Fetzer's message, do you know who

11  Jeff Rense is?

12     A.  Yes.

13     Q.  Okay.  Do you remember Paul Watson also

14  telling you at the same time that he told you that Jim

15  Fetzer was bat shit crazy that Jeff Rense was bat shit

16  crazy?  Do you remember that?

17     A.  No.

18     Q.  Okay.  Going up to Jim Fetzer's email, or he

19  identifies himself as Jim and James so it's going to be

20  used both in this document, but he says, Rob, we are

21  making the book available to the public for free.  Here

22  is the cover and PDF.  Several sites are now offering

23  it.  I would be glad if Alex were to do the same.  I am

24  sure James would be glad to come on with me if Alex

25  wanted to interview us about this stunning event.  I

1  think the latest case was the Pentagon Papers.  Did I

2  read that correctly?

3      A.   Yes.

4      Q.   Okay.  And then Rob Dew writes back to Jim

5  Fetzer.  Says, Thanks for the heads up.  Sent the links

6  to Adan and he is writing an article about it.  Please

7  let us know if there is a bump in downloads.  Rob.  Did

8  I read that correctly?

9      A.   Yes.

10      Q.   Okay.  And from this Bates label at the bottom

11  that says FSSTX, we know that this is a document that

12  resided in Infowars' corporate files.  Correct?

13      A.   Yes.

14      Q.   Okay.

15          MR. BANKSTON:  Okay.  Can you show me tab

16  4?

17          (Exhibit 10 marked.)

18      Q.   I'm going to show you what I've marked as

19  Exhibit 10.  Do you recognize that?

20      A.   Yes.

21      Q.   Okay.  Can you tell us what this is?

22      A.   Zero Hedge article.

23      Q.   Do you know why it might be relevant to this

24  lawsuit?

25      A.   This is the article Owen was reading that he's

98

1  been sued for and the coverage I gave of Owen that I was

2  sued for.

3      Q.   Okay.  Can you flip over to the second page

4  for me?  Do you see there's a big blank space in the

5  middle of the page?  Seems to be the way it printed from

6  the internet?

7      A.   Uh-huh.

8      Q.   Below that big blank space, do you see where

9  it says accept this does not comport with the official

10  story?

11      A.   Yes.

12      Q.   Okay.  And then it says Jim Fetzer, professor

13  emeritus at the University of Minnesota who wrote a book

14  claiming Sandy Hook was staged, notes that, based on the

15  facts of the case, Heslin's statement that he held his

16  son with a bullet hole through his head could not have

17  happened.  Have I read that correctly?

18      A.   Yes.

19      Q.   Okay.  Now I want you to flip to the third

20  page.  You see that first sentence, the first paragraph

21  there?  It's just one long sentence.

22      A.   Yes.

23      Q.   Okay.  And how that paragraph begins is by

24  saying it's entirely possible that Mr. Heslin had access

25  to his son after the shooing.  Do you see where it says

99

1  that?

2      A.   Yes.

3      Q.   Okay.  That wasn't said by Infowars, though.

4   Right?

5      A.   I don't have the clip in front of me.

6      Q.   Okay.  When you said on July 20th, 2017 the

7   stuff I found was that they never let the parents see

8   the bodies, that's Jim Fetzer's book Nobody Died At

9   Sandy Hook.  That's what you found.  Right?

10      A.   I remember going off the news reports for

11   that.  I don't know if it was this one.

12      Q.   I mean, that's not -- Mr. Fetzer's book and

13   all that, he's not a news reporter.  You understand

14   that?

15      A.   Yes.  I'm not even sure that I was going off

16   that.

17      Q.   Right.  That's what I'm asking you.  I don't

18   think you were going off that because when you said the

19   stuff that I had found, that had obviously happened

20   before this brouhaha started.  Right?  So I'm saying

21   when you say the stuff I found was that they never let

22   the parents see the bodies, the stuff that you found was

23   Jim Fetzer's book Nobody Died At Sandy Hook?

24           MR. REEVES:  Objection.  Form.

25      A.   I just -- I don't remember the information

                              100

1   enough to be able to comment on it accurately.

2      Q.   Okay.

3           MR. BANKSTON:  Will you get me tab 34?

4   Oh, no.  I'm sorry.  Second folder, tab 34.  Actually,

5    skip that.  Give me 23 out of this book.  I do want to

6    see that.

7        Q.   All right, Mr. Jones.  Just to let you know

8    for your -- FYI, I do think I can get you out of here by

9    2 o'clock.

10       A.   Okay.  Great.

11       Q.   Because we're doing a good job.  Okay.  I've

12   shown you what I've marked as Exhibit 11.

13              (Exhibit 11 marked.)

14       Q.   And I know this hasa real -- like, has a lot

15   of stuff in it, some really tiny print.

16       A.   I may not, yeah --

17       Q.   Yeah.

18       A.   -- be able to read the tiny print.

19       Q.   I know.  Like, yeah, I don't -- the only thing

20   that I'm actually -- I think when we get into this

21   document, we'll quickly discover that it may not be

22   necessary to even read all of this stuff.  But if so, I

23   may need to give you some time to go read it, if you

24   want to do that.  But what I want to ask you about this

25   document is:  Up at the very top you see that this is an

                              101


1    email on June 29th, 2018?

2        A.   Uh-huh.

3        Q.   Okay.  That's about a month after you were

4    sued.  You understand that?

5        A.   Uh-huh.

6    Q.  Okay.  And it's from Nico.  What was Nico's

7  job title at that time?

8    A.  Radio producer.

9    Q.  Okay.  And then Daria, what's her title?

10   A.  She was sound operator then.

11   Q.  Okay.  And today she's a producer as well.

12  Right?

13   A.  Yes.

14   Q.  Okay.  And so Daria is sending this to Nico,

15  and the subject is forward:  vanishing blog:  Not only

16  is "Noah Pozner" a fiction, but his father, "Lenny," is

17  also a fake.  Have you ever seen this email?

18   A.  No.

19   Q.  Okay.  I don't think I need to ask you

20  anything else about it, then.  If you'd never read this,

21  I don't think we need to talk about it.  My only other

22  question was:  Do you have any idea why Nico would be

23  sending things to Daria from Jim Fetzer right after you

24  were sued?

25   A.  I mean, no, I have no idea.

                              102


1    Q.  Okay.

2        MR. BANKSTON:  Tab 10.

3    Q.  I'm going to talk a little bit about Wolfgang

4  Halbig.  Do you know what I mean when I talk about the

5  Super Bowl picture?

6    A.  No.

7    Q.  Okay.  Do you know what I mean when I talk

8  about the Super Bowl choir of fourth grades from Sandy

9  Hook?

10    A.   Yes, I've heard of that.

11    Q.   Okay.

12    A.   And that's when I really started thing it

13  probably did happen because that's -- it's crazy.

14    Q.   Just crazy.  Right?

15    A.   Yeah.

16    Q.   Okay.  I've shown you what I've marked as

17  Exhibit 12.

18          (Exhibit 12 marked.)

19    Q.   You'll see again at the bottom there's no

20  Bates number on this one.  Right?

21    A.   No.

22    Q.   Okay.  This one is dated 11-19-2016?

23    A.   Yes.

24    Q.   Towards the end of 2016.  It is from Wolfgang

25  Halbig.  Right?

103

1    A.   Uh-huh.

2    Q.   The "to" line, the main people it's sent to,

3  include Nico.  That's an Infowars employee.  Right?

4    A.   Yes.

5    Q.   Then several -- a couple of addresses to the

6  Trump organization.  Correct?

7    A.   Yes.

8    Q.   Rob Dew, who is also another employee of

9   yours.  Right?

10      A.   Yes.

11      Q.   And then J. Rense.  Do you think it would be a

12  fair assumption to say that's probably Jeff Rense?

13      A.   Yes.

14      Q.   Okay.  And then also copied -- there's a cc

15  line, and there are several other people copied who are

16  either media organizations and there's also some

17  government addresses.  Do you see that?

18      A.   Yes.

19      Q.   Okay.  Now, there are also a bunch of

20  attachments listed.  Do you see that?

21      A.   Yes.

22      Q.   Okay.  And those attachments appear to be png

23  files.  Those are images.  Right?

24      A.   Yes.

25      Q.   Okay.  And then the subject line says trust

                                    104


1   but always verify, please verify with your uncle.

2   Thanks.  Do you see that?

3       A.   Yes.

4       Q.   Okay.  And then I'm going to go ahead and read

5   this email to you.  All right?  It says, Nico and Rob,

6   Rob, Please send this video to your uncle, the former

7   FBI agent who attended my Connecticut Freedom of

8   Information hearings in Hartford, Connecticut.  He told

9   me that I was right about what was happening, which gave

10  me a tat more courage.  He has friends who can verify

11  this video to be accurate and now we know that the

12  children who supposedly died at Sandy Hook are at the

13  Super Bowl on February 3rd, 2013 and that is why we have

14  never ever heard them sing again.

15          Think about it for just a second.  They

16  sing before 110 million people worldwide with Jennifer

17  Hudson.  They have 87,000 people in the stadium with

18  over 3500 news reporters and we never have one interview

19  in the newspaper of on television from them.  Why?

20          Just think about how much money came

21  flowing in after that February 3rd, 2013 Super Bowl

22  performance from across the world.  Why have they never

23  performed again if they were so great to be asked to

24  sing at the February 3rd, 2013 Super Bowl?  Why no

25  appearances on the national early morning television

1  shows?  They sing before 110 million people and they

2  simply disappear.  Even Beyonce met them.  Where are

3  they?  Are they all dead?  Are they coerced and

4  threatened by the NFL and CBS Sports and by their own

5  parents never to talk about the greatest day in their

6  lives?  Are they part of child trafficking?  Who would

7  do this to fourth grade children when we all know that

8  children need to express their feelings or emotions or

9  it can have long-term mental health issues.

10          Then below that is a YouTube link.  And

11  then it says, Please have your uncle verify and tell me

12  that I am not crazy because I -- because I have now run

13  out of funds chasing the truth.  Please help if you can

14  afford it.  Wolfgang Halbig.  And then he gives his

15  address and phone number.

16      A.   Uh-huh.

17      Q.   Correct?  I've read all that correctly?

18      A.   Yes.

19      Q.   Okay.  When he asked them to verify that he is

20  not crazy, that's not something that could be done for

21  this email.  This is crazy, isn't it?

22      A.   That is when I really started thinking that it

23  probably did happen, when things took these turns, yes.

24  But then I still saw some anomalies, but I'm not the

25  progenitor of this.  I'm not saying this.

106

1      Q.   No.  I understand that.  But once you see

2  this, you have to understand that Wolfgang Halbig isn't

3  reliable anymore.  Right?

4      A.   Yes.  When he first came out, though, I'd see

5  him on national TV as a big top expert in all the

6  things, so that's why I was relying on him.

7      Q.   Yeah.  Okay.  But after this, it's clear you

8  shouldn't be relying on Wolfgang Halbig.  This man is

9  not well?

10      A.   Well, I didn't learn about this till later.

11  But I have -- I don't remember when, but I remember

12  after this -- sometime after this the stuff about, you

13  know, the Sandy Hook kids at the Super Bowl.

14     Q.   It's crazy.  Right?  It's not a thing a

15   rational or sane person would do.  Right?  Claim that

16   the Super Bowl choir was actually the murdered children.

17   Right?

18          MR. REEVES:  Objection.  Form.

19     A.   I never claimed that.

20     Q.   I'm not -- right.  I get that.  I'm saying the

21   person who did, if somebody was to claim that, that's

22   not a thing a rational person would do.  Right?

23     A.   I don't think that's rational.  And around the

24   same time people started thinking I was Beau Bridges and

25   Bill Hicks, so I started experiencing --

                                107


1     Q.   Right.  And that's unrational.  Like, I've

2   actually heard about that, people think you're Bill

3   Hicks.

4     A.   Yeah.

5     Q.   And that's dumb, isn't it?

6     A.   Yeah.

7     Q.   It's really stupid.  And one thing that I've

8   noticed is that a lot of times people are, like,

9   completely face blind and they, like, look at a picture

10   of you and Bill Hicks and they're, like, that's the same

11   person.  And it's obviously not the same person.  Right?

12     A.   Yes.

13     Q.   Okay.  People who say things like that, like,

14   for instance, if somebody was to say about the people at

15  Sandy Hook, oh, there's actors who were playing the

16  different parts of different people, like, there's a guy

17  who's playing a police officer and he's also a parent

18  and he's also this guy, that's also irrational.  Right?

19      A.  Well, the reason people have those questions

20  is it's called Astro turf.  And you really can hire

21  1000, 5,000, 100 wherever you want people to go be, and

22  governments and others have done that.  That kind of

23  stuff goes on.  And I remember seeing some of those

24  anomalies where they were saying the coroner looked like

25  his guy, and they did look very similar.  But I could

108

1  see why people were thinking that and then the

2  extrapolation goes out to, like, the Super Bowl and the

3  rest of it.  But that's just -- the system has lost so

4  much credibility with the public.  We've been lied to so

5  much that then -- there certainly have been cases where

6  things that are real, the public questions them because

7  they've lost so much confidence and they don't know

8  what's real anymore.

9      Q.  You know, you bring up an interesting point.

10  And I actually think just for -- I've been pretty

11  aggressive with you in this deposition.  I understand

12  that.

13      A.  Uh-huh.

14      Q.  But I think I need to be fair with you for a

15  moment about something that happened in your previous

16  deposition, which is the media ran with something in

17 your deposition, and I think they kind of distorted it

18 and didn't quite say what you really said, which is you

19 remember all those headlines about you saying that you

20 said things about Sandy Hook because of psychosis?

21 Right?

22　　A.　Yes.

23　　Q.　And that wasn't really accurate, was it?　The

24 way the mainstream media spun that was not really

25 accurate.　You were not literally saying you had a

109

1 mental illness.　Right?

2　　A.　No, I was not saying that I was mentally ill.

3　　Q.　Right.

4　　A.　I was saying it was like a form of.　And

5 that's -- the general public doesn't believe anything

6 they're told anymore because the corporate press lies on

7 purpose, so then you start reflexively not believing

8 anything you're told.　And I'm simply just being honest

9 saying I believe the things I said, I believe the things

10 I did.　And in the aggregate, even at the time I had

11 problems with a lot of my listeners who didn't actually

12 like what I was saying.　But I never said things and did

13 things to just get an audience.　I said it because I was

14 generally questioning.　Like, I had over 130, 40 radio

15 stations on 9-11.　And I would have already been the

16 next Rush Limbaugh, but then I thought there were bombs

17 in the buildings.　It looked like.　They said on the

18 local news that they had blown up building seven.  I had

19 the news cast.  And I went on air and said that I think

20 the government was involved or at least let it happen,

21 and I lost over 100 of my stations in the next month.

22 And I didn't care because I thought I was telling the

23 truth.

24          Now, looking back at 9-11 now and that,

25 even more evidence has come out.  But I didn't go say

                              110


1 9-11 was an inside job for audience.  That took my

2 revenue now massively.  Totally hurt us.  But it was the

3 right thing to do.  And so after 9-11, and if you've

4 seen that, then you start thinking, you know, more stuff

5 is going on.

6     Q.   No.  I get what you're saying there.  In fact,

7 this might surprise you to learn this.  But when I was

8 in college, I watched loose change.  Like, I understood

9 it's important to ask questions.  Right?

10          You would agree with me that in this

11 country today the phenomenon you're talking about where

12 people have a hard time telling what's real, this

13 country has failed in so many ways to its public.  And

14 the media has failed in so many ways to the public that

15 it is genuinely difficult sometimes for members of the

16 public to know what's real anymore.  Right?

17     A.   Yes.

18     Q.   Okay.  Those members of the public, the only

19 way that they can be kept from being lost in the sea of

20  confusion is if there are enough responsible journalists

21  in this country.  That's the only way it's going to

22  happen.  Right?

23      A.  Yes.

24      Q.  Okay.  And right now there's not.  You'd agree

25  with me?  The state of journalism in America is bad?

111

1      A.  Yes.  And I've -- I've tried to get better

2  even before I got sued, and so I've definitely never

3  said I was perfect.  And I see the whole state of the

4  country.  And I have four children.  I'm really worried

5  about them, and that's why I've tried to be more

6  measured and everything, because I've never realized how

7  big my show is.  I mean, I didn't even realize how big

8  my show was ten years ago, five years ago.  I mean, I do

9  now.  And that's -- that's -- but that's also because,

10  you know, I've been contacted by so many prominent

11  people who -- who have lost confidence in the system and

12  now basically listen to me.  And so with that -- that's

13  a lot of power; comes with a lot of responsibility.

14      Q.  Responsibility.  Correct.  And the only way --

15  well, I won't say the only way, but one of the ways that

16  we help or we could help maybe making journalism better

17  in this country is if we ensure that journalists are

18  held accountable when they publish false facts and do so

19  carelessly.  You'd agree with that?

20      A.  Well, that's not what's happening.  The big

21  corporations are lying on purpose more than ever.  I

22  never lied on purpose.  And they are supporting the

23  destruction of independent journalism and small-time

24  journalism and citizen journalists who mean well but

25  make mistakes, whereas, the big corporations are owned

112

1  by trillion-dollar companies and are actively supporting

2  the attempts to silence us and shut us down.  And it's

3  all over the news that they say they hope your lawsuits

4  take us off the air.

5       Q.  Yeah, because they hate you.  Right?

6       A.  Well, the big corporations do.

7       Q.  Yeah.

8       A.  And listen, I mean, I'll just be honest with

9  those big corporations.  It's had the opposite effect.

10  Big media is so hated and so distrusted.  This has been

11  a terrible process for me and my family, and it's been a

12  growing process because I would have grown anyway as you

13  get older.  This -- all this persecution has just -- I

14  mean, has made us bigger.  I mean, it's like -- it's --

15  I mean, so like I told you last time, you guys, I mean,

16  this is all just a process.  And whatever -- whatever it

17  is that big shots think they're doing, it's not going to

18  do what they think they did.

19       Q.  Yeah.  So when the media piles on you, for

20  instance, that actually is counterproductive to what

21  they think their goals are.  Right?  Like, they're

22  actually making you more popular.  Correct?

23     A.   Well, people know that I legitimately question

24  and -- and am not lying to them on purpose.  And I

25  actually admit when I'm wrong on air and -- and am

113

1  trying to be better.  But I've also --

2     Q.   And it's important we try to be better.

3  Right?  You agree that particularly for independent

4  media, if we have any prayer in this country, it's that

5  we get out from the yolk of corporate media.  And the

6  only way we can do that is through independent media.

7  You'd agree with that?

8     A.   But the big corporate media as a default in

9  these cases only puts out what you guys says and hammers

10  it everywhere because they want to silence all the

11  little people.  So whether you like it or not, Mark

12  Bankston, you are on the side of the cutting edge of the

13  establishment.

14     Q.   No.  I'm suing them too.  And I think I just

15  told you right now in this deposition for the record

16  they messed up doing that.  When they come in here and

17  they take your words out of these depositions and they

18  distort them, that isn't good.  I understand that.  What

19  I'm asking you is from the standpoint of the independent

20  media.  It's important, crucially important.  Like,

21  there's a lot of new independent medias that have come

22  out in the past five, six years.  You'd agree with that?

23  We've seen almost a revolution --

24     A.   Yes.  The corporate's attempt -- the corporate

25  attempt to use Sandy Hook -- I'm not saying you yourself

114

1  are doing this because I can't read your motives -- they

2  are using this and even writing articles about how

3  they're going to try to use it to silence all their

4  opposition.  So that's why -- that's why the

5  establishment supports it.  And that's fine because the

6  establishment is making a real run at censorship,

7  authoritarianism, and control, and thinks it can use a

8  demonized version of Alex Jones as the poster child of

9  the villain.  But when you've got the real system that's

10  the real villain and people know that and they see the

11  big villain coming after Alex Jones, they go he's not a

12  villain.

13            So I mean, I guess you've actually blessed

14  me.  So it's hard, it's rough, but I'm going to go

15  through this and I'm going to grow and be better at the

16  other end.  But I really meant to be good and I really

17  meant to tell the truth.  And so at the end of the day,

18  this is just the way it is.

19     Q.   Villains are going to be villains.  Right?  We

20  know no matter what happens in this lawsuit, corrupt

21  corporate media is going to be corrupt corporate media.

22  There's no stopping them.  Right?  They're going to do

23  what they're going to do?

24            MR. REEVES:  Objection.  Form.

25     Q.   Right?

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 642 of 1044

115

1     A.   I'm just telling you that -- that the power

2  structure is anti-Alex Jones, and so I've got a lot more

3  serious issues to deal with for my children and the

4  future of the country and everybody than this -- this --

5  this whirlpool that is Sandy Hook.  And so I don't hang

6  my hat on Sandy Hook, and I wish things would have gone

7  better and been different, believe me, in hindsight.

8  But the claim that I got famous off Sandy Hook and I

9  like Sandy Hook and I want Sandy Hook isn't true.  Until

10  they made me the Sandy Hook guy and I'm being attacked

11  for it, that has given -- you know, made me a lot

12  bigger.  But I didn't do that.  The previous Sandy Hook

13  stuff hurt me and made me lose audience, made everybody

14  get mad at me and made my crews -- made one of my crew

15  get mad at me.

16              Once -- once, though, the system took it

17  up and started attacking me with it, now people -- you

18  know, the people see what it is.

19     Q.   Yeah.  And I wish they would -- we'll not go

20  into my feelings about what they're...  But you'd agree

21  with me if we're going to solve what's wrong with

22  information right now, what's being pulled over the

23  public's eyes, we can't rely on corporate media to fix

24  it; it's got to be independent media.  Would you agree

25  with that?

1    A.   Well, Mark, let me just say this since we

2    actually here talking:  In that PBS documentary

3    Frontline you were in, one of the parents says that

4    he -- to paraphrase, he sent his attack dog hinchman at

5    us.  And it's some woman I never even heard of until she

6    got arrested.  And it's on the show everyone consciously

7    up there talking about Alex Jones sent this woman.  It

8    wasn't said, oh, what he said made her do it.  It was --

9    it was Alex Jones sent his attack dog knowing what she

10   would do.  That is fake 100 percent not true.  And if

11   you ever thought about the stuff that my family gets and

12   what happens to my children over stuff like that that is

13   not true.  And so we can all sit here and claim that we

14   want to be these great journalists who want to be

15   perfect and everything, but I wouldn't have said

16   something like that about somebody unless I was sure

17   that indeed they did send that poor schizophrenic woman

18   after them.

19   Q.   And again, because I'm sympathetic for what

20   you're saying right.  If -- was that something that one

21   of my clients said? because I don't think my clients

22   were on that show.  Right?  I'm just trying to check.

23   A.   Here's -- I'm being honest.  Mark, it all

24   just -- it all -- I forget who said it on the show, but

25   I basically word for word -- I mean --

117


1    Q.   What I'm trying to get at, Mr. Jones, is I'm

2  pretty sure I didn't say it.  But if somebody on that

3  show said that, if PBS put somebody on that show to say

4  that, I'm going to demand a retraction.

5      A.  Okay.  Great.

6      Q.  I want to know:  Do you know who said that?

7      A.  I'd have to go review it again.  I'm telling

8  you this is --

9      Q.  I promise you --

10      A.  I don't say this as a victim, but this is

11  traumatic for me.  And I'm tired of hearing about it.

12  And so I'll be honest.  Just like 9-11 became a

13  traumatic thing, I never talk about 9-11 because I got

14  to sick of talking about it and attacked over it.  And

15  now I have, like, a mental wall on Sandy Hook that just

16  goes up because I can't deal with the stress of it.  And

17  so I just put a mental wall up.  You ask me these

18  questions, and it's like I just can't deal with it

19  anymore.

20      Q.  Okay.  Let's not talk about Sandy Hook just

21  for a minute.  Maybe we can bring the temperature down.

22  Which is that you agree with me that independent media,

23  people who do independent media, if they do it poorly,

24  they hurt the cause of independent media.  People like a

25  Jeff Rense or a Fetzer that people were we're

                                118


1  criticizing, that's not good for independent media.

2  Would you --

3      A.   Yes.  And I want to move out of that class

4   that I wasn't completely in into a better class.

5      Q.   I hear you.  I do.

6      A.   But then that doesn't gauge me by the

7   corporate press that is trained to analyze on purpose,

8   whereas I was untrained and went through this whole

9   process.

10      Q.   Look, I'm with you that I want to hold

11   corporate media accountable wherever I can.  But do you

12   also agree that it's good for journalism to hold

13   independent media accountable wherever we can?

14      A.   Yeah.  But independent media is being

15   absolutely censored and attacked and sued with lawfare

16   everywhere.  There's a real system -- systemwide attack

17   on -- and very legitimate stuff like Senator Paul gives

18   a speech about -- about learn ^  Israeli study being 13

19   times better and YouTube censors it saying the WHO

20   doesn't authorize that statement.  The American Heart

21   Association comes out and says on the inserts of the

22   Pfizer shot, it says increase in myocarditis and heart

23   attacks.  They said we don't care.  You're not allowed

24   to scare people, and they block the American Heart

25   Association.  So see, people are pissed about this

119

1   censorship.  And so --

2      Q.   For sure.

3      A.   -- and so they see what's happening to us as

4   that.  And that's why you've got the corporate backing.

5    So you can't -- you can't -- Mark, you can't get out of

6    the fact that you've got the establishment behind you.

7        Q.   Oh, 100 percent I get that.  No.  I know that,

8    in other words, if -- if -- there is a feeling in

9    corporate media that if you are discredited it helps

10   them.  You understand that that exists?

11       A.   Yes.

12       Q.   And then that is something that they want to

13   try to do.

14       A.   And so that's why Tucker Carlson basically

15   endorsed me last week --

16       Q.   I saw that.

17       A.   -- is because they now understand it's the

18   symbol like this to Hitler, like Alex Jones is now the

19   symbol of victory.

20       Q.   It's only because you brought that up and I'm

21   just actually fascinated by this.  Did you -- did you

22   see the story, the thing that broke from -- that Lin

23   Wood put out there about Tucker Carlson getting a

24   recommendation for his kid from Hunter Biden, and all

25   that?

                              120


1        A.   No, I didn't follow --

2        Q.   No.  There's a story, and again, maybe we

3    can't talk --

4        A.   Well, I mean, I'll just say this.  Lin Wood --

5    I'm not going to get onto Lin Wood but Lin Wood is

6  definitely what I don't want to be.

7    Q.   Right.  I'm just saying like sometimes you see

8  some things come out and you realize it's a big club and

9  maybe we're not in it?  Have you ever heard that phrase?

10    A.   Yes, I've been learning that I'm definitely

11  not in the club.

12    Q.   Yeah.

13    A.   Believe me, the problems with this is the

14  least of my problems.

15    Q.   You're referring to January 6?

16    A.   All of that, yeah.

17    Q.   Okay.  I'll do you a favor.  We won't talk

18  about that today.  I want to show you this.  This I've

19  marked as Exhibit 13.

20         (Exhibit 13 marked.)

21    Q.   Okay.  This, as you see at the bottom it, it

22  says FSSTX-039550?

23    A.   Yes.

24    Q.   Okay.  And this is from Wolfgang Halbig.

25  Right?

121

1    A.   Yes.

2    Q.   Okay.  And then this is to a couple of email

3  addresses that I bet you don't know who those people

4  are.  Right?

5    A.   No, I don't.

6    Q.   The one safeandsoundschools.org, have you ever

7  heard of an organization called that?

8      A.   Not in my memory.

9      Q.   I don't either.  Okay.  I'm going to assume,

10  though -- you see the address is written to somebody

11  named Michele?

12      A.   Yes.

13      Q.   Okay.  And then the subject line is "I urge

14  Michele to stop using Josephine and making money and

15  appearing on speaking engagements."  You saw that?

16      A.   Yes.

17      Q.   Okay.  The date of this email is December

18  21st, 2014?

19      A.   Yes.

20      Q.   Okay.  And as we see from Free Speech Systems

21  at the bottom, this is a document from Infowars'

22  corporate files.  Right?

23      A.   Yes.

24      Q.   The attachments here, we see a bunch of png's.

25  That's correct?

122

1      A.   Yes.

2      Q.   Okay.  I'm going to go ahead and read the

3  email to you.  All right?  Michele, how could you and

4  your husband as responsible parents even allow your

5  precious child Josephine to attend that filthy and

6  deplorable looking school on December 14th, 2012?  This

7  school has you must have known is and was a toxic waste

8  dump as reported by Environmental Consultants who

9    requested more money from City of Newtown leaders before

10   demolishing the school and transported all of the high

11   levels of lead paint, high levels of asbestos and

12   especially the high levels of PCPs in the groundwater at

13   Sandy Hook out of state.  Josephine your child should

14   have expected more from you before that tragic day as a

15   parent.  You are supposed to protect her from serious

16   lifelong health risks when you send her to that school

17   every day.  Why would you as a parent and all those

18   other parents who supposedly lost a child to gunfire

19   allow their children as you did to serious toxic waste?

20   This all unfolded before the first shot at that school

21   even occurred.  Did you not see the filth and deplorable

22   conditions when you went to that school or are you

23   blind?  I do not understand unless you explain it to me

24   and the world why you and your husband failed Josephine,

25   who is a nonverbal child as you stated and depended on

123

1    for her safety.  She's needed you to protect her from

2    all the serious health risks that you sentenced her to

3    on a daily basis.  Now you talk about school security.

4    You have got to be joking.  You have all these experts

5    on your staff who are now part of your conspiracy.  They

6    should be ashamed of their actions in supporting you.  A

7    mom puts her own child at risk on a daily basis and is

8    now the expert on school security?

9              I look forward meeting you one day when I

10   can take your deposition about not the shoot -- not

11  about the shooting but why you and your husband failed

12  Josephine by sending her to that filthy and deplorable

13  school with all that toxic waste.  We call this child

14  endangerment when you know of the danger that exposes

15  your child to serious lifelong health risks.  You must

16  have known without a doubt because pictures do not --

17  and it says li, but I believe that says -- means lie.

18  You put her life in serious risk every day knowing how

19  filthy and deplorable that school is.  I am enclosing

20  photos that you must recognize since you took your child

21  to school.  And having a child in special needs, you

22  would expect a school environment and school climate

23  that allows children to learn and teachers to teach.

24  Right?  Please explain to me if you can why school

25  principle Dawn Hochsprung would allow her school to be

124

1  so filthy and deplorable looking.  There is not one

2  female elementary school principal in this country who

3  would allow her school to be that filthy and deplorable

4  both inside and outside, and most of all, allow her to

5  become a toxic waste dump, placing every child in her

6  school staff in serious lifelong health risk.  Right?

7  All of the pictures are taken by the major crime squad

8  from the Connecticut state police.  Please respond since

9  you are now the expert on school security.  Wolfgang W.

10  Halbig, www.SandyHookJustice.com.  Have I read that

11  correctly?

12    A.   Yes.

13    Q.   How do you feel about that?

14    A.   It's horrible.  I've never seen this before.

15 I mean, I guess he sent it to us too.

16    Q.   Well, it's in Infowars' corporate files.

17 Right?

18    A.   Yeah.  It's just -- I don't even see Infowars

19 on here.  I'm wondering why we had it.

20    Q.   That was going to be my next question.  Do you

21 know?

22    A.   I don't.

23         MR. BANKSTON:  Okay.  Give me tab 20.

24         (Exhibit 14 marked.)

25    Q.   I'm going to show you what I've marked as

                              125

1 Exhibit 14.  You see at the top there's another email

2 from Wolfgang Halbig?

3    A.   Yes.

4    Q.   Right?  Okay.  And on this one you see about

5 right here?  See what that blue line is?  I'll show you

6 again.  You see that?  And so you see on your document

7 too you got the --

8    A.   Yes.

9    Q.   -- Infowars' email addresses there?

10    A.   Yes.

11    Q.   Okay.  And that would be Rob Dew and Nico who

12 got this email?

13    A.   Yes.

14    Q.    Okay.  This was March 21st, 2017?

15    A.    Yes.

16    Q.    Okay.  The subject was, Anyone needing the

17    address for a visit to welcome them to Florida please

18    call and this was a great day for me.  Who says that you

19    cannot catch a big fish in Florida?  That's what the

20    subject line says?

21    A.    Yes.

22    Q.    Okay.  And then there's a png attached, an

23    image file.  Is that correct?

24    A.    Yes.

25    Q.    Okay.  And then I'm going to go ahead and read

126

1    this email to you.  It says, Nick and Laura Phelps did a

2    great job acting in Newtown on -- Newtown, Connecticut,

3    on December 14th, 2012.  I visited their home today at

4    1924 Westover Reserve Boulevard, Windmere, Florida

5    34786.  And thanks to Lieutenant Vangehle telling me

6    during my wellness check of Nick and Laura Phelps, that

7    they no longer live in Newtown, Connecticut, and that

8    they are now -- and they are now Richard and Jennifer

9    Sexton.  Guess what.  He is totally right and can you

10    believe it that my Newtown Police Department guided me

11    in the right direction?  They have a beautiful home with

12    a three-car garage.  They were not home today, but the

13    good news was that the three adult female moms with

14    their children standing outside their homes observed me

15  and wanted to know what I was doing.  It was spring

16  break -- it is spring break for Orange County, Florida,

17  school children.  I showed them this picture and I told

18  them that I did not want to go to the wrong house to

19  surprise Nick and Laura from Newtown, Connecticut, a/k/a

20  Richard and Jennifer Sexton, today.  It took a few

21  minutes for them to look at the pictures.  And then when

22  they asked why I wanted to speak to them, I told him

23  that I had been in Newtown and wanted to surprise them

24  since they now live in Florida.  They asked for my

25  namne, which I gave as Wolfgang Halbig.  They told me

127

1  how I would know them -- knew them, and I told them they

2  have been on the national news, so I wanted to meet them

3  again.  Our conversation was all about Newtown,

4  Connecticut.  So she said, Do you mind if I text her?  I

5  said absolutely not.  Waited about 10 minutes, only to

6  learn that they did not know me, which surprised me.

7  They verified the pictures, and why should she text them

8  about Newtown, Connecticut, and that someone from there

9  wanted to visit if they were not NIck and Laura Phelps

10  now, Richard and Jennifer Sexton.

11          At first, I did not want to enter since it

12  is a gated community.  But several people told me just

13  go in on in there, there is no security at the gates.

14  If there is CC TV, they will see me being told to go in,

15  and that is the only reason or I would not have entered.

16  Now, who says law enforcement does not know what they

17   are doing?  Thank you, Newtown, Connecticut Police

18   Department.

19            Can you turn the document over?  First of

20   all, have I read that email correctly?

21       A.   Yes.

22       Q.   Okay.  And then on the back you see there's a

23   picture here.  Right?

24       A.   Yes.

25       Q.   And at the top it says Sandy Hook hoax actors.

128

1   Correct?

2       A.   Yes.

3       Q.   And it has arrows pointing to the Phelps.

4   Right?

5       A.   Yes.

6       Q.   And then at the bottom it says playing the

7   part of grief-stricken parents.  Yes?

8       A.   Yes.

9       Q.   This is a horrible email, isn't it?

10       A.   I've never seen this email, and it's --

11            MR. REEVES:  Objection.  Form.  Go ahead.

12       A.   Yes.  I don't like this email.  And again,

13   this is someone else, Wolfgang Halbig, after I'd already

14   clearly knew he cracked up.  And so that's not my work.

15       Q.   The next month you did a video called Sandy

16   Hook Vampires Exposed.  Right?

17       A.   Someone edited the video but then -- I've seen

18  that.

19     Q.   Okay.  And during that video, you repeated all

20  of Wolfgang Halbig's claims.  Right?  His 16 questions

21  thing?

22          MR. REEVES:  Objection.  Form.

23     A.  I don't remember that.  I'd have to see that

24  video, but I believe it was about people using it to

25  continue to try to get gun control and money.  But I'd

129

1  have to watch it, if you've got it.  But I don't

2  remember --

3          MR. BANKSTON:  Tab 15.

4          (Exhibit 15 marked.)

5     Q.   Mr. Jones, I've handed you what I've marked as

6  Exhibit 15.  At the bottom you see it says FSXTX-040027

7  [sic]?

8     A.  Yes.

9     Q.   This is an email from Infowars' corporate

10  files?

11     A.  Yes.

12     Q.   Okay.  At the top it says Wolfgang Halbig.

13  Right?  That's who it's from?

14     A.  Yes.

15     Q.   Okay.  It says to Wildrosefarm1740@gmail.com.

16  Do you know who that is?

17     A.  No.

18     Q.   That's my client, Scarlett Lewis.

19     A.  Okay.

20     Q.   The subject line says, How could you as a

21  mother stop and buy your special brand of coffee on

22  December 14th, 2012, when you heard as a mom that shots

23  had been fired at the Sandy Hook school?  Have I read

24  that correctly?

25     A.   Yes.

130

1     Q.   This is a March 10th, 2015 email.  Correct?

2     A.   Yes.

3     Q.   He says in this email, Scarlet, it is just a

4  matter of time and all that money you have has to be

5  returned.  How could you even stop to buy your coffee

6  and you bought coffee for two other people.  What other

7  mother does that especially when you see on the news

8  tell everyone how you ran across that fire department

9  parking lot.  If you did you would have spilled the

10  coffee.  Do some serious soul searching because the scam

11  is up.  Wolfgang and his phone number.  Have I read that

12  correctly?

13     A.   Yes.

14     Q.   Okay.  So at least Infowars had in its --

15  Infowars had received information that Mr. Halbig was

16  harassing Ms. Lewis.  Correct?

17          MR. REEVES:  Objection.  Form.

18     A.   We had millions of emails.  I've never -- I'd

19  never seen those up until the time of these lawsuits, so

20  I'm not Wolfgang Halbig.

21    Q.  I understand.  All I'm asking is -- Infowars

22  received that?

23    A.  Yes.

24    Q.  Okay.  Infowars -- was Infowars aware that

25  Mr. Halbig -- what he was doing at the Catholic school

131

1  in -- bad question.  You can't answer for all of

2  Infowars.  Do you know what Mr. Halbig was up to at the

3  Catholic school in Newtown?

4    A.  No.  I knew that he was getting mad at us

5  because we wouldn't have him on and because I was saying

6  that, hey, it probably happened.  And so -- and then I

7  was aware over time that, you know, that he'd seemed

8  like he had deteriorated some.  And so that's what I was

9  talking about, you know, where I had questions about the

10  questions.

11    Q.  Did you know what he did at the Catholic

12  school?

13    A.  No.

14    Q.  Okay.

15    A.  I'm trying to search my memory.

16    Q.  I'm going to show you what I've marked as

17  Exhibit 16.

18        (Exhibit 16 marked.)

19    Q.  You see at the bottom this has Bates label

20  that says FSXTX-042477 [sic]?  That's correct?

21    A.  Yes.

22    Q.  This is a June 25th, 2015, letter.  You see

23  it's from the Diocese of Bridgeport?

24     A.  Yes.

25     Q.  Okay.  It's to Mr. Wolfgang Halbig in

132

1  Sorrento, Florida?

2     A.  Yes.

3     Q.  Says, Dear Mr. Halbig, As the chief legal

4  officer of the Diocese of Bridgeport, I write to serve

5  you notice that you are to cease and desist any activity

6  on or in the vicinity of St. Rose of Lima Parish,

7  including the church, rectory, school, and any other

8  ancillary buildings on or near the parish grounds.  Your

9  presence will be considered a trespass and a nuisance.

10          Should there be any violation of this

11  order, the parish reserves the right to seek any and all

12  remedies available to it under the law and will

13  immediately contact law enforcement to remove you and

14  any individuals in your company from the property,

15  forcibly if necessary.

16          This order shall remain in effect from the

17  date of this letter forward.  Very truly yours, Anne O.

18  McCrory, chief legal and real estate officer.  Have I

19  read that correctly?

20     A.  Yes.

21     Q.  So Infowars had received information that

22  Mr. Halbig had been banned from the premises of the

23  local Catholic school?

24        MR. REEVES:  Objection.  Form.

25    Q.   Correct?

                              133

1     A.   I mean, I guess that's what this shows.  I --

2  I'm not Wolfgang Halbig.

3          MR. BANKSTON:  Can you give me second

4  photo Tab 31?

5          (Exhibit 17 marked.)

6     Q.   Okay.  This is a one-page email.  You see at

7  the bottom this has been marked Exhibit 17?

8     A.   Yes.

9     Q.   At the bottom it's marked FSSTX-053394?

10    A.   Yes.

11    Q.   Okay.  This is a series of emails.  Correct?

12    A.   Yes.

13    Q.   The first email is from Jonathan Reich.  Do

14 you know who that is?

15    A.   No.

16    Q.   Okay.  It's to Wolfgang Halbig.  It was sent

17 on May 16th, 2016.  Correct?

18    A.   Yes.

19    Q.   Okay.  It says Saint Rose security guard video

20 footage, and then it has a link to download for some

21 video footage.  Right?

22    A.   Yes.

23    Q.   Okay.  And then the next email is from

24 Mr. Halbig, right, on May 17th, 2016.  Correct?

25    A.   Yes.

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 660 of 1044

134

1    Q.    And it says, Arturo, this is the Saint Rose

2  Lima video that we shot accusing us of being a pedophile

3  and was trespassed.  False police reports filed by

4  Monseigneur Weise.  Have I read that correctly?

5    A.    Yes.

6    Q.    Then Arturo Rico responds.  Do you know this

7  associate of Mr. Halbig's?

8    A.    No.

9    Q.    Okay.  He says, Thank you.  And then there's

10  another email from Arturo.  Correct?

11    A.    Yes.

12    Q.    And that's to Wolfgang Halbig on May 17th.

13  Right?

14    A.    Yes.

15    Q.    Okay.  And he says in that email, I saw the

16  video.  I'm so upset.  I'm looking into the face of the,

17  quote, security, unquote.  He is no security.  He is

18  government.  We need to speak.  I will explain

19  everything.  Yes, there is suspicion that the pastor was

20  part of it, but not the church itself.  Wait until I get

21  the official green light.  There are people inside that

22  school.  They knew you were coming.  They followed you.

23  Not the church, but the government.  They got -- I

24  believe it's "the" school on gag order.  I wish I would

25  have been there with you guys.  The, quote, principal,

1  unquote, of Saint Rose of Lima is the same, quote,

2  principal, unquote, that, quote, died, unquote, at Sandy

3  Hook -- Sandy Hook shooting.  But the, quote, principal,

4  unquote, of Saint Rose was always fake.  I know the

5  location of that person.  This is the most serious event

6  the church has and will go through Arturo.  Have I read

7  that correctly?

8      A.   Yes.

9      Q.   And then the next email is from Wolfgang

10  Halbig, and this email is sent to Nico at Infowars.

11  Correct?

12      A.   Yes.

13      Q.   And the other person it's sent to is

14  npattis@pattislaw.com.  Correct?

15      A.   I guess so, yes.

16      Q.   And is that the company's lawyer?

17      A.   That is a lawyer that we work with.

18      Q.   Okay.  At that time was that the company's

19  lawyer?

20      A.   No.

21      Q.   Okay.  And then there are a couple of other

22  people copied on the email too.  Right?  Do you know who

23  Tony Mead is?

24      A.   No.

25      Q.   Do you know who Richard Carlisle is?

136

1      A.   No.

2     Q.   Okay.  The --

3     A.   I mean, I can volunteer that Pattis had

4  run-ins with Halbig and doesn't like him.  So I mean, I

5  jsut -- that's just an added thing.  I don't think

6  they're working together.

7     Q.   Okay.  It says Wolfgang says it's going to

8  fall apart very shortly.  I want my lawsuit to come to

9  closure for my family's sake.  Wolf.  Have I read that

10  correctly?

11     A.   Yes.

12     Q.   Okay.  Now, the idea that the principal of

13  Saint Rose of Liam is the same murdered principal at

14  Sandy Hook, that's -- that's not rational.  Right?

15          MR. REEVES:  Objection.  Form.

16     A.   I've not investigated it; but no, it doesn't

17  look like a pattern of sanity to me.

18     Q.   Okay.

19     A.   But, I mean, like I told you, I've never -- he

20  just forwards everything to us.  I have nothing to do

21  with it.

22     Q.   So a lot of times you just ignore what he

23  says?

24     A.   He seemed very credible early on.  I looked up

25  who he was on TV, the things he was saying, the

137

1  anomalies.  But I think, you know, obviously there seems

2  to be a deterioration here, but I am not Wolfgang Halbig

3  and I've not talked to him in probably five, six years.

4    Q.    You said there's been a deterioration.  We saw

5  emails from, like, 2014 of him harassing parents that's

6  kind of weird --

7    A.    Yeah, I wasn't -- I wasn't aware of that, and

8  it doesn't seem good.

9    Q.    It doesn't.  It seems like maybe you didn't

10  know what was going on with Wolfgang Halbig's mental

11  state?

12    A.    No.

13    Q.    Okay.

14        MR. BANKSTON:  Can you give me 14?

15        (Exhibit 18 marked.)

16    Q.    And if we just power through, I think we can

17  do it and get out of here by 2:00.  We're at 1:20 right

18  now.

19        I'm going to show you what I've marked as

20  Exhibit 18.  You see at the bottom it's FSSTX-039897?

21    A.    Yes.

22    Q.    Okay.  This is a 2015 email sent March 6,

23  2015?

24    A.    Yes.

25    Q.    Okay.  And this is -- the top email is Nico

138

1  forwarding something to Rob Dew.  Correct?

2    A.    Yes.

3    Q.    And it says forward, two cents from a third

4  year law student.  Right?

5      A.   Yes.

6      Q.   And then it says some comments on Halbig's

7   last interview from a law student.  Okay?

8      A.   Uh-huh.

9      Q.   And then I'm going to go ahead and read you

10   this email from a gentleman named R. Darren Brumfield.

11   It was sent to mediacontacts@infowars.com.  He writes:

12   Two cents from a third year law student.  Madam or sir:

13   I am in my final semester of law school.  I listened to

14   the Wolfgang Halbig video and some significant alarm

15   bells went off.  I also wrote on the YouTube page, but I

16   copy and paste here.  Ok.  So I just get this straight.

17   Starting at 31:30, he filed his lawsuit in Seminole

18   County Court in Florida?  Not in federal court in

19   Florida, but in state court?  There is a legal

20   requirement called, quote, standing, unquote.  He does

21   not have standing to sue in Seminole County Court.  He

22   was not a party in the shooting in any fashion.  There

23   is also a concept called, quote, jurisdiction, unquote.

24   Either the man is lying or the judge is insane.  A

25   Florida county level judge would not have jurisdiction

139

1   for any reason other than a contract, tort, or crime

2   issue directly involving Halbig.  Something is

3   completely wrong here.  Had he said, quote, in the

4   federal district of Florida, quote, or whatever district

5   it might be if the state is split, that may at least be

6  plausible.  This is completely insane and cannot go

7  anywhere but into the trash can.  No standing, no

8  subject matter jurisdiction, no personal jurisdiction,

9  two cents from a third year law student who is legally

10  current in his education.  The man seems to be grasping

11  and stretching.  No judge in their right mind would do

12  such a thing as he describes.  Here's an example.

13  Imagine there is a crime in Las Vegas and the criminal

14  kills himself.  There is no law whatsoever that would

15  allow Alex or anyone else to file suit in San Antonio

16  for anything involving the crime in Las Vegas.  There is

17  no claim that could be made in Texas for something that

18  happened in Nevada.  It is a rule.  R. Darren Brumfield.

19  Have I read all that correctly?

20      A.   Yes.

21      Q.   Okay.  So here we have that not only did

22  Infowars receive information suggesting that what Halbig

23  was up to was completely insane in Darren Brumfield's

24  words, but actually Nico ended up forwarding that

25  information directly to Rob Dew.  Correct?

140

1      A.   Yes.

2      Q.   Okay.

3      A.   Which is good that he found that, because we

4  get about 10,000 emails a day, or at least we did.

5      Q.   It's good that he found that in 2015?

6      A.   Yeah.  I mean, it wasn't shown to me, but I

7  mean, it shows -- I guess Rob Dew wanted to know about

8   anything coming in about Sandy Hook because he was

9   interested in it.  And so that's why it was sent to him.

10   Q.   Okay.

11        MR. REEVES:  Which one are you talking

12   about in 2015?

13        MR. BANKSTON:  This email is in 2015?

14        MR. REEVES:  You said it was found in

15   2015.

16        MR. BANKSTON:  Right, that Nico found

17   this in 2015.  He said he's glad he found this, like,

18   this is something that they actually found.  His

19   testimony is about them sending tons of emails that they

20   don't even see or ever recognize.  And he got this one,

21   and this one was found in 2015.  We know it was found in

22   2015 because Nico forwarded it to Rob Dew in 2015.

23   Q.   In fact, let's ask that question.  We know

24   this email was found and actually seen by somebody at

25   Infowars because it was forwarded to Rob Dew in 2015?

141

1   A.   Yes.

2   Q.   Thank you.

3        MR. REEVES:  I just -- I didn't mean

4   to --

5        MR. BANKSTON:  No.  I understand.  I

6   understand.  I clear up your --

7        MR. REEVES:  Thanks.  I appreciate it.

8        MR. BANKSTON:  Can you give me tab 17?

9      Q.   Now, as far back as 2014, you were raising

10  money for Halbig's court actions.  Correct?

11      A.   He'd been a guest a few times, and we let

12  guests -- a lot of guests do stuff like that, but yes.

13      Q.   And you told your audience support Halbig.  Go

14  to sandyhookjustice.com and give them money.  You told

15  your audience that?

16      A.   I don't remember doing that, but that may have

17  happened.

18      Q.  Okay.

19      A.   Because, again, I thought he was -- they had

20  him on actual TV as a top school safety expert.  I

21  thought he was going to find out.  I mean, even Rob

22  Dew's retired FBI agent uncle thought it sounded

23  credible enough to go actually hear what they said at

24  the event.  So...

25          MR. BANKSTON:  Object as nonresponsive.

142

1      Q.   Infowars was aware that Mr. Halbig was

2  harassing Mr. Pozner for years.  Right?

3      A.   No, no.

4      Q.   Okay.  Infowars was following the lawsuit

5  between Mr. Halbig and Mr. Pozner, was keeping up with

6  it?

7      A.   I mean, I think Rob Dew was.  I really wasn't.

8      Q.   Your news -- Rob Dew was news director at that

9  point?

10      A.   Well, news directly on the nightly news.

11    Q.   Okay.

12    A.   Not he director of everything at the office.

13    Q.   Let's talk about Dan Badani (phonetic).

14  Right?  You sent Dan Badani to Newtown multiple times?

15    A.   Dan lived nearby and would go, and then he was

16  on the show some.

17    Q.   Well, I mean, you said on your show, We sent

18  our reporter Dan Badani up to Newtown to cover this?

19  You've said that plenty of times?

20    A.   I think so, yes.

21    Q.   Okay.  He went there to film videos about

22  Wolfgang Halbig.  Correct?

23    A.   I believe so.

24    Q.   Okay.  You understood that Dan Badani was

25  prone to causing trouble.  You knew that?

143

1     A.   Later I figured it out.

2     Q.   When did you think you figured that out?

3     A.   He came down to Austin for a few months and he

4   was a nice fellow but he would not follow direction.  So

5   we sent him back to Connecticut.  He didn't officially

6   work for us.  And then he just would go out and do

7   things, some interesting, some that we didn't agree

8   with.  And then he would still occasionally call on the

9   show or be on the show.

10    Q.   But you would send him out on a mission, you

11  knew he was likely to cause trouble.  You knew that.

12  Right?

13          MR. REEVES:  Objection.  Form.

14    A.  No.

15    Q.  Okay.  I want to play an audio clip from you,

16  and this audit clip will be Exhibit 19.

17          (Exhibit 19 marked.)

18    Q.  I want you -- I'm going to play an audio clip

19  from you, and I want you to tell me is this you talking.

20    A.  Okay.  (Audio playing)

21    Q.  A kraken is a mythological Greek monster.

22  Correct?

23    A.  Yes.

24    Q.  Release the kraken is a rather famous line of

25  dialog from the film Clash of the Titans?

                              144


1    A.  Yes.  A listener sent us a painting saying

2  he's the -- and that was from -- that we're talking

3  about, that was from the Boston bombing.

4    Q.  Okay.

5    A.  That's what we were talking about.

6    Q.  Right.  Because he caused some trouble in the

7  Boston bombing and stuff.  I remember that.

8    A.  I mean, there really were a bomb squad there

9  that looked like they were wearing black water uniforms.

10    Q.  Oh, look, before we dive into the esoterica of

11  whether the Boston bombing happened or not, I'm actually

12  just referring when Dan Badani went to do some coverage

13  in the Boston bombing, there was -- there was some

14  fracus?

15     A.  Well, he asked some questions.

16     Q.  Yeah.  And wasn't it -- didn't somebody try to

17  kick him out of a room or something?  Somebody tried to

18  make --

19     A.  It was a press conference.

20     Q.  Okay.

21     A.  And that's what I was talking about in that

22  clip.  I mean, I remember the clip.

23     Q.  So you had had previous experience with Dan

24  Badandi sending him out?

25     A.  Yes.

145

1     Q.  Okay.  Okay.  Tell you, Mr. Jones:  Let me let

2  you take a short break, and I -- actually, let me ask

3  you about one more thing before we do that.  I've got --

4  I've got a couple more topics to talk about, but I don't

5  think it's going to be too long.  The one I did want to

6  bring up, though, real quick because I think we can

7  cover it real quick, do you know who -- do you know who

8  I'm talking about when I say Darren Howard?

9     A.  No.

10     Q.  Okay.  Do you remember accusing a man of being

11  a Covid crisis actor, being a fake Covid patient, in the

12  United Kingdom?

13     A.  I remember -- I remember covering people

14  saying that, yes.

15    Q.   Okay.  So -- okay.  Who do you think was

16  saying that?  Do you remember?

17    A.   I don't remember the specifics.

18    Q.   Okay.  Can you explain what Darren Howard was

19  being accused of right now?  Do you remember?

20    A.   I don't remember.

21    Q.   Okay.  Do you know if you apologized to him?

22    A.   I do believe so, yes.

23    Q.   Okay.

24    A.   Well, what is that question of that for?

25        MR. REEVES:  Just answer the question.

                                146


1    Q.   If you apologized to him in writing, do you

2  think you have it?

3    A.   I don't know.

4    Q.   Okay.  Yeah, go ahead and let's take a quick

5  comfort break, and we'll come back on the record in

6  five.

7        THE VIDEOGRAPHER:  Off the record at 1:31

8  p.m.

9        (Short recess.)

10       THE VIDEOGRAPHER:  We're back on the

11  record at 1:41 p.m.

12    Q.   All right, Mr. Jones.  Just a couple of last

13  things.  You would agree with me your company does not

14  have any documents that are used to train Infowars

15  employees in how to verify factual information and

16  Infowars stories.  Those documents, you don't have

17  anything like that?

18     A.   Well, I mean, we've had lots of meetings and

19  things about if we're going to do something original,

20  then we have to prove it and have multiple witnesses.

21  And generally, it's video journalism out in the street

22  like it is what it is.  You see it.  Then on air it's

23  just commentary and opinion and analysis.  So I've

24  always told people, you know, make sure, you know, what

25  you're saying is -- is backed up.  And the areas we've

147

1  gotten in trouble with have been things where it's these

2  big internet hubbub speculation things.  And I really

3  try to steer clear of those now.

4     Q.   Okay.  But my question is:  There are no

5  documents that -- that set forth the policies or

6  procedures for vetting factual information at Infowars.

7  That's not something that exists in a document.

8  Correct?

9     A.   No.

10     Q.   Okay.  Your company has never disciplined

11  anyone due to a false fact about Sandy Hook published on

12  Infowars.  Correct?

13          MR. REEVES:  Objection.  Form.

14     A.   I don't remember.

15     Q.   You think it's possible you may have

16  disciplined somebody for saying something false about

17  Sandy Hook?

18      A.   I wouldn't say false.  I mean, people have

19  gotten in trouble for talking about it.  I've tried to,

20  like, you know, stay out of it and myself get sunk back

21  into it.  I think people testified to that, too.  At

22  least, that's what I was told.

23      Q.   One of the reasons that you in 2015 went to

24  people like Adan Salazar and told them stop printing

25  articles about Sandy Hook is because Leonard Pozner kept

148

1  getting strikes against the company.  Right?

2      A.   I don't remember if it was Leonard Pozner.  I

3  mean, I know I've seen people make a big thing between

4  me and Leonard Pozner.  I barely know who he is and I've

5  seen him in some shows.  But no, I just did not -- yes,

6  I mean, I did not want to -- I had -- I had seen some of

7  the anomalies and things be proven that should not be

8  anomalies.  And so I wasn't sure that it was staged.

9  But then, you know, I go back and forth like anybody on

10  these -- kind of these mysteries.  But -- so that's --

11  that's where I stand on that.

12      Q.   I want to know:  Do you -- so the day after

13  the Connecticut default happened, there was a company

14  registered in Delaware called Restore America Marketing

15  Company.  Is that your company?

16      A.   Restore America Marketing Company?  No, I've

17  never heard of that.

18      Q.   Okay.  The company apparently has something to

19  do with Reset Wars.  Can you tell me what Reset Wars is?

20     A.   Reset Wars is somebody else's company.

21     Q.   Okay.  What is Reset Wars?  Does that have

22 anything -- is that affiliated with Free Speech Systems

23 in any way or you?

24     A.   No.  That is -- that is somebody else's

25 company that -- that is for promotions.

149

1     Q.   Does that have anything to do with Free Speech

2 Systems and Infowars and its business?

3     A.   Well, yes.  I mean, I am working with them.

4 They are producing a six-hour course titled Reset Wars.

5     Q.   A course.  Like a educational course?

6     A.   Yes.

7     Q.   Okay.  And does there plan to be, like,

8 students who sign up for it and watch it online?  Is

9 that the idea?

10     A.   I wouldn't call it students, but it's like a

11 self-help deal.

12     Q.   So it's not -- what I'm trying to distinguish

13 with is it's not an in-person class.  It's an online

14 thing?

15     A.   Yes.

16     Q.   Okay.  I want to show you what I marked as

17 Exhibit 19 [sic].

18          (Exhibit 19 marked.)

19     Q.   At the bottom we see FSSTX-077501?

20     A.   Yes.

21    Q.   Okay.  And this is from somebody named Logan

22  Ponder, and their email is at the topic.  And I take you

23  don't know this person personally?

24    A.   No.

25    Q.   This is to writers at Infowars.com?

150

1    A.   Yes.

2    Q.   And the subject is "I'm with you all."

3  Correct?

4    A.   Yes.

5    Q.   The date is April 17th, 2013.  Correct?

6    A.   Yes.

7    Q.   I'm going to read this email.  My name is

8  Logan Ponder.  I'm 21 years old and what's going on in

9  this world is disgusting.  You guys are always on top of

10  information.  I am so glad I have all of you to refer to

11  because you know what's going on.  The government and

12  all these groups are trying to take over the world and

13  they are clearly succeeding.  What can I do to help stop

14  this madness?  Sandy Hook and now this Boston bombing

15  marathon are clearly inside jobs.  It's obvious.  So

16  what can I do to help?  What can I do to change the

17  expected outcome?  Please tell me.  I want to help.  I

18  live in Lexington, Kentucky.  If there's anything I can

19  do to help your cause, please let me know.  I support

20  you guys all the way.  Sincerely, Logan Ponder.  Sent

21  from my iPad.  Correct?

22    A.   Yes.

23    Q.   Okay.  This is actually somewhat typical, not

24  a -- this is not an unusual email for you.  Right?  You

25  have a lot of fans who are very supportive of you?

151

1    A.   We get millions of emails.  I don't -- you can

2  find, basically, anything you wanted in the emails.

3    Q.   Oh, I've found a lot of things in them, yeah,

4  sure.  There's people sending you just hundreds of pages

5  of crazy numerology.  Have you seen stuff like that?

6  And that's of kind of stuff you can just throw in the

7  trash.  Right?

8    A.   We can't even -- we've thought about getting

9  rid of the email addresses.  You can't look at all of

10  it.

11    Q.   But this email, now that you've seen it today,

12  this is something you're proud of.  Right?

13    A.   I don't know who this person is.

14    Q.   No.  What I mean, just generally, I mean,

15  we're looking at somebody here who is kind of waking up

16  to some of the forces that are involved in this country

17  and they're listening to you and they want to get

18  involved in the fight.  That's kind of the mission

19  statement of your show.  Right?  To get people woken up

20  like this.  Right?

21        MR. REEVES:  Objection.  Form.

22    A.   I mean, yes.  I like people to become aware of

23  the international corporate tyranny that's taking over

24 publicly in front of all of us right now.

25      Q.  And in doing that, I would imagine that you

152

1  feel a sense of responsibility to people like Logan

2  Ponder.  Right?  They're looking for you for

3  information.  You feel a sense of responsibility to him?

4      A.  I mean, this is an email from nine years ago.

5  I don't know what to say.

6      Q.  No.  I mean, let's talk about anybody who you

7  have, unless -- I don't think it would be inappropriate

8  for me to say you have millions of fans.  Right?  Would

9  you agree with that?

10      A.  Sure.

11      Q.  Okay.  And those millions of fans who follow

12  you and are engaged by you, some of them follow you

13  because they're entertained by you and some follow

14  because they like the information.  Right?  There could

15  be different reasons people are a fan of yours.  Right?

16  Some people could be really into your comedy.  Some

17  people could be really into your commentary.  Some

18  people could be really into your website and what you're

19  doing there.  There's lots of different reason people

20  could be a fan of yours.  Right?

21      A.  Yes.

22      Q.  Okay.  But in terms of those millions of

23  people who are your fans, do you feel some sense of

24  responsibility to them?

25           MR. REEVES:  Objection.  Form.

1    A.   I mean, yes.  And it's been a growing,

2   learning process as well.

3          THE VIDEOGRAPHER:  Counsel, I have

4   Exhibit 19 as the audio clip.

5          MR. BANKSTON:  Oh, you're absolutely

6   right.  Let's go ahead and re-mark that for the record.

7   Thank you so much.

8          (Exhibit 19 marked.)

9    Q.   Mr. Jones, I have -- as you see, I've put in

10  front of you an exhibit that's been re-marked as Exhibit

11  20.  You see that?

12          (Exhibit 20 marked.)

13   A.   Yes.

14   Q.   And so this is the Logan Ponder email --

15   A.   Yes.

16   Q.   Let me ask that one more time because she's

17  got to write it down.  This is the Logan Ponder email

18  we've been talking about?

19   A.   Yes.

20   Q.   Okay.  I'm going to show you what I've marked

21  as Exhibit 21.

22          (Exhibit 21 marked.)

23   Q.   Do you see where it says FSSTX-078964?

24   A.   Yes.

25   Q.   Okay.  So this is another email from Infowars'

1  corporate files?

2    A.  Yes.

3    Q.  And it looks like here we have an email from a

4  person named Gabriel Jones, is how they sign it.

5  Correct?

6    A.  Uh-huh.

7    Q.  Okay.  This was an email sent on March 24th,

8  2014?

9    A.  Yes.

10    Q.  Okay.  I'm going to read this email.  Okay?

11  It says, Dear Alex Jones, I'm not sure if this is the

12  way to contact you or not but I hope this is received.

13  My name is Gabriel Jones.  I'm 15 and I now truly

14  realize that nothing is what it seems.  Raised to think

15  this way by my conspiracy theorist father, Evan Jones, I

16  now understand everything from 9-11 and Sandy Hook all

17  the way down to chemtrails in the skies and GMOs in our

18  foods.  My father listens to you all the time and knows

19  all about you.  About one hour ago he just made his

20  first "Elephant in the Room" "Chemtrails Aren't

21  Invisible."  You see, sir, I've been watching this and I

22  finally understand the things my father had been putting

23  into my brain.  We can't trust big brother and something

24  big is going to happen soon.  Anyway...I'm sorry for the

25  long story, but I had a huge question.  You see, my

155

1  father is unemployed and he just wants to live a

2  peaceful life and do what he loves.  I want to help in

3  this fight.  The, quote, Infowars, unquote, you can say

4  (bad joke, sorry) but you see, I feel as though my

5  father could do so much in this.  Just to show people

6  the truth even...But I don't know how to do this for him

7  or help...  But anyway, I ask of you...Do you have any

8  ideas?  I know you would before anybody.  So that is why

9  I ask you.  If this gets to you...Thank you so much.

10  Continue the good fight.  Thank you.  Gabriel Jones.

11           Now, I take it you've never seen this

12  email.  Right?

13     A.  No.

14     Q.  But now that it has gotten to you and Gabriel

15  now, seven years after the fact, you've seen Gabriel's

16  thanking you?

17     A.  Very sweet.

18     Q.  You're proud of this email.  Right?

19           MR. REEVES:  Objection.  Form.

20     A.  I mean, I think it's a sweet person.  He

21  sounds sweet, doesn't he?

22     Q.  He does.  He sounds like a real sweet kid,

23  doesn't he?  Sounds like he's maybe waking up to some

24  things in the world.  Right?

25           MR. REEVES:  Objection.  Form.

156

1     Q.  Correct?

2     A.  I mean, I think it's good to question.

3    Q.   Yeah.  And you're proud that you're able to do

4  this, that people are going to follow you and you might

5  be making a difference.  Right?

6       MR. REEVES:  Objection to the form.

7    A.   I mean, I've tried to tell the truth and I've

8  been warning people about tyranny and forced

9  inoculations.  And now it's here.

10    Q.   You didn't -- you didn't start Infowars and do

11  what you do every day four hours talking, you didn't do

12  that just to make money.  Right?  You did that to make a

13  difference.  Right?

14    A.   Yes.

15    Q.   Okay.  Mr. Jones, I appreciate your time

16  today.  That's all the questions I've got for you.

17    A.   Thanks.

18       MR. REEVES:  Reserve for time of trial.

19       THE VIDEOGRAPHER:  This concludes the

20  deposition.  We are going off the record at 1:53 p.m.

21

22

23

24

25

# Exhibit 6

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Interval | Orders | Sales Item | Sales Total | Invoiced | Refunded | Sales Tax | Sales Shipping | Sales Discount | Canceled |
|---|---|---|---|---|---|---|---|---|---|
| 18-Sep-15 | 2 | 3 | $15.00 | $0.00 | $0.00 | $0.00 | $15.00 | $0.00 | $0.00 |
| 5-Oct-15 | 1 | 1 | $81.90 | $0.00 | $0.00 | $0.00 | $5.00 | $0.00 | $0.00 |
| 6-Oct-15 | 2 | 4 | $119.01 | $0.00 | $0.00 | $0.00 | $20.00 | $0.00 | $0.00 |
| 8-Oct-15 | 2 | 5 | $320.40 | $0.00 | $0.00 | $0.00 | $25.00 | $0.00 | $0.00 |
| 13-Oct-15 | 1 | 2 | $83.01 | $0.00 | $0.00 | $5.56 | $10.00 | $0.00 | $0.00 |
| 21-Oct-15 | 1 | 1 | $32.50 | $0.00 | $0.00 | $0.00 | $5.00 | $0.00 | $0.00 |
| 27-Oct-15 | 2 | 2 | $91.08 | $0.00 | $0.00 | $6.18 | $10.00 | $0.00 | $0.00 |
| 28-Oct-15 | 6 | 21 | $3,919.11 | $0.00 | $0.00 | $296.01 | $35.17 | $0.00 | $0.00 |
| 3-Nov-15 | 2 | 2 | $33.14 | $33.14 | $0.00 | $0.48 | $26.76 | $0.00 | $0.00 |
| 4-Nov-15 | 2 | 3 | $35.25 | $0.00 | $0.00 | $0.64 | $26.76 | $0.00 | $0.00 |
| 5-Nov-15 | 8 | 38 | $1,085.07 | $1,085.07 | $0.00 | $0.33 | $71.83 | $181.09 | $0.00 |
| 6-Nov-15 | 17 | 75 | $2,170.36 | $1,959.26 | $0.00 | $1.27 | $197.83 | $464.24 | $0.00 |
| 7-Nov-15 | 8 | 43 | $914.22 | $914.22 | $0.00 | $0.00 | $61.55 | $160.00 | $0.00 |
| 13-Nov-15 | 248 | 743 | $25,291.17 | $25,073.60 | $0.00 | $3.48 | $2,362.73 | $1,879.86 | $0.00 |
| 14-Nov-15 | 96 | 311 | $10,479.37 | $10,479.37 | $0.00 | $14.06 | $888.81 | $800.00 | $0.00 |
| 15-Nov-15 | 18 | 72 | $2,213.79 | $2,213.79 | $0.00 | $5.11 | $152.27 | $180.00 | $0.00 |
| 16-Nov-15 | 3 | 4 | $154.70 | $154.70 | $0.00 | $0.00 | $19.95 | $10.00 | $0.00 |
| 17-Nov-15 | 1 | 2 | $48.63 | $48.63 | $0.00 | $0.47 | $5.75 | $2.49 | $0.00 |
| 18-Nov-15 | 2 | 6 | $221.05 | $221.05 | $0.00 | $0.00 | $28.90 | $0.00 | $0.00 |
| 19-Nov-15 | 34 | 111 | $3,566.34 | $3,566.34 | $0.00 | $6.97 | $303.59 | $0.00 | $0.00 |
| 20-Nov-15 | 336 | 1017 | $39,499.13 | $38,591.00 | $0.00 | $36.60 | $3,000.47 | $7.00 | $0.00 |
| 21-Nov-15 | 316 | 878 | $33,321.50 | $32,835.22 | $0.00 | $37.80 | $2,779.96 | $0.00 | $0.00 |
| 22-Nov-15 | 248 | 694 | $31,222.18 | $31,222.18 | $0.00 | $8.80 | $3,027.90 | $28.80 | $0.00 |
| 23-Nov-15 | 270 | 697 | $29,135.08 | $29,053.53 | $0.00 | $27.07 | $1,898.16 | $8.40 | $0.00 |
| 24-Nov-15 | 714 | 2323 | $122,312.21 | $122,081.67 | $0.00 | $42.48 | $1,753.42 | $19.48 | $0.00 |
| 25-Nov-15 | 735 | 2290 | $83,003.11 | $82,626.47 | $0.00 | $22.77 | $1,612.66 | $31.17 | $0.00 |
| 26-Nov-15 | 722 | 2241 | $88,382.29 | $88,254.66 | $0.00 | $57.23 | $1,518.99 | $27.45 | $0.00 |
| 27-Nov-15 | 1816 | 7567 | $172,626.44 | $171,476.45 | $0.00 | $128.31 | $2,827.35 | $34.77 | $0.00 |
| 28-Nov-15 | 2296 | 11091 | $219,515.79 | $219,515.79 | $9.95 | $117.75 | $4,624.00 | $218.74 | $0.00 |
| 29-Nov-15 | 729 | 3499 | $80,053.21 | $80,053.21 | $60.86 | $57.48 | $1,917.36 | $39.73 | $0.00 |
| 30-Nov-15 | 1441 | 6636 | $166,847.10 | $166,405.97 | $283.15 | $174.09 | $2,388.26 | $181.45 | $0.00 |
| 1-Dec-15 | 2051 | 7908 | $223,376.50 | $219,312.02 | $239.25 | $402.71 | $3,470.24 | $313.91 | $0.00 |
| 2-Dec-15 | 664 | 2177 | $68,356.36 | $68,356.36 | $30.91 | $137.51 | $1,114.94 | $359.23 | $0.00 |
| 3-Dec-15 | 1144 | 4132 | $114,573.00 | $114,420.39 | $106.85 | $223.45 | $2,389.06 | $636.90 | $0.00 |

FSSTX-086589

001



## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 4-Dec-15 | 861 | 2760 | $76,299.05 | $76,416.83 | $149.25 | $97.47 | $1,599.52 | $322.50 | $117.78 |
| 5-Dec-15 | 838 | 2828 | $75,636.95 | $75,636.95 | $0.00 | $91.84 | $1,351.75 | $169.61 | $0.00 |
| 6-Dec-15 | 415 | 1383 | $55,584.36 | $55,584.36 | $0.00 | $94.95 | $1,153.66 | $248.61 | $0.00 |
| 7-Dec-15 | 517 | 1517 | $62,432.12 | $62,432.12 | $54.90 | $172.70 | $1,031.20 | $130.99 | $0.00 |
| 8-Dec-15 | 339 | 780 | $33,459.64 | $33,459.64 | $0.00 | $105.53 | $1,037.74 | $126.40 | $0.00 |
| 9-Dec-15 | 480 | 1205 | $55,326.92 | $55,326.92 | $0.00 | $86.71 | $1,231.52 | $204.07 | $0.00 |
| 10-Dec-15 | 538 | 1309 | $77,758.12 | $77,758.12 | $0.00 | $304.04 | $1,443.20 | $110.00 | $0.00 |
| 11-Dec-15 | 404 | 942 | $49,684.46 | $49,684.46 | $0.00 | $282.33 | $989.47 | $234.43 | $0.00 |
| 12-Dec-15 | 317 | 747 | $33,811.87 | $33,811.87 | $0.00 | $74.00 | $796.97 | $160.93 | $0.00 |
| 13-Dec-15 | 267 | 689 | $29,982.12 | $29,982.12 | $0.00 | $47.53 | $526.01 | $209.91 | $0.00 |
| 14-Dec-15 | 337 | 882 | $39,710.40 | $39,710.40 | $0.00 | $147.91 | $823.39 | $218.78 | $0.00 |
| 15-Dec-15 | 325 | 814 | $41,130.63 | $41,130.63 | $0.00 | $69.76 | $679.39 | $93.64 | $0.00 |
| 16-Dec-15 | 487 | 1182 | $49,325.96 | $49,325.96 | $0.00 | $83.13 | $1,051.06 | $707.55 | $0.00 |
| 17-Dec-15 | 580 | 1470 | $71,647.39 | $71,647.39 | $0.00 | $93.67 | $1,168.49 | $668.57 | $0.00 |
| 18-Dec-15 | 844 | 2201 | $94,563.20 | $94,563.20 | $319.05 | $380.01 | $989.11 | $2,586.21 | $0.00 |
| 19-Dec-15 | 350 | 897 | $37,073.57 | $37,073.57 | $0.00 | $63.78 | $710.03 | $484.30 | $0.00 |
| 20-Dec-15 | 181 | 442 | $18,901.56 | $18,901.56 | $0.00 | $16.26 | $552.83 | $97.66 | $0.00 |
| 21-Dec-15 | 242 | 642 | $28,461.78 | $28,461.78 | $0.00 | $67.17 | $597.28 | $882.52 | $0.00 |
| 22-Dec-15 | 231 | 635 | $25,031.33 | $25,031.33 | $0.00 | $27.26 | $923.51 | $304.98 | $0.00 |
| 23-Dec-15 | 154 | 452 | $19,152.94 | $19,152.94 | $0.00 | $47.53 | $1,288.18 | $279.96 | $0.00 |
| 24-Dec-15 | 136 | 314 | $18,512.15 | $18,512.15 | $89.95 | $47.10 | $1,276.27 | $263.07 | $0.00 |
| 25-Dec-15 | 119 | 304 | $13,320.76 | $13,320.76 | $0.00 | $25.16 | $1,165.37 | $103.73 | $0.00 |
| 26-Dec-15 | 183 | 464 | $20,098.27 | $20,098.27 | $0.00 | $22.45 | $1,652.82 | $899.79 | $0.00 |
| 27-Dec-15 | 176 | 441 | $19,406.90 | $19,406.90 | $0.00 | $9.16 | $1,852.80 | $999.32 | $0.00 |
| 28-Dec-15 | 197 | 567 | $28,345.74 | $28,345.74 | $0.00 | $302.92 | $1,819.81 | $1,545.12 | $0.00 |
| 29-Dec-15 | 264 | 771 | $36,129.69 | $36,129.69 | $0.00 | $195.68 | $2,539.74 | $1,911.31 | $0.00 |
| 30-Dec-15 | 267 | 754 | $35,297.36 | $35,297.36 | $0.00 | $177.83 | $2,356.76 | $2,786.04 | $0.00 |
| 31-Dec-15 | 289 | 894 | $38,768.47 | $38,768.47 | $0.00 | $104.27 | $3,009.71 | $3,735.52 | $0.00 |
| 1-Jan-16 | 222 | 600 | $24,874.59 | $24,874.59 | $0.00 | $74.44 | $2,030.53 | $1,436.18 | $0.00 |
| 2-Jan-16 | 213 | 511 | $24,425.91 | $24,425.91 | $0.00 | $11.66 | $2,051.85 | $597.26 | $0.00 |
| 3-Jan-16 | 178 | 432 | $22,729.64 | $22,729.64 | $66.39 | $56.87 | $1,913.39 | $698.22 | $0.00 |
| 4-Jan-16 | 223 | 545 | $27,053.24 | $27,053.24 | $0.00 | $46.57 | $2,117.30 | $967.98 | $0.00 |
| 5-Jan-16 | 291 | 726 | $31,124.48 | $31,124.48 | $0.00 | $78.18 | $2,563.21 | $1,282.82 | $0.00 |
| 6-Jan-16 | 273 | 815 | $32,762.14 | $32,762.14 | $0.00 | $107.25 | $2,565.77 | $1,621.62 | $0.00 |
| 7-Jan-16 | 426 | 1243 | $42,823.87 | $42,823.87 | $41.47 | $159.13 | $3,885.21 | $2,619.82 | $0.00 |

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 8-Jan-16 | 453 | 1212 | $52,037.97 | $52,037.97 | $0.00 | $63.71 | $4,349.10 | $3,883.83 | $0.00 |
| 9-Jan-16 | 435 | 1225 | $49,054.38 | $49,054.38 | $0.00 | $103.93 | $4,101.49 | $3,357.78 | $0.00 |
| 10-Jan-16 | 197 | 512 | $20,394.61 | $20,394.61 | $0.00 | $78.83 | $1,733.43 | $848.87 | $0.00 |
| 11-Jan-16 | 321 | 750 | $32,682.36 | $32,682.36 | $0.00 | $48.92 | $2,911.74 | $2,179.52 | $0.00 |
| 12-Jan-16 | 301 | 759 | $32,420.07 | $32,420.07 | $0.00 | $88.30 | $2,968.25 | $1,167.12 | $0.00 |
| 13-Jan-16 | 335 | 895 | $38,755.15 | $38,755.15 | $0.00 | $60.05 | $3,438.30 | $1,732.56 | $0.00 |
| 14-Jan-16 | 297 | 782 | $45,234.74 | $45,234.74 | $0.00 | $70.62 | $2,687.00 | $607.75 | $0.00 |
| 15-Jan-16 | 374 | 953 | $66,383.17 | $66,383.17 | $0.00 | $106.25 | $2,757.65 | $697.69 | $0.00 |
| 16-Jan-16 | 353 | 972 | $82,199.47 | $82,199.47 | $0.00 | $68.48 | $3,711.84 | $2,123.51 | $0.00 |
| 17-Jan-16 | 209 | 495 | $33,556.33 | $33,556.33 | $0.00 | $51.50 | $1,929.88 | $150.68 | $0.00 |
| 18-Jan-16 | 281 | 810 | $41,335.61 | $41,335.61 | $239.85 | $48.00 | $2,528.08 | $631.10 | $0.00 |
| 19-Jan-16 | 337 | 809 | $43,393.16 | $43,393.16 | $0.00 | $155.48 | $2,999.43 | $360.04 | $0.00 |
| 20-Jan-16 | 592 | 1547 | $75,276.72 | $75,276.72 | $0.00 | $251.63 | $5,266.39 | $932.50 | $0.00 |
| 21-Jan-16 | 459 | 1257 | $54,562.33 | $54,562.33 | $57.94 | $160.83 | $4,271.50 | $1,139.78 | $0.00 |
| 22-Jan-16 | 438 | 1031 | $47,763.05 | $47,763.05 | $0.00 | $207.15 | $3,825.03 | $414.52 | $0.00 |
| 23-Jan-16 | 399 | 1090 | $49,083.53 | $49,083.53 | $0.00 | $66.38 | $3,578.75 | $1,507.98 | $0.00 |
| 24-Jan-16 | 249 | 696 | $32,495.24 | $32,495.24 | $0.00 | $93.15 | $2,211.55 | $1,234.63 | $0.00 |
| 25-Jan-16 | 352 | 1086 | $45,682.02 | $45,682.02 | $0.00 | $81.54 | $2,536.36 | $1,116.35 | $0.00 |
| 26-Jan-16 | 450 | 1408 | $58,283.59 | $58,283.59 | $303.06 | $90.38 | $1,777.25 | $3,388.58 | $0.00 |
| 27-Jan-16 | 986 | 2963 | $131,476.74 | $131,476.74 | $0.00 | $144.08 | $2,908.30 | $4,245.56 | $0.00 |
| 28-Jan-16 | 993 | 2645 | $159,380.00 | $159,380.00 | $92.62 | $92.40 | $3,248.60 | $4,988.79 | $0.00 |
| 29-Jan-16 | 671 | 1753 | $105,042.17 | $105,139.67 | $59.99 | $126.73 | $2,066.74 | $3,587.02 | $97.50 |
| 30-Jan-16 | 596 | 1584 | $89,183.52 | $89,183.52 | $0.00 | $111.11 | $1,842.24 | $2,604.87 | $0.00 |
| 31-Jan-16 | 211 | 601 | $27,172.03 | $27,172.02 | $0.00 | $20.86 | $604.39 | $682.09 | $0.00 |
| 1-Feb-16 | 351 | 1012 | $41,442.82 | $41,442.81 | $59.90 | $81.75 | $1,595.07 | $1,205.66 | $0.00 |
| 2-Feb-16 | 402 | 1112 | $45,388.46 | $45,388.42 | $0.00 | $65.31 | $1,660.78 | $1,384.39 | $0.00 |
| 3-Feb-16 | 525 | 1366 | $54,989.88 | $54,989.80 | $0.00 | $74.52 | $1,952.92 | $1,556.40 | $0.00 |
| 4-Feb-16 | 931 | 2073 | $97,412.95 | $97,412.81 | $0.00 | $68.13 | $3,169.55 | $4,010.24 | $0.00 |
| 5-Feb-16 | 653 | 1481 | $73,351.90 | $73,351.85 | $0.00 | $123.11 | $2,232.49 | $2,326.16 | $0.00 |
| 6-Feb-16 | 470 | 1148 | $54,500.99 | $54,500.95 | $0.00 | $93.09 | $1,792.30 | $1,885.08 | $0.00 |
| 7-Feb-16 | 313 | 811 | $37,115.38 | $37,115.36 | $0.00 | $29.93 | $1,221.12 | $921.96 | $0.00 |
| 8-Feb-16 | 387 | 1041 | $48,669.07 | $48,669.04 | $0.00 | $63.80 | $1,510.19 | $1,787.79 | $0.00 |
| 9-Feb-16 | 458 | 1322 | $57,248.12 | $57,248.07 | $0.00 | $90.56 | $1,898.16 | $2,065.84 | $0.00 |
| 10-Feb-16 | 773 | 1838 | $87,420.09 | $87,419.98 | $570.60 | $69.22 | $2,893.78 | $2,476.34 | $0.00 |
| 11-Feb-16 | 712 | 1674 | $96,267.51 | $96,267.43 | $27.80 | $66.26 | $2,172.28 | $2,676.34 | $0.00 |

FSSTX-086589

003

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 12-Feb-16 | 997 | 2374 | $205,088.07 | $205,088.00 | $0.00 | $141.69 | $3,541.31 | $6,679.09 | $0.00 |
| 13-Feb-16 | 506 | 1263 | $81,542.17 | $81,542.10 | $0.00 | $78.36 | $1,699.99 | $2,297.86 | $0.00 |
| 14-Feb-16 | 380 | 967 | $45,150.07 | $45,150.05 | $189.00 | $37.03 | $1,899.28 | $1,015.54 | $0.00 |
| 15-Feb-16 | 570 | 1429 | $75,320.91 | $75,320.86 | $286.20 | $98.75 | $2,235.79 | $2,410.70 | $0.00 |
| 16-Feb-16 | 511 | 1358 | $64,231.69 | $64,231.63 | $0.00 | $71.43 | $2,843.73 | $1,846.84 | $0.00 |
| 17-Feb-16 | 597 | 1713 | $75,962.89 | $75,962.79 | $0.00 | $89.45 | $2,387.46 | $2,020.63 | $0.00 |
| 18-Feb-16 | 758 | 2107 | $83,589.21 | $83,589.08 | $163.25 | $66.64 | $2,869.46 | $2,023.77 | $0.00 |
| 19-Feb-16 | 797 | 2067 | $92,637.57 | $92,637.42 | $0.00 | $102.64 | $3,139.72 | $2,149.59 | $0.00 |
| 20-Feb-16 | 552 | 1327 | $57,290.23 | $57,290.10 | $0.00 | $117.12 | $2,356.03 | $1,346.42 | $0.00 |
| 21-Feb-16 | 369 | 921 | $39,411.80 | $39,411.71 | $53.90 | $84.74 | $1,532.54 | $731.01 | $0.00 |
| 22-Feb-16 | 511 | 1352 | $58,393.74 | $58,393.62 | $0.00 | $135.48 | $2,081.13 | $1,520.72 | $0.00 |
| 23-Feb-16 | 617 | 1590 | $68,314.53 | $68,314.37 | $0.00 | $124.77 | $2,520.15 | $1,739.46 | $0.00 |
| 24-Feb-16 | 692 | 1744 | $69,319.15 | $69,318.91 | $0.00 | $110.81 | $2,792.15 | $1,428.01 | $0.00 |
| 25-Feb-16 | 589 | 1450 | $56,569.16 | $56,569.00 | $55.25 | $47.26 | $2,586.09 | $1,188.78 | $0.00 |
| 26-Feb-16 | 1037 | 3714 | $102,368.62 | $102,368.26 | $924.29 | $120.06 | $3,164.09 | $25,637.90 | $0.00 |
| 27-Feb-16 | 1709 | 6885 | $179,613.86 | $179,613.46 | $266.70 | $270.25 | $3,147.71 | $76,330.75 | $0.00 |
| 28-Feb-16 | 1319 | 4971 | $141,236.30 | $141,236.05 | $174.93 | $263.94 | $2,504.95 | $57,521.44 | $0.00 |
| 29-Feb-16 | 2930 | 11152 | $334,820.44 | $334,819.96 | $1,345.40 | $716.27 | $4,109.77 | $141,048.14 | $0.00 |
| 1-Mar-16 | 3890 | 15706 | $434,748.05 | $434,747.35 | $302.05 | $765.85 | $5,319.71 | $188,463.90 | $0.00 |
| 2-Mar-16 | 1609 | 5321 | $142,563.32 | $142,562.88 | $0.00 | $279.74 | $3,124.23 | $51,472.50 | $0.00 |
| 3-Mar-16 | 690 | 2543 | $61,384.86 | $61,384.64 | $0.00 | $87.40 | $3,456.33 | $2,202.83 | $0.00 |
| 4-Mar-16 | 661 | 2356 | $54,635.17 | $54,634.97 | $0.00 | $54.61 | $3,665.59 | $1,058.37 | $0.00 |
| 5-Mar-16 | 516 | 2003 | $44,741.78 | $44,741.58 | $147.45 | $64.89 | $2,703.13 | $789.22 | $0.00 |
| 6-Mar-16 | 413 | 1539 | $39,347.59 | $39,347.44 | $0.00 | $73.22 | $2,428.09 | $572.57 | $0.00 |
| 7-Mar-16 | 600 | 2203 | $45,792.27 | $45,792.10 | $0.00 | $94.15 | $2,851.00 | $805.54 | $0.00 |
| 8-Mar-16 | 469 | 1634 | $37,450.25 | $37,450.09 | $26.90 | $33.84 | $2,764.40 | $548.74 | $0.00 |
| 9-Mar-16 | 636 | 2154 | $53,932.65 | $53,932.38 | $0.00 | $62.30 | $2,868.06 | $2,347.28 | $0.00 |
| 10-Mar-16 | 848 | 1983 | $95,319.25 | $95,318.71 | $0.00 | $52.41 | $2,797.06 | $2,783.07 | $0.00 |
| 11-Mar-16 | 500 | 1185 | $55,834.93 | $55,834.56 | $0.00 | $17.05 | $1,570.36 | $1,436.33 | $0.00 |
| 12-Mar-16 | 332 | 768 | $35,122.19 | $35,122.02 | $0.00 | $8.70 | $1,365.77 | $605.57 | $0.00 |
| 13-Mar-16 | 274 | 623 | $26,420.47 | $26,420.32 | $0.00 | $31.02 | $1,160.45 | $532.97 | $0.00 |
| 14-Mar-16 | 569 | 1190 | $59,031.20 | $59,030.95 | $0.00 | $21.26 | $2,248.86 | $1,071.51 | $0.00 |
| 15-Mar-16 | 859 | 1948 | $118,855.69 | $118,855.38 | $99.25 | $78.07 | $3,344.37 | $1,879.53 | $0.00 |
| 16-Mar-16 | 696 | 1599 | $74,826.86 | $74,826.57 | $308.59 | $95.47 | $3,470.72 | $1,164.49 | $0.00 |
| 17-Mar-16 | 803 | 1951 | $67,352.93 | $67,352.61 | $0.00 | $31.64 | $4,052.36 | $1,434.36 | $0.00 |

FSSTX-086589

004

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 18-Mar-16 | 1249 | 3390 | $107,145.61 | $107,145.07 | $0.00 | $126.75 | $6,388.23 | $3,408.79 | $0.00 |
| 19-Mar-16 | 620 | 1722 | $58,049.57 | $58,049.31 | $0.00 | $31.87 | $2,836.85 | $1,222.06 | $0.00 |
| 20-Mar-16 | 529 | 1415 | $45,689.00 | $45,688.70 | $0.00 | $48.22 | $2,720.07 | $1,195.94 | $0.00 |
| 21-Mar-16 | 806 | 2324 | $74,872.72 | $74,872.36 | $0.00 | $66.30 | $3,754.17 | $1,643.37 | $0.00 |
| 22-Mar-16 | 786 | 2106 | $70,282.50 | $70,282.17 | $0.00 | $117.53 | $3,638.63 | $1,849.70 | $0.00 |
| 23-Mar-16 | 618 | 1386 | $55,748.86 | $55,748.61 | $0.00 | $88.65 | $2,391.45 | $1,513.78 | $0.00 |
| 24-Mar-16 | 603 | 1277 | $58,574.64 | $58,574.44 | $0.00 | $30.48 | $2,356.24 | $1,889.53 | $0.00 |
| 25-Mar-16 | 614 | 1493 | $65,128.25 | $65,128.03 | $0.00 | $82.51 | $3,095.44 | $2,300.63 | $0.00 |
| 26-Mar-16 | 403 | 953 | $40,927.18 | $40,927.06 | $0.00 | $41.67 | $1,775.90 | $1,302.60 | $0.00 |
| 27-Mar-16 | 351 | 1019 | $39,723.40 | $39,723.28 | $0.00 | $26.79 | $1,502.77 | $1,486.89 | $0.00 |
| 28-Mar-16 | 474 | 1068 | $44,982.06 | $44,981.88 | $0.00 | $53.18 | $1,588.67 | $1,848.23 | $0.00 |
| 29-Mar-16 | 666 | 1674 | $66,366.03 | $66,365.71 | $0.00 | $123.14 | $1,630.64 | $1,875.02 | $0.00 |
| 30-Mar-16 | 1252 | 2841 | $112,347.84 | $112,347.32 | $0.00 | $93.17 | $2,340.75 | $3,944.08 | $0.00 |
| 31-Mar-16 | 1479 | 3566 | $136,789.74 | $136,788.55 | $0.00 | $68.35 | $3,185.15 | $6,073.92 | $0.00 |
| 1-Apr-16 | 1180 | 2842 | $106,500.48 | $106,499.64 | $0.00 | $161.85 | $2,544.45 | $4,170.20 | $0.00 |
| 2-Apr-16 | 750 | 1837 | $64,553.28 | $64,552.76 | $0.00 | $46.59 | $1,898.78 | $2,534.93 | $0.00 |
| 3-Apr-16 | 557 | 1399 | $50,788.49 | $50,788.07 | $39.90 | $74.89 | $1,589.32 | $2,093.00 | $0.00 |
| 4-Apr-16 | 753 | 1865 | $73,104.65 | $73,104.18 | $0.00 | $84.01 | $1,890.26 | $3,027.23 | $0.00 |
| 5-Apr-16 | 879 | 2350 | $89,174.67 | $89,174.06 | $0.00 | $38.78 | $2,109.23 | $3,558.32 | $0.00 |
| 6-Apr-16 | 1128 | 2829 | $134,427.48 | $134,426.11 | $0.00 | $69.58 | $2,601.08 | $6,306.25 | $0.00 |
| 7-Apr-16 | 1237 | 3146 | $170,499.64 | $170,498.13 | $56.95 | $82.69 | $2,881.19 | $9,935.90 | $0.00 |
| 8-Apr-16 | 958 | 2238 | $109,894.38 | $109,893.42 | $0.00 | $110.31 | $2,100.86 | $5,531.29 | $0.00 |
| 9-Apr-16 | 658 | 1546 | $79,237.68 | $79,236.92 | $0.00 | $98.16 | $1,780.37 | $3,352.70 | $0.00 |
| 10-Apr-16 | 516 | 1244 | $55,722.87 | $55,722.43 | $0.00 | $100.66 | $1,503.36 | $2,624.14 | $0.00 |
| 11-Apr-16 | 745 | 1846 | $80,688.10 | $80,687.47 | $0.00 | $103.87 | $1,704.52 | $5,225.80 | $0.00 |
| 12-Apr-16 | 625 | 1533 | $78,205.72 | $78,369.77 | $0.00 | $120.11 | $1,626.14 | $3,347.53 | $164.51 |
| 13-Apr-16 | 692 | 1815 | $75,090.69 | $75,090.29 | $133.40 | $130.49 | $1,398.33 | $4,359.78 | $0.00 |
| 14-Apr-16 | 1191 | 3059 | $110,601.53 | $110,601.55 | $0.00 | $73.80 | $2,781.93 | $4,228.39 | $0.00 |
| 15-Apr-16 | 1073 | 2766 | $99,817.42 | $99,817.35 | $67.38 | $47.96 | $2,178.29 | $3,649.47 | $0.00 |
| 16-Apr-16 | 752 | 1865 | $70,904.70 | $70,904.55 | $0.00 | $73.34 | $1,717.32 | $2,830.19 | $0.00 |
| 17-Apr-16 | 535 | 1464 | $55,211.11 | $55,211.00 | $0.00 | $52.19 | $1,471.51 | $2,583.83 | $0.00 |
| 18-Apr-16 | 732 | 2011 | $79,924.81 | $79,924.73 | $24.95 | $112.15 | $1,654.65 | $3,157.72 | $0.00 |
| 19-Apr-16 | 931 | 2531 | $90,450.69 | $90,450.58 | $0.00 | $84.67 | $1,905.17 | $4,279.82 | $0.00 |
| 20-Apr-16 | 1144 | 3202 | $112,540.85 | $112,540.71 | $0.00 | $58.62 | $2,151.04 | $4,825.96 | $0.00 |
| 21-Apr-16 | 1028 | 2592 | $99,826.09 | $99,825.91 | $0.00 | $96.14 | $2,182.45 | $3,825.86 | $0.00 |

FSSTX-086589

005

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 22-Apr-16 | 756 | 1915 | $94,070.50 | $94,070.03 | $0.00 | $147.50 | $1,728.31 | $4,451.86 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| 23-Apr-16 | 575 | 1457 | $69,131.49 | $69,131.01 | $0.00 | $85.91 | $1,452.11 | $2,244.63 | $0.00 |
| 24-Apr-16 | 407 | 997 | $45,865.33 | $45,864.96 | $0.00 | $39.89 | $1,111.74 | $1,497.61 | $0.00 |
| 25-Apr-16 | 717 | 1891 | $104,904.72 | $104,904.28 | $0.00 | $104.47 | $1,852.43 | $5,707.29 | $0.00 |
| 26-Apr-16 | 992 | 2460 | $204,784.59 | $204,784.07 | $187.28 | $105.07 | $2,923.30 | $6,068.03 | $0.00 |
| 27-Apr-16 | 849 | 2469 | $157,163.02 | $157,162.33 | $0.00 | $36.21 | $2,408.47 | $7,599.33 | $0.00 |
| 28-Apr-16 | 980 | 2437 | $143,911.67 | $143,910.79 | $142.25 | $253.56 | $1,979.92 | $4,318.36 | $0.00 |
| 29-Apr-16 | 1184 | 3089 | $211,701.67 | $211,700.65 | $0.00 | $110.14 | $2,667.82 | $7,493.39 | $0.00 |
| 30-Apr-16 | 933 | 2416 | $198,791.23 | $198,790.44 | $59.85 | $138.36 | $2,304.58 | $7,173.46 | $0.00 |
| 1-May-16 | 679 | 1628 | $120,848.88 | $120,848.18 | $0.00 | $61.99 | $1,784.11 | $4,611.99 | $0.00 |
| 2-May-16 | 1118 | 2783 | $236,122.73 | $236,122.19 | $0.00 | $301.44 | $2,287.19 | $7,923.22 | $0.00 |
| 3-May-16 | 1446 | 3731 | $263,614.29 | $263,614.76 | $0.00 | $279.41 | $2,317.73 | $8,568.69 | $0.00 |
| 4-May-16 | 974 | 2492 | $174,305.02 | $174,305.36 | $243.95 | $88.40 | $2,241.59 | $5,320.64 | $0.00 |
| 5-May-16 | 979 | 2562 | $147,266.27 | $147,266.72 | $0.00 | $134.94 | $2,161.74 | $5,683.26 | $0.00 |
| 6-May-16 | 1134 | 2531 | $150,295.68 | $150,295.84 | $0.00 | $60.24 | $2,382.13 | $6,278.27 | $0.00 |
| 7-May-16 | 768 | 1832 | $129,840.49 | $129,840.97 | $0.00 | $215.71 | $1,476.56 | $5,515.63 | $0.00 |
| 8-May-16 | 705 | 1840 | $151,436.72 | $151,436.87 | $0.00 | $107.23 | $1,547.00 | $5,525.64 | $0.00 |
| 9-May-16 | 984 | 2417 | $189,917.40 | $189,917.64 | $17.96 | $172.56 | $2,509.03 | $6,148.12 | $0.00 |
| 10-May-16 | 725 | 1692 | $100,557.56 | $100,557.11 | $0.00 | $134.49 | $1,488.13 | $4,760.26 | $0.00 |
| 11-May-16 | 925 | 2068 | $115,831.18 | $115,830.00 | $0.00 | $138.45 | $2,079.13 | $6,199.79 | $0.00 |
| 12-May-16 | 1120 | 2413 | $135,831.93 | $135,830.58 | $0.00 | $180.07 | $2,901.09 | $5,315.52 | $0.00 |
| 13-May-16 | 901 | 1974 | $114,449.56 | $114,448.58 | $0.00 | $101.24 | $1,981.69 | $4,730.70 | $0.00 |
| 14-May-16 | 697 | 1588 | $92,243.98 | $92,243.14 | $0.00 | $101.46 | $1,559.16 | $3,717.67 | $0.00 |
| 15-May-16 | 567 | 1328 | $83,115.56 | $83,114.85 | $43.45 | $66.67 | $1,483.46 | $3,438.37 | $0.00 |
| 16-May-16 | 779 | 1805 | $109,736.03 | $109,735.27 | $0.00 | $92.71 | $2,555.61 | $4,296.32 | $0.00 |
| 17-May-16 | 899 | 2094 | $126,449.36 | $126,448.51 | $0.00 | $119.31 | $2,802.87 | $4,286.13 | $0.00 |
| 18-May-16 | 872 | 2425 | $101,373.96 | $101,373.60 | $0.00 | $90.94 | $2,985.75 | $4,207.04 | $0.00 |
| 19-May-16 | 1062 | 2981 | $111,806.73 | $111,806.45 | $0.00 | $137.53 | $3,459.23 | $3,631.05 | $0.00 |
| 20-May-16 | 999 | 2931 | $111,293.07 | $111,292.85 | $0.00 | $161.05 | $3,315.17 | $4,692.81 | $0.00 |
| 21-May-16 | 1067 | 3243 | $104,778.95 | $104,778.81 | $199.95 | $142.94 | $3,908.25 | $10,482.65 | $0.00 |
| 22-May-16 | 644 | 1940 | $61,459.30 | $61,459.01 | $92.92 | $59.54 | $2,170.85 | $4,977.49 | $0.00 |
| 23-May-16 | 986 | 3020 | $101,484.73 | $101,484.44 | $0.00 | $186.11 | $2,952.31 | $9,122.50 | $0.00 |
| 24-May-16 | 972 | 2888 | $102,817.80 | $102,817.58 | $0.00 | $137.76 | $3,270.57 | $7,209.40 | $0.00 |
| 25-May-16 | 887 | 2599 | $105,979.63 | $105,979.33 | $0.00 | $126.26 | $2,825.18 | $5,138.30 | $0.00 |
| 26-May-16 | 848 | 2466 | $109,113.95 | $109,113.52 | $0.00 | $130.68 | $3,255.92 | $6,853.74 | $0.00 |

FSSTX-086589

006

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 27-May-16 | 1019 | 2968 | $118,248.71 | $118,248.15 | $0.00 | $103.76 | $3,208.27 | $5,864.14 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| 28-May-16 | 1254 | 4004 | $158,030.70 | $158,030.59 | $0.00 | $132.98 | $4,030.86 | $6,272.65 | $0.00 |
| 29-May-16 | 806 | 2547 | $94,070.30 | $94,070.12 | $0.00 | $106.53 | $2,349.27 | $4,307.97 | $0.00 |
| 30-May-16 | 950 | 3006 | $123,008.91 | $123,008.64 | $0.00 | $83.36 | $2,764.65 | $5,861.98 | $0.00 |
| 31-May-16 | 1072 | 3412 | $140,623.15 | $140,622.98 | $0.00 | $142.27 | $2,687.84 | $5,489.83 | $0.00 |
| 1-Jun-16 | 1123 | 3152 | $134,764.49 | $134,764.07 | $177.30 | $222.70 | $2,705.55 | $5,634.04 | $0.00 |
| 2-Jun-16 | 702 | 1738 | $94,453.13 | $94,452.74 | $414.45 | $196.40 | $1,693.73 | $4,435.61 | $0.00 |
| 3-Jun-16 | 821 | 2237 | $114,500.00 | $114,499.65 | $246.40 | $289.11 | $2,538.03 | $4,807.23 | $0.00 |
| 4-Jun-16 | 697 | 1951 | $89,330.20 | $89,329.88 | $0.00 | $217.38 | $2,591.73 | $3,957.69 | $0.00 |
| 5-Jun-16 | 648 | 1684 | $84,744.60 | $84,743.99 | $0.00 | $209.24 | $1,850.45 | $4,397.91 | $0.00 |
| 6-Jun-16 | 925 | 2275 | $122,545.51 | $122,544.78 | $0.00 | $547.04 | $2,740.43 | $5,741.24 | $0.00 |
| 7-Jun-16 | 1128 | 3022 | $148,365.09 | $148,364.52 | $166.45 | $496.89 | $3,383.55 | $6,505.80 | $0.00 |
| 8-Jun-16 | 929 | 2234 | $106,733.63 | $106,733.01 | $59.90 | $305.31 | $2,961.04 | $3,639.55 | $0.00 |
| 9-Jun-16 | 1450 | 4347 | $174,931.87 | $174,931.31 | $0.00 | $199.22 | $4,705.85 | $5,963.45 | $0.00 |
| 10-Jun-16 | 1149 | 3190 | $131,806.03 | $131,805.40 | $739.80 | $236.76 | $3,336.69 | $5,634.14 | $0.00 |
| 11-Jun-16 | 809 | 2156 | $95,379.78 | $95,379.27 | $87.30 | $141.38 | $2,674.44 | $3,218.22 | $0.00 |
| 12-Jun-16 | 596 | 1552 | $76,002.80 | $76,002.41 | $59.95 | $159.19 | $2,054.88 | $3,263.54 | $0.00 |
| 13-Jun-16 | 955 | 2360 | $108,415.65 | $108,415.19 | $64.90 | $293.15 | $2,277.01 | $4,104.87 | $0.00 |
| 14-Jun-16 | 1095 | 2989 | $138,948.17 | $138,947.67 | $614.70 | $333.74 | $3,157.29 | $5,929.80 | $0.00 |
| 15-Jun-16 | 786 | 1939 | $89,633.34 | $89,632.79 | $0.00 | $261.07 | $2,415.34 | $3,425.40 | $0.00 |
| 16-Jun-16 | 1091 | 3011 | $129,238.80 | $129,238.20 | $0.00 | $179.62 | $3,099.98 | $4,968.72 | $0.00 |
| 17-Jun-16 | 865 | 2235 | $102,915.07 | $102,914.63 | $211.68 | $81.72 | $1,997.07 | $4,164.61 | $0.00 |
| 18-Jun-16 | 494 | 1267 | $60,581.62 | $60,581.23 | $0.00 | $124.33 | $1,346.68 | $2,358.36 | $0.00 |
| 19-Jun-16 | 395 | 1016 | $47,644.60 | $47,644.28 | $0.00 | $55.40 | $1,207.42 | $1,742.85 | $0.00 |
| 20-Jun-16 | 747 | 2148 | $87,806.01 | $87,805.61 | $0.00 | $168.67 | $2,418.44 | $4,969.79 | $0.00 |
| 21-Jun-16 | 983 | 2722 | $103,214.25 | $103,213.83 | $0.00 | $123.57 | $2,977.63 | $8,757.25 | $0.00 |
| 22-Jun-16 | 1188 | 3539 | $112,631.58 | $112,631.16 | $0.00 | $240.88 | $4,119.37 | $8,889.47 | $0.00 |
| 23-Jun-16 | 1299 | 3996 | $121,313.84 | $121,313.54 | $171.77 | $211.58 | $5,108.66 | $9,345.74 | $0.00 |
| 24-Jun-16 | 1004 | 2774 | $89,411.98 | $89,411.37 | $685.15 | $168.10 | $3,887.38 | $6,857.46 | $0.00 |
| 25-Jun-16 | 664 | 1677 | $60,576.21 | $60,575.82 | $0.00 | $115.35 | $2,669.82 | $3,846.69 | $0.00 |
| 26-Jun-16 | 503 | 1274 | $54,318.76 | $54,318.27 | $27.00 | $98.61 | $1,812.86 | $3,514.54 | $0.00 |
| 27-Jun-16 | 691 | 1796 | $71,821.68 | $71,821.27 | $169.90 | $158.00 | $2,813.08 | $4,252.31 | $0.00 |
| 28-Jun-16 | 714 | 1923 | $89,907.63 | $89,907.31 | $89.90 | $199.37 | $2,293.00 | $5,179.90 | $0.00 |
| 29-Jun-16 | 791 | 1895 | $99,579.42 | $99,578.98 | $0.00 | $136.83 | $3,132.32 | $4,384.93 | $0.00 |
| 30-Jun-16 | 918 | 2164 | $174,041.14 | $174,040.25 | $75.52 | $197.21 | $2,430.02 | $5,922.61 | $0.00 |

FSSTX-086589

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1-Jul-16 | 1071 | 2767 | $193,518.58 | $193,517.99 | $0.00 | $262.94 | $2,834.81 | $8,246.99 | $0.00 |
| 2-Jul-16 | 839 | 2328 | $163,720.51 | $163,720.27 | $0.00 | $286.98 | $2,113.91 | $5,927.19 | $0.00 |
| 3-Jul-16 | 819 | 2340 | $139,090.64 | $139,090.39 | $1,038.12 | $141.80 | $2,502.10 | $4,893.45 | $0.00 |
| 4-Jul-16 | 1184 | 3642 | $291,416.77 | $291,416.39 | $0.00 | $481.78 | $3,594.58 | $10,720.07 | $0.00 |
| 5-Jul-16 | 1231 | 3398 | $277,358.68 | $277,358.20 | $913.60 | $647.36 | $3,699.76 | $10,321.55 | $0.00 |
| 6-Jul-16 | 1189 | 3161 | $190,055.46 | $190,054.85 | $50.21 | $280.60 | $4,237.69 | $6,582.62 | $0.00 |
| 7-Jul-16 | 1124 | 3015 | $196,845.78 | $196,845.23 | $0.00 | $256.72 | $4,525.19 | $7,770.11 | $0.00 |
| 8-Jul-16 | 1408 | 3932 | $262,409.23 | $262,408.74 | $342.30 | $480.31 | $4,382.36 | $9,931.09 | $0.00 |
| 9-Jul-16 | 1109 | 3270 | $219,696.14 | $219,696.36 | $241.60 | $329.70 | $3,717.29 | $7,711.88 | $0.00 |
| 10-Jul-16 | 878 | 2448 | $152,505.90 | $152,506.17 | $0.00 | $353.73 | $2,437.80 | $6,610.19 | $0.00 |
| 11-Jul-16 | 1345 | 3967 | $278,310.19 | $278,310.49 | $162.36 | $342.04 | $3,069.91 | $11,280.39 | $0.00 |
| 12-Jul-16 | 1349 | 3780 | $257,189.29 | $257,189.53 | $0.00 | $548.70 | $3,742.68 | $10,198.97 | $0.00 |
| 13-Jul-16 | 1247 | 3199 | $206,248.26 | $206,248.51 | $152.70 | $169.03 | $3,298.30 | $7,774.60 | $0.00 |
| 14-Jul-16 | 1420 | 3863 | $250,893.24 | $250,893.27 | $0.00 | $206.85 | $3,517.39 | $13,349.81 | $0.00 |
| 15-Jul-16 | 1031 | 2623 | $165,836.64 | $165,836.18 | $210.44 | $209.09 | $2,901.48 | $7,476.53 | $0.00 |
| 16-Jul-16 | 667 | 1681 | $98,182.69 | $98,182.35 | $222.41 | $81.85 | $2,287.54 | $5,176.01 | $0.00 |
| 17-Jul-16 | 602 | 1549 | $79,239.60 | $79,239.22 | $520.68 | $75.96 | $2,137.86 | $3,765.83 | $0.00 |
| 18-Jul-16 | 779 | 2058 | $110,115.24 | $110,114.87 | $1,091.20 | $171.41 | $2,399.01 | $5,864.91 | $0.00 |
| 19-Jul-16 | 803 | 2106 | $114,401.79 | $114,401.38 | $653.79 | $182.36 | $2,525.90 | $8,092.06 | $0.00 |
| 20-Jul-16 | 887 | 2377 | $121,494.60 | $121,494.14 | $0.00 | $138.87 | $3,456.37 | $6,349.37 | $0.00 |
| 21-Jul-16 | 952 | 2335 | $110,571.37 | $110,570.99 | $132.45 | $160.66 | $3,110.61 | $6,011.01 | $0.00 |
| 22-Jul-16 | 639 | 1670 | $63,976.19 | $63,975.77 | $0.00 | $111.78 | $2,314.45 | $3,438.60 | $0.00 |
| 23-Jul-16 | 479 | 1135 | $48,420.05 | $48,419.79 | $0.00 | $111.86 | $2,322.32 | $2,127.96 | $0.00 |
| 24-Jul-16 | 467 | 1131 | $47,504.22 | $47,503.85 | $0.00 | $65.94 | $1,602.02 | $2,061.49 | $0.00 |
| 25-Jul-16 | 729 | 1784 | $66,097.10 | $66,096.72 | $97.43 | $113.76 | $3,114.85 | $3,062.10 | $0.00 |
| 26-Jul-16 | 1398 | 4872 | $166,683.50 | $166,683.72 | $0.00 | $223.39 | $4,040.68 | $7,377.06 | $0.00 |
| 27-Jul-16 | 4161 | 17632 | $524,615.55 | $524,615.67 | $279.67 | $567.52 | $13,125.45 | $33,915.14 | $0.00 |
| 28-Jul-16 | 4730 | 20888 | $640,284.65 | $640,316.10 | $350.11 | $864.23 | $14,556.20 | $39,995.50 | $31.26 |
| 29-Jul-16 | 2378 | 9849 | $306,187.86 | $306,187.95 | $27.94 | $302.32 | $6,935.01 | $19,331.41 | $0.00 |
| 30-Jul-16 | 1322 | 5197 | $177,099.25 | $177,099.30 | $0.00 | $216.57 | $4,599.76 | $7,832.69 | $0.00 |
| 31-Jul-16 | 1398 | 5440 | $174,919.97 | $174,920.06 | $48.91 | $219.26 | $4,414.61 | $11,342.75 | $0.00 |
| 1-Aug-16 | 1796 | 5303 | $188,953.80 | $188,953.79 | $196.51 | $136.37 | $3,941.46 | $6,510.86 | $0.00 |
| 2-Aug-16 | 1384 | 3745 | $148,067.22 | $148,067.22 | $130.00 | $119.78 | $2,977.67 | $4,846.18 | $0.00 |
| 3-Aug-16 | 1324 | 3125 | $121,364.77 | $121,697.86 | $60.21 | $105.34 | $2,586.29 | $4,945.69 | $333.38 |
| 4-Aug-16 | 1279 | 3104 | $116,844.67 | $116,893.91 | $119.85 | $85.47 | $2,535.15 | $5,562.52 | $49.27 |

FSSTX-086589

008

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|------|------|------|------------|------------|------------|----------|------------|------------|
| 5-Aug-16 | 1203 | 2940 | $108,085.49 | $108,085.52 | $0.00 | $107.81 | $1,964.72 | $4,431.02 | $0.00 |
| 6-Aug-16 | 793 | 1971 | $75,182.62 | $75,182.44 | $0.00 | $57.40 | $1,330.95 | $3,177.71 | $0.00 |
| 7-Aug-16 | 819 | 2011 | $83,826.71 | $83,826.58 | $0.00 | $34.69 | $1,669.56 | $4,252.98 | $0.00 |
| 8-Aug-16 | 1138 | 2782 | $100,471.46 | $100,471.23 | $0.00 | $139.99 | $1,876.16 | $2,968.50 | $0.00 |
| 9-Aug-16 | 963 | 2420 | $88,837.06 | $88,837.09 | $0.00 | $148.06 | $1,483.18 | $4,343.65 | $0.00 |
| 10-Aug-16 | 1178 | 3992 | $120,428.46 | $120,427.71 | $1,995.00 | $299.51 | $3,983.72 | $4,694.55 | $0.00 |
| 11-Aug-16 | 1160 | 4104 | $111,356.01 | $111,355.13 | $99.50 | $321.71 | $4,025.60 | $4,184.42 | $0.00 |
| 12-Aug-16 | 1072 | 3721 | $113,055.52 | $113,054.72 | $1,995.00 | $141.88 | $3,859.74 | $4,784.18 | $0.00 |
| 13-Aug-16 | 748 | 2276 | $74,819.94 | $74,819.14 | $0.00 | $137.52 | $2,411.68 | $3,117.22 | $0.00 |
| 14-Aug-16 | 743 | 2450 | $83,613.62 | $83,613.03 | $0.00 | $124.19 | $2,411.87 | $3,205.73 | $0.00 |
| 15-Aug-16 | 1630 | 3868 | $138,152.11 | $138,151.47 | $0.00 | $564.43 | $6,990.52 | $4,162.14 | $0.00 |
| 16-Aug-16 | 1567 | 3277 | $127,430.84 | $127,430.25 | $0.00 | $607.63 | $7,302.35 | $3,491.32 | $0.00 |
| 17-Aug-16 | 1398 | 3147 | $119,885.96 | $119,885.25 | $268.85 | $301.22 | $6,262.48 | $3,568.54 | $0.00 |
| 18-Aug-16 | 1295 | 2894 | $110,679.87 | $110,679.16 | $679.95 | $255.24 | $5,524.57 | $3,247.82 | $0.00 |
| 19-Aug-16 | 1226 | 3071 | $115,878.60 | $115,877.89 | $156.51 | $280.26 | $4,909.48 | $3,603.62 | $0.00 |
| 20-Aug-16 | 809 | 1924 | $76,439.66 | $76,439.04 | $0.00 | $322.13 | $3,226.95 | $2,257.06 | $0.00 |
| 21-Aug-16 | 719 | 1673 | $69,411.88 | $69,411.32 | $0.00 | $101.20 | $2,730.08 | $2,316.70 | $0.00 |
| 22-Aug-16 | 1191 | 2928 | $115,900.10 | $115,899.60 | $0.00 | $668.55 | $4,296.40 | $4,232.45 | $0.00 |
| 23-Aug-16 | 1300 | 3032 | $114,048.05 | $114,047.45 | $0.00 | $518.04 | $4,714.78 | $3,340.84 | $0.00 |
| 24-Aug-16 | 1558 | 4104 | $144,574.40 | $144,573.32 | $0.00 | $269.93 | $5,460.71 | $4,297.72 | $0.00 |
| 25-Aug-16 | 1617 | 4279 | $142,646.30 | $142,645.19 | $50.24 | $375.70 | $6,754.03 | $4,384.41 | $0.00 |
| 26-Aug-16 | 2047 | 4936 | $139,966.51 | $139,965.47 | $277.34 | $374.47 | $5,443.73 | $4,016.14 | $0.00 |
| 27-Aug-16 | 1287 | 2983 | $88,283.53 | $88,282.47 | $0.00 | $233.00 | $3,156.73 | $3,195.71 | $0.00 |
| 28-Aug-16 | 994 | 2387 | $79,043.02 | $79,042.27 | $9.95 | $190.14 | $2,801.21 | $2,774.79 | $0.00 |
| 29-Aug-16 | 1330 | 3314 | $103,309.03 | $103,308.34 | $283.20 | $192.93 | $3,330.44 | $3,984.16 | $0.00 |
| 30-Aug-16 | 1417 | 3561 | $110,055.77 | $110,055.15 | $0.00 | $190.79 | $4,163.68 | $4,130.61 | $0.00 |
| 31-Aug-16 | 1430 | 3478 | $109,094.51 | $109,093.86 | $29.85 | $168.31 | $3,924.08 | $3,693.67 | $0.00 |
| 1-Sep-16 | 1384 | 3431 | $107,074.33 | $107,073.59 | $0.00 | $168.45 | $3,501.84 | $4,260.23 | $0.00 |
| 2-Sep-16 | 1279 | 3275 | $101,520.56 | $101,519.95 | $9.95 | $146.84 | $3,446.79 | $3,788.13 | $0.00 |
| 3-Sep-16 | 747 | 1889 | $74,764.61 | $74,764.03 | $114.55 | $63.60 | $2,845.23 | $3,381.18 | $0.00 |
| 4-Sep-16 | 602 | 1461 | $72,276.05 | $72,275.38 | $0.00 | $107.76 | $2,129.34 | $2,713.16 | $0.00 |
| 5-Sep-16 | 827 | 2143 | $84,845.08 | $84,844.40 | $193.91 | $212.47 | $2,679.14 | $3,634.21 | $0.00 |
| 6-Sep-16 | 1135 | 3023 | $131,620.17 | $131,619.48 | $0.00 | $159.38 | $3,350.86 | $6,030.02 | $0.00 |
| 7-Sep-16 | 1026 | 2632 | $141,156.32 | $141,155.60 | $46.17 | $235.12 | $3,157.04 | $4,927.07 | $0.00 |
| 8-Sep-16 | 1041 | 2697 | $125,090.90 | $125,090.13 | $266.70 | $90.58 | $3,507.46 | $5,538.55 | $0.00 |

FSSTX-086589

009

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 9-Sep-16 | 1225 | 3172 | $146,228.53 | $146,227.97 | $119.30 | $164.27 | $3,496.35 | $6,607.34 | $0.00 |
| 10-Sep-16 | 870 | 2063 | $96,223.06 | $96,222.84 | $1,707.80 | $129.40 | $2,911.25 | $3,254.03 | $0.00 |
| 11-Sep-16 | 926 | 2379 | $122,855.00 | $122,854.79 | $0.00 | $88.15 | $2,442.52 | $4,639.52 | $0.00 |
| 12-Sep-16 | 1260 | 3059 | $161,644.85 | $161,644.26 | $9.95 | $282.77 | $3,501.38 | $7,143.62 | $0.00 |
| 13-Sep-16 | 1475 | 3887 | $214,877.04 | $214,876.71 | $0.00 | $252.33 | $3,313.76 | $7,378.46 | $0.00 |
| 14-Sep-16 | 1206 | 2933 | $181,475.53 | $181,475.17 | $41.25 | $220.35 | $3,374.20 | $5,861.83 | $0.00 |
| 15-Sep-16 | 1231 | 3042 | $160,564.14 | $160,563.74 | $0.00 | $194.34 | $3,833.24 | $5,731.90 | $0.00 |
| 16-Sep-16 | 1150 | 2929 | $148,588.01 | $148,587.48 | $0.00 | $246.05 | $3,430.18 | $6,504.15 | $0.00 |
| 17-Sep-16 | 742 | 1728 | $99,555.83 | $99,555.46 | $59.95 | $77.84 | $2,340.70 | $3,385.96 | $0.00 |
| 18-Sep-16 | 740 | 1812 | $80,598.72 | $80,598.36 | $57.40 | $20.88 | $2,739.56 | $2,856.60 | $0.00 |
| 19-Sep-16 | 809 | 1956 | $88,861.37 | $88,881.02 | $0.00 | $138.74 | $2,981.38 | $2,960.79 | $19.95 |
| 20-Sep-16 | 1109 | 2736 | $126,455.03 | $126,455.03 | $49.90 | $65.98 | $3,846.93 | $4,113.70 | $0.00 |
| 21-Sep-16 | 1203 | 3279 | $139,154.93 | $139,154.58 | $0.00 | $108.61 | $3,995.51 | $5,093.79 | $0.00 |
| 22-Sep-16 | 1178 | 3156 | $136,020.64 | $136,020.53 | $0.00 | $103.48 | $3,749.91 | $4,652.89 | $0.00 |
| 23-Sep-16 | 1128 | 2817 | $135,641.94 | $135,641.63 | $0.00 | $303.96 | $4,063.49 | $4,698.15 | $0.00 |
| 24-Sep-16 | 775 | 1901 | $78,121.84 | $78,121.40 | $0.00 | $78.12 | $3,049.04 | $3,470.50 | $0.00 |
| 25-Sep-16 | 815 | 2128 | $94,130.94 | $94,130.56 | $232.15 | $184.44 | $2,815.68 | $3,795.68 | $0.00 |
| 26-Sep-16 | 1855 | 4484 | $190,126.91 | $190,126.17 | $79.17 | $133.01 | $3,605.98 | $7,099.76 | $0.00 |
| 27-Sep-16 | 1275 | 3196 | $139,696.68 | $139,696.11 | $150.97 | $84.58 | $2,165.73 | $5,657.62 | $0.00 |
| 28-Sep-16 | 1491 | 3251 | $157,446.09 | $157,444.98 | $0.00 | $166.59 | $2,856.57 | $6,132.85 | $0.00 |
| 29-Sep-16 | 1493 | 3778 | $196,856.94 | $196,855.68 | $49.41 | $186.14 | $3,220.61 | $8,324.89 | $0.00 |
| 30-Sep-16 | 1050 | 2406 | $118,398.34 | $118,397.11 | $0.00 | $137.80 | $2,865.76 | $4,640.06 | $0.00 |
| 1-Oct-16 | 664 | 1561 | $68,326.97 | $68,326.04 | $0.00 | $67.01 | $1,828.09 | $3,471.65 | $0.00 |
| 2-Oct-16 | 702 | 1653 | $74,578.20 | $74,577.37 | $0.00 | $187.35 | $2,460.79 | $3,059.53 | $0.00 |
| 3-Oct-16 | 947 | 2384 | $108,308.82 | $108,307.87 | $0.00 | $118.12 | $3,152.26 | $5,193.46 | $0.00 |
| 4-Oct-16 | 1034 | 2333 | $121,809.47 | $121,808.74 | $0.00 | $102.32 | $3,282.62 | $5,510.94 | $0.00 |
| 5-Oct-16 | 1254 | 3152 | $142,107.19 | $142,106.35 | $0.00 | $215.63 | $4,235.03 | $5,715.62 | $0.00 |
| 6-Oct-16 | 1201 | 2953 | $141,809.64 | $141,808.75 | $0.00 | $185.35 | $4,234.24 | $5,526.75 | $0.00 |
| 7-Oct-16 | 1042 | 2531 | $123,621.62 | $123,620.78 | $104.31 | $134.08 | $3,663.57 | $5,806.40 | $0.00 |
| 8-Oct-16 | 767 | 1849 | $90,640.95 | $90,640.23 | $0.00 | $112.86 | $2,901.30 | $3,695.25 | $0.00 |
| 9-Oct-16 | 820 | 2003 | $89,055.01 | $89,054.41 | $0.00 | $92.00 | $3,409.94 | $3,137.88 | $0.00 |
| 10-Oct-16 | 1063 | 2684 | $122,957.51 | $122,956.77 | $131.30 | $193.81 | $3,880.22 | $5,126.81 | $0.00 |
| 11-Oct-16 | 1149 | 3021 | $147,998.93 | $147,998.14 | $0.00 | $159.82 | $4,231.98 | $6,243.67 | $0.00 |
| 12-Oct-16 | 915 | 2266 | $99,389.28 | $99,388.58 | $0.00 | $125.97 | $3,178.41 | $4,642.20 | $0.00 |
| 13-Oct-16 | 933 | 2574 | $96,360.47 | $96,360.47 | $36.87 | $106.44 | $3,153.78 | $3,050.46 | $0.00 |

FSSTX-086589

010

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 14-Oct-16 | 1039 | 2881 | $96,907.10 | $96,907.10 | $0.00 | $134.53 | $3,889.95 | $3,311.33 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| 15-Oct-16 | 777 | 2036 | $67,400.62 | $67,400.62 | $0.00 | $62.53 | $2,727.41 | $2,068.18 | $0.00 |
| 16-Oct-16 | 820 | 2168 | $74,047.96 | $74,047.96 | $95.85 | $158.54 | $2,803.04 | $1,156.71 | $0.00 |
| 17-Oct-16 | 1463 | 4120 | $128,434.00 | $128,433.89 | $267.32 | $257.42 | $4,573.65 | $4,245.20 | $0.00 |
| 18-Oct-16 | 2223 | 5346 | $184,154.31 | $184,152.98 | $31.96 | $213.81 | $5,804.90 | $8,196.28 | $0.00 |
| 19-Oct-16 | 2340 | 5915 | $188,135.94 | $188,964.39 | $485.65 | $285.70 | $4,401.93 | $5,541.19 | $828.96 |
| 20-Oct-16 | 1821 | 4596 | $155,145.47 | $155,144.94 | $44.85 | $215.84 | $3,235.89 | $5,236.32 | $0.00 |
| 21-Oct-16 | 1180 | 3106 | $112,365.49 | $112,365.06 | $0.00 | $188.84 | $3,704.48 | $4,952.05 | $0.00 |
| 22-Oct-16 | 755 | 2022 | $76,672.63 | $76,672.17 | $0.00 | $107.50 | $2,887.74 | $3,149.96 | $0.00 |
| 23-Oct-16 | 822 | 2119 | $75,119.23 | $75,118.60 | $0.00 | $71.37 | $3,107.05 | $3,163.68 | $0.00 |
| 24-Oct-16 | 1266 | 3393 | $110,554.75 | $110,554.14 | $0.00 | $229.66 | $5,094.96 | $4,338.23 | $0.00 |
| 25-Oct-16 | 1098 | 2949 | $101,025.38 | $101,024.97 | $249.54 | $184.87 | $5,013.26 | $3,422.03 | $0.00 |
| 26-Oct-16 | 2018 | 5164 | $210,771.15 | $210,770.44 | $0.00 | $286.71 | $6,697.88 | $8,143.80 | $0.00 |
| 27-Oct-16 | 1647 | 4277 | $183,213.28 | $183,212.53 | $0.00 | $245.71 | $4,168.85 | $7,172.95 | $0.00 |
| 28-Oct-16 | 1369 | 4339 | $186,984.95 | $186,984.08 | $0.00 | $194.99 | $4,316.44 | $12,175.16 | $0.00 |
| 29-Oct-16 | 947 | 2458 | $108,534.30 | $108,533.64 | $301.95 | $78.96 | $3,280.38 | $4,142.39 | $0.00 |
| 30-Oct-16 | 970 | 2460 | $116,888.35 | $116,887.72 | $0.00 | $148.31 | $3,542.34 | $5,151.71 | $0.00 |
| 31-Oct-16 | 1156 | 2972 | $137,533.86 | $137,533.33 | $124.86 | $142.56 | $4,458.97 | $5,822.87 | $0.00 |
| 1-Nov-16 | 1217 | 3102 | $197,667.21 | $197,666.59 | $0.00 | $295.96 | $4,458.67 | $8,177.51 | $0.00 |
| 2-Nov-16 | 1175 | 2848 | $164,967.69 | $164,966.61 | $317.22 | $184.86 | $5,502.22 | $8,636.65 | $0.00 |
| 3-Nov-16 | 1378 | 3441 | $171,436.63 | $171,435.39 | $0.00 | $174.80 | $4,275.10 | $8,373.50 | $0.00 |
| 4-Nov-16 | 1370 | 3522 | $187,956.92 | $187,955.72 | $0.00 | $254.05 | $4,729.67 | $8,350.69 | $0.00 |
| 5-Nov-16 | 1006 | 2670 | $159,610.13 | $159,609.17 | $54.90 | $205.09 | $3,779.36 | $6,196.95 | $0.00 |
| 6-Nov-16 | 1014 | 2595 | $130,542.36 | $130,541.51 | $422.73 | $193.35 | $3,452.21 | $4,098.81 | $0.00 |
| 7-Nov-16 | 2517 | 7929 | $313,221.64 | $313,385.17 | $48.47 | $375.48 | $6,192.33 | $12,736.22 | $164.37 |
| 8-Nov-16 | 6010 | 22511 | $668,721.76 | $668,905.96 | $469.91 | $443.41 | $12,562.38 | $22,203.94 | $184.64 |
| 9-Nov-16 | 8782 | 32117 | $849,754.49 | $849,754.00 | $427.68 | $1,004.96 | $16,270.56 | $22,872.09 | $0.00 |
| 10-Nov-16 | 2929 | 9236 | $285,597.59 | $285,597.51 | $394.81 | $261.06 | $6,324.63 | $10,112.83 | $0.00 |
| 11-Nov-16 | 2119 | 6119 | $203,622.06 | $203,622.16 | $49.84 | $131.23 | $3,624.22 | $7,729.01 | $0.00 |
| 12-Nov-16 | 1346 | 3658 | $126,177.39 | $126,177.41 | $41.94 | $94.14 | $2,998.58 | $3,712.54 | $0.00 |
| 13-Nov-16 | 1456 | 4298 | $154,793.70 | $154,793.70 | $668.68 | $83.27 | $2,864.99 | $4,431.08 | $0.00 |
| 14-Nov-16 | 2363 | 6589 | $234,906.41 | $234,906.23 | $0.00 | $221.68 | $4,489.93 | $7,927.81 | $0.00 |
| 15-Nov-16 | 1216 | 3097 | $128,764.69 | $128,764.32 | $0.00 | $165.60 | $4,454.53 | $3,634.18 | $0.00 |
| 16-Nov-16 | 1121 | 2691 | $87,864.50 | $87,863.85 | $0.00 | $142.41 | $5,124.93 | $2,604.66 | $0.00 |
| 17-Nov-16 | 1497 | 3662 | $130,294.58 | $130,293.58 | $87.40 | $102.13 | $6,240.35 | $5,605.56 | $0.00 |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 18-Nov-16 | 1332 | 3101 | $103,513.11 | $103,512.03 | $0.00 | $170.25 | $5,242.99 | $3,217.42 | $0.00 |
| 19-Nov-16 | 968 | 2379 | $79,667.81 | $79,666.96 | $0.00 | $166.29 | $4,889.18 | $2,711.87 | $0.00 |
| 20-Nov-16 | 817 | 1960 | $67,364.29 | $67,855.90 | $0.00 | $74.55 | $3,424.46 | $2,383.40 | $492.30 |
| 21-Nov-16 | 1131 | 2830 | $86,974.12 | $86,973.38 | $0.00 | $102.10 | $2,809.78 | $3,358.21 | $0.00 |
| 22-Nov-16 | 1679 | 4390 | $127,343.23 | $127,342.52 | $29.92 | $94.02 | $3,825.93 | $4,123.10 | $0.00 |
| 23-Nov-16 | 1874 | 4921 | $138,827.89 | $138,827.63 | $0.00 | $142.74 | $4,403.82 | $4,920.36 | $0.00 |
| 24-Nov-16 | 1343 | 3582 | $120,030.42 | $120,030.25 | $56.95 | $67.72 | $4,043.17 | $4,005.48 | $0.00 |
| 25-Nov-16 | 3477 | 12233 | $309,438.61 | $309,438.23 | $71.77 | $215.29 | $6,606.16 | $9,540.43 | $0.00 |
| 26-Nov-16 | 2282 | 8140 | $193,640.11 | $193,639.62 | $34.46 | $152.86 | $5,709.78 | $7,661.72 | $0.00 |
| 27-Nov-16 | 2184 | 7300 | $182,801.91 | $182,801.43 | $303.51 | $126.89 | $4,865.52 | $5,882.14 | $0.00 |
| 28-Nov-16 | 3384 | 10648 | $302,872.38 | $302,871.93 | $0.00 | $272.19 | $7,341.40 | $9,354.45 | $0.00 |
| 29-Nov-16 | 2027 | 6097 | $184,682.19 | $184,681.92 | $160.37 | $178.11 | $6,343.62 | $5,852.46 | $0.00 |
| 30-Nov-16 | 1885 | 5796 | $172,857.83 | $172,857.56 | $0.00 | $158.85 | $5,835.27 | $6,116.52 | $0.00 |
| 1-Dec-16 | 1042 | 2898 | $107,201.93 | $107,201.59 | $454.44 | $91.55 | $4,234.09 | $4,340.88 | $0.00 |
| 2-Dec-16 | 938 | 2176 | $87,600.21 | $87,599.12 | $27.25 | $102.30 | $4,345.54 | $4,376.14 | $0.00 |
| 3-Dec-16 | 776 | 1724 | $67,032.91 | $67,032.05 | $0.00 | $103.62 | $3,384.48 | $3,254.48 | $0.00 |
| 4-Dec-16 | 719 | 1626 | $62,610.07 | $62,609.23 | $298.35 | $110.85 | $2,902.38 | $2,687.63 | $0.00 |
| 5-Dec-16 | 987 | 2263 | $96,446.84 | $96,445.91 | $37.25 | $197.83 | $3,611.69 | $4,494.21 | $0.00 |
| 6-Dec-16 | 1014 | 2451 | $100,386.47 | $100,385.62 | $0.00 | $97.74 | $4,155.80 | $4,149.10 | $0.00 |
| 7-Dec-16 | 1326 | 3238 | $127,604.35 | $127,603.17 | $0.00 | $226.91 | $4,670.63 | $4,859.82 | $0.00 |
| 8-Dec-16 | 1451 | 3673 | $143,674.07 | $143,672.94 | $211.25 | $138.00 | $5,540.97 | $5,724.50 | $0.00 |
| 9-Dec-16 | 1375 | 3323 | $140,778.88 | $140,777.54 | $0.00 | $107.00 | $4,678.20 | $6,080.96 | $0.00 |
| 10-Dec-16 | 892 | 2103 | $93,374.08 | $93,373.12 | $0.00 | $82.47 | $3,263.37 | $3,912.40 | $0.00 |
| 11-Dec-16 | 915 | 2064 | $88,818.44 | $88,817.64 | $0.00 | $82.20 | $2,591.93 | $4,330.90 | $0.00 |
| 12-Dec-16 | 1796 | 5187 | $167,243.86 | $167,243.28 | $0.00 | $210.87 | $3,113.06 | $5,291.86 | $0.00 |
| 13-Dec-16 | 2985 | 9895 | $243,078.85 | $243,078.51 | $0.00 | $457.32 | $5,512.60 | $8,870.36 | $0.00 |
| 14-Dec-16 | 3296 | 10449 | $245,798.39 | $245,797.90 | $9.95 | $519.32 | $5,261.69 | $7,604.97 | $0.00 |
| 15-Dec-16 | 3304 | 11111 | $266,472.61 | $266,472.18 | $78.53 | $522.52 | $5,465.29 | $8,253.06 | $0.00 |
| 16-Dec-16 | 3326 | 11114 | $287,820.75 | $287,820.36 | $9.95 | $475.72 | $4,522.04 | $9,049.77 | $0.00 |
| 17-Dec-16 | 1639 | 4881 | $129,621.53 | $129,621.19 | $4.95 | $202.09 | $2,767.71 | $4,369.08 | $0.00 |
| 18-Dec-16 | 1357 | 4062 | $108,213.98 | $108,213.81 | $4.95 | $201.95 | $2,489.43 | $3,647.45 | $0.00 |
| 19-Dec-16 | 1876 | 5441 | $147,296.69 | $147,296.42 | $89.79 | $221.72 | $3,547.45 | $4,544.24 | $0.00 |
| 20-Dec-16 | 1667 | 5266 | $141,481.65 | $141,481.44 | $4.99 | $218.02 | $3,493.97 | $3,900.22 | $0.00 |
| 21-Dec-16 | 1632 | 4615 | $119,943.03 | $119,942.91 | $0.00 | $144.43 | $3,100.93 | $4,217.78 | $0.00 |
| 22-Dec-16 | 1556 | 4435 | $113,676.38 | $113,676.09 | $121.70 | $193.87 | $3,067.58 | $4,398.43 | $0.00 |

FSSTX-086589

012

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 23-Dec-16 | 1311 | 3823 | $100,829.07 | $100,828.80 | $56.65 | $133.81 | $2,433.92 | $3,849.23 | $0.00 |
| 24-Dec-16 | 797 | 2390 | $69,898.19 | $69,898.04 | $0.00 | $29.48 | $1,596.91 | $3,136.59 | $0.00 |
| 25-Dec-16 | 953 | 2445 | $75,393.73 | $75,393.58 | $0.00 | $51.70 | $1,440.40 | $2,770.99 | $0.00 |
| 26-Dec-16 | 956 | 2278 | $77,051.92 | $77,051.70 | $24.47 | $87.50 | $1,894.97 | $3,993.94 | $0.00 |
| 27-Dec-16 | 1524 | 3831 | $129,419.55 | $129,419.18 | $0.00 | $83.93 | $2,605.85 | $4,783.02 | $0.00 |
| 28-Dec-16 | 1665 | 4392 | $149,319.36 | $149,318.92 | $29.90 | $169.94 | $2,853.77 | $5,281.02 | $0.00 |
| 29-Dec-16 | 1500 | 3866 | $131,603.56 | $131,603.29 | $0.00 | $131.90 | $3,048.42 | $4,277.66 | $0.00 |
| 30-Dec-16 | 1610 | 4015 | $138,431.76 | $138,431.43 | $27.01 | $235.44 | $2,549.55 | $6,049.97 | $0.00 |
| 31-Dec-16 | 1409 | 3733 | $129,600.18 | $129,599.93 | $54.90 | $64.30 | $2,290.08 | $4,622.82 | $0.00 |
| 1-Jan-17 | 1146 | 2818 | $96,197.31 | $96,197.03 | $0.00 | $143.97 | $2,437.16 | $2,091.18 | $0.00 |
| 2-Jan-17 | 1427 | 3366 | $123,478.49 | $123,487.13 | $0.00 | $51.44 | $2,437.14 | $2,198.55 | $8.95 |
| 3-Jan-17 | 1358 | 3381 | $153,538.56 | $153,538.23 | $165.45 | $124.67 | $2,596.39 | $2,297.84 | $0.00 |
| 4-Jan-17 | 1443 | 3637 | $141,774.76 | $141,774.53 | $1,748.92 | $244.88 | $3,518.98 | $3,828.76 | $0.00 |
| 5-Jan-17 | 1051 | 2792 | $108,732.74 | $108,732.55 | $266.00 | $187.57 | $4,166.18 | $4,285.06 | $0.00 |
| 6-Jan-17 | 869 | 2177 | $94,092.31 | $94,092.10 | $0.00 | $342.63 | $3,161.87 | $3,005.70 | $0.00 |
| 7-Jan-17 | 836 | 1969 | $86,546.95 | $86,546.69 | $0.00 | $353.01 | $3,290.50 | $3,732.90 | $0.00 |
| 8-Jan-17 | 937 | 2298 | $98,117.08 | $98,116.72 | $89.21 | $83.44 | $4,486.88 | $4,292.11 | $0.00 |
| 9-Jan-17 | 934 | 2226 | $87,658.60 | $87,658.38 | $0.00 | $150.66 | $3,654.69 | $4,160.87 | $0.00 |
| 10-Jan-17 | 1018 | 2569 | $98,524.78 | $98,524.48 | $0.00 | $194.85 | $3,531.29 | $4,710.68 | $0.00 |
| 11-Jan-17 | 1017 | 2663 | $103,267.33 | $103,267.22 | $185.93 | $75.93 | $3,638.97 | $3,635.33 | $0.00 |
| 12-Jan-17 | 979 | 2454 | $105,847.25 | $105,847.26 | $1,501.74 | $95.64 | $4,201.37 | $4,539.10 | $0.00 |
| 13-Jan-17 | 1107 | 2769 | $109,683.34 | $109,683.15 | $541.25 | $135.92 | $4,490.75 | $4,211.56 | $0.00 |
| 14-Jan-17 | 811 | 1968 | $76,616.36 | $76,616.34 | $0.00 | $78.04 | $3,069.10 | $3,388.71 | $0.00 |
| 15-Jan-17 | 737 | 1943 | $77,849.03 | $77,848.86 | $0.00 | $116.12 | $3,108.82 | $3,275.78 | $0.00 |
| 16-Jan-17 | 1052 | 3071 | $123,486.57 | $123,486.41 | $0.00 | $99.61 | $3,900.79 | $6,370.55 | $0.00 |
| 17-Jan-17 | 1061 | 2748 | $116,403.90 | $116,403.83 | $0.00 | $175.54 | $3,694.10 | $3,552.94 | $0.00 |
| 18-Jan-17 | 1195 | 3150 | $135,307.20 | $135,307.21 | $0.00 | $176.99 | $4,858.19 | $4,708.52 | $0.00 |
| 19-Jan-17 | 1327 | 3798 | $156,581.99 | $156,581.95 | $0.00 | $299.43 | $5,200.20 | $5,456.24 | $0.00 |
| 20-Jan-17 | 1897 | 5346 | $219,377.41 | $219,377.34 | $0.00 | $381.73 | $9,060.59 | $5,760.45 | $0.00 |
| 21-Jan-17 | 1052 | 2996 | $112,386.24 | $112,386.13 | $0.00 | $176.11 | $4,232.91 | $3,385.50 | $0.00 |
| 22-Jan-17 | 1232 | 3599 | $147,982.50 | $147,982.47 | $212.28 | $251.93 | $4,588.65 | $5,169.64 | $0.00 |
| 23-Jan-17 | 1575 | 4605 | $168,888.34 | $168,888.17 | $240.29 | $274.50 | $6,620.17 | $6,139.80 | $0.00 |
| 24-Jan-17 | 1866 | 4606 | $146,823.92 | $146,823.66 | $271.90 | $472.20 | $8,730.29 | $4,481.81 | $0.00 |
| 25-Jan-17 | 944 | 2180 | $87,962.89 | $87,961.71 | $129.90 | $228.46 | $4,153.46 | $3,531.16 | $0.00 |
| 26-Jan-17 | 887 | 1998 | $84,469.78 | $84,468.82 | $0.00 | $59.12 | $3,546.56 | $3,389.85 | $0.00 |

FSSTX-086589

013

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 27-Jan-17 | 1228 | 2639 | $114,217.69 | $114,216.19 | $0.00 | $178.22 | $5,161.46 | $5,306.09 | $0.00 |
| 28-Jan-17 | 912 | 1956 | $87,359.96 | $87,358.76 | $147.75 | $254.00 | $3,856.28 | $3,669.01 | $0.00 |
| 29-Jan-17 | 855 | 2035 | $92,706.92 | $92,705.98 | $0.00 | $135.40 | $3,384.87 | $3,172.26 | $0.00 |
| 30-Jan-17 | 1023 | 2582 | $135,699.52 | $135,698.41 | $0.00 | $273.83 | $3,770.19 | $5,168.52 | $0.00 |
| 31-Jan-17 | 1301 | 3050 | $132,789.17 | $132,788.24 | $0.00 | $428.90 | $5,769.91 | $4,235.76 | $0.00 |
| 1-Feb-17 | 1481 | 3398 | $143,292.01 | $143,290.58 | $148.50 | $390.08 | $6,629.74 | $4,904.34 | $0.00 |
| 2-Feb-17 | 1184 | 2722 | $128,323.74 | $128,322.64 | $0.00 | $601.95 | $5,956.24 | $4,319.58 | $0.00 |
| 3-Feb-17 | 1391 | 3214 | $143,110.43 | $143,109.36 | $0.00 | $379.17 | $6,231.56 | $4,232.77 | $0.00 |
| 4-Feb-17 | 1064 | 2446 | $115,378.81 | $115,377.89 | $42.45 | $347.09 | $4,790.39 | $3,965.57 | $0.00 |
| 5-Feb-17 | 913 | 2192 | $102,931.60 | $102,930.71 | $0.00 | $354.12 | $3,885.84 | $3,277.39 | $0.00 |
| 6-Feb-17 | 1632 | 3633 | $192,564.25 | $192,562.85 | $0.00 | $1,081.79 | $6,463.25 | $6,948.34 | $0.00 |
| 7-Feb-17 | 2123 | 6158 | $188,039.19 | $188,037.35 | $0.00 | $621.44 | $8,635.71 | $6,526.18 | $0.00 |
| 8-Feb-17 | 2173 | 6543 | $171,372.50 | $171,370.90 | $0.00 | $583.77 | $10,209.01 | $5,124.60 | $0.00 |
| 9-Feb-17 | 2404 | 7085 | $191,320.89 | $191,319.41 | $0.00 | $552.40 | $10,895.32 | $4,945.89 | $0.00 |
| 10-Feb-17 | 2097 | 6085 | $165,459.15 | $165,458.00 | $0.00 | $630.87 | $9,425.98 | $3,942.33 | $0.00 |
| 11-Feb-17 | 1354 | 3856 | $114,627.33 | $114,626.35 | $0.00 | $237.97 | $6,128.59 | $3,380.66 | $0.00 |
| 12-Feb-17 | 1228 | 3337 | $102,112.23 | $102,111.04 | $0.00 | $242.46 | $5,288.76 | $3,099.32 | $0.00 |
| 13-Feb-17 | 1393 | 3967 | $117,896.30 | $117,895.00 | $0.00 | $346.65 | $5,704.96 | $4,013.65 | $0.00 |
| 14-Feb-17 | 1361 | 3892 | $120,859.19 | $120,857.98 | $0.00 | $309.13 | $5,631.90 | $4,425.47 | $0.00 |
| 15-Feb-17 | 2664 | 7506 | $248,852.87 | $248,850.79 | $104.35 | $580.73 | $9,162.08 | $8,248.16 | $0.00 |
| 16-Feb-17 | 1924 | 5325 | $178,087.62 | $178,086.41 | $164.90 | $291.39 | $6,965.05 | $6,254.65 | $0.00 |
| 17-Feb-17 | 1546 | 4002 | $158,571.18 | $158,569.82 | $1,894.00 | $351.88 | $5,229.83 | $5,629.87 | $0.00 |
| 18-Feb-17 | 907 | 2272 | $95,754.92 | $95,754.06 | $0.00 | $154.94 | $2,891.77 | $3,325.33 | $0.00 |
| 19-Feb-17 | 1066 | 2691 | $115,790.84 | $115,789.96 | $288.94 | $201.82 | $3,957.14 | $4,163.95 | $0.00 |
| 20-Feb-17 | 1246 | 2970 | $132,107.70 | $132,106.46 | $130.00 | $224.94 | $3,868.80 | $5,190.78 | $0.00 |
| 21-Feb-17 | 3563 | 10468 | $362,437.68 | $362,612.65 | $213.21 | $875.33 | $11,823.31 | $9,310.51 | $176.28 |
| 22-Feb-17 | 5314 | 15952 | $600,540.91 | $600,540.53 | $90.11 | $1,193.67 | $18,079.73 | $14,450.12 | $0.00 |
| 23-Feb-17 | 3203 | 9252 | $352,667.22 | $352,666.97 | $155.11 | $549.09 | $11,387.89 | $10,702.75 | $0.00 |
| 24-Feb-17 | 2119 | 5906 | $220,724.20 | $220,723.93 | $23.60 | $246.06 | $6,974.18 | $6,563.19 | $0.00 |
| 25-Feb-17 | 1500 | 4099 | $167,611.48 | $167,611.28 | $0.00 | $219.81 | $5,141.78 | $5,313.73 | $0.00 |
| 26-Feb-17 | 1846 | 5354 | $207,132.61 | $207,132.38 | $0.00 | $327.77 | $6,658.33 | $7,103.14 | $0.00 |
| 27-Feb-17 | 2183 | 6022 | $227,027.04 | $227,026.57 | $0.00 | $251.92 | $7,646.32 | $8,610.87 | $0.00 |
| 28-Feb-17 | 2560 | 7348 | $239,171.98 | $239,171.29 | $80.51 | $362.11 | $10,227.81 | $10,661.78 | $0.00 |
| 1-Mar-17 | 3651 | 11407 | $334,008.90 | $334,008.31 | $0.00 | $516.18 | $13,048.74 | $47,897.92 | $0.00 |
| 2-Mar-17 | 2893 | 8727 | $253,947.39 | $253,946.87 | $234.82 | $522.68 | $10,532.87 | $30,367.63 | $0.00 |

FSSTX-086589

014

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 3-Mar-17 | 2363 | 6543 | $184,464.19 | $184,463.57 | $0.00 | $455.48 | $9,941.97 | $15,228.07 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| 4-Mar-17 | 1012 | 2615 | $95,958.36 | $95,957.19 | $30.45 | $245.42 | $3,914.21 | $7,910.91 | $0.00 |
| 5-Mar-17 | 1090 | 2743 | $90,872.96 | $90,872.08 | $55.40 | $324.40 | $4,353.20 | $4,043.66 | $0.00 |
| 6-Mar-17 | 1174 | 2954 | $102,309.42 | $102,308.26 | $62.40 | $219.65 | $4,661.08 | $3,474.67 | $0.00 |
| 7-Mar-17 | 1956 | 4374 | $141,232.59 | $141,231.26 | $0.00 | $483.23 | $3,725.27 | $7,794.00 | $0.00 |
| 8-Mar-17 | 4579 | 9619 | $413,486.37 | $413,483.83 | $234.76 | $952.55 | $7,134.77 | $14,116.75 | $0.00 |
| 9-Mar-17 | 4491 | 9929 | $426,707.96 | $426,785.21 | $267.67 | $1,060.69 | $8,982.55 | $22,784.23 | $79.90 |
| 10-Mar-17 | 3081 | 7082 | $284,112.58 | $284,110.46 | $498.02 | $459.04 | $5,486.04 | $17,319.50 | $0.00 |
| 11-Mar-17 | 2144 | 4865 | $207,367.28 | $207,365.71 | $283.81 | $314.77 | $4,795.36 | $8,179.95 | $0.00 |
| 12-Mar-17 | 1556 | 3577 | $147,117.00 | $147,115.68 | $19.90 | $240.97 | $3,190.37 | $4,803.53 | $0.00 |
| 13-Mar-17 | 2448 | 5873 | $241,937.48 | $241,935.79 | $310.93 | $476.82 | $3,913.19 | $14,822.30 | $0.00 |
| 14-Mar-17 | 1720 | 3894 | $157,598.09 | $157,596.69 | $0.00 | $304.81 | $3,146.06 | $12,908.48 | $0.00 |
| 15-Mar-17 | 1968 | 4233 | $173,055.05 | $173,053.58 | $19.95 | $168.08 | $2,882.75 | $8,561.97 | $0.00 |
| 16-Mar-17 | 1630 | 3580 | $137,833.44 | $137,832.60 | $155.82 | $207.73 | $2,910.47 | $6,419.01 | $0.00 |
| 17-Mar-17 | 1822 | 4024 | $147,362.56 | $147,361.26 | $164.95 | $257.35 | $3,428.15 | $10,370.51 | $0.00 |
| 18-Mar-17 | 1242 | 2787 | $104,787.85 | $104,786.95 | $164.74 | $291.91 | $2,128.53 | $6,872.78 | $0.00 |
| 19-Mar-17 | 1214 | 2637 | $101,173.00 | $101,172.17 | $0.00 | $120.98 | $2,480.40 | $5,059.53 | $0.00 |
| 20-Mar-17 | 2694 | 6653 | $190,308.06 | $190,306.78 | $296.80 | $469.37 | $3,629.23 | $9,254.53 | $0.00 |
| 21-Mar-17 | 2156 | 5873 | $168,982.19 | $168,980.88 | $122.40 | $343.68 | $6,443.74 | $7,733.71 | $0.00 |
| 22-Mar-17 | 2008 | 5663 | $171,451.70 | $171,477.41 | $266.31 | $497.54 | $7,325.49 | $5,976.78 | $27.35 |
| 23-Mar-17 | 1889 | 5139 | $161,326.19 | $161,324.48 | $0.00 | $306.27 | $7,503.21 | $5,281.07 | $0.00 |
| 24-Mar-17 | 1779 | 4914 | $159,499.61 | $159,497.86 | $0.00 | $393.35 | $7,360.91 | $5,881.31 | $0.00 |
| 25-Mar-17 | 1280 | 3236 | $114,537.79 | $114,536.23 | $56.85 | $200.24 | $5,012.03 | $4,342.98 | $0.00 |
| 26-Mar-17 | 1147 | 3045 | $110,684.44 | $110,683.28 | $0.00 | $176.86 | $4,520.56 | $3,600.20 | $0.00 |
| 27-Mar-17 | 1313 | 3669 | $141,258.04 | $141,256.70 | $0.00 | $316.42 | $4,932.07 | $4,662.89 | $0.00 |
| 28-Mar-17 | 1709 | 4967 | $161,536.88 | $161,535.58 | $294.95 | $262.97 | $6,778.95 | $7,294.94 | $0.00 |
| 29-Mar-17 | 1842 | 5347 | $152,769.61 | $152,768.30 | $0.00 | $337.56 | $6,508.17 | $7,117.07 | $0.00 |
| 30-Mar-17 | 1999 | 6040 | $189,135.27 | $189,134.13 | $8,083.95 | $265.43 | $7,058.29 | $6,835.24 | $0.00 |
| 31-Mar-17 | 2483 | 7462 | $237,026.55 | $237,025.51 | $3,594.00 | $151.47 | $8,071.80 | $7,291.57 | $0.00 |
| 1-Apr-17 | 1404 | 4026 | $137,543.27 | $137,542.33 | $4,489.95 | $108.51 | $5,131.99 | $5,332.65 | $0.00 |
| 2-Apr-17 | 1223 | 3603 | $123,551.56 | $123,550.68 | $4,479.75 | $151.21 | $3,913.23 | $4,228.08 | $0.00 |
| 3-Apr-17 | 3547 | 11513 | $321,562.86 | $321,562.16 | $431.49 | $313.84 | $10,802.18 | $8,869.41 | $0.00 |
| 4-Apr-17 | 2229 | 6970 | $210,842.82 | $210,936.69 | $3,943.50 | $364.23 | $7,293.00 | $22,645.87 | $95.00 |
| 5-Apr-17 | 1969 | 5625 | $190,004.39 | $190,002.95 | $157.45 | $259.12 | $6,540.83 | $22,547.30 | $0.00 |
| 6-Apr-17 | 1615 | 4467 | $160,587.17 | $160,585.70 | $99.90 | $210.68 | $5,283.83 | $9,732.06 | $0.00 |

FSSTX-086589

015

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7-Apr-17 | 1611 | 4547 | $158,786.27 | $158,784.59 | $0.00 | $294.61 | $4,829.02 | $10,827.01 | $0.00 |
| 8-Apr-17 | 1066 | 2634 | $92,570.52 | $92,568.97 | $59.95 | $120.08 | $3,679.47 | $6,435.72 | $0.00 |
| 9-Apr-17 | 1036 | 2399 | $102,101.09 | $102,099.67 | $0.00 | $352.62 | $4,009.82 | $5,182.16 | $0.00 |
| 10-Apr-17 | 1288 | 3325 | $130,110.87 | $130,109.43 | $0.00 | $143.54 | $4,190.26 | $8,700.20 | $0.00 |
| 11-Apr-17 | 1522 | 3807 | $176,818.52 | $176,817.39 | $244.11 | $659.61 | $4,972.34 | $8,726.14 | $0.00 |
| 12-Apr-17 | 2332 | 7231 | $259,095.36 | $259,094.30 | $129.00 | $535.96 | $7,933.44 | $10,381.16 | $0.00 |
| 13-Apr-17 | 1915 | 5871 | $204,471.83 | $204,471.57 | $52.46 | $313.14 | $8,220.74 | $7,046.61 | $0.00 |
| 14-Apr-17 | 1921 | 5914 | $195,766.16 | $195,765.96 | $189.00 | $203.97 | $6,561.55 | $6,992.75 | $0.00 |
| 15-Apr-17 | 1385 | 4115 | $136,898.91 | $136,898.93 | $0.00 | $128.07 | $4,671.19 | $5,291.46 | $0.00 |
| 16-Apr-17 | 1921 | 5814 | $192,057.86 | $192,057.82 | $26.86 | $248.30 | $6,236.08 | $6,778.27 | $0.00 |
| 17-Apr-17 | 2200 | 6819 | $220,987.44 | $220,987.40 | $0.00 | $259.47 | $7,024.32 | $7,137.96 | $0.00 |
| 18-Apr-17 | 2436 | 7753 | $255,625.77 | $255,625.74 | $0.00 | $567.37 | $8,000.72 | $8,723.45 | $0.00 |
| 19-Apr-17 | 2367 | 7301 | $228,904.86 | $228,904.78 | $27.70 | $313.23 | $8,073.31 | $7,752.71 | $0.00 |
| 20-Apr-17 | 1879 | 5452 | $174,519.37 | $174,519.20 | $28.36 | $341.04 | $7,316.16 | $5,531.13 | $0.00 |
| 21-Apr-17 | 1657 | 4525 | $144,618.40 | $144,618.33 | $0.00 | $236.30 | $6,883.60 | $4,523.99 | $0.00 |
| 22-Apr-17 | 1056 | 2731 | $90,559.06 | $90,558.60 | $0.00 | $160.40 | $4,261.90 | $3,670.46 | $0.00 |
| 23-Apr-17 | 1100 | 2905 | $92,531.41 | $92,530.88 | $0.00 | $205.00 | $4,523.08 | $4,614.04 | $0.00 |
| 24-Apr-17 | 1729 | 4523 | $158,320.29 | $158,319.61 | $37.30 | $267.47 | $5,608.08 | $6,793.87 | $0.00 |
| 25-Apr-17 | 2624 | 7178 | $242,940.68 | $242,939.57 | $0.00 | $362.61 | $7,996.81 | $7,514.00 | $0.00 |
| 26-Apr-17 | 2134 | 5680 | $193,742.86 | $193,741.69 | $94.95 | $254.38 | $7,018.47 | $6,763.11 | $0.00 |
| 27-Apr-17 | 2060 | 5465 | $195,463.14 | $195,461.99 | $130.23 | $271.97 | $6,646.82 | $7,837.80 | $0.00 |
| 28-Apr-17 | 2068 | 5297 | $177,397.60 | $177,396.43 | $0.00 | $341.22 | $7,007.68 | $5,746.91 | $0.00 |
| 29-Apr-17 | 1372 | 3190 | $106,075.48 | $106,074.16 | $0.00 | $254.65 | $6,070.20 | $4,100.85 | $0.00 |
| 30-Apr-17 | 1588 | 4036 | $136,596.74 | $136,595.37 | $0.00 | $237.14 | $5,543.28 | $5,611.01 | $0.00 |
| 1-May-17 | 2616 | 7302 | $214,584.25 | $214,582.75 | $119.41 | $359.38 | $8,941.53 | $7,315.82 | $0.00 |
| 2-May-17 | 2414 | 7228 | $194,273.17 | $194,271.77 | $38.45 | $439.07 | $9,182.33 | $7,060.31 | $0.00 |
| 3-May-17 | 2949 | 9397 | $325,636.55 | $325,634.77 | $360.72 | $505.47 | $10,145.86 | $13,660.15 | $0.00 |
| 4-May-17 | 2925 | 9211 | $307,609.97 | $307,609.21 | $522.76 | $474.72 | $10,409.85 | $10,925.16 | $0.00 |
| 5-May-17 | 1956 | 5785 | $196,872.48 | $196,872.02 | $54.86 | $372.10 | $7,280.54 | $7,461.75 | $0.00 |
| 6-May-17 | 1205 | 3477 | $112,304.05 | $112,303.60 | $0.00 | $207.37 | $4,688.04 | $4,724.85 | $0.00 |
| 7-May-17 | 1332 | 3772 | $136,293.80 | $136,432.25 | $48.41 | $228.80 | $4,943.66 | $5,725.90 | $139.29 |
| 8-May-17 | 1558 | 4081 | $155,721.11 | $155,719.77 | $618.65 | $185.32 | $5,634.27 | $6,705.79 | $0.00 |
| 9-May-17 | 1406 | 3449 | $144,522.76 | $144,520.81 | $0.38 | $310.26 | $5,620.79 | $6,613.14 | $0.00 |
| 10-May-17 | 1301 | 3375 | $119,067.46 | $119,065.69 | $94.85 | $183.40 | $5,616.62 | $5,403.39 | $0.00 |
| 11-May-17 | 1350 | 3502 | $118,949.18 | $118,947.65 | $0.00 | $192.93 | $5,448.67 | $4,528.88 | $0.00 |

FSSTX-086589

016

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 12-May-17 | 1502 | 3912 | $127,941.23 | $127,939.80 | $0.00 | $252.99 | $5,385.65 | $4,742.18 | $0.00 |
|-----------|------|------|-------------|-------------|-------|---------|-----------|-----------|-------|
| 13-May-17 | 1073 | 2688 | $90,636.02 | $90,634.77 | $17.90 | $160.03 | $3,909.10 | $3,449.50 | $0.00 |
| 14-May-17 | 910 | 2292 | $85,067.20 | $85,066.01 | $366.55 | $116.59 | $3,658.31 | $3,764.38 | $0.00 |
| 15-May-17 | 1676 | 5060 | $138,546.90 | $138,678.43 | $236.95 | $313.96 | $7,064.32 | $4,386.70 | $132.97 |
| 16-May-17 | 1848 | 5420 | $157,013.17 | $157,011.68 | $0.00 | $276.49 | $6,527.01 | $5,194.79 | $0.00 |
| 17-May-17 | 1748 | 5287 | $164,832.71 | $164,831.43 | $26.96 | $412.50 | $6,323.51 | $5,796.51 | $0.00 |
| 18-May-17 | 1324 | 4012 | $117,877.61 | $117,876.51 | $0.00 | $408.93 | $4,855.81 | $4,755.85 | $0.00 |
| 19-May-17 | 1263 | 3809 | $105,765.08 | $105,764.15 | $8.65 | $305.29 | $4,537.12 | $3,654.23 | $0.00 |
| 20-May-17 | 848 | 2447 | $78,005.95 | $78,005.21 | $0.00 | $411.52 | $2,624.64 | $2,910.41 | $0.00 |
| 21-May-17 | 860 | 2549 | $77,916.74 | $77,915.88 | $0.00 | $157.31 | $3,106.91 | $3,165.45 | $0.00 |
| 22-May-17 | 1098 | 3165 | $91,152.05 | $91,150.67 | $0.00 | $156.47 | $3,728.37 | $3,441.89 | $0.00 |
| 23-May-17 | 2337 | 8806 | $235,572.54 | $235,571.20 | $0.00 | $356.70 | $7,446.08 | $9,608.39 | $0.00 |
| 24-May-17 | 2738 | 10294 | $288,885.65 | $288,885.50 | $363.16 | $386.50 | $9,778.57 | $10,314.69 | $0.00 |
| 25-May-17 | 2705 | 10577 | $286,575.15 | $286,574.97 | $339.58 | $402.30 | $9,325.67 | $10,756.61 | $0.00 |
| 26-May-17 | 2447 | 9565 | $252,158.52 | $252,158.14 | $1,199.11 | $416.29 | $9,072.64 | $9,782.34 | $0.00 |
| 27-May-17 | 1794 | 6862 | $189,297.01 | $189,296.82 | $550.00 | $378.45 | $6,584.39 | $6,799.58 | $0.00 |
| 28-May-17 | 1664 | 6427 | $178,195.32 | $178,194.95 | $0.00 | $297.41 | $7,038.17 | $6,826.30 | $0.00 |
| 29-May-17 | 2626 | 10377 | $279,792.55 | $279,792.29 | $31.37 | $509.74 | $7,834.11 | $10,269.20 | $0.00 |
| 30-May-17 | 2732 | 10685 | $286,256.05 | $286,255.78 | $337.55 | $520.89 | $8,193.31 | $11,098.06 | $0.00 |
| 31-May-17 | 2065 | 6798 | $190,892.16 | $190,891.69 | $220.15 | $428.71 | $7,504.50 | $8,258.38 | $0.00 |
| 1-Jun-17 | 1791 | 5839 | $164,835.13 | $164,834.66 | $316.67 | $275.64 | $7,248.19 | $6,967.97 | $0.00 |
| 2-Jun-17 | 1720 | 5522 | $160,315.24 | $160,315.00 | $20.45 | $167.78 | $6,209.02 | $6,226.99 | $0.00 |
| 3-Jun-17 | 1267 | 3967 | $116,839.37 | $116,838.97 | $692.32 | $94.62 | $5,132.68 | $6,381.43 | $0.00 |
| 4-Jun-17 | 1277 | 3909 | $113,483.62 | $113,483.16 | $0.00 | $183.35 | $4,614.33 | $4,746.98 | $0.00 |
| 5-Jun-17 | 2033 | 7525 | $202,942.73 | $202,942.39 | $189.00 | $197.86 | $6,861.30 | $7,617.58 | $0.00 |
| 6-Jun-17 | 1364 | 3818 | $118,809.17 | $118,808.57 | $605.50 | $212.95 | $5,288.11 | $4,881.82 | $0.00 |
| 7-Jun-17 | 1613 | 4439 | $128,238.39 | $128,236.93 | $99.78 | $350.89 | $6,198.08 | $4,832.87 | $0.00 |
| 8-Jun-17 | 1455 | 3984 | $111,436.47 | $111,435.13 | $0.00 | $291.09 | $5,517.68 | $4,762.04 | $0.00 |
| 9-Jun-17 | 1470 | 4038 | $111,000.41 | $110,999.10 | $250.67 | $237.84 | $5,142.36 | $3,892.91 | $0.00 |
| 10-Jun-17 | 911 | 2401 | $72,744.27 | $72,743.26 | $59.85 | $132.83 | $3,253.43 | $2,462.09 | $0.00 |
| 11-Jun-17 | 891 | 2411 | $75,531.75 | $75,530.77 | $0.00 | $132.83 | $3,561.65 | $2,967.81 | $0.00 |
| 12-Jun-17 | 1293 | 3477 | $103,881.93 | $103,880.68 | $15.54 | $200.41 | $5,152.69 | $3,565.10 | $0.00 |
| 13-Jun-17 | 1367 | 3984 | $119,913.26 | $119,912.14 | $29.95 | $324.45 | $5,302.18 | $4,292.97 | $0.00 |
| 14-Jun-17 | 1527 | 3671 | $109,246.04 | $109,244.95 | $0.00 | $243.58 | $3,820.04 | $3,899.97 | $0.00 |
| 15-Jun-17 | 1868 | 4125 | $134,936.67 | $134,935.49 | $380.91 | $500.18 | $2,860.84 | $6,835.93 | $0.00 |

FSSTX-086589

017

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 16-Jun-17 | 1686 | 3899 | $113,984.80 | $113,983.81 | $79.80 | $185.39 | $2,682.24 | $4,863.93 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| 17-Jun-17 | 1074 | 2608 | $81,655.07 | $81,654.50 | $303.90 | $197.56 | $2,049.84 | $3,420.68 | $0.00 |
| 18-Jun-17 | 1046 | 2397 | $77,390.09 | $77,389.35 | $49.95 | $195.53 | $2,385.00 | $2,841.87 | $0.00 |
| 19-Jun-17 | 1533 | 3560 | $115,358.68 | $115,357.85 | $1,197.68 | $217.01 | $2,271.70 | $2,799.29 | $0.00 |
| 20-Jun-17 | 1417 | 3408 | $115,830.60 | $115,829.62 | $872.20 | $168.09 | $2,778.57 | $3,223.64 | $0.00 |
| 21-Jun-17 | 1690 | 4201 | $136,634.20 | $136,633.25 | $731.31 | $244.94 | $3,192.31 | $4,547.99 | $0.00 |
| 22-Jun-17 | 1706 | 4337 | $133,645.09 | $133,644.61 | $226.17 | $185.11 | $2,903.44 | $5,680.38 | $0.00 |
| 23-Jun-17 | 1936 | 4625 | $148,391.27 | $148,390.81 | $289.08 | $273.58 | $2,755.39 | $4,926.09 | $0.00 |
| 24-Jun-17 | 1280 | 3132 | $98,786.30 | $98,785.98 | $1,396.39 | $94.05 | $2,295.56 | $3,696.54 | $0.00 |
| 25-Jun-17 | 1298 | 3255 | $103,001.99 | $103,001.71 | $695.31 | $207.82 | $2,415.96 | $3,175.56 | $0.00 |
| 26-Jun-17 | 1583 | 3929 | $122,648.98 | $122,648.66 | $653.91 | $471.15 | $2,754.83 | $3,601.16 | $0.00 |
| 27-Jun-17 | 1482 | 3947 | $123,818.72 | $123,818.39 | $205.82 | $228.66 | $3,023.34 | $3,871.71 | $0.00 |
| 28-Jun-17 | 1911 | 4777 | $176,851.06 | $176,850.52 | $195.08 | $339.84 | $3,854.17 | $4,798.73 | $0.00 |
| 29-Jun-17 | 2034 | 4872 | $183,600.67 | $183,600.09 | $739.04 | $339.57 | $4,524.16 | $4,722.39 | $0.00 |
| 30-Jun-17 | 2094 | 5244 | $210,012.45 | $210,011.87 | $4,944.65 | $470.23 | $4,069.69 | $5,700.83 | $0.00 |
| 1-Jul-17 | 1538 | 3931 | $143,419.51 | $143,418.90 | $958.56 | $232.71 | $3,871.67 | $3,397.99 | $0.00 |
| 2-Jul-17 | 1378 | 3273 | $121,417.95 | $121,417.55 | $570.45 | $177.50 | $2,833.54 | $3,627.40 | $0.00 |
| 3-Jul-17 | 1750 | 4131 | $153,860.88 | $153,860.16 | $1,089.39 | $322.12 | $3,358.73 | $4,053.28 | $0.00 |
| 4-Jul-17 | 1941 | 5136 | $182,830.54 | $182,830.01 | $545.85 | $341.10 | $4,213.86 | $4,004.15 | $0.00 |
| 5-Jul-17 | 2139 | 5273 | $248,941.86 | $248,941.75 | $703.27 | $506.02 | $3,946.04 | $5,799.23 | $0.00 |
| 6-Jul-17 | 2408 | 5646 | $267,251.11 | $267,337.83 | $349.30 | $579.06 | $4,595.97 | $5,649.89 | $86.85 |
| 7-Jul-17 | 2075 | 4890 | $223,873.73 | $223,873.58 | $852.24 | $447.59 | $4,537.55 | $5,415.93 | $0.00 |
| 8-Jul-17 | 1285 | 2789 | $123,959.67 | $123,959.33 | $228.75 | $285.09 | $3,204.79 | $2,985.77 | $0.00 |
| 9-Jul-17 | 1254 | 2743 | $117,663.41 | $117,663.06 | $65.49 | $289.62 | $2,135.83 | $2,843.76 | $0.00 |
| 10-Jul-17 | 1792 | 4127 | $183,214.84 | $183,214.52 | $1,847.94 | $302.84 | $3,188.59 | $4,073.07 | $0.00 |
| 11-Jul-17 | 1744 | 4143 | $166,984.20 | $166,983.99 | $221.62 | $274.74 | $3,109.38 | $3,922.54 | $0.00 |
| 12-Jul-17 | 1413 | 3405 | $145,078.22 | $145,077.95 | $337.23 | $217.62 | $3,144.70 | $3,017.12 | $0.00 |
| 13-Jul-17 | 1821 | 4489 | $166,076.98 | $166,076.60 | $276.20 | $391.09 | $3,347.19 | $3,609.38 | $0.00 |
| 14-Jul-17 | 1589 | 4045 | $152,293.48 | $152,293.02 | $107.92 | $262.91 | $3,240.28 | $2,996.74 | $0.00 |
| 15-Jul-17 | 1209 | 2898 | $112,509.95 | $112,509.72 | $168.33 | $405.52 | $2,012.73 | $2,809.08 | $0.00 |
| 16-Jul-17 | 1209 | 2967 | $115,700.72 | $115,700.55 | $571.28 | $249.49 | $2,066.17 | $2,726.61 | $0.00 |
| 17-Jul-17 | 1706 | 4400 | $162,739.18 | $162,738.98 | $219.55 | $413.93 | $3,349.71 | $3,686.93 | $0.00 |
| 18-Jul-17 | 2269 | 5926 | $234,561.85 | $234,561.87 | $345.72 | $409.43 | $4,738.09 | $10,162.64 | $0.00 |
| 19-Jul-17 | 2034 | 5488 | $215,094.67 | $215,094.43 | $860.19 | $530.19 | $3,984.67 | $8,665.88 | $0.00 |
| 20-Jul-17 | 1888 | 4643 | $181,630.38 | $181,630.05 | $418.49 | $359.74 | $4,072.54 | $6,211.93 | $0.00 |

FSSTX-086589

018

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 21-Jul-17 | 2058 | 5675 | $183,815.49 | $183,814.81 | $416.80 | $383.12 | $3,639.50 | $5,278.96 | $0.00 |
| 22-Jul-17 | 1568 | 4313 | $142,463.29 | $142,462.80 | $285.72 | $231.81 | $3,222.23 | $4,623.17 | $0.00 |
| 23-Jul-17 | 1751 | 4915 | $155,982.67 | $155,982.67 | $785.38 | $299.20 | $3,141.54 | $4,823.00 | $0.00 |
| 24-Jul-17 | 2105 | 5544 | $173,979.54 | $173,978.85 | $467.09 | $290.92 | $4,401.64 | $4,626.34 | $0.00 |
| 25-Jul-17 | 1955 | 5416 | $174,366.80 | $174,365.64 | $450.00 | $262.69 | $4,276.69 | $5,501.90 | $0.00 |
| 26-Jul-17 | 2761 | 8010 | $260,237.28 | $260,235.35 | $1,199.30 | $355.21 | $5,153.70 | $7,226.23 | $0.00 |
| 27-Jul-17 | 2363 | 6866 | $223,241.95 | $223,240.54 | $463.28 | $496.09 | $4,260.32 | $6,278.17 | $0.00 |
| 28-Jul-17 | 2228 | 5997 | $191,731.78 | $191,730.18 | $555.84 | $310.89 | $3,626.87 | $5,340.97 | $0.00 |
| 29-Jul-17 | 1557 | 3957 | $136,321.34 | $136,319.90 | $651.69 | $281.49 | $3,269.07 | $4,389.31 | $0.00 |
| 30-Jul-17 | 2141 | 5810 | $196,442.74 | $196,441.22 | $1,998.31 | $639.69 | $3,992.12 | $6,231.03 | $0.00 |
| 31-Jul-17 | 3627 | 10978 | $349,749.36 | $349,747.78 | $1,372.17 | $790.79 | $4,751.94 | $9,355.32 | $0.00 |
| 1-Aug-17 | 2387 | 6415 | $201,898.33 | $201,897.13 | $776.52 | $410.37 | $3,729.78 | $6,392.23 | $0.00 |
| 2-Aug-17 | 2415 | 6111 | $204,438.09 | $204,436.98 | $4,848.69 | $470.65 | $3,872.48 | $5,353.60 | $0.00 |
| 3-Aug-17 | 2684 | 8407 | $219,726.44 | $219,998.07 | $635.87 | $347.56 | $3,461.14 | $6,600.39 | $272.52 |
| 4-Aug-17 | 1937 | 5898 | $160,476.66 | $160,665.95 | $387.44 | $510.86 | $3,506.16 | $5,050.81 | $189.63 |
| 5-Aug-17 | 1331 | 4059 | $118,979.90 | $118,979.66 | $867.91 | $189.33 | $2,478.64 | $4,182.76 | $0.00 |
| 6-Aug-17 | 1276 | 3859 | $106,842.42 | $106,842.19 | $438.28 | $114.59 | $2,957.39 | $3,887.38 | $0.00 |
| 7-Aug-17 | 1428 | 4257 | $129,355.69 | $129,355.26 | $501.33 | $327.53 | $4,268.10 | $3,597.92 | $0.00 |
| 8-Aug-17 | 1348 | 3978 | $131,912.12 | $131,911.68 | $1,117.65 | $380.34 | $4,395.77 | $3,739.18 | $0.00 |
| 9-Aug-17 | 1727 | 5127 | $181,479.99 | $181,479.69 | $3,295.08 | $484.42 | $5,397.44 | $5,854.44 | $0.00 |
| 10-Aug-17 | 1998 | 5853 | $189,279.29 | $189,279.09 | $1,096.77 | $513.61 | $4,049.36 | $4,978.98 | $0.00 |
| 11-Aug-17 | 2177 | 6490 | $203,919.85 | $203,919.79 | $547.86 | $562.92 | $3,612.05 | $6,056.51 | $0.00 |
| 12-Aug-17 | 1628 | 4993 | $152,996.28 | $152,996.02 | $30.46 | $471.97 | $3,009.61 | $4,605.39 | $0.00 |
| 13-Aug-17 | 1420 | 4202 | $122,755.01 | $122,754.92 | $238.25 | $202.26 | $2,187.17 | $3,562.46 | $0.00 |
| 14-Aug-17 | 2015 | 6817 | $211,749.95 | $211,749.79 | $6,269.23 | $493.38 | $3,495.83 | $7,402.10 | $0.00 |
| 15-Aug-17 | 1842 | 5792 | $169,954.85 | $169,954.55 | $258.65 | $350.82 | $3,864.70 | $5,795.51 | $0.00 |
| 16-Aug-17 | 1932 | 6134 | $187,374.00 | $187,373.81 | $1,167.06 | $497.75 | $3,572.61 | $6,675.47 | $0.00 |
| 17-Aug-17 | 1907 | 6267 | $187,200.11 | $187,200.11 | $203.53 | $482.41 | $3,702.04 | $5,911.89 | $0.00 |
| 18-Aug-17 | 1910 | 5931 | $178,412.68 | $178,412.56 | $174.86 | $497.58 | $3,293.53 | $6,004.39 | $0.00 |
| 19-Aug-17 | 1427 | 4116 | $119,835.78 | $119,835.57 | $453.30 | $372.37 | $2,588.92 | $3,314.76 | $0.00 |
| 20-Aug-17 | 1475 | 4543 | $140,971.43 | $140,971.10 | $172.86 | $260.81 | $3,040.78 | $4,081.45 | $0.00 |
| 21-Aug-17 | 2117 | 6623 | $195,545.96 | $195,545.75 | $352.66 | $537.52 | $2,738.05 | $6,428.22 | $0.00 |
| 22-Aug-17 | 2004 | 6130 | $180,648.66 | $180,648.23 | $1,313.76 | $500.14 | $3,688.94 | $6,472.75 | $0.00 |
| 23-Aug-17 | 1884 | 5495 | $177,332.75 | $177,332.28 | $2,928.28 | $434.02 | $3,211.17 | $6,218.09 | $0.00 |
| 24-Aug-17 | 2309 | 7027 | $213,401.00 | $213,400.11 | $318.37 | $216.28 | $5,628.73 | $5,925.15 | $0.00 |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 25-Aug-17 | 2347 | 7069 | $226,905.32 | $226,904.34 | $496.49 | $417.44 | $7,498.94 | $6,072.73 | $0.00 |
| 26-Aug-17 | 1361 | 4314 | $137,484.45 | $137,483.79 | $1,173.46 | $338.36 | $5,445.24 | $4,289.95 | $0.00 |
| 27-Aug-17 | 1376 | 4057 | $132,154.37 | $132,153.71 | $673.78 | $233.20 | $5,665.17 | $4,056.74 | $0.00 |
| 28-Aug-17 | 1649 | 4638 | $159,853.56 | $160,170.47 | $4,377.88 | $209.95 | $5,940.69 | $6,442.41 | $317.72 |
| 29-Aug-17 | 1967 | 5422 | $186,755.18 | $186,753.73 | $790.06 | $276.81 | $7,625.60 | $4,891.73 | $0.00 |
| 30-Aug-17 | 1768 | 4769 | $158,047.70 | $158,046.04 | $341.38 | $408.62 | $6,175.12 | $4,790.95 | $0.00 |
| 31-Aug-17 | 1743 | 4565 | $155,034.35 | $155,162.44 | $327.76 | $258.41 | $6,383.70 | $4,829.98 | $129.70 |
| 1-Sep-17 | 2056 | 5560 | $192,751.75 | $192,749.99 | $1,491.57 | $301.47 | $7,642.63 | $5,063.09 | $0.00 |
| 2-Sep-17 | 1912 | 5146 | $184,292.80 | $184,291.43 | $574.49 | $286.48 | $7,034.49 | $4,740.71 | $0.00 |
| 3-Sep-17 | 1495 | 3972 | $139,627.82 | $139,626.50 | $383.88 | $185.63 | $5,341.30 | $4,038.30 | $0.00 |
| 4-Sep-17 | 1997 | 5603 | $206,014.95 | $206,013.42 | $668.57 | $440.45 | $6,645.50 | $5,644.20 | $0.00 |
| 5-Sep-17 | 1626 | 4535 | $162,941.67 | $162,940.32 | $630.33 | $298.65 | $6,053.28 | $4,495.52 | $0.00 |
| 6-Sep-17 | 1696 | 4393 | $191,161.13 | $191,159.87 | $1,366.54 | $649.37 | $5,813.73 | $9,279.28 | $0.00 |
| 7-Sep-17 | 1802 | 4794 | $248,880.17 | $248,879.03 | $2,426.04 | $990.18 | $5,435.68 | $13,403.50 | $0.00 |
| 8-Sep-17 | 1610 | 4257 | $214,702.53 | $214,701.30 | $1,306.39 | $688.15 | $6,052.89 | $13,931.11 | $0.00 |
| 9-Sep-17 | 1136 | 2857 | $155,906.72 | $155,905.70 | $2,124.44 | $622.28 | $4,403.54 | $14,252.10 | $0.00 |
| 10-Sep-17 | 1183 | 3044 | $153,535.41 | $153,534.38 | $2,066.40 | $578.03 | $4,263.86 | $12,960.35 | $0.00 |
| 11-Sep-17 | 1169 | 3038 | $142,879.15 | $142,878.02 | $373.56 | $570.94 | $4,849.05 | $11,970.75 | $0.00 |
| 12-Sep-17 | 1197 | 3152 | $117,803.64 | $117,802.68 | $140.18 | $479.30 | $4,906.20 | $6,902.44 | $0.00 |
| 13-Sep-17 | 1280 | 3311 | $130,468.64 | $130,467.43 | $329.54 | $242.48 | $4,643.01 | $7,646.49 | $0.00 |
| 14-Sep-17 | 1149 | 2977 | $120,091.44 | $120,090.41 | $1,022.02 | $669.24 | $4,030.74 | $7,199.36 | $0.00 |
| 15-Sep-17 | 1442 | 3702 | $165,169.01 | $165,167.92 | $2,454.97 | $302.99 | $4,806.99 | $13,127.55 | $0.00 |
| 16-Sep-17 | 1030 | 2664 | $121,296.10 | $121,295.03 | $62.37 | $133.39 | $3,819.64 | $9,364.43 | $0.00 |
| 17-Sep-17 | 1014 | 2479 | $121,918.90 | $121,918.06 | $1,686.07 | $181.98 | $3,973.09 | $8,828.62 | $0.00 |
| 18-Sep-17 | 1202 | 3244 | $135,241.99 | $135,240.99 | $503.89 | $316.32 | $4,499.50 | $8,522.28 | $0.00 |
| 19-Sep-17 | 1745 | 4577 | $224,210.25 | $224,209.16 | $1,898.87 | $552.03 | $6,196.74 | $19,112.84 | $0.00 |
| 20-Sep-17 | 1704 | 4546 | $224,114.50 | $224,113.38 | $704.75 | $634.37 | $5,156.12 | $19,465.50 | $0.00 |
| 21-Sep-17 | 1578 | 4024 | $192,837.80 | $192,836.53 | $2,812.66 | $409.91 | $5,293.89 | $15,841.72 | $0.00 |
| 22-Sep-17 | 1545 | 3930 | $173,183.38 | $173,182.08 | $292.56 | $567.99 | $5,240.61 | $13,746.96 | $0.00 |
| 23-Sep-17 | 1143 | 2833 | $126,091.29 | $126,090.13 | $74.98 | $208.57 | $4,105.60 | $9,269.98 | $0.00 |
| 24-Sep-17 | 1033 | 2469 | $111,599.36 | $111,598.20 | $584.17 | $158.62 | $4,180.12 | $8,397.29 | $0.00 |
| 25-Sep-17 | 1353 | 3279 | $186,146.14 | $186,144.97 | $959.79 | $379.01 | $4,881.47 | $15,361.04 | $0.00 |
| 26-Sep-17 | 1239 | 3189 | $136,889.83 | $136,888.46 | $565.72 | $378.87 | $4,480.21 | $6,328.24 | $0.00 |
| 27-Sep-17 | 1346 | 3524 | $131,802.30 | $131,800.93 | $450.72 | $403.37 | $4,510.28 | $3,357.04 | $0.00 |
| 28-Sep-17 | 1474 | 4033 | $143,760.00 | $143,758.56 | $594.81 | $285.36 | $5,618.47 | $3,827.49 | $0.00 |

FSSTX-086589

020

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 29-Sep-17 | 1516 | 4197 | $149,243.73 | $149,242.14 | $3,123.85 | $510.40 | $5,104.92 | $4,637.14 | $0.00 |
| 30-Sep-17 | 1231 | 3095 | $110,949.58 | $110,948.15 | $301.52 | $304.70 | $4,165.08 | $3,624.73 | $0.00 |
| 1-Oct-17 | 1243 | 3240 | $116,079.40 | $116,077.86 | $388.39 | $292.72 | $4,224.48 | $3,629.78 | $0.00 |
| 2-Oct-17 | 2053 | 5979 | $206,398.98 | $206,397.57 | $673.13 | $441.80 | $7,313.56 | $4,803.39 | $0.00 |
| 3-Oct-17 | 2158 | 6207 | $203,911.10 | $203,910.29 | $703.98 | $445.27 | $8,119.81 | $3,703.89 | $0.00 |
| 4-Oct-17 | 2416 | 7614 | $238,277.58 | $238,276.51 | $590.96 | $502.64 | $7,838.88 | $4,779.86 | $0.00 |
| 5-Oct-17 | 1956 | 5901 | $182,589.25 | $182,588.46 | $282.96 | $525.74 | $7,379.57 | $3,703.22 | $0.00 |
| 6-Oct-17 | 2078 | 5993 | $185,426.98 | $185,426.09 | $475.36 | $644.50 | $7,274.60 | $3,250.77 | $0.00 |
| 7-Oct-17 | 1461 | 3948 | $126,659.44 | $126,766.35 | $381.98 | $254.54 | $5,190.61 | $2,678.48 | $107.64 |
| 8-Oct-17 | 1380 | 3905 | $126,457.81 | $126,457.16 | $606.67 | $234.34 | $4,622.40 | $2,612.28 | $0.00 |
| 9-Oct-17 | 2253 | 6580 | $205,631.24 | $205,630.61 | $896.03 | $406.49 | $8,138.11 | $3,529.43 | $0.00 |
| 10-Oct-17 | 2350 | 7363 | $226,827.54 | $226,826.89 | $819.40 | $429.30 | $7,509.92 | $4,702.13 | $0.00 |
| 11-Oct-17 | 2315 | 7071 | $209,798.21 | $209,797.40 | $661.98 | $391.28 | $9,002.40 | $4,283.36 | $0.00 |
| 12-Oct-17 | 1859 | 5717 | $172,494.03 | $172,493.53 | $538.57 | $346.80 | $6,857.93 | $3,529.51 | $0.00 |
| 13-Oct-17 | 1916 | 5677 | $168,515.93 | $168,515.30 | $767.73 | $380.47 | $6,911.54 | $3,803.09 | $0.00 |
| 14-Oct-17 | 1287 | 3821 | $113,391.18 | $113,390.53 | $635.62 | $204.03 | $5,070.61 | $2,819.96 | $0.00 |
| 15-Oct-17 | 1407 | 4062 | $119,067.53 | $119,066.94 | $389.33 | $131.35 | $5,677.23 | $2,850.05 | $0.00 |
| 16-Oct-17 | 1852 | 5414 | $151,764.88 | $151,764.28 | $316.57 | $203.82 | $6,737.28 | $3,483.40 | $0.00 |
| 17-Oct-17 | 2344 | 7384 | $210,388.52 | $210,387.96 | $149.73 | $350.19 | $7,659.42 | $4,395.94 | $0.00 |
| 18-Oct-17 | 2394 | 7436 | $212,580.16 | $212,579.75 | $588.75 | $475.84 | $8,846.23 | $3,970.50 | $0.00 |
| 19-Oct-17 | 2101 | 6483 | $180,708.77 | $180,708.44 | $479.06 | $272.26 | $7,972.29 | $3,651.93 | $0.00 |
| 20-Oct-17 | 2196 | 6658 | $179,709.54 | $179,709.29 | $393.47 | $291.73 | $8,212.84 | $3,880.20 | $0.00 |
| 21-Oct-17 | 1488 | 4204 | $119,513.36 | $119,513.03 | $467.53 | $188.91 | $6,369.81 | $3,093.13 | $0.00 |
| 22-Oct-17 | 1370 | 4404 | $130,281.87 | $130,281.51 | $199.28 | $180.39 | $5,906.54 | $2,535.24 | $0.00 |
| 23-Oct-17 | 1657 | 5156 | $137,047.64 | $137,047.40 | $414.84 | $267.98 | $6,069.66 | $3,540.58 | $0.00 |
| 24-Oct-17 | 2116 | 6939 | $180,080.65 | $180,080.59 | $215.79 | $260.01 | $7,650.84 | $3,998.46 | $0.00 |
| 25-Oct-17 | 1819 | 5781 | $155,573.23 | $155,573.31 | $300.04 | $250.41 | $7,132.99 | $3,680.27 | $0.00 |
| 26-Oct-17 | 1727 | 5513 | $145,928.57 | $145,928.38 | $334.54 | $262.15 | $6,344.74 | $3,510.33 | $0.00 |
| 27-Oct-17 | 1876 | 5731 | $140,513.23 | $140,513.23 | $233.32 | $357.70 | $7,367.19 | $15,417.16 | $0.00 |
| 28-Oct-17 | 1241 | 3510 | $94,732.51 | $94,732.35 | $367.54 | $240.67 | $5,115.31 | $2,235.55 | $0.00 |
| 29-Oct-17 | 1303 | 3861 | $112,235.26 | $112,235.05 | $75.66 | $189.85 | $6,151.59 | $2,580.59 | $0.00 |
| 30-Oct-17 | 2025 | 5941 | $199,839.78 | $199,839.52 | $447.60 | $277.50 | $7,650.80 | $19,959.58 | $0.00 |
| 31-Oct-17 | 2337 | 7278 | $260,268.76 | $260,268.72 | $1,753.14 | $332.42 | $8,985.39 | $20,080.10 | $0.00 |
| 1-Nov-17 | 2228 | 6776 | $230,984.14 | $230,984.00 | $469.57 | $359.32 | $8,128.00 | $4,265.73 | $0.00 |
| 2-Nov-17 | 1811 | 5179 | $180,512.47 | $180,512.41 | $174.32 | $263.49 | $7,644.63 | $3,306.74 | $0.00 |

FSSTX-086589

021

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 3-Nov-17 | 1652 | 4469 | $157,183.65 | $157,183.39 | $445.40 | $220.99 | $6,593.40 | $3,308.13 | $0.00 |
| 4-Nov-17 | 1466 | 3933 | $141,998.74 | $141,998.27 | $569.09 | $261.03 | $5,951.09 | $2,781.71 | $0.00 |
| 5-Nov-17 | 1322 | 3706 | $133,730.56 | $133,730.04 | $203.78 | $212.14 | $6,320.87 | $2,470.78 | $0.00 |
| 6-Nov-17 | 1474 | 3901 | $148,299.43 | $148,299.15 | $908.47 | $208.26 | $5,996.18 | $2,665.60 | $0.00 |
| 7-Nov-17 | 1407 | 3844 | $137,274.66 | $137,274.12 | $101.63 | $224.72 | $5,594.07 | $2,506.36 | $0.00 |
| 8-Nov-17 | 3854 | 11546 | $331,276.41 | $331,274.54 | $686.97 | $796.75 | $7,376.30 | $4,922.96 | $0.00 |
| 9-Nov-17 | 4366 | 13722 | $383,257.75 | $383,255.26 | $1,123.84 | $613.81 | $6,538.15 | $5,566.91 | $0.00 |
| 10-Nov-17 | 3009 | 9236 | $263,232.54 | $263,230.49 | $1,014.72 | $580.19 | $5,045.83 | $3,923.06 | $0.00 |
| 11-Nov-17 | 1856 | 5172 | $149,885.28 | $149,883.68 | $220.82 | $328.22 | $3,750.17 | $2,627.77 | $0.00 |
| 12-Nov-17 | 1801 | 5107 | $157,815.45 | $157,813.74 | $486.35 | $265.82 | $3,352.49 | $3,135.49 | $0.00 |
| 13-Nov-17 | 1902 | 4867 | $161,593.77 | $161,592.09 | $544.17 | $229.45 | $3,376.81 | $3,420.80 | $0.00 |
| 14-Nov-17 | 1791 | 4410 | $145,652.66 | $145,651.14 | $375.50 | $320.74 | $2,666.53 | $3,200.38 | $0.00 |
| 15-Nov-17 | 1668 | 4202 | $132,727.42 | $132,725.72 | $374.66 | $226.43 | $2,640.33 | $3,057.69 | $0.00 |
| 16-Nov-17 | 1699 | 4098 | $139,241.12 | $139,239.41 | $194.50 | $335.60 | $2,893.96 | $2,935.58 | $0.00 |
| 17-Nov-17 | 1587 | 3691 | $124,288.16 | $124,286.40 | $184.84 | $160.62 | $2,434.90 | $2,989.83 | $0.00 |
| 18-Nov-17 | 1133 | 2632 | $85,410.59 | $85,409.11 | $74.12 | $142.60 | $2,886.10 | $2,025.44 | $0.00 |
| 19-Nov-17 | 1145 | 2727 | $87,580.43 | $87,578.71 | $362.97 | $131.61 | $2,403.43 | $2,511.51 | $0.00 |
| 20-Nov-17 | 1400 | 3204 | $103,471.99 | $103,470.15 | $708.45 | $161.11 | $2,792.38 | $2,674.77 | $0.00 |
| 21-Nov-17 | 1861 | 5442 | $135,721.95 | $135,720.18 | $171.86 | $214.74 | $3,426.12 | $3,096.26 | $0.00 |
| 22-Nov-17 | 1935 | 5816 | $153,160.13 | $153,158.23 | $27.64 | $166.32 | $3,636.65 | $3,660.74 | $0.00 |
| 23-Nov-17 | 1541 | 4537 | $143,088.43 | $143,086.79 | $1,564.03 | $227.66 | $2,980.80 | $2,633.29 | $0.00 |
| 24-Nov-17 | 2750 | 8807 | $293,128.27 | $293,126.35 | $325.79 | $598.57 | $6,002.55 | $3,714.66 | $0.00 |
| 25-Nov-17 | 2078 | 5977 | $170,739.35 | $170,737.65 | $350.60 | $292.26 | $4,113.52 | $2,947.48 | $0.00 |
| 26-Nov-17 | 2068 | 6264 | $190,338.86 | $190,337.09 | $201.58 | $380.59 | $4,382.29 | $3,301.43 | $0.00 |
| 27-Nov-17 | 5321 | 15701 | $493,217.22 | $493,213.43 | $1,186.04 | $528.42 | $6,876.08 | $7,850.19 | $0.00 |
| 28-Nov-17 | 3423 | 9565 | $315,004.49 | $315,001.70 | $697.74 | $301.90 | $5,551.53 | $5,765.79 | $0.00 |
| 29-Nov-17 | 2850 | 8141 | $258,444.69 | $258,442.35 | $2,019.37 | $269.95 | $4,568.47 | $3,767.57 | $0.00 |
| 30-Nov-17 | 2749 | 7599 | $236,545.44 | $236,543.06 | $1,028.46 | $237.14 | $4,757.13 | $4,093.34 | $0.00 |
| 1-Dec-17 | 2459 | 6749 | $198,768.28 | $198,765.97 | $976.91 | $254.79 | $3,934.38 | $4,213.28 | $0.00 |
| 2-Dec-17 | 1649 | 4396 | $131,622.60 | $131,620.90 | $1,124.01 | $162.26 | $2,690.10 | $2,856.53 | $0.00 |
| 3-Dec-17 | 1649 | 4568 | $127,990.79 | $127,989.06 | $1,375.76 | $185.06 | $2,946.88 | $2,925.97 | $0.00 |
| 4-Dec-17 | 1689 | 4281 | $153,368.94 | $153,367.34 | $1,424.00 | $282.91 | $2,872.33 | $2,685.14 | $0.00 |
| 5-Dec-17 | 1507 | 3788 | $134,654.04 | $134,612.62 | $726.20 | $247.41 | $3,041.83 | $2,603.57 | $0.00 |
| 6-Dec-17 | 1505 | 3732 | $134,755.83 | $134,754.11 | $963.13 | $178.26 | $3,267.28 | $2,454.12 | $0.00 |
| 7-Dec-17 | 2292 | 6192 | $214,762.86 | $214,760.94 | $730.73 | $333.92 | $4,485.25 | $3,797.30 | $0.00 |

FSSTX-086589

022

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 8-Dec-17 | 2182 | 5574 | $184,348.87 | $184,346.83 | $1,434.81 | $276.75 | $4,441.92 | $3,811.41 | $0.00 |
| 9-Dec-17 | 1432 | 3526 | $113,892.15 | $113,890.23 | $568.26 | $235.00 | $2,659.38 | $3,375.10 | $0.00 |
| 10-Dec-17 | 1407 | 3580 | $115,381.28 | $115,379.47 | $163.16 | $163.50 | $2,580.97 | $3,023.62 | $0.00 |
| 11-Dec-17 | 2062 | 5824 | $177,822.12 | $177,820.13 | $430.17 | $296.98 | $3,556.75 | $3,367.46 | $0.00 |
| 12-Dec-17 | 2155 | 6455 | $182,496.89 | $182,495.03 | $639.89 | $289.23 | $3,557.51 | $3,279.96 | $0.00 |
| 13-Dec-17 | 2123 | 6435 | $187,502.95 | $187,501.04 | $387.23 | $315.31 | $3,711.94 | $3,341.09 | $0.00 |
| 14-Dec-17 | 2352 | 6711 | $193,071.72 | $193,069.79 | $1,075.21 | $337.36 | $4,675.15 | $3,155.40 | $0.00 |
| 15-Dec-17 | 2560 | 7651 | $222,710.10 | $222,707.94 | $397.28 | $407.41 | $4,565.40 | $3,873.10 | $0.00 |
| 16-Dec-17 | 1788 | 5324 | $147,441.31 | $147,439.53 | $399.81 | $262.13 | $3,233.87 | $3,115.45 | $0.00 |
| 17-Dec-17 | 1805 | 5709 | $162,066.08 | $162,064.51 | $345.59 | $309.55 | $3,294.97 | $3,066.29 | $0.00 |
| 18-Dec-17 | 3226 | 10664 | $296,590.69 | $296,588.52 | $533.88 | $609.51 | $5,101.20 | $4,473.98 | $0.00 |
| 19-Dec-17 | 2924 | 9334 | $252,771.88 | $252,769.58 | $292.66 | $438.16 | $5,520.10 | $4,151.09 | $0.00 |
| 20-Dec-17 | 3188 | 9727 | $284,567.81 | $284,565.28 | $652.22 | $450.54 | $5,095.52 | $4,477.67 | $0.00 |
| 21-Dec-17 | 2516 | 7644 | $229,076.11 | $229,074.04 | $831.21 | $313.06 | $5,344.63 | $3,371.92 | $0.00 |
| 22-Dec-17 | 2248 | 6782 | $205,519.14 | $205,517.31 | $2,892.27 | $261.55 | $3,824.95 | $3,183.14 | $0.00 |
| 23-Dec-17 | 1565 | 4414 | $133,788.25 | $133,786.73 | $1,158.49 | $237.76 | $2,899.72 | $2,390.23 | $0.00 |
| 24-Dec-17 | 1276 | 3455 | $103,270.96 | $103,269.52 | $640.53 | $110.72 | $2,633.63 | $2,295.69 | $0.00 |
| 25-Dec-17 | 1153 | 3034 | $87,164.14 | $87,162.46 | $1,208.62 | $151.00 | $2,177.45 | $2,382.76 | $0.00 |
| 26-Dec-17 | 1629 | 4366 | $137,356.30 | $137,354.70 | $682.94 | $164.67 | $2,910.96 | $2,641.91 | $0.00 |
| 27-Dec-17 | 1864 | 5304 | $163,541.95 | $163,540.25 | $1,607.46 | $171.31 | $3,506.57 | $2,702.68 | $0.00 |
| 28-Dec-17 | 2137 | 5664 | $172,190.36 | $172,188.35 | $254.78 | $250.21 | $4,167.07 | $3,194.54 | $0.00 |
| 29-Dec-17 | 2250 | 6511 | $196,818.07 | $196,815.88 | $1,438.63 | $288.76 | $3,847.16 | $3,554.50 | $0.00 |
| 30-Dec-17 | 1708 | 4669 | $138,364.82 | $138,363.00 | $264.21 | $199.63 | $3,936.08 | $2,676.19 | $0.00 |
| 31-Dec-17 | 1724 | 4841 | $143,649.68 | $143,647.81 | $416.36 | $197.39 | $3,071.04 | $2,986.28 | $0.00 |
| 1-Jan-18 | 1726 | 4820 | $142,617.65 | $142,615.73 | $326.14 | $187.91 | $3,436.17 | $3,008.90 | $0.00 |
| 2-Jan-18 | 2117 | 6060 | $179,764.65 | $179,762.59 | $501.04 | $328.57 | $3,769.64 | $3,605.48 | $0.00 |
| 3-Jan-18 | 2483 | 7078 | $205,622.24 | $205,620.00 | $627.52 | $371.01 | $4,383.36 | $4,277.23 | $0.00 |
| 4-Jan-18 | 2613 | 7787 | $212,333.02 | $212,331.07 | $1,776.49 | $600.73 | $4,535.26 | $3,752.82 | $0.00 |
| 5-Jan-18 | 2098 | 5543 | $155,117.14 | $155,408.31 | $1,233.78 | $326.43 | $3,475.57 | $3,115.26 | $293.15 |
| 6-Jan-18 | 1485 | 3689 | $106,689.97 | $106,688.25 | $19.95 | $133.02 | $2,929.89 | $2,525.10 | $0.00 |
| 7-Jan-18 | 1581 | 4007 | $120,163.31 | $120,161.36 | $632.98 | $171.89 | $2,243.89 | $2,757.47 | $0.00 |
| 8-Jan-18 | 2208 | 5859 | $165,955.43 | $165,952.96 | $831.34 | $328.49 | $3,457.37 | $4,113.57 | $0.00 |
| 9-Jan-18 | 1763 | 4601 | $139,491.15 | $139,488.97 | $634.61 | $194.52 | $3,429.96 | $3,110.31 | $0.00 |
| 10-Jan-18 | 1494 | 3611 | $106,554.15 | $106,552.30 | $729.07 | $97.62 | $2,668.66 | $2,860.32 | $0.00 |
| 11-Jan-18 | 1431 | 3371 | $104,135.52 | $104,133.91 | $493.56 | $177.09 | $3,246.38 | $2,597.18 | $0.00 |

FSSTX-086589

023

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 12-Jan-18 | 1427 | 3465 | $115,317.12 | $115,315.44 | $97.31 | $164.91 | $5,118.51 | $2,869.13 | $0.00 |
| 13-Jan-18 | 1014 | 2610 | $89,594.74 | $89,593.33 | $284.98 | $97.73 | $4,318.29 | $2,755.37 | $0.00 |
| 14-Jan-18 | 1009 | 2381 | $84,267.92 | $84,266.48 | $328.14 | $145.00 | $4,542.22 | $2,731.90 | $0.00 |
| 15-Jan-18 | 1491 | 3744 | $126,029.34 | $126,027.42 | $814.32 | $137.81 | $5,546.57 | $6,899.92 | $0.00 |
| 16-Jan-18 | 1108 | 2841 | $97,553.94 | $97,552.25 | $707.18 | $210.22 | $5,111.93 | $5,732.42 | $0.00 |
| 17-Jan-18 | 1456 | 3686 | $122,819.45 | $122,817.65 | $424.04 | $129.76 | $5,893.43 | $3,294.24 | $0.00 |
| 18-Jan-18 | 1916 | 4357 | $157,764.19 | $157,762.26 | $365.41 | $239.45 | $7,148.36 | $3,694.54 | $0.00 |
| 19-Jan-18 | 1807 | 4086 | $162,608.51 | $162,606.65 | $412.18 | $400.13 | $6,472.67 | $3,956.48 | $0.00 |
| 20-Jan-18 | 1246 | 2745 | $112,927.31 | $112,925.70 | $212.30 | $305.20 | $4,397.68 | $3,150.74 | $0.00 |
| 21-Jan-18 | 1148 | 2678 | $102,486.11 | $102,484.60 | $169.90 | $86.80 | $4,265.41 | $2,743.36 | $0.00 |
| 22-Jan-18 | 1642 | 3978 | $157,465.07 | $157,463.51 | $3,230.73 | $483.94 | $6,434.76 | $3,172.59 | $0.00 |
| 23-Jan-18 | 1749 | 4209 | $167,107.06 | $167,105.54 | $3,653.89 | $448.86 | $6,547.28 | $3,188.36 | $0.00 |
| 24-Jan-18 | 1739 | 4223 | $161,772.69 | $161,770.89 | $3,779.93 | $259.37 | $5,717.35 | $3,990.44 | $0.00 |
| 25-Jan-18 | 1894 | 4877 | $178,347.24 | $178,345.47 | $255.41 | $348.44 | $7,293.22 | $4,600.32 | $0.00 |
| 26-Jan-18 | 1863 | 4651 | $169,118.19 | $169,115.97 | $437.94 | $242.10 | $6,424.33 | $5,160.04 | $0.00 |
| 27-Jan-18 | 1522 | 3581 | $132,297.00 | $132,294.68 | $135.21 | $220.45 | $5,649.21 | $5,398.38 | $0.00 |
| 28-Jan-18 | 1444 | 3599 | $133,909.32 | $133,907.48 | $478.02 | $171.13 | $4,652.04 | $4,615.01 | $0.00 |
| 29-Jan-18 | 1635 | 3942 | $151,308.87 | $151,307.01 | $543.31 | $224.51 | $5,904.87 | $4,084.45 | $0.00 |
| 30-Jan-18 | 1921 | 4665 | $186,562.14 | $186,559.89 | $1,304.09 | $251.18 | $5,836.76 | $5,788.33 | $0.00 |
| 31-Jan-18 | 1871 | 4828 | $210,164.86 | $210,162.72 | $683.76 | $263.51 | $7,481.63 | $6,242.03 | $0.00 |
| 1-Feb-18 | 2042 | 5204 | $208,631.74 | $208,629.52 | $942.51 | $220.05 | $7,080.69 | $5,952.93 | $0.00 |
| 2-Feb-18 | 2061 | 5268 | $199,310.45 | $199,308.28 | $226.75 | $185.55 | $6,704.05 | $5,554.95 | $0.00 |
| 3-Feb-18 | 1614 | 4664 | $163,954.06 | $163,952.31 | $404.80 | $244.83 | $5,534.90 | $7,530.77 | $0.00 |
| 4-Feb-18 | 1264 | 3415 | $119,908.57 | $119,907.04 | $466.08 | $202.10 | $4,463.12 | $6,465.09 | $0.00 |
| 5-Feb-18 | 1504 | 3762 | $140,385.51 | $140,383.86 | $517.76 | $234.67 | $5,319.83 | $4,516.95 | $0.00 |
| 6-Feb-18 | 1696 | 4230 | $154,441.60 | $154,439.60 | $158.07 | $176.01 | $5,481.94 | $4,517.17 | $0.00 |
| 7-Feb-18 | 2027 | 5451 | $175,766.50 | $175,764.21 | $471.73 | $131.98 | $7,237.06 | $5,614.61 | $0.00 |
| 8-Feb-18 | 1916 | 5125 | $173,321.29 | $173,319.31 | $770.91 | $201.82 | $6,706.37 | $5,052.11 | $0.00 |
| 9-Feb-18 | 1843 | 4966 | $165,719.52 | $165,717.51 | $574.44 | $133.85 | $6,361.30 | $5,440.13 | $0.00 |
| 10-Feb-18 | 1473 | 3974 | $130,391.32 | $130,389.45 | $485.09 | $182.60 | $5,791.83 | $6,355.56 | $0.00 |
| 11-Feb-18 | 1399 | 3862 | $131,901.95 | $131,900.31 | $791.32 | $68.44 | $4,796.39 | $7,021.19 | $0.00 |
| 12-Feb-18 | 1461 | 3863 | $135,521.03 | $135,519.45 | $751.41 | $176.20 | $5,605.34 | $4,357.46 | $0.00 |
| 13-Feb-18 | 1543 | 4080 | $137,172.49 | $137,170.84 | $669.80 | $181.30 | $5,923.65 | $4,224.74 | $0.00 |
| 14-Feb-18 | 1894 | 5354 | $166,208.84 | $166,206.96 | $229.98 | $215.35 | $6,936.43 | $8,605.10 | $0.00 |
| 15-Feb-18 | 1948 | 5737 | $166,769.41 | $166,767.78 | $370.94 | $299.65 | $7,366.13 | $8,009.81 | $0.00 |

FSSTX-086589

024

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 16-Feb-18 | 2063 | 6291 | $182,739.81 | $182,738.20 | $219.99 | $253.86 | $7,966.93 | $5,360.20 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| 17-Feb-18 | 1650 | 5043 | $148,825.46 | $148,823.96 | $482.40 | $144.06 | $6,642.14 | $6,650.53 | $0.00 |
| 18-Feb-18 | 1664 | 5184 | $149,813.53 | $149,811.99 | $695.91 | $232.75 | $6,050.17 | $6,762.02 | $0.00 |
| 19-Feb-18 | 1883 | 5673 | $167,096.06 | $167,094.60 | $488.49 | $176.49 | $7,540.58 | $5,513.30 | $0.00 |
| 20-Feb-18 | 1637 | 4733 | $141,753.59 | $141,752.23 | $332.41 | $270.11 | $6,344.74 | $4,098.47 | $0.00 |
| 21-Feb-18 | 1562 | 4641 | $142,506.15 | $142,504.87 | $160.05 | $158.09 | $6,520.15 | $4,081.29 | $0.00 |
| 22-Feb-18 | 1711 | 5232 | $164,545.98 | $164,544.76 | $250.97 | $307.45 | $6,276.44 | $3,975.84 | $0.00 |
| 23-Feb-18 | 1807 | 5206 | $166,231.27 | $166,229.79 | $411.71 | $224.43 | $6,550.13 | $4,584.52 | $0.00 |
| 24-Feb-18 | 1468 | 4247 | $130,020.22 | $130,018.88 | $496.59 | $192.14 | $5,647.36 | $3,648.44 | $0.00 |
| 25-Feb-18 | 1568 | 4555 | $142,229.09 | $142,227.80 | $341.27 | $244.36 | $5,303.41 | $4,073.30 | $0.00 |
| 26-Feb-18 | 1984 | 5414 | $191,687.69 | $191,686.03 | $554.52 | $179.40 | $6,826.11 | $4,727.50 | $0.00 |
| 27-Feb-18 | 2091 | 5793 | $218,245.91 | $218,244.21 | $293.83 | $204.36 | $7,628.82 | $4,720.90 | $0.00 |
| 28-Feb-18 | 2289 | 6242 | $211,669.41 | $211,667.91 | $1,263.51 | $325.85 | $7,197.62 | $5,409.70 | $0.00 |
| 1-Mar-18 | 4330 | 11752 | $379,068.55 | $379,068.39 | $2,414.56 | $605.69 | $7,966.74 | $8,226.44 | $0.00 |
| 2-Mar-18 | 3845 | 10551 | $338,662.90 | $338,662.68 | $1,361.65 | $513.72 | $7,384.69 | $7,188.98 | $0.00 |
| 3-Mar-18 | 2104 | 5494 | $174,787.48 | $174,787.24 | $223.13 | $222.47 | $3,996.74 | $4,410.70 | $0.00 |
| 4-Mar-18 | 1940 | 5012 | $166,278.19 | $166,276.47 | $1,864.43 | $225.11 | $3,382.20 | $4,347.95 | $0.00 |
| 5-Mar-18 | 2270 | 5910 | $191,731.27 | $191,730.94 | $116.30 | $168.47 | $3,439.94 | $4,672.92 | $0.00 |
| 6-Mar-18 | 2046 | 5362 | $169,827.73 | $169,827.40 | $181.31 | $202.26 | $4,129.74 | $3,933.50 | $0.00 |
| 7-Mar-18 | 2168 | 5424 | $174,921.37 | $174,921.33 | $289.56 | $351.43 | $4,289.52 | $4,345.47 | $0.00 |
| 8-Mar-18 | 2098 | 5225 | $166,024.71 | $166,023.00 | $147.38 | $261.50 | $3,580.24 | $5,467.59 | $0.00 |
| 9-Mar-18 | 2215 | 5697 | $176,604.98 | $176,604.72 | $832.17 | $210.74 | $4,481.01 | $4,585.67 | $0.00 |
| 10-Mar-18 | 2047 | 4932 | $158,107.57 | $158,106.70 | $352.83 | $352.40 | $4,442.80 | $5,519.07 | $0.00 |
| 11-Mar-18 | 1651 | 4665 | $155,362.20 | $155,362.12 | $418.05 | $126.88 | $3,995.90 | $3,756.90 | $0.00 |
| 12-Mar-18 | 2649 | 7222 | $245,632.55 | $245,632.38 | $674.64 | $258.38 | $4,568.65 | $4,937.18 | $0.00 |
| 13-Mar-18 | 2095 | 5206 | $178,608.75 | $178,608.60 | $221.67 | $240.58 | $5,443.73 | $4,563.29 | $0.00 |
| 14-Mar-18 | 1681 | 3981 | $142,348.25 | $142,347.01 | $952.64 | $118.83 | $5,500.52 | $3,580.40 | $0.00 |
| 15-Mar-18 | 1559 | 3542 | $141,735.14 | $141,733.82 | $668.86 | $269.66 | $5,374.51 | $3,608.63 | $0.00 |
| 16-Mar-18 | 1503 | 3786 | $133,430.26 | $133,428.73 | $70.24 | $262.54 | $5,056.89 | $3,824.98 | $0.00 |
| 17-Mar-18 | 1057 | 2527 | $83,411.61 | $83,410.28 | $33.48 | $76.60 | $3,740.22 | $2,879.49 | $0.00 |
| 18-Mar-18 | 1125 | 2713 | $92,799.15 | $92,797.61 | $323.40 | $120.52 | $4,522.15 | $3,410.22 | $0.00 |
| 19-Mar-18 | 1417 | 3332 | $123,447.22 | $123,479.71 | $1,121.78 | $183.95 | $4,971.68 | $3,505.86 | $34.20 |
| 20-Mar-18 | 1487 | 3582 | $130,288.42 | $130,286.68 | $386.49 | $219.15 | $5,496.94 | $4,196.79 | $0.00 |
| 21-Mar-18 | 1646 | 4071 | $144,593.45 | $144,591.96 | $253.16 | $463.01 | $5,720.84 | $3,829.47 | $0.00 |
| 22-Mar-18 | 1519 | 3846 | $139,166.62 | $139,165.23 | $217.86 | $280.75 | $5,093.86 | $3,960.35 | $0.00 |

FSSTX-086589

025

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 23-Mar-18 | 1434 | 3538 | $137,415.80 | $137,414.24 | $460.03 | $240.51 | $4,872.71 | $3,655.94 | $0.00 |
| 24-Mar-18 | 1108 | 2688 | $108,226.81 | $108,225.58 | $62.22 | $293.12 | $4,297.14 | $2,855.35 | $0.00 |
| 25-Mar-18 | 1151 | 2808 | $109,309.64 | $109,308.21 | $873.59 | $245.60 | $4,065.32 | $3,356.53 | $0.00 |
| 26-Mar-18 | 2131 | 5904 | $209,907.05 | $209,904.95 | $428.93 | $394.49 | $6,511.16 | $8,131.20 | $0.00 |
| 27-Mar-18 | 2269 | 5989 | $211,939.40 | $211,937.27 | $767.07 | $372.80 | $7,577.01 | $6,305.40 | $0.00 |
| 28-Mar-18 | 2086 | 5140 | $187,413.47 | $187,411.27 | $670.38 | $281.61 | $6,840.34 | $5,816.57 | $0.00 |
| 29-Mar-18 | 1991 | 5321 | $190,636.29 | $190,634.34 | $492.93 | $214.12 | $6,663.86 | $5,273.34 | $0.00 |
| 30-Mar-18 | 1951 | 5161 | $172,091.03 | $172,088.77 | $653.61 | $200.34 | $6,257.87 | $7,782.32 | $0.00 |
| 31-Mar-18 | 1417 | 3537 | $119,379.15 | $119,377.04 | $1,146.04 | $154.92 | $5,381.08 | $6,564.49 | $0.00 |
| 1-Apr-18 | 1379 | 3500 | $126,203.29 | $126,201.26 | $114.58 | $249.54 | $4,829.48 | $5,611.41 | $0.00 |
| 2-Apr-18 | 1787 | 4415 | $157,680.45 | $157,678.27 | $97.79 | $441.31 | $6,129.50 | $5,971.92 | $0.00 |
| 3-Apr-18 | 2153 | 5782 | $210,426.60 | $210,424.64 | $1,227.26 | $290.20 | $7,159.47 | $6,691.19 | $0.00 |
| 4-Apr-18 | 2268 | 5864 | $212,608.58 | $212,606.45 | $1,444.59 | $319.00 | $6,964.12 | $7,038.29 | $0.00 |
| 5-Apr-18 | 2143 | 5466 | $208,167.25 | $208,165.17 | $759.55 | $223.61 | $6,625.44 | $7,244.85 | $0.00 |
| 6-Apr-18 | 2244 | 5953 | $229,926.29 | $229,924.08 | $640.94 | $198.96 | $6,184.17 | $7,297.52 | $0.00 |
| 7-Apr-18 | 1645 | 4238 | $160,145.93 | $160,143.99 | $288.39 | $321.32 | $5,871.31 | $6,621.32 | $0.00 |
| 8-Apr-18 | 1453 | 3576 | $136,565.80 | $136,563.86 | $498.33 | $135.80 | $5,264.81 | $4,902.48 | $0.00 |
| 9-Apr-18 | 2211 | 5798 | $217,543.64 | $217,541.49 | $1,145.75 | $253.63 | $7,099.32 | $7,298.43 | $0.00 |
| 10-Apr-18 | 2371 | 5687 | $209,977.71 | $209,974.67 | $1,718.23 | $280.34 | $9,832.82 | $10,066.33 | $0.00 |
| 11-Apr-18 | 1937 | 5230 | $198,731.00 | $198,729.02 | $1,108.25 | $195.97 | $6,620.05 | $6,336.27 | $0.00 |
| 12-Apr-18 | 2546 | 7182 | $266,963.57 | $266,961.34 | $490.03 | $275.35 | $7,684.40 | $11,770.46 | $0.00 |
| 13-Apr-18 | 2383 | 6558 | $248,233.23 | $248,231.20 | $331.16 | $167.20 | $7,074.52 | $10,771.93 | $0.00 |
| 14-Apr-18 | 1516 | 4209 | $165,318.65 | $165,316.96 | $1,385.01 | $157.12 | $4,998.74 | $7,766.22 | $0.00 |
| 15-Apr-18 | 1652 | 4673 | $175,643.74 | $175,641.82 | $1,109.54 | $137.53 | $5,332.00 | $8,077.00 | $0.00 |
| 16-Apr-18 | 2373 | 6907 | $269,585.31 | $269,583.46 | $544.22 | $193.63 | $7,183.41 | $8,522.56 | $0.00 |
| 17-Apr-18 | 2111 | 5609 | $221,060.52 | $221,058.54 | $332.71 | $193.62 | $6,919.96 | $7,358.83 | $0.00 |
| 18-Apr-18 | 1867 | 4892 | $185,284.29 | $185,282.41 | $920.12 | $148.84 | $6,220.49 | $5,732.27 | $0.00 |
| 19-Apr-18 | 1719 | 4503 | $170,900.55 | $170,898.79 | $378.08 | $130.09 | $5,815.38 | $5,649.40 | $0.00 |
| 20-Apr-18 | 1613 | 4393 | $167,238.89 | $167,237.11 | $493.58 | $147.07 | $5,480.79 | $5,633.52 | $0.00 |
| 21-Apr-18 | 1200 | 3008 | $113,180.56 | $113,179.08 | $26.96 | $72.37 | $4,581.60 | $4,452.75 | $0.00 |
| 22-Apr-18 | 1248 | 3286 | $127,390.58 | $127,389.17 | $252.02 | $127.61 | $4,332.65 | $5,246.62 | $0.00 |
| 23-Apr-18 | 1611 | 4345 | $165,086.18 | $165,084.56 | $827.12 | $125.09 | $5,920.74 | $4,949.20 | $0.00 |
| 24-Apr-18 | 1524 | 4022 | $149,285.69 | $149,283.95 | $424.12 | $154.84 | $5,495.99 | $4,870.50 | $0.00 |
| 25-Apr-18 | 1761 | 4622 | $175,637.46 | $175,635.66 | $288.12 | $137.48 | $6,190.36 | $7,244.97 | $0.00 |
| 26-Apr-18 | 1599 | 4164 | $157,104.14 | $157,102.35 | $437.75 | $145.75 | $5,659.62 | $5,799.79 | $0.00 |

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 27-Apr-18 | 1537 | 3843 | $143,841.62 | $143,839.89 | $2,007.03 | $89.68 | $5,333.87 | $5,224.56 | $0.00 |
| 28-Apr-18 | 1093 | 2705 | $104,304.04 | $104,302.59 | $180.24 | $115.21 | $4,379.99 | $3,441.02 | $0.00 |
| 29-Apr-18 | 1313 | 3294 | $126,404.15 | $126,402.51 | $265.97 | $106.07 | $5,102.83 | $4,415.45 | $0.00 |
| 30-Apr-18 | 1712 | 4456 | $164,523.33 | $164,521.09 | $872.68 | $143.57 | $6,139.52 | $5,695.98 | $0.00 |
| 1-May-18 | 1922 | 4804 | $186,562.22 | $186,559.91 | $1,539.25 | $188.73 | $6,306.64 | $7,955.77 | $0.00 |
| 2-May-18 | 2129 | 5526 | $222,628.04 | $222,625.82 | $484.56 | $123.85 | $6,676.72 | $15,685.65 | $0.00 |
| 3-May-18 | 2165 | 5601 | $223,931.95 | $223,929.77 | $535.35 | $145.69 | $6,646.95 | $14,887.89 | $0.00 |
| 4-May-18 | 1824 | 4659 | $189,678.77 | $189,676.68 | $1,507.55 | $154.48 | $5,739.02 | $8,437.72 | $0.00 |
| 5-May-18 | 1285 | 3533 | $144,358.00 | $144,356.18 | $271.96 | $194.43 | $4,262.75 | $7,771.12 | $0.00 |
| 6-May-18 | 1226 | 3045 | $124,514.60 | $124,512.97 | $238.03 | $194.64 | $4,050.04 | $5,777.72 | $0.00 |
| 7-May-18 | 1632 | 4440 | $151,422.88 | $151,420.92 | $481.77 | $153.61 | $5,731.08 | $7,629.33 | $0.00 |
| 8-May-18 | 1668 | 4700 | $149,768.91 | $149,767.26 | $650.91 | $190.15 | $5,847.69 | $8,467.47 | $0.00 |
| 9-May-18 | 1697 | 4897 | $160,193.32 | $160,191.95 | $589.53 | $146.97 | $5,908.45 | $8,336.82 | $0.00 |
| 10-May-18 | 2167 | 5520 | $176,127.33 | $176,125.01 | $1,031.37 | $289.29 | $8,939.56 | $9,754.11 | $0.00 |
| 11-May-18 | 1718 | 4743 | $164,111.99 | $164,110.51 | $276.41 | $156.32 | $5,655.63 | $7,808.69 | $0.00 |
| 12-May-18 | 1292 | 3685 | $110,438.51 | $110,437.33 | $528.12 | $101.12 | $3,747.29 | $8,429.68 | $0.00 |
| 13-May-18 | 1253 | 3898 | $118,579.40 | $118,578.27 | $239.36 | $115.90 | $4,021.02 | $10,785.97 | $0.00 |
| 14-May-18 | 1420 | 4091 | $140,048.07 | $140,046.82 | $822.57 | $166.52 | $4,811.91 | $6,751.45 | $0.00 |
| 15-May-18 | 1691 | 4584 | $147,659.97 | $147,658.64 | $1,693.77 | $150.84 | $5,580.67 | $7,390.51 | $0.00 |
| 16-May-18 | 1613 | 4539 | $152,120.00 | $152,118.50 | $574.16 | $149.85 | $5,297.09 | $7,937.83 | $0.00 |
| 17-May-18 | 1757 | 4934 | $161,220.03 | $161,218.61 | $1,169.14 | $267.22 | $6,119.77 | $7,635.28 | $0.00 |
| 18-May-18 | 1604 | 4499 | $144,005.31 | $144,003.72 | $1,258.65 | $155.32 | $5,618.82 | $7,268.95 | $0.00 |
| 19-May-18 | 1316 | 4001 | $116,882.47 | $116,881.00 | $4.95 | $102.48 | $4,047.81 | $8,346.28 | $0.00 |
| 20-May-18 | 1341 | 4056 | $121,276.62 | $121,275.33 | $495.20 | $108.31 | $4,583.19 | $9,192.31 | $0.00 |
| 21-May-18 | 1559 | 4753 | $148,062.00 | $148,060.85 | $1,106.38 | $192.95 | $5,555.07 | $7,350.33 | $0.00 |
| 22-May-18 | 1808 | 5744 | $183,282.37 | $183,280.97 | $239.90 | $211.76 | $5,597.36 | $9,616.85 | $0.00 |
| 23-May-18 | 1770 | 5517 | $175,526.13 | $175,524.63 | $732.28 | $150.64 | $6,068.75 | $8,276.75 | $0.00 |
| 24-May-18 | 1783 | 5187 | $162,852.63 | $162,851.14 | $244.73 | $111.06 | $5,209.08 | $8,493.37 | $0.00 |
| 25-May-18 | 1885 | 5234 | $165,096.62 | $165,094.78 | $672.80 | $78.16 | $3,750.66 | $8,151.68 | $0.00 |
| 26-May-18 | 1546 | 4156 | $137,853.33 | $137,851.60 | $1,359.90 | $95.24 | $2,748.37 | $8,593.43 | $0.00 |
| 27-May-18 | 1614 | 4657 | $158,447.04 | $158,445.16 | $1,697.30 | $100.04 | $2,952.23 | $8,410.93 | $0.00 |
| 28-May-18 | 2020 | 6479 | $223,823.92 | $223,822.10 | $1,130.10 | $83.97 | $3,762.30 | $10,324.77 | $0.00 |
| 29-May-18 | 1872 | 5283 | $179,986.42 | $179,984.67 | $513.80 | $145.04 | $3,966.32 | $8,241.85 | $0.00 |
| 30-May-18 | 1811 | 5046 | $159,565.06 | $159,563.08 | $774.57 | $95.88 | $3,394.58 | $7,620.64 | $0.00 |
| 31-May-18 | 1914 | 5142 | $165,283.30 | $165,281.39 | $977.53 | $134.88 | $3,522.04 | $8,229.37 | $0.00 |

FSSTX-086589

027

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 1-Jun-18 | 2116 | 5518 | $172,874.74 | $173,744.40 | $1,776.29 | $122.91 | $3,371.16 | $10,159.58 | $871.82 |
|---|---|---|---|---|---|---|---|---|---|
| 2-Jun-18 | 1511 | 3735 | $116,780.10 | $116,778.40 | $420.00 | $85.85 | $2,482.81 | $7,934.78 | $0.00 |
| 3-Jun-18 | 1455 | 4013 | $127,121.95 | $127,120.40 | $462.07 | $139.00 | $3,173.35 | $7,582.44 | $0.00 |
| 4-Jun-18 | 1623 | 4170 | $132,989.87 | $132,988.15 | $321.59 | $87.95 | $3,049.01 | $6,703.93 | $0.00 |
| 5-Jun-18 | 1556 | 3955 | $126,910.03 | $126,908.35 | $322.07 | $161.51 | $2,927.74 | $6,741.68 | $0.00 |
| 6-Jun-18 | 1555 | 4062 | $126,663.28 | $126,661.53 | $389.72 | $136.04 | $3,432.82 | $7,242.90 | $0.00 |
| 7-Jun-18 | 1816 | 4992 | $154,269.35 | $154,267.76 | $264.43 | $112.49 | $3,176.49 | $6,902.81 | $0.00 |
| 8-Jun-18 | 1928 | 5158 | $156,344.83 | $156,343.35 | $791.76 | $104.46 | $3,605.93 | $7,102.18 | $0.00 |
| 9-Jun-18 | 1477 | 4020 | $116,558.29 | $116,557.10 | $697.41 | $123.19 | $2,645.04 | $5,980.22 | $0.00 |
| 10-Jun-18 | 1576 | 4543 | $135,713.65 | $135,712.38 | $748.66 | $116.84 | $3,420.19 | $6,349.97 | $0.00 |
| 11-Jun-18 | 1706 | 4859 | $140,978.04 | $140,976.66 | $336.70 | $82.58 | $2,629.51 | $6,725.61 | $0.00 |
| 12-Jun-18 | 1855 | 5032 | $146,425.97 | $146,424.79 | $226.50 | $157.88 | $3,466.29 | $6,646.43 | $0.00 |
| 13-Jun-18 | 1721 | 4573 | $136,535.95 | $136,534.71 | $1,940.01 | $111.63 | $2,770.64 | $5,986.55 | $0.00 |
| 14-Jun-18 | 1922 | 5545 | $165,192.84 | $165,218.66 | $532.93 | $122.69 | $3,651.88 | $6,702.59 | $27.27 |
| 15-Jun-18 | 2251 | 6534 | $194,026.54 | $194,024.84 | $1,345.07 | $205.30 | $3,731.10 | $8,136.63 | $0.00 |
| 16-Jun-18 | 1506 | 4250 | $122,948.23 | $122,946.56 | $855.40 | $86.83 | $2,679.54 | $5,616.08 | $0.00 |
| 17-Jun-18 | 1535 | 4243 | $122,124.18 | $122,122.43 | $780.67 | $111.04 | $2,847.86 | $5,143.38 | $0.00 |
| 18-Jun-18 | 2179 | 6646 | $197,081.14 | $197,079.40 | $1,301.78 | $133.29 | $4,482.67 | $8,259.73 | $0.00 |
| 19-Jun-18 | 2227 | 6638 | $198,261.59 | $198,259.84 | $1,131.36 | $103.92 | $3,920.63 | $8,745.34 | $0.00 |
| 20-Jun-18 | 1155 | 2862 | $97,002.19 | $97,000.84 | $752.63 | $147.45 | $3,237.40 | $4,384.20 | $0.00 |
| 21-Jun-18 | 923 | 2039 | $75,401.41 | $75,400.63 | $465.41 | $120.98 | $3,063.50 | $3,954.37 | $0.00 |
| 22-Jun-18 | 1108 | 2808 | $92,621.62 | $92,620.77 | $773.33 | $198.06 | $3,682.92 | $4,719.84 | $0.00 |
| 23-Jun-18 | 991 | 2601 | $78,154.68 | $78,154.05 | $822.06 | $178.10 | $3,750.69 | $4,650.40 | $0.00 |
| 24-Jun-18 | 1004 | 2745 | $86,065.02 | $86,064.22 | $360.20 | $161.39 | $3,842.07 | $5,328.05 | $0.00 |
| 25-Jun-18 | 1017 | 2633 | $86,330.11 | $86,329.46 | $63.14 | $129.10 | $4,030.82 | $4,817.56 | $0.00 |
| 26-Jun-18 | 1044 | 2811 | $86,887.90 | $86,887.16 | $330.29 | $119.10 | $4,173.13 | $4,955.85 | $0.00 |
| 27-Jun-18 | 1141 | 2998 | $97,042.71 | $97,042.09 | $338.73 | $279.77 | $3,814.05 | $5,152.38 | $0.00 |
| 28-Jun-18 | 1172 | 3013 | $97,485.93 | $97,485.19 | $232.77 | $249.27 | $4,836.01 | $4,738.41 | $0.00 |
| 29-Jun-18 | 1722 | 4738 | $138,478.92 | $138,478.01 | $1,040.75 | $342.93 | $4,477.53 | $6,408.27 | $0.00 |
| 30-Jun-18 | 1484 | 4138 | $112,801.30 | $112,800.11 | $492.71 | $192.82 | $2,746.49 | $5,669.93 | $0.00 |
| 1-Jul-18 | 1511 | 4097 | $113,571.41 | $113,570.36 | $915.51 | $213.35 | $2,199.31 | $7,112.61 | $0.00 |
| 2-Jul-18 | 1663 | 4558 | $128,268.66 | $128,267.33 | $658.29 | $190.38 | $3,150.33 | $7,371.61 | $0.00 |
| 3-Jul-18 | 1867 | 5567 | $152,308.62 | $152,307.63 | $1,234.04 | $258.04 | $3,119.75 | $7,496.58 | $0.00 |
| 4-Jul-18 | 2038 | 6141 | $168,746.87 | $168,745.73 | $1,521.02 | $329.39 | $3,969.90 | $9,506.81 | $0.00 |
| 5-Jul-18 | 1711 | 4841 | $132,535.67 | $132,534.76 | $750.18 | $204.53 | $2,696.87 | $7,041.43 | $0.00 |

FSSTX-086589

028

CONFIDENTIAL – ATTORNEY'S EYES ONLY

| 6-Jul-18 | 1797 | 4837 | $138,913.63 | $138,912.54 | $273.31 | $164.39 | $2,951.16 | $7,842.83 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| 7-Jul-18 | 1355 | 3670 | $102,592.64 | $102,591.55 | $1,140.70 | $128.62 | $2,394.60 | $6,475.54 | $0.00 |
| 8-Jul-18 | 1303 | 3588 | $103,260.11 | $103,259.25 | $1,380.48 | $178.01 | $1,978.95 | $6,060.58 | $0.00 |
| 9-Jul-18 | 1617 | 4547 | $127,122.44 | $127,121.30 | $850.88 | $200.14 | $2,683.45 | $6,320.20 | $0.00 |
| 10-Jul-18 | 1852 | 5440 | $156,139.34 | $156,138.02 | $1,171.90 | $217.24 | $3,209.75 | $7,700.35 | $0.00 |
| 11-Jul-18 | 1712 | 4764 | $134,155.60 | $134,154.67 | $690.69 | $140.90 | $2,734.01 | $5,978.69 | $0.00 |
| 12-Jul-18 | 1594 | 4453 | $118,398.69 | $118,397.67 | $344.86 | $198.84 | $2,522.33 | $7,317.18 | $0.00 |
| 13-Jul-18 | 1504 | 3808 | $105,687.99 | $105,687.07 | $449.82 | $224.54 | $2,436.55 | $5,713.09 | $0.00 |
| 14-Jul-18 | 1270 | 3162 | $91,107.08 | $91,106.09 | $812.40 | $135.78 | $2,262.33 | $6,144.73 | $0.00 |
| 15-Jul-18 | 1196 | 3145 | $91,886.34 | $91,885.43 | $567.84 | $177.27 | $2,306.49 | $5,695.34 | $0.00 |
| 16-Jul-18 | 1524 | 4270 | $118,249.93 | $118,249.07 | $472.53 | $180.65 | $2,887.52 | $6,498.00 | $0.00 |
| 17-Jul-18 | 1668 | 4541 | $129,781.76 | $129,780.86 | $379.71 | $196.87 | $3,576.55 | $6,457.24 | $0.00 |
| 18-Jul-18 | 1716 | 4658 | $133,275.90 | $133,274.95 | $209.33 | $139.60 | $3,214.36 | $6,112.70 | $0.00 |
| 19-Jul-18 | 1597 | 4592 | $133,198.97 | $133,197.99 | $919.39 | $136.67 | $3,265.61 | $6,345.75 | $0.00 |
| 20-Jul-18 | 1623 | 4459 | $126,140.64 | $126,139.83 | $1,544.00 | $88.82 | $3,345.15 | $6,044.53 | $0.00 |
| 21-Jul-18 | 1143 | 3050 | $86,512.74 | $86,512.04 | $686.59 | $83.61 | $2,124.83 | $3,728.62 | $0.00 |
| 22-Jul-18 | 1170 | 3204 | $90,014.11 | $90,013.32 | $600.40 | $92.65 | $2,301.15 | $4,362.93 | $0.00 |
| 23-Jul-18 | 1575 | 4846 | $140,102.12 | $140,101.23 | $2,109.32 | $119.13 | $3,213.84 | $8,659.20 | $0.00 |
| 24-Jul-18 | 1737 | 5140 | $147,148.49 | $147,147.57 | $674.07 | $156.82 | $3,859.60 | $6,790.65 | $0.00 |
| 25-Jul-18 | 1843 | 5107 | $151,748.41 | $151,747.32 | $1,081.29 | $207.48 | $3,894.50 | $7,288.44 | $0.00 |
| 26-Jul-18 | 1592 | 4245 | $125,147.58 | $125,146.45 | $916.73 | $90.11 | $3,246.45 | $6,163.49 | $0.00 |
| 27-Jul-18 | 1519 | 4064 | $116,612.39 | $116,611.55 | $451.65 | $133.95 | $3,581.04 | $5,497.61 | $0.00 |
| 28-Jul-18 | 1132 | 3091 | $88,961.69 | $88,960.83 | $546.89 | $63.51 | $5,544.53 | $5,321.04 | $0.00 |
| 29-Jul-18 | 1153 | 3022 | $94,078.03 | $94,077.07 | $890.02 | $99.35 | $5,276.28 | $4,598.02 | $0.00 |
| 30-Jul-18 | 1228 | 3079 | $100,754.69 | $100,753.73 | $462.40 | $194.76 | $5,885.87 | $5,094.43 | $0.00 |
| 31-Jul-18 | 1361 | 3303 | $113,963.70 | $113,962.33 | $2,128.76 | $150.07 | $6,427.57 | $6,394.35 | $0.00 |
| 1-Aug-18 | 1437 | 3689 | $127,649.90 | $127,648.45 | $1,510.41 | $180.42 | $5,597.02 | $7,305.11 | $0.00 |
| 2-Aug-18 | 1278 | 3304 | $111,295.06 | $111,294.00 | $371.93 | $229.62 | $4,681.32 | $6,138.96 | $0.00 |
| 3-Aug-18 | 1317 | 3296 | $111,496.17 | $111,494.89 | $505.86 | $172.71 | $4,655.95 | $6,077.11 | $0.00 |
| 4-Aug-18 | 934 | 2121 | $73,683.25 | $73,682.32 | $445.28 | $135.74 | $3,489.08 | $4,263.02 | $0.00 |
| 5-Aug-18 | 965 | 2386 | $83,996.37 | $83,995.41 | $673.32 | $122.62 | $3,575.75 | $4,879.47 | $0.00 |
| 6-Aug-18 | 2226 | 5693 | $187,786.72 | $187,785.34 | $2,137.83 | $340.90 | $8,225.11 | $7,540.01 | $0.00 |
| 7-Aug-18 | 2395 | 6612 | $210,378.49 | $210,377.25 | $1,243.31 | $341.29 | $9,814.02 | $7,534.20 | $0.00 |
| 8-Aug-18 | 2431 | 6632 | $200,973.58 | $200,972.30 | $526.01 | $394.27 | $7,102.17 | $7,305.05 | $0.00 |
| 9-Aug-18 | 2153 | 5958 | $175,251.99 | $175,250.97 | $338.59 | $253.47 | $4,488.16 | $6,610.96 | $0.00 |

FSSTX-086589

029

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| 10-Aug-18 | 1946 | 5341 | $151,965.39 | $151,964.21 | $258.96 | $255.89 | $2,967.89 | $6,502.69 | $0.00 |
|---|---|---|---|---|---|---|---|---|---|
| 11-Aug-18 | 1462 | 3784 | $104,638.10 | $104,637.03 | $693.05 | $163.33 | $2,734.47 | $4,996.19 | $0.00 |
| 12-Aug-18 | 1390 | 3726 | $113,523.45 | $113,522.45 | $459.93 | $215.33 | $2,658.77 | $4,903.35 | $0.00 |
| 13-Aug-18 | 2071 | 6008 | $175,130.84 | $175,594.96 | $547.74 | $261.34 | $4,296.85 | $7,000.96 | $465.24 |
| 14-Aug-18 | 2603 | 7836 | $233,948.82 | $233,947.68 | $1,272.28 | $393.87 | $5,035.32 | $8,050.84 | $0.00 |
| 15-Aug-18 | 2176 | 6279 | $192,112.29 | $192,111.16 | $1,548.75 | $220.50 | $4,920.68 | $6,780.19 | $0.00 |
| 16-Aug-18 | 1949 | 5526 | $171,910.40 | $171,909.27 | $1,007.19 | $219.53 | $3,840.81 | $6,609.11 | $0.00 |
| 17-Aug-18 | 1858 | 5220 | $145,198.12 | $145,196.88 | $1,065.12 | $194.05 | $3,065.99 | $9,190.36 | $0.00 |
| 18-Aug-18 | 1402 | 3883 | $113,499.16 | $113,498.16 | $1,360.72 | $138.27 | $3,132.21 | $6,458.75 | $0.00 |
| 19-Aug-18 | 1387 | 3932 | $118,962.93 | $118,962.04 | $654.70 | $198.43 | $2,675.96 | $4,715.51 | $0.00 |
| 20-Aug-18 | 2245 | 6960 | $203,568.80 | $203,567.85 | $1,667.26 | $240.98 | $4,909.70 | $7,836.74 | $0.00 |
| 21-Aug-18 | 2164 | 6591 | $179,380.87 | $179,379.70 | $2,418.32 | $210.30 | $4,222.04 | $8,673.76 | $0.00 |
| 22-Aug-18 | 1846 | 5059 | $149,063.45 | $149,062.21 | $1,399.57 | $201.94 | $6,032.93 | $7,457.45 | $0.00 |
| 23-Aug-18 | 1650 | 4516 | $141,377.27 | $141,375.85 | $1,563.23 | $214.68 | $7,285.46 | $6,659.23 | $0.00 |
| 24-Aug-18 | 1481 | 3768 | $116,863.66 | $116,862.43 | $709.89 | $154.34 | $6,166.03 | $5,423.74 | $0.00 |
| 25-Aug-18 | 1014 | 2532 | $81,229.07 | $81,227.96 | $1,017.84 | $82.51 | $4,155.90 | $4,649.97 | $0.00 |
| 26-Aug-18 | 1132 | 3053 | $100,589.75 | $100,588.78 | $928.06 | $79.94 | $4,742.86 | $4,813.93 | $0.00 |
| 27-Aug-18 | 1536 | 4401 | $132,952.51 | $132,951.28 | $1,385.33 | $119.22 | $5,571.61 | $6,086.44 | $0.00 |
| 28-Aug-18 | 1762 | 5108 | $157,734.44 | $157,732.95 | $775.12 | $166.24 | $6,304.44 | $7,812.67 | $0.00 |
| 29-Aug-18 | 1785 | 5149 | $159,441.14 | $159,439.66 | $390.94 | $254.89 | $5,953.05 | $7,725.39 | $0.00 |
| 30-Aug-18 | 1723 | 4930 | $153,023.07 | $153,021.67 | $220.28 | $102.86 | $5,111.63 | $7,624.56 | $0.00 |
| 31-Aug-18 | 2127 | 6216 | $187,319.37 | $187,317.74 | $1,229.03 | $214.32 | $7,556.64 | $8,467.04 | $0.00 |
| 1-Sep-18 | 1403 | 3995 | $120,220.99 | $120,219.74 | $307.48 | $167.45 | $5,255.51 | $6,973.34 | $0.00 |
| 2-Sep-18 | 1264 | 3621 | $113,437.39 | $113,436.15 | $533.51 | $75.67 | $5,110.40 | $6,425.30 | $0.00 |
| 3-Sep-18 | 1510 | 4362 | $144,457.93 | $144,652.89 | $860.34 | $160.36 | $5,839.08 | $6,390.33 | $196.17 |
| 4-Sep-18 | 1639 | 4766 | $158,872.28 | $158,871.04 | $2,646.48 | $307.10 | $6,023.71 | $7,213.02 | $0.00 |
| 5-Sep-18 | 1746 | 5314 | $171,441.44 | $171,440.15 | $3,893.00 | $139.85 | $6,701.30 | $8,326.73 | $0.00 |
| 6-Sep-18 | 1699 | 4950 | $152,159.97 | $152,158.57 | $2,128.07 | $282.82 | $6,941.72 | $6,229.11 | $0.00 |
| 7-Sep-18 | 1833 | 4994 | $153,464.80 | $153,463.22 | $1,413.65 | $196.14 | $6,591.77 | $6,539.01 | $0.00 |
| 8-Sep-18 | 1345 | 3962 | $128,383.65 | $128,382.50 | $817.80 | $189.93 | $4,496.65 | $5,469.97 | $0.00 |
| 9-Sep-18 | 1402 | 4232 | $129,988.04 | $129,986.86 | $432.24 | $174.31 | $4,631.68 | $6,291.85 | $0.00 |
| 10-Sep-18 | 2192 | 6780 | $228,888.50 | $228,887.10 | $2,167.15 | $165.53 | $7,562.30 | $8,991.30 | $0.00 |
| 11-Sep-18 | 2384 | 7457 | $254,746.10 | $254,744.86 | $2,042.81 | $211.57 | $7,968.42 | $10,004.48 | $0.00 |
| 12-Sep-18 | 2199 | 6358 | $222,389.98 | $222,388.50 | $1,096.91 | $252.13 | $7,604.11 | $8,465.40 | $0.00 |
| 13-Sep-18 | 1836 | 5399 | $190,307.07 | $190,305.68 | $851.16 | $167.68 | $7,927.75 | $7,400.96 | $0.00 |

FSSTX-086589

030

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 14-Sep-18 | 1798 | 4850 | $168,651.07 | $168,649.45 | $1,458.48 | $185.37 | $6,792.41 | $7,133.42 | $0.00 |
| 15-Sep-18 | 1260 | 3479 | $123,108.90 | $123,107.64 | $1,180.98 | $153.26 | $5,735.00 | $5,262.29 | $0.00 |
| 16-Sep-18 | 1245 | 3535 | $120,106.92 | $120,133.18 | $1,110.99 | $169.74 | $4,363.05 | $5,137.32 | $27.55 |
| 17-Sep-18 | 1435 | 4149 | $143,714.58 | $143,713.33 | $382.22 | $142.28 | $5,393.36 | $6,365.56 | $0.00 |
| 18-Sep-18 | 1521 | 4441 | $153,670.99 | $153,669.72 | $1,410.67 | $128.33 | $5,927.67 | $6,029.38 | $0.00 |
| 19-Sep-18 | 1518 | 4297 | $150,826.62 | $150,825.22 | $999.76 | $139.68 | $6,247.23 | $5,741.05 | $0.00 |
| 20-Sep-18 | 1540 | 4589 | $154,849.81 | $154,848.43 | $1,176.39 | $188.85 | $6,094.60 | $6,075.25 | $0.00 |
| 21-Sep-18 | 2425 | 7541 | $263,373.00 | $263,371.55 | $8,145.11 | $255.28 | $8,668.99 | $8,995.97 | $0.00 |
| 22-Sep-18 | 1810 | 5576 | $189,734.17 | $189,732.74 | $2,810.98 | $275.79 | $6,971.69 | $6,947.83 | $0.00 |
| 23-Sep-18 | 1761 | 5356 | $181,281.53 | $181,280.19 | $382.00 | $155.89 | $6,167.63 | $7,297.32 | $0.00 |
| 24-Sep-18 | 1745 | 5625 | $193,485.54 | $193,484.10 | $7,456.02 | $175.52 | $7,117.07 | $7,039.47 | $0.00 |
| 25-Sep-18 | 1808 | 5629 | $184,684.88 | $184,683.87 | $884.57 | $193.48 | $7,026.97 | $7,279.57 | $0.00 |
| 26-Sep-18 | 1688 | 5150 | $162,927.74 | $162,926.68 | $589.91 | $214.52 | $6,341.88 | $6,571.39 | $0.00 |
| 27-Sep-18 | 1444 | 4261 | $133,161.55 | $133,160.61 | $109.48 | $177.16 | $5,395.66 | $5,704.85 | $0.00 |
| 28-Sep-18 | 1815 | 5425 | $170,432.87 | $170,431.85 | $636.73 | $194.49 | $6,448.04 | $7,239.95 | $0.00 |
| 29-Sep-18 | 1377 | 4061 | $129,854.37 | $129,803.58 | $1,480.82 | $122.86 | $4,781.11 | $5,545.13 | $0.00 |
| 30-Sep-18 | 1491 | 4805 | $162,725.34 | $162,724.38 | $1,202.16 | $173.39 | $6,487.78 | $6,678.74 | $0.00 |
| 1-Oct-18 | 1952 | 6126 | $194,807.47 | $194,663.23 | $266.66 | $266.66 | $7,363.21 | $9,446.29 | $0.00 |
| 2-Oct-18 | 1845 | 5713 | $179,952.47 | $179,951.65 | $2,301.82 | $157.24 | $6,609.19 | $9,104.91 | $0.00 |
| 3-Oct-18 | 1622 | 4885 | $156,320.23 | $156,319.37 | $375.65 | $159.06 | $6,460.17 | $7,397.73 | $0.00 |
| 4-Oct-18 | 1531 | 4711 | $143,665.26 | $143,664.38 | $535.41 | $179.81 | $5,060.48 | $7,357.32 | $0.00 |
| 5-Oct-18 | 1454 | 4240 | $130,242.93 | $130,242.01 | $1,957.00 | $168.89 | $5,435.47 | $7,324.38 | $0.00 |
| 6-Oct-18 | 1127 | 2965 | $95,539.86 | $95,538.96 | $572.43 | $123.98 | $4,457.74 | $6,074.20 | $0.00 |
| 7-Oct-18 | 1147 | 3063 | $97,898.81 | $97,897.90 | $1,299.82 | $202.32 | $3,961.77 | $6,078.85 | $0.00 |
| 8-Oct-18 | 2569 | 11882 | $292,293.02 | $292,293.02 | $589.12 | $188.51 | $7,386.39 | $13,347.40 | $0.00 |
| 9-Oct-18 | 2919 | 13189 | $315,371.91 | $315,372.15 | $4,330.15 | $320.59 | $6,249.66 | $12,301.32 | $0.00 |
| 10-Oct-18 | 2761 | 11885 | $282,316.83 | $282,317.04 | $1,397.45 | $307.92 | $5,356.19 | $12,092.26 | $0.00 |
| 11-Oct-18 | 2434 | 10795 | $276,118.64 | $276,118.84 | $4,151.46 | $283.06 | $5,623.60 | $10,263.34 | $0.00 |
| 12-Oct-18 | 2437 | 10291 | $245,074.61 | $245,074.79 | $991.83 | $273.65 | $4,024.54 | $10,475.69 | $0.00 |
| 13-Oct-18 | 1849 | 7723 | $193,576.10 | $193,576.33 | $1,642.12 | $205.76 | $3,692.91 | $7,758.02 | $0.00 |
| 14-Oct-18 | 1873 | 7986 | $198,847.99 | $198,848.33 | $471.97 | $278.38 | $3,905.64 | $8,832.17 | $0.00 |
| 15-Oct-18 | 2244 | 9576 | $243,044.60 | $243,044.84 | $701.18 | $366.81 | $5,094.48 | $9,860.24 | $0.00 |
| 16-Oct-18 | 2071 | 8467 | $226,837.92 | $226,838.28 | $1,798.32 | $245.44 | $4,744.38 | $8,965.05 | $0.00 |
| 17-Oct-18 | 1987 | 7790 | $199,891.79 | $199,891.99 | $1,557.15 | $247.20 | $4,378.66 | $8,043.31 | $0.00 |
| 18-Oct-18 | 1985 | 7472 | $183,967.38 | $183,967.67 | $1,059.00 | $370.82 | $3,735.75 | $7,703.42 | $0.00 |

FSSTX-086589

031

CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 19-Oct-18 | 2049 | 8291 | $211,516.58 | $211,516.76 | $1,387.27 | $252.96 | $4,085.79 | $7,892.79 | $0.00 |
| 20-Oct-18 | 1562 | 5741 | $138,519.70 | $138,519.93 | $1,783.06 | $137.67 | $2,706.17 | $6,061.91 | $0.00 |
| 21-Oct-18 | 1512 | 5986 | $145,891.16 | $145,891.14 | $130.35 | $324.62 | $3,592.93 | $6,433.63 | $0.00 |
| 22-Oct-18 | 1848 | 6806 | $180,688.10 | $180,688.30 | $952.12 | $213.07 | $3,693.48 | $7,033.22 | $0.00 |
| 23-Oct-18 | 1955 | 7532 | $195,581.68 | $195,581.81 | $1,414.29 | $264.76 | $4,236.39 | $7,667.40 | $0.00 |
| 24-Oct-18 | 2002 | 7679 | $193,563.29 | $193,563.35 | $377.34 | $201.50 | $3,756.97 | $8,021.86 | $0.00 |
| 25-Oct-18 | 1838 | 6856 | $181,397.83 | $181,398.00 | $534.20 | $177.48 | $4,454.01 | $6,921.02 | $0.00 |
| 26-Oct-18 | 1802 | 6672 | $170,980.23 | $170,980.37 | $412.43 | $142.17 | $3,787.03 | $6,355.85 | $0.00 |
| 27-Oct-18 | 1116 | 5245 | $135,431.26 | $135,431.26 | $1,204.79 | $180.59 | $2,737.54 | $3,508.30 | $0.00 |
| 28-Oct-18 | 1358 | 6162 | $164,770.60 | $164,770.60 | $1,084.73 | $114.19 | $2,316.75 | $4,310.25 | $0.00 |
| 29-Oct-18 | 1735 | 7912 | $205,107.61 | $205,107.57 | $2,086.20 | $216.99 | $3,663.95 | $8,719.91 | $0.00 |
| 30-Oct-18 | 3451 | 15130 | $376,315.57 | $376,315.70 | $3,728.25 | $538.78 | $5,969.67 | $17,326.68 | $0.00 |
| 31-Oct-18 | 3418 | 11593 | $295,127.84 | $295,128.32 | $3,335.63 | $265.01 | $7,538.75 | $15,413.48 | $0.00 |
| 1-Nov-18 | 1842 | 4565 | $132,141.78 | $132,142.28 | $2,025.61 | $151.36 | $3,258.39 | $7,358.66 | $0.00 |
| 2-Nov-18 | 1315 | 2842 | $105,783.55 | $105,782.68 | $1,577.27 | $203.54 | $2,320.06 | $6,369.25 | $0.00 |
| 3-Nov-18 | 914 | 2002 | $73,816.55 | $73,815.75 | $1,172.12 | $53.13 | $2,099.65 | $4,548.96 | $0.00 |
| 4-Nov-18 | 923 | 1936 | $72,984.77 | $72,983.95 | $644.58 | $159.25 | $1,813.86 | $4,062.93 | $0.00 |
| 5-Nov-18 | 1435 | 3988 | $122,740.48 | $122,739.40 | $1,906.01 | $146.43 | $2,324.15 | $6,451.53 | $0.00 |
| 6-Nov-18 | 1658 | 4659 | $133,438.02 | $133,436.72 | $1,084.55 | $334.32 | $3,022.76 | $6,950.85 | $0.00 |
| 7-Nov-18 | 1269 | 3447 | $100,349.11 | $100,347.97 | $766.77 | $169.54 | $2,472.37 | $4,948.28 | $0.00 |
| 8-Nov-18 | 1380 | 3773 | $112,773.65 | $112,772.37 | $888.85 | $180.80 | $2,336.59 | $5,846.68 | $0.00 |
| 9-Nov-18 | 1413 | 3744 | $108,212.23 | $108,210.93 | $297.29 | $155.14 | $2,363.14 | $5,985.44 | $0.00 |
| 10-Nov-18 | 1082 | 3029 | $84,085.51 | $84,084.61 | $628.55 | $123.64 | $1,702.24 | $4,829.58 | $0.00 |
| 11-Nov-18 | 1037 | 2782 | $75,349.10 | $75,347.98 | $670.29 | $89.82 | $1,567.73 | $5,052.31 | $0.00 |
| 12-Nov-18 | 1325 | 3552 | $106,336.80 | $106,335.59 | $357.63 | $249.20 | $1,876.25 | $6,286.24 | $0.00 |
| 13-Nov-18 | 1424 | 3881 | $123,286.00 | $123,284.68 | $876.02 | $407.70 | $2,126.01 | $5,971.47 | $0.00 |
| 14-Nov-18 | 1428 | 3973 | $117,380.80 | $117,379.34 | $602.71 | $342.69 | $2,803.49 | $5,917.17 | $0.00 |
| 15-Nov-18 | 1570 | 4205 | $151,385.81 | $151,384.48 | $833.56 | $491.55 | $2,100.65 | $6,498.07 | $0.00 |
| 16-Nov-18 | 1602 | 4264 | $171,548.50 | $171,547.44 | $2,135.50 | $645.01 | $2,384.35 | $7,077.93 | $0.00 |
| 17-Nov-18 | 1184 | 3084 | $121,232.81 | $121,231.70 | $1,033.99 | $408.12 | $1,948.16 | $5,278.86 | $0.00 |
| 18-Nov-18 | 1369 | 3761 | $138,981.21 | $138,980.20 | $506.69 | $586.21 | $2,118.27 | $5,509.40 | $0.00 |
| 19-Nov-18 | 1679 | 5063 | $164,975.25 | $164,975.47 | $1,295.51 | $500.06 | $2,894.51 | $6,824.21 | $0.00 |
| 20-Nov-18 | 1597 | 4473 | $149,112.76 | $149,113.31 | $886.68 | $482.14 | $2,974.09 | $7,044.61 | $0.00 |
| 21-Nov-18 | 1510 | 4567 | $146,119.84 | $146,120.25 | $649.76 | $405.83 | $2,597.43 | $6,330.38 | $0.00 |
| 22-Nov-18 | 1262 | 3738 | $113,818.91 | $113,819.18 | $567.64 | $287.37 | $2,378.01 | $4,989.76 | $0.00 |

FSSTX-086589

032

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Date | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 23-Nov-18 | 2129 | 7083 | $227,344.72 | $227,345.08 | $632.59 | $494.10 | $3,404.26 | $9,383.83 | $0.00 |
| 24-Nov-18 | 1422 | 4353 | $130,222.65 | $130,223.06 | $532.23 | $250.27 | $2,448.70 | $6,102.74 | $0.00 |
| 25-Nov-18 | 1526 | 5234 | $161,331.26 | $161,331.60 | $569.53 | $295.35 | $2,693.39 | $6,512.72 | $0.00 |
| 26-Nov-18 | 2234 | 7811 | $239,189.53 | $239,189.78 | $1,661.60 | $571.14 | $3,629.80 | $9,900.12 | $0.00 |
| 27-Nov-18 | 1518 | 4861 | $155,664.83 | $155,665.09 | $827.75 | $428.42 | $2,609.11 | $6,238.58 | $0.00 |
| 28-Nov-18 | 1626 | 5077 | $163,646.62 | $163,646.82 | $1,296.60 | $501.00 | $2,917.30 | $6,035.74 | $0.00 |
| 29-Nov-18 | 1756 | 5278 | $164,536.74 | $164,537.06 | $950.68 | $444.22 | $2,531.64 | $7,220.41 | $0.00 |
| 30-Nov-18 | 2413 | 6508 | $214,405.06 | $214,405.79 | $1,201.91 | $614.43 | $3,752.62 | $9,628.31 | $0.00 |
| 1-Dec-18 | 1933 | 5442 | $181,029.01 | $181,029.53 | $960.11 | $427.68 | $3,403.84 | $8,143.09 | $0.00 |
| 2-Dec-18 | 1779 | 5715 | $199,439.51 | $199,439.96 | $2,670.23 | $806.27 | $2,852.43 | $9,318.35 | $0.00 |
| 3-Dec-18 | 2909 | 9780 | $217,478.44 | $217,478.97 | $1,608.06 | $766.90 | $3,453.27 | $59,298.37 | $0.00 |
| 4-Dec-18 | 2779 | 9087 | $176,960.38 | $176,961.08 | $920.45 | $395.61 | $4,139.91 | $62,607.25 | $0.00 |
| 5-Dec-18 | 3122 | 10101 | $194,981.13 | $194,981.69 | $802.67 | $451.99 | $4,614.27 | $68,286.68 | $0.00 |
| 6-Dec-18 | 2517 | 8461 | $179,273.01 | $179,298.61 | $1,143.34 | $564.61 | $3,214.93 | $52,603.40 | $0.00 |
| 7-Dec-18 | 2596 | 8804 | $175,331.73 | $175,332.35 | $2,066.77 | $477.02 | $3,948.62 | $53,829.09 | $0.00 |
| 8-Dec-18 | 2078 | 7332 | $144,053.62 | $144,054.12 | $745.20 | $314.31 | $3,684.06 | $40,762.57 | $0.00 |
| 9-Dec-18 | 1793 | 6272 | $129,280.15 | $129,280.51 | $526.61 | $219.76 | $3,120.35 | $34,359.42 | $0.00 |
| 10-Dec-18 | 2815 | 9659 | $191,499.96 | $191,500.71 | $929.07 | $354.03 | $3,915.64 | $56,059.92 | $0.00 |
| 11-Dec-18 | 2572 | 9083 | $192,209.82 | $192,210.49 | $1,281.31 | $406.66 | $3,772.54 | $52,767.22 | $0.00 |
| 12-Dec-18 | 2771 | 9005 | $183,245.16 | $183,245.87 | $895.98 | $401.69 | $3,667.19 | $60,150.37 | $0.00 |
| 13-Dec-18 | 3186 | 11839 | $202,507.94 | $202,508.70 | $542.19 | $451.11 | $3,760.37 | $70,845.30 | $0.00 |
| 14-Dec-18 | 3110 | 11974 | $221,778.96 | $221,779.47 | $949.81 | $448.29 | $4,771.53 | $68,963.97 | $0.00 |
| 15-Dec-18 | 2131 | 7960 | $155,021.75 | $155,022.26 | $496.98 | $307.89 | $3,498.20 | $45,226.08 | $0.00 |
| 16-Dec-18 | 1959 | 7519 | $151,421.93 | $151,422.44 | $236.87 | $354.61 | $2,797.55 | $41,005.62 | $0.00 |
| 17-Dec-18 | 2439 | 9437 | $183,531.10 | $183,531.53 | $750.19 | $414.97 | $3,889.42 | $15,791.97 | $0.00 |
| 18-Dec-18 | 2824 | 11659 | $233,898.70 | $233,899.25 | $2,746.80 | $537.14 | $4,512.83 | $8,666.09 | $0.00 |
| 19-Dec-18 | 3487 | 14794 | $290,480.20 | $290,480.67 | $2,587.28 | $777.89 | $5,955.40 | $11,197.27 | $0.00 |
| 20-Dec-18 | 2109 | 8217 | $164,227.41 | $164,227.80 | $443.90 | $305.01 | $3,812.00 | $6,106.31 | $0.00 |
| 21-Dec-18 | 2040 | 7522 | $143,443.95 | $143,444.41 | $889.90 | $228.95 | $3,303.72 | $6,764.26 | $0.00 |
| 22-Dec-18 | 1356 | 4918 | $105,068.12 | $105,068.45 | $814.53 | $118.55 | $2,808.58 | $4,498.62 | $0.00 |
| 23-Dec-18 | 1049 | 3531 | $90,787.33 | $90,787.28 | $497.76 | $265.93 | $1,716.02 | $4,256.34 | $0.00 |
| 24-Dec-18 | 1168 | 3996 | $92,000.20 | $92,000.05 | $663.18 | $244.19 | $1,882.20 | $12,754.84 | $0.00 |
| 25-Dec-18 | 995 | 3272 | $69,255.13 | $69,255.08 | $177.16 | $110.17 | $1,825.01 | $10,845.38 | $0.00 |
| 26-Dec-18 | 1401 | 5137 | $99,483.21 | $99,483.19 | $403.12 | $57.03 | $2,378.08 | $18,326.05 | $0.00 |
| 27-Dec-18 | 1591 | 6203 | $119,440.43 | $119,440.72 | $1,848.80 | $142.00 | $2,239.62 | $20,933.14 | $0.00 |

FSSTX-086589

033

## CONFIDENTIAL - ATTORNEY'S EYES ONLY

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 28-Dec-18 | 1862 | 7351 | $141,988.86 | $141,988.90 | $959.56 | $174.00 | $3,401.95 | $24,960.04 | $0.00 |
| 29-Dec-18 | 1624 | 5864 | $112,704.50 | $112,704.95 | $908.69 | $114.38 | $2,965.50 | $19,790.72 | $0.00 |
| 30-Dec-18 | 2040 | 6341 | $140,199.37 | $140,199.41 | $1,257.93 | $146.56 | $3,575.63 | $21,299.73 | $0.00 |
| 31-Dec-18 | 3419 | 14248 | $284,610.63 | $284,610.76 | $2,104.95 | $258.89 | $5,096.71 | $46,760.74 | $0.00 |
| Total | 1714054 | 4910167 | $165,230,014.62 | $165,221,923.87 | $580,552.61 | $267,021.69 | $4,858,826.51 | $7,589,805.16 | $6,163.12 |

FSSTX-086589

034

# Exhibit 7

## DEFENDANT, FREE SPEECH SYSTEMS, LLC'S, ANSWER TO INTERROGATORY REGARDING NET WORTH

**INTERROGATORY NO. 1:** Provide a statement of your net worth. The term "net worth" means the amount by which total assets (including income) exceed total liabilities. Assets shall include items such as cash on hand, cash in accounts, checking, savings, brokerage, securities, cryptocurrency, tradeable commodities, precious metals, vehicles, business equipment, real estate, personal items, and negotiable instruments. Liabilities shall include such items as loans, notes, accounts payable, credit card balances, and mortgages. The statement of net worth should include:

    a. All income and assets whatsoever kind and nature and wherever situated.

    b. A list of all assets transferred in any manner since April 16, 2018. Transfers in the routine course of business which resulted in an exchange of assets or services of substantially equivalent value need not be specifically disclosed.

**ANSWER:**

Defendant's current estimated net worth is based on the information in its 2020 balance sheet, which provides assets and liabilities as of December 31, 2020. Defendant is in the process of preparing its reconciliation and year-end balance sheet for 2021 and will further supplement this answer as necessary once that balance sheet for 2021 has been completed. Based on the latest available information from the December 31, 2020 balance sheet, Defendant's net worth is approximately negative $52,880,888.00, which is comprised of the following assets and liabilities (which are again as of December 31, 2020—bank account records for 2021 have been produced but are not included in the current assets and liabilities statement):

- Assets
  - Petty cash = $960.21
  - Bank accounts with cash of approximately $525,328.16
  - Inventory worth approximately $1,334,453.01
  - Pre-paid insurance of $19,847.64
  - Pre-paid software licenses of $120,042.71
  - Prepaid vendor deposits of $244,439.09
  - Pre-paid other of $14,394.78
  - Gross fixed assets of $1,731.877.57
  - Security deposits of $43,376.328
  - Intangible assets of $406,371.59

- Liabilities
  - Credit card liabilities of $388,732.93
  - Current short term liabilities of $198,740.41
  - Long term liabilities of $55,014,222.87 mainly comprised of a significant note payable to PQPR

4

o   Defendant also has current unknown potential liabilities arising out of current lawsuits

Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure.

STATE OF TEXAS                    §
                                  §
COUNTY OF TRAVIS                  §

On this day, Alex Jones, appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, he said he is authorized to execute this verification on behalf of Defendant, Free Speech Systems, LLC, and that he has read Defendant, Free Speech Systems, LLC's, Answer to Plaintiffs' Interrogatory Regarding Net Worth, and that the Answers on behalf of Free Speech Systems, LLC are true and correct to the best of his knowledge.

By: _____

Alex Jones, on behalf of
Free Speech Systems, LLC


SUBSCRIBED AND SWORN TO BEFORE ME on this the 7ᵗʰ day of December, 2021.

BRADLEY JORDAN REEVES
Notary Public, State of Texas
Comm. Expires 04-02-2024
Notary ID 132425142

_____
NOTARY PUBLIC, STATE OF TEXAS

2

# Exhibit 8

### DEFENDANT, ALEX JONES'S, ANSWER TO INTERROGATORY REGARDING NET WORTH

**INTERROGATORY NO. 1:** Provide a statement of your net worth. The term "net worth" means the amount by which total assets (including income) exceed total liabilities. Assets shall include items such as cash on hand, cash in accounts, checking, savings, brokerage, securities, cryptocurrency, tradeable commodities, precious metals, vehicles, business equipment, real estate, personal items, and negotiable instruments. Liabilities shall include such items as loans, notes, accounts payable, credit card balances, and mortgages. The statement of net worth should include:

a. All income and assets whatsoever kind and nature and wherever situated.

b. A list of all assets transferred in any manner since April 16, 2018. Transfers in the routine course of business which resulted in an exchange of assets or services of substantially equivalent value need not be specifically disclosed.

### ANSWER:

Defendant's current estimated net worth is negative $20,635,000.00, which is comprised of the following assets and liabilities (including asset of negative equity in Free Speech Systems, LLC):

- Assets
  - Bank accounts with cash of approximately $458,000.00
  - Income beneficiary of a $25,900,000.00 note due to sale of closely held business interest (note is interest only note)
  - Cryptocurrency valued at approximately $206,800 based on current market rates
  - Real estate comprised of 3 properties valued at approximately $2,350,000.00
  - $3,100,000.00 in proceeds of November 2021 sale of homestead, which such proceeds are held in a 1031 exchange trust
  - Equity interest of ($53,000,000) based on book balance of Free Speech Systems, LLC
  - Household items, collectibles, personal property valued at approximately $200,000.00;
  - Vehicles valued at approximately $150,000.00

- Liabilities
  - Current unknown contingent liabilities based on pending lawsuits
  - Defendant is also a personal guarantor of several leases and certain loans for which the current potential liability is unknown.

Defendant will further supplement this answer as necessary in accordance with the Texas Rules of Civil Procedure.

STATE OF TEXAS                    §
                                  §
COUNTY OF TRAVIS                  §

On this day, Alex Jones, appeared before me, the undersigned notary public, and after I administered an oath to him, upon his oath, that he has read Defendant, Alex Jones's, Answer to Plaintiffs' Interrogatory Regarding Net Worth, and that the Answers are within his personal knowledge and are true and correct to the best of his knowledge.

By: _____

Alex Jones

SUBSCRIBED AND SWORN TO BEFORE ME on this the 7TH day of December, 2021.

BRADLEY JORDAN REEVES
Notary Public, State of Texas
Comm. Expires 04-02-2024
Notary ID 132425142

NOTARY PUBLIC, STATE OF TEXAS

2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 60315855
Status as of 12/29/2021 9:09 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 12/27/2021 3:25:51 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 12/27/2021 3:25:51 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 12/27/2021 3:25:51 PM | SENT |

1/4/2022 12:11 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Selina Hamilton

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 459th JUDICIAL DISTRICT |
| *Defendants,* | § | |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## DEFENDANTS' MOTION TO EXCLUDE
## PLAINTIFFS' EXPERTS, FRED ZIPP AND BECCA LEWIS

Defendants, Free Speech Systems, LLC; Infowars, LLC; Alex Jones; and Owen Shroyer,

move to exclude Plaintiffs designated experts, Fred Zipp and Becca Lewis, and would respectfully show unto the Court as follows:

## I.  BACKGROUND

These defamation and intentional infliction of emotional distress cases arise out of statements allegedly made by Defendants, either individually or on their behalf or for which Defendants are otherwise vicariously liable, arising out of the Sandy Hook tragedy in Newtown, Connecticut. Throughout their petitions, Plaintiffs cite to numerous alleged defamatory video broadcasts and articles from Defendants that go as far back as January 2013, despite Plaintiffs not filing suit until April, 2018 at the earliest.

To attempt to bolster their claims, Plaintiffs have designated two (2) liability experts to support their contentions: (1) Fred Zipp of the University of Texas School of Journalism; and (2) Becca Lewis of the Stanford University Department of Communication. *See* Exs. 1, 2, and 3, Plaintiffs' Second Supplemental Designation of Experts.

In their expert designations, Plaintiffs have disclosed that Mr. Zipp will testify about:

> the standards of care in news reporting, and he will opine on how those standards were recklessly disregarded in this case. [He] will oping that Defendants ignored elementary precautions in journalism. [He] will also opine that Defendants entertained serious doubts about the accuracy of their statements. [He] will analyze the facts and circumstances of the publications which show that Defendants were motivated by a desire to avoid the truth and to inflict harm on Plaintiff.

*Id.* at 3.

Plaintiffs have further disclosed that Ms. Lewis is an "academic researcher in the field of media technologies and online discourse, with a focus on media manipulation and disinformation." *Id.* at 6. Plaintiffs' designation discloses that they anticipate Ms. Lewis will testify in that she:

2

> will offer her expertise on digital political subcultures, internet
> celebrity, and online news platforms. [She] will testify about
> InfoWars' cultural footprint and role in the online media ecosystem.
> [She] will opine that Defendants' actions were a substantial factor
> in the spread of false facts about the Sandy Hook shooting.

*Id.* at 6.

As the Court is well aware, while Defendants continue to contend the incorrect decision was made, the Court has entered default judgments against Defendants as to liability due to alleged discovery misconduct. Consequently, neither of these liability-based experts designated by Plaintiffs are necessary or otherwise should be allowed to testify, since the Court has determined that liability has been established. Moreover, Ms. Lewis's proposed testimony is completely unnecessary and not germane to any aspect of Plaintiffs' underlying claims. Plaintiffs have sued for defamation and intentional infliction of emotional distress claiming that Defendants made false statements about them and otherwise intentionally caused them emotional harm with these statements. The concept of a "cultural footprint" and opinion testimony that Defendants' actions "were a substantial factor" in the spread of allegedly false facts about Sandy Hook has nothing to do with whether the statements were defamatory nor whether they were intentionally made to cause Plaintiffs' emotional harm or distress. Instead, Ms. Lewis's proposed testimony is nothing more than an attempt by Plaintiffs to further prejudice the Court and the jury to inflate their damages claims, despite Ms. Lewis having no ability or expertise to enable her to testify as to any aspect of Plaintiffs' damages.

For the reasons set forth herein, if the Court does not reconsider its prior default-judgment rulings as to Defendants to allow these cases to proceed to trial on their full merits to a jury, Defendants request the Court grant this motion and exclude Fred Zipp and Becca Lewis from testifying as expert witnesses for Plaintiffs.

## II.    ARGUMENTS AND AUTHORITIES

Whether an expert is qualified is, under Rule 104(a), a preliminary question to be decided by the trial court. *Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 718 (Tex. 1998). If a motion to exclude expert testimony is filed, the party offering the expert testimony bears the burden of showing the testimony is admissible. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 557 (Tex. 1995). "The offering party must demonstrate that the witness possess[es] special knowledge as to the very matter on which he proposes to give an opinion." *Gammill,* 927 S.W.2d at 718.

Rule 702 of the Texas Rules of Evidence governs the admission of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

TEX. R. EVID. 702; *see also Robinson,* 923 S.W.2d at 554. Stated differently, "Rule 702 contains three requirements for the admission of expert testimony: (1) the witness must be qualified; (2) the proposed testimony must be 'scientific . . . knowledge' and (3) the testimony must 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Robinson,* 923 S.W.2d at 556. In *Robinson,* the seminal Texas Supreme Court case pertaining to expert witness testimony, the Texas Supreme Court held that "in addition to showing an expert is qualified, Rule 702 requires the proponent to show that the expert's testimony is relevant to the issues in the case and is based upon a reliable foundation." *Id.* Moreover, even if these experts' opinions are generally admissible, they should be excluded because the probative value of any such opinions if far outweighed by its unfair prejudice and is otherwise a needless presentation of cumulative evidence. *See* TEX. R. EVID.

4

403. Whether expert testimony is required and should be presented to a jury is a question of law
for the Court. *FFE Transp. Servs., Inc. v. Fulgham,* 154 S.W.3d 84, 90 (Tex. 2004).

In this case, Mr. Zipp and Ms. Lewis should be excluded from testifying because given the
default judgments on liability: (1) their opinions and testimony are not relevant; (2) the subjects
upon which Mr. Zipp and Ms. Lewis intend to provide testimony are by and large not topics that
require expert testimony because they can easily be comprehended by a layperson, rendering their
testimony entirely unnecessary; and (3) their opinions are further unnecessary because they are
simply intended to bolster the already-determined liability of Defendants and would serve to do
nothing more than further prejudice the jury against Defendants or to otherwise present prejudicial
cumulative evidence of Defendants' liability which is wholly unnecessary given the Court's
default-judgment rulings. As such, Defendants request the Court grant this motion and exclude
Mr. Zipp and Ms. Lewis as experts in these cases.

## A. Mr. Zipp's and Ms. Lewis's testimony should be excluded because their testimony is not relevant.

The Court should also exclude Mr. Zipp and Ms. Lewis as expert witnesses because their
opinions are not relevant to the remaining issues to be decided at trial. An expert's testimony is
relevant if it assists the fact finder in determining an issue or in understanding the evidence. TEX.
R. EVID. 702.

Here, Mr. Zipp's proposed testimony as to the standards of care in news reporting, whether
those standards were "recklessly disregarded" by Defendants, whether Defendants "ignored
elementary precautions in journalism," and whether "Defendants entertained serious doubts about
the accuracy of their statements" have no relevance to these proceedings given the liability default
judgments. *See* Exs. 1, 2, and 3 at p. 3. There is no relevance or need for Mr. Zipp to testify about

applicable standards of care, whether those standards were disregarded, or otherwise because the Court has deemed those in favor of Plaintiffs as part of the Court's liability default judgments.

By the same token, Ms. Lewis's testimony should be excluded because her designated opinions have no relevance to the underlying claims in this lawsuit. For example, her expertise on digital political subcultures, internet celebrity, and online news platforms, testimony about InfoWars' cultural footprint and role in the online media ecosystem, and unreliable opinion testimony that Defendants' actions were a substantial factor in the spread of false facts about the Sandy Hook shooting have nothing to do with whether statements made were defamatory or were otherwise intentionally made to inflict emotional distress. These opinions lack any reliable foundation and otherwise do nothing to assist the trier of fact. Rather, Ms. Lewis's opinions are largely prejudicial and are simply because she says so, without any true evidentiary support. But an "expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statement to link his conclusions to the facts." *Earle v. Ratliff,* 998 S.W.2d 882, 890 (Tex. 1999) (citing *Gammill,* 972 S.W.2d at 726–27).

Mr. Zipp's and Ms. Lewis's purported expert opinions are nothing but speculation and conjecture, and "[o]pinions which are purely speculative or conjectural in their nature should be excluded." *Earle,* 998 S.W.3d at 890 (citing *UMC, Inc. v. Coonrod Elec. Co.,* 667 S.W.2d 549, 559 (Tex. App.—Corpus Christi 1983, writ ref'd n.r.e.)); *see also Naegeli Transp. v. Gulf Electroquip, Inc.,* 853 S.W.2d 737, 741 (Tex. App.—Houston [14th Dist.] 1993, no writ) (citing *Ochs v. Martines,* 789 S.W.2d 949, 958 (Tex. App.—San Antonio 1990, writ denied) ("Expert testimony cannot be based upon mere guess or speculation, but must have a proper factual basis.").

Because these experts; opinions lack any sort of reliable foundation, are otherwise purely speculative, and have no relevance to the remaining issues in this case, Mr. Zipp's and Ms. Lewis's

opinions are not relevant evidence and should be excluded by the Court. Defendants' motion should be granted.


**B.     Mr. Zipp and Ms. Lewis should be excluded as an expert because the subject matter of his testimony is of such a nature to be within the experience or capability of an ordinary layperson and is thus unnecessary in this case.**

Mr. Zipp's and Ms. Lewis's testimony should be excluded because their testimony will not assist the trier-of-fact in determining alleged damages if the liability default judgments are left in place. Simply because "a witness has knowledge, skill, expertise, or training does not necessarily mean that the witness can assist the trier-of-fact." *In re Commitment of Bohannan,* 388 S.W.3d at 304. Expert testimony "assist[s] the trier-of-fact when the expert's knowledge and experience on a relevant issue are beyond that of the average juror and the testimony helps the trier-of-fact understand the evidence or determine a fact issue." *Id.* "Where, as here, the issue involves only general knowledge and experience rather than expertise, it is within the province of the jury to decide." *GTE Sw., Inc., v. Bruce,* 998 S.W.2d 605, 620 (Tex. 1999); *see also Kmart Corp. v. Honeycutt,* 24 S.W.3d 375, 360 (Tex. 2000) ("When the jury is equally competent to form an opinion about the ultimate fact issue or the expert's testimony is within the common knowledge of the jury, the trial court should exclude the expert's testimony."); *see also Coastal Chem., Inc. v. Brown,* 35 S.W.3d 90, 98 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("It is error, however, to admit expert testimony on an issue if no specialized or technical knowledge is necessary.").

Much of the subject matter of Mr. Zipp's and Ms. Lewis's opinions and testimony— ultimately whether something was defamatory or intentionally done to inflict emotional distress and whether those statements were spread in some way—does not require an expert. An ordinary

layperson can easily and competently understand the facts of this case and determine whether any such statements were defamatory or intentionally made to inflict emotional distress and whether they were done so with the requisite degree of culpability to establish something like an entitlement to punitive damages. The ordinary laypeople of the jury will undoubtedly be able to make their own analysis of the facts as presented to them at trial and make the requisite determinations of those claims. Mr. Zipp's and Ms. Lewis' opinions and testimony are merely an attempt by Plaintiff to confuse the jury by offering unnecessary "expert" testimony regarding these alleged defamatory statements by Defendants about Plaintiffs, when those issues have already been determined by the Court's liability default judgments.

Any layperson of ordinary intelligence can see, hear, and analyze the facts and evidence in this case to understand and determine whether and to what degree of culpability Defendants should face for these alleged statements in the context of determining any damages award. Mr. Zipp's and Ms. Lewis's opinions and testimony do not in any way assist the trier-of-fact with understanding the evidence in this case or in determining any fact issues. As such, Mr. Zipp and Ms. Lewis should be excluded as experts.

**C.     Mr. Zipp and Ms. Lewis should be excluded as experts because the probative value of their testimony, if any, is clearly outweighed by the danger of unfair prejudice and needlessly presenting cumulative evidence to the jury.**

Given the liability default judgments in this case, it is clear that even the testimony of Mr. Zipp and Ms. Lewis is otherwise admissible, they should be excluded as experts because their designated areas of testimony has little probative value, and to the extent there is any probative value, that is "substantially outweighed by a danger of one or more of the following: unfair prejudice . . . or needlessly presenting cumulative evidence." TEX. R. EVID. 403. Factors in considering whether evidence's probative value is outweighed by a risk of unfair prejudice

"include the probative value of the evidence, the potential of the evidence to impress the jury in some irrational way, the time needed to develop the evidence, and the proponent's need for the evidence." *See In re Commitment of Stuteville,* 463 S.W.3d 543, 555 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (quoting *In re Commitment of Anderson,* 392 S.W.3d 878, 882 (Tex. App.—Beaumont 2013, pet. denied)).

Because the Court has granted default judgments on liability, it is clear that any testimony or opinions by these supposed experts would do nothing but to further inflame the jury, confuse them with irrelevant issues, or would otherwise simply be unnecessary cumulative evidence that has the sole purpose of prejudicing the jury as much as possible, since these opinions are wholly unnecessary to assist in any finding of liability. Consequently, the Court should exclude Mr. Zipp and Ms. Lewis as experts in these matters.

### PRAYER

WHEREFORE, Defendants, Free Speech Systems, LLC; Owen Shroyer; Alex Jones; and Infowars, LLC; respectfully request that the Court grant this motion and exclude Fred Zipp and Becca Lewis as expert witnesses at the time of trial of this case, and for such other and further relief to which Defendants may be justly entitled.

Dated: January 3, 2022.

Respectfully submitted,

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701

Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**ATTORNEY FOR DEFENDANTS**

## CERTIFICATE OF CONFERENCE

The undersigned counsel for Defendants has previously conferred with counsel for Plaintiff regarding this Motion, and counsel for Plaintiff has indicated Plaintiff is **opposed** to this Motion.

*/s/ Bradley J. Reeves*
Bradley J. Reeves

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on January 3, 2022.

Mark Bankston                          *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

*/s/ Bradley J. Reeves*
Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 60455400
Status as of 1/6/2022 3:23 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 1/4/2022 12:11:55 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 1/4/2022 12:11:55 AM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 1/4/2022 12:11:55 AM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 1/4/2022 12:11:55 AM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 1/4/2022 12:11:55 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 1/4/2022 12:11:55 AM | SENT |

1/4/2022 12:11 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Selina Hamilton

# D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| AND FREE SPEECH SYSTEMS, LLC, | § | 98th DISTRICT COURT |
| *Defendants* | § | |

---

## PLAINTIFF'S SECOND SUPPLEMENTAL DESIGNATION OF EXPERTS

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Scarlett Lewis, Plaintiff, and files this his Second Supplemental Designation of Expert Witnesses and in supplementation of all prior discovery requests requesting identification of fact and expert witnesses, as follows:

I.

### Plaintiff's Non-Retained Medical Experts

Ira Israel
Psychotherapist
And Custodians of Medical and Billing Records
12304 Santa Monica Blvd., Ste. 219
Los Angeles, California 90025
(310) 430-5150

David Grand, Ph.D.
And Custodians of Medical and Billing Records
2415 Jerusalem Ave.
New York, New York 11710

Laurie Patton, M.A.
And Custodians of Medical and Billing Records
1919 South 40th Street, Ste. 312
Lincoln, Nebraska 68502
(402) 475-5069

Michael Crouch, LCSW
And Custodians of Medical and Billing Records

-1-

999 Summer Street
Stamford, Connecticut 06905
(203) 961-1152

All medical care providers listed above may testify regarding matters contained in their records and depositions. Their observations, diagnosis, opinions, prognosis, facts, physical and clinical examinations, and tests done, reviewed or relied upon are incorporated herein by reference. This includes opinions regarding Plaintiff's pain, mental anguish, medical care, medical expenses, limitations, physical impairment, or any other medical issue in this case. The Custodians of Records will authenticate the records.

Plaintiff is unaware of the general substance of these experts' mental impressions and opinions, as they are treating physicians and custodians of records. However, presumably the general substance of these experts' impressions and opinions would be as contained in their respective records.

**Plaintiff's Retained Experts**

Fred Zipp
University of Texas School of Journalism
300 W Dean Keeton St
Austin, TX 78712
(512) 471-1845

Mr. Zipp is a former newspaper editor and journalism professor. He will offer his expertise concerning the standards of care in news reporting, and he will opine on how those standards were recklessly disregarded in this case. Mr. Zipp will opine that Defendants ignored elementary precautions in journalism. Mr. Zipp will also opine that Defendants entertained serious doubts about the accuracy of their statements. Mr. Zipp will analyze the facts and circumstances of the publications which show that Defendants were motivated by a desire to avoid the truth and to inflict harm on Plaintiff. Materials reviewed by Mr. Zipp are being produced as SANDY HOOK-000001-000642. Mr. Zipp has also reviewed the March 4, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Free Speech Systems, and the November 27, 2019 deposition of Paul Watson. Mr. Zipp has also reviewed the YouTube video clips described in his affidavits submitted in response to Defendants' TCPA Motions. Mr. Zipp has also reviewed the videos produced as SH VIDEO 13, consisting of Megyn Kelly's profile of Alex Jones, and SH VIDEO 14, consisting of Anderson Cooper's Interview with Veronique De La Rosa. Mr. Zipp has also reviewed Plaintiff's petition. Mr. Zipp has also reviewed Plaintiff's discovery requests and Defendants' responses. Mr. Zipp's curriculum vitae is attached hereto as Exhibit "1."

In addition to the materials described above, Mr. Zipp has viewed the following videos or portions thereof:

| | Title | Date | Produced as |
|---|---|---|---|
| 1 | Connecticut School Massacre Looks Like False Flag Says Witnesses | December 14, 2012 | SH VIDEO 1 |
| 2 | Creepy Illuminati Message in Batman Movie Hints at Sandy Hook School | December 17, 2012 | F2mRuEhmoGA |
| 3 | Sandy Hook 2nd Shooter Cover-Up | December 19, 2012 | 6W6b-voc-Ds |
| 4 | Sandy Hook Father Remembers Fallen Hero | December 19, 2012 | 8cZkHDHl6nQ |
| 5 | Lower Part of Gotham Renamed "Sandy Hook" in Dark Knight Film | December 21, 2012 | Fus1FpQiU-Q |
| 6 | Callers React to Foreign Media Pushing Total Gun Confiscation | January 4, 2013 | SH VIDEO 2 |
| 8 | Prof. Claims Sandy Hook Massacre MSM Misinformation | January 10, 2013 | D8GxrKJDSL8 |
| 9 | Sandy Hook AR-15 Hoax? Still No School Surveillance Footage | January 15, 2013 | Oo74myC3bqY |
| 10 | Clearing Up Some Disinfo on Sandy Hook Massacre with James Tracy | January 18, 2013 | SH VIDEO 3 |
| 11 | Why People Think Sandy Hook is a Hoax | January 27, 2013 | tM5ZdO-IgEE |
| 12 | Dr. Steve Pieczenik: Sandy Hook was A Total False Flag! | March 27, 2013 | 5EfyD7Wu5fQ |
| 13 | Crisis Actors Used at Sandy Hook! Special Report | April 1, 2013 | shQSVhS0hLw |
| 14 | Obama Gun Grab Psyop | April 9, 2013 | SH VIDEO 4 |
| 15 | Shadow Govt Strike Again | April 16, 2013 | SH VIDEO 5 |
| 16 | Sandy Hook Police Ordered to Stand Down? | November 23, 2013 | xP9fhKUaudo |
| 17 | Sandy Hook Investigator Stonewalled and Threatened | February 20, 2014 | oGpWtqdiSCY |

| 18 | Sandy Hook, False Narratives Vs. The Reality | March 14, 2014 | esIvAO2aIlw |
|----|------|------|------|
| 19 | Revealed: Sandy Hook Truth Exposed | May 9, 2014 | _rSLOYCHNdw |
| 20 | Sandy Hook "Officials" Caught In Coverup And Running Scared | May 13, 2014 | MH6hmI1h-iQ |
| 21 | Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert | May 13, 2014 | x2a1FwYEZS4 |
| 22 | Sandy Hook Deaths Missing From FBI Report | September 25, 2014 | A2Z0zUZBn7k |
| 23 | Sandy Hook Film Censorship Efforts Backfire | December 12, 2014 | 4T8_WYzH5SM |
| 24 | The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms | December 12, 2014 | 6aK0P-WxjU8 |
| 25 | Will Bushmaster Lawsuit Reveal Sandy Hook Hoax? | December 16, 2014 | BFyDqDLAcLQ |
| 26 | Lawsuit Could Reveal Truth About Sandy Hook Massacre | December 27, 2014 | kK8CnIBA928 |
| 27 | America the False Democracy | December 28, 2014 | SH VIDEO 6 |
| 28 | Why We Accept Govt Lies | January 13, 2015 | SH VIDEO 7 |
| 29 | Title Unknown – Video discussing HONR Network | February 12, 2015 | SH VIDEO 8 |
| 30 | New Bombshell Sandy Hook Information In-Bound | March 4, 2015 | _7ib5WkULBY |
| 31 | New Sandy Hook Questions Arise from FOIA Hearing | May 29, 2015 | 5cll79t7Mrw |
| 32 | Sandy Hook: The Lies Keep Growing | May 29, 2015 | Ml3KVj2nVRA |
| 33 | School Administrator Exposes Sandy Hook Stonewall | May 29, 2015 | SO8Xb-t4nT4 |
| 34 | Official Claims DHS Involved in Sandy Hook | June 4, 2015 | BWsbyH2Wa0E |

| 35 | Govt is Manufacturing Crises | July 7, 2015 | SH VIDEO 9 |
| 36 | Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP | July 7, 2015 | jCOe3qIgyFA |
| 37 | The Fight for Freedom of Information in Sandy Hook | July 8, 2015 | l0miXJ-djeA |
| 38 | Alex Jones Final Statement on Sandy Hook | November 18, 2016 | MwudDfz1yAk |
| 39 | Hunt for Wikileaks Source Begins | March 8, 2017 | SH VIDEO 10 |
| 40 | Sandy Hook Vampires Exposed | April 22, 2017 | rUn1jKhWTXI |
| 41 | Media Refuses To Report Alex Jones' Real Statements On Sandy Hook | June 13, 2017 | kf2F7RxJ9e4 |
| 42 | Zero Hedge Discovers Anomaly In Alex Jones Hit Piece | June 26, 2017 | SH VIDEO 11 |
| 43 | JFK Assassination Documents To DROP Tonight | October 26, 2017 | SH VIDEO 12 |
| 44 | Watch as Megyn Kelly Opens Old Wounds Of Sandy Hook Victims | April 20, 2018 | uQkAJykqyeo |

Becca Lewis
Stanford University, Department of Communication
Building 120, Room 110
450 Jane Stanford Way
Stanford, CA 94305
(650) 723-1941

Ms. Lewis is an academic researcher in the field of media technologies and online discourse, with a focus on media manipulation and disinformation. Ms. Lewis will offer her expertise on digital political subcultures, internet celebrity, and online news platforms. Ms. Lewis will testify about InfoWars' cultural footprint and role in the online media ecosystem. Ms. Lewis will opine that Defendants' actions were a substantial factor in the spread of false facts about the Sandy Hook shooting. Materials reviewed by Ms. Lewis are being produced as SANDY HOOK-000643-002142. Ms. Lewis has also reviewed the March 4, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Alex Jones, and the November 27, 2019 deposition of Paul Watson. Ms. Lewis has also reviewed the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly In Alex Jones Hit Piece" and the April 22, 2017 video entitled "Sandy Hook Vampires Exposed." Ms. Lewis has also reviewed FSSTX-082669-082812; FSSTX-085731-FSSTX-086492; FSSTX-086569-

FSSTX-086583; FSSTX-086588-FSSTX-086589. Ms. Lewis has also reviewed Plaintiff's petition. Ms. Lewis has also reviewed Plaintiff's discovery requests and Defendants' responses. Ms. Lewis' curriculum vitae is attached as Exhibit "2."

Dr. Roy Lubit
165 West End Ave #3k
New York, NY 10023
(917) 846-7829

Dr. Lubit is a forensic psychiatrist with expertise in the impact of stress and emotional trauma. Dr. Lubit will testify about Plaintiffs' mental injury and the psychological stresses involved from Defendants' false statements and denial of Plaintiffs' trauma. Dr. Lubit will opine that Defendants' actions were a substantial factor in Plaintiffs' severe mental anguish and continuing grief. Dr. Lubit will testify about his evaluation of Plaintiff. Dr. Lubit will also review any medical records produced in this suit. Dr. Lubit's curriculum vitae is attached as Exhibit "3."

## II.

Plaintiff reserves the right to supplement this designation with additional designations of experts within the time limits imposed by the Court or any alterations of same by subsequent Court Order or agreement of the parties, or pursuant to the Texas Rules of Civil Procedure and/or the Texas Rules of Civil Evidence.

## III.

Plaintiff reserves the right to elicit, by way of cross-examination, opinion testimony from experts designated and called by other parties to the suit. Plaintiff expresses his intention to possibly call, as witnesses associated with adverse parties, any of Defendants' experts.

## IV.

Plaintiff reserves the right to call undesignated rebuttal expert witnesses whose testimony cannot reasonably be foreseen until the presentation of the evidence against Plaintiff.

## V.

Plaintiff reserves the right to withdraw the designation of any expert and to aver positively that any such previously designated expert will not be called as a witness at trial, and to re-designate same as a consulting expert, who cannot be called by opposing counsel.

## VI.

Plaintiff reserves the right to elicit any expert opinion or lay opinion testimony at the time of trial which would be truthful, which would be of benefit to the jury to determine material issues of fact, and which would not be violative of any existing Court Order or the Texas Rules of Civil Procedure.

## VII.

Plaintiff hereby designates, as adverse parties, potentially adverse parties, and/or as witnesses associated with adverse parties, all parties to this suit and all experts designated by any party to this suit, even if the designating party is not a party to the suit at the time of trial.  In the event a present or future party designates an expert but then is dismissed for any reason from the suit or fails to call any designated expert, Plaintiff reserves the right to designate and/or call any such party or any such experts previously designated by any party.

## VIII.

Plaintiff reserves whatever additional rights they might have with regard to experts, pursuant to the Texas Rules of Civil Procedure, the Texas Rules of Civil Evidence, the case law construing same, and the rulings of the trial court.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____

MARK D. BANKSTON

State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
(713) 221-8300 Telephone
(713) 221-8301 Fax

**ATTORNEY FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 2nd day of December, the forgoing document was served upon all counsel of record via electronic service.

Bradley J. Reeves
Reeves Law, PLLC
702 Rio Grande St., Suite 203
Austin, Texas 78701
Email:  brad@brtx.law

_____
MARK D. BANKSTON

# D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | 345th DISTRICT COURT |
| AND FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | |

---

## PLAINTIFFS' SECOND SUPPLEMENTAL DESIGNATION OF EXPERTS

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Leonard Pozner and Veronique De La Rosa, Plaintiffs and files this his

Second Supplemental Designation of Expert Witnesses and in supplementation of all prior

discovery requests requesting identification of fact and expert witnesses, as follows:

I.

**Plaintiff's Non-Retained Medical Experts**

Caron Renaissance
And Custodians of Medical and Billing Records
7789 NW Beacon Square Boulevard
Boca Raton, Florida 33487
(561) 241-7977
Medical Provider for Veronique De La Rosa

CVS Pharmacy
And Custodian of Billing Records
Pharmacy Privacy Office
One CVS Drive, Mail Code B120
Woonsocket, RI 02895
Pharmacy Provider for Veronique De La Rosa

Newton Youth & Family Services
And Custodians of Medical and Billing Records
15 Berkshire Road
Sandy Hook, CT 06482
(203) 270-4335

*Medical Provider for Leonard Pozner*

Michelle L. Rivera-Clonch, PhD., LMHC, NCC
And Custodians of Medical and Billing
6900 Tavistock Lakes Boulevard, Ste. 400
Orlando, Florida 32827
*Medical Provider for Veronique De La Rosa*

Dean John Rotondo, MD, PA
And Custodians of Medical and Billing Records
399 Camino Gardens Boulevard, Ste. 200
Boca Raton, Florida 33432
*Medical Provider for Veronique De La Rosa*

Leslie Rouder, LCSW
And Custodians of Medical and Billing Records
21643 Cypress Road
Boca Raton, Florida 33433
(561) 706-1274
*Medical Provider for Veronique De La Rosa*

Silver Lining Psychiatry
And Custodians of Medical and Billing Records
3724 Winter Garden Vineland Road
Winter Garden, Florida 34787
*Medical Provider for Veronique De La Rosa*

Linda Tepper, LCSW
And Custodians of Medical and Billing Records
7777 Glades Road, Suite 205
Boca Raton, Florida 33434
(561) 288-3876
*Medical Provider for Leonard Pozner*

Iliana Torres, MS, LMHC
Agape Therapy Institute
And Custodians of Medical and Billing Records
37 N. Orange Ave., Suite 1100
Orlando, Florida 32801
(407) 900-8633
*Medical Provider for Leonard Pozner*

All medical care providers listed above may testify regarding matters contained in their records and depositions. Their observations, diagnosis, opinions, prognosis, facts, physical and clinical examinations, and tests done, reviewed or relied upon are incorporated herein by reference. This includes opinions regarding Plaintiff's pain, mental anguish, medical care, medical expenses, limitations, physical impairment, or any other medical issue in this case. The Custodians of Records will authenticate the records.

Plaintiff is unaware of the general substance of these experts' mental impressions and opinions, as they are treating physicians and custodians of records. However, presumably the general substance of these experts' impressions and opinions would be as contained in their respective records.

**Plaintiff's Retained Experts**

Fred Zipp
University of Texas School of Journalism
300 W Dean Keeton St
Austin, TX 78712
(512) 471-1845

Mr. Zipp is a former newspaper editor and journalism professor. He will offer his expertise concerning the standards of care in news reporting, and he will opine on how those standards were recklessly disregarded in this case. Mr. Zipp will opine that Defendants ignored elementary precautions in journalism. Mr. Zipp will also opine that Defendants entertained serious doubts about the accuracy of their statements. Mr. Zipp will analyze the facts and circumstances of the publications which show that Defendants were motivated by a desire to avoid the truth and to inflict harm on Plaintiff. Materials reviewed by Mr. Zipp are being produced as SANDY HOOK-000001-000642. Mr. Zipp has also reviewed the March 4, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Free Speech Systems, and the November 27, 2019 deposition of Paul Watson. Mr. Zipp has also reviewed the YouTube video clips described in his affidavits submitted in response to Defendants' TCPA Motions. Mr. Zipp has also reviewed the videos produced as SH VIDEO 13, consisting of Megyn Kelly's profile of Alex Jones, and SH VIDEO 14, consisting of Anderson Cooper's Interview with Veronique De La Rosa. Mr. Zipp has also reviewed Plaintiff's petition. Mr. Zipp has also reviewed Plaintiff's discovery requests and Defendants' responses. Mr. Zipp's curriculum vitae is attached hereto as Exhibit "1."

In addition to the materials described above, Mr. Zipp has viewed the following videos or portions thereof:

| | Title | Date | Produced as |
|---|---|---|---|
| 1 | Connecticut School Massacre Looks Like False Flag Says Witnesses | December 14, 2012 | SH VIDEO 1 |
| 2 | Creepy Illuminati Message in Batman Movie Hints at Sandy Hook School | December 17, 2012 | F2mRuEhmoGA |
| 3 | Sandy Hook 2nd Shooter Cover-Up | December 19, 2012 | 6W6b-voc-Ds |
| 4 | Sandy Hook Father Remembers Fallen Hero | December 19, 2012 | 8cZkHDHl6nQ |

| 5 | Lower Part of Gotham Renamed "Sandy Hook" in Dark Knight Film | December 21, 2012 | Fus1FpQiU-Q |
|---|---|---|---|
| 6 | Callers React to Foreign Media Pushing Total Gun Confiscation | January 4, 2013 | SH VIDEO 2 |
| 8 | Prof. Claims Sandy Hook Massacre MSM Misinformation | January 10, 2013 | D8GxrKJDSL8 |
| 9 | Sandy Hook AR-15 Hoax? Still No School Surveillance Footage | January 15, 2013 | Oo74myC3bqY |
| 10 | Clearing Up Some Disinfo on Sandy Hook Massacre with James Tracy | January 18, 2013 | SH VIDEO 3 |
| 11 | Why People Think Sandy Hook is a Hoax | January 27, 2013 | tM5ZdO-IgEE |
| 12 | Dr. Steve Pieczenik: Sandy Hook was A Total False Flag! | March 27, 2013 | 5EfyD7Wu5fQ |
| 13 | Crisis Actors Used at Sandy Hook! Special Report | April 1, 2013 | shQSVhS0hLw |
| 14 | Obama Gun Grab Psyop | April 9, 2013 | SH VIDEO 4 |
| 15 | Shadow Govt Strike Again | April 16, 2013 | SH VIDEO 5 |
| 16 | Sandy Hook Police Ordered to Stand Down? | November 23, 2013 | xP9fhKUaudo |
| 17 | Sandy Hook Investigator Stonewalled and Threatened | February 20, 2014 | oGpWtqdiSCY |
| 18 | Sandy Hook, False Narratives Vs. The Reality | March 14, 2014 | esIvAO2aIlw |
| 19 | Revealed: Sandy Hook Truth Exposed | May 9, 2014 | _rSLOYCHNdw |
| 20 | Sandy Hook "Officials" Caught In Coverup And Running Scared | May 13, 2014 | MH6hmI1h-iQ |
| 21 | Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert | May 13, 2014 | x2a1FwYEZS4 |
| 22 | Sandy Hook Deaths Missing From FBI Report | September 25, 2014 | A2Z0zUZBn7k |

| 23 | Sandy Hook Film Censorship Efforts Backfire | December 12, 2014 | 4T8_WYzH5SM |
| 24 | The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms | December 12, 2014 | 6aK0P-WxjU8 |
| 25 | Will Bushmaster Lawsuit Reveal Sandy Hook Hoax? | December 16, 2014 | BFyDqDLAcLQ |
| 26 | Lawsuit Could Reveal Truth About Sandy Hook Massacre | December 27, 2014 | kK8CnIBA928 |
| 27 | America the False Democracy | December 28, 2014 | SH VIDEO 6 |
| 28 | Why We Accept Govt Lies | January 13, 2015 | SH VIDEO 7 |
| 29 | Title Unknown – Video discussing HONR Network | February 12, 2015 | SH VIDEO 8 |
| 30 | New Bombshell Sandy Hook Information In-Bound | March 4, 2015 | _7ib5WkULBY |
| 31 | New Sandy Hook Questions Arise from FOIA Hearing | May 29, 2015 | 5cll79t7Mrw |
| 32 | Sandy Hook: The Lies Keep Growing | May 29, 2015 | Ml3KVj2nVRA |
| 33 | School Administrator Exposes Sandy Hook Stonewall | May 29, 2015 | SO8Xb-t4nT4 |
| 34 | Official Claims DHS Involved in Sandy Hook | June 4, 2015 | BWsbyH2Wa0E |
| 35 | Govt is Manufacturing Crises | July 7, 2015 | SH VIDEO 9 |
| 36 | Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP | July 7, 2015 | jCOe3qIgyFA |
| 37 | The Fight for Freedom of Information in Sandy Hook | July 8, 2015 | l0miXJ-djeA |
| 38 | Alex Jones Final Statement on Sandy Hook | November 18, 2016 | MwudDfz1yAk |
| 39 | Hunt for Wikileaks Source Begins | March 8, 2017 | SH VIDEO 10 |
| 40 | Sandy Hook Vampires Exposed | April 22, 2017 | rUn1jKhWTXI |

| | | | |
|---|---|---|---|
| 41 | Media Refuses To Report Alex Jones' Real Statements On Sandy Hook | June 13, 2017 | kf2F7RxJ9e4 |
| 42 | Zero Hedge Discovers Anomaly In Alex Jones Hit Piece | June 26, 2017 | SH VIDEO 11 |
| 43 | JFK Assassination Documents To DROP Tonight | October 26, 2017 | SH VIDEO 12 |
| 44 | Watch as Megyn Kelly Opens Old Wounds Of Sandy Hook Victims | April 20, 2018 | uQkAJykqyeo |

Becca Lewis
Stanford University, Department of Communication
Building 120, Room 110
450 Jane Stanford Way
Stanford, CA 94305
(650) 723-1941

Ms. Lewis is an academic researcher in the field of media technologies and online discourse, with a focus on media manipulation and disinformation. Ms. Lewis will offer her expertise on digital political subcultures, internet celebrity, and online news platforms. Ms. Lewis will testify about InfoWars' cultural footprint and role in the online media ecosystem. Ms. Lewis will opine that Defendants' actions were a substantial factor in the spread of false facts about the Sandy Hook shooting. Materials reviewed by Ms. Lewis are being produced as SANDY HOOK-000643-002142. Ms. Lewis has also reviewed the March 4, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Alex Jones, and the November 27, 2019 deposition of Paul Watson. Ms. Lewis has also reviewed the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly In Alex Jones Hit Piece" and the April 22, 2017 video entitled "Sandy Hook Vampires Exposed." Ms. Lewis has also reviewed FSSTX-082669-082812; FSSTX-085731-FSSTX-086492; FSSTX-086569-FSSTX-086583; FSSTX-086588-FSSTX-086589. Ms. Lewis has also reviewed Plaintiff's petition. Ms. Lewis has also reviewed Plaintiff's discovery requests and Defendants' responses. Ms. Lewis' curriculum vitae is attached as Exhibit "2."

Dr. Roy Lubit
165 West End Ave #3k
New York, NY 10023
(917) 846-7829

Dr. Lubit is a forensic psychiatrist with expertise in the impact of stress and emotional trauma. Dr. Lubit will testify about Plaintiffs' mental injury and the psychological stresses involved from Defendants' false statements and denial of Plaintiffs' trauma. Dr. Lubit will opine that Defendants' actions were a substantial factor in Plaintiffs' severe mental anguish

-6-

and continuing grief. Dr. Lubit will testify about his evaluation of Plaintiff. Dr. Lubit will also review any medical records produced in this suit. Dr. Lubit's curriculum vitae is attached as Exhibit "3."

II.

Plaintiff reserves the right to supplement this designation with additional designations of experts within the time limits imposed by the Court or any alterations of same by subsequent Court Order or agreement of the parties, or pursuant to the Texas Rules of Civil Procedure and/or the Texas Rules of Civil Evidence.

III.

Plaintiff reserves the right to elicit, by way of cross-examination, opinion testimony from experts designated and called by other parties to the suit.  Plaintiff expresses his intention to possibly call, as witnesses associated with adverse parties, any of Defendants' experts.

IV.

Plaintiff reserves the right to call undesignated rebuttal expert witnesses whose testimony cannot reasonably be foreseen until the presentation of the evidence against Plaintiff.

V.

Plaintiff reserves the right to withdraw the designation of any expert and to aver positively that any such previously designated expert will not be called as a witness at trial, and to re-designate same as a consulting expert, who cannot be called by opposing counsel.

VI.

Plaintiff reserves the right to elicit any expert opinion or lay opinion testimony at the time of trial which would be truthful, which would be of benefit to the jury to determine material issues of fact, and which would not be violative of any existing Court Order or the Texas Rules of Civil Procedure.

VII.

Plaintiff hereby designates, as adverse parties, potentially adverse parties, and/or as witnesses associated with adverse parties, all parties to this suit and all experts designated by any party to this suit, even if the designating party is not a party to the suit at the time of trial.  In the event a present or future party designates an expert but then is dismissed for any reason from the suit or fails to call any designated expert, Plaintiff reserves the right to designate and/or call any such party or any such experts previously designated by any party.

VIII.

Plaintiff reserves whatever additional rights they might have with regard to experts, pursuant to the Texas Rules of Civil Procedure, the Texas Rules of Civil Evidence, the case law construing same, and the rulings of the trial court.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____
MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
(713) 221-8300 Telephone
(713) 221-8301 Fax

**ATTORNEY FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 2nd day of December, the forgoing document was served upon all counsel of record via electronic service.

Bradley J. Reeves
Reeves Law, PLLC
702 Rio Grande St., Suite 203
Austin, Texas 78701
Email:  brad@brtx.law

MARK D. BANKSTON

# D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | 459th DISTRICT COURT |
| OWEN SHROYER, | § | |
| *Defendants* | § | |

---

## PLAINTIFF'S SECOND SUPPLEMENTAL DESIGNATION OF EXPERTS

---

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Neil Heslin, Plaintiff and files this his Second Supplemental Designation of Expert Witnesses, and in supplementation of all prior discovery requests requesting identification of fact and expert witnesses, as follows:

I.

### Plaintiff's Non-Retained Medical Experts

Contemporary Care Psychiatric Centers of Excellence
And Custodians of Medical and Billing Records
84 Hospital Ave.
Danbury, CT 06810
(203) 769-1312

F. Carl Mueller, MD, MPH, M.S., F.A.P.A.
And Custodians of Medical and Billing Records
999 Summer St., Ste. 200
Stamford, CT 06905
(203) 357-7773

W. Michael Crouch, LCSW
And Custodians of Medical and Billing Records
999 Summer Street, Ste. 200
Stamford, CT 06905
(203) 961-1152

-1-

All medical care providers listed above may testify regarding matters contained in their records and depositions. Their observations, diagnosis, opinions, prognosis, facts, physical and clinical examinations, and tests done, reviewed or relied upon are incorporated herein by reference. This includes opinions regarding Plaintiff's pain, mental anguish, medical care, medical expenses, limitations, physical impairment, or any other medical issue in this case. The Custodians of Records will authenticate the records.

Plaintiff is unaware of the general substance of these experts' mental impressions and opinions, as they are treating physicians and custodians of records. However, presumably the general substance of these experts' impressions and opinions would be as contained in their respective records.

### Plaintiff's Retained Experts

Fred Zipp
University of Texas School of Journalism
300 W Dean Keeton St
Austin, TX 78712
(512) 471-1845

Mr. Zipp is a former newspaper editor and journalism professor. He will offer his expertise concerning the standards of care in news reporting, and he will opine on how those standards were recklessly disregarded in this case. Mr. Zipp will opine that Defendants ignored elementary precautions in journalism. Mr. Zipp will also opine that Defendants entertained serious doubts about the accuracy of their statements. Mr. Zipp will analyze the facts and circumstances of the publications which show that Defendants were motivated by a desire to avoid the truth and to inflict harm on Plaintiff. Materials reviewed by Mr. Zipp are being produced as SANDY HOOK-000001-000642. Mr. Zipp has also reviewed the March 4, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Free Speech Systems, and the November 27, 2019 deposition of Paul Watson. Mr. Zipp has also reviewed the YouTube video clips described in his affidavits submitted in response to Defendants' TCPA Motions. Mr. Zipp has also reviewed the videos produced as SH VIDEO 13, consisting of Megyn Kelly's profile of Alex Jones, and SH VIDEO 14, consisting of Anderson Cooper's Interview with Veronique De La Rosa. Mr. Zipp has also reviewed Plaintiff's petition. Mr. Zipp has also reviewed Plaintiff's discovery requests and Defendants' responses. Mr. Zipp's curriculum vitae is attached hereto as Exhibit "1."

In addition to the materials described above, Mr. Zipp has viewed the following videos or portions thereof:

|   | Title | Date | Produced as |
|---|-------|------|-------------|
| 1 | Connecticut School Massacre Looks Like False Flag Says Witnesses | December 14, 2012 | SH VIDEO 1 |

| 2 | Creepy Illuminati Message in Batman Movie Hints at Sandy Hook School | December 17, 2012 | F2mRuEhmoGA |
| 3 | Sandy Hook 2nd Shooter Cover-Up | December 19, 2012 | 6W6b-voc-Ds |
| 4 | Sandy Hook Father Remembers Fallen Hero | December 19, 2012 | 8cZkHDHl6nQ |
| 5 | Lower Part of Gotham Renamed "Sandy Hook" in Dark Knight Film | December 21, 2012 | Fus1FpQiU-Q |
| 6 | Callers React to Foreign Media Pushing Total Gun Confiscation | January 4, 2013 | SH VIDEO 2 |
| 8 | Prof. Claims Sandy Hook Massacre MSM Misinformation | January 10, 2013 | D8GxrKJDSL8 |
| 9 | Sandy Hook AR-15 Hoax? Still No School Surveillance Footage | January 15, 2013 | Oo74myC3bqY |
| 10 | Clearing Up Some Disinfo on Sandy Hook Massacre with James Tracy | January 18, 2013 | SH VIDEO 3 |
| 11 | Why People Think Sandy Hook is a Hoax | January 27, 2013 | tM5ZdO-IgEE |
| 12 | Dr. Steve Pieczenik: Sandy Hook was A Total False Flag! | March 27, 2013 | 5EfyD7Wu5fQ |
| 13 | Crisis Actors Used at Sandy Hook! Special Report | April 1, 2013 | shQSVhS0hLw |
| 14 | Obama Gun Grab Psyop | April 9, 2013 | SH VIDEO 4 |
| 15 | Shadow Govt Strike Again | April 16, 2013 | SH VIDEO 5 |
| 16 | Sandy Hook Police Ordered to Stand Down? | November 23, 2013 | xP9fhKUaudo |
| 17 | Sandy Hook Investigator Stonewalled and Threatened | February 20, 2014 | oGpWtqdiSCY |
| 18 | Sandy Hook, False Narratives Vs. The Reality | March 14, 2014 | esIvAO2aIlw |
| 19 | Revealed: Sandy Hook Truth Exposed | May 9, 2014 | _rSLOYCHNdw |

| 20 | Sandy Hook "Officials" Caught In Coverup And Running Scared | May 13, 2014 | MH6hmI1h-iQ |
| 21 | Bombshell: Sandy Hook Massacre Was A DHS Illusion Says School Safety Expert | May 13, 2014 | x2a1FwYEZS4 |
| 22 | Sandy Hook Deaths Missing From FBI Report | September 25, 2014 | A2Z0zUZBn7k |
| 23 | Sandy Hook Film Censorship Efforts Backfire | December 12, 2014 | 4T8_WYzH5SM |
| 24 | The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms | December 12, 2014 | 6aK0P-WxjU8 |
| 25 | Will Bushmaster Lawsuit Reveal Sandy Hook Hoax? | December 16, 2014 | BFyDqDLAcLQ |
| 26 | Lawsuit Could Reveal Truth About Sandy Hook Massacre | December 27, 2014 | kK8CnIBA928 |
| 27 | America the False Democracy | December 28, 2014 | SH VIDEO 6 |
| 28 | Why We Accept Govt Lies | January 13, 2015 | SH VIDEO 7 |
| 29 | Title Unknown – Video discussing HONR Network | February 12, 2015 | SH VIDEO 8 |
| 30 | New Bombshell Sandy Hook Information In-Bound | March 4, 2015 | _7ib5WkULBY |
| 31 | New Sandy Hook Questions Arise from FOIA Hearing | May 29, 2015 | 5cll79t7Mrw |
| 32 | Sandy Hook: The Lies Keep Growing | May 29, 2015 | Ml3KVj2nVRA |
| 33 | School Administrator Exposes Sandy Hook Stonewall | May 29, 2015 | SO8Xb-t4nT4 |
| 34 | Official Claims DHS Involved in Sandy Hook | June 4, 2015 | BWsbyH2Wa0E |
| 35 | Govt is Manufacturing Crises | July 7, 2015 | SH VIDEO 9 |
| 36 | Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP | July 7, 2015 | jCOe3qIgyFA |

| 37 | The Fight for Freedom of Information in Sandy Hook | July 8, 2015 | l0miXJ-djeA |
| 38 | Alex Jones Final Statement on Sandy Hook | November 18, 2016 | MwudDfz1yAk |
| 39 | Hunt for Wikileaks Source Begins | March 8, 2017 | SH VIDEO 10 |
| 40 | Sandy Hook Vampires Exposed | April 22, 2017 | rUn1jKhWTXI |
| 41 | Media Refuses To Report Alex Jones' Real Statements On Sandy Hook | June 13, 2017 | kf2F7RxJ9e4 |
| 42 | Zero Hedge Discovers Anomaly In Alex Jones Hit Piece | June 26, 2017 | SH VIDEO 11 |
| 43 | JFK Assassination Documents To DROP Tonight | October 26, 2017 | SH VIDEO 12 |
| 44 | Watch as Megyn Kelly Opens Old Wounds Of Sandy Hook Victims | April 20, 2018 | uQkAJykqyeo |

Becca Lewis
Stanford University, Department of Communication
Building 120, Room 110
450 Jane Stanford Way
Stanford, CA 94305
(650) 723-1941

Ms. Lewis is an academic researcher in the field of media technologies and online discourse, with a focus on media manipulation and disinformation. Ms. Lewis will offer her expertise on digital political subcultures, internet celebrity, and online news platforms. Ms. Lewis will testify about InfoWars' cultural footprint and role in the online media ecosystem. Ms. Lewis will opine that Defendants' actions were a substantial factor in the spread of false facts about the Sandy Hook shooting. Materials reviewed by Ms. Lewis are being produced as SANDY HOOK-000643-002142. Ms. Lewis has also reviewed the March 4, 2019 deposition of Alex Jones, the November 26, 2019 deposition of Alex Jones, and the November 27, 2019 deposition of Paul Watson. Ms. Lewis has also reviewed the June 26, 2017 video entitled "Zero Hedge Discovers Anomaly In Alex Jones Hit Piece" and the April 22, 2017 video entitled "Sandy Hook Vampires Exposed." Ms. Lewis has also reviewed FSSTX-082669-082812; FSSTX-085731-FSSTX-086492; FSSTX-086569-FSSTX-086583; FSSTX-086588-FSSTX-086589. Ms. Lewis has also reviewed Plaintiff's petition. Ms. Lewis has also reviewed Plaintiff's discovery requests and Defendants' responses. Ms. Lewis' curriculum vitae is attached as Exhibit "2."

Dr. Roy Lubit
165 West End Ave #3k
New York, NY 10023
(917) 846-7829

Dr. Lubit is a forensic psychiatrist with expertise in the impact of stress and emotional trauma. Dr. Lubit will testify about Plaintiff's mental injury and the psychological stresses involved from Defendants' false statements and denial of Plaintiff's trauma. Dr. Lubit will opine that Defendants' actions were a substantial factor in Plaintiff's severe mental anguish and continuing grief. Dr. Lubit will testify about his evaluation of Plaintiff. Dr. Lubit will also review any medical records produced in this suit. Dr. Lubit's curriculum vitae is attached as Exhibit "3."

II.

Plaintiff reserves the right to supplement this designation with additional designations of experts within the time limits imposed by the Court or any alterations of same by subsequent Court Order or agreement of the parties, or pursuant to the Texas Rules of Civil Procedure and/or the Texas Rules of Civil Evidence.

III.

Plaintiff reserves the right to elicit, by way of cross-examination, opinion testimony from experts designated and called by other parties to the suit.  Plaintiff expresses his intention to possibly call, as witnesses associated with adverse parties, any of Defendants' experts.

IV.

Plaintiff reserves the right to call undesignated rebuttal expert witnesses whose testimony cannot reasonably be foreseen until the presentation of the evidence against Plaintiff.

V.

Plaintiff reserves the right to withdraw the designation of any expert and to aver positively that any such previously designated expert will not be called as a witness at trial, and to re-designate same as a consulting expert, who cannot be called by opposing counsel.

VI.

Plaintiff reserves the right to elicit any expert opinion or lay opinion testimony at the time of trial which would be truthful, which would be of benefit to the jury to determine material issues of fact, and which would not be violative of any existing Court Order or the Texas Rules of Civil Procedure.

## VII.

Plaintiff hereby designates, as adverse parties, potentially adverse parties, and/or as witnesses associated with adverse parties, all parties to this suit and all experts designated by any party to this suit, even if the designating party is not a party to the suit at the time of trial.  In the event a present or future party designates an expert but then is dismissed for any reason from the suit or fails to call any designated expert, Plaintiff reserves the right to designate and/or call any such party or any such experts previously designated by any party.

## VIII.

Plaintiff reserves whatever additional rights they might have with regard to experts, pursuant to the Texas Rules of Civil Procedure, the Texas Rules of Civil Evidence, the case law construing same, and the rulings of the trial court.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
(713) 221-8300 Telephone
(713) 221-8301 Fax

**ATTORNEY FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

       I hereby certify that on 2nd day of December, the forgoing document was served upon all counsel of record via electronic service.

       Bradley J. Reeves
       Reeves Law, PLLC
       702 Rio Grande St., Suite 203
       Austin, Texas 78701
       Email:  brad@brtx.law

MARK D. BANKSTON

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 60455400
Status as of 1/6/2022 3:23 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 1/4/2022 12:11:55 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 1/4/2022 12:11:55 AM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 1/4/2022 12:11:55 AM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 1/4/2022 12:11:55 AM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 1/4/2022 12:11:55 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 1/4/2022 12:11:55 AM | SENT |

No.  D-1-GN-18-001842

1/5/2022 1:44 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Alexus Rodriguez

| | | |
|---|---|---|
| **LEONARD POZNER AND** | : | **IN THE DISTRICT COURT OF** |
| **VERONIQUE DE LA ROSA** | : | |
| | : | |
| **vs.** | : | **TRAVIS COUNTY, TEXAS** |
| | : | |
| **ALEX E. JONES, INFOWARS, LLC,** | : | |
| **AND FREE SPEECH SYSTEMS, LLC** | : | **345TH JUDICIAL DISTRICT** |

## NOTICE OF DELIVERY

RE:  **Rotondo, Dean, John, M.D., P.A. (Medical/Psychiatric)**

I,    **Cris Garza**    , Notary Public in and for the State of Texas, hereby certify pursuant to the Rule 203, Texas Rules of Civil Procedure,

1.  That this Deposition by Written Questions of **Raelene Maia**, the Custodian of Records for the above named is a true and exact duplicate of the records pertaining to **Leonard Pozner**, given by the witness named herein

2.  That the transcript is a true record of the testimony given by the witness;

3.  That $ **182.55** is the charge for the preparation of the completed Deposition by Written Questions and any copies of exhibits, charged to Attorney for **Plaintiff, Mark D. Bankston, TBA # 24001430;**

4.  **That the deposition transcript was submitted on  10/13/2021 9:00AM.** to the witness for examination, signature and return to the officer by a specified date;

5.  That changes, if any made by the witness, in the transcript and otherwise are attached thereto or incorporated therein;

6.  That the witness returned the transcript;

7.  That the original deposition by Written Questions and a copy thereof, together with copies of all exhibits was delivered to **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 1117 Herkimer Street Houston, 77008** who Noticed the first questions for safekeeping and use at trial;

8.  That pursuant to information made a part of the records at the time said testimony was taken, the following includes all parties of record:
    **Bradley Reeves (Reeves Law, PLLC) 512-318-2484**
    **Mark D. Bankston (Kaster, Lynch, Farrar & Ball, LLP) 713-221-8301**
and
9.  A copy of this Notice of Delivery was served on all parties shown herein.

GIVEN UNDER MY HAND AND SEAL OF OFFICE ON  10/28/2021 .

**Discovery Resource**
**1511 West 34th Street**
**Houston, TX 77018**
**713-223-3300 Fax713-228-3311**



Notary Public in and for the State of Texas

93512.005

CRIS GARZA
MY COMMISSION EXPIRES
JUNE 23, 2025
NOTARY ID: 126941309

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 60520287
Status as of 1/7/2022 10:22 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 1/5/2022 1:44:14 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 1/5/2022 1:44:14 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 1/5/2022 1:44:14 PM | SENT |
| Mark Bankston | 24071066 | mark@fbtrial.com | 1/5/2022 1:44:14 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 1/5/2022 1:44:14 PM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 1/5/2022 1:44:14 PM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 1/5/2022 1:44:14 PM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 1/5/2022 1:44:14 PM | SENT |
| Robert Linkin | | rlinkin@munckwilson.com | 1/5/2022 1:44:14 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 1/5/2022 1:44:14 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 1/5/2022 1:44:14 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 1/5/2022 1:44:14 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 1/5/2022 1:44:14 PM | SENT |

1/5/2022 12:54 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Chloe Jimenez

**CAUSE NO. D-1-GN-18-001842**

| | | |
|---|---|---|
| LEONARD POZNER AND VERONIQUE DE LA ROSA, | § § § | IN THE DISTRICT COURT OF |
| **Plaintiff,** | § § | |
| **v.** | § § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, et al., | § § § | |
| **Defendants.** | § § | 345TH JUDICIAL DISTRICT |

## NON-PARTY MEDIA VERITE'S UNOPPOSED REQUEST FOR ORDER TO ALLOW RECORDING AND BROADCASTING OF COURT PROCEEDINGS

Non-Party Media Verite files this Unopposed Request for Recording and Broadcasting of Court Proceedings pursuant to TEX. R. CIV. P. 18c and Travis County Local Rule 16, and in support thereof shows the Court the following:

### I.    SUMMARY

Media Verite is a multi-award-winning production company, Canadian and British based, helmed by four-time academy award nominated and two-time Oscar Winner Malcolm Clarke. The filmmakers would like permission to film the court proceedings for a documentary based in part on the First Amendment rights battle between InfoWars and the families of Sandy Hook. The documentary seeks to look into the court case and legal battles between the two sides and the issues and effects on the broader public in the USA. By this request, Media Verite seeks to record the proceedings in this lawsuit and broadcast portions of the proceedings in the documentary. These recordings will not harm or disadvantage any party or potential witness but will instead promote

public access and exposure to the court system, in general, and the issues in this lawsuit, in particular.

Media Verite will accommodate any necessary restrictions on recording imposed by the Court and be as unobtrusive as possible in its operations. Media Verite respectfully requests the Court exercise its discretion and allow the recording and broadcasting of these important proceedings.

## II. STATEMENT OF CONSENT

Plaintiff previously consented to a similar request by Amos Pictures, Ltd. to record all proceedings in this lawsuit, which request was granted by this Court on July 16, 2021 ("Court Order"). *See* Exhibit 1. That request and Court Order was supported by and agreed as to form and substance by both Plaintiffs and Defendants. *See id.* at 3. In addition, neither Plaintiff nor Defendants object to Media Verite's request to record all proceedings in this lawsuit. See Exhibits 2 and 3.

## III. PROCEDURAL BACKGROUND

This lawsuit is part of the following set of cases brought against Alex Jones, InfoWars, LLC, and Free Speech Systems, LLC ("Defendants"):

- Cause No. D-1-GN-18-001835: *Neil Heslin v. Alex E. Jones, InfoWars, LLC, et al.*; in the 261st Judicial District, Travis County, Texas;

- Cause No. D-1-GN-18-001842: *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, InfoWars, LLC, et al.*; in the 345th Judicial District, Travis County, Texas;

- Cause No. D-1-GN-18-006623; *Scarlett Lewis vs. Alex Jones, InfoWars, LLC & Free Speech Systems, LLC*; in the 98th Judicial District, Travis County, Texas; and

- Cause No. D-1-GN-19-004651; *Neil Heslin vs. Alex E. Jones, InfoWars, LLC & Free Speech Systems, LLC*; in the 261st Judicial District, Travis County, Texas.

(the "Lawsuits"). According to the allegations, the Lawsuits arise from:

> [T]he intentional infliction of emotional distress committed against Plaintiff for the past five years through InfoWars' recklessly false statements concerning the circumstances of the death of his child, as well as InfoWars' coordination and encouragement of a fringe community of dangerous fanatics who have stalked and endangered the Sandy Hook parents.

Orig. Pet., Cause No. D-1-GN-19-004651.[1]

Pursuant to TEX. R. CIV. P. 18c and Travis County Local Rule 16, this Court previously granted the Requests for Recording and Broadcasting of Court Proceedings in these Lawsuits brought by Non-Party Media, Amos Pictures, Ltd. *See* Exhibit 1. Similarly, Media Verite is filing Requests for Recording and Broadcasting of Court Proceedings in each of these Lawsuits.

## IV.    ARGUMENTS & AUTHORITIES

Trial courts in the United States have long recognized a presumption of openness in their proceedings grounded in the public's right to know ensured by the First and Sixth Amendments to the United States Constitution as well as Article 1, Sections 8 and 10 of the Texas Constitution.[2] Both the Sixth Amendment right to a public trial and the free speech and press clause affirmatively mandate access for cameras in the courtroom. In addition, the policies underlying these amendments favor media coverage of court proceedings as a means of advancing the public's understanding of the way in which the government, and specifically the judicial system, works. The Texas Constitution's free speech amendment provides in pertinent part:

---

[1]    There is one additional lawsuit against the Defendants (Cause No. D-1-GN-18-001605; *Marcel Fontaine v. Alex E. Jones, InfoWars, LLC*, et al.; in the 459th Judicial District, Travis County, Texas) that is unrelated to the Sandy Hook-related allegations. Media Verite does not seek to record or broadcast proceedings from this lawsuit.

[2]    Article I, Section 8 is the free speech provision to the Texas Constitution. Article I, Section 10 is the public trial provision to the Texas Constitution.

Every person shall be at liberty to speak, write or publish his opinions on any subject . . . and no law shall ever be passed curtailing the liberty of speech or of the press.

Media Verite requests permission to serve the constitutional mandates established by the United States and Texas Constitutions (and further enacted within the Travis County Local Rules) and record the proceedings in the Lawsuits.

**A.      The United States and Texas Constitutions Provide the Right of the Press and the Public to Attend Trials.**

The U.S. Supreme Court has long recognized that the Constitution requires both the press and the public be permitted to attend and observe judicial proceedings absent the most compelling circumstances. *See, e.g., Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 9 (1986). There are no compelling circumstances in this case to warrant otherwise. This is particularly true given the global pandemic, where the public now must rely even more heavily on the press to cover relevant court proceedings.

According to the U.S. Supreme Court, the essential factors to consider when determining whether access attaches to a particular proceeding are: (1) whether the place and process in question historically have been open to the press and the public in general, and (2) whether public access plays a significant positive role in the functioning of the particular process in question.[3] *Id.* at 8-9. Courts in the Fifth Circuit have applied these factors in determining access to civil proceedings in state courts, including those in Texas. *See Doe v. Santa Fe Indep. Sch. Dist.*, 933 F. Supp. 647, 650 (S.D. Tex. 1996) (citing *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059 (3rd Cir. 1984)); *see also Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981). Finally, the Texas Supreme Court demonstrated its belief that both factors were met by lifting the ban on cameras in the courtroom, effective September 1, 1990. The Texas Supreme Court deleted Canon 3(a)(10) of the

---

[3]      These factors will be discussed *infra* Section IV.B.3.

Code of Judicial Conduct and amended Rule 18c of the Texas Rules of Civil Procedure to establish guidelines for the use of cameras in civil trial courts.

Texas Rule of Civil Procedure 18c provides that a trial court "may permit broadcasting, televising, recording, or photographing of proceedings" in three distinct circumstances. Subparagraph (b) contains a requirement for consent by the parties. At the time of filing, neither Plaintiff nor Defendants object to the request for recording and broadcasting by Non-Party Media Verite, so recording and broadcasting is appropriate under Rule 18c(b). Even absent this consent, recording and broadcasting is still proper under Rule 18c(a). Consent of the parties is **not** required under Rule 18c(a) where the media coverage is sought under guidelines promulgated by the Supreme Court. Accordingly, as set forth below, Media Verite's media coverage of this hearing pursuant to TEX. R. CIV. P. 18c(a), in accordance with the Local Rules adopted by the Supreme Court, is a proper circumstance under which the Court may permit the videotaping and broadcasting of these proceedings without regard to consent of the parties.

**B. Recording and Broadcasting of the Lawsuits Should be Permitted Under Travis County Local Rules.**

In accordance with the Texas Supreme Court's guidance, many local jurisdictions—including Travis County—have adopted their own rules and procedures regarding cameras in the courtroom. The Rules Governing the Recording and Broadcasting of Court Proceedings in the Civil District Courts of Travis County (the "Local Rules") were approved by order of the Texas Supreme Court on April 14, 2014. Under the Local Rules, "the decision to allow [media] coverage is discretionary and will be made by the Court on a case-by-case basis." Local Rule 16.3.4. "In determining an application for coverage, the Court shall consider all relevant factors, including but not limited to:

    a) the type of case involved;

    b)  whether the coverage would cause harm to any participants;

    c)  whether the coverage would interfere with the fair administration of justice, advancement of a fair trial, or the rights of the parties;

    d)  whether the coverage would interfere with any law enforcement activity;

    e)  the objections of any of the parties, prospective witnesses, victims, or other participants in the proceeding for which coverage is sought; the physical structure of the courtroom and the likelihood that and equipment required to conduct coverage of proceedings can be installed and operated without disturbance to those proceedings or any other proceedings in the Courthouse;

    f)  the extent to which the coverage would be barred by law in the judicial proceeding of which coverage is sought; and

    g)  the fact that any party, prospective witness, victim, or other participant in the proceeding is a child, to which fact the Court shall give great weight."

*Id*. Here, as discussed below, these factors weigh heavily in favor of allowing Media Verite

to record and broadcast the proceedings.

### 1.  The type of case involved.

At their core, the Lawsuits involve issues related to freedom of speech, defamation, and media rights. The plaintiffs in these Lawsuits allege that the Defendants published false and defamatory statements in videos and articles with the intent to cause emotional distress, harassment, and ridicule to the plaintiffs. In response, the Defendants claim the following:

> [T]his lawsuit is also a strategic device used by Plaintiff and her attorneys, in conjunction with at least other two lawsuits filed by her attorneys on behalf of others with whom Plaintiff is acting, to silence Defendants' free speech and an attempt to hold Defendants liable for simply expressing their opinions about **matters of public concern**. The goal of Plaintiff and her attorneys in this lawsuit as well as the goal of others who have similarly sued, is to silence Defendants from expressing what she and they consider to be inappropriate speech about Sandy Hook and other **matters of public concern**.

*See* Defendants' Motion to Dismiss under the Texas Citizens Participation Act, Cause No. D-1-

GN-18-006623 (emphasis added). Media Verite believes the public has great interest in not only

the subject matter of these Lawsuits, but also in how the judicial system will resolve these contentious claims, which is still a topic of interest today.[4]

## 2. Whether the coverage would cause harm to any participants.

Plaintiff—who arguably could suffer the most harm from having these proceedings broadcast—has consented to their recording. Defendants likewise do not object to Media Verite's request. Nor can anyone offer any demonstrable injury that might result from such recordings. Indeed, the Defendants, who operate in the media space, should embrace open access to these proceedings. InfoWars.com has reached more than 1 million page visits per day and, as of 2018, averaged more than 25 million page views per month.[5] It would be incongruous to allow the Defendants to broadcast the very statements, articles, interviews, and videos at issue in these Lawsuits while, at the same time, disallowing the public from viewing proceedings that attempt to hold Defendants liable for those publications.

## 3. Whether the coverage would interfere with the fair administration of justice, advancement of a fair trial, or the rights of the parties.

Trials have traditionally been open for public scrutiny. *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 580 n.17 (1980);[6] *Gannett Co. v. DePasquale*, 443 U.S. 368, 386, n. 15 (1979). This is, in part, because the public and the press have a First Amendment right to attend

---

[4]   https://www.nytimes.com/2021/10/01/us/alex-jones-lawsuit-sandy-hook.html

[5]   https://www.statesman.com/story/business/2018/08/13/bans-dont-seem-to-be-lessening-reach-of-alex-jones-infowars/9964821007/

[6]   In *Richmond Newspapers*, the Supreme Court addressed squarely for the first time whether a criminal trial could be closed to the public on the request of a defendant without a demonstration that closure is required to protect the defendant's right to a fair trial, or that some other overriding consideration requires closure. The Supreme Court held that it could not. Long ago, Texas reached the same conclusion. See *Ex parte Foster*, 44 Tex. Crim. 423, 71 S.W. 593 (1903); *Ex parte McCormick*, 129 Tex. Crim. 457, 88 S.W.2d 104 (1935). While *Richmond Newspapers* addressed the closure of a criminal trial, its reasoning is generally applicable to civil trials. Indeed, the court noted that historically both civil and criminal trials have been presumptively open. *Richmond Newspapers*, 448 U.S. at 575.

trials. "[T]he First Amendment can be read as protecting the right of everyone to attend trials ...." *Richmond Newspapers*, 448 U.S. at 573-575. Indeed, openness "has long been recognized as an indispensable attribute of an Anglo-American trial." *Id*. at 569; *accord Craig v. Harney*, 331 U.S. 367, 374 (1947) ("A trial is a public event. What transpires in the courtroom is public property."). As Justice Brennan explained: "Where ... the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspapers v. Superior Court*, 457 U.S. 596, 606-07 (1982).

The core purpose of this right of access is to enable the public, through the press, to monitor judicial proceedings.[7] *See Richmond*, 448 U.S. at 555. This purpose is clearly met in this case. The First Amendment right to attend trials serves to reinforce public acceptance of "both the process and its results." *Id*. at 571. In his concurring opinion, Justice Brennan referred to this as the presses' broader "structural" role of ensuring full and informed participation in the democratic process. *Id*. at 587-88.[8] In a later case, the Supreme Court reiterated that "[p]ublic access to civil proceedings plays a significant role in the proper functioning of the judicial process and the government as a whole." *Globe Newspapers*, 457 U.S. at 606.

The U.S. Supreme Court has repeatedly made it clear that press and public rights to attend both civil and criminal trials serve not only to educate the public about how the justice systems works, but also to secure confidence in that system. *Richmond Newspapers*, 448 U.S. at 572; *Globe*

---

[7]     Paul, Angelique M., *Turning the Camera on Court TV: Does Televising Trials Teach us Anything About the Real Law?*, 58 OHIO ST. L. J. 655, 691, at n. 3 (1997)("For any democracy to survive and flourish, the citizens of that democracy must know what their public servants are doing and how well they are performing the jobs with which they have been entrusted.").

[8]     Justice Brennan also noted that "public access to trials displays their fairness, prevents public resentment, dissuades judges from excess, and calls the attention of important, but unknown witnesses." *Richmond Newspapers*, 448 U.S. at 595-97.

*Newspapers Co.*, 457 U.S. at 605-06. The Court's justification for allowing filming applies equally
to civil proceedings.[9]

During the current global pandemic where in-person attendance is not feasible, the right to
attend trial is vindicated through the press' ability to cover trial proceedings. Here, Media Verite'
coverage will enhance the dignity of the proceedings and the public's perception of them. The
coverage of the actual proceedings, with a dignified judge presiding over a respectful and attentive
courtroom, will contrast with the typically skewed or sensationalized events, such as "spin control"
conducted by parties and television dramatizations of courtroom proceedings, that may transpire
**outside** the courtroom. The camera inside the courtroom, unobtrusively and accurately recording
the dignified proceedings, will enable the public to see what actually occurred and create an
historical record.

**4.  Whether the coverage would interfere with any law enforcement activity.**

Media Verite is not aware of any law enforcement activity related to the subject matter of
the Lawsuits. Even so, allowing Media Verite access to these proceedings would not interference
with any law enforcement activity.

**5.  The objections of any of the parties, prospective witnesses, victims, or other
participants in the proceeding for which coverage is sought; the physical structure of
the courtroom and the likelihood that any equipment required to conduct coverage
of proceedings can be installed and operated without disturbance to those
proceedings or any other proceedings in the Courthouse.**

---

[9]      Cameras have also traditionally been allowed in a variety of civil proceedings. *See Deatherage v.
Examining Bd. of Psychology*, 932 P.2d 1267 (Wash. App. 1996) (cameras allowed in an administrative
disciplinary hearing of a Washington psychologist); *New York v. Haygood*, 23 Med. L. Rptr. 1636 (N.Y.
Sup. Ct. 1995)(camera allowed in civil trial of podiatrist accused of billing fraud); *Sprecher v. Sprecher*,
15 Med. L. Rptr. 1773 (N.Y. Sup. Ct. 1988) (camera allowed in child custody proceeding); *Lang v. Tampa
Television, Inc.*, 11 Med. L. Rptr. 1150 (Fla. 4th Cir. Ct. 1984) (television station granted permission to
broadcast proceedings in civil action by rape victim).

No party, prospective witnesses, victims, or other participants in the Lawsuits has voiced any objection to Media Verite being allowed to record and broadcast the proceedings.

If the proceedings in the Lawsuits are conducted virtually via Zoom, then there will be very little, if any, obstruction. If the proceedings are conducted at the courthouse, Media Verite will operate at all times with great care and in close consultation with the Court and its staff and will submit to the Court in all matters related to any restrictions on recording. Media Verite has significant prior experience filming court proceedings in the United States and will ensure that the business of the court is not impeded and the Judge's instructions are followed. Equipment will be unobtrusive and consist of one digital cinema camera on a tripod, which can be operated from a seated position, as well as a number of remotely operated wireless microphones.

Given the parameters of Media Verite' request and the breadth of experience Media Verite has in filming in an unobtrusive manner in the courtroom, the Court can comfortably set conditions on Media Verite that will eliminate any concerns of interference in the proceedings.

6. **The extent to which the coverage would be barred by law in the judicial proceeding of which coverage is sought.**

Media Verite is not aware of any law that would prevent or prohibit the recording and broadcast of the proceedings in this Lawsuit. Instead, as set forth above, the law strongly supports Media Verite' proposed filming of the proceedings.

7. **The fact that any party, prospective witness, victim, or other participant in the proceeding is a child, to which fact the Court shall give great weight.**

The Sandy Hook school shooting involved the tragic loss of the lives of multiple children. But in this Lawsuit, there are no minor plaintiffs, nor minor witnesses expected. As a result, this factor weighs in favor of recording and broadcasting.

In the unexpected event that a minor does testify in the proceedings, Media Verite will comply with any restrictions on recording the Court deems necessary. In this regard, the opinion in *Doe v. Santa Fe Independent School District*, 933 F. Supp. 647, 650 (S.D. Tex. 1996) is instructive. In *Doe*, the court considered access to a civil trial involving adult and minor plaintiffs over violations of the First Amendment establishment clause. *Id*. The court held that the trial would be closed only to the extent necessary to protect the minor plaintiffs but would not be closed to protect the adult plaintiffs. *Id*. at 651. The court held that the trial should remain open to the public unless "denial [of the constitutional right of access] is necessitated by a compelling governmental interest and is narrowly tailored to serve that interest." *Id*. at 650 (*quoting Globe Newspaper*, 457 U.S. at 607). Ultimately, the court found the adult plaintiffs' right of privacy was insufficient to deny the public's First Amendment right of access. *Id*. at 652. Accordingly, to the extent the Court requires restrictions related to minor victims or minor witnesses, the Court should grant open access to the remaining proceedings that do not involve minors.

### C. Media Verite Will Comply with Travis County Local Rules.

Media Verite and its personnel understand and agree that:

1. All media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and the Local Rules.

2. If the Court requires, there will be no audio or visual coverage of the testimony of any witness unless consent of that witness has been obtained in the manner required by the Court and filed with the District Clerk, with a copy delivered to the trial court.

3. Permission may be withdrawn by the Court at any time pursuant to the Local Rules, at which time media coverage will immediately cease.

4. This request has been filed with the District Clerk, with a copy delivered to the trial court and the Court Administrator.

## V.     CONCLUSION

The factors set forth by the Travis County Local Rules applied to the circumstances of the

Lawsuits favor open access to—and recording and broadcasting of—all proceedings in the

Lawsuits. Accordingly, Media Verite respectfully requests an order allowing it to record and

broadcast all proceedings in the Lawsuits pursuant to Local Rule 16.

Respectfully submitted,

By:   */s/ Robert E. Linkin*

**ROBERT E. LINKIN**
State Bar No. 00795773
**MUNCK WILSON MANDALA LLP**
rlinkin@munckwilson.com
807 Las Cimas Parkway, Suite 300
Austin, Texas 78746
737-201-1616 *tel*
737-201-1601 *fax*

## **CERTIFICATE OF SERVICE**

This is to certify that on the 5th day of January 2022, a true and correct copy of the foregoing
has been served via electronic service on all counsel of record:

Mark Bankston
Farrar & Ball, LLP
1117 Herkimer Street
Houston, TX 77008
713.221.8300
mark@fbtrial.com

Bradley Reeves
Reeves Law, PLLC
702 Rio Grande Street
Austin, TX, 78701
(512) 827-2246
brad@brtx.law

*/s/ Robert E. Linkin*
Robert E. Linkin

7/19/2021 4:33 PM
**Velva L. Price
District Clerk
Travis County
D-1-GN-18-001835
Jessica A. Limon**

## CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| **NEIL HESLIN,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES, et al.** | § | |
| *Defendants.* | § | **261st JUDICIAL DISTRICT** |

## CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| **SCARLETT LEWIS,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES, et. al,** | § | |
| *Defendants.* | § | **261st JUDICIAL DISTRICT** |

## CAUSE NO. D-1-GN-19-004651

| | | |
|---|---|---|
| **NEIL HESLIN,** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES, et. al,** | § | |
| *Defendants.* | § | **261st JUDICIAL DISTRICT** |

## CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| **LEONARD POZNER, et al.** | § | **IN THE DISTRICT COURT OF** |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES, et. al,** | § | |
| *Defendants.* | § | **345th JUDICIAL DISTRICT** |

## ORDER ALLOWING RECORDING AND<br>BROADCASTING OF COURT PROCEEDINGS

On this day, the Court considered Non-Party Amos Pictures, Ltd.'s ("Amos Pictures")

Request for Recording and Broadcasting of Court Proceedings pursuant to TEX. R. CIV. P.

Unofficial copy Travis Co. District Clerk Velva L. Price

18c and Travis County Local Rule 16 ("Request"). After considering the Request, the relevant factors, as well as the consent of the parties, the Court finds that the Request should be and is hereby GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Amos Pictures' Request for Recording and Broadcasting of Court Proceedings pursuant to TEX. R. CIV. P. 18c and Travis County Local Rule 16 is GRANTED.

IT IS FURTHER ORDERED that Amos Pictures is entitled to record and broadcast all proceedings in the above-captioned lawsuits through both visual coverage[1] and audio coverage.[2] Amos Pictures shall be entitled to install equipment in the courtroom for the purpose of such coverage.

IT IS FURTHER ORDERED all media personnel covering the proceedings will comply with applicable provisions of the Texas Rules of Civil Procedure and the Travis County Local Rules.

IT IS SO ORDERED.

Signed on this __16th__ day of July 2021.

HONORABLE JUDGE MAYA GUERRA GAMBLE

---

[1] Pursuant to Travis County Local Rule 16.1, "visual coverage" shall mean and include coverage by equipment that has the capacity to reproduce or telecast an image, and includes still and moving picture photographic equipment and video equipment.

[2] Pursuant to Travis County Local Rule 16.1, "audio coverage" shall mean coverage by equipment that has the capacity to reproduce or broadcast sounds, and includes digital, tape and cassette sound recorders, and radio and video equipment.

## AGREED AS TO FORM AND SUBSTANCE:

*/s/ Mark Bankston (w/ permission JAR)*
Mark Bankston
*Counsel for Plaintiffs*


*/s/ Brad Reeves (w/ permission JAR)*
Brad Reeves
*Counsel for Defendants*


*/s/ Joshua A. Romero*
Joshua A. Romero
*Counsel for Amos Pictures*


29530896v.2

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Shannon Matusek-Steele on behalf of Samuel Denton
Bar No. 24064378
shannon.matusek-steele@traviscountytx.gov
Envelope ID: 55490948
Status as of 7/19/2021 10:00 PM CST

Associated Case Party: NeilHeslin

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark D.Bankston | | mark@fbtrial.com | 7/19/2021 4:33:03 PM | SENT |

Associated Case Party: AlexE.Jones

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/19/2021 4:33:06 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 7/19/2021 4:33:06 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 7/19/2021 4:33:06 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 7/19/2021 4:33:06 PM | SENT |
| Mark Charles Enoch | 6630360 | fly63rc@verizon.net | 7/19/2021 4:33:06 PM | SENT |
| Warren Lloyd Vavra | 786?0 | warren.vavra@traviscountytx.gov | 7/19/2021 4:33:06 PM | SENT |
| Velva Lasha Price | 16015950 | velva.price@traviscountytx.gov | 7/19/2021 4:33:06 PM | SENT |
| William Ogden | | bill@fbtrial.com | 7/19/2021 4:33:06 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 7/19/2021 4:33:06 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 7/19/2021 4:33:06 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 7/19/2021 4:33:06 PM | SENT |

Associated Case Party: InfoWars, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/19/2021 4:33:06 PM | SENT |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Shannon Matusek-Steele on behalf of Samuel Denton
Bar No. 24064378
shannon.matusek-steele@traviscountytx.gov
Envelope ID: 55490948
Status as of 7/19/2021 10:00 PM CST

Associated Case Party: Free Speech, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/19/2021 4:33:06 PM | SENT |

Associated Case Party: Owen Shroyer

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 7/19/2021 4:33:06 PM | SENT |

| | |
|---|---|
| **From:** | Mark Bankston |
| **To:** | Gaby Monahan; brad@brtx.law |
| **Cc:** | Robert E. Linkin; Michael A. Dimmitt; Kelsey Tauzin |
| **Subject:** | RE: Consent to Media Verite"s Request for Recording and Broadcasting of Court Proceedings |
| **Date:** | Monday, January 3, 2022 6:41:35 PM |
| **Attachments:** | image002.png |

[External]


Plaintiffs have no objection.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

---

**From:** Gaby Monahan <gmonahan@munckwilson.com>
**Sent:** Monday, January 3, 2022 4:40 PM
**To:** brad@brtx.law; Mark Bankston <mark@fbtrial.com>
**Cc:** Robert E. Linkin <rlinkin@munckwilson.com>; Michael A. Dimmitt
<mdimmitt@munckwilson.com>; Kelsey Tauzin <ktauzin@munckwilson.com>
**Subject:** Consent to Media Verite's Request for Recording and Broadcasting of Court Proceedings

Good afternoon,

Rob Linkin and I represent Media Verite, a multi-award-winning production company,
Canadian and British based, helmed by four-time academy award nominated and two-time
Oscar Winner Malcolm Clarke.  The filmmakers will be seeking permission to film the court
proceedings in the cases listed below. The recordings will be used to create a documentary
based in part on the First Amendment rights battle between InfoWars and the families of
Sandy Hook. The documentary seeks to look into the court case and legal battles between the
two sides and the issues and effects on the broader public in the USA.

Please advise if you object to Media Verite's recording of these proceedings. We intend to file
before the end of this week.

- Cause No. D-1-GN-18-001835: *Neil Heslin v. Alex E. Jones, InfoWars, LLC, et al.*; in the
  261st Judicial District, Travis County, Texas;
- Cause No. D-1-GN-18-001842: *Leonard Pozner and Veronique De La Rosa v. Alex E.
  Jones, InfoWars, LLC, et al.*; in the 345th Judicial District, Travis County, Texas;
- Cause No. D-1-GN-18-006623; *Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC & Free
  Speech Systems, LLC*; in the 98th Judicial District, Travis County, Texas; and
- Cause No. D-1-GN-19-004651; *Neil Heslin vs. Alex E. Jones, InfoWars, LLC & Free Speech
  Systems, LLC*; in the 261st Judicial District, Travis County, Texas.

Thanks,

**Gaby I. Monahan**
Partner



807 Las Cimas Pkwy, Building II
Suite 300
Austin, Texas 78746
d. +1 737.201.1604
m. +1 773.715.1457
e: gmonahan@munckwilson.com
w. munckwilson.com
Connect with me on LinkedIn
Follow Munck on LinkedIn
Follow Munck on Twitter



**Confidentiality Notice:**  This e-mail (including any attachments) may contain information that is private, confidential or protected by attorney-client or other privilege.  It is intended solely for the use of the addressee(s) listed above.  If you are not the intended recipient of this message, please do not print, copy or disclose this information.  If you received this e-mail in error, please disregard it and delete it and any attachments from your system.  Please also notify us by return email or by telephone at 972.628.3600 so that we may correct our records.

Please note that the "from" field and signature block of this email does not constitute an electronic signature, offer, or acceptance of any kind.

| | |
|---|---|
| **From:** | Bradley Reeves |
| **To:** | Robert E. Linkin; Mark Bankston |
| **Cc:** | Gaby Monahan; Michael A. Dimmitt; Kelsey Tauzin |
| **Subject:** | RE: Consent to Media Verite"s Request for Recording and Broadcasting of Court Proceedings |
| **Date:** | Tuesday, January 4, 2022 2:51:14 PM |
| **Attachments:** | image002.png |

[External]


No objection.

Best regards,

Brad Reeves

---

**From:** Robert E. Linkin <rlinkin@munckwilson.com>
**Sent:** Monday, January 3, 2022 7:13 PM
**To:** Mark Bankston <mark@fbtrial.com>
**Cc:** Gaby Monahan <gmonahan@munckwilson.com>; Bradley Reeves <brad@brtx.law>; Michael A. Dimmitt <mdimmitt@munckwilson.com>; Kelsey Tauzin <ktauzin@munckwilson.com>
**Subject:** Re: Consent to Media Verite's Request for Recording and Broadcasting of Court Proceedings


Thanks for your response.

Much appreciated.

Best,

Robert E. Linkin


CONFIDENTIAL COMMUNICATION
This electronic mail message and any attachments are intended



On Jan 3, 2022, at 6:41 PM, Mark Bankston <mark@fbtrial.com> wrote:


[External]


Plaintiffs have no objection.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

**From:** Gaby Monahan <gmonahan@munckwilson.com>
**Sent:** Monday, January 3, 2022 4:40 PM
**To:** brad@brtx.law; Mark Bankston <mark@fbtrial.com>
**Cc:** Robert E. Linkin <rlinkin@munckwilson.com>; Michael A. Dimmitt <mdimmitt@munckwilson.com>; Kelsey Tauzin <ktauzin@munckwilson.com>
**Subject:** Consent to Media Verite's Request for Recording and Broadcasting of Court Proceedings

Good afternoon,

Rob Linkin and I represent Media Verite, a multi-award-winning production company, Canadian and British based, helmed by four-time academy award nominated and two-time Oscar Winner Malcolm Clarke.  The filmmakers will be seeking permission to film the court proceedings in the cases listed below. The recordings will be used to create a documentary based in part on the First Amendment rights battle between InfoWars and the families of Sandy Hook. The documentary seeks to look into the court case and legal battles between the two sides and the issues and effects on the broader public in the USA.

Please advise if you object to Media Verite's recording of these proceedings. We intend to file before the end of this week.

- Cause No. D-1-GN-18-001835: *Neil Heslin v. Alex E. Jones, InfoWars, LLC, et al.*; in the 261st Judicial District, Travis County, Texas;
- Cause No. D-1-GN-18-001842: *Leonard Pozner and Veronique De La Rosa v. Alex E. Jones, InfoWars, LLC, et al.*; in the 345th Judicial District, Travis County, Texas;
- Cause No. D-1-GN-18-006623; *Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC & Free Speech Systems, LLC*; in the 98th Judicial District, Travis County, Texas; and
- Cause No. D-1-GN-19-004651; *Neil Heslin vs. Alex E. Jones, InfoWars, LLC & Free Speech Systems, LLC*; in the 261st Judicial District, Travis County, Texas.

Thanks,

**Gaby I. Monahan**
Partner



807 Las Cimas Pkwy, Building II
Suite 300

Austin, Texas 78746
d. +1 737.201.1604
m. +1 773.715.1457
e: gmonahan@munckwilson.com
w. munckwilson.com
Connect with me on LinkedIn
Follow Munck on LinkedIn
Follow Munck on Twitter



**Confidentiality Notice:**  This e-mail (including any attachments) may contain information that is private, confidential or protected by attorney-client or other privilege.  It is intended solely for the use of the addressee(s) listed above.  If you are not the intended recipient of this message, please do not print, copy or disclose this information.  If you received this e-mail in error, please disregard it and delete it and any attachments from your system.  Please also notify us by return email or by telephone at 972.628.3600 so that we may correct our records.

Please note that the "from" field and signature block of this email does not constitute an electronic signature, offer, or acceptance of any kind.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Michael Dimmitt on behalf of Robert Linkin
Bar No. 795773
mdimmitt@munckwilson.com
Envelope ID: 60517395
Status as of 1/7/2022 1:50 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 1/5/2022 12:54:37 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 1/5/2022 12:54:37 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 1/5/2022 12:54:37 PM | SENT |
| Mark Bankston | 24071066 | mark@fbtrial.com | 1/5/2022 12:54:37 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 1/5/2022 12:54:37 PM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 1/5/2022 12:54:37 PM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 1/5/2022 12:54:37 PM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 1/5/2022 12:54:37 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 1/5/2022 12:54:37 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 1/5/2022 12:54:37 PM | SENT |
| Robert Linkin | | rlinkin@munckwilson.com | 1/5/2022 12:54:37 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 1/5/2022 12:54:37 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 1/5/2022 12:54:37 PM | SENT |

1/5/2022 12:54 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Chloe Jimenez

## MUNCK WILSON MANDALA

### Trials. Transactions. Technology.

ROBERT E. LINKIN                                                                        rlinkin@munckwilson.com
Direct Dial: (737) 201-1616

January 5, 2022

**_Via E-File_**

The Honorable Jan Soifer
345th District Court
Heman Marion Sweatt Travis County Courthouse
1000 Guadalupe, 5th Floor
Austin, Texas 78701

Re:     Media Request
        Cause No.: D-1-GN-18-001842

Your Honor,

We represent Media Verite, a multi-award-winning production company, Canadian and British based, helmed by four-time academy award nominated and two-time Oscar Winner Malcolm Clarke. Media Verite seeks permission to film court proceedings in the following cases:

- Cause No. D-1-GN-18-001835; *Neil Heslin vs. Alex E. Jones, InfoWars, LLC, et al*;

- Cause No. D-1-GN-18-001842: *Leonard Pozner and Veronique De La Rosa vs. Alex E. Jones, INFOWARS, LLC, et al*;

- Cause No. D-1-GN-18-006623: *Scarlett Lewis vs. Alex E. Jones, InfoWars, LLC, and Free SpeechSystems, LLC*;

- Cause No. D-1-GN-19-004651: *Neil Heslin vs. Alex E. Jones, InfoWars, LLC and Free SpeechSystems, LLC*;

Should the Court grant Media Verite's request, it would likely film all court proceedings from this date forward.

In view of the immense public interest and cultural significance of these cases, Media Verite is creating a documentary based in part on the First Amendment rights battle between InfoWars and the families of Sandy Hook. The documentary seeks to look into the court case and legal battles between the two sides and the issues and effects on the broader public in the USA. The program will be broadcast worldwide after the conclusion of legal proceedings in Texas.

The program, which will be strictly non-political and non-partisan, will seek to closely involve its audience in the complexities and the dramatic unfolding of the judicial process.

*The Honorable Jan Soifer*
*January 5, 2022*
*Page 2*

For the avoidance of doubt, no material filmed in court will be released or shared in any way before legal proceedings in each case listed above have come to an end.

We have reviewed the Texas Rule of Civil Procedure 18c and Travis County Local Rules of Civil Procedure and Rules of Decorum (Local Rules) Chapter 16.

We will operate at all times with great care and in close consultation with the court and its officers and will submit to the authority of the Court in all matters pertaining to the enforcement of the rules around filming.

We are available, at the Court's convenience to answer any questions regarding the above.

Respectfully,

MUNCK WILSON MANDALA, LLP

Robert E. Linkin

REL/kmt

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Michael Dimmitt on behalf of Robert Linkin
Bar No. 795773
mdimmitt@munckwilson.com
Envelope ID: 60517395
Status as of 1/7/2022 1:50 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 1/5/2022 12:54:37 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 1/5/2022 12:54:37 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 1/5/2022 12:54:37 PM | SENT |
| Mark Bankston | 24071066 | mark@fbtrial.com | 1/5/2022 12:54:37 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 1/5/2022 12:54:37 PM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 1/5/2022 12:54:37 PM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 1/5/2022 12:54:37 PM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 1/5/2022 12:54:37 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 1/5/2022 12:54:37 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 1/5/2022 12:54:37 PM | SENT |
| Robert Linkin | | rlinkin@munckwilson.com | 1/5/2022 12:54:37 PM | SENT |

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 1/5/2022 12:54:37 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 1/5/2022 12:54:37 PM | SENT |

1/7/2022 6:15 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Chloe Jimenez

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | 459th DISTRICT COURT |
| *Defendants* | § | |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |
| | § | |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |

---

**DEFENDANT, FREE SPEECH SYSTEMS, LLC'S, RESPONSE IN
OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS REGARDING
CORPORATE REPRESENTATIVE DEPOSITION**

---

## INTRODUCTION

Plaintiffs' motion is one of the most overreaching motion for sanctions filed to date in these cases, which is saying a lot considering Plaintiffs' propensity for filing such motions. Despite Plaintiffs' faux outrage at what Plaintiffs and their counsel perceive as deficiencies in the recent FSS corporate representative deposition, what is clear is that this motion is actually nothing more than a mechanism by which Plaintiffs' counsel has made usurped the confidentiality and protective orders entered by the Court to place confidential, attorney's-eyes-only documents and sensitive financial information of FSS *and* other Defendants who are not even a focus of this motion into the public eye to create a media firestorm and prejudice Defendants. It is absolutely ridiculous that Plaintiffs would file a motion for sanctions about a FSS corporate representative deposition, yet attach net worth discovery responses from Alex Jones and sensitive financial information completely unrelated to the corporate representative deposition itself as purported exhibits in support of their motion. These violations of the Court's confidentiality and protective order will be further addressed in a forthcoming motion for sanctions being filed by Defendants, but at the outset of dealing with the instant motion, it must be made clear that Plaintiffs have filed this not for the purposes of obtaining discovery they believe they are entitled to, but rather to further try this case in the media and public and to prejudice Defendants as much as possible prior to trial.

As for Plaintiffs' motion, not only are the complaints about the corporate representative deposition unfounded and without merit, but the issues raised by Plaintiffs revolve entirely around liability-related issues—issues the Court has currently held are determined as a matter of law by virtue of the liability-default judgments entered by this Court. Thus, to the extent any responses were unsatisfactory, that is immaterial and Plaintiffs are in no way prejudiced or negatively impacted by that. In addition, the corporate representative for FSS was able to provide sufficient answers as to the vast majority of the questions asked of her; Plaintiffs are seemingly upset because she was not prepared to provide granular details in response to every single question Plaintiffs might ask. Regardless, she was more than able to (and did) provide appropriate responses as to FSS's knowledge, understanding, and information it had which relate to the issues in this case. Even if the

2

Court disagrees and for some reason finds some of the corporate representative's responses were lacking, that in no way justifies the outrageous sanctions Plaintiffs have asked for in their motion. There is no basis for awarding what is assuredly a ridiculous amount of money Plaintiffs will claim are their entirety of their litigation costs and additional sanctions such as precluding discovery or precluding the determination of any issues which remain outstanding to be decided by a jury. Plaintiffs' motion has no merit and certainly does not in any way support the imposition of the extreme sanctions Plaintiffs have sought. The Court should deny Plaintiffs' motion for sanctions.

### MS. KARPOVA WAS A COMPETENT, PREPARED REPRESENTATIVE

Ms. Karpova is a producer and manager for InfoWars[1] and is an appropriate choice of corporate representative. She testified that she had spent four or more hours preparing for her deposition.[2] She brought documents that she reasonably believed were relevant to the deposition.[3] Plaintiffs argue that the documents she brought and reviewed were not relevant and have alleged that Ms. Karpova was not properly prepared, however the documents brought by Ms. Karpova were already in excess of the total amount of relevant documents required. There were no relevant documents for her to bring in, she was not required to bring in any documents, and Defendants would like to penalize her (and, thereby, FSS) because they find the few documents that Ms. Karpova thought might be helpful to be less than adequate.

Ms. Karpova was prepared to testify about sourcing and research for the videos described in Plaintiffs' petitions.[4] During an abusive series of depositions, she was repeatedly asked to mentally reference multiple documents. When she responded that she had generally reviewed the

---

[1] Pl.'s Ex. 4 at 3:4.

[2] *Id.* at 5:8, 4:1, 11:8.

[3] *Id.* at 9:20.

[4] It is worth noting that Plaintiffs' Motion (Footnote 22) includes a thinly veiled allegation that Marc Randazza has somehow engaged in unauthorized practice of law by asking factual questions to the witness as she prepared for deposition (despite never providing a shred of legal advice to the witness), which is a serious allegation. It is also a false allegation made in bad faith, as Plaintiffs' counsel is surely aware that this Court has previously indicated that Mr. Randazza can assist Mr. Reeves in a similar capacity to that of an associate, even if he cannot appear in this case. *See* Transcript of Hearing, August 31, 2021, at 98:19-98:23.

relevant documents but could not necessarily references specific documents and videos – indeed,

the exact lines and headlines from specific documents and videos – without being provided broader

context, she was treated by Plaintiffs' counsel as if she was not competent to answer any questions

at all.

In one such exchange, Mr. Bankston asks Ms. Karpova to identify a single still frame from

an Infowars episode:

Q. Where does this come from, this picture? Where does it come from?

A. This is a still from the show.

Q. Do you know what show?

A. Not specifically. It doesn't have the date [or] year.

Q. Okay. It's one you just apparently watched a couple of minutes ago. You don't remember

seeing this?

A. Not this part specifically.

Q. So you maybe didn't even watch this part of the video?

A. I watched the video.

Q. Okay.

A. I don't remember this specific –

Q. Okay. [Continues with questioning.][5]

She was asked confusing and often meandering compound questions. Again, when she

responded with confusion, she was treated in a hostile manner by Plaintiffs' counsel. When asked

directly about the company source of some videos, she respondes that "the company believes it to

be Wolfgang Halbig[,]"[6] which is an appropriate answer as a corporate representative. As a

corporate representative, Ms. Karpova is not required to have personal knowledge about every

topic, but she must be able to answer for the company and what the company reasonably knows. If

the company "believes [the source of a video] to be Wolfgang Halbig[,]" then this is a perfectly

---

[5] Pl.'s Ex. 4 at 127:14-128:4.

[6] *Id.* at 101:18-101:20.

acceptable response. Further, if the company does not have specific knowledge of a fact, but can make reasonable inferences, the corporate representative – acting on behalf of the company – should be afforded the same flexibility. Thus, if the company itself does not have records of an event – Ex. "there's no way to go back to that video because we don't keep those kinds of records of every show"[7] – Ms. Karpova should not be held to a standard other than that of a representative reporting what the company does *or does not* know. Ms. Karpova made this clear on multiple occasions. For example, when asked outright "Does the company know if these emails actually exist[,]" she responded, "No it doesn't."[8] This is not a failure of preparation or competence of a corporate representative, but rather Plaintiffs' disappointment that the company records it seeks are simply not maintained to the professional standard that Plaintiffs would prefer.

The abusive and persnickety manner in which Ms. Karpova was treated by Mr. Bankston is evident in the following exchange, which – to Defendant's surprise – Plaintiffs chose to include in their Motion:

A: Can we review the video right now?

Q: No. I'm not going to play a 2-hour video for you right now, no.

A: But you expect me to know what's going on in every video?

Q: Uh-huh. I do. I do, Ms. Karpova. And I expected Rob Dew to do the same thing when he showed up to the deposition to talk about sourcing and research and he didn't do that twice.[9]

Plaintiffs' Motion scolds Ms. Karpova for reviewing one video during a break in the deposition while Ms. Karpova was breastfeeding. Again, Plaintiffs show a lack of good faith in this style of argument. Ms. Karpova was subjected to repeated questioning about a specfic video, made a good faith attempt to review the material during a break – something she was not required to do

---

[7] Pl.'s Ex. 4 at 79:20-79:22.

[8] *Id.* at 121:14-121:16.

[9] *Id.* at 51:20-52:3.

– and was reprimanded by Plaintiffs' counsel for attempting to be helpful. This is shown in the following exchange:

Q. Okay. How much of that one did you watch?

A. That's a long video. I watched parts of it.

Q. You understand that doesn't help me, right? That that's not helping me understand what you've watched. You understand that?[10]

Despite this hostility, she continued to answer questions as best she could and gave clear company responses. She answered questions in manners such as "[the videos were sourced from] previously sourced information Alex [received] from his guests as well as other reports,"[11] and "[t]he company believes that I have sufficient knowledge to testify regarding these matters."[12] These are unambigous corporate-level responses.

Plaintiffs are ultimately upset – not that Ms. Karpova was not given access to what they had hoped were vast vaults of sourcing records for specific videos – but rather that she was fully prepared to represent the company in stating that it was not sure of the sourcing for many videos, as sourcing records for individual shows simply do not exist. Thus, any statements about sourcing were necessarily going to include conjecture, imperfect recollections, and inferences.

### THE FACTS AT ISSUE ARE NOT RELEVANT TO DAMAGES

As for Ms. Karpova's inability to recall, in the moment, specific conversations about or with employees of FSS, information about cable bundling packages, and other issues completely extraneous to the matter of damages, they are not relevant in the slightest. Every issue raised by Plaintiffs in their motion touches on the issue of liablity, not damages. Issues related to liability are not relevant at this stage, due to the liability default judgments entered by this Court. For example, Infowars is a 'free to air' radio program. FSS does not even know who is carrying the program on a given day. Ms. Karpova's lack of knowledge on this information represents, directly, the corporate

---

[10] Pl.'s Ex. 4 at 133:5-133:9.

[11] *Id.* at 134:12-134:14.

[12] *Id.* at 118:25-119:1.

model in place at FSS. While this may be frustrating for Plaintiffs, it does not diminish Ms. Karpova's competence and willingness to answer questions at deposition. Given that the program is 'free to air,' it also makes the question of cable packages irrelevant as to damages, as her failure to recall the known listener metrics is not revelevant if the metrics are not knowable at all.

Plaintiffs' absurd motion is focused entirely upon questions that relate only to liability issues, and thus have no relevance to the remaining issues in this case at this time, and similarly cause Plaintiffs no prejudice, even if responses were somehow insufficient. Moreover, Mr. Bankston had previously told this Court that "I think I have enough to prove punitive damages right now[,]"[13] and that future discovery requests would "be very limited."[14] FSS finds it difficult to understand how Plaintiffs apparently felt they had "enough" to prove their alleged damages and even punitive damages prior to the corporate represenative deposition, yet now posture to the Court that they somehow did not obtain crucial information warranting extreme sanctions.

In all instances that this Court might find Ms. Karpova's answers to be both relevant and lacking, however, Defendants assert that Ms. Karpova's inability to regurgitate numerous highly-specific facts, without being provided the necessary context and for hours on end, was not a failure of preparation, but a failure of memory. Further, the specificity and range of topics demanded by Plaintiffs were unreasonable – expecting the witness to be able to cite specific lines out of hours-long videos and to be able to immediately know how many cable packages included Infowars – and, most often, completely irrelevant to the issue of damages.

Additionally, Plaintiffs point to Alex Jones's personal opinion on the state of litigation as evidence of bad faith on the part of FSS. This is an absurd notion. Having a negative view of the proceedings is not evidence of bad faith, unless Plaintiffs are ready to make the broad generalization that every party upset by litigation is somehow acting in bad faith. Mr. Jones is well within his rights to hold an opinion and he is welcome to express it during deposition so long as he answers the questions put to him – which he has done. And while Plaintiffs decry their perceived instances

---

[13] Pl.'s Ex. 3 74:23-74:25.

[14] *Id.* at 75:8-75:12.

of bad faith, they just as quickly make baseless claims that "Plaintiffs also expect that [Mr. Jones] has additional assets squirreled away, likely in some other shell company as yet undisclosed."[15] Are allegations of this sort, when presented with zero evidence, an example of good faith? Similarly, Plaintiffs' assertion that Mr. Jones has $50 million in assets is a material misrepresentation.[16] The parenthesis around $50 million in Jones's [assets document title] represents negative equity, which any competent lawyer would know. And since Mr. Bankston is clearly competent, this can only be a purposeful misrepresentation.

## SANCTIONS SHOULD BE DENIED IN THEIR ENTIRETY

Sanctions are not appropriate in this matter. First, precluding further discovery and resolving all unresolved issues in favor of Plaintiffs would be a heavy-handed, unfair advantage to Plaintiffs – and the suggestion alone is an example of a party asking for "discovery for me but not for thee." There is no prejudice involved in this issue, as none of these issues have to do with damages. Even if this Court were to decide that sanctions were appropriate, assessing all or most of Plaintiffs litigation costs upon Defendant would be a disproportionate penalty. If this Court finds that sanctions are appropriate, which Defendant continues to assert they are not, they should be minimal.

## CONCLUSION AND PRAYER

Plaintiffs' Motion, following an abusive series of depositions, is filled with issues that have no bearing on this matter. Ms. Karpova was adequately prepared to answer questions relevant to the issue of damages. Plaintiffs may be upset with themselves for asking questions that largely focused on liability, despite the issue of liability having already been decided by default-judgment, but this is not the fault of Ms. Karpova or Defendant. Plaintiffs use bad faith misrepresentations throughout their Motion and then have the gall to ask this Court to assess disproportionate sanctions upon Defendants.

---

[15] Plaintiff's Motion, p. 39.
[16] Id.

WHEREFORE, PREMISES CONSIDERED, Defendant, Free Speech Systems, LLC, requests the Court deny Plaintiffs' motion for sanctions, along with such other and further relief to which Defendant may be justly entitled.

Dated: January 7, 2022.

Respectfully Submitted,

**REEVES LAW, PLLC**

By:  */s/ Bradley J. Reeves*
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on January 7, 2022.

Mark Bankston                              *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

__*/s/ Bradley J. Reeves*_____
Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 60629329
Status as of 1/10/2022 9:54 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 1/7/2022 6:15:51 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 1/7/2022 6:15:51 PM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 1/7/2022 6:15:51 PM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 1/7/2022 6:15:51 PM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 1/7/2022 6:15:51 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 1/7/2022 6:15:51 PM | SENT |

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | 459th DISTRICT COURT |
| *Defendants* | § | |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |
| | § | |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| | § | |
| VS. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th DISTRICT COURT |

## [PROPOSED] ORDER DENYING PLAINTIFFS' MOTION FOR SANCTIONS REGARDING CORPORATE [REPRESENTATIVE] DEPOSITION

On this day, came to be heard Plaintiffs' Motion for Sanctions Regarding Corporate [Representative] Deposition of Defendant, Free Speech Systems, LLC. The Court, having considered the Motion, Defendant's response thereto, along with the arguments of counsel, finds

that Plaintiffs' motion is without merit and should be DENIED.

It is therefore ORDERED that Plaintiffs' Motion for Sanctions Regarding Corporate [Representative] Deposition is hereby DENIED in all respects.

SIGNED ON THIS THE _____ DAY OF _____, 2022.

_____
HONORABLE JUDGE MAYA GUERRA GAMBLE

APPROVED AS TO FORM
AND ENTRY REQUESTED:

REEVES LAW, PLLC

By: ___/s/ Bradley J. Reeves_____
Bradley J. Reeves
Texas Bar No. 24068266
702 Rio Grande St., Suite 203
Austin, TX 78701
brad@brtx.law
Telephone:      (512) 827-2246
Facsimile:      (512) 318-2484

ATTORNEY FOR DEFENDANTS

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 60629329
Status as of 1/10/2022 9:54 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 1/7/2022 6:15:51 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 1/7/2022 6:15:51 PM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 1/7/2022 6:15:51 PM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 1/7/2022 6:15:51 PM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 1/7/2022 6:15:51 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 1/7/2022 6:15:51 PM | SENT |

1/11/2022 5:41 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Alyssa Butler

## CAUSE NO. D-1- GN-18-001842

| | | |
|---|---|---|
| **LEONARD POZNER AND,** | § | **IN THE DISTRICT COURT OF** |
| **VERONIQUE DE LA ROZA** | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| **vs.** | § | **TRAVIS COUNTY, TEXAS** |
| | § | |
| **ALEX E. JONES, INFOWARS, LLC,** | § | |
| **and FREE SPEECH SYSTEMS, LLC** | § | |
| | § | |
| *Defendants* | § | **459ᵗʰ JUDICIAL DISTRICT** |

### NOTICE OF APPEARANCE AND DESIGNATION OF LEAD COUNSEL

JACQUELYN W. BLOTT files this Notice of Appearance. Defendants ALEX E. JONES,

INFOWARS, LLC, and FREE SPEECH SYSTEMS, LLC ("Defendants") designate

JACQUELYN W. BLOTT as the attorney in charge in accordance with Rule 8 of the Texas Rules

of Civil Procedure. All communication from the Court or other counsel with respect to this suit

shall be sent to the undersigned as follows:

> Jacquelyn W. Blott
> Law Offices of Jacquelyn W. Blott
> 200 University Ave., Ste. 225 #251
> Round Rock, Texas 78665

> Respectfully submitted,

> LAW OFFICE OF JACQUELYN W. BLOTT

By: _____
    Jacquelyn W. Blott
    SBN: 07473250
    100 University Blvd., Ste. 225 #251
    Round Rock, Texas 78665
    Telephone: (512) 639-9904
    Facsimile: (833) 377-0087
    Email: jblott@jblottlaw.com

REEVES LAW, PLLC

By: _Bradley Reeves /s/jab_

Bradley J. Reeves
SBN: 2406826
702 Rio Grande St., Suite 203
Austin, Texas 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484
Email: brad@brtx.law

*\* signed by permission*

**ATTORNEYS FOR DEFENDANTS
ALEX JONES, INFOWARS, LLC,  and
FREE SPEECH SYSTEMS, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of *Notice of Appearance and Designation of Lead Counsel* was served pursuant to Rule 21a of the Texas Rules of Civil Procedure on this the 11th day of January 2022 as follows.

Mark Bankston
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, Texas 77008

*Email: mark@fbtrial.com*
*Email: bill@fbtrial.com*

Jacquelyn W. Blott

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacquelyn Blott on behalf of Jacquelyn Blott
Bar No. 7473250
law.jacquelynwblott@gmail.com
Envelope ID: 60688345
Status as of 1/12/2022 3:54 PM CST

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 1/11/2022 5:41:22 AM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 1/11/2022 5:41:22 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Scott Weatherford | | sweatherford@jw.com | 1/11/2022 5:41:22 AM | SENT |
| Joshua ARomero | | jromero@jw.com | 1/11/2022 5:41:22 AM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 1/11/2022 5:41:22 AM | SENT |
| Mark Bankston | 24071066 | mark@fbtrial.com | 1/11/2022 5:41:22 AM | SENT |
| Bradley Reeves | | brad@brtx.law | 1/11/2022 5:41:22 AM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 1/11/2022 5:41:22 AM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 1/11/2022 5:41:22 AM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 1/11/2022 5:41:22 AM | SENT |
| Robert Linkin | | rlinkin@munckwilson.com | 1/11/2022 5:41:22 AM | SENT |
| Marc Randazza | | ecf@randazza.com | 1/11/2022 5:41:22 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 1/11/2022 5:41:22 AM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 1/11/2022 5:41:22 AM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 1/11/2022 5:41:22 AM | SENT |

1/12/2022 5:39 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Irene Silva

D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| vs. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants* | § | 459th  DISTRICT COURT |
| | § | |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs* | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | 459th  DISTRICT COURT |
| | § | |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN DISTRICT COURT OF |
| *Plaintiff* | § | |
| | § | |
| vs. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants* | § | |
| | § | 459th  DISTRICT COURT |
| | § | |

## DEFENDANTS' MOTION FOR CONTEMPT AND SANCTIONS

Defendants, ALEX JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC and OWEN SHROYER, file this *Defendants' Motion for Contempt and Sanctions* and in support thereof show as follows:

## RELIEF REQUESTED

Defendants, ALEX JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC and OWEN SHROYER, respectfully request that Plaintiffs, NEIL HESLIN, LEONARD POZNER, VERONIQUE DE LA ROSA, and SCARLETT LEWIS and/or their attorney of record, MARK BANKSTON, be held in contempt for violating the Court's *Order on Motion for Protective Order of Confidentiality dated October 25, 2021* and this Court award appropriate sanctions in favor of Defendants, ALEX JONES, INFOWARS, LLC, FREE SPEECH SYSTEMS, LLC and OWEN SHROYER.

## SUMMARY

Plaintiffs, NEIL HESLIN ("Heslin"), LEONARD POZNER ("Pozner"), VERONIQUE DE LA ROSA ("Rosa"), and SCARLETT LEWIS ("Lewis") and/or their attorney of record, MARK BANKSTON ("Mr. Bankston"), have repeatedly sought to litigate this matter in the press and now, with no shame, have violated the *Order on Motion for Protective Order* ("Protective Order") entered by this Court on *February 25, 2019* In Cause No. D-1-18-GN-006623L *Scarlett Lewis v. Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC* (the "Lewis Litigation"), and as adopted in all cases on *October 25, 2021*[1].  Instead of serving the Sanctions Motion as required  or filing a motion for temporary sealing order, as required by the Protective Order, Plaintiff cast aside the Court's Protective Order, making sure that documents clearly labeled as Confidential and

---

[1] A duplicative order was also signed on December 2, 2021, and filed on December 3, 2021.

Attorneys' Eyes Only ("AEO") as well as depositions of Defendant's Corporate Representative and Defendant Jones were filed for public dissemination including, but not limited to, the media

## **FACTS IN SUPPORT OF MOTION**

On February 25, 2021, this Court entered its Protective Order in the Lewis Litigation. On October 25, 2021, this Court entered its Order on Motion for Protective Order of Confidentiality applying the Protective Order entered in the Lewis Litigation to Cause No. D-1-GN-18-001835; *Neil Heslin v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Owen Shroyer* (the "Heslin Litigation") and Cause No. D-1-GN-18-001842; *Leonard Pozner and Veronique de la Rosa v. Alex E. Jones, Infowars, LLC and Free Speech Systems, LLC* (the "Pozner Litigation"). *See*, Protective Order, filed among the pleadings herein on ***October 26, 2021, incorporated herein by reference as if set forth in full.*** The Court signed the same order on December 2, 2021, filed among the pleadings herein on ***December 3, 2021***, incorporated herein by reference as if set forth in full.

The identical Protective Orders provide as follows:

TERMS

3. "Discovery includes all written discovery, request for production, interrogatories, requests for admissions, requests for disclosure, oral depositions, deposition transcripts, oral or video recording of a deposition, depositions on written questions to third parties, and subpoenas to third parties, and other documents exchanged between the parties for the purpose of sharing information regarding the facts of the case.

*Protective Orders*, filed among the pleadings of the cases herein on October 25, 2021 and December 3, 2021.

The Protective Order further provides:

4. "Confidential Information" means information that constitutes a trade secret, reveals valuable and sensitive proprietary data or commercial information, or otherwise qualifies for legal protection under Texas law.

5.      "Confidential Discovery" means discovery disclosed by the parties in this case and which also contains Confidential Information.

*Id.*, p. 4

The Protective Order also provides that depositions are to remain confidential as follows:

12.      Testimony and information disclosed at a deposition of a Party or any other witness may be designated "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" during the deposition, and within thirty (30) days following the depositions, any Party may designate any information disclosed during a deposition as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY." ***For the thirty (30) days following any deposition, the Parties must treat all of the deposition testimony and exhibits and other documents produced at any deposition as "ATTORNEYS' EYES ONLY."***

*Id*. p. 5 (emphasis added).

The Protective Order provided that documents designated as confidential would not be disseminated to anyone other than certain individual including, but not limited to*, **all parties and their counsel of record.***

Less than two weeks after the Protective Order was signed ***for the second time and entered in the pleadings***, Plaintiffs breached it.[2]

On December 15, 2021, Plaintiffs filed their *Motion for Sanctions Regarding Corporate Deposition*. ("Sanctions Motion").[3]  *See, Sanctions Motion,* filed amont the pleadings herein on December 15, 2021and incorporated herein by reference as if set forth in full.  ***Attached as Exhibit 6 to the Sanctions Motion is a financial document produced in discovery by Defendant, Free Speech Systems, LLC ("Free Speech"), marked "CONFIDENTIAL-ATTORNEY'S EYES ONLY" in large, bold, capital letters at the top of each page.***  *Id*, Exhibit 6.

---

[2] Although not the subject of this motion, Plaintiffs also breached the order when they surreptitiously permitted a podcaster to attend the confidential deposition of Alex Jones on December 4, 2021.  These compounding violations mandate terminating sanctions even if each, individually, did not rise to that level.

[3] That motion is without merit, further aggravating the nature of the misconduct.

*Exhibit 4 of the Sanctions Motion is a copy of the transcript of the Deposition of Daria Karpova, the designated corporate representative for Free Speech Systems* ("Corporate Rep Deposition"). *Id*., Exhibit 4.

The deposition of Jones was taken on December 4, 2021. The official transcript was not released to counsel until December 30, 2021. *The deposition of Jones was attached as Exhibit 5 to the Motion for Sanctions. See, Motion for Sanctions, Exhibit 5*.

Plaintiffs have *flagrantly* violated the Protective Order. By efiling the Sanctions Motion, Plaintiffs have made the Sanctions Motion and, more importantly, the exhibits attached in support of the Sanctions Motion, accessible to the public at large, at a minimum, and to those members of the public, including the media, who have the wherewithall to obtain copies of pleadings, including the Sanction Motion *and the attachments containing confidential information*, from the Records Division of the Travis County District Clerk's Office.

Paragraphs 21 & 22 of the Protective Orders govern submission of confidential materials to the Court. They prohibit direct filing—they require service and a motion for Temporary Sealing Order. Plaintiffs filed no motion for Temporary Sealing Order. Instead, Plaintiffs directly emailed them to 459 Submission <459.Submission@traviscountytx.gov>; Keri Ward <Keri.Ward@traviscountytx.gov>, bypassing the requirements of the order and placing them in the public record. In addition, Plaintiffs efiled the documents. As a result, the confidential documents and depositions were viewed by and published by, at the very least, the media. Plaintiffs and their counsel – through their actions –effectively provided these Confidential, Attorneys' Eyes Only

documents to The Huffington Post,[4] Rolling Stone,[5] Yahoo,[6] and The Daily Beast[7] for worldwide publication.

## ARGUMENT AND AUTHORITIES

**A.     Plaintiffs have Violated the Integrity of the Discovery Process and Flagrantly Violated this Court's Protective Order.**

"[A] court has an interest in preserving the integrity of the discovery process by encouraging full investigation of the disputed facts and issues, and that such investigation will occur effectively only if the court can assure the parties that disclosed confidential materials will be used only for the purpose of litigation." *Hous. Chronicle Pub. Co. v. Hardy*, 678 S.W.2d 495, 506 (Tex. App.—Corpus Christi 1984, no writ) (*citing Tavoulareas v. The Washington Post Co.*, 724 F.2d 1010 (D.C.Cir.1984). It is only when it is actually used at trial that a deposition becomes a court record, presumed open to the public. *See, In re Cook* , 629 S.W.3d 591, 608-09 (Tex. App.—Dallas 2021).

This Court entered its Protective Order to enourage full investiation of the disputed facts and issues.  Mr. Bankston should never have filed the Sanctions Motion with the confidential financial records nor the depositions of the Corporate Representative or Defendant Jones without following this Court's Protective Order for filing pleadings containing confidential information. The document in question was both marked as confidential and used during a deposition where confidential designations were still pending, making this disclosure doubly egregious. Likewise,

---

[4] https://www.huffpost.com/entry/infowars-store-alex-jones_n_61d71d8fe4b0bcd2195c6562

[5] https://www.rollingstone.com/politics/politics-news/alex-jones-infowars-store-165-million-1281059/

[6] https://www.yahoo.com/entertainment/alex-jones-raked-165-million-195522851.html

[7] https://www.thedailybeast.com/alex-jones-claims-he-can-barely-pay-the-billsafter-infowars-made-dollar165-million-in-three-years

Plaintiffs violated the Protective Order by filing the depositions within thirty (30) days following the deposition of the Corporate Representative and Defendant Jones.

Plaintiffs' and Mr. Bankston's knowledge that a violation of any confidentiality order is particularly offensive to the administration of justice. Counsel for Plaintiffs, Mr. Bankston, has been keenly following parallel litigation in Connecticut, even going so far as convincing this Court that Judge Bellis' characterization of Defendants' actions there demanded that default be entered here. In Connecticut, Judge Bellis deemed an unintentional disclosure to be "cavalier actions and willful misconduct" would "have a chilling effect on the testimony of witnesses," and that the course of action should have been to challenge the designation, "not to blatantly disregard it and make the confidential information available" to third parties. *Lafferty v. Jones*, Case No. UWY-CV-18-6046436-S (Super. Ct. Conn. Aug. 5, 2021). Plaintiffs must be held to the strict standards applied in Connecticut – standards for which they advocated—which resulted in a death-penalty sanction.

This was not an issue of Mr. Bankston failing to realize what he was doing: this was gratuitous and done with the intent that the information be picked up and reported by the media. This is, of course, old hat for Mr. Bankston. He has previously published depositions from this series of cases online for the purpose of litigating this matter in the press. In the past, he has published the video of Mr. Jones' initial 2019 deposition on his own website, which made its way into the press. He knew that the gross revenue of a controversial news outlet such as Infowars would be reported and misinterpreted by the press, as the documents leaked ignore key financial metrics such as the cost of goods sold and the overall cost of operations that goes into this primary source of revenue.

Under the terms of the confidentiality order, Mr. Bankston had an opportunity to challenge the AEO designation on the financial documents at issue. *See*, December 3, 2021 Protective Order, ¶14(1)-14(2). He failed to do so. Confidential treatment is afforded to such marked material until any dispute over designation has been ruled upon by the presiding Judge, though in this instance there was no dispute at all. Mr. Bankston simply violated the confidentiality order. *Id.*

## B.    Sanctions are Warranted and Appropriate

A trial court may impose sanctions on any party that abuses the discovery process in seeking, making, or resisting discovery. Tex. R. Civ. P. 215.3; *See, Wein v. Sherman, 03-10-00499-CV, 2013 WL 4516013, at *1* (Tex. App.—Austin Aug. 23, 2013, no pet.)(noting that Rule 215 sanctions are not damages for harm alleged in underlying lawsuit but are used to punish parties who violate discovery rules). A trial court also has inherent power to sanction to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process. *IFC Credit Corp. v. Specialty Optical Sys., Inc.*, 252 S.W.3d 761, 772 (Tex. App.—Dallas 2008, pet. denied)(citing Eichelberger v. Eichelberger, 582 S.W.2d 395, 398 (Tex. 1979).

In *Scarbrough v. Purser,* monetary sanctions of over $25,000 were imposed merely for providing records, once to law enforcement and once to a litigant's relative. Far from only providing the materials at issue to law encforcement and a single individual, Plaintiffs put them in the public record for global consumption, and nothing can be done to put them back into a state of confidentiality. The direct effect this disclosure may have on further witnesses cannot be overstated, as the exposure of the confidential information has already been widespread. Thus, Defendants ask the Court for sanctions including but not limited to, dismissing Plaintiffs' claims with prejudice to the refiling of same. *Scarbrough v. Purser*, No. 03-13-00025-CV, 2016 Tex. App. LEXIS 13863, at *61-63 (Tex. App. Dec. 30, 2016).

Providing confidential or otherwise protected documents to Mr. Bankston is no different than just releasing them to the press. The Court has made it clear that discovery abuse in this matter will not be tolerated. Defendants respectfully ask the Court to uphold this stance and hold Plaintiffs and their counsel accountable for their repeated and consequential impropriety. The Court must dismiss Plaintiffs' claims against Defendants as a sanction and impose a severe monetary penalty against Plaintiffs' counsel for purposefully violating the confidentiality of the protective and confidentiality order.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Defendants request the Court grant this motion for sanctions, finding that the Plaintiffs and their counsel are in contempt of this Court's Protective Order, imposing sanctions as requested herein, and such other and further relief, both at law and equity, to which Defendants may be justly entitled.

Respectfully submitted,

LAW OFFICE OF JACQUELYN W. BLOTT

By: _Jacquelyn W. Blott_

Jacquelyn W. Blott
SBN: 07473250
100 University Blvd., Ste. 225 #251
Round Rock, Texas 78665
Telephone: (512) 639-9904
Facsimile: (833) 377-0087
Email: jblott@jblottlaw.com

Bradley J. Reeves
REEVES LAW, PLLC
SBN: 2406826
702 Rio Grande St., Suite 203
Austin, Texas 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484
Email: brad@brtx.law

**ATTORNEYS FOR DEFENDANTS
ALEX JONES, INFOWARS, LLC,
FREE SPEECH SYSTEMS, LLC
and OWEN SHROYER**

9

## CERTIFICATE OF CONFERENCE

The undersigned counsel for Defendants has previously conferred with counsel for Plaintiff regarding this Motion, and counsel for Plaintiff has indicated Plaintiff is opposed to this Motion.

*/s/ Bradley J. Reeves*
Bradley J. Reeves

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on January 12, 2022.

Mark Bankston                                   *via electronic service*
William Ogden
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

Jacquelyn W. Blott

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacquelyn Blott on behalf of Jacquelyn Blott
Bar No. 7473250
law.jacquelynwblott@gmail.com
Envelope ID: 60772801
Status as of 1/13/2022 9:22 AM CST

Associated Case Party: ALEXEJONES

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 1/12/2022 5:39:53 PM | SENT |

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 1/12/2022 5:39:53 PM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Scott Weatherford | | sweatherford@jw.com | 1/12/2022 5:39:53 PM | SENT |
| Joshua ARomero | | jromero@jw.com | 1/12/2022 5:39:53 PM | SENT |
| Charles L.Babcock | | cbabcock@jw.com | 1/12/2022 5:39:53 PM | SENT |
| Mark Bankston | 24071066 | mark@fbtrial.com | 1/12/2022 5:39:53 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 1/12/2022 5:39:53 PM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 1/12/2022 5:39:53 PM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 1/12/2022 5:39:53 PM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 1/12/2022 5:39:53 PM | SENT |
| Robert Linkin | | rlinkin@munckwilson.com | 1/12/2022 5:39:53 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 1/12/2022 5:39:53 PM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 1/12/2022 5:39:53 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 1/12/2022 5:39:53 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 1/12/2022 5:39:53 PM | SENT |

2/1/2022 2:38 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Selina Hamilton

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

### PLAINTIFFS' MOTION FOR SANCTIONS UNDER RULE 215.4 RELATING TO REQUESTS FOR ADMISSION

---

This Motion concerns false and unreasonable answers given to Plaintiffs' Requests for Admissions concerning authenticity. Plaintiffs attempted to authenticate over a dozen videos for use at trial, but Defendants failed to take any steps to respond. Even more troubling, Defendants' counsel made false statements in their answers. For the reasons discussed below, Plaintiffs move for an order under Rule 215.4 finding the matters admitted and awarding all costs.

### FACTUAL BACKGROUND

1.  On December 2, 2021, Plaintiffs served Requests for Admission regarding the authenticity of certain videos and documents. At the same time, Plaintiffs provided a

1

download link for videos which were subject to the Requests for Admission. (*See* Exhibit 1, Emails with Brad Reeves).

2.      On December 23, 2021, Defendants requested an extension to respond, with a new deadline on January 24, 2022. (*See* Exhibit 2, Email granting extension).

3.      On January 24, 2022, the day the responses were due, Defendants' counsel Bradley Reeves forwarded Plaintiffs' December 2nd email providing the videos. Defendants' counsel stated, "This dropbox link no longer works. Please re-send." (*See* Exhibit 1, Emails with Brad Reeves).

4.      Hours later, Defendants served their responses, bearing the name of both of their attorneys. Defendants refused to admit the authenticity of the videos at issue, claiming that "Defendant is unable to comply with the discovery request...as Plaintiffs failed to provide a copy of the videos." (*See* Exhibit 3, Defendant's Responses to Requests for Admission).

5.      This statement is false. The videos provided by Plaintiffs on December 2, 2021 were nearly 4 gigabytes in size, and they could not be hosted by Plaintiffs' counsel indefinitely. The videos were therefore provided through a Dropbox Transfer link, which expires after thirty days.

6.      Even worse, Defendants' counsel knew the statement was false. In subsequent correspondence, Plaintiffs' counsel demonstrated how the testimony of Daria Karpova proves that Mr. Reeves showed her at least one of the videos provided on December 2nd. The specific video had never been previously produced. (*See* Exhibit 4, Emails with Jacquelyn Blott). As such, Ms. Karpova's testimony proves that Plaintiffs provided the videos and that Mr. Reeves downloaded them.

7. In response, Defendants' counsel Bradley Reeves now admits that the discovery responses were false and that he downloaded the videos. He also now admits that he showed clips from the videos to Ms. Kaprova during the lunch break of her deposition. (*See* Exhibit 1, Emails with Brad Reeves).

8. Defendants' counsel now claims the files later "became corrupted or unviewable" as some unspecified time. (*Id.*).

9. As to why Defendants' Response stated that "Plaintiffs failed to provide a copy of the videos," Defendants' counsel Jacquelyn Blott stated that her co-counsel Mr. Reeves "misinformed" her. (*See* Exhibit 4, Emails with Jacquelyn Blott).

10. Because Defendants' counsel did not raise any issue until the day the responses were due, even after an extension, it is obvious that Defendants' counsel made false certifications that the discovery had been answered with reasonable inquiry. Defendants' counsel made no inquiry until the day the responses were due, and they made false statements in their answers.

## LEGAL STANDARD FOR MOTION UNDER RULE 215.4

Under Rule 215.4, the Court may enter certain orders for a party's "failure to comply with Rule 198" regarding Requests for Admissions. "If the court determines that an answer does not comply with the requirements of Rule 198, it may order either that the matter is admitted or that an amended answer be served." Tex. R. Civ. P. 215.4(a). In addition, "[t]he provisions of Rule 215.1(d) apply to the award of expenses incurred in relation to the motion." *Id.*

## ARGUMENT

**I.      Defendants' Responses Failed to Comply with Rule 198.**

Under Rule 198, "[a] response must fairly meet the substance of the request." Tex. R. Civ. P. 198.2(b). Defendants' Responses did not meet the substance of the request. The request asked the Defendants to confirm the authenticity of 14 videos, and Defendants did not take steps to respond. The failure to respond was caused purely by Defendants' own lack of diligence.

Defendants' Responses also blamed Plaintiffs for failing to provide videos, but this was a false statement that was not made with reasonable inquiry. After being confronted with proof, Defendants' counsel now admit the videos were provided, but they claim the files later became corrupted. Apparently, Defendants' counsel did not notice any problem with the videos until the day the responses were due. Obviously, this means Defendants were not taking any actions to confirm the authenticity of the videos prior to the day the responses were due.

Under Rule 198, "[l]ack of information or knowledge is not a proper response unless the responding party states that a reasonable inquiry was made." *Id*. Here, not only did Defendants fail to make a reasonable inquiry, but they made a false statement in their Responses which blamed Plaintiffs for their failure.  With discovery long since closed and the trial date rapidly approaching, Plaintiffs have been prejudiced by Defendants' failure to respond to the requests.

**CONCLUSION**

Given the long history of discovery abuse and neglect in this case, Defendants' Responses are egregious but unsurprising. As such, Plaintiffs move the Court to order the requests at issue admitted and award Plaintiffs their attorney fees in connection with this dispute.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

**CERTIFICATE OF CONFERENCE**

I hereby certify that I conferred with opposing counsel about this Motion, and they are opposed.

MARK D. BANKSTON

## CERTIFICATE OF SERVICE

I hereby certify that on February 1, 2022, the forgoing document was served upon all counsel of record via electronic service.

_____

MARK D. BANKSTON

# D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

# D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

## ORDER ON PLAINTIFFS' MOTION FOR SANCTIONS UNDER RULE 215.4 RELATING TO REQUESTS FOR ADMISSION

---

On this day, the Court considered Plaintiffs' Motion for Sanctions Under Rule 215.4 Relating to Requests for Admission. After considering the pleadings, evidence, and arguments of counsel, if any, the Court finds that the Motion should be GRANTED. As such, the Court ORDERS the following:

1.     The authenticity of the videos labeled SH VIDEO 1-14 shall be deemed admitted.

2.     Defendants shall pay all costs and expenses associated with serving the requests at issue and bringing their motion. Plaintiffs are ordered to submit an itemization of their costs and expenses to Defendants. If Defendants cannot agree to the amount,

1

Plaintiffs shall submit evidence to the Court of the reasonable value of their costs and
expenses.

      Dated _____, 2022.


                                         _____

                                         Hon. Maya Guerra Gamble

# Exhibit 1

| | |
|---|---|
| **From:** | Bradley Reeves |
| **To:** | Mark Bankston |
| **Cc:** | Jacquelyn Blott; Bill Ogden |
| **Subject:** | RE: Discovery service |
| **Date:** | Thursday, January 27, 2022 5:02:18 PM |

Not that I really have to answer your questions, but just for you Mark, I will. The answer is "yes" to both of your questions. Did she not testify she had seen the videos? Are you saying she is lying? And why does that even matter considering you get another bite at the apple with a corporate rep?

I don't know why you are being so difficult about this. I have made a simple request, and I really shouldn't have to answer your questions just to have you re-send me a link that should have never gone bad in the first place (as you know, I have kept every dropbox link I have sent you alive so that you can continue to access the files).

So, please send a new link with this video production, particularly for Ms. Blott's benefit, since she has taken over as lead counsel and would much prefer to get them directly from you as we work to prepare these corporate representatives for the upcoming depositions.

As always, I appreciate your professionalism, Mark. Please let us know when we can expect to receive a new link from you with this additional video production or if you are refusing to do so.

Best regards,

Brad Reeves

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Thursday, January 27, 2022 4:31 PM
**To:** Bradley Reeves <brad@brtx.law>
**Cc:** Jacquelyn Blott <jblott@jblottlaw.com>; Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Discovery service

Before I do anything further, I would like unequivocal answers to the following questions:

1. It is true that you accessed and viewed these files?

2. It is true that you showed one or more of these videos to Ms. Karpova?

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Thursday, January 27, 2022 2:32 PM
**To:** Mark Bankston <mark@fbtrial.com>
**Cc:** Jacquelyn Blott <jblott@jblottlaw.com>
**Subject:** RE: Discovery service

Thank you. Please re-send at your earliest convenience, as I am working with Ms. Blott regarding these video files as it pertains to the discovery requests, and I want to ensure I have everything correct (the last time I downloaded these, the .zip download became corrupted or unviewable, hence why I have asked you to re-send).

Best regards,

Brad Reeves

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Tuesday, January 25, 2022 4:36 PM
**To:** Bradley Reeves <brad@brtx.law>
**Cc:** Jacquelyn Blott <jblott@jblottlaw.com>
**Subject:** RE: Discovery service

I am travelling, but I will arrange another dropbox link when I am back in the office.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

---

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Monday, January 24, 2022 2:42 PM
**To:** Mark Bankston <mark@fbtrial.com>
**Cc:** Jacquelyn Blott <jblott@jblottlaw.com>
**Subject:** RE: Discovery service

Mark:

This dropbox link no longer works. Please re-send.

Best regards,

Brad Reeves

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Thursday, December 2, 2021 11:13 PM
**To:** Bradley Reeves <brad@brtx.law>
**Subject:** Discovery service

Attached are supplemental expert designations for each plaintiff, along with a set of requests for admission and requests for production. I have captioned the discovery for all cases, and the plaintiffs are fine with one set of answers.

Also, below is a link to a dropbox transfer with additional video production:
https://link.edgepilot.com/s/3e888761/agGz9QCXsEy4j3kXZrXKJA?

u=https://www.dropbox.com/t/OFKk8A0FZOThMgo2

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

# Exhibit 2

| | |
|---|---|
| **From:** | Mark Bankston |
| **To:** | Bradley Reeves |
| **Subject:** | RE: Discovery service |
| **Date:** | Thursday, December 23, 2021 1:03:00 PM |

That's fine.

Mark Bankston

Kaster Lynch Farrar & Ball, LLP

---

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Thursday, December 23, 2021 12:54 PM
**To:** Mark Bankston <mark@fbtrial.com>
**Subject:** RE: Discovery service

Mark:

I am requesting a 21-day extension of the deadline for these supplemental discovery requests, i.e., from January 3, 2021 to January 24, 2021. Please let me know if you are agreeable to same.

Thank you.

Best regards,

Brad Reeves

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Thursday, December 2, 2021 11:13 PM
**To:** Bradley Reeves <brad@brtx.law>
**Subject:** Discovery service

Attached are supplemental expert designations for each plaintiff, along with a set of requests for admission and requests for production. I have captioned the discovery for all cases, and the plaintiffs are fine with one set of answers.

Also, below is a link to a dropbox transfer with additional video production:
https://link.edgepilot.com/s/e8062e18/VL-fCa8mwEK1XG3KYXjK3Q?
u=https://www.dropbox.com/t/OFKk8A0FZOThMgo2

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

# Exhibit 3

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, FREE | § | |
| SPEECH SYSTEMS, LLC, AND OWEN | § | |
| SHROYER | § | |
| | § | 459th JUDICIAL DISTRICT |
| *Defendants,* | § | |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

**DEFENDANT, FREE SPEECH SYSTEMS, LLC'S, OBJECTIONS AND RESPONSES TO PLAINTIFFS' SECOND SET OF REQUESTS FOR ADMISSION**

TO:     Plaintiffs, NEIL HESLIN, LEONARD POZNER, VERONIQUE DE LA ROSA, and SCARLETT LEWIS, by and through their attorneys of record, Mark Bankston and William Ogden, KASTER LYNCH FARRAR & BALL, LLP, 1117 Herkimer Street, Houston, Texas 77008

Defendant, FREE SPEECH SYSTEMS, LLC, objects and responds to *Plaintiffs' Second Set of Requests for Admissions* as follows:

Respectfully submitted,

LAW OFFICE OF JACQUELYN W. BLOTT

By: *Jacquelyn B. Blott*
Jacquelyn W. Blott
SBN: 07473250
100 University Blvd., Ste. 225 #251
Round Rock, Texas 78665
Telephone: (512) 639-9904
Facsimile: (833) 377-0087
Email: jblott@jblottlaw.com

REEVES LAW, PLLC
Bradley J. Reeves
SBN: 2406826
702 Rio Grande St., Suite 203
Austin, Texas 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484
Email: brad@brtx.law

ATTORNEYS FOR DEFENDANTS
ALEX JONES, INFOWARS, LLC,  and
FREE SPEECH SYSTEMS, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of *Defendant Free Speech Systems, LLC's Objections and Responses to Plaintiffs' Second Requests for Admissions* was served pursuant to Rule 21a of the Texas Rules of Civil Procedure on this the 24th day of January 2022 as follows.

Mark Bankston                      Email: mark@fbtrial.com
William Ogden                      Email: bill@fbtrial.com
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, Texas 77008

*Jacquelyn B. Blott*
Jacquelyn W. Blott

**D**EFENDANT**, F**REE **S**PEECH **S**YSTEMS**, LLC**'**S**, **R**ESPONSES TO **R**EQUESTS FOR **P**RODUCTION **R**EGARDING **N**ET **W**ORTH

**Request for Admission No. 1:** Admit that each of the following videos is a true and accurate copy of any original video created by Free Speech Systems, LLC.

| | Title | Date | Produced As |
|---|---|---|---|
| 1 | Connecticut School Massacre Looks Like False Flag Says Witness | December 14, 2012 | SH VIDEO 1 |
| 2 | Creepy Illumaniti Message in Batman Movie Hints at Sandy Hook School | December 17, 2012 | F2mRuEhmoGA |
| 3 | Sandy Hook 2nd Shooter Cover-Up | December 19, 2012 | 6W6b-voc-Ds |
| 4 | Sandy Hook Father Remembers Fallen Hero | December 19, 2012 | 8cZkHDH16nQ |
| 5 | Lower Part of Gotham Renamed "Sandy Hook" in Dark Knight Film | December 21, 2012 | Fus1FbQiU-Q |
| 6 | Callers React to Foreign Media Pushing Total Gun Confiscation | January 4, 2013 | SH VIDEO 2 |
| 8 | Prof. Claims Sandy Hook Massacre MSM Misinformation | January 10, 2013 | D8GxrKJDSL8 |
| 9 | Sandy Hook AR-15 Hoax? Still No School Surveillance Footage | January 15, 2013 | Oo74myC3bqY |
| 10 | Clearing Up Some Disinfo on Sandy Hook Massacre with James Tracy | January 18, 2013 | SH VIDEO 3 |
| 11 | Why People Think Sandy Hook is a Hoax | January 27, 2013 | tM5ZdO-IgEE |
| 12 | Dr. Steve Pieczenik: Sandy Hook was A Total False Flag! | March 27, 2013 | 5EfyD7Wu5fQ |
| 13 | Crisis Actors Used at Sandy Hook! Special Report | April 1, 2013 | shQSVhS0hLw |
| 14 | Obama Gun Grab Psyop | April 9, 2013 | SH VIDEO 4 |
| 15 | Shadow Govt Strike Again | April 16, 2013 | SH VIDEO 5 |
| 16 | Sandy Hook Police Ordered to Stand Down? | November 23, 2013 | xP9fhKUaudo |
| 17 | Sandy Hook Investigator Stonewalled and Threatened | February 20, 2014 | oGpWtqiSCY |
| 18 | Sandy Hook, False Narratives Vs. The Reality | March 14, 2014 | esIvAO2aI1w |
| 19 | Revealed: Sandy Hook Truth Exposed | May 9, 2014 | rSLOWCHNdw |
| 20 | Sandy Hook "Officials" Caught in Coverup and Running Scared | May 13, 2014 | MH6hmI1H-iQ |
| 21 | Bombshell: Sandy Hook Massacre Was a DHS Illusion Says School Safety Expert | May 13, 2014 | x2a1FwYEZS4 |

| 22 | Sandy Hook Deaths Missing From FBI Report | September 25, 2014 | A2Z0zUZBn7k |
| 23 | Sandy Hook Film Censorship Efforts Backfire | December 12, 2014 | 4T8_WYzH5SM |
| 24 | The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms | December 12, 2014 | 6aK0P-WxjU8 |
| 25 | Will Bushmaster Lawsuit Reveal Sandy Hook Hoax? | December 16, 2014 | BFyDqDLAcLQ |
| 26 | Lawsuit Could Reveal Truth About Sandy Hook Massacre | December 27, 2014 | kK8CnIBA928 |
| 27 | America the False Democracy | December 18, 2014 | SH VIDEO 6 |
| 28 | Why We Accept Govt Lies | January 13, 2015 | SH VIDEO 7 |
| 29 | Title Unknown – Video discussing HONR Network | February 12, 2015 | SH VIDEO 8 |
| 30 | New Bombshell Sandy Hook Information In-Bound | March 4, 2015 | _7ib5WkULBY |
| 31 | New Sandy Hook Questions Arise from FOIA Hearing | May 29, 2015 | 5cll79t7Mrw |
| 32 | Sandy Hook: The Lies Keep Growing | May 29, 2015 | Ml3KVj2nVRA |
| 33 | School Administrator Exposes Sandy Hook Stonewall | May 29, 2015 | SO8Xb-t4nT4 |
| 34 | Official Claims DHS Involved in Sandy Hook | June 4, 2015 | BWsbyH2Wa0E |
| 35 | Govt is Manufacturing Crises | July 7, 2015 | SH VIDEO 9 |
| 36 | Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP | July 7, 2015 | jCOe3qIgyFA |
| 37 | The Fight for Freedom of Information in Sandy Hook | July 8, 2015 | l0miXJ-djeA |
| 38 | Alex Jones Final Statement on Sandy Hook | November 18, 2016 | MwudDfz1yAk |
| 39 | Hunt for Wikileaks Source Begins | March 8, 2017 | SH VIDEO 10 |
| 40 | Sandy Hook Vampires Exposed | April 22, 2017 | rUn1jKhWTXI |
| 41 | Media Refuses to Report Alex Jones' Real Statements on Sandy Hook | June 13, 2017 | kf2F7RxJ9e4 |
| 42 | Zero Hedge Discovers Anomaly in Alex Jones Hit Piece | June 26, 2017 | SH VIDEO 11 |
| 43 | JFK Assassination Documents to DROP Tonight | October 26, 2017 | SH VIDEO 12 |
| 44 | Watch as Megyn Kelly Opens Old Wounds Of Sandy Hook Victims | April 20, 2018 | uQkAJykqyeo |

**OBJECTION:**

**Defendant objects that it is unable to comply with the discovery request because Defendant cannot admit or deny the genuineness of the videos as the same were not attached to the Second Request for Admissions.**

**Response:**

**Subject to the foregoing objection, Defendant answers as follows:**

**Defendant admits that the following video clips and/or broadcast videos were published and distributed over the internet by Defendant and videotapes bearing these file names were produced to Plaintiffs.**

**Defendant denies that the video clips and/or broadcast videos are copies of the original broadcasts.**

| | Title | Date | Produced By Defendant As |
|---|---|---|---|
| 2 | Creepy Illumaniti Message in Batman Movie Hints at Sandy Hook School | December 17, 2012 | F2mRuEhmoGA |
| 3 | Sandy Hook 2nd Shooter Cover-Up | December 19, 2012 | 6W6b-voc-Ds |
| 4 | Sandy Hook Father Remembers Fallen Hero | December 19, 2012 | 8cZkHDH16nQ |
| 5 | Lower Part of Gotham Renamed "Sandy Hook" in Dark Knight Film | December 21, 2012 | Fus1FbQiU-Q |
| 8 | Prof. Claims Sandy Hook Massacre MSM Misinformation | January 10, 2013 | D8GxrKJDSL8 |
| 9 | Sandy Hook AR-15 Hoax? Still No School Surveillance Footage | January 15, 2013 | Oo74myC3bqY |
| 11 | Why People Think Sandy Hook is a Hoax | January 27, 2013 | tM5ZdO-IgEE |
| 12 | Dr. Steve Pieczenik: Sandy Hook was A Total False Flag! | March 27, 2013 | 5EfyD7Wu5fQ |
| 13 | Crisis Actors Used at Sandy Hook! Special Report | April 1, 2013 | shQSVhS0hLw |
| 16 | Sandy Hook Police Ordered to Stand Down? | November 23, 2013 | xP9fhKUaudo |
| 17 | Sandy Hook Investigator Stonewalled and Threatened | February 20, 2014 | oGpWtqiSCY |
| 18 | Sandy Hook, False Narratives Vs. The Reality | March 14, 2014 | esIvAO2aI1w |
| 19 | Revealed: Sandy Hook Truth Exposed | May 9, 2014 | rSLOWCHNdw |
| 20 | Sandy Hook "Officials" Caught in Coverup and Running Scared | May 13, 2014 | MH6hmI1H-iQ |
| 21 | Bombshell: Sandy Hook Massacre Was a DHS Illusion Says School Safety Expert | May 13, 2014 | x2a1FwYEZS4 |
| 22 | Sandy Hook Deaths Missing From FBI Report | September 25, 2014 | A2Z0zUZBn7k |
| 23 | Sandy Hook Film Censorship Efforts Backfire | December 12, 2014 | 4T8_WYzH5SM |

| | **Title** | **Date** | **Produced By Defendant As** |
|---|---|---|---|
| 24 | The Ultimate Sandy Hook Debate As The 2nd Anniversary Looms | December 12, 2014 | 6aK0P-WxjU8 |
| 25 | Will Bushmaster Lawsuit Reveal Sandy Hook Hoax? | December 16, 2014 | BFyDqDLAcLQ |
| 26 | Lawsuit Could Reveal Truth About Sandy Hook Massacre | December 27, 2014 | kK8CnIBA928 |
| 30 | New Bombshell Sandy Hook Information In-Bound | March 4, 2015 | _7ib5WkULBY |
| 31 | New Sandy Hook Questions Arise from FOIA Hearing | May 29, 2015 | 5cll79t7Mrw |
| 32 | Sandy Hook: The Lies Keep Growing | May 29, 2015 | Ml3KVj2nVRA |
| 33 | School Administrator Exposes Sandy Hook Stonewall | May 29, 2015 | SO8Xb-t4nT4 |
| 34 | Official Claims DHS Involved in Sandy Hook | June 4, 2015 | BWsbyH2Wa0E |
| 36 | Retired FBI Agent Investigates Sandy Hook: MEGA MASSIVE COVER UP | July 7, 2015 | jCOe3qIgyFA |
| 37 | The Fight for Freedom of Information in Sandy Hook | July 8, 2015 | l0miXJ-djeA |
| 38 | Alex Jones Final Statement on Sandy Hook | November 18, 2016 | MwudDfz1yAk |
| 39 | Hunt for Wikileaks Source Begins | March 8, 2017 | SH VIDEO 10 |
| 40 | Sandy Hook Vampires Exposed | April 22, 2017 | rUn1jKhWTXI |
| 41 | Media Refuses to Report Alex Jones' Real Statements on Sandy Hook | June 13, 2017 | kf2F7RxJ9e4 |
| 44 | Watch as Megyn Kelly Opens Old Wounds Of Sandy Hook Victims | April 20, 2018 | uQkAJykqyeo |

**Defendant is unable to comply with the discovery request as it relates to the following because Defendant cannot admit or deny that the videos are true and accurate copies of any original video created by Free Speech Systems, LLC as Plaintiffs failed to provide a copy of the videos.**

**Defendant will comply with the request if and when the videos are provided by Plaintiffs.**

| | Title | Date | Produced As |
|---|---|---|---|
| 1 | Connecticut School Massacre Looks Like False Flag Says Witness | December 14, 2012 | SH VIDEO 1 |
| 6 | Callers React to Foreign Media Pushing Total Gun Confiscation | January 4, 2013 | SH VIDEO 2 |
| 10 | Clearing Up Some Disinfo on Sandy Hook Massacre with James Tracy | January 18, 2013 | SH VIDEO 3 |
| 14 | Obama Gun Grab Psyop | April 9, 2013 | SH VIDEO 4 |
| 15 | Shadow Govt Strike Again | April 16, 2013 | SH VIDEO 5 |

|    | Title | Date | Produced As |
|----|-------|------|-------------|
| 27 | America the False Democracy | December 18, 2014 | SH VIDEO 6 |
| 28 | Why We Accept Govt Lies | January 13, 2015 | SH VIDEO 7 |
| 29 | Title Unknown – Video discussing HONR Network | February 12, 2015 | SH VIDEO 8 |
| 35 | Govt is Manufacturing Crises | July 7, 2015 | SH VIDEO 9 |
| 39 | Hunt for Wikileaks Source Begins | March 8, 2017 | SH VIDEO 10 |
| 42 | Zero Hedge Discovers Anomaly in Alex Jones Hit Piece | June 26, 2017 | SH VIDEO 11 |
| 43 | JFK Assassination Documents to DROP Tonight | October 26, 2017 | SH VIDEO 12 |

**Request for Admission No. 2**: Admit that the video produced as SH VIDEO 13 is a true and accurate copy of the June 19, 2017 profile of Alex Jones hosted by Megyn Kelly.

**OBJECTION:**

**Defendant is unable to comply with the discovery request because Defendant cannot admit or deny that the video is a true and correct of any original video created by Free Speech Systems, LLC as Plaintiffs failed to provide a copy of the videos.**

**Response:**

**Defendant will comply with the request if and when the video is provided by Plaintiffs.**

**Request for Admission No. 3**: Admit that the video produced as SH VIDEO 14 is a true and accurate copy of Veronique De La Rosa's alleged green-screen interview with Anderson.

**OBJECTION:**

**Defendant is unable to comply with the discovery request because Defendant cannot admit or deny that the video is a true and correct of any original video created by Free Speech Systems, LLC as Plaintiffs failed to provide a copy of the videos.**

**Response:**

**Defendant will comply with the request if and when the video is provided by Plaintiffs.**

**Request for Admission No. 4**: Admit that each of the following documents identified by Bates number is a true and accurate copy of a genuine original document in Free Speech Systems, LLC's corporate files:

FSSTX-003561
FSSTX-003653
FSSTX-004181
FSSTX-005008

FSSTX-012516
FSSTX-012519
FSSTX-012650
FSSTX-012675
FSSTX-013639
FSSTX-014466
FSSTX-015270
FSSTX-018756
FSSTX-018762
FSSTX-019237
FSSTX-027752
FSSTX-027766
FSSTX-028423
FSSTX-037204
FSSTX-037740
FSSTX-038175
FSSTX-038928
FSSTX-039429
FSSTX-039550
FSSTX-039897
FSSTX-040027
FSSTX-040802
FSSTX-042477
FSSTX-042462
FSSTX-042476
FSSTX-043252
FSSTX-043869
FSSTX-043912
FSSTX-051348
FSSTX-052942
FSSTX-052975
FSSTX-053016
FSSTX-053394
FSSTX-068265
FSSTX-072489
FSSTX-075327
FSSTX-075755
FSSTX-075784
FSSTX-075922
FSSTX-075936
FSSSTX-075999
FSSTX-076069
FSSTX-076105
FSSTX-076236
FSSTX-076571
FSSTX-076588

FSSTX-077006
FSSTX-077014
FSSTX-077076
FSSTX-077501
FSSTX-077825
FSSTX-078964
FSSTX-079481
FSSTX-079546
FSSTX-082669 – FSSTX-082812
FSSTX-084601
FSSTX-085544
FSSTX-085731 – FSSTX-086492
FSSTX-086569 – FSSTX-086583
FSSTX-086588
FSSTX-086589
Heslin (19-4651) – 000125
Heslin (19-4651) – 000166
Heslin (19-4651) – 000627
Heslin (19-4651) – 000661
Heslin (19-4651) – 000712
Heslin (19-4651) – 000719
Heslin (19-4651) – 000766
Heslin (19-4651) – 000862
Heslin (19-4651) – 000873

**OBJECTION:**

**Defendant objects to the use of the term "corporate files" as the same is vague and
ambiguous.**

**Response:**

**To the extent that Plaintiffs are requesting Defendant to admit that these documents are kept
in the course of the regularly conducted business activity of Defendant, DENIED.**

**Request for Admission No. 5:** Admit that during the October 1, 2021 episode of the Alex Jones
Show, Mr. Jones stated the following:

> Just like the New York Times lying about WMDs on purpose and all of the evil
> things like that – oh, but I questioned one of the big events they hyped up because
> of a lot of anomalies, and I have a right to question that. In fact, I, for a while,
> thought it didn't happen, then I thought it probably did, and now seeing how
> synthetic everything is, maybe my original instinct – maybe Alex Jones is always
> right. I'm pretty much right 99% of the time folks, and so are you. I mean we all
> know, this is easy to look at and see what's happening.

**<u>Response:</u>**

**Admit**

# Exhibit 4

| | |
|---|---|
| **From:** | Jacquelyn Blott |
| **To:** | Mark Bankston |
| **Cc:** | Bill Ogden |
| **Subject:** | RE: Requests for Admissions |
| **Date:** | Thursday, January 27, 2022 1:34:11 PM |

I was misinformed about Plaintiffs' production of the videos as well as the other documents you provided with the Requests for Admissions.  I have spoken with Mr. Reeves and emailed him that portion of your email saying that he had produced them on December 2, 2021.  He is searching but has yet to find videos labeled SH Videos.

I have not accused anyone in this case of malpractice and don't have an opinion in that regard either way.  It is a waste of energy. My focus is from the date I undertook to represent the Defendants (some 14 days ago)  and moving forward.

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Thursday, January 27, 2022 1:14 PM
**To:** Jacquelyn Blott <jblott@jblottlaw.com>
**Cc:** Bill Ogden <bill@fbtrial.com>
**Subject:** RE: Requests for Admissions

I'm not sure why you've removed Mr. Reeves from this email, but I have left him off, following your lead. I assume it's because you've accused him of malpractice.

In any case, I again need to confirm your position. It appears you are saying that the reason you falsely represented in your discovery answers that Plaintiffs failed to provide the videos is because Mr. Reeves misinformed you. Is that correct?

Also, before we file our motion with the Court, I want to confirm that you have no response to Ms. Karpova's testimony which seems to prove that Mr. Reeves in fact possessed a copy of SH VIDEO 12. Is that also correct?

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

---

**From:** Jacquelyn Blott <jblott@jblottlaw.com>
**Sent:** Thursday, January 27, 2022 6:14 AM
**To:** Mark Bankston <mark@fbtrial.com>
**Subject:** RE: Requests for Admissions

Mr. Bankston:

Your assumptions are incorrect.  When I asked Mr. Reeves if they had been served

with the discovery requests, I was misinformed.  I did not notice your email that was below his email to you.   I expended considerable time including time of others trying to track down the videos that were labeled as "SH Video…." to no avail and the search continues.  The videos on our index have as file names alphanumeric file names.  In the interim, Connecticut counsel is looking to identify the videos marked with the prefix SH VIDEO to the alphanumeric names.  I will amend the response the earlier of receiving the identifying information from Connecticut counsel or I receive the link to the Dropbox.

With Respect to Request for Admission No. 4, your request asks Free Speech Systems, LLC to admit whether the documents are "true and accurate copies of a genuine original document in Free Speech Systems, LLC's **corporate files.**  You state, We served a standard authentication request that these documents are genuine copies produced from Free Speech Systems' files.   I am amending the Admissions to reflect those documents that are contained in FSS' files and admit the authenticity of those that are not (e.g. the deposition and trial transcript from Mr. Jones' divorce).

Connecticut counsel received Mr. Shroyer's deposition transcript in the Connecticut proceedings and Plaintiffs' First Supplemental Objections and Responses to Plaintiffs' 3rd Request for Production were served via eFile Texas using the Heslin cause number.  Please advise if there were any issues with the receiving same.

Best regards,

Jacquelyn W. Blott

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Tuesday, January 25, 2022 4:31 PM
**To:** Bradley Reeves <brad@brtx.law>
**Cc:** Jacquelyn Blott <jblott@jblottlaw.com>; Bill Ogden <bill@fbtrial.com>
**Subject:** Requests for Admissions

Ms. Blott,

I need to confer about several issues with the responses you served yesterday.

As it concerns Plaintiffs' Request for Admission 1-3, you stated that "Defendant is unable to comply with the discovery request…as Plaintiffs failed to provide a copy of the videos." That is a false statement to which you made with no reasonable inquiry. As shown in the email below, the videos were provided to Defendants on December 2, 2021 at the same time at the discovery requests. Collectively, those videos are nearly four gigabytes and cannot be maintained on our Dropbox account indefinitely. Therefore, the files were sent using a Dropbox transfer link, which has since expired.

Apparently, Mr. Reeves never even downloaded the files. And as Mr. Reeves noted in yesterday's

email, the download link *no longer* works. But Plaintiffs absolutely provided copies of the videos. And it's obvious there was never any genuine effort to respond (even after being granted an extension) since the first time Mr. Reeves raised any issue about not having the videos was on the day your responses were due. This turn of events is ridiculous, and I'm positive the Court would feel the same way.

As it concerns Plaintiffs' Request for Admission No. 4, we requested admissions concerning authenticity. This kind of request is specifically authorized by Rule 198.1, which permits a request for admission for the genuineness of any documents. In response, you completely evaded the question, refused to admit or deny authenticity, and instead responded by disclaiming the hearsay exception under Rule 803(6) that the documents were kept in the course of the regularly conducted business. Our request had nothing to do with hearsay, nor do we care about hearsay exceptions since none of these documents would ever be offered for the truth of the matters asserted within. Quite to contrary, in fact. Instead, we served a standard authentication request that these documents are genuine copies produced from Free Speech Systems' files. You unreasonably evaded that simple, routine request.

We demand that you withdraw your false and frivolous answers, and that you serve new responses admitting authenticity of all matters. Otherwise, we will move the Court to assess sanctions for your unreasonable responses, deem the requests admitted, and award all costs. Given the effort required to organize, prepare, and serve this video and document related discovery, not to mention a motion and eventual hearing, we expect those costs would be rather extensive.

Finally, we have concerns over what appear to be contradictions between your responses and the testimony given by Ms. Karpova on December 3, 2021. During her deposition, Ms. Karpova testified that she had been shown certain videos during the break, such as the following:

> Q.      This talks about an October 26, 2017 video called "JFK
>         Assassination Documents to Drop Tonight." Is that another one
>         that you just looked at at the break?
> A.      Yes. (136:22-137:1).

That video was produced by Plaintiffs on December 2, 2021 as "SH VIDEO 12." It was never produced by Defendants, and we have no record of ever producing it on any prior occasion. Let me know if I'm incorrect, because otherwise this is a major discrepancy in your responses. At present, we do not understand how Mr. Reeves was able to show Ms. Karpova the video if he did not have access to "SH VIDEO 12."

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

---

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Monday, January 24, 2022 2:42 PM
**To:** Mark Bankston <mark@fbtrial.com>

**Cc:** Jacquelyn Blott <jblott@jblottlaw.com>
**Subject:** RE: Discovery service

Mark:

This dropbox link no longer works. Please re-send.

Best regards,

Brad Reeves

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Thursday, December 2, 2021 11:13 PM
**To:** Bradley Reeves <brad@brtx.law>
**Subject:** Discovery service

Attached are supplemental expert designations for each plaintiff, along with a set of requests for admission and requests for production. I have captioned the discovery for all cases, and the plaintiffs are fine with one set of answers.

Also, below is a link to a dropbox transfer with additional video production:
https://link.edgepilot.com/s/3e888761/agGz9QCXsEy4j3kXZrXKJA?
u=https://www.dropbox.com/t/OFKk8A0FZOThMgo2

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 61353136
Status as of 2/2/2022 9:38 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 2/1/2022 2:38:38 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 2/1/2022 2:38:38 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 2/1/2022 2:38:38 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 2/1/2022 2:38:38 PM | SENT |

2/8/2022 1:38 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Selina Hamilton

# D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

# D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

## NOTICE OF FILING OF DECLARATION ON ATTORNEY'S FEES

---

Plaintiffs hereby file the attached Declaration setting forth attorney's fees and expenses in connection with their Motion for Sanctions Regarding Corporate Deposition.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone

713.221.8301 Fax

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2022 the forgoing document was served upon all counsel of record via electronic service.

_____
MARK D. BANKSTON

## <u>DECLARATION OF MARK BANKSTON</u>

STATE OF TEXAS    §
                       §
HARRIS COUNTY    §

I, Mark Bankston, declare under penalty of perjury that the following declaration is true and correct and based upon my personal knowledge:

1. My name is Mark Bankston. I am a partner at Kaster Lynch Farrar & Ball, LLP. I am over the age of 21 and competent to make this declaration.

2. As a civil litigator, I have twelve years of experience in handling tort lawsuits. I have tried more than a dozen injury lawsuits to a jury. I have represented scores of clients in over twenty different states in connection with various product liability, civil rights, employment, and negligence cases in state and federal court. I have also represented plaintiffs in over a dozen appellate victories at the state and federal level.

3. I have recounted my credentials and accolades in numerous prior declarations to this Court, so I will not repeat them here, but instead ask the Court to take judicial notice of its own file and prior fee awards.

4. My professional rate for the kind of work performed in this case is $550 per hour, and I have previously been awarded fees at that rate in this Court.

5. The InfoWars lawsuits pending in this Court require an attorney who is both capable and willing to handle this unusually demanding, extraordinarily high-profile litigation. This lawsuit involves complicated legal and evidentiary issues which require an attorney of a high level of competence.

6. I am personally familiar with the rates charged by other attorneys of my experience and professional background in this locality, as well as rates charged by attorneys in high-profile defamation lawsuits, and it is my opinion that $550 per hour is a reasonable rate for the work necessary in connection with these motions.

7. The following legal services were rendered in connection with the recent corporate deposition and Plaintiffs' Motion for Sanctions:

**Arranging Deposition, October – November 2021**

I spent 3.5 hours corresponding with Defendants, scheduling and arranging the deposition, as well as selecting topics to be used in the deposition and preparing the notice and amended notice. The reasonable value of this time at $550/hour is $1,925.

**Preparation for the Deposition of Free Speech Systems, LLC, November 2021**

I spent 28 hours preparing for the deposition of Free Speech Systems, LLC. The reasonable value of this time at $550/hour is $15,400.

**Travel – Houston to Austin, December 1, 2021**

I spent 3 hours travelling from Houston to Austin to take the deposition. The reasonable value of this time at $550/hour is $1,650.

**Deposition of Free Speech Systems, December 3, 2021**

I spent 6.5 hours taking the deposition of Free Speech Systems, LLC. The reasonable value of this time at $550/hour is $3,575.

**Travel – Austin to Houston, December 4, 2021**

I spent 3 hours travelling home to Houston following the deposition. The reasonable value of this time at $550/hour is $1,650.

**Plaintiffs' Motion for Sanctions, filed December 27, 2021**

This brief was 42 pages long with 488 pages of exhibits. The brief outlined the history of non-appearances at corporate depositions and outlined the deficient nature of the December 3, 2021 deposition. I spent 32 hours writing and editing the brief. In total, the reasonable value of this time at $550/hour is $17,600.

**Editing of Deposition Video, December 29-30, 2021**

To help argue the motion to the Court, I spent 5 hours compiling and editing a ten-minute compilation of Ms. Karpova's testimony from the original deposition video. The reasonable value of this time at $550/hour is $2,750.

**Defendants' Response to Scarlett Lewis' Motion to Compel, filed January 7, 2021**

Defendants' Response was 9 pages long with 10 pages of exhibits. I spent 1.5 hours reviewing this Response and taking notes on the legal arguments and facts alleged. The reasonable value of this time at $550/hour is $825.

### Creation of PowerPoint Presentation, January 8-11, 2021

I created a PowerPoint presentation setting forth the history of the corporate deposition discovery disputes and Defendants' bad faith obstruction of the latest deposition. I spent 12 hours creating this presentation. The reasonable value of this time at $550/hour is $4,950.

### Preparation for Hearing, January 13, 2021

I spent 6 hours preparing for the hearing. The reasonable value of this time at $550/hour is $3,300.

### Time in the Hearing, October 25, 2021

I spent 2 hours arguing the motions. The reasonable value of this time at $550/hour is $1,100.

8.    I provided a total of 102.5 hours of legal services. At $550 per hour, the value of those services is $56,375.

9.    Plaintiffs also incurred the following expenses for the corporate representative deposition:

| | |
|---|---|
| Hotel Expense | $265.00 |
| Court Reporting / Transcript Expenses | $2,795.00 |
| Videographer / Video Delivery Expenses | $1,310.00 |
| **Total** | **$4,370.00** |

10.   The total value of legal services and expenses is $60,745.

Executed on January 26, 2022 in Harris County, Texas.

_____

MARK D. BANKSTON

3

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 61545438
Status as of 2/9/2022 9:02 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 2/8/2022 1:38:36 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 2/8/2022 1:38:36 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 2/8/2022 1:38:36 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 2/8/2022 1:38:36 PM | SENT |

2/9/2022 12:59 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Selina Hamilton

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

## NOTICE OF DEPOSITION OF CORPORATE REPRESENTATIVE

TO:  Plaintiffs, NEAL HESLIN, LEONARD POZNER, VERONIQUE DE LA ROSA, and
SCARLETT LEWIS, by and through their attorneys of record, Mark Bankston and
William Ogden, KASTER LYNCH FARRAR & BALL, LLP, 1117 Herkimer Street,
Houston, Texas 77008

Defendant, FREE SPEECH SYSTEMS, LLC, designates the following individual as the

corporate representative pursuant to Rule 199.2 of the Texas Rules of Civil Procedure:

Brittany Paz
4 Research Drive, Suite 402
Shelton, Connecticut 06484
Telephone: (203)242-3013

Ms. Paz will testify as to all topics in *Plaintiffs' Notice of Taking the Oral and Videotaped Deposition of Free Speech Systems, LLC's Corporate Representative(s)* dated January 26, 2022.

Respectfully submitted,

LAW OFFICE OF JACQUELYN W. BLOTT

By: _____
Jacquelyn W. Blott
SBN: 07473250
100 University Blvd., Ste. 225 #251
Round Rock, Texas 78665
Telephone: (512) 639-9904
Facsimile: (833) 377-0087
Email: jblott@jblottlaw.com

REEVES LAW, PLLC
Bradley J. Reeves
SBN: 2406826
702 Rio Grande St., Suite 203
Austin, Texas 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484
Email: brad@brtx.law

ATTORNEYS FOR DEFENDANTS
ALEX JONES, OWEN SHROYER,
INFOWARS, LLC,  and FREE SPEECH
SYSTEMS, LLC

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of *Defendant Free Speech Systems, LLC's First Supplemental Objections and Responses to Third Set of Requests for Production* was served pursuant to Rule 21a of the Texas Rules of Civil Procedure on this the 9th day of February 2022 as follows.

Mark Bankston                    Email: mark@fbtrial.com
William Ogden                    Email: bill@fbtrial.com
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, Texas 77008

_____
Jacquelyn W. Blott

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 61587020
Status as of 2/9/2022 3:50 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 2/9/2022 12:59:54 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 2/9/2022 12:59:54 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 2/9/2022 12:59:54 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 2/9/2022 12:59:54 PM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 2/9/2022 12:59:54 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 2/9/2022 12:59:54 PM | SENT |

2/17/2022 3:34 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Gilberto Diaz Rios

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## **UNOPPOSED MOTION FOR WITHDRAWAL OF COUNSEL**

Pursuant to Rule 10 of the Texas Rules of Civil Procedure, the undersigned, Bradley Reeves of REEVES LAW, PLLC, one of the counsels for Defendants in the above-captioned matters, brings this Unopposed Motion for Withdrawal of Counsel, and in support thereof, and would show unto the Court as follows:

**MOTION**

The undersigned requests the Court grant this unopposed motion for withdrawal of counsel, allowing Bradley Reeves of REEVES LAW, PLLC to withdraw as counsel of record for Defendants. Good cause exists for this withdrawal because a conflict of interest as arisen between the undersigned and Defendants which implicate serious ethical considerations and prevent the undersigned from further representation of Defendants. These considerations reduce the ability of the undersigned to provide adequate representation to the Defendants within ethical bounds and renders an ongoing attorney-client relationship impossible. These considerations have further resulted in making the undersigned unable to effectively communicate with Defendants in a manner consistent with good attorney-client relations.

The undersigned has informed Defendants of his intent to withdraw, and Defendants have voiced no objections or otherwise responded to the notifications from the undersigned. Moreover, should the Court allow this withdrawal, Defendants will still be represented in these cases by Ms. Jacquelyn Blott of the LAW OFFICE OF JACQUELYN W. BLOTT, who has made her appearance and is designated as lead counsel in all matters. As such, withdrawal of the undersigned as counsel of record for Defendants can be accomplished with no material adverse effect on the interests of Defendants and the representation of Defendants in these matters.

Pursuant to Local Rule 6.2(a), counsel for Plaintiffs consents to the withdrawal as indicated by his electronic signature below. In addition, the undersigned certifies that to the best of his

knowledge, there are currently no rulings of this Court which have yet to be reduced to writing. Finally, this motion is not made for any purpose of delay in these cases.

WHEREFORE, the undersigned, Bradley Reeves of REEVES LAW, PLLC, respectfully requests the Court grant this unopposed motion for withdrawal of counsel and permit Bradley Reeves of REEVES LAW, PLLC to withdraw as counsel of record for Defendants, along with such other and further relief to which the undersigned may be entitled.

Dated: February 17, 2022.

Respectfully submitted,

By:  __ /s/ Bradley J. Reeves_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
**REEVES LAW, PLLC**
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**WITHDRAWING ATTORNEY FOR DEFENDANTS**

CONSENT TO WITHDRAWAL:

KASTER LYNCH FARRAR & BALL, LLP

By:*/s/ Mark D. Bankston (by permission)*
Mark D. Bankston
Texas Bar No. 24071066
mark@fbtrial.com
William R. Ogden
Texas Bar No. 24073531
bill@fbtrial.com
1117 Herkimer Street
Houston, TX 77008
Tel:    (713) 221-7008
Fax:    (713) 221-8301

**ATTORNEYS FOR PLAINTIFFS**

3

### CERTIFICATE OF CONFERENCE

I hereby certify that I conferred with opposing counsel regarding this motion for withdrawal of counsel, and counsel for Plaintiffs has indicated they are unopposed to and consent to this withdrawal.

_/s/ Bradley J. Reeves_
Bradley J. Reeves

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by the method indicated below upon all counsel of record and interested parties in accordance with the Texas Rules of Civil Procedure on February 17, 2022.

Mark Bankston                                          *via electronic service*
William Ogden
KASTER LYNCH FARRAR & BALL, LLP
1117 Herkimer Street
Houston, TX 77008

_/s/ Bradley J. Reeves_
Bradley J. Reeves

## Automated Certificate of eService

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 61862993
Status as of 2/22/2022 9:54 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 2/17/2022 3:34:39 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 2/17/2022 3:34:39 PM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 2/17/2022 3:34:39 PM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 2/17/2022 3:34:39 PM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 2/17/2022 3:34:39 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 2/17/2022 3:34:39 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 2/17/2022 3:34:39 PM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 2/17/2022 3:34:39 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 2/17/2022 3:34:39 PM | SENT |

CAUSE NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, AND | § | |
| OWEN SHROYER | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

CAUSE NO. D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, AND | § | |
| FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants,* | § | 459th JUDICIAL DISTRICT |

## ORDER GRANTING UNOPPOSED MOTION FOR WITHDRAWAL OF COUNSEL

CAME ON for consideration the Unopposed Motion for Withdrawal of Counsel filed by

Bradley Reeves of REEVES LAW, PLLC seeking to withdraw as counsel of record for Defendants

in the above-captioned matters, and the Court, after considering the motion, is of the opinion that

the motion should be GRANTED. It is therefore,

ORDERED, ADJUDGED, and DECREED that Bradley J. Reeves of the law firm of

REEVES LAW, PLLC is permitted to withdraw as an attorney of record for Defendants in each of

the above-captioned matters.

SIGNED ON _____, 2022.


_____
HONORABLE JUDGE MAYA GUERRA GAMBLE

**APPROVED AS TO FORM
AND ENTRY REQUESTED:**

REEVES LAW, PLLC

By: ___*/s/ Bradley J. Reeves*_____
Bradley J. Reeves
Texas Bar No. 24068266
brad@brtx.law
702 Rio Grande St., Suite 203
Austin, TX 78701
Telephone: (512) 827-2246
Facsimile: (512) 318-2484

**WITHDRAWING ATTORNEY FOR DEFENDANTS**

KASTER LYNCH FARRAR & BALL, LLP

By:*/s/ Mark D. Bankston (by permission)*
Mark D. Bankston
Texas Bar No. 24071066
mark@fbtrial.com
William R. Ogden
Texas Bar No. 24073531
bill@fbtrial.com
1117 Herkimer Street
Houston, TX 77008
Tel:     (713) 221-7008
Fax:     (713) 221-8301

**ATTORNEYS FOR PLAINTIFFS**

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Bradley Reeves on behalf of Bradley Reeves
Bar No. 24068266
brad@brtx.law
Envelope ID: 61862993
Status as of 2/22/2022 9:54 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 2/17/2022 3:34:39 PM | SENT |
| Bradley Reeves | | brad@brtx.law | 2/17/2022 3:34:39 PM | SENT |
| Judge Maya Guerra Gamble | | 459.submission@traviscountytx.gov | 2/17/2022 3:34:39 PM | SENT |
| Velva Lasha Price | | velva.price@traviscountytx.gov | 2/17/2022 3:34:39 PM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 2/17/2022 3:34:39 PM | SENT |
| Marc Randazza | | ecf@randazza.com | 2/17/2022 3:34:39 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 2/17/2022 3:34:39 PM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 2/17/2022 3:34:39 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 2/17/2022 3:34:39 PM | SENT |

2/22/2022 6:19 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Victoria Benavides

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

## MOTION FOR ADMISSION OF COUNSEL PRO HAC VICE

Applicant Mr. Norman A. Pattis, a nonresident attorney licensed in another state but not in Texas, and movant Ms. Jacquelyn W. Blott, an attorney licensed in Texas, file this motion for admission of counsel pro hac vice in the above action. In support of this motion, applicant and movant show the court as follows:

1.     The defendants in the above cases, Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC, and Owen Shroyer, desire that applicant Attorney Pattis provide counsel and be permitted to

appear in any and all proceedings in the above cases in association with Attorney Blott, of the Texas law firm of the Law Office of Jacquelyn W. Blott, 200 University Boulevard, Suite 225 #251 Round Rock, Texas 78665.

2.      Accordingly, applicant Attorney Pattis seeks permission to participate in the above case. In accordance with Rule XIX of the Rules Governing Admission to the State Bar of Texas, applicant files this sworn motion requesting permission to participate.

3.      Applicant is an attorney duly admitted to practice law in the State of Connecticut. Applicant is not licensed to practice law in Texas.

4.      Applicant is a member of the law firm of Pattis & Smith, LLC, with offices at 383 Orange St, 1st floor New Haven, CT 06511, telephone (203) 393-3017, facsimile (203) 393-9745, e-mail address NPattis@pattisandsmith.com.

5.      Applicant has not appeared or sought leave to appear or participate in any cases or causes in Texas courts within the past two years.   Concurrent herewith, a Motion for Admission Pro Hac Vice was filed on even-date herewith in Cause No. D-1-GN-18-001605; *Marcel Fontaine v. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Kit Daniels*; In the 345th Judicial District Court of Travis County, Texas.

6.      Applicant is a licensed and active member in good standing, in the following jurisdictions and courts:

a. Connecticut, 1993-present;
b. United States District Court for the District of Connecticut, 1994-present;
c. United States Court of Appeals for the Second Circuit, 1995-Present;
d. United States Court of Appeals for the Sixth Circuit, 1997-Present;
e. United States Supreme Court, 1997-Present;
f. United States District Court, Southern District of New York, 2012-Present;

2

g. United States District Court, District of Columbia, 2012-Present;

h. United States District Court, Eastern District of New York, 2013-present;

i. United States Federal Court of Claims, 2016-Present;

j. United States Court of Appeals for the D.C. Circuit, 2016-Present; and

k. United States Court of Appeals for the Ninth Circuit, 2018-Present.

7.      Applicant was subject to a disciplinary hearing regarding an affidavit submitted in Connecticut in litigation related to the above captioned matters. After a full evidentiary hearing, the case was dismissed. A copy of the decision dismissing the action is attached as "Exhibit A." The Applicant has not been the subject of any other disciplinary action by the Bar or by courts of any jurisdiction in which applicant is licensed.

8.       Applicant has not been denied admission to the courts of any state or to any federal court during the preceding five years.

9.       Applicant is familiar with the State Bar Act, the State Bar Rules, and the Texas Disciplinary Rules of Professional Conduct governing the conduct of members of the State Bar of Texas and will at all times abide by and comply with those provisions as long as the above captioned cases are pending and said applicant has not withdrawn as counsel herein.

10.      On the granting of this motion, applicant will be associated with movant Attorney Blott, State Bar Number 07473250, of the Law Office of Jacquelyn W. Blott, 200 University Boulevard, Suite 225 #251 Round Rock, Texas 78665, telephone (512) 639-9904, facsimile (888) 377-0087, e-mail address jblott@jblottlaw.com.

11.      Movant Attorney Blott finds Attorney Pattis to be a reputable attorney and recommends that Attorney Pattis be granted permission to participate in the captioned cases.

3

12.     This motion is based on the sworn statement of Attorney Pattis, which is attached as "Exhibit B" and is incorporated by reference.

13.     This motion is also based on the sworn statement of Attorney Blott, which is attached as "Exhibit C" and is incorporated by reference. Attorney Blott is the resident practicing Texas attorney with whom the applicant will be associated in the above cases.

14.     Before filing this motion, applicant filed with the Texas Board of Law Examiners the fee required by Section 82.0361 of the Texas Government Code, along with the required application for admission pro hac vice promulgated by the Board. A copy of the Board's Acknowledgement Letter of the filing of the fee and application form is attached as "Exhibit D" and is incorporated by reference.

Therefore, applicant Attorney Pattis and Attorney Blott respectfully request that this motion for admission of counsel pro hac vice be granted, that Attorney Pattis be permitted to participate in all proceedings in the above cases pro hac vice, and for any other relief to which the above captioned defendants, Attorney Pattis, and Attorney Blott may be justly entitled.

Respectfully submitted,

LAW OFFICE OF JACQUELYN W. BLOTT
200 University Boulevard, Suite #225 250
Round Rock, Texas 78665
Telephone: (512) 639-9904

Jacquelyn W. Blott
SBN: 07473250
Email: jblott@jblottlaw.com

4

## **CERTIFICATE OF CONFERENCE**

I certify that I have spoken with Mark D. Bankston, counsel for Neil Heslin, Leonard Pozner, Veronique de La Rosa, and Scarlett Lewis, on February 15, 2022, and he is opposed to this Motion.

Jacquelyn W. Blott

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this Motion has been forwarded to all counsel of record pursuant to Rule 21a of the Texas Rules of Civil Procedure on this the 22nd day of February 2022 as follows:

Mark Bankston                    Email: mark@fbtrial.com
William Ogden                    Email: bill@fbtrial.com
FARRAR & BALL, LLP
1117 Herkimer Street
Houston, Texas 77008

Jacquelyn W. Blott

5

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

**MOTION FOR ADMISSION OF COUNSEL PRO HAC VICE**

# EXHIBIT A

## STATEWIDE GRIEVANCE COMMITTEE

Danbury Judicial District Grievance Panel  :
    Complainant

vs.  :  Grievance Complaint #19-0367

Norman A. Pattis  :
    Respondent

### DECISION

Pursuant to Practice Book §2-35, the undersigned, duly-appointed reviewing committee of the Statewide Grievance Committee, conducted a hearing at the Superior Court, 80 Washington Street, Hartford, Connecticut on October 3, 2019. The hearing addressed the record of the complaint filed on June 12, 2019, and the probable cause determination filed by the New Haven Judicial District Grievance Panel for the towns of Bethany, New Haven and Woodbridge on July 22, 2019, finding that there existed probable cause that the Respondent violated Rules 3.3(a)(1) and (2), 3.4(1) and 8.4(1),(2),(3) and (4) of the Rules of Professional Conduct.

Notice of the hearing was mailed to the Complainant, to the Respondent and to the Office of the Chief Disciplinary Counsel on August 28, 2019. Pursuant to Practice Book §2-35(d), Chief Disciplinary Counsel Brian Staines pursued the matter before this reviewing committee. The Respondent appeared and testified. Attorney Mark Dubois represented the Respondent. No exhibits were admitted into evidence.

This reviewing committee makes the following findings:

On March 1, 2019, the Respondent appeared in lieu of previous counsel on behalf of Alex Jones and related corporate defendants in civil litigation pending in Connecticut. At the time of the Respondent's appearance, discovery orders were outstanding against the Respondent's clients. A hearing on the plaintiffs' motion for sanctions was scheduled for March 22, 2019 at 2:00 p.m. On the day of the hearing, the Respondent met in his New Haven office with Mr. Jones' personal representative, who had a power of attorney, and an attorney from Washington, D.C. who represented Mr. Jones in other matters.

On the day of the March 22, 2019 meeting, it was determined that an affidavit needed to be filed regarding Mr. Jones' belief that there had been compliance with discovery. The Respondent drafted an affidavit for Mr. Jones, who was in Texas where he and his corporations reside and do business. Mr. Jones personal representative contacted him on the phone and reviewed the contents of the affidavit with Mr. Jones. The Respondent spoke with Mr. Jones on the phone and asked him "to swear to the truth of the statements in the affidavit", which he did. Mr. Jones authorized his personal representative and attorney in fact to sign his name to the affidavit. The personal representative signed Alex Jones' name to the affidavit. The Respondent

Grievance Complaint #19-0367
Decision
Page 2

signed his name as Commissioner of the Superior Court on the affidavit, which stated "sworn to
and subscribed before me." The affidavit did not state where it was signed.

The Respondent filed the affidavit with the Court and produced it before counsel.
Thereafter, at a hearing before Judge Barbara N. Bellis on April 10, 2019, plaintiffs' counsel
inquired as to the location of the signing of the affidavit. The Respondent disclosed to the Court
the circumstances of the signing of the affidavit. The Respondent represented to the Court that
there was no intent to deceive. Thereafter, a new affidavit signed by Mr. Jones was filed. The
Respondent self-reported the matter to Grievance Panel Counsel by correspondence dated April
12, 2019. Judge Bellis made a referral to the Office of the Chief Disciplinary Counsel by
correspondence dated April 24, 2019.

This reviewing committee also considered the following:

Disciplinary Counsel contended that the affidavit appears objectively false. Disciplinary
Counsel argued that the affidavit was not subscribed before the Respondent in Connecticut nor
was it signed by Alex Jones. Disciplinary Counsel indicated that the facts in the affidavit are not
in dispute, the facts are true. Disciplinary Counsel indicated that the substance of the affidavit is
not claimed to be false. The Respondent stated that "[w]hile Mr. Jones did not physically appear
before me, I believed I had the functional equivalent of his appearance, and there was no doubt
in my mind he had sworn to the facts in the affidavit." The Respondent contended that "Mr.
Jones' attorney-in-fact had authority under Texas law to offer a statement of fact in the
Connecticut litigation" and that the Respondent "reasonably believed that this authority included
his signing an affidavit." The Respondent indicated that he made a mistake. Instead of having the
agent sign his own name, he had him sign the name of his principal. The Respondent, through
counsel, explained that he incorrectly believed that he could take the oath remotely. The
Respondent explained that when he realized his error, he immediately took corrective action. The
Respondent explained that the new affidavit signed by Mr. Jones was "identical in form" to the
subject March 22, 2019 affidavit.

The Respondent testified that on March 22, 2019, shortly after appearing in the litigation,
he was under time constraints in connection with the preparation of the affidavit and the
subsequent hearing that afternoon. The Respondent testified that at the March 22, 2019 meeting,
he did not ask to view the power of attorney document but rather relied on the representations of
his client and his client's representative. The Respondent indicated that there was no claim of
prejudice by opposing counsel in connection with the affidavit.

Grievance Complaint #19-0367
Decision
Page 3

This reviewing committee concludes that the Respondent's conduct in connection with the affidavit did not rise to the level of an ethical violation, in this instance. The record lacks clear and convincing evidence to substantiate a finding that the Respondent violated Rules 3.3(a)(1) and (2), 3.4(1) or 8.4(1),(2),(3) and (4) of the Rules of Professional Conduct. The Respondent acknowledged that he made a mistake in connection with the execution of the affidavit. When the Respondent realized his error, he immediately corrected it. We find the Respondent credible that he made a mistake and had no intent to deceive the Court or opposing counsel. Notwithstanding, we are critical of the Respondent's level of diligence in researching how to handle an affidavit involving an attorney-in-fact acting under a Texas power of attorney in a Connecticut civil proceeding. It is the opinion of this reviewing committee that the Respondent's practice was sloppy with regard to the execution of the affidavit and that he exercised bad judgment. Further, it was inappropriate not to request the power of attorney document for review. Finally, since we conclude that the Respondent did not violate the Rules of Professional Conduct, we dismiss the complaint.

**DECISION DATE:** _12-20-19_

(DFR)
(4)

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

**MOTION FOR ADMISSION OF COUNSEL PRO HAC VICE**

# EXHIBIT B

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants.* | § | 261st JUDICIAL DISTRICT |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 98th JUDICIAL DISTRICT |

## SWORN STATEMENT OF NORMAN A. PATTIS

BEFORE ME, the undersigned authority, on this day personally appeared Norman A. Pattis, who, upon his oath, deposed and stated the following:

1.    My name is Norman A. Pattis. I am over the age of eighteen (18), and make this statement based upon my personal knowledge.

2.    I am an attorney duly admitted to practice law in the State of Connecticut.

3.      I am a partner in the law firm of Pattis & Smith, LLC, 383 Orange St, 1st Floor New Haven, CT 06511, telephone (203) 393-3017, facsimile (203) 393-9745.

4.      I have not appeared or participated in any cases or causes in Texas courts. Concurrent herewith, a Motion for Admission Pro Hac Vice was filed on even-date herewith in Cause No. D-1-FN-18-001605; *Marcel Fontaine vs. Alex E. Jones, Infowars, LLC, Free Speech Systems, LLC and Kit Daniels*; In the 345th Judicial District Court of Travis County.

5.      I am presently an active member in good standing in the State Bar of Connecticut and have been a member in good standing since 1993.

6.      I am also a licensed and active member in good standing, in the following jurisdictions and courts:

a. Connecticut, 1993-present;

b. United States District Court for the District of Connecticut, 1994-present;

c. United States Court of Appeals for the Second Circuit, 1995-Present;

d. United States Court of Appeals for the Sixth Circuit, 1997-Present;

e. United States Supreme Court, 1997-Present;

f. United States District Court, Southern District of New York, 2012-Present;

g. United States District Court, District of Columbia, 2012-Present;

h. United States District Court, Eastern District of New York, 2013-present;

i. United States Federal Court of Claims, 2016-Present;

j. United States Court of Appeals for the D.C. Circuit, 2016-Present; and

k. United States Court of Appeals for the Ninth Circuit, 2018-Present.

7.      I was subject to a disciplinary hearing regarding an affidavit submitted in Connecticut in litigation related to the above captioned matters. After a full evidentiary hearing, the case was dismissed. I have not been the subject of any other disciplinary action by the Bar or by courts of any jurisdiction in which I am licensed. *See*, Decision, *Danbury Judicial District Grievance Panel vs. Norman A. Pattis*, Grievance Complaint #19-0367; Statewide Grievance Committee, attached hereto as Exhibit A and incorporated herein by reference as if set forth in full.

2

8.      I have never been denied admission to the courts of any State or to any federal court.

9.      I am familiar with the State Bar Act, the State Bar Rules and the Texas Disciplinary Rules of Professional Conduct governing the members of the State Bar of Texas and will at all times abide by and comply with the same so long as the above-captioned cases are pending and I have not withdrawn as counsel herein.

10.     I will be associated with Texas counsel, Jacquelyn W. Blott, State Bar Number 07473250, of the Law Office of Jacquelyn W. Blott, 200 University Boulevard, Suite 225 #251 Round Rock, Texas 78665, telephone (512) 639-9904, facsimile (888) 377-0087.

_____
Norman A. Pattis


SWORN AND SUBSCRIBED TO before me on this ___ day of February 2022.

_____
Notary Public


Notary Public
State of Washington
AMIT K. PATEL
Lic. No. 147047
MY COMMISSION EXPIRES
January 10, 2026

3

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

---

**MOTION FOR ADMISSION OF COUNSEL PRO HAC VICE**

---

# EXHIBIT C

## NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

## D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

## SWORN STATEMENT OF JACQUELYN W. BLOTT

| | |
|---|---|
| | § |
| STATE OF TEXAS | |
| | § |
| COUNTY OF WILLIAMSON | § |

BEFORE ME, the undersigned authority, on this day personally appeared Jacquelyn W. Blott, who, upon her oath, deposed and stated the following:

1.      My name is Jacquelyn W. Blott. I am over the age of eighteen (18), and make this statement based upon my own personal knowledge.

2.    Norman A. Pattis, the applicant, is a reputable attorney.

3.    I recommend that Norman A. Pattis be granted permission to participate in
the captioned case.

_____
Jacquelyn W. Blott

SWORN AND SUBSCRIBED TO before me on this the 21st day of February 2022.

_____
Notary Public

JASMINE OGWO
Notary ID #131207344
My Commission Expires
July 13, 2025

2

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

**MOTION FOR ADMISSION OF COUNSEL PRO HAC VICE**

# EXHIBIT D

# Board of Law Examiners

Appointed by the Supreme Court of Texas

January 11, 2022

Norman A. Pattis
Via: E-Mail

Acknowledgment Letter

Non-Resident Attorney Fee

According to Texas Government Code §82.0361, "a nonresident attorney requesting permission to participate in proceedings in a court in this state shall pay a fee of $250 for each case in which the attorney is requesting to participate."

**This Acknowledgement Letter serves as proof that the Board of Law Examiners has received $250 in connection with the following matter:**

**Non-resident attorney: Norman A. Pattis**

**Case: D-1-GN-001835, D-1-GN-18-001842, D-1-18-00623, 1-GN-001605**

**Texas court or body: In the District Court of Travis County**

After satisfying the fee requirement, a non-resident attorney shall file a motion in the Texas court or body in which the non-resident attorney is requesting permission to appear. The motion shall contain the information and statements required by Rule 19(a) of the Rules Governing Admission to the Bar of Texas. The motion must be accompanied by this Acknowledgment Letter and by a motion from a resident practicing Texas attorney that contains the statements required by Rule 19(b).

The decision to grant or deny a non-resident attorney's motion for permission to participate in the proceedings in a particular cause is made by the Texas court or body in which it is filed.

For more information, please see Rule 19 of the Rules Governing Admission to the Bar of Texas and §82.0361, of the Texas Government Code, which can be found on the Board's website.

Cordially,

Nahdiah Hoang
Executive Director

| MAILING ADDRESS | TELEPHONE: 512- 463-1621 - FACSIMILE: 512- 463-5300 | STREET ADDRESS |
|---|---|---|
| Post Office Box 13486 | WEBSITE: www.ble.texas.gov | 205 West 14th Street, Ste.500 |
| Austin,Texas 78711-3486 | | Austin, Texas 78701 |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacquelyn Blott on behalf of Jacquelyn Blott
Bar No. 7473250
law.jacquelynwblott@gmail.com
Envelope ID: 61945627
Status as of 2/28/2022 1:38 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 2/22/2022 6:19:09 AM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 2/22/2022 6:19:09 AM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 2/22/2022 6:19:09 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 2/22/2022 6:19:09 AM | SENT |

NO. D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN, | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER, | § | |
| *Defendants.* | § | 261st JUDICIAL DISTRICT |

D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN THE DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| *Plaintiffs,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 345th JUDICIAL DISTRICT |

D-1-GN-18-006623

| | | |
|---|---|---|
| SCARLETT LEWIS | § | IN THE DISTRICT COURT OF |
| *Plaintiff,* | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| *Defendants.* | § | 98th JUDICIAL DISTRICT |

## ORDER ON NORMAN PATTIS' MOTION PRO HAC VICE

After considering Norman A. Pattis' and Jacquelyn W. Blott's motion pro hac vice, the Court:

o   DENIES the motion

o   GRANTS the motion and declares that Norman A. Pattis is admitted to this Court pro hac vice with all the rights and privileges of an attorney in the State of Texas.

SIGNED _____, 2022.

_____
PRESIDING JUDGE

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jacquelyn Blott on behalf of Jacquelyn Blott
Bar No. 7473250
law.jacquelynwblott@gmail.com
Envelope ID: 61945627
Status as of 2/28/2022 1:38 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 2/22/2022 6:19:09 AM | SENT |
| Warren Lloyd Vavra | | warren.vavra@traviscountytx.gov | 2/22/2022 6:19:09 AM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 2/22/2022 6:19:09 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 2/22/2022 6:19:09 AM | SENT |

2/25/2022 1:47 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Alexus Rodriguez

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

## NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL

---

COME NOW, Plaintiffs Neil Heslin, Scarlett Lewis, Leonard Pozner, and Veronique De La Rosa, and give notice of the appearance of the following as additional counsel:

> Cordt C. Akers
> THE AKERS FIRM, PLLC
> TBN: 24080122
> 3401 Allen Parkway, Suite 101
> Houston, TX 77019
> Phone: (713) 877-2500
> Fax:     (713) 583-8662

Respectfully submitted,

**THE AKERS FIRM, PLLC**

*/s/ Cordt C. Akers*
Cordt C. Akers
TBN: 24080122
3401 Allen Parkway, Suite 101
Houston, TX 77019
Phone: (713) 877-2500
Fax:    (713) 583-8662
cca@akersfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2022, the forgoing document was served upon all counsel of record via electronic service.

*/s/ Cordt C. Akers*
Cordt C. Akers

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 62091945
Status as of 3/1/2022 3:13 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 2/25/2022 1:47:37 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 2/25/2022 1:47:37 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 2/25/2022 1:47:37 PM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 2/25/2022 1:47:37 PM | SENT |

2/25/2022 1:54 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Alexus Rodriguez

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER AND | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

### NOTICE OF APPEARANCE OF ADDITIONAL COUNSEL

---

COME NOW, Plaintiffs Neil Heslin, Scarlett Lewis, Leonard Pozner, and Veronique De La Rosa, and give notice of the appearance of the following as additional counsel:

Avi Moshenberg
TBN: 24083532
MCDOWELL HETHERINGTON LLP
1001 Fannin Street, Suite 2700
Houston, TX 77002
Phone: (713) 337-5580
Fax:     (713) 337-8850

Respectfully submitted,

**MᴄDᴏᴡᴇʟʟ Hᴇᴛʜᴇʀɪɴɢᴛᴏɴ LLP**

By:     _/s/ Avi Moshenberg_
        Avi Moshenberg
        Texas Bar No. 24083532
        avi.moshenberg@mhllp.com
        1001 Fannin Street, Suite 2700
        Houston, TX 77002
        Phone: (713) 337-5580
        Fax:    (713) 337-8850

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 25, 2022, the forgoing document was served upon all counsel of record via electronic service.

_/s/ Avi Moshenberg_
Avi Moshenberg

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 62092342
Status as of 3/1/2022 3:15 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 2/25/2022 1:54:02 PM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 2/25/2022 1:54:02 PM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 2/25/2022 1:54:02 PM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 2/25/2022 1:54:02 PM | SENT |

3/1/2022 9:54 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Chloe Jimenez

# D-1-GN-18-001605

| | | |
|---|---|---|
| MARCEL FONTAINE | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| KIT DANIELS | § | 459th DISTRICT COURT |

# D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

# D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

**PLAINTIFFS' RESPONSE TO NORMAN PATTIS'**
**MOTION FOR ADMISSION OF COUNSEL PRO HAC VICE**

---

For over three years, Mr. Jones has made a mockery of this litigation while exercising

his right to choose his counsel on no less than nine occasions. Mr. Jones was initially

represented by Austin attorney Randall Wilhite. Mr. Jones was next represented by Dallas

attorney Mark Enoch. This was followed by Austin attorneys Michael Burnett and Scott Nytiray. Mr. Jones then received permission for California attorney and InfoWars host Robert Barnes to appear pro hac vice. Mr. Barnes was then replaced by Austin attorney T. Wade Jefferies. Mr. Jefferies was then replaced by Austin attorney Brad Reeves. Defendants had been represented in the *Fontaine* matter by Austin attorney Eric Taube, but Mr. Taube withdrew for ethical reasons and was also replaced by Mr. Reeves. Next, attorney Jacquelyn Blott made an appearance earlier this year. Soon thereafter, Mr. Reeves moved to withdraw, also citing ethical issues. Now, after nine attorneys have appeared in a set of cases riddled with sanctions and bizarre misconduct, Mr. Jones seeks to add controversial Connecticut attorney and InfoWars personality Norm Pattis, who has already wreaked havoc and incurred sanctions for his misconduct in the parallel *Lafferty* lawsuit.

Given the prior history of this case, this Court should not take a chance on granting the privilege of pro hac vice admission on the eve of trial to "Connecticut's most colorful and controversial lawyer."[1] This is especially true given Mr. Pattis' pattern of disruptive and disobedient actions in the *Lafferty* lawsuit. This Court need not risk "the cavalier actions and willful misconduct" that the *Lafferty* court has been forced to endure. (*See* Ex. 1, August 5, 2021 *Lafferty* Order).

This Court's first introduction to Mr. Pattis was a video from 2019 which he was co-hosting InfoWars with Mr. Jones, laughing and joking while Mr. Jones made violent and disgusting threats against the life of opposing counsel. Since that time, his representation of

---

[1] Sai Rayala. "Qinxuan Pan retains controversial New Haven-based defense attorney Norm Pattis." *Yale Daily News*. October 15, 2021. Available at:

https://yaledailynews.com/blog/2021/10/15/qinxuan-pan-retains-controversial-new-haven-based-defense-attorney-norm-pattis/

the Defendants has been a disaster of disobeyed orders and bizarre misconduct. Judge Barbara Bellis called his actions "frightening" and noted that others should be "rightfully concerned" about his conduct in the future. (*See* Ex. 1, August 5, 2021 *Lafferty* Order). In *Lafferty,* Mr. Pattis has routinely botched discovery, has been sanctioned for his cavalier disclosure of Plaintiffs' confidential information during a deposition, has submitted an affidavit he knew had not been signed by Mr. Jones, and insists on endless gamesmanship, much to the consternation of Judge Bellis. Mr. Pattis also engages in improper extrajudicial commentary during his regular appearances as an InfoWars commentator, and his propensity for theatrics and outrageous conduct is a risk that should not be countenanced, especially on the eve of trial.

Appearing pro hac vice is a privilege, and it should be denied where a court has reason to believe an applicant may be detrimental to the fair or efficient administration of justice. Here, Mr. Pattis' history puts the Plaintiffs at risk of further sanctionable misconduct, especially when combined with Defendants' existing history of misconduct in this Court. For the reasons discussed below, Plaintiffs pray the Court denies Mr. Pattis' application.

**LEGAL STANDARD**

## I. There is a Lower Standard for Application than for Revocation.

Once an attorney is admitted pro hac vice, the standard for revocation is high, and it is difficult for a court to rid itself of a recalcitrant out-of-state attorney. Revocation requires finding "the non-resident attorney engage[d] in professional misconduct as that term is defined by the State Bar Act." *In re Golden Peanut Company, LLC*, 2018 WL 6616894, at *2 (Tex.App.-Dallas, 2018), quoting Tex. R. Governing Admission to the Bar XIX(e). But when an application is first submitted to a court, the standard is much lower. Not only can the court

deny the application if it believes "the non-resident attorney is not a reputable attorney who will observe the ethical standards required of Texas attorneys," but it can also deny the application if "other good cause exists to deny the motion." *Id.*, quoting Tex. R. Governing Admission to the Bar XIX(d).

## II.     Trial Courts have Wide Discretion to Assess Good Cause.

Assessing reputability of a non-resident attorney is addressed to the discretion of the trial court. *See State Bar v. Belli*, 382 S.W.2d 475, 476 (Tex. 1964) (noting "the matter of [applicant's] qualification as 'A reputable nonresident attorney' under Rule X(i) will be addressed to the discretion of the court in which the case is pending."). In denying pro hac vice applications, courts may consider conduct which may not rise to the level of revocation, including "unlawyerlike conduct" or "past inappropriate and unprofessional behavior by counsel in other matters." *Kampitch v. Lach*, 405 F.Supp.2d 210, 215-16 (D.R.I. 2005). The court may also consider delays, disruptions, and sanctions in prior matters, especially related matters. In sum, the discretionary privilege of pro hac vice admission should be denied where the Court believes it "may be detrimental to the prompt, fair and efficient administration of justice." *See* ABA Model Rule on Pro Hac Vice Admission.[2]

## ARGUMENT

## I.     Mr. Pattis was Sanctioned for Alarming Misconduct in Disobeying the *Lafferty* Protective Order.

On August 5, 2021, the *Lafferty* court issued sanctions after Mr. Pattis flagrantly violated the Protective Order under bizarre circumstances. Mr. Pattis was attending the first

---

[2]

https://www.americanbar.org/groups/professional_responsibility/committees_commissions/commission_on_multijurisditional_practice/mjp_comm_iadc3/

deposition of a Sandy Hook parent, which had been designated confidential at the start of the deposition. During the deposition, Mr. Pattis inserted information from the confidential testimony into a motion and filed it with the Court while the deposition was still underway. The motion filed by Mr. Pattis was an outlandish request to compel the deposition of Hillary Clinton. At a later hearing in this case, Mr. Reeves tried to distance himself from Mr. Pattis' strange actions:

> MR. REEVES: About this filing that occurred in the midst of a deposition, Mr. Pattis, who filed that thing in Connecticut…[H]e wasn't even in the deposition, that was kind of his thing that he did, he wasn't even the one doing that. But more importantly, I had nothing to do --
>
> THE COURT: You just said he wasn't -- "That was his thing that he did, he didn't even do that." That's literally what just came out of your mouth.
>
> MR. REEVES: No, I'm sorry, I didn't mean that. He -- he did not -- Mr. Pattis was not taking the deposition. He did not file the motion as he was taking the deposition. Another lawyer for the defendants was taking the deposition and he just, in the midst of this, filed it…But really overall, the overarching point here is that there's nothing in Connecticut that has anything to do with these cases as far as the discovery is concerned. (*See* Ex. 2, August 31, 2021 Heslin Transcript, p. 81-82).

The *Lafferty* plaintiffs brought the issue to Judge Bellis' attention in a motion for sanctions. In an exhaustive order, Judge Bellis explained the court's "grave concerns" with the "frightening" positions taken by Mr. Pattis:

> The Jones defendants filed no less than three versions of a proposed protective order for the court's approval…The order…set forth simple procedures by which the designation of "confidential" could be subsequently challenged, and how confidential information could be filed with the court…
>
> In the midst of taking the first deposition of a plaintiff, the defendants Free Speech Systems LLC, Infowars LLC, Infowars Health LLC, and Prison Planet TV LLC (Infowars), filed a motion to depose Hillary Clinton, using deposition testimony that had just been designated as

"Confidential-Attorneys Eyes Only," and completely disregarding the court ordered procedures. At no point prior to filing the Clinton motion did Infowars profess ignorance of the procedures they had proposed and which were court ordered to be followed, nor have they since taken any steps to correct their improper filing.

If Infowars was of the opinion that the plaintiffs' designation was unreasonable and not made in good faith, the solution was to follow the court ordered procedure to challenge the designation, not to blatantly disregard it and make the confidential information available on the internet by filing it in the court file. The court rejects Infowars' baseless argument that there was no good cause to issue the protective orders, where both sides recited, in writing, detailed justification for a good cause basis.

In short, Infowars, having advocated for a court ordered protective order, filing no less than three versions, having recited in writing the good cause bases for the issuance of the protective order, and having no objection to the plaintiffs' proposed modification, now takes the absurd position that the court ordered protective order circumvents the good cause requirements of Practice Book 13-5, did not need to be complied with, and should not be enforced by the court. **This argument is frightening**. Given the cavalier actions and willful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has **grave concerns** that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public. (Ex. 1, August 5, 2021 Lafferty Order on Confidentiality) (emphasis added).

Judge Bellis set a sanctions hearing regarding this misconduct and a variety of other sanctionable issues. In her November 21, 2021 ruling on default sanctions, Judge Bellis explained how Mr. Pattis' subsequent arguments highlighted the potential danger of future cavalier misconduct:

So I'll first address the Clinton deposition issue and the conduct of July 1, 2021. In the July 19, 2021 court filing by the defendants Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet, LLC, they described how in the motion to depose Hillary Clinton, testimony designated by the plaintiffs as highly confidential was filed in the Clinton deposition motion. They explained that this was done because in their opinion, the plaintiffs did not have a good-

6

faith basis to designate the deposition as highly confidential before
the deposition had commenced, despite the fact that the Jones
defendants had previously done so themselves.

And it is not lost on the Court that the highly confidential information
was improperly filed in the middle of the first deposition of a plaintiff.
The July 19, 2021 filing is in sharp contrast to the Jones defendants'
position at the October 20, 2021 sanctions ' hearing where the Court
addressed what, if any, sanctions should enter. At the October 20
hearing, the Jones defendants claim they could publish confidential
information as long as they did not reveal the name of the witness.
That is, they argued unconvincingly that they didn't understand the
very protective order that they themselves drafted and asked the
Court to approve as a Court order, which the Court did.

The position of the Jones defendants at the October 20, 2021
sanctions hearing did nothing but reinforce the Court's August 5th,
2021 order and findings that the cavalier actions on July 1st, 2021
constituted willful misconduct and violated the Court's clear and
unambiguous protective order. (Ex. 3, November 15, 2021 Sanctions
Ruling, p. 3-4).

These events alone provide ample good cause to "find that the admission of an out of
state attorney pro hac vice is fraught with potential abusive misconduct." *Collins v. Collins,*
2020 OK CIV APP 65, ¶ 32, 481 P.3d 270, 277. Further aggravating the concerns with Mr.
Pattis is that his misconduct was driven by his desire to politicize these suits and spin wild
conspiracy theories. This theme will reappear throughout this Response.

## II.   Mr. Pattis' Participation in Mr. Jones' Threatening Broadcast was Unlawyerlike, Unprofessional, and Harmful to Reputability of our Profession.

In a prior hearing, this Court viewed portions of a broadcast of Mr. Pattis and Mr.
Jones on InfoWars discussing the discovery of child pornography in their discovery
documents. The broadcast was a 20-minute profane and disturbing tirade from Mr. Jones in
which he repeatedly threatened the life of Plaintiff's counsel Chris Mattei, interspersed with
commentary from Mr. Pattis. As Judge Bellis noted, the June 14 video was "indefensible,

unconscionable, despicable, and possibly criminal behavior." (June 18, 2019 *Lafferty* Hearing, p. 50). The Connecticut Supreme Court noted that the broadcast was "a threat to the administration of justice" with "genuine potential to influence the fairness of the proceedings." *Lafferty v. Jones,* 336 Conn. 332, 366 (2020), cert. denied, 141 S. Ct. 2467 (2021). The Connecticut Supreme Court noted that the broadcast featured "threats to those involved in the case and created a hostile atmosphere that could discourage individuals from participating in the litigation," including Mr. Jones offering "a one million dollar bounty on the head of opposing counsel." *Id.* at 370.

Mr. Pattis' participation in this broadcast, and his jocular reactions to Mr. Jones' statements, raise doubts about his character and his potential future acts in Texas. Under our disciplinary rules, "[a] lawyer shall not counsel or assist another person" in making "an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have a substantial likelihood of materially prejudicing an adjudicatory proceeding." Tex. Disciplinary R. Prof. Conduct 3.07. Additionally, "[i]f a particular statement would be inappropriate for a lawyer to make, however, the lawyer is as readily subject to discipline for counseling or assisting another person to make it as he or she would be for doing so directly." *Id.* at cmt 2.

Even after sanctions were issued, and despite the obvious threat to Mr. Mattei, Mr. Pattis continued to breathe life into the conspiracy theory that Mr. Mattei was somehow involved in malfeasance. Mr. Pattis stated in a later affidavit that the circumstances surrounding the child pornography and subsequent investigation were "especially suspect

given that Attorney Mattei worked for the United States Attorney's Office from 2007 through
2015." (Ex. 4, Affidavit of Norm Pattis, p. 15).

These kinds of public statements are typical for Mr. Pattis, who has embraced his
conspiratorial mindset and need for attention by becoming a regular InfoWars on-air
personality. They have also caused Mr. Pattis to indulge Mr. Jones' worst instincts and
paranoias, leading to one fiasco after another in the *Lafferty* case.

### III.    Mr. Pattis has been at the Center of the Non-Stop Debacles in *Lafferty.*

As the Court has gleaned from prior pleadings, the proceedings in *Lafferty* have been
extraordinarily chaotic and bizarre. Most importantly, those proceedings have been plagued
by constant failures to litigate in good faith. As the *Lafferty* court first explained back in 2019:

> Putting aside the fact that the documents the Jones defendants did
> produce contained child pornography, putting aside the fact that the
> Jones defendants filed with the Court a purported affidavit from Alex
> Jones that was not in fact signed by Alex Jones, the discovery in this
> case had been marked with obfuscation and delay on the part of the
> defendants, who, despite several court ordered deadlines as recently
> as yesterday, they continue in their filings to object to having to, what
> they call affirmatively gather and produce documents which might
> help the plaintiffs make their case. (Ex. 5, June 18, 2019 *Lafferty*
> Transcript, p. 46-47).

The *Lafferty* court explained how much of this discovery obstruction has been
attorney-driven:

> By way of one example, on June 10th, counsel for the Jones defendants
> stated in their filing that Alex Jones' cellphone had only been searched
> for emails, not for text messages or other data. In their June 17 filing,
> defendants still try to argue with respect to the text messages that
> there is little to no personal nexus between the text messages and the
> litigation, and that the plaintiffs are simply prying into the Alex Jones
> defendants' personal affairs. But the discovery objections were ruled
> on by the Court months ago and the defendants still have not fully and
> fairly complied...

> So in short, we've held approximately a dozen discovery status conferences. The Court's entered discovery deadlines, extended discovery deadlines, and discovery deadlines have been disregarded by the Jones defendants, who continue to object to their discovery and failed to produce that which is within their knowledge, possession, or power to obtain. And again, among the documents that they did produce contained images of child pornography. (*Id.,* p. 47-49)

The *Lafferty* court's frustration with Mr. Pattis has been clear throughout its many orders and hearings. A review of the 699 docket entries in *Lafferty* shows judicial resources constantly devoted to collateral issues.[3] In particular, Mr. Pattis' gamesmanship has been improper, as Judge Bellis explained in her November 21, 2021 ruling on default sanctions:

> The history of the attorneys who have appeared for the defendants, Alex Jones, Infowars, LLC, Free Speech Systems, LLC, Infowars Health, LLC and Prison Planet TV, LLC is a convoluted one, even putting aside the motions to withdraw appearance, the claims of conflict of interest and the motions for stay advanced by these five defendants. As the record reflects, on June 28, 2018, Attorney Wolman appeared for all five of the Jones defendants. Eight months later, on March 1st, 2019, Attorney Wolman is out of the case and Pattis & Smith filed an in-lieu-of appearance for all five defendants. On February 24, 2020, Attorney Latonica also appeared for all five defendants. Five months later on July 7, 2020, Attorney Latonica and Pattis & Smith is now out of the case and Attorney Wolman is back in the case for all five defendants. Then on June 28, 2020, Pattis & Smith is back in the case, but now only appears for the four LLC defendants.

> But what is perhaps more significant is **the transparent attempt to cloud the issues by Pattis & Smith**, for example, by listing the names of only three of the four clients they represent when filing the motion to take the deposition of Hillary Clinton and then listing all four clients in the July 19, 2021 filing relating to the issue. And by Attorney Wolman who then argued in his October 20, 2021 filing that Infowars, LLC had no involvement in the motion for commission because their lawyer did not list their name on the motion. It is simply improper under our rules of practice for an attorney to do so. (Ex. 3, November 15, 2021 Sanctions Ruling, p. 4-5) (emphasis added).

---

[3] *See* http://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=UWYCV186046436S

The *Lafferty* court also noted that the "disregard for the discovery process and procedure and for Court orders is a pattern of obstructive conduct." (*Id.,* p. 15). In the same order, the *Lafferty* court also chastised recent misrepresentations made in pleadings regarding social media analytics, noting, "They represented in court filings that they did not rely on social media analytics and this, too, is false." (Ex. 3, November 15, 2021 Sanctions Ruling, p. 12). The court that damning evidence was later discovered which "totally contradict[s] the Jones defendants' misrepresentations to the Court that, quote: There is no evidence to suggest that Mr. Jones or Free Speech Systems ever used these analytics to drive content, end quote." (*Id.*). Most importantly, it became clear that analytics had been withheld:

> I would note that regardless of this reliance on social media analytics, the concept is simple. The defendants were ordered to produce the documents and our law requires them to produce information within their knowledge, possession or power. Discovery is not supposed to be a guessing game. What the Jones defendants have produced by way of analytics is not even remotely full and fair compliance required under our rules. The Court finds that the Jones defendants have withheld analytics and information that is critical to the plaintiff's ability to conduct meaningful discovery and to prosecute their claims. (*Id.*, p. 14).

Despite immense patience by Judge Bellis through these endless discovery debacles, Mr. Pattis also insists on causing delay and interruption with his stubborn exchanges with the court, particularly as it concerns his conspiracy theories about the litigation itself:

| | |
|---|---|
| THE COURT: | I'll take that up on the papers. |
| ATTY. PATTIS: | And then also we'd like to have them be directed to find out who's financing this because -- |
| THE COURT: | Right. I read -- Attorney Pattis, I read it. No right to argument on that issue. I don't need help on that issue. And I'll issue that -- |
| ATTY. PATTIS: | My client would like me to be heard today for these purposes because -- |
| THE COURT: | All right. Attorney Pattis, listen to me carefully. I'm trying to be polite. |
| ATTY. PATTIS: | I always do. |

| THE COURT: | Okay. I'm going to take that issue on the papers. There's no right to argument on that issue and I will rule today on that issue for you. Okay? But you can tell your client that there's no right to argument on that issue and I'm not extending -- I'm denying your request for argument, politely. |
| ATTY. PATTIS: | And I will politely tender his objection on the grounds that when his -- |
| THE COURT: | All right. Attorney Pattis -- |
| ATTY. PATTIS: | -- information on the business finds itself -- |
| THE COURT: | -- I think we're done. |
| ATTY. PATTIS: | -- in the press to his economic detriment -- |
| THE COURT: | We're done for the day. |

(Ex. 4, Affidavit of Norm Pattis).

It is telling that Mr. Pattis later submitted this exchange as part of his affidavit seeking to recuse Judge Bellis in *Lafferty.* Indeed, it is nearly certain that Mr. Pattis would pursue the same course in this case and seek recusal. In his *Lafferty* recusal motion, Mr. Pattis already stated that "the Texas judge presiding over similar Sandy Hook-related matters" is "not impartial." (Ex. 6, Motion to Recuse, p. 7). Yet regardless of what course of action Mr. Pattis takes, it is certain to be disruptive given his frustrating history in the *Lafferty* case.

## IV.    Mr. Pattis' Handling of an Affidavit in *Lafferty* Raises Concerns about his Judgment.

As noted above, Mr. Pattis submitted an affidavit from Alex Jones that he knew was not signed by Alex Jones. Judge Bellis described the problem as follows:

> I reviewed the transcripts and the affidavit and I do want to put a statement on the record, and I think I'm going to proceed a certain way. So on March 22nd, 2019, Defense Counsel filed the affidavit that indicated it was signed by Alex Jones under oath, and the e-filing description referred to a March 22nd, 2019, affidavit of A. Jones. That was the e-file description. And the attestation clause indicates that the affidavit was sworn to and subscribed to on March 22nd, 2019; and we learned on that same date that Attorney Pattis -- I'm sorry, we learned subsequently on April 10th that Attorney Pattis had taken the signature and that the signature was not that of Mr. Jones but of an

authorized representative who didn't want to be named because he didn't want to be harassed. But on March 22nd, 2019, on the record Attorney Pattis referred to the document as an affidavit from Jones. The affidavit is devoid of any language that would reveal that Mr. Jones' agent or employee or authorized representative signed his name to the document. There's no attempted power of attorney language or acknowledgement or anything at all to show that some other person signed Alex Jones' name to the affidavit. So in the Court's opinion, the affidavit is invalid and is a false affidavit. Affidavits are supposed to be signed by the author, not surreptitiously by some other unknown, although authorized, person. So I am going to refer this matter to Disciplinary Counsel.

(Ex. 4, Affidavit of Norm Pattis, p. 8-9).

After reviewing the referral, the Disciplinary Counsel pursued action, and Mr. Pattis appeared before the Connecticut Grievance Committee. The Committee found that Disciplinary Counsel had not proven an offense rising to an ethical violation, but, "[n]otwithstanding, we are critical of the Respondent's level of diligence in researching how to handle an affidavit involving an attorney-in-fact acting under a Texas power of attorney in a Connecticut civil proceeding." (Ex. 7, Committee Grievance Complaint #19-0367 Decision, p. 3). Further, "[i]t [was] the opinion of this reviewing committee that the Respondent's practice was sloppy with regard to the execution of the affidavit and that he exercised bad judgment." (*Id.*). Finally, the Committee found "it was inappropriate not to request the power of attorney document for review." (*Id.*).

While Mr. Pattis will defend himself on the basis that no ethical violation was proven, his conduct nonetheless provides additional basis to deny the privilege of pro hac vice admission. As noted in *Kohlmayer*, sloppy actions and bad judgment "may not constitute a technical violation of the ethical rules," but such conduct "often delays the judicial process." *Kohlmayer*, 124 F.Supp.2d at 879. "Where a court is made aware of a pattern of ... behavior by an attorney, bordering on the unethical, which has resulted in the waste of judicial time

13

in the past, it must have discretion to deny the otherwise leniently granted pro hac vice applications in the interest of judicial economy." *Id.*

## V. Mr. Pattis' Role as an InfoWars Personality has been Unlawyerlike and Risks Serious Future Prejudice.

Mr. Pattis has been playing a dual role for Mr. Jones, serving both as an attorney but also a major contributor to InfoWars programming. As a regular on-air personality, Mr. Pattis is an integral part of Mr. Jones' spectacle. From what Plaintiffs can tell from the limited search capability available, Mr. Pattis has appeared on InfoWars *at least* 30 times in the past year. (Note: This number only includes videos in which Mr. Pattis' name is mentioned in the video description, and InfoWars video descriptions do not always contain the name of those who appear).[4] Examples are shown below:







---

[4] https://www.banned.video/results?query=%22norm%20pattis%22






Descriptions of his videos are often inflammatory or depraved, such as "Alex Jones is joined by Norm Pattis and Will Johnson to break down the vile agenda to sexualize children by demonic pedophiles."[5] In addition to covering InfoWars' standard topics (typically, mass tyranny by globalist enslavers), Mr. Pattis frequently discusses these lawsuits. In these discussions, Mr. Pattis exceeds his ethical responsibilities for pre-trial publicity.

For example, Mr. Pattis was the guest on the November 16, 2021 episode of The Alex Jones Show entitled "Deep State Launches Martial Law Through Judicial Tyranny." During the episode, Mr. Pattis stated:

> I'll assert and hope we get to trial on this issue, the Plaintiffs do not a coherent theory of damages, and as a matter of law, no jury should be permitted to hear. **Based on what I've heard. And I can't tell you what it is.** I can't even tell you what I've heard

---

[5] "Man With A Wig Arrested For Harassing Families." *The Alex Jones Show.* October 29, 2019. Available at: https://www.banned.video/watch?id=5db8b6f352f632001920f77f

> under these court orders because, you know, the Sandy Hook Plaintiffs are given, uh, privileged treatment in this.[6]

Attorneys should not state conclusions of fact by citing special knowledge allegedly gained through access to confidential materials. The public places great emphasis on the statements of attorneys based on their access to judicial materials. In essence, Mr. Pattis stated that confidential information exists disproving any suffering by the *Lafferty* plaintiffs. In doing so, he has purported to disclose the nature and content of that confidential information. When making pretrial statements, "[a] lawyer ordinarily will violate [the Rule]…when the statement refers to…the expected testimony of a party or witness." Rule 3.07(b)(1). By contrast, "a lawyer ordinarily will not violate [the Rule]" when the statement is based on "information contained in a public record." Rule 3.07(c)(2). Given the confidential nature of the information allegedly cited by Mr. Pattis (and thus no reasonable method to combat it through counter-speech), Mr. Pattis knew these statements could prejudice the proceedings.

Mr. Pattis co-hosted an episode with Mr. Jones on October 1, 2021 in which they discussed the recent default judgments in Texas while denigrating this Court:

> PATTIS: Some states elect judges. I know they elect them down in Texas. I think that's a horrible idea. Because then you get judges racing to the bottom and pandering to the lowest common denominator.

> JONES: I mean, George Soros has put in all the new judges in Travis County, put in the City Attorney, the County Attorney. And they're literally bomb-throwing maniacs.

---

[6] "Deep State Launches Martial Law Through Judicial Tyranny." *The Alex Jones Show.* November 16, 2021. (Quotation at 1:40). Available at: https://www.banned.video/watch?id=61944580d741df5018565b4c

> PATTIS: Well, Travis County, they ought to sell it to Northern California and let Texans be Texans. Elected judges are a horrible idea.[7]

Mr. Pattis' routine encouragement of Mr. Jones' inflammatory rhetoric is also concerning, such as the following exchange:

> JONES: Let's just say it, you've been doing a lot of stuff, and you've been really good about these. And they know they don't have the case they claim, so I don't get to have a jury. I don't think America is going to put up with that.
>
> PATTIS: I hope you're right. But I think we've have thus far. I think it's time for we the people to stand up and say we're mad as hell and we're not going to take it anymore.[8]

On the January 12, 2022 episode, Mr. Pattis continued to spin his conspiracy theories about a cover-up of some shadowy funding of these lawsuits for nefarious purposes:

> PATTIS: What reporter is going to sit down, study the data, and ask the hard questions in this case. Who is funding the litigation? Why are they funding it? What is their objective? And why is it that the plaintiffs seem hell bent to avoid having these cases tried on the merits?[9]

Mr. Pattis also made ominous comments about how the Plaintiffs should be worried about what Mr. Jones will say about them at trial:

> PATTIS: The downside of a defamation lawsuit, and I've often said to folks who want to bring them, be careful what you wish for. If you think somebody's opinion of you hurt you before, what are you going to do when the trial is televised?

---

[7] "Dem Governors Mobilize National Guard for COVID Tyranny." *The Alex Jones Show.* October 1, 2021, at 12:00. Available at: https://www.banned.video/watch?id=6157a3d373e088289566833c

[8] *Id.* at 15:20.

[9] "The Enemy Has Become Our Government Run by Self Righteous Bullies Seizing Our Rights, says Norm Pattis." *The Alex Jones Show.* January 12, 2022. (Quotation at 19:48) Available at: https://www.banned.video/watch?id=61df6e59ae95bf6e8f3a7386

> JONES: Hold on, let's talk about that. That's why the judges and
> everybody feel they can't let me have a real trial. Because they
> did this.[10]

Thus, in addition to the concerns relating to Mr. Pattis' prior conduct in litigation, Mr. Pattis also poses a substantial risk of prejudice through his extra-judicial statements. As the parties approach trial, this risk grows more acute, as does the likelihood of outrageous theatrics from Mr. Pattis. As shown below, Mr. Pattis' judgment and character in this respect leave much to be desired.

## VI.   Mr. Pattis' Racist and Insensitive Commentary Raises Further Concerns about his Reputability.

*The Connecticut Post* reported in 2019 that:

> Local attorney Norm Pattis posted Monday a photo depicting three white-hooded beer cans around a brown beer bottle hanging by the neck from a refrigerator rack to his Facebook page. The caption read "Ku Klux Coors."[11]

The *Post* noted that Pattis "defended the initial post with another later Monday night, that read, 'Let's face it: If you're white, you can't be right.'"[12] The *Post* also reported that "[w]hen newly elected Rep. Rashida Tlaib — the first Palestinian-American woman to serve in Congress — said on Twitter that she would 'always speak truth to power,' Pattis replied, 'No suicide bombing?'"[13] Plaintiffs' counsel are vigorous advocates of political speech, but this is not about politics. It is vile, bigoted non-sense. Mocking a Palestinian-American in this way is deeply racist and childish. It does not reflect well on Mr. Pattis' character. While

---

[10] *Id.* at 25:01.

[11] Fenster, Jordan. "NAACP condemns lawyer Norm Pattis over 'racist' image." *Connecticut Post.* January 8, 2019. Available at:

https://www.ctpost.com/local/article/NAACP-condemns-lawyer-Norm-Pattis-over-racist-13518133.php
[12] *Id.*
[13] *Id.*

behaving in racist, brutish ways may not violate ethical rules, it is a stain on our profession, and it is a matter of character which is fairly considered when granting the privilege of pro hac vice admission.

*The Connecticut Post* also reported that Mr. Pattis made unlawyerlike statements about mass shootings which are especially worrisome given the sensitivities necessary in this case. The *Post* reported that in response to a video game in which the player shoots school classmates, Pattis said it "sort of looks like fun."[14] In response to the question, "What do you think about…Louis CK mocking Parkland, FL shooting survivors?", Mr. Pattis responded, "Much needed. Thank you, Louis CK."[15] Again, this is not about politics or political speech. This is about cheap and performative callousness. Yet this is what can be expected from Mr. Pattis. When interviewed by the *Post,* Mr. Pattis stated, "I enjoy being provocative for the sake of provocation."[16] He stated, "It's more than blood sport. I suppose I like the attention."[17] The last thing this case needs on the eve of trial is an attention-seeking InfoWars commentator who spins conspiracy theories and provokes situations for fun, all while dragging the heavy baggage of his misconduct and misadventures in the *Lafferty* suit.

Courts "can, and must, consider the character of an applicant and his or her record of civility when determining whether to grant pro hac vice status." *Kohlmayer*, 124 F.Supp.2d at 882-83. Denial of the application in such circumstances is especially appropriate when the party has already shown the ability to secure other representation. *See, e.g., Meschi v. Iverson*, 805 N.E.2d 72, 75, 60 Mass.App.Ct. 678, 682 (2004) (Application properly denied where out-

---

[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*

of-state counsel's past conduct had "skated perilously close to the line" of violating an ethical rule, and where in-state counsel had already appeared); *Mike Woods v. On Baldwin Pond, LLC*, 2014 WL 12625077, at *2 (M.D.Fla. 2014) (Noting that although "the Court [did] not find that the conduct here amounts to an ethical violation," it was nonetheless proper to deny the application, especially "in view of the appearance of existing counsel."); *PCG Trading, LLC v. Seyfarth Shaw*, LLP, 460 Mass. 265, 276, 951 N.E.2d 315, 322 (2011) (Finding that "adequate representation by existing counsel, when combined with the already extended procedural history of this case, may have reasonably prompted the judge to deny the motion."). Here, 1) Defendants are represented by in-state counsel, 2) they already exercised the opportunity to choose their counsel on nine prior occasions including an attorney admitted *pro hac vice*, and 3) the case is on the eve of trial after an extended procedural history.

## CONCLUSION

Given the troubling and bizarre history up to this point, these cases need a Texas lawyer invested in practicing in this state, or at the very least, an out of state lawyer without a questionable record or a history of outrageous and sanctionable conduct in the parallel Sandy Hook case. A contrary ruling risks substantial eleventh-hour prejudice to Plaintiffs and endangers their trials. For these reasons, Plaintiffs pray that this Court denies pro hac vice admission.

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

_____

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN

State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 1, 2022 the forgoing document was served upon all counsel of record via electronic service.

_____
MARK D. BANKSTON

# D-1-GN-18-001605

| | | |
|---|---|---|
| MARCEL FONTAINE | § | IN DISTRICT COURT OF |
| | § | |
| VS. | § | |
| | § | TRAVIS COUNTY, TEXAS |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| KIT DANIELS | § | 459th DISTRICT COURT |

# D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

# D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

## PLAINTIFFS' RESPONSE TO NORMAN PATTIS'
## MOTION FOR ADMISSION OF COUNSEL PRO HAC VICE

---

On this day, the Court considered Norman Pattis' Motion for Admission of Counsel

Pro Hac Vice. After considering the pleadings, and the arguments of counsel, if any, the Court

finds there is good cause to deny pro hac vice admission to Mr. Pattis.

1

The Court therefore DENIES the Motion for Admission of Counsel Pro Hac Vice.


Dated _____, 2022.


_____

Hon. Maya Guerra Gamble

ORDER   421277

DOCKET NO: UWYCV186046436S

SUPERIOR COURT

LAFFERTY, ERICA Et Al
    V.
JONES, ALEX EMRIC Et Al

JUDICIAL DISTRICT OF WATERBURY
    AT WATERBURY

8/5/2021

## ORDER

ORDER REGARDING:
07/06/2021 394.00 MOTION FOR ORDER

The foregoing, having been considered by the Court, is hereby:

ORDER:

By written stipulation, and unless the court orders otherwise, parties can agree to modify discovery procedures. See Connecticut Practice Book Section 13-32. In these consolidated cases, the defendants Alex Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC ("the Jones defendants") did just that. Additionally, they took their agreement with the plaintiffs a step further and asked the court to issue a protective order pursuant to Practice Book Section 13-5 and approve their joint discovery stipulation. The Jones defendants filed no less than three versions of a proposed protective order for the court's approval, see entry numbers 177,181,183, and 185, asserting that they were asking for the same discovery protection that would have been in place in federal court had the cases not been remanded back to state court. They indicated, correctly, that discovery materials are not filed with the court and as such are not ordinarily available to the public. The court ultimately approved the stipulation of the parties, which complied with all relevant requirements of the Connecticut Practice Book and which, inter alia, set forth the procedure by which sensitive confidential information obtained through pretrial discovery would be handled and, if necessary, filed with the court. The order provided that of all or part of a deposition transcript could be designated as confidential by counsel for the deponent or designated party, by requesting such treatment on the record at the deposition or in writing no later than thirty days after the date of the deposition. It set forth simple procedures by which the designation of "confidential" could be subsequently challenged, and how confidential information could be filed with the court. Importantly for the purposes of this motion, the protective order clearly prohibited discovery information designated as confidential from being filed with the court until such time that the court had ruled on the designating party's motion under Practice Book Section 11-20A. The Jones defendants did not oppose the plaintiffs' June 8,2021 motion to modify the protective order, which recited a good cause basis for the modification and which added a "Confidential- Attorneys Eyes Only" designation to the above mentioned procedures. Based upon the written motions filed by the plaintiffs and the Jones defendants, the court, in entering the protective orders, found good cause for both the issuance of the original protective order and its modification. In support of the motion for protective order, the Jones defendants identified their privacy interests in sensitive proprietary information including proprietary business, financial, and competitive information that they maintain as trade secrets, proprietary business and marketing plans, marketing data, web analytics, sales analytics, and/or other web traffic data, and marketing data or analytics. They referred to the "unique" business model that makes them competitive and successful. The plaintiffs, in support of the modification to the protective order, identified their privacy interests in their medical histories, psychiatric records,and private social media accounts. In the midst of taking the first deposition of a plaintiff, the defendants Free Speech Systems LLC, Infowars LLC, Infowars Health LLC, and Prison Planet TV LLC (Infowars),filed a motion to depose Hillary Clinton, using deposition testimony that had just been designated as "Confidential-Attorneys Eyes Only," and completely disregarding the court ordered procedures. At no point prior to filing the Clinton motion did Infowars profess ignorance of the procedures they had proposed and which were court ordered to be followed, nor have they since taken

any steps to correct their improper filing. If Infowars was of the opinion that the plaintiffs' designation was unreasonable and not made in good faith, the solution was to follow the court ordered procedure to challenge the designation, not to blatantly disregard it and make the confidential information available on the internet by filing it in the court file. The court rejects Infowars' baseless argument that there was no good cause to issue the protective orders, where both sides recited, in writing, detailed justification for a good cause basis. In short, Infowars, having advocated for a court ordered protective order, filing no less than three versions, having recited in writing the good cause bases for the issuance of the protective order, and having no objection to the plaintiffs' proposed modification, now takes the absurd position that the court ordered protective order circumvents the good cause requirements of Practice Book 13-5, did not need to be complied with, and should not be enforced by the court. This argument is frightening. Given the cavalier actions and willful misconduct of Infowars in filing protected deposition information during the actual deposition, this court has grave concerns that their actions, in the future, will have a chilling effect on the testimony of witnesses who would be rightfully concerned that their confidential information, including their psychiatric and medical histories, would be made available to the public. The court will address sanctions at a future hearing.

Judicial Notice (JDNO) was sent regarding this order.

421277
_____

Judge: BARBARA N BELLIS

This document may be signed or verified electronically and has the same validity and status as a document with a physical (pen-to-paper) signature. For more information, see Section I.E. of the *State of Connecticut Superior Court E-Services Procedures and Technical Standards* (https://jud.ct.gov/external/super/E-Services/e-standards.pdf), section 51-193c of the Connecticut General Statutes and Connecticut Practice Book Section 4-4.

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 920 of 1044

1

```
 1                    REPORTER'S RECORD
                    VOLUME 1 OF 1 VOLUME
 2

 3   NEIL HESLIN,                 )  IN THE DISTRICT COURT
                                  )
 4        Plaintiff              )  TRAVIS COUNTY, TEXAS
                                  )
 5   VS.                          )  459TH JUDICIAL DISTRICT
                                  )
 6   ALEX E. JONES, INFOWARS,    )
     LLC, ET AL.,                 )  TRIAL COURT CAUSE NO.
 7                                )  D-1-GN-18-001835 AND
          Defendant             )  D-1-GN-19-004651
 8

 9   LEONARD POZNER AND           )  IN THE DISTRICT COURT
     VERONIQUE DE LA ROSA,        )
10                                )  TRAVIS COUNTY, TEXAS
          Plaintiff             )
11                                )  459TH JUDICIAL DISTRICT
     VS.                          )
12                                )
     ALEX E. JONES, INFOWARS,    )  TRIAL COURT CAUSE NOS.
13   LLC, ET AL.,                 )  D-1-GN-18-001842
                                  )
14        DEFENDANTS             )

15
     SCARLETT LEWIS,              )  IN THE DISTRICT COURT
16                                )
          Plaintiff             )  TRAVIS COUNTY, TEXAS
17                                )
     VS.                          )  459TH JUDICIAL DISTRICT
18                                )
     ALEX E. JONES, INFOWARS,    )
19   LLC, ET AL.,                 )  TRIAL COURT CAUSE NO.
                                  )  D-1-GN-18-006623
20        DEFENDANTS             )

21
     ---------------------------------------------------------
22

23
              MOTION TO COMPEL; MOTION FOR SANCTIONS
24

25
```

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
921 of 1044

81

1    corporate rep. depositions for the TCPA motion to

2    dismiss that Mr. Bankston was unhappy about the

3    answers, and he brought those to Judge Jenkins's

4    attention and Judge Jenkins entered an order of

5    contempt and a $500 fine on that.

6         But there's been no missed depositions.  I

7    haven't received any requests for additional

8    depositions.  There's been no pushback from me on him

9    saying he's not entitled to depositions.  So I don't

10   know where that comes from.

11        You know, and the last thing about this

12   filing that occurred in the midst of a deposition,

13   Mr. Pattis, who filed that thing in Connecticut, first

14   of all, he didn't identify the plaintiff, he didn't

15   actually provide quotes to transcription of the

16   statements, but he wasn't even in the deposition, that

17   was kind of his thing that he did, he wasn't even the

18   one doing that.

19        But more importantly, I had nothing to do --

20        THE COURT:  You just said he wasn't -- that

21   was his thing that he did, he didn't even do that.

22   That's literally what just came out of your mouth.

23        MR. REEVES:  No, I'm sorry, I didn't mean

24   that.

25        He -- he did not -- Mr. Pattis was not taking

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
922 of 1044

82

1  the deposition.  He did not file the motion as he was

2  taking the deposition.  Another lawyer for the

3  defendants was taking the deposition and he just, in

4  the midst of this, filed it.  And that was, you know.

5  But he didn't actually do anything as far as

6  identifying the plaintiff or anything like that.

7         But really overall, the overarching point

8  here is that there's nothing in Connecticut that has

9  anything to do with these cases as far as the discovery

10  is concerned.  I know Mr. Bankston wants to draw

11  corollaries between them, but the discovery stuff that

12  is at issue in Connecticut is far broader, far more

13  encompassing than the discovery issue here.  And so

14  it's not a one-to-one correlation to what's there

15  versus what should be here.

16         Mr. Bankston also fails to mention that

17  there's also a Virginia case where there has been no

18  discovery issues because, frankly, Mr. Randazza is part

19  of that case now and discovery has proceeded orderly

20  there.  There's no issues there.  There's been some

21  slight disagreements, but there's been none of this --

22  you know, Connecticut and here, there's a lot of puff

23  up over discovery, lots of motions for sanctions and

24  lots of issues there, but that's, you know.

25         Again, I can't -- I'm here to live in the

1

XO6 UWY CV18-6046436-S      :      SUPERIOR COURT

ERICA LAFFERTY, ET AL      :      JUDICIAL DISTRICT OF WATERBURY

V                          :      AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL    :      NOVEMBER 15, 2021

-------------------------------------------------------------

XO6 UWY CV18-6046437-S      :      SUPERIOR COURT

WILLIAM SHERLACH, ET AL    :      JUDICIAL DISTRICT OF WATERBURY

V                          :      AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL    :      NOVEMBER 15, 2021

-------------------------------------------------------------

XO6 UWY CV18-6046438-S      :      SUPERIOR COURT

WILLIAM SHERLACH, ET AL    :      JUDICIAL DISTRICT OF WATERBURY

V                          :      AT WATERBURY, CONNECTICUT

ALEX EMRIC JONES, ET AL    :      NOVEMBER 15, 2021

### COURT'S RULING

B E F O R E:

        THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S:

  Representing the Plaintiffs:

      ATTORNEY CHRISTOPHER MATTEI
      ATTORNEY ALINOR STERLING
      ATTORNEY MATTHEW BLUMENTHAL
      Koskoff Koskoff & Bieder
      350 Fairfield Avenue
      Bridgeport, Connecticut  06604

2

Representing the Defendants:

    ATTORNEY JAY MARSHALL WOLMAN
    Randazza Legal Group
    100 Pearl Street
    Hartford, Connecticut  06103

    ATTORNEY CAMERON L. ATKINSON
    Pattis & Smith
    383 Orange Street
    New Haven, Connecticut  06511

    ATTORNEY MARIO CERAME
    Brignole Bush & Lewis
    73 Wadsworth Street
    Hartford, Connecticut  06106

                              Recorded and Transcribed By:
                              Patricia Sabol
                              Court Monitor
                              400 Grand Street
                              Waterbury, Connecticut  06702

3

1    THE COURT:  All right.  So I will order a copy of

2  the transcript of the following ruling, and I will

3  sign it and I will place it in the court file as my

4  decision for the purposes of any appeal.

5    So I'll first address the Clinton deposition

6  issue and the conduct of July 1, 2021.  In the July

7  19, 2021 court filing by the defendants Infowars, LLC,

8  Free Speech Systems, LLC, Infowars Health, LLC and

9  Prison Planet, LLC, they described how in the motion

10  to depose Hillary Clinton, testimony designated by the

11  plaintiffs as highly confidential was filed in the

12  Clinton deposition motion.  They explained that this

13  was done because in their opinion, the plaintiffs did

14  not have a good-faith basis to designate the

15  deposition as highly confidential before the

16  deposition had commenced, despite the fact that the

17  Jones defendants had previously done so themselves.

18  And it is not lost on the Court that the highly

19  confidential information was improperly filed in the

20  middle of the first deposition of a plaintiff.

21    The July 19, 2021 filing is in sharp contrast to

22  the Jones defendants' position at the October 20, 2021

23  sanctions hearing where the Court addressed what, if

24  any, sanctions should enter.  At the October 20

25  hearing, the Jones defendants claim they could publish

26  confidential information as long as they did not

27  reveal the name of the witness.  That is, they argued

4

1    unconvincingly that they didn't understand the very

2    protective order that they themselves drafted and

3    asked the Court to approve as a Court order, which the

4    Court did.

5        The position of the Jones defendants at the

6    October 20, 2021 sanctions hearing did nothing but

7    reinforce the Court's August 5th, 2021 order and

8    findings that the cavalier actions on July 1st, 2021

9    constituted willful misconduct and violated the

10    Court's clear and unambiguous protective order.

11        The history of the attorneys who have appeared

12    for the defendants, Alex Jones, Infowars, LLC, Free

13    Speech Systems, LLC, Infowars Health, LLC and Prison

14    Planet TV, LLC is a convoluted one, even putting aside

15    the motions to withdraw appearance, the claims of

16    conflict of interest and the motions for stay advanced

17    by these five defendants.

18        As the record reflects, on June 28, 2018,

19    Attorney Wolman appeared for all five of the Jones

20    defendants.  Eight months later, on March 1st, 2019,

21    Attorney Wolman is out of the case and Pattis & Smith

22    filed an in-lieu-of appearance for all five

23    defendants.  On February 24, 2020, Attorney Latonica

24    also appeared for all five defendants.  Five months

25    later on July 7, 2020, Attorney Latonica and Pattis &

26    Smith is now out of the case and Attorney Wolman is

27    back in the case for all five defendants.  Then on

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 927 of 1044

5

1   June 28, 2020, Pattis and Smith is back in the case,

2   but now only appears for the four LLC defendants.

3   But what is perhaps more significant is the

4   transparent attempt to cloud the issues by Pattis &

5   Smith, for example, by listing the names of only three

6   of the four clients they represent when filing the

7   motion to take the deposition of Hillary Clinton and

8   then listing all four clients in the July 19, 2021

9   filing relating to the issue.  And by Attorney Wolman

10  who then argued in his October 20, 2021 file that

11  Infowars, LLC had no involvement in the motion for

12  commission because their lawyer did not list their

13  name on the motion.  It is simply improper under our

14  rules of practice for an attorney to do so.

15  Turning to the issue of the subsidiary ledgers.

16  The five Jones defendants on November 6, 2020 filed

17  with the Court their discovery objections relating to

18  the deposition of Free Speech Systems' accounting

19  manager and current employee, Melinda Flores.  In

20  response to the plaintiff's request for subsidiary

21  ledgers, the Jones defendants objected on the basis

22  that the production of the subsidiary ledgers was

23  oppressive, unduly burdensome, disproportionate,

24  harassing and that it will require digging through

25  eight years of accounting.  No objection was raised as

26  to the term "subsidiary ledger", although parties

27  frequently will object to a discovery request if they

6

1    consider it vague or confusing.

2         On April 29, 2021, the Court overruled the

3    objection.  On May 6, 2021, the Court ordered the

4    deposition of Flores to take place on June 4, 2021 and

5    ordered the documents to be produced by the close of

6    business on May 14, 2021 stating that failure to

7    comply may result in sanctions.

8         On May 14, 2021, the five Jones defendants

9    responded to the document request and Court order and

10   stating that the subsidiary ledgers were incorporated

11   into the trial balances and had been produced.

12        At her June 4, 2021 deposition, Flores, the

13   accounting manager, testified that subsidiary ledgers

14   or detail was easily accessible and available to her.

15   She testified that it would show the sources of

16   advertising income and she testified repeatedly that

17   Free Speech Systems maintained subsidiary ledger

18   information.  Flores did not believe she was obligated

19   to produce the subsidiary ledgers, and it is unclear

20   as to whether they have been produced.

21        It was impossible to reconcile the expert hired

22   by Free Speech Systems with the November 6, 2020

23   objections filed with the Court and with Flores'

24   deposition testimony.  While the Jones defendants in

25   their May 5th, 2021 motion state that Flores would be

26   the best employee to identify and produce the

27   requested documents and further state that Flores

7

1  would be compelled by Free Speech Systems to produce

2  the requested documents at the deposition, the

3  defendants hired expert, Mr. Roe, said that Flores was

4  wrong and that Free Speech Systems doesn't use or have

5  subsidiary ledgers.

6      The Court, in its August 6, 2021 order, found

7  that the subsidiary ledger information was easily

8  accessible by Flores by clicking on each general

9  account, that, despite the Court orders and although

10  the information exists and is maintained by Free

11  Speech Systems and was required by the Court order to

12  be produced, it had not been produced.  And, again, it

13  is still unclear as to what documents have been

14  produced.

15      The Court rejected Roe's statements in his

16  affidavit as not credible in light of the

17  circumstances.  The Court found that the plaintiffs

18  were prejudiced in their ability to prosecute their

19  claims and conduct further meaningful depositions and

20  that sanctions would be addressed at a future hearing.

21      At the October, 2021 sanctions hearing, the Court

22  addressed whether sanctions should enter.  The Court

23  finds that sanctions are, in fact, appropriate in

24  light of the defendant's failure to fully and fairly

25  comply with the plaintiff's discovery request and the

26  Court's orders of April 29, 2021, May 6, 2021 and

27  August 6, 2021.

8

1        Turning to the trial balances.  In addition to

2     objecting to the deposition of Flores, the Jones

3     defendants, as I mentioned, filed discovery objections

4     to the request for production directed to Flores.  The

5     Court ruled in favor of the defendants on one

6     production request and ruled in favor of the

7     plaintiffs with respect to others.

8        In addition to the subsidiary ledgers, the Court

9     ordered production of the trial balances.  Flores had

10    run trial balances in the past unrelated to this

11    action.  Flores testified at her June 4, 2021

12    deposition that she personally accessed Quick Books

13    and selected the option to generate trial balances for

14    2012 to 2019.  She testified that she ran the reports

15    and printed them out and believed that the reports

16    were produced.  Her testimony the reports that she ran

17    were produced was left uncorrected by counsel at the

18    deposition.

19        The reports were not produced by the

20    Court-ordered deadline of May 14, 2021.  They were not

21    produced at her June 4, 2021 deposition, and they have

22    not been produced to date, despite their obligation to

23    do so.

24        While the Jones defendants, in their May 5, 2021

25    Court filing, emphasized that Flores would be the best

26    employee to identify and produce the requested

27    documents which would include the trial balances and

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
931 of 1044

9

1     that Flores would be compelled by Free Speech Systems

2     to produce the documents at her deposition, not only

3     were the reports not produced, but the Jones

4     defendants in their October 7, 2021 filing now claim

5     that Flores, a mere bookkeeper, provided flawed

6     information to the defendants that the defendants,

7     through Roe, had to correct.  And the Court rejects

8     that position.

9         The Jones defendants argue that Roe combined some

10    accounts that were not used consistently and

11    consolidated some general accounts because various

12    transactions all involved the same account and those

13    records created by the Jones defendants' outside

14    accountant were the records that were produced.  But

15    these records that removed accounts and consolidated

16    accounts altered the information in the reports that

17    their own accounting manager had produced, and they

18    contain trial balances that did not balance.  These

19    sanitized, inaccurate records created by Roe were

20    simply not responsive to the plaintiff's request or to

21    the Court's order.

22         Turning to the analytics.  The date for the

23    parties to exchange written discovery has passed after

24    numerous extensions by the Court.  On May 14, 2021,

25    the Court ordered that the defendants were obligated

26    to fully and fairly comply with the plaintiff's

27    earlier request for disclosure and production.

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 932 of 1044

10

On June 1, 2021, the defendants filed an
emergency motion for protective order apparently
seeking protection from the Court's own order where
the defendants again attempted to argue the scope of
appropriate discovery.

The Court, on June 2, 2021, declined to do so and
extended the deadline for final compliance to June 28,
2021 ordering the defendants to begin to comply
immediately on a rolling basis.  In its June 2nd
order, the Court warned that failure to comply would
result in sanctions including default.

With respect to analytics, including Google
Analytics and social media Analytics, the defendants
on May 7, 2019 represented that they had provided all
the analytics that they had.  They stated with respect
to Google Analytics that they had access to Google
Analytics reports, but did not regularly use them.  As
the Court previously set forth in its September 30,
2021 order, the defendants also claim that on June 17,
2019, they informally emailed zip files containing
Google Analytics reports to the plaintiffs, but not
the codefendants, an email the plaintiffs state they
did not receive and that the Court found would not
have been in compliance with our rules of practice.

On June 28, 2021, the Jones defendants filed a
notice of compliance stating that complete final
supplemental compliance was made by the defendants,

11

1    Alex Jones and Free Speech Systems, LLC and that

2    Infowars, LLC, Infowars Health, LLC and Prison Planet,

3    LLC, quote:  Had previously produced all documents

4    required to be produced, end quote, representing that

5    with respect to the Google Analytics documents, Free

6    Speech Systems, LLC could not export the dataset and

7    that the only way they could comply was through the

8    sandbox approach.

9        Then on August 8, 2021, the Jones defendants for

10   the first time formally produced Excel spreadsheets

11   limited to Google Analytics apparently for Infowars

12   dot com and not for any of the other websites such as

13   Prison Planet TV or Infowars Health.  Importantly, the

14   Jones defendants to date have still not produced any

15   analytics data from any other platform such as Alexa,

16   Comcast or Criteo.

17       The Jones defendants production of the social

18   media analytics has similarly been insubstantial and

19   similarly has fallen far short both procedurally and

20   substantively, despite prior representations by the

21   Jones defendants that they had produced the social

22   media analytics and despite the May 25, 2021

23   deposition testimony of Louis Certucci, Free Speech

24   Systems social media manager for nearly a decade, that

25   there were no such documents.

26       At the June 28, 2021 deposition of Free Speech

27   Systems corporate designee Zimmerman, Mr. Zimmerman

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 934 of 1044

12

1   testified that, in fact, he had obtained some

2   responsive documents from Certucci which were then

3   loaded into a deposition chat room by counsel for the

4   Jones defendants.  It appears that these documents

5   were minimal summaries or reports for Facebook and

6   Twitter, but not for other platforms used by the

7   defendants such as You Tube.

8       Any claim of the defendants that the failure to

9   produce these documents was inadvertent falls flat as

10  there was no evidence submitted to the Court that the

11  defendants had a reasonable procedure in place to

12  compile responsive materials within their power,

13  possession or knowledge.

14      Months later, on October 8, 2021, the Jones

15  defendants formally produced six documents for the

16  spring of 2017 for Facebook containing similar

17  information to the Zimmerman chat room documents, but

18  not included in the chat room documents and screen

19  shots of posts by Free Speech Systems to an

20  unidentified social media account with no analytics.

21      The defendants represented that they had produced

22  all the analytics when they had not done so.  They

23  represented in court filings that they did not rely on

24  social media analytics and this, too, is false.

25      I'm going to need to take a thirty second water

26  break, please.

27      (A short break in the proceedings occurred.)

13

1       This response was false.  The plaintiffs in

2   support of their motion for sanctions on the analytics

3   issue attached as exhibit D, an email dated December

4   15, 2014 between former Free Speech Systems business

5   manager Timothy Fruge and current Free Speech Systems

6   employee Buckley Hamman.  Fruge attaches annotated

7   charts of detailed analytics concerning Jones' 2014

8   social media audience including gender demographics

9   engagement and social media sites that refer people to

10  Infowars dot com.  As pointed out by the plaintiffs,

11  Fruge's annotations are even more telling than the

12  charts themselves and totally contradict the Jones

13  defendants misrepresentations to the Court that,

14  quote:  There is no evidence to suggest that Mr. Jones

15  or Free Speech Systems ever used these analytics to

16  drive content, end quote.

17      The next image on the document shows key

18  indicators on Twitter.  Those are engagement and

19  influence.  Again, this is reading from Fruge's notes.

20  Again, the next image shows the key indicators on

21  Twitter.  Those are engagement and influence.  Notice

22  our influence is great and our engagement is low.  I

23  bring this up -- again these are Fruge's notes --

24  because we should try and raise our engagement with

25  our audience.  Engagement is how well we are

26  communicating and interacting with our audience.  The

27  higher our engagement, the more valuable our audience

14

1    will become to our business. And that is the end of

2    Fruge's notes.

3        I would note that regardless of this reliance on

4    social media analytics, the concept is simple. The

5    defendants were ordered to produce the documents and

6    our law requires them to produce information within

7    their knowledge, possession or power. Discovery is

8    not supposed to be a guessing game. What the Jones

9    defendants have produced by way of analytics is not

10    even remotely full and fair compliance required under

11    our rules.

12        The Court finds that the Jones defendants have

13    withheld analytics and information that is critical to

14    the plaintiff's ability to conduct meaningful

15    discovery and to prosecute their claims. This callous

16    disregard of their obligations to fully and fairly

17    comply with discovery and Court orders on its own

18    merits a default against the Jones defendants.

19        Neither the Court nor the parties can expect

20    perfection when it comes to the discovery process.

21    What is required, however, and what all parties are

22    entitled to is fundamental fairness that the other

23    side produces that information which is within their

24    knowledge, possession and power and that the other

25    side meet its continuing duty to disclose additional

26    or new material and amend prior compliance when it is

27    incorrect.

15

1    Here the Jones defendants were not just careless.

2    Their failure to produce critical documents, their

3    disregard for the discovery process and procedure and

4    for Court orders is a pattern of obstructive conduct

5    that interferes with the ability of the plaintiffs to

6    conduct meaningful discovery and prevents the

7    plaintiffs from properly prosecuting their claims.

8    The Court held off on scheduling this sanctions

9    hearing in the hopes that many of these problems would

10   be corrected and that the Jones defendants would

11   ultimately comply with their discovery obligations and

12   numerous Court orders, and they have not.

13   In addressing the sanctions that should enter

14   here, the Court is not punishing the defendants.  The

15   Court also recognizes that a sanction of default is

16   one of last resort.  This Court previously sanctioned

17   the defendants not by entering a default, but by a

18   lesser sanction, the preclusion of the defendant's

19   special motions to dismiss.  At this point entering

20   other lesser sanctions such as monetary sanctions, the

21   preclusion of evidence or the establishment of facts

22   is inadequate given the scope and extent of the

23   discovery material that the defendants have failed to

24   produce.

25   As pointed out by the plaintiffs, they are

26   attempting to conduct discovery on what the defendants

27   publish and the defendants' revenue.  And the failure

16

1    of the defendants to produce the analytics impacts the

2    ability of the plaintiffs to address what is published

3    and the defendants failure to produce the financial

4    records such as sub-ledgers and trial balances affects

5    the ability of the plaintiffs to address the

6    defendants' revenue.  The prejudice suffered by the

7    plaintiffs, who had the right to conduct appropriate,

8    meaningful discovery so they could prosecute their

9    claims again, was caused by the Jones defendants

10   willful noncompliance, that is, the Jones defendants

11   failure to produce critical material information that

12   the plaintiff needed to prove their claims.

13       For these reasons, the Court is entering a

14   default against the defendants Alex Jones, Infowars,

15   LLC, Free Speech Systems, LLC, Infowars Health, LLC

16   and Prison Planet TV, LLC.  The case will proceed as a

17   hearing in damages as to the defendants.  The Court

18   notes Mr. Jones is sole controlling authority of all

19   the defendants, and that the defendants filed motions

20   and signed off on their discovery issues jointly.  And

21   all the defendants have failed to fully and fairly

22   comply with their discovery obligations.

23       As I said, I will order a copy of the transcript.

24   I will sign it and I will file it in the Court as the

25   Court's order.

26

27                               Bellis, J.

17

```
 1    XO6 UWY CV18-6046436-S      :    SUPERIOR COURT.

 2    ERICA LAFFERTY, ET AL       :    JUDICIAL DISTRICT OF WATERBURY

 3    V                           :    AT WATERBURY, CONNECTICUT

 4    ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021

 5    -------------------------------------------------------------

 6    XO6 UWY CV18-6046437-S      :    SUPERIOR COURT

 7    WILLIAM SHERLACH, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

 8    V                           :    AT WATERBURY, CONNECTICUT

 9    ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021

10    -------------------------------------------------------------

11    XO6 UWY CV18-6046438-S      :    SUPERIOR COURT

12    WILLIAM SHERLACH, ET AL     :    JUDICIAL DISTRICT OF WATERBURY

13    V                           :    AT WATERBURY, CONNECTICUT

14    ALEX EMRIC JONES, ET AL     :    NOVEMBER 15, 2021
```

15

16                C E R T I F I C A T I O N

17        I hereby certify the foregoing pages are a true and

18    correct transcription of the audio recording of the

19    above-referenced case, heard in the Superior Court, Judicial

20    District of Waterbury, at Waterbury, Connecticut, before the

21    Honorable Barbara N. Bellis, Judge, on the 15th day of

22    November, 2021.

23        Dated this 15th day of November, 2021, in Waterbury,

24    Connecticut.

25

26                              Patricia Sabol

27                              Court Monitor

| NO. X06-UWY-CV-18-6046436 S   : | SUPERIOR COURT |
| ERICA LAFFERTY, ET AL : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 18, 2021 |
| NO. X06-UWY-CV-18-6046437 S   : | SUPERIOR COURT |
| WILLIAM SHERLACH : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 18, 2021 |
| NO. X06-UWY-CV-18-6046438 S   : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 18, 2021 |

### Affidavit in Support of Motion to Recuse Judge Bellis

I, Norman Pattis, declare as follows:

1. I am more than 18 years old, competent to testify, and have personal knowledge regarding the statements set forth in this declaration.

2. I execute this affidavit for the purpose of seeking recusal of Judge Barbara Bellis and obtaining transfer of the hearing of this case to another judge. As detailed below, the record in this matter is littered with issues creating the appearance of judicial impropriety that raise substantial questions about whether a reasonable person would question Judge Bellis' impartiality.

3. I have appeared before Judge Barbara Bellis in the above captioned matters, and I have read certified court transcripts of any hearings that I was unable to attend.

4. **1 March 2019**. Pattis & Smith, LLC filed an appearance in the above captioned matters on behalf of the Jones Defendants. Previously, with prior counsel, the Jones Defendants filed a special motion to dismiss under Conn. Gen. Stat § 52-196a. Pursuant to that

section, in order DN123.1, Judge Bellis found good cause to order specified and limited discovery. "Specified and limited" is not defined. Neither the parties nor the court were aware of a case defining this term. Judge Bellis refused to opine on what constitutes "specific and limited" discovery, instead deciding to take up each discovery objection after the parties attempted to resolve any issues themselves. After the parties were unable to come to an agreement, Judge Bellis in order DN148 overruled two of the Jones Defendants' objections without further explanation. The Jones Defendants' attempt to appeal this order was denied and the parties agreed to comply with discovery by 23 February 2019.

5. **7 March 2019 hearing**. Discovery compliance on behalf of the Jones Defendants was incomplete and overdue.

   a. I informed the Court and plaintiffs that I expected my appearance to be limited to moving another attorney in *pro hac vice* to represent the Jones Defendants. (Transcript, 8:9-10, Exhibit A). Previously, the court denied the *pro hac vice* application of the Jones Defendants' original counsel of choice. This, in part, resulted in a replacement of prior counsel

   b. The Court stated its dissatisfaction with the current state of discovery and missing of court ordered discovery compliance deadlines. (*Id.* at 4:1-27).

   c. Despite its dissatisfaction, the Court granted the Jones Defendants an additional two weeks for discovery compliance, with a caveat that if the Jones Defendants "continue to ignore court deadlines they're going to lose the ability, quite frankly, to pursue their motion to dismiss." (*Id.* 6:18-21).

2

6. **13 March 2019 hearing**. The Jones Defendants found themselves without *pro hac vice* counsel, further exacerbating discovery compliance.

   a. I informed the Court that:

      i. to my surprise, "counsel who expressed an interest in appearing will not be appearing and that I will in fact for the foreseeable future be the only counsel for these defendants." (Transcript, 4:14-17, Exhibit B).

      ii. I had personally made the Jones Defendants aware that the ability to have their special motion to dismiss heard depended on complying with the court's discovery orders. (*Id.* 7:23-8:1).

   b. Judge Bellis agreed with this assessment regarding the Jones Defendants' special motion to dismiss. (*Id.* 8:2).

7. **22 March 2019 hearing**. I took the reins of the defendant's discovery compliance efforts, determined why the Jones Defendants had yet to comply, and what was necessary to bring them into compliance.

   a. Prior to this hearing, on 21 March 2019, the Jones Defendants filed a motion for an extension of time to comply with discovery, which in part indicated that the Jones Defendants had previously been under the impression compliance had been tendered. (Transcript, 3:25-4:3, Exhibit C).

   b. Judge Bellis inquired as to how, given the history of discovery compliance, the Jones Defendants could be under that impression. (*Id.* 4:1-3).

   c. I provided a candid history of the impact the two previous changes in counsel had on discovery compliance and provided a roadmap as to how discovery

compliance could progress given the voluminous nature of the court ordered

discovery. (*Id.* 5-38).

d.  At that time, Judge Bellis decided to not preclude the Jones Defendants' special

motion to dismiss, noting that based on my representation:

> [i]t sounds like you pretty handily, without much of a struggle, was
> able to determine that this was going to be an expensive search,
> and it was going to involve a lot of documents. If Mr. Jones' first
> attorney had done what you're doing, I would have been back
> probably with everyone maybe on January 30th, at which point I
> would have been told this is going to be -- it's going to take longer,
> it's nine million, or however many emails, but instead what
> happened -- and I don't want to beat a dead horse -- is that the
> deadlines were missed and they were like moving targets.

(*Id.* 40:7-18).

8.  **26 March 2019 hearing**. The Jones Defendants produced a large quantity of discovery

materials.

a.  In response to the Court's inquiry about the status of discovery compliance, I

stated:

> the Court reserved effectively on whether to reconsider our motion
> to — for an extension of time to comply with discovery. And I
> recited the transitional difficulties as this case has migrated from
> several counsel to our office. My impressions Friday is the Court
> was going to keep an open mind about what to do and based in part
> on whether the defendants could make some showing that they
> were making a bonafide and good faith effort to comply with
> discovery under new counsel. What we had done since Friday
> consist of the following. We have, as you know there is a related
> Texas case and the Texas firm has given us complete access to
> what they have disclosed in -- in that case. So I delivered to counsel
> for the plaintiffs at their home on Sunday afternoon, a hard drive
> consisting of all the documents we had received to date from
> counsel in Texas that were responsive to search terms in our case,
> together with the — I sent an email describing what I thought was
> in that disc. Was operating under the speed of light. I have
> authorization from my client to rely on Texas' compliance without
> having to look through it myself with respect to those items.

(Transcript, 3:14-4:12, Exhibit D).

b. Following an extended inquiry by the Court, Judge Bellis reasoned that "we sort of need a better grasp of what has been produced to date… since some of the materials were just produced last night, I think before I make a decision, I think that we need to be on the same page, both sides, as to what has been produced and what is still owed." (*Id.* 23:2-10).

c. Judge Bellis then concluded "So I think the best that you could do is if you could ask for a week for the Court to. . . decide the issue. . . not a week extension, a week to decide the issue. (*Id.* 29:18-25). "If you want to come back in a week, hopefully with interrogatories and production requests under oath so that I could then decide the issue. . . I'm willing to do that. . . Does that work for other counsel?" (*Id.* 30:13-24).

d. Opposing counsel agreed with Judge Bellis' proposed course of action. (*Id.* 30:24-25).

9. **10 April 2019 hearing**. Judge Bellis determined the Jones Defendants were now in substantial compliance with the court ordered discovery. An issue regarding a signature on an affidavit arose. Judge Bellis was unable to articulate the relevance or materiality of the signature issue. Regardless, she ordered a separate hearing to resolve this issue and *sua sponte* incorporated this issue as a potential second basis for a sanction preventing the Jones Defendants from having their special motion to dismiss heard.

a. Judge Bellis indicated that "the issue at this point for me is whether there's been substantial good faith compliance or not such that the defendant should be

allowed to pursue their special motion to dismiss." (Transcript, 12:15-18, Exhibit E). (*Id.* 12:27-13:6).

b.  The Jones Defendants proceeded to outline the current state of discovery compliance. (*Id.* 13:13-16:22).

c.  After addressing non-substantive issues with the discovery compliance, Judge Bellis inquired of the plaintiffs "[h]ow is this not substantial compliance?" (*Id.* 22:6-7).

d.  Plaintiffs raised concerns regarding the content of answers provided in the discovery compliance, to which Judge Bellis responded "that would require an evidentiary hearing., (*Id.* 22:23-24). "[b]ut I don't see how this is not substantial compliance." (*Id.* 24:1-2).

e.  Plaintiffs then conceded that "it's apparent from the Court's comments that the Court is satisfied there is at least substantial compliance." (*Id.* 27:4-6).

f.  **Affidavit issue**. In my haste to satisfy the court ordered expedited discovery, I executed an affidavit containing a technical deficiency that impacted neither it's substance nor veracity.

    i.  Plaintiffs next inquired on the record about an affidavit signed by Alex Jones, specifically where the affidavit was signed. (*Id.* 29:3-7).

    ii.  I indicated it was signed in New Haven, Connecticut by "an authorized representative . . . who spoke to [him] and spoke with [Alex Jones] and authorized [him] to sign it for him under the formalities of an oath." (*Id.* 29:17-26). This procedure occurred because Alex Jones could not travel to

Connecticut to personally sign the affidavit. (*Id.* 30:2-4). This was not indicated on the affidavit.

iii. Judge Bellis responded as follows, "I've never heard of that," (*Id.* 29:27). "I -- I know, but I've never heard of that in my life. I've never heard of that ever. . . ever . . . But I've never -- I -- I - - I've never heard of that. I've never — I've just never heard of it, I've never even anecdotally heard of it. I've never heard of it done in any case ever, I've never read about it ever. (*Id.* 30:1-15).

iv. I responded, "[t]here was certainly no intent to deceive. . . If there's a concern, I'll have him sign it and refile it tomorrow." (*Id.* 31:6-16).

v. In response to Judge Bellis' inquiry regarding who signed the affidavit and why that name did not appear on the document, I indicated that "its an individual's who appeared for him in Connecticut who is an -- an assistant . . . [h]is concern is that he does not want to be harassed by (inaudible). who have harassed others in this case." (*Id.* 31:18-25).

vi. Because I was appearing remotely, Judge Bellis indicated that affidavit issue would be addressed immediately upon my return to Connecticut. (*Id.* 32:3-8).

vii. Plaintiffs inquired whether the court was "prepared to rule on the motion for reconsideration or motion for sanctions [for failure to comply with discovery]. (*Id.* 35:3-4).

viii. Judge Bellis replied:

7

> I am going to have a hearing on that affidavit issue. And I
> don't think there's any harm in proceeding. I mean, I think
> this is *substantial compliance* but until I deal with that
> affidavit issue, I'm not — I'm not going to rule on — I'll
> take it under advisement; the motion for reconsideration
> and the motion for sanctions. But I'm going to have the
> hearing on the affidavit first.

(*Id.* 35:9-16). (emphasis added).

10. **22 April 2019 hearing**. Given Judge Bellis' reaction to the affidavit issue, I self-referred

to the grievance counsel. Judge Bellis indicated her intent to refer the issue to the

grievance counsel a second time. Judge Bellis then invited the plaintiffs to use this issue

as a pretext to provide an additional basis to sanction the Jones Defendants. The plaintiffs

declined this invitation, indicating their position was that there was insufficient

information to indicate culpability on the part of the Jones Defendants. Despite

previously ordering a hearing on the issue and the plaintiffs indicating that without a

hearing they lacked information necessary to take a position, Judge Bellis pressed the

plaintiffs to take a position without a hearing, which they declined to do.

    a. Judge Bellis took up the affidavit issue by stating:

> I reviewed the transcripts and the affidavit and I do want to put a
> statement on the record, and I think I'm going to proceed a certain
> way. So on March 22nd, 2019, Defense Counsel filed the affidavit
> that indicated it was signed by Alex Jones under oath, and the e-
> filing description referred to a March 22nd, 2019, affidavit of A.
> Jones. That was the e-file description. And the attestation clause
> indicates that the affidavit was sworn to and subscribed to on
> March 22nd, 2019; and we learned on that same date that Attorney
> Pattis --I'm sorry, we learned subsequently on April 10th that
> Attorney Pattis had taken the signature and that the signature was
> not that of Mr. Jones but of an authorized representative who didn't
> want to be named because he didn't want to be harassed. But on
> March 22nd, 2019, on the record Attorney Pattis referred to the
> document as an affidavit from Jones. The affidavit is devoid of any
> language that would reveal that Mr. Jones' agent or employee or
> authorized representative signed his name to the document. There's
> no attempted power of attorney language or acknowledgement or

8

> anything at all to show that some other person signed Alex Jones'
> name to the affidavit. So in the Court's opinion, the affidavit is --
> is invalid and is a false affidavit. Affidavits are supposed to be
> signed by the author, not surreptitiously by some other unknown,
> although authorized, person. So I am going to refer this matter to
> Disciplinary Counsel.

(Transcript, 12:15-18, Exhibit F).

b.  I indicated that I already self-referred because I was:

> so taken aback by your reaction and the reaction of Counsel,
> although I stand by what I did. I take your role as Court very
> seriously. I referred that to the New Haven Committee, care of
> Michael Georgetti, the Friday of our hearing. I've alerted Counsel
> to it in the event they wanted to weigh in. They asked for a copy of
> my filing. I didn't give them one because it contains more
> information than was placed on the record. But nonetheless, Judge,
> if I erred, the Grievance Committee will tell me. I don't believe I
> did.

(*Id.* 5:16-27).

c.  Judge Bellis indicated:

> I am going to make the referral, nonetheless, but I am glad to hear
> that you did it, Attorney Pattis. And I will leave it to them to figure
> out what if anything needs to be done. However, the question
> remains as to what if any sanctions should enter as to the
> defendants in light of the affidavit.

(*Id.* 6:8-15).

d.  The plaintiffs' position was that "we came here today believing that this issue

was one between Counsel and the Court, frankly. . . we just don't know enough

about the circumstances under which that affidavit was made to know whether

Mr. Jones's role. . . based on what we know right now, we weren't prepared to

argue that." (*Id.* 7:11-27).

e.  Judge Bellis' response invited the plaintiffs to make an argument for sanctions,

stating "I'm not sure what you would need to know to take a position." (*Id.* 8:6-

7).

     f.  The plaintiffs refused the invitation to argue for sanctions and took no position.

        Judge Bellis indicated, "[a]ll right. Then in light of that, I am satisfied with not

        taking any further action." (*Id.* 8:9-22).

11. **7 May 2019 hearing**. Judge Bellis ruled that there has been sufficient discovery

compliance to afford the defendants the opportunity to pursue their special motion to

dismiss. Then, plaintiffs raised an issue about discovery of draft interrogatories. Judge

Bellis immediately retracted the ruling regarding substantial compliance, without fully

comprehending the issue raised by plaintiffs. Counsel for the Jones Defendants attempted

to inform the court it misunderstood the issue raised, but was immediately cut off by

Judge Bellis. Once the court fully comprehended the plaintiffs' request, Judge Bellis

denied it but never addressed whether the prior ruling finding substantial compliance or

the subsequent retraction was the law of the case.

     a.  Judge Bellis began this hearing by stating:

> I do want to just state for the record what is probably clear to
> everyone at this point. I had said a few times that I thought that
> there was substantial enough compliance. So in effect I have really
> extended --had extended the deadlines for the defendant to comply.
> So that would be my ruling, just for the record, on the issue of the
> additional time to comply. I understand it's not necessarily 100
> percent complete compliance, but I think *I've seen enough of it at
> this point to afford the defendants the opportunity to pursue their
> special motion to dismiss.*

(Transcript, 1:18-2:3, Exhibit G). (Emphasis added).

     b.  The court then addressed additional discovery related issues concerning, among

        other issues, the production of metadata from emails previously produced to

        plaintiffs. Judge Bellis ordered that the metadata be produced within two weeks.

        (*Id.* 4:1-25).

    c.  Plaintiffs subsequently raised an issue concerning interrogatory responses made by Alex Jones, indicating that they had received a signed copy but were not in possession of "the version that Mr. Jones previously signed that Attorney Pattis has described for the Court and which were responses to our request for production, they simply declined to produce them." (*Id.* 10:10-14).

    d.  While the court ultimately ruled the plaintiffs were not entitled to these draft responses, (*Id.* 10:15-12:3), upon plaintiffs first raising the issue and without inquiring the position of the Jones Defendants, Judge Bellis stated, "this is news to me. So here's what I would say on that. *I now retract my prior comments that there has been substantial compliance, good-faith, substantial compliance.*" (*Id.* 8:24-9:1). (Emphasis added).

    e.  Despite ultimately holding that the plaintiffs were not entitled to discovery of the draft interrogatory responses, Judge Bellis took no steps to clarify what ruling stood with regard to whether there had been substantial enough compliance to afford the defendants the opportunity to pursue their special motion to dismiss. (*Id.* 10:15-12:2).

12. **22 May 2019 hearing**. Metadata related to previously discovered emails was provided to plaintiffs.

    a.  The plaintiffs acknowledged receipt of the previously requested metadata on 21 May 2019 in accordance with the court's 7 May 2019 order. (Transcript, 2:25-27, Exhibit H).

13. **5 June 2019 hearing**. Judge Bellis ruled that the Jones Defendants have fully and fairly

complied with discovery despite plaintiffs' objections. When I requested the ability to make discovery requests of the plaintiffs, Judge Bellis attempted to silence me. When I objected, Judge Bellis terminated the hearing.

a. At the start of the hearing, Judge Bellis inquired what motions were ready for adjudication. The plaintiffs replied that two of their motions were ready for adjudication along with a consolidated response by the Jones Defendants.

(Transcript, 1:12-16, Exhibit I).

b. Judge Bellis next outlined how the hearing would proceed:

> So I looked at them and there's no right to argument on these, but I'm going to give you some -- an opportunity to just briefly address the exact issue. So I don't want to have a rehash of how we got here, what's transpired. It was all laid out in the motions and I'm more than familiar. So I basically want the plaintiff to tell me why the defendant has not fully and fairly complied with the discovery request. And then I would like to hear from the Defense as to why the Defense has fully and fairly complied with the discovery request. And I want to be able to look --actually look at the exact inquiries that we're talking about.

(*Id.* 1:17-2:3).

c. The plaintiffs' motions concerned discovery compliance issues, despite Judge Bellis previous ruling that there had been substantial enough compliance to afford the Jones Defendants the opportunity to pursue their special motion to dismiss. (*Id.* 1-50).

d. For example, in one request the plaintiffs asked the Jones Defendants to produce "business marketing plans" and, after depositions, took issue with the manner in which the defendants searched for these materials. (*Id.* 36:24-27).

e. In response, Judge Bellis ruled that "unless you have some, you know, a good

faith basis and some evidence that in fact the documents do exist, I think that you have to be satisfied with the answers under oath. And no such documents exist is a proper response. (*Id.* 38:23-27). "This is just full and fair compliance. And sometimes the answer is going to be it doesn't exist." (*Id.* 39:26-40:1).

f.  The court afforded the plaintiffs 46 transcript pages to address the issues raised in their motions. Believing that Judge Bellis had now clarified any confusion regarding discovery compliance so that the next step was a hearing on the special motion to dismiss, the Jones Defendants indicated that "in our motions we suggested we'd like permission to do a little bit of discovery ourselves." (*Id.* 48:23-25).

g.  Judge Bellis' immediately replied, "I'll take that up on the papers." (*Id.* 49:1).

h.  The Jones Defendants' attempt to be heard as to the nature of the discovery sought, was met with the following exchange:

> THE COURT: I'll take that up on the papers.
>
> ATTY. PATTIS: And then also we'd like to have them be directed to find out who's financing this because --
>
> THE COURT: Right. I read -- Attorney Pattis, I read it. No right to argument on that issue. I don't need help on that issue. And I'll -- I'll issue that --
>
> ATTY. PATTIS: My client would like me to be heard today for these purposes because --
>
> THE COURT: All right. Attorney Pattis, listen to me carefully. I'm trying to be polite.
>
> ATTY. PATTIS: I always do.
>
> THE COURT: Okay. I'm going to take that issue on the papers. There's no right to argument on that issue and I will rule today on that issue for you. Okay? But you can tell your client that there's no right to argument on that issue and I'm not extending -- I'm denying your request for argument, politely.

ATTY. PATTIS: And I will politely tender his objection on the grounds that when his --

THE COURT: All right. Attorney Pattis --

ATTY. PATTIS: -- information on the business finds itself --

THE COURT: -- I think we're done.

ATTY. PATTIS: -- in the press to his economic detriment

THE COURT: We're done for the day.

(*Id.* 49-50).

14. **14 & 15 June 2019 broadcasts**. Alex Jones aired two broadcasts. The first was an emotional response to learning that he and the Jones Defendants were the victims of a cyber-attack designed to frame them for possession of child pornography. The second was an apology for his emotional outburst.

a. On 14 June 2019, defendant Alex Jones appeared in a broadcast in which he opined on the discovery compliance in the above captioned matters, specifically focusing on the discovery of unopened child pornography that was hidden in metadata attached to emails sent to the Jones Defendants from third parties. Plaintiffs specifically requested this metadata via motion and the Jones Defendants complied with the courts order to produce this data to the plaintiffs within 2 weeks, by 21 May 2019. Plaintiffs provided this data to an "electronic storage information expert" in order to review the metadata associated with approximately 58,000 emails. (Transcript, 7:9-21, Exhibit J).

b. On 4 June, after 15 days with the data, the plaintiffs' expert review discovered a single image of suspected child pornography attached to an email sent to the Jones Defendants by a third-party. (*Id.* 7:9-27).

c. On 7 June the FBI took possession of the data and immediately analyzed it for an

additional 6 days. (*Id.* 8:5-15).

d.  On 12 June, the FBI informed only the plaintiffs that the weeklong investigation uncovered an additional 11 emails containing suspected child pornography. The FBI also informed only the plaintiffs that the investigation concluded that the Jones Defendants had not opened any of the images at any time. (*Id.* 8:15-20).

e.  Plaintiffs' counsel Attorney Chris Mattei then called and informed me that the Jones Defendants had been the victims of 12 distinct acts of cyber-crime. Subsequently, the United States Attorney's Office called me. Counsel for plaintiffs were included on this call. (*Id.* 8:21-9:24).

f.  Following this call, and prior to the 14 June broadcast, I informed the Jones Defendants that as a result of discovery compliance the FBI launched a weeklong investigation into whether the Jones Defendants knowingly possessed child pornography in violation of federal law.

g.  Upon learning that they were the victims of 12 distinct acts of cyber-crime involving a child pornography email scam, ostensibly to frame and extort them, the Jones Defendants reacted. The Jones Defendants were outraged. They found the manner in which the FBI handled the investigation disconcerting. Plaintiffs' counsel, not the Jones Defendants who were the victims of the cyber-attack, were the first party informed of the outcome of the investigation. Then it was plaintiffs' counsel Attorney Chris Mattei, not a Federal Investigator or member of the FBI's Victim Services Division, that informed me about the investigation. This was especially suspect given that Attorney Mattei worked for the United States Attorney's Office from 2007 through 2015.

15

h. While all this information was coalescing in his mind, Alex Jones raised these issues in an emotionally charged stream of consciousness broadcast on 14 June 2019. The narrative began with an account of how discovery compliance resulted in an FBI investigation and ended in Mr. Jones expressing his opinion that he wanted the perpetrator of these cyber-attacks brought to justice. In the course of that narrative, Mr. Jones indicated a belief that Attorney Mattei's involvement in this entire course of events was suspicious. Attorney Mattei had argued in court to obtain metadata associated with approximately 58,000 emails. This metadata was provided to an "electronic storage information expert" that spent 15 days combing through the data to find a single image. Plaintiffs' counsel then provided this to the FBI, who spent an additional week analyzing the metadata. In the end, it was Attorney Mattei that called to inform them about the results of the investigation by the FBI, specifically that the Jones Defendants were cleared of any criminal liability. This left Alex Jones demanding to know who attacked the Jones Defendants and why Attorney Mattei played such a prominent role in the FBI's investigation.

i. The following day, on 15 June 2019, Alex Jones issued another broadcast, apologizing for his emotional response and indicating that the 14 June 2019 broadcast should not be construed as suggesting that plaintiffs' attorneys were involved in any criminal activity related to the discovery of child pornography in the metadata.

15. **18 June 2019 hearing**. Given Judge Bellis' previous willingness to entertain arguments for sanctions against the Jones Defendants without a hearing and meaningful opportunity

to be heard, the broadcasts created a perfect opportunity for the plaintiffs to resurrect their attempt to prevent the Jones Defendants from pursuing their special motion to dismiss. The plaintiffs requested time to file a motion and a hearing on the issue. Judge Bellis' response betrayed an eagerness to find additional bases to support a sanction precluding the Jones Defendants' special motion to dismiss.

    a. Plaintiffs' counsel capitalized on Alex Jones broadcast. The day prior, plaintiffs filed a motion requesting an expedited briefing schedule concerning what, if any, orders should issue in relation to the broadcast. The following day at the hearing, plaintiffs reiterated to the court that they intended to file a motion for sanctions requesting a hearing on the issue:

> It is our intention, Your Honor, to file a motion for sanctions. We will be seeking a sanction up to and including default based on Mr. Jones's conduct. We would propose to get that motion filed within a very short period of time, and we'd ask for a hearing on that motion as soon as possible.

(*Id.* 11:3-8).

    b. Judge Bellis disregarded the plaintiffs' request to (1) provide written briefs and (2) hold a meaningful hearing on the issue:

> this is the time that you're going to make your argument and you're going to tell me why sanctions should enter. And defense will argue their position and tell me why sanctions should not enter. But I did do my own research as well, and I know — I'll rule on this today."

(*Id.* 11:9-16).

    c. Plaintiffs, obviously caught off guard by Judge Bellis' decision to proceed without a meaningful opportunity to be heard, began by stating they would not address the actual broadcast: "Well, and the conduct, Your Honor, speaks for

itself. I don't need to argue what happened." (*Id.* 12:6-8). Plaintiffs were then allowed to argue, without interruption, that sanctions were appropriate because (1) of a 2016 incident that occurred at Planet Pizza in Washington, DC; (2) the prior issues with discovery compliance; and (3) the apology during the 15 June 2019 broadcast was insufficient. (*Id.* 12:6-13:19).

d.  Judge Bellis then allowed counsel for Jones Defendants to argue, requesting they begin by addressing the nature of the apology during the 15 June 2019 broadcast. Defense counsel was able to get two full sentences out before Judge Bellis challenged the characterization of the apology. (*Id.* 14:26-15:1-7).

e.  Counsel next moved to address the actual 14 June Broadcast, attempting to illustrate Alex Jones point of view upon learning of the FBI investigation into the child pornography cyber-attack against the Jones Defendants. Judge Bellis questioned whether the emotion portrayed by Alex Jones during the broadcast was genuine. (*Id.* 15:13-26).

f.  When counsel for the Jones Defendants attempted to establish the genuineness of Alex Jones' response, Judge Bellis prevented this, stating: "Well, but then you need — then you would want to put on evidence in that regard, because there's no evidence. The evidence before me are the broadcasts that you submitted. . . this is unchartered territory, Counsel. . . and despite my research, *I couldn't find a case that came close*." (*Id.* 16:1-10). (Emphasis added).

g.  From this point on, defense counsel's argument was transformed into a cross examination by Judge Bellis, directed at establishing the broadcast was not Alex Jones exercising his right to free speech under the first amendment, but rather

18

some attempt to impact the integrity of the judicial process. (*Id.* 19:25-22:19).

h. Despite previously stating that the court was not able to find a case that came close to the facts at issue, Judge Bellis then indicated the court would take a recess so counsel for Jones Defendants could familiarize themselves with a recent appellate case that held sanctions appropriate:

> So I think the way to proceed on this, if you don't mind, is we take the recess now. I think Counsel should take a look at that case. And then if he wants to have any further argument and then I can hear from the plaintiffs as well as to whether they want any further argument, and then I'll be prepared to rule.

(*Id.* 22:21-27).

i. Upon review of the case referenced by Judge Bellis, I reached the same conclusion as the Judge did earlier in the hearing, the facts and circumstances of the case the court provided for review were not even close to the facts at issue in the instant matter. Regardless, Judge Bellis attempted to shoehorn the facts of the broadcast into the reasoning of the provided case in order to justify reaching a similar holding, so the court could impose sanctions without a hearing and meaningful opportunity to be heard. (*Id.* 26:6-37:23).

j. Following plaintiffs' argument, Judge Bellis denied the Jones Defendants the opportunity to pursue their special motion to dismiss, (*Id.* 53:25-27), for the following reasons:

> i. Putting aside the fact that the documents the Jones defendants did produce contained child pornography, putting aside the fact that the Jones defendants filed with the Court a purported affidavit from Alex Jones that was not in fact signed by Alex Jones, the discovery in this case had been marked with obfuscation and delay on the part of the defendants, who, despite several court ordered deadlines as recently as yesterday, they continue in their filings to object to having to, what they call affirmatively gather and produce

documents which might help the plaintiffs make their case. (*Id.* 46:25-47:13).

ii. "I also note that the Jones defendants have been on notice from this Court both on the record and in writing in written orders that the Court would consider denying them their opportunity to pursue a special motion to dismiss if the continued noncompliance continued." (*Id.* 49:2-7).

iii. Judge Bellis next addressed the 14/15 June 2019 broadcasts. Despite having admonished counsel for the Jones Defendants earlier that an evidentiary hearing was required to characterize the broadcast, Judge Bellis stated "because I want to make a good record for appeal, I'm going to refer to certain portions of the transcript of the website." (*Id.* 50:8-10). Without an evidentiary hearing, or at the very least permitting the Jones Defendants to make a record, Judge Bellis made the following findings:

1. The 14/15 June broadcasts were "indefensible, unconscionable, despicable, and possibly criminal behavior." (*Id.* 50:1-3).

2. "Now, the transcript doesn't reflect this, but when I listened to the broadcast, I heard, I'm going to kill. Now, that's not in the transcript, but that is my read and understanding and what I heard in the broadcast." (*Id.* 50:22-26).

3. Judge Bellis went on to "reject the Jones defendants' claim that Alex Jones was enraged. . . find[ing] based upon a review of the broadcast clips that it was an intentional, calculated act of rage for his viewing audience," (*Id.* 53:8-12).

20

16. **21 June 2019 order**. Following the sanctions order, the Jones Defendants published a news report on the Infowars website reporting on the status of the case. In the comments section of that news article, the FBI found comments containing an alleged threat against Judge Bellis.

   a. After imposing a sanction against the Jones Defendants precluding their special motion to dismiss, the court entered order DN271 indicating that the Connecticut State Police forwarded a report from the FBI that Judge Bellis was the subject of threats made by individuals commenting on the Infowars website. The order indicated there was no further information regarding the alleged threat. (DN271, Exhibit K). To date the Jones Defendants are not aware of any further information regarding the nature or quality of the threat nor the identity of the author. Plaintiffs in their filings concede as much, but then attempt to use this allegation to turn Judge Bellis against the Jones Defendants. Plaintiffs conclude, without providing evidence, that "Jones turned his fire on [Judge Bellis]" insinuating the Jones Defendants were somehow responsible for getting his audience to "threaten[] the judge… after the sanctions order issued." (*Lafferty v. Jones*, Conn. Supreme Court Records & Briefs, First Term, 2019, Plaintiffs' Brief p. 31, Exhibit L).

17. **20 December 2019 Statewide Grievance Committee Grievance Complaint #19-0367 Decision.** The Statewide Grievance Committee conducted an adversarial hearing regarding the affidavit issue, *supra* at 9f. After both sides had a meaningful opportunity to be heard, the Committee concluded that my conduct "in connection with the affidavit did not rise to the level of an ethical violation," "did not violate the Rules of Professional

Conduct," and at most I made an unintentional mistake in executing the affidavit. (Exhibit M, p. 3). Accordingly, the Grievance Committee dismissed the complaint. *Id.*

18. **Appeal of Sanction Denying Defendant's Special Motion to Dismiss**. The appeal of the Court's 18 June 2019 sanction denying the Jones Defendants' special motion to dismiss stayed the proceedings in this matter for the majority of 2020.

    a. On 23 July 2020 the Connecticut Supreme Court affirmed the sanction. (Exhibit N, p. 1).

    b. On 28 July 2020 the Jones Defendants' appealed this order to the United States Supreme Court, which denied *certiorari* on 5 April 2021. (Exhibit O, p. 1)

    c. Following the denial of *certiorari*, on 14 April 2021, the above captioned matters resumed holding the pre-appeal monthly status conferences. (Transcript, 12:3-21, Exhibit P).

19. **6 May 2021 hearing.** At this hearing the Court reached back to the 22 April 2019 hearing to reiterate that in the past it had "previously referred the Jones defendants' prior counsel to the disciplinary authorities." (Transcript, 13:25-26, Exhibit Q). The Court's purpose in resurrecting this issue was purportedly because in an objection to a deposition requested by plaintiffs, counsel for the Jones Defendants cited the fact "that there was an application for a stay filed with the U.S. Supreme Court" as one of six bases in support of that objection. The Court took issue with the fact that when this objection was filed on 6 November 2020 the United States Supreme Court had, in fact, denied the request for the stay the day before and counsel for the Jones Defendants did not file a correction. (*Id.* 7:25-8:2).

a. Judge Bellis stated, in part, that

> because I do not wish to [refer the Jones defendants' counsel to the disciplinary authorities] again, I am directing counsel — and that's all counsel in this case—to review the relevant sections of the Rules of Professional Conduct. . . look at what is and what is not considered attorney misconduct under the rules. . . Rule 3.3, Candor Towards the Tribunal. All right. I was somewhat concerned at the time with the filing that suggested that there was a—the request for the stay that was pending with the United States Supreme Court, but the filing itself was filed the—after it had already been denied and no subsequent filing was ever made with the Court that the Court saw by the Jones defendants. You may all get notice from higher courts when you appeal to the US Supreme Court, but I was the last one— I would be the last one to find out, so it was incumbent upon whoever—whatever counsel made that filing to correct it because it was—it was not—it was not correct. It's that simple. . . So just—just refresh your familiarity with those sections so that as we move forward, we can hopefully avoid any—any further issues.

(*Id.* 13:24-15:18).

b. Judge Bellis did not acknowledge the 20 December 2019 Statewide Grievance Committee Grievance Complaint #19-0367 Decision dismissing her prior referral of the Jones defendants' counsel to the disciplinary authorities.

c. Counsel for the Jones Defendants attempted to inform the Court that although the Supreme Court docket noted that the application for a stay was denied on November 5, 2020—notice of that order was not received until 3:57 p.m. on Friday, November 6, 2020 after counsel had already begun Sabbath observance. On the next business day, Monday November 9, 2020, the Plaintiffs informed the Court of the denial. (*Id.* 16:3-17:6); *see* DN337 at 1 n.1.

d. In response Judge Bellis stated, in part:

> I don't want to get into a colloquy here. I said what I said. I made my ruling. I will just say in the future moving forward for your own sake that if you do, because at least with respect to the app -- the application for the stay with the US Supreme Court, what you filed with the Court on that day represented something that, in fact, was not accurate and I -- I would say it would have been incumbent upon

> you to correct what you had filed. I did learn subsequently that it wasn't correct, but I just think just as we move forward, if it's your or -- or even an innocent -- and I'm not saying it was anything but an innocent mistake, but it would be incumbent upon you to just correct that mistake because I don't want to have continued problems moving forward.

(*Id.* 17:17-18:5).

20. **Order Regarding DN 337.00 11 May 2021 Motion for Stay**. In preparing to propound discovery, counsel for the Jones Defendants discovered that Plaintiffs' counsel failed to advise the Court (1) regarding a bankruptcy issue lasting for a two-year period pertaining to one of the plaintiffs' claims in the instant matter and (2) that one of the plaintiffs passed away in 2019. DN337 at 1

a. Given the Court's 6 May 2021 admonishment—in particular the importance it placed on counsel for the Jones Defendants not correcting a filing that contained a purported misrepresentation of the status of a request for a stay that at worst lingered for a single weekend—counsel for the Jones Defendants raised these issues via a motion. DN337.

b. Ultimately the issue related to counsel for Plaintiffs' failure to disclose the death of one of the Plaintiffs caused the court to lose subject matter jurisdiction over the claims related to that Plaintiff and voided all orders entered with regard to that Plaintiff for a period of more than two years. *See* DN337; DN 337.20

c. In contrast to the importance the Court placed on making a record that counsel for the Jones Defendants may have violated Rule 3.3, Candor Towards the Tribunal, Judge Bellis took the opposite tact when confronted with possible violations by counsel for the Plaintiffs:

> Finally, with respect to the filing of this "Motion to Stay and Notice

24

of Violation of Duty of Candor," it is entirely inappropriate for counsel for the Jones defendants to invoke the Rules of Professional Conduct as a procedural weapon in this forum. The Rules are not designed to be a basis for civil liability in this or any other motion, and should not be used by counsel to obtain a tactical advantage. It is the court's obligation to supervise the attorneys who appear before it, as attorneys, as officers of the court, are continually accountable to it. Any further such usage of the Rules of Professional Conduct by counsel in filings in this civil action shall result in immediate action by the court. See Practice Book §2-45.

DN337.20

d.  Practice Book §2-45 permits a court to issue summary orders disciplining attorneys without a complaint or hearing.

21. **Order Regarding DN 394.00 6 July 2021 Motion for Sanctions for a Purported Violation of a Protective Order**. In DN 394.10 the court ordered that the Jones defendants violated a Protective Order (PO) governing the disclosure of "confidential information" elicited during a deposition. In issuing that order, the court ignored the Jones defendants' position that the Plaintiffs failed to satisfy the requirement that the party invoking the PO do so based upon "a *good faith determination by counsel* so designating to the Court *that there is good cause for the material so designated* to receive the protections of" the PO. DN. 185.00. at 2-3. (emphasis added). In its order, the Court mischaracterized the Jones defendants' position that the plaintiffs failed to meet this threshold good faith determination. DN 394.10 at 2. Rather, the Court recast the Jones defendants' argument as an attack on whether there was good cause to issue the PO itself and characterized this argument as "frightening" and concluded that the Jones Defendants' disclosure of the information at issue was "willful misconduct." DN 394.10 at 2. At no point did the Jones Defendants make the argument the Court indicated in this order. *Id.*

25

a. On February 22, 2019, the Court a entered a PO per Practice Book § 13-5, which permits a court, upon a showing of good cause, to make an order "protecting a party from annoyance, embarrassment, oppression, or undue burden or expense." The applicability of the PO to information produced by the parties is contingent upon that information falling within a protected category of information based upon "a *good faith determination by counsel* so designating to the Court *that there is good cause for the material so designated* to receive the protections of" the PO. Id. at 3-4. (emphasis added.)

b. On 1 July 2021, the parties held the first deposition of a plaintiff in this case. At the start of the deposition the plaintiffs' attorney attempted to designate the entire deposition "Highly Confidential – Attorneys Eyes Only." Plaintiffs concede that this designation occurred "at the beginning of the deposition," and therefore without any knowledge of the actual information that was ultimately elicited. Pls.' Mot. for Sanctions Based On The Jones Defendants' Violation Of The Protective Order, DN. 394.00, at 4, Jul. 6, 2021. Plaintiffs' counsel did not indicate on what basis he was able to make the required good faith determination that unknown information yet to be elicited via the deposition should be protected by the PO.

c. Accordingly, counsel for the defendants believed that plaintiffs' counsel failed to satisfy the PO's good faith determination threshold requirement. This threshold requirement could not be met because plaintiffs could not know whether the information it sought to protect would fall within the definition of confidential information contained in the PO.

26

rulings ultimately resulted in Judge Bellis depriving the Jones Defendants of any meaningful opportunity to be heard prior to the court's imposition of sanctions only magnifies this effect. Moreover, the plaintiffs have suggested that the Jones Defendants played a role in a threat made by an unknown third party against Judge Bellis. At a minimum, this accusation creates an intolerable appearance of impropriety that would cause a reasonable person to doubt Judge Bellis' impartiality and ability to fairly exercise her judicial authority.

23. I execute this affidavit for the purpose of seeking recusal by Judge Bellis and obtaining transfer of the hearing of this case to another judge.

NORMAN A. PATTIS

Signed and sworn to before me at _Media_ , _Pa_ , this _30th_ day of _Oct_ , 2021.

Notary Public

Commonwealth of Pennsylvania - Notary Seal
William Lee Cavanagh, Notary Public
Delaware County
My commission expires June 26, 2025
Commission number 1024960
Member, Pennsylvania Association of Notaries

28

```
NO:  UWY-CV18-6046437 S      :   SUPERIOR COURT
SHERLACH, WILLIAM            :   JUDICIAL DISTRICT
                                 OF FAIRFIELD
v.                          :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX, ET AL.          :   JUNE 18, 2019
```

```
NO:  UWY-CV18-6046438 S      :   SUPERIOR COURT
LAFFERTY, ERICA, ET AL.      :   JUDICIAL DISTRICT
                                 OF FAIRFIELD
v.                          :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.    :   JUNE 18, 2019
```

```
NO:  UWY-CV18-6046436 S      :   SUPERIOR COURT
SHERLACH, WILLIAM, ET AL.    :   JUDICIAL DISTRICT
                                 OF FAIRFIELD
v.                          :   AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.    :   JUNE 18, 2019
```


              BEFORE THE HONORABLE BARBARA N. BELLIS, JUDGE

A P P E A R A N C E S :
    Representing the Plaintiffs:
        ATTORNEY CHRISTOPHER MATTEI
        ATTORNEY WILLIAM BLOSS
        ATTORNEY JOSHUA KOSKOFF
        ATTORNEY MATTHEW BLUMENTHAL
        Koskoff, Koskoff & Bieder, PC
        350 Fairfield Avenue
        Bridgeport, CT  06604

    Representing the Defendants Alex Jones; Infowars, LLC; Free
    Speech Systems, LLC; Infowars Health, LLC; and Prison Planet
    TV, LLC:
        ATTORNEY ZACHARY REILAND
        ATTORNEY NORMAN PATTIS
        Pattis & Smith, LLC
        383 Orange Street
        1st Floor
        New Haven, CT  06511

    Representing the Defendant Cory Sklanka:
        ATTORNEY KRISTAN JAKIELA
        Regnier, Taylor, Curran & Eddy
        100 Pearl Street
        14th Floor
        Hartford, CT  06103

    Representing the Defendant Midas Resources, Inc.:
        ATTORNEY STEPHEN BROWN
        Wilson Elser Moskowitz Edelman & Dicker
        1010 Washington Boulevard
        Stamford, CT  06901


                            Recorded By:
                            Colleen Birney
                            Transcribed By:
                            Colleen Birney
                            Court Recording Monitor
                            1061 Main Street
                            Bridgeport, CT  06604
```

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
969 of 1044

46

1    litigation, the parties before it, and the processes

2    before it.  This exceeds any kind of sanctionable

3    conduct that the Connecticut Courts have ever

4    considered.  And really exceeds sanctionable conduct

5    in some of the federal cases that we've cited to Your

6    Honor.

7          So I think unless Your Honor has any questions,

8    I'll --

9          THE COURT:  Thank you, Attorney Bloss.  Did you

10   want to respond briefly, Counsel, or are you all set?

11         ATTY. REILAND:  Your Honor, we'll -- we'll stand

12   on Attorney Pattis's argument.  I would just say, I

13   guess reasonable minds could disagree, because of all

14   the sanctions and all the, hate to say, grandstanding

15   that we're seeing here reading from the transcript,

16   I'm not seeing any threats to Attorney Mattei here.

17   You know, it's -- it's not great language.  It's bad

18   language in some points.  But it's not an apparent

19   threat.  So thank you, Judge.

20         THE COURT:  So I'll take a two-minute recess.

21         **(THE COURT RECESSED AND RETURNED WITH THE**

22   **FOLLOWING)**

23         THE COURT:  All right.  So I'm going to start

24   with the discovery issues.

25         Putting aside the fact that the documents the

26   Jones defendants did produce contained child

27   pornography, putting aside the fact that the Jones

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg. 970 of 1044

47

1        defendants filed with the Court a purported affidavit

2        from Alex Jones that was not in fact signed by Alex

3        Jones, the discovery in this case has been marked

4        with obfuscation and delay on the part of the

5        defendants, who, despite several Court-ordered

6        deadlines as recently as yesterday, they continue in

7        their filings to object to having to, what they call

8        affirmatively gather and produce documents which

9        might help the plaintiffs make their case.  Despite

10       over approximately a dozen discovery status

11       conferences and several Court-ordered discovery

12       deadlines, the Jones defendants have still not fully

13       and fairly complied with their discovery obligations.

14            By way of one example, on June 10th, counsel for

15       the Jones defendants stated in their filing that Alex

16       Jones' cellphone had only been searched for emails,

17       not for text messages or other data.  In their June

18       17 filing, defendants still try to argue with respect

19       to the text messages that there is little to no

20       personal nexus between the text messages and the

21       litigation, and that the plaintiffs are simply prying

22       into the Alex Jones defendants' personal affairs.

23       But the discovery objections were ruled on by the

24       Court months ago and the defendants still have not

25       fully and fairly complied.

26            Also, as another example, the Google Analytics

27       data was ordered to be produced.  And this is a

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg. 971 of 1044

48

1     Google Analytics account that had to be created and

2     set up by and utilized, according to the testimony,

3     by some of the Jones defendants.  Only a 35-page

4     report was produced.  In their June 17 filing, the

5     Jones defendants apparently say that they don't

6     possess the data themselves and they should not have

7     to get it from Google because Google holds Alex Jones

8     in contempt.  And anything that Google generated

9     would be, and I quote, inherently unreliable,

10    unquote.  And again, the Jones defendants miss the

11    mark.  They were ordered to produce that data.

12         Our rules of practice require a party to produce

13    materials and information, quote, within their

14    knowledge, possession, or power; and it is clearly

15    within the power of the Jones defendants to obtain

16    the information from Google if, as they claim, they

17    don't possess it themselves.  So their objection is

18    too late and their failure to fully and fairly comply

19    is inexcusable.

20         So in short, we've held approximately a dozen

21    discovery status conferences.  The Court's entered

22    discovery deadlines, extended discovery deadlines,

23    and discovery deadlines have been disregarded by the

24    Jones defendants, who continue to object to their

25    discovery and failed to produce that which is within

26    their knowledge, possession, or power to obtain.  And

27    again, among the documents that they did produce

22-01021-hcm Doc#1-10 Filed 04/18/22 Entered 04/18/22 12:34:52 Exhibit B contd. Pg 972 of 1044

49

1    contained images of child pornography.

2         I also note that the Jones defendants have been

3    on notice from this Court both on the record and in

4    writing in written orders that the Court would

5    consider denying them their opportunity to pursue a

6    special motion to dismiss if the continued

7    noncompliance continued.

8         Now with respect to the plaintiffs' request for

9    immediate review and the Jones defendants' objections

10   thereto, as I've said, I've reviewed the -- both

11   broadcasts several times.  The law is clear in

12   Connecticut and elsewhere, for that matter, that the

13   Court has authority to address out-of-court bad-faith

14   litigation misconduct where there is a claim that a

15   party harassed or threatened or sought to intimidate

16   counsel on the other side.  And indeed, the Court has

17   the obligation to ensure the integrity of the

18   judicial process and functioning of the Court.

19        So if Mr. Jones truly believed that Attorney

20   Mattei or anyone else in the Koskoff firm planted

21   child pornography trying to frame him, the proper

22   course of action would be to contact the authorities

23   and/or to have your attorney file the appropriate

24   motions in the existing case.  Just by way as an

25   example, the Jones defendants here could have filed a

26   motion asking that the lawsuits be dismissed for that

27   reason.

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
973 of 1044

50

1        What is not appropriate, what is indefensible,

2    unconscionable, despicable, and possibly criminal

3    behavior is to accuse opposing counsel, through a

4    broadcast, no less, of planting child pornography,

5    which is a serious felony.  And to continue with the

6    accusations in a tirade or rant for approximately 20

7    minutes or so.

8        Now, because I want to make a good record for

9    appeal, I'm going to refer to certain portions of the

10   transcript of the website.  And I would note that Mr.

11   Jones refers to Attorney Mattei as a Democratic-

12   appointed US attorney, holds up on the camera

13   Attorney Mattei's Wikipedia page which indicates that

14   he is a Democrat, and puts the camera on the website

15   page, which looks like it's from the law firm.

16       Alex Jones states: what a nice group of

17   Democrats.  How surprising, what nice people.  Chris

18   Mattei, Chris Mattei.  Let's zoom in on Chris Mattei.

19    Oh, nice, little Chris Mattei.  What a good

20   American.  What a good boy.  You'll think you'll put

21   me on.

22       Now, the transcript doesn't reflect this, but

23   when I listened to the broadcast, I heard, I'm going

24   to kill.  Now, that's not in the transcript, but that

25   is my read and understanding and what I heard in the

26   broadcast.

27       He continues to say: anyways, I'm done.  Total

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg 974 of 1044

51

1  war.  You want it, you got it.  I'm not into kids

2  like your Democratic Party, you cocksuckers, so get

3  ready.

4      And during this particular tirade, he slammed

5  his hand on Attorney Mattei's picture, which was on

6  the camera at that point.

7      He continues on shortly thereafter: the point

8  is, I'm not putting up with these guys anymore, man,

9  and their behavior because I'm not an idiot.  They

10  literally went right in there and found this hidden

11  stuff.  Oh, my god, oh, my god, and they're my

12  friends.  We want to protect you now, Alex.  Oh,

13  you're not going to get into trouble for what we

14  found.  F you, man, F you to hell.  I pray God, not

15  anybody else, God visit vengeance upon you in the

16  name of Jesus Christ and all the saints.  I pray for

17  divine intervention against the powers of Satan.

18      I literally would never have sex with children.

19  I don't like having sex with children.  I would

20  never have sex with children.  I am not a Democrat.

21  I am not a Liberal.  I do not cut children's genitals

22  off like the left does.

23      Further on, referring to the person who sent the

24  child porn, he says: I wonder who the person of

25  interest is.  Continues to say: oh, no.  Attorney

26  Pattis says: look, are you showing Chris Mattei's

27  photograph on here; and the record should reflect

22-01021-hcm  Doc#1-10  Filed 04/18/22  Entered 04/18/22 12:34:52  Exhibit B contd. Pg
975 of 1044

52

1    that when Alex Jones said I wonder who the person of

2    interest is, Attorney Mattei's photo was on the

3    camera.  Again, referring to who planted the child

4    pornography.  Then Alex Jones says: oh, no, that was

5    an accidental cut.  He's a nice Obama boy.  He's a

6    good -- then Attorney Pattis cuts him off.  Attorney

7    -- Alex Jones goes on to say: he's a white Jew-boy

8    that thinks he owns America.

9         Later on in the broadcast, Alex Jones says,

10    quote, the bounty is out, bitches.  And you know your

11    feds, they're going to know you did it.  They're

12    going to get your ass you little dirt bag.  One

13    million, bitch, it's out on your ass.

14         Shortly thereafter, he says: a million dollars

15    is after them.  So I bet you'll sleep real good

16    tonight, little jerk, because your own buddies are

17    going to turn you in and you're going to go to

18    prison, you little white Jew-boy jerk-off son of a

19    bitch.  I mean, I can't handle them.  They want more,

20    they're going to get more.  I am sick of these

21    people, a bunch of chicken-craps that have taken this

22    country over that want to attack real Americans.

23         And those are just portions of the transcript

24    that the Court relied on.  The Court has no doubt

25    that Alex Jones was accusing Plaintiffs' Counsel of

26    planting the child pornography.

27         Again, these are just a few examples where Jones

1        either directly harasses or intimidates Attorney

2        Mattei, repeatedly accuses Plaintiffs' Counsel of

3        requesting the metadata so they could plant the child

4        pornography, continues to call him a bitch, a sweet

5        little cupcake, a sack of filth, tells him to go to

6        hell, and the rant or tirade continues with frequent

7        declarations of war against Plaintiffs' Counsel.

8            I reject the Jones defendants' claim that Alex

9        Jones was enraged.  I disagree with Attorney Pattis's

10       representation here.  I find based upon a review of

11       the broadcast clips that it was an intentional,

12       calculated act of rage for his viewing audience.  So

13       -- and I note as Plaintiffs' Counsel pointed out,

14       that Alex Jones was the one who publically brought

15       the existence of the child pornography to light on

16       his Infowars show.

17           But putting that aside, putting aside whether it

18       was -- he was in a real rage or whether he was acting

19       out rage, it doesn't really matter for the purposes

20       of the discussion whether he was truly enraged or

21       not, because the 20-minute deliberate tirade and

22       harassment and intimidation against Attorney Mattei

23       and his firm is unacceptable and sanctionable.  And

24       the Court will sanction here.

25           So for all these reasons, the Court is denying

26       the Alex Jones defendants the opportunity to pursue

27       their special motions to dismiss and will award

54

1     attorney's fees upon further hearing and the filing

2     of affidavits regarding attorney's fees.  I would

3     note that the attorney's fees will be related only to

4     the conduct relating to the child pornography issue

5     and not for the discovery failures.

6         At this point, I decline to default the Alex

7     Jones defendants, but I will -- I don't know how

8     clearly I can say this.  As this case progresses, and

9     we will get today before you leave a trial date in

10     the case now and a scheduling order.  As the

11     discovery in this case progresses, if there is

12     continued obfuscation and delay and tactics like I've

13     seen up to this point, I will not hesitate after a

14     hearing and an opportunity to be heard to default the

15     Alex Jones defendants if they from this point forward

16     continue with their behavior with respect to

17     discovery.

18         So I'm going to call other matters now.  I'm

19     going to ask that you -- that there not be any

20     conversations in the courtroom because I do have

21     other matters to call.  I'm going to ask Counsel to

22     work on a scheduling order, pick a trial date.  I am

23     going to need to see it before you leave.  So if you

24     could maybe do that in another room, and then I'll

25     come back on the record for that.

26         **(THE COURT PROCEEDED WITH OTHER MATTERS AND**

27     **RETURNED WITH THE FOLLOWING)**

55

1      THE COURT:  Were you able to complete a

2  scheduling order and pick a trial date?

3      ATTY. MATTEI:  Yes, Your Honor, we have.  The

4  completed scheduling order here is signed by Counsel

5  --

6      THE COURT:  Can I take a --

7      ATTY. MATTEI:  -- with a proposed trial date of

8  November, 2020.

9      THE COURT:  Okay.  Can I take a look at it?  Do

10  you mind?

11      ATTY. MATTEI:  Yes.

12      THE COURT:  Thank you very much.  What about

13  summary judgment motions?

14      ATTY. MATTEI:  Your Honor, you'll note that we

15  left that blank because certain defendants in the

16  case still have their Anti-SLAPP motion pending.  And

17  so we thought it best to leave that date open at

18  least for now.  Attorney Brown and Attorney Jakiela

19  obviously both want to reserve their right, if

20  necessary, to file a motion for summary judgment.

21  But because they still have motions to dismiss

22  pending, the timing of that was uncertain.

23      THE COURT:  All right.  And the Court Officer in

24  Waterbury is on vacation this week anyway.  So I'm

25  not -- unlike Bridgeport where we can put 20 cases

26  down for trial in the same day, I'm not sure that

27  they'll be able to accommodate this exact trial date.

56

1    So I'll give this over to him.  At some point, we're

2    going to need summary judgment deadlines, though,

3    because what I can't have is the summary judgments

4    argued, you know, two weeks before the trial date.  I

5    definitely want the 120 days.

6         ATTY. MATTEI:  Correct, Your Honor.

7         THE COURT:  Okay.  Anything else today?

8         ATTY. MATTEI:  No.  Thank you very much, Your

9    Honor.

10        ATTY. REILAND:  No, Your Honor.

11        THE COURT:  Thank you, Counsel.

12

13                    * * * * * *

14        **(END OF TRANSCRIPT)**

15

16

17

18

19

20

21

22

23

24

25

26

27

```
NO:  UWY-CV18-6046437 S        :  SUPERIOR COURT
SHERLACH, WILLIAM              :  JUDICIAL DISTRICT
                                  OF FAIRFIELD
v.                             :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX, ET AL.            :  JUNE 18, 2019
```

```
NO:  UWY-CV18-6046438 S        :  SUPERIOR COURT
LAFFERTY, ERICA, ET AL.        :  JUDICIAL DISTRICT
                                  OF FAIRFIELD
v.                             :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.      :  JUNE 18, 2019
```

```
NO:  UWY-CV18-6046436 S        :  SUPERIOR COURT
SHERLACH, WILLIAM, ET AL.      :  JUDICIAL DISTRICT
                                  OF FAIRFIELD
v.                             :  AT BRIDGEPORT, CONNECTICUT
JONES, ALEX EMRIC, ET AL.      :  JUNE 18, 2019
```

C E R T I F I C A T I O N

        I hereby certify the foregoing pages are a true and
correct transcription of the audio recording of the above-
referenced case, heard in Superior Court, Judicial District of
Fairfield, at Bridgeport, Connecticut, before the Honorable
Barbara N. Bellis, Judge, on the 18th day of June, 2019.

        Dated this 19th day of June, 2019, in Bridgeport,
Connecticut.

                                    _____
                                    Colleen Birney
                                    Court Recording Monitor

| NO. X06-UWY-CV-18-6046436 S : | SUPERIOR COURT |
|---|---|
| ERICA LAFFERTY, ET AL : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 19, 2021 |
| NO. X06-UWY-CV-18-6046437 S : | SUPERIOR COURT |
| WILLIAM SHERLACH : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 19, 2021 |
| NO. X06-UWY-CV-18-6046438 S : | SUPERIOR COURT |
| WILLIAM SHERLACH, ET AL : | COMPLEX LITIGATION DOCKET |
| V. : | AT WATERBURY |
| ALEX EMRIC JONES, ET AL : | OCTOBER 19, 2021 |

## MOTION TO RECUSE JUDGE BELLIS

Defendants Alex Jones, Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC, through their counsel, move under Practice Book §§ 1-22, 1-23, and Conn. Gen. Stat. § 51-183 to disqualify Judge Barbara Bellis from hearing this case. The record in the above-captioned matters is rife with the appearance of judicial impropriety. The evolution of the case, including a threat made against Judge Bellis by an unknown third-party that the plaintiffs somehow attribute to Defendants, and the series of subsequent comments and rulings, would lead a reasonable person knowing all the circumstances to question Judge Bellis's impartiality.

Judge Bellis has employed a shifting standard for what constitutes specific, limited, and relevant discovery permitted under Conn. Gen. Stat. §52-196 and the Practice Book. This left Defendants victim to the plaintiffs' tireless campaign to expand the scope of the Court's discovery orders and to attempt to win on technicalities.

A reasonable person observing Defendants scramble to satisfy the shifting discovery standard and arbitrary threshold requirements for the special motion to dismiss and subsequent discovery, only to be ambushed by judicial whim and caprice, would question Judge Bellis's

1

impartiality in this proceeding. Although the decision terminating the anti-SLAPP motion was upheld by the Connecticut Supreme Court, it must be viewed as part of a course of conduct by a jurist who wound up presiding over multiple Sandy Hook cases involving the same nominal plaintiffs and their lawfirm.

Following the imposition of this sanction, Judge Bellis's rulings continued to demonstrate a high degree of antagonism towards Defendants. For example, at the first status conference following the remand of this action, Judge Bellis reminded counsel for Defendants that the Court referred Defendants' other counsel to the grievance committee (having previously given a pass to Plaintiffs' counsel's unethical pre-trial publicity). Despite being corrected factually, Judge Bellis erroneously claimed that Defendants may have violated Rule 3.3 of the Rules of Professional Conduct, "Candor Towards the Tribunal." The handling of this issue creates the appearance that Judge Bellis has prejudged the truthfulness of Defendants and their counsel. The insidious nature of this prejudice now pervades all aspects of this case, creating the appearance of impropriety that would cause a reasonable person to question Judge Bellis's impartiality. Notably, despite placing such weight on Rule 3.3, Judge Bellis, when apprised of a clear violation of that rule by Plaintiffs' counsel newly stated she did not want the parties to advise of violations. And, oddly, sanctions orders have issued against all moving defendants, even when several of them had nothing to do with the alleged misconduct. A reasonable person would believe Judge Bellis has taken sides.

## FACTS

In support of this motion, the undersigned counsel for Defendants submits attached herewith his affidavit setting forth the facts that show grounds for disqualification. The record in this matter is complex and varied, spanning multiple counsel and, at times, weekly status hearings. The attached affidavit sets out the evolution of issues creating the appearance of judicial impropriety. That chronology will not be rehashed here, but summarized, in an effort to prevent Defendants from

becoming the metaphorical frog boiling in a vat of impropriety.

## I.    Alleged Third-Party Threat Against Judge Bellis

On 21 June 2019 Judge Bellis issued order DN271. That order indicated that the Connecticut

State Police notified the court of an ongoing federal investigation related to threatening comments

made by unknown third-party/ies about Judge Bellis. The threats were posted to the comments

section of a news article published on Defendant Infowars website. Affidavit, para. 16a. The ordered

contained no amplifying information. *Id*. The order indicated that Judge Bellis was not aware of any

further information regarding the threat and therefore did not plan to take any further action. *Id*.

While there is no reason to doubt that Judge Bellis received limited information from the

Connecticut State Police about the ongoing federal investigation, the assertion that the court was

not aware of any further information regarding the "threat" is inaccurate.

Since its inception, this matter is replete with plaintiffs' accusations that every time

Defendants make a statement about any matter in public discourse it is in fact a "call to arms"

designed to "activate" a network of conspiracy theorists. *See* Compl. ¶¶7, 12-16, 40-57. For

example, plaintiffs' complaint and subsequent arguments on the record refer *ad nauseum* to the

actions of a third-party, not related to Defendants. The story goes that, after Defendants ran a news

report on the infamous "Pizzagate" conspiracy theory, a third-party traveled to Washington DC and

fired 3 rounds from a rifle into a pizzeria. Accordingly, plaintiffs argue, Defendants are responsible

for the independent actions of this third-party. *Palsgraf* aside, plaintiffs trot out this *post hoc* fallacy

anytime Defendants exercise their First Amendment right to express an opinion. *See e.g.*, Affidavit,

para. 15c.

The threat Judge Bellis referenced in order DN271, and its ramifications for this case, lay

dormant until the plaintiffs referenced it in a pleading dated 19 August 2019 before the Connecticut

Supreme Court. That pleading addressed whether Judge Bellis abused her discretion by ordering a

sanction against Defendants for statements made during a broadcast that the plaintiffs argued were a "true threat" against plaintiffs' counsel Chris Mattei. That sanction precluded Defendants' ability to take a special interest appeal under Connecticut's anti-SLAPP statute, Conn. Gen. Stat. § 52-196a. Affidavit, para. 15a-j. Prior to this filing, neither party addressed the issue of the third-party's threat to Judge Bellis. Affidavit, para. 16a.

The plaintiffs' reference to the Judge Bellis threat consists of a single sentence and accompanying footnote. Plaintiff's claim, "Jones' audience threatened the judge in this case after the sanctions order issued and Jones turned his fire on her." *Id.* The accompanying footnote went on to claim:

> [a]fter the trial court sanctioned him, Jones posted a broadcast titled "Judicial Tyranny? Judge Says Criticism Of Democrat Lawyers Forbidden." Shortly after that broadcast was posted, the court filed a notice stating that it had been "contacted by the Connecticut State Police who were reportedly contacted by the FBI regarding threats against the undersigned made by individuals on the defendant Infowars website." Jones then apparently removed the broadcast; it is no longer accessible via the Infowars website.

*Id.* at n.22. This text appears in section III.C of the plaintiffs' brief[1]. Section III addressed whether the trial court abused its discretion in considering the broadcast by Alex Jones as a basis for the above-mentioned sanction. Here, plaintiffs argued that the speech in question was a true and immediate threat of violence, a call to his audience to engage in violent acts directed at plaintiffs' counsel.

In their pleading, the plaintiffs provides a more robust version of the argument that they presented orally during the 18 June 2019 hearing regarding sanctions,

> Jones' audience has a history; he knows it, and so does anyone who reads the news. The trial court recognized that Jones' broadcast was meant to activate his audience: "it was an intentional, calculated act of rage for his viewing audience.". . . That audience has threatened and stalked Sandy Hook family members and acted on

---

[1] The entirety of this section can be found at *Lafferty v. Jones*, Conn. Supreme Court Records & Briefs, First Term, 2019, Plaintiffs' Brief pp. 28-33.

4

> Jones' promotion of Pizzagate to shoot up the Comet Ping Pong pizza restaurant in Washington D.C. Jones tapped into precisely that history. He called on "the patriots that are left, and 4chan and 8chan, and anonymous," and he summoned an attack: "I summon all of it against the enemy." That Jones' threat of violence says it is to be effectuated by others makes it no less a threat.

*Lafferty v. Jones*, Conn. Supreme Court Records & Briefs, First Term, 2019, Plaintiffs' Brief p. 30. (Citations omitted). Plaintiffs' pleading continues by citing to a "recently issued" FBI "Field Intelligence Bulletin." This bulletin concludes generally that broadcasts and news reports that "[are] anti-government, [are] identity based, and [pertain to] fringe political conspiracy theories *very likely* motivate some domestic extremists, wholly or in part, to commit criminal and sometimes violent activity." *Id.* (emphasis added). Plaintiffs' pleadings note that the term "'Very likely' is a term of art used by the FBI to mean an 80-95% chance." *Id.* at 31. The pleading goes on to claim that broadcasts and news reports of this type,

> very likely encourage the targeting of specific people, places, and organizations, thereby increasing the risk of extremist violence against such targets.... This targeting occurs when promoters of conspiracy theories, claiming to act as 'researchers' or 'investigators,' single out people, businesses, or groups which they falsely accuse of being involved in the imagined scheme. These targets are then subjected to harassment campaigns and threats by supporters of the theory, and become vulnerable to violence or other dangerous acts.

*Id.*

It is in this context and against this backdrop that the plaintiffs insert the above quoted reference to order DN271. The not-so-subtle implication of the *post hoc* fallacy employed in the plaintiffs' pleadings is clear. Just as the plaintiffs allege the broadcast mentioning Attorney Mattei was a call to Alex Jones' audience to engage in violent acts against plaintiffs' counsel, so too are the plaintiffs alleging that the news article mentioning Judge Bellis was a call to incite violence against the court. Plaintiffs conclude, without providing evidence, that "Jones turned his fire on [Judge Bellis]" insinuating Defendants were somehow responsible for getting his audience to "threaten[] the judge... after the sanctions order issued." Affidavit, para. 16a.

Judge Bellis may have been careful to author order DN271 in a seemingly neutral and detached way—the court was made aware of an FBI investigation "regarding threats against the undersigned by individuals on the defendant Infowars website." Affidavit, para. 16a. However, the plaintiffs' accusation removes any shroud of neutrality, raising the specter that Alex Jones had a hand in the threat made against Judge Bellis. Despite offering no evidence to support this argument, from the record it appears that Judge Bellis relied on it, at least in part, to conclude that broadcast was "indefensible, unconscionable, despicable, and possibly criminal behavior." Affidavit, para. 15jiii1.

## II.  Evolution Of Discovery Compliance, Sanctions, and Defendants' Opportunity to Pursue their Special Motion to Dismiss

Conn. Gen. Stat. §52-196 protects defendants facing certain types of lawsuits by allowing them an opportunity to file a special motion to dismiss. While the special motion to dismiss is pending, all discovery is stayed, unless the court "order[s] specified and limited discovery relevant to the special motion to dismiss." Conn. Gen. Stat. §52-196(d),  Initially, Judge Bellis left the parties to work discovery issues out themselves. Unremarkably, plaintiffs sought unlimited discovery and Defendants the opposite. Affidavit, para. 4. Unable to reach an agreement, in order DN148, Judge Bellis overruled all but two of Defendants' discovery objections without further explanation. Although interlocutory appeal of this order was not permitted, that denial is not an appellate endorsement of the breadth of discovery permitted.  Subsequently, Defendants agreed to comply with a discovery deadline of 23 February 2019 at the risk of facing an even shorter deadline. *Id.* Defendants sought an extension due to an inability to meet that deadline. Plaintiffs immediately sought sanctions in the form of an order precluding Defendants from having their special motion to dismiss heard.

From 13 March to 10 April 2019, Defendants' inability to comply with the broad discovery

6

order was the sole basis for a potential sanction precluding the special motion to dismiss. Affidavit,

para. 6-8. On 13 March, Defendants found themselves without counsel familiar with the record and

pleadings, due in part to the surprising denial of a *pro hac vice* application of Defendants' original

counsel of choice, a denial that curiously only occurred in this and the Texas Sandy Hook cases.

Affidavit, para. 6ai. Although that attorney had been the subject of then-recent discipline, none of

it was for litigation conduct, and numerous courts (including Hon. Daniel Klau in Connecticut) have

seen fit to admit him *pro hac vice* or as an outright member of the bar since.[2]

By 22 March, Pattis & Smith, LLC was sole counsel for Defendants and attempting to

comply with discovery. At that time, Defendants were still facing the threat of the sanction. Judge

Bellis decided to stay her decision on the preclusion sanction, based on representations made by

Defendants regarding (1) the impact changes in prior counsel had on discovery compliance and (2)

a plan for getting in compliance in short order. Affidavit, para. 7c-d.

By 26 March, Defendants made substantial steps in complying with discovery. Affidavit,

para. 8. Judge Bellis, recognizing this, stated the court would take a week to decide the sanctions

issue and that any material produced prior to that decision would be considered as to compliance.

Affidavit, para. 8c. Opposing counsel affirmatively agreed with this course of action. Affidavit,

para. 8d.

By 10 April, with regard to the sanction, Judge Bellis stated "the issue at this point for me

is whether there's been substantial good faith compliance or not such that the defendant should be

allowed to pursue their special motion to dismiss." Affidavit, para. 9a. "I'm not looking at this point

to go through each one individually and address whether—whether every single document has been

---

[2] The only other judge to deny him *pro hac vice* admission is the Texas judge presiding over similar Sandy Hook-related matters, despite the Texas Supreme Court having previously permitted him to appear *pro hac vice*. That only the trial court judges overseeing Sandy Hook matters would deprive Defendants of their counsel of choice plays into the reasonable person believing those judges are not impartial.

7

produced. . . I'm pushed at this point trying to figure out whether there's been finally an—an effort at meeting the discovery obligations." *Id*. At this hearing, Judge Bellis stated multiple times that Defendants substantially complied with the discovery orders. Affidavit, para. 9c-e. In fact, Judge Bellis expressed this view so strongly that the plaintiffs' conceded "it's apparent from the Court's comments that the Court is satisfied there is at least substantial compliance." Affidavit, para. 9e.

Despite clearly finding Defendants in substantial compliance with the ordered discovery, Judge Bellis did not address the sanction issue at that time. Rather, plaintiffs raised an issue involving the signature on a discovery related affidavit. Affidavit, para. 9f. Defendants informed the court that an affidavit bearing Alex Jones signature and indicating that signature was made in New Haven was, in fact not signed by Alex Jones. Instead, it was signed in New Haven by an authorized representative after speaking with Alex Jones telephonically. Affidavit, para. 9fii. Thereupon, she ordered a separate hearing to resolve this issue and *sua sponte* incorporated this issue as a potential second basis for a sanction preventing Defendants from having their special motion to dismiss heard:

> I am going to have a hearing on that affidavit issue. And I don't think there's any harm in proceeding. I mean, I think this is *substantial compliance* but until I deal with that affidavit issue, I'm not — I'm not going to rule on — I'll take it under advisement; the motion for reconsideration and the motion for sanctions. But I'm going to have the hearing on the affidavit first.

Affidavit, para. 9fvii. (emphasis added).

By the following appearance, the attorney for Defendants already self-referred the matter to the Grievance Committee and filed a corrected affidavit. Affidavit, para. 10b. Despite this, Judge Bellis made a second referral and then sought the plaintiffs' input on what sanctions should enter against Defendants. Affidavit, para. 10c. Plaintiffs' reaction captured their surprise at Judge Bellis's inquiry,

> we came here today believing that this issue was one between Counsel and the

8

> Court, frankly. . . we just don't know enough about the circumstances under which that affidavit was made to know whether Mr. Jones's role. . . based on what we know right now, we weren't prepared to argue that.

Affidavit, para. 10d. Judge Bellis prodded the plaintiffs to take a position. Affidavit, para. 10e. The

plaintiffs declined and then Judge Bellis ruled "[a]ll right. Then in light of that, I am satisfied with

not taking any further action." Affidavit, para. 10e. Ultimately, on 20 December 2019, the Grievance

Committee dismissed the complaint related to the affidavit issue, finding it to be a mistake that did

not rise to the level of an ethical violation or violate the Rules of Professional Responsibility.

Affidavit, para. 17.

> At the next hearing, on 7 May, Judge Bellis began by stating:

> I do want to just state for the record what is probably clear to everyone at this point. I had said a few times that I thought that there was substantial enough compliance. So in effect I have really extended --had extended the deadlines for the defendant to comply. So that would be my ruling, just for the record, on the issue of the additional time to comply. I understand it's not necessarily 100 percent complete compliance, but I think *I've seen enough of it at this point to afford the defendants the opportunity to pursue their special motion to dismiss.*

Affidavit, para. 11a. (emphasis added). Plaintiffs continued to raise discovery issues, the majority

of which did not affect Judge Bellis's decision to allow Defendants to pursue the special motion to

dismiss. Affidavit, para. 11b. However, this changed when plaintiffs represented to Judge Bellis

that Defendants had not produced Alex Jones' signed interrogatory responses. Judge Bellis, without

fully comprehending that the plaintiffs were referring to an early draft of signed interrogatory

responses, immediately responded by saying "this is news to me. So here's what I would say on that.

*I now retract my prior comments that there has been substantial compliance, good-faith, substantial*

*compliance*." Affidavit, para. 11d. (emphasis added). Despite ultimately holding that the plaintiffs

were not entitled to discovery of the draft interrogatory responses, Judge Bellis took no steps to

clarify what ruling stood with regard to whether there had been substantial enough compliance to

afford the defendants the opportunity to pursue their special motion to dismiss. Affidavit, para. 11e.

The confusion arising from Judge Bellis's contradictory statements at the 7 May hearing appeared to be resolved by 5 June. At that hearing, plaintiffs continued to raise discovery compliance issues. Affidavit, para. 13a-d. In total, these issues covered 46 transcript pages. Affidavit, para.13f. At no time did Judge Bellis indicate that any of the issues raised demonstrated that Defendants were not in substantial compliance with the discovery ordered. For example, the plaintiffs took issue with deposition testimony regarding the manner in which Defendants searched for "business marketing plans." In response, Judge Bellis ruled that

> unless you have some, you know, a good faith basis and some evidence that in fact the documents do exist, I think that you have to be satisfied with the answers under oath. And no such documents exist is a proper response. . . *This is just full and fair compliance*. And sometimes the answer is going to be it doesn't exist.

Affidavit, para. 13d-e. (emphasis added).

With discovery compliance apparently settled, and believing the next step was litigating the special motion to dismiss, Defendants, requested permission from the court to obtain discovery from the plaintiffs, stating "in our motions we suggested we'd like permission to do a little bit of discovery ourselves." Affidavit, para. 13f. Judge Bellis immediately responded "I'll take that up on the papers" and attempted to silence Defendants. Affidavit, para. 13g-h. When Defendants objected, Judge Bellis terminated the hearing. *Id*.

Following the 5 June hearing, plaintiffs' counsel informed Defendants that they had been the victim of 12 distinct acts of cyber-crime. Affidavit, para. 14e. An unidentified third-party or parties sent emails to Defendants with attachments hiding child pornography. Affidavit, para. 14b-d. The child pornography was embedded in email metadata demanded by the plaintiffs and ordered to be produced within 14 days. Affidavit, para. 14a. Initially, only a single image was located after an "electronic storage information expert" retained by the plaintiffs scoured the metadata of approximately 58,000 emails for over 15 days. Affidavit, para. 14a-b. Based on this, plaintiffs then

provided the data to the FBI, who immediately spent an additional 6 days combing through the metadata, finding 11 additional hidden images of child pornography. Affidavit, para. 14c-d. Once the FBI and DOJ concluded their investigation, they informed plaintiffs' counsel of the results and then plaintiffs' counsel contacted counsel for Defendants. Affidavit, para. 14e.

When Defendants discovered a third-party or parties attempted to frame them for possession of child pornography they were understandably enraged. Affidavit, para. 14g-h. The manner in which they were made aware of this information was equally enraging. *Id.* Being told by a non-law enforcement entity that you are the victim of 12 distinct acts of cyber-crime involving a child pornography email scam, ostensibly to frame and extort you, is unorthodox as the FBI/DOJ have a Victim Services Division specifically dedicated to liaising with crime victims. Affidavit, para. 14g. While all this information was coalescing in his mind, Alex Jones raised these issues in an emotionally charged stream of consciousness broadcast on 14 June 2019. In this broadcast, Alex Jones expressed his opinion that the perpetrator(s) of these cyber-attacks should be brought to justice and that Attorney Mattei's involvement in this entire course of events was suspicious. Affidavit, para. 14h. The following day, on 15 June 2019, Alex Jones issued another broadcast, apologizing for his emotional response and indicating that the 14 June 2019 broadcast should not be construed as suggesting that plaintiffs' attorneys were involved in any criminal activity related to the discovery of child pornography in the metadata. Affidavit, para. 14i.

At the 18 June hearing, plaintiffs attempted to capitalize on these broadcasts, requesting the court review a transcript of the 14 June Broadcast. Affidavit, para. 15a. At that hearing the plaintiffs indicated that they intended to file a written brief requesting a hearing regarding what, if any, sanctions were appropriate. *Id.* Judge Bellis declined the plaintiffs request to (1) brief the issue and (2) have a meaningful hearing, indicating that the court would rule that day on whether sanctions should enter against Defendants because of the broadcast. Affidavit, para. 15b.

11

Plaintiffs, citing no caselaw and explicitly choosing to not discuss the actual content of the broadcast, argued sanctions were appropriate based on (1) "Pizzagate;" (2) the prior issues with discovery compliance; and (3) their assertion that the apology during the 15 June 2019 broadcast was insufficient. Affidavit, para. 15c. Judge Bellis then turned to Defendants, interrupting their defense counsel two sentences into their argument. Affidavit, para. 15d. Judge Bellis challenged Defendants' characterization of both the apology and the initial broadcasts. Affidavit, para. 15d-e. Counsel for Defendants attempted to respond to this challenge, only to be told "[w]ell, but then you need — then you would want to put on evidence in that regard, because there's no evidence. The evidence before me are the broadcasts that you submitted. . . this is unchartered territory, Counsel. . . and despite my research, *I couldn't find a case that came close*." Affidavit, para. 15f. (emphasis added). The Court was already engaged in research without notice or affording Defendants the opportunity to do the same.

Judge Bellis then began a quasi-cross examination of counsel for Defendants, creating the appearance that the court was attempting to justify a predetermined outcome. Affidavit, para. 15g. Following additional argument, but without an evidentiary hearing or a meaningful opportunity to be heard, Judge Bellis denied Defendants the opportunity to pursue their special motion to dismiss. Affidavit, para. 15j. In doing so she held the 14 June 2019 broadcast was "indefensible, unconscionable, despicable, and possibly criminal behavior." Affidavit, para. 15jiii1. Judge Bellis went on to "reject Defendants' claim that Alex Jones was enraged. . . find[ing] based upon a review of the broadcast clips that it was an intentional, calculated act of rage for his viewing audience." Judge Bellis made this adverse ruling despite having admonished counsel for Defendants earlier that an evidentiary hearing was required to characterize the broadcasts. Affidavit, para. 15jiii3. Although the decisions of Judge Bellis were affirmed on appeal, her actions to that point nonetheless created the appearance of bias.

### III.   The Perception of Prejudice Created By Judge Bellis's Conduct Towards Defendants Following The Appeal Of The Sanction Order

Defendants appealed this sanction to the State of Connecticut Supreme Court and, then, the United States Supreme Court. Affidavit, para. 18. Ultimately the appeal was not successful and, after a second attempt at removal, Defendants returned to Judge Bellis's courtroom on 14 April 2021. Affidavit, para. 18c. Immediately upon returning from the second removal, which had been based upon Plaintiffs' strategic dismissal of the one Connecticut-resident defendant, whose sole purpose as a defendant was to thwart removal, Judge Bellis demonstrated a bias against Defendants—admonishing their counsel for not immediately apprising the Court of a United States Supreme Court order denying a stay that was received when sabbath observance was beginning. Affidavit, para. 19. Judge Bellis indicated that she viewed this as a possible violation of Rule 3.3 of the Rules of Professional Conduct, "Candor Towards the Tribunal". *Id.*

The filing at issue was filed on 6 November 2020. *Id.* In that filing, counsel for Defendants cited the fact "that there was an application for a stay filed with the U.S. Supreme Court" as one of six bases in support of an objection. *Id.* The Supreme Court docket indicates that the application for a stay referenced in that filing was denied on November 5, 2020. However, counsel for Defendants did not receive notice of the denial until 3:57 p.m. on Friday, November 6, 2020. Affidavit, para. 19c. Counsel for Defendants became aware of this notice after submitting the filing and that awareness occurred after sabbath observance, which had begun minutes after the e-mailed denial was sent to Attorney Randazza, who could not apprise the Court himself because he had been denied the ability to appear. *Id.* On the next business day, Monday November 9, 2020, the plaintiffs informed the Court of the denial. *Id.* Judge Bellis acknowledged subsequently learning that the request for a stay was no longer pending. Affidavit, para. 19d. At a hearing on the issue, Judge Bellis insinuated that counsel for Defendants violated his ethical responsibility to be candid with

13

the court:

> with respect to the app -- the application for the stay with the US Supreme Court, what you filed with the Court on that day represented something that, in fact, was not accurate and I -- I would say it would have been incumbent upon you to correct what you had filed. I did learn subsequently that it wasn't correct, but I just think just as we move forward, if it's your or -- or even an innocent -- and I'm not saying it was anything but an innocent mistake, but it would be incumbent upon you to just correct that mistake because I don't want to have continued problems moving forward.

*Id.* Once Plaintiffs beat Defendants to notifying the Court of the denial of the stay, there was nothing for Defendants to do, yet Judge Bellis nonetheless chose to admonish counsel.

Judge Bellis's responses to putative ethical violations have been one-sided, as seen by her subsequent reaction to counsel for Defendants bringing similar and far more disruptive conduct by counsel for plaintiffs to the Court's attention. Affidavit, para. 20. The conduct at issue resulted in the court losing subject matter jurisdiction over certain claims and voided all orders entered regarding certain plaintiffs for a period of more than two years. Affidavit, para. 20b. This conduct had a substantial impact on the above captioned matters that far exceeded the issue that the Court previously admonished counsel for Defendants over. However, despite this, Judge Bellis did not admonish counsel for Plaintiffs. Rather, counsel for Defendants was again admonished by the Court for referencing the Rules of Professional Responsibility in this context. Ultimately, the Court indicated that referencing the Rules of Professional Conduct in filings before the Court could subject counsel to summary disciplinary orders by the Court. The Court indicated that it would rely on Practice Book § 2-45 to bypass the grievance committee which had previously dismissed Judge Bellis's earlier referral of counsel for Defendants regarding the affidavit issue. Affidavit, para. 20c.

This hostility to Defendants carried over into subsequent orders by the Court. At a deposition of a plaintiff in this case, counsel for the plaintiffs attempted to invoke the protections of a stipulated protective order (PO). Affidavit, para. 21b. That protective order permits counsel to designate all or part of a deposition as confidential based upon "a *good faith determination by counsel* so

14

designating to the Court *that there is good cause for the material so designated* to receive the protections of" the PO. DN. 185.00 at 2-3. (emphasis added). At the start of the deposition a plaintiffs' attorney attempted to designate the entire deposition "Highly Confidential – Attorneys Eyes Only." Affidavit, para. 21b. Plaintiffs concede that this designation occurred "at the beginning of the deposition," and therefore without any knowledge of the actual information that was ultimately elicited. *Id.* Accordingly, plaintiffs' counsel failed to satisfy the PO's good faith determination threshold requirement. Affidavit, para. 21c. Because the PO was not properly invoked, counsel for Defendants believed there was no impediment to using the information disclosed during the deposition, especially information that did not fit any of the categories of information permitted to be designated confidential. Affidavit, para. 21d. Accordingly, prior to the conclusion of the deposition, and based on the information elicited, counsel for the defendants filed a motion for a commission to take the deposition of Hillary Clinton without naming the deponent. *Id.*

Plaintiffs filed a motion requesting sanctions for a purported violation of the PO. Affidavit, para. 21b. In response, Defendants argued that no violation occurred because plaintiffs failed to meet the PO's good faith determination threshold requirement. Affidavit, para. 21. In its order responding to the request for sanctions, the Court ignored Defendants' threshold requirement argument. *Id.* Instead, Judge Bellis recast Defendants' argument as an attack on whether there was good cause to issue the stipulated PO itself, characterized this argument as "frightening," and concluded that Defendants' disclosure of the information at issue was "willful misconduct." *Id.* However, Defendants made no such argument. *Id.* Even if counsel for Defendants technically violated the confidentiality order, sanctions were never appropriate where that violation was based on a good-faith view of the effect of that order and otherwise ensuring that no real confidential information (not even the deponent's name) was being revealed.

15

Judge Bellis has since sanctioned Defendants twice more, with another sanctions motion pending and the actual sanction to be determined. On August 6, 2021 (DN 428.10 & 428.11), the Court sanctioned Defendants for not having produced a "subsidiary ledger" for their accounts. Judge Bellis disregarded the fact that Defendants reasonably relied on their CPA, who provided a declaration in this case, that Free Speech Systems (the only defendant to whom the request was actually directed) does not use subsidiary ledgers. Sanctions were issued against Mr. Jones and all of his companies, even though, at worst, only Free Speech Systems was in violation of the order requiring production of subsidiary ledgers. It is one thing to compel Free Speech Systems to produce something it did not think it actually had based on a good faith interpretation of the Court's order, and it is another thing entirely to sanction four other defendants and to give no reason why an expert CPA's opinion is given no weight, finding the expert "not credible" without taking any live testimony or Plaintiffs' expert having been subjected to cross-examination. Neither did Judge Bellis explain how Plaintiffs were prejudiced when they were given an opportunity to redepose the bookkeeper (but have made little effort to do so since).

Then, on September 30, 2021 (DN 450.20 & 450.21), Judge Bellis sanctioned Defendants following a motion by Plaintiffs seeking sanctions for alleged non-compliance with their discovery requests for Google Analytics and social media analytics. In actuality, those requests were fulfilled in a timely manner. Instead of sanctioning Defendants on the bases proffered by Plaintiffs, Judge Bellis, *sua sponte*, decided that Practice Book § 10-12(a) was violated because the documents were not served on co-defendants who had not sought such discovery. Defendants are unable to find any cases in which a Connecticut court has ruled that Section 10-12(a) means that all produced documents in discovery are "papers" required to be served on all parties, not merely the requesting party. In Federal practice, the rules "only require[] the responding party to produce the requested documents to the requesting party or its representative, not to all parties in the litigation." *Zurich*

16

*Am. Ins. Co. v. BASF Corp.*, 2011 U.S. Dist. LEXIS 162697 at *8 (S.D. Fla. Nov. 4, 2011)(emphasis in original). Perhaps the Court is right that the Practice Book has a different requirement, but that sanctions would issue, in the absence of a clear and intentional violation, makes Judge Bellis appear biased.

Another sanctions motion is pending, with Plaintiffs absurdly claiming that Defendants did not produce their real trial balances. (DN 457.00). First, the request was only directed to Free Speech Systems, not all Defendants. Second, the real trial balances were produced—Plaintiffs' apparent complaint is that they were not given *incorrect* trial balances. If the Court awards sanctions on this motion, the public will have no other view of Judge Bellis than her being on the Plaintiffs' team. And, the fact that the plaintiffs are now trying to liquidate all of the above sanctions, to obtain a default, shows how this whole process is being abused.

## ARGUMENT

The foregoing is just a sampling of the perception of prejudice created by Judge Bellis's conduct in this matter. This prejudice pervades all aspects of this case creating an appearance of impropriety that would cause a reasonable person to question Judge Bellis's impartiality. Practice Book §§ 1-22, 1-23 and Conn. Gen. Stat. § 51-183 provide that any party may, by motion and affidavit, establish that a judge currently presiding over a matter is disqualified from acting because of an appearance of judicial impropriety. A claim of an appearance of impropriety under Canon 1 Rule 1.2 of the Connecticut Code of Judicial Conduct is fundamentally different from a claim of actual bias. *Abington Ltd. Pshp. v. Heublein*, 246 Conn. 815, 819 (1998).

> The Code of Judicial Conduct requires a judge to disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. The reasonableness standard is an objective one. Thus, the question is not only whether the particular judge is, in fact, impartial but *whether a reasonable person would question the judge's impartiality on the basis of all the circumstances. . . Even in the absence of actual bias, a judge must disqualify h[er]self in any proceeding in which h[er] impartiality might reasonably be questioned*, because the appearance

17

and the existence of impartiality are both essential elements of a fair exercise of
judicial authority.

*State v. Webb*, 238 Conn. 389, 460-61, *aff'd after remand*, 252 Conn. 128, *cert. denied*, 531 U.S.

835 (2000) (citations omitted; internal quotation marks omitted; emphasis added). "The question is

not whether the judge is impartial in fact." *Heublein*, at 820. "To prevail on [a] claim of a violation

of this canon, the [moving party] need not show actual bias. The [moving party] has met its burden

if it can prove that the conduct in question gave rise to a reasonable appearance of impropriety." *Id.*

at 819-21.

## I. A Reasonable Person Would Question the Court's Impartiality

A reasonable person would question the court's impartiality based on (1) the alleged third-

party threat against the court; (2) Judge Bellis's sanctioning Defendants following the 14 June

broadcast; (3) Judge Bellis's indicating the Court would use Practice Book §2-45 to bypass the

grievance committee and subject Counsel for Defendants to summary disciplinary orders; and (4)

the perception of prejudice created by Judge Bellis's conduct towards Defendants following the

appeal of the sanction order.

In addition, a reasonable person would question Judge Bellis's impartiality based on other

matters over which she has presided. Prior to these matters, Judge Bellis was the presiding jurist in

*D'Avino, et al. v. Starks*, Case No. FBT-CV-15-6048108-S, which were the claims of various Sandy

Hook decedents against the estate of Nancy Lanza. That matter, which was consolidated with eight

other matters, included many of the same plaintiffs as in this case (nominally, though in fiduciary

capacity), represented by the same firm. Similarly, Judge Bellis is the presiding jurist over *Soto, et*

*al. v. Bushmster Firearms Int'l, LLC,* Case No. UWY-CV15-60500025-S, which is claims of

various Sandy Hook decedents against the gun manufacturer and other parties. That matter, which

is ongoing, also includes many of the same plaintiffs as in this case (again, nominally), represented

18

by the same firm. There is no reason for Judge Bellis to be the Sandy Hook judge, exposed to arguments and evidence in other cases that would tend to color any jurist's opinion of defendants accused of calling Sandy Hook a hoax.

Courts use an objective rather than a subjective standard in deciding whether there has been a violation of Canon 1 Rule 1.2. This objective standard is guided by "two well established propositions concerning the appearance of judicial impropriety." *Heublein*, at 822. "The first proposition is that the prevention of the appearance of impropriety is of vital importance to the judiciary and to the judicial process." *Id.* "The judiciary should be acutely aware that any action they take, whether on or off the bench, must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved." *Id.* at 823. "The duty to avoid creating an appearance of impropriety is one of taking reasonable precautions to avoid having a negative effect on the confidence of the thinking public in the administration of justice." *Id.* (internal quotation marks omitted.) The second proposition

> requires a sensitive evaluation of all the facts and circumstances in order to determine whether a failure to disqualify the judge was an abuse of sound judicial discretion. . . Judges who are asked to recuse themselves are reluctant to impugn their own standards. Likewise, judges sitting in review of others do not like to cast aspersions. . . Yet *drawing all inferences favorable to the honesty and care of the judge whose conduct has been questioned could collapse the appearance of impropriety standard . . . into a demand for proof of actual impropriety.*

*Id.* at 823-24. (citations omitted; internal quotations omitted; emphasis added).

### a. Judge Bellis's Personal Involvement in this Matter via the Alleged Threat Against Her Created the Appearance of Impropriety

"It is [the trial judge's] responsibility to have the trial conducted in a manner which approaches an atmosphere of perfect impartiality which is so much to be desired in a judicial proceeding." (Internal quotation marks omitted. *State v. Echols*, 170 Conn. 11, 13 (1975), quoting *Glasser v. United States*, 315 U.S. 60, 82 (1942). In Abington Ltd. Pshp. v. Heublein, the

19

Connecticut Supreme Court held that after a judge performed an *ex parte* site visit to a property that was the subject of the matter before him, "a well-informed, thoughtful and objective observer reasonably could decide that there was. . . a significant risk of a judicial impropriety." *Heublein*, at 826. In that case, the trial judge's site visit personally involved him in the subject matter of the litigation before the court, however, the judge refused to recuse himself based "entirely on his determination that his *ex parte* site visit had not in fact caused him to be prejudiced in any way." *Id.* at 821, 824. The Connecticut Supreme Court reasoned that, "the record in the case contain[ed] persuasive evidence of an appearance of impropriety," and that the trial judge abused his discretion by failing to recuse himself. *Id.* at 824. The Supreme Court reasoned further that a "judge's lack of knowledge of a disqualifying circumstance does not eliminate the risk that h[er] impartiality might reasonably be questioned by other persons." *Heublein*, at 825.

Courts scrutinize judicial conduct from inception through a full and fair hearing on the merits to determine whether a party "received a fair trial. . . before an impartial court, and that the core danger of judicial vindictiveness has not been realized." *State v. Herbert*, 99 Conn. App. 63, 69 (2007). Here, Judge Bellis conduct is similar to the trial judge in Heublein, where the Connecticut Supreme Court held an objective observer could conclude there was a risk of judicial impropriety. In Heublein, the trial judge became personally involved with the subject matter of the litigation. In the instant matter, Defendants' speech is the subject matter of the entire litigation. The alleged third-party threat against Judge Bellis has drawn her, albeit unwillingly, into the subject matter of this litigation. If the only information before the court were the notification by the Connecticut State police of the FBI investigation, then the prejudice realized in Heublein might be absent here. However, that is not the case.

Plaintiffs' complaint and subsequent arguments on the record allege that when Defendants speak it is designed to activate his audience to take action against the subject of the speech. Plaintiffs

trot out an FBI "Field Intelligence Bulletin" of dubious reliability to claim that when Defendants speak, the subject of that speech is "very likely"—meaning an 80-95% chance—to be targeted by Defendants' audience. As proof of this plaintiffs point to "Pizzagate." Had Judge Bellis rejected this correlation implies causation argument, then again the risk of the perception of judicial impropriety found in <u>Heublein</u> might not be present.

Unfortunately, Judge Bellis did not reject this logical fallacy. Instead, she embraced it. Based on this argument, Judge Bellis found the 14 June broadcast to be a "calculated act of rage for his viewing audience," determining via a personal viewing of the broadcast that Alex Jones stated, "I'm going to kill," despite this phrase not appearing in any transcript before the court. Affidavit, para. 15jiii2. Moreover, Judge Bellis relied on this argument to characterize the broadcasts as "indefensible, unconscionable, despicable, and possibly criminal behavior." Affidavit, para. 15jiii1. This demonstrates Judge Bellis's true unfiltered view of Defendants commenting on the proceedings in this case. It is against this backdrop that the third-party threat must be evaluated. Clearly, in that context, the arguments advanced by the plaintiffs and Judge Bellis's endorsement of them creates the appearance of impropriety. Here, Judge Bellis, without an evidentiary hearing, concludes that when Defendants speak it is "indefensible, unconscionable, despicable, and possibly criminal behavior," based largely on the plaintiffs' "Pizzagate" rational. Employing an objective standard, there is no way to conclude that a reasonable person knowing all these circumstances would not question Judge Bellis's impartiality following the alleged third-party threat. To find otherwise is tantamount to collapsing the appearance of impropriety standard into a demand for proof of actual impropriety.

> **b. Judge Bellis's Rulings Over the Course of Discovery Compliance Reveal a High Degree of Antagonism, Creating the Appearance That Fair Judgment Is Impossible, Thereby Requiring Her Disqualification.**

"In assessing a claim of judicial bias, [Connecticut Courts] are mindful that adverse rulings,

21

alone, provide an insufficient basis for finding bias even when those rulings may be erroneous." *Massey v. Branford*, 118 Conn. App. 491, 502, *cert. denied*, 295 Conn. 913, (2010). Adverse rulings alone "cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required." *Liteky v. United States*, 510 U.S. 540, 555 (1994). However, adverse rulings "*may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." *Id.*; *Schimenti v. Schimenti*, 181 Conn. App. 385, 395 (2018).

In Berger v. United States, the United States Supreme Court held that the comments of the district judge revealed the degree of antagonism necessary to make fair judgement impossible and that the judge should have recused himself based on the alleged comments. *Liteky*, at 555-56; *Berger v. United States*, 255 U.S. 22, 36 (1921). The Supreme Court reasoned that when seeking recusal "the reasons and facts for the belief the litigant entertains . . . must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment." *Id.*; at 33-4. The Supreme Court went on to conclude that, "[t]he facts and reasons" stated by the defendants in support of recusal "are not frivolous or fanciful but substantial and formidable and they have relation to the attitude of [the] Judge's ... mind toward defendants." *Id.*

Almost a century later, Connecticut Courts still follow the holding of Berger. In Schimenti v. Schimenti, the Connecticut Appellate Court held that a trial court judge should have recused herself from hearing a marriage dissolution proceeding. *Schimenti*, at 403-04. The appellate court reasoned that, while "a trial judge need not leave insights and common sense derived from her life's experience at the courthouse door. . . attitudes garnered from personal life experience cannot serve as a substitute for properly admitted evidence at a hearing." *Id.* at 402. By denying a request for an evidentiary hearing, "the trial judge did not follow her prescribed decision-making pathway but,

instead, relied exclusively on her own prejudices born of her life experiences. The court's proper focus should have been on the well-established decisional pathway." *Id.* at 403. The appellate court concluded by observing that, "[t]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal . . . In sum, the responsibility of the court in hearing a disputed matter is to act with impartiality. This requirement entails not only being impartial but also acting in a manner that projects impartiality." *Id.* (citation omitted; internal quotation marks omitted.) Here, Judge Bellis did not hold an evidentiary hearing before terminating the anti-SLAPP motion and she did not hold any evidentiary hearings before awarding any sanctions.

Refusing to hold evidentiary hearings, the "well established decisional pathway" employed by impartial courts, is not the only way Connecticut Courts suss out when a trial judge's adverse rulings demonstrate a level of antagonism that makes a fair judgment impossible. Courts also look to evidence that the court has prejudged a party's truthfulness. In Cameron v. Cameron, the Connecticut Supreme Court reasoned that "[t]he trial judge may be under a duty to reprimand counsel in order to protect the rights of litigants" and "also has a duty to see that no falsehood or other fraud is perpetrated in court," however, "[o]nce a [trial judge] declares that [s]he believes a party or a witness has been deceitful . . . she cannot continue to preside in h[er] role of impartial arbiter." 187 Conn. 163, 170 (1982).. While minor criticisms to correct erroneous statements on an affidavit may be justified, once a judge declares a belief a party has been deceitful, she must recuse herself.

Here, Judge Bellis adverse rulings against Defendants include both denying evidentiary hearings and taking actions indicating that she believed that either Defendants or their counsel (or their independent expert) had been deceitful. These actions continued on after the Grievance Committee dismissed the Court's referral regarding the affidavit issue. Before 10 April 2019 the position Defendants found themselves in as a result of Judge Bellis's adverse rulings were entirely

23

facially neutral. These adverse rulings alone are an insufficient basis for disqualification. However, on 10 April Judge Bellis repeated so frequently that Defendants had now substantially complied with the discovery orders that even plaintiffs' counsel remarked "it's apparent from the Court's comments that the Court is satisfied there is at least substantial compliance." Affidavit, para. 9e. Up to this point, Defendants' special motion to dismiss and the plaintiffs request for a sanction precluding it, hinged on substantial compliance with the court's discovery orders. However, at this time the issue regarding a signature on an affidavit developed.

Judge Bellis's reaction to the affidavit signature issue is analogous to the reaction of the trial judge in Cameron, which went beyond merely correcting the issue and demonstrated a belief that the defendant and or counsel were attempting to perpetrate a fraud on the court. By the time Judge Bellis was ready to address the affidavit issue, the matter had already been referred to the grievance counsel and a corrected affidavit submitted. However, Judge Bellis referred the matter to the grievance counsel a second time and then *sua sponte* solicited an argument from the plaintiffs for sanctions against Defendants. This was without holding an evidentiary hearing regarding the creation of the original affidavit.

Judge Bellis pressed the plaintiffs to request a sanction. When the plaintiffs refused, Judge Bellis indicated that in light of the plaintiffs refusing to argue for sanctions, the court was satisfied with not taking any further action. However, later when ultimately sanctioning Defendants Judge Bellis explicitly referenced the affidavit issue. As the United States Supreme Court reasoned in Liteky, the focus is on the impact of adverse rulings, not merely the presence of adverse comments in the record. Accordingly, in the context of judicial disqualification, actions speak louder, or at least as loud, as words.    And, the sanctions orders highlight these actions, once for a misunderstanding regarding the protective order, once for a differing understanding of what was supposed to be produced, and once for a *sua sponte* different interpretation of the rules where no

24

Connecticut case is known to have imposed a different requirement than in Federal practice.

This conclusion accords with the second proposition the Connecticut Supreme Court advanced in Heublein. In the context of disqualification due to the appearance of impropriety, requiring that a judge make comments on the record that explicitly demonstrate prejudice against a party would collapse the appearance of impropriety standard into a demand for proof of actual impropriety. Accordingly, evidence that Judge Bellis prejudged Defendants' truthfulness is found in her *sua sponte* incorporation of the affidavit issue as an additional basis for sanctioning Defendants and in rejecting Defendants' expert. This is especially true given that Judge Bellis did so both times without an evidentiary hearing.

The Grievance Committee's decision to dismiss the complaint arising from the affidavit issue only emphasizes the fact that Judge Bellis's reaction, at a minimum, creates the appearance of impropriety. The Grievance Committee reached their conclusion following an adversarial hearing at which both sides were afforded a meaningful opportunity to be heard. Affidavit para. 17. Like in Cameron, where the Supreme Court reasoned that once a trial judge indicates that she believes a party deceitful that judge cannot continue to preside over a matter, here Judge Bellis's conduct indicated a belief that Defendants were in some way deceitful.

Moreover, over a year after the Grievance Committee dismissed the complaint Judge Bellis continued to reference the affidavit issue, demonstrating a continued prejudice against Defendants. At a 6 May 2021 status conference, Judge Bellis threatened to refer Counsel for Defendants to the Grievance Committee again. Affidavit para. 19a. This time the conduct at issue was Counsel for Defendants' failure to violate his observance of the sabbath to inform the Court he received notice of a denial of a stay application. Affidavit para. 19c. When Counsel for Defendants referenced the stay in a filing, the reference to the status of the stay was correct based upon the available information. Despite this, Judge Bellis admonished Counsel for Defendants even though the Court

25

was made aware of the denial on the next business day. *Id.*

The Court's continued prejudice against Defendants was not confined to this single exchange. Given the Court's 6 May 2021 admonishment—in particular the importance it placed on counsel for Defendants not correcting a filing that contained a purported misrepresentation of the status of a request for a stay that lingered for a single weekend—counsel for Defendants raised similar conduct by Counsel for plaintiffs via a motion. That misconduct had a far more egregious impact on the litigation. Affidavit para. 20. Rather than similarly admonishing Counsel for Plaintiffs, Judge Bellis indicated that "[a]ny further such usage of the Rules of Professional Conduct by counsel in filings in this civil action shall result in immediate action by the court. See Practice Book §2-45." Affidavit para. 20c. Importantly, §2-45 permits a court to bypass the Grievance Committee and impose summary disciplinary orders without a complaint or hearing. Practice Book §2-45. Given the prior history in which Judge Bellis's referral of Counsel for Defendants to the grievance committee was dismissed, it is difficult to interpret this reference as anything other than threatening Counsel for Defendants with summary sanctions for referencing the Rules of Professional Responsibility.

Judge Bellis's reaction—both immediate and sustained— to the affidavit issue alone creates the appearance of impropriety that would cause an objective observer to question the courts impartiality. However, Judge Bellis based her decision to sanction Defendants on more than just the affidavit issue. Just prior to sanctioning Defendants in 2019, Judge Bellis referenced the child pornography issue and the 14 June broadcast as additional bases for the sanction. On information and belief, an evidentiary hearing into the inadvertent production of discovery containing child pornography would have shown the following: At plaintiffs' request, Judge Bellis ordered metadata for 58,000 emails be produced in 2 weeks. Affidavit, para. 14a. Plaintiffs then provided this data to a paid "electronic storage information expert" that spent 15 days reviewing the data. Affidavit, para.

14b. This was longer than the time allotted by Judge Bellis for Defendants to produce this material. In those 15 days, the experts were able to detect a single image of child pornography. *Id.* Next, the FBI spent an additional 6 days to find 11 additional emails containing child pornography. Affidavit, para. 14c-d. In total, it took 21 days, at unknown cost, for paid experts and the federal government to detect these images. Had Defendants attempted to complete this type of review prior to providing this material to the plaintiffs, they would have missed the court ordered discovery deadline by over 7 days. Undoubtedly, this would have been deemed another mark of "obfuscation and delay," most likely determined without a hearing to ascertain the reason why Defendants were not able to meet the 2-week production deadline.

Similarly, there was no evidentiary hearing regarding the 14 June Broadcast. At the 18 June hearing, plaintiffs announced their intention to file, at some future date, a motion regarding the hearing that would request sanctions. Judge Bellis declined this invitation to follow the "well-established decisional pathway" of an evidentiary hearing and meaningful opportunity to be heard, opting instead for counsels' best extemporaneous analysis sans evidence. The conflicting nature of Judge Bellis's analysis of the broadcast, demonstrates why the court in Schimenti favored the "well-established decisional pathway" of an evidentiary hearing over a judge relying on insights and common sense derived from her life's experience. Judge Bellis applied her own prejudices to what she assumed were the facts of the 14 June broadcast. For example, Judge Bellis claims to have heard "I'm going to kill" in the broadcast, despite it not appearing in any transcript before the court. Yet, when counsel for Defendants attempted to characterize the broadcasts, Judge Bellis prevented this without an evidentiary hearing.

In Schimenti, the appellate court stated that when a trial judge issues adverse rulings in this way it abandons its responsibility to act in a manner that projects impartiality. Judge Bellis's decision to assume facts, multiple refusals to hold evidentiary hearings, and rely on prejudices to

27

justify a sanction impacting the substantive rights of Defendants clearly falls far below the protective floor established by the Due Process Clause. Judge Bellis's rulings over the course of this litigation culminating in the imposition of sanctions reveals a high degree of antagonism. Notably, Judge Bellis admonished counsel for Defendants for conduct that had a minimal impact on the above captioned matters and then subsequently shielded Counsel for plaintiffs for similar conduct that had a far more substantial effect. This is evidence of actual bias. However, without even considering whether the record in this case contains evidence of actual bias, it is clear that there is an appearance of impropriety that would make an objective observer conclude it is not possible for Defendants to receive fair judgment.

Fair judgment requires a willingness to hear and evaluate the arguments of each side before executing judgment. She has repeatedly failed to do so. Therefore, Judge Bellis must be disqualified from this matter.

## CONCLUSION

For all these reasons, Defendants respectfully requests that the Court disqualify Judge Bellis from this matter and substitute another judge to hear it.

## CERTIFICATION OF COUNSEL

The undersigned Counsels for Defendants hereby certify that this motion is made in good faith.

Respectfully Submitted,

By: /s/ Jay M. Wolman /s/
Jay M. Wolman – Juris #433791 of
Randazza Legal Group, PLLC
100 Pearl Street, 14th Floor
Hartford, CT 06103 P: 702-420-2001
F: 305-437-7662
jmw@randazza.com

*Counsel for Defendants Alex E. Jones, Free*

28

*Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC*

And

BY: /s/ Norman A. Pattis /s/
Norman A. Pattis,
PATTIS & SMITH, LLC
Juris No. 423934
383 Orange Street
New Haven, CT 06511
V: 203-393-3017 F: 203-393-9745
npattis@pattisandsmith.com

*Counsel for Defendants Free Speech Systems, LLC, Infowars, LLC, Infowars Health, LLC, and Prison Planet TV, LLC*

## STATEWIDE GRIEVANCE COMMITTEE

Danbury Judicial District Grievance Panel　　　　　:
　　Complainant

vs.　　　　　　　　　　　　　　　　　　　　:　　Grievance Complaint #19-0367

Norman A. Pattis　　　　　　　　　　　　　　:
　　Respondent

### DECISION

Pursuant to Practice Book §2-35, the undersigned, duly-appointed reviewing committee of the Statewide Grievance Committee, conducted a hearing at the Superior Court, 80 Washington Street, Hartford, Connecticut on October 3, 2019. The hearing addressed the record of the complaint filed on June 12, 2019, and the probable cause determination filed by the New Haven Judicial District Grievance Panel for the towns of Bethany, New Haven and Woodbridge on July 22, 2019, finding that there existed probable cause that the Respondent violated Rules 3.3(a)(1) and (2), 3.4(1) and 8.4(1),(2),(3) and (4) of the Rules of Professional Conduct.

Notice of the hearing was mailed to the Complainant, to the Respondent and to the Office of the Chief Disciplinary Counsel on August 28, 2019. Pursuant to Practice Book §2-35(d), Chief Disciplinary Counsel Brian Staines pursued the matter before this reviewing committee. The Respondent appeared and testified. Attorney Mark Dubois represented the Respondent. No exhibits were admitted into evidence.

This reviewing committee makes the following findings:

On March 1, 2019, the Respondent appeared in lieu of previous counsel on behalf of Alex Jones and related corporate defendants in civil litigation pending in Connecticut. At the time of the Respondent's appearance, discovery orders were outstanding against the Respondent's clients. A hearing on the plaintiffs' motion for sanctions was scheduled for March 22, 2019 at 2:00 p.m. On the day of the hearing, the Respondent met in his New Haven office with Mr. Jones' personal representative, who had a power of attorney, and an attorney from Washington, D.C. who represented Mr. Jones in other matters.

On the day of the March 22, 2019 meeting, it was determined that an affidavit needed to be filed regarding Mr. Jones' belief that there had been compliance with discovery. The Respondent drafted an affidavit for Mr. Jones, who was in Texas where he and his corporations reside and do business. Mr. Jones personal representative contacted him on the phone and reviewed the contents of the affidavit with Mr. Jones. The Respondent spoke with Mr. Jones on the phone and asked him "to swear to the truth of the statements in the affidavit", which he did. Mr. Jones authorized his personal representative and attorney in fact to sign his name to the affidavit. The personal representative signed Alex Jones' name to the affidavit. The Respondent

Grievance Complaint #19-0367
Decision
Page 2

signed his name as Commissioner of the Superior Court on the affidavit, which stated "sworn to and subscribed before me." The affidavit did not state where it was signed.

The Respondent filed the affidavit with the Court and produced it before counsel. Thereafter, at a hearing before Judge Barbara N. Bellis on April 10, 2019, plaintiffs' counsel inquired as to the location of the signing of the affidavit. The Respondent disclosed to the Court the circumstances of the signing of the affidavit. The Respondent represented to the Court that there was no intent to deceive. Thereafter, a new affidavit signed by Mr. Jones was filed. The Respondent self-reported the matter to Grievance Panel Counsel by correspondence dated April 12, 2019. Judge Bellis made a referral to the Office of the Chief Disciplinary Counsel by correspondence dated April 24, 2019.

This reviewing committee also considered the following:

Disciplinary Counsel contended that the affidavit appears objectively false. Disciplinary Counsel argued that the affidavit was not subscribed before the Respondent in Connecticut nor was it signed by Alex Jones. Disciplinary Counsel indicated that the facts in the affidavit are not in dispute, the facts are true. Disciplinary Counsel indicated that the substance of the affidavit is not claimed to be false. The Respondent stated that "[w]hile Mr. Jones did not physically appear before me, I believed I had the functional equivalent of his appearance, and there was no doubt in my mind he had sworn to the facts in the affidavit." The Respondent contended that "Mr. Jones' attorney-in-fact had authority under Texas law to offer a statement of fact in the Connecticut litigation" and that the Respondent "reasonably believed that this authority included his signing an affidavit." The Respondent indicated that he made a mistake. Instead of having the agent sign his own name, he had him sign the name of his principal. The Respondent, through counsel, explained that he incorrectly believed that he could take the oath remotely. The Respondent explained that when he realized his error, he immediately took corrective action. The Respondent explained that the new affidavit signed by Mr. Jones was "identical in form" to the subject March 22, 2019 affidavit.

The Respondent testified that on March 22, 2019, shortly after appearing in the litigation, he was under time constraints in connection with the preparation of the affidavit and the subsequent hearing that afternoon. The Respondent testified that at the March 22, 2019 meeting, he did not ask to view the power of attorney document but rather relied on the representations of his client and his client's representative. The Respondent indicated that there was no claim of prejudice by opposing counsel in connection with the affidavit.

Grievance Complaint #19-0367
Decision
Page 3

This reviewing committee concludes that the Respondent's conduct in connection with the affidavit did not rise to the level of an ethical violation, in this instance. The record lacks clear and convincing evidence to substantiate a finding that the Respondent violated Rules 3.3(a)(1) and (2), 3.4(1) or 8.4(1),(2),(3) and (4) of the Rules of Professional Conduct. The Respondent acknowledged that he made a mistake in connection with the execution of the affidavit. When the Respondent realized his error, he immediately corrected it. We find the Respondent credible that he made a mistake and had no intent to deceive the Court or opposing counsel. Notwithstanding, we are critical of the Respondent's level of diligence in researching how to handle an affidavit involving an attorney-in-fact acting under a Texas power of attorney in a Connecticut civil proceeding. It is the opinion of this reviewing committee that the Respondent's practice was sloppy with regard to the execution of the affidavit and that he exercised bad judgment. Further, it was inappropriate not to request the power of attorney document for review. Finally, since we conclude that the Respondent did not violate the Rules of Professional Conduct, we dismiss the complaint.

**DECISION DATE:** _12-20-19_

(DFR)
(4)

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 62169375
Status as of 3/3/2022 8:59 AM CST

Associated Case Party: INFOWARS LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| T. Wade Jefferies | | twadejefferies@twj-law.com | 3/1/2022 9:54:11 AM | SENT |

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 3/1/2022 9:54:11 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 3/1/2022 9:54:11 AM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/1/2022 9:54:11 AM | SENT |

3/1/2022 10:09 AM
Velva L. Price
District Clerk
Travis County
D-1-GN-18-001842
Chloe Jimenez

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and<br>SCARLETT LEWIS | §<br>§<br>§ | IN DISTRICT COURT OF |
| | | TRAVIS COUNTY, TEXAS |
| VS. | §<br>§ | |
| | | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC,<br>FREE SPEECH SYSTEMS, LLC, and<br>OWEN SHROYER | §<br>§<br>§ | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and<br>VERONIQUE DE LA ROSA | §<br>§ | IN DISTRICT COURT OF |
| | | TRAVIS COUNTY, TEXAS |
| VS. | §<br>§ | |
| | | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC,<br>and FREE SPEECH SYSTEMS, LLC | §<br>§ | |

### PLAINTIFFS' RESPONSE TO MOTION FOR CONTEMPT AND SANCTIONS

Defendants allege that the public filing of Plaintiffs' December 27, 2021 Motion for Sanctions violated the Protective Order. In truth, Defendants' counsel is simply ill-informed about the details of the Protective Order and the history of the case. As shown below, Plaintiffs' public filing was mandatory under the Protective Order, and the same series of events has occurred multiple times with no complaint from Defendants.

### BACKGROUND

### I. The Protective Order has Requirements for Pleadings with "Attorneys' Eyes Only" Material.

There is no dispute that materials at issue in Defendants' Motion for Sanctions were considered "Attorneys' Eyes Only." Under the Protective Order, all deposition transcripts are

1

to be considered "Attorneys' Eyes Only" for thirty days following a deposition, and the transcripts at issue here were filed inside that period. Whenever a party seeks to file a pleading which includes materials designated "Confidential" or "Attorneys' Eyes Only," the party must follow a procedure laid out in paragraph 21 of the Protective Order.

That provision for **"FILINGS OR HEARINGS IN THE PUBLIC RECORD"** requires that "[i]f a party wishes to include a document, or portions of a document marked as 'Confidential' or 'Attorney's Eyes Only' in a pleading or other paper to be filed with the Clerk, that party shall serve the pleading or other paper on opposing parties but shall not file it." (*See* Ex. 1, February 25, 2019 Protective Order, para. 21). Then, "[f]or 7 days following service, no party shall file the pleading or other paper with the Clerk except pursuant to a ruling on a motion for a Temporary Sealing Order under Rule 76a." (*Id.*). "Immediately thereafter, if no motion for a Temporary Sealing Order has been granted, the party who served the pleading or other paper shall file it unsealed with the Clerk." (*Id.*). This section of the Protective Order is shown below:

---

**FILINGS OR HEARINGS IN THE PUBLIC RECORD**

21.     If a party wishes to include a document, or portions of a document marked as "Confidential" or "Attorney's Eyes Only" in a pleading or other paper to be filed with the Clerk, that party shall serve the pleading or other paper on opposing parties but shall not file it. Service alone shall constitute filing for the purpose of any deadline. For 7 days following service, no party shall file the pleading or other paper with the Clerk except pursuant to a

---

> ruling on a motion for a Temporary Sealing Order under Rule 76a. Immediately thereafter, if no motion for a Temporary Sealing Order has been granted, the party who served the pleading or other paper shall file it unsealed with the Clerk.

This provision allows the producing party to obtain an immediate Temporary Sealing Order upon request, at which point its confidential material would remain sealed pending a later Rule 76a hearing with public notice. However, if a party chooses not to request a Temporary Sealing Order within 7 days of service, then any protection over the confidential material is lost, and the movant is <u>required</u> to file the pleading unsealed. It is worth noting that Defendants proposed the *Lewis* Protective Order in 2019, and they agreed to the same language in the remaining cases in the summer of 2021.

## II. Previous Filings have Contained Confidential Material.

This is not the first time Plaintiffs have included confidential materials in their pleadings which later entered the public domain when no Temporary Sealing Order was sought. Indeed, this same series of events has occurred multiple times.

The first depositions of Mr. Jones and Free Speech Systems took place in the *Lewis* case on March 14, 2019. Defendants designated the transcripts confidential on the day of the deposition. Under the Protective Order, the transcripts were also to be considered "Attorneys' Eyes Only" over the next thirty days. One week after the deposition, on March 20, 2019, Ms. Lewis included the expedited transcript in a motion which she served, but did ***not*** file with the Clerk. That same day, Ms. Lewis wrote to the Court requesting a hearing, and she asked for clarification whether the Court's Protective Order contemplated service on the Court as well as opposing counsel:

> Today the Plaintiff has served InfoWars with a copy of her Motion for Sanctions for Discovery Abuse…The motion cites evidence designated as confidential. Under the terms of the protective order, Plaintiff has served this motion, but has not yet filed it pending Defendants' action on a Temporary Sealing Order…Plaintiff would also be happy to provide a courtesy copy of the motion, but was not sure if courtesy service on the Court was intended by the Protective Order. (*See* Ex. 2, March 20, 2019 email discussion with Court).

The Court responded:

> Please provide the Court with a courtesy copy of plaintiff's motion. I will be back in touch regarding your request for a hearing. (*Id.*).

Eight days following service, after the period for temporary sealing had elapsed with no request from the Defendants, Ms. Lewis publicly filed her motion unsealed with the Clerk on March 28, 2019. The "Attorneys' Eyes Only" materials, including the depositions of Mr. Jones and Free Speech Systems, entered the public domain. Mr. Jones' deposition became the subject of intense public interest and media scrutiny after that public filing.

Later that fall, following Mr. Jones' second deposition on November 26, 2019, Plaintiff followed the same procedure, and a pleading containing his deposition was filed publicly on December 12, 2019 after Defendants again chose not to seek a Temporary Sealing Order. On neither of those occasions did Defendants allege that the Protective Order had been violated.

## PLAINTIFFS' DECEMBER 27, 2021 FILING

These same events were repeated in December 2021. Plaintiffs took depositions of Alex Jones and Free Speech Systems on December 3-4, 2021. During those depositions, Defendants designated the transcripts as confidential. Additionally, under the Protective Order, those transcripts were to be considered "Attorneys' Eyes Only" for thirty days following the deposition. (Ex. 1, Protective Order, para. 12). Defendants also provided

answers to net worth discovery on December 7, 2021. Those materials were likewise designated "Attorneys' Eyes Only" at the time of production.

Plaintiffs' Motion for Sanctions Regarding Corporate Representative Deposition cites these "Attorneys' Eyes Only" materials. As noted above, when a party seeks to file a pleading which includes materials designated "Attorneys' Eyes Only," the party must follow the procedure laid out in paragraph 21 of the Protective Order. As such, on December 15th, 2021, Plaintiffs served a copy of their motion, but did ***not*** file it with Clerk, informing the Court and opposing counsel that:

> Today, the Sandy Hook plaintiffs have brought a motion alleging the failure to prepare a corporate representative for the company's December 3rd deposition on compensatory and punitive damages issues. Plaintiffs' brief contains materials designated by Defendants as confidential. Therefore, Plaintiffs are serving the Court but not filing this brief with the Clerk pursuant to the Protective Order. (*See* Ex. 3, December 15, 2021 email to Court).

During the following week, Defendants did not ask the Court to enter a Temporary Sealing Order as set forth in paragraph 21 of the Protective Order. The following Monday after that period expired, on December 27th, 2021, Plaintiffs filed their pleading unsealed with the clerk as directed by paragraph 21. This series of events transpired exactly as it had on two prior occasions in this case.

That same day, Defendants' counsel wrote to Plaintiffs after the motions were filed, asking for an explanation. Plaintiffs' counsel advised that "the motion was filed with the clerk unsealed today pursuant to Paragraph 21 of the Protective Order." (*See* Ex. 4, December 27, 2021 email between counsel).

On December 29, 2021, Defendants' counsel wrote advising of his intention to seek sanctions for violation of the Protective Order. Plaintiffs' counsel responded: "Regarding the

unsealed motion we filed, I need you to explain how our filing an unsealed pleading pursuant to paragraph 21 breaches the Protective Order. You did not respond to my email earlier this week, so my assumption is that you recognized that it was consistent with the order." (*See* Ex. 5, December 29, 2021 email between counsel). More than a week passed with no response from Defendants.

On January 7, 2022, the Huffington Post published a story regarding InfoWars' revenue, citing a copy of Plaintiffs' pleading which they obtained from the District Clerk. Plaintiffs' counsel was contacted by the reporter but declined to comment, as noted in the article.

On January 8, 2022, Defendants filed a Response to Plaintiffs' Motion for Sanctions in which they alleged Plaintiffs' Motion had violated the Protective Order. On January 10, 2022, Plaintiffs' counsel wrote: "Since you have now publicly accused me in a pleading of violating the Court's protective order, I am once again asking you to specify exactly how you contend our filing on December 27th violated the order. I have asked this question multiple times, and you have refused to respond." (*See* Ex. 6, January 10, 2022 email between counsel).

Defendants' counsel responded, identifying three alleged violations:

- "[Y]ou have breached the protective order in filing the deposition transcripts and exhibits to the deposition without allowing the requisite period of time under the order to designate confidential materials."

- "[W]hen you submitted the original filing, you provided it to the Court instead of just the parties, which violates the protective order in and of itself."

- "[O]verall your filings of confidential private AEO materials, particularly the net worth documentation, violates the protective order and the spirit of the designations themselves." (*Id.*).

6

On January 12, 2022, Defendants filed their Motion for Sanctions, though now Defendants also argue that Plaintiffs violated the Protective Order by not moving for a Temporary Sealing Order themselves. (Def. Motion, p. 5). All these arguments are baseless.

## ARGUMENT

### I.      The Transcripts were Designated Confidential and Treated as Such by Plaintiffs.

Defendants first complain that Plaintiffs filed their motion without allowing the period of time under the Protective Order to designate confidential materials to expire. Yet the transcripts had already been designated confidential, both during the depositions and automatically by the Protective Order itself. In paragraph 12, the Protective Order states:

> Testimony and information disclosed at a deposition of a Party or any other witness may be designated "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" during the deposition, and within thirty (30) days following the depositions, any Party may designate any information disclosed during a deposition as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY." For the thirty (30) days following any deposition, the Parties must treat all of the deposition testimony and exhibits and other documents produced at any deposition as "ATTORNEYS' EYES ONLY."

Thus, a party may designate the transcript as confidential on the day of the deposition or within thirty days. Here, Defendants designated the transcript confidential on the day of the deposition. Even if they had not, all transcripts are automatically considered "Attorneys' Eyes Only" for thirty days. In short, Plaintiffs do not dispute that the deposition transcripts were required to be treated as "Attorneys' Eyes Only" under the Protective Order.[1]

---

[1] Defendants' Motion also claims that "Plaintiffs violated the Protective Order by filing the depositions within thirty (30) days following the deposition of the Corporate Representative and Defendant Jones." (Def. Motion, p. 7). Yet there is nothing in the Protective Order to support that proposition. The Protective Order merely requires that all deposition transcripts be treated as "Attorneys' Eyes Only" during that thirty-day period. Plaintiffs did exactly that. The Protective Order does not limit when pleadings may be filed.

Because the transcripts were considered "Attorneys' Eyes Only," Plaintiffs were obligated to follow the Protective Order when bringing any motion which contained those transcripts. For this reason, Plaintiffs followed paragraph 21 of the Protective Order. Plaintiffs served the motion without filing the brief with the Clerk. Plaintiffs then took no action during the period in which Defendants were allowed to request a Temporary Sealing Order. When no order was requested, Plaintiffs filed the brief unsealed as <u>required</u> by paragraph 21 of the Protective Order. This same process had already occurred multiple times in this lawsuit. Any complaint by Defendants is due purely to their own lack of diligence under a Protective Order which they proposed.

## II.    The Court Previously Instructed Plaintiffs to Serve the Court in Addition to Opposing Counsel.

Defendants next complain that when serving the motion, Plaintiffs "provided it to the Court instead of just the parties, which violates the protective order in and of itself." (January 10 email). This is untrue. Plaintiffs served a courtesy copy to chambers because the Court had previously confirmed that service to chambers was contemplated by the Protective Order.

The first time Ms. Lewis brought a motion with confidential information in 2019, Plaintiffs' counsel noticed that the Protective Order directs parties to serve their opponent, and it forbids filing with the Clerk for the next seven days, but it was silent on whether the Court should be served. For this reason, Ms. Lewis asked the Court on March 20, 2019 for clarification as to whether "courtesy service on the Court was intended by the Protective Order." (Ex. 2, March 20, 2019 discussion with Court). In response, the Court advised that the Plaintiff should "provide the Court with a courtesy copy." (*Id.*). Later that fall, Mr. Heslin

8

followed the same procedure when he served opposing counsel and the Court with a motion containing Mr. Jones' second deposition, and then filed the motion publicly after the Temporary Sealing period expired. Plaintiffs likewise followed the same procedure with their latest filing.

In short, Plaintiffs were following a well-established process which they had previously confirmed with the Court. Moreover, Defendants cannot identify any prejudice from serving a courtesy copy directly to chambers in addition to the opposing party. Paragraph 21 of the Protective Order exists to allow an opportunity for a party to prevent an unsealed filing with the Clerk, thereby limiting public dissemination. The Court and its staff, on the other hand, will obtain an unsealed copy in either case.

## III.    Plaintiffs were not Obligated to Request a Temporary Sealing Order.

Defendants next argue that Plaintiffs violated the Protective Order because after serving their motion, "Plaintiffs filed no motion for Temporary Sealing Order." (Def. Motion, p. 5). In reality, there is no requirement in the Protective Order that any party move for a Temporary Sealing Order. The window for seeking a Temporary Sealing Order exists so that the party who owns the designated material can seek enhanced protection over a court record which would otherwise be presumptively public. Plaintiffs are not responsible for protecting the interests of their adversaries, and there is nothing in the Protective Order which forces them to bring such a motion on behalf of Defendants. Plaintiffs are merely required to allow for a window for Defendants to request a Temporary Sealing Order if they choose. This procedure is further borne out by the multiple times in which Plaintiffs previously filed material which had been designated as "Attorneys' Eyes Only." (*See* Ex. 2,

March 20, 2019 email discussion with Court) (Noting Plaintiff "has not yet filed [the motion] pending **Defendants' action** on a Temporary Sealing Order.").

When the Defendants chose not to request a Temporary Sealing Order, Plaintiffs had no choice but to file the document publicly, as it was mandatory under the Protective Order. (Ex. 1, Protective Order, para. 21) ("Immediately thereafter, if no motion for a Temporary Sealing Order has been granted, the party who served the pleading or other paper **shall** file it unsealed with the Clerk."). Defendants' complaint lies solely with their own lack of diligence.

## IV. Plaintiffs can only be Sanctioned for Violating the Order, not a Subjective Complaint about the "Spirit of the Designations."

In their meet and confer letter, Defendants argued that Plaintiffs' "filings of confidential private AEO materials, particularly the net worth documentation, violates…the spirit of the designations themselves." (*See* Ex. 6, January 10, 2022 email). It is unclear whether Defendants' Motion also adopts this position. The argument suggests that even if Plaintiffs complied with the terms of the Protective Order, and even if Defendants slept on their rights, sanctions should issue.

Defendants' contempt motion cannot be granted based on some subjective "spirit" of the designations. To find Plaintiffs in contempt of the order, "the order allegedly violated 'must spell out the details of compliance in clear, specific and unambiguous terms so that such person will readily know exactly what duties or obligations are imposed upon him.' The order's interpretation may 'not rest upon implication or conjecture.' Rather, the alleged violation 'must be directly contrary' to the order's express terms. If the order's 'interpretation requires inferences or conclusions about which reasonable persons might

differ,' it cannot support a contempt judgment." *In re Janson,* 614 S.W.3d 724, 727 (Tex. 2020) (citations omitted).

The text of the Protective Order places obligations on the party filing a pleading, all of which were followed by the Plaintiffs. Plaintiffs included the confidential materials in their motion to support their legitimate argument that Defendants possessed the resources to properly prepare their corporate representative. Defendants may be displeased with the public disclosure of their confidential information, but the fault lays at the feet of their own counsel, who failed to take the available action under a Protective Order which Defendants proposed.

## CONCLUSION

Plaintiffs complied with the requirements in paragraph 21 of the Protective Order when bringing their Motion for Sanctions, and they followed the same procedure they have always followed when filing confidential materials. These same procedures have been confirmed with the Court, and they have resulted in the prior public release of materials designated as confidential with no complaint from the Defendants. Defendants' Motion has been brought solely for strategic purposes by counsel who are ill-informed about the history of this case and the details of the Protective Order. In truth, the Protective Order specifically provides a mechanism for Defendants to avoid the harm they now claim. Through lack of diligence, Defendants failed to utilize that mechanism. When the Defendants failed to utilize that mechanism, the Protective Order required Plaintiffs to file the pleading and exhibits unsealed with the Clerk, just as they have on every prior occasion. Under these facts, there is

no basis to find that Plaintiffs violated any terms of the Protective Order, Defendants' motion should be denied.[2]

Respectfully submitted,

**KASTER LYNCH FARRAR & BALL, LLP**

MARK D. BANKSTON
State Bar No. 24071066
WILLIAM R. OGDEN
State Bar No. 24073531
1117 Herkimer
Houston, Texas 77008
713.221.8300 Telephone
713.221.8301 Fax

---

[2] Defendants make a passing allegation that Plaintiffs "surreptitiously permitted a podcaster to attend the confidential deposition of Alex Jones." In truth, the individual in question is consulting expert Dan Friesen, and his signed acknowledgement of the Protective Order identifying him as a consulting expert was provided to Defendants' counsel at the time of the deposition.

Mr. Friesen is chiefly known "for his unparalleled knowledge of Alex Jones." (*See* Robert Evans. "How Coronavirus Disinformation Gets Past Social Media Moderators." *Bellingcat.* April 3, 2020. Available at: https://www.bellingcat.com/news/2020/04/03/how-coronavirus-disinformation-gets-past-social-media-moderators/). Mr. Friesen is the creator and host of "Knowledge Fight," a podcast which critically examines InfoWars and deconstructs their news stories. Mr. Friesen has been widely recognized in the media for "perform[ing] the invaluable public service of debunking some of Jones's wilder theories in a conversational podcast." (*See* Tim Adams. "QAnon and on: Why the fight against extremist conspiracies is far from over." *The Guardian.* June 20, 2021. Available at: https://www.theguardian.com/us-news/2021/jun/20/qanon-conspiracy-theories-pizzagate-infowars-storm-is-upon-us-mike-rothschild). Mr. Friesen's encyclopedic knowledge of InfoWars makes him an invaluable consultant to the Plaintiffs.

In nearly all previous depositions, Plaintiffs' counsel has been accompanied by a consulting expert, most frequently Brooke Binkowski, a similar online debunker of InfoWars. Plaintiffs reminded Defendants of all these facts, yet Defendants still included this false allegation in their Motion.

## **CERTIFICATE OF SERVICE**

I hereby certify that on March 1, 2022 the forgoing document was served upon all counsel of record via electronic service.

_____

MARK D. BANKSTON

## D-1-GN-18-001835

| | | |
|---|---|---|
| NEIL HESLIN and | § | IN DISTRICT COURT OF |
| SCARLETT LEWIS | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 261st DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| FREE SPEECH SYSTEMS, LLC, and | § | |
| OWEN SHROYER | § | |

## D-1-GN-18-001842

| | | |
|---|---|---|
| LEONARD POZNER and | § | IN DISTRICT COURT OF |
| VERONIQUE DE LA ROSA | § | |
| | § | TRAVIS COUNTY, TEXAS |
| VS. | § | |
| | § | 345th DISTRICT COURT |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC | § | |

---

### ORDER ON DEFENDANTS' MOTION FOR CONTEMPT AND SANCTIONS

---

On this day, the Court considered Defendants Motion for Contempt and Sanctions. After reviewing the pleadings, and considering the arguments of counsel, if any, the Court finds that the Motion should be in all respects DENIED.

Dated _____, 2022.

_____
Hon. Maya Guerra Gamble

1

NO. D-1-GN-18-006623

Filed in The District Court
of Travis County, Texas

FEB 25 2019

At_____ 2:30 P.M.
Velva L. Price, District Clerk

| | | |
|---|---|---|
| SCARLETT LEWIS, | § | IN THE DISTRICT COURT OF |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| ALEX E. JONES, INFOWARS, LLC, | § | |
| and FREE SPEECH SYSTEMS, LLC, | § | |
| | § | |
| *Defendants* | § | 98th JUDICIAL DISTRICT |

## PROTECTIVE ORDER OF CONFIDENTIALITY

In order to preserve the rights of litigants in these proceedings to claim the confidentiality of certain documents to be produced in discovery by the parties, the Court orders as follows:

1.   This Protection/Confidentiality Order governs all discovery, and all information disclosed, produced, or submitted by any party to any other party in connection with this lawsuit during the course of discovery.

2.   This Order is entered for purposes of this lawsuit and shall remain in full force and effect until such time as the Parties agree in writing otherwise or the Court enters a different order. This Court shall retain jurisdiction to make amendments and modifications to this Order as the Court may deem appropriate, as well as to resolve any disputes.

### TERMS

3.   "Discovery includes all written discovery, request for production, interrogatories, requests for admissions, requests for disclosure, oral depositions, deposition transcripts, oral or

video recording of a deposition, depositions on written questions to third parties, and subpoenas to third parties, and other documents exchanged between the parties for the purpose of sharing information regarding the facts of the case.

4.      "Confidential Information" means information that constitutes a trade secret, reveals valuable and sensitive proprietary data or commercial information, or otherwise qualifies for legal protection under Texas law.

5.      "Confidential Discovery" means discovery or any materials within the scope of Tex. R. Civ. P. 192 to be produced or otherwise disclosed by the parties in this case and which also contains Confidential' Information.

6.      "Similar InfoWars Sandy *Hook* Lawsuit" means any other lawsuit in which any of the Defendants have been sued on the basis of their conduct relating to the Sandy *Hook* Elementary School Shooting.

7.      Reference    to    Plaintiff,    Defendants,    or    the    Parties    to    this Protective/Confidentiality Order also includes reference to any other person or entity acting on any Party's behalf or in concert or in participation with any Party, directly or indirectly, to the extent that any discovery in this lawsuit requires a person or entity other than Plaintiff or Defendants to produce documents or tangible things or give testimony.

8.      "Producing Party" shall mean a Party to this lawsuit that produces documents, information and/or tangible things.

## DESIGNATION OF CONFIDENTIAL DISCOVERY

10.     A document or tangible thing that the Producing Party determines in good faith to be Confidential Discovery can be claimed as confidential by (1) stamping the word "CONFIDENTIAL" or "ATTORNEY'S EYES ONLY" on the document, or (2) using any other

reasonable method agreed to by the Parties. Such stamping shall not obscure any writings on the documents.

11.    In the event a Producing Party inadvertently fails to mark a confidential document as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY," that Producing Party or any Party may: (1) notify counsel of record for every other Party in writing specifically identifying the material, and (2) provide a replacement copy of the document(s) marked "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY."

12.    Testimony and information disclosed at a deposition of a Party or any other witness may be designated "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" during the deposition, and within thirty (30) days following the depositions, any Party may designate any information disclosed during a deposition as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY." For the thirty (30) days following any deposition, the Parties must treat all of the deposition testimony and exhibits and other documents produced at any deposition as "ATTORNEYS' EYES ONLY."

13.    By designating a document as Confidential Discovery pursuant to paragraphs 9, 10 or 11, the Producing Party represents that it has made a bona fide, good faith determination that the document does, in fact, contain Confidential Information.

## CHALLENGING DESIGNATION

14.    Any Party may contest the designation of any document, information or tangible things as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" by requesting in writing that the Producing Party change the designation. If the Parties are unable to reach an agreement on the designation of such challenged documents within five (5) business days, the

Party challenging the designation may at any time thereafter seek an order to alter the status of the challenged designation.

14.     Until any dispute over designation is ruled upon by the presiding Judge, the designation will remain in full force and effect, and the documents, tangible things, testimony and information will continue to be accorded the confidential treatment required by this Protective Order.

## AUTHORIZED USE OF CONFIDENTIAL DISCOVERY

15.     Confidential Discovery shall be used solely for the purposes of this lawsuit and shall not be disclosed or made available to any person(s) other than those persons specified herein. Persons who may have access to documents or other information designated as "CONFIDENTIAL" shall include only the following persons:

> a.      The Parties, and the Producing Party, if other than Plaintiff or Defendants;

> b.      The Plaintiffs in any Similar InfoWars Sandy Hook Lawsuit.

> c.      Counsel of record for the Parties, and counsel for the Producing Party, if other than Plaintiff or Defendants, and their respective employees;

> d.      Counsel of record for the Parties in any Similar InfoWars Sandy Hook Lawsuit, and their respective employees.

> e.      Consultants or experts retained in connection with this lawsuit provided that such consultant or expert shall acknowledge and

accept the terms of this Protective / Confidentiality Order by first signing the attached Exhibit "A";

f. Consultants or experts retained in connection with any Similar InfoWars Sandy Hook Lawsuit provided that such consultant or expert shall acknowledge and accept the terms of this Protective / Confidentiality Order by first signing the attached Exhibit "A."

g. Court personnel; and

h. Court reporters and videographers who first acknowledge and accept the terms of this Protective/Confidentiality Order by signing the attached Exhibit "A."

16. All such signed Exhibits "A" completed by persons under subparts (c) or (e) shall be immediately served on all Defendants' and Plaintiff's counsel.

17. Any documents, testimony, information or tangible things designated as "ATTORNEYS' EYES ONLY" shall be used solely for the purpose of this lawsuit and any Similar InfoWars Sandy Hook Lawsuit and shall not be disclosed or made available to any person(s) other than those persons specified below. Persons who may have access to documents or other information designated as "ATTORNEYS' EYES ONLY" shall include only the following persons:

a. Counsel of record for the Parties, and counsel for the Producing Party, if other than Plaintiff or Defendants, and their respective employees;

b. Counsel of record for the Parties in any Similar InfoWars Sandy Hook Lawsuit, and their respective employees.

PROTECTIVE ORDER OF CONFIDENTIALITY -- Page 5 of 8

18.    If a Party is required (by oral questions, interrogatories, requests for information

or documents in legal proceedings, subpoena, civil investigative demand or other similar

process) to produce documents or information that have been designated "CONFIDENTIAL" or

"ATTORNEYS' EYES ONLY," such Party will provide written notice immediately to every

other Party, and the Producing Party in order to allow time to object to such production and

otherwise seek protection.

## INSPECTION OF CONFIDENTIAL DISCOVERY

19.    Except as provided herein, each person to whom Confidential Discovery

containing confidential information is disclosed or made available shall first be advised of the

existence and the contents of this Order. Confidential Discovery may only be inspected or

revealed by the Parties to the persons listed in paragraph 15 and 17 herein, provided that the

disclosing Party is responsible to ensure that any person or entity who receives such

Confidential Discovery shall maintain the document as confidential as set forth in this Order.

20.    Any mediator in this case or any Similar Travis County InfoWars Lawsuit may

be provided Confidential Discovery so long as the Confidential Discovery is being disclosed

pursuant to confidential settlement negotiations and the mediator returns the Confidential

Discovery at the end of the mediation without making duplications/copies.

## FILINGS OR HEARINGS IN THE PUBLIC RECORD

21.    If a party wishes to include a document, or portions of a document marked as

"Confidential" or "Attorney's Eyes Only" in a pleading or other paper to be filed with the

Clerk, that party shall serve the pleading or other paper on opposing parties but shall not file

it. Service alone shall constitute filing for the purpose of any deadline. For 7 days following

service, no party shall file the pleading or other paper with the Clerk except pursuant to a

PROTECTIVE ORDER OF CONFIDENTIALITY -- Page **6** of **8**

ruling on a motion for a Temporary Sealing Order under Rule 76a. Immediately thereafter, if no motion for a Temporary Sealing Order has been granted, the party who served the pleading or other paper shall file it unsealed with the Clerk.

22.     If a party wishes to offer a document, or portions of a document marked as "Confidential" or "For Counsel Only" in evidence, any party may, at the time the document is offered, move for a Temporary Sealing Order.

## ORDER DOES NOT WAIVE CERTAIN RIGHTS

23.     This Protective/Confidentiality Order shall not be deemed a waiver of (i) any right to object to any discovery requests on any grounds; (ii) any right to seek an order compelling discovery with respect to any discovery request; (iii) any right at any proceeding in this lawsuit to object to the admission of evidence on any ground; (iv) any right of a Party to use its own documents and translate them with complete discretion and/or (v) the right to seek a modification of this Protective/Confidential Order.

24.     Designation of a document or other information as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" is not evidence that the document, other information or tangible thing is in fact confidential. A party's failure to object to another Party's designation of any document or other information as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" shall not be evidence or an admission that the designated document, tangible things or information is in fact confidential.

## RETURN OF CONFIDENTIAL DISCOVERY

25.     Within thirty (30) days after the conclusion of this lawsuit including all appeals, the Parties, their counsel as well as anyone who has executed Exhibit "A" are hereby Ordered to return to the Producing Party all testimony, including deposition transcripts, and

PROTECTIVE ORDER OF CONFIDENTIALITY -- Page 7 of 8

all other documents or information that was produced to them and designated "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" and all copies thereof. It will be a direct violation of this Order if anyone retains any Confidential Discovery (whether marked "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY") or any portion thereof after this thirty (30) day period.

26. This Order will not be used in any manner or form, directly or indirectly, as evidence in any trial or any hearing, other than to resolve any issue related to the enforcement of any provisions of the Order.

SIGNED this 25th day of February , 2019.

_____
PRESIDING JUDGE

| From: | Mark Bankston |
|---|---|
| To: | fly63rc@verizon.net; millig@gpm-law.com |
| Cc: | Bill Ogden; Yvonne Maund |
| Subject: | Fwd: Lewis v Jones, GN-18-6623 - Motion for sanctions |
| Date: | Monday, March 25, 2019 3:45:52 PM |

April 3rd at 2pm works for me.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP


Begin forwarded message:

**From:** Elissa Hogan <Elissa.Hogan@traviscountytx.gov>
**Date:** March 25, 2019 at 3:37:31 PM CDT
**To:** Mark Bankston <mark@fbtrial.com>, "fly63rc@verizon.net" <fly63rc@verizon.net>, "robertbarnes@barneslawllp.com" <robertbarnes@barneslawllp.com>
**Cc:** Melanie Illig <MIllig@gpm-law.com>, Bill Ogden <bill@fbtrial.com>, Tiffaney Gould <Tiffaney.Gould@traviscountytx.gov>, Yvonne Maund <ymaund@fbtrial.com>
**Subject: Lewis v Jones, GN-18-6623 - Motion for sanctions**


Counsel,

Judge Jenkins can be available for a hearing on plaintiff's motion for sanctions on April 3 at 2 pm or April 4 at 9 am. Please confer and let me know which of those options is preferable. Please also let me know when we will receive defendants' response.

**From:** Yvonne Maund [mailto:ymaund@fbtrial.com]
**Sent:** Monday, March 25, 2019 12:00 PM
**To:** Elissa Hogan
**Cc:** Mark Bankston; fly63rc@verizon.net; robertbarnes@barneslawllp.com; Melanie Illig; Bill Ogden
**Subject:** RE: Cause No. D-1-GN-18-006623

Ms. Hogan,

Attached please find a courtesy copy of Plaintiff's Motion for Sanctions, per your request. Thank you for your assistance regarding our request for a hearing on same. Should you have any questions, concerns or comments, please feel free to contact at the number below.

Kindest regards,

*Yvonne Maund, Paralegal*
**FARRAR & BALL, LLP**
1010 Lamar, Suite 1600
Houston, TX 77002
Tel: 713-221-8300
Fax: 713-221-8301
ymaund@fbtrial.com

**From:** Elissa Hogan <Elissa.Hogan@traviscountytx.gov>

**Sent:** Monday, March 25, 2019 10:50 AM
**To:** Yvonne Maund <ymaund@fbtrial.com>; Tiffaney Gould
<Tiffaney.Gould@traviscountytx.gov>
**Cc:** fly63rc@verizon.net; robertbarnes@barneslawllp.com; Bill Ogden
<bill@fbtrial.com>; Mark Bankston <mark@fbtrial.com>
**Subject:** RE: Cause No. D-1-GN-18-006623

Ms. Maund,

Please provide the Court with a courtesy copy of plaintiff's motion. I will be back in touch regarding your request for a hearing.

Elissa Hogan

Staff Attorney for Judge Jenkins

**From:** Yvonne Maund [mailto:ymaund@fbtrial.com]
**Sent:** Wednesday, March 20, 2019 12:04 PM
**To:** Elissa Hogan; Tiffaney Gould
**Cc:** fly63rc@verizon.net; robertbarnes@barneslawllp.com; Bill Ogden; Mark Bankston
**Subject:** Cause No. D-1-GN-18-006623

**CAUTION**: This email is from OUTSIDE Travis County. Links or attachments may be dangerous. Click the Phish Alert button above if you think this email is malicious.

Today the Plaintiff has served InfoWars with a copy of her Motion for Sanctions for Discovery Abuse. Plaintiff has filed this motion for a variety of reasons, including Defendants' total failure to produce any further documents under the Court's Orders, which forced Plaintiff to take depositions with no meaningful discovery. Defendants also failed to produce complete video evidence, failed to prepare their corporate representative to give any testimony whatsoever, spoliated evidence, and more.

The motion cites evidence designated as confidential. Under the terms of the protective order, Plaintiff has served this motion, but has not yet filed it pending Defendants' action on a Temporary Sealing Order. Nonetheless, given the urgency of the relief requested, the gravity of the allegations made in the motion, and the time constraints of the TCPA, Plaintiff would like to request a hearing with the Court as its earliest available opportunity to avoid any further expense and effort in a TCPA process which has been thoroughly disrupted by discovery abuse.

Plaintiff would also be happy to provide a courtesy copy of the motion, but was not sure if courtesy service on the Court was intended by the Protective Order.

Kindest regards,

*Yvonne Maund, Paralegal*
**FARRAR & BALL, LLP**
1010 Lamar, Suite 1600
Houston, TX 77002
Tel: 713-221-8300
Fax: 713-221-8301
ymaund@fbtrial.com

This electronic mail message, including any attachments, may be confidential or privileged under applicable law. This email is intended solely for the use of the

individual or entity to which it is addressed. If you are not the intended recipient of this email, you are notified that any use, dissemination, distribution, copying, disclosure or any other action taken in relation to the content of this email including any attachments is strictly prohibited. If you have received this email in error, please notify the sender immediately and permanently delete the original and any copy of this email, including secure destruction of any printouts.

| | |
|---|---|
| **From:** | Mark Bankston |
| **To:** | 459 Submission; Keri Ward |
| **Cc:** | Bradley Reeves; Bill Ogden |
| **Subject:** | Request for Hearing on Motions in Alex Jones / Sandy Hook / Parkland Cases |
| **Date:** | Wednesday, December 15, 2021 1:00:00 PM |
| **Attachments:** | 2021-12-15 Pltfs Mt for Sanctions Regarding Corp Deposition.pdf |
| | 2021-12-15 Proposed Order on Pltfs Mt for Sanctions Regarding Corp Deposition.docx |
| | 2021-12-15 Fontaine Motion to Compel.pdf |
| | 2021-12-15 Proposed Order on Fontaine Motion to Compel.docx |

After conferring with Defendants' counsel, I am writing to request potential dates for a hearing on two discovery motions.

### 1. Heslin/Lewis/Pozner Motions for Sanctions Regarding Corporate Deposition

Today, the Sandy Hook plaintiffs have brought a motion alleging the failure to prepare a corporate representative for the company's December 3$^{rd}$ deposition on compensatory and punitive damages issues. Plaintiffs' brief contains materials designated by Defendants as confidential. Therefore, Plaintiffs are serving the Court but not filing this brief with the Clerk pursuant to the Protective Order.

### 2. Fontaine Motion to Compel and Motion for Sanctions

Today, Mr. Fontaine filed a motion alleging Defendants are again resisting his requests for production. Two weeks ago, Mr. Reeves informed Plaintiff's counsel that he has taken over representation after withdrawal of prior counsel, so this matter can be set for the same hearing.

Courtesy copies of both motions are attached, and paper copies will be mailed to the court today. I have attached Word copies of the proposed orders for the convenience of the court staff.

The parties have conferred about a hearing, and they agree they will need no more than two hours total for both sides to argue these motions. Due to the gravity and nature of the relief sought in these motions as it relates to imminent discovery in February, Plaintiffs ask the Court to accommodate a hearing before the end of January.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

| | |
|---|---|
| **From:** | Mark Bankston |
| **To:** | Bradley Reeves |
| **Subject:** | RE: Motion filings |
| **Date:** | Monday, December 27, 2021 3:59:00 PM |

We'll supplement with final copies of the deposition transcripts prior to the hearing next month, and as far as confidentiality, the motion was filed with the clerk unsealed today pursuant to Paragraph 21 of the Protective Order.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Monday, December 27, 2021 3:32 PM
**To:** Mark Bankston <mark@fbtrial.com>
**Subject:** Motion filings

Mark:

I am unclear as to why you have filed the transcripts of depositions that are not certified or anything I'm clear violation of our protective order. Can you please explain?

Best regards,

Brad Reeves

Reeves Law, PLLC
702 Rio Grande St., Suite 203
Austin, TX 78701
T: (512) 827-2246
F: (512) 318-2484
E: brad@brtx.law
https://link.edgepilot.com/s/b9a76e7e/Thx1MVH6CUeiRObepmtzOA?u=http://www.brtx.law/

| | |
|---|---|
| **From:** | Mark Bankston |
| **To:** | Bradley Reeves |
| **Cc:** | Bill Ogden |
| **Subject:** | RE: Heslin/Lewis/Pozner/De La Rosa - Conference on Motion for Sanctions |
| **Date:** | Thursday, December 30, 2021 3:14:00 PM |
| **Attachments:** | image001.jpg |

So I'm pretty confused by your email. As you know Dan is our consulting expert, and we've long had an agreement in these cases since 2019 to be able to bring an expert to depositions. In nearly every prior deposition in these cases, we've had either our retained expert Fred Zipp or more frequently our consulting expert Brooke Binkowski in the deposition. And I do not understand your email because I did announce Dan's presence and made sure his name appears on the record of those present, and I provided you a copy of his protective order acknowledgement in the documents I gave you at Ms. Karpova's deposition. I certainly felt like you understood he was there as my consultant. I even jokingly teased Dan at one point by saying "What do you know, you're only the expert," which you chuckled at (though I'm guessing now only out of politeness). This feels like maybe it's really coming from Mr. Randazza, who was only there for the final deposition? In any case, I'm not sure what the basis for your motion would be. Maybe I'm not understanding how you contend you were harmed?

Regarding the unsealed motion we filed, I need you to explain how our filing an unsealed pleading pursuant to paragraph 21 breaches the Protective Order. You did not respond to my email earlier this week, so my assumption is that you recognized that it was consistent with the order.

Mark Bankston

Kaster Lynch Farrar & Ball, LLP

---

**From:** Bradley Reeves <brad@brtx.law>
**Sent:** Wednesday, December 29, 2021 4:44 PM
**To:** Mark Bankston <mark@fbtrial.com>
**Subject:** Heslin/Lewis/Pozner/De La Rosa - Conference on Motion for Sanctions

Mark:

I am preparing to file a motion for sanctions due to you having Dan Friesen at the prior depositions without announcing him or otherwise indicating he was not someone from your office, in addition to you breaching the protective order by filing the uncertified transcript of the corporate rep deposition.

My clients will be seeking monetary sanctions as a result in excess of $50K, but I obviously need to confer with you prior to filing such a motion.

Please let me know by COB tomorrow if possible. Thank you.

Best regards,

Brad Reeves



**Reeves Law, PLLC**
**702 Rio Grande St., Suite 203**
**Austin, TX 78701**
**T: (512) 827-2246**
**F: (512) 318-2484**
**E: brad@brtx.law**
https://link.edgepilot.com/s/1d9d627e/oprTNdg-rU2s-xEid5VJaw?u=http://www.brtx.law/

The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender immediately by telephone at (512) 827-2246 or by return e-mail and delete this message, along with any attachments, from your computer. Thank you.

| | |
|---|---|
| **From:** | Bradley Reeves |
| **To:** | Mark Bankston |
| **Subject:** | RE: Protective Order |
| **Date:** | Monday, January 10, 2022 5:22:38 PM |

Mark:

It is our position that you have breached the protective order in filing the deposition transcripts and exhibits to the deposition without allowing the requisite period of time under the order to designate confidential materials.

In addition, when you submitted the original filing, you provided it to the Court instead of just the parties, which violates the protective order in and of itself, and overall your filings of confidential private AEO materials, particularly the net worth documentation, violates the protective order and the spirit of the designations themselves.

Seeing as you will certainly not agree to withdraw these filings and that the damage has been done, we will be moving for severe sanctions, including dismissal of the claims. This shall serve as the requisite certificate of conference prior to the filing of such motions.

Thank you for your attention to this.


Best regards,

Brad Reeves

---

**From:** Mark Bankston <mark@fbtrial.com>
**Sent:** Monday, January 10, 2022 4:01 PM
**To:** Bradley Reeves <brad@brtx.law>
**Subject:** Protective Order


Since you have now publicly accused me in a pleading of violating the Court's protective order, I am once again asking you to specify exactly how you contend our filing on December 27th violated the order. I have asked this question multiple times, and you have refused to respond.

Mark Bankston
Kaster Lynch Farrar & Ball, LLP

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Carmen Scott on behalf of Mark Bankston
Bar No. 24071066
carmen@fbtrial.com
Envelope ID: 62170500
Status as of 3/3/2022 9:00 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Mark Bankston | 24071066 | mark@fbtrial.com | 3/1/2022 10:09:00 AM | SENT |
| Norman Pattis | | npattis@pattisandsmith.com | 3/1/2022 10:09:00 AM | SENT |
| Carmen Scott | | carmen@fbtrial.com | 3/1/2022 10:09:00 AM | SENT |
| Jacquelyn W.Blott | | jblott@jblottlaw.com | 3/1/2022 10:09:00 AM | SENT |